EDDIE L. BOLDEN,

        Plaintiff,

      v.

CITY OF CHICAGO, MICHAEL BAKER,
JOSEPH BARNES, EDWARD HICKS,
MICHAEL KILL, JAMES OLIVER, ANGELO
PESAVENTO, MICHAEL ROWAN, EDWARD
SIWEK, and BARBARA TEMPLE,

        Defendants.

No. 17 CV 417

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Eddie L. Bolden had served 22 years of a life sentence when his murder conviction was reversed, charges against him were dismissed, and he received a certificate of innocence. Bolden now brings claims against several Chicago police officers and the City of Chicago. The defendant officers[1] and city move to dismiss the complaint in part. For the following reasons, the officers' motion is granted in part and denied in part. The city's motion is denied.

## I. Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). The court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's

---

[1] The motion to dismiss was filed on behalf of Officers Baker, Barnes, Oliver, Pesavento, Rowen, Siwek, and Temple. It was not filed on behalf of Officers Hicks or Kill.

favor, but the court need not accept legal conclusions or conclusory allegations. *Id.* at 678–79.

## II. Background

Bolden spent 22 years in prison for crimes he did not commit—the murders of Derrick Frazier and Ledell Clayton, and the attempted murder of Clifford Frazier. [40] ¶¶ 1, 9.[2] In January of 1994, the Fraziers and Ledell Clayton attempted to sell multi-kilograms of cocaine. *Id.* ¶ 12. Clifford Frazier kept lookout while the other two entered a nearby J&J Fish Restaurant. *Id.* ¶ 13. All three men were heavily armed. *Id.* ¶ 12. When the prospective drug purchaser arrived, he, Derrick Frazier, and Clayton, drove off in Derrick Frazier's car. *Id.* ¶ 13. While in the backseat, the buyer shot and killed both Derrick Frazier and Clayton. *Id.* ¶ 15. He then returned to the original scene and exchanged gunfire with Clifford Frazier, shooting Frazier in the back. *Id.* At all relevant times, Bolden was inside J&J Fish playing a video game. *Id.* ¶ 16. He was there when Clifford Frazier ran into the restaurant for help, and Bolden called 911 from the phone inside the restaurant to report Frazier's injuries. *Id.* ¶ 16.

When the defendant officers arrived, they interviewed several witnesses, including Bolden. *Id.* ¶ 17.[3] None of the witnesses identified Bolden, or anyone

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The amended complaint is [40].

[3] The complaint often refers to the "defendant officers" collectively with respect to specific facts. *E.g.*, [40] ¶ 22. In some situations, such group pleading might not give sufficient notice to each defendant about his or her alleged conduct; each defendant's liability for constitutional torts must be based on personal involvement. In this case, I read the complaint to allege that every one of the defendant officers committed the acts attributed to

matching Bolden's description, as the man who shot Frazier. *Id.* ¶ 17. Tenesha Gatson, who worked at J&J Fish, told the defendant officers that Bolden had remained at the restaurant throughout the evening and was there when Frazier entered after being shot. *Id.* ¶ 18. The officers failed to investigate Gatson's statements or conduct follow-up interviews with any of the witnesses who could have corroborated Bolden's alibi. *Id.* ¶ 41. Officers also interviewed Vondell Goins, who had been inside J&J Fish at the time of the shooting, but did not ask her about Bolden. *Id.* ¶ 42. Had she been asked, Goins would have explained that she was speaking with Bolden inside the restaurant both when she heard the shooting outside and when Frazier entered the restaurant. *Id.* Officers took down the name of Todd Henderson, who witnessed the fight between Frazier and his attacker and who, at the time, could have described the attacker. *Id.* ¶ 44. The officers never questioned or followed up with him. *Id.* The defendant officers also interviewed, but never attempted to contact, at least one other witness and failed to interview another owner of J&J Fish who could have corroborated Bolden's story. *Id.* ¶¶ 43, 45.

Clifford Frazier told defendant officers that he had gotten a good look at the shooter, who he described as between 5 foot 10 inches and 6 feet tall, clean-shaven, with a light complexion, low-cut hair, and a medium build. *Id.* ¶ 19. Bolden was 6 feet 2 inches tall, very thin, and bald, with a dark complexion and a moustache. *Id.*

---

"defendant officers," and I accept that as true. If the facts belie such a group allegation, some of the officers may not face liability. Eventually, Bolden will have to be more specific as to the facts as to each defendant.

