1

```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    EDDIE L. BOLDEN,                 )
                                       )
 4                  Plaintiff,         )
                                       )
 5         vs.                         )  No. 17 C 417
                                       )
 6    CITY OF CHICAGO, et al.,         )  Chicago, Illinois
                                       )  February 14, 2018
 7                  Defendants.        )  10:31 o'clock a.m.

 8                      TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE MANISH S. SHAH

10    APPEARANCES:

11
      For the Plaintiff:        RILEY SAFER HOLMES & CANCILA, LLP
12                              BY:  MR. RONALD S. SAFER
                                     MS. VALARIE HAYS
13                                   MR. ELI J. LITOFF
                                     MS. VALERIE BRUMMEL
14                              70 West Madison Street, Suite 2900
                                Chicago, Illinois  60602
15                              (312) 471-8736

16    For Defendant City:       GREENBERG TRAURIG, L.L.P.
                                BY:  MS. TIFFANY S. FORDYCE
17                                   MR. JOHN F. GIBBONS
                                     MR. ELAN A. SHPIGEL
18                              77 West Wacker Drive, Suite 3100
                                Chicago, Illinois  60601
19                              (312) 456-8400

20    For Defendants Baker,     HALE LAW, L.L.C.
      Oliver, Pesavento,        BY:  MR. ALEXANDER W. TAPLING
21    Siwek, Barnes, and        53 West Jackson Boulevard, Suite 330
      Rowan:                    Chicago, Illinois  60604
22                              (847) 612-0430

23

24

25
```

**Colleen M. Conway, Official Court Reporter**

1    APPEARANCES (Continued):

2

3    For Defendant Temple:      RAVITZ & PALLES
                                 BY:  MR. ERIC S. PALLES
4                                     MR. GARY J. RAVITZ
                                 203 North LaSalle Street, Suite 2100
5                                Chicago, Illinois  60601
                                 (312) 558-1689
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                         COLLEEN M. CONWAY, CSR, RMR, CRR
23                            Official Court Reporter
                         219 South Dearborn Street, Room 1714
24                           Chicago, Illinois  60604
                                 (312) 435-5594
25                        colleen_conway@ilnd.uscourts.gov

1              (Proceedings heard in open court:)

2              THE CLERK:  17 C 417, Bolden versus City of Chicago.

3              MR. SAFER:  Good morning, Your Honor.  Ron Safer, Val

4   Hays, Eli Litoff, and Valerie Brummel on behalf of Mr. Bolden.

5              MS. FORDYCE:  Good morning, Your Honor.  Tiffany

6   Fordyce, John Gibbons, and Elon Shpigel on behalf of the City

7   of Chicago.

8              MR. PALLES:  Eric Palles and Gary Ravitz for Barbara

9   Temple.

10             MR. RAVITZ:  Good morning.

11             MR. TAPLING:  And Alexander Tapling on behalf of the

12  other defendant officers.

13             THE COURT:  Good morning, everyone.

14             The motion to proceed by stipulation as to Defendant

15  Kill is granted.

16             MR. SAFER:  Thank you.

17             THE COURT:  The proposed order is fine, so I'll get

18  that entered.

19             Then will plaintiff revise the second-amended

20  complaint accordingly?

21             MR. SAFER:  We will, Your Honor.

22             THE COURT:  Okay.  And my understanding was there was

23  no objection to the second-amended complaint being filed?

24             MS. FORDYCE:  That's correct, Your Honor.

25             THE COURT:  Okay.  So the motion to file a

1  second-amended complaint is granted.

2          Will you get the second-amended complaint on file

3  today, tomorrow?

4          MR. LITOFF:  We can do it today, Your Honor.

5          THE COURT REPORTER:  Your name again?

6          MR. LITOFF:  Eli Litoff.

7          THE COURT:  Okay.  So if you could do that.  I'll

8  give you until tomorrow to do it.

9          So amended complaint will be filed February 15th.

10 All the defendants named in that amended complaint will need to

11 respond.  Would two weeks be enough time to do that?

