**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

EDDIE L. BOLDEN,             )
                                )
               Plaintiff,       )        Case No. 17 C 00417
                                )
        vs.                 )        Honorable Manish S. Shah
                                )
CITY OF CHICAGO, et al.,    )
                                )
             Defendants.   )

**DEFENDANT JAMES OLIVER, ANGELO PESAVENTO, AND ED SIWKE'S RULE 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants James Oliver, Angelo Pesavento, and Edward Siwek ("Defendant Officers"), through their undersigned attorneys, hereby present their Local Rule 56.1(a)(3) Statement of Undisputed Facts in Support of their Motion for Summary Judgment, and state as follows:

**JURISDICTION AND VENUE**

1.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1367. (Defendant Officers' Answer to Plaintiff's Third Amended Complaint ("DOs' Ans.") at ¶ 7, attached hereto as Exhibit 1). Venue is proper under 28 U.S.C § 1391(b) because Plaintiff resides in this judicial district and the events giving rise to Plaintiff's claims occurred in this district. (Ex. 1 at ¶ 8).

**PARTIES**

2.     Defendants James Oliver ("Officer Oliver"), Angelo Pesavento ("Detective Pesavento"), and Ed Siwek ("Detective Siwek") were duly sworn Chicago Police Officers employed by the City of Chicago. (Ex. 1, DOs' Ans., at ¶ 10).

1

3.     Detective Pesavento and Detective Siwek were assigned to investigate the murders of Irving Ledell Clayton ("Irving") and Derrick Frazier ("Derrick"), as well as the shooting of Clifford Frazier ("Clifford"). (Ex. 1, DOs' Ans., at ¶ 11).

4.     Officer Oliver was a gang crimes officer who assisted the detectives assigned to investigate these crimes. (James Oliver December 21, 2017 deposition ("Oliver Dep.") at 22:22-24; 23:1-3; 34:3-13, 17-19; 35:1-6, attached hereto as Exhibit 2).

5.     Plaintiff, Eddie Lynier Bolden ("Plaintiff"), was convicted of murdering Irving and Derrick and attempt murder of Clifford after a jury trial. (*People v. Bolden*, 94 CR 0839701, Order ("Post-Conviction Order") EB 920, (Cir. Ct. Cook Cty., Jan. 21, 2016), attached hereto as Exhibit 3) Plaintiff's convictions were subsequently vacated based on ineffective assistance of counsel for failing to investigate an alibi witness, he was granted a new trial, and the State chose not to retry him. (Ex. 3, Post-Conviction Order, at EB 920-942; *see also* Linda Walls' June 13, 2018 deposition ("Walls' dep") at 18:17-24; 19:1-4; 20:9-12, attached hereto as Exhibit 4).

**THE MURDERS OF IRVING AND DERRICK AND THE SHOOTING OF CLIFFORD**

6.     On January 29, 1994, Anthony Williams ("Ant") offered to buy two kilos of cocaine from Irving and Derrick. (Cynthia Steward September 6, 2018 deposition ("Steward dep") at 25:8-13; 33:21-24; 34:1-22; 36:20-23, attached hereto as Exhibit 5)

7.     At approximately 5:00 p.m., Irving and Derrick went to the J&J Fish Restaurant at 64th and Cottage Grove, which was owned by Ant's family. (Ex. 5, Steward Dep. at 36:20-24; 37:1-6; 77:16-24; 148:21-23; *see also* Edna Williams March 27, 2018 deposition ("Edna dep") at 12:24-25, 13:23-14:5, 15:7-15, attached hereto as Exhibit 6).

8.     As Irving and Derrick drove by the J&J, they observed Ant, who was at the time a general in the Gangster Disciples, having a Gangster Disciple meeting and they drove away. (Ex.

2

5 Steward Dep. at 26:6-19, 37:14-24; *see also* Eddie Bolden May 25, 2018 deposition, ("Bolden dep") at 31:16-24; 32:1-2, attached hereto as Exhibit 7)

9.      Shortly thereafter, Irving and Derrick arrived at Clifford's apartment arguing about whether to complete the drug sale to Ant. (Clifford Frazier June 3, 2018 deposition ("Clifford dep.") at 10:4-24, 11:1-6, attached hereto as Exhibit 8)

10.      Irving and Derrick went forward with the sale and Clifford went with them to watch their backs. (Ex. 8, Clifford Dep. at 11:1-8).

11.      Irving, Derrick, and Clifford went to the J&J where Irving and Derrick met Ant. (Ex. 8, Clifford Dep. at 11:9-24; 12:1-6) Clifford was watching Irving and Derrick from a Harold's Chicken that was across the street from the J&J Fish Restaurant. (Ex. 8, Clifford Dep. at 11:17-19).

12.      A fourth individual joined the meeting. (Ex. 8, Clifford Dep. at 11:19-20). Eventually, Irving, Derrick, and this other individual came inside the Harold's Chicken. (Ex. 8, Clifford Dep. at 11:23-24; 12:1-2) Derrick told Clifford that he, Irving, and the other individual were going to go count the money. (Ex. 8, Clifford Dep. at 13:4-11) Clifford watched Irving and Derrick drive off as this other individual was sitting in the backseat behind them. (Ex. 8, Clifford Dep. at 13:13-17)

**The Minerva Crime Scene**

13.      On January 29, 1994, at approximately 8:05 p.m. Officers Garrick Harvey and Heard responded to a car on fire at 6546 South Minerva (the "Minerva Crime Scene") and pulled two individuals out of the car. (Garrick Harvey Criminal Trial Testimony ("Harvey Tr. Test.") at EB 6784:3-18, EB 6786:6-14, 6787:7-21, attached hereto as Exhibit 9; *see also* Garrick Harvey

May 7, 2018 deposition ("Harvey Dep.") at 16:21-24, 17:1-4, 21:14-22, attached hereto as Exhibit 10).

14.     Derrick, the passenger of the vehicle, sustained two contact range gunshot wounds to the back of his head. (Nancy Jones Criminal Trial Testimony ("Jones Tr. Test.") at EB 6923:10-24, 6924:1-24, attached hereto as Exhibit 11). Derrick died as a result of multiple gunshot wounds. (Ex. 11, Jones Tr. Test. at EB 6928:1-9).

