**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EDDIE L. BOLDEN, | |
| Plaintiff, | |
| v. | No. 1:17-cv-00417 |
| CITY OF CHICAGO, JAMES OLIVER, ANGELO PESAVENTO and EDWARD SIWEK, | The Honorable Manish S. Shah Magistrate Judge Susan E. Cox |
| Defendants. | |

**DEFENDANT CITY OF CHICAGO'S ANSWER
TO PLAINTIFF'S THIRD AMENDED COMPLAINT**

Defendant City of Chicago ("City"), by its undersigned counsel, and in response to the

Third Amended Complaint ("TAC") filed by Plaintiff Eddie Bolden. ("Plaintiff"), answers as

follows:

**INTRODUCTION**

1.    Plaintiff Eddie L. Bolden spent 22 years, 1 month, and 22 days in prison for crimes he did not commit. Mr. Bolden was wrongfully convicted for the murders of Derrick Frazier and Ledell Clayton and the attempted murder of Clifford Frazier. Mr. Bolden received a natural life sentence for the murders, to run consecutively with a thirty-year sentence for the attempted murder. This miscarriage of justice was the direct result of police misconduct in accordance with the pattern and practice of the Chicago Police Department.

**ANSWER:**

The City admits that Plaintiff spent 22 years in prison. The City admits that Plaintiff

received a natural life sentence for the murders, to run consecutively with a thirty-year sentence

for attempted murder. The City denies the remaining allegations contained in Paragraph 1.

2.    Not a single piece of physical or forensic evidence linked Mr. Bolden to these crimes. Instead, Mr. Bolden's wrongful conviction rested solely upon evidence fabricated by Defendant Officers, including Clifford Frazier's false identification of Mr. Bolden during a tainted live lineup. The tainted lineup was intentionally engineered by the Defendants pursuant to the City of Chicago's widespread practices at the time, which encouraged "solving" crimes at all

costs, regardless of a suspect's guilt or innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 2.

3.      The Defendants, determined to frame Mr. Bolden for these crimes and "close" the case, engineered the tainted live lineup *after* Clifford Frazier described his attacker as someone who looked nothing like Mr. Bolden and *after* Clifford Frazier failed to identify Mr. Bolden as his attacker on two separate occasions—first, at the crime scene in the aftermath of the shooting and then in a photo array provided by the police. Several weeks later, having no evidence at this point implicating Mr. Bolden in the shootings, Defendant Officers intentionally walked Clifford Frazier past Mr. Bolden in the stationhouse immediately before the live lineup, physically blocked Mr. Bolden's attorney from viewing the lineup, and called Mr. Bolden by name during the lineup to ensure Clifford Frazier's false identification.

**ANSWER:**

The City admits that Plaintiff's attorney was not permitted to enter a lineup viewing

room. The City denies all allegations not expressly admitted in Paragraph 3.

4.      In addition to engineering the false lineup identification, Defendant Officers intentionally caused and secured Mr. Bolden's wrongful conviction by offering perjured testimony at trial about the propriety of the lineup, by disregarding and failing to investigate credible eye- witness statements and other evidence that would have cleared Mr. Bolden of all charges, and by destroying, withholding, and failing to preserve in bad faith critical information and evidence that proved Mr. Bolden's innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 4.

5.      Now exonerated and granted a Certificate of Innocence, Mr. Bolden brings this lawsuit to redress the injustice and hardship that Defendants inflicted upon him through their misconduct.

**ANSWER:**

The City admits that Plaintiff has been granted a Certificate of Innocence and that Bolden

brought a lawsuit. The City denies all allegations not expressly admitted in Paragraph 5.

### Jurisdiction and Venue

6.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the deprivation of Mr. Bolden's rights secured by the United States Constitution.

**ANSWER:**

The City admits that this action is purportedly brought under 42 U.S.C. § 1983 and Illinois law. The City denies that Plaintiff has had any deprivation of rights and denies all allegations not expressly admitted in Paragraph 6.

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**

The City admits the allegations contained in Paragraph 7.

8.     Venue is proper under 28 U.S.C. § 1391(b) because Mr. Bolden resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events and omissions giving rise to Mr. Bolden's claims occurred within this judicial district.

**ANSWER:**

The City lacks sufficient information regarding Bolden's residence to admit or deny these allegations, and on that basis denies same. The City admits the remaining allegations contained in Paragraph 8.

**The Parties**

9.     Plaintiff Eddie L. Bolden is 48 years old and lives in Maywood, Illinois. At the time of his conviction, he was just 27 years old and had his whole life ahead of him.

**ANSWER:**

The City admits that Plaintiff is 48 years old and was 27 years old at the time of his conviction. The City lacks sufficient information  to admit or deny that Bolden lives in Maywood, Illinois and on that basis denies same. The City denies all allegations not expressly admitted in Paragraph 9.

10.     At all relevant times, Defendants James Oliver, Angelo Pesavento, and Edward Siwek were duly sworn Chicago Police Officers employed by Defendant City of Chicago and acting within the scope of their employment and under color of law. These Defendants are referred to as the "Defendant Officers."

**ANSWER:**

The allegations in Paragraph 10 regarding the Defendants acting within the scope of their employment and under color of law state legal conclusions to which no response is required. To the extent a response is deemed to be required, the City denies same. The City admits the remaining allegations contained in Paragraph 10.

11.     Defendants Pesavento and Siwek and George Karl were detectives in the Chicago Police Department's Area 2 Violent Crimes Unit. On January 29, 1994, Defendants Pesavento and Siwek and George Karl (hereinafter collectively "the Assigned Detectives") were assigned to investigate the shootings of Derrick Frazier, Ledell Clayton, and Clifford Frazier (hereinafter "the Investigation"). Oliver was tasked with assisting the Assigned Detectives with the investigation.

**ANSWER:**

The City admits the allegations contained in Paragraph 11.

12.     The Assigned Detectives were responsible for conducting and managing the investigation and making the decision to arrest Mr. Bolden. They also were responsible for (1) preserving evidence, (2) interviewing the victim and all witnesses to the crimes present at the crime scenes, (3) searching the crime scenes to discover additional physical evidence, (4) canvassing the areas adjacent to the crime scenes to identify additional witnesses, (5) preparing reports to record all substantive information learned during the investigation, (6) ensuring that all information obtained during the investigation was included in the case file, and (7) investigating any information obtained about the case.

**ANSWER:**

The City denies that Plaintiff has accurately stated the duties of each and every assigned detective and therefore denies the allegations in paragraph 12.

13.     Defendant Pesavento was one of the detectives assigned to investigate the shootings. He investigated the crime scenes, interviewed key witnesses, presented the photo lineup to Clifford Frazier, and ran the subsequent tainted live lineup. He participated in Mr. Bolden's arrest and post-arrest interview. He also was the point of contact for the firearms examiners and subsequently informed the State's Attorney's Office prior to Mr. Bolden's trial that the Chicago Police Department destroyed the two guns that Clifford Frazier brought to the scene of the shootings, despite a request from Mr. Bolden's counsel that they be preserved.

**ANSWER:**

The City denies that Defendant Pesavento ran a tainted live lineup. The City also denies

that Defendant Pesavento "informed the State's Attorney's Office prior to Mr. Bolden's trial that the Chicago Police Department destroyed the two guns that Clifford Frazier brought to the scene of the shootings, despite a request from Mr. Bolden's counsel that they be preserved." The City admits the remaining allegations contained in Paragraph 13.

14.     Defendant Siwek was one of the detectives assigned to investigate the shootings. He interviewed key witnesses and ran the tainted lineup. He participated in Mr. Bolden's arrest and post-arrest interview.

**ANSWER:**

The City denies that the lineup at which Plaintiff was identified as Clifford Frazier's assailant was tainted. The City admits the remaining allegations in Paragraph 14.

15.     Defendant James Oliver was a Gang Crimes Specialist who investigated one of the crime scenes and subsequently gathered intelligence for the Assigned Detectives. He participated in key witness interviews, including Clifford Frazier's interview, and the tainted lineup. He also helped coordinate or was otherwise involved when the FBI and Clifford Frazier created a sketch of the perpetrator, which looked nothing like Mr. Bolden. He participated in Mr. Bolden's arrest.

**ANSWER:**

The City admits that Defendant Oliver was a Gang Crimes Specialist who investigated one of the crime scenes and gathered intelligence. The City admits Defendant Oliver interviewed Clifford Frazier. The City denies the remaining allegations contained in Paragraph 15.

