EDDIE L. BOLDEN,

        Plaintiff,

    v.

CITY OF CHICAGO, JAMES OLIVER,
ANGELO PESAVENTO, and EDWARD
SIWEK,

        Defendants.

No. 17 CV 417

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Eddie Bolden was wrongfully convicted of murder and attempted murder. Now exonerated, Bolden seeks damages from the police officers whose investigation led to his imprisonment. One of Bolden's claims is that defendants violated his Fourteenth Amendment right to due process by destroying, suppressing, and fabricating evidence. Defendants move for summary judgment on that claim. For the reasons below, the motion is granted in part, denied in part.

## I. Legal Standards

Summary judgment is appropriate if defendants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine dispute over a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the movants, defendants bear the burden of establishing that the summary judgment standard is met, but Bolden must show evidence to establish every element of his claim for which

he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I construe the facts in the light most favorable to Bolden and draw reasonable inferences from them in his favor. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## II.    Facts

On January 29, 1994, someone murdered Irving Clayton and Derrick Frazier and shot Clifford Frazier, Derrick's brother. [266] ¶¶ 1, 6, 9, 37.[1] On the day of the shootings, the three victims met with Anthony Williams (or Ant, for short) so that Clayton and Derrick[2] could sell him two kilograms of cocaine. [251] ¶¶ 6, 11. Ant was a governor in the Gangster Disciples. [251] ¶ 8. The men met at J&J Fish, a restaurant owned by Ant's family. [251] ¶¶ 7, 11; [266] ¶ 4. Derrick and Clayton handled the meeting, while Clifford guarded Clayton's car with the drugs. [251] ¶ 11; [266] ¶ 3. Clifford had two guns with him—a .40 caliber pistol and a Mac 11. [251] ¶ 90. At some point, another man joined the meeting. [251] ¶ 12. When and where the newcomer joined is disputed, but he eventually climbed into the backseat of Derrick's car, and Clayton, Derrick, and the man drove away to count the money. [251] ¶ 12. A few hours later, Derrick and Clayton were found in the car less than a mile away from the J&J Fish, both with multiple gunshot wounds to the backs of

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings, other than when referring to depositions, in which I use the transcript's page numbers. Facts are mostly taken from the parties' responses to each other's Local Rule 56.1 statements of material facts, which include both the original facts and the responses. [251]; [266].

[2] Multiple Fraziers and Williamses are involved in this case, so I refer to them by their first names.

their heads. [251] ¶¶ 14–15; [266] ¶ 6. Both men died from their injuries. [251] ¶¶ 14–15.

As for Clifford, he had been waiting near J&J Fish. [266] ¶ 4. Clifford was standing outside his car when a man began shooting at him—Clifford returned fire. [251] ¶¶ 98–99; [266] ¶ 8. Bullets struck Clifford in the back and leg as he ran. [266] ¶ 9. The shooter caught up to Clifford, and the two men fought near J&J Fish. [266] ¶ 10. Eventually, the shooter fled, and Clifford entered the restaurant. [266] ¶¶ 10–11. Someone called 911, and the police responded to the scene. [266] ¶¶ 18, 148.

## A.    The Investigation

Defendants are Chicago police officers who investigated the shootings. [251] ¶¶ 3–4. Angelo Pesavento and Ed Siwek were detectives assigned to the investigation, and James Oliver was a gang crimes specialist who assisted them. [251] ¶¶ 3–4.[3]

The Chicago Police Department notified all detectives about its investigative file policy. [266] ¶ 191. The policy required detectives investigating homicides to "record and preserve all relevant information during their investigations" and to keep one central, official file that included all reports, notes (including handwritten ones), and other materials generated or obtained during the investigation. [266] ¶¶ 193, 196. The thought was that the policy would help ensure officers' compliance with their

---

[3] Three other officers—Karl, Higgins, and Kill—were initially named as defendants but have since died. The parties agreed to stipulations covering these deceased defendants, under which Bolden dismissed his claims against them with prejudice but they remained part of the case for evidentiary purposes and as a potential source of liability for the City of Chicago. *See* [70]; [169]. The motion for summary judgment at issue now was filed on behalf of the defendant officers, not the deceased former defendants, so I focus on the defendants' conduct.

disclosure obligations, since the file—containing everything—would be turned over to the prosecution and, in turn, the defense. [266] ¶¶ 193–94. Detectives were also responsible for keeping each other updated on evidence they found. [266] ¶ 19.

### 1. *Pesavento and Karl's Witness Interviews*

Detectives Pesavento and Karl interviewed several witnesses on the day of the shootings, and the next day, they prepared a typed supplementary report to summarize their investigation up to that point. [266] ¶ 75. The report included details about the some of the witnesses like their ages, birthdates, addresses, and phone numbers. [266] ¶ 75.

One of the witnesses was Lee Williams, who, according to the report, said he saw a car pull over in front of his house and then saw a man in the backseat shoot the two men in the front seats. [251] ¶ 17. The report says Lee described the shooter as a black man in his early twenties, wearing dark clothing. [251] ¶ 17. At trial, Lee's story was different. Lee testified that though he had seen the car, he never saw a shooting or the car's driver, and that he told the police he saw someone get out of the backseat and walk away but could not tell the person's gender or race. [266] ¶ 79.

The Pesavento-Karl report also summarizes interviews with witnesses from J&J Fish, including Tenesha Gatson, Edna and James Williams (Ant's parents), Maurice Stewart, and David McCray. [251] ¶ 37; [266] ¶¶ 68–70. The report says that Gatson told detectives someone named "Lynier" had entered J&J Fish earlier in the day to speak with Ant because his pager was broken, that Lynier had been directed to the next-door pager shop, that Lynier and Ant later spoke inside J&J Fish for 15 minutes, and that Ant then left and Lynier stayed at J&J Fish. [251] ¶ 39; [266] ¶ 82.

It notes that Gatson said Lynier had a light complexion. [266] ¶ 81. Lynier is Bolden's middle name and nickname. [266] ¶ 73. At trial, Gatson testified that—contrary to the report—she did not tell the detectives that Lynier had come into J&J Fish with a broken pager looking for Ant, that he was directed to the pager shop, or that he spoke with Ant for 15 minutes. [266] ¶ 83. Instead, she had told the detectives that she saw Lynier and Ant speak at some point (but she did not know how long) and that Ant left some time after Clifford entered but before Lynier left. [266] ¶ 83. And years later, in her deposition for this case, Gatson testified that she never said Lynier had a light complexion. [266] ¶ 81.

The report says that Edna and James denied witnessing anything and had nothing helpful to say. [251] ¶ 38. At trial, Edna testified that the detectives never asked her who the shooter was or who was in J&J Fish before the shooting and that she told the detectives that she saw a man run into the restaurant with a gun in his hand. [251] ¶¶ 38, 120. As for the other J&J Fish witnesses—Stewart and McCray—the report says that neither saw anything. [251] ¶¶ 41–42.

### 2. *Clifford Frazier*

Clifford—who survived the shooting—was the main witness of the night's events, and he was interviewed several times. Officer Barbara Temple first interviewed Clifford on the scene at J&J Fish, where he did not provide a description of the shooter. [251] ¶ 21. According to Officer Temple, Clifford said that he had a gun that he dropped outside on the sidewalk, though Clifford denies telling her that. [266] ¶ 22.

Clifford was later taken to the hospital, where Officer Oliver interviewed him, together with one or two other officers. [251] ¶ 30. Officer Willis wrote a report summarizing the interview, and the parties dispute whether Officer Willis himself participated in the interview or if his report was only relating information he gathered from other officers. [251] ¶ 31; [266] ¶¶ 24, 181. Officer Willis's report describes the shooter as a black male, about 25 years old, wearing a white coat, between 5 feet 10 inches and 6 feet 1 inch tall, and with a medium-toned complexion. [251] ¶ 31. The report also notes that Clifford was informed of his *Miranda* rights. [266] ¶ 25. According to the report, Clifford said that on the night of the shootings he was acting as security for the drug transaction, and Ant, Derrick, and Clayton met inside J&J Fish to discuss the terms. [254-8] at 2; [266] ¶¶ 27–28. "A lone offender" left the restaurant with Derrick and Clayton, in the back seat of Derrick's car. [254-8] at 2. The offender later returned alone, said "freeze, don't move," and he and Clifford began shooting at one another. [254-8] at 2. Clifford ran, and the offender got into a physical fight with him, where the offender "beat [Clifford] about the head and body with his weapon the offenders." [254-8] at 2–3. Clifford broke loose and ran into J&J Fish, where David McCray took Clifford's .40 caliber pistol and hid it under an ice machine. [254-8] at 3.

