# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDDIE L. BOLDEN,                )
                                )
            Plaintiff,          )
                                ) No. 17 CV 417
       vs.                      )
                                ) Honorable
CITY OF CHICAGO; MICHAEL BAKER; ) Manish S. Shah
JOSEPH BARNES; JAMES OLIVER;    )
ANGELO PESAVENTO; MICHAEL       ) Honorable Susan
ROWAN; EDWARD SIWEK; BARBARA    ) E. Cox
TEMPLE and AS-YET UNKNOWN       )
CURRENT OR FORMER EMPLOYEES OF  )
THE CITY OF CHICAGO,            )
                                )
            Defendants.         )

    The deposition of KEVIN FOSTER, taken pursuant to the Federal Rules of Civil Procedure, before Monica Hammond Scheppe, Certified Shorthand Reporter No. 0084-003163, at 53 West Jackson Boulevard, Suite 330, Chicago, Illinois, on Thursday, May 3, 2018, commencing at 9:30 a.m. pursuant to subpoena.

Page 2

 1  APPEARANCES:
 2      MS. VALARIE HAYS, of the firm of
           Riley Safer Holmes & Cancila, LLP,
 3         70 West Madison Street
           Suite 2900
 4         Chicago, Illinois 60602
           312-471-8781
 5         vhays@rshc-law.com
 6      appeared on behalf of the plaintiff;
 7      MS. TIFFANY S. FORDYCE, of the firm of
           Greenberg Traurig, LLP,
 8         77 West Wacker Drive
           Suite 3100
 9         Chicago, Illinois 60601
           312-456-1031
10         fordycet@gtlaw.com
11      appeared on behalf of the defendant City
           of Chicago;
12
       *MS. CELESTE STACK, and
13     *MR. MOHAMMED KAHN, of the firm of
           Hale Law, LLC,
14         53 West Jackson Boulevard
           Suite 330
15         Chicago, Illinois 60604
           312-870-6926
16         cstack@ahalelaw.com
17      appeared on behalf of the defendants
           Michael Baker, Joseph Barnes, James
18         Oliver, Angelo Pesavento, Michael Rowan
           and Edward Siwek;
19
       MR. GARY RAVITZ, of the firm of
20         Ravitz & Palles, PC,
           203 North LaSalle Street
21         Suite 2100
           Chicago, Illinois 60601
22         312-558-1689
           gravitz@ravitzpalles.com
23
       appeared on behalf of the defendant
24         Barbara Temple.

Page 3

 1  *Mr. Mohammed Kahn enters on page 65.
    *Ms. Celeste Stack exits on page 104.
 2  *Ms. Celeste Stack re-enters on page 115.
 3
                - - - -
 4

Page 4

 1              INDEX
 2  WITNESS       EXAMINATION BY          PAGE
 3  Mr. Foster    Ms. Stack          05
                  Ms. Hays           86
 4                Mr. Ravitz        111
                  Ms. Fordyce       135
 5                Ms. Stack         138
                  Ms. Hays          152
 6                Mr. Ravitz        154
 7
 8
 9
10
           E X H I B I T S            PAGE
11
    Deposition Exhibit No. 1, id       45
12  Deposition Exhibit No. 2, id       47
    Deposition Exhibit No. 3, id       49
13  Deposition Exhibit No. 4, id       55
    Deposition Exhibit No. 5, id       59
14  Deposition Exhibit No. 6, id       59
    Deposition Exhibit No. 7, id       69
15  Deposition Exhibit No. 8, id       71
    PD Deposition Exhibit No. 9, id    86
16  PD Deposition Exhibit No. 10, id   95
    PD Deposition Exhibit No. 11, id   98
17  PD Deposition Exhibit No. 12, id  104
    PD Deposition Exhibit No. 13, id  117
18  PD Deposition Exhibit No. 14, id  126
    PD Deposition Exhibit No. 15, id  138
19
20          (Exhibits scanned.)
21
22
23
24

Page 5

1  KEVIN FOSTER,
2  called as a witness by the defendants Michael
3  Baker, Joseph Barnes, James Oliver, Angelo
4  Pesavento, Michael Rowan and Edward Siwek, having
5  been first duly sworn, was examined and testified
6  as follows:
7  EXAMINATION
8  By Ms. Stack:
9  Q. Good morning. How are you today?
10 A. I'm good.
11 Q. Will you please state your full name for
12 the record?
13 A. Kevin F. Foster, F-o-s-t-e-r.
14 Q. And are you employed?
15 A. Well, I'm an attorney in private practice.
16 Not doing a whole hell of a lot at this particular
17 point in time.
18 Q. Okay. Can you give us an overview of your
19 professional bio?
20 A. Well, I was with the public -- it was a
21 small firm right after I got out of law school
22 which is 1980. A small firm for a couple of years.
23 Then I joined the Public Defender's Office in 1983
24 and I retired at the end of 2011. So 28 years I

