EXHIBIT F

JAMES OLIVER,                                      December 21, 2017

**Page 1**

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDDIE L. BOLDEN,               )
          Plaintiff,           )
               vs.             )   No. 17-cv-00417
CITY OF CHICAGO, et al.,       )
          Defendants.          )

     Deposition of JAMES OLIVER, called for
examination, taken pursuant to notice, agreement and
by the provisions of the Rules of Civil Procedure
for the United States District Courts pertaining to
the taking of depositions, taken before PATRICIA A.
ARMSTRONG, a Notary Public within and for the County
of DuPage, State of Illinois, and a Certified
Shorthand Reporter, No. 084-1766, of said state, at
the law offices of Riley, Safer, Holmes & Cancila,
LLP, Three First National Plaza, 70 West Madison
Street, Chicago, Illinois, on the 21st day of
Deember, 2017 at 10:00 a.m.

**Page 2**

```
 1      APPEARANCES:
 2      RILEY, SAFER, HOLMES & CANCILA, LLP
 3      (Three First National Plaza,
 4      70 West Madison Street, Suite 2900,
 5      Chicago, Illinois 60602
 6      312-471-8780), by:
 7      MS. SANDRA L. MUSUMECI,
 8      smusumeci@rshc-law.com
 9      MR. ELI J. LITOFF,
10      elitof@rshc-law.com
11         appeared on behalf of the Plaintiff;
12      HALE LAW, LLC
13      (53 West Jackson Boulevard, Suite 330,
14      Chicago, Illinois 60604,
15      312-341-9646), by:
16      MS. BARRETT BOUDREAUX
17      bboudreaux@ahalelaw.com
18         and
19      MR. ALEXANDER TAPLING,
20      atapling@ahalelaw.com
21         appeared on behalf of Defendants
22      Michael Baker, Joseph Barnes, James
23      Oliver, Angelo Pesavento, Michael Rowan
24      and Edward Siwek;
```

**Page 3**

```
 1      APPEARANCES:  (Continued.)
 2
 3      GREENBERG, TRAURIG,
 4      (77 West Wacker Drive, Suite 3100,
 5      Chicago, Illinois 60601,
 6      312-476-5057), by:
 7      MR. ELAN SHPIGEL,
 8      shpigele@gtlaw.com
 9         appeared on behalf of Defendant City of
10         Chicago;
11
12      RAVITZ & PALLES, P.C.
13      (203 North LaSalle Street, Suite 2100,
14      Chicago, Illinois 60601,
15      312-558-1689), by:
16      MR. ERIC S. PALLES,
17      epalles@ravitzpalles.com
18         appeared on behalf of Defendant Barbara
19         Temple;
20
21
22               -and-
23
24
```

**Page 4**

```
 1      APPEARANCES:  (Continued.)
 2      LAW OFFICES OF GEORGE E. BECKER,
 3      (33 North LaSalle Street, Suite 3300,
 4      Chicago, Illinois 60602,
 5      312-236-2803), by:
 6      MR. GEORGE E. BECKER,
 7      george_becker@sbcglobal.net
 8         appeared on behalf of Defendant Michael
 9         Kill;
10      LEINENWEBER, BARONI & DAFFADA, LLC
11      (120 North LaSalle Street, Suite 2000,
12      Chicago, Illinois 60602,
13      312-663-3003), by:
14      MR. THOMAS MORE LEINENWEBER,
15      thomas@ILESQ.COM
16         and
17      MR. MICHAEL BONAGURO,
18      mike@ilesq.com
19         appeared on behalf of Defendant Edward
20         Hicks.
21
22      REPORTED BY: PATRICIA ARMSTRONG, CSR, RPR.
23         Certificate No. 84-1766.
24
```

                                    1  (Pages 1 to 4)

JAMES OLIVER,                                    December 21, 2017

---

**Page 9**

1          (WHEREUPON, the witness was
2      duly sworn.)
3              JAMES OLIVER,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MS. MUSUMECI:
8      Q.   Good morning, Detective Oliver.
9      A.   Good morning.
10     Q.   My name is Sandra Musumeci. I am
11  here, an attorney at Riley, Safer, Holmes, and
12  Cancila. I represent Eddie Bolden, the plaintiff in
13  this case, and we're going to start your deposition
14  today.
15          Could you please state and spell your
16  name?
17     A.   James Oliver, J-a-m-e-s O-l-i-v-e-r.
18     Q.   Detective, what city and state do you
19  currently reside in?
20     A.   Monee, Illinois.
21     Q.   With whom do you live?
22     A.   My wife.
23     Q.   How long have you been married?
24     A.   Actually, I think we got married in

