**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EDDIE L. BOLDEN, )
)
Plaintiff, ) Case No. 17 C 00417
)
vs. ) Honorable Steven C. Seeger
)
CITY OF CHICAGO, et al., )
)
Defendants. )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT OFFICERS' MOTION *IN LIMINE* NO. 7 TO BAR**
**CERTAIN EVIDENCE RELATED TO THE POLICE INVESTIGATION.**

Plaintiff Eddie L. Bolden, by his undersigned counsel, respectfully submits this Response in Opposition to Defendant Officers' Motion *in Limine* No. 7 to Bar Certain Evidence Related to the Police Investigation (Dkt. 314).

## INTRODUCTION

The motion to bar evidence related to Defendants' failure to investigate is based on a misunderstanding of Judge Shah's prior rulings and the law as it pertains to Plaintiff's remaining causes of action. It is well-established that departures from reasonable police practices during investigations are relevant to establishing police officers' intent, which is an element of proof for Plaintiff's remaining causes of action. Defendants' departures from reasonable police practices also are relevant to the issue of probable cause with respect to Plaintiff's Fourth Amendment and malicious prosecution claims.

In ruling on the motion to dismiss, Judge Shah concluded that the Seventh Circuit does not recognize an independent due process cause of action for failure to investigate, but he did not suggest that the evidence was inadmissible for purposes of proving the elements of Plaintiff's

1

remaining causes of action.  *See* Dkt. 133, at 13.  Indeed, Judge Shah acknowledged during a court status hearing that the admissibility of the evidence for this purpose was a separate issue and assumed, for purposes of estimating the length of the trial, that the evidence would be admissible. Specifically, he stated:

> So I appreciate your continued patience while I keep working on the summary judgment, but I think that pretrial schedule should work.  And as I've been thinking about it, and in looking through the motion for summary judgment, and I'll see it when I see your pretrial filings, ***but I'm not so sure how much the evidentiary landscape is going to change one way or the other.***  I at least anticipate from the plaintiff, even if some of the due process theories are not in the case as to some or even all of the defendants.  Some of the evidence there will likely to be filing motions in limine saying, admit this evidence anyway.  ***So obviously we'll plan accordingly.  But I'm hopeful, and I still think that the three weeks that we blocked off in November will be enough time to get it done.***

 Ex. A, June 11, 2019 Status Hrg. Tr. at 4:1–13.

In addition to misconstruing Judge Shah's prior rulings, Defendants fail to address the applicable law.  They cite cases indicating that *if* there is probable cause, there is no constitutional obligation for police officers to investigate further.  *See* Mot. at 2.  They ignore, however, well-established Seventh Circuit legal precedent holding that departures from reasonable police practices are relevant in establishing that police officers did not have probable cause or otherwise acted with improper intent.  Defendants also cite to cases indicating that there is no independent due process claim for failure to investigate.  *See id.*  Again, Defendants miss the point.  Plaintiff is not introducing the evidence of their departures from reasonable police practices to prove a separate failure to investigate due process claim.  The evidence is relevant to proving the absence of probable cause and showing Defendants' intent with respect to Plaintiff's remaining causes of action.

Defendants also seek to exclude all of the evidence related to Defendant James Oliver threatening witnesses and covertly investigating the contents of the victims' safety deposit boxes

as "other acts" evidence. In order to make this argument, Defendants have offered a new theory, one that they have never asserted before during the years of litigating this case, namely that the Chicago Police Department ("CPD") was conducting two entirely separate investigations—a murder investigation and a narcotics investigation—and that Oliver was only involved in the narcotics investigation. Mot. at 4. Defendants ignore that there is nothing in the record to support this version of events. Indeed, the record establishes the opposite. There was only one investigative case file related to the events of January 29, and no one was investigated for or charged with a narcotics-related crime. The murders took place during and were intricately related to the attempted drug deal. The two aspects of these crimes cannot be and were not separated from each other. Moreover, Oliver was an active participant in investigating the homicides, including interviewing witnesses about the shootings and participating in the unduly suggestive live lineup during which Clifford Frazier ("Clifford"), in response to Defendants' misconduct, identified Plaintiff as the offender. Indeed, Oliver admitted to investigating the shootings during his deposition. Accordingly, Oliver's improper actions are not "other acts" evidence that Plaintiff seeks to admit for purposes addressed in Federal Rule of Evidence 404(b). Oliver's actions were part of the homicide investigation at issue, and the evidence related to his conduct further supports the suggestiveness of the live lineup, the absence of probable cause to detain Plaintiff, and malice and extreme and outrageous conduct on the part of Oliver, all of which are elements of proof for Plaintiff's causes of action.

