UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-417 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO PESAVENTO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

The Court makes this supplemental ruling about the availability of Defendant James Oliver to testify at trial. The punchline is that Oliver must testify – in person, in the courtroom – if Plaintiff wants him to testify.

This Court already summarized the record about Oliver's medical condition in its earlier ruling. *See* 10/5/21 Order (Dckt. No. 480). But for the sake of completeness, this Order will include some of that background once again.

Oliver is a retired officer from the Chicago Police Department. He is 77-years old, and has some chronic health issues. He resides in Arkansas.

This Court looked into those medical issues in the fall of 2020. Defense counsel flagged his medical condition in a filing about rescheduling the trial, and expressed concerns about Oliver testifying in person in the midst of a pandemic. At that point, the vaccine was months away.

At that time, there was no suggestion that Oliver was too unhealthy to testify in person at trial. That is, Defendants did not argue that Oliver could not testify at trial because of his underlying medical conditions, standing alone. Instead, Defendants suggested that Covid-19

posed risks to Oliver's health because of his underlying medical conditions. The argument rested on the risks from the pandemic (*i.e.,* he was vulnerable to COVID-19).

Just to be safe, Plaintiff requested a second deposition, to preserve his testimony. Oliver opposed that request. This Court looked at the medical records, and determined that his health was not sufficiently serious to warrant a second deposition. Defendants agree that that ruling was the right decision at the time. *See* Defs.' Supplemental Filing, at 2 (Dckt. No. 488).

But this Court ordered an early warning system, to be on the safe side. This Court ordered Defendants to keep Plaintiff's counsel and this Court in the loop about Oliver's health condition. The goal was to avoid unwelcome surprises. Since then, Oliver never claimed that he was too ill to testify in person. (Until a few days before trial, that is.)

As late as mid-September 2021, Oliver planned to testify in person. He spoke with defense counsel on September 13, 2021 about making arrangements to book a flight. *See* Defs.' Supplemental Filing, at 2 (Dckt. No. 488). "In the fall of 2020 – and as recently as mid-September – Oliver appeared well-enough to testify." *Id.*

At that point, there was no concern about whether he was healthy enough to travel to Chicago to testify. Instead, the concern was an expired license, which might prevent him from getting on a plane. On September 13, 2021, Oliver expressed concerns about whether he could board a flight with an expired license. *Id.* ("Because Oliver's driver's license was expired, he was concerned he would not be able to board a plane to Chicago.").

Defense counsel looked into it, and determined that Oliver could fly with an expired license under TSA rules. So he was good to go. "Both Oliver and defense counsel anticipated that Mr. Oliver would fly to Chicago to testify in his defense in a few weeks." *Id.*

2

On September 22, during the walk to the courthouse for the final pretrial conference, defense counsel learned that Oliver was in the hospital. Defense counsel proactively raised that issue with this Court at the hearing on September 22. So defense counsel shared the news about the hospitalization on the same day that they learned of the hospitalization.

Oliver was admitted the hospital on September 21, and discharged on September 24. So he was discharged about two and a half weeks ago.

Defense counsel spoke with Oliver on September 29, and again on October 1. During the call on October 1, defense counsel spoke with both Oliver and Oliver's physician, Dr. Erica Stokes. Dr. Stokes orally expressed the opinion that Oliver was medically unable to travel to Chicago to testify.

Defense counsel notified Plaintiff's counsel of that opinion. Plaintiff's counsel asked for an affidavit from Dr. Stokes. But Dr. Stokes then seemingly went AWOL. Defense counsel learned that she was out of the office until Wednesday, October 6. That's the day before trial.

In the recent filing, Defendants state: "Based on this timeline, Plaintiff's claim of unfair surprise is unfounded." *See* Defs.' Supplemental Filing, at 6 (Dckt. No. 488). Let's put aside for a second whether the surprise was unfair. This Court felt surprised.

This Court did not know until the hearing on Monday, October 4, that Oliver did not plan to appear at trial. That's three days before jury selection. Oliver is a defendant, and a key witness in this case. Yet this Court did not know until the last minute that Oliver did not plan to make an appearance.

