**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 C 00417 |
| | ) | |
| vs. | ) | Honorable Steven C. Seeger |
| | ) | |
| ANGELO PESAVENTO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO CLARIFY THE COURT'S RULING AND
SUPPLEMENTAL RULING ON DEFENDANTS' MOTION *IN LIMINE* NO. 10
(REGARDING THE TESTIMONY OF HIS EXPERT, DR. WILLIAM T. GAUT)**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

BACKGROUND ...................................................................................................... 1

I.     The Court's Ruling and Supplemental Ruling .................................................... 1

II.    Plaintiff's Intended Approach with Dr. Gaut .................................................... 2

ARGUMENT ........................................................................................................... 3

I.     Dr. Gaut Should Be Permitted to Testify About the Application of CPD Standard Operating Procedures and How Defendants Deviated from the SOPs. ............................ 3

II.    Dr. Gaut Should Be Permitted to Educate the Jury About How One-Way Windows Work and How They Are Affected by the Lighting in the Connected Rooms.................. 9

        A.    Dr. Gaut's explanation about how one-way windows work, and how their transparency is affected by the lighting in the conjoined rooms, is not within the common knowledge of the jury and would be helpful to the jury in evaluating Mr. Bolden's claims. ............................................................ 9

        B.    Dr. Gaut's testimony rebuts Defense Counsel's opening statement and Defendant Pesavento's trial testimony that it was impossible for Mr. Bolden to see through the one-way window. ................................................... 10

CONCLUSION ....................................................................................................... 12

# TABLE OF CONTENTS

Page

**CASES**

*Anderson v. City of Chicago*,
454 F. Supp. 3d 808 (N.D. Ill. 2020) ........................................................................4

*Aponte v. City of Chicago*,
2011 WL 1838773 (N.D. Ill. 2011) ..........................................................................6

*Brooks v. Fitzsimmons*,
658 F. Supp. 840 (N.D. Ill. Apr. 28, 1987)..............................................................10

*Cage v. City of Chicago*,
979 F. Supp. 2d 787 (N.D. Ill. 2013) ......................................................................5, 6

*Carter v. United States*,
1992 WL 390273 (E.D.N.Y. Dec. 11, 1992) ........................................................10, 11

*Davis v. Duran*,
276 F.R.D. 227 (N.D. Ill. 2011 ................................................................................6

*Florek v. Vill. of Mundelein*,
649 F.3d 594 (7th Cir. 2011) ................................................................................4, 9

*Hopkins v. City of Huntsville, Ala.*,
2014 WL 5488403 (N.D. Ala. 2014) ........................................................................2

*Jimenez v. City of Chicago*,
732 F.3d 710 (7th Cir. 2013) ................................................................................4, 5

*Ledbetter v. Edwards*,
35 F.3d 1062 (6th Cir. 1994) ................................................................................10

*Monfils v. Taylor*,
165 F.3d 511 (7th Cir. 1998) ................................................................................4

*Myers v. Ill. Centr. R.R. Co.*,
629 F.3d 639 (7th Cir. 2010) ................................................................................6

*Sanders v. City of Chicago Heights*,
2016 WL 1730608 (N.D. Ill. 2016) ..........................................................................1

*Sieveking v. Reliastar Life Ins. Co.*,
2009 WL 1795090 (S.D. Ind. June 23, 2009)............................................................5

*Thompson v. City of Chicago*,
472 F.3d 444 (7th Cir. 2006) ...................................................3

*United State v. Proano*,
912 F.3d 431 (7th Cir. 2019) ...............................................3, 4

*United States v. Aldo Brown*,
871 F.3d 532 (7th Cir. 2017) ...............................................3, 4

*United States v. Blount*,
502 F.3d 674 (7th Cir. 2007) ...................................................9

*United States v. Brown*,
461 F.2d 134 (D.C. Cir. 1971) .............................................10

*United States v. David Brown*,
250 F.3d 580 (7th Cir. 2001) ...............................................3, 4

**STATUTES**

18 U.S.C. § 242 .......................................................................3, 4

42 U.S.C. § 1983 .........................................................................5

**RULES**

Fed. R. Evid. 702 ...................................................................4, 6, 9

Plaintiff Eddie L. Bolden, by and through his undersigned counsel, respectfully submits this Motion to Clarify the Court's Ruling (Dkt. 467) and Supplemental Ruling (Dkt. 489) on Defendants' Motion *in Limine* No. 10. Plaintiff believes that Dr. William T. Gaut's opinions and anticipated trial testimony fall squarely within the Court's Order. Nonetheless, to avoid creating any unnecessary delay during the trial, Plaintiff makes this submission to inform the Court of the general topics that Plaintiff intends to cover during the direct examination of Dr. Gaut.

First, Plaintiff will question Dr. Gaut regarding the application of the Chicago Police Department Standards of Procedures ("SOPs"), based upon his extensive police training and his knowledge of generally acceptable police practices. Dr. Gaut's testimony regarding relevant professional standards will give the jury a baseline to help the jury evaluate the Defendants' conduct. Second, Plaintiff will ask Dr. Gaut to render an opinion as to whether Defendants deviated from these applicable standards. These topics are both admissible and relevant to the issues in this trial, and these topics stay in the bounds articulated by this Court.[1]

## BACKGROUND

### I.     The Court's Ruling and Supplemental Ruling

This Court held that Dr. "Gaut can testify about whether Defendants complied with generally applicable standards for law enforcement." Dkt. 467 at 29 (*citing Sanders v. City of Chicago Heights*, 2016 WL 1730608, at *7 (N.D. Ill. 2016) (St. Eve, D.J.) ("Dr. Gaut, however, may testify as to the relevant professional standards and identify departures from these standards,

---

[1] Also, consistent with this Court's ruling, Plaintiff will ***not*** ask Dr. Gaut to opine regarding police department protocols that did not apply to the Chicago Police Department at the time of this investigation. Further, Plaintiff will *not* ask Dr. Gaut to testify about specific ***training*** protocols that deviate from the ***training*** that the Defendants received. Lastly, Plaintiff will ***not*** ask Dr. Gaut to opine regarding whether the Chicago Police Department had bad or insufficient policies, practices, and guidelines.

including that the City's customs or practices led to violations of generally acceptable police standards and procedures."); *Hopkins v. City of Huntsville, Ala.*, 2014 WL 5488403, at \*5 (N.D. Ala. 2014) ("The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible, however, and will be considered by this court.")). The Court then clarified in a supplemental ruling that "Plaintiff cannot offer evidence simply to show that the Chicago Police Department had bad policies, practices, and guidelines. But Plaintiff can offer evidence that officers in question failed to follow the policies, practices, and guidelines of the Chicago Police Department." Dkt. 489 at 18. The Court went on to state that "Plaintiff may offer evidence about the policies, practices, and guidelines of the Chicago Police Department at the time in question. Plaintiff also may offer evidence that the officers in question did not follow those policies, practices, and guidelines. Defendants may offer evidence of their own on those subjects, meaning what policies, practices, and guidelines were in place, and whether they knew about them." *Id.*

## II.     Plaintiff's Intended Approach with Dr. Gaut

In general, Plaintiff plans to direct Dr. Gaut to specific Chicago Police Department Standard Operating Procedures or General Orders and ask him to explain what those directives entail based on his extensive experience, training and expertise. The topics covered will include thorough investigations, lineups and similarly broad topics. It will not include references to specialized areas that might vary by department because of differing policies, *e.g.,* guidelines regarding use of force or describing the resources of the Department (which may refer to specialized testing that smaller police departments may not necessarily have the resources to pursue). Consistent with the Court's rulings, Plaintiff intends to elicit testimony from Dr. Gaut regarding both the generally applicable standards for law enforcement and the policies, orders, and

guidelines of the Chicago Police Department.[2] Dr. Gaut will also be asked to opine whether and how Defendants failed to follow these applicable policies, orders, and guidelines.

## ARGUMENT

I.    **Dr. Gaut Should Be Permitted to Testify About the Application of CPD Standard Operating Procedures and How Defendants Deviated from the SOPs.**

Dr. Gaut will testify, if allowed, to the application of the Chicago Police Department's Standard Operating Procedures based upon his training, experience, and knowledge of generally

---

[2] Neither of these topics run afoul of the Seventh Circuit's decisions in *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006) or *United State v. Proano*, 912 F.3d 431 (7th Cir. 2019), both of which are 18 U.S.C. § 242 criminal cases addressing the use of excessive force.

In *Thompson*, the court determined that a CPD General Order on Excessive Force was inadmissible, where the only question was whether the use of force was "objectively reasonable" under the circumstances. The court found that the "fact that excessive force is 'not capable of precise definition' necessarily means that, while the CPD's General Order may give police administration a framework whereby commanders may evaluate officer conduct and job performance, it sheds no light on what may or may not be considered 'objectively reasonable' under the Fourth Amendment given the infinite set of disparate circumstances which officers might encounter. Indeed, the CPD's General Orders state that they are intended to 'provide members guidance on the reasonableness of a particular response option,' when taking a suspect into custody." 472 F.3d at 454.

Here, Plaintiff does not intend to offer expert testimony regarding CPD's Standard Operating Procedure to establish that a constitutional violation took place. Rather, the existence of an applicable operating procedure and Defendants' deviation from that procedure, is relevant to the Defendants' intent.

Similarly, in *Proano*, the Seventh Circuit determined that departmental polices can be relevant to show intent in § 242 cases. 912 F.3d at 439 (*citing United States v. Aldo Brown*, 871 F.3d 532, 538 (7th Cir. 2017); *United States v. David Brown*, 250 F.3d 580, 586 (7th Cir. 2001)). The court then determined whether evidence of Proano's training was probative of his intent. The government offered evidence of CPD-specific training, which Proano received. The court found that this was properly admitted by the district court.

Here, Plaintiff only intends to elicit testimony regarding the governing, relevant CPD standards and the policies and procedures that were widely accepted and used at the time of the underlying investigation. Both sets of protocols applied to Defendants. Plaintiff does not intend to elicit testimony regarding SOPs that did not apply to the Defendants, and Plaintiff does not intend to elicit testimony about practices and procedures that did not apply to Defendants.

accepted police practices. This is proper expert testimony, and Dr. Gaut is qualified to offer opinion testimony on these topics. *See* Fed. R. Evid. 702; *see also United States v. Aldo Brown*, 871 F.3d 532, 537 (7th Cir. 2017) (in the context of a § 242 excessive force case the "legal standard contemplates a reasonable *officer*, not a reasonable person, so it may be useful in a particular case to know how officers typically act in like cases.") (citing *Florek v. Vill. of Mundelein*, 649 F.3d 594, 602 (7th Cir. 2011)); *see also Anderson v. City of Chicago*, 454 F. Supp. 3d 808 (N.D. Ill. 2020) (in a § 1983 case, while some of the expert's testimony was limited, the court noted that expert testimony was "entirely appropriate" to highlight "what the professional standards are" and to identify "departures from them[.]") (*citing Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("When an expert offers an opinion relevant to applying a legal standard . . . the expert's role is limited to describing sound professional standards and identifying departures from them.")).

Dr. Gaut's testimony is relevant for two separate purposes. First, his opinions regarding the applicable CPD SOPs, and Defendants' deviations from the SOPs, are relevant to Defendants' intent and whether they acted with malice. *See, e.g., United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("We have before recognized that evidence of departmental policies can be relevant to show intent in § 242 cases." (*citing Aldo Brown*, 871 F.3d 532, 538 (7th Cir. 2017); *United States v. David Brown*, 250 F.3d 580, 586 (7th Cir. 2001)); *Monfils v. Taylor*, 165 F.3d 511, 520 (7th Cir. 1998) (noting that at trial, police practices expert testified as to whether "in his opinion [Defendant] Taylor 'followed generally accepted practices and conformed to the police department that was in effect'"). Second, his opinions regarding generally acceptable police practices, and Defendants deviations from those practices, are relevant to whether Defendants were merely negligent or acted for a purpose other than bringing the true perpetrator of the crime to justice. *See Jimenez*, 732 F.3d at 721-722 ("Expert testimony regarding relevant professional standards can

give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.") (citations omitted). In *Jimenez*, a § 1983 case alleging violations of due process and malicious prosecution, the Seventh Circuit approved of admitting expert testimony that discussed "the steps a reasonable police investigator would have taken to solve the [] murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed." *Id.* at 722; *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 804-05 (N.D. Ill. 2013) (expert's testimony would assist the jury in determining whether the defendant "acted with deliberate indifference by performing a cursory 'rubber-stamp' review of the report that fell short of nationally established standards"); *Sieveking v. Reliastar Life Ins. Co.*, 2009 WL 1795090, at *2 (S.D. Ind. June 23, 2009) ("A lay jury unfamiliar with the [relevant] industry could be aided by an expert's explanation of how a [] claim should be processed, and DiLisio's proposed testimony will be relevant to the jury's ultimate determination of whether defendants' actions and inactions amounted to bad faith in this case.").

For example, Dr. Gaut will testify that the SOPs require that detectives "diligently investigate all cases they receive for follow-up. Their investigation must be thorough, careful, and objective." Plaintiff's Trial Exhibit 5, at 71 (Chapter 8, 8.1(B)). Defendant Pesavento testified that he received training in conducting a thorough investigation and that the training included locating and interviewing all relevant witnesses, including trying to learn if there are any other witnesses with relevant information. *See* Oct. 13, 2021 Trial Tr. at 844:13-844:3, 872:2-15, attached hereto as Ex. 1. The SOPs also required that detectives "seek witnesses by a canvass of the area in the immediate vicinity of the location of occurrence." *Id.* at 72 (Chapter 8, 8.3 (B)). Of course, these standards applied to Defendants at the time of the underlying investigation.

Several topics within the scope of this testimony will be: (1) types of evidence detectives must collect during a thorough investigation of this type, including 9-1-1 calls; (2) the requirement to locate and interview all relevant witnesses; and (3) the general, universal practice of assessing material witnesses' credibility. Dr. Gaut will explain that the CPD SOP's as well as universally recognized police practices require these basic investigatory steps. This is admissible opinion testimony, as experts can offer opinions based on specialized knowledge when the testimony will help the jurors understand the evidence and determine facts in issue. *See Cage*, 979 F. Supp. 2d at 799 ("First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue.") (citing *Myers v. Ill. Centr. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *Davis v. Duran*, 276 F.R.D. 227, 231 (N.D. Ill. 2011) ("Rule 702 requires that expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue … Expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person."); *e.g.*, *Aponte v. City of Chicago*, 2011 WL 1838773, at *4 (N.D. Ill. 2011) (allowing expert to testify about whether handcuffing of plaintiff met "industry standard" and why). Dr. Gaut will explain why, in his opinion, these are necessary steps to conduct a thorough investigation. He will then opine as to whether Defendants in this case conducted a "thorough" investigation.

The SOPs also require that detectives "view the crime scene and locate, secure and evaluate any evidence found." Plaintiff's Trial Exhibit 5 at 72 (Chapter 8, 8.3 (C)). Detectives also must "determine if any services of a mobile crime lab unit or an evidence technician may aid in the

identification of the offender(s). If the detective feels this assistance is appropriate it will be requested without delay." *Id* at 72 (Chapter 8, 8.3 (D)). The SOPs further provide that "a detective **will**: obtain the assistance as necessary of appropriate support units, such as the Crime Laboratory Division…" (Chapter 8, 8.4(D) (emphasis added).

Dr. Gaut will testify regarding these basic CPD standards. He will explain that these are commonly accepted standards that apply generally to all detectives, including the Defendants at the time of the investigation. Dr. Gaut will apply these directives to this case, and will opine as to whether Defendants deviated from these directives and practice.

Dr. Gaut will also testify regarding the applicable line-up/identification procedures that governed the detectives' conduct at the time of this investigation. These opinions are based on Dr. Gaut's review of Plaintiff's Trial Exhibit 13 (CPD's General Order regarding line-up procedures), his training and experience, and his understanding of generally acceptable police practices, including those applicable to the Defendants at the time of the investigation. Dr. Gaut will testify regarding what those standards required, including: (1) the witness must not be told that the suspect is under arrest, i.e., that the witness not be told that the suspect is in the lineup; (2) that no suspect will be seen with police officers prior to the lineup unless all subjects to be in the lineup are seen together with the officers; (3) suspects in a lineup should generally be of the same height and weight and should have similar hair and skin color; (4) police officers should not be used unless other alternatives have been exhausted; and (5) defense attorneys for a suspect are generally allowed to view the lineup as an observer. Once again, Defendant Pesavento testified that he has been trained in lineups and that the training covered virtually all of these topics. *See* Ex. 1 (Oct. 13, 2021 Trial Tr.) at 911:9-913:24. Dr. Gaut will testify to why these procedures are widely used and accepted, and he will testify as to the importance of each of these factors to a fair and impartial

lineup. Dr. Gaut will also opine as to whether Defendants deviated from these procedures. The latter is particularly important. This jury has no perspective on the reasonable range of deviation from the requirement in the General Order that the fillers must have the same general characteristics of the suspect. Dr. Gaut, who has viewed a plethora of lineups can provide the jury with critical context.

Lastly, Dr. Gaut will testify regarding detectives' obligation to investigate and present for prosecution persons who commit crimes, including cooperating witnesses. These opinions are based on Dr. Gaut's review of Chapter 8 of the SOPs, as well as his training and experience, and his knowledge of generally applicable police practices. Defendants conduct was governed by these standards and practices. The governing SOP states that "the objectives of [detectives] investigative efforts are to determine if a crime actually occurred, gather evidence of the crime, identify and arrest the person(s) responsible for criminal acts, recover stolen property, and aid in the prosecution of the arrestee." Plaintiff's Trial Exhibit 5 at 71 (Chapter 8, 8.1 (A)). Dr. Gaut will testify that generally acceptable police practices include application of this provision to the arrest and prosecution of cooperating witnesses. Dr. Gaut will testify that it is generally accepted police practice to investigate and arrest persons who commit serious felonies, including felonies involving large quantities of drugs and automatic firearms. He will opine that, generally, detectives and sworn law enforcement officers are tasked with the responsibility to serve and protect their communities, and that those tenets are violated when a person is not arrested and charged after committing serious offenses. Dr. Gaut will also testify that it is commonly accepted police practice to arrest witnesses who committed crimes so that they can subsequently be prosecuted, and their cooperation can later be credited in the prosecution or recommended sentence. He will opine, as Defendant Pesavento acknowledged, that this practice is routine and holds the cooperating witness

8

accountable to the truth through the court system, rather than through the police. *See* Oct. 14, 2021 Trial Tr. at 1243:14-1247:11, attached hereto as Ex. 2. Dr. Gaut will further opine as to whether Defendants followed the COPs, and commonly accepted police practices, when they failed to arrest Clifford Frazier or present him for prosecution.

Ultimately, how much weight to assign to Dr. Gaut's testimony and opinions will be left to the jury. But each of his opinions on the above-described topics are admissible and relevant.

## II. Dr. Gaut Should Be Permitted to Educate the Jury About How One-Way Windows Work and How They Are Affected by the Lighting in the Connected Rooms.

### A. Dr. Gaut's explanation about how one-way windows work, and how their transparency is affected by the lighting in the conjoined rooms, is not within the common knowledge of the jury and would be helpful to the jury in evaluating Mr. Bolden's claims.

The Court previously held that Dr. Gaut may not testify that "Mr. Bolden would have been able to see the silhouettes of individuals in the witness room under the conditions he described." Dkt. 467 at 28. The Court also held that Dr. Gaut could not "buttress Plaintiff's credibility" or "offer testimony about whether a witness is believable." *Id.* at 29.

Dr. Gaut will not opine on Plaintiff's credibility or testify that Plaintiff is believable. Plaintiff seeks the Court's permission to offer limited testimony from Dr. Gaut regarding ***how*** one-way windows work—namely, that they rely on a contrast between the lighting the two rooms. The operation of one-way windows is not well understood by "the average juror." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) (admitting expert testimony because "[t]he average juror does not know how a drug business is run[.]"); *see also Florek*, 649 F.3d at 602 ("Expert testimony is more likely to satisfy Federal Rule of Evidence 702's requirement that it 'assist the trier of fact to understand the evidence or determine a fact in issue' when something peculiar about law enforcement (*e.g.*, ***the tools they use*** or the circumstances they face) informs the issues to be decided by the finder of fact."). At least one other federal court has allowed similar expert

testimony in recognition that juries may not be familiar with such windows. *See, e.g., Carter v. United States*, 1992 WL 390273, at *4 (E.D.N.Y. Dec. 11, 1992) (finding no error where "the government … proffer[ed] the theory of an expert explaining ***how*** a microphone worn by someone who was on one side of a one-way mirror might not have captured all of a conversation that happened on the opposite side of that mirror") (emphasis added). Factual retellings in other federal cases similarly reflect the need for an explanation to laypersons how one-way mirrors work. *See, e.g., Brooks v. Fitzsimmons*, 658 F. Supp. 840, 842-43 (N.D. Ill. Apr. 28, 1987) ("[Officer] Fitzsimmons met with [the witness] in an interview room and … explained about the one-way mirror."). Lack of common knowledge about how these windows work is also evinced by their varying descriptions in judicial opinions. *Compare United States v. Brown*, 461 F.2d 134, 143 (D.C. Cir. 1971) ("[T]he goal at lineups is to make it ***impossible*** for the accused to see the identification procedures … [using] a one-way mirror behind which the men in the lineup stand, where they may be viewed by witnesses, but may not see them.") (emphasis added) *with Ledbetter v. Edwards*, 35 F.3d 1062, 1066 (6th Cir. 1994) (because the "office lights were turned on," the defendant saw through the one-way mirror into the witness viewing room).

As an expert in police practices, Dr. Gaut is intimately familiar with how one-way windows work, and how police typically use them during lineups. It would not be improper bolstering for Dr. Gaut to simply explain that to the jury. Dr. Gaut will, if allowed, simply educate the jury about how differences in lighting between two rooms connected by a one-way window may affect the transparency or opaqueness of that window.

> **B.** **Dr. Gaut's testimony rebuts Defense Counsel's opening statement and Defendant Pesavento's trial testimony that it was impossible for Mr. Bolden to see through the one-way window.**

The Court held in its prior ruling that Dr. Gaut could not rely on an inspection by Plaintiff's investigator in 2018 to opine about what was visible in 1994 because the light conditions may have

changed since then, and Dr. Gaut is not an expert in "interior lighting." *Id.* at 28-29 ("[Dr. Gaut's]

opinion rests on the unstated and unsupported assumption that light conditions in 2018 were the

same as the light conditions in 1994."). But during her opening statement, defense counsel showed

a photo *taken by Plaintiff's investigator in 2018* and told the jury:

> *[T]his is where the lineup took place*. And one room has the participants in it. The
> other room has the witness in it. And in this wall, behind that wall, is a one-way
> mirror or a one-way piece of glass. And the way it works is that you can only—the
> witness can see in, *but the participants of the lineup cannot see out* based on the
> way that the lights are on or off in the room. […]
>
> Well, of course, Bolden disputes all of this and says that he could somehow see
> through this glass that is *specifically designed not to be seen through during
> lineups*.

Oct. 12, 2021 Trial Tr. at 640:24-5, 19-22. Defendants then showed that same photo—again, taken

by Plaintiff's investigator in 2018—to Pesavento and elicited his testimony that it is utterly

impossible to see through the one-way window:

> Q.      Mr. Pesavento, can you describe what is seen *in this photograph?*
>
> A.      Well, this is one of the interview rooms, *the dark—big dark thing there,
>         that's the mirror, the two-way mirror*.
>
> Q.      Okay.
>
> A.      If you're in this room now and the lights are on and you look into that
>         mirror, you don't see—*you will only see yourself*.

Oct. 14, 2021 Trial Tr. at 1192:20-1193:2. Defendants used and relied on the photos taken by

Plaintiff's investigator in 2018, despite the Court's stated concerns that "[v]isibility in 2018

doesn't shed much light on visibility in 1994 without a showing that the light conditions remained

the same" because "light fixtures [may have] change[d] in the past 25+ years" or "[m]aybe [the

Area 2 stationhouse installed] new bulbs." Dkt. 467 at 28-29. Seeing as Defendants have waived

those concerns, Dr. Gaut should be permitted to likewise rely on the inspection of Plaintiff's

investigator in 2018 to opine about what might have been visible in 1994. In summary, Plaintiff

asks the Court to permit Dr. Gaut to testify, in rebuttal to opening statements by defense counsel and trial testimony by Defendant Pesavento, that it *is* possible that Mr. Bolden could see through the one-way window based on the lighting conditions in the witness room and lineup room.

## CONCLUSION

For the foregoing reasons, Plaintiff Eddie L. Bolden respectfully asks the Court to clarify its prior ruling and supplemental ruling on Defendants' Motion *in Limine* No. 10 to permit his expert, Dr. William T. Gaut, to: (1) testify regarding "thorough" investigations, proper lineup procedures, and other similarly broad topics covered by CPD policies; (2) testify regarding generally accepted standards for law enforcement applicable to members of the CPD; (3) opine whether and how Defendants deviated from CPD policies, orders, and guidelines and generally accepted standards for law enforcement; (4) educate the jury about how one-way windows work and how they are typically used for lineups; and (5) opine that it is ***possible*** that Mr. Bolden could see through the one-way window during the lineup procedure to which he was subjected.

Dated: October 18, 2021        Respectfully Submitted,

*/s/ Ronald S. Safer*
Ronald S. Safer
Matthew Crowl
Eli J. Litoff
Valerie Brummel
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700
rsafer@rshc-law.com
mcrowl@rshc-law.com
elitoff@rshc-law.com
vbrummel@rshc-law.com

Sandra L. Musumeci (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
136 Madison Avenue
6th Floor

New York, New York 10016
(212) 660-1000
smusumeci@rshc-law.com

*Attorneys for Plaintiff Eddie L. Bolden*