TALMAY ANDERSON, JR.                              February 21, 2018

```
                                                    Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4    EDDIE L. BOLDEN,                )

 5            Plaintiff,              )

 6            -vs-                    )  No. 17-cv-00417

 7    CITY OF CHICAGO, et al.,        )

 8            Defendants.             )

 9

10            The deposition of TALMAY ANDERSON, JR.,

11    called for examination pursuant to Subpoena and the

12    Rules of Civil Procedure for the United States

13    District Courts pertaining to the taking of

14    depositions, taken before Lisa M. Bringle, C.S.R.,

15    within and for the County of Lake and State of

16    Illinois, at 70 West Madison Street, Suite 2900,

17    Chicago, Illinois, on the 21st day of

18    February, 2018, at the hour of 10:13 a.m.

19

20

21

22

23    REPORTED BY:  LISA M. BRINGLE, CSR

24    LICENSE NO.:  084-003301
```

TALMAY ANDERSON, JR.                                    February 21, 2018

---

Page 2

```
1   APPEARANCES:
2      RILEY, SAFER, HOLMES & CANCILA, LLP,
       BY:  MS. SANDRA L. MUSUMECI
3           MS. VALERIE BRUMMEL
       1330 Avenue of the Americas, Sixth Floor
4      New York, New York 10019
       (212) 660-1000
5      smusumeci@rshc-law.com
6           Representing the Plaintiff;
7
       GREENBERG TRAURIG, LLP,
8      BY:  MR. ELAN SHPIGEL
       77 West Wacker Drive, Suite 3100
9      Chicago, Illinois  60601
       (312) 476-5033
10     shpigele@gtlaw.com
11          Representing the Defendants,
            City of Chicago and deponent;
12
13     RAVITZ & PALLES, P.C.,
       BY:  MS. JULIE PALLES
14     203 North LaSalle Street, Suite 2100
       Chicago, Illinois 60601
15     (312) 558-1689
       jpalles@ravitzpalles.com
16
            Representing the Defendant,
17          Barbara Temple;
18
       HALE LAW, LLC,
19     BY:  MR. ALEXANDER TAPLING
            MS. BARRETT BOUDREAUX
20     53 West Jackson Boulevard, Suite 330
       Chicago, Illinois 60604
21     (312) 341-9646
       atapling@ahalelaw.com
22
            Representing individual defendant
23          officers.
24
```

---

Page 3

```
1
2
3                  I N D E X
4
5   WITNESS                        EXAMINATION
6   TALMAY ANDERSON, JR.
7      By Ms. Musumeci                     4
8      By Ms. Palles                      85
9      By Mr. Tapling                     88
10
11
12
13
14
15              E X H I B I T S
16  NUMBER                        MARKED FOR ID
17  Anderson Deposition
       Exhibit No. 1                       7
18     Exhibit No. 2                      23
       Exhibit No. 3                      26
19     Exhibit No. 4                      27
       Exhibit No. 5                      42
20     Exhibit No. 6                      44
       Exhibit No. 7                      47
21     Exhibit No. 8                      50
       Exhibit No. 9                      56
22     Exhibit No. 10                     58
       Exhibit No. 11                     63
23
24
```

---

Page 4

```
1        MS. MUSUMECI:  Mr. Anderson, before I swear you
2   in, can you state your full name, please?
3        THE WITNESS:  Swear me in?
4        MS. MUSUMECI:  She's got to give you an oath to
5   tell the truth.
6        THE WITNESS:  A bolt of lightening might strike
7   you.
8              First name is Talmay, T-a-l-m-a-y.  Last
9   name is Anderson, Junior.
10       MS. MUSUMECI:  You can swear him in.
11             (Witness sworn.)
12             TALMAY ANDERSON, JR.,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15             EXAMINATION
16  BY MS. MUSUMECI:
17       Q.   Okay.  Good morning, Mr. Anderson.  My
18  name is Sandra Musumeci, and I am an attorney with
19  the law firm of Riley, Safer, Holmes and Cancila,
20  and my associate, Valerie Brummel, is here as well.
21  We represent Eddie Bolden, who is the plaintiff in
22  this case, and I'm going to ask you a few -- more
23  than a few questions.
24             Can I start by asking you in what city and
```

---

Page 5

```
1   state do you currently reside?
2        A.   Clarkson, C-l-a-r-k-s-o-n, Kentucky.
3        Q.   And how old are you, Mr. Anderson?
4        A.   Seventy-four.
5        Q.   And how are you feeling today?
6        A.   With both hands.  Good.
7        Q.   Okay.  Are you currently taking any
8   medications or experiencing any medical conditions
9   that might interfere with your ability to answer my
10  questions or --
11       A.   No.
12       Q.   -- participate in this deposition?
13       A.   No.
14       Q.   Okay.  Have you ever been deposed before?
15       A.   Yes, on a traffic -- just a traffic
16  deposition years ago.
17       Q.   And was that here in Chicago?
18       A.   Yes.
19       Q.   And what was your role in that case?  Were
20  you one of the -- were you the defendant, or was it
21  in your capacity as a police officer or something
22  else?
23       A.   I was suing an individual that hit me.
24       Q.   Okay.  So you were the plaintiff in the
```

---

TALMAY ANDERSON, JR.                                    February 21, 2018

---

Page 6

1  case?
2      A.   Yes.
3      Q.   Okay.  So you may know from prior
4  experience, but I just want to go over some general
5  ground rules and the procedure of how this
6  deposition is going to work.
7           As you see, there is a court reporter
8  here, who is going to take down everything that is
9  said in the room.  She records my questions and
10 your answers, and so it's a lot easier for her if
11 we are not talking over each other.  So it's a
12 little bit artificial, but I would ask that you let
13 me finish my questions before you give your
14 answers, and I'll let you finish your answers
15 before I go into the next question.  Is that okay?
16     A.   Yes.
17     Q.   And because the court reporter is here, we
18 need verbal answers.  So if you could give a "yes"
19 or "no" or "I don't know" as opposed to a head nod
20 or shake or a shoulder shrug.  Okay?
21     A.   Okay.
22     Q.   If you don't understand a question that I
23 ask you, please let me know.  Otherwise, if you
24 answer the question, I'll assume that you

---

Page 7

1  understood it.  Okay?
2      A.   Okay.
3      Q.   And we can take a break at any time.  So
4  if you need a break for whatever reason, just feel
5  free to ask.  The only exception is that if there
6  is a question pending, if I've asked you a question
7  and you haven't answered it yet, I'm going to ask
8  that you answer the question before we take a
9  break.  Okay?
10     A.   Okay.
11     Q.   Do you have any questions before we get
12 started?
13     A.   No.
14     MS. MUSUMECI:  I'm going to start by showing
15 you what -- off the record one moment.
16               (Discussion off the record.)
17               (Whereupon, Anderson Deposition
18                Exhibit No. 1 was marked for
19                identification.)
20 BY MS. MUSUMECI:
21     Q.   I'm going to show you what has been marked
22 as Anderson Exhibit No. 1.  It's a subpoena to
23 testify at a deposition in a civil action, and it's
24 addressed to Mr. Talmay Anderson, and you recognize

---

Page 8

1  that as being you, right?
2      A.   Yes.
3      Q.   And do you understand that you're
4  testifying today under oath?
5      A.   Yes.
6      Q.   Did you do anything to prepare for this
7  deposition today?
8      A.   When you say did I do anything to
9  prepare --
10     Q.   Did you meet with anybody, meet with your
11 attorney, speak with any of your former colleagues,
12 review any documents, anything like that?
13     A.   I spoke with my attorney yesterday.
14     Q.   Okay.  And about how long did you meet
15 for?
16     A.   Half hour, 45 minutes.
17     Q.   Was anyone else present?
18     A.   No.
19     Q.   Okay.  And did you review any materials?
20     A.   Yes.
21     Q.   What materials did you review?
22     A.   Several documents relating to the arrest
23 of -- that was made on -- I can't recall the
24 individual's name.

---

Page 9

1      Q.   The arrest of Eddie Bolden in 1994?
2      A.   No.
3      Q.   Related to the shooting of Derrick Frazier
4  and Ledell Clayton?
5      A.   Yes.
6      Q.   Did you speak with any of your former
7  colleagues from the Chicago Police Department about
8  this deposition?
9      A.   I have spoke to my ex-partner.  He
10 informed me that he had to do a deposition.
11     Q.   Okay.
12     A.   That was about the extent of it.
13     Q.   Did you speak to him about the types of
14 questions that he was asked and what -- did you
15 speak to him about the questions he was asked?
16     A.   No.
17     Q.   And did he tell you anything about the
18 testimony or answers that he gave?
19     A.   No.
20     Q.   And when did you speak with your former
21 partner?
22     A.   We talk about once a week or once every
23 other week.
24     Q.   Okay.  And when you talk about your former

---

**Page 10**

1  partner, is that James Oliver?
2  A.  Yes.
3  Q.  Mr. Anderson, are you currently employed?
4  A.  No.
5  Q.  Are you retired?
6  A.  Yes.
7  Q.  When were you last employed?
8  A.  Approximately six -- five, six years ago.
9  Q.  Okay.  And who was that -- who did you
10 work for at that time?
11 A.  Kroger.
12 Q.  And what type of work did you do for
13 Kroger?
14 A.  Loss prevention.
15 Q.  Did you previously work for the Chicago
16 Police Department?
17 A.  Yes.
18 Q.  And what were your years of employment
19 with the Chicago Police Department?
20 A.  March 1970 up until March 1998.
21 Q.  And when you left the Chicago Police
22 Department, is that when you went to work for
23 Kroger, or did you work somewhere else in between?
24 A.  No.  I retired and slept late every day.

**Page 11**

1  Q.  When you did loss prevention for Kroger,
2  where was that?
3  A.  Louisville and the surrounding area.
4  Q.  Have you had any other employers for let's
5  say a period of a year or longer?
6  A.  I worked, I would say, approximately a
7  year for Winn-Dixie doing the same thing, loss
8  prevention.
9  Q.  Anyone else?
10 A.  No.
11 Q.  What is your educational background?
12 A.  I have a college degree, sociology.
13 Q.  Approximately when did you earn that and
14 from where?
15 A.  I graduated Chicago State, I think 1976.
16 Q.  So you began at the Chicago Police
17 Department in March 1970.  Can you describe briefly
18 your employment history with the Chicago Police
19 Department in terms of your assignments and your
20 ranks?
21 A.  From March -- I'm sorry.  October -- March
22 until October of 1970, I was in the academy.  After
23 I left the academy in October, I believe it was, I
24 was assigned to the 8th District, Chicago Lawn.  I

**Page 12**

1  worked patrol there for up until -- I am sorry, up
2  until 1983.
3         1983 I left the 8th District and went to
4  gangs and, I worked gangs up until I retired in
5  '98.
6  Q.  Where is the -- approximately where is the
7  8th District located?
8  A.  3500 West 63rd Street.
9  Q.  And when you worked in gangs, were you
10 assigned to a particular geographic region of the
11 city?
12 A.  I worked the South Side from '83 up until,
13 I believe, '86, and I was promoted to gang
14 specialist and then assigned to the West Side, and
15 I worked the West Side of Chicago -- I can't recall
16 the year.  In the late '80s or early '90s, I
17 transferred back to the South Side, where I
18 remained until I graduated -- I am sorry, until I
19 retired.
20 Q.  And when you say you were promoted to gang
21 specialist in 1986, does that mean you were a
22 patrol officer doing gangs for your first three
23 years and then at some point you were promoted?
24 A.  Well, they don't term it as patrol.  The

**Page 13**

1  gang unit at that time was divided into two
2  sections.  If you wasn't a specialist, then you
3  were on the tactical side.
4  Q.  And what was the difference in terms of
5  the work that a specialist or the tactical side
6  did?
7  A.  Tactical was primarily you're kind of like
8  freelance, whereas with the specialist, it was more
9  investigative.
10 Q.  Did both specialists and the tactical side
11 report through the same chain of command?
12 A.  To the same commander, yes, just had
13 different sergeants.
14 Q.  And when you were -- when you became --
15 well, withdraw.
16        When you started in a gang unit, first on
17 the tactical side, did you receive any special
18 training related to the gang work?
19 A.  No.
20 Q.  When you became a gang crime specialist,
21 did you receive any special training?
22 A.  No.
23 Q.  Did you receive any training particularly
24 with respect to investigative procedures?

TALMAY ANDERSON, JR.                          February 21, 2018

---

Page 14

1    A.   No.
2    Q.   And whether at the academy or at any point
3  in your career, do you remember receiving training
4  specifically regarding constitutional rights?
5    A.   Our training, to the best of my
6  recollection, in the academy was primarily -- well,
7  they primarily dwell on Chapter 38.  I don't recall
8  any lengthy discussions in terms of constitutional
9  rights other than the fact that there are things
10  that was touched up on in terms of Miranda
11  warnings, a person's rights in terms of before they
12  are questioned, their right to an attorney and so
13  forth.
14    Q.   Okay.  So when you became a gang crime
15  specialist, were you assigned to a particular unit?
16    A.   That was the unit.
17    Q.   Okay.  In some of the paperwork, I saw a
18  reference to a Unit 710 and a Unit 156.  Does that
19  mean anything to you?
20    A.   710, I don't -- I don't recall.  There are
21  two different -- I don't recall the two -- I'd have
22  to look at the paperwork and exactly what time
23  frame we were talking about.
24    Q.   Okay.  That's no problem.

---

Page 15

1         As a result of your police work, were you
2  familiar with particular gangs that were active in
3  Chicago in the 1990s?
4    A.   Yes.
5    Q.   Were you familiar with the Gangster
6  Disciples?
7    A.   Yes.
8    Q.   Can you just describe your familiarity
9  with the Gangster Disciples in the 1990s?
10    MR. SHPIGEL:  I'll object to vagueness and
11  unclear.
12  BY MS. MUSUMECI:
13    Q.   You can still answer.
14    A.   At that particular time, I was quite --
15  well, I was up on the Gangster Disciples because a
16  lot of our work dealt with the Gangster Disciples.
17    Q.   Could you describe how the gang unit --
18  withdraw.
19         During the time that you were a gang crime
20  specialist and you were doing investigative work,
21  how did you go about doing that type of work?  What
22  were some of the tactics or strategies that you
23  generally used?
24    A.   On the gang specialist side, each

---

Page 16

1  specialist was generally assigned a gang that we
2  had to keep tabs on, learn not so much -- didn't
3  concentrate so much on the individual members
4  because there were so many, but kept tabs on the
5  hierarchy of the gang.
6    Q.   I'm sorry, the hierarchies of it?
7    A.   Yes.
8    Q.   And while you were working as a gang crime
9  specialist, did you -- did you do any undercover
10  work, you personally?
11    A.   No.
12    Q.   Were there undercover officers in the gang
13  unit at that time?
14    A.   When you say "undercover," you could say
15  yes and no.  We had guys that did drug buys on a
16  regular basis.  So you could say, yeah, there were
17  some that did undercover.
18    Q.   So in January of 1994, am I correct that
19  you were a gang crime specialist working in the
20  South Side?
21    A.   Yes.
22    Q.   And, at that time, were you working in the
23  area that was -- that included Area 2 and District
24  3, if you recall?

---

Page 17

1    A.   Yes.
2    Q.   At that time, were you working in uniform
3  or plain clothes?
4    A.   Plain clothes.
5    Q.   Do you recall if you had a steady shift in
6  terms of time of day, or did it vary?
7    A.   My partner and I generally worked
8  evenings.
9    Q.   And when you say "evenings," about what
10  time would that be?
11    A.   4:00 to 12:00, 3:00 to -- well, generally,
12  4:00 to 12:00.
13    Q.   Did you work in a vehicle or on foot?
14    A.   Vehicle.
15    Q.   And was it a marked car or an unmarked
16  car?
17    A.   Unmarked.
18    Q.   Do you recall what kind of car -- did you
19  have a steady car that you drove?
20    A.   Yes.  Well, I'd have to clarify that.  At
21  one point I had a regular -- I think it was a
22  Pontiac or something, but at that particular time,
23  I believe we were using an unmarked police vehicle.
24    Q.   Okay.  And in January of 1994, your steady

---

TALMAY ANDERSON, JR.                                    February 21, 2018

---

Page 18

1    partner was James Oliver?
2        A.   Yes.
3        Q.   Did you and Oliver take particular roles
4    when you went out on the job in terms of one of you
5    drove, one of you navigated or anything along those
6    lines?
7        A.   No.  That was -- if I drove today, he
8    would drive tomorrow.  If he didn't feel like
9    driving today, then I would drive.  So we didn't
10   have no set pattern.
11       Q.   Who did you report to at that time?  Who
12   was your supervisor?
13       A.   At that particular time, I do not recall.
14       Q.   At some point, did you report to a
15   Sergeant Darling?
16       A.   Yes.
17       Q.   And could that have been in the mid '90s,
18   around 1994?
19       A.   I don't recall exactly what time period we
20   went to work for Darling.  Like I say, we might
21   have been -- I don't believe we were working for
22   Darling at the time.  I don't recall.
23       Q.   Okay.
24       A.   We worked for Darling up until I retired,

Page 19

1    but I don't recall the time period that we started
2    working for him.
3        Q.   As a gang crime specialist, how did you
4    get your assignments on a given evening?
5        A.   How did we get our assignment?
6        Q.   Yeah.  When you would come to work, how
7    would you decide or know what you were to do that
8    shift?
9        A.   A gang specialist was like we had no -- no
10   assignments other than our assigned gang that we
11   worked on.
12       Q.   So you were assigned a particular gang to
13   work on, but you had discretion to do what you felt
14   was appropriate to do to keep up tabs on the
15   hierarchy of the gang; is that correct?
16       A.   Yes.
17       Q.   Okay.  And in January of 1994, what gang
18   was your assigned gang?
19       A.   I don't recall.
20       Q.   Might it have been the Gangster Disciples?
21       A.   I don't recall.  It might have been.  I
22   don't recall.
23       Q.   Were you working on January 29th, 1994?
24   And for context, I will let you know that

Page 20

1    January 29th, 1994, was the day that Ledell Clayton
2    and Derrick Frazier were shot.
3        A.   Then apparently I was working.
4        Q.   Do you recall what shift you were working?
5        A.   Evenings.
6        Q.   And how did you learn that there had been
7    a shooting involving individuals by the name of
8    Derrick Frazier, Ledell Clayton and Clifford
9    Frazier?
10       A.   I didn't -- or I should say we didn't know
11   the names of who was shot until we got on the
12   scene, the call, and I don't recall exactly how the
13   call came over the radio, whether it was shot fired
14   or man shot on the street at certain such location,
15   but once the call came over, my partner and I
16   responded to that location.
17       Q.   And that was Oliver and yourself, right?
18       A.   Yes.
19       Q.   And was that location on Minerva?
20       A.   To the best of my recollection, yes.
21       Q.   What did -- what did you do when you got
22   to that location to Minerva?
23       A.   Basically verified the fact that there had
24   been a shooting.

Page 21

1        Q.   Okay.  Verified that how?  So did you --
2    presumably, you drove to Minerva?
3        A.   Yes.
4        Q.   And did you get out of your car when you
5    got to the location?
6        A.   Yes.
7        Q.   What did you see there?
8        A.   I don't recall now.
9        Q.   Do you remember if there were other police
10   officers there before you?
11       A.   I don't -- I'm assuming.  I don't recall
12   if they were there before us or after.
13       Q.   Did you see the victims of the shooting?
14       A.   I don't recall.  I'm assuming I did.  I
15   don't recall.  It was quite a while ago, and I
16   don't recall exactly what I observed at that time.
17       Q.   Did you -- over the course of your career,
18   did you respond to many shootings?
19       A.   Yes.
20       Q.   And as a gang crime specialist, when you
21   responded to a shooting, was there a particular
22   task or objective that you had as a gang crime
23   specialist in connection with a shooting?
24       A.   No more than what a normal police officer

TALMAY ANDERSON, JR.                                    February 21, 2018

---

Page 22

1  would do.  If there is a shooting, try to ascertain
2  as much info -- information as we possibly can to
3  try to, if at all possible, learn the identity of
4  the person that was responsible for the shooting.
5       Q.   So do you recall if when you went to the
6  scene of the shooting, did you determine at that
7  time that the shootings were fatalities?
8       A.   Again, without looking at the paperwork, I
9  don't recall because that's all hazy to me at this
10 point.
11      Q.   Okay.  And at some point, did you learn
12 that the shootings involved people by the name of
13 Derrick Frazier, Ledell Clayton and Clifford
14 Frazier?
15      A.   Run that by me again.
16      Q.   Sure.  At some point, did you learn that
17 the shootings involved people by the name of
18 Derrick Frazier, Ledell Clayton and Clifford
19 Frazier?
20      A.   Yes.
21      Q.   Prior to January 29th, 1994, the day we
22 are discussing, were you familiar with any of those
23 three people?
24      A.   No.

---

Page 23

1              (Whereupon, Anderson Deposition
2              Exhibit No. 2 was marked for
3              identification.)
4  BY MS. MUSUMECI:
5       Q.   I'm going to show you what has been marked
6  as Anderson Exhibit No. 2, and this is a
7  supplementary report of the Chicago Police
8  Department, Bates stamped EB0000423 through 428.
9  You could take a moment to look through that.
10           Mr. Anderson, have you seen this document
11 before?
12      A.   Yes.
13      Q.   And did you review this in preparing for
14 your deposition today?
15      A.   Not really.
16      Q.   Does this document appear to be a report
17 related to the shooting that you responded to on
18 January 29th, 1994?
19      A.   Yes.
20      Q.   Do you recall how long you were at the
21 crime -- the shooting scene on Minerva?
22      A.   No, I don't.
23      Q.   Do you recall if you spoke to anyone
24 there?

---

Page 24

1       A.   No.
2       Q.   Do you recall if James Oliver got out of
3  the car to go to the crime scene with you?
4       A.   Yes.  We both exited the vehicle.
5       Q.   Did you collect any evidence at that
6  scene?
7       A.   No.
8       Q.   Did you take any notes from being at that
9  scene?
10      A.   No.
11      Q.   Do you recall how long you were there?
12      A.   No.
13      Q.   What did you do after you left that crime
14 scene?
15      A.   To the best of my recollection, I
16 believe -- I don't -- I don't recall if this is, in
17 fact, the truth, but I do believe we went over to
18 that J&J Fish on Cottage Grove.
19      Q.   Okay.  So at some point, did you learn
20 that there had been a second shooting that might be
21 related to this first shooting at Minerva?
22      A.   Yes.
23      Q.   Do you recall how you learned that?
24      A.   No.

---

Page 25

1       Q.   And what did you do or see when you got to
2  the J&J Fish restaurant?
3       A.   I don't recall.
4       Q.   Were you familiar with J&J Fish?
5       A.   Not really, no.
6       Q.   When you got to J&J Fish, did you see
7  other police personnel there?
8       A.   I'm assuming I did.  I don't recall.
9       Q.   Is there anything that would refresh your
10 recollection about that?
11      A.   I don't know.  It might.  I don't know if
12 it would or not.  I just -- to the best of my
13 recollection, I do believe we went there and then
14 left the J&J and went to Christ Hospital.
15      Q.   Okay.  And what was your purpose in going
16 to Christ Hospital?
17      A.   To talk to the subject that had been shot
18 to try to ascertain the name of the individual that
19 did the shooting.
20      Q.   Okay.  And did you learn that the person
21 who had been shot and who was at Christ Hospital
22 was Clifford Frazier?
23      A.   Yes.
24      Q.   Let me just go back a moment to when you

---

TALMAY ANDERSON, JR.                                February 21, 2018

Page 26

1  went to J&J Fish. Do you recall if you spoke to
2  anybody at J&J Fish?
3      A.   No, I don't.
4      Q.   Did you take any notes from your visit to
5  J&J Fish on that night?
6      A.   No.
7      Q.   Were you familiar with a person named
8  Anthony Williams or "Ant" Williams?
9      A.   I have knowledge -- I had knowledge of
10 Ant, never had any personal contact with Ant.
11     Q.   And what did you know about Ant at that
12 time? What type of --
13     A.   That he was a drug dealer.
14     Q.   Did you see Ant at J&J Fish that night?
15     A.   I don't recall if I did or not.
16     Q.   Do you recall if you actually went into
17 the restaurant?
18     A.   No, I don't.
19                    (Whereupon, Anderson Deposition
20                     Exhibit No. 3 was marked for
21                     identification.)
22     MS. MUSUMECI:  And I'm going to ask that this
23 be marked Anderson Exhibit 4.
24

Page 27

1                    (Whereupon, Anderson Deposition
2                     Exhibit No. 4 was marked for
3                     identification.)
4  BY MS. MUSUMECI:
5      Q.   Mr. Anderson, if you could look at what
6  has been marked as Anderson Exhibit 4. The Bates
7  stamp is CCSAO 0001450 through 1453. I apologize
8  for the quality of these photographs.
9          Do you recognize the location depicted in
10 these photographs?
11     A.   The ones at the top, vaguely, yes.
12     Q.   And what location is that?
13     A.   That's the area where that J&J Fish is
14 located.
15     Q.   Okay. And looking at these photographs,
16 does that refresh your recollection at all as to
17 whether you entered J&J Fish on January 29, 1994?
18     A.   No.
19     Q.   Okay. You can put that aside. Thank you.
20          Sorry. One more question. Did you take
21 these photographs?
22     A.   No.
23     Q.   I'm going to show you what has been marked
24 as Anderson Exhibit No. 3, and this is Bates

Page 28

1  stamped CCSAO 002391 through 2394. It's a General
2  Offense Case Report for the Chicago police.
3          Are you familiar with this document?
4      A.   No.
5      Q.   Do you recall having seen this document
6  before?
7      A.   No.
8      Q.   Looking at the first page, CCSAO 002391,
9  it appears to be a report produced by B. Temple and
10 T. Sumter. Are you familiar with either of those
11 officers?
12     A.   No.
13     Q.   And the report at the top of that first
14 page references Clifford Frazier. Do you see that?
15     A.   Yes.
16     Q.   And then beneath that there are three
17 witnesses named Edna Williams, Octavia Jackson and
18 Todd Henderson. Are you familiar with any of those
19 people?
20     A.   No.
21     Q.   And if you could turn to the third page of
22 the exhibit, which is marked 002393. Towards the
23 bottom of the page there is a continued narrative,
24 and on the third line of that narrative, and it

Page 29

1  refers to a Witness 4, Aginis, A-g-i-n-i-s, Robert.
2  Are you familiar with that person?
3      A.   No.
4      Q.   Looking at the narrative on the second
5  page of the exhibit and the third page of the
6  exhibit, there is references to several beat
7  numbers. Did you and James Oliver have a beat
8  number as gang crime specialists?
9      A.   Yes.
10     Q.   Do you recall what your beat number was?
11     A.   No, but ours was always a four-digit
12 number. We possibly might have been 4429, but I
13 don't recall what our number was at this time.
14 When you look at like that 3, that's a district
15 number. Specialized units had different numbers
16 altogether.
17     Q.   So on the second page of the exhibit over
18 on the right column at the last line, there is a
19 reference to Beat 5213 responded to 3rd District.
20 Do you know if that's a reference to you?
21     A.   No. That's, again, that's not a gang
22 unit.
23     Q.   Okay. And does looking at this document
24 refresh your recollection as to whether you or

TALMAY ANDERSON, JR.                                    February 21, 2018

Page 30

1   James Oliver spoke to anybody at J&J Fish on
2   January 29th, 1994?
3        A.   I don't recall speaking to anyone at J&J
4   Fish.
5        Q.   Okay.  You can put that aside.  Thank you.
6             Mr. Anderson, as a gang crime specialist,
7   could you describe what your practice was with
8   respect to taking notes or completing reports of
9   your activities?
10       MR. SHPIGEL:  I'll object to foundation
11  insomuch as you're asking for the overall policy
12  for a gang crime specialist.
13            You can answer to the best of your
14  knowledge.
15  BY MS. MUSUMECI:
16       Q.   And I will rephrase my question.  I'm
17  asking what your practice, your personal practice,
18  was while you were working as a gang crime
19  specialist with respect to taking notes.
20       A.   If in some cases we were assigned a
21  gang-related homicide or if I personally handled a
22  case, I would take notes.  In this case, it was
23  assigned to the detective division; therefore, I
24  had no reason to take notes or anything, and since

Page 31

1   I didn't author the paper, all of this is foreign
2   to me.
3        Q.   Were there standard report templates that
4   you would take your notes on in the gang crime
5   unit?
6        MR. SHPIGEL:  I'll object to foundation, but
7   you can answer to the best of your knowledge.
8        THE WITNESS:  No.
9   BY MS. MUSUMECI:
10       Q.   Did you carry a notebook or a memo book
11  with you to take notes?
12       A.   No.
13       Q.   And did you have to record your activities
14  for any given shift, just in general, aside from
15  any investigative work that you were doing?
16       A.   No.
17       Q.   Did you and James Oliver have an
18  agreed-upon division of labor between yourselves as
19  to who would take notes if you were speaking to a
20  witness on an investigation that you were handling?
21       A.   We -- well, it was I wouldn't say an
22  agreed-upon anything.  Between the two of us, I
23  generally authored most of the paperwork that we
24  did.

Page 32

1        Q.   And was there a reason for that?
2        A.   My partner didn't like report writing.
3        Q.   If you could look back at Exhibit 2, which
4   was the multi-page case report, supplementary
5   report, this is 2.  And if you could turn to the
6   third page of that report, which is marked
7   EB0000425.  Do you see there is a list of personnel
8   assigned?
9        A.   Um-hum.
10       Q.   Is your name included on that list?
11       A.   I don't see it, no.
12       Q.   And do you know why your name is not
13  included on that list?
14       A.   Yes.
15       Q.   Why is that?
16       A.   Because we had nothing really to do with
17  the case.
18       MR. SHPIGEL:  I'll object, hypothetical -- or
19  speculative to the prior question.
20  BY MS. MUSUMECI:
21       Q.   Did you collect any evidence from J&J Fish
22  when you went there on January 29th, 1994?
23       A.   No.
24       Q.   Did you observe anyone else collecting any

Page 33

1   evidence from J&J Fish?
2        A.   Not to my recollection, no.
3        Q.   Did you take any photographs while you
4   were there?
5        A.   No.
6        Q.   Now, you mentioned that you recall going
7   to Christ Hospital in an attempt to speak with the
8   victim, Clifford Frazier; is that right?
9        A.   That's correct.
10       Q.   Did you go to Christ Hospital?
11       A.   Yes.
12       Q.   And did you speak with Mr. Frazier?
13       A.   Yes.
14       Q.   What do you recall about that?
15       A.   Not much.
16       Q.   Can you tell me what you do remember?
17       A.   All I can recall at this time was he was
18  up -- he was up, and he was able to talk to us, and
19  our primary questions to him was basically, "Who
20  shot you?"  Now, what he told us I don't recall.
21       Q.   Do you recall whether he was willing to
22  speak with you?
23       A.   Yes.
24       Q.   And did he give you a description or tell

TALMAY ANDERSON, JR.                    February 21, 2018

---

Page 34

1  you about who shot him?
2      A.   I believe he did.  Like I say, I don't
3  recall exactly.
4      Q.   Do you remember who was there when you
5  spoke with him?
6      A.   My partner, Oliver.
7      Q.   Was anyone else there?
8      A.   I believe, and I'm not a hundred percent
9  certain, I believe Detective Baker was at the
10 hospital also.
11     Q.   And did you take notes of that
12 conversation?
13     A.   No.
14     Q.   Do you remember if -- who led that
15 conversation from the police side -- let me
16 rephrase that.
17          Do you recall who between yourself, Oliver
18 and Baker, took the lead in questioning
19 Mr. Frazier?
20     A.   I wouldn't say either one of us took a
21 lead.  Whatever we wanted to ask, we asked.
22     Q.   Okay.  Do you recall informing Clifford
23 Frazier that his brother, Derrick, had been shot at
24 Minerva?

---

Page 35

1      A.   I don't recall.  We might have.
2      Q.   Do you remember what Mr. -- what
3  Mr. Clifford Frazier's demeanor was when you were
4  speaking with him?
5      A.   Other than the fact that he was in pain,
6  no.
7      Q.   And I'm sorry.  You said you did not take
8  notes of that conversation?
9      A.   No.
10     Q.   Do you remember how long you were speaking
11 to Mr. Frazier?
12     A.   No.  It wasn't that long of a period of
13 time, but no, I don't recall.
14     Q.   And did you speak with anyone else at the
15 hospital?
16     A.   Not that I recall.
17     Q.   Did you go anywhere else on January 29th,
18 1994, in connection with these shootings?
19     A.   I don't recall if I did or not.
20     Q.   Do you recall if you went to visit any
21 family members or associates of any of the shooting
22 victims?
23     A.   I don't recall, but I'm almost certain we
24 didn't.

---

Page 36

1      Q.   Do you -- you're familiar with an officer
2  from District 3 named Maurice Willis?
3      A.   I'm familiar with Officer Willis.
4  However, Willis was not in the 3rd District.
5  Willis was assigned to gangs at that time.
6      Q.   Okay.  Sorry.  Do you recall if you had
7  any interactions with Officer Willis on the night
8  of the shooting, January 29th, 1994?
9      A.   Yes.
10     Q.   What was that interaction?
11     A.   Again, I don't recall how we transmitted
12 to Willis that they were to sit on the vehicle
13 because we had been told by Frazier that there was
14 dope in the vehicle.  However, when we went back to
15 the scene, Willis and his partner had already
16 removed the dope from the vehicle, and we said a
17 few words to him and left.
18     Q.   Okay.  Let me just break that down a
19 little bit.
20          Do you recall how you learned that there
21 was dope in a car?
22     A.   Yes.  Frazier had told us about it.
23     Q.   And that was during the conversation at
24 the hospital?

---

Page 37

1      A.   Yes.
2      Q.   And the car you're referring to, where was
3  that car?
4      A.   I don't recall.
5      Q.   Was it in the vicinity of J&J Fish?
6      A.   I'm not certain.  I don't recall where the
7  car was located.  I don't recall where the car was
8  located.
9      Q.   And did Clifford Frazier tell you at the
10 hospital that the shootings were related to a drug
11 transaction or an attempted drug transaction?
12     A.   He might have.  I don't recall.
13     Q.   So you just said you went back to the
14 scene and saw that Willis and their -- and his
15 partner had removed the dope from the car rather
16 than just sat on the car?
17     MR. SHPIGEL:  I object to the characterization
18 of "the scene."
19 BY MS. MUSUMECI:
20     Q.   I'll rephrase.  You said that you recall
21 that you went back -- withdrawn.
22          You said that after you transmitted
23 somehow to Willis that he was to sit on a car, you
24 learned that he and his partner had removed dope

---

TALMAY ANDERSON, JR.                    February 21, 2018

---

Page 38

1  from the car?
2      A.  That is correct.
3      Q.  How did you determine that they had
4  removed the dope from the car?
5      A.  It was in plain sight when we arrived on
6  the scene.
7      Q.  And what scene was that?
8      A.  I don't recall what location it was at.
9      Q.  Okay.  So after the hospital you went --
10     A.  Back.
11     Q.  -- back somewhere?
12     A.  Yes, back to the area where all of this
13 transpired.
14     Q.  Okay.  And when you say it was in plain
15 sight, you saw Officer Willis holding or guarding
16 the dope?
17     A.  Yes.
18     Q.  And when you say "dope," is that cocaine?
19     A.  White powder.
20     Q.  White powder.  Do you recall who Willis'
21 partner was at that time?
22     A.  No.
23     Q.  And you said that you and Oliver had words
24 with Willis.  Would it be fair to say that you were

---

Page 39

1  irritated with Willis?
2      A.  Yes.
3      Q.  Those were angry words?
4      A.  Yes.
5      Q.  Okay.  And what was the reason for being
6  angry with him about that?
7      A.  As I indicated, he was supposed to sit on
8  the car, not go through the car.
9      Q.  Are you aware of whether Willis recovered
10 anything else from the car?
11     A.  I don't recall.
12     Q.  Okay.  And did you have any other -- any
13 other conversations with Willis aside from
14 expressing your frustration that he had recovered
15 the dope?
16     A.  To my recollection, that was the extent of
17 it.
18     Q.  And was Willis somebody that you regularly
19 worked with in your role in the gangs unit?
20     A.  No.
21     Q.  But he reported out of the same gangs unit
22 that you did?
23     A.  Yes.  Again, Willis was tactical.  We were
24 specialists.

---

Page 40

1      Q.  Okay.  Do you recall in connection with
2  your work on January 29th, 1994, if you collected
3  any personal effects of any of the victims of the
4  shooting?
5      A.  No.
6      Q.  Did you recover any safe deposit box key?
7      A.  No.
8      Q.  Did you recover anything from any vehicle?
9      A.  No.
10     Q.  And did you recover anything from inside
11 J&J Fish?
12     A.  No.
13     MS. MUSUMECI:  This might be a good point for
14 just a quick five-minute break.
15     MR. SHPIGEL:  Sure.
16          (A short break was taken.)
17 BY MS. MUSUMECI:
18     Q.  Mr. Anderson, moving on, after
19 January 29th, 1994, at some point, did you and
20 Mr. Oliver identify a possible suspect for the
21 shooting through your work in the gang unit?
22     A.  I didn't.
23     Q.  Are you familiar with somebody by the name
24 of Mitch McCullough?

---

Page 41

1      A.  Yes.
2      Q.  Who is Mitch McCullough?
3      A.  Who is he?
4      Q.  Yes.
5      A.  He's a police officer -- was a police
6  officer.  He was assigned -- well, him and I was
7  partners at one time, and then he was assigned to
8  FBI task force.
9      Q.  And what was the FBI task force?
10     A.  You said where was it?
11     Q.  No.  What was it?  What was the FBI task
12 force?
13     A.  He was assigned to the FBI on the task
14 force.
15     Q.  As a member of the Chicago Police
16 Department, or did he become an FBI agent?
17     A.  No.  He was still Chicago police assigned
18 to a task force that was dealing with gangs, and he
19 was assigned to do that for a number of years.
20     Q.  Do you recall if you had any contact with
21 Mitch McCullough in connection with the shootings
22 of Derrick Frazier, Ledell Clayton and Clifford
23 Frazier?
24     A.  I don't -- a lot of that is hazy.  I don't

---

TALMAY ANDERSON, JR.                                    February 21, 2018

Page 42

1  recall.
2              (Whereupon, Anderson Deposition
3              Exhibit No. 5 was marked for
4              identification.)
5  BY MS. MUSUMECI:
6      Q.  I'm going to show you what's been marked
7  as Anderson Exhibit No. 5, Bates stamped EB0001524
8  and 1525, if you could take a look at that, and
9  I'll give you a moment to read it.
10             Are you familiar with this document?
11     A.  No.
12     Q.  The two officers whose names or the two
13 detectives whose names are on this document,
14 W. Higgins and M. Rowan, are you familiar with
15 either of them?
16     A.  No.
17     Q.  And the narrative of this report refers to
18 information from Derrick Frazier to officers of the
19 3rd District regarding possible involvement of
20 Anthony Williams and a Lynier in connection with
21 this shooting.
22             Does looking at this document refresh your
23 recollection at all as to whether you provided
24 information to Area 2 detectives about possible

Page 43

1  suspects for these shootings?
2      A.  Not to my knowledge, no.
3      Q.  Do you know who the 3rd District officers
4  referenced in this narrative are?
5      A.  Which narrative, this one here?
6      Q.  Yeah, where it says, "Derrick Frazier
7  informed officers from the 3rd District."
8      A.  Oh, no, no.
9      Q.  You can put that aside.  Actually, sorry,
10 one more -- a few more questions on that.
11             This report references the reporting
12 detectives went to Williams' Beeper Service, which
13 was located at 6420 Cottage Grove.
14             Were you familiar with a beeper service
15 owned by Anthony Williams at that location?
16     A.  No.
17     Q.  It also references that the detectives
18 went to the 3rd District to learn if there was an
19 emergency address card on Williams.  Do you know
20 what an emergency address card is?
21     A.  Nothing other than what that says,
22 emergency address.  To my knowledge, I have no way
23 of knowing what it meant.
24

Page 44

1              (Whereupon, Anderson Deposition
2              Exhibit No. 6 was marked for
3              identification.)
4  BY MS. MUSUMECI:
5      Q.  I'm going to show you what I have marked
6  as Anderson Exhibit No. 6.  It's a one-page
7  document Bates stamped EB0000435.
8              Mr. Anderson, are you familiar with this
9  document?
10     A.  No.
11     Q.  This report concerns Clifford Frazier
12 leading officers from the 3rd District to a cache
13 of cocaine in his apartment.
14             Did you have any involvement in recovering
15 cocaine from Clifford Frazier's apartment?
16     A.  No.
17     MR. SHPIGEL:  I object to the characterization
18 of "leading."
19 BY MS. MUSUMECI:
20     Q.  Did you have any -- let me rephrase my
21 question.
22             Did you have any involvement in recovering
23 cocaine from the apartment of Clifford Frazier?
24     A.  No.

Page 45

1      Q.  This report is attributed to officers
2  T. Jackson, N. Silas and M. Robbins.  Do you know
3  those officers?
4      A.  Yes.
5      Q.  And did you have -- how do you know those
6  officers?
7      A.  If it's the same Silas, he was a tactical
8  guy in the gang unit, along with Mike Robbins.
9  That "M" is Mike Robbins.  They are both assigned
10 to the gang unit, and looking at the sergeant that
11 signed, that would be Wilindez, which was a
12 sergeant in our unit.
13     Q.  Okay.  Toward the bottom of the page in
14 the lower left corner, there is a reference for
15 extra copies required and notifications made to A2
16 detectives, OCD and gang intel.
17             Was gang intel a reference to the unit
18 where you worked?
19     A.  Gang intelligence, yes.
20     Q.  Do you know -- do you know -- withdrawn.
21             What would be the reason to provide a copy
22 of this report to gang intelligence?
23     MR. SHPIGEL:  I'll object to hypothetical.
24             You can answer.

TALMAY ANDERSON, JR.                                    February 21, 2018

Page 46

1    THE WITNESS:  Just for the -- nothing other
2  than paperwork that would be filed with the gang
3  unit.
4  BY MS. MUSUMECI:
5    Q.    Were you made aware in January or early
6  February 1994 that additional cocaine was recovered
7  from Clifford Frazier's apartment?
8    A.    No.
9    Q.    At any point following the shootings on
10  January 29th, 1994, did you talk with Clifford
11  Frazier about where money was kept in connection
12  with his drug transactions?
13    A.    Didn't have any other conversation with
14  Frazier after the talk at the hospital, never
15  encountered him again.
16    Q.    You can put that document aside.
17    Did you participate in an interview with
18  Anthony Williams at Area 2 headquarters on
19  February 1st, 1994?
20    A.    No.
21    Q.    Did you have any contact with Ant, or
22  Anthony Williams, in connection with the shooting
23  on January 29th, 1994?
24    A.    I don't believe I did, no.

Page 47

1    Q.    Did you ever work with Anthony Williams on
2  any other investigations?
3    A.    No.
4    Q.    Did you have any conversations with
5  Detective Pesavento or Detective Karl from Area 2
6  in connection with the shooting investigation?
7    A.    No.
8    Q.    Did you have conversations with any other
9  detective or sergeant from Area 2 in connection
10  with this investigation?
11    A.    Not that I recall, no.
12    Q.    Did you have any subsequent interactions
13  with Clifford Frazier beyond when you spoke with
14  him at the hospital?
15    MR. SHPIGEL:  Object, asked and answered.
16    You can answer.
17    THE WITNESS:  That was the only time I talked
18  to him to my recollection.
19  BY MS. MUSUMECI:
20    Q.    Was at the hospital?
21    A.    Yes.
22                  (Whereupon, Anderson Deposition
23                   Exhibit No. 7 was marked for
24                   identification.)

Page 48

1  BY MS. MUSUMECI:
2    Q.    Showing you Anderson Exhibit 7, which is a
3  one-page document, Bates stamp CCSAO 0327.
4    Do you recognize this document?
5    A.    No.
6    Q.    Do you recognize the sketch in the
7  document?
8    A.    No.
9    Q.    Do you recognize the person whose image is
10  depicted in this sketch?
11    A.    No.
12    Q.    Are you familiar or are you aware that
13  Clifford Frazier was brought to a sketch artist to
14  prepare a sketch of suspect from the shootings?
15    A.    No.
16    Q.    Did you -- do you know how a suspect
17  sketch was prepared in this case?
18    A.    No.
19    Q.    Are you familiar with somebody named
20  Detective Glynn, G-l-y-n-n?
21    A.    I've heard of him.  I don't know him
22  personally.
23    Q.    What do you know about Detective Glynn?
24    A.    That he's a detective assigned to Area 2.

Page 49

1    Q.    Are you familiar with an FBI agent named
2  Abel Pena, P-e-n-a?
3    A.    No.
4    Q.    I am sorry, no?
5    A.    No.
6    Q.    Were you ever, in your career, involved in
7  bringing a witness to a sketch artist to prepare a
8  composite sketch of a suspect?
9    A.    Not that I recall.
10    Q.    Are you familiar with Eddie Bolden, the
11  plaintiff in this case?
12    A.    No.
13    Q.    Just looking at this sketch, would you
14  agree with me that the person depicted in this
15  sketch appears to have a short -- have hair, but a
16  short haircut?
17    A.    Yes.
18    Q.    And appears clean shaven?
19    A.    Yes.
20    Q.    And appears to be light skinned?
21    A.    I would have no way of knowing.
22    Q.    And appears to have light eyes?
23    A.    Again, I would have no way of knowing.
24    Q.    What was your next involvement with the

TALMAY ANDERSON, JR.                                    February 21, 2018

---

**Page 50**

1   investigation of the shooting of Derrick Frazier
2   and Ledell Clayton and Clifford Frazier?
3       A.   To my knowledge, none.
4       Q.   Do you know if you were working on
5   February 26th, 1994?
6       A.   I don't recall if I was or not.  I
7   wouldn't, without looking at the time sheet or a
8   document with my name on it, that would be the only
9   way I would know.
10      Q.   Okay.  Do you recall if you and James
11  Oliver went to the Area 2 detective headquarters at
12  any point on February 26th, 1994, in connection
13  with a lineup procedure?
14      A.   To my knowledge, I didn't.
15      MS. MUSUMECI:  I'm going to show you what I
16  will mark as Anderson Exhibit 8.
17              (Whereupon, Anderson Deposition
18              Exhibit No. 8 was marked for
19              identification.)
20  BY MS. MUSUMECI:
21      Q.   Before I show you the exhibit,
22  Mr. Anderson, how did you and Detective Oliver
23  communicate to investigators the information that
24  you learned from Clifford Frazier at Christ

---

**Page 51**

1   Hospital on January 29th, 1994?
2       A.   To my knowledge, I don't recall
3   communicating anything because Detective Baker was
4   at the hospital.  So everything that we knew, he
5   knew.
6       Q.   As a gang crime specialist and
7   investigator, how did you gather intelligence about
8   different gangs or potential crime suspects?
9       MR. SHPIGEL:  I'll object to hypothetical, but
10  you can answer.
11      THE WITNESS:  When you say how did we do what?
12  BY MS. MUSUMECI:
13      Q.   I'll rephrase my question.  Let me go
14  back.
15           When I was asking you about Mitch
16  McCullough, after he was assigned to the FBI joint
17  task force, did you continue to have contact with
18  him?
19      A.   Very little, and most of it was on a
20  social basis because him and I had a long history.
21  We both worked the 8th District together.  We
22  worked Kennedy Hospital together.  We drank
23  together.  Him and I worked -- we were partners for
24  a period of time.

---

**Page 52**

1       Q.   Okay.  Would the gang unit, where you
2   worked, share information or collect information
3   from the FBI gang task force regarding whatever
4   investigation you might be working on?
5       MR. TAPLING:  Objection, foundation.
6   BY MS. MUSUMECI:
7       Q.   You can answer.
8       A.   No.  Let me add something to that.  And,
9   again, I'm not -- I don't recall if -- at one point
10  while Mitch McCullough and I was working together,
11  we worked a -- what you could say was a family of
12  drug dealers in the 2nd District, I believe it was,
13  and when he went to the task force, I believe I
14  might have talked to him about some of the
15  individuals involved in that.  I don't recall
16  exactly what we talked about or what, but that
17  was -- that's the only information or anything that
18  him and I shared after he left and was assigned to
19  the FBI.
20      Q.   And that work that you had done together
21  regarding a family of drug dealers, to your
22  knowledge, was that entirely separate from the
23  shooting that occurred on January 29th, 1994?
24      A.   Entirely separate, nothing to do with

---

**Page 53**

1   that, to my knowledge.
2       Q.   Do you recall having a phone conversation
3   with Mitch McCullough in connection with this
4   shooting where he indicated to you information
5   about somebody named Lynier?
6       A.   I don't recall.  I might have.  I don't
7   recall.  Like I said, him and I talked once about
8   that gang that we had worked together, and he might
9   have.  I don't recall if he did give me that name
10  or not.
11      Q.   Do you recall James Oliver being
12  interested in speaking further with Clifford
13  Frazier?
14      A.   Not to my knowledge.
15      Q.   Sorry, my fault.  Let me start over.
16           Do you recall James Oliver having an
17  interest in speaking further with Clifford Frazier
18  to get information about a restaurant in
19  Mr. Oliver's home neighborhood where he believed
20  drug dealing was taking place?
21      A.   Not to my knowledge.
22      Q.   I'm going to show you Anderson Exhibit 8.
23  This is a two-page document Bates stamped EB0000446
24  to 447.

---

U.S. Legal Support, Inc.
(312) 236-8352

TALMAY ANDERSON, JR.                                    February 21, 2018

Page 54

1                    (Discussion off the record.)
2    BY MS. MUSUMECI:
3         Q.   We are looking at Exhibit 8, which is a
4    supplementary report, which in the narrative says
5    this is an Area 2 V/C line-up report.  Are you
6    familiar with this document?
7         A.   No.
8         Q.   Does this document refresh your
9    recollection at all as to whether you participated
10   or were present for a lineup that took place at
11   Area 2 on February 26, 1994?
12        A.   I don't believe so, and I'm quite sure my
13   partner at some point informed you guys that the
14   gang unit did not do lineups.  That was strictly a
15   detective function.
16        Q.   And why do you believe that Mr. Oliver
17   told us that?
18        A.   Because he would tell you the same thing.
19   We didn't do lineups.
20        Q.   Okay.  Did you speak with Mr. Oliver about
21   whether you did a lineup or not?
22        A.   No.
23        Q.   Do you recall whether you and Mr. Oliver
24   drove Clifford Frazier from his home to Area 2 so

Page 55

1    that Mr. Frazier could view a lineup?
2         A.   I don't recall ever doing that, no.
3         Q.   Did you -- so based on what you just said,
4    did you -- as of 1994, did you ever, to your
5    knowledge, participate in conducting a lineup?
6         A.   Not to my knowledge, no.
7         Q.   Do you recall if you went to Area 2
8    headquarters on -- during the day on Saturday,
9    February 26, 1994?
10        A.   There would be no way of my telling you
11   whether I did or not.  I don't recall.
12        Q.   Do you recall having any interaction with
13   Eddie Bolden, the plaintiff in this case?
14        A.   To my knowledge, I've never had any
15   interaction with Bolden.
16        Q.   Do you know if you've ever seen him
17   personally?
18        A.   Not to my knowledge.
19        Q.   Did you have any interaction with a man by
20   the name of Charles Ingles, who was an attorney for
21   Mr. Bolden back in 1994?
22        A.   None to my recollection.
23        Q.   Did you, in 1994, make any efforts to
24   speak with Mr. Bolden or any members of his family?

Page 56

1         A.   Not that I recall, no.
2         Q.   And is there anything that would refresh
3    your recollection about that?
4         A.   If I authored some paper or something,
5    yes.
6         Q.   But can you think of any papers you might
7    have authored that would indicate that?
8         A.   Not to my recollection.
9                    (Whereupon, Anderson Deposition
10                   Exhibit No. 9 was marked for
11                   identification.)
12   BY MS. MUSUMECI:
13        Q.   I'm going to show you what's marked as
14   Anderson Exhibit 9.  It's a two-page document Bates
15   stamped CCSAO 001407 and 08.
16             Looking at those two photographs, does
17   that refresh your recollection as to whether you
18   had any involvement with a lineup on February 26,
19   1994?
20        A.   I don't recall any of it.
21        Q.   Do you recognize any of the individuals
22   depicted in that photograph?
23        A.   No.
24        Q.   I'm going to ask you a number of

Page 57

1    questions.  I think I know what your answer is
2    going to be, but I would ask you just to be patient
3    with me and bear with me as I ask you these
4    questions.
5              Do you have any personal knowledge as to
6    whether Eddie Bolden's attorney attempted to
7    observe a lineup on February 26th, 1994?
8         A.   No.
9         Q.   Do you have any personal knowledge as to
10   whether Charles Ingalls was prevented from viewing
11   the lineup by Detective Pesavento or any other
12   detectives on that day?
13        A.   No.
14        Q.   Do you have any personal knowledge as to
15   whether the participants in the lineup were sitting
16   and standing when they were viewed by Clifford
17   Frazier?
18        A.   No.
19        Q.   Do you have any personal knowledge as to
20   whether any of the participants in the lineup
21   switched positions during the lineup?
22        A.   No.
23        Q.   Do you have any personal knowledge as to
24   whether Eddie Bolden was allowed to choose his

TALMAY ANDERSON, JR.                                February 21, 2018

Page 58

1  position in the lineup?
2      A.   No.
3      Q.   Do you have any personal knowledge as to
4  whether any officer or detective called out to
5  Mr. Bolden by name during the lineup?
6      A.   No.
7      Q.   Do you have any personal knowledge as to
8  the circumstances under which Clifford Frazier
9  purportedly identified Mr. Bolden as a shooter
10 during the lineup?
11     A.   No.
12     Q.   Are you familiar with the lineup room or
13 rooms at Area 2?
14     A.   Vaguely.  I'm not that familiar with them,
15 no.
16     Q.   Do you know police officer Joe Barnes?
17     A.   Name don't ring a bell.
18               (Whereupon, Anderson Deposition
19               Exhibit No. 10 was marked for
20               identification.)
21 BY MS. MUSUMECI:
22     Q.   I'm going to show you what is marked as
23 Anderson Exhibit 10.  It's a one-page document
24 Bates stamped EB0001526.

Page 59

1           Do you recognize this document?
2      A.   No.
3      Q.   Would you agree with me it appears to be
4  an arrest report related to the arrest of Eddie
5  L. Bolden on February 26th, 1994, in connection
6  with the shooting of Derrick Frazier, Ledell
7  Clayton and Clifford Frazier?
8      A.   Yes.
9      Q.   And do you see just below midway on the
10 page where it lists arresting investigating
11 officers, it says GCS. T. Anderson, No. 14640.  Do
12 you see that?
13     A.   Yes.
14     Q.   Is that a reference to you?
15     A.   Yes, it is.
16     Q.   And I'm sorry.  I should have asked you
17 this at the very start.  While you were with the
18 Chicago Police Department, was your star number
19 14640?
20     A.   I've had two star numbers, but I believe
21 in -- I don't know what year they changed our star
22 numbers, but at that particular time, it was 14640.
23     Q.   And it also references J. Oliver,
24 No. 15564.  Is that a reference to your partner,

Page 60

1  James Oliver?
2      A.   Yes.
3      Q.   What did you and James Oliver do in
4  connection with the arrest of Eddie Bolden for the
5  shooting?
6      A.   I don't recall doing anything.
7      Q.   Did you know that you were listed as an
8  arresting or investigating officer in connection
9  with this shooting and arrest?
10     A.   Not until you showed me this paper.
11     Q.   Okay.  Were you ever assigned by a
12 supervisor to investigate this shooting?
13     A.   No.
14     Q.   In the narrative section of this report,
15 the second sentence, it says, "After being advised
16 of his Constitutional rights in the presence of his
17 attorney, C. Ingles, this subject admitted to being
18 at the location that Clifford was shot but denied
19 any participation."  Do you see that?
20     A.   Yes.
21     Q.   Were you present or involved in the
22 questioning of Eddie Bolden and this alleged
23 statement?
24     A.   I don't recall, no.

Page 61

1      Q.   Do you know, looking back at just below
2  there where it lists the officers, arresting
3  officers and arresting investigating officers, do
4  you know what role detective -- well, withdrawn.
5           You've already testified that you are not
6  familiar with W. Higgins and M. Rowan; is that
7  correct?
8      A.   Correct.
9      Q.   Do you know what role Detective M. Baker
10 had in this investigation or arrest?
11     A.   I believe that case was assigned to Baker,
12 if I make no mistake -- I'm not a hundred percent
13 certain.
14     Q.   And Baker was the detective who was
15 present at Christ Hospital when you spoke to
16 Clifford Frazier?
17     A.   I believe he was, yes.
18     Q.   By the way, do you recall if Detective
19 Baker was taking notes when you spoke to Clifford
20 Frazier at the hospital?
21     A.   I don't recall if he was, but generally
22 detectives do take notes, but I don't recall if he
23 was or not.
24     Q.   Did you review any written -- any written

TALMAY ANDERSON, JR.                          February 21, 2018

---

Page 62

1  record of that interview of Clifford Frazier at the
2  hospital for accuracy?
3      A.   No.
4      Q.   Do you know what role Detective M. Kill
5  had in this investigation or the arrest?
6      A.   No.
7      Q.   And then looking down below, there is
8  three additional detectives listed who produced
9  this report:  Detective E. Siwek, Detective G. Karl
10  and Detective A. Pesavento.  Are you familiar with
11  those three detectives?
12      A.   Siwek I'm familiar with.
13      Q.   Do you know what his role was in this
14  investigation?
15      A.   No, nothing other than he was assisting
16  Baker and his partner.
17      Q.   Okay.  And are you familiar with
18  Detectives Karl and Pesavento?
19      A.   I know them.  I am not that familiar with
20  them.  I know who they are, or I knew who they
21  were.
22      Q.   Do you know what role they had in this
23  investigation?
24      A.   No.

---

Page 63

1      MS. MUSUMECI:  I'm going to mark Exhibit 11.
2              (Whereupon, Anderson Deposition
3                   Exhibit No. 11 was marked for
4                   identification.)
5  BY MS. MUSUMECI:
6      Q.   You can take a look at this.  Exhibit 11
7  is a Supplementary Report designated In Custody
8  Report, Bates stamped EB0000442 through 445.  Take
9  a moment to review that.
10      MR. TAPLING:  Can you state those Bates stamps
11  again?
12      MS. MUSUMECI:  Sure.  EB0000442 through 445.
13      MR. TAPLING:  The ones that we were just handed
14  are 0001527 to 0001530.
15      MR. SHPIGEL:  It is also an In Custody Report,
16  though.
17      MR. TAPLING:  Yes.  It is an In Custody Report,
18  but it is a different Bates stamp.
19      MS. MUSUMECI:  I apologize.  My copy is wrong.
20          Exhibit 11 is a Supplementary Report
21  designated In Custody Report, Bates stamped
22  EB0001527 through 15730.
23      MR. TAPLING:  Okay.
24

---

Page 64

1  BY MS. MUSUMECI:
2      Q.   Have you had a chance to look at that
3  document?
4      A.   Um-hum.
5      Q.   Are you familiar with it?
6      A.   No.
7      Q.   If you could turn to the second page of
8  the document, about midway down the page where it
9  says, "Investigation," the first paragraph says,
10  "In conjunction with gang crime specialists Oliver
11  and Anderson."
12          Is that reference to gang crime specialist
13  Anderson a reference to you?
14      A.   Yes.
15      Q.   And the sentence reads, "The reporting
16  detectives learned that the possible offender was a
17  person by the name of Eddie Lynier Bolden."
18          Can you tell me what was your role in
19  learning that the possible offender was Eddie
20  Bolden?
21      A.   In my earlier statement in regards to
22  Mitch McCullough, that might have been -- at that
23  time, he might have been the one that gave me that
24  name.  And, again, I don't recall -- I couldn't sit

---

Page 65

1  here and tell you for certain that that's what
2  transpired, but that might have been the time that
3  he did tell me that the guy was named Lynier.
4      Q.   Do you have a recollection about that, or
5  are you sort of speculating based --
6      A.   I'm just speculating.
7      Q.   Okay.  So is it fair to say that you do
8  not have a clear recollection of what the basis for
9  this sentence in conjunction with gang crime
10  specialist Oliver and Anderson, the reporting
11  detectives, learned that the possible offender was
12  a person by the name of Eddie Lynier Bolden?
13      A.   That would be the only link to that.
14      Q.   If you look at the next paragraph below
15  that -- again, I'm on the second page -- it states
16  that, "On February 3rd, 1994, the reporting
17  detectives showed a group of photographs to the
18  witness, Clifford Frazier."
19          Were you involved with showing photographs
20  to Clifford Frazier?
21      A.   Not to my recollection, no.
22      Q.   Do you know who specifically showed
23  photographs to Clifford Frazier?
24      A.   No.  I couldn't tell you.

---

TALMAY ANDERSON, JR.                                February 21, 2018

Page 66

1    Q.   Do you know what was discussed with
2  Mr. Frazier before he looked at the photographs or
3  while he was looking at the photographs?
4    A.   No.
5    Q.   And do you have any personal knowledge
6  about what Mr. Frazier may have said in response to
7  looking at the photographs?
8    A.   No.
9    Q.   The next paragraph refers to on
10 February 6, 1994, Mr. James Williams, who works at
11 J&J Fish, being shown a photo of Eddie Bolden.
12      Were you involved in showing a photograph
13 to Mr. James Williams at J&J Fish?
14   A.   No.
15   Q.   Do you recall speaking with James Williams
16 at any point in this investigation?
17   A.   Not to my recollection, no.
18   Q.   If you could turn to the third page, which
19 is Bates stamp 1529, and the second from bottom
20 paragraph, it refers to on February 26, 1994, an
21 ASA James Beligratis.  Do you know who James
22 Beligratis is?
23   A.   No.
24   Q.   Were you present when James Beligratis

Page 67

1  spoke to Clifford Frazier?
2    A.   I don't recall.
3    Q.   It's your testimony that you had no
4  involvement in actually placing Eddie Bolden under
5  arrest; is that right?
6    A.   I don't recall doing it, no.
7    Q.   So I'm correct that that is your
8  testimony?
9    A.   Yes.  I'm not saying I didn't, but I don't
10 recall ever having anything to do with arresting
11 Mr. Bolden.
12   Q.   Do you have any knowledge from James
13 Oliver that he saw Eddie Bolden at J&J Fish on
14 January 29th, 1994?
15   A.   I don't recall.
16   Q.   And do you have any knowledge that Eddie
17 Bolden asked to speak with James Oliver following
18 the lineup on February 26, 1994?
19   A.   I don't recall, no.
20   Q.   Am I correct that you did not -- you and
21 James Oliver did not collect any physical evidence
22 from -- in connection with these shootings on
23 January 29, 1994?
24   A.   I don't recall collecting any.

Page 68

1    Q.   Okay.  And do you have any knowledge as to
2  what evidence was collected by other detectives or
3  officers in connection with this investigation?
4    A.   No.
5    Q.   Although you did testify earlier that you
6  are aware that cocaine was recovered from a car in
7  connection with this investigation, right?
8    A.   Yes.
9    Q.   Are you aware of any other evidence
10 besides the cocaine recovered from the car?
11   A.   Not to my knowledge, no.
12   Q.   Are you aware of firearms being recovered?
13   A.   I don't recall if there was firearm or
14 not.  I don't recall.
15   Q.   So then you have no knowledge as to how
16 any evidence in this case was preserved or
17 destroyed, do you?
18   A.   No.
19   Q.   About how many homicides have you been
20 involved with in the course of your career with the
21 Chicago Police Department?
22   MR. TAPLING:  Objection, vague as to
23 "involved."
24

Page 69

1  BY MS. MUSUMECI:
2    Q.   You can answer.
3    A.   I don't recall.
4    Q.   This case was -- you know that this case
5  was a double homicide, right?  Two people were shot
6  and killed?
7    A.   Yes.
8    Q.   Have you -- to your recollection, did you
9  respond to any other double homicides during your
10 time as a Chicago police officer?
11   A.   I couldn't -- I couldn't recall at this
12 time.
13   Q.   Okay.  You testified earlier that you have
14 responded to other shootings, right?
15   A.   Yes.
16   Q.   And have you responded to other shootings
17 where people died as a result of those shootings?
18   A.   Yes.
19   Q.   Could you -- could you estimate if you've
20 been to more than ten shootings where people were
21 killed?
22   A.   I could safely say yes.
23   Q.   Do you recall whether there was a 911 call
24 in this case when the shootings occurred?

TALMAY ANDERSON, JR.                           February 21, 2018

**Page 70**

1  A.  I don't recall a 911 call, no.
2  Q.  Did you know that Eddie Bolden called 911
3  from J&J Fish on the night of the shootings?
4  A.  Not to my knowledge, no.
5  Q.  Would you agree that in the course of an
6  investigation, getting a 911 recording would
7  provide helpful information about the crime?
8  MR. TAPLING:  Objection.
9  MR. SHPIGEL:  Object.  I'll object that it's
10 speculative.
11 MR. TAPLING:  Objection, incomplete
12 hypothetical.  Join on speculative.
13 BY MS. MUSUMECI:
14 Q.  You can answer.  You want to hear the
15 question again?
16 A.  Yes.
17 MS. MUSUMECI:  Could you read it back?
18         (Whereupon, the record was
19         read.)
20 THE WITNESS:  I couldn't say.
21 BY MS. MUSUMECI:
22 Q.  At any point, did you become aware that
23 anyone had made a 911 call in this case?
24 A.  I would have no way of knowing that.

**Page 71**

1  Q.  So you didn't become aware of that?
2  A.  No.
3  Q.  You did know that Clifford Frazier was
4  involved with narcotics on January 29th, 1994,
5  right?
6  A.  I learned that, yes.
7  Q.  And you learned that from him, right?
8  A.  Yes.
9  Q.  He told you that there were drugs in a car
10 and then you observed that drugs had been recovered
11 from that car, right?
12 A.  Right.
13 Q.  Did you arrest Clifford Frazier for
14 narcotics activity?
15 A.  No.
16 Q.  Why not?
17 A.  I didn't have any proof that he had any --
18 he didn't have any drugs on him, so I couldn't
19 arrest him on something he said.
20 Q.  As a gang crime specialist, you did have
21 discretion and authority to make arrests when you
22 felt it was appropriate, right?
23 A.  Yes.
24 Q.  Did you or any other police officer

**Page 72**

1  accompany Clifford Frazier to a funeral in January
2  or February of 1994?
3  A.  I don't recall my doing it, no.
4  Q.  Are you aware of anyone else doing it?
5  A.  Not to my knowledge, no.
6  Q.  Did you ever provide protection to
7  Clifford Frazier?
8  A.  No.
9  Q.  Did you ever tell Clifford Frazier that he
10 was being deputized?
11 A.  No.
12 Q.  Did you ever discuss with Clifford Frazier
13 the possibility of moving him to a new home?
14 A.  No.
15 Q.  Did you ever speak with Clifford Frazier
16 to obtain information in connection with any other
17 investigation?
18 A.  Not to my knowledge, no.
19 Q.  Did you ever try to recruit Clifford
20 Frazier to be an informant?
21 A.  No.
22 Q.  Are you familiar with whether any law
23 enforcement agency, including the FBI, used or
24 tried to use Clifford Frazier as an informant?

**Page 73**

1  A.  None to my knowledge.
2  MR. SHPIGEL:  When you reach a natural break
3  point, can we take just a few minutes?
4  MS. MUSUMECI:  Yes.  You know what, this is a
5  good moment.
6  MR. SHPIGEL:  Okay.
7         (A short break was taken.)
8  BY MS. MUSUMECI:
9  Q.  Mr. Anderson, are you aware that
10 detectives interviewed several witnesses in or
11 around J&J Fish restaurant on January 29th, 1994?
12 A.  I'm not aware of, no.
13 Q.  And am I correct that, to your
14 recollection, the only witness that you interviewed
15 or spoke to in connection with this shooting was
16 Clifford Frazier on January 29th, 1994, at Christ
17 Hospital?
18 A.  I don't have any recollection of talking
19 to anyone on the scene.  I'm not saying that my
20 partner and I didn't.  I don't recall.  So I would
21 have to say that the only person I recall talking
22 to relative to this would be the one that was shot
23 at Christ Hospital.
24 Q.  Okay.  And you didn't take any notes of

TALMAY ANDERSON, JR.                          February 21, 2018

---

Page 74

1  any conversations that you may have had in
2  connection with the shooting on that night?
3      A.   No.
4      Q.   Are you familiar with a person by the name
5  of Tenesha Gatson?
6      A.   Not to my knowledge, no.
7      Q.   Are you familiar with a person by the name
8  of Edna Williams?
9      A.   No.
10     Q.   Are you familiar with a person by the name
11 of Vondell Goins?
12     A.   Not to my knowledge.
13     Q.   And did you make any arrests on
14 January 29th, 1994, the night of the shooting?
15     A.   I have no way of knowing if I arrested
16 anybody on that day or not.
17     Q.   Do you have any clear recollection of
18 making an arrest that night?
19     A.   Not in regards to this, no.
20     Q.   So I don't want to put words in your
21 mouth, but is your recollection if you did make an
22 arrest, it was unrelated to this shooting?
23     A.   Yes.
24     Q.   Okay.  To your knowledge, have you worked

Page 75

1  on cases where the wrong person was arrested?
2      A.   Nothing that -- none that I can think of.
3      Q.   Are you familiar with other officers whose
4  investigative work has resulted in a wrongful
5  conviction?
6      A.   None that I -- no, no.
7      Q.   At any time during the investigation of
8  the shooting, did you engage in any violation of
9  Chicago Police Department policies or procedures?
10     A.   None that I know of.
11     Q.   Are you aware of any other officers or
12 detectives who were involved in the investigation
13 of these January 29th, 1994, shootings engaging in
14 any violations of Chicago Police Department
15 policies or procedures?
16     A.   None that I am aware of.
17     Q.   Have you ever -- are you aware --
18 withdrawn.
19          Have you ever taken evidence from a crime
20 scene without reporting it or documenting it?
21     A.   Not that I recall.
22     Q.   Have you ever taken property from a
23 witness without reporting it or documenting it?
24     A.   Not that I recall, no.

Page 76

1      Q.   Have you ever taken property from a
2  witness for your own benefit?
3      A.   Not that I recall, no.
4      Q.   If you took property from a witness for
5  your own benefit, you would remember that, right?
6      A.   Pretty much.
7      Q.   So fair to say you haven't done that?
8      A.   Not that I recall, no.
9      Q.   Have you ever intentionally misstated or
10 omitted information from a report?
11     A.   I would have to say no.  Something I
12 learned, I was taught in the academy that once you
13 submit a report, you can't go back and correct it.
14 So I generally, in all of the years that I
15 submitted a report, I tried to include as much
16 information that was possible and not try to omit
17 anything.
18     Q.   To your knowledge, did any other officers
19 or members of the Chicago Police Department ever
20 report you for misconduct during your career?
21     MR. SHPIGEL:  I'll object to the term
22 "misconduct" as vague.
23 BY MS. MUSUMECI:
24     Q.   I'll rephrase.  Did you or any -- I am

Page 77

1  sorry.
2          Did any officers or members of the Chicago
3  Police Department ever report you for misconduct or
4  policy violations during the course of your career?
5      MR. SHPIGEL:  I still object to the term
6  "misconduct."
7          You can answer.
8      THE WITNESS:  I have no way of knowing.
9  BY MS. MUSUMECI:
10     Q.   Are you aware of any complaints against
11 you being sustained in connection with your Chicago
12 Police Department career?
13     A.   One -- one, I believe, that I remember or
14 recall.
15     Q.   And what was -- what was that?
16     A.   Failure to display license plate on the
17 front of my vehicle or displaying city sticker.
18     Q.   And were you penalized for that?
19     A.   Yes.
20     Q.   What was the penalty?
21     A.   Eight hours in lieu of.
22     Q.   Okay.  So you lost a day of vacation
23 essentially?
24     A.   Yes, not a day of -- just a day.  In other

---

TALMAY ANDERSON, JR.                                    February 21, 2018

Page 78

1  words, I used eight hours of my time due to pay for
2  that.
3      Q.   Are you familiar with the term "street
4  file"?
5      A.   I've heard that on TV.
6      Q.   Okay.  Have you heard the term or the
7  practice of keeping a street file in connection
8  with the Chicago Police Department?
9      A.   No.
10     Q.   Do you know if Detective Oliver completed
11  any paperwork in connection with the shooting on
12  January 29th, 1994?
13     A.   None that I can recall.
14     Q.   Are you aware that the plaintiff in this
15  case, Eddie Bolden, was granted a Certificate of
16  Innocence in connection with his conviction for the
17  shootings of January 29th, 1994?
18     A.   Never knew he was convicted.  Never knew
19  he had a Certificate of Innocence, so no.
20     Q.   And are you aware of any violations of
21  Mr. Bolden's rights that you observed or were told
22  about in connection with the shooting
23  investigation?
24     A.   No.

Page 79

1      Q.   I just want to go back to a few things,
2  and I promise you, we are almost finished.
3           Back on January 29th, when you and
4  detective -- when you and James Oliver went to
5  Christ Hospital, did you communicate your plans to
6  go to Christ Hospital to anybody in the Chicago
7  Police Department, like by radio dispatch or
8  something?
9      A.   No, not that I recall, no.
10     Q.   Do you remember if Detective Baker was
11  already there when you arrived or if you arrived
12  first?
13     A.   I don't recall.
14     Q.   Did you coordinate with Area 2 detectives
15  at all with respect to your activities on
16  January 29th, 1994?
17     A.   Not -- no.
18     Q.   When you first heard the radio call about
19  the shooting or whatever it was that alerted you
20  and Oliver that there was a shooting on Minerva,
21  what was your -- what prompted you to respond to
22  that shooting?
23     A.   Generally if there is a call of shots
24  fired or a man shot, police need assistance, if we

Page 80

1  are close, we generally would respond.
2      Q.   Did you at any point believe that those
3  shootings were gang related?
4      A.   Prior to or once we got on the scene?
5      Q.   Either one.  Let's start prior to.  Did
6  you --
7      A.   We'd have no way of knowing prior to.
8  Once you get on the scene and talk to -- find out
9  what's going on, you get a sense that it's gang
10  related.
11     Q.   And so on this particular shooting of the
12  two Fraziers and Mr. Clayton, once you got on the
13  scene, was there anything that indicated to you
14  that this might be gang related?
15     A.   That was our assumption.
16     Q.   And do you remember what made you assume
17  that?
18     A.   There was a lot of things that would come
19  into play there, the location, the people involved,
20  our knowledge of what gangs controlled what
21  territory.  So a whole lot of things would give us
22  that -- we would assume -- get that assumption.
23     Q.   And then turning back towards the
24  interaction you had with Officer Willis that night,

Page 81

1  was there a hierarchy -- I don't know if I'm using
2  the right terminology -- was there a hierarchy
3  between gang crime specialists and tactical gang
4  officers where, in other words, were the tactical
5  officers supposed to follow directions of gang
6  crime specialists?
7      A.   No.  We have no -- a gang specialist had
8  no authority over anybody.  The only person that
9  had any authority would have sergeant, lieutenant
10  or the commander.
11     Q.   Do you recall if you kept your sergeant
12  apprised of your activities on January 29th as it
13  was happening?
14     A.   We generally didn't until generally at
15  night we would check out, we ended the car -- ended
16  the shift.
17     Q.   Why were you and Oliver so upset when
18  Willis and his partner retrieved the cocaine as
19  opposed to sitting on it?
20     A.   I didn't say so upset.  I said we were
21  disturbed because we had gave them information, and
22  if we were going to do anything in terms of
23  follow-up on that investigation, we didn't want
24  them messing with whatever because we couldn't come

TALMAY ANDERSON, JR.                                    February 21, 2018

---

Page 82

1  in after they, more or less, I guess you could say,
2  taint whatever, we no longer have anything to do
3  with it.
4      Q.  Do you know if Willis and his partner
5  followed up on the cocaine investigation in any
6  way?
7      A.  I don't know, have no way of knowing.
8      Q.  Did Willis recovering that cocaine or that
9  white powder make you and Oliver less interested in
10 this investigation?
11     A.  You could say yes.
12     Q.  Do you know if Officer Willis is still a
13 member of the Chicago Police Department?
14     A.  I don't believe so.
15     Q.  And do you know under what circumstances
16 he left the police department?
17     A.  No.  I had heard rumors that he was
18 terminated.  I don't know if that's, in fact, the
19 truth, but I heard that he had been terminated.
20     Q.  And did you hear why he was terminated?
21     A.  No.
22     Q.  Did you know Willis to be a good officer?
23     A.  I wasn't his supervisor.
24     Q.  But as a colleague, what was your -- what

---

Page 83

1  was your opinion about Willis?
2      A.  Again, I didn't make assessments on other
3  policemen.
4      Q.  Did you have other occasions where Willis
5  took an action that interfered with your
6  investigation?
7      A.  No.
8      Q.  I asked you at the beginning of this
9  deposition what you did to prepare for the
10 deposition.  I just want to go back and clarify.
11     Have you spoken with any of the other
12 officers involved in this investigation about your
13 deposition?
14     A.  As I stated before, the only person that I
15 talked to is my ex-partner.  We talk generally once
16 a week, once every other week, not so much to do
17 with anything with the deposition, but just he
18 calls to check on me; I call to check on him.
19     Q.  And are you aware that Mr. Oliver is
20 actually a defendant in this lawsuit?
21     A.  I was told by my counsel that he was.
22     Q.  And has Mr. Oliver communicated to you any
23 opinion about his hoped-for outcome of this
24 litigation?

---

Page 84

1      A.  No.
2      Q.  Have you had any communication, including
3  today, about this deposition with any of the
4  attorneys for -- any of the attorneys other than
5  your attorney?
6      A.  I don't know any of them.
7      Q.  Well, the people in this room?
8      A.  No.
9      MS. MUSUMECI:  Off the record.
10          (Discussion off the record.)
11 BY MS. MUSUMECI:
12     Q.  Mr. Anderson, I understand that you wanted
13 to clarify something that I asked you about
14 earlier.
15     A.  Yes.  Him and I had talked about a CR that
16 I got when I was still in the 8th District, and I
17 don't recall -- I doubt if it was sustained because
18 I didn't do any time, but I got a CR for missing a
19 day in court.  And prior to retiring, they review
20 your records.  So if there is a date out there,
21 then you'd have to do it.  So I don't know, like I
22 say, whether it was sustained or not.
23     Q.  Okay.  And when you say missing a day in
24 court, in your duties as a police officer, were you

---

Page 85

1  occasionally assigned to go give testimony in
2  court?  Is that what you're referring to?
3      A.  This was traffic court.
4      Q.  Traffic court.
5      A.  We had to go to traffic court every --
6  once a month.
7      Q.  Okay.  Is there anything else, thinking
8  about all of the questions that I've asked you this
9  morning, that you need to clarify or expand upon?
10     A.  Nothing that I can recall, no.
11     Q.  Okay.  And is there anything that I
12 haven't asked you about pertaining to your
13 involvement in the shootings of January 29th, 1994,
14 that comes to mind?
15     A.  No.
16     MS. MUSUMECI:  I have nothing further for
17 Mr. Anderson.
18             EXAMINATION
19 BY MS. PALLES:
20     Q.  I have a few very short ones.
21     Do patrol officers report to the gangs
22 crime unit?  Do they report to anyone in the gang
23 crime unit, regular patrol officers?
24     A.  Patrol officers is a district function.

---

TALMAY ANDERSON, JR.                    February 21, 2018

---

Page 86

1 Gangs is a specialized unit. So there is no
2 connection between the two.
3      Q.   Do you know if patrol officers report to
4 detectives?
5      A.   Patrol --
6      Q.   Do detectives oversee patrol officers?
7      A.   No. The only person patrol officers are
8 accountable to is district commander, lieutenants
9 and the sergeants.
10     Q.   Okay. Do patrol officers and
11 detectives -- patrol officers and detectives then
12 do not report along the same chain of command; is
13 that correct?
14     A.   Correct.
15     Q.   Do patrol officers conduct investigations?
16     A.   They can, yes, depending.
17          I conducted one which stands out. I mean,
18 you know, burglaries, if you're assigned a district
19 and you come upon a burglary, which means you do
20 some legwork. As I mentioned earlier, in '72, I
21 did some work on a homicide where a 16-year-old
22 shot and killed a policeman, and my partner and I
23 apprehended that individual. So you could say
24 that's doing an investigation.

Page 87

1      Q.   If a patrol officer was called to the
2 scene of a shooting, would the patrol officer
3 instigate an investigation?
4      MS. MUSUMECI: Objection as to form.
5          You can answer.
6      THE WITNESS: That would be assigned to a
7 detective.
8 BY MS. PALLES:
9      Q.   Okay. And do patrol officers take notes
10 of investigations?
11     MS. MUSUMECI: Objection as to form.
12 BY MS. PALLES:
13     Q.   Do patrol officers take notes of
14 investigations that have been assigned to
15 detectives?
16     A.   No. I mean, there is no -- I'll have to
17 explain the best way I can. The only time a patrol
18 officer would take notes, if something happened and
19 you want to interview witnesses on the scene, you
20 take notes, and then once the detectives come in,
21 they take over the investigation. They run
22 through -- they have the -- they are city wide,
23 which means they can go places, whereas a patrol
24 officer can only go on that particular beat that

Page 88

1 he's assigned to within a district. So that's --
2 that's as far as taking notes would go with a
3 patrol officer.
4      MS. PALLES: Okay. Thank you. I have no
5 further questions.
6               EXAMINATION
7 BY MR. TAPLING:
8      Q.   I just have a couple for you,
9 Mr. Anderson.
10          Do you remember -- I can't remember the
11 exhibit number offhand. I think it was Exhibit 7,
12 the sketch that you were shown?
13     A.   Yes.
14     Q.   You were asked a couple of questions about
15 that, and I would just like to ask a couple of
16 clarifying questions.
17          Am I correct that your testimony today is
18 that you, to your recollection, as you sit here
19 today, had nothing to do with setting up having
20 this sketch done?
21     A.   No.
22     Q.   To your knowledge, as you sit here today,
23 James Oliver had nothing to do with getting this
24 sketch done?

Page 89

1      MS. MUSUMECI: Objection, form.
2      MR. SHPIGEL: You can answer.
3      THE WITNESS: Not to my knowledge.
4 BY MR. TAPLING:
5      Q.   And the same basic questions, on the date
6 of the 26th, the lineup that you were asked about,
7 to your knowledge, as you sit here today, you did
8 not present Clifford Frazier for his lineup, to
9 view the lineup?
10     A.   No.
11     Q.   You did not walk Clifford Frazier anywhere
12 in Area 2 that day?
13     A.   Not to my knowledge, no.
14     Q.   To the best of your knowledge, did James
15 Oliver present Clifford Frazier for his -- to view
16 the lineup that day?
17     A.   Not to my knowledge. And, again, that's
18 strictly a detective function.
19     Q.   Right. And the last question: To your
20 knowledge, as you sit here today, did James Oliver
21 walk Clifford Frazier through Area 2 on that date?
22     A.   Not to my knowledge.
23     MR. TAPLING: Those are all the questions I
24 have. Thank you for your time today.

TALMAY ANDERSON, JR.                          February 21, 2018

---

Page 90

1     MR. SHPIGEL:  I have no questions.
2          Do you have any clarification?
3     MS. MUSUMECI:  No, I don't.
4          Thank you, Mr. Anderson.
5     MR. TAPLING:  Mr. Anderson, do you want the
6  chance to review the transcript before it's
7  published, or are you just going to say that you
8  trust that what she types up is going to be an
9  accurate representation of what you said?
10     THE WITNESS:  I'm good with it.
11     MR. SHPIGEL:  I would recommend that you waive.
12     THE WITNESS:  Okay.
13     MR. SHPIGEL:  Okay.  Waive.
14               (Proceedings concluded at
15               12:51 p.m.)
16
17
18
19
20
21
22
23
24

---

Page 91

1  STATE OF ILLINOIS  )
2                     )  SS:
3  COUNTY OF L A K E  )
4
5          I, Lisa M. Bringle, a Certified Shorthand
6  Reporter within and for the State of Illinois, duly
7  commissioned and qualified, do hereby certify that
8  the within named witness, TALMAY ANDERSON, JR., was
9  by me first duly sworn to testify the truth, the
10  whole truth and nothing but the truth in the cause
11  aforesaid; that the testimony then given by the
12  above-referenced witness was by me reduced to
13  stenotypy in the presence of said witness;
14  afterwards transcribed, and that the foregoing is a
15  true and correct transcription of the testimony so
16  given by the above-referenced witness.
17          I do further certify that this deposition
18  was taken at the time and place in the foregoing
19  caption specified and was completed without
20  adjournment.
21          I do further certify that the signature to
22  the foregoing deposition was waived by counsel for
23  the respective parties.
24

---

Page 92

1          I do further certify that I am not a
2  relative, counsel or attorney for either party, or
3  otherwise interested in the event of this action.
4     IN TESTIMONY WHEREOF:  I have hereunto set my
5  hand on March 6, 2018.
6
7
8          _Lisa M. Bringle_____
9          Lisa M. Bringle,
10          Certified Shorthand Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

U.S. Legal Support, Inc.
(312) 236-8352

TALMAY ANDERSON, JR.

February 21, 2018
Index: 0001450..Aginis

| Exhibits | 0 |
|---|---|

**EX 0001 T.**
**Anderson 022**
**118** 3:17 7:18,22
**EX 0002 T.**
**Anderson 022**
**118** 3:18 23:2,6 32:3
**EX 0003 T.**
**Anderson 022**
**118** 3:18 26:20 27:24
**EX 0004 T.**
**Anderson 022**
**118** 3:19 26:23 27:2,6
**EX 0005 T.**
**Anderson 022**
**118** 3:19 42:3,7
**EX 0006 T.**
**Anderson 022**
**118** 3:20 44:2,6
**EX 0007 T.**
**Anderson 022**
**118** 3:20 47:23 48:2 88:11
**EX 0008 T.**
**Anderson 022**
**118** 3:21 50:16,18 53:22 54:3
**EX 0009 T.**
**Anderson 022**
**118** 3:21 56:10,14
**EX 0010 T.**
**Anderson 022**
**118** 3:22 58:19,23
**EX 0011 T.**
**Anderson 022**
**118** 3:22 63:1,3,6, 20

**0**
**0001450** 27:7
**0001527** 63:14
**0001530** 63:14
**001407** 56:15
**002391** 28:1,8
**002393** 28:22
**0327** 48:3
**08** 56:15

**1**
**1** 7:18,22
**10** 58:19,23
**11** 63:1,3,6,20
**12:00** 17:11,12
**12:51** 90:15
**1453** 27:7
**14640** 59:11,19, 22
**1525** 42:8
**1529** 66:19
**15564** 59:24
**156** 14:18
**15730** 63:22
**16-year-old** 86:21
**1970** 10:20 11:17, 22
**1976** 11:15
**1983** 12:2,3
**1986** 12:21
**1990s** 15:3,9
**1994** 9:1 16:18 17:24 18:18 19:17, 23 20:1 22:21 23:18 27:17 30:2 32:22 35:18 36:8 40:2,19

46:6,10,19,23 50:5, 12 51:1 52:23 54:11 55:4,9,21,23 56:19 57:7 59:5 65:16 66:10,20 67:14,18, 23 71:4 72:2 73:11, 16 74:14 75:13 78:12,17 79:16 85:13
**1998** 10:20
**1st** 46:19

**2**
**2** 16:23 23:2,6 32:3, 5 42:24 46:18 47:5, 9 48:24 50:11 54:5, 11,24 55:7 58:13 79:14 89:12,21
**2394** 28:1
**26** 54:11 55:9 56:18 66:20 67:18
**26th** 50:5,12 57:7 59:5 89:6
**29** 27:17 67:23
**29th** 19:23 20:1 22:21 23:18 30:2 32:22 35:17 36:8 40:2,19 46:10,23 51:1 52:23 67:14 71:4 73:11,16 74:14 75:13 78:12,17 79:3,16 81:12 85:13
**2nd** 52:12

**3**
**3** 16:24 26:20 27:24 29:14 36:2
**3500** 12:8
**38** 14:7
**3:00** 17:11
**3rd** 29:19 36:4 42:19 43:3,7,18 44:12 65:16

**4**
**4** 26:23 27:2,6 29:1
**428** 23:8
**4429** 29:12
**445** 63:8,12
**447** 53:24
**45** 8:16
**4:00** 17:11,12

**5**
**5** 42:3,7
**5213** 29:19

**6**
**6** 44:2,6 66:10
**63rd** 12:8
**6420** 43:13

**7**
**7** 47:23 48:2 88:11
**710** 14:18,20
**72** 86:20

**8**
**8** 50:16,18 53:22 54:3
**80s** 12:16
**83** 12:12
**86** 12:13
**8th** 11:24 12:3,7 51:21 84:16

**9**
**9** 56:10,14
**90s** 12:16 18:17
**911** 69:23 70:1,2,6, 23
**98** 12:5

**A**
**A-G-I-N-I-S** 29:1
**A2** 45:15
**Abel** 49:2
**ability** 5:9
**academy** 11:22, 23 14:2,6 76:12
**accompany** 72:1
**accountable** 86:8
**accuracy** 62:2
**accurate** 90:9
**action** 7:23 83:5
**active** 15:2
**activities** 30:9 31:13 79:15 81:12
**activity** 71:14
**add** 52:8
**additional** 46:6 62:8
**address** 43:19, 20,22
**addressed** 7:24
**admitted** 60:17
**advised** 60:15
**agency** 72:23
**agent** 41:16 49:1
**Aginis** 29:1

TALMAY ANDERSON, JR.

February 21, 2018
Index: agree..Charles

**agree** 49:14 59:3 70:5

**agreed-upon** 31:18,22

**alerted** 79:19

**alleged** 60:22

**allowed** 57:24

**altogether** 29:16

**Anderson** 4:1,9, 12,17 5:3 7:17,22, 24 10:3 23:1,6,10 26:19,23 27:1,5,6, 24 30:6 40:18 42:2, 7 44:1,6,8 47:22 48:2 50:16,17,22 53:22 56:9,14 58:18,23 59:11 63:2 64:11,13 65:10 73:9 84:12 85:17 88:9 90:4,5

**angry** 39:3,6

**answers** 6:10,14, 18 9:18

**Ant** 26:8,10,11,14 46:21

**Anthony** 26:8 42:20 43:15 46:18, 22 47:1

**apartment** 44:13,15,23 46:7

**apologize** 27:7 63:19

**apparently** 20:3

**appears** 28:9 49:15,18,20,22 59:3

**apprehended** 86:23

**apprised** 81:12

**approximately** 10:8 11:6,13 12:6

**area** 11:3 16:23 27:13 38:12 42:24 46:18 47:5,9 48:24 50:11 54:5,11,24 55:7 58:13 79:14

89:12,21

**arrest** 8:22 9:1 59:4 60:4,9 61:10 62:5 67:5 71:13,19 74:18,22

**arrested** 74:15 75:1

**arresting** 59:10 60:8 61:2,3 67:10

**arrests** 71:21 74:13

**arrived** 38:5 79:11

**artificial** 6:12

**artist** 48:13 49:7

**ASA** 66:21

**ascertain** 22:1 25:18

**assessments** 83:2

**assigned** 11:24 12:10,14 14:15 16:1 19:10,12,18 30:20, 23 32:8 36:5 41:6,7, 13,17,19 45:9 48:24 51:16 52:18 60:11 61:11 85:1 86:18 87:6,14 88:1

**assignment** 19:5

**assignments** 11:19 19:4,10

**assistance** 79:24

**assisting** 62:15

**associate** 4:20

**associates** 35:21

**assume** 6:24 80:16,22

**assuming** 21:11,14 25:8

**assumption** 80:15,22

**attempt** 33:7

**attempted** 37:11 57:6

**attorney** 4:18 8:11,13 14:12 55:20 57:6 60:17 84:5

**attorneys** 84:4

**attributed** 45:1

**author** 31:1

**authored** 31:23 56:4,7

**authority** 71:21 81:8,9

**aware** 39:9 46:5 48:12 68:6,9,12 70:22 71:1 72:4 73:9,12 75:11,16,17 77:10 78:14,20 83:19

---

**B**

**back** 12:17 25:24 32:3 36:14 37:13,21 38:10,11,12 51:14 55:21 61:1 70:17 76:13 79:1,3 80:23 83:10

**background** 11:11

**Baker** 34:9,18 51:3 61:9,11,14,19 62:16 79:10

**Barnes** 58:16

**based** 55:3 65:5

**basic** 89:5

**basically** 20:23 33:19

**basis** 16:16 51:20 65:8

**Bates** 23:8 27:6, 24 42:7 44:7 48:3 53:23 56:14 58:24 63:8,10,18,21 66:19

**bear** 57:3

**beat** 29:6,7,10,19 87:24

**beeper** 43:12,14

**began** 11:16

**beginning** 83:8

**believed** 53:19

**Beligratis** 66:21, 22,24

**bell** 58:17

**beneath** 28:16

**benefit** 76:2,5

**bit** 6:12 36:19

**Bolden** 4:21 9:1 49:10 55:13,15,21, 24 57:24 58:5,9 59:5 60:4,22 64:17, 20 65:12 66:11 67:4,11,13,17 70:2 78:15

**Bolden's** 57:6 78:21

**bolt** 4:6

**book** 31:10

**bottom** 28:23 45:13 66:19

**box** 40:6

**break** 7:3,4,9 36:18 40:14,16 73:2,7

**briefly** 11:17

**bringing** 49:7

**brother** 34:23

**brought** 48:13

**Brummel** 4:20

**burglaries** 86:18

**burglary** 86:19

**buys** 16:15

---

**C**

**C-L-A-R-K-S-O-N** 5:2

**cache** 44:12

**call** 20:12,13,15 69:23 70:1,23 79:18,23 83:18

**called** 4:13 58:4 70:2 87:1

**calls** 83:18

**Cancila** 4:19

**capacity** 5:21

**car** 17:15,16,18,19 21:4 24:3 36:21 37:2,3,7,15,16,23 38:1,4 39:8,10 68:6, 10 71:9,11 81:15

**card** 43:19,20

**career** 14:3 21:17 49:6 68:20 76:20 77:4,12

**carry** 31:10

**case** 4:22 5:19 6:1 28:2 30:22 32:4,17 48:17 49:11 55:13 61:11 68:16 69:4,24 70:23 78:15

**cases** 30:20 75:1

**CCSAO** 27:7 28:1,8 48:3 56:15

**Certificate** 78:15,19

**chain** 13:11 86:12

**chance** 64:2 90:6

**changed** 59:21

**Chapter** 14:7

**characterization** 37:17 44:17

**Charles** 55:20 57:10

TALMAY ANDERSON, JR.

February 21, 2018
Index: check..discretion

**check** 81:15
83:18

**Chicago** 5:17 9:7
10:15,19,21 11:15,
16,18,24 12:15 15:3
23:7 28:2 41:15,17
59:18 68:21 69:10
75:9,14 76:19 77:2,
11 78:8 79:6 82:13

**choose** 57:24

**Christ** 25:14,16,
21 33:7,10 50:24
61:15 73:16,23
79:5,6

**circumstances**
58:8 82:15

**city** 4:24 12:11
77:17 87:22

**civil** 7:23

**clarification**
90:2

**clarify** 17:20
83:10 84:13 85:9

**clarifying** 88:16

**Clarkson** 5:2

**Clayton** 9:4 20:1,
8 22:13,18 41:22
50:2 59:7 80:12

**clean** 49:18

**clear** 65:8 74:17

**Clifford** 20:8
22:13,18 25:22
28:14 33:8 34:22
35:3 37:9 41:22
44:11,15,23 46:7,10
47:13 48:13 50:2,24
53:12,17 54:24
57:16 58:8 59:7
60:18 61:16,19 62:1
65:18,20,23 67:1
71:3,13 72:1,7,9,12,
15,19,24 73:16
89:8,11,15,21

**close** 80:1

**clothes** 17:3,4

**cocaine** 38:18
44:13,15,23 46:6
68:6,10 81:18 82:5,
8

**colleague** 82:24

**colleagues** 8:11
9:7

**collect** 24:5 32:21
52:2 67:21

**collected** 40:2
68:2

**collecting** 32:24
67:24

**college** 11:12

**column** 29:18

**command** 13:11
86:12

**commander**
13:12 81:10 86:8

**communicate**
50:23 79:5

**communicated**
83:22

**communicatin
g** 51:3

**communicatio
n** 84:2

**complaints**
77:10

**completed**
78:10

**completing**
30:8

**composite** 49:8

**concentrate**
16:3

**concerns** 44:11

**concluded**
90:14

**conditions** 5:8

**conduct** 86:15

**conducted**
86:17

**conducting**
55:5

**conjunction**
64:10 65:9

**connection**
21:23 35:18 40:1
41:21 42:20 46:11,
22 47:6,9 50:12
53:3 59:5 60:4,8
67:22 68:3,7 72:16
73:15 74:2 77:11
78:7,11,16,22 86:2

**constitutional**
14:4,8 60:16

**contact** 26:10
41:20 46:21 51:17

**context** 19:24

**continue** 51:17

**continued** 28:23

**controlled** 80:20

**conversation**
34:12,15 35:8 36:23
46:13 53:2

**conversations**
39:13 47:4,8 74:1

**convicted** 78:18

**conviction** 75:5
78:16

**coordinate**
79:14

**copies** 45:15

**copy** 45:21 63:19

**corner** 45:14

**correct** 16:18
19:15 33:9 38:2
61:7,8 67:7,20
73:13 76:13 86:13,
14 88:17

**Cottage** 24:18
43:13

**counsel** 83:21

**couple** 88:8,14,
15

**court** 6:7,17
84:19,24 85:2,3,4,5

**CR** 84:15,18

**crime** 13:20 14:14
15:19 16:8,19 19:3
21:20,22 23:21
24:3,13 29:8 30:6,
12,18 31:4 51:6,8
64:10,12 65:9 70:7
71:20 75:19 81:3,6
85:22,23

**Custody** 63:7,15,
17,21

**D**

**Darling** 18:15,20,
22,24

**date** 84:20 89:5,21

**day** 10:24 17:6
20:1 22:21 55:8
57:12 74:16 77:22,
24 84:19,23 89:12,
16

**dealer** 26:13

**dealers** 52:12,21

**dealing** 41:18
53:20

**dealt** 15:16

**decide** 19:7

**defendant** 5:20
83:20

**degree** 11:12

**demeanor** 35:3

**denied** 60:18

**department** 9:7
10:16,19,22 11:17,
19 23:8 41:16 59:18
68:21 75:9,14 76:19
77:3,12 78:8 79:7
82:13,16

**depending**
86:16

**depicted** 27:9
48:10 49:14 56:22

**deposed** 5:14

**deposit** 40:6

**deposition**
5:12,16 6:6 7:17,23
8:7 9:8,10 23:1,14
26:19 27:1 42:2
44:1 47:22 50:17
56:9 58:18 63:2
83:9,10,13,17 84:3

**deputized** 72:10

**Derrick** 9:3 20:2,
8 22:13,18 34:23
41:22 42:18 43:6
50:1 59:6

**describe** 11:17
15:8,17 30:7

**description**
33:24

**designated**
63:7,21

**destroyed** 68:17

**detective** 30:23
34:9 47:5,9 48:20,
23,24 50:11,22 51:3
54:15 57:11 58:4
61:4,9,14,18 62:4,9,
10 78:10 79:4,10
87:7 89:18

**detectives**
42:13,24 43:12,17
45:16 57:12 61:22
62:8,11,18 64:16
65:11,17 68:2 73:10
75:12 79:14 86:4,6,
11 87:15,20

**determine** 22:6
38:3

**died** 69:17

**difference** 13:4

**directions** 81:5

**Disciples** 15:6,9,
15,16 19:20

**discretion** 19:13
71:21

TALMAY ANDERSON, JR.

February 21, 2018
Index: discuss..Frazier

**discuss** 72:12

**discussed** 66:1

**discussing** 22:22

**discussion** 7:16 54:1 84:10

**discussions** 14:8

**dispatch** 79:7

**display** 77:16

**displaying** 77:17

**district** 11:24 12:3,7 16:23 29:14, 19 36:2,4 42:19 43:3,7,18 44:12 51:21 52:12 84:16 85:24 86:8,18 88:1

**disturbed** 81:21

**divided** 13:1

**division** 30:23 31:18

**document** 23:10,16 28:3,5 29:23 42:10,13,22 44:7,9 46:16 48:3,4, 7 50:8 53:23 54:6,8 56:14 58:23 59:1 64:3,8

**documenting** 75:20,23

**documents** 8:12,22

**dope** 36:14,16,21 37:15,24 38:4,16,18 39:15

**double** 69:5,9

**doubt** 84:17

**drank** 51:22

**drive** 18:8,9

**driving** 18:9

**drove** 17:19 18:5, 7 21:2 54:24

**drug** 16:15 26:13 37:10,11 46:12 52:12,21 53:20

**drugs** 71:9,10,18

**due** 78:1

**duly** 4:13

**duties** 84:24

**dwell** 14:7

**E**

**earlier** 64:21 68:5 69:13 84:14 86:20

**early** 12:16 46:5

**earn** 11:13

**easier** 6:10

**EB0000423** 23:8

**EB0000425** 32:7

**EB0000435** 44:7

**EB0000442** 63:8,12

**EB0000446** 53:23

**EB0001524** 42:7

**EB0001526** 58:24

**EB0001527** 63:22

**Eddie** 4:21 9:1 49:10 55:13 57:6,24 59:4 60:4,22 64:17, 19 65:12 66:11 67:4,13,16 70:2 78:15

**Edna** 28:17 74:8

**educational** 11:11

**effects** 40:3

**efforts** 55:23

**emergency** 43:19,20,22

**employed** 10:3, 7

**employers** 11:4

**employment** 10:18 11:18

**encountered** 46:15

**ended** 81:15

**enforcement** 72:23

**engage** 75:8

**engaging** 75:13

**entered** 27:17

**essentially** 77:23

**estimate** 69:19

**evening** 19:4

**evenings** 17:8,9 20:5

**evidence** 24:5 32:21 33:1 67:21 68:2,9,16 75:19

**ex-partner** 9:9 83:15

**EXAMINATION** 4:15 85:18 88:6

**examined** 4:14

**exception** 7:5

**exhibit** 7:18,22 23:2,6 26:20,23 27:2,6,24 28:22 29:5,6,17 32:3 42:3, 7 44:2,6 47:23 48:2 50:16,18,21 53:22 54:3 56:10,14 58:19,23 63:1,3,6, 20 88:11

**exited** 24:4

**expand** 85:9

**experience** 6:4

**experiencing** 5:8

**explain** 87:17

**expressing** 39:14

**extent** 9:12 39:16

**extra** 45:15

**eyes** 49:22

**F**

**fact** 14:9 20:23 24:17 35:5 82:18

**Failure** 77:16

**fair** 38:24 65:7 76:7

**familiar** 15:2,5 22:22 25:4 26:7 28:3,10,18 29:2 36:1,3 40:23 42:10, 14 43:14 44:8 48:12,19 49:1,10 54:6 58:12,14 61:6 62:10,12,17,19 64:5 72:22 74:4,7,10 75:3 78:3

**familiarity** 15:8

**family** 35:21 52:11,21 55:24

**fatalities** 22:7

**fault** 53:15

**FBI** 41:8,9,11,13, 16 49:1 51:16 52:3, 19 72:23

**February** 46:6, 19 50:5,12 54:11 55:9 56:18 57:7 59:5 65:16 66:10,20 67:18 72:2

**feel** 7:4 18:8

**feeling** 5:5

**felt** 19:13 71:22

**file** 78:4,7

**filed** 46:2

**find** 80:8

**finish** 6:13,14

**finished** 79:2

**firearm** 68:13

**firearms** 68:12

**fired** 20:13 79:24

**firm** 4:19

**Fish** 24:18 25:2,4, 6 26:1,2,5,14 27:13, 17 30:1,4 32:21 33:1 37:5 40:11 66:11,13 67:13 70:3 73:11

**five-minute** 40:14

**follow** 81:5

**follow-up** 81:23

**foot** 17:13

**force** 41:8,9,12, 14,18 51:17 52:3,13

**foreign** 31:1

**form** 87:4,11 89:1

**foundation** 30:10 31:6 52:5

**four-digit** 29:11

**frame** 14:23

**Frazier** 9:3 20:2, 8,9 22:13,14,18,19 25:22 28:14 33:8,12 34:19,23 35:11 36:13,22 37:9 41:22,23 42:18 43:6 44:11,23 46:11,14 47:13 48:13 50:1,2, 24 53:13,17 54:24 55:1 57:17 58:8 59:6,7 61:16,20 62:1 65:18,20,23 66:2,6 67:1 71:3,13 72:1,7,9,12,15,20, 24 73:16 89:8,11, 15,21

TALMAY ANDERSON, JR.

February 21, 2018
Index: Frazier's..involved

**Frazier's** 35:3
44:15 46:7

**Fraziers** 80:12

**free** 7:5

**freelance** 13:8

**front** 77:17

**frustration**
39:14

**full** 4:2

**function** 54:15
85:24 89:18

**funeral** 72:1

---

**G**

**G-L-Y-N-N** 48:20

**gang** 12:13,20
13:1,16,18,20 14:14
15:17,19,24 16:1,5,
8,12,19 19:3,9,10,
12,15,17,18 21:20,
22 29:8,21 30:6,12,
18 31:4 40:21 45:8,
10,16,17,19,22 46:2
51:6 52:1,3 53:8
54:14 64:10,12 65:9
71:20 80:3,9,14
81:3,5,7 85:22

**gang-related**
30:21

**gangs** 12:4,9,22
15:2 36:5 39:19,21
41:18 51:8 80:20
85:21 86:1

**Gangster** 15:5,9,
15,16 19:20

**gather** 51:7

**Gatson** 74:5

**gave** 9:18 64:23
81:21

**GCS** 59:11

**general** 6:4 28:1
31:14

**generally** 15:23
16:1 17:7,11 31:23
61:21 76:14 79:23
80:1 81:14 83:15

**geographic**
12:10

**give** 4:4 6:13,18
33:24 42:9 53:9
80:21 85:1

**Glynn** 48:20,23

**Goins** 74:11

**good** 4:17 5:6
40:13 73:5 82:22
90:10

**graduated** 11:15
12:18

**granted** 78:15

**ground** 6:5

**group** 65:17

**Grove** 24:18
43:13

**guarding** 38:15

**guess** 82:1

**guy** 45:8 65:3

**guys** 16:15 54:13

---

**H**

**hair** 49:15

**haircut** 49:16

**Half** 8:16

**handed** 63:13

**handled** 30:21

**handling** 31:20

**hands** 5:6

**happened** 87:18

**happening**
81:13

**hazy** 22:9 41:24

**head** 6:19

**headquarters**
46:18 50:11 55:8

**hear** 70:14 82:20

**heard** 48:21 78:5,
6 79:18 82:17,19

**helpful** 70:7

**Henderson**
28:18

**hierarchies**
16:6

**hierarchy** 16:5
19:15 81:1,2

**Higgins** 42:14
61:6

**history** 11:18
51:20

**hit** 5:23

**holding** 38:15

**Holmes** 4:19

**home** 53:19 54:24
72:13

**homicide** 30:21
69:5 86:21

**homicides**
68:19 69:9

**hoped-for** 83:23

**hospital** 25:14,
16,21 33:7,10 34:10
35:15 36:24 37:10
38:9 46:14 47:14,20
51:1,4,22 61:15,20
62:2 73:17,23 79:5,
6

**hour** 8:16

**hours** 77:21 78:1

**hundred** 34:8
61:12

**hypothetical**
32:18 45:23 51:9
70:12

---

**I**

**identification**
7:19 23:3 26:21
27:3 42:4 44:3
47:24 50:19 56:11
58:20 63:4

**identified** 58:9

**identify** 40:20

**identity** 22:3

**image** 48:9

**include** 76:15

**included** 16:23
32:10,13

**including** 72:23
84:2

**incomplete**
70:11

**individual** 5:23
16:3 25:18 86:23

**individual's**
8:24

**individuals** 20:7
52:15 56:21

**info** 22:2

**informant** 72:20,
24

**information**
22:2 42:18,24 50:23
52:2,17 53:4,18
70:7 72:16 76:10,16
81:21

**informed** 9:10
43:7 54:13

**informing** 34:22

**Ingalls** 57:10

**Ingles** 55:20
60:17

**Innocence**
78:16,19

**inside** 40:10

**insomuch** 30:11

**instigate** 87:3

**intel** 45:16,17

**intelligence**
45:19,22 51:7

**intentionally**
76:9

**interaction**
36:10 55:12,15,19
80:24

**interactions**
36:7 47:12

**interest** 53:17

**interested** 53:12
82:9

**interfere** 5:9

**interfered** 83:5

**interview** 46:17
62:1 87:19

**interviewed**
73:10,14

**investigate**
60:12

**investigating**
59:10 60:8 61:3

**investigation**
31:20 47:6,10 50:1
52:4 61:10 62:5,14,
23 64:9 66:16 68:3,
7 70:6 72:17 75:7,
12 78:23 81:23
82:5,10 83:6,12
86:24 87:3,21

**investigations**
47:2 86:15 87:10,14

**investigative**
13:9,24 15:20 31:15
75:4

**investigator**
51:7

**investigators**
50:23

**involved** 22:12,
17 49:6 52:15 60:21

TALMAY ANDERSON, JR.

February 21, 2018
Index: involvement..moving

65:19 66:12 68:20,
23 71:4 75:12 80:19
83:12

**involvement**
42:19 44:14,22
49:24 56:18 67:4
85:13

**involving** 20:7

**irritated** 39:1

---

**J**

**J&j** 24:18 25:2,4,6,
14 26:1,2,5,14
27:13,17 30:1,3
32:21 33:1 37:5
40:11 66:11,13
67:13 70:3 73:11

**Jackson** 28:17
45:2

**James** 10:1 18:1
24:2 29:7 30:1
31:17 50:10 53:11,
16 60:1,3 66:10,13,
15,21,24 67:12,17,
21 79:4 88:23
89:14,20

**January** 16:18
17:24 19:17,23 20:1
22:21 23:18 27:17
30:2 32:22 35:17
36:8 40:2,19 46:5,
10,23 51:1 52:23
67:14,23 71:4 72:1
73:11,16 74:14
75:13 78:12,17
79:3,16 81:12 85:13

**job** 18:4

**Joe** 58:16

**Join** 70:12

**joint** 51:16

**JR** 4:12

**Junior** 4:9

---

**K**

**Karl** 47:5 62:9,18

**keeping** 78:7

**Kennedy** 51:22

**Kentucky** 5:2

**key** 40:6

**Kill** 62:4

**killed** 69:6,21
86:22

**kind** 13:7 17:18

**knew** 51:4,5 62:20
78:18

**knowing** 43:23
49:21,23 70:24
74:15 77:8 80:7
82:7

**knowledge** 26:9
30:14 31:7 43:2,22
50:3,14 51:2 52:22
53:1,14,21 55:5,6,
14,18 57:5,9,14,19,
23 58:3,7 66:5
67:12,16 68:1,11,15
70:4 72:5,18 73:1
74:6,12,24 76:18
80:20 88:22 89:3,7,
13,14,17,20,22

**Kroger** 10:11,13,
23 11:1

---

**L**

**labor** 31:18

**late** 10:24 12:16

**law** 4:19 72:22

**Lawn** 11:24

**lawsuit** 83:20

**lead** 34:18,21

**leading** 44:12,18

**learn** 16:2 20:6
22:3,11,16 24:19

25:20 43:18

**learned** 24:23
36:20 37:24 50:24
64:16 65:11 71:6,7
76:12

**learning** 64:19

**led** 34:14

**Ledell** 9:4 20:1,8
22:13,18 41:22 50:2
59:6

**left** 10:21 11:23
12:3 24:13 25:14
36:17 45:14 52:18
82:16

**legwork** 86:20

**lengthy** 14:8

**license** 77:16

**lieu** 77:21

**lieutenant** 81:9

**lieutenants**
86:8

**light** 49:20,22

**lightening** 4:6

**line-up** 54:5

**lines** 18:6

**lineup** 50:13
54:10,21 55:1,5
56:18 57:7,11,15,
20,21 58:1,5,10,12
67:18 89:6,8,9,16

**lineups** 54:14,19

**link** 65:13

**list** 32:7,10,13

**listed** 60:7 62:8

**lists** 59:10 61:2

**litigation** 83:24

**located** 12:7
27:14 37:7,8 43:13

**location** 20:14,
16,19,22 21:5 27:9,
12 38:8 43:15 60:18
80:19

**long** 8:14 23:20
24:11 35:10,12
51:20

**longer** 11:5 82:2

**looked** 66:2

**loss** 10:14 11:1,7

**lost** 77:22

**lot** 6:10 15:16
41:24 80:18,21

**Louisville** 11:3

**lower** 45:14

**Lynier** 42:20 53:5
64:17 65:3,12

---

**M**

**made** 8:23 45:15
46:5 70:23 80:16

**make** 55:23 61:12
71:21 74:13,21 82:9
83:2

**making** 74:18

**man** 20:14 55:19
79:24

**March** 10:20
11:17,21

**mark** 50:16 63:1

**marked** 7:18,21
17:15 23:2,5 26:20,
23 27:2,6,23 28:22
32:6 42:3,6 44:2,5
47:23 50:18 56:10,
13 58:19,22 63:3

**materials** 8:19,
21

**Maurice** 36:2

**Mccullough**
40:24 41:2,21 51:16
52:10 53:3 64:22

**means** 86:19
87:23

**meant** 43:23

**medical** 5:8

**medications**
5:8

**meet** 8:10,14

**member** 41:15
82:13

**members** 16:3
35:21 55:24 76:19
77:2

**memo** 31:10

**mentioned** 33:6
86:20

**messing** 81:24

**mid** 18:17

**midway** 59:9
64:8

**Mike** 45:8,9

**mind** 85:14

**Minerva** 20:19,22
21:2 23:21 24:21
34:24 79:20

**minutes** 8:16
73:3

**Miranda** 14:10

**misconduct**
76:20,22 77:3,6

**missing** 84:18,23

**misstated** 76:9

**mistake** 61:12

**Mitch** 40:24 41:2,
21 51:15 52:10 53:3
64:22

**moment** 7:15
23:9 25:24 42:9
63:9 73:5

**money** 46:11

**month** 85:6

**morning** 4:17
85:9

**mouth** 74:21

**moving** 40:18
72:13

TALMAY ANDERSON, JR.

February 21, 2018
Index: multi-page..police

**multi-page** 32:4

**Musumeci** 4:1, 4,10,16,18 7:14,20 15:12 23:4 26:22 27:4 30:15 31:9 32:20 37:19 40:13, 17 42:5 44:4,19 46:4 47:19 48:1 50:15,20 51:12 52:6 54:2 56:12 58:21 63:1,5,12,19 64:1 69:1 70:13,17,21 73:4,8 76:23 77:9 84:9,11 85:16 87:4, 11 89:1 90:3

**N**

**named** 26:7 28:17 36:2 48:19 49:1 53:5 65:3

**names** 20:11 42:12,13

**narcotics** 71:4, 14

**narrative** 28:23, 24 29:4 42:17 43:4, 5 54:4 60:14

**natural** 73:2

**navigated** 18:5

**neighborhood** 53:19

**night** 26:5,14 36:7 70:3 74:2,14,18 80:24 81:15

**nod** 6:19

**normal** 21:24

**notebook** 31:10

**notes** 24:8 26:4 30:8,19,22,24 31:4, 11,19 34:11 35:8 61:19,22 73:24 87:9,13,18,20 88:2

**notifications** 45:15

**number** 29:8,10, 12,13,15 41:19 56:24 59:18 88:11

**numbers** 29:7, 15 59:20,22

**O**

**oath** 4:4 8:4

**object** 15:10 30:10 31:6 32:18 37:17 44:17 45:23 47:15 51:9 70:9 76:21 77:5

**Objection** 52:5 68:22 70:8,11 87:4, 11 89:1

**objective** 21:22

**observe** 32:24 57:7

**observed** 21:16 71:10 78:21

**obtain** 72:16

**occasionally** 85:1

**occasions** 83:4

**occurred** 52:23 69:24

**OCD** 45:16

**Octavia** 28:17

**October** 11:21, 22,23

**offender** 64:16, 19 65:11

**Offense** 28:2

**offhand** 88:11

**officer** 5:21 12:22 21:24 36:1,3,7 38:15 41:5,6 58:4, 16 60:8 69:10 71:24 80:24 82:12,22 84:24 87:1,2,18,24 88:3

**officers** 16:12 21:10 28:11 42:12, 18 43:3,7 44:12 45:1,3,6 59:11 61:2, 3 68:3 75:3,11 76:18 77:2 81:4,5 83:12 85:21,23,24 86:3,6,7,10,11,15 87:9,13

**Oliver** 10:1 18:1,3 20:17 24:2 29:7 30:1 31:17 34:6,17 38:23 40:20 50:11, 22 53:11,16 54:16, 20,23 59:23 60:1,3 64:10 65:10 67:13, 17,21 78:10 79:4,20 81:17 82:9 83:19,22 88:23 89:15,20

**Oliver's** 53:19

**omit** 76:16

**omitted** 76:10

**one-page** 44:6 48:3 58:23

**opinion** 83:1,23

**opposed** 6:19 81:19

**outcome** 83:23

**oversee** 86:6

**owned** 43:15

**P**

**P-E-N-A** 49:2

**p.m.** 90:15

**pain** 35:5

**PALLES** 85:19 87:8,12 88:4

**paper** 31:1 56:4 60:10

**papers** 56:6

**paperwork** 14:17,22 22:8 31:23 46:2 78:11

**paragraph** 64:9 65:14 66:9,20

**participants** 57:15,20

**participate** 5:12 46:17 55:5

**participated** 54:9

**participation** 60:19

**partner** 9:21 10:1 17:7 18:1 20:15 32:2 34:6 36:15 37:15,24 38:21 54:13 59:24 62:16 73:20 81:18 82:4 86:22

**partners** 41:7 51:23

**patient** 57:2

**patrol** 12:1,22,24 85:21,23,24 86:3,5, 6,7,10,11,15 87:1,2, 9,13,17,23 88:3

**pattern** 18:10

**pay** 78:1

**Pena** 49:2

**penalized** 77:18

**penalty** 77:20

**pending** 7:6

**people** 22:12,17, 23 28:19 69:5,17,20 80:19 84:7

**percent** 34:8 61:12

**period** 11:5 18:19 19:1 35:12 51:24

**person** 22:4 25:20 26:7 29:2 48:9 49:14 64:17 65:12 73:21 74:4,7, 10 75:1 81:8 83:14 86:7

**person's** 14:11

**personal** 26:10 30:17 40:3 57:5,9, 14,19,23 58:3,7 66:5

**personally** 16:10 30:21 48:22 55:17

**personnel** 25:7 32:7

**pertaining** 85:12

**Pesavento** 47:5 57:11 62:10,18

**phone** 53:2

**photo** 66:11

**photograph** 56:22 66:12

**photographs** 27:8,10,15,21 33:3 56:16 65:17,19,23 66:2,3,7

**physical** 67:21

**place** 53:20 54:10

**places** 87:23

**placing** 67:4

**plain** 17:3,4 38:5, 14

**plaintiff** 4:21 5:24 49:11 55:13 78:14

**plans** 79:5

**plate** 77:16

**play** 80:19

**point** 12:23 14:2 17:21 18:14 22:10, 11,16 24:19 40:13, 19 46:9 50:12 52:9 54:13 66:16 70:22 73:3 80:2

**police** 5:21 9:7 10:16,19,21 11:16, 18 15:1 17:23 21:9, 24 23:7 25:7 28:2 34:15 41:5,15,17 58:16 59:18 68:21 69:10 71:24 75:9,14

76:19 77:3,12 78:8
79:7,24 82:13,16
84:24

**policeman**
86:22

**policemen** 83:3

**policies** 75:9,15

**policy** 30:11 77:4

**Pontiac** 17:22

**position** 58:1

**positions** 57:21

**possibility**
72:13

**possibly** 22:2
29:12

**potential** 51:8

**powder** 38:19,20
82:9

**practice** 30:7,17
78:7

**prepare** 8:6,9
48:14 49:7 83:9

**prepared** 48:17

**preparing** 23:13

**presence** 60:16

**present** 8:17
54:10 60:21 61:15
66:24 89:8,15

**preserved** 68:16

**Pretty** 76:6

**prevented** 57:10

**prevention**
10:14 11:1,8

**previously**
10:15

**primarily** 13:7
14:6,7

**primary** 33:19

**prior** 6:3 22:21
32:19 80:4,5,7
84:19

**problem** 14:24

**procedure** 6:5
50:13

**procedures**
13:24 75:9,15

**proceedings**
90:14

**produced** 28:9
62:8

**promise** 79:2

**promoted** 12:13,
20,23

**prompted** 79:21

**proof** 71:17

**property** 75:22
76:1,4

**protection** 72:6

**provide** 45:21
70:7 72:6

**provided** 42:23

**published** 90:7

**purportedly**
58:9

**purpose** 25:15

**put** 27:19 30:5
43:9 46:16 74:20

**Q**

**quality** 27:8

**question** 6:15,
22,24 7:6,8 27:20
30:16 32:19 44:21
51:13 70:15 89:19

**questioned**
14:12

**questioning**
34:18 60:22

**questions** 4:23
5:10 6:9,13 7:11
9:14,15 33:19 43:10
57:1,4 85:8 88:5,14,
16 89:5,23 90:1

**quick** 40:14

**R**

**radio** 20:13 79:7,
18

**ranks** 11:20

**reach** 73:2

**read** 42:9 70:17,19

**reads** 64:15

**reason** 7:4 30:24
32:1 39:5 45:21

**recall** 8:23 12:15
14:7,20,21 16:24
17:5,18 18:13,19,22
19:1,19,21,22 20:4,
12 21:8,11,14,15,16
22:5,9 23:20,23
24:2,11,16,23 25:3,
8 26:1,15,16 28:5
29:10,13 30:3 33:6,
14,17,20,21 34:3,
17,22 35:1,13,16,
19,20,23 36:6,11,20
37:4,6,7,12,20 38:8,
20 39:11 40:1 41:20
42:1 47:11 49:9
50:6,10 51:2 52:9,
15 53:2,6,7,9,11,16
54:23 55:2,7,11,12
56:1,20 60:6,24
61:18,21,22 64:24
66:15 67:2,6,10,15,
19,24 68:13,14
69:3,11,23 70:1
72:3 73:20,21
75:21,24 76:3,8
77:14 78:13 79:9,13
81:11 84:17 85:10

**receive** 13:17,21,
23

**receiving** 14:3

**recognize** 7:24
27:9 48:4,6,9 56:21
59:1

**recollection**
14:6 20:20 24:15
25:10,13 27:16

29:24 33:2 39:16
42:23 47:18 54:9
55:22 56:3,8,17
65:4,8,21 66:17
69:8 73:14,18
74:17,21 88:18

**recommend**
90:11

**record** 7:15,16
31:13 54:1 62:1
70:18 84:9,10

**recording** 70:6

**records** 6:9
84:20

**recover** 40:6,8,
10

**recovered** 39:9,
14 46:6 68:6,10,12
71:10

**recovering**
44:14,22 82:8

**recruit** 72:19

**reference** 14:18
29:19,20 45:14,17
59:14,24 64:12,13

**referenced** 43:4

**references**
28:14 29:6 43:11,17
59:23

**referring** 37:2
85:2

**refers** 29:1 42:17
66:9,20

**refresh** 25:9
27:16 29:24 42:22
54:8 56:2,17

**region** 12:10

**regular** 16:16
17:21 85:23

**regularly** 39:18

**related** 9:3 13:18
23:17 24:21 37:10
59:4 80:3,10,14

**relating** 8:22

**relative** 73:22

**remained** 12:18

**remember** 14:3
21:9 33:16 34:4,14
35:2,10 76:5 77:13
79:10 80:16 88:10

**removed** 36:16
37:15,24 38:4

**rephrase** 30:16
34:16 37:20 44:20
51:13 76:24

**report** 13:11
18:11,14 23:7,16
28:2,9,13 31:3 32:2,
4,5,6 42:17 43:11
44:11 45:1,22 54:4,
5 59:4 60:14 62:9
63:7,8,15,17,20,21
76:10,13,15,20 77:3
85:21,22 86:3,12

**reported** 39:21

**reporter** 6:7,17

**reporting** 43:11
64:15 65:10,16
75:20,23

**reports** 30:8

**represent** 4:21

**representation**
90:9

**required** 45:15

**reside** 5:1

**respect** 13:24
30:8,19 79:15

**respond** 21:18
69:9 79:21 80:1

**responded**
20:16 21:21 23:17
29:19 69:14,16

**response** 66:6

**responsible**
22:4

**restaurant** 25:2
26:17 53:18 73:11

TALMAY ANDERSON, JR.

February 21, 2018
Index: result..suspect

**result** 15:1 69:17

**resulted** 75:4

**retired** 10:5,24 12:4,19 18:24

**retiring** 84:19

**retrieved** 81:18

**review** 8:12,19,21 23:13 61:24 63:9 84:19 90:6

**rights** 14:4,9,11 60:16 78:21

**Riley** 4:19

**ring** 58:17

**Robbins** 45:2,8,9

**Robert** 29:1

**role** 5:19 39:19 61:4,9 62:4,13,22 64:18

**roles** 18:3

**room** 6:9 58:12 84:7

**rooms** 58:13

**Rowan** 42:14 61:6

**rules** 6:5

**rumors** 82:17

**run** 22:15 87:21

**S**

**safe** 40:6

**safely** 69:22

**Safer** 4:19

**Sandra** 4:18

**sat** 37:16

**Saturday** 55:8

**scene** 20:12 22:6 23:21 24:3,6,9,14 36:15 37:14,18 38:6,7 73:19 75:20 80:4,8,13 87:2,19

**section** 60:14

**sections** 13:2

**sense** 80:9

**sentence** 60:15 64:15 65:9

**separate** 52:22, 24

**sergeant** 18:15 45:10,12 47:9 81:9, 11

**sergeants** 13:13 86:9

**service** 43:12,14

**set** 18:10

**setting** 88:19

**Seventy-four** 5:4

**shake** 6:20

**share** 52:2

**shared** 52:18

**shaven** 49:18

**sheet** 50:7

**shift** 17:5 19:8 20:4 31:14 81:16

**shooter** 58:9

**shooting** 9:3 20:7,24 21:13,21,23 22:1,4,6 23:17,21 24:20,21 25:19 35:21 36:8 40:4,21 42:21 46:22 47:6 50:1 52:23 53:4 59:6 60:5,9,12 73:15 74:2,14,22 75:8 78:11,22 79:19,20,22 80:11 87:2

**shootings** 21:18 22:7,12,17 35:18 37:10 41:21 43:1 46:9 48:14 67:22 69:14,16,17,20,24 70:3 75:13 78:17 80:3 85:13

**short** 40:16 49:15, 16 73:7 85:20

**shot** 20:2,11,13,14 25:17,21 33:20 34:1,23 60:18 69:5 73:22 79:24 86:22

**shots** 79:23

**shoulder** 6:20

**show** 7:21 23:5 27:23 42:6 44:5 50:15,21 53:22 56:13 58:22

**showed** 60:10 65:17,22

**showing** 7:14 48:2 65:19 66:12

**shown** 66:11 88:12

**SHPIGEL** 15:10 30:10 31:6 32:18 37:17 40:15 44:17 45:23 47:15 51:9 63:15 70:9 73:2,6 76:21 77:5 89:2 90:1,11,13

**shrug** 6:20

**side** 12:12,14,15, 17 13:3,5,10,17 15:24 16:20 34:15

**sight** 38:5,15

**signed** 45:11

**Silas** 45:2,7

**sit** 36:12 37:23 39:7 64:24 88:18,22 89:7,20

**sitting** 57:15 81:19

**Siwek** 62:9,12

**sketch** 48:6,10, 13,14,17 49:7,8,13, 15 88:12,20,24

**skinned** 49:20

**slept** 10:24

**social** 51:20

**sociology** 11:12

**sort** 65:5

**South** 12:12,17 16:20

**speak** 8:11 9:6, 13,15,20 33:7,12,22 35:14 54:20 55:24 67:17 72:15

**speaking** 30:3 31:19 35:4,10 53:12,17 66:15

**special** 13:17,21

**specialist** 12:14, 21 13:2,5,8,20 14:15 15:20,24 16:1,9,19 19:3,9 21:20,23 30:6,12,19 51:6 64:12 65:10 71:20 81:7

**specialists** 13:10 29:8 39:24 64:10 81:3,6

**specialized** 29:15 86:1

**specifically** 14:4 65:22

**speculating** 65:5,6

**speculative** 32:19 70:10,12

**spoke** 8:13 9:9 23:23 26:1 30:1 34:5 47:13 61:15,19 67:1 73:15

**spoken** 83:11

**stamp** 27:7 48:3 63:18 66:19

**stamped** 23:8 28:1 42:7 44:7 53:23 56:15 58:24 63:8,21

**stamps** 63:10

**standard** 31:3

**standing** 57:16

**stands** 86:17

**star** 59:18,20,21

**start** 4:24 7:14 53:15 59:17 80:5

**started** 7:12 13:16 19:1

**state** 4:2 5:1 11:15 63:10

**stated** 83:14

**statement** 60:23 64:21

**states** 65:15

**steady** 17:5,19,24

**sticker** 77:17

**strategies** 15:22

**street** 12:8 20:14 78:3,7

**strictly** 54:14 89:18

**strike** 4:6

**subject** 25:17 60:17

**submit** 76:13

**submitted** 76:15

**subpoena** 7:22

**subsequent** 47:12

**suing** 5:23

**Sumter** 28:10

**supervisor** 18:12 60:12 82:23

**supplementary** 23:7 32:4 54:4 63:7, 20

**supposed** 39:7 81:5

**surrounding** 11:3

**suspect** 40:20 48:14,16 49:8

TALMAY ANDERSON, JR.

February 21, 2018
Index: suspects..work

**suspects** 43:1
51:8

**sustained** 77:11
84:17,22

**swear** 4:1,3,10

**switched** 57:21

**sworn** 4:11,14

---

**T**

**T-A-L-M-A-Y**
4:8

**tabs** 16:2,4 19:14

**tactical** 13:3,5,7,
10,17 39:23 45:7
81:3,4

**tactics** 15:22

**taint** 82:2

**taking** 5:7 30:8,19
53:20 61:19 88:2

**talk** 9:22,24 25:17
33:18 46:10,14 80:8
83:15

**talked** 47:17
52:14,16 53:7 83:15
84:15

**talking** 6:11
14:23 73:18,21

**Talmay** 4:8,12
7:24

**TAPLING** 52:5
63:10,13,17,23
68:22 70:8,11 88:7
89:4,23 90:5

**task** 21:22 41:8,9,
11,13,18 51:17
52:3,13

**taught** 76:12

**telling** 55:10

**templates** 31:3

**Temple** 28:9

**ten** 69:20

**Tenesha** 74:5

**term** 12:24 76:21
77:5 78:3,6

**terminated**
82:18,19,20

**terminology**
81:2

**terms** 11:19 13:4
14:8,10,11 17:6
18:4 81:22

**territory** 80:21

**testified** 4:14
61:5 69:13

**testify** 7:23 68:5

**testifying** 8:4

**testimony** 9:18
67:3,8 85:1 88:17

**thing** 11:7 54:18

**things** 14:9 79:1
80:18,21

**thinking** 85:7

**time** 7:3 10:10
13:1 14:22 15:14,19
16:13,22 17:2,6,10,
22 18:11,13,19,22
19:1 21:16 22:7
26:12 29:13 33:17
35:13 36:5 38:21
41:7 47:17 50:7
51:24 59:22 64:23
65:2 69:10,12 75:7
78:1 84:18 87:17
89:24

**today** 5:5 8:4,7
18:7,9 23:14 84:3
88:17,19,22 89:7,
20,24

**Todd** 28:18

**told** 33:20 36:13,
22 54:17 71:9 78:21
83:21

**tomorrow** 18:8

**top** 27:11 28:13

**touched** 14:10

**traffic** 5:15 85:3,
4,5

**training** 13:18,
21,23 14:3,5

**transaction**
37:11

**transactions**
46:12

**transcript** 90:6

**transferred**
12:17

**transmitted**
36:11 37:22

**transpired**
38:13 65:2

**trust** 90:8

**truth** 4:5 24:17
82:19

**turn** 28:21 32:5
64:7 66:18

**turning** 80:23

**TV** 78:5

**two-page** 53:23
56:14

**type** 10:12 15:21
26:12

**types** 9:13 90:8

---

**U**

**Um-hum** 32:9
64:4

**unclear** 15:11

**undercover**
16:9,12,14,17

**understand**
6:22 8:3 84:12

**understood** 7:1

**uniform** 17:2

**unit** 13:1,16 14:15,
16,18 15:17 16:13
29:22 31:5 39:19,21

40:21 45:8,10,12,17
46:3 52:1 54:14
85:22,23 86:1

**units** 29:15

**unmarked**
17:15,17,23

**unrelated** 74:22

**upset** 81:17,20

---

**V**

**V/c** 54:5

**vacation** 77:22

**vague** 68:22
76:22

**vaguely** 27:11
58:14

**vagueness**
15:10

**Valerie** 4:20

**vary** 17:6

**vehicle** 17:13,14,
23 24:4 36:12,14,16
40:8 77:17

**verbal** 6:18

**verified** 20:23
21:1

**vicinity** 37:5

**victim** 33:8

**victims** 21:13
35:22 40:3

**view** 55:1 89:9,15

**viewed** 57:16

**viewing** 57:10

**violation** 75:8

**violations** 75:14
77:4 78:20

**visit** 26:4 35:20

**Vondell** 74:11

---

**W**

**waive** 90:11,13

**walk** 89:11,21

**wanted** 34:11
84:12

**warnings** 14:11

**week** 9:22,23
83:16

**West** 12:8,14,15

**white** 38:19,20
82:9

**wide** 87:22

**Wilindez** 45:11

**Williams** 26:8
28:17 42:20 43:15,
19 46:18,22 47:1
66:10,13,15 74:8

**Williams'** 43:12

**Willis** 36:2,3,4,5,
7,12,15 37:14,23
38:15,24 39:1,9,13,
18,23 80:24 81:18
82:4,8,12,22 83:1,4

**Willis'** 38:20

**Winn-dixie** 11:7

**withdraw** 13:15
15:18

**withdrawn**
37:21 45:20 61:4
75:18

**witnesses** 28:17
73:10 87:19

**words** 36:17
38:23 39:3 74:20
78:1 81:4

**work** 6:6 10:10,12,
15,22,23 13:5,18
15:1,16,20,21 16:10
17:13 18:20 19:6,13
31:15 40:2,21 47:1
52:20 75:4 86:21

TALMAY ANDERSON, JR.

February 21, 2018
Index: worked..yesterday

**worked** 11:6
12:1,4,9,12,15 17:7
18:24 19:11 39:19
45:18 51:21,22,23
52:2,11 53:8 74:24

**working** 16:8,19,
22 17:2 18:21 19:2,
23 20:3,4 30:18
50:4 52:4,10

**works** 66:10

**writing** 32:2

**written** 61:24

**wrong** 63:19 75:1

**wrongful** 75:4

_____

Y
_____

**year** 11:5,7 12:16
59:21

**years** 5:16 10:8,
18 12:23 41:19
76:14

**yesterday** 8:13