Frazier met with a sketch artist, and the resulting picture looked nothing like Bolden. *Id.* ¶ 20. The defendant officers showed Frazier a photo array, which included a photo of Bolden, and Frazier did not recognize anyone in any of the photos. *Id.* ¶ 24. Around the same time of the photo array, defendants Higgins and Rowan signed a police report indicating that they learned from Derrick Frazier that a man named Anthony Williams had been involved in the murders and that "Lanier" (Lynier is Bolden's middle name) was with Williams prior to the incident. *Id.* ¶ 23. Derrick Frazier, of course, was dead at this time; this evidence was fabricated to frame Bolden. *Id.*

Upon learning he was wanted for questioning, Bolden hired an attorney to represent him during his encounter with the police. *Id.* ¶ 26. The lawyer accompanied Bolden to the Area 2 Violent Crimes Unit, where the defendant officers instructed them to wait in the waiting room. *Id.* ¶¶ 26–27. While there, defendant Oliver walked Frazier directly past Bolden and his lawyer so Frazier could see Bolden. *Id.* ¶ 27. The defendant officers then asked Bolden to participate in a lineup, and he agreed on the condition that his lawyer could be present. *Id.* ¶ 28. Defendant officers said they would allow the attorney to be present, but when he attempted to enter the viewing room alongside Bolden, defendant Pesavento physically blocked his path. *Id.* ¶¶ 28, 30. Twice during the lineup, officer Karl asked Bolden, "you, Eddie Bolden, right?" *Id.* ¶ 31. Defendants Barnes, Pesavento, and at least one other defendant officer witnessed Karl's actions and allowed the

lineup to proceed. *Id*. ¶ 31. Frazier identified Bolden, who was subsequently arrested and charged. *Id*. ¶ 32.

While Bolden was held in a room prior to be being sent to the lockup, defendant Kill entered, looked at Bolden, and laughed, noting that Bolden was bald—presumably because Frazier had previously described the shooter as having hair. *Id*. ¶ 33. Around the same time, Bolden asked Karl to bring defendant Oliver into the room because Oliver had seen Bolden inside J&J Fish after the shootings and could corroborate his alibi. *Id*. ¶ 34. Karl responded, "he doesn't remember" and kicked the door to the room shut. *Id*.

Officers recovered two firearms during the investigation, Clifford Frazier's .40 caliber pistol recovered from inside the J&J Fish and a nine millimeter pistol from Frazier's Cadillac nearby. *Id*. ¶ 35. The state's ballistic expert concluded that the recovered firearms did not fire the deadly shots. [81] at 16 n. 9.[4] After Bolden's attorney requested production of these weapons, the defendant officers destroyed them. [40] ¶ 36. The .40 caliber pistol recovered from J&J Fish was the firearm Frazier had with him while he was chased by the true perpetrator. [81] at 17 n. 10. At trial, Frazier testified that the perpetrator grabbed the firearm from him and hit him over the head with it, meaning the firearm could have contained the perpetrator's fingerprints. *Id*.

---

[4] Bolden clarified this in his response to defendants' motions to dismiss. A nonmovant may properly elaborate on his factual allegations so long as those elaborations are consistent with the pleadings. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012).

The defendant officers destroyed[5] defendant Temple's notes from interviews she conducted inside J&J Fish on the night of the murders, including interviews with Bolden and with Frazier before he went to the hospital. [40] ¶ 37. And although Bolden's attorney informed the defendant officers that Bolden had made a 911 call on the night of the murders, and that there would be a recording of that call, the defendants intentionally failed to act on that information. *Id.* ¶ 38. The recording was destroyed pursuant to the City of Chicago's policy at the time, which called for destruction of 911 recordings after 30 days absent a request for preservation. *Id.*

In October of 1996, Bolden was tried before a jury. *Id.* ¶ 46. The only evidence directly implicating him was fabricated by the defendant officers, including Clifford Frazier's false identification in a tainted lineup—no physical or forensic evidence linked Bolden to the crimes. *Id.* ¶ 2. Despite Clifford Frazier's confession to his involvement in a large drug deal, and to being part of a larger drug conspiracy, he was never charged with any crime. *Id.* ¶ 47. Instead, the defendant officers overlooked Frazier's illegal conduct in exchange for his false testimony against Bolden. *Id.* The defendant officers intentionally withheld information about this benefit and other benefits—such as the personal protection Frazier received—from

---

[5] Bolden's complaint alleges that the defendant officers either destroyed or withheld exculpatory evidence. [40] ¶ 37. But in his response in opposition to defendants' motions to dismiss, Bolden clarified that his due process claim regarding the notes is based solely on a bad faith destruction of evidence theory, not a *Brady* failure-to-disclose theory. *See* [81] at 14 n. 8.

Bolden. *Id*. The defendant officers also offered perjured testimony about the propriety of the lineup. *Id*. ¶ 46.

Bolden was found guilty, and in December 1996, was sentenced to a natural life term for the murders, to run consecutively to a thirty-year sentence for the attempted murder. *Id*. ¶ 48. The convictions remained in place, and Bolden was in custody until the charges were dismissed in April 2016. *Id*. ¶ 51.

## III. Analysis

### A. Due Process (Count I)

Bolden alleges that the defendant officers destroyed exculpatory evidence in bad faith, fabricated a false identification through a faulty lineup, and failed to investigate his alibi, violating his due process rights.

#### 1. *Destruction of Evidence*

Due process requires that prosecutors turn over to the defense all potentially exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "That obligation extends to police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). "[A] duty to refrain from bad-faith *destruction* flows necessarily, and obviously, from [*Brady's*] familiar holding that *suppression* of material exculpatory evidence violates due process." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015). *Brady* claims involving a failure to disclose evidence are distinguishable from cases involving destruction of evidence. *Id*. at 552. A plaintiff alleging destruction of evidence needs to show only (1) that

defendant destroyed potentially exculpatory evidence in bad faith or while engaged in other misconduct, and (2) a deprivation of plaintiff's liberty.[6] *Id.* at 551. Unlike a claim alleging suppression of evidence, the plaintiff's awareness of the destroyed evidence and his ability to obtain the information encompassed in that evidence from another source are irrelevant. *See id.*

Rule 9(b) of the Federal Rules of Civil Procedure provides that a person's state of mind may be alleged generally. Fed. R. Civ. P. 9(b). Bad faith in a destruction of evidence claim is sufficiently pleaded when the allegations paint the defendant as pursuing the plaintiff through any means necessary. *Armstrong*, 786 F.3d at 547. The alleged exculpatory value of the destroyed evidence need only be potential or apparent. *Id.* at 552; *see also id.* at 548–49 (plaintiff's inability to show that destroyed evidence was actually exculpatory did not defeat his due process claim).

Bolden alleges that the defendant officers destroyed three pieces of evidence: Clifford Frazier's guns, Officer Temple's notes from interviewing Bolden and Frazier the night of the crime, and the recording of Bolden's 911 call. The defendant officers argue that Bolden failed to allege both that the officers acted in bad faith and that the evidence was potentially exculpatory.

Defendant officers first argue that the guns belonged to Frazier—not the perpetrator—and so were not exculpatory.[7] In his complaint, Bolden asserts,

---

[6] The defendants do not dispute that Bolden suffered a deprivation of liberty.

[7] There was some initial confusion by both parties about whether the officers turned the firearms over to the prosecution. But Bolden clarified in his response, and the defendant

"Defendant Officers knowingly concealed, withheld, and/or destroyed exculpatory and impeachment evidence from Mr. Bolden and from prosecutors." [40] ¶ 66. This is a conclusory statement which, taken alone, need not be accepted as true. But in his brief, Bolden elaborates on why the firearms were potentially exculpatory. [81] at 17 n. 10. He asserts that Frazier had one of the recovered firearms—the .40 caliber pistol—with him while he was chased by the perpetrator. *Id*. And Frazier testified at trial that the perpetrator wrestled this gun from him and hit him over the head with it. *Id*. The gun, then, could have contained the real perpetrator's fingerprints. The presence of those fingerprints, or the lack of Bolden's fingerprints, could have suggested Bolden's innocence.

The defendant officers further argue that Bolden has failed to adequately allege that they destroyed the two firearms in bad faith. Bolden, however, asserted that the defendant officers destroyed the guns *after* Bolden requested their production. [40] ¶ 66. This timing of the destruction—combined with the potential significance of the firearms and Bolden's other allegations of misconduct throughout the investigation—is sufficient to allege that the defendant officers acted in bad faith in destroying the firearms. Bolden paints a picture of the defendant officers attempting to pursue him through any means necessary, which is enough. Fed. R. Civ. P. 9(b); *see Armstrong*, 786 F.3d at 547.

Finally, although Bolden has not specifically alleged which defendants are responsible for destroying the firearms, he has alleged that the defendant officers

officers agreed in their reply, that the firearms were never turned over to the prosecution. *See* [81] at 16; [90] at 7 n. 3.

were the ones who destroyed them, and as noted above, this means he is saying they all did. Whether he can prove the allegation is an issue that cannot be resolved at this stage of the case. Bolden has stated a claim based on the defendant officers' alleged destruction of the two firearms.

The defendant officers next move to dismiss Bolden's destruction claim regarding Officer Temple's interview notes, arguing again that Bolden has failed to satisfy the standard for bad faith set out in *Armstrong*. They argue that the conduct alleged here is not as egregious as that alleged in *Armstrong*. The bad-faith test in *Armstrong* is not limited to its specific facts. Here, the entire complaint adequately paints a picture of defendants taking any action necessary to close the case, including by framing Bolden. When that mindset is paired with the destruction of potentially exculpatory evidence, the complaint states a due process claim.

Aside from a conclusory statement, the complaint fails to allege the exculpatory nature of the notes. In his response to defendants' motions to dismiss, though, Bolden elaborates—arguing that the very existence of the notes was exculpatory because it proved the police interviewed Bolden at J&J Fish immediately after the shooting, and "[t]he real gunman obviously never entered the restaurant and was not interviewed by police side-by-side with Frazier." [81] at 15. This is sufficient. *See Armstrong*, 786 F.3d at 549 (discussing *Killian v. United States*, 368 U.S. 231 (1961), where "the connection between [the] evidence in question . . . and guilt or innocence of the charged crime was much more attenuated").

Defendant officers also argue that Bolden could have gotten the information contained in the notes from another source, making Bolden's claim one for suppression and not destruction. But Bolden has alleged that the defendant officers destroyed the notes themselves, not that they suppressed the information within those notes. Even if not admissible in their own right at trial, the notes had independent evidentiary value as contemporaneous corroboration of Bolden's location in close proximity to Clifford Frazier shortly after the shooting. The defendant officers can be liable for the bad-faith destruction of the notes.

Bolden's third and final allegation of destruction of evidence involves the defendant officers' failure to preserve a recording of the 911 call Bolden made inside J&J Fish on the night of the murders. The officers argue that they had no duty to preserve evidence outside of their possession. Bolden asserts that defendant officers "caused the destruction of the critical 911 recording," that Bolden's attorney informed the officers of the call, and that the officers intentionally failed to act on that information so that the recording would be destroyed pursuant to the city's policy at the time. [40] ¶ 38. Bolden fails to allege that the tape was under the defendant officers' control or that the officers' were somehow responsible for the tape's destruction. Though an affirmative act of destruction is not necessarily required, *see Armstrong*, 786 F.3d at 548–50, Bolden must somehow attribute the destruction of the recording to the defendant officers. The allegation that they "caused" the destruction is conclusory and need not be accepted. Bolden's claim, as

stated, is too tenuous to infer the officers' responsibility. It is dismissed, without prejudice.

### 2.    *Fabrication of Evidence*

A police officer who fabricates false evidence against the accused violates due process if that evidence is later used to deprive the accused of his liberty in some way. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Bolden alleges that the defendant officers engineered a faulty lineup by having Bolden participate in the lineup even though Frazier had failed to identify him in a photo spread, by walking Frazier past Bolden immediately prior to the lineup, and by having Officer Karl mention Bolden's name while executing the lineup. The defendant officers argue that these actions do not demonstrate that they knew Frazier's identification was false. But Bolden has alleged that the officers were aware of Frazier's initial description of his attacker (which did not match Bolden), that Frazier had failed to recognize a photo of Bolden, and that after Frazier was identified, defendant Kill laughed, pointing out that Bolden was bald (presumably because Bolden looked nothing like the attacker Frazier had previously described). These facts, taken as true, are sufficient to allege that the defendant officers acted with the requisite knowledge to support a claim for fabrication of evidence. Evidence of the fabricated lineup was presented at trial—Clifford Frazier's false identification from the lineup was the only evidence that directly implicated Bolden. [40] ¶ 2. Bolden has alleged a claim for fabrication of evidence. To the extent Bolden also alleges a fabrication

claim for the officers' testimony about the lineup, however, the officers are absolutely immune from liability. *Briscoe v. LaHue*, 460 U.S. 325, 342 (1983).

### 3. *Failure to Investigate*

Bolden asserts a final due process claim: that the defendant officers' failure to investigate his alibi rose to the level of egregious misconduct, thereby constituting a denial of due process. The parties agree that there is generally no due process right to a specific investigation by the police. *See Harris*, 486 F.3d at 1015; *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992). And the prosecution does not have to conduct an investigation for the accused, or assist in the presentation of the accused's case. *White*, 970 F.2d at 337. Bolden, however, argues that when the investigating officers' conduct is intentional or reckless, so that it shocks the conscience, the failure to investigate violates the constitutional rights of the accused. *See Winslow v. Smith*, 696 F.3d 716, 732–34 (8th Cir. 2012); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 957 (8th Cir. 2001). Certain actions officers may take during an investigation—such as destroying, withholding, or fabricating evidence— violate the due process rights of the accused, as evidenced by the *Brady* line of cases. But the Seventh Circuit, unlike the Eighth, has not held that a failure to investigate, in and of itself, constitutes a due process violation. Because the police misconduct Bolden alleges is encompassed by existing doctrines, it is unnecessary to expand his damages claim to reckless investigations. To the extent the complaint alleges a separate violation for defendant officers' failure to investigate, such a claim is dismissed.

### B.  *Monell* (Count IV)

Bolden's claims against the City of Chicago are based on the city's alleged custom to pursue suspects by any means necessary to obtain a conviction, regardless of accuracy, which caused the defendant officers to violate Bolden's constitutional rights. Under *Monell*, a municipality cannot be held liable under § 1983 for its employees' actions based on a theory of respondeat superior, instead a plaintiff must show that the city somehow caused the alleged harm. *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978). A municipality may be held liable when (1) it has an express policy that, if enforced, would cause a constitutional deprivation, (2) there is a common practice so widespread and settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority caused the constitutional injury. *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 844 (7th Cir. 2004). To show liability based on a widespread practice, the plaintiff must show that the accused authority knew or acquiesced to a pattern of unconstitutional conduct. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993).

The city argues that Bolden makes only conclusory allegations about its widespread practice of securing false convictions and alleges no facts to support the existence of such a policy. But Bolden specifically asserts that Chicago's widespread practices consisted of conducting illegal or improperly coercive interrogations; manufacturing, fabricating, or using improper tactics to obtain false witness statements; filing false reports and giving false statements or testimony;

14

withholding, destroying, or suppressing evidence; and perpetuating a code of silence where officers covered up or refused to report instances of misconduct. [40] ¶ 88. Bolden also alleges that the city had a widespread practice of failing to adequately train, supervise, and discipline its officers to ensure that they: employed proper identification techniques; faithfully represented material facts when seeking criminal charges; secured, maintained, and prevented the destruction of material evidence; disclosed exculpatory and impeachment information to prosecutors; and adequately investigated potential leads, including questioning alibi witnesses. *Id.* ¶ 90. Bolden further asserts that the Chicago Police Department's Area 2 Violent Crimes Unit, where Bolden was questioned, arrested, and charged, has been the epicenter of the city's unconstitutional practice of obtaining false convictions through flawed investigations. *Id.* ¶ 56. This practice began in the 1970s, Bolden alleges, under the direction of Jon Burge, when officers, including at least some of the defendant officers, engaged in the previously named tactics. *Id.* ¶ 57.

Bolden's allegations illustrate his theory of the city's liability, describing the specific department at issue and the time frame during which the widespread practice was in place, and also outline the specific conduct encompassed by the city's practice. These allegations are not disguised "legal conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss." *See McCauley v. City of Chicago*, 671 F.3d 611, 617–18 (7th Cir. 2011). Nor are they factual allegations that are entirely consistent with lawful conduct, such as the lawful allocation of limited police resources. *See id.* at 619. Bolden's allegations have put

the city on notice of the unlawful conduct for which it is accused, and state sufficient facts to make plausible Bolden's assertion that the city had a widespread policy of obtaining false convictions through flawed investigations. The city's motion to dismiss is denied.

## C.  Federal Malicious Prosecution (Count VI)

Bolden asserts a federal "malicious prosecution" claim based on both the Fourth and Fourteenth Amendments. The defendants argue that Bolden's claim as based on the Fourth Amendment is untimely and that, because Bolden also asserts a state-law claim for malicious prosecution, his claim as based on the Fourteenth Amendment is barred by *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

### 1.  *Fourth Amendment*

In *Manuel v. City of Joliet*, the Court held that the Fourth Amendment right to be free from an unlawful government seizure extends to claims for unlawful pretrial detention after legal process. 137 S.Ct. 911, 919 (2017). The Court declined to go further, however, remanding to the Seventh Circuit to decide which common law tort is most analogous to a Fourth Amendment post-legal-process pretrial detention violation, what the elements of such a claim are, and when that claim accrues. *Id*. at 920.

As the Court pointed out in *Manuel*, "[i]n defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts." *Id*. The parties dispute whether Bolden's Fourth Amendment claim accrued at the time he was unlawfully seized—in which case it

would be barred by Illinois' two-year statute of limitations—or whether it accrued upon the favorable resolution of the proceedings in Bolden's favor, and is therefore timely. One element of the state-law tort of malicious prosecution is an outcome of the criminal proceedings in favor of the accused. *Johnson v. Target Stores, Inc.*, 341 Ill.App.3d. 56, 72 (1st Dist. 2003). Eight of the ten[8] other circuits that have recognized a Fourth Amendment claim for continued detention have looked to malicious prosecution and have incorporated the "favorable termination" element into the § 1983 claim. *See Manuel*, 137 S.Ct. at 921. And because a cause of action cannot accrue before all of the elements have occurred, those circuits have reasoned that a Fourth Amendment continued-detention claim does not accrue until the proceedings have terminated in favor of the accused. *See id.* Now that the Fourth Amendment is understood to apply to continued detention, even after the initiation of legal process, and since there can be no § 1983 claim that depends on questioning the validity of detention authorized by legal process until that detention is terminated in the accused's favor, it makes sense to hold that a Fourth Amendment claim of this sort does not accrue until favorable termination. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (holding that a § 1983 damages suit that questions custody cannot be filed before the favorable termination of the proceedings against the accused). Bolden's Fourth Amendment claim is akin to malicious prosecution and accrued on April 19, 2016, when the Cook County Circuit

---

[8] The Ninth and D.C. Circuits have not yet decided whether a Fourth Amendment malicious prosecution claim includes a favorable termination element.

Court dismissed all charges against him. *See* [40] ¶ 51.[9] Bolden filed this lawsuit on January 19, 2017, within the two-year statute of limitations. Defendant officers' motion to dismiss Bolden's claim under the Fourth Amendment is denied.

### 2. *Fourteenth Amendment*

Bolden's malicious prosecution claim based on the Fourteenth Amendment is barred by the rule established in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001). That case held, in part, that the existence of a tort claim under state law knocks out any due process theory of malicious prosecution. *Id*. at 750. Bolden argues that after *Manuel*, *Newsome* is no longer good law and so, despite his state-law claim, he can also assert a federal claim based on the Fourteenth Amendment. *Manuel* abrogated *Newsome's* holding that pretrial detention following the start of legal process could not give rise to a Fourth Amendment claim, *see Manuel*, 137 S.Ct. at 920, but it did not disturb the court's holding that when a state-law remedy exists, due process of law has been afforded. *See Newsome*, 256 F.3d at 750–52. Because Illinois law provides an adequate avenue for Bolden to vindicate his due process rights, namely a state-law claim for malicious prosecution, his federal claim grounded in the Fourteenth Amendment is dismissed.

---

[9] In *Manuel*, the Court observed that "once a trial has occurred, the Fourth Amendment drops out." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n. 8 (2017). Bolden's seizure under the Fourth Amendment stopped upon his conviction. Thereafter, the state's ability to restrain his liberty was subject to the due process clause. *See id*. But that does not mean his civil rights action for money damages accrued at that time. He still would not be able to file a suit questioning the validity of the post-legal process detention until the favorable termination of the entire case, because of the *Heck*-related constraints on § 1983.

### D. Remaining Claims

In addition to seeking dismissal of Counts I, V, and VI, the defendant officers' motion to dismiss also listed Count III, which alleges a conspiracy to deprive Bolden of his constitutional rights. [57] at 7. The defendants clarified in their reply that their previous reference to Count III was made in error, and that they do not seek dismissal of Bolden's conspiracy claim. *See* [90] at 1 n. 1. In Bolden's response to defendants' motions to dismiss, he agreed to drop Count V of his complaint, which alleged false arrest and imprisonment. *See* [81] at 11 n. 4. Count III is not subject to dismissal and Count V is withdrawn.

## IV. Conclusion

The defendant officers' motion to dismiss [57] is granted in part and denied in part. Count I is dismissed as to the *Brady* claim for destruction of the 911 call recording and as to the separate due process claim for failure to investigate. Count VI is dismissed to the extent it is based on the Fourteenth Amendment. The City of Chicago's motion to dismiss [61] is denied.


ENTER:

Manish S. Shah
United States District Judge

Date: December 12, 2017