12         MR. TAPLING:  Should be fine for defendant officers,

13 Your Honor.

14         MS. FORDYCE:  That's fine for the City, Your Honor.

15         THE CLERK:  Counsel, that's going to be March 1st.

16         MR. TAPLING:  One more time?  What was the date

17 again?

18         THE CLERK:  March 1st.

19         MR. TAPLING:  Thank you.

20         THE COURT:  The motions to file a reply *instanter* and

21 to file a surreply *instanter* are granted.  I read them, so they

22 are -- I'll let you file them.

23         You don't need to file them now separately.  They're

24 attached as exhibits.  They're on the docket.  That's fine.

25         Okay.  So then let's talk about the bifurcation

1    motion.

2          The thing that's been on my mind is it's something

3    Mr. Safer said the last time we were in, which was that the

4    facts of this case have been aired.  There have been trials,

5    there have been hearings.  So I am wondering if we can't be a

6    little bit more concrete, then, about what fact pattern exists

7    by which all of the individual officers are found not liable,

8    but there is still nevertheless a constitutional violation

9    that's out there.

10          MR. SAFER:  So, Your Honor, first -- the first

11    scenario is -- one of the critical events of this case is a

12    line-up which was, in our view, improperly suggestive.

13          These defendants could all assert successfully,

14    theoretically, that they believe that the line-up process was

15    lawful and that it followed the City's policies and practice

16    with the line-up and, yet, the line-up was unduly suggestive

17    because, first, the City inadequately trained --

18          THE COURT:  Let me just stop you there.  Would that

19    even be a defense to the constitutional tort against the

20    individual officers?

21          It's an objective test as to whether the line-up was

22    constitutionally defective or not; they would have personally

23    participated in an unduly suggestive line-up.  Would it even be

24    a defense to liability on their part to say, "Well, I thought

25    subjectively this was okay because I was following City of

1    Chicago" or "Chicago Police Department procedures," when we

2    know that Chicago Police Department procedures don't establish

3    the constitutional test for any of this?  So why would an

4    officer be able to assert that defense successfully?

5              MR. SAFER:  Well, it -- you know, it may -- it's

6    certainly an objective test as to whether or not it was

7    constitutional, as to whether or not it was unduly suggestive,

8    but whether they intentionally violated the constitutional

9    rights, they would -- it would certainly be an issue, I think,

10   as to, you know, "We didn't intend to do" -- "We didn't intend

11   to violate their rights.  We believed that the City's policy

12   was" -- what's the -- you know, the constitutional contours.

13             THE COURT:  But I am not -- I mean, are you saying

14   that intent on the part of the officer is an element of the

15   *prima facie* case that the plaintiff --

16             MR. SAFER:  No.

17             THE COURT:  -- would have to establish?

18             MR. SAFER:  No.

19             THE COURT:  No.  I don't --

20             MR. SAFER:  No, not for --

21             THE COURT:  -- think you are.

22             MR. SAFER:  -- unduly suggestive, right.

23             THE COURT:  Right.  You know, that might be an

24   argument about punitive damages, but that doesn't -- that's not

25   going to -- that's not helping me decide the bifurcation

1    question.

2          And I am trying to think of a scenario where -- and
3    you've named eight to nine individual officers.  What scenario
4    is there where all of them are not liable for any of the
5    constitutional torts that have been asserted against them?

6          MR. SAFER:  Okay.  So they -- let's move to two other
7    areas.  One is with regard to the destruction of the weapons.
8    So -- and the destruction of the 911 tape.  And I'll take the
9    911 tape first.

10         So the City's policy is that the 911 tapes are
11   destroyed 30 days after, after the event, after the -- they're
12   received.  That is true whether or not it is flagged for the
13   City that those recordings can be exculpatory.  So not
14   subpoenaed yet, but flagged for the City that it is -- that
15   those tapes contain exculpatory information.  And these
16   officers may not have had that flagged for them, but it was
17   flagged for them, and the City knew of it, and that could give
18   rise to a claim against the City but not necessarily these
19   officers.

20         The second aspect of that is the City has a policy
21   that if they are subpoenaed after the 30 days -- and in this
22   case, it was just a day or two after the 30 days -- they don't
23   check to see whether or not the tape exists that has yet to be
24   destroyed.  And so it could be that the tape was -- that the
25   tape existed and they didn't check.  It wasn't these officers

```
1    that destroyed those tapes.  But the City would, in our view,
2    be liable for that.
3              THE COURT:  And those two policies that you've
4    articulated as being a potential cause for the loss of
5    exculpatory evidence, those are not -- that's not the policy to
6    close cases at all costs and condone police misconduct?
7              MR. SAFER:  Those are not.
8              THE COURT:  Right.  That is, in a way, a different
9    Monell-type claim attributing liability to the City.
10             MR. SAFER:  Yes.
11             THE COURT:  I just want to make sure I understand the
12   facts.
13             MR. SAFER:  Yes.  That's not a close cases at all
14   costs, yes.
15             THE COURT:  Okay.
16             MR. SAFER:  With regard to the guns, there were two
17   guns that were destroyed.  And we are not -- we're still not --
18   I don't think it is these officers, although there is an
19   officer in the case who is involved in the paper trail that we
20   have received in the destruction of the -- of these guns.
21             We don't know yet, the City has not told us, has not
22   responded to the question of why were these guns destroyed in
23   the middle of this litigation.  We have paperwork, but we still
24   don't have an answer to why they were destroyed.
25             To the extent these defendants, these officers were
```

1    not personally involved in destroying them, and yet they were
2    destroyed by the City for whatever reason, that was -- and that
3    was after they were requested in discovery by the defense and
4    after they were tested -- and those test results were used in
5    the case -- you know, that would give rise -- may give rise to
6    the City's liability without these officers being involved.
7          THE COURT:  Okay.  Can -- do you want to respond to
8    those points?
9          MS. FORDYCE:  Please, Your Honor.  And I'll take them
10   in the same order that Mr. Safer did.
11         The first issue with respect to the 911 tapes is this
12   is something that Your Honor dismissed in the motion to dismiss
13   order, this issue about the destruction of the 911 tapes.
14         THE COURT:  It's coming back in the second-amended
15   complaint, though.
16         MS. FORDYCE:  It's coming back, and it may be subject
17   to a second motion.  But I think that this was fully vetted
18   before the Court.  That's my first point, Your Honor.
19         My second is that the evidence in this case, assuming
20   it goes forward, we're having -- because of the fact that that
21   issue was dismissed, we are -- have been engaged in extensive
22   meet-and-confer over the relevancy of this, but the evidence
23   does not bear out that if you get a subpoena, the
24   records-keepers of the 911 tapes don't even look for it.
25   That's inaccurate.  So the premise of this liability doesn't

1   exist.

2          Third, Your Honor, even assuming that everything that

3   Mr. Safer has just articulated to the Court is true, we still

4   go back to our original *Monell* liability standard.  This is

5   still going to turn on an objective analysis, and you still are

6   going to have to have an individual, regardless if it's one of

7   these individual police officers currently named in this case,

8   take the affirmative action of destroying a tape.  And so the

9   legal standard isn't going to be any different.

10          I think it's telling, Your Honor, that all of the

11  cases to date cited by Bolden to oppose the bifurcation motion

12  has to do with a failure-to-provide-medical-care claim, which

13  has a completely separate subjective standard by which you

14  evaluate liability.  And so even under this theory of these 911

15  tapes, we're still looking at that objective standard and we

16  still are going to require objective individual liability on

17  behalf of somebody.

18          With respect to the destruction of the guns, Your

19  Honor, again -- and the evidence has borne this out in the

20  discovery that's been tendered to date -- this wasn't just a

21  rogue police officer destroying these guns.  This all happened

22  pursuant to a court order.  There's a process.  Okay?  And so,

23  again, this isn't going to turn on one individual police

24  officer's rogue actions.

25          Second, again, we're getting back to our objective

1    standard.  If you're talking about *Brady* material, you're

2    talking about destroying evidence.  We have cited several cases

3    that address this issue and say it's an objective standard that

4    requires individual liability.  Your Honor, respectfully, that

5    doesn't move the needle away from bifurcation.

6              THE COURT:  Okay.  Let me switch to a question I have

7    of the City on this issue, on the issue of bifurcation, and

8    that's -- the notion that if you're going to fight over whether

9    a discovery request is geared toward a *Monell* theory versus

10   individual liability, then I am going to get these discovery

11   fights anyway and it's not going to save judicial resources to

12   bifurcate.

13             I would think, from some of the correspondence that I

14   have seen back and forth, that there are some pretty clear

15   categories that require a fair amount of response or

16   documentary follow-up that are geared towards the individual

17   officer claims.  And the City might have been awfully quick to

18   just dismiss a discovery request as being *Monell*-related when

19   it really wasn't *Monell*-related.  And if those are the kinds of

20   fights I am going to get, and if you're going to be overly

21   broad in your reading of their discovery requests as being

22   *Monell*, "so we don't have to answer them," then it's not going

23   to save me any time because I am going to have to wade through

24   all of those.  And so you, as the proponent of bifurcation,

25   need to disabuse me of a concern that I would have that this

1    isn't going to save me any time anyway.

2        MS. FORDYCE:  Well, Your Honor, I think that's a fair

3    point.  And I guess I would respectfully disagree that we've

4    had a lot of fights purely over whether or not something's the

5    scope of *Monell*.

6        One specific example that was raised in Mr. Bolden's

7    opposition was having to do with a deposition over these 911

8    tapes.  We didn't pull this witness because we thought he was a

9    *Monell* witness.  We pulled the witness because we felt that the

10   destruction of the 911 tapes was out of the case pursuant to

11   your order on the motion to dismiss except for one exception

12   that Your Honor articulated, and that was:  If you could show

13   bad faith on behalf of the individual police officers that they

14   affirmatively did something to destroy these tapes or to make

15   sure they weren't preserved intentionally, then that issue is

16   still back in the case.  So we said okay.  We can talk about

17   that.  But if you want to talk about these broader issues,

18   that's outside the scope, you know, given the fact that that

19   count was dismissed in the motion to dismiss.

20       Another huge issue with respect to our current

21   meet-and-confer efforts on the, you know, quote-unquote, *Monell*

22   discovery is simply just the breadth of it.  It's not -- we did

23   object because we had these pending motions, but we also object

24   based on overbreadth.

25       And just to give Your Honor a few examples.  I know

1    they're laid out in our brief.  But they want to know who at

2    the City had or, quote, should have had knowledge of police

3    misconduct over a four-year period.

4         Your Honor, for us to determine who should have had

5    knowledge of, quote-unquote, police misconduct, which could

6    range anywhere from not wearing a properly-colored shirt to

7    coercing a false confession, that's hugely broad.  We estimate

8    we had 60,000 employees over that time.  There's no meaningful

9    way, *Monell* or no *Monell* in this case, for us to respond to

10   that.

11        Another example -- and this is ongoing, which I

12   actually think this is pretty clearly *Monell*, but it's all

13   lawsuits alleging wrongful conviction due to police misconduct

14   from 1990 to 1994.

15        Your Honor, the City of Chicago doesn't maintain

16   their documents in such a way that we can push a button and

17   pull this information.  What we could do and what we would have

18   to do is go through PACER, go through every single lawsuit

19   that's filed against the City and figure out if it's

20   responsive.  There are approximately, over this time period,

21   Your Honor, 10,000 lawsuits, we estimate, that were filed on

22   the City during this time frame.

23        If the plaintiffs want that information, the burden

24   of them getting it themselves is equal to ours.  So, I mean,

25   again, this is really a breadth issue.

1          THE COURT:  Let me just stop you there.  I get that

2    debate over how burdensome *Monell* discovery is, and so -- and

3    that's aired out in the papers.  What I want to focus on are

4    the two points that I have raised.  One, how practical is it to

5    pursue the *Monell* case at all if -- I shouldn't say at all, but

6    now if we will get to the bottom of individual liability as to

7    the officers.  And there likely wouldn't be, as a result of

8    individual liability on the part of any one officer, much

9    value, either economic or societal, to pursuing the *Monell*

10   claim at that point.

11          So that was the first point that we talked about.

12   And then the second point was if I do bifurcate, is it really

13   going to save judicial resources?  And you've responded to that

14   saying you don't think there are that many of those kinds of

15   disputes out there, and you'll work on that.

16          And if I take off the table some of the clearly

17   *Monell*-targeting discovery requests that are geared toward this

18   "close cases at all costs" policy, then that would obviate the

19   need to come to me over breadth and burden arguments.  So I get

20   that.

21          From the plaintiff's perspective, do you foresee from

22   fact discovery to date on -- and the historical airing of the

23   facts of the case another amendment naming any additional

24   individuals?

25          MR. SAFER:  Not based on information we have today,

1  no.  Again, the destruction of guns is problematic.  We don't

2  know why that happened.  And there, of course, it's *Brady*

3  material, and we do -- it is subjective.  We do have to prove

4  some element of bad faith.  But with that exception --

5        THE COURT:  Right.  And how -- let's tease that out a

6  little bit.  Is there a way that you could see establishing bad

7  faith on the part of an unidentified, unnamed individual?

8        MR. SAFER:  We -- yeah.  It's -- obviously, that's

9  challenge -- a challenge because it had -- it is subjective, so

10  somebody had to have done it.  However, the -- there was a

11  court order obtained in a different case, and it is, at the

12  moment, a bizarre puzzle and not more than that.  So it is --

13  without knowing how this happened, it's difficult for me to

14  say.  But yeah, it is a -- it's a challenge because you have to

15  say at the end of the day, somebody acted in bad faith.  And

16  it's hard to say a system acted in bad faith, but it's also

17  hard to imagine that this happened.

18        THE COURT:  Okay.  But that discovery wouldn't

19  involve many of the kinds of widespread policy and practice

20  issues you've raised in your discovery requests.

21        Similar to the 911 call, there's a targeted way to

22  get to the bottom of what happened with those pieces of

23  evidence that would not require pursuit of a number of other

24  issues.  Fair?

25        MR. SAFER:  I think that's right, Your Honor.

1           THE COURT:  Okay.  And how are things coming along on
2    the fact discovery front as to the individual officers?  I know
3    I gave extra time, and the defense was looking to subpoena
4    people.  What's the update on that front?
5           MR. SAFER:  We were steaming along.  And then when
6    there was more time, we had -- I think there were eight -- or
7    there were ten depositions that were scheduled.  Eight of them
8    have been canceled.  There may be --
9           MS. HAYS:  So there was --
10          MR. SAFER:  I may be off on that.
11          MS. HAYS:  There's a few, yeah.  I think it's more
12   like eleven or twelve, and they were all canceled.
13          MS. FORDYCE:  And, Your Honor, to be clear, they have
14   been canceled by all the parties.
15          MS. HAYS:  No.
16          MS. FORDYCE:  And -- plaintiff's counsel did cancel a
17   deposition in Florida over Ms. Temple's objections, vociferous
18   objections.  It's -- a lot -- we are moving along.  We've taken
19   several depositions.
20          And I don't want to speak to this issue because they
21   weren't my depositions, but several of the ones that were
22   canceled were third-party ones where either subpoenas weren't
23   served or witnesses said they weren't going to show up.  But
24   it's not that we've stopped.  There -- certainly discovery has
25   been tracking along very nicely.  There's also two depositions

1    scheduled for next week that we anticipate will go forward.

2            THE COURT:  Sure.  And the reason I ask that is if I

3    were to bifurcate in some way, maybe I should advance the close

4    of discovery as to the -- what I will call individual claims or

5    individual liability claims to get us to the point where then I

6    can have a better sense of should we now pursue *Monell*.

7            Have we gotten to the bottom of everything that we

8    need to get to the bottom of?  And can people make arguments

9    about whether any of the individual defendants are going to

10   move for summary judgment on one or more theories?  What's that

11   going to look like?  Does that then invite the idea that, oh,

12   maybe there would be a qualified immunity argument that might

13   pass muster such that we should go back to rethink discovery on

14   *Monell*?

15           So, again, looking to try to get to the bottom of

16   things as quickly as possible to meaningfully advance the

17   merits of the constitutional claims is my goal.  And it might

18   be that if I took some of these *Monell* issues off the table for

19   now, everyone could ramp up on the other fronts and get them

20   done before June, which is our current deadline, and we can

21   then see what's happened there.

22           And so for that, let me look towards the defense

23   counsel for the individual defendants and see if things are

24   moving along from your perspective in a way that maybe they can

25   move along even a little faster.

1          THE COURT REPORTER:  Name again, please.

2          MR. PALLES:  Eric Palles for Ms. Temple.

3          As Ms. Fordyce mentioned, our -- Ms. Temple's

4    deposition was scheduled.  It was unilaterally canceled,

5    postponed by plaintiff's lawyers.  We objected at the time.  We

6    wanted to go ahead.  The argument that we received at that time

7    was that materials received from the State's Attorney's Office

8    suggested that there would be additional third-party discovery

9    necessary before there was enough information to proceed with

10   Ms. Temple's deposition.  Now, as far as I know, that -- I'm

11   not aware of any additional documents that have come in.

12         Our goal, of course, is -- Ms. Temple's long retired,

13   a resident of Florida.  We'd like her to be deposed once.  We

14   don't want, you know, somebody to say, "Oh, now we've got more

15   documents," et cetera.  So we stand ready to produce her when

16   that third-party discovery has, you know, been shared, and

17   we'll be ready to go.  It won't take that long.  She's

18   indicated that she would generally be available for a

19   deposition.

20         MR. TAPLING:  It was our subpoenas that went out to

21   the deponents that led to the canceled depositions, Your Honor.

22   Part of the problem we had was we simply weren't able to

23   perfect service on some of these people, false addresses or old

24   addresses.  We simply weren't able to find them in time for

25   their -- for them to have adequate notice that they were being

1    deposed at all.

2           So some of that burden lies on us.  And not to make

3    excuses for ourselves, but we don't have the luxury of seeking

4    to depose people represented by counsel in this case available

5    through the City.  These are people with whom the plaintiff was

6    familiar at the time, for the most part.  And so we are

7    endeavoring to find them.

8           Right now, we're working on perfecting service.  As

9    counsel for the City said, we have two depositions going

10   forward next week, one of which is one that we were able to

11   actually perfect service on.  We're getting ready to produce a

12   slew of documents that we've requested as well as materials

13   from the Illinois Department of Corrections.

14          But from where we stand, production -- discovery is

15   going forward well.  Our issue is simply perfecting the

16   depositions.  And while I understand the frustration, you know,

17   there's little we can do if someone cannot be served.

18          THE COURT:  And from the plaintiff's perspective, how

19   soon do you think you can get to the bottom of some of the more

20   granular factual issues you're pursuing as to the

21   constitutional claims here?

22          MS. HAYS:  For the most part, Your Honor, I think we

23   have -- we're just waiting for the City to respond on more

24   details on the guns, why they were destroyed.  I mean,

25   that's -- that gets into the issues with Ms. Temple.  We

1  recently got a production from the State's Attorney that showed

2  her on at least some of these -- on some of this paperwork, but

3  felt like we couldn't go forward until we knew why the guns

4  were destroyed and have some of that information.  So as soon

5  as we get that, I don't see any other barriers time-wise.

6         MS. FORDYCE:  And, Your Honor, we've notified

7  plaintiff's counsel in writing several times we have turned

8  over every piece of paper we could find on the destruction of

9  the guns.  This happened in the '90s.  Nobody remembers it.

10  Nobody who was involved was there.  They have everything we

11  have.  We have nothing else to give them on that.

12         And I also just want to raise with that point, Your

13  Honor, two things.  One is the guns were tested before they

14  were destroyed, and it was indisputably determined that those

15  guns were not the weapons that were used in the murder that

16  Mr. Bolden was convicted of.

17         THE COURT:  But that's not their theory as to why

18  they're of import to their constitutional claims.

19         MS. FORDYCE:  Right.

20         THE COURT:  So I get that.

21         MR. SAFER:  Thank you.

22         MS. FORDYCE:  And the Appellate Court held, when they

23  overturned Mr. Bolden's conviction, that the fact that the guns

24  were destroyed was not prejudicial.

25         MR. SAFER:  That --

1    THE COURT:  Let her finish.

2    MR. SAFER:  I'm sorry.

3    MS. FORDYCE:  Yeah.  So anyway, just to kind of put

4    it in the bigger context.  I'm not saying they're not entitled

5    to it.  We're not claiming it's *Monell*.  We turned everything

6    over.  But we can't give them what we don't have.

7    THE COURT:  Right.  And I am trying to not wade into

8    the merits of the theories because we're not at that -- that's

9    not the stage I want to be at myself.  I want to just get

10   people where they need to be so we can get there.

11   MR. SAFER:  Right.  It's -- I believe, and I'm pretty

12   confident, that that's just wrong.  The Court of Appeals, the

13   Illinois Court of Appeals, did find it prejudicial and did find

14   that it was one of the two grounds that merited a new trial.

15   MS. HAYS:  And just a few days ago, Your Honor, the

16   City said they would get back to us on whose initials were on

17   the log for the gun destruction.  So there is more information

18   they're plan -- they've at least expressed they're planning on

19   sharing with us.  And they've never answered the interrogatory

20   that they have no additional information on why.

21   MS. FORDYCE:  That's not true.

22   THE COURT:  Here's what I am going to do.  I am going

23   to give it a little more thought and I'll issue something

24   probably short.  I don't expect it will contribute to either

25   side's string cites of, as Judge Shadur would say,

1    non-authoritative district judge's wading in on this question

2    of bifurcation.  So I don't plan on musing at length about it.

3    I'll try to just give you some direction on it.

4           And I'll -- by way of preview, what I have done in

5    other cases is not to make a decision about bifurcation of

6    trial but really focus on what should we be doing

7    discovery-wise in the short run and getting us one step at a

8    time closer and closer to the merits so that everybody has the

9    information they need to make good judgments about what to do

10   next without necessarily foreclosing what the ultimate trial

11   will look like.

12          So that's just so you have a sense of where I've come

13   out on these kinds of things before.  But the discussion's been

14   helpful.  I just want to think about it a little bit more, and

15   I'll get you something.

16          This was our status.  From what I am hearing, I

17   don't -- and I'll just tell you this.  I don't think advancing

18   the close of discovery date, if I were to bifurcate, is going

19   to be useful to anybody, so that's probably not going to

20   happen.

21          Let me put you down for a status in early May.

22          THE CLERK:  Let's see.  Everyone, how does Wednesday,

23   May 9th at -- 9:30 or an off-time?

24          THE COURT:  Let's do it at an off-time.

25          THE CLERK:  Sure.  Everyone, 10:30 again.

1          MR. TAPLING:  That works.

2          MR. SAFER:  Yes.

3          THE CLERK:  Okay.  So it will be Wednesday, May 9th,

4    10:30.

5          MR. SAFER:  Thank you, Your Honor.

6          MS. FORDYCE:  Thank you, Your Honor.

7          MR. SAFER:  We'll see you then.

8          MS. HAYS:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. LITOFF:  Thank you, Your Honor.

11       (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5                I, Colleen M. Conway, do hereby certify that the

6      foregoing is a complete, true, and accurate transcript of the

7      proceedings had in the above-entitled case before the

8      HONORABLE MANISH S. SHAH, one of the Judges of said Court, at

9      Chicago, Illinois, on February 14, 2018.

10

11

12          */s/ Colleen M. Conway, CSR, RMR, CRR*          *03/20/18*

13              Official Court Reporter                   Date
                United States District Court
14             Northern District of Illinois
                   Eastern Division
15

16

17

18

19

20

21

22

23

24

25