15.     Irving, the driver of the vehicle, sustained three gunshot wounds, two to the back of the head and one in his right cheek. (Ex. 11, Jones Tr. Test. at EB 6932:12-24, 6933:1-24, 6934:1-24). Irving died as a result of multiple gunshot wounds. (Ex. 11, Jones Tr. Test. at EB 6936:19-24, 6937:1-10).

16.     Evidence technicians recovered two nine-millimeter Winchester cartridge cases on the front driver's seat of the car and one nine-millimeter cartridge case on the floor near the front passenger seat. (John Naujokas Criminal Trial Testimony ("Naujokas Tr. Test.") at EB 6823:1-16, attached hereto as Exhibit 12)

17.     Detective Pesavento canvassed the area near the Minerva Crime Scene and interviewed Lee Williams. (Angelo Pesavento January 9, 2018 deposition ("Pesavento dep.") at 33:8-14, attached hereto as Exhibit 13). Detective Pesavento recorded in a supplementary report that Williams saw a car pull over in front of his house and the individual in the backseat of the car shoot the two individuals in the front seat of the car. (Ex. 13, Pesavento dep. at 42:5-24; 43:1-2 and Exhibit 5 attached to Pesavento dep at p. 4-5) The shooter exited the car and walked northbound on Minerva. (Ex. 13, Pesavento dep. at 42:5-24; 43:1-2 and Exhibit 5 attached to Pesavento dep at p. 5) The shooter was described as a male black in his early twenties and wearing dark clothing. (Ex. 13, Pesavento dep. at 42:5-24; 43:1-2 and Exhibit 5 attached to

Pesavento dep at p. 5) Detective Pesavento may or may not have taken handwritten notes of this interview. (Ex. 13, Pesavento dep. at 38:7-21; 39:1-10).

18.     Detective Pesavento also spoke with Ralph Vallot, Renee Peterson, Naomi Dean, Malachi Dean, and Carol Wells during the canvass of the area. (Ex. 13, Pesavento dep and Exhibit 5 attached to Pesavento dep at p. 3)**.** Detective Pesavento wrote down these witnesses biographical information even though they did not provide him with any relevant information. (Ex. 13, Pesavento dep and Exhibit 5 attached to Pesavento dep at p. 3).

19.     While at the Minerva Crime Scene, Detective Pesavento learned that there was another shooting at 64th and Cottage Grove (the "Cottage Grove Crime Scene"). (Angelo Pesavento Criminal Trial Testimony ("Pesavento Tr. Test.") at EB 6950:1-12, attached hereto as Exhibit 14).

**The Cottage Grove Crime Scene**

20.     Police Officers Barbara Temple and Terry Sumter responded to the Cottage Grove Crime Scene at approximately 8:25 p.m. (Barbara Temple Criminal trial testimony ("Temple Tr. Test.") at EB 7039:15-24; 7040:1-2, attached hereto as Exhibit 15)

21.     Clifford, who had sustained gunshot wounds a beating across the head, was intervied by Officer Temple inside the J&J. (Exhibit 15, Temple Crim. Tr. Test. at EB 7041:14-17; 7042:2-5; *see also* Ex. 8, Clifford dep. at 13:12-15:6). Officer Temple asked for a description of the offender, but Clifford was unable to provide one. (Ex. 15, Temple Crim. Tr. Test. at EB 7038:2-10).

22.     Temple went to Clifford's car to get the inhaler and saw a Mac 11 gun under the front passenger seat. (Ex. 15, Temple Dep. at 49:14-24).

23. Officer Temple wanted to arrest Clifford, but a sergeant told her not to because the car was unsecured prior to her finding of the Mac 11. (Ex. 16, Temple Dep. at 55:24-25; 56:1-9).

24. Officer Temple also interviewed Ant's mother Edna Williams ("Edna"), Robert Aginis, Octavia Jackson ("Jackson"), and Todd Henderson. (Ex. 16, Temple Dep. at 12:2-5; 26:2-4; 39:24; 40-41 and Exhibit 2 attached to Temple's dep; *see also* Ex. 6, Edna dep. at p. 6:2-8)

25. Temple reported that Enda stated that she saw several males struggling with each other in front of the J&J and one of them fled inside the restaurant saying he was shot. (Ex. 16, Temple Dep. at 34:5-9; Exhibit 2 attached to Temple's dep.; *see also* Ex. 6, Edna Dep. at 73:5-9).

26. Jackson provided her name, address, and telephone number to the police, and stated that she heard gunshots and saw a man run into the restaurant. (Octavia Jackson May 4, 2018 deposition ("Jackson dep.") at 60:8-24; 61:1-15, attached hereto as Exhibit 17).

27. Officer Maurice Willis responded to the Cottage Grove Crime Scene and spoke with the officers who interviewed Clifford. (Maurice Willis Stipulation ("Willis Stip") at EB 6863:11-24; 6864:3-6, attached hereto as Exhibit 18). Officer Willis then went to a gray Chevrolet Caprice nearby and recovered two large packets of suspect cocaine. (Ex. 18, Willis Stip. at EB 6864:7-10).

28. Five shell casings were recovered from the ground near Clifford's car at the Cottage Grove Crime Scene. (Robert Mclin Criminal trial testimony ("Mclin Crim. Tr. Test.") at EB 7006:5-11; 7008:2-7, attached hereto as Exhibit 19)

29. When Detective Pesavento arrived at the Cottage Grove Crime Scene, Edna, James Williams ("James"), Tenesha Gatson ("Gatson"), Maurice Stewart ("Maurice"), and David McCray ("McCray") were present at the J&J Fish Restaurant. (Ex. 14, Pesavento Crim. Tr. Test.at EB 6953:7-17).

**Follow-Up Investigation**

30. Clifford was taken to the hospital where Officers Oliver and T. Anderson spoke to him. (Michael Baker March 16, 2018 deposition ("Baker Dep.") at 136:19-24:137:1-3, attached hereto as Exhibit 20; *see also* Ex. 2, Oliver Dep. at 35:16-24; 36:24; 37:1-3).

31. Clifford's interviews inside the J&J and at the hospital with Officers Oliver and Anderson were documented in a police report authored by Officer Willis (the "Willis Report"). (Maurice Willis April 19, 2018 deposition ("Willis dep") at 17:25; 18-20, attached hereto as Exhibit 21). The Willis Report identifies Clifford as the crime victim. ( The Willis Report at EB-FBI000041-42, attached hereto as Exhibit 22). It describes the offender as a male black, approximately 25 years old, wearing a white coat, between 5'10'' and 6'1'' and medium complection. (Ex. 21, Willis Dep. at 22:1-20; *see also* Ex. 22, Willis Report at EB-FBI000041-42).

32. The Willis Report was produced by the FBI in response to Plaintiff' subpoena concerning the shootings. (*See* Ex. 22, Willis Report at EB-FBI000041-42) The Willis Report was not contained in the Area file, Cook County State's Attorney's file or the Public Defender's file that were produced in this case. (City of Chicago's Response to Plaintiff's Request to Admit, ("RTA") at ¶ 1, attached hereto as Exhibit 23; *see also* Kevin Foster May 3, 2018 deposition ("Foster dep.") at p. 105:20-106:10, attached hereto as Exhibit 24).

33.     Detective Michael Baker ("Detective Baker") interviewed Clifford at the hospital for approximately fifteen minutes. (Ex. 20, Baker Dep. at 20:15-17 and Exhibit 3, General Progress Report, attached to Baker's dep).

34.     Clifford stated that after Irving, Derrick and the third individual left the Harold's Chicken, he sat in his car in the vacant lot until two men exited the nearby pool hall, approached the lot and began watching his car. (Ex. 20, Baker Dep. at 28:19-24 and Exhibit 3 attached to Baker's dep.) He got out of his car, popped his hood, and watched the two men. (Ex. 20, Baker Dep. at 29:1-16, and Exhibit 3 attached to Baker's dep.). The individual who had left with Irving and Derrick came running at Clifford, yelled "don't move", and started shooting at him. (Michael Baker Criminal Trial Testimony ("Baker Crim. Tr. Test.") at EB 7023:15-21 attached hereto as Exhibit 25; *see also* Ex. 20, Baker Dep. at 29:17-23 and Exhibit 3 attached to Baker dep). Clifford fired back until he ran out of ammunition. (Ex. 25, Baker Crim. Tr. Test. at EB 7023:22-24; 7024:1-4).

35.     During this interview, Clifford admitted to being a participant in a drug deal, but Clifford was not arrested. (Ex. 20, Baker Dep. at 69:10-24; 70:1-10).

36.     Officer Willis went back to the J&J and recovered Clifford's .40 caliber gun. (Ex. 18, Willis Stip., at EB 6864:15-20).

***The J&J Witnesses***

37.     Edna, James Williams ("James"), Gatson, Maurice Stewart ("Maurice") and David McCray ("McCray") were all brought to Area 2 and interviewed by Detective Pesavento. (Ex. 14, Pesavento Crim. Tr. Test. at 6954:2-6).

*Edna and James Williams*

38.     In his supplementary report, Detective Pesavento noted that Edna and James could not add anything to the investigation and denied witnessing anything. (Ex. 13, Pesavento dep. at 42:5-43:15 and Exhibit 5, the Supplementary Report, attached thereto at EB p. 1449).

*Tenesha Gatson*

39.     In his supplementary report, Detective Pesavento summarized Gatson's statement: According to Gatson, Lynier entered the J&J at approximately 7:00 p.m. looking for Ant. (Ex. 13, Pesavento Dep. at p. 42:5-43:15 and Exhibit 5, the Supplementary Report, attached thereto at p. EB 1449) Lynier was directed next door to the pager shop. (Ex. 13, Pesavento Dep. at 42:5-43:15 and Exhibit 5, the Supplementary Report, attached thereto at p. EB 1449) Later, Ant and Lynier entered the J&J and spoke for approximately fifteen minutes. (Ex. 13, Pesavento Dep. at 78:13-19). Ant left the J&J and Lynier remained. (Ex. 13, Pesavento Dep. at 78:13-19).

40.     Gatson described Lynier as being in his early twenties, approximately 5'10'' to six feet, slender, and light complected. (Ex. 13, Pesavento Dep. at 274:10-12). Detectives Pesavento and Karl were not taking notes during this interview. (Tenesha Gatson April 12, 2018 deposition ("Gatson Dep.") at 178:8-179:8, attached hereto as Exhibit 26)

*Maurice Stewart*

41.     In his supplementary report, Detective Pesavento summarized the Maurice interview by noting that Maurice did not see anything because he was busy cooking in the back of the restaurant. (Ex. 13, Pesavento Dep. at p. 42:5-43:15 and Exhibit 5, the Supplementary Report, attached thereto at p. EB 1449)

*David McCray*

42.     David McCray worked as the delivery person at the J&J Fish Restaurant. (Tenesha Gatson Criminal Trial Testimony ("Gatson Crim. Tr. Test."), at EB 7058:14-18,

attached hereto as Exhibit 27) In his supplementary report, Detective Pesavento noted that McCray stated he was not in the restaurant at the time of the shooting and only returned after Clifford was inside. (Ex. 13, Pesavento Dep. at 42:5-43:15 and Exhibit 5, the Supplementary Report, attached thereto at p. EB 1449)

***The Cynthia Steward Interviews[1]***

43.     After the shootings, the police found Steward at a party she was throwing for Irving. (Ex. 5, Steward Dep. p. 45:3-46:15).

44.     She was placed in a police vehicle and questioned by plainclothes, African-American police officers. (Ex. 5, Steward Dep. at 49:4-7; 50:6-15). In the car, she told the officers that the shootings may have been a gang hit by the Gangster Disciples ordered by Ant, "Byron," or "Charlie" and that Andre Kimbrough was solicited by Ant to perform the hit, but Kimbrough declined. (Ex. 5, Steward Dep at 49:23-24; 50:1-5, 69:1-70:8; 132:23-24; 133:1). Steward gave the names of any high ranking Gangster Disciples that could have ordered a hit. (Ex. 5, Steward Dep. at 50:1-5).

45.     The following day, January 30, 1994, four police officers – two African-American males and two white males – came to her house. (Ex. 5, Steward Dep. at 109:14-17, 170:15-24; 171:1-4). Defendant Oliver was one of the African American officers and Steward thinks that Detective Karl was also present. (Ex. 5, Steward Dep at 110:17-24; 111:1-3; 170:15-19). The police went through all of Irving's papers, wrote down telephone numbers on paper, asked for Irving's key to a safe deposit box, and took all of Irving's keys that Steward was unfamiliar with. (Ex. 5, Steward Dep. at 63:9-24; 64:1-12; 113:12-24; 114:1-8). Oliver told her that they would

---

[1] The Defendant Officers admit only for the purposes of this motion that the following interviews occurred as described.

take her kids away or arrest her for involvement if she did not cooperate. (Ex. 5, Steward Dep. at 107:13-17; 110:23-24; 111:1-3). Steward was unaware of any bank account that Irving had. (Ex. 5, Steward Dep. at 118:17-22).

46.    Approximately two days later, unknown police officers came to her house and questioned whether she had heard anything or received any phone calls about the homicides. (Ex. 5, Steward Dep. at 122:20-24, 123:1-6).

47.    Two days after Irving's funeral, unknown police officers came to Steward's house and asked her to mark anyone who wrote in the sign-in book at the funeral that she believed was suspicious. (Ex. 5, Steward Dep. at 130:16-21).

48.    Approximately one week later, unknown police officers came to Stewards house and questioned her regarding where Irving and Derrick were getting their drugs. (Ex. 5, Steward Dep. at 124:10-17).

49.    Steward was also interviewed at Area 2 by police officers that were different than the officers who questioned her in the police car on the night of the murders. (Ex.5, Steward Dep. at 80:8-18). During this interview, she told Detective Karl that she thought the murders were a hit ordered by high ranking members of the Gangster Disciples. (Ex. 5, Steward Dep. at 160:10-16). She gave the police the names of high ranking Gangster Disciples with the authority to order a hit, including naming Ant for the area he controlled. (Ex. 5, Steward Dep. at 133:18-24; 134:1-3; 136:3-24; 137-139, 160:10-16) She also gave the police Andre Kimbrough's name as the individual who provided her with the information about the hit. (Ex. 5, Steward Dep. at 133:18-134:10) Besides the information about the hit, the supplementary report concerning this interview is an accurate summary of what she said during the interview. (Ex. 5, Steward Dep. at 75:21-24;76:1-8 and Exhibit 1, Supplementary Report, attached to Steward's dep. at pg. 2).

50. At some point she told the police that one to two days before the murders she took $100,000 of Irving's money and stored it at Derrick's mom's house. (Ex. 5, Steward Dep. at 115:20-24; 116:1-4; 126:4-16).

51. Detectives Karl and Siwek recorded in a supplementary report that Steward told them that on January 29, 1994, Irving and Derrick were going to make a drug sale to Ant. (Edward Siwek January 17, 2018 deposition ("Siwek Dep.") at 147:2-10; 148:21-149:6, attached hereto as Exhibit 28; *see also* Ex. 5, Steward Dep. at 37:14-20 and Exhibit 1, Supplementary Report, attached to Steward's dep at p. 2).

**The Investigation Continues**

52. Detective Siwek interviewed James and Jeffrey Ferguson who stated that they were with Irving and Derrick shortly before the murders. (Ex. 28, Siwek Dep. at 149:20-150:15). They stated that Irving and Derrick had previously sold drugs to Ant on 64th and Cottage Grove. (Ex. 28, Siwek Dep. at 44:22-46:9; 150:20-151:1 and Exhibit 6, Supplementary Report, attached to Siwek's dep at pg. 2). Jeffrey stated that Irving and Derrick were acting strange and appeared nervous. (Ex. 28, Siwek Dep. at 150:6-10 and Exhibit 6 to Siwek's dep attached thereto at pg. 2).

53. On February 1, 1994, Detective Pesavento interviewed Ant. (Ex. 13, Pesavento Dep. at 112:18-113:4 and Exhibit 16 attached to Pesavento's dep. at p. 1) Ant stated that on the night of the shootings he closed the beeper shop and he and Plaintiff went next door to the J&J Fish Restaurant (Ex. 13, Pesavento Dep. at 112:18-113:4 and Exhibit 16, Supplementary Report, attached to Pesavento's dep thereto at p. 1-2) Ant stated that Irving and Derrick entered the J&J at approximately 8:00 p.m. and he briefly spoke to them (*Id*.) Approximately twenty minutes later, Ant heard gunshots and saw Clifford and an unknown man fighting in front of his beeper store. (Ex. 13, Pesavento Dep. at 282:18-23). Clifford ran into the J&J with a gun in his hand,

announced he was shot, and requested help. (Ex.13, Pesavento Dep. at 282:18-24; 283:1-2). Ant stated that while all this was happening Lynier was in the J&J. (Ex.13, Pesavento Dep. at 113:19-23 and Exhibit 16 attached to Pesavento's dep thereto at pg. 1-2). Ant described Plaintiff as approximately 25 years old, 6'2'', thin, with close cropped hair, and medium light in complection. (Ex.13, Pesavento Dep. at 274:17-275:1 and Exhibit 16 attached to Pesavento's dep thereto at pg. 1-2).

54. Octavia Jackson was interviewed by unidentified police officers a week after the shooting and was asked the same questions that she was asked at the J&J on the night of the shooting. (Ex.17, Jackson Dep. at 65:10-66:1, 75:22-76:12). Jackson provided these officers with the same information that she provided on the night of the shootings, namely that she heard gunshots and saw a man run into the restaurant. (Octavia Jackson Post-conviction testimony ("Jackson PC Test") at 40:6:**1**6, attached hereto as Exhibit 29; Ex. 17, Jackson Dep. at 60:8-61:10).

55. In January 1994, the FBI and Chicago police department were conducting an investigation into the illegal activities of Ant. (Memorandum re: AntBan, EB 17596-17600, attached hereto as Exhibit 30)

56. Mitchell McCullough, a gang crimes specialist detailed to an FBI task force, contacted Officers Oliver or his partner Anderson, and provided information that Lynier was most likely responsible for the shootings. (Ex. 2, Oliver Dep. at 74:21-76:11).

57. This relayed to the detectives and Officers Oliver and Anderson worked with the detectives to determine that Lynier was Plaintiff. (Ex. 13, Pesavento Dep. at 80:9-17; Ex. 2, Oliver Dep. at 97:10-22).

58.     On February 6, 1994, the police showed James Williams a photo of Plaintiff and James confirmed that Plaintiff was the person who previously lived above the J&J. (Ex. 13, Pesavento Dep. at 151:15-21 and Exhibit 11, the Clear Close Report, attached to Pesavento's dep. at p. EB 443).

59.     On February 18, 1994, the detectives learned from the CPD's forensics unit that the casings recovered from the Minerva Crime Scene were fired from the same gun as the casings recovered from the Cottage Grove Crime Scene. (Ex.13, Pesavento Dep. at 262:6-16 and Exhibit 11, the Clear Close Report, attached to Pesavento's dep at p. EB 443-444).

**Clifford's Identification of Plaintiff**

60.     Clifford was shown a photo array, which contained Plaintiff's photograph. (Motion to Suppress Identification Testimony of Angelo Pesavento ("Pesavento MtS ID Test.") at p. EB 7385:2-12, attached hereto as Exhibit 31). Frazier indicated that he would have to see the person live in order to make a positive identification. (Ex. 31, Pesavento MtS ID Test., p. EB 7385:13-19)

61.     On February 26, 1994, Plaintiff went to Area 2 and was asked to stand in a lineup (Motion to Suppress Identification Testimony of Eddie Bolden ("Plaintiff MtS ID Test."), at p. EB 7415:22-7416:19, 7418:18-22, attached hereto as Exhibit 32)

62.     While waiting for the lineup to occur, Detective Karl was informed by Plaintiff and/or his attorney, Charles Ingles, that Plaintiff made a 911 call from the J&J to report the shooting. (Charles Ingles March 19, 2018 deposition ("Ingles Dep.") at 32:2-4; 33:14-23, 47:2-16, attached hereto as Exhibit 33).

63.     The Defendant Officers (Detective Pesavento, Detective Siwek, and Officer Oliver) were not aware of the contents of the 911 call. (Ex. 13, Pesavento Dep., at 179:18-22, 182:12-18; *see also* Ex. 28, Siwek Dep., at 101:10-13; Ex. 2, Oliver Dep., at 141:11-18)

64.     While waiting for the lineup to occur in the main room of Area 2, Plaintiff saw an African American detective and two other African Americans walk past him. (Ex. 32, Pl's MtS ID Test., at EB 7417:9-14)

65.     Clifford viewed and immediately identified Plaintiff as the offender. (Ex 31, Pesavento MtS ID Test., at EB 7423; *see also* Ex. 8, Frazier Dep. at p. 23:15-24:2). However, Plaintiff testified that Clifford identified someone else initially and the detectives called out Plaintiff's name in order to change his identification. (Ex. 32, Pl's MtS ID Test. at EB 7423:5-24; 7424:1-24; 7425:1-3).

66.     Plaintiff was arrested after the lineup. (Motion to Suppress Identification Testimony of Charles Ingles (Ingles MtS. ID Test.") at p. EB0007407:4-6 attached hereto as Exhibit 34)

67.     James Beligratis, an assistant State's Attorney assigned to the felony review unit, was assigned to the double homicide to determine whether felony charges against Plaintiff were appropriate. (Criminal Trial Testimony of James Beligratis ("Beligratis Crim. Tr. Test."), at EB 7155:7-7256:11, attached hereto as Exhibit 35)

68.     Beligratis approved murder charges against Plaintiff. (James Beligratis May 21 2018 deposition ("Beligratis Dep."), at 30:8-13, attached hereto as Exhibit 36)

69.     Beligratis wrote a note in his felony review jacket that the police did not want charges approved in which Clifford would be the victim. (Ex. 36, Beligratis Dep., at p. 49:7-16 and Exhibit 4, the felony review folder, attached to Beligratis' dep.)

**Clifford's .40 Caliber Gun**

70.     Clifford's .40 caliber gun that he dropped in the J&J was inventoried under number 1266045. (Dachae Blanton June 22, 2018 deposition, ("Blanton Dep."), at 73:12-19 and Exhibit 6, the "Property Inventory Report" attached thereto, as Exhibit 37) The Property Inventory Report notes that there is blood on the weapon. (Ex. 37, Blanton Dep. at 74:9-11 and Exhibit 6, the Property Inventory Report, attached thereto) Clifford was identified as either the owner or the arrestee. (Ex. 37, Blanton Dep., at 75:13-17 and Exhibit 6, the Property Inventory Report attached thereto) The charge listed is unlawful use of a weapon. (Ex. 37, Blanton Dep., at 77:4-13 and Exhibit 6, the Property Inventory Report Attached, thereto) The arresting officers are identified as Maurice Willis and C. Kirk. (Ex. 37, Blanche Dep. at 78:10-79:2)

71.     The Property Inventory Report was produced to the Cook County State's Attorney's Office. (CCSAO 895, Property Inventory Report, attached hereto as Exhibit 38; Lynda Peters May 22, 2018 deposition ("Peters Dep.") at p. 17:4-13, attached hereto as Exhibit 39)

72.     David McCray was arrested by Maurice Willis and C. Kirk on January 30, 1994, and charged with, *inter alia*, unlawful use of a firearm. (Ex. 21, Willis Dep. at 45:5-14 and Exhibit 7, McCray Arrest Report, attached thereto) The firearm at issue in McCray's arrest was Clifford's .40 caliber gun with the property inventory number of 1266045. (*Id*.)

73.     A judge for the Circuit Court of Cook County issued a court order on March 18, 1994 directing the Evidence Recovered Property Section of the Chicago Police Department to destroy Cliff's .40 caliber gun in *People v. David McCray*. (Ex. 37, Blanton Dep., at 87:5- 89:3 and Exhibit 10, Confiscate and Destroy Order, attached thereto).

**Plaintiff's Criminal Proceedings**

74.     Detective Pesavento testified at the grand jury that the motive for the murders was retaliation against Irving and Derrick for their refusal to pay a street tax on their drug sales. (Angelo Pesavento March 23, 1994 Grand Jury Testimony ("Pesavento GJ Test.") at 7:4-13, attached hereto as Exhibit 40).

75.     On March 4, 1994, Plaintiff's criminal defense attorney, Kevin Foster, issued a subpoena to the Chicago Police Department for 9-1-1 tapes, flash messages, dispatch cards, etc., for the shootings. (Ex. 24, Foster Dep. at 95:7-96:4, and Exhibit 10, Subpoena Duces Tecum, attached thereto) Mr. Foster did not recall whether he ever received the dispatch cards. (Ex. 24, Foster Dep., at 96:22:24)

76.     Dispatch cards were used by the 911 call-takers to write down information that was being relayed by the 911 caller. (Thomas Sadler June 25, 2018 deposition ("Sadler Dep.") at 30:21-31-31:8, attached hereto as Exhibit 41)

77.     In response to Mr. Foster's subpoena, the Chicago Police Department informed him that the subpoena was sent outside of the 30-day retention period and could not be fulfilled. (Ex. 24, Foster Dep. at 97:21-99:3)

78.     The dispatch cards are not subject to a 30-day retention period. (Joseph Perfetti August 16, 2018 deposition ("Perfetti Dep.") at 128:13-129:5, attached hereto as Exhibit 42)

79.     After Mr. Foster received the Chicago Police Department's response to his subpoena concerning the 911 recording, Mr. Foster took no further steps to obtain information regarding the alleged 911 call made by Plaintiff. (Ex. 24, Foster Dep., at 99:8-11)

80.     During discovery in Plaintiff's criminal case, Mr. Foster received, *inter alia*, (1) Officer Temple's General Offense Case Report which identified Edna Williams and Octavia Jackson as witnesses and provided their contact information, (2) Detective Pesavento's

17

supplementary report dated January 30, 1994 detailing the Minerva Crime Scene Canvass, Detective Baker's interview of Clifford, and the interviews with the J&J witnesses, (3) the Interview Report of Ant, (4) the supplementary report containing the Steward and Ferguson interviews, (5) the Cleared Close Report mentioning James Williams' identification of Plaintiff's photograph. (Donna Medrek July 2, 2018 declaration ("Medrek Dec."); *see also* EB-CCPDO-000554-557, Temple's General Offense Case Report; EB-CCPDO-00239-244, the January 30th Supp. Report, EB-CCPDO-000319-320, the Interview Report of Ant, EB-CCPDO-000335-336, the Steward and Ferguson Interviews, EB-CCPDO-000331-334, the Cleared Close Report, attached hereto as Group Exhibit 43).

81.     Prior to trial, Plaintiff told Mr. Foster that Octavia Jackson was a potential alibi witness. (Kevin Foster Post-Conviction Hearing Testimony ("Foster PC Test."), at 90:2-91:2, attached hereto as Exhibit 44; Ex. 24, Foster Dep., at 38:15-39:21)

82.     During his investigation into the case, Mr. Foster interviewed Edna and James Williams on August 7, 1995. (Ex. 24, Foster Dep. at 141:19-142:12)

83.     Mr. Foster sent an investigator to interview Clifford and this investigator spoke with Clifford. (Ex. 24, Foster Dep. at 43:8-12, 53:8-12)

84.     Prior to trial, Plaintiff moved *in limine* to bar the State from presenting proof of gangs, gang retaliation, or gang affiliation. (Report of Proceedings ("ROP") October 23, 1996, at EB 6591:3-6592:14, attached hereto as Exhibit 45).

85.     Both the State and Plaintiff knew that Ant was unavailable to testify as he was in a drug-induced coma. (Ex. 45, ROP October 23, 1996, at p. EB 6592:6-23)

***The State's Case***

86. Steward, Irving's fiancée, accompanied Irving and Derrick to the J&J Fish on three occasions between August 1993 and December 1993 while they sold drugs to Ant. (Cynthia Steward Criminal Trial Testimony ("Steward Crim. Tr. Test.") at EB 6673:5-7, 6674:23-6675:19, attached hereto as Exhibit 46) On the first two occasions she, Irving, and Derrick went to Clifford's house to pick up the drugs. (Ex. 46, Steward Crim. Tr. Test., at EB 6647:10-13, 6650:10-12)

87. Clifford testified that on January 29, 1994, he was in Indiana and got back to the Chicagoland area at approximately 5:30 p.m. (Clifford Frazier Criminal Trial Testimony ("Frazier Crim. Tr. Test.") at EB 6665:18-6666:3, attached hereto as Exhibit 47).

88. At approximately 7:15 p.m., Irving and Derrick came to his house and got two kilograms of cocaine. (Ex. 47, Frazier Crim. Tr. Test., at EB 6668:13-6669:2)

89. Clifford, Derrick, and Irving drove to the J&J. (Ex. 47, Frazier Crim. Tr. Test. at EB 6670:14-20)

90. Clifford brought two guns with him – a .40 caliber and a Mac 11 – both of which were previously stored at his house. (Ex. 47, Frazier Crim. Tr. Test. at EB 6671:20-6672:10).

91. Clifford went to the Harold's Chicken and watched Derrick, Irving and Ant. (Ex. 47, Frazier Crim. Tr. Test. at EB 6674:23-6675:4)

92. After approximately five minutes, an individual exited the beeper store, entered the J&J, and shook hands with everyone. (Ex. 47, Frazier Crim. Tr. Test. at EB 6676:5-14)

93. Approximately five to ten minutes later, Derrick, Irving, and this third individual went into the Harold's Chicken. (Ex. 47, Frazier Crim. Tr. Test., at EB 6676:24-6677:8)

94.     After a conversation between Irving and Clifford, this third individual, Derrick, and Irving all exited the Harold's Chicken. (Ex. 47, Frazier Crim. Tr. Test. at EB 6681:19-21, 6682:15-20).

95.     This individual was wearing a long, light colored, shiny coat. (Ex. 47, Frazier Crim. Tr. Test. at EB 6721:1-5)

96.     Clifford identified Plaintiff in court as the third individual. (Ex. 47, Frazier Crim. Tr. Test. at EB 6682:21-6683:7)

97.     Clifford moved his car into a vacant lot next to the Harold's Chicken. (Ex. 47, Frazier Crim. Tr. Test. at 106:8-18)

98.     While standing by the front of his vehicle, Plaintiff approached him and yelled "freeze, mother fucker, don't move." (Ex. 47, Frazier Crim. Tr. Test. at 107:9-108:6)

99.     Plaintiff began shooting at Clifford. (Ex. 47, Frazier Crim. Tr. Test. at EB 6687:13-14)

100.    Clifford was shot in his leg and his back. (Ex. 47, Frazier Crim. Tr. Test. at 6688:4-5).

101.    Clifford began shooting at Plaintiff. (Ex. 47, Frazier Crim. Tr. Test. at 110:17-19)

102.    Plaintiff hit Clifford with Clifford's gun repeatedly on top of his head. (Ex. 47, Frazier Crim. Tr. Test. at EB 6691:16-21) Plaintiff dropped Clifford's gun and ran south down Cottage Grove. (Ex. 47, Frazier Crim. Tr. Test. at EB 6692:5-13)

103.    Clifford grabbed his gun and went into the J&J. (Ex. 47, Frazier Crim. Tr. Test. at EB 6692:14-18)

104.    Clifford admitted that he spoke with police personnel at the J&J, at the hospital, and he continued to speak with the police in the weeks after the shooting. (Ex. 47, Frazier Crim. Tr. Test. at EB 6693:20-6694:16, 6695:17-20)

105.    On February 26, 1994, Clifford viewed a lineup and identified Plaintiff as the individual who got in the car with Derrick and Irving. (Ex. 47, Frazier Crim. Tr. Test. at EB 6697:2-19)

106.    During cross-examination, Clifford admitted that Derrick and Irving stored the cocaine at his apartment. (Ex. 47, Frazier Crim. Tr. Test. at EB 6709:3-9) Clifford also stored more than two guns at his apartment. (Ex. 47, Frazier Crim. Tr. Test. at EB 6712:5-7)

107.    Clifford admitted there was four kilograms of cocaine in his bedroom closet on the night of the murders. (Ex. 47, Frazier Crim. Tr. Test. at EB 6712:2-7)

108.    Clifford admitted that days after the shooting, he viewed a photo array and did not make an identification. (Ex. 47, Frazier Crim. Tr. Test. at EB 6741:23-6742:6)

109.    Clifford admitted to guarding the cocaine on the night of the shootings. (Ex. 47, Frazier Crim. Tr. Test. at EB 6750:21-24; 6752:16-23)

110.    Clifford admitted that he was never charged with the cocaine, that he turned the remaining drugs in after the shooting, and that he was not arrested and charged with a crime in relation to this case. (Ex. 47, Frazier Crim. Tr. Test. at EB 6755:4-24; 6756:15-17) No promises were made in exchange for his testimony. (Ex. 47, Frazier Crim. Tr. Test. at EB 6762:3-7). Clifford was cross-examined about the differences in Plaintiff's appearance compared to a sketch the F.B.I completed based on a description given by Clifford. (Ex. 47, Fraizer Crim. Tr. Test. at EB 6743:11-6744:14).

111.    Lee Williams testified that on January 29, 1994, at approximately 8:00 p.m., at his home at 6546 South Minerva, he heard a series of gunshots. (Lee Williams Crim. Tr. Test. ("Lee Crim. Tr. Test.") at EB 6766:14-17; 6767:11-24; 6768:1-7, attached hereto as Ex. 48)

112.    Lee Williams observed an individual exit a car, which was stopped a little north of his house, and observed that person walk north on Minerva. (Ex. 48, Lee Crim. Tr. Test. at EB6770:7-24; 6771:7-11)

113.    Richard Chenow, a firearms expert, microscopically compared the three nine millimeter cartridge cases recovered from the Minerva Crime Scene with the five nine millimeter cartridge cases recovered from the Cottage Grove Crime Scene and concluded that the discharged cartridge cases were all fired from the same weapon. (Richard Chenow Criminal Trial Testimony ("Chenow Tr. Test.) at EB 6888:14-24; 6889:1-3, attached hereto as Exhibit 49).

114.    Defendant Oliver was not called as a witness by either the State or Plaintiff at Plaintiff's criminal trial. (Ex. 45, ROP October 23, 1996 at EB 6581:4-15; and ROP October 24, 1996 at EB 6804, ROP October 28, 1996 at EB 6998:3-9, ROP October 29, 1996 at EB 7119:2-14, attached hereto as Group Exhibit 50).

*Plaintiff's Case*

115.    Detective Baker testified that during his interview with Clifford at Christ Hospital, Clifford did not tell him (a) that he accompanied Irving and Derrick into the J&J and was told to leave because he had a gun, (b) that he saw an individual come from the beeper store into the J&J and shake hands with Ant, Irving, and Derrick, (c) that Irving, Derrick, and the third individual came into the Harold's chicken store that he was in, (d) that the third individual was "eyeballing" him in the Harold's chicken, (e) that the third individual asked for change for a dollar at the Harold's chicken, (f) that he would give the offender the drugs if the offender let

22

him live, and (g) that the offender put the gun to his head. (Ex. 25, Baker Crim. Tr. Test. at EB 7019:9-24; 7021:5-8; 7022:2-13; 7025:20-24; 7026:1-3; EB 7028:1-4)

116.    Detective Baker testified that Clifford described the offender as a light complected male black, approximately 20-21 years old, 6 feet tall, skinny, clean shaven, and wearing a heavy light colored winter coat. (Ex. 25, Baker Crim. Tr. Test., EB 7031:8-15)

117.    Officer Temple testified that she interviewed Clifford for approximately five to ten minutes at the Cottage Grove Crime Scene and Clifford was unable to give her a description of the offender. (Ex. 15, Temple Crim. Tr. Test. at EB 7037:6-10; 7038:2-7; EB 7041:14-17)

118.    Tenesha Gatson, an employee of the Williams family at the J&J, testified that Plaintiff was inside the restaurant when Clifford ran into the restaurant and had been in the restaurant for an hour before Clifford ran in. (Ex. 27, Gatson Crim. Tr. Test., at EB 7051:8-24; 7054:16-24: 7055:1-4) Gatson testified that Plaintiff was tall, skinny, had a receding hairline, and his skin tone was brown, not light. (Ex. 27, Gatson Crim. Tr. Test. at EB 7062:9-24; 7063:1-2; 7067:1-3)

119.    Edna Williams testified that when Clifford ran into the J&J, Plaintiff was in the restaurant. (Edna Williams Criminal trial testimony, ("Edna Crim. Tr. Test") at EB 7081:8-24: 7082:1-2), attached hereto as Exhibit 51).

120.    When Edna spoke to the police at the station, she told them that she saw the man run into the restaurant with a gun saying that he was shot in the back. (Ex. 51, Edna Crim. Tr. Test. at EB 7088:19-22; 7089:20-24: 7090:1) Enda admitted that she told the police that she could add nothing to the investigation. (Ex. 51, Edna Crim. Tr. Test. at EB 7091:10-14).

**Plaintiff's Relationship with the Williams Family**

121. Plaintiff and Ant were childhood friends, who grew up together in Stateway Gardens. (Ex. 51, Edna Crim. Tr. Test. at EB 7087:2-11; *see also* Ex. 7, Bolden Dep., at 13:2-16, 25:20-26:12)

122. Plaintiff became a Gangster Disciple in 1985. (Ex. 7, Bolden Dep., at 29:7-9)

123. In 1985, at the direction of two Gangster Disciple leaders at Stateway Gardens, Plaintiff shot and killed Lafereye Boyd. (Ex. 7, Bolden Dep., at 70:22-71:4, 71:17-72:5, 81:1-10, 98:8-10) Plaintiff was convicted of involuntary manslaughter for this shooting. (Ex. 7, Bolden Dep., at 98:5-10)

124. Ant operated the beeper store that was located next to the J&J. (Ex. 6, Edna Dep., at 15:7-15) He also worked the night shift at the J&J. (Ex. 6, Edna Dep., at 30:15-18)

125. After Plaintiff was released from prison in 1992 on his involuntary manslaughter case, he worked at the J&J. (Ex. 7, Bolden Dep., at 98:5-15, 100:10-101:1)

126. In the summer of 1993, Plaintiff moved into an apartment above the J&J. (Ex. 7, Bolden Dep., at 102:2-8)

127. Prior to the shootings, Ant gave Plaintiff drugs on four or five separate occasions and Plaintiff subsequently sold the drugs, through an intermediary, at the Stateway Gardens. (Ex. 7, Bolden Dep., at 120:6-121:20)

128. On prior occasions when Irving and Derrick went to the J&J to sell drugs to Ant, if Ant was not present, then Irving and Derrick would deal with Plaintiff. (Ex. 5, Steward Dep., at 60:8-61:12)

129. On January 28, 1994, the day before the murders, while at Ant's beeper store, Ant offered Plaintiff $20,000.00 to lure two individuals, one of whom was another governor of the

24

Gangster Disciples, out of a party where they would be killed. (Ex. 7, Bolden Dep. at 55:6-56:16, 68:20-69:2)

130.    Ant is deceased. (Louis Williams March 27, 2108 deposition ("Louis Dep."), at 35:7-22, attached hereto as Exhibit 52).

**Plaintiff's Theory of the Shooting[2]**

131.    Plaintiff knew that Ant was involved in the shootings that occurred on January 29, 1994. (Ex. 7, Bolden Dep. at 222:11-14)

132.    At the time of the shooting, Octavia Jackson, who Plaintiff knew as someone who worked at Ant's beeper store, was in the J&J Fish Restaurant. (Ex. 7, Bolden Dep., at 139:3-13)

133.    Plaintiff, who was in the J&J Fish Restaurant, saw two individuals – Roderick Stewart and Clifford - fighting outside of the restaurant. (Ex. 7, Bolden Dep., at 147:8-21)

134.    After Roderick walked away from the J&J, Clifford entered and asked Ant, "Did you get the shit." (Ex. 7, Bolden Dep., at 152:10-153:6) Ant said "no" and then pulled a gray car alarm remote out, wiped off his fingerprints, and handed it to Clifford. (Ex. 7, Bolden Dep., at 152:10-153:6) Both Ant and Clifford then looked at Plaintiff. (Ex. 7, Bolden Dep. at 152:10-153:6)

135.    When the police arrived at the J&J, Ant was staring at Clifford. (Ex. 7, Bolden Dep., at 172:15-16) The police told Clifford that two other people were found in a gray Chevy a few blocks away, and Clifford confirmed that he knew those victims. (Ex. 7, Bolden Dep., at 172:24-173:7) Clifford was asked who Irving and Derrick left with and Clifford looked at Ant and told the police to ask Ant. (Ex. 7, Bolden Dep., at 172:24-173:18) Ant folded his arms across

---

[2] The Defendant Officers admit that the following recounting of the events is the Plaintiff's theory of what happened, the Defendant Officers dispute that Plaintiff's theory is truthful or accurate.

his chest and stared at Clifford. (Ex. 7, Bolden Dep. at 172:24-173:18) Clifford then told the

police he would know the person when he saw him. (Ex. 7, Bolden Dep., at 172:24-173:18)

**Discovery in the Current Case**

136.    The investigative file control card was not produced in this litigation. (Deposition

of Patrick Loftus ("Loftus Dep.") at p. 141:4-6, attached hereto as Exhibit 53)

137.    The investigative file control card was a green card attached to the investigative

file. Detectives had to sign their names and date whenever they temporarily took out and

returned the investigative file. (Ex. 53, Loftus Dep. at 68:12-22, 138:4-140:2)

138.    Octavia Jackson testified that when the shooting and fight occurred outside the

J&J, Plaintiff was inside the J&J. (Ex. 29, Jackson PC Test." at 6:20-7:23, 13:23-14:10) The first

time that Jackson told anyone this was in 2012 when she spoke with Plaintiff's investigator. (Ex.

29, Jackson PC Test., at 8:23-9:10, 9:24-11:12; 12:21-14:10; *see also* Ex. 3, *People v. Bolden*, 94

CR 8397, Order, p. 15, (Cir. Ct. Cook County, Jan. 21, 2016))

139.    James Williams testified that Plaintiff was inside the restaurant when the man ran

into the restaurant. (James Williams April 10, 2018 deposition ("James Dep.") at 69:5-9,

attached hereto as Exhibit 54).

140.    Mr. Foster does not know whether all documents received in response to

subpoenas would be contained in the public defender's file. (Ex. 24, Foster dep at 97:6-12).

141.    Mr. Foster testified that he would not have had Clifford .40 Caliber gun tested for

DNA or fingerprints because the testing might have inculpated Plaintiff. (Ex. 24, Foster PC Test.

at EB 12080:6-15).

Respectfully submitted,

/s/ *Barrett Boudreaux*
One of the Attorneys for Defendant

Officers

Andrew M. Hale
Amy A. Hijjawi
Barrett Boudreaux
Brian J. Stefanich
Jennifer Bitoy
HALE LAW LLC
53 W. Jackson, Suite 330
Chicago, IL 60604