16.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of each of the Defendant Officers.

**ANSWER:**

The City admits the allegations contained in Paragraph 16.

## FACTUAL BACKGROUND

### The Murder of Derrick Frazier and Ledell Clayton

17.     On the evening of January 29, 1994, Derrick Frazier, Ledell Clayton, and Clifford Frazier, brother of Derrick Frazier, were attempting to sell multi-kilograms of cocaine to a buyer. Clifford Frazier acted as security for this drug deal and routinely stored his brother's guns and

drugs for the drug operation in his apartment.

**ANSWER:**

The City admits that Derrick Frazier, Ledell Clayton, Clifford Frazier, brother of Derrick Frazier were attempting to sell multi-kilograms of cocaine to Bolden on the evening of January 29, 1994. The City lacks sufficient information to admit or deny the remaining allegations in paragraph 17 and on that basis denies same.

18.     According to Clifford Frazier, on the evening of January 29, he kept lookout while Derrick Frazier and Ledell Clayton entered the J & J Fish restaurant near 64th and Cottage Grove. He then saw another man enter the restaurant (hereinafter referred to as "Drug Dealer 4") and, after a few minutes, Derrick Frazier, Ledell Clayton, and Drug Dealer 4 drove off in Derrick Frazier's car.

**ANSWER:**

The City admits that Clifford Frazier kept lookout while Derrick Frazier and Ledell Clayton entered J & J Fish restaurant near 64th and Cottage Grove and Derrick Frazier, Ledell Clayton, and a third individual whom on information and belief was Eddie Bolden, drove off in Derrick Frazier's car. The City denies the remaining allegations contained in Paragraph 18.

19.     According to Clifford Frazier, Derrick Frazier and Ledell Clayton allowed Drug Dealer 4 to enter and sit in the backseat of their car while they sat in front. Mr. Bolden had never met either Derrick Frazier or Ledell Clayton.

**ANSWER:**

The City admits that Derrick Frazier and Ledell Clayton allowed the third individual whom on information and belief was Eddie Bolden, to enter and sit in the backseat of the car while they sat in front. The City denies the remaining allegations contained in Paragraph 19.

20.     Once in the backseat of the car, Drug Dealer 4 purportedly shot and killed Derrick Frazier and Ledell Clayton while their car was parked at 6546 S. Minerva. He also purportedly returned to the original scene and exchanged gunfire with Clifford Frazier. Clifford Frazier was shot in the back and ran into J & J Fish to seek help.

**ANSWER:**

The City admits that Bolden committed the acts described in Paragraph 20.

21.     At all times during the criminal activity described above, Mr. Bolden was in J & J Fish playing a video game. In fact, Mr. Bolden was still present in J & J Fish when Clifford Frazier entered the store seeking assistance after he was shot, and Mr. Bolden used the telephone inside J & J Fish to call 911 seeking assistance for Clifford Frazier.

**ANSWER:**

The City denies the allegations contained in Paragraph 21.

22.     After Clifford Frazier entered J & J Fish and Mr. Bolden called 911, numerous Chicago Police Department officers and detectives, including George Karl and Defendants Pesavento and Oliver, went to the restaurant, collected evidence, and interviewed several witnesses, *including Mr. Bolden*. None of the witnesses identified Mr. Bolden or anyone matching Mr. Bolden's description as the man who had engaged in the gunfight with Clifford Frazier.

**ANSWER:**

The City admits that after Clifford Frazier's entrance into J & J Fish, numerous Chicago

Police Department officers and detectives, including George Karl, Pesavento, and Oliver entered

the restaurant, collected evidence, and interviewed several witnesses. The City denies all

allegations not expressly admitted in Paragraph 22.

23.     To the contrary, Tenesha Gatson, an employee at J & J Fish, told Defendant Pesavento and the other Defendant Officers shortly after the shootings that a man she knew as "Lynier" (later identified as Mr. Bolden) arrived at the restaurant earlier that evening and was still in the restaurant when Clifford Frazier entered the restaurant seeking help.

**ANSWER:**

The City admits that Tenesha Gatson informed Chicago police personnel that someone

she identified as "Lynier" was in J & J Fish during the shooting of Clifford Fraizer. The City

denies all allegations not expressly admitted in Paragraph 23.

24.     Anthony Williams, another eyewitness to the events at J & J Fish, also told Defendants Pesavento and Siwek and George Karl prior to Mr. Bolden's arrest that Mr. Bolden was in the restaurant when Clifford Frazier was fighting with the perpetrator outside and when Clifford Frazier entered the restaurant seeking help.

**ANSWER:**

The City admits the allegations contained in Paragraph 24.

25.     A patrol officer named Barbara Temple interviewed both Mr. Bolden and Clifford Frazier at the restaurant, and Defendant Oliver and a detective named Michael Baker interviewed Clifford Frazier again in the hospital. Clifford Frazier said he got a "good look" at the shooter and described him as clean-shaven with a light complexion. He further stated that the shooter had low- cut hair and was 6 feet tall, with a medium build. In stark contrast, Mr. Bolden was 6 feet 2 inches tall, very thin, bald, and had a dark complexion and mustache. In other words, Clifford Frazier gave a description of someone other than Mr. Bolden. Furthermore, Clifford Frazier did not point out Mr. Bolden as the shooter when they were in the restaurant together after the shooting.

**ANSWER:**

The City admits Temple interviewed Clifford Frazier at the restaurant, and Defendants

Baker and Oliver interviewed Clifford Frazier at the hospital and Frazier stated that he got a

good look at the shooter. The City denies the remaining allegations contained in Paragraph 25.

26.     Clifford Frazier subsequently met with an FBI sketch artist who created a sketch of the perpetrator based on Clifford Frazier's description; that sketch looked nothing like Mr. Bolden. Defendant Oliver was involved in coordinating the creation of the sketch, and Defendant Pesavento, George Karl, and the other Defendant Officers saw the sketch prior to arresting Mr. Bolden.

**ANSWER:**

The City denies that Defendant Oliver was involved in coordinating the creation of the

sketch. The City admits the remaining allegations in paragraph 26.

27.     Defendant Pesavento and George Karl then presented Clifford Frazier with a five-person photo spread, which included a photograph of Mr. Bolden. Clifford Frazier told Defendant Pesavento and George Karl that he was unable to identify anyone in the photos as the perpetrator.

**ANSWER:**

The City admits that Clifford Frazier was presented with a five- person photo spread,

which included a photograph of Mr. Bolden. The City denies the remaining allegations contained

in Paragraph 27.

28.     Not only did the police investigation yield zero witness statements linking Mr. Bolden to the crime, it yielded absolutely no physical or forensic evidence implicating Mr. Bolden. There were no fingerprints, no blood, no DNA – there was simply nothing connecting Mr. Bolden to the murders.

**ANSWER:**

The City admits that the police investigation did not yield any evidence of fingerprints or

DNA. The City denies all allegations not expressly admitted in Paragraph 28.

### Fabrication of Evidence Against Mr. Bolden

29.     Undaunted by the lack of evidence against Mr. Bolden, Defendant Officers set out on their mission – pursuant to the pattern and practice in the Chicago Police Department at the time – to close the case at all costs. In this case, that meant framing Mr. Bolden for a crime he did not commit.

**ANSWER:**

The City denies the allegations contained in Paragraph 29.

30.     On January 31, 1994, Defendant Siwek and George Karl obtained information from three sources who all identified Anthony Williams (a/k/a "Ant") as the potential buyer of the cocaine that Derrick Frazier and Ledell Clayton attempted to sell on January 29 prior to being murdered. Mr. Williams' parents owned J & J Fish. None of these sources mentioned Mr. Bolden or his nickname "Lynier."

**ANSWER:**

The City admits that information was obtained from sources who identified Anthony

Williams (a/k/a "Ant") as the potential buyer of the cocaine that Derrick Frazier and Ledell

Clayton attempted to sell on January 29 prior to being murdered, and that Anthony Williams'

parents operated the J & J Fish. The City denies all allegations not expressly admitted in

Paragraph 30.

31.     Since Defendant Officers did not have evidence linking Mr. Bolden to the shootings, Detective William Higgins created and signed off on a report, dated January 31, 1994, which falsely stated that Clifford Frazier[2] told officers from the 3rd District that "Lanier was

---

[2] The report initially stated that the information was provided by Derrick Frazier, who was deceased at the time. This was a typographical error and the report was intended to convey that this information was provided by Clifford Frazier.

with Anthony Williams prior to the double murder." Upon information and belief, the portion of the report referring to "Lanier" was fabricated. When Clifford Frazier gave his statements to Detective Baker and Defendant Oliver on January 29, he provided information about "Ant," but he never mentioned the name "Lynier." Additionally, when Clifford Frazier testified at Mr. Bolden's trial in 1996, he never testified about hearing the name "Lynier" prior to the shootings.

**ANSWER:**

The City denies the allegations contained in Paragraph 31.

32.     The only witness who had truly provided the name "Lynier" before January 31 was Tenesha Gatson, who told Defendant Pesavento and the other Defendant Officers that "Lynier" was with Anthony Williams inside J & J Fish earlier in the evening on January 29, but she also stated that "Lynier" was still inside J & J Fish when the shooting between Clifford Frazier and the perpetrator took place outside the store. In other words, she said that Lynier was nearby at the time of the shooting and was not the shooter.

**ANSWER:**

The City admits that Tenesha Gatson told investigating Officers that Lynier was with

Anthony Williams inside J&J Fish earlier in the evening on January 29, 1994. The City denies all

allegations not expressly admitted in Paragraph 32.

33.     Defendant Pesavento and George Karl also fabricated information in their progress report, dated January 30, 1994, to make the case against Mr. Bolden look stronger than it was and their investigation more thorough than it was, including that Gatson described Lynier as being light complected (to be consistent with Frazier's description of the shooter) and that Enda and James Williams, who were inside J & J Fish when Clifford Frazier ran into the store, denied witnessing anything. The report also included information purportedly provided by Clifford Frazier that was not reflected in the notes of his interview and omitted material information that he provided.

**ANSWER:**

The City denies the allegations contained in Paragraph 33.

34.     On February 1, 1994, Defendants Pesavento and Siwek and George Karl conducted their one and only interview of Anthony Williams. Despite the fact that Williams was identified as being involved in the January 29 drug deal with Derrick Frazier and Ledell Clayton by multiple sources and despite the fact that Williams admitted to the detectives that he met with Derrick Frazier and Ledell Clayton earlier that evening, shortly before they were killed, the detectives inexplicably failed to ask Williams the obvious follow up question of why he met with the victims. Defendant Officers also never asked Williams a single question about his knowledge of or involvement in the drug deal and the shootings. Defendant Oliver also spoke to Williams on the evening of January 29, but he too failed to ask Williams these questions.

**ANSWER:**

The City admits that on February 1, 1994 Anthony Williams was interviewed by police officers. The City admits that Williams was identified as being involved in the January 29 drug deal with Derrick Frazier and Ledell Clayton. The City denies the remaining allegations contained in Paragraph 34.

35.     Defendants Pesavento and Siwek and George Karl also failed to ask Williams obvious and basic questions about "Lynier," the person they purportedly suspected of being the perpetrator. Williams, like Gatson, told the detectives that "Lynier" was present inside J & J Fish at the time Clifford Frazier was fighting with the perpetrator on the street outside the restaurant. In other words, "Lynier" was not the shooter. After receiving this information from Williams, the detectives failed to ask Williams any questions to challenge it. They never asked Williams about what Lynier was doing inside J & J Fish, whether he was meeting with Williams, and if so, for what purpose.

**ANSWER:**

The City denies the allegations contained in Paragraph 35.

36.     Despite having no evidence at this point linking Mr. Bolden to the shootings and having identified two alibi witnesses for Mr. Bolden, the detectives began trying to build a case against Mr. Bolden and failed to investigate any other potential suspects.

**ANSWER:**

The City denies the allegations contained in Paragraph 36.

37.     On February 3, 1994, Detective Pesavento and George Karl showed a photo array, which included a photo of Mr. Bolden, to Clifford Frazier. Clifford Frazier did not recognize any of the depicted individuals and did not identify Mr. Bolden as the person who shot him.

**ANSWER:**

The City admits that on February 3, 1994, Detectives Pesavento and Karl showed a photo array, which included a photo of Mr. Bolden, to Clifford Frazier. The City admits that Clifford Fraizer did not identify anyone, stating that he wanted to see his attacker in person prior to making an identification. The City denies all allegations not expressly admitted in Paragraph 37.

38.     Detective Kill and another detective subsequently went to Mr. Bolden's mother's residence and interviewed her about Mr. Bolden's whereabouts. Detective Kill told Mr. Bolden's

mother that he wanted to question Mr. Bolden about the murders and that if Mr. Bolden did not turn himself in Detective Kill would "blow his brains out." When the detectives refused to leave, Mr. Bolden's mother threatened to call the police. Detective Kill snatched the phone from her hands and responded, "We are the police."

**ANSWER:**

The City denies the allegations contained in Paragraph 38.

39.     Mr. Bolden subsequently hired attorney Charles Ingles to represent him in his interactions with the police in connection with this investigation. Ingles agreed to make Mr. Bolden available for questioning at Area 2's headquarters.

**ANSWER:**

The City admits the allegations contained in Paragraph 39.

40.     There was no arrest warrant for Mr. Bolden at the time he voluntarily agreed to answer the detectives' questions.

**ANSWER:**

The City admits the allegations contained in Paragraph 40.

41.     On February 26, 1994, Ingles accompanied Mr. Bolden to Area 2 headquarters. Defendant Pesavento and George Karl directed Ingles and Mr. Bolden to a waiting area. While they were standing in this area, Defendant Oliver walked Clifford Frazier directly past Mr. Bolden and Ingles so that Clifford Frazier could see Mr. Bolden.

**ANSWER:**

The City admits that on February 26, 1994, Charles Ingles accompanied Plaintiff to

Area 2 headquarters and that Defendant Pesavento and George Karl directed Ingles and

Mr. Bolden to a waiting area. The City denies the remaining allegations contained in

Paragraph 41.

42.     Defendant Officers subsequently asked Mr. Bolden to participate in a lineup. Mr. Bolden agreed to participate in the lineup so long as Defendant Officers allowed Ingles to observe. Defendant Officers agreed to this condition and promised Ingles that he would be allowed to observe the lineup.

**ANSWER:**

The City admits that Plaintiff was asked by some of the Defendant Officers to participate

in a lineup and that Plaintiff agreed to participate in the lineup. The City denies the remaining

allegations contained in Paragraph 42.

43.     Mr. Bolden joined the other participants in the lineup room. Joseph Barnes, a tactical officer, acted as a participant/filler in the lineup.

**ANSWER:**

The City admits the allegations contained in Paragraph 43.

44.     As Clifford Frazier entered the adjacent room, where witnesses view the persons participating in the lineup, Ingles attempted to follow Frazier into the viewing room as agreed, but Defendant Pesavento physically blocked his path and prevented him from entering the room.

**ANSWER:**

The City admits that Charles Ingles was not allowed to enter the viewing room. The City

denies the remaining allegations contained in Paragraph 44.

45.     With Ingles successfully neutralized, Defendant Officers ensured that Clifford Frazier would not fail to identify Mr. Bolden again. Twice during the lineup, and in the presence of Clifford Frazier, George Karl asked Mr. Bolden (whom Clifford Frazier had just seen in the waiting room), "You, Eddie Bolden, right?" Defendants Pesavento and Siwek witnessed Karl's actions and allowed the lineup to proceed. Defendants Pesavento and Oliver directed Clifford Frazier to select Mr. Bolden after Frazier originally identified a filler.

**ANSWER:**

The City denies the allegations contained in Paragraph 45.

46.     Pursuant to the Chicago Police Department's policy at the time, prior to both the photo spread and live lineup, the detectives involved in conducting the photo spread and lineup should have given Clifford Frazier an instruction form and had him sign the form certifying his receipt. The form that they should have provided to him stated that "the suspect might not be in the lineup or photo spread and the eyewitness is not obligated to make an identification. The eyewitness should not assume that the person administering the lineup or photo spread knows which person is the suspect in the case." Defendant Officers failed to provide Clifford Frazier with this form or the warnings on the form.

**ANSWER:**

The City admits that pursuant to the Chicago Police Department's policy at the time,

prior to both the photo spread and live lineup, the detectives involved in conducting the photo

spread and lineup were to give Clifford Frazier an instruction form and had him sign the form certifying his receipt; the form stated that "the suspect might not be in the lineup or photo spread and the eyewitness is not obligated to make an identification. The eyewitness should not assume that the person administering the lineup or photo spread knows which person is the suspect in the case;" and Defendant Officers did not give Plaintiff that form. The City denies the remaining allegations contained in Paragraph 46.

47.    As a result of the intentional efforts of Defendant Officers to engineer a suggestive and tainted lineup and a resulting false identification, Clifford Frazier falsely identified Mr. Bolden as the person who shot him outside J & J Fish on January 29.

**ANSWER:**

The City denies the allegations contained in Paragraph 47.

48.    After Clifford Frazier identified Mr. Bolden on February 26, he was again interviewed about the events of January 29 at the Area 2 Violent Crimes Unit by an Assistant State's Attorney in the presence of Defendant Pesavento and George Karl. Pesavento and Karl failed to prepare and preserve handwritten notes or a report of that interview.

**ANSWER:**

The City admits that Clifford Frazier identified Mr. Bolden on February 26 and Mr. Bolden was subsequently interviewed by Detectives. The City denies all allegations not expressly admitted in Paragraph 48.

49.    Defendant Officers' intentional and egregious failure to investigate identified leads on the real shooter and evidence that was exculpatory for Mr. Bolden further demonstrates that they *intentionally* fabricated evidence against Mr. Bolden in bad faith.

**ANSWER:**

The City denies the allegations contained in Paragraph 49.

50.    As explained above, on the night of the murders, Tenesha Gatson informed Defendant Pesavento and the other Defendant Officers that Mr. Bolden was inside the restaurant throughout the evening, including when the shots were fired outside the restaurant and when Clifford Frazier entered the restaurant seeking help. Anthony Williams provided similar information to Pesavento, Siwek, Karl and the other Defendant Officers a few days later.

14

**ANSWER:**

The City denies the allegations contained in Paragraph 50.

51.     Yet, Defendant Officers – in conformance with their pattern and practice of ignoring exculpatory evidence – ignored and refused to investigate Gatson's and Williams' assertions. They did not even ask Williams about his involvement in the drug deal that immediately preceded Derrick Frazier and Ledell Clayton's deaths, his knowledge about the shootings, or any details about what Mr. Bolden was doing inside J & J Fish on the evening of January 29.

**ANSWER:**

The City denies the allegations contained in Paragraph 51.

52.     Defendant Officers also failed to conduct follow-up interviews with any one of the several witnesses inside J & J who could have corroborated Mr. Bolden's alibis.

**ANSWER:**

The City denies the allegations contained in Paragraph 52.

53.     On the night of the murders, the police performed a perfunctory interview of another individual inside J & J Fish, Vondell Goins, but they never asked Goins about Mr. Bolden. Defendant Officers never attempted to contact Goins again. Had Defendant Officers asked Goins about Mr. Bolden, she would have explained that she was speaking with Mr. Bolden inside J & J fish at the time she heard shooting outside the restaurant and at the time Clifford Frazier entered the restaurant. The Chicago Police Department's case file for this investigation did not include any interview notes or reports related to the interview of Goins.

**ANSWER:**

The City admits that the police interviewed another individual inside J&J Fish, named

Vondell Goins. The City admits that the police did not attempt to contact Vondell Goins again.

The City admits that the Chicago Police Department's case file for the investigation does not

include interview notes related to the interview of Goins. The City denies the remaining

allegations contained in Paragraph 53.

54.     Officer Temple identified Octavia Jackson as an eye witness in her preliminary investigation report, which she provided to the Assigned Detectives. Jackson was in J & J Fish on the night of the murders. Within one week of the shootings, the police interviewed Jackson, who was with Goins and spoke to Mr. Bolden inside J & J Fish on the night of the murders. At the time of the interview, Jackson did not know Mr. Bolden's name, but she told the police that

she was speaking with a young black man when Clifford Frazier ran inside the store bleeding from gunshot wounds. After that interview, the police officers never attempted to contact Jackson again, show her photographs, or otherwise identify the person with whom she was speaking at the time of Clifford Frazier's altercation outside of J & J Fish. The Chicago Police Department's case file for this investigation did not include any interview notes or reports related to the interview of Jackson.

**ANSWER:**

The City admits that Officer Temple identified Octavia Jackson as a witness in her preliminary investigation report. The City admits that Jackson was in J&J Fish on the night of the murders. The City denies the remaining allegations contained in Paragraph 54.

55.     Officer Temple also identified Todd Henderson as a witness to the events at J & J Fish in her preliminary investigation report, and she recorded his contact information in her report. None of the Defendant Officers subsequently attempted to interview Henderson. Had they interviewed him, Henderson would have told them that he saw Goins, Jackson, and Mr. Bolden inside the restaurant and also witnessed the fight between Clifford Frazier and the perpetrator outside the restaurant. At the time, Henderson could have described the individuals involved in the fight, including their clothes and identifying features.

**ANSWER:**

The City admits that Officer Temple identified Todd Henderson as a witness. The City denies the remaining allegations contained in Paragraph 55.

56.     Defendant Officers also failed to ask Edna Williams and James Williams, the owners of J & J Fish, whether Mr. Bolden was present in the restaurant during the shootings. Both witnesses would have provided additional confirmation that Mr. Bolden was present inside J & J Fish when Clifford Frazier ran into the restaurant after he was shot.

**ANSWER:**

The City admits that Defendant Officers did not ask Edna Williams and James Williams if Plaintiff was inside J&J Fish during the shootings. The City denies any allegations not expressly admitted in Paragraph 56.

57.     Defendant Officers obtained Anthony Williams' telephone number, but they never obtained his phone records to determine whether he was speaking with the victims shortly before the shootings took place on January 29.

**ANSWER:**

The City admits that the Defendant Officers obtained Anthony Williams' telephone number but did not obtain his phone records. The City denies all allegations not expressly admitted in Paragraph 57.

58.     According to Clifford Frazier, he fired approximately eight or nine shots at the perpetrator near J & J Fish and believed that he had struck him with a bullet because he saw the perpetrator fall. Blood was found on Clifford Frazier's firearm, which the perpetrator held and used to hit Clifford Frazier's head during his physical altercation with Frazier after the shootings. The Assigned Detectives, however, never requested DNA or fingerprint testing on the firearm. The Chicago Police Department destroyed the firearm before Mr. Bolden's counsel could have testing conducted.

**ANSWER:**

The City admits Clifford Frazier claims he fired 8 or 9 shots. The City admits that Clifford Frazier stated he believed he had struck the perpetrator. The City admits that the firearm was destroyed. The City denies the remaining allegations contained in Paragraph 58.

59.     Defendant Officers also ignored evidence that contradicted Clifford Frazier's version of events. First, Clifford Frazier's statement that he fired eight or nine shots at the perpetrator with the .40 caliber Smith & Weston semi-automatic pistol that was later recovered inside J & J Fish was directly refuted by the fact that neither Defendant Officers nor any other police personnel found any casings from this weapon in the vicinity of J & J Fish. Second, a Chicago Police Department desk sergeant informed the medical examiner that Ledell Clayton "and several of his friends were sitting in an automobile at the location of occurrence when an unknown person or persons walked up to the vehicle and fired a volley of shots in the car." This information was recorded in a report that Defendant Officers received, and the report contradicted Clifford Frazier's statement that the perpetrator was in the backseat of the car with Ledell Clayton and Derrick Frazier. Finally, Officer Temple's report indicated that Clifford Frazier first told her that he had dropped his gun outside on the sidewalk, but he later told Defendant Officers that he kicked the gun under a table inside J & J Fish. Defendant Officers failed to investigate any of these inconsistencies.

**ANSWER:**

The City denies the allegations contained in Paragraph 59.

60.     Defendant Officers failed to conduct any investigation into Mr. Bolden's alleged motive to commit these crimes and ignored the fact that they had no evidence of his motive. They failed to investigate whether the shootings were the result of gang retaliation, despite the fact that Defendant Officers had information suggesting that Derrick Frazier and Ledell Clayton

17

had a gang-related hit on them at the time of the shootings and Defendant Officers had the names of the individuals believed to be involved in trying to execute the hit, none of whom were Mr. Bolden, as detailed further below.

**ANSWER:**

The City denies the allegations contained in Paragraph 60.

61.     Defendant Officers failed to obtain and review the Chicago Police Department's 911 recording or corresponding dispatch card from January 29, despite being informed by Mr. Bolden that he was the one who called 911 from inside J & J Fish after Clifford Frazier was shot.

**ANSWER:**

The City admits that nobody, including Defendant Officers or Bolden's counsel, obtained

or reviewed the Chicago Police Department's 911 recording or corresponding dispatch card or

sought the 911 recording until after the expiration of the retention period of the 911 recording. In

addition, the City states that any alleged dispatch card would not have identified the individual

who allegedly called 911. The City denies all allegations not expressly admitted in Paragraph 61.

62.     On February 26, 1994, after Clifford Frazier falsely identified Mr. Bolden in the live lineup, Pesavento, Karl, Siwek, Oliver, and Kill arrested Mr. Bolden for the murders of Derrick Frazier and Ledell Clayton and the attempted murder of Clifford Frazier.

**ANSWER:**

The City admits that Plaintiff was arrested for the murders of Derrick Frazier and Ledell

Clayton and the attempted murder of Clifford Frazier. The City denies all allegations not

expressly admitted in Paragraph 62.

63.     After Mr. Bolden was placed under arrest, he was held in an interview room for several hours before being sent to the lockup. While Mr. Bolden was sitting in this room, Detective Kill entered, looked at Mr. Bolden, and laughed. While laughing, Detective Kill noted that Mr. Bolden was bald. As explained above, Clifford Frazier described the shooter as a man with hair.

**ANSWER:**

The City denies the allegations contained in Paragraph 63.

64.     Also during this time, Mr. Bolden asked George Karl to bring Defendant Oliver into the room, because Defendant Oliver had seen Mr. Bolden inside J & J Fish after the shootings, and could corroborate that Mr. Bolden was inside the restaurant when the police arrived. Karl, however, kicked the door to the room shut and said, "He doesn't remember."

**ANSWER:**

The City denies the allegations contained in Paragraph 64.

65.     The Assigned Detectives notified the State's Attorney's Office of Mr. Bolden's arrest on the same day that it occurred, February 26, 1994. The Chicago Police Department's Standard Operating Procedures for Detectives at that time stated that before contacting the State's Attorney's Office after an arrest, the Assigned Detectives must "gather and review all available evidence and will determine what additional information is necessary and obtainable to support the felony charge and initiate steps to gather the additional evidence." After reviewing the paucity of evidence against Mr. Bolden and the substantial evidence indicating that he was not the perpetrator, the Assigned Detectives failed to take any actions to gather additional evidence to support the charges brought against Mr. Bolden. They requested that the case be "cleared and closed" on February 27, 1994.

**ANSWER:**

The City admits detectives notified the State's Attorney's Office of Mr. Bolden's arrest.

The City admits that the Chicago Police Department's Standard Operating Procedures for

Detectives at that time contained the following language: "gather and review all available

evidence and will determine what additional information is necessary and obtainable to support

the felony charge and initiate steps to gather the additional evidence." The City denies the

remaining allegations contained in Paragraph 65.

66.     During the investigation, Defendant Officers recovered two firearms that Clifford Frazier brought with him to the anticipated drug transaction on January 29 – a MAC 11 nine-millimeter pistol recovered from Clifford Frazier's Cadillac near 64th Street and Cottage Grove, and Clifford Frazier's .40 caliber Smith & Wesson semi-automatic pistol recovered from inside the J & J Fish restaurant.

**ANSWER:**

The City admits the allegations contained in Paragraph 66.

67.     The .40 caliber pistol was potentially exculpatory evidence for Mr. Bolden. Clifford Frazier informed Defendant Officers that he had the .40 caliber pistol with him when he fought with the perpetrator and that the perpetrator wrestled this gun from him and hit him over

19

the head with it. The gun also was covered in blood, and Frazier stated that he believed he had struck the perpetrator with a bullet. Accordingly, the gun could have contained the perpetrator's fingerprints and DNA.

**ANSWER:**

The City admits that Clifford Frazier informed Defendant Officers that he had the .40 caliber pistol with him when he fought with the perpetrator and that the perpetrator wrestled this gun from him and hit him over the head with it. The City denies all allegations not expressly admitted in Paragraph 67.

68.     After Mr. Bolden's attorney requested production of these weapons on May 5, 1994, the Chicago Police Department destroyed them, preventing Mr. Bolden from obtaining his own expert to analyze them. The .40 caliber pistol was destroyed on May 27, 1994.

**ANSWER:**

The City admits that the firearms were destroyed pursuant to a court order. The City denies all allegations not expressly admitted in Paragraph 68.

69.     Defendant Officers also withheld and/or destroyed potentially exculpatory witness interview notes, a potentially exculpatory investigative file control card, and two case reports that were exculpatory and had impeachment value, namely a Clifford Frazier interview report and the inventory for Clifford Frazier's gun, which identified blood on the gun and the fact that Frazier was arrested for his involvement in the events of January 29.

**ANSWER:**

The City denies the allegations contained in Paragraph 69.

70.     Defendant Officers also withheld and/or destroyed exculpatory interview notes and reports related to additional interviews they conducted of Ledell Clayton's girlfriend. Defendant Officers provided one short typed report of an interview they conducted of Clayton's girlfriend on January 31, 1994. In actuality, they also interviewed her on the night of the shootings and on approximately three occasions at her residence. Defendant Officers failed to disclose to Mr. Bolden's counsel exculpatory information that Clayton's girlfriend provided to Defendant Officers during these interviews. Specifically, Clayton's girlfriend told Defendant Officers that shortly before the shootings, a gang had put a hit out on Derrick Frazier and Ledell Clayton. She provided Defendant Officers, including George Karl and Defendant Oliver, with the names of the gang members who may have been tasked with ordering and carrying out the hit, none of whom were Mr. Bolden. She further stated that on the night that Derrick Frazer and Ledell Clayton were killed, they were being extra careful because they had heard about a hit being put out on them. Defendant Officers failed to disclose this exculpatory information and

other exculpatory information she provided to the State's Attorney or Mr. Bolden's attorney.

**ANSWER:**

The City denies the allegations contained in Paragraph 70.

71.    Defendant Oliver and George Karl also failed to disclose a search they conducted and physical evidence they obtained as part of this investigation. This information potentially would have affected the credibility of the Defendant Officers who testified at Mr. Bolden's trial. On the day after the shootings, Defendant Officers went to Ledell Clayton's girlfriend's house and took the key to Clayton's safe deposit box. They also went through certain paperwork belonging to Clayton in their presence. Defendant Officers failed to provide any information to the State's Attorney or Mr. Bolden's defense counsel about their seizure of the safe deposit key or what they did with the key and possibly the contents of the safe deposit box. Defendant Oliver also threatened Clayton's girlfriend and forced her to lie down in the backseat of his law enforcement vehicle to hide her from other detectives.

**ANSWER:**

The City denies the allegations contained in Paragraph 71.

72.    Defendant Oliver seized Derrick Frazier's safe deposit key after his death and asked Clifford Frazier to assist him in collecting the contents of the safe deposit box. When Clifford Frazier told other law enforcement officers about Defendant Oliver's request, Oliver threatened Clifford Frazier. Defendant Oliver failed to provide this information to the State's Attorney or Mr. Bolden's defense counsel.

**ANSWER:**

The City denies the allegations contained in Paragraph 72.

73.    Defendant Officers failed to disclose that they and/or their partners recovered 30 guns from Clifford Frazier's apartment during the course of this investigation.

**ANSWER:**

The City denies the allegations contained in Paragraph 73.

74.    Defendant Officers also failed to preserve in bad faith evidence that would have exonerated Mr. Bolden, namely the recording of the call Mr. Bolden made to 911 from inside J & J Fish after the shooting of Clifford Frazier.

**ANSWER:**

The City denies the allegations contained in Paragraph 74.

75.    The 911 recording was in the possession and control of the Chicago Police

Department. According to the Chicago Police Department's policy with which Defendant Officers were familiar, 911 recordings would remain in the possession of the Chicago Police Department's Communications Division and be preserved for 30 days. The recordings could be erased and reused after 30 days unless a police officer or detective placed a hold on them, using the Chicago Police Department's "Request to Review/Hold Recording Tape" form.

**ANSWER:**

The City admits that according the Chicago Police Department's policy, 911 recordings

would be preserved by the Chicago Police Department's Communications Division for 30 days.

The City admits that the recordings could be erased and reused after 30 days unless a hold was

placed on them by an individual such as a Police Officer, Detective, or defense attorney. The

City denies all allegations not expressly admitted in Paragraph 75.

76.     The exculpatory nature of the 911 recording was apparent to Defendant Officers *before* its destruction, yet they failed to preserve it in bad faith. When Mr. Bolden first retained Charles Ingles as his attorney, Mr. Bolden informed Ingles that he made a 911 call from inside J & J Fish after Clifford Frazier was shot and ran into the store. Ingles in turn informed Defendant Officers that there would be a recording of Mr. Bolden's 911 call for police assistance. Immediately following his arrest, Mr. Bolden explicitly informed the Defendant Officers who participated in his post-arrest interview that he called 911 from inside J & J Fish after the shooting and that they should obtain the 911 recording. Ingles and Mr. Bolden provided Defendant Officers with information about the 911 recording well within the 30-day window before its destruction.

**ANSWER:**

The City lacks sufficient information to admit or deny what Plaintiff informed Charles

Ingles, and therefore denies the allegations related thereto. The City denies the remaining

allegations contained in Paragraph 76.

77.     Defendant Officers could have preserved the 911 recording beyond 30 days simply by making the request to the Chicago Police Department's Communications Division, as detectives routinely did as part of their investigations, but they failed to do so in bad faith, knowing that this exculpatory evidence could be destroyed after 30 days.

**ANSWER:**

The City admits that there were processes by which the 911 recordings could have been

preserved beyond 30 days. The City denies all allegations not expressly admitted in

Paragraph 77.

78.     Mr. Bolden could not obtain evidence comparable to the 911 recording from any other source.

**ANSWER:**

The City denies the allegations contained in Paragraph 78.

79.     As a direct result of Defendant Officers' failure to preserve the 911 recording, the recording was destroyed by the Chicago Police Department, Mr. Bolden's trial attorney was unable to obtain the recording via subpoena, and the jury was unable to hear this critical evidence.

**ANSWER:**

The City admits that the jury did not hear any alleged 911 recording. The City denies all

allegations not expressly admitted in Paragraph 79.

80.     As explained in more detail below, Defendant Officers also intentionally withheld *Brady* material concerning the benefits given to Clifford Frazier in exchange for his testimony. Among other things, Defendant Officers provided Frazier with protection and never requested that charges be brought against Frazier despite his admitted unlawful possession of firearms and participation in a large-scale narcotics conspiracy.

**ANSWER:**

The City admits that Defendant Officers never requested that charges be brought against

Frazier. The City denies the remaining allegations not expressly admitted in Paragraph 80.

81.     In October 1996, Mr. Bolden's case was tried before a jury. The only evidence directly implicating Mr. Bolden was the engineered and flawed testimony of Clifford Frazier identifying Mr. Bolden as the shooter. Clifford Frazier's testimony was bolstered by the perjured testimony of Defendant Officers, who intentionally lied under oath about the propriety of the live lineup in which Clifford Frazier identified Mr. Bolden.

**ANSWER:**

The City admits that in October of 1996, Plaintiff's case was tried before a jury. The City

denies the remaining allegations contained in Paragraph 81.

82.     Clifford Frazier admitted to acting as the lookout for a multi-kilogram narcotics transaction on January 29, bringing two loaded weapons to the deal, and working under Derrick Frazier's directive to "shoot any motherfucker who came near the car." He also admitted to being

an integral part of a larger narcotics conspiracy by housing cocaine and weapons at his residence. Had he been charged with this conduct, he would have been eligible for several decades of incarceration. However, in exchange for his false testimony against Mr. Bolden, Clifford Frazier was not charged with any crime. He also received other benefits from Defendant Officers, including personal protection. The existence of these benefits was intentionally withheld from Mr. Bolden and his counsel in accordance with the policies and practice of the City of Chicago.

**ANSWER:**

The City admits that Clifford Frazier admitted to acting as the lookout in the drug transaction on January 29, 1994, bringing two loaded weapons, and was told by Derrick Frazier to "shoot any motherfucker who came near the car." The City denies all allegations not expressly admitted in Paragraph 82.

83.     On October 30, 1996, Mr. Bolden was found guilty of First-Degree Murder of Derrick Frazier and Ledell Clayton, attempted First Degree Murder of Clifford Frazier, and Aggravated Battery with a Firearm of Clifford Frazier. On December 2, 1996, Mr. Bolden was sentenced to natural life for the first-degree murder counts and 30 years, to run consecutively, for the attempted murder count.

**ANSWER:**

The City admits the allegations contained in Paragraph 83.

84.     After his direct appeals were denied, Mr. Bolden filed a *pro se* post-conviction petition on November 1, 1999. Mr. Bolden's post-conviction petition was dismissed by the Cook County Circuit Court on November 20, 2012, but the Appellate Court of Illinois, First District, Third Division, reversed the Circuit Court's decision and remanded with instructions to hold a stage three evidentiary hearing.

**ANSWER:**

The City admits the allegations contained in Paragraph 84.

85.     On remand, evidentiary hearings were held before the Honorable Alfredo Maldonado. On January 21, 2016, Judge Maldonado ordered Mr. Bolden's convictions be reversed and further ordered a new trial on the charges against Mr. Bolden.

**ANSWER:**

The City admits the allegations contained in Paragraph 85.

86.     On April 19, 2016, pursuant to the State's oral motion, the Court dismissed all charges against Mr. Bolden.

**ANSWER:**

The City admits the allegations contained in Paragraph 86.

87.     On September 1, 2016, the Honorable LeRoy K. Martin, Presiding Judge of the Criminal Division, held that Mr. Bolden was innocent of the crimes charged and granted Mr. Bolden a Certificate of Innocence.

**ANSWER:**

The City admits the allegations contained in Paragraph 87.

88.     At the time he was wrongfully convicted, Mr. Bolden was only 27 years old with his whole life ahead of him.

**ANSWER:**

The City admits that at the time Plaintiff was convicted he was 27 years old. The City

denies all allegations not expressly admitted in Paragraph 88.

89.     In serving more than two decades behind bars, Mr. Bolden was unjustly deprived of much of his life and liberty. He was stripped of the privileges and pleasures that are part of the human experience, including the opportunity to share holidays, births, weddings, funerals, and other life events with loved ones. He was forced to endure the extremely harsh conditions of confinement in maximum security prisons. Mr. Bolden must now attempt to rebuild his life outside of prison, and he will always carry with him the scars and disadvantages associated with wrongful imprisonment.

**ANSWER:**

The City denies the allegations contained in Paragraph 89.

90.     As a result of the foregoing, Mr. Bolden suffered tremendous damage, including, but not limited to, loss of liberty, mental anguish, humiliation, degradation, physical injury, emotional distress, enduring physical and psychological injuries and other grievous injuries all proximately caused by the Defendants' misconduct.

**ANSWER:**

The City denies the allegations contained in Paragraph 90.

91.     For decades, the Chicago Police Department's Area 2 Violent Crimes Unit – where Mr. Bolden was questioned, arrested, and charged – has been the epicenter of the City of Chicago's unconstitutional policy and practice to secure false convictions through flawed investigations.

**ANSWER:**

The City denies the allegations contained in Paragraph 91.

92.     Specifically, beginning in the 1970s, a group of Chicago Police Officers under the tutelage of Jon Burge, including some or all of the Defendant Officers in this case, engaged in a systematic pattern of coercion, fabrication of evidence, withholding and destruction of exculpatory information, and various other illegal tactics in order to "solve" cases at all costs. This practice included keeping *Brady* material in so-called "street files" that were never disclosed to State's Attorneys or defense attorneys and were subsequently destroyed.

**ANSWER:**

The City denies the allegations contained in Paragraph 92.

93.     The institutional practice to quickly "solve" crimes regardless of a suspect's guilt or innocence was known to command personnel, who themselves participated in the practice.

**ANSWER:**

The City denies the allegations contained in Paragraph 93.

94.     The above-described widespread practices were so well-settled as to constitute *de facto* policy in the Chicago Police Department during the time period at issue. In addition to Mr. Bolden, there are now dozens of other known victims of similar abuses.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already bifurcated any such claim from this case. Since the claim supported by this paragraph has been bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the City denies the allegations in paragraph 94.

95.     These above-described widespread practices existed because municipal policymakers with authority over the same exhibited deliberate indifference to the problem. The City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight, accountability, or punishment of the Chicago Police Officers who engaged in these practices. Indeed, the Police Department's system for investigating and disciplining police officers accused of the type of misconduct which befell Mr. Bolden was, for all practical purposes, nonexistent.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already

bifurcated any such claim from this case. Since the claim supported by this paragraph has been

bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the

City denies the allegations in paragraph 95.

96.     The Chicago police officers who manufactured criminal cases against individuals such as Mr. Bolden had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but they also stood to be rewarded for closing a case no matter what the cost. In this way, the system proximately caused abuses, such as the misconduct at issue in this case.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already

bifurcated any such claim from this case. Since the claim supported by this paragraph has been

bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the

City denies the allegations in paragraph 96.

97.     As described more fully herein, Mr. Bolden's injuries were proximately caused by these above-described practices.

**ANSWER:**

The City denies the allegations contained in Paragraph 97.

**COUNT I—42 U.S.C. § 1983**
**Violation of Due Process**

98.     Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

99.     As described more fully above, Defendant Officers, while acting individually, jointly, under color of law and within the scope of their employment, deprived Mr. Bolden of his constitutional right to a fair trial.

**ANSWER:**

The allegations in Paragraph 99 regarding the Defendants acting within the scope of their

employment and under color of law state legal conclusions to which no response is required. To the extent a response is deemed to be required, the City lacks sufficient information to admit or deny these allegations and on that basis denies same. The City denies all remaining allegations in Paragraph 99.

100.    Defendant Officers knowingly fabricated false evidence, including engineering a tainted lineup, thereby misleading and misdirecting the criminal prosecution of Mr. Bolden and causing his wrongful conviction.

**ANSWER:**

The City denies the allegations contained in Paragraph 100.

101.    The tainted lineup was unduly suggestive and used against Mr. Bolden at trial.

**ANSWER:**

The City denies the allegations contained in Paragraph 101.

102.    Defendant Officers knowingly concealed, withheld from Mr. Bolden and prosecutors, failed to preserve, and/or destroyed exculpatory and impeachment evidence to Mr. Bolden's detriment. Notably, Defendant Officers destroyed or concealed exculpatory interview notes, reports, and information obtained during interviews and failed to preserve the exculpatory recording of Mr. Bolden's call to 911 in bad faith, even though comparable evidence could not be obtained by other reasonably available means. As a result, Mr. Bolden was unable to exercise his right to test or review material evidence, thus impeding his right to a fair trial.

**ANSWER:**

The City denies the allegations contained in Paragraph 102.

103.    In addition, Defendant Officers concealed and/or fabricated additional evidence that is not yet known to Mr. Bolden.

**ANSWER:**

The City denies the allegations contained in Paragraph 103.

104.    Defendant Officers also intentionally and recklessly ignored and/or failed to investigate evidence supporting Mr. Bolden's alibi and other potentially exculpatory evidence.[3]

---

[3] Mr. Bolden understands that the Court dismissed his failure to investigate due process claim in the First Amended Complaint. Mr. Bolden pleads this claim here in order to preserve the issue for appeal.

**ANSWER:**

The City denies the allegations contained in Paragraph 104.

105.     Defendant Officers' misconduct directly and proximately resulted in the unjust criminal conviction of Mr. Bolden, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Mr. Bolden could not have and would not have been pursued, and Mr. Bolden would not have been convicted.

**ANSWER:**

The City denies the allegations contained in Paragraph 105.

106.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of Mr. Bolden, and in total disregard of the truth and Mr. Bolden's innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 106.

107.     As a result of the misconduct described herein, Mr. Bolden suffered injuries, including but not limited to personal physical injury and emotional distress, as more fully alleged above.

**ANSWER:**

The City denies the allegations contained in Paragraph 107.

108.     The misconduct described in this Count was undertaken by employees of the City of Chicago, including but not limited to the named Defendants, pursuant to the City of Chicago's policy and practice in the manner described more fully above and in Count IV.

**ANSWER:**

The City denies the allegations contained in Paragraph 108.

### Count II—42 U.S.C. § 1983 Failure to Intervene

109.     Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this Answer as if fully restated herein.

110.    During the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, even though they had a reasonable opportunity to do so.

**ANSWER:**

The City denies the allegations contained in Paragraph 110.

111.    As a result of Defendant Officers' failure to intervene to prevent the violation of Mr. Bolden's constitutional rights, Mr. Bolden was wrongfully convicted and suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

**ANSWER:**

The City denies the allegations contained in Paragraph 111.

112.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with deliberate indifference to Mr. Bolden's clearly established constitutional rights.

**ANSWER:**

The City denies the allegations contained in Paragraph 112.

113.    The misconduct described in this Count was undertaken by employees of the City of Chicago, including but not limited to the named Defendants, under color of law and pursuant to the City of Chicago's policy and practice in the manner described more fully above and in Count IV.

**ANSWER:**

The City denies the allegations contained in Paragraph 113.

**Count III – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

114.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

115.    After the murders of Derrick Frazier and Ledell Clayton, Defendant Officers, acting within the scope of their employment and under the color of law, instead of speaking to all potential witnesses or pursuing alternative leads, reached an agreement amongst themselves to

frame Mr. Bolden and to thereby deprive Mr. Bolden of his constitutional rights, including his right to due process and to a fair trial, as described in this Third Amended Complaint.

**ANSWER:**

The allegations in Paragraph 115 regarding the Defendants acting within the scope of their employment and under color of law state legal conclusions to which no response is required. To the extent a response is deemed to be required, the City lacks sufficient information to admit or deny these allegations and on that basis denies same. The City denies any remaining allegations contained in Paragraph 115.

116. Additionally, before and after Mr. Bolden's conviction, Defendant Officers further conspired to deprive Mr. Bolden of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or a more timely exoneration.

**ANSWER:**

The City denies the allegations contained in Paragraph 116.

117. In this manner, Defendant Officers, acting in concert with each other and other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**

The City denies the allegations contained in Paragraph 117.

118. In furtherance of the conspiracy, each of the co-conspirators committed overt acts, including but not limited to those set forth above, and were otherwise willful participants in joint activity.

**ANSWER:**

The City denies the allegations contained in Paragraph 118.

119. As a direct and proximate result of the illicit prior agreement referenced above, Mr. Bolden's rights were violated and he suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

**ANSWER:**

The City denies the allegations contained in Paragraph 119.

120.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Mr. Bolden's rights.

**ANSWER:**

The City denies the allegations contained in Paragraph 120.

121.    The misconduct described in this Count was undertaken by employees of the City of Chicago, including but not limited to the named Defendants, pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above and in Count IV.

**ANSWER:**

The City denies the allegations contained in Paragraph 121.

### Count IV – 42 U.S.C. § 1983
### *Monell* Claim

122.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

123.    The policies and practices of the City of Chicago were underlying causes of the misconduct described in this Third Amended Complaint, in that Chicago Police Department employees and agents regularly pursued wrongful convictions through flawed investigations in order to "solve" cases at all costs, and did so with the knowledge and approval of persons with final policy-making authority for the City of Chicago.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already

bifurcated any such claim from this case. Since the claim supported by this paragraph has been

bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the

City denies the allegations in paragraph 123.

124.    At all relevant times, the City of Chicago's interrelated *de facto* policies, practices, and customs included, but were not limited to: (1) conducting illegal or improperly coercive interrogations of witnesses, suspects, and arrestees; (2) manufacturing, fabricating, or using improper suggestive tactics to obtain false witness statements; (3) filing false reports and giving false statements or testimony; (4) withholding, destroying, covering up, or suppressing

32

evidence, including *Brady* material; and (5) perpetuating, encouraging, and condoning a "code of silence," pursuant to which Chicago Police Officers refused to report or otherwise covered up instances of police misconduct.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already bifurcated any such claim from this case. Since the claim supported by this paragraph has been bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the City denies the allegations in paragraph 124.

125.    Pursuant to the City of Chicago's policies and practices, Defendant Officers attempted to "solve" this case through flawed and suggestive identification procedures, false testimony, concealment of exculpatory evidence, and other illegal tactics. The cost: over 22 years of an innocent man's life. The above-described widespread practices, which were so well-settled as to constitute *de facto* policy in the Chicago Police Department, existed because municipal policymakers with authority over the same exhibited deliberate indifference to the misconduct, thereby effectively ratifying it.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already bifurcated any such claim from this case. Since the claim supported by this paragraph has been bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the City denies the allegations in paragraph 125.

126.    The City of Chicago also created and maintained a *de facto* custom, policy, and practice of deliberate indifference to the constitutional rights of citizens by failing to adequately train, supervise, and discipline its police officers and other employees and agents, including the individual defendants in this case, to ensure that they:

A.    employed proper and non-suggestive identification techniques;

B.    faithfully represented material facts when seeking criminal charges;

C.    secured, maintained, and prevented the destruction of material evidence, including *Brady* material;

D.    disclosed exculpatory and impeachment information to prosecutors; and

E.    adequately investigated potential leads, including questioning alibi witnesses.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already bifurcated any such claim from this case. Since the claim supported by this paragraph has been bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the City denies the allegations in paragraph 126.

127.    The customs and practices set forth above were the moving force behind the numerous constitutional violations in this case.

**ANSWER:**

Pursuant to the Court's granting of the City's motion to bifurcate (Dkt. 171), these allegations are moot and no answer is required. To the extent an answer is required, the City denies the allegations contained in Paragraph 127.

128.    The City of Chicago's failure to train, discipline, and supervise its police officers adequately in their constitutional duties, and its creation and maintenance of customs, policies, and practices of fabricating evidence and failing to disclose exculpatory evidence, directly and proximately caused Mr. Bolden to suffer constitutional deprivations, including his false arrest, unfair trial, wrongful conviction, and the other grievous and permanent injuries and damages set forth above.

**ANSWER:**

The City notes that this paragraph alleges a *Monell* claim. This Court has already bifurcated any such claim from this case. Since the claim supported by this paragraph has been bifurcated, the City is not obligated to answer. To the extent an answer is deemed necessary, the City denies the allegations in paragraph 128.

### Count V – 42 U.S.C. § 1983
### Federal Malicious Prosecution

129.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

130.    Defendant Officers accused Mr. Bolden of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Bolden without any probable cause for doing so, in violation of his rights secured by the Fourth and Fourteenth[4] Amendments.

**ANSWER:**

The City denies the allegations contained in Paragraph 130.

131.    Defendant Officers caused Mr. Bolden to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**

The City denies the allegations contained in Paragraph 131.

132.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Bolden's innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 132.

133.    As a result of the misconduct described in this Count, Mr. Bolden suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

**ANSWER:**

The City denies the allegations contained in Paragraph 133.

**Count VI – State Law Claim**<br>**Malicious Prosecution**

134.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

135.    Defendant Officers accused Mr. Bolden of criminal activity, knowing those

---

[4] Mr. Bolden understands that in his First Amended Complaint, the Court dismissed his federal malicious prosecution claim to the extent it is based on the Fourteenth Amendment. Mr. Bolden pleads this claim here in order to preserve the issue for appeal.

accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

**ANSWER:**

The City denies the allegations contained in Paragraph 135.

136.    Defendant Officers caused Mr. Bolden to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**

The City denies the allegations contained in Paragraph 136.

137.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Bolden's innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 137.

138.    As a result of the misconduct described in this Count, Mr. Bolden suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

**ANSWER:**

The City denies the allegations contained in Paragraph 138.

**Count VII – State Law Claim**
**Intentional Infliction of Emotional Distress**

139.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

140. The acts, omissions, and conduct of Defendant Officers as set forth above were extreme and outrageous. Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Bolden, as is more fully alleged above.

**ANSWER:**

The City denies the allegations contained in Paragraph 140.

141. As a direct and proximate result of Defendant Officers' actions, Mr. Bolden suffered and continues to suffer emotional distress.

**ANSWER:**

The City denies the allegations contained in Paragraph 141.

### Count VIII – State Law Claim
### Civil Conspiracy

142. Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

143. As described more fully above, Defendant Officers, acting in concert with other co- conspirators, known and unknown, reached an agreement amongst themselves to frame Mr. Bolden for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Bolden of these rights.

**ANSWER:**

The City denies the allegations contained in Paragraph 143.

144. In furtherance of their conspiracy, each of these co-conspirators committed overt acts, including those described in this Third Amended Complaint, and were otherwise willful participants in joint activity.

**ANSWER:**

The City denies the allegations contained in Paragraph 144.

145. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in

total disregard for the truth and Mr. Bolden's innocence.

**ANSWER:**

The City denies the allegations contained in Paragraph 145.

146.    As a result of the Defendants' misconduct described in this Count, Mr. Bolden suffered loss of liberty, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries.

**ANSWER:**

The City denies the allegations contained in Paragraph 146.

**Count IX – State Law Claim**
**Respondeat Superior**

147.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

148.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, employees of, and/or agents of the Chicago Police Department and the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:**

The allegations in Paragraph 148 regarding the Defendants acting within the scope of their employment and under color of law state legal conclusions to which no response is required.  To the extent a response is deemed to be required, the City lacks sufficient information to admit or deny these allegations and on that basis denies same. The City denies any remaining allegations contained in Paragraph 148.

149.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**

The City denies the allegations contained in Paragraph 149.

### Count X – State Law Claim
### Indemnification

150.    Mr. Bolden incorporates each paragraph of this Third Amended Complaint as if fully restated herein.

**ANSWER:**

The City incorporates each paragraph of this answer as if fully restated herein.

151.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**

The City admits that 745 ILCS 10/9-102 sets forth that a local public entity is empowered and directed to pay any tort judgement or settlement for compensatory damages for which it or an employee while acting with the scope of his employment is liable in the manner provided in 745 ILCS 10. The City denies the remaining allegations contained in Paragraph 151.

152.    Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**

The City admits the Defendant Officers are or were employees of the Chicago Police Department.  The allegations in Paragraph 152  regarding the Defendants acting within the scope of their employment state legal conclusions to which no response is required.  To the extent a response is deemed to be required, the City denies same. The City denies all allegations not expressly admitted in Paragraph 152.

### AFFIRMATIVE DEFENSES

1.    To the extent any individual employees of the City of Chicago or its police department are not liable as alleged in the TAC, the City would not be liable.

2.       Plaintiff's claims in the TAC are barred by the doctrines of res judicata and collateral estoppel.

3.       Plaintiff's claims in the TAC are barred by the applicable statutes of limitations.

4.       As to Plaintiff's state law claims, the City of Chicago is not liable to pay attorneys' fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill. 2d 154, 166 (1979).

5.       Any damages obtained by Plaintiff for the injuries alleged in the TAC are subject to a set-off and should be reduced by any amount previously received by Plaintiff for the same alleged injuries.

6.       Plaintiff's causes of action are barred because the investigation, arrest, and incarceration of Plaintiff were justified.

7.       The City is a public entity and therefore immune from exemplary damages under Illinois law.

8.       The City is not liable for acts or omissions which occurred outside of its employee's scope of employment with the City.

9.       To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton and/or other wrongful conduct on the part of Plaintiff as reflected in the public record, including but not limited to police reports, any verdict or judgment obtained by Plaintiff must be reduced by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case.

10.      Plaintiff's *Monell* claim has been bifurcated (Dkt. 171) and thus all *Monell* allegations should be stricken.

11.      Plaintiff cannot prevail on counts previously dismissed in previous Orders issued by the

Court.

12.    The City reserves its right to amend its Affirmative Defenses.


Dated: October 19, 2018                    **CITY OF CHICAGO**


                                           By:  _/s/ Kyle L. Flynn_

                                           John F. Gibbons (Attorney No. 6190493)
                                           Tiffany S. Fordyce (Attorney No. 235063)
                                           Kyle L. Flynn (Attorney No. 6312817)
                                           Greenberg Traurig, LLP
                                           77 West Wacker Drive, Suite 3100
                                           Chicago, Illinois 60601
                                           (312) 456-8400 (Main)
                                           (312) 456-8435 (Facsimile)
                                           gibbonsj@gtlaw.com
                                           fordycet@gtlaw.com
                                           flynnk@gtlaw.com

## CERTIFICATE OF SERVICE

I, Kyle Flynn, an attorney, hereby certify that on October 19, 2018, I caused *Defendant City of Chicago's Answer to Third Amended Complaint* to be served through the ECF system on all attorneys of record.


*/s/ Kyle L. Flynn*