Detective Baker also interviewed Clifford at the hospital. [251] ¶ 33; [266] ¶ 32. Detective Baker took notes, and Detective Pesavento used those notes (at least in part) to include a summary of the interview in the Pesavento-Karl supplementary report. [266] ¶¶ 33, 84. Detective Pesavento's summary varies from Detective Baker's

notes in a couple of ways. The summary says that Clifford said he got a good look at the shooter and that the shooter's gun looked like the one Clifford had in his car, but those details are not in Detective Baker's notes. [266] ¶ 85. And though Detective Baker notes that the shooter was clean shaven and wearing a light-colored coat, Detective Pesavento did not include those details in his summary. [266] ¶ 86.

The reports of Detective Baker's interview of Clifford relay a similar story to the one described in the Willis report, with a little more detail. Again, Clifford told the police that he went with Derrick and Clayton to sell cocaine. [254-4] at 6. Derrick gave Clifford two guns and told him to shoot anyone who came near the car he was guarding. [254-4] at 6. Derrick and Clayton went inside J&J Fish, and they came out with a black male who was tall, thin, had a light complexion, and was in his early twenties. [254-4] at 6. After they drove away, Clifford went inside a nearby Harold's Chicken to get some food, and he sat in his car eating it. [254-4] at 6. Two men were watching Clifford, which made him nervous, so Clifford got out of the car with one of his guns and pretended to check under the hood. [254-4] at 6. Clifford was there when a man came running, shooting at him. [254-4] at 6. Clifford ran away as they exchanged fire but then fell. [254-4] at 6. The shooter caught up to Clifford and began hitting him on the head with "his" gun, until Clifford was able to wrestle the gun away from the shooter. [254-4] at 6. At this time, Clifford recognized the shooter as the same person who had earlier driven away with Derrick and Clayton. [254-4] at 6. When Clifford got the gun from the shooter, the shooter fled, and Clifford dropped the gun on the street and kept his own. [254-4] at 6. Clifford then went into J&J Fish,

where he was told to drop his gun and a black man with a dark complexion kicked it under a table. [254-4] at 6.

Another officer—Officer Higgins—prepared a report that said, "Derrick Frazier informed officers … that [Ant] was involved in this incident and that Lynier was with Williams prior to the double murder." [266] ¶ 87. The report's reference to Derrick was a mistake—Derrick was dead, and Officer Higgins meant to attribute the information to Clifford. [266] ¶ 88. And though the report suggests that Clifford named Lynier, Clifford did not at the time claim to know the name (or nickname) of the shooter. [266] ¶ 88.

Clifford also had other interactions with the police investigating the case. Officers recovered cocaine and firearms from Clifford's home. [266] ¶¶ 61–62. Officer Oliver asked Clifford for information on Derrick and Clayton's drug supplier, though the discussion was not fruitful. [266] ¶ 161. Clifford told the police that Clayton's fiancée had a gun and that she had information about the drug supplier. [266] ¶ 162. Clifford once left a prosecutor a message saying that a public defender had tried to speak to him, but Clifford did not say anything. [266] ¶ 165. An officer may have accompanied Clifford to a funeral. [266] ¶ 163. And when Bolden was charged, defendants asked the prosecutor not to charge him with any charges that involved Clifford as a victim, though the prosecutors later added one. [266] ¶ 164.

### 3. Clifford's .40 Caliber Gun

Officer Willis found Clifford's .40 caliber pistol at J&J Fish. [251] ¶ 36. McCray—one of the witnesses from J&J Fish—was arrested and charged with the unlawful use of a firearm for hiding it. [251] ¶ 72. The inventory report for the gun

notes that there was blood on it, and it lists Clifford's name in the fields for both owner and arrestee. [251] ¶ 70. The listed charge is unlawful use of a weapon. [251] ¶ 70. The inventory report contains a field saying, "Hold for Investigation and/or Evidence," with a box and space for the investigating officer's name, star number, and unit next to it. [254-24] at 2. Officer Willis filled in his information, but the box was not checked. [254-24] at 2; [266] ¶ 59.

The state disclosed the gun as physical evidence that might be used in Bolden's trial, and Bolden's trial attorney asked that it be preserved, but in March 1994, the court presiding over McCray's criminal case ordered that the gun be destroyed. [251] ¶ 73; [266] ¶ 51.

### 4.    *Cynthia Steward*

Cynthia Steward was Clayton's fiancée. [266] ¶ 92. On the night Clayton was murdered, Steward told officers the shootings may have been a gang hit by the Gangster Disciples and that shortly before the murders, someone named Andre Kimbrough told her that Ant had asked him to carry out a hit on Clayton and Derrick. [251] ¶ 44.

The next day, officers, including Officer Oliver and maybe Detective Karl, went to Steward's home that she shared with Clayton to conduct a search. [266] ¶ 100. They asked Steward to give them Clayton's keys, including a key to a safe deposit box, and Officer Oliver threatened that she could lose her children or be arrested if she did not cooperate. [251] ¶ 45; [266] ¶ 103. The officers searched the house for Clayton's documents and said they were looking for (among other things) bank records that would show where he kept the deposit box. [266] ¶ 102. The officers wrote

down phone numbers they got from some of Clayton's documents and took some of the documents with them. [266] ¶¶ 101–02.

Later, officers, including Detectives Siwek and Karl, interviewed Steward at the police station. [266] ¶ 92.[4] Detectives Siwek and Karl summarized the hours-long interview in a four-paragraph report, noting that Steward said Clayton and Frazier sometimes sold drugs to Ant and Clayton told her they were going to do so on the day of the murders. [266] ¶ 92. But that was not all Steward told the detectives during the interview. [266] ¶ 93. Steward also told the detectives what she had said on the night of the shootings—that Ant and others had solicited Kimbrough for a hit on Clayton and Derrick. [266] ¶ 93. Kimbrough told Steward that he did not agree to do it but gave her the names of others who might have been approached. [266] ¶ 93. Steward gave the detectives those names, which did not include Bolden's. [266] ¶ 94. Steward also said that Clayton was with her when Kimbrough gave her the disturbing news, so Clayton and Derrick—aware of the hit out on them—were extra cautious on the day they were murdered. [266] ¶ 95. Steward said Clayton and Derrick would not have let someone they did not know well into their car. [266] ¶ 95. None of Steward's information about the hit made it into the detectives' report. [266] ¶ 97.

---

[4] Bolden claims that Officer Oliver was present too, but Oliver's presence is not supported by the evidence. When asked whether Officer Oliver participated in the interview, Steward replied that she was "not sure about Oliver." [254-17] at 127:18–23.

5. *Lineup*

About a month after the shootings, Bolden was asked to participate in a lineup at the police station. [251] ¶ 61. Clifford had earlier been asked to identify his shooter in a photo array (which included Bolden's photo), but Clifford said he needed to see the shooter in person to make the identification. [251] ¶ 60. Bolden agreed to participate in the lineup, and he was accompanied by a retained attorney. [266] ¶¶ 118, 120–21. According to Bolden, while he and his attorney were waiting for the lineup to begin, Officer Oliver walked Clifford right by them, and Clifford looked at Bolden. [266] ¶ 122. At around the same time, either Bolden or his attorney told Detective Karl that Bolden was the one who made the 911 call from J&J Fish to report the shooting. [251] ¶ 62; [266] ¶ 124.

Detectives Pesavento, Siwek, and Karl conducted the lineup of Bolden and four other men. [266] ¶ 125. Clifford had described the shooter as being about 20 or 21 years old, 6 feet tall, and thin. [266] ¶ 126. Bolden—24 years old, 6 feet 2 inches tall, and skinny—was the only person in the lineup close to meeting all of those characteristics. [266] ¶ 126. For example, three of the four fillers were 5 feet 9 inches or shorter, and the only other man who was above 6 feet tall weighed 260 pounds. [256-24] at 3. From there, the parties dispute what happened in the lineup room. According to Bolden, he could see Clifford through the tinted window that separated them. [266] ¶ 136. Bolden says that he saw Clifford point to one of the lineup fillers and start to walk away, prompting Detective Karl to open the door, look at Bolden, and say, "you are Eddie Bolden, right?" [266] ¶¶ 138–39. Bolden also says he saw Clifford and an officer move in front of him, where the officer said something to

Clifford, and Clifford shook his head no and walked away. [266] ¶ 140. The officer then directed Clifford back to the window, and Clifford shook his head yes to identify Bolden. [266] ¶ 140. Defendants deny that these events occurred and that Bolden was capable of seeing them through the glass.

Bolden was arrested after the lineup. [266] ¶ 143. In his post-arrest interview, Bolden repeated that he was the one who had called 911 when Clifford was injured, though Detective Pesavento does not recall him saying that. [266] ¶ 143.[5] Bolden told Detective Karl to bring Officer Oliver into the interview room because, according to Bolden, Officer Oliver knew that he was in J&J Fish when the police arrived. [266] ¶ 143. Detective Karl kicked the door shut and said that Officer Oliver did not remember Bolden. [266] ¶ 143. Later on, Bolden was waiting in an interview room when Detective Kill looked into the room, smiled, and said, "he's bald." [266] ¶ 143.

### 6. 911 Recording

The police department only kept 911 recordings for 30 days unless someone requested that they be preserved. [266] ¶ 147. There was a form that detectives could fill out and submit if they wanted to preserve a 911 recording. [266] ¶ 153. Detective Pesavento knew that he could have obtained the recording of the 911 call from J&J Fish, but he never did. [266] ¶ 155. The department also kept dispatch cards with the

---

[5] Defendants argue that Bolden never told Detective Pesavento that he made the 911 call. But Bolden said in his deposition that he told the officers in his post-arrest interview, [254-16] at 210:24–211:24, and Detective Pesavento was at the post-arrest interview. [254-20] at 182:1–7. So though Detective Pesavento does not recall Bolden telling him to get the 911 recording, [254-20] at 182:12–18, Bolden has presented enough evidence from which to infer he did.

911 dispatchers' notes about the call, including the caller's name if possible. [251] ¶ 76; [266] ¶ 151. Dispatch cards were retained for at least 60 days. [266] ¶ 156.

On March 4, 1994, Bolden's trial attorney subpoenaed the 911 tapes and dispatch cards for the shootings. [251] ¶ 75. The police department responded to the subpoena by saying that it was too late—Bolden's subpoena was sent outside of the retention period for tape recordings. [251] ¶ 77. The letter did not specifically address the dispatch cards, instead noting generally that "[Bolden's] request for information [could] not be accommodated." [266] ¶ 152.

## B.    The Trial

In October 1996, a jury heard the case against Bolden. [266] ¶ 167. Bolden was represented by a public defender who had taken over representation sometime after Bolden's initial appearance. [266] ¶ 150. The prosecution's theory was that the drug transaction was a ruse orchestrated by Ant, meant to lure the victims somewhere where Bolden could shoot them. [266] ¶ 174. By this time, Ant was in a drug-induced coma and unavailable to testify. [251] ¶ 85. The prosecution called Detective Pesavento to testify about the lineup procedure, and Detectives Pesavento and Karl were both called to rebut testimony that the lineup was tainted. [266] ¶ 171. Neither Detective Siwek nor Officer Oliver testified. [266] ¶ 173.

The prosecution's main witness was Clifford, who identified Bolden as the one who had climbed into his brother's car and later come back to shoot Clifford. [266] ¶ 175. Clifford testified that on the night of the shootings, Clayton and Derrick came to his house to get two kilograms of cocaine, and the three of them drove to J&J Fish. [251] ¶¶ 88–89. He said that he brought two guns with him, both of which he got from

his house. [251] ¶ 90. A detail not captured in the police reports, Clifford testified that he had entered the J&J Fish with Clayton and Derrick to meet with Ant and that Ant asked him to leave because he was armed, so Clifford went across the street to Harold's Chicken. [266] ¶ 176. From there, Clifford said he saw Bolden exit the next-door beeper store, enter J&J Fish, and shake hands with everyone. [251] ¶¶ 91–92; [266] ¶ 176. Clifford also testified that Bolden, Derrick, and Clayton all came into the Harold's Chicken before they left to count the money, giving Clifford a good look at Bolden's face. [251] ¶ 93; [266] ¶ 177.

Clifford testified that as he later stood outside his car, Bolden returned and began shooting at him, hitting him in the leg and back. [251] ¶¶ 98–100. Clifford shot back. [251] ¶ 101. Clifford said that when he and Bolden physically struggled near J&J Fish, Bolden told him to drop his gun and then Bolden picked it up. [266] ¶ 182. Clifford said that Bolden repeatedly hit him on the head with "the gun," [243-47] at 112:18, leaving some ambiguity about whose gun he was saying Bolden hit him with. Clifford went on to say that Bolden then dropped Clifford's gun and ran down the street, and Clifford went into J&J Fish. [251] ¶¶ 102–03. Among the things Clifford remembered about Bolden from the altercation was Bolden's eyebrows. [266] ¶ 187. Clifford also testified that Ant was the one who hid his gun inside J&J Fish and that he never told police that the shooter's gun looked like the one in his car. [266] ¶¶ 85, 185. Clifford admitted that he spoke with the police at J&J Fish, at the hospital, and in the weeks that followed. [251] ¶ 104.

Bolden's attorney cross-examined Clifford about his "new" testimony—that he had entered and left J&J Fish, watched the other men's meeting from Harold's Chicken, and gotten a good look at Bolden's face when the men stopped inside Harold's—and Clifford said he had told these things to officers before. [266] ¶ 178. Later, the defense called Detective Baker to impeach Clifford's testimony, and the detective confirmed that Clifford never told him that he had entered the J&J Fish with Clayton or Derrick or that he had come face-to-face with Bolden inside Harold's Chicken. [266] ¶ 179. However, Detective Baker also testified that his interview of Clifford had been brief—only 10 to 12 minutes—and he had asked Clifford to give him just a summary of what happened. [266] ¶ 180.

On cross-examination, Bolden's attorney also elicited information about Clifford's involvement in his brother's drug business—Derrick stored cocaine at Clifford's apartment and kept guns (more than just the two Clifford brought with him on the night of the murders) there too. [251] ¶ 106. Clifford admitted that on the night in question, he had four kilograms of cocaine in his bedroom closet, and he was involved in the drug transaction by guarding the cocaine. [251] ¶¶ 107, 109. And yet, Clifford testified, he was never charged or arrested in connection with the drug transaction. [251] ¶ 110. On re-direct, Clifford confirmed that no one had promised him anything in exchange for his testimony. [251] ¶ 110. In closing, the prosecution emphasized that Clifford had no motive to lie, arguing, "What motivation does Clifford have to lie and say that Edward Bolden is this man? What possible motivation does he have?" [266] ¶ 189.

Bolden's defense centered around his presence inside J&J Fish at the time Clifford was shot. Both Gatson and Edna Williams testified that Bolden was inside J&J Fish when Clifford ran in. [251] ¶¶ 118–19. Detective Karl testified that when he and Detective Pesavento interviewed Edna about the shooting, they asked her if she knew who did it and who was in the J&J Fish before and after the shooting, but that Edna had denied witnessing anything. [266] ¶ 169. Detective Karl also testified about his interview of Gatson, testifying consistently with the notes in the Pesavento-Karl supplementary report. [266] ¶ 170. He testified that Gatson never said Bolden was in J&J Fish when Clifford ran in wounded. [266] ¶ 170.

The jury convicted Bolden of murdering Clayton and Derrick and attempting to murder Clifford. [251] ¶ 5. In 2014, the state court granted Bolden's petition for post-conviction relief, finding that Bolden was entitled to a new trial because his counsel was ineffective in failing to call an alibi witness, and the state chose not to retry him. [251] ¶ 5. The court granted Bolden's petition for a certificate of innocence in 2016. [266] ¶ 201.

## III.   Analysis

Bolden brings his due-process claim under 42 U.S.C. § 1983, which "creates a species of tort liability" for violations of constitutional rights. *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). There is no such thing as vicarious liability in a § 1983 claim—a defendant is only liable if he is personally responsible for the constitutional deprivation. *See Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 469 (7th Cir. 2016). To be personally responsible, the defendant must have himself committed the violation, directed it, or at least have known about and acquiesced to it. *See id.*; *Gill v. City of*

*Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). Negligence does not suffice. *Wilson*, 830 F.3d at 469.

## A.    Destruction of Evidence

Bolden claims that defendants destroyed (or failed to preserve) certain pieces of evidence that would have exculpated him. Due process does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Instead, the failure to preserve potentially useful evidence only violates due process when the police act in bad faith. *Id*. So, to prove that a defendant violated his right to due process by failing to preserve evidence, Bolden must prove: "(1) bad faith by [the defendant], (2) that the exculpatory nature of the evidence was apparent before its destruction, and (3) that he could not obtain the same evidence anywhere else." *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019). Bad faith "requires proof of an official animus or a conscious effort to suppress exculpatory evidence, and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *Id*. (cleaned up). The requirements that the evidence have apparent exculpatory value and not be obtainable elsewhere are another way of saying the evidence must be constitutionally material, or somewhat irreplaceable. *See California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

In footnotes, Bolden mounts a couple of half-hearted challenges to that articulation of the failure-to-preserve standard, arguing that courts have not "consistently" or "explicitly" required that the plaintiff could not obtain the evidence

17

elsewhere and that bad faith is not an element when the evidence had "actual" exculpatory value that was apparent before its destruction (as opposed to potential exculpatory value). [253] at 16 n.6–7.

Due process requires preservation of only material evidence, and in this context, materiality means that the evidence has apparent exculpatory value and "that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488. Bolden cites to cases that do not mention alternative means of securing comparable evidence, but the absent evidence in those cases was unlikely to have had a comparable source. *See Youngblood*, 488 U.S. at 58 (semen sample from rectal swab and victim's clothing); *Armstrong v. Daily*, 786 F.3d 529, 551 (7th Cir. 2015) (semen sample from victim's bathrobe). *Trombetta* and the Seventh Circuit's articulation of the standard require the plaintiff to show that he would not have been able to get comparable evidence by other means. *See White v. Fitzpatrick*, 755 Fed.App'x 563, 570 (7th Cir. 2018); *Tabb v. Christianson*, 855 F.3d 757, 768 (7th Cir. 2017). I am not persuaded by Bolden's argument otherwise.

As for whether bad faith is required where the evidence had "actual" exculpatory value, the case law does suggest that the destruction of "apparently" exculpatory evidence can violate due process even without bad faith. *See Armstrong*, 786 F.3d at 556 ("[*Trombetta* and *Youngblood*] made clear that the bad-faith destruction of potentially exculpatory evidence—or destruction of evidence with apparent exculpatory value, even without bad faith—violated a criminal defendant's

right to due process of law."). The parties' confusion seems to stem from muddled use of the terms "apparent," "potential," and "actual." *Trombetta* makes clear that destroyed evidence must have apparent exculpatory value to support a claim, 467 U.S. at 489, meaning the exculpatory value must be conspicuous or noticeable. Evidence can have apparent potential exculpatory value or apparent actual exculpatory value (though calling it "actual" is redundant—it just has exculpatory value). The former is the type of evidence at issue in *Youngblood*, which required more analysis to determine whether it would, in fact, be exculpatory. 488 U.S. at 57 (referring to "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"). This type of evidence does require proof of bad faith. *Id.* at 58. *See also Illinois v. Fisher*, 540 U.S. 544, 549 (2004) ("[T]he applicability of the bad-faith requirement in *Youngblood* depended … on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence."). The latter is something like, for example, a video showing someone other than the defendant committing the crime. In the case of actually exculpatory evidence—whether its exculpatory value is apparent or not—one need not resort to *Youngblood*, because the *Brady* right to exculpatory evidence applies. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (citing *Brady* for the proposition that the "failure to preserve [apparently exculpatory evidence] violates due process regardless of the government's good or bad faith"); *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011) (noting that *Brady* governs when "the government knew

the material was exculpatory and failed to preserve it" and *Youngblood* governs when "the government failed to preserve [evidence] while recognizing that it was potentially exculpatory").

In short, if evidence has apparent exculpatory value (as opposed to apparent potential exculpatory value), Bolden need not show bad faith to establish a due-process violation, and *Brady* provides the due-process test. (Though, as I explain below, a § 1983 claim adds an element to the *Brady* analysis.) Of the four categories of evidence that Bolden alleges defendants destroyed or failed to preserve, he argues that only one—the 911 recording—had apparent actual exculpatory value. *See* [253] at 16 n.7.

### 1. 911 Recording

Before turning to the constitutional inquiry, I begin with the statutory one— even if the failure to preserve the recording of the 911 call from J&J Fish were a constitutional violation, are any of the defendants liable under § 1983? Liability requires personal responsibility for failing to preserve the recording. It is undisputed that the 911 recording was destroyed as a matter of course, consistent with the CPD's retention policy. Bolden's theory is that Detectives Pesavento and Karl "had the ability and responsibility to preserve the recording," but "intentionally chose to let it be destroyed." [253] at 18. Though it lies on the border of conduct that can give rise to § 1983 liability, a defendant can be personally responsible for a constitutional violation caused by his intentional inaction or "deliberate, reckless indifference." *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007). But for the detectives to have acted intentionally, they would have had to have known that the tape would be

destroyed (or otherwise not preserved) if they did not take steps to preserve it. Absent that knowledge, the detectives might have thought the recording would be there when they got around to it. That procrastination would be negligence at most.

Though Bolden argues that the retention policy was "well-known," he cites no evidence that the defendants knew of it. His expert opines that the failure to preserve the 911 recording violated accepted police practices, *see Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013), but it is too speculative, without more, to attribute personal responsibility to these defendants based on a general notion of accepted practices. Bolden cites to a criminal case to suggest that the detectives can be held liable because they had the ability to control the evidence. *See United States v. Bohl*, 25 F.3d 904, 912 (10th Cir. 1994) (finding bad faith where "the government" had "possession or the ability to control" the evidence when notified about its exculpatory value). In a criminal case, the issue is whether the defendant's constitutional rights have been violated, but in a civil § 1983 case, the inquiry involves the added step of asking whether a particular defendant is personally liable for the violation. Here, defendants are not liable under § 1983, regardless of whether Bolden's constitutional rights were violated.

Anyway, there is reason to doubt the detectives violated Bolden's due-process rights by failing to preserve the recording. Bolden argues that the 911 recording had exculpatory value—not just potentially exculpatory value—and therefore he need not demonstrate bad faith. I disagree. Any exculpatory value was only potential because we do not know what was on the tape. Bolden's testimony that he made the call is

enough to infer that the tape would have identified him as the caller but review of the tape would be necessary to realize its exculpatory potential, which was to show that Bolden was inside J&J Fish right after Clifford was shot (whereas the shooter never entered). [266] ¶ 11. It would also have helped corroborate Gatson's and Edna's testimony that Bolden was inside the restaurant during the shooting, since it would put him inside the restaurant shortly after.

Destruction of potentially exculpatory evidence does not violate due process unless done in bad faith, which requires a "conscious effort to suppress exculpatory evidence." *United States v. Fletcher*, 634 F.3d 395, 408 (7th Cir. 2011) (quoting *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir.2000)). As I explained above, Bolden has not shown that the detectives acted with intent sufficient to demonstrate that they are personally responsible for the failure to preserve the recording, and without intent, there can be no bad faith. This is true even though the pivotal question in the bad-faith inquiry is whether the defendant knew the evidence's exculpatory value, which the evidence suggests both detectives did. *See* [266] ¶¶ 124, 143. Defendants argue that the detectives never heard the 911 recordings for themselves, but Bolden and his attorney told them that it was him, which is sufficient to raise a dispute over defendants' knowledge. That Bolden and his attorney told the detectives about the 911 recording (albeit just a few days before the retention period expired), combined with other evidence that Bolden points to—like that CPD's Standard Operating Procedures required the detectives to preserve "all relevant information" and other irregularities in the detectives' handling of evidence—would

raise a reasonable inference of bad faith if the detectives had directed the evidence to be destroyed or even known what would happen to the recording if they did not act. But here, where the evidence shows only that the detectives sat idly by, there can be no reasonable inference of bad faith. Now that Bolden is past the complaint stage, he must come forward with more than the accusation that defendants destroyed the recording in bad faith, and he has not done so.[6]

### 2.    .40 Caliber Gun

Bolden's case for the failure to preserve Clifford's .40 caliber gun fails for similar reasons. Bolden argues that fingerprint, DNA, or blood analysis on the gun could have shown that someone other than Bolden or Clifford held it, which would have exculpated Bolden. Here too, there is no evidence that any of the defendants are personally responsible for the gun's unavailability. Officer Willis (who is not a defendant) is the one who filled out the inventory report, and even drawing the inference in Bolden's favor that putting his name in the preservation field was not sufficient to preserve the gun because he had to check the box, there is nothing to tie any of the named defendants to Officer Willis's failure to properly preserve the gun. Bolden argues that, as investigating detectives, defendants would have seen the inventory report and noticed that the preservation box was not checked, so their

---

[6] I need not consider the issue of materiality. *See United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) ("Only if bad faith is shown does the court consider the constitutional materiality of the evidence in question."). But I note that Bolden subpoenaed the dispatch card, and there is a dispute over whether he received it. He diligently pursued this alternative, and defendants' argument that Bolden could have called the dispatcher is not supported by evidence that the dispatcher had any independent memory. Without more conclusive evidence that Bolden had the dispatch card, there is a dispute over whether the exculpatory evidence of Bolden's presence inside J&J Fish was available elsewhere.

failure to correct it makes them personally responsible. That logical chain is premised on too much speculation. There is no evidence from which to infer that defendants saw that the preservation box was unchecked, and if there were, it would still fall short of the sort of intentional or reckless conduct required for § 1983 liability. The gun was destroyed pursuant to a court order, and there is no evidence that, for example, one of the defendants heard about the order and chose not to take any action to stop it from being carried out, despite knowing the value it held for Bolden.

As with the 911 recording, the lack of evidence that any of the defendants acted (or refrained from acting) intentionally to cause the gun's destruction also falls short of establishing bad faith. Bolden points to defendants' fishy behavior with respect to the gun evidence—the other gun (the Mac 11) was not preserved either, Detective Pesavento submitted the casings from the crime scenes to be analyzed but did not submit the .40 caliber gun for analysis, and Clifford's changing narrative should have roused suspicion—but defendants could not have failed to preserve the gun in bad faith without knowing that it had exculpatory value. *See Youngblood*, 488 U.S. at 56 n.* ("The presence or absence of bad faith … must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."); *Cherry*, 920 F.3d at 1140. The inventory report notes that the gun had blood on it, but the police reports are vague as to whether Clifford meant the shooter hit him with his gun or with the shooter's gun. Either way, there is no evidence that defendants thought analysis could yield exculpatory results for Bolden.

### 3. *Interview Notes*

Bolden claims that defendants destroyed handwritten notes from their interviews of Lee, Edna, McCray, Gatson, Steward, and Clifford. Who destroyed what notes, he does not say. There is no evidence that defendants were the ones who failed to preserve the notes or destroyed them, which is reason enough to grant summary judgment on the theory.

The theory is further plagued by a problem not uncommon to claims of this kind. Where the issue is that defendants have allegedly destroyed or otherwise lost evidence, courts are left to conduct a postmortem examination without a body. *See Trombetta*, 467 U.S. at 486 ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."). It is not impossible to do—like above, where Bolden's testimony was enough to suggest the contents of the 911 recording—but here, there is nothing but speculation. *See* [253] at 43–46 (Bolden's response brief describing what the notes "likely would have established," "likely contained," and "likely would have corroborated"). It is reasonable to infer from the level of detail contained in the typed interview reports that handwritten notes existed at some point, but the contents of those notes are a mystery. Even in the case of Gatson, for example, where she testified that she never told the detectives that "Lynier" had a light complexion, there is no evidence as to whether the notes reflected that fact or not. Bolden alleges that defendants fabricated the portion of their typed report that says Gatson said Lynier was light-complected, so maybe they fabricated their notes too. There is no evidence either way.

Bolden suggests that the appropriate course is to compare the typed interview reports with the witnesses' trial testimony and assume that if the two are inconsistent, then the handwritten notes "might" also be inconsistent with the typed reports. [253] at 43. In support of this proposed analysis, he cites to *Tabb*, in which the court found no evidence that destroyed interview notes contained exculpatory information. 855 F.3d at 768. Bolden is presumably referring to the court's remark that the witness's "deposition testimony after the report was typed is consistent with the report." *Id*. But Bolden goes too far in taking that observation to mean that whenever later testimony contradicts the typed report, one can infer that the missing handwritten notes were exculpatory. In fact, in the line before the consistency is noted, the *Tabb* court wrote that "[the witness's] prior statements were not consistent with some key details in the summary reports, but that does not mean the reports do not accurately reflect her statements to the State investigators." *Id*. In other words, the typed report's inconsistencies with prior or later statements do not provide a reasonable basis from which to infer the contents of handwritten notes. Without knowing what the notes said, I cannot determine whether they had exculpatory value or whether that exculpatory value was apparent to defendants before the notes were destroyed. To defeat summary judgment, Bolden had to point to some evidence suggesting exculpatory content, and he did not. *See id*. ("While we recognize that it is difficult to present evidence of the contents and nature of destroyed evidence, the standard requires more than the destruction itself to support an inference that the evidence was exculpatory.").

Bolden also did not marshal evidence to suggest that defendants acted in bad faith. Bolden points to cases in which courts have said that when notes are destroyed as part of a routine practice, it suggests they were destroyed in good faith. *See Killian v. United States*, 368 U.S. 231, 242 (1961); *Tabb*, 855 F.3d at 768. That does not necessarily mean that when notes are destroyed contrary to routine practice, it always raises an inference of bad faith. Here, where there is no evidence that the notes contained exculpatory evidence or that defendants were aware of their exculpatory contents, there can be no bad faith, even if the notes were destroyed contrary to CPD policy. And without evidence of bad faith, I need not move on to materiality.[7]

### 4.    *Search Findings*

Bolden's claim that defendants destroyed the evidence seized from their search of Clayton's home is similarly deficient. Bolden offers no evidence of who destroyed it. Steward's testimony supports the notion that Detective Karl and Officer Oliver were at the search, but Bolden goes further and asserts that one can infer that Detectives Pesavento and Siwek had "knowledge of the search" too because detectives had a duty to share relevant information with the other case detectives. [253] at 50–

---

[7] The handwritten notes of at least some of the interviews were not material because Bolden could have gotten comparable evidence from the witnesses themselves. For Edna and Gatson, for example, Bolden's theory with respect to the notes is not, as may often be the case, that he would have used the witnesses' prior statements to impeach them on the stand at trial because he does not claim that they lied during their trial testimony. Instead, he claims that the witnesses were telling the truth, but defendants' typed reports misrepresented what they said before. If that is the case, then Bolden could ask the witnesses what they told defendants in their interviews. Bolden responds that some of the witnesses were unavailable to them but does not make that argument as to Edna and Gatson, [253] at 48, meaning at least the notes of their interviews were not material.

51. Even so, knowledge of the search is not the same as knowledge of the failure to preserve or destruction of the fruit of the search.

And there is no evidence of what the seized evidence was. Steward testified that the officers who conducted the search "took different papers" but she did not know what those papers were. *See* [254-17] at 118:2–6. Steward also said that the officers took down names and phone numbers but there is no evidence of whose names they were and where they came from. Bolden suggests that the evidence was exculpatory because it would show that Clayton did not know Bolden, but this is speculation, not reasonable inference. Without evidence of what the seized documents were or whose names the officers took down, a jury cannot infer the evidence's value to Bolden. Bolden also argues that the fact that the officers took the key to a safe deposit box would bear on their credibility, but he misses several links between the seized key and a negative credibility inference. Presumably, he means to argue that the fact that officers, perhaps Detective Karl or Officer Oliver, took the key suggests that they took it to get into Clayton's safe deposit box to steal his money, but there is no evidence to support such a claim. And Bolden's argument that the seized documents could have shown defendants' failure to follow up on leads contained within them holds no weight without evidence of what those leads (if any) were.

To find that the seized evidence had potential exculpatory value to Bolden, that defendants knew that, or that defendants were personally involved in the destruction of the evidence, would be sheer conjecture. *See Coleman v. City of Peoria, Illinois*, 925

F.3d 336, 345 (7th Cir. 2019) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

### B. Suppression of Evidence

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. This duty extends to the police, requiring them to disclose exculpatory evidence to the prosecutors so that they, in turn, can disclose the evidence to the defendant. *See Coleman*, 925 F.3d at 349. "To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, No. 18-2211, 2019 WL 3334655, at *7 (7th Cir. July 25, 2019).

Favorable evidence is either exculpatory or impeaching. *Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007). "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Suppressed evidence is material if there is a reasonable probability that the jury's verdict would have been different if the evidence had been presented to it. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) ("*Goudy II*"). If, in light of the entire record, "the cumulative effect of all the suppressed information is to undermine

confidence in the verdict," the evidence is material. *Id.* (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)).

As I noted above, Bolden must prove that defendants are personally responsible for the constitutional violation because his claim is under § 1983. This adds a wrinkle to the analysis as articulated in *Brady v. Maryland*, which held that the suppression of favorable, material evidence violates due process, "*irrespective of the good faith or bad faith of the prosecution.*" 373 U.S. at 87 (emphasis added). *See also Goudy II*, 922 F.3d at 838 ("[A] plaintiff must demonstrate … that the state 'suppressed' the favorable evidence either willfully or inadvertently.").[8] But though there is no mental state requirement for a constitutional *Brady* violation, there is one for a § 1983 violation, and it is something more than negligence. *See McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35–36 (2d Cir. 2017)); *Wilson*, 830 F.3d at 469 (explaining that to be liable under § 1983, a defendant must be personally responsible for the constitutional deprivation, which "is a mental state requirement and requires plaintiffs to prove more than mere negligence"); *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006) ("Section 1983 claims cannot be founded on negligence.").

---

[8] *Goudy II* is a § 1983 case, but the quoted "willfully or inadvertently" language comes from its statement of what is required "[t]o show a *Brady* violation" and does not specifically address the § 1983 personal responsibility issue. 922 F.3d at 838. The court also later notes, in the context of materiality, that it was not addressing whether § 1983 *Brady* standards differ from other contexts in which *Brady* issues arise. *See id.* at 842 ("No one has argued that [the materiality] standard is different in a case under section 1983, such as this one, from the standard that applies in habeas corpus actions. We therefore do not explore that possibility.").

Other circuits have held that "the no-fault standard of care *Brady* imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process." *Porter v. White*, 483 F.3d 1294, 1306 (11th Cir. 2007). Some courts require proof of intent or bad faith. *See Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). Others require only recklessness. *See Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009) ("[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."). One circuit has declined to impose a state-of-mind requirement on § 1983 plaintiffs. *See Moldowan v. City of Warren*, 578 F.3d 351, 386 (6th Cir. 2009).

The Seventh Circuit has not directly addressed the state of mind required to sustain a § 1983 *Brady* claim. In *Steidl*, the court rejected the notion that "police officers violate due process only if they deliberately withhold or conceal exculpatory evidence from the prosecutor." 494 F.3d at 631 (cleaned up). It pointed instead to its decision in *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988), in which it said that to be personally responsible under § 1983, defendants "must … act either knowingly or with deliberate, reckless indifference." More recently, the court noted that "[t]he *Brady* constitutional standard in a criminal case applies to both willful and negligent failures to disclose exculpatory evidence. For civil claims for due-process violations, though, the general rule is that the defendant must have acted

intentionally or at least recklessly," but the court found it unnecessary to decide the required state of mind to resolve that appeal. *Cairel v. Alderden*, 821 F.3d 823, 832 n.2 (7th Cir. 2016). Though the Seventh Circuit has not definitively held that at least recklessness is required for a § 1983 *Brady* claim, *Steidl* and *Cairel* give me enough reason to believe that it would. *See Anderson*, 2019 WL 3334655, at *7 (stating standard for civil *Brady* claims and citing to footnote 2 in *Cairel*).

Bolden's recurring personal responsibility argument is that the detectives were responsible for updating each other on the evidence they found, *see* [266] ¶ 19, suggesting that the detective defendants should be charged with knowledge of any evidence suppressed in the investigation. But just because detectives were responsible for keeping each other updated does not mean they did so. One officer's negligence cannot be the sole basis for another's personal liability. Bolden must instead come forward with something more to tie defendants to the allegedly suppressed evidence.

### 1.  *Evidence of Clifford's Role as an Informant*

Bolden argues that defendants suppressed evidence that Clifford was acting as an informant: Clifford gave defendants information about a gun Steward had and told them what Steward might know about the shootings, defendants asked Clifford for information about Clayton and Derrick's drug supplier, Clifford met with defendants multiple times, Clifford told officers that Officer Oliver had Derrick's safe deposit box key and asked him for help recovering cash from the box, Officer Oliver threatened Clifford for telling the officers about the key, defendants recovered 30 guns from Clifford's apartment and did not arrest him for illegally possessing them,

Steward told officers that illegal drug proceeds were being stored at Clifford's mother's home but defendants did not seize or report the funds, an officer escorted Clifford to a funeral, and defendants arrested Clifford in connection with the January 29 events but did not charge him. [253] at 40–41.[9]

Defendants do not dispute that the evidence was favorable to Bolden and was not disclosed to him. Instead, they argue that Bolden should have uncovered the evidence on his own by questioning Clifford. Whether Clifford—a prosecution witness—would have been willing to tell Bolden about his cooperation is disputed. Bolden points to evidence that Clifford once left a message with a prosecutor to say that a public defender (presumably the one representing Bolden) had tried to contact him but "he said nothing," [266] ¶ 165, from which one can infer that Clifford was reluctant to speak with the defense. Defendants respond with Bolden's trial attorney's testimony that he thought the defense investigator had spoken with Clifford, [251] ¶ 83, but the fact that they spoke is not helpful when there is no evidence of what Clifford said. Maybe he said, "I don't want to talk to you." A jury could conclude that speaking with Clifford was not an available alternative to Bolden. This evidence, with one exception discussed in footnote 13 below, was suppressed.[10]

---

[9] Bolden also argues that defendants suppressed the inventory report for Clifford's .40 caliber pistol. He argues that it was favorable to him because it shows Clifford was arrested, since Clifford's name is written in the form's arrestee field. Even if the inventory report was suppressed, it was not material because, as I explain below, the fact of Clifford's arrest was not material.

[10] The parties do not drill down on which defendants are personally responsible for suppressing which pieces of informant-related evidence, so I won't either. But ultimately, Bolden bears the burden to establish personal responsibility for each defendant.

As long as the list of allegedly suppressed evidence relating to Clifford's informant status is, the parties give short shrift to explaining why any of it was material. The impeachment value of the evidence lies in the existence of an agreement—explicit, tacit, or maybe just expected—between Clifford and the state, in which Clifford would testify against Bolden (and cooperate with the investigation in other ways) in exchange for not being charged for his own criminal activity. *See Wearry v. Cain*, 136 S.Ct. 1002, 1007 (2016) ("[E]ven though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material because the jury might well have concluded that the witness had fabricated testimony in order to curry the prosecution's favor." (cleaned up)); *Wisehart v. Davis*, 408 F.3d 321, 323–24 (7th Cir. 2005). Such an agreement would impeach Clifford's credibility because it would be a reason to lie. For a witness as important as Clifford, that kind of evidence is usually material. *See Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019) ("The Supreme Court has clearly established that strong and non-cumulative impeachment evidence related to an important trial witness is material under *Brady*."). But Bolden's jury heard evidence of Clifford's motive to lie. The jury heard from Clifford's own lips that he assisted in a two-kilogram cocaine transaction on the night of the murders and that he harbored drugs and guns in his home (and knew those things were crimes), and the jurors heard that Clifford was not charged for any of it.

I understand Bolden to argue that more evidence on both sides of the agreement—that he did more (e.g., gave officers information about Steward) and got

more (e.g., a funeral escort)—would be stronger evidence that a formal agreement existed, and if the state was explicitly dangling a criminal charge over Clifford's head, that would be more impeaching than, say, Clifford trying to curry favor with the state based on an expectation of what it might do. But the evidence about what Clifford did for the state is minimal. He admitted at trial that he met with the police multiple times—the jury heard that. Though Bolden contends Clifford told officers about Derrick and Clayton's supplier, the evidence is that he was asked but did not provide the help. The same is true of Officer Oliver asking Clifford to help him recover cash from Derrick's safe deposit box.[11] That leaves only the evidence suggesting that Clifford told officers that Steward had a gun and might know something about what happened. When the jury already knows that Clifford has given multiple interviews to the police and agreed to testify against Bolden, that he pointed them in the direction of a potential witness does not make him look materially more cooperative (particularly when the witness he pointed the police to was an obvious one—the victim's live-in fiancé).

Nor do any of the suppressed facts make it look like Clifford received much more than the reprieve from criminal charges that was aired at trial. Clifford testified that he had more than two guns in his apartment. *See* [251] ¶ 106. Bolden argues that defendants suppressed the fact that he had 30 of them. Bolden's attorney could

---

[11] The alleged facts surrounding Officer Oliver and the safe deposit box are not impeaching of Clifford. That he did not comply with Officer Oliver's request (which Bolden paints as unethical) and instead told other officers about it bolsters his credibility. Officer Oliver's threat to "fuck up" Bolden does not bear on Clifford's informant status, and Bolden offers no argument for its materiality independent from his general argument about the materiality of informant status.

have followed up at trial to elicit the exact number of guns he had. *See* [243-47] at 133:5–10 (on cross, Bolden's attorney asking Clifford if he kept guns in his apartment other than the two he had the night of the shooting and Clifford responding that "[t]hey had other guns in there"). Defendants' failure to follow up on Steward's report of illegal drug money stored at Clifford's mother's home was not a clear-cut benefit to Clifford. There is no evidence that Steward's information was reliable, that Clifford benefitted from the money, or that the police intended Clifford to keep it in exchange for his cooperation. To the extent the suggestion is that Clifford cooperated to protect his mother from criminal liability, there is not enough evidence about the circumstances to know if Clifford's mother faced any criminal liability at all. There is evidence to suggest that an officer went with Clifford to a funeral, but a jury could not infer that this was a benefit to Clifford.[12] Finally, even if Clifford was arrested, there is little practical difference between being arrested and not being charged and never being arrested to begin with. Bolden argues that the fact that Clifford was arrested "calls into greater question the credibility of Clifford's testimony that there was no deal or even discussions between Clifford and the police about how Clifford could avoid charges." [253] at 35. But there is no evidence that Clifford's arrest— mentioned in an inventory report and suggested by a reference to Miranda warnings

---

[12] Though Bolden claims that an officer "provided protection for Clifford so he could attend Clayton's funeral," [266] ¶ 163, the evidence establishes only that an officer accompanied him to the funeral, without providing the reason behind it. [256-4] at 146:1–6.

in Willis's report—involved any formal processing indicative of the state pressing charges.[13]

In short, it was obvious to the jury that the state had leverage over Clifford—he was at the scene of the crime, interviewed, and incriminated in a large drug deal, yet he was never charged. *See* [266-9] at 4, 17–18 (in closing, arguing that "[p]eople want to cooperate with the State so they don't get charged with a major drug deal" and "[Clifford's] cooperating with the police, so he doesn't get charged"). The allegedly suppressed evidence, including the inventory report referencing Clifford's arrest, was cumulative of the impeachment evidence at trial, and there is no reasonable probability that disclosure would have altered the trial's outcome. *See United States v. Dweck*, 913 F.2d 365, 371 (7th Cir. 1990) ("Generally, where impeachment evidence is merely cumulative and thereby has no reasonable probability of affecting the result of trial, it does not violate the *Brady* requirement.").

### 2. *Willis Report*

The Willis report was favorable to Bolden because it could have impeached Clifford by showing that he never told Officer Willis some of the facts he testified to at trial. This information was not available to Bolden through other means—there was no other source of information about what Clifford said in the interview that the Willis report summarizes. Detective Baker's interview of Clifford gave Bolden the

---

[13] If by "arrest" Bolden means formal processing, then that information was not suppressed because Bolden could have subpoenaed Clifford's rap sheet or arrest record from other sources.

impeachment-by-omission evidence, but that was a different interview, so an omission from another interview is incrementally more favorable.[14]

A reasonable jury could conclude that Officer Oliver and Detective Siwek suppressed Clifford's statements in the Willis report.[15] First, the report was not in CPD's investigative file, the prosecutor's file, or the public defender's file as they were produced in this case. Defendants correctly note that there is no evidence to establish that the files' contents as they exist today are representative of what the contents were at the time of Bolden's trial—maybe something that was in the files at the time of Bolden's trial has been lost in the years since then. And they point out that the public defender's file for Bolden's case contains a document from a seemingly completely unrelated case, suggesting that things were sometimes misfiled. A jury

---

[14] Bolden also argues that the report says Clifford identified Ant as the buyer for the drugs Derrick and Clayton were selling on the night of their deaths, showing that detectives had reason to investigate Ant but did not. But the detectives' choice not to run down an investigative lead would not exculpate Bolden or materially impeach the detectives' trial testimony. Anyway, evidence that Ant sought to buy drugs from the victims on the night of their murder was introduced at trial. That Clifford described the shooter as 5 feet 10 inches to 6 feet 1 inch tall would not have been materially exculpatory for Bolden, given that Bolden is 6 feet 2 inches tall, and the 3-inch range would not have materially undermined confidence in his identification. [256-24] at 3; [266] ¶ 126. Bolden also argues that the report showed Clifford was arrested (since the report notes he was informed of his *Miranda* rights), but, again, that was not materially impeaching of Clifford.

[15] Officer Oliver is listed as being at the interview described in the report, [251] ¶ 31, so he knew of Clifford's statement and had an obligation to ensure that the report was disclosed to the prosecutors. There is evidence that Detective Siwek disclosed the Willis report to the FBI in March 1994, meaning he was aware of it. [266] ¶ 31. (Defendants argue that I should disregard Agent Tipton's affidavit because he was not disclosed in Bolden's Rule 26(a)(1) disclosures and the affidavit was produced to defendants after fact discovery in this case closed, [266] ¶ 31, but there is no prejudice to them since they had Tipton's report, and the affidavit contains no surprises not apparent from the report.) From their knowledge, a reasonable jury could conclude that their failure to disclose the report to the prosecution was deliberately reckless.

could nonetheless reasonably conclude from the files' current state that the report was not disclosed to the prosecution.

Also, Bolden's trial attorney testified that he had never been informed that Officer Willis had interviewed Clifford and prepared a separate interview report and that if such a report had been produced to him, it would have been in the public defender's file. [255-5] at 105:20–106:6. Defendants argue that Officer Willis did not himself interview Clifford, rather he summarized the interview of other officers, so the fact that the attorney said he did not know that Officer Willis interviewed Clifford and prepared a report of the interview is nonresponsive to the issue of whether he knew about the Willis report. But there is enough evidence for a jury to decide that Officer Willis did in fact conduct the interview. Officer Willis testified that an arresting officer would fill out the report (which suggests that since he was the report's author, he was an arresting officer), [254-23] at 19:17–19, and the report says the arresting officers interviewed Clifford. And if the Willis report is a summary of an interview Officer Willis did, then Bolden's attorney denied knowledge of it, giving rise to an inference that it was not disclosed to the prosecution and not disclosed to the defense.

Defendants argue that Bolden's attorney used evidence contained only in the Willis report at the trial, demonstrating that the report had been disclosed to him. Specifically, the attorney asked Clifford whether he had ever described the shooter as being 5 feet 10 inches to 6 feet tall. [266] ¶ 172. But the Willis report lists the shooter's height as 5 feet 10 inches to 6 feet 1 inch, [266] ¶ 29, so I am not persuaded

that the only reasonable inference from the attorney's question is that he had access to Officer Willis's report.

Even though the suppressed Willis report was favorable to Bolden, it was not material. Clifford's identification of Bolden as the one who he saw drive away with the murder victims and later return to shoot him was the strongest evidence against Bolden, so evidence impeaching that identification is generally material. *See Anderson*, 2019 WL 3334655, at *8 ("[S]uppressed evidence takes on particular significance—and is 'plainly material'—where the prosecution's case rests solely on the credibility of an eyewitness."). Bolden argues that the Willis report shows that Clifford did not say during that interview any of the following things that he testified to at trial—he saw Bolden exit a pager store and enter J&J Fish to meet with Derrick, Clayton, and Ant; he came face-to-face with Bolden in Harold's Chicken; he remembered the shooter's eyebrows; and the shooter grabbed Clifford's gun from him and later dropped it on the street after Clifford grabbed him. [253] at 29–30.

Detective Baker testified at trial that Clifford did not tell him some of these new details. As a result, additional impeachment via the Willis report on those points would have been cumulative. Bolden argues that the Willis report was not cumulative because Detective Baker established that Clifford did not tell them to him, but the Willis report could have shown that Clifford did not tell whoever conducted that interview either (and Clifford testified that he spoke to multiple officers). The value would have been minimal, particularly because Detective Baker's testimony was stronger on these points than the Willis report would have been. Not only did Clifford

not tell Detective Baker about watching the meeting inside J&J Fish from Harold's and later encountering Bolden there, what he did tell Detective Baker conflicted with those details. The Pesavento-Karl report (which was disclosed to the defense, [251] ¶ 80) says that Clifford told Detective Baker that "after [Clayton, Derrick, and the shooter] drove off he pulled his car into the Harold's Chicken lot and he was hungry so he went in and got some chicken" and then ate it in his car. [254-4] at 6. That directly conflicts with the story Clifford testified to at trial, as opposed to the Willis report, which contains no mention of Harold's at all. Bolden also contends that the Willis report would have helped counter the weakness in Detective Baker's impeachment, which was that his interview of Clifford was short and directed. But there is no evidence that the interview underlying the Willis report was any longer— indeed, it has less factual content than the summaries of Detective Baker's interview.

As for the fourth point—what Clifford said about the shooter grabbing his gun and dropping it on the ground—Bolden argues that it was "significant because Clifford offered multiple and conflicting stories about his altercation with the shooter." [253] at 30. But the Willis report would have offered little impeachment on that point since it is itself vague. The Willis report says that "the [shooter] beat [Clifford] about the head and body with his weapon the offenders." [254-8] at 3. It says nothing about who grabbed a gun from whom or how it was disposed of, and it is unclear on whose weapon was the bludgeon. Contrast that with the Pesavento-Karl report's account of the Baker interview, which notes that "[Clifford] related that he fought with [the shooter] and was able to wrestle the gun away from him," that the

shooter "fled after he got the gun away from him," and that "he dropped this gun on the street and kept his gun." [254-4] at 6. Detective Baker also testified at trial that Clifford told him that Clifford wrestled the gun away from the shooter. [254-2] at 28:14–22. The omissions of the Willis report would have little to nothing to add to the directly conflicting evidence from the Baker interview.

Because the Willis report would have offered only cumulative or very weak impeachment of Clifford, it was not material, so suppressing it did not violate Bolden's right to due process.

### 3. Steward's Statements about the Gang Hit

Bolden claims that defendants suppressed Steward's statements about what Kimbrough told her regarding the gang hit that the Gangster Disciples (possibly at the direction of Ant) had out on Clayton and Derrick, including the names of others who may have been asked and the fact that Clayton was there when Kimbrough told her.[16] Bolden argues that the evidence is favorable to him because it shows that Clayton and Derrick would not have let a stranger into their car under those circumstances, and, Bolden says, there was no evidence that Bolden was anything but a stranger to them. But the evidence was not exculpatory, and even if it were, it would not have been material. As an initial matter, though Steward did not recognize Bolden's photo when she saw it during defendants' investigation, she testified in her

---

[16] Defendants argue that the evidence is inadmissible hearsay, and so under current Seventh Circuit precedent, is per se immaterial. *See United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014). But the evidence would have been admissible, since Bolden would have used it as evidence of Clayton and Derrick's state of mind, not to prove that the Gangster Disciples in fact had a hit out on them.

deposition in this case that she had heard of Bolden before the shooting and that she had heard Clayton mention him. [266] ¶ 146. So, there is evidence that Bolden was not a stranger to Clayton. And it is undisputed that Clayton and Derrick met with Ant to sell him drugs, undercutting the theory that news of the hit made them cautious. As a result, introduction of the theory that the duo would have been unlikely to let Bolden into their car would not have moved the needle. In fact, it could have inculpated Bolden. If the Gangster Disciples had a hit out on the murder victims, then Bolden's gang involvement would have become relevant, since he was a Gangster Disciple. [251] ¶ 122. Moreover, the evidence of the victim's knowledge of the gang hit was not suppressed, because Steward was available to the defense. Though Bolden argues that he was not on notice that she would have information about the gang hit, I disagree—Clayton's fiancée was a natural witness for information about his state of mind in his final days.

Bolden offers other theories of the gang hit's relevance, including that it would "raise questions about the veracity of what Clifford claimed he saw and whether more than one offender was involved in the shootings." [253] at 37. It is unclear to me how Steward's statements contradict what Clifford said he saw or suggest that there was more than one shooter. Even if that were true, that there was more than one offender would not have been evidence that Bolden was not one of them. And Bolden also suggests again that the evidence would have affected the credibility of the detectives by questioning the quality of their investigation. But whether the detectives followed up on the leads provided by Steward would not have made a difference. The

prosecution argued the theory that Ant directed Bolden to commit the murders, meaning if Bolden wanted to discredit the investigation for failing to follow up on Ant's involvement, he had sufficient opportunity to do so. As for the other names Steward said Kimbrough gave her, their weight would have been even more minimal. Kimbrough's guesses at who the Gangster Disciple leaders might have solicited after him were speculation on his part and hearsay on Steward's.[17]

Finally, even if Steward's statements were material and suppressed, only Detective Siwek would be personally responsible for the suppression, because he is the only defendant who was present to hear Steward's statements. Bolden argues without citation to the record that "Steward testified that she was not sure whether Oliver was present at the interview, but the fact that the majority of her interview focused on gang intelligence, circumstantial evidence is strong that he was there." [253] at 36 n.16. That sort of speculation falls short of the evidentiary burden that Bolden carries at this stage.

## C.   Fabrication of Evidence

Officers violate a defendant's right to due process when they "knowingly use false evidence … to obtain a tainted conviction." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).[18] To prove fabrication, Bolden must show that defendants knew,

---

[17] Though I analyze the materiality of the suppressed evidence separately for ease of explanation (and because that is how the parties argued it), the evidence was not collectively material either. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (materiality of suppressed evidence should be "considered collectively, not item by item").

[18] Defendants raised in their opening brief the argument that Bolden's fabrication claims were precluded by the availability of a state-law malicious prosecution claim, but they abandoned the argument in their reply. *See Avery v. City of Milwaukee*, 847 F.3d 433, 441 (7th Cir. 2017) ("The availability of a state-law remedy for malicious prosecution doesn't

"with certainty," that the evidence was false. *Coleman*, 925 F.3d at 344. Evidence that only suggests defendants had reason to doubt that the evidence was true is insufficient to meet the knowledge requirement. *Id*. at 345.

### 1. *Pesavento-Karl Supplementary Report*

Bolden claims that defendants fabricated evidence in the Pesavento-Karl supplementary report. More specifically, he says the report included the following false information—(1) that Gatson described Lynier as "light-complected," when she really said his complexion was medium or dark; (2) that Lee said he saw the murders and described the shooter as a black male in his early twenties, when he did not actually see the shooting and could not identify the shooter's race or gender; and (3) that Clifford told Detective Baker that he got a good look at the person who shot him and the shooter's gun looked like Clifford's own, when Clifford did not say the latter part. Gatson, Lee, and Clifford all later testified that they did not tell the detectives the statements attributed to them. [266] ¶¶ 79, 81, 85. If the witnesses did not tell the detectives those statements, then it is reasonable to infer that the detectives knew it was false to say that they did.

Bolden has not, however, provided sufficient evidence to suggest that the fabrications caused him a deprivation of liberty. Just as for common law torts, causation and injury are essential elements of constitutional torts. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ("[I]f an officer … fabricates evidence

---

defeat a federal due-process claim against an officer who fabricates evidence that is later used to obtain a wrongful conviction.").

and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest."). That said, fabricated evidence need not be used at trial to deprive someone of liberty. *See Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2019), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) (sufficient to "show that the fabricated police reports furthered the prosecution"); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him.").

Bolden argues that the report was used in his trial to impeach Gatson, but he cites only to trial transcripts showing that Detective Karl testified about his interviews with her, not that the report was used. [253] at 54 n.27; [266] ¶¶ 168–70. Other than use at trial, Bolden suggests that the Gatson fabrication "falsely bolstered Clifford's false identification of Mr. Bolden," the Lee fabrication "falsely implicated Mr. Bolden as a potential suspect" in the double homicide and attempted murder, and the Clifford fabrication was "used to bolster Clifford's credibility … and minimize inconsistencies" in his statements to the police, but he does not cite to any evidence for those propositions or link them to prosecution decisions. [253] at 54. In his sur-reply, Bolden points to deposition testimony from the Assistant State's Attorney who approved charges against him, in which the prosecutor says that he based the charges on "[t]he totality of the evidence that the police presented to [him] as represented by their police reports" and his own interviews. [272] at 3. Though this fact may have

sufficed to link the fabrications to a liberty deprivation, Bolden did not include this fact in his Local Rule 56.1 statement of additional facts, depriving defendants of an opportunity to respond, so I disregard it.[19] *See Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 664 (N.D. Ill. 2015) (collecting cases establishing that Local Rule 56.1 requires parties' briefs to cite to their statements of fact, not the record). Bolden also forfeited the argument by raising it for the first time in his sur-reply, when it could have been made in his response brief. In any event, just because the prosecutor considered the totality of the reports does not mean that every fabrication caused a deprivation of liberty. Bolden must still show that the prosecution would have ended sooner if the false reports came to light, and he has not done so.

### 2. *Lineup Identification*

Bolden advances two theories of due-process violations with respect to the lineup. The first is that defendants fabricated the identification evidence. This theory hinges on whether defendants knew that Clifford's identification of Bolden was false. *See Coleman*, 925 F.3d at 346 ("Coerced testimony is not necessarily fabricated. A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures

---

[19] Bolden also claims that Detective Higgins fabricated his report, which contained the false statement that Clifford said "Lanier" was with Ant before the double murder. Bolden does not argue that any of the defendant officers were involved in fabricating evidence in Detective Higgins' report, so the claim fails against defendants. But even as to Detective Higgins, there is no properly presented evidence linking the Higgins report to the advancement of Bolden's prosecution. In fact, though Bolden argues that without Detective Higgins's fabrication of Clifford's statement, "[d]efendants had no putative reason for including Mr. Bolden in an identification procedure," [253] at 54, he asserts in his statement of facts that defendants relied solely on Gatson's statement at the time of the photo array. [266] ¶ 115.

used. Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up."). Taken in a light favorable to Bolden, defendants' actions during the lineup could be characterized as coercive, but there are no facts to suggest that they knew the identification they were coercing was false. To argue otherwise, Bolden points to evidence that suggests defendants should have known it was false—for example, Bolden did not match Clifford's initial description of the shooter, and Clifford could not identify Bolden in the photo array. But it is not enough that defendants should have known that the evidence was false; they must have actually known that it was. *See id*. at 344–45. Bolden also points to evidence of their other due-process theories like destruction and fabrication of evidence, but evidence of bad faith with respect to other claims does not suffice to establish intentional fabrication of evidence with respect to this evidence. Even in the light most favorable to Bolden, the officers' bad faith approach to the investigation does not suggest that they believed Bolden was innocent. Nor does the fact that an officer smiled while remarking that Bolden was bald or that Detective Karl said Officer Oliver did not remember Bolden suggest that defendants knew Clifford's identification of Bolden was false. Proving fabrication is "a high bar to clear," *id*., and Bolden has fallen short of it.

Bolden's second due-process theory with respect to the lineup is that it was unduly suggestive. Defendants take the stance that such a theory is not viable since it would amount to coercion, not fabrication, but they are wrong. "[T]he Fourteenth Amendment's Due Process Clause requires the exclusion of an eyewitness

identification if the unduly suggestive circumstances are so egregious as to taint the entire trial." *Id.* at 347 (citing *Foster v. California*, 394 U.S. 440, 442 (1969)). Defendants did not defend against Bolden's argument for why the facts entitle him to trial on the claim, so they have forfeited the argument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver.").

### D.  Qualified Immunity

Qualified immunity protects officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam)). To determine whether qualified immunity applies, courts consider (1) whether plaintiffs have adequately shown the violation of a constitutional right and (2) whether the right in question was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Defendants are entitled to qualified immunity on most of Bolden's theories of due-process violations because, as I explained above, they did not violate his rights. The only remaining theory for Bolden's due-process claim is that the lineup was unduly suggestive, so the remaining question is whether the infringed right was clearly established by the time of the alleged violations. It was clearly established many years before 1994 that "the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of

law." *Foster*, 394 U.S. at 442. Defendants are not entitled to qualified immunity with respect to the unduly suggestive lineup theory.

## IV. Conclusion

Defendants' motion for summary judgment [241-1] is granted in part, denied in part. Bolden can proceed on his due-process claim as it relates to the unduly suggestive lineup. Defendants are entitled to summary judgment on the rest of the due-process claim and the portions of Counts II and III that derive from it.

ENTER: 8/9/19

Manish S. Shah
United States District Judge

Date: 8/9/19