Page 6

1  guess -- 28 and a half years.
2  Q. Since 2011 what have you been doing?
3  A. I've just been self-employed. I had a
4  little bit of private practice, and I had a few
5  cases that were appointed to me that I tried after
6  I left the Public Defender's office. A few judges
7  appointed me cases and I tried those. One came
8  back on appeal. Tried that.
9  Q. Okay.
10 A. So that is what I did.
11 Q. Okay. Can you give us an overview of your
12 assignments when you were with the Public
13 Defender's office?
14 A. I started out with misdemeanors.
15 Various -- Where did I start? Chicago Avenue
16 Police Station which is no longer there. Then I
17 went to traffic court. Then I went to I think auto
18 theft court. Then I went to 13th and Michigan. It
19 was misdemeanor jury. I don't know if it is there
20 anymore.
21        Then I went to 26th Street in
22 1986. I was in various courtrooms. Then I joined
23 the murder task force in I think 1991 maybe. I
24 think -- or -- '91 or '93. I can't remember now.

Page 7

1  Q. Now, did you stay there the rest of
2  your --
3  A. I did. I did. From whenever that was
4  until I retired.
5  Q. So pretty much 20 years in the --
6  A. Yes. Yes.
7  Q. -- murder task force?
8  A. Yes.
9  Q. Can you explain for the record what the
10 murder task force is?
11 A. It is a group of attorneys that do, you
12 know, only murder cases; and we did death penalty
13 cases, of course, when death penalty was in
14 Illinois.
15 Q. Okay.
16 A. We were assigned cases from time to time.
17 We took them from when we were assigned until we
18 tried them or until the case was over.
19 Q. Okay. Can you explain when a death
20 penalty case was assigned to you how -- how you --
21 when you came into the case, at what point in the
22 prosecution and how you guys followed those cases?
23 A. I mean you get a case no matter if it is a
24 death penalty case or just a murder case. You get

Page 8

1  it early on. If it is a death penalty, you start
2  getting mitigation ready. You know, there was a
3  difference between really a regular murder that
4  wasn't a death penalty case versus a death penalty
5  case.
6  Q. Okay. Was there a set time that the
7  murder task force would be assigned during the
8  prosecution; like the bond court or arraignment or
9  was it individual?
10 A. We had a bond court which I explained to
11 somebody that it was Branch 66. That is when the
12 murders came in. I think violent crimes -- We
13 would with be assigned like once a month let's say.
14 Like today would be my date, the 3rd or whatever it
15 is. I go down there about noon and any case that
16 came in, you would -- It could be zero people or
17 it could be 15 people. You'd interview the people
18 back in the lockup and then you'd do a bond
19 hearing.
20        And then you don't -- You
21 wouldn't necessarily get that case that you stood
22 up on at the bond hearing. Later on maybe a week
23 later or two you'd get -- once the case is set up
24 by our office, the boss would give it to you. It

Page 61

1   MS. STACK: Q. Now, can you read Number 5 for
2   us?
3       A. You want me to read the whole thing?
4       Q. Yes.
5       A. Investigative report that we use. Eddie
6   Bolden. 94-8397. Charge murder. 1-12-95 return
7   date. K. Foster. Requested 1-10-95. Judge
8   Madden. Branch/room 203. Need response ASAP.
9   Wrote the time of the incident. 29 of January '94.
10  20:07. 6546 South Minerva. Then I have
11  investigative action request. Locate, interview.
12  Oh, hostile. Yes.
13      Q. Did you check it? Are those boxes that
14  you checked?
15      A. They are boxes I'm reading that I checked.
16  Locate. Interview. Type of witness hostile. That
17  would refer to Clifford Frazier I'm assuming.
18  Attorney wishes to accompany. No.
19          First one is Clifford Frazier.
20  He is the star witness. This person identified
21  Eddie Bolden in lineup. Obviously. See copy of
22  motion attached. It is probably before the motion.
23  I don't know. Ask Frazier this is what happened at
24  lineup.

Page 62

1           To James Gulley see motion and
2   police lineup report. Ask him if he did switch
3   chairs with Eddie during the lineup as our motion
4   says.
5       Q. Okay. Now -- Hang on a minute. All
6   right. James Gulley. Let's focus on him instead
7   of Terrell Lindsey. I'll get to him next.
8           Does anything in document Number
9   5, your official form that you fill out, indicate
10  that your investigator completed the task of
11  talking to James Gulley?
12      A. The first page, Exhibit 5?
13      Q. Right.
14      A. No, it wouldn't.
15      Q. Okay. How would -- How -- Are there
16  some times when -- Well, strike that.
17          How would you find out the
18  results of your investigator's efforts?
19      A. She'd either write a report or tell me
20  orally.
21      Q. Okay. And what is the significance of an
22  investigator telling you orally as opposed to
23  writing a report?
24      A. Probably she didn't find the person or

Page 63

1   whatever.
2       Q. Okay. Is there any way to tell from
3   number five the document we are looking at whether
4   or not your investigator filed a written report on
5   this request?
6       A. No, there is no way. You can't tell on
7   that.
8       Q. Now, drawing your attention to page Number
9   6.
10      A. Uh-huh.
11      Q. For the record that looks like lined paper
12  with handwritten notes, correct?
13      A. Right. It is probably a yellow pad.
14      Q. Okay. Can you read document Number 6 out
15  loud for us?
16      A. James Gulley. 9449986. I'm not sure what
17  number that would be. An IR Number. I don't know.
18  Division 9 2H. That would be Division 9 in the
19  jail. I see my -- This is probably my writing.
20  Lineup. Doesn't remember switching seats. Doesn't
21  recall the identification procedure. Then on the
22  bottom is 94 1197 D-3. I don't know what those
23  numbers refer to.
24      Q. Okay. That is your handwriting?

Page 64

1       A. I think so.
2       Q. And that would be your notes regarding
3   following up on the James Gulley lead?
4       A. Probably.
5       MS. HAYS: Objection. Form.
6       THE WITNESS: I don't know. Could be.
7       MS. STACK: Q. What is your common sense
8   reading of that tell you?
9       MS. HAYS: Objection. Form.
10      THE WITNESS: I don't know. Somehow I -- I
11  made the notes. I don't know where I got them
12  from.
13      MS. STACK: Q. Your investigator that was
14  assigned the -- your request to go and see James
15  Gulley and document Number 5, who was that?
16      A. It probably would have been Judy Lajoyo,
17  but I'm not 100 percent. She was my investigator
18  for a while. It is not noted there.
19      Q. Did she -- In your experience was she a
20  responsible investigator?
21      A. Yeah.
22      Q. She would follow-up on the requests you
23  gave her?
24      A. Right, or I would follow-up with tell me

Page 97

1   Q. And do you remember if the CPD ever
2   produced any information responsive to this
3   subpoena?
4   A. This? I don't know. I don't remember. I
5   don't recall.
6   Q. And if they had produced anything
7   responsive, would it be in the Public Defender's
8   file --
9   MS. FORDYCE: Objection. Speculation.
10  MS. HAYS: Q. -- for this case?
11  MS. FORDYCE: Objection. Speculation.
12  THE WITNESS: Could or could not be. I assume.
13  MS. HAYS: Q. If they had produced anything in
14  response to the subpoena, can you imagine a
15  scenario as to, you know, where would it be kept
16  and saved in the Public Defender's file?
17  A. It would --
18  MS. STACK: Objection. Form.
19  THE WITNESS: It would be in the file.
20  MS. HAYS: Q. Showing you what has been marked
21  as Public Defender's Exhibit 11.
22          (Whereupon said document was
23           marked as PD Deposition Exhibit
24           Number 11.)

Page 98

1   THE WITNESS: That's a letter to me from the
2   Police Department Communications Division.
3   MS. HAYS: Q. Actually do you recognize this
4   as a letter to you --
5   A. To me.
6   Q. -- from the --
7   A. Right.
8   Q. -- police department's communication
9   division?
10  A. Right.
11  Q. And it says Mr. Foster we have reviewed
12  the subpoena, and the subpoena is again referencing
13  the one --
14  A. Right.
15  Q. -- here Exhibit 10; right?
16  A. Yes.
17  Q. In the case of People of the State of
18  Illinois versus Eddie Bolden. It is the policy of
19  the Chicago Police Department to retain all
20  recorded tapes of radio and telephone conversations
21  for a period of 30 days from the date of incident.
22  The above referenced subpoena was received and
23  process after the expiration of this retention
24  period. As a result, your request for information

Page 99

1   cannot be accommodated.
2           Did I read that correctly?
3   A. Yes.
4   Q. Does that appear to be a fair and accurate
5   copy of the record you received in March of '94?
6   A. I don't remember receiving it, but it
7   looks like it is fair.
8   Q. After receiving this letter did you take
9   any further steps to obtain the 9-1-1 information?
10  A. No, I don't remember receiving this
11  letter.
12  Q. You can put those aside. I think we are
13  done with those. I'll talk to you a little about
14  Mr. Clifford Frazier and his testimony at trial.
15  A. Okay.
16  Q. He testified at Mr. Bolden's trial, true?
17  A. Right.
18  Q. And you didn't find him to be very
19  credible, fair?
20  A. No.
21  Q. A significant part of Mr. Bolden's defense
22  at trial was focused on the fact that Frazier was
23  not a credible witness, right?
24  A. Right.

Page 100

1   Q. Mr. Frazier's testimony was the only
2   evidence the state had linking Mr. Bolden to the
3   shooting at issue, correct?
4   A. Yes.
5   Q. And Mr. Frazier during the trial when he
6   testified provided new information that he never
7   previously told law enforcement, true?
8   MS. STACK: Objection.
9   THE WITNESS: Yeah, he -- Right. Yes.
10  MS. HAYS: Q. He testified for the first time
11  at trial that he personally went into J&J with
12  Derrick Frazier and Ledell Clayton, right?
13  A. Right.
14  MS. STACK: Objection.
15  MS. HAYS: Q. He testified for the first time
16  at trial that he also went into Harold's Chickens
17  and watched the offender enter J&J's, true?
18  MS. STACK: Objection. Relevance. Form.
19  THE WITNESS: Yes.
20  MS. HAYS: Q. He testified for the first time
21  at trial that the offender initially entered
22  Harold's Chicken himself when Frazier was still in
23  there, true?
24  A. I believe he said that. I read his