---

**Page 10**

1  '75, we was divorced in 2001 for maybe seven or
2  eight months or whatever, and got remarried.
3      Q.   How old are you, Detective?
4      A.   73.
5      Q.   How are you feeling today?
6      A.   I feel okay.
7      Q.   Are you currently taking any
8  medications or experiencing any medical conditions
9  that would interfere with your ability to answer my
10  questions?
11     A.   No.
12     Q.   Have you ever been deposed before?
13     A.   Yes.
14     Q.   How many times?
15     A.   I don't recall.
16     Q.   Approximately?
17     A.   Maybe once or twice. I was deposed in
18  the divorce. I remember that much.
19     Q.   Do you know if you have ever been
20  deposed before in a case related to your work at the
21  Chicago Police Department?
22     A.   No, I don't recall. I don't think so.
23     Q.   So you were deposed in your divorce, so
24  that was obviously personal issues?

---

**Page 11**

1      A.   Right.
2      Q.   You may know these rules from your
3  prior experience, but I would like to go over some
4  of them with you just since we are going to be doing
5  this all day.
6          As you see, there's a court reporter
7  who is taking down everything that we say. We will
8  make things a lot easier on her if we don't talk
9  over each other, so I ask that you let me finish my
10  question before you start your answer, and I'll let
11  you finish your answer before I start my next
12  question.
13          If your attorney or any of the
14  attorneys make an objection, don't talk over the
15  objection. Let them make their objection, and then
16  you can begin your answer.
17          And because the court reporter is here,
18  we need verbal answers, so you can't have a head nod
19  or a head shake. You need to say "yes" or "no" and
20  "uh-huh" or "uhn-uhn."
21          Do you understand?
22     A.   Yes, I understand that.
23     Q.   If you do not understand a question,
24  please let me know, and I'll try to clarify; okay?

---

**Page 12**

1      A.   Okay. No problem.
2      Q.   If you answer a question that I asked,
3  we will understand that to mean that you understood
4  the question. Is that fair?
5      A.   Yes.
6      Q.   And we can take a break at any time, so
7  if you need a break, just ask. The only exception
8  is that if there is a question pending, meaning I've
9  asked a question, I ask that you give an answer to
10  that question before we take a break; okay?
11     A.   Okay.
12     Q.   We will plan to take periodic breaks
13  over the course this deposition.
14          Do you have any questions before we get
15  started?
16     A.   No.
17     Q.   I'm going to start off by showing you
18  what we will mark as Oliver Deposition Exhibit 1.
19          (WHEREUPON, document marked as
20          Oliver Deposition Exhibit No. 1,
21          for identification, as of December
22          21, 2017.)
23  BY MS. MUSUMECI:
24     Q.   This is your amended deposition notice.

---

3 (Pages 9 to 12)

JAMES OLIVER,                                    December 21, 2017

Page 73

1    officers what you had learned through talking to
2    this witness?
3        A.   No.
4        Q.   And your conversation with the 3rd
5    District was essentially to yell at them for taking
6    the drugs out of the car rather than just securing
7    it?
8        A.   Right.
9        Q.   And then it says that Lanier was with
10   Williams prior to the double murder.  That was not
11   information that you shared with the 3rd District
12   either; right?
13       A.   3rd District?  No, no.
14       Q.   If you look at the bottom of this
15   narrative it, says, "While in the 3rd District, the
16   R/Ds" -- meaning reporting detectives -- learned
17   that Derrick Frazier was out of the hospital and
18   that he had taken officers from the 3rd District to
19   a large cache of suspected cocaine."
20            Do you know what that refers to?
21       A.   No, because I never read this report,
22   and I really didn't know that they had went -- you
23   know, they did that.  I didn't know.  I didn't know
24   anything about it.

Page 74

1        Q.   Okay.  So you didn't contribute to this
2    report in any way; is that right?
3        A.   This report?  No.
4        Q.   And you hadn't seen this report before?
5        A.   No, not that I could tell.
6        Q.   If we could turn back to Exhibit 2, the
7    interrogatory responses, and I am going to direct
8    you to Page 4, Interrogatory No. 3, the question is,
9    "Please describe in detail your role in the
10   investigation."
11            After citing objections, your response
12   is, "Defendant Oliver was one of the gangs crimes
13   specialists assigned to the case to assist the
14   primary detectives.  Defendant Oliver assisted in
15   the discovery of Mr. Bolden as a possible suspect
16   and was one of the officers credited with his
17   arrest." Do you see that?
18       A.   Uh-huh.
19       Q.   Is that accurate?
20       A.   Yes, somewhat.  Yes.
21       Q.   Can you tell me how you assisted in the
22   discovery of Mr. Bolden as a possible suspect?
23       A.   Well, when there's a homicide such as
24   this, especially a double homicide such as this,

Page 75

1    taking place there, Anthony Williams -- although
2    he's a big dope dealer, was a big dope dealer -- he
3    still had a lot of enemies.  So we get a lot of
4    calls.  We get a lot of calls.
5            And during this time there was one gang
6    specialist that was assigned to the FBI, and his
7    name was Mitch McCullough.  And I'm sure he -- I'm not
8    100 percent positive that -- but I'm sure that
9    someone had called the FBI with the name Lanier.
10       Q.   So Mitch McCullough was part of CPD,
11   but he was detailed to the FBI?
12       A.   Right.
13       Q.   And he worked with you in gang crimes?
14       A.   Yes, before he left there.
15       Q.   Would you in a case like this, a double
16   homicide, would you be reaching out to the other
17   gang crimes specialists or to the FBI to try to
18   generate leads?
19       A.   Oh, no.  No.  They'll come to you.  All
20   you got to do is sit there.  They'll come to you.
21       Q.   How would Mitch McCullough have known
22   that you were the person to tell about this, that
23   you were involved with this investigation?
24       A.   I'm not certain.  We was friends.  I

Page 76

1    mean, we worked in the same unit.  Now, did he call
2    us, say, "Hey, Oliver," you know -- before he left
3    and before T and I worked together, they worked
4    together, so the information may have went to T
5    first, but singly, I talked to him too.
6        Q.   So your recollection is that McCullough
7    got a tip through his work at the FBI that Ant was
8    involved with somebody named Lanier that night?
9        A.   I don't think he mentioned Ant.  He may
10   have just said that the tip that he got may have
11   been Lanier did the shooting.
12       Q.   Let's back up a moment.
13            So after January 29th, after everything
14   that you have described, you didn't do anything more
15   with respect to the shooting on that night; is that
16   correct?
17       A.   I don't recall doing too much of
18   nothing past that night.  I did talk to that girl,
19   that lady, and I'm not sure whether I talked to her
20   from the office or whether I talked to her from my
21   home number.  I'm not sure about that.
22            I did see a report that Willis and them
23   did when they went back there that night and
24   arrested Ant's mother, took her to Area 2, and they

19 (Pages 73 to 76)

JAMES OLIVER,                                    December 21, 2017

Page 97

1      A.   Yes.  I said he may have been the one
2  that came up with that, and it may have came over
3  the telephone in the office, but I'm not certain.
4      Q.   So when you say "may have," are you
5  speculating, or do you have some reason to believe
6  that McCullough or some recollection that
7  McCullough --
8      A.   I remember speaking to Mitch during
9  that time.
10     Q.   Okay.  And when you got a tip from
11 McCullough that Lanier did the shooting, what did
12 you do with that information?
13     A.   I probably called Baker and told him.
14     Q.   So was Baker your main liaison to this
15 investigation?
16     A.   Yes, I would have spoken to him because
17 I saw him at the hospital, and I know that he was
18 handling this case, was part of it.
19     Q.   You don't recall sharing that
20 information with Detective Rowan, for example?
21     A.   I don't think so.  Like I said, I would
22 have talked to Baker.
23     Q.   How about Karl or Pesavento?
24          Well, Let me break that down.  How

Page 98

1  about Detective Karl?
2      A.   I didn't talk to Karl that much.
3      Q.   How about Detective Pesavento?
4      A.   I know him.  I would have spoken to
5  him, but I think it was Baker.
6      Q.   Looking at this report, Exhibit 7, do
7  you know what role each of these listed people had
8  in this arrest?  Let's start with Detective Higgins.
9      A.   No, I don't know.
10     Q.   How about Detective Rowan?
11     A.   No.
12     Q.   Detective Baker, we have spoken about.
13 How about Detective Kill?
14     A.   No.
15     Q.   No knowledge of what Detective Kill
16 did?
17     A.   No.
18     Q.   Did your partner Anderson do anything
19 in connection with this investigation beyond what
20 you have already told us?
21     A.   No.
22     Q.   And then looking at the bottom here,
23 this report was prepared by Detective Siwek?
24     A.   Yes.

Page 99

1      Q.   I don't know if I'm pronouncing that
2  right.
3          MS. BOUDREAUX:  I think it's Siwek.
4  BY THE WITNESS:
5      A.   Siwek.
6  BY MS. MUSUMECI:
7      Q.   Do you know Detective Siwek?
8      A.   I know him when I see him, you know.
9      Q.   Do you know what role Detective Siwek
10 had in this case?
11     A.   No.
12     Q.   And Detective Karl?
13     A.   No.
14     Q.   What role he had, you don't know?
15     A.   No.
16     Q.   And do you know what role Detective
17 Pesavento had?
18     A.   No.
19     Q.   Are you familiar with Detective Eddie
20 Hicks?
21     A.   I don't know Hicks.  You know, I might
22 know him by face, but I don't remember the name.
23     Q.   Do you remember any involvement of
24 Detective Hicks in this investigation?

Page 100

1      A.   No, I don't recall.
2          MS. MUSUMECI:  You know what?  This would be
3  a good place to take a break.
4          (WHEREUPON, a lunch recess was had
5           at 12:30 p.m., after which the
6           hearing resumed at 1:00 p.m. as
7           follows:)
8          MS. MUSUMECI:  Back on the record.
9          I am marking this next document as
10 Exhibit 8.
11         (WHEREUPON, document marked as
12          Oliver Deposition Exhibit No. 8,
13          for identification, as of December
14          21, 2017.)
15         MS. MUSUMECI:  We are back on the record
16 after lunch.
17 BY MS. MUSUMECI:
18     Q.   Detective Oliver, how are you?
19     A.   Fine.
20     Q.   Okay.  Still feel good to answer some
21 questions?
22     A.   Oh, yes.
23     Q.   And you remember that you're still
24 under oath; right?

25 (Pages 97 to 100)

JAMES OLIVER,                                    December 21, 2017

Page 101

1    A.   Yes.
2    Q.   I am going to show you another exhibit
3  which has been marked as Oliver Deposition Exhibit
4  8. I will bring that out.  It is Bates stamp
5  EB0001527 through 1530.  If you could just take a
6  look at that.
7        Do you recognize this report?
8    A.   I know what it is, yes.
9    Q.   What is it?
10   A.   It is a supplemental report to the
11 arrest.
12   Q.   Does this also relate to the arrest of
13 Eddie Bolden on February 26, 1994?
14   A.   Over here it says 27th, so I don't
15 know.
16   Q.   Okay.  The report is from February 27,
17 1994; right?
18   A.   Yes.  The date of arrest was the 26th.
19   Q.   Okay.  If you turn to the second page,
20 which is marked 1528 on the Bates stamp, again
21 arresting and investigating officers, do you see
22 your name listed there?
23   A.   Yes.
24   Q.   And J. Oliver, No. 15564, that was your

Page 102

1  star number; right?
2    A.   Yes.
3    Q.   If you look down just below that,
4  there's a description of the investigation, and it
5  reads, "In conjunction with gang crimes specialists
6  Oliver and Anderson, the reporting detectives,
7  learned that the possible offender was a person by
8  the name of Eddie Lanier Bolden."
9        Do you see that?
10   A.   Yes.
11   Q.   And the in conjunction with gang crimes
12 specialists Oliver and Anderson, does that refer to
13 the tip that you received from Mitch McCullough that
14 you passed along to Detective Baker?
15   A.   Yes, and I'm not sure that -- I'm sure
16 that I did pass it along, but where the first tip,
17 the first thing, may have came from a telephone to
18 gang crime.
19   Q.   Okay.  Is there anything else that you
20 can think of that you did at this point that led the
21 detectives to learn that the possible offender was
22 Eddie Lanier Bolden?
23   A.   No.  No, not that I can recall.
24   Q.   And is there anything that might help

Page 103

1  refresh your recollection on that?
2    A.   No.
3    Q.   If you look at the next paragraph, it
4  says, "On the 3rd of February 1994, the reporting
5  detectives showed a group of photos to the witness,
6  Clifford Frazier."
7        Do you see that?
8    A.   Yes.
9    Q.   Were you involved in showing
10 photographs to Clifford Frazier?
11   A.   No.
12   Q.   Did you ever show him any
13 photographs --
14   A.   No.
15   Q.   (Continuing.) -- in the course of this
16 investigation?
17   A.   No.
18   Q.   Okay.  Have you ever conducted a photo
19 array in your police work unrelated to this
20 investigation?
21   A.   No.
22   Q.   Did you receive any training in how to
23 conduct a photo array?
24   A.   No.

Page 104

1    Q.   The next paragraph, it says on the 6th
2  of February 1994, Mr. James Williams, who works at
3  J & J Fish, 6420 South Cottage Grove, was shown a
4  photo of Eddie Lanier Bolden.  Do you know who James
5  Williams is?
6    A.   No.  I didn't talk to him, but I
7  believe that James Williams might be Anthony
8  Williams -- Ant's father.
9    Q.   But you never spoke to James Williams?
10   A.   No, I don't remember speaking to him.
11   Q.   And you were not involved in showing
12 Mr. Williams photographs?
13   A.   No.
14   Q.   You described earlier a conversation
15 that you had with Ant Williams -- and just to be
16 clear, Ant Williams is Anthony Williams; right?
17   A.   Right.
18   Q.   Did you have any conversation with
19 Anthony Williams in connection with this
20 investigation after the night of the shootings?
21   A.   No.
22   Q.   The next paragraph says, "On the 6th of
23 February 1994, the reporting detectives went to 5249
24 South Honore in an attempt to interview Bolden."

26  (Pages 101 to 104)