## BACKGROUND

### I.     Defendants' Deviations from Reasonable Police Practices

Defendants arrested and detained Plaintiff based solely on the word of Clifford, an incredible witness, despite knowing that Clifford (1) was involved in the two kilogram cocaine

transaction that led to the murders of Derrick Frazier and Ledell Clayton on January 29, 1994 and was under orders "to shoot any motherfucker" who came near the car holding the cocaine, (2) lied to law enforcement about the events of January 29, (3) told a version of events that was contradicted by the physical evidence recovered, (4) did not have an opportunity to get a good look at the shooter, (5) was not able to describe the shooter immediately after the events in question, (6) eventually gave a description of the shooter that did not match Plaintiff's physical appearance, (7) was not able to identify Plaintiff from a photo lineup, and (8) only identified Plaintiff in an unduly suggestive live lineup that took place one month after the events in question.

Even though Defendants had nothing more than Clifford's unreliable identification of Plaintiff—which they procured through an unduly suggestive identification procedure— Defendants failed to conduct any further investigation before arresting Plaintiff and closing the case. They engaged in the following egregious deviations from reasonable police practices, among others:[1] (1) failure to review the 911 recording or attempt to obtain the dispatch card (which recorded the 911 caller's name) after Plaintiff and his counsel informed Defendants that Plaintiff had called 911 from inside J&J Fish after the shootings (and therefore, could not have been the shooter);[2] (2) failure to interview key eyewitnesses known to them; (3) fabrication of witness statements; (4) failure to test and improper destruction of physical evidence; (5) ignoring physical

---

[1] This list does not include Defendants' deviations from reasonable police practices with respect to the live lineup. Additionally, to the extent any of the failure to investigate evidence is the subject of Defendant Officers' Motion *in Limine* No. 4 to Preclude Certain Evidence or Argument Based on the Court's Summary Judgment Ruling, the admissibility of the evidence is discussed in Plaintiff's Response thereto. Plaintiff incorporates by reference the arguments made in his Response to Defendants' Motion *in Limine* No. 4.

[2] Judge Shah ruled that there was insufficient evidence to hold Defendants responsible for a due process violation for a failure to preserve the 911 call recording, but he did not preclude Plaintiff's argument that Defendants' failure to listen to the recording or review the dispatch card is relevant to establishing Defendants' improper intent.

evidence and witness statements that contradicted Clifford's version of events; (6) ignoring evidence implicating other suspects; and (7) failure to report and investigate exculpatory and relevant information. Plaintiff's expert will testify that all of these investigative failures, especially when considered together, constitute extreme deviations from reasonable police practices.[3] Additionally, many of these deviations were violations of the CPD's written policies and procedures that were in place during the relevant time period.[4]

## II.   Plaintiff's Causes of Action and the Intent-Related Elements of Proof

Plaintiff has nine remaining causes of action. These causes of action include the following: (1) violation of due process based on the unduly suggestive lineup (Count I); (2) violation of the Fourth Amendment based on the illegal detention of Plaintiff (Count V);[5] (3) failure to intervene and stop the due process and Fourth Amendment violations (Count II); (4) conspiracy to violate Plaintiff's constitutional rights (based on the due process and Fourth Amendment violations) (Count III); (5) malicious prosecution (Count VI); (6) intentional infliction of emotional distress (Count VII); (7) civil conspiracy to maliciously prosecute Plaintiff and/or inflict emotional distress (Count VIII); (8) vicarious liability (Count IX); and (9) indemnification (Count V). As detailed below, these causes of action have some form of an intent element of proof. Additionally, Plaintiff has a punitive damages claim, which also includes an intent element.

---

[3] Plaintiff's expert's opinions are further discussed in Plaintiff's Response to Defendants' Motion *in Limine* No. 10.

[4] Defendants' violations of the Chicago Police Department's policies and procedures are discussed in more detail in Plaintiff's Response to Defendants' Motion *in Limine* No. 9.

[5] The Third Amended Complaint refers to this count as a federal malicious prosecution claim. Dkt. 236, at 29. The Seventh Circuit has since suggested that illegal detention is the better characterization for this claim. *See Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018).

For the Fourth Amendment claim, one of the elements Plaintiff must prove is that Defendants did not have probable cause for Plaintiff to be detained pending trial. *See, e.g., Manuel*, 903 F.3d at 670. Probable cause existed if, based on the evidence known at the time, a reasonable person in the Defendants' position would have believed that Plaintiff committed the crime charged. *See, e.g.*, Fed. Civ. Jury Instr. of the 7th Cir. § 7.08; *see also Lawson v. Veruchi*, 637 F.3d 699, 703-04 (7th Cir. 2011). In evaluating whether probable cause existed, the jury may consider whether the Defendants "close[d] [their] eyes to facts that would help clarify the circumstances" of the crime. *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). The jury may also consider whether Plaintiff's arrest and illegal detention "could have been avoided if the arresting officer[s] had conducted a proper investigation" *Id.* at 127.

For the malicious prosecution claim, in addition to proving that Defendants did not have probable cause, Plaintiff also must prove that they acted with malice. *See Swick v. Liataud*, 662 N.E.2d 1238, 1244 (Ill. 1996). A person acts with malice if he acts for any reason other than to prosecute the actual perpetrator of the crime charged. *See, e.g.*, *Williams v. City of Chicago*, 733 F.3d 749, 759-60 (7th Cir. 2013) ("'Malice' in the context of malicious prosecution means that the officer who initiated the prosecution had 'any motive other than that of bringing a guilty party to justice.'"). "Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith." *Manning v. Dye*, No. 02 C 372, 2004 WL 2496456, at *15 (N.D. Ill. Nov. 5, 2004) (citing *Mack v. First Sec. Bank of Chi.*, 511 N.E.2d 714, 717 (Ill. App. Ct. 1987)).

Plaintiff's claim for intentional infliction of emotional distress requires proof of several elements that relate to Defendants' intent. First, Plaintiff has to prove that Defendants intended to inflict emotional distress on Plaintiff or knew there was a high probability that their conduct would do so. *See, e.g.*, *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 941 (Ill. App. Ct. 1997).

Second, Plaintiff must prove that Defendant's conduct was extreme and outrageous.  *Id.*  "A pattern, course, or accumulation of acts" can make an individual's conduct extreme, even if "one instance of such behavior might not be."  *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003).

Plaintiff also asserts a claim for punitive damages.  In order for the jury to award punitive damages, it must find that Defendants' conduct was malicious or in reckless disregard of Plaintiff's rights.  *See* Fed. Civ. Jury Instr. of the 7th Cir. § 7.28.  Conduct is considered reckless if, under the circumstances, Defendants did not care about Plaintiff's rights.  *Id.*

## III.    Officer Oliver's Conduct During the Investigation of Plaintiff

### 1.  Oliver was investigating the murders on January 29, 1994

Oliver testified during his deposition that on January 29, 1994, after hearing a dispatch call about a shooting, he went to the scene on Minerva Street where Derrick Frazier and Ledell Clayton had been shot, and subsequently went to the scene at J&J Fish.  *See* Ex. B, Excerpts of Deposition of James Oliver, at 36:1–22.  Between these two stops, Oliver and his partner went to the hospital where Clifford was being treated for gunshot wounds to question him about the shootings.  *Id.* at 58:12–59:21.  Oliver only learned about the drug transaction that took place between the victims and Anthony Williams after he arrived at the hospital to question Clifford about the shootings.  *Id.* at 40:20–41:17.  When asked during his deposition whether the information Clifford provided about their drug supplier was related to some other investigation Oliver was conducting at that time, Oliver responded, "No."  *Id.* at 41:23–42:1.  When asked whether the information about the drug supplier was significant to him at the time, Oliver responded that it was only significant because he lived a half a block from where the victims picked up the drugs "and these jackasses was picking up keys of cocaine right there at that restaurant that I go to."  *Id.* at 42:2–7.

After he interviewed Clifford, Oliver went to J&J Fish and spoke briefly to Anthony

7

Williams "to see what had transpired." *Id.* at 63:4–7. At no point did Oliver ask Williams about the narcotics transaction, even though Clifford identified Williams as being involved in the drug transaction with the victims earlier that evening. *Id.* at 63:1–3.

### 2. Oliver's investigation of the safety deposit boxes

At some point shortly after the shootings, Oliver obtained a safety deposit box key that was on Derrick Frazier's body at the time of his death. Oliver never inventoried this key. Instead, Oliver took the key to the house where Clifford was staying after he got out of the hospital. *See* Ex. C, Investigative Report, at ¶¶ 5-6. Oliver demanded that Clifford tell him where Derrick Frazier's safety deposit box was located and how much cash was inside the box. *Id.* at ¶ 6. Clifford confirmed for Oliver that there was $500,000 in the box and told him where the box was located. *Id.*[6] Oliver then told Clifford, "I can get you in," referring to the safety deposit box. Ex. D, Excerpts of Deposition of Clifford Frazier, at 33:2–7. Clifford refused to participate in obtaining the cash with Oliver, and Oliver expressed his frustration over Clifford's decision. *Id.* at 33:7–12. In addition to failing to inventory the safety deposit box key, Oliver never reported the information Clifford provided about the safety deposit box or any information about the investigation he conducted related to the safety deposit box, in violation of generally accepted law enforcement standards as well as the CPD's policies and procedures.

### 3. Oliver's threats to Clifford

Clifford believed that Oliver was "a crooked cop" who was attempting to steal Derrick Frazier's funds, so he reported Oliver's conduct to the CPD's Internal Affairs Division ("IAD").

---

[6] Clifford first reported this information to Plaintiff's investigator on October 2, 2010. *See* Ex. C, ¶ 1. During Clifford's deposition in this matter, Frazier admitted that Oliver presented the safety deposit box to him, but he denied telling Oliver where the safety deposit box was located or how much cash was inside the box. Ex. D, at 32:18–23. Plaintiff will call the investigator who interviewed Clifford to impeach him if Clifford testifies inconsistently with his prior statements to the investigator.

*Id.* at 34:5-16, 46:15–47:3. An IAD officer then asked Clifford to participate in a sting investigation in which Clifford would act in an undercover capacity and sell one kilogram of cocaine to Oliver, but Clifford refused. *Id.* at 43:8–18. When Oliver found out that Clifford was talking to IAD about him, he confronted Clifford and said words to the effect of "I'll fuck you up, man. What you doin' talking to [IAD]?" *Id.* at 47:9–48:4. Clifford testified during his deposition that as a result of Oliver's conduct, he was "scared to death" of the police. *Id.* at 34:13-18.

### 4. Oliver's interactions with Clifford during live lineup

Oliver threatened Clifford before Clifford identified Plaintiff in a live lineup. *Id.* at 17:17–18:17, 47:23–48:4. Nevertheless, Oliver was the law enforcement officer who interacted the most with Clifford during the lineup process. On February 26, 1994, Oliver picked up Clifford in his car and drove Clifford to the Area 2 police station for the lineup. *Id.* at 20:24–21:2. Oliver told Clifford prior to the lineup, "We think we got the guy who did the shooting. We're going to have you look at some people in the lineup." *Id.* at 20:15–21:5. These statements were in violation of generally accepted police practices, and also violated the CPD's lineup policy, which stated Oliver was supposed to tell Clifford that the suspect might not be in the lineup. *See* Ex. E, Chicago Police Department General Order 88-18 Lineup Procedures, at 1.B.(b)(1)–(2). Oliver also was the officer who walked Clifford by Plaintiff and his attorney immediately before the lineup. *See* Ex. F, Excerpt of Deposition of Eddie L. Bolden, at 196:20–197:3; *see also* Ex. G, Excerpt of Deposition of Charles Ingles, at 29:16–22. Finally, Oliver was inside the lineup room with Clifford during the lineup. *See* Ex. G at 69:6–15; *see also* Ex. D at 21:6–21.

### 5. Oliver's interactions with Cynthia Steward

Oliver interviewed Cynthia Steward, Ledell Clayton's fiancée, during the course of the investigation. On at least one occasion, Oliver went to Steward's house. During this meeting, he

told her that if she did not cooperate with him, the police would take her children.  *See* Ex. H, Excerpts of Deposition of Cynthia Steward, at 107:11–108:7, 110:10–22.  He also threatened that if someone did not remove her crying baby from the room, he would have her arrested.  *Id.* at 110:11–111:3. During this meeting, he demanded that Steward provide him with Ledell's safety deposit box key, and she complied.  *Id.* at 114:2–20.  Oliver never inventoried the key, returned the key to Steward, or reported anything about his key investigation, in violation of generally accepted law enforcement standards and CPD policies.  Oliver also took a number of documents from Steward's residence, including bank records.  *Id.* at 117:21–119:7.  He did not inventory these documents or otherwise prepare a report describing what he seized.[7]

## ARGUMENT

I.    **The Evidence of Defendants' Deviations from Reasonable Police Practices Is Relevant to Their Intent and Probable Cause.**

Defendants' departures from reasonable police practices during their investigation are probative of their intent. Evidence about deviations from reasonable police practices "can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).  Plaintiff's police practices expert, William Gaut, will testify that Defendants

---

[7] At the time of Steward's deposition, Plaintiff did not have a good photograph of Oliver to show Steward. Plaintiff requested photographs of Oliver in discovery, but Oliver represented that he did not have a single photograph of himself from anywhere close to the relevant time period.  *See* Ex. I, Defendant Oliver's Response to Plaintiff's Second Set of Requests for Production. This led to Steward not being able to conclusively identify Oliver as the law enforcement officer who engaged in this conduct during her deposition.  The name Oliver was familiar to her, and she remembered that the officer who engaged in this conduct was African American.  Plaintiff continued his investigation and recently obtained a photograph of Oliver from the relevant time period.  Upon seeing the photograph, Steward confirmed that Oliver was the person who engaged in the conduct described herein.  *See* Ex. J, Declaration of Cynthia Steward.

engaged in numerous deviations from reasonable police practices, as detailed in the Background section above.  All of the deviations are relevant to establishing that Defendants (1) intentionally violated Plaintiff's Fourth Amendment rights, (2) acted maliciously and in reckless disregard of Plaintiff's rights, (3) intentionally inflicted emotional distress on Plaintiff, and (4) knowingly conspired with others to commit these acts.  Specifically, Dr. Gaut's testimony will help "the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that [Defendants] acted deliberately to violate [Plaintiff's] rights." *Jimenez*, 732 F.3d at 722; *see also Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative [sic] and probative circumstantial evidence of [unlawful] intent."); *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (citing *Jimenez* and holding that an expert's testimony was admissible because it was "introduced to inform the jury 'what a reasonable police investigator'" would have done in the defendants' situation).

In an analogous case, Judge St. Eve rejected a *Daubert* challenge seeking to preclude Dr. Gaut from testifying about the defendants' "investigative failures." *See Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *10 (N.D. Ill. May 2, 2016).  The defendants asserted that Dr. Gaut's opinions were irrelevant and misinterpreted the *Brady* standard because he "fail[ed] to acknowledge that the police officers were not required to investigate Sanders' defense nor were they required to investigate other perpetrators once the officers had established probable cause to arrest Sanders." *Id.*  The court recognized, however, that Dr. Gaut did not "opine that Defendant Officers' failure to investigate the alleged perpetrators constitutes a *Brady* violation.  Instead, Dr. Gaut opine[d] that these investigative shortcomings deviated from proper police practices." *Id.*  In applying *Jimenez*'s instruction, the court held that this testimony was

relevant and denied the *Daubert* motion. *Id.* Dr. Gaut's testimony, and the evidence on which that testimony is based, is relevant for the same reasons in this case.

Similarly, in *Grayson v. City of Aurora*, the court found that the defendants' failure to investigate was probative of malice. 157 F. Supp. 3d 725, 747 (N.D. Ill. 2016). Specifically, the court reasoned that plaintiff provided the names of suspects, "yet the officers did not interview either individual" and officers "did little to further investigate." *Id.* The court also found that there was "no evidence that the Defendants followed up with" additional witnesses. *Id.* Accordingly, the court denied summary judgment on plaintiff's malicious prosecution claim because "[a] reasonable jury could decide from this evidence that the Defendants acted with malice." *Id.* In this case, the jury could similarly find that Defendants' investigative failures—which Dr. Gaut will testify were severe, persistent departures from accepted police standards—support an inference of malice.

Defendants' failure to investigate also is relevant to the element of probable cause. *See Jimenez*, 732 F.3d at 721 (finding expert's testimony regarding "reasonable police practices" admissible and stating that it "had direct implications for applying legal standards such as probable cause"). The probable cause analysis is an objective one, requiring the jury to consider whether "a reasonable person in Defendant's position would have believed" that Plaintiff committed these crimes. Fed. Civ. Jury Instr. of the 7th Cir. § 7.08. In making this determination, the jury "should consider what [the defendant] knew and the reasonably trustworthy information [the defendant] received." *Id.* Here, Defendants only had Clifford's identification of Plaintiff, which was unreliable and procured through an unduly suggestive identification procedure. When "information from or about a person claiming to be the victim of crime would lead a reasonable officer to be suspicious, making further investigation prudent . . . the officer must do more."

*Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994). The fact that there were various reasonable avenues of investigation Defendants should have pursued but chose not to is highly probative for a probable cause determination. The jury could conclude that Defendants "close[d] [their] eyes to facts that would have helped clarify the circumstances" of the crime and that Plaintiff's arrest and illegal detention "could have been avoided if the arresting officer[s] had conducted a proper investigation." *BeVier*, 806 F.2d at 127-28. Accordingly, Defendants' decisions not to investigate is highly relevant to the probable cause analysis. *See also Hebron*, 18 F.3d at 423 (finding that the circumstances "made it unreasonable—and therefore unconstitutional—to arrest [and detain] [Plaintiff] on [a witness's] mere say-so.").

## II. Defendant Oliver's Misconduct Is Relevant to His Intent.

Oliver's actions related to threatening witnesses and taking safety deposit box keys are directly relevant to Plaintiff's claims. Defendants' new contention that this conduct is "other acts" evidence because Oliver was only involved in a separate narcotics investigation and not the homicide investigation has no support in the record. In fact, their assertion is contradicted by the record, including Oliver's own testimony about his investigation of the shootings and the testimony of other witnesses establishing that he was heavily involved in the live lineup. There is no basis, therefore, to apply a Rule 404(b) analysis to the evidence of his misconduct. *See, e.g.*, *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010) (acts committed in furtherance of an alleged conspiracy are not "other acts" within the meaning of Rule 404(b)).

The evidence that Oliver threatened Clifford is relevant to proving that the live lineup was unduly suggestive. It was bad enough that Oliver told Clifford that he thought the offender was in the live lineup, in violation of the CPD's lineup policy. But Oliver telling Clifford this suggestive information *after* he had previously threatened Clifford and Clifford was "scared to death" of him makes the suggestive nature of this statement even more egregious. Clifford was likely to feel

13

pressured to keep Oliver happy and perceive that Oliver expected him to select someone out of the lineup as the shooter. Accordingly, Oliver's threats and the events leading up to the threats are directly relevant to proving the unduly suggestive nature of the lineup. Additionally, Oliver's knowledge about the improper influence he had on Clifford impacts the probable cause analysis, making it even more unreasonable for Oliver to believe that Clifford identified the actual shooter.

A jury also may infer malice from Oliver's conduct. "Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with actions made in good faith." *Manning*, 2004 WL 2496456, at *15. Oliver obtaining a safety deposit box key from Derrick Frazier's body, learning that Derrick Frazier had $500,000 in a safety deposit box and the location of the box, threatening law enforcement's only witness for reporting Oliver's conduct pertaining to the safety deposit box, and not reporting any of this information, in violation of the CPD's policies, is inconsistent with good faith actions.

The same reasoning applies to the evidence of Oliver threatening Cynthia Steward, taking Ledell's safety deposit box key and bank records, and not reporting any of this information. Based on this evidence, the jury can infer that Oliver was acting for reasons other than prosecuting the actual offender. Oliver's misconduct also provided him with a motive to close the homicide case as quickly as possible, irrespective of whether there was probable cause to arrest Plaintiff, in order to avoid further scrutiny of his improper investigative actions.

Oliver's conduct also further supports Plaintiff's cause of action for intentional infliction of emotional distress. His conduct was extreme and outrageous, especially when considering that "[a] pattern, course, or accumulation of acts" can make an individual's conduct extreme, even if "one instance of such behavior might not be." *Feltmeier*, 798 N.E.2d at 83. Accordingly, the evidence related to Oliver's conduct is highly probative of several elements that Plaintiff must

prove for his causes of action.

### III. The Evidence Related to Defendants' Deviations From Reasonable Police Practices and Oliver's Misconduct Should Not be Precluded Pursuant to Rule 403.

Defendants' contention that the evidence of their extreme departures from reasonable police practices and Oliver's misconduct should be excluded pursuant to Rule 403 lacks merit. The evidence is directly relevant to, and critically important for proving, the unduly suggestive and intent-related elements of Plaintiff's causes of action. With respect to the police practices evidence, Defendants contend that they would be unfairly prejudiced by this evidence in part because it would "imply that officers engaged in misconduct." Mot. at 3. With respect to the evidence regarding Oliver's actions, they contend "the evidence is plainly intended to imply that Oliver was engaged in corrupt practices…." Mot. at 6. The mere fact that the evidence is unfavorable for Defendants is not a basis for exclusion under Rule 403. *See, e.g.*, *Kelsay v. Consol. Rail Corp.*, 749 F.2d 437, 443 (7th Cir. 1984) ("Of course, 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'").

Furthermore, contrary to Defendants' assertion, there is no risk of jury confusion with respect to the failure to investigate evidence. Defendants have inserted confusion into the analysis by arguing a moot point, namely that failure to investigate is not an independent constitutional claim, rather than focusing on the real purposes for which Plaintiff will be offering this evidence. That confusion will not exist at trial because the jury will be properly instructed on the elements of the causes of action.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Eddie L. Bolden respectfully asks this Court to enter an Order denying Defendant Officers' Motion *in Limine* No. 7.

Dated: November 8, 2019

Respectfully Submitted,

/s/ Valarie Hays
Ronald S. Safer
Valarie Hays
Eli J. Litoff
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700
rsafer@rshc-law.com
vhays@rshc-law.com
elitoff@rshc-law.com

Sandra L. Musumeci (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
1330 Avenue of the Americas, 6th Floor
New York, New York 10019
(212) 660-1000
smusumeci@rshc-law.com

*Attorneys for Eddie L. Bolden*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2019, I caused the foregoing document to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Valarie Hays*
Valarie Hays