That surprise was unwelcome, because this Court put a process in place to guard against last-minute surprises. Again, one year ago, this Court ordered Oliver to give periodic updates

about his health. The whole point of that exercise was to prevent the type of last-minute surprise that the parties and this Court are currently facing.

Here's how the Court sees it. As recently as a few weeks ago, Oliver apparently planned to testify in court. That's why he communicated with defense counsel about his ability to board a plane – for a flight to Chicago – with an expired license. So the question is whether, from a medical standpoint, his health has deteriorated since then in a way, and to a degree, that prevents him from appearing in person.

In recent days, this Court has received and reviewed Oliver's medical records, which are on the docket under seal. *See* Medical Records (Dckt. No. 488). Oliver put his medical condition at issue, and the public has an interest in knowing the basis for the Court's ruling. Even so, this Court wants to protect his privacy. So this Court will use pseudonyms, as appropriate. The rest of the information in this Order is not particularly confidential.

The backstory is as follows. On September 21, Oliver woke up and experienced significant fatigue. *See* 10/6/21 Letter from Dr. Stokes (Dckt. No. 488-6) (describing his condition in greater detail). He went to urgent care complaining of fatigue and generalized weakness. *See* Medical Records (Dckt. No. 488-7, at 33, 48 of 49). At urgent care, the medical staff determined that he had elevated levels of Chemical Compound A, which relates to the function of Organ X. *Id.*

So the doctors sent him to the hospital. He was admitted to the hospital "in stable condition for further care." *Id.*; *see also id.* at 30 of 49. The severity of his fatigue was "[m]oderate." *Id.* at 23 of 49. The timing was "[c]onstant," and the progression was "[u]nchanged." *Id.* He denied having a slew of related symptoms. *Id.*

4

Oliver stayed three days in the hospital, from September 21 to 24. *Id.* at 16 of 49. The doctors confirmed that he had elevated levels of Chemical Compound A, because of a disease relating to Organ X. But that disease was not new. He had a "history" of disease involving Organ X. *Id.* at 30 of 49.

He was discharged on September 24. In the discharge report, the doctor states that Oliver's symptoms "resolved during his stay." *See* Medical Records (Dckt. No. 488-7, at 16 of 49). He was "discharged home in a stable condition." *Id.* The doctor noted that he could resume his "normal diet and activity as tolerated." *Id.* at 17 of 49.

On Friday, October 1 – six days before trial – Oliver visited his primary care physician, Dr. Stokes. Oliver told the doctor about his upcoming testimony in this lawsuit. "Patient is a retired police office[r] with over 30 years of service in Chicago. He shares that he was d[e]posed in a case where an inmate was released and is now suing the city. He has been called to testify but is concerned that this would affect his health." *See* Medical Records (Dckt. No. 488-7, at 2 of 49).

The doctor took note of his emotional reaction to the possibility of testifying. "Patient becomes tearful when recounting his story about serving as an officer and how he feels being called to testify in a law suit[] at his age and in his state of health." *Id.* at 3 of 49.

At that visit, Oliver presented "new symptoms." *See* 10/6/21 Letter from Dr. Stokes (Dckt. No. 488-6). The letter (also under seal) recounts those symptoms. *Id.* In the end, Dr. Stokes recommended that Oliver not travel and testify.

Four things about that letter jumped out to the Court.

First, the statement by Dr. Stokes was relatively mild. And the tone was much different than the tone in Defendants' recent motion for a protective order, which suggested that Oliver may not survive testimony.

Dr. Stokes stated: "The stress of traveling could be detrimental to the patient's health. After evaluating Mr. Oliver in clinic, I do not recommend he travel at this time." *Id.* That's all. A statement that a doctor "do[es] not recommend" travel because the stress "could be detrimental" to a patient's health is not particularly compelling. The alarm bells are not ringing loudly.

Second, the basis for that recommendation seems to be different than the condition that landed him in the hospital in the first place. Oliver went to the hospital on September 21 with fatigue, and the hospital determined that he had high level of Chemical Compound A relating to a disease involving Organ X. But in her letter, Organ X received little attention.

The letter describes potential problems with Organ Y. The "new symptoms" suggest that he "may have" an "unknown diagnosis" of Condition Z. *Id.* "He is at risk . . . if he doesn't get control of these symptoms now." *Id.* But during his hospital stay, the doctors evaluated Oliver's Organ Y, and it appears to this Court that things were "normal." *See* Medical Records (Dckt. No. 488-7, at 43–44 of 49). The story seems to change, and the medical conditions seem to evolve.

Third, Dr. Stokes recommended that he see a specialist for Organ Y, and scheduled an appointment for October 7, 2021 (*i.e.,* the first day of trial). *Id.* On October 8, this Court requested an update. *See* 10/8/21 Order (Dckt. No. 488). On October 9, defense counsel filed a statement confirming that Oliver is awaiting the results. As things stand, there is nothing in the record from a specialist suggesting any dire problems with Organ Y.

Fourth, Dr. Stokes now thinks that Oliver can testify remotely after all. Dr. Stokes seemed to set conditions for his testimony, as if she – and not this Court – was in charge of that decision. "As long as the patient has a relative with him at all times and is allowed to take short breaks when needed, he may testify remotely via Zoom. If at anytime he starts to feel ill he will need to stop and seek medical care." *Id.*

The suggestion of testifying by Zoom caught this Court's attention. In a recent filing, Defendants suggested that even testifying by Zoom could put his life in jeopardy. "Because of serious health issues that have arisen in the last two weeks, Oliver will be putting his health at grave risk if he is forced to travel to Chicago to participate in this trial *or to testify remotely*." *See* Mtn. for Protective Order, at 1 (Dckt. No. 476) (emphasis added). "Oliver cannot safely testify, *even by remote means*, due to his extremely poor medical condition." *Id.* (emphasis added); *id.* at 2 ("[I]t is clear that Oliver cannot testify either in-person *or remotely* due to significant health risks.") (emphasis added).

In fact, Defendants' motion for a protective order stated that Dr. Stokes foreclosed even testimony by Zoom. *Id.* at 1 ("Oliver's primary care physician, Dr. Erica Stokes, M.D., has advised him not to not [sic] travel to Chicago to attend the trial or to participate by *remote means*.") (emphasis added). "[H]is doctor has advised him that even participating in the trial *remotely* will be *dangerous to his health*." *Id.* at 3 (emphasis added). "In short, forcing Oliver to testify would place Oliver's health, and perhaps his life, in jeopardy."

Those representations did not age well. The very next day, Dr. Stokes signed her letter, under penalty of perjury, stating that Oliver can, in fact, testify remotely after all. *See* 10/6/21 Letter from Dr. Stokes (Dckt. No. 488-6). So the story changed yet again.

7

Viewing everything as a whole, this Court concludes that Oliver is not too sick or too weak to testify in person in the courtroom. The medical conditions are moderate. They're not out of the ordinary for someone of his age. His medical conditions are not so serious to foreclose in-person testimony.

One could be forgiven for thinking that Oliver is feeling stressed about the trial and simply doesn't want to testify. Understandably so. Maybe Oliver is concerned that the experience will be stressful, and that the experience could impact his health. Maybe so. But Oliver is not too weak or too sick to testify.

This Court fully appreciates that Oliver is a senior citizen with medical conditions, and that he deserves care and respect. But there are other considerations at play, too. One of them is the fact that he is a party, and a critical witness. In fact, he is important to both sides. Defense counsel has represented that they want him here, too.

Oliver needs to be here, unless he can't be here. Based on this Court's careful review of the medical records, he can be here. So he needs to be here.

At trial, this Court will take appropriate precautions to ensure that Oliver is comfortable, and to ensure that the experience is not unduly stressful. When he is on the stand, this Court will be able to see his condition in person, and will be able to take precautions as necessary.

The Court directs defense counsel to notify Oliver of this Court's ruling immediately. Plaintiff must file a statement by noon tomorrow confirming whether they want Oliver to testify in person, and if so, when. Defense counsel then must notify Oliver of that filing. By 5:00 p.m. tomorrow, defense counsel must file a statement and inform this Court whether Oliver will follow this Court's Order and appear for in-person testimony. If not, this Court will consider other alternatives, including other arrangements for ensuring his in-person appearance.

8

Date: October 10, 2021

Steven C. Seeger
United States District Judge

9