1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3  EDDIE L. BOLDEN,                )
                                   )
4                    Plaintiff,    )
                                   )  Case No. 17 CV 417
5  -vs-                            )
                                   )  Chicago, Illinois
6  ANGELO PESAVENTO, *et al.*,     )  September 22, 2021
                                   )  2:22 p.m.
7                    Defendants.   )

8

9        TRANSCRIPT OF PROCEEDINGS - Pretrial Conference
          BEFORE THE HONORABLE STEVEN C. SEEGER

10

   APPEARANCES:
11

   For the Plaintiff:      RILEY SAFER HOLMES & CANCILA, LLP
12                          BY:  MR. RONALD S. SAFER
                                 MR. ELI J. LITOFF
13                               MS. SANDRA L. MUSUMECI
                                 MR. MATTHEW C. CROWL
14                               MS. VALERIE BRUMMEL
                            70 West Madison Street
15                          Suite 2900
                            Chicago, IL  60602
16
   For the Defendant       GREENBERG TRAURIG, LLP
17  City of Chicago:        BY:  MS. TIFFANY S. FORDYCE
                                 MR. KYLE L. FLYNN
18                          77 West Wacker Drive
                            Suite 3100
19                          Chicago, IL  60601

20

21

22  Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 2318A
24                          Chicago, IL  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov

1    APPEARANCES (CONT'D):

2    For the Individual      HALE & MONICO, LLC
     Officer Defendants:     BY:  MR. ANDREW M. HALE
3                                 MS. BARRETT E. BOUDREAUX
                                  MR. WILLIAM E. BAZAREK
4                                 MR. BRIAN J. STEFANICH
                                  MS. AMY A. HIJJAWI
5                            53 West Jackson Boulevard
                             Suite 330
6                            Chicago, IL  60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings heard in open court:)
 2              THE COURT:  Good afternoon, folks.
 3              MULTIPLE SPEAKERS:  Good afternoon.
 4              THE COURT:  Sorry to keep you waiting.  We're just
 5    still getting to know each other.  I'll tell you, I don't like
 6    keeping people waiting.  I never have.  So I'm sorry to have
 7    to do that.
 8              So I know some of you.  I don't know all of you.  Why
 9    don't we go around and introduce ourselves.
10              For those of you who don't know me, I'm Steve Seeger,
11    a relatively new district court judge.  I know a couple of you
12    but not very many.
13              So why don't we go around the room, maybe stand up,
14    introduce yourself.  We'll start with the plaintiff.
15              MR. SAFER:  Good afternoon, Your Honor.
16              I'm Ron Safer.
17              THE COURT:  Yep.  Good afternoon, Mr. Safer.
18              MR. LITOFF:  Good afternoon.
19              Eli Litoff, Your Honor.
20              MS. MUSUMECI:  Good afternoon, Your Honor.
21              Sandra Musumeci.
22              MS. BRUMMEL:  Good morning [sic], Your Honor.
23              Valerie Brummel.
24              MR. CROWL:  Judge, I'm Matthew Crowl.
25              THE COURT:  Tell me your last name one more time.
```

4

1          MR. CROWL:  Crowl, C-r-o-w-l.

2          THE COURT:  Got it.

3          MS. BOUDREAUX:  Good morning, Judge.

4          Barrett Boudreaux.

5          MR. HALE:  Good afternoon, Your Honor.

6          Andy Hale.

7          THE COURT:  Good afternoon.

8          MR. STEFANICH:  Brian Stefanich.

9          MR. BAZAREK:  Good afternoon, Judge.

10         William Bazarek.

11         MS. HIJJAWI:  Good afternoon, Your Honor.

12         Amy Hijjawi.

13         Congratulations.

14         THE COURT:  Thank you.

15         MS. FORDYCE:  Good afternoon, Your Honor.

16         Tiffany Fordyce on behalf of the City of Chicago.

17         MR. FLYNN:  And also Kyle Flynn on behalf of the City

18   of Chicago.

19         THE COURT:  All right.  Well, good afternoon,

20   everyone.

21         We are here for a pretrial conference.  Let me say

22   one thing at the outset that I've said to you before, and I

23   don't know that I need to cover it again, but I feel like

24   saying it again.

25         I regret that your case was moved, your trial.  You

1  know, this case was -- sorry, folks.

2        This case was scheduled for trial in November of

3  2019, as some or probably all of you are painfully aware.  I

4  know what it's like to get ready for trial and how much lead

5  time it is and how hard it is on the witnesses -- can you guys

6  hear me okay?  I'm getting some feedback.

7        I know how hard it is to work to prepare for trial.

8  I know how much comfort you get from having a judge that stays

9  the same.  There's a lot of predictability and consistency

10  that happens when you have the same judge.

11        I don't know if there's anything we can do about the

12  feedback here.  Is there anything we can do?

13        We're working on it.

14        There's a lot of institutional benefits from having

15  the same judge.  It is terribly disruptive when you get a new

16  judge in the case.  It's a necessary part of getting new

17  bodies into the building to help ease out the load.

18        That being said, I -- I deeply regret the fact that

19  you folks were reassigned right before a trial.  I don't want

20  to say too much.  My personal view, little ole me, is that

21  shouldn't happen.  I think that was not fair to you folks.  It

22  was not fair to the parties.  Again, I don't want to say too

23  much.

24        And nothing I've said is directed in any way, shape,

25  or form at Judge Shah, who I think is a very fine judge.  I

1    deeply respect him.  I admire him.  None of this is -- he had

2    nothing to do with any of it.  Okay.  It's a clerk's office

3    mechanism where it's automatic.  So it was out of his hands.

4    He, frankly, couldn't have kept it if he wanted to.  Okay.

5    It's out of our hands.  But I regret the disruption.

6              You know, when I took the bench, I got saddled with

7    342 cases.  I did not have staff for a month.  And the moment

8    I took my oath, put my hand down, I got on the wheel, which

9    means by the time the new -- by the time I had staff, I had

10   370 cases.  Okay.  So that's when I had staff in week five.

11   Okay.  I could not try this case in week five or week six.

12   You just can't do it.  Okay.  I barely even had met my

13   courtroom deputy and my court reporter.  So I had no choice,

14   really, no choice, really, to reschedule trial.

15             You folks wouldn't have wanted me to try that case.

16   I couldn't have done a good job, frankly.  Okay.

17             So I rescheduled it for 2020.  Unbeknownst to me, the

18   pandemic was coming.  I had no idea, obviously.  And then you

19   guys got derailed with the pandemic.

20             And so the bottom line is, you got about a two-year

21   delay.  And I think that's highly unfortunate, and I just

22   wanted to acknowledge that at the outset.  So if any of you

23   are feeling frustration, fatigue, anything like that at the

24   fact that this case is still here, I think you deserved better

25   through no fault of anyone.  So I just wanted to say that at

1    the outset. Okay? At a very human level, I acknowledge,

2    especially in a case like this where the case is already old.

3    And, you know, no case gets better with time. You know,

4    people lose interest, witnesses lose memory, documents get

5    lost.

6         You know, when I was on the plaintiff's side at the

7    SEC, I wanted to try my cases the day before yesterday, like

8    now, let's go. And so it doesn't help anybody to delay the

9    case.

10         So at a very human level, I just wanted to

11   acknowledge that on day one. Here we are. So your day has

12   finally come.

13         Okay. Anything anybody wants to say to that? You

14   don't have an obli- -- any --

15         MR. SAFER: We appreciate that, Your Honor. The

16   system is what it is. It's difficult -- it's a difficult

17   process, but we're glad that we're here now.

18         THE COURT: Okay. Very good.

19         I want to make sure my court reporter can hear

20   everybody. I assume she could. Speak into the mic, if you

21   can. Mr. Safer projected pretty well there, so I appreciate

22   that. Make sure your mic is on when you address the Court.

23         Okay, folks. So we're here now, though, to talk

24   about the trial. I have a lot of logistics to cover with you

25   folks. So I'm going to address the following in no particular

1   order.   Okay?

2        Let's talk about the calendar.  And this is maybe the

3   main thing that we've got to talk about.  We're in COVID land.

4   Okay.  We're in COVID land.  The world has changed in ways

5   large and small.  And the way that it's impacted your trial is

6   not only the calendar, it's also affected the amount of time

7   you get.

8        As you know, I had to submit a request to the

9   committee in terms of when the case would be tried, and it's

10  up to the clerk's office to tell me when exactly it will start

11  and when exactly it will end.  And there's nothing I can do

12  about it.  Okay.

13       I put a minute order out the other day that you folks

14  got, obviously.  I had it out about ten minutes after I got

15  the word.  So you knew it basically when I did.

16       Trial is going to start on Thursday, October 7th.

17  And this is all in the minute order.  So this isn't new, but

18  in case it helps anybody.  Thursday, October 2nd -- excuse

19  me -- Thursday, October 7th.  And what that means is, the jury

20  is going to come in a couple days before.  They're going to

21  fill out the questionnaire.  They're going to get COVID

22  tested.  All that stuff is going to happen.  We're going to

23  roll in and do jury selection on Thursday, the 7th.

24       Trial has to end on Thursday, October 28th.  Now, I

25  had to ask Tom Bruton, the Clerk of the Court, what exactly

1    that means.  That does not mean your evidence is done.  That

2    does not mean the jury gets the case.  That means hasta la

3    vista, we're going home, the doors are locked, we're out of

4    here.  The whole thing is done, the whole enchilada is over by

5    October 28th.  Because the courtroom we're going to be in,

6    which is courtroom 1441, has another trial the very next day

7    with Judge Lefkow.  Okay.

8         So I need you folks to understand and appreciate that

9    this is a real deadline.  It is a cement wall.  It is not

10   going to get crashed through by us.  This is not like the good

11   ole days, you're like, well, we estimate it's going to be

12   three weeks, but, you know, if it goes three or four, four and

13   a half, so be it.  No.  We're going to be done, capital D,

14   done by October 28th.  Book your flights for the morning of

15   the 29th if you want because we're not going to be here.

16   Okay?

17        And we've got to plan accordingly, folks, because

18   October 11th is Columbus Day.  Okay.  So when you look at the

19   calendar, we've got October 7th as a start date.  I want to

20   pick a jury on the 7th.  Maybe we'll do openings on the 7th.

21   I don't know.  Maybe we'll do it on the 8th.  We're going to

22   get rolling.  It's not even 15 trial days if you lose Monday,

23   the 11th.  Okay?  Thanks to Columbus getting lost on his way

24   to India, you get a day off.  So you've got to plan

25   accordingly.

1    What that means is, it is incumbent on all of you to
2    be efficient on your questioning.  Every second you spend,
3    every question you ask is time that cannot be spent on
4    anything else.  If you ask a question, it needs to matter.  If
5    you object, it better matter, it better be important.  Okay?
6    We don't have time to go through stuff that doesn't matter,
7    either by way of objections or evidence because, you know
8    what, when we're done, we're done, and if you didn't cover
9    what you wanted to cover, that's going to be it.  Okay?

10    I am going to have my courtroom deputy mark the time
11    like a forensic accountant.  Every start time, stop time,
12    every sidebar you request, she is going to have exactly with a
13    big, bright, red clock down to the minute summary for me of
14    who does what and when and how much time you're spending.  So
15    if I say at the end of day six, huh, which side is spending
16    more time, I'll know.

17    So if part way through the trial I need to figure
18    out, boy, we're not as far along as we should be, who is going
19    to get most of the rest of the time, I'll say, okay, well, the
20    plaintiff has used, let's say, ten hours and you've used six,
21    so fairness dictates, *et cetera*, or *vice versa*.  I'll know.

22    So you guys have got to think, if you request a
23    sidebar from me, it better be important.  If you go on at
24    length with your witnesses, it better be important.  Because
25    I've just got to be strict with you folks on your usage of

1    time.  It's going to help you.  You know, the jury doesn't

2    want to sit here and get bored.

3           So we're going to be real strict in terms of our

4    allocation of time, in terms of who is -- you know, in terms

5    of our keeping track of who is doing the time.  Okay?

6           I have not thought yet definitively how much time is

7    allocated between the parties.  My inclination would be

8    plaintiff gets more time because they have the burden.  But I

9    don't know.  I'd have to think about that a little more.  I

10   don't know if you guys have talked about that.

11          I don't know if you've got a reasonable estimate,

12   Mr. Safer, about how long you think to take -- do you have an

13   estimate of either in hours or days?

14          MR. SAFER:  We do in both, Your Honor.

15          THE COURT:  Okay.

16          MR. SAFER:  So we think it will take us -- and this

17   includes our direct and cross --

18          THE COURT:  Okay.

19          MR. SAFER:  -- so no matter where it comes --

20          THE COURT:  Yes.

21          MR. SAFER:  -- in the case -- 42 hours.

22          So we figure if there are at least six-hour days,

23   then we will take seven days to put in our case and our

24   defense --

25          THE COURT:  Okay.

 1          MR. SAFER:  -- of their case.

 2          THE COURT:  Okay.  Defense side, have you talked

 3   about this?

 4          And if you have not gotten that level of granularity,

 5   that's okay, but have you thought about it?

 6          And tell me your name again.  I'm sorry.

 7          MS. BOUDREAUX:  Barrett Boudreaux.

 8          THE COURT REPORTER:  I'm sorry, can you speak near a

 9   microphone?

10          MS. BOUDREAUX:  Oh, sure.  Yeah.  I'm sorry.

11          Barrett Boudreaux.

12          We did talk about it.  We sort of reached an impasse

13   in the conversation because we're not sure who they're calling

14   in their case-in-chief, but I guess if we just had to estimate

15   our case-in-chief, without reference to theirs, we would also

16   say seven days.

17          THE COURT:  Okay.  Is that -- when you say "our

18   case-in-chief," is that including crossing their witnesses?

19          Because I understood Mr. Safer to say his exam and

20   his cross.  So you're saying you think it would be seven for

21   your witnesses and the cross of theirs?

22          MS. BOUDREAUX:  Yes.

23          THE COURT:  Okay.  So that's an estimate of magically

24   14 days.  Look at that.  And 14 days, by my math, is -- I

25   guess if we got two Thursdays, that's technically -- so that's

1   nine -- all right.  16 days.  So we've got jury selection.

2   We've got opening and closing.

3          So things in life take longer than you think.  You

4   may not get all that time.  I'm going to push you guys to

5   be -- to be efficient.  It's for your own good.  Okay?

6          Okay.  So that's -- that's the speech I wanted to say

7   on the time.

8          Anything else on the time that we need to cover in

9   terms of any logistics?  And we can always circle back to this

10  as we move along.

11         So let me give you an overview of the pretrial order

12  before we dive into some things.  I want to cover some

13  logistics, too, and then we're going to dive into the pretrial

14  order a little bit later.

15         I've thought about which version of me is going to

16  come out here to talk about the pretrial order.  I'll give you

17  the softer version.  The softer version is, there were a lot

18  of objections in there.  There's a lot to resolve.  I thought

19  to myself, if I take these people, and I march them up to the

20  lockup -- this is maybe the harder version of me now all of a

21  sudden transitioning -- if I march all of you up to the

22  lockup, and we're there for the next two weeks, I'm not sure

23  we can get through all these objections, folks.

24         One of my observations being on this side of the

25  veil, if I can tell you, is, I don't think lawyers have a full

1   appreciation for the limits of judicial resources.  Like, I

2   don't think people think that's actually real.  It is a real

3   thing.

4          You know, I've probably -- since I've gotten this

5   job, I've probably worked between 80 and 90 hours a week or

6   sometimes more since I took the bench.  I've issued like a

7   hundred summary judgment decisions in the last six months.

8   Okay.

9          I -- even if I drop all -- every other case I've got

10  and do nothing but you guys -- and you're going to get some

11  TLC from me, no worries, in the next couple of weeks,

12  certainly -- I don't know that I can rule on this stuff

13  because, at the end of the day, it's just me.  I've got to

14  make a decision on this.  I can only call so many balls and

15  strikes.

16         Maybe if you're in front of Matt Kennelly, he could.

17  I am not Matt Kennelly.  Okay.  I am new at this, and I'm

18  doing the best I can, working as hard as I can, but it's a lot

19  to cut through.

20         So I have to think about myself -- I have to think to

21  myself, how do I manage this?

22         I'll tell you another observation I had is, when I

23  was a lawyer, I tried not to object very much.  I tried to

24  object when it mattered.  So when I was in front of a judge

25  and I spoke up, it meant something.  It's like, you know,

1    Seeger is saying something, he probably cares about it because

2    I don't hear him complaining very often.  It probably matters.

3            I don't know that I thought all of the pretrial order

4    was consistent with that approach.  Now, I get what it's like

5    to be in your shoes, too.  When I was a young lawyer, a senior

6    lawyer said something profound to me that stuck with me.  He

7    said, I fear nothing in the world except waiver.  That's the

8    only thing I'm afraid of.

9            So I know when you guys are putting something like

10   this together, you're like, oh, I don't want to exclude a

11   witness, I don't want to forget an objection, then it's

12   waived, and then I'm out of luck.  So I get it.  I really,

13   really genuinely truly do.  Okay?

14           But I don't know how many of these objections are

15   real.  And let me give you a real concrete example.  The jury

16   instructions, a lot of issues.  I joked with my clerks that,

17   you know, who knew that when we got this case, this case had

18   the most intractable set of legal questions since the adoption

19   of the code of Justinian.  Like, not since the Anglo-Saxons

20   arrived has there been such mysterious legal imponderables as

21   this case apparently presents.  I mean, you folks really could

22   not agree on a lot of things.

23           And I get it.  I used to fight over jury

24   instructions, too.  I really, truly, honestly get it.  I've

25   been in your shoes.  I get it.

1        But I'm on this side of the veil now, and I have to

2    think to myself, how do we work through that?  How do we work

3    through that?

4        One approach, which I don't think I'm going to do,

5    but it occurred to me, you know, maybe we should do a baseball

6    arbitration.  You present your set of jury instructions.  You

7    present yours.  I'll adopt the most reasonable one wholesale.

8    I've never seen a judge do that.  Maybe they have.  But it's

9    an idea.  It encourages people to be reasonable.

10        Another option is -- and this is probably what I'm

11    going to do -- we're just going to stay super late each night

12    in trial because I don't know what else to do.

13        Here's what's not going to happen:  The night before

14    I instruct the jury, people show up at 6:00 o'clock and we try

15    to go through hundreds of pages of objections.  That will not

16    happen.  That's not good for me.  It's not good for you folks.

17    It's not how it's going to roll.  It's too much on us.  It's

18    not good for you people.

19        I think we are probably going to -- every night say

20    everybody gets to stay.  I'm locking the door with a friendly

21    CSO, and we're going to go through a couple jury instructions

22    every day until it's done so that we don't have a mountain

23    facing us at the end.  That's one idea.

24        I could make you guys confer more to see if you can

25    narrow -- I don't know how hard you guys have tried.  Maybe

1    you've tried really hard, and this just is what it is.  I

2    don't know.  I haven't figured that out yet, how hard you have

3    tried.  I have not yet figured out in the jury instructions

4    which side is being unreasonable.  I'll sniff it out.  Don't

5    worry.  I'll figure it out.

6          But I think you folks need to be cognizant that if

7    you're going to object like this -- I'm going to borrow a line

8    from Judge Ashman, who I enjoyed being in front of.  He looked

9    at me once and he said, "I guess everyone is going to have to

10   bleed."  Okay.

11         So I think if you're objecting like this, everyone is

12   going to have to bleed.  Because it's going to hurt to go

13   through all these objections.  I don't know what else to do,

14   because these are the objections you're shooting at each

15   other.  Okay?

16         Another example is the deposition designations.

17   There are lots and lots and lots and lots and lots of

18   designations and objections.  If you want me to go through all

19   those, we can.  You may not sleep.  I don't need a lot of

20   sleep, and I have a lot of chocolate-covered espresso beans.

21   I'll be fine.  You guys may or may not be fine, because we're

22   not going to get a lot of sleep if we're going to have to

23   resolve each of those objections.  Okay?

24         So I think to myself, how do we get through that?

25   You know, one option is, I could do something draconian, like,

1  say, plaintiff, you get to offer two witnesses; defendant, you

2  get to offer two witnesses, and be done.  Or I can say, you

3  can object to -- you can object ten times, and then you're

4  done.  Or I can say, you can -- do what Judge -- I tried a

5  case once in front of Judge Stadtmueller in Milwaukee.  He

6  said, you know, you get to designate 125 lines of testimony,

7  total.  That's it.  125 lines.  Which at the time I thought

8  was crazy.  Now I think it's a little bit brilliant.  I

9  understand the brilliance.  When you're on this side of the

10 veil, sometimes you appreciate certain things differently than

11 when you're a practicing lawyer.

12         Can I tell you, I don't want to do any of those

13 things truthfully.  I really don't.  I want this to be a good

14 experience for you.  I want this to be easy.  I want the truth

15 to come out.  I want the facts to come out.  I want it to be

16 decided on the merits.  I want this to be a pleasant,

17 professional experience for you folks.  I really, truly do.

18         But as a judge trying to wade through this, I'm a

19 little bit at a loss to think, okay, how can I practically do

20 this.  Just -- I'm a human being up here.  How do I cut

21 through all this testimony and all these objections in a way

22 that will be consistent with the fact that I can work 80, 90,

23 a hundred hours a week.  I can't work much more than that, and

24 I don't know if I am humanly capable of cutting through it

25 all.

1        There were a lot of objections to a lot of the

2 exhibits, too.  And some of the witnesses.  Some of that, you

3 know, we've covered in the motions *in limine* that I ruled on

4 and we'll talk about later.

5        That's a long way of saying that you folks have put a

6 lot on my plate, which is fine.  There's a lot of things to

7 cut through, which is fine.  And I understand why you're doing

8 it.  It's a big case.  It's an important case.  It's a

9 valuable case.  It means a lot to both sides.  I'm with you.

10 I get it.

11        But we find ourselves in a situation now where we

12 have to find a practical solution for me to resolve all these

13 things.  And I'm going to have to figure out a way to do that

14 in a way that's consistent with the truth coming out and

15 consistent with an efficient operation of a trial.

16        So I say all of that by way of a preview to let you

17 folks know that when I got your submission, wheels turned in

18 my head about how am I going to be able to cut through all

19 this in a way that gets to the right result, that's consistent

20 with the law, in an efficient manner that's fair to the

21 parties?  And I don't fully know what the answer is to that.

22        Before we dive in, does anybody have any reaction to

23 any of this?

24        And you're welcome to speak up.  You're welcome to

25 not say anything.  There's no pressure.

20

1          Mr. Safer, go ahead.

2          MR. SAFER:  Your Honor, what -- I have just two

3    thoughts about that.

4          THE COURT:  Yeah.

5          MR. SAFER:  One is -- and I appreciate all of that,

6    and I agree with it.

7          The motion *in limine* rulings will -- I know for our

8    objections will do away with a lot of them or resolve them one

9    way or the other.  Obviously, we're going to withdraw the ones

10   where we objected and we lost the motion *in limine*.

11         And so I think we need to go back -- I'm speaking for

12   myself -- and revisit those objections in light of the rulings

13   on the motions *in limine*.

14         With regard to exhibits, I believe the -- although

15   there are lots of objections, the vast majority of them will

16   melt away once there is a ruling on the police reports.  So if

17   the police reports -- one way -- are ruled on one way or the

18   other, I know, again speaking for our objections, that's going

19   to melt away -- I don't know what percentage -- but more than

20   50 percent, a large percentage of them.

21         So our dep designations will decrease because of your

22   rulings.  Some of our exhibit objections will decrease because

23   of your rulings.  And a ruling on police reports as a category

24   will take care of a lot of our objections.

25         THE COURT:  Okay.  I appreciate that, Mr. Safer.

1        Anybody on the defense side?

2        MR. BAZAREK:  Just --

3        THE COURT REPORTER:  Could I have your name again?

4   I'm sorry.

5        MR. BAZAREK:  William Bazarek.

6        I will say one thing, this goes to the --

7        THE COURT REPORTER:  I'm sorry, I'm having trouble

8   hearing you.

9        THE COURT:  Yeah, do you want to go ahead and --

10       MR. BAZAREK:  Oh, I'm sorry.

11       THE COURT:  You know, it won't bother me if you bend

12  over.  Go ahead.

13       MR. BAZAREK:  Judge, and this goes to the limited

14  amount of time we have to try this case.

15       THE COURT:  Yep.

16       MR. BAZAREK:  But I can tell you, in terms of -- a

17  lot of 30(b)(6) witnesses are identified in this case.  And as

18  an example, where you have a director of the records division

19  talking about how they handle subpoenas or other testimony

20  along those lines that really -- I think that it's not

21  relevant to anything.  And without that, I think it would make

22  for a more efficient trial on what really matters in this

23  case.

24       But I -- that's the one thing that really stands out

25  in my mind, is all these 30(b)(6) witnesses, as opposed to,

1   you know, we have our clients and what these different

2   designated witnesses for the City are going to testify.  I

3   think that's part of one of the issues in terms of

4   designations and both the amount of witnesses.

5          THE COURT:  Okay.  I appreciate that.

6          Without drilling down into that -- and we can

7   later -- I mean, we should be calling witnesses that matter.

8   The jury doesn't want to be bored by -- you guys don't want to

9   call custodians either.  You want to call witnesses that move

10  the ball.  Don't you?  I mean, I'm sure you do.  So we can

11  talk about how to move the ball forward.

12         I want you guys to present impactful testimony that

13  the jury wants to hear.  Nobody wants to hear from somebody

14  about subpoenas.  It will be a snooze fest, and you won't help

15  your client.

16         Let me talk about a couple other things before we

17  drill down, folks.  Those are just some overarching comments.

18  I think we ought to meet again before the trial.  You know,

19  the fact that we are starting on the 7th means we have a

20  little bit more runway, right?  We've got Monday, Tuesday,

21  Wednesday.  I think that's a blessing.  I was frankly pleased

22  to see it.

23         I would propose that we meet again on Monday, the

24  4th, in the afternoon if people are free.  And then the jury

25  is going to come in and fill out the questionnaires on the

1    5th.   I'd like you folks to have a chance to come in before

2    the 7th and read them and tell me if you think there's a cause

3    objection or talk about any individual jurors that you think

4    are problematic or talk about follow-up questions.

5            I think that if they come in on the 5th, the jury

6    questionnaires will be available to us on the 5th.   I perhaps

7    need to check with that.

8            I think if you guys came in on the 4th to talk about

9    any cleanup stuff from today and then came in either on the

10   afternoon of the 5th or preferably, probably on maybe the

11   morning of the 6th to talk about the jury questionnaires, I

12   think that might be a good idea.   I'm loathed to do it the

13   afternoon before trial because people should be buying power

14   bars and getting a nap and, you know, talking to your

15   witnesses and all that, practicing your openings.

16           So I've got to check with the clerk's office to see

17   when the questionnaires will be available.   But the point of

18   that would be, come in, look at the questionnaires.   You guys

19   can study them, think about, boy, I like this juror.   I don't

20   like this juror.   I want to make sure to ask this juror this

21   and make some notes so that we can be as efficient as possible

22   when you guys roll in for jury selection.

23           Does that work for everybody?   Do people like that

24   idea, coming in on the 4th?   And then why don't we pencil in

25   Wednesday, the 6th, in the morning.

1          I will tell you, folks, we're still getting to know

2     each other.  I'm receptive to good ideas.  If people have a

3     better idea than what I have, I'm receptive to you.  Okay?

4     But that's the best that little ole me can come up with today.

5          We'll meet again on Wednesday.  Let's do 2:00 o'clock

6     on the 4th.  Does that work for everybody?  And then maybe

7     we'll come in Wednesday morning at 10:00.  Okay?  We'll

8     ballpark that.  Okay?

9          Let's talk about preliminary instructions for a

10    second before we get into the motions *in limine* and the

11    pretrial order itself.

12         I would -- I think we need to help this jury

13    understand the case.  Preliminary instructions will be part of

14    that.

15         I did get your instructions.  It looked to me like

16    they were post-evidence instructions.  Is that -- do I have

17    that right?  Were any of those intended to be pre-opening

18    instructions?

19         I didn't think so.

20         Have you folks thought about that?

21         I don't know if there are some general instructions

22    that you folks want to give as a preliminary matter.  It seems

23    like a good idea to me.  Not a lot.  Don't overwhelm them.

24         And then what I would like to do is this:  I would

25    like to give the jury a short preview of what the claims are

1    going to be and what the elements are going to be so they

2    aren't hearing it for the first time at the end of the trial.

3              I do recall seeing your statement of the case, and I

4    assume we'll read that before, you know, we get rolling with

5    the jury.  So that's useful.

6              But I think it would be helpful to say, This case

7    involves nine claims.  The first claim is such and such.

8              For a claim of intentional infliction of emotional

9    distress, a plaintiff must prove five things.  1, 2, 3, 4, 5.

10   Nice and simple.  Super easy to understand, easy to digest.

11   Not complicated.  Not a lot of law, just here's the claim,

12   here are the elements.  Okay?

13             This is something you folks should absolutely, lock

14   and load, be able to do by agreement.  Just send it to me.  I

15   would like you to send it to me by September 30th in Word.  So

16   nice and easy, folks.  There are nine claims.  The first claim

17   is X.  For a claim of X, a plaintiff has to prove 1, 2, and 3.

18             Everybody with me on that?  I think that will be

19   helpful.

20             Does anybody foresee any problems with an agreement

21   about what the claims are or what the elements are?  It seems

22   pretty easy to me.  Anybody have a problem with that?

23             MS. BOUDREAUX:  I think there might be an issue with

24   one claim, as evidenced by the dispute in the jury

25   instructions --

1          THE COURT:  Yeah.

2          MS. BOUDREAUX:  -- but really only to that claim.

3          THE COURT:  Okay.  Good.  Well, if there's something

4   that I've got to figure out before the trial starts on that,

5   I'll do that.  I think that would be useful to the jury.

6          And let me just say, don't -- don't be overly

7   argumentative.  I thought to myself going into this, if I get

8   overly argumentative proposals from the sides on this, if they

9   can't agree on this, what do I do?  Do I tell them, whoever is

10  unreasonable, you get your opening time cut in half?  I don't

11  want to have to do that.  I don't like that part of judging.

12  I want this to go smoothly.

13         So I would just encourage you folks to be reasonable,

14  act in good faith, don't push the envelope.  Just give me a

15  straightforward, neutral explanation of what the claims are

16  and what the elements are.  Because that's all I want.  Nice

17  and neutral.  Okay?

18         So please send that to me by September 30th.

19         Oh, one other deliverable I want to cover with you

20  folks:  The jury questionnaire, you know, they're going to get

21  a letter from me that says welcome to the courthouse.  It's

22  going to have a sentence or two about the case.  I'm going to

23  need your feedback in help putting that together.  I need to

24  attach a list of names and organizations that may come into

25  play.  So I'll send that to you.  I'm just going to put

1   "insert."  I'd like you to fill that in.

2          And, you know, I've got a rough draft here from

3   another case.  You know, it's basically a list of who the

4   witnesses are so they'll be able to look at it on advance.

5   It's a way of speeding things along for jury selection day.

6          You know, this particular one that I've got had just

7   a couple sentences.  You know, the plaintiff is so-and-so.

8   The defendants are so-and-so.  And it had like two or three

9   sentences.  The case is about such and such.  Just give a

10  little preview.

11         And then I've got a two-page questionnaire that I'm

12  intending to use.  I know you folks submitted one by

13  agreement.  We'll get to that.  I'll send you mine, and I'll

14  look at yours, too, in detail and see if I need to change

15  anything.  I thought yours was relatively short, which was

16  good.  I don't think it's good to overwhelm people.

17         But I'll send that to you.  I'd like you folks to

18  give me that -- any feedback to that by September 30th.  Okay?

19  And I'll try to send it to you before the end of this week.

20  It's a short document.  It's like five pages.  But I will need

21  you to just send something back to me with a list of witnesses

22  and whatnot.

23         Does that sound okay to everybody?

24         Okay.  So those are the deliverables.  I'd like the

25  preliminary instructions and the questionnaire feedback.

1    Talking about -- let's talk about the motions *in*

2  *limine* next.  As you folks saw but probably have not read,

3  I've just now ruled on the motions *in limine*.  I know you

4  folks have not had a chance to read it maybe at all, maybe not

5  in detail.  The punch line is, I granted some and denied some

6  and granted some in part and denied some in part.

7    Let me give you a couple overarching thoughts on

8  this.

9    I -- I appreciate certain things now being on this

10  side of the bench that I did not appreciate when I was on your

11  side of the bench.  When I was on your side of the bench, I

12  loved filing motions *in limine*.  I loved it because it was a

13  way of limiting the other side's evidence and, you know -- if

14  they would pull fast ones in discovery, I wanted to make sure

15  they couldn't pull fast ones at trial, and I get that.

16    I will tell you, it's a lot on the receiving end of

17  it.  It can feel a little bit like being the Village of

18  Dresden at some point with the carpet bombing that it has gone

19  through.  It's also a challenge, frankly, from a knowledge

20  standpoint.  You folks are ahead of me by a wide margin in

21  terms of your depth of familiarity with the facts.  I do not

22  know the facts as well as you do.  And even if I read

23  everything, it's a lot, because I may not fully appreciate all

24  of the nuances that you folks can appreciate.

25    So here's what I will say:  I did the best I could

1    based on what I know about the facts as I understood them.

2    I've tried to be as fair as I could, as faithful as I could to

3    the precedent and make rulings that I thought were consistent

4    with the facts and the law.

5            I wear a robe.  I do not wear a cloak of

6    infallibility.  If I just got something dead-bang wrong, I

7    will listen to you, and you can tell me.  Okay?

8            Don't abuse that, though.  I don't want you to

9    re-argue every ruling I've made, because things will just go

10   off the rails, and it's going to come at the expense of

11   testimony.  And what you really should focus on is preparing

12   for trial within the parameters that I've set so far.

13           If you think there's something that I just completely

14   missed and you really think it's important for me to clean up,

15   I will listen to you.  But please be judicious, so to speak,

16   when you do that.  Okay?  It's a long way of saying I did the

17   best I could with what I had based on my understanding of --

18   of the facts of the case.

19           There could be some nuance I'm missing.  And if it's

20   important, I'll listen to you, but don't view this as an -- I

21   hesitate to say this, by the way.  When I took the bench, I

22   put an order out there that said, here's what I want, for any

23   rare questions, you can call chambers.  That was a mistake

24   because my phone rang off the hook for days.  People have a

25   different impression of what a rare question is than I do.

1      So I hesitate to say you folks can come back to me if
2  I got something wrong on a motion *in limine.*
3      I'm saying that with some level of trust that you
4  folks will not abuse that.  I did the best I could with my
5  rulings.  If you think there's something that is sufficiently
6  important and you think I just got it wrong, you can tell me.
7  I am trying very hard in this job to make the right rulings
8  for the right reasons.  But I will listen to you.
9      Does that make sense, folks?
10      MS. BOUDREAUX:  Yes.
11      THE COURT:  Here's the other thing I would say:  I --
12  has anybody read my ruling on -- or -- excuse me -- my
13  standing order on depositions?  It's fine if you haven't.
14  Have you read that?
15      MS. BOUDREAUX:  Yes.
16      THE COURT:  You know, when I -- when I took the
17  bench, I thought to myself -- I actually did this when I was
18  going through an 18-month confirmation process.  I had time to
19  ponder, and I thought about depositions, and I thought about
20  all the things that had happened to me in my 20-some-year
21  career that I didn't like.  And I wrote them down, and I
22  thought I'm going to prohibit people from doing those things
23  because I didn't like it when people would roll their eyes at
24  my witness.  I didn't like it when people would lie to my
25  witness.  I didn't like it when I asked a perfectly reasonable

1   question, and they would object at length, or when I would ask

2   a question they wouldn't answer, I'd ask it again, and I'd get

3   an asked-and-answered objection.  It's like, they didn't

4   answer the question.  It drove me nuts.  I said, I'm going to

5   bar people from doing that.

6        So I'm now going to think in a similar way towards

7   trials.  Okay?  I'm going to try to bar people from doing

8   stuff I didn't like when I was a lawyer.  I didn't like it

9   when people would object in bad faith to knock your opponent

10  off in openings and closings.

11       You know, if somebody is really doing a good job in

12  opening and closing and somebody objects just to take momentum

13  away or distract a jury or something like that, I didn't like

14  that.  That's kicking sand in somebody's face.  That's not

15  what we should be doing as lawyers.

16       I didn't like it when people requested sidebars just

17  to interrupt the flow, you know, when somebody is really doing

18  impactful stuff.

19       I didn't like it when people would disrespect rulings

20  on motions *in limine*.  If I filed a motion *in limine*, and I

21  got a ruling in my favor and somebody would try to sneak

22  something in there, I didn't like that.

23       I didn't like it when I issued a ruling on a motion

24  *in limine* and people didn't let the witnesses know.  So

25  somebody would blurt something out that they're not supposed

1    to say.  I didn't like that.

2         So as somebody on this side of the bench, I'm going

3    to try to encourage lawyers not to do those things.

4         I expect you to follow the motions *in limine* rulings

5    as faithfully as you can.  If you're not sure about what I

6    ruled, you can ask.  If you want to ask in advance, I will

7    never hold it against you.  If you want to say, Judge, I just

8    want to make sure that so-and-so is consistent with my ruling.

9         Please don't push the envelope.  Please make sure

10   that you tell your witnesses what they can and cannot say.

11   For example, if I said witness so-and-so cannot express her

12   beliefs about who the real culprit was, I expect that witness

13   not to blurt it out.  I will respond poorly if somebody blurts

14   it out.

15        If it's your witness and they disobey my motion *in

16   limine*, it's on you.  I expect your witnesses to know the

17   parameters of my rulings.  Okay?

18        That's a long way of saying, you can fight hard, but

19   you have to fight fair.  Okay?  I want you folks to try this

20   case in the highest standards of the Northern District of

21   Illinois.  Okay?  And I know the caliber of this group, and I

22   know that you're capable of doing that.

23        Okay.  So that's -- that's a windup.  I know that

24   there will probably be some follow-up questions on the motions

25   *in limine*.  I did the best I could with what I had.  You'll

1   see when you read them, for some of them, I was, like, I'm not

2   a hundred percent sure on this part of it.

3         The motion *in limine* on the expert, No. 13, I was not

4   a hundred percent sure on that, so I reserved judgment.  I've

5   got to think about that one a little more.

6         I will tell you by way of a preview, I am not sure

7   about having a witness opine about whether somebody's memory

8   is reliable.  That's not intuitive to me.  But I've never

9   briefed that issue, truthfully.

10        I looked at the St. Eve opinion, and I know that I've

11  got more reading to do on that.  I do.  She, who I think, you

12  know, may be the most competent member of the federal

13  judiciary, let in some of that evidence, I think.  So that

14  carries some weight with me.  But, you know, she's not here,

15  I'm here, and I've got to make my own decision on this.

16        So I have some questions about whether it's really

17  helpful for the trier of fact to say so-and-so is unlikely to

18  have remembered something.  I don't know.  I'm a little

19  skeptical of that, but I'm not sure.  This is just a preview,

20  folks.  Okay.

21        Another one is the gang affiliation.  I was just not

22  a hundred percent sure that I knew enough about the importance

23  of the gang affiliation to the case.  So I reserved it.

24        So let's plan on talking about that on Monday when

25  we -- the Monday before trial.  If there's anything -- so

34

1  you'll see sprinkled through the motion *in limine* rulings,

2  there's a couple things where I say, I'm not a hundred percent

3  sure on this or this is what I think.

4          The goal of this exercise was to give you parameters

5  for how I see the evidence coming in.  It's a preliminary

6  ruling.  It's supposed to help you plan.  Okay?

7          Does that make sense, everybody?

8          MS. BOUDREAUX:  Yes.

9          THE COURT:  So if there's anything you want to raise

10  on that as a follow-up on Monday, the 4th, you can.

11          Okay.  So let's talk about the pretrial order.  Do

12  you want to go through the -- just at a high level, the stuff

13  in the order, everybody?

14          Everybody got the -- thank you for the binder.  You

15  folks did an excellent job of giving me hard copies, and you

16  were very organized.  So I appreciate all of that.

17          I have a trial brief from the plaintiff.  Thank you.

18          Defendants, you did not submit a trial brief.  That's

19  totally fine.  I don't hold it against you that you didn't.  I

20  will say, if you wanted to say something short, even in a

21  couple pages, I'll listen to you.  But don't feel pressured,

22  too.  If you decide, look, I'd rather prepare my cross

23  outlines and get ready for trial, get ready for opening,

24  great.  That's fine.

25          MS. BOUDREAUX:  Okay.  Thank you, Judge.

1    THE COURT:  I'm not going to -- I don't favor anybody

2  because somebody gave me a brief and somebody didn't.  But I

3  read what you send me.  Okay?

4    MS. BOUDREAUX:  Okay.

5    THE COURT:  Okay.  So let's go through that.

6    Okay.  The list of trial attorneys.  Are these

7  everybody's cell phone numbers by chance?  I assume.  I'm

8  looking at Page 2 of 35.  No.

9    MR. LITOFF:  Those are office numbers.

10    THE COURT:  Those are office numbers.  Okay.

11    What I would propose is you folks giving me cell

12  phone numbers.  Send an e-mail to my courtroom deputy.

13    I don't know how this is going to roll.  I don't know

14  if we'll get a question from a jury at an odd hour or who

15  knows what.  Something happens, you know.  You know, if -- if

16  -- suppose I've got to contact you right away because there is

17  a COVID-related thing or whatnot, it seems like a good idea

18  for me to have your number.  So if you could send an e-mail

19  from each side that says here's the list of lawyers and their

20  cell phone numbers, I'd appreciate that.  Okay?

21    So I have the statement of the case.  Thank you.

22    This is agreeable to everyone, I assume?  I can read

23  this to the jury before the case --

24    MS. BOUDREAUX:  Yes.

25    THE COURT:  -- proceeds; is that right?

1    I see nodding heads.  Okay.  Thank you.

2    *Voir dire*.  Okay.  So I see -- and if I'm going too

3  fast, everybody, just tell me.  Agreed *voir dire*, I got your

4  agreed questionnaire.  It's pretty similar to what I've got.

5  I'll send you mine, obviously.

6    I have agreed proposed questions to be asked orally.

7  Here's -- here are a couple of concerns I have:  I have

8  concerns about how long this is going to take.  Okay.  Every

9  minute we spend on *voir dire* is a minute that you guys cannot

10  spend with a witness.  Okay?

11    And this is going to add up, right.  It's going to

12  add up.  So you've got to think to yourself, okay, if we spend

13  an extra half-day -- suppose I go through all of these 26

14  questions and suppose we don't pick a jury until the end of

15  Thursday or, who knows, Friday morning -- with COVID,

16  everything takes longer.  You know, you order furniture now,

17  it takes longer.  You order a jury now, it takes longer.

18  Everything takes longer because of COVID.

19    Just the experience of other judges in the building,

20  it's just taking longer because everybody has to go through

21  all of these procedures.  I am concerned about going through

22  all of these questions because it's going to take longer, and

23  I cannot move the cement wall on the back end.

24    So I guess what I would invite you folks to do is

25  really, really think hard about whether we need to cover all

1    of these questions.

2          What I was inclined to do is to say, each side, look

3    at this list of 26 questions.  What are the five that you

4    think I've really, really, really got to cover from each side?

5          Maybe this will go faster than I think, folks.  I

6    don't know.  I am new at this.  Maybe this -- from this side

7    of the veil.  Okay?

8          MS. BOUDREAUX:  Judge, I think these were questions

9    that both sides actually believed were critically important

10   just because of the climate and what's going on in the world

11   in terms of this type of a case.  So I think we can make an

12   effort to do what you're saying, but, you know, we actually

13   had a lot of agreement on --

14         THE COURT:  Great.

15         MS. BOUDREAUX:  -- the questions.

16         THE COURT:  So everything has a price tag.  So I hear

17   you said it's critical.  Great.  Okay.  You lose a trial day

18   and you lose a trial day, hypothetically.  Now is it critical?

19   Do you see what I'm saying?

20         Like, there's a price tag to this.  I mean, everybody

21   gets, you know, a hundred dollars to spend in the bazaar, and

22   if you spend it on this, you're not spending it on that.

23         So we're living in a zero sum world.  That's what I'm

24   just trying to say.  A lot of these are good questions, and

25   frankly, I would -- I get where you're coming from on this.

1            Mr. Safer, go ahead.

2            MR. SAFER:  Your Honor, we -- we'll work together to

3    try to cut it down.  We worked together well to develop it.  I

4    think we can probably --

5            THE COURT:  Okay.

6            MR. SAFER:  -- work together to cut it down.

7            THE COURT:  I mean, here's what I'm trying to avoid,

8    okay, I'm trying to avoid everybody getting panicky and grumpy

9    and uncomfortable at the end of the second week because, holy

10   smoke, we have not made as much progress.  We invested all

11   this time and energy into this trial, and now the defense,

12   they go second, and they're saying they feel like they can't

13   get their time -- enough time with their witnesses, and you

14   feel like you're not getting enough time with

15   cross-examination and, all of a sudden, closings have to be

16   short.

17           And, you know, I really don't want that to be the

18   vibe with you folks at the end of the second week.  And any

19   money -- if time is money -- any time we spend on *voir dire* is

20   time that's -- it's zero sum.  So we're not spending it on the

21   back end.  Okay?  You hear what I'm saying, folks?

22           MS. BOUDREAUX:  Yes.

23           THE COURT:  That's all.

24           I will tell you, too, I -- I was concerned about

25   question six, about asking people about Black Lives Matter and

1    Blue Lives Matter.  I get, in principle, why you would want to

2    know if people have strong opinions on that.  I really, truly

3    do understand it.  Because people have strong opinions.

4    You're kind of pulling a thread on a sweater there by getting

5    people to express all of this, and I had some questions about

6    whether we want to inject all of that -- whether it was

7    necessary in this particular case.

8         If you folks think it is necessary -- and maybe it

9    is.  I don't know, maybe it is.  I just paused on that, and I

10   said, boy, is that going to be a distracting thing for people.

11        Let me ask you this -- and I have not polled my

12   fellow judges on this -- is this a question that is typically

13   being asked when picking a jury in this district in this day

14   and age?  And do people feel like it's a got-to-have?

15        Mr. Safer, you go first.

16        MR. SAFER:  No.  No, Your Honor.  I mean, it's -- I

17   think it's unique to this kind of case, and it's probably

18   unique to events that have transpired since people last picked

19   juries.

20        THE COURT:  Yes.

21        MR. SAFER:  So --

22        THE COURT:  Is there a race component for this trial

23   that you think will come out overtly?

24        MR. SAFER:  You know, Your Honor, we're not going

25   to -- we're not going to escape the fact that the defendant is

1　black.

2　　　　　　THE COURT:  Yeah.  The plaintiff is black, you mean?

3　　　　　　MR. SAFER:  Sorry.  The plaintiff is black.  One of

4　the defendants is black.  The three other detectives were

5　white.  I mean, there's race -- there's -- there's a race

6　element to everything that happens in our society.

7　　　　　　THE COURT:  Yeah, I understand that.  But the

8　question is:  Do you really want to inject that in the jury

9　selection process?

10　　　　　　MR. SAFER:  Well, yes, there are -- there are --

11　there are racial issues that -- that arose during this.

12　　　　　　THE COURT:  Okay.  Go ahead.

13　　　　　　MS. BOUDREAUX:  I was going to say that it's --

14　throughout their filings a racial theme has come up saying

15　that, you know, the plaintiff was railroaded as a black man by

16　white officers.  So I suspect it will be a part of this trial.

17　　　　　　THE COURT:  Okay.  So here's what I'd say, folks:  If

18　you think it's critical, I will -- it doesn't mean I'll do it,

19　but it means I will listen and I'll think about it.  Okay?

20　　　　　　I just -- I want people to be thinking about

21　everything as a price tag.  And you've got a hundred units of

22　time, and you get a hundred units of time.  Do you want to

23　spend five of your units on this question?  We can.  You're

24　just not going to be able to cross this witness as long as you

25　want.  I'm just going to have to cut you off.  So that's all.

1    So what I would propose, folks, on September 30th,

2    can you send me a revised -- just a revised list?

3    I've often wondered if the *voir dire* process is as

4    important as people think it is. Part of me, when I was

5    trying cases, didn't care. I just wanted 12 bodies in the

6    seats, and we'll go. I'll get up there. I don't know. You

7    all may have a different view of that. But maybe you're

8    right.

9    MR. SAFER: Your Honor, while we're on this

10    subject --

11    THE COURT: Yeah.

12    MR. SAFER: -- do you have a thought as to how many

13    jurors you are going to select?

14    THE COURT: Yeah, good question. So I will say, I

15    think we'll cover jury selection in more detail on Monday, the

16    4th.

17    Absent COVID, I would like there to be a -- well,

18    maybe because of COVID, too. I think a larger jury is better

19    because it is a long trial. If we lose people, I want to have

20    mistrial insurance. You know, I don't want to lose bodies

21    and say we've got to start over. So it's like a little bit of

22    body armor on keeping going.

23    I think a bigger pool is a diverse pool, which is

24    positive. I want to make sure that it's a representative

25    sampling of our community. So I think that would be useful.

1    You know, we have had instances, you know, as

2    recently as last week in the building where a juror gets COVID

3    and, all of a sudden, one or two of them are gone because

4    somebody sat next to somebody, and they got to get bounced,

5    too.

6    So I've got to talk to the clerk's office on this. I

7    want to see if I can get 12 jurors. I don't know on that.

8    But here's the thing: There is a cost to that, too,

9    right? Then I've got to pick 12 people. That takes time on

10   the front end. So do I want to spend units of time picking

11   people that I may not need? It takes time, but I get more

12   insurance. So we can buy some insurance, but the price of

13   that is some of the trial time.

14   Do you folks have a perspective on that?

15   I guess my inclination, if the clerk's office will

16   let me, given the length of the trial, the COVID environment,

17   the likelihood that we're going to lose people, I would like

18   to have a bigger pool of people than a smaller pool.

19   Everybody agree with that?

20   MR. SAFER: We do, Your Honor. I've tried only one

21   case in this building since COVID. We lost three jurors --

22   THE COURT: Yeah.

23   MR. SAFER: -- in the first four days.

24   THE COURT: Okay.

25   MR. SAFER: It was problematic.

1          THE COURT:  Got it.

2          MS. BOUDREAUX:  We also agree.

3          THE COURT:  Yeah, okay.  So I'll try to get -- if I

4    can get a full panel, we'll get 12.

5          And my understanding is, we typically -- we typically

6    have three people in -- three or four people in the box and

7    the rest sit in the gallery.

8          I know, Mr. Safer, you've tried a case in this

9    building recently, so you know how it goes.  But there's a

10   jury overflow room.  The jury is spread out in the back over

11   there.

12         What I will probably do is have the jurors rotate

13   where they sit so we don't have some guy in the back row

14   that's asleep every day.  Someday he's going to have to be

15   right in front where he can actually see the witnesses and see

16   people.  No assigned seats like a typical jury.

17         So it's going to be a little bit different in terms

18   of people moving around, but we're not going to have somebody

19   in the nose bleeds for three weeks.  That's not good for them.

20   That's not good for you.  You want to be able to --

21         MS. BOUDREAUX:  So the only ones allowed in the

22   gallery will be jurors?

23         THE COURT:  That's my understanding, yes.

24         MS. BOUDREAUX:  Okay.

25         THE COURT:  So -- unless you've got a client

1   representative who can come, obviously.  But we have a jury

2   overflow room -- I'm sorry.  We have a jury overflow room for

3   the selection, but then we have a public viewing room.  So if

4   you've got people who -- you know, let's say somebody is just

5   interested in the trial, and they want to watch, it's going to

6   be broadcasted.

7           Have I given you that number, I think?  It's --

8   1342 --

9           MS. BOUDREAUX:  Yes.

10          THE COURT:  -- was the room.

11          But in here, it's going to be jurors and parties and

12  lawyers and assistants and whatnot.  Okay?  So they'll be

13  spread around.

14          I am not a hundred percent sure, folks, which

15  elevator you're supposed to use.  Maybe my courtroom deputy

16  will know.  And maybe I can get her attention.  Do you know

17  which -- I'll tell you on Monday, the 4th, which elevator

18  you're supposed to use.  But we'll have the jurors use one

19  elevator, and please use the other one.  I think you guys use

20  the north elevator, but I could be wrong on that.

21          Okay.  Anything else on the jury stuff?  We'll talk

22  more about the actual selection on the 4th.

23          Okay.  Witnesses.  Everybody there?  I'm on Page 15

24  of 35.

25          You know what would help me, folks.  I could use, for

1   each witness, a couple sentences saying what the point of the

2   testimony is.  Like, so I see Brenda Lee is the plaintiff's

3   aunt.  I don't remember that name from the motions *in limine*.

4   Maybe it was in there.  I could have missed it, but I don't

5   remember that in there.  So I think, okay, well, what's she

6   going to say?  I'm not really sure.

7          Nothing fancy, but I could -- I could use some help

8   from you folks about your witnesses.  Say, okay, let's say,

9   Steve Maris.  This is a City of Chicago 30(b)(6) witness.

10  Mr. Maris will testify about procedures for X, Y, and Z.  You

11  know what I mean?  It shouldn't be a surprise to you folks.

12  You should know what everybody is going to say, too.

13         Any chance you could do that by the 30th, too?

14         And, folks, this is just like a low-key -- I bet one

15  of the young people on your staff could do this in about an

16  hour or two.  Just write down who each witness is and what

17  it's going to be.  And it's not going to be a preclusive

18  effect.  I don't want to hear anybody arguing later, oh, you

19  didn't say in your statement to the judge on this date that

20  they were going to offer this.  It's just to educate me.

21  Because I don't know all of the people.  I want to get up to

22  speed.

23         I will tell you, my reaction when I looked at the

24  witness list was, boy, if we had six months, this would be a

25  great trial.  This would be fun.

1          It's going to be a challenge to get through a lot of

2     this.  I'm confident that unless you're going to be super

3     short, we're not going to be able to do all of this.  And

4     we're going to have to figure out how to do that.

5          You know, on the plaintiff's side, Mr. Safer, for

6     example, I don't know how long each of these testimonies are

7     going to be.  I'm going to ballpark that you've got probably,

8     what do you think, 12 to 15 will calls and a bunch of may

9     calls.

10         I just encourage everybody, as strongly as I can say

11    this, to be realistic on the front end.  I'm giving each of

12    you a hundred -- I'm not allocating it this way 50/50

13    necessarily.  But imagine you've got a hundred units of time.

14    You've got to figure out how to allocate that.  And, you know,

15    any time you spend on James Hickey is time you can't spend

16    with James Oliver.  Right?

17         And I don't want people to be disappointed at the end

18    that they didn't have enough time because they went on too

19    long with some other witness.  Okay?

20         I'm not going to micromanage how you do things.  You

21    folks know your case.  You know what's important more than I

22    do.  So it's going to be up to you.  But just be going into

23    this trial with eyes wide open that you can't have everything

24    you want in terms of your time.  Okay?

25         I also want you folks to be as upfront with each

47

1    other as you can be on the witnesses.  You know, at the end of

2    each trial day, I'm going to come down, and I'm going to talk

3    to you folks, okay, what's the plan for tomorrow?  You should

4    be able to tell me, we're going to call these witnesses.

5    Because you know.  You know the day before who's coming

6    tomorrow.  Who it's going to be, what the order is going to

7    be.  And, you know, I may ask you, okay, what's the point of

8    that testimony, *et cetera*, *et cetera*.

9         Okay.  Be fair to each other.  No surprises.  You

10   guys should know what you're doing by now.

11        MR. HALE:  We'd even prefer more notice, Your Honor.

12        THE COURT:  Yeah, I mean, have you folks talked about

13   that?

14        I mean, I don't know how much notice -- I mean, I

15   think -- you know, Mr. Safer, I assume you know who your first

16   couple witnesses are going to be.  I'm not saying you've got

17   to let them know now.  I assume you probably know who it's

18   going to be.  They should know -- I don't know.  I mean, what

19   do you think is fair in terms of telling the other side who

20   your first three witnesses are going to be?

21        MR. SAFER:  Yeah, Your Honor --

22        THE COURT:  And I'm not saying you have to tell them

23   now.  I don't mean that.  But go ahead.

24        MR. SAFER:  We're going to evaluate the motions *in*

25   *limine* --

1    THE COURT:  Yeah, of course.  Yeah.

2    MR. SAFER:  -- and how that affects our case, but we

3  should be able to do that -- sometime during -- sometime next

4  week --

5    THE COURT:  Okay.

6    MR. SAFER:  -- we should be able to give them our

7  first three witnesses.

8    THE COURT:  Okay.  Great.

9    Why don't we do this:  By October the 4th -- so when

10  we come in on the 4th, just be ready to tell the defendants

11  who -- who your next -- your first three witnesses are going

12  to be in order.  Okay?  That way you can plan accordingly.

13    And I never -- to go back to the things I didn't like

14  at trial, I never liked it when people had people in their may

15  call list who they had no intention of ever calling.  You

16  know, I had to make a cross-examination outline just in case.

17  Or you put somebody in a may call list and you knew full well

18  you were absolutely going to call them, but you did it just to

19  put question marks, you know, air of mystery.

20    Be straight with each other.

21    If you're -- if you're going to call somebody, tell

22  them.  If you're not going to call somebody, tell them, tell

23  the other side.  Okay?  And I'll expect that from both sides.

24  And when it's -- you're going to get the benefit of this when

25  the other side presents their stuff, too.

1          You know, for example, Mr. Safer, when you're winding

2    down your list, you know, you think you're about done, you

3    know, when you're done, I want the defense to be ready to rock

4    and roll and offer your first witness, right.  So, you know,

5    do the best you can in terms of giving them, you know, lead

6    time.

7          What I don't want to have happen is, all of a -- and,

8    you know, things can change in trial, you know, but I don't

9    want to have it happen where you're done all of a sudden on a

10   Thursday afternoon, and we've got three hours, and it's like,

11   oh, this person can't come until tomorrow morning at 10:00.

12   Well, we've now lost a bunch of time.  Okay.  So work together

13   as cooperatively as you can.

14         I want both sides to maximize your time with trial so

15   we get a good ruling from the merits from these jurors, right.

16   That's what we want.  We want a ruling that's consistent with

17   the law and consistent with the truth and use our time to the

18   fullest.  So please be straight with each other.

19         MR. SAFER:  Your Honor, I should raise that our

20   first -- the first thing that we need to do is put in the

21   investigative file.

22         THE COURT:  Okay.

23         MR. SAFER:  Because that's going to be used with all

24   of the witnesses.

25         THE COURT:  Okay.

1        MR. SAFER:  The -- and we've told the -- the

2   defendants and the City that that's what we intend to do

3   first.  We've got two records witnesses who would be 15

4   minutes a piece, to put that in.

5        We've proposed a stipu- -- now, they've got

6   scheduling issues.  They're under subpoena.  They have to be

7   here.  You know, I'm sure they will not violate their court

8   order to be here.  We proposed a stipulation which would be

9   one minute to -- because it was a very straightforward thing.

10  Standard operating procedures in the investigative file.

11  Those are going to be used with a bunch of witnesses.

12       So those are our first two witnesses.

13       THE COURT:  Okay.  Let me drill down into that one,

14  for example.  And we don't need to get into the weeds in all

15  of this today.  But have you guys really thought about

16  stipulating to this kind of thing?

17       I mean, if Mr. Safer is proposing saving 14 minutes,

18  if I did a little quick math there, that seems positive for

19  everybody.  You know, it's good for you folks.

20       I have thought to myself as I'm back -- I'll let you

21  speak in one second.

22       MS. BOUDREAUX:  No, go ahead.

23       THE COURT:  I thought to myself back in chambers, how

24  do I manage this if somebody is unreasonable?  Do I say, okay,

25  well, you've just wasted 15 minutes of Ron Safer's time or

1   you've wasted 15 minutes of the other side's time, right,

2   wasted the defense's time -- do I say, okay, therefore, you

3   lose 30 minutes?  Like there's a -- you know, a waste time

4   multiplier.  If you waste time, you're double penalized, sort

5   of punitive damages from -- with respect to time.  I don't

6   know.  I don't know if that's a good idea or not.

7          But I encourage people to be reasonable and stipulate

8   to as much as you can, unless there's a good reason not to.  I

9   don't know.  Maybe there's a good reason not to.  I don't

10  know.

11         Go ahead.

12         MS. BOUDREAUX:  In this instance, there was a good

13  reason not to.  I did not find it to be accurate.  The City

14  attorneys said that they were going to look into it a little

15  bit more later today.

16         THE COURT:  Okay.

17         MS. BOUDREAUX:  But, normally, I would be more than

18  willing to stipulate to something foundational like this as

19  long as it were accurate, but this just happened not to be.

20         THE COURT:  Okay.  Here's what I would say -- thank

21  you for that.

22         Here's what I would say:  I have to decide how to

23  allocate time to people.  If people dig in their heels and

24  force the other side to waste time that could have been

25  avoided, I will probably penalize that party by giving them

1   less time on other stuff.  Right.  So if you force the other

2   side to burn time, you will probably pay for it because I'm

3   going to take away some of your time units.

4          I don't know what else to do, frankly.  I don't know

5   what else to do to manage this, other than to say I'm

6   incentivizing good behavior and I'm disincentivizing bad

7   behavior, and bad behavior would be forcing the other side to

8   waste their time on stuff that doesn't matter.  Let's focus on

9   stuff that matters.  And beyond that, it's up to you, you

10  know.

11         So those are the reactions I had on the -- on the

12  witnesses.  I was concerned about the number of witnesses.

13  And I want to make sure you disclose to each other.

14         Any other overarching comments?

15         Is there anything else in terms of the witnesses that

16  you folks need a ruling on -- I assume not -- but is there any

17  witness you're like, boy, I really need to know if this is

18  coming in or not before you give an opening?  I want you to

19  think about that.  And it's a general matter.  If there's

20  anything you guys got to know from me before you give an

21  opening, I want you to tell me.  See what I mean?  Like, if

22  there's something you're like, boy, is this fact coming in or

23  not before I tell the jury about it.

24         Sometimes I was in trials and the other side would

25  overpromise something on opening.  That doesn't work out well

1    for people.  You know, so be sensitive to that.

2          Okay.  Unless we've got something else on witnesses,

3    folks, we'll keep rolling forward.

4          Dep designations.  I guess the other overarching

5    thing I would say on dep designations, it's a struggle because

6    you've got to -- you've got to make your record.  You've got

7    to get stuff.  You've got to lay the foundation for things.

8    You've got to have a sufficient body of evidence in the record

9    to support a verdict in your favor.  I get all that, you know.

10   There are reasons to do it.

11         It also can turn into sleepy time for the jurors if

12   you're not careful.  So be sensitive to how it's going to land

13   with the jury when you think about using your time for dep

14   designations.  Any time you spend on dep designations is time

15   out of your budget with a live witness.  Okay.

16         I think this is a TBD situation about how I'm going

17   to manage the dep designations.  I think I need to give that a

18   little more thought and talk to you about it before trial.

19         If you folks are really intending to read into the

20   record all of those dep designations, it's going to take a lot

21   of time.  And you can spend your time on that if you want; but

22   it means, number one, you're going to have less time with live

23   witnesses because there's a brick wall; and, number two, we're

24   going to have to stay late many nights to go through all these

25   objections.  There's no other way to do it.  All right.

1        So I encourage you folks to be really thoughtful, see

2  what you can stipulate to.  Maybe you can stipulate to giving

3  some deposition transcripts to the jury in writing.  I don't

4  know.  I don't know if it's a good idea.

5        But think about that.  Okay?

6        Anything else on that?

7        MS. BOUDREAUX:  No.

8        THE COURT:  Expert qualifications.  Anything to say

9  on that?  Anything -- I mean, we -- you know.

10       MS. BOUDREAUX:  No.

11       THE COURT:  I've told you I've reserved judgment on

12  one of the motions *in limine*.  I've got to think about that.

13       Exhibits.  So let me -- let me -- well, let me

14  bracket the exhibits.  We'll cover that in a little bit.

15       So I -- I had a laugh out loud point when I read your

16  undisputed facts and evidentiary stipulations, and it was a

17  grand total of two.  Boy, they really busted their humps

18  working on those two stipulated facts.

19       I don't know that you gave this maybe your college

20  try, your all-out effort to come to stipulations.  I encourage

21  stipulations.  I feel like maybe we should be able to come up

22  with a couple more.  I bet if I sat back in chambers, I could

23  write some facts that you all couldn't disagree with.

24       And I will tell you, in terms of things that drove me

25  nuts as a lawyer, I never liked it when I offered stipulations

1    that were totally -- like, metaphysically -- not

2    metaphysically in doubt, like, absolutely true, two times two

3    is four, and the other side would object, they wouldn't agree

4    to it.  I didn't like that.  You know, it seemed -- and they

5    would propose things that were just outlandish.  I hope I

6    never did that to people.

7           Think about whether you can come up with some

8    stipulations.  Think of your units of time, folks.

9           If you won't stipulate to basic core facts in the

10   case, you've got to present it in a witness, and that great

11   cross-examination outline that you've been dreaming it out for

12   months, yeah, you're not going to be able to use a lot of it.

13   You probably would have scored some points with the witness,

14   but now you can't because you've got to lay the foundation for

15   some things that you probably should have stipulated to.

16   Right?

17          I mean, you guys have got to really, really think,

18   okay, if I'm forcing them to prove everything, that's going to

19   come back to bite me, too, because they're going to do the

20   same with me, and then my great -- the great examination

21   points that I wanted to cover, I just can't because we're out

22   of time, because there's a brick wall.  Okay.

23          It's a long way of saying, think it over.  Okay?  The

24   jury would appreciate it, too.  You'd befriend the jury.

25          Okay.  Proposed jury instructions.  I've given you

1    some preliminary thoughts on that.  If -- did I set a date for

2    you folks to confer on this?  I think I did.  To confer and

3    try to come to terms?

4              MS. BOUDREAUX:  September 30th.

5              THE COURT:  Yeah, just -- well -- so the 30th was for

6    you to give me the preliminary instructions, right?

7              MS. BOUDREAUX:  Mm-hmm, yes.

8              THE COURT:  Here's my question:  Are you guys sure

9    that you're at loggerheads on the jury instructions, meaning

10   the post-evidence jury instructions?  Have you really met and

11   conferred and just absolutely hit a wall and there's no way

12   we're going to agree to this?

13             You know, maybe you want -- maybe each side -- and I

14   don't know.  Maybe each side says I'm going to have the most

15   pro-plaintiff set of instructions and maybe the most

16   pro-defendant set of instructions, and I'm just going to stick

17   to my guns and let the judge sort it out.

18             Maybe that's where we are.  Maybe that's what you're

19   doing.  I don't know.  Maybe the plaintiff is, you know, just

20   an inch over the line in favor of the plaintiff, and the

21   defendant is extreme.  Or maybe it's the opposite; maybe the

22   defendant is really pretty neutral and the plaintiff is out

23   here somewhere.  I don't know.  I'll figure it out.

24             If you're truly at loggerheads, and I've got to rule

25   on each of these, I will do it.  I'll do it.  But we're going

1    to have to stay late basically every night of trial because I

2    can't do this the night before.  It will be a train wreck, and

3    everybody will be grumpy, and we'll get bad outcomes.

4         So you're going to have to plan on staying for trial

5    -- staying late at trial more than you want, you know.  When

6    guys are at trial, you want to -- you know, you want to

7    prepare your witnesses, you want to make your outlines, you

8    want to get your exhibits in order.

9         When I was in front of the jury, I wanted it to be

10   smooth, totally smooth and seamless and effortless.  And the

11   only way I could be smooth is if I had everything prepared to

12   a tee and it looked nice and easy, right.  And that took

13   preparation time, and so I'd get ready long before trial.  And

14   I used time the night before to finalize stuff, right.

15        You don't want to be talking jury instructions, do

16   you, on the second day of trial?  Do people want to do that

17   instead of preparing your cross-examination outlines?

18        We're going to have to.  If we can't come to terms on

19   this, we're going to have to have a squadron of each of you

20   covering jury instructions during the trial.  So think about

21   it.  Okay.  I don't know how else to do it.

22        Anything else that you want to talk about for

23   purposes of today on jury instructions?

24        MS. BOUDREAUX:  No, Judge.

25        THE COURT:  Proposed verdict form.  I've ruled on the

1   motion *in limine*, which you haven't seen yet -- or you
2   probably haven't read yet, on the -- the references to the
3   City.

4          I know that reasonable jurists have disagreed on
5   this.  I know that Judge Dow and Judge St. Eve have allowed
6   the City -- the City's name to appear on the jury instructions
7   and verdict form even though there are no substantive claims
8   against them.

9          If I had to pick two jurists in the building I didn't
10  want to disagree with, I would probably pick St. Eve and Dow.
11  Don't tell everyone else I said that.  But that's a pretty
12  good pick.  They've got a lot of street cred with me.  But I'm
13  not a hundred percent sure I see things the same way.  I don't
14  -- unless I'm missing something, I don't see the point of
15  having their names on the verdict form and on the jury
16  instructions if there are no substantive claims against them.
17  It would just signal to the jury that there's a deep pocket
18  behind the defendants.

19         You can read my motion *in limine*.  If I made a
20  grievous error on that, you can tell me, and I will listen.
21  But that's my inclination.

22         So I would expect you folks to submit an agreed jury
23  verdict form that's consistent with that.

24         And it looks like -- for most of this, it's otherwise
25  pretty well agreed, it looks like.

1          Anything else -- I mean, we can cover anything else

2     on the 4th, but . . .

3          Okay.  Designations we've covered.

4          Joint exhibits.  So I was a little concerned --

5     sorry, "concerned" is the wrong word.  I was a little confused

6     when I saw the joint trial exhibit list.  When I saw the joint

7     trial exhibit list, I thought to myself, these are going to be

8     the agreed exhibits, the exhibits that everybody agrees are

9     coming into evidence.  Some cooperation and, you know,

10    unanimity and everybody is on the same page.  And that's not

11    exactly what this was.

12         You know, Joint Exhibit No. 1 was the expert report

13    of the plaintiff's expert which surprised me because, you

14    know, expert reports don't come into evidence.  They're

15    disclosure documents.  They're not substantive evidence.

16    They're hearsay, all of these problems.  They don't come into

17    evidence.  It's not substantive evidence.  It's just a way of

18    telling the other side what somebody is going to say.  And I

19    didn't know why it was here anyway.  Maybe you're just marking

20    it so you can refer to it, like, as a demonstrative.  Maybe

21    that's what you meant.

22         MS. BOUDREAUX:  Yes.

23         MR. SAFER:  There's a little X, Your Honor, under

24    "Marked for ID only."

25         THE COURT:  I saw that, yeah.  So --

1          MR. SAFER:  And that's just --

2          THE COURT:  -- I inferred from that -- so this is an

3     exhibit, but it's not really an exhibit in the sense it's not

4     coming into evidence.

5          MR. SAFER:  Exactly.  Exactly.

6          THE COURT:  Do we have or could we have an agreed set

7     of exhibits that are actually coming into evidence?  Have you

8     guys talked about that?

9          Like, you know, you guys agree that these 32

10    documents should come in, and you folks agree to do it, too.

11    And then the first moment of trial, I can wave my hand and

12    say, hey, jury, exhibits, you know, blah-blah-blah are in.

13         Have you guys talked about that?  I have not done the

14    math myself to compare your list and your list to see how much

15    overlap there is.  Is there overlap?

16         MR. LITOFF:  There's no overlap, Judge, unless it's

17    accidental.  I'm sure there could be a couple that overlap.

18         The -- so these joint exhibits are, you know,

19    exhibits that we all agree will be used.  The dispute is over

20    whether they'll just be marked for identification or they

21    should actually be admitted into evidence.  So that's what the

22    joint says.

23         THE COURT:  So joint means you agree that someone

24    will use them?

25         MR. LITOFF:  Yes.

1          THE COURT:  Okay.

2          MS. BOUDREAUX:  Yeah, so as plaintiff referenced,

3   there's sort of a dispute about whether any or all police

4   reports will come into substantive evidence.  So that was sort

5   of a stopping point for us, where we -- we all agree it's

6   going to be used in some fashion, but we did not know if it

7   was going to go in substantively.

8          But there are other things that are fully agreed,

9   like photographs of the scene and, you know, photographs of

10  the plaintiff, things of that nature.

11         THE COURT:  Okay.

12         MS. BOUDREAUX:  So I -- if you want, we could put

13  those on a separate list.

14         And are you saying that we wouldn't have to lay the

15  foundation for those at trial?

16         THE COURT:  Well -- so there are a couple things.

17  There are exhibits that in a hypothetical universe you both

18  are going to use.  It's a contract dispute, let's say, and you

19  agree that the contract is an exhibit, a joint exhibit.  That

20  would be everybody admits it comes into evidence.

21         It sounds like, from what I understand, there is no

22  overlap between the plaintiff's exhibits and the defendants'

23  exhibits, it sounds like.  Not a photograph, nothing.

24         MS. BOUDREAUX:  No, we -- there is.

25         MR. LITOFF:  There is?

1    MS. BOUDREAUX:  Well, what we -- what we put as the

2  joint exhibits are things that we both --

3    MR. LITOFF:  Correct.

4    MS. BOUDREAUX:  -- agree that are going to come in or

5  at least be used by both sides.

6    MR. LITOFF:  Yeah, so maybe I'll take a step back,

7  Judge.

8    So before we had your pretrial order --

9    THE COURT:  Yeah.

10    MR. LITOFF:  -- we each had separate exhibit lists.

11    THE COURT:  Yep.

12    MR. LITOFF:  Then when we got your pretrial order

13  that said "include joint exhibits," what we did is, went

14  through and compared, and anything that was on both of our

15  exhibit lists, we took it off and put it into the joint

16  exhibit list.

17    THE COURT:  Okay.

18    MR. LITOFF:  So that's what we have.

19    THE COURT:  I've got it.

20    Here's what I would say:  If there are exhibits that

21  you both intend to use, I would think that you ought to

22  stipulate to it.  And I'll just say, right off the bat in

23  trial, you know, maybe at the end of the first witness, say,

24  Judge, we move into evidence joint exhibits, you know, X

25  through Y, and that would come in.  I think that's a useful

1    time-saver for everybody.

2              MS. BOUDREAUX:  Okay.

3              THE COURT:  If there are exhibits that you intend to

4    offer that the other side does not object to, I do not require

5    you to lay the foundation, but you do have to use it and say

6    "I offer it into evidence" for it to be in the record and go

7    to the jury.

8              MS. BOUDREAUX:  Okay.

9              THE COURT:  You got it?

10             So let's say it's the contract, and you agree to it,

11   right, you still have to say, hey, witness, is this the

12   contract -- or -- sorry -- you have to use it with a witness.

13   So it's not in evidence until you use it, is what I'm trying

14   to say.

15             MS. BOUDREAUX:  Okay.

16             THE COURT:  But you don't have to go through all of

17   the foundational aspects in terms of a time-saving device.  I

18   didn't say that as artfully as I could have there, but do you

19   understand what I'm saying, everybody?

20             MR. LITOFF:  Yes.

21             MS. BOUDREAUX:  Yes.

22             THE COURT:  Okay.

23             MS. BOUDREAUX:  Your Honor, should we talk about the

24   police reports for a second?

25             THE COURT:  We can.  I will tell you, I have not

1  drilled down into that particular -- but I'm happy to hear a

2  preview.  Go ahead.

3        MS. BOUDREAUX:  I think the preview is that they are

4  saying that all of these will come into substantive

5  evidence --

6        THE COURT:  I want to make sure.  Can you hear her

7  okay?

8        MS. BOUDREAUX:  Oh, I'm so sorry.

9        The preview is, is that the plaintiff's position is

10  that these will all come in as substantive evidence.  And my

11  position is more that they have to be looked at in a piecemeal

12  fashion.  And it's going to be dependent on who -- which

13  officer actually authored the reports, whether they do have

14  some recollection of it or not.

15        And then the third layer of analysis would be whether

16  the report contains third-party witness statements versus the

17  officer's own observations.

18        So I guess that's why we're at an impasse on so many

19  of these exhibits, and I -- I just wanted to know if you had a

20  feeling on that, because then we could start withdrawing some

21  of our objections, possibly.

22        MR. SAFER:  Yeah.  Your Honor, our position is that,

23  first of all, what is in the investigative file, which is the

24  vast majority of the police reports, has independent

25  significance because the investigative file under the standard

1    operating procedures is supposed to contain all of the reports

2    that are pertinent to the investigation and, therefore, form

3    the basis of probable cause.

4            All of the detectives have access to that

5    investigative file, and there is substantial evidence that

6    they've reviewed that investigative file.  So that file,

7    which, again, covers 90 percent of the police reports, has

8    independent significance regardless of the source of the

9    information.

10           So, for example, some -- there could be a hearsay

11   statement in there of somebody who says the plaintiff didn't

12   commit this crime; so-and-so did.  That would normally be

13   hearsay.  Except that, in this case, the fact that somebody

14   said that has independent significance because the defendants

15   would have read that, had access to it, and would have -- you

16   know, the jury can decide whether they should have followed up

17   on that or not.

18           So the existence in the investigative file has

19   significance independent of -- of the individual pieces.

20           THE COURT:  Got it.  And we're not arguing -- I

21   appreciate that.  We're not arguing anything today.

22           Is there anything else you want to say that -- so let

23   me ask you this, folks:  Do you -- I don't know if you would

24   welcome this or internally roll your eyes at this.  I don't

25   know.  Do people want to submit something short to me on the

1     police report?  It sounds like this is pretty important to you

2     folks.  How about Friday, the 1st?  Does that work?

3           MR. SAFER:  Yes, Your Honor.

4           THE COURT:  Like something short, something not fancy

5     by way of a preview.  I don't -- I don't need you -- I'm

6     thinking five to ten pages max.

7           Is that --

8           MR. SAFER:  Yes, Your Honor.

9           THE COURT:  Is that helpful?

10           MS. BOUDREAUX:  Yeah, sure.

11           THE COURT:  I mean, that way I'll be better informed

12     about it, you know.

13           Yeah, go ahead.

14           MR. LITOFF:  I assume you mean a joint filing, five

15     to ten pages?

16           THE COURT:  Well, I think if -- so I've got -- it

17     sounds like a pretty important evidentiary ruling on the

18     police reports, it sounds like.  It does not have to be a

19     joint filing *per se*.  Each side can tell me anything they want

20     me to know before I think about the police reports.

21           MS. BOUDREAUX:  That sounds good.

22           THE COURT:  It's a way to talk to me in greater

23     detail about the admissibility of the police reports.

24     Anything you want to say, I'll listen to.

25           MS. BOUDREAUX:  Okay.

1           THE COURT:  Does that sound good?

2           MR. SAFER:  Yes.

3           MS. BOUDREAUX:  Yes.

4           THE COURT:  You don't have to make it the world's

5    greatest filing.  Just tell me what you think I need to know

6    and why it should come in or why it should come out or

7    what's -- give me a preview of what some of the obstacles are

8    going to be.

9           MS. BOUDREAUX:  Okay.

10          THE COURT:  Okay?  Because you folks are really,

11   really knowledgeable, really well versed about this case.

12   You're ahead of me.  And I've got to get caught up.  And if

13   you tell me things, I'll listen, and I'll try to close the gap

14   step by step here.  Okay?  Does that make sense?

15          MS. BOUDREAUX:  Yes.

16          THE COURT:  Don't feel pressured to make this the

17   world's most glamorous filing.  Just tell me what I need to

18   know.  Okay?

19          Anything else on exhibits, folks?

20          I do want to talk about demonstratives, too.  But I

21   guess what I would propose is, I'd like you folks to think

22   about doing a list -- an agreed list of exhibits where we can

23   say off the bat these come in, they're in evidence.

24          And I want to make sure that I know, you know, which

25   exhibits are really in dispute and which ones people have got

1   to lay the foundation on.  I don't want people burning time if

2   they don't have to burn time on exhibits.  Okay?

3            MS. BOUDREAUX:  Yes.

4            THE COURT:  Anything else on exhibits?  Anybody?

5            MS. BOUDREAUX:  No.

6            THE COURT:  Could we talk about demonstratives before

7   I forget?  I don't know if you folks intend to use

8   demonstratives.  I don't know if you folks have talked about a

9   protocol for exchanging them.  You know, I don't know if

10  people intend to use demonstratives during openings.  I don't

11  know if you've talked about exchanging that.

12           Do you folks know if you intend to have -- during

13  openings, do you intend to have demonstratives?  And if so, do

14  you intend to share them with each other?  It seems like --

15           MS. BOUDREAUX:  I would be fine with that.  We do not

16  have any demonstratives made as of this point.

17           THE COURT:  Yeah.

18           MS. BOUDREAUX:  We were thinking about a map of the

19  area.

20           THE COURT:  Okay.

21           MR. SAFER:  Yeah.  Yeah, we're on the same page.

22           MS. BOUDREAUX:  Yeah.

23           MR. SAFER:  We would think of a map of the area and

24  maybe a diagram of J&J.  So we can -- we can get -- we'll get

25  together.  We'll let them see in advance any demonstratives

1    that we -- we intend to use, and hopefully they'll be

2    noncontroversial.

3          THE COURT:  Yeah, that's great.  When we meet the day

4    before, you know, show up with whatever demonstratives you

5    want to show in your opening.

6          And then I think it's good to be giving each other

7    previews of demonstratives, show them to the other side in

8    advance.  I don't know.  Have you talked about that with each

9    other, you know, if you want to -- you had a demonstrative

10   with a witness?  A lot of times they do it the day before.

11         MR. SAFER:  We'll do that, Your Honor.

12         THE COURT:  You know, what do you think?  Like, the

13   evening before, show it to each other.  You should know by the

14   evening before what it's going to be.

15         MS. BOUDREAUX:  That's fine.

16         THE COURT:  You know, don't sandbag each other.  I

17   don't expect this group to do that, but, you know.

18         Okay.  So that's what I've got on exhibits.

19         Two other things on exhibits before I forget:  So

20   we're obviously going to be using the JERS system, which you

21   folks should be familiar with, which means you've got to have

22   an electronic copy of your trial exhibits.  Have that ready to

23   go so that when the jury gets back there, they've got

24   everything.

25         Okay.  So the day of closing -- before closings,

70

1    you've got to show up with your side's list of -- or -- I'm

2    sorry -- your exhibits ready to go.

3           Number two, I think it would be a good idea to keep a

4    running list of exhibits that are in evidence.  I never liked

5    chaos in trials.  Uncertainty doesn't help anybody.

6           So what I would propose is the following:  By, let's

7    say, 8:30 the morning of each trial day, or preferably the

8    night before but no later than 8:30, the party that is

9    presenting its case will file just a list of the exhibits that

10   were admitted the prior day.

11          So let's say, Mr. Safer, on Wednesday, you start

12   presenting your case.  So no later than Thursday morning, it

13   will just say, Wednesday, you know, October X, admitted

14   exhibits, and just list them.

15          And then on Friday, you're not going to delete that.

16   You're going to file something on Friday that's going to have

17   that information.  You're just going to add to it, you know,

18   Thursday's filings.  And that way, at the end, we have an

19   agreed list of what's been admitted.  No questions, right?

20          I never liked it when I was like, well, jeez, did

21   Exhibit 17 come into evidence, and then we've got to ask my

22   courtroom deputy and go back to the record.

23          It's in your interest to have a real clear record of

24   what's in because you don't want to be in a position where

25   you're like, oh, I thought this was in evidence and it's not.

1   That's not good for you people, right.

2           MS. BOUDREAUX:  Are you saying file that with the

3   Court?

4           THE COURT:  I think so.

5           MS. BOUDREAUX:  Okay.

6           THE COURT:  I think that's a good idea.  Is there any

7   reason why we can't?  Do other -- I don't know if other judges

8   have done that.  I feel like I've seen that.  I don't know

9   that I've seen that in this district.  I'm open to better

10  ideas.  I don't begin to purport to think I have a monopoly of

11  good ideas up here, folks, but it seems like a good idea to

12  just keep a running log that everybody can agree on.

13          MS. BOUDREAUX:  Okay.

14          THE COURT:  It shouldn't be too burdensome.  Like

15  anything else, if anybody thinks this a bad idea, I'll listen

16  to you, but I think that's a -- it strikes me as a good idea

17  just to have a running list.

18          MS. BOUDREAUX:  Okay.

19          THE COURT:  Anything else on exhibits, folks?  It's

20  pretty high-level stuff.

21          Jury instructions we've talked about.

22          Let me talk about COVID testing.  So some or many or

23  maybe all of you know all of this, but bear with me.  So to

24  keep everybody safe and healthy, we've got to have you folks

25  do COVID testing.  You've got to sign up.  You've got to get

1    an account and sign up.  Maybe you've done that, but if you

2    haven't, please do that.  You can go through the clerk's

3    office to do that.

4         Anybody who is going to be in the courtroom for more

5    than two days, including lawyers, clients, tech people,

6    anything like that, they've got to sign up for it, and they've

7    got to get tested every couple of days.  Okay.  So please make

8    sure you do that.  It's for your health and safety.

9         You've got to wear masks at all times over your nose,

10   over your mouth, except a witness when they're testifying.

11        I know masks are uncomfortable in a lot of ways.

12   I'll tell you, when I sentence people, I don't wear a mask

13   because I feel uncomfortable with it.  There's a level of

14   inhumanity to it when you can't see somebody's face that I

15   don't like.  But I think I -- I will probably wear a mask

16   myself through the whole trial.  I don't love that.  There's

17   something about that I don't like, just being --

18        MR. SAFER:  Your Honor, what is the Court's position

19   about attorneys who are questioning the witness?

20        THE COURT:  I feel like you should have a mask on.  I

21   mean, what's been your experience -- what was your last trial?

22   You didn't have to?

23        MR. SAFER:  We did not have to because it -- as

24   you --

25        THE COURT:  Yeah.

1    MR. SAFER:  It muffles.  It's -- you have

2  miscommunication with the witness.

3    THE COURT:  Yeah.

4    MR. SAFER:  And we -- and because of the significant

5  distance that you're away from anybody, the judge said do not

6  wear a mask when questioning witnesses or giving opening or

7  closing argument, and -- and it worked.

8    THE COURT:  So let me ask.  I hear that, but you look

9  behind you, your new best friend behind you, the juror, is

10  going to be sitting right there who may or may not like you

11  spitting 6 or 8 feet away.

12    MR. SAFER:  I think --

13    THE COURT:  I wonder if they're going to be

14  comfortable with that.  Go ahead.

15    MR. SAFER:  I think, Your Honor -- I don't know how

16  1441 is going to be set up.

17    THE COURT:  Yeah, they're smaller on 14.

18    MR. SAFER:  But it's also -- the way they set it up

19  was different --

20    THE COURT:  Okay.

21    MR. SAFER:  -- than this.  And we were like in the

22  middle, and we were well away from the jurors.

23    THE COURT:  Okay.  Yeah, fair enough.

24    MR. SAFER:  It's difficult, I think, for the jurors

25  to hear, for the witness to interact without seeing the lawyer

1    ask questions.

2              THE COURT:  Yeah.  Have you folks talked about this,

3    by the way?  I don't know if you -- I'd encourage you folks to

4    talk about that.

5              I will talk to my fellow judges to see what their

6    protocols are on that.  I don't know how much leeway I have.

7    I don't know if that other judge went rogue, which happens.

8              MR. SAFER:  He -- it was Judge Leinenweber,

9    Your Honor.  He's -- he tends not to go rogue.

10             THE COURT:  Yeah.

11             MR. SAFER:  And he said that Judge Pallmeyer --

12   Judge Pallmeyer's instructions were that it's at the

13   discretion of the Court.

14             THE COURT:  Okay.  I assume I will have a mask on to

15   set an example for people.  The jurors aren't going to like it

16   if they have to wear a mask --

17             MR. SAFER:  Yeah.

18             THE COURT:  -- and I'm up here, you know, sipping

19   beverages without a mask on.  It's not going to be any good.

20             Okay.  Why don't you folks confer on that?  I don't

21   know if anybody is uncomfortable with anybody else having a

22   mask on.  I don't know if you all are vaccinated.  I don't

23   know if that's an issue for anybody, if somebody feels

24   uncomfortable if a lawyer is here speaking without a mask.  I

25   don't know.  I don't know your health situation.  Be candid

1   with each other.  And if anybody -- you don't have to get into

2   names, but if anybody is uncomfortable with a lawyer speaking

3   without a mask for legitimate, good faith, actual reasons, I

4   want you to tell each other.

5              So, Mr. Safer, I want you to tell the other side

6   whether anybody on your side would have a problem with them

7   not wearing a mask and vice versa.  I don't know if you've

8   shared with each other whether you're vaccinated or not or if

9   anybody has a health situation.  I don't know what your

10  situation is.  I don't want people to be uncomfortable.  I

11  wish we didn't have to wear them.  I get it.

12             And I will double-check that courtroom, and I'll go

13  down there before the 4th and just kind of snoop around and

14  see if I can get a better sense of what it's going to be like.

15  I don't know whose courtroom that is in 1441.  I don't know if

16  that's --

17             THE CLERK:  Judge Durkin.

18             THE COURT:  Judge Durkin's.  So that's the one in the

19  corner.

20             MR. SAFER:  Yes.  Yeah.

21             THE COURT:  I don't know that I feel entirely

22  comfortable sitting in Judge Durkin's seat, but that's what

23  they're going to ask me to do.

24             MR. SAFER:  He will be honored.

25             THE COURT:  Well, I don't know about that.

1          But is there anything else about the COVID protocol?

2          I would say it's been kind of a wild ride here in the

3    courthouse with these trials and COVID.  A lot of stuff has

4    popped up, you know, where somebody will show up -- you know,

5    they have COVID -- they're not sure, but they've got a fever

6    all of a sudden, you know.  So --

7          MS. BOUDREAUX:  I guess I have a question.

8          THE COURT:  Yeah.

9          MS. BOUDREAUX:  So if someone gets COVID during the

10   trial, what happens?

11         THE COURT:  So I think if someone gets COVID during

12   the trial, they are excused because they would have to

13   quarantine for a certain amount of time.

14         We then would have to go through the jury and see if

15   anybody was within a certain number of feet of this person for

16   a certain amount of time.  And then we need to talk about --

17   without asking them directly "Are you vaccinated or not,"

18   because people have different situations and views on that

19   part of life, we need to ascertain whether that person needs

20   to quarantine.  If they've been within a certain number of

21   feet with a person for a certain amount of time, depending on

22   their vaccination status, they may need to be off the jury,

23   too.

24         See what I mean?  So --

25         MS. BOUDREAUX:  So what about a lawyer?

1            THE COURT:  What's that?

2            MS. BOUDREAUX:  What if a lawyer gets it?

3            THE COURT:  So I think if one of you gets it, you

4    can't come back for a couple weeks, and, you know, in football

5    they say next man up or next woman up, right?

6            MS. BOUDREAUX:  The show must go on.

7            THE COURT:  The show must go on.

8            MS. BOUDREAUX:  Got it.

9            THE COURT:  It looks like you've got a well-equipped

10   arsenal of people here.  Wear your masks.  Be as careful as

11   you can in the meantime.  I think we're going to roll.  You

12   know, you guys have waited too long for trial.  You know,

13   we -- it's not a situation, say, oh, you know, somebody has

14   got COVID, why don't we take a break and come back in a couple

15   weeks.  We can't.  We've just got to roll.

16           You know, I know that some people get COVID when

17   they're, you know, absolutely a hundred percent careful.  You

18   know, you do have to go to the grocery store at some point in

19   your life, right?  Be as careful as you can.

20           I don't want to -- you all have worked too hard to

21   get to this point to miss part of the trial, and I'd hate for

22   that to happen to anybody.  But I expect that if you get

23   COVID, you're going to get voted off the island.  Okay.  And

24   not in a good way.

25           And then, you know, if you're sitting in trial, you

1   know, you get -- one of you gets COVID, and you've been

2   sitting next to somebody else this whole time, I expect that

3   person is going to have to get probably a negative test before

4   they can come back.

5        I'm telling you a little bit more than I know for

6   sure, but that's what I expect to happen.  If one of you gets

7   COVID, anybody within a certain number of feet of you is going

8   to have to get tested, and it's going to have to be a negative

9   test before you're allowed back in.

10       MS. BOUDREAUX:  Makes sense.

11       THE COURT:  I'm going to talk to Tom Bruton, the

12  Clerk of the Court, about all of these protocols beforehand in

13  the hope of never having to use any of it.

14       Any other COVID-related stuff, folks, that you want

15  to talk about?  I'm happy to . . .

16       I'm just going to go through my list here and make

17  sure I've covered -- with all the talking I've done, it's

18  inconceivable I've not covered a lot of the ground, probably.

19  But we'll see what I've got here.

20       In terms of the schedule -- I don't think we've

21  covered that.  I think it was in my standing order.  Thank

22  you, folks, for bearing with me.  I was thinking of you guys,

23  by the way, when I put that -- that standing order out there

24  about the pretrial order.  I thought, boy, I hope they don't

25  roll their eyes and say now he tells me what he wants after,

1　　you know, this far down the line.  So that's why I put that

2　　order out there that said to you folks, look, if you've

3　　already got something in the hopper, I'm going to give you

4　　guys extra room.

5　　　　　　But I do think the order I put out there had a

6　　relatively ambitious amount of time.  I think it was 9:30 to

7　　4:45, I think.  Just going from memory here.

8　　　　　　I want you folks to have your trial and get as much

9　　time as you can.  So I don't know if I can give you more time

10　　than that.  If I can, I will try.  Okay?  If I can, I will

11　　try.  I'm your ally on that.  We do have resource restraints.

12　　Some poor court reporter has to take down everything I say,

13　　and I feel sorry for that person.

14　　　　　　But if we -- if we go too late in the day, I've got

15　　to get a new person to come in, and there are issues with that

16　　as well.  But I'd like to do a full trial day.  Probably go

17　　from 9:30 until probably 10:45.  Everybody can take a few

18　　minutes.  Maybe go from 11:00 to 12:30, and then have a

19　　relatively short lunch break.  Maybe come back 1:15, you know,

20　　roll till, you know, 3:00, take a quick break, and then go

21　　until 4:45, something like that.

22　　　　　　We're blessed with days, but only a certain number of

23　　days, so I want to maximize the amount of time that you've got

24　　to go.

25　　　　　　I do want to talk about trial technology, too, folks.

1    I don't think I've covered that yet.  I don't know if you

2    folks have a technology person, either side, if you're

3    intending to use somebody to publish to the jury.

4           It looks like plaintiff's side is --

5           MR. SAFER:  Yes.

6           MR. LITOFF:  Yes.

7           THE COURT:  And have you talked to the other side

8    about that?  And have you --

9           MR. SAFER:  No.

10          THE COURT:  It's only -- I assume, defense side, are

11   you having your own person or using the same person?  None of

12   it?

13          MS. BOUDREAUX:  None of it.

14          THE COURT:  Okay.  Do you -- do you plan on using the

15   ELMO?

16          MS. BOUDREAUX:  Yes.

17          THE COURT:  Okay.  I'm not familiar with

18   Judge Durkin's setup.  I know he is a trial lawyer friendly

19   person, so I'm sure he is well equipped.  I just haven't gone

20   down there.

21          Mr. Safer, on your team, do you need setup time

22   beforehand so we can rock and roll when you're ready?  I mean,

23   do you need to set it up the day before and whatnot?  And do I

24   need to make arrangements with --

25          MR. SAFER:  Your Honor, what typically happens is he

1    comes in, he works through your clerk.

2              THE COURT:  Yep.

3              MR. SAFER:  And the technology people from the

4    building, they have it all down.

5              THE COURT:  Yep.

6              MR. SAFER:  We'll be ready to go, you know, opening

7    statement.  Not a problem.

8              THE COURT:  Okay.  Good.  I'll leave that to you,

9    then.  I don't know if that courtroom is going to be used the

10   day before, hopefully not, but I would encourage you to get in

11   there as soon as you can.

12             MR. SAFER:  Yes.

13             THE COURT:  You know, when I did cases, I liked

14   coming in there, and if I had slides in the opening, I'd, you

15   know, give it a quick go.  So hopefully you can do that, and

16   it will all go smoothly.

17             Let me talk about sidebars for a second.  Ordinarily

18   we turn the white noise machine on, right.  We go have a

19   meeting off to the side.  Some of you lawyers come over, and

20   we'll talk in a microphone.

21             It's different in COVID land.  In COVID land, we

22   still turn the white noise machine on, but we use headsets,

23   sort of like glorified walkie-talkies, where we just put it

24   on, and we can talk to each other and nobody can hear us.  It

25   should work reasonably well.  I hope -- I hope it goes

1   smoothly.  Maybe we can test it the morning before, make sure

2   the headsets work.

3          You know, sidebars are necessary from the following

4   standpoint:  I don't like objections that go on at length and

5   are argumentative.  The jury doesn't want to hear that.  It's

6   not what it's for.  Sometimes you want to make an objection

7   that's outside the presence of the jury, as you should, right?

8          I don't like sidebars that are intended to disrupt

9   the other side and to suck time away and to knock people off

10  their game.

11         I don't expect that to happen, but if I feel like

12  that's happening, I will let you know.

13         So if you think you have a sidebar need, you can ask

14  for one, I'll give it to you.  Just do it in good faith.

15  Okay.  Play fair.  Do it in good faith.  And I'll expect the

16  other side, too.  When you're presenting your stuff, I'm not

17  going to like it if the other side jerks you around by

18  requesting a bunch of sidebars, too.  Okay?  I'll try to be as

19  evenhanded with that as I can.

20         I'm going to allow the jury to take notes.  I have

21  had jury trials before where juries were allowed to ask

22  questions.  Pre-COVID land, I actually liked it as a lawyer.

23  I had good experience with it because I got to get a sense of

24  what the jury was thinking about, and I don't like having

25  unanswered questions that they don't know.

1          I feel like this is probably not that case, partly

2   for time reasons and partly because there just could be a lot

3   of stuff that they want to know that they can't know for a

4   variety of evidentiary reasons.  I think we would be opening

5   up a can of worms and consuming time.

6          I think it would be probably more of a time suck

7   unless -- if this were 403 land, I think the probative value

8   would be substantially outweighed by the consumption of time

9   here.  I don't know if anybody has a different view on that,

10  but I was not inclined to have jurors ask questions.

11         What I've done before, they submit written questions,

12  and then we powwow and we talk about whether any of these

13  should be asked, and then somebody would read the question if

14  it's good.  You know, that made sense when we had loads of

15  time here.

16         I think the odds of the jury asking something that

17  would materially advance the law that is worth the time,

18  energy, and distraction is probably low.  And I think it is

19  likely they're going to want to know stuff that they can't

20  know, and then they'll feel deflated and put off.  I asked

21  this great question, it's obviously important, but you won't

22  answer, now I feel like you're hiding stuff from me.  That's

23  no good.

24         So unless people have a different view of this, which

25  I will hear, I'm not inclined to invite questions from the

1   jury here.

2            Mr. Hale, go ahead.

3            MR. HALE:  [Indiscernible.]

4            THE COURT REPORTER:  Can you speak into the

5   microphone, please.

6            MR. HALE:  I'm sorry.  That's something we will

7   confer about, and if we --

8            THE COURT:  Okay.

9            MR. HALE:  -- think we need to raise it, we will.  We

10  just haven't decided.

11           THE COURT:  Yeah, okay.  I mean, I -- I'll listen to

12  you.  I think it's -- if I had a month to do this trial, and

13  it wasn't COVID land, I'd probably let you do it.  Probably.

14  I don't know.  It's a little thorny here from an evidentiary

15  standpoint.  I don't know what I'd be walking into.  But you

16  can talk about that.

17           You know, in terms of moving about the courtroom, in

18  general, I never liked it as a lawyer when people would get in

19  the face of the jury, like right up and close.  I feel like

20  they're in a mini hostage situation anyway, and people have a

21  right to their own space.  I think it's kind of -- I thought

22  it was off-putting and disrespectful to get so close to them.

23  People are entitled to a certain amount of space, especially

24  in COVID land where I think you've just got to maintain your

25  distance.

1    So, you know, when you -- you know, I'll let you --

2  you know, you don't have to be a statue up there.  You don't

3  have to be Venus de Milo.  You can move around a little, but,

4  you know, don't go on the prowl when you're -- think of it

5  like your basketball pivot or something, you know, that's your

6  zone of movement.  You know what I mean?  Does that make

7  sense?

8    I don't know if there's going to be a need to

9  approach the witness *per se*.  Given that somebody is not going

10 to have a mask on, I don't think that's a great idea.  I

11 assume not.  There's not going to be a need for that here

12 because we can just publish things.  So I don't see a need for

13 that.  If there is a document that you think the witness needs

14 to have in hand in a hard copy, let's say, somebody who can't

15 see well, they have a problem with -- they need a copy, you

16 know, a hard copy, prepare in advance.

17    MS. BOUDREAUX:  Yeah, our clients are 81 and 79.

18    THE COURT:  Okay.

19    MS. BOUDREAUX:  So I actually think we will need to

20 hand them things.

21    THE COURT:  Yep.

22    MS. BOUDREAUX:  But I think the clients will be

23 comfortable with -- with that.

24    THE COURT:  Yep.

25    MS. BOUDREAUX:  And we'll talk about it with the

1    other side or --

2         THE COURT:  Yeah, when I -- when I was on your side

3    of the veil, I had a hard copy of all of my exhibits for the

4    witnesses when they took the bench -- or took the stand,

5    rather.  Even when I used a technology person.  Here you go,

6    you want a -- because I didn't want somebody going, oh, I

7    can't see it.  Here you go, I gave you a copy.

8         MS. BOUDREAUX:  Yeah.

9         THE COURT:  Nice and easy.  Nice and smooth.

10        I don't know if you need that.  I don't know if you

11   need to go to that trouble here.  I do think for the older

12   witnesses, we're asking for trouble to go to the screen,

13   probably.  It's up to you.

14        MS. BOUDREAUX:  Yeah, I agree.  So --

15        THE COURT:  Think about having a courtesy copy.

16        And, Mr. Safer, if you're going to cross-examine

17   them, I want your exam to be on the merits.  Both sides.  I

18   want it to go smoothly on both sides.  Think about having it

19   easy for the -- you know, it doesn't do anybody any good if

20   the jury sees a senior citizen struggling with technology.

21   It's not a good vibe.

22        MS. BOUDREAUX:  Yeah, thank you, Judge.

23        THE COURT:  You know, so I'd encourage you to have --

24   maybe we don't need it for most witnesses, but for some, we

25   may.

1          You know, when I do closing instructions, I expect

2     that I'll project it on a screen.  You know, we'll read along,

3     you know, so it will be nice and easy.  You can see what I'm

4     saying.  You can correct me if I say something wrong.  But

5     that's what I expect to do.  And then give them a hard copy

6     when they go back there.

7          I am loathed to say I'm out of topics because we've

8     covered a lot and, undoubtedly, despite going on for a couple

9     hours now, I probably haven't covered everything.  It's 4:15

10    now.  I was a little late again today.  I apologize for that

11    again.  But we have covered a lot in two hours.  Hopefully

12    you've got a better vibe of how it's going to go.

13         I'm in listening mode here, folks.  If there's

14    something that you want to raise today, if there's something

15    that you think I should think about, if there's something you

16    think I should read, if there is a plan that you want to

17    propose between now and the start date of trial, I'll listen

18    to you.

19         I know it's an adversarial setting in the sense of,

20    you know, the plaintiff believes he's wrong and wants a bunch

21    of damages and defendants have a much different view of the

22    world, but we still have to do this cooperatively in the sense

23    of fight fair, engage each other in good faith, have it be,

24    you know, on the merits, a smooth, clean trial you folks can

25    have confidence in.

1          You know, I'm going to expect the other side to treat

2     you fairly, and I'll expect you to do the same.  Okay.  So I

3     don't want the defendants to give the plaintiff a hard time

4     and *vice versa*.  Make good objections that matter.  At this

5     point I'm repeating myself, probably.

6          Do you folks want to confer with each other for a

7     minute and just see if there's anything you want to raise?  Do

8     you guys want to break for five minutes and think -- do you

9     want to come back in five minutes?  Do you want to confer?

10          MR. BAZAREK:  Your Honor, one thing I do want to

11     raise with the Court.  Plaintiff's counsel is already aware.

12          So I reached out to my client today, James Oliver --

13          THE COURT:  Okay.

14          MR. BAZAREK:  -- and he has been hospitalized.

15          THE COURT:  Oh --

16          MR. BAZAREK:  He is --

17          THE COURT:  -- I'm sorry to hear that.

18          MR. BAZAREK:  -- in Arkansas.

19          THE COURT:  Okay.

20          MR. BAZAREK:  All I know is, they are doing testing

21     on him.  So that's what I know right now.

22          THE COURT:  Okay.

23          MR. BAZAREK:  And I found that out this afternoon

24     before I walked across the street.

25          THE COURT:  Okay.  I appreciate that.

1          How old is Mr. Oliver?

2          MR. BAZAREK:  I believe he is 77.

3          THE COURT:  Okay.  You can tell Mr. Oliver that the

4    Court and everybody, you know, plaintiff and everybody, wishes

5    him well from a health standpoint.  I think we can all agree

6    to that.  Hope he is well.

7          I appreciate you flagging that.  If it becomes an

8    issue, I want you to be upfront about it with the plaintiff.

9          I don't know -- Mr. Safer, I don't know if you took

10   his deposition by video?  It sounds like he's still planning

11   to come, obviously.  I don't know.  But did you -- we're

12   getting way ahead of ourselves, but did you --

13         MR. SAFER:  There was no video, Your Honor.

14         THE COURT:  Okay.  Just keep me posted.  And if it

15   becomes an issue, you know, be upfront with Mr. Safer and the

16   plaintiff's team.  You know, I -- I do think, given the nature

17   of the case, it's important for him to be here, the body

18   permitting.  So if it's a serious thing, I want you to be

19   upfront with Mr. Safer and -- you know, don't surprise

20   anybody.

21         MR. BAZAREK:  Of course not.  Yes, Your Honor.

22         THE COURT:  I know you'd do that anyway.  I don't

23   need to tell you that.  But thank you for raising that.

24         Do you folks want to confer with each other as your

25   team for five minutes and just see if there's something that

1    you want to raise with me?  If you feel like you've shot your

2    wad, and you don't need to do it, I --

3            MR. SAFER:  I think we -- I think Your Honor has

4    covered everything on -- on the landscape.

5            MS. BOUDREAUX:  Yeah, I agree.  We don't need to

6    confer.

7            THE COURT REPORTER:  I'm sorry, I can't hear you.

8            MS. BOUDREAUX:  I'm so sorry.  We do not need to

9    confer.

10           The only other thing I wanted to say was that if your

11   courtroom clerk is going to contact us for the technology

12   meeting, we would like to be included in that just so we can

13   have a laptop in here, too.

14           THE COURT:  Okay.  Fine.  Yeah, just work together

15   cooperatively.

16           MS. BOUDREAUX:  Okay.

17           THE COURT:  All right.  So the only thing I would say

18   is, I'm going to be out of the office next week.  If you need

19   to reach me, I will make time for you.  Okay?  I just -- I

20   can't promise it's going to be the very next day, but I will

21   make time for you if you need it, but I wanted to be upfront

22   about that.

23           I'm going to be at a judicial conference outside of

24   Yellowstone, of all places.  So . . .

25           MS. BOUDREAUX:  Cool.

1       THE COURT:  That one, I'll go to.  The only place in

2    the country I'd go right now, probably.

3       But if you need to reach me, if you need a ruling on

4    something, I'll try to give you TLC.

5       I guess the last thing I'll say, I know that it took

6    me a while, folks, on the motions *in limine*.  Thank you for

7    your patience.  I hope I gave you enough runway here to still

8    prepare for trial.  You've got a couple of weeks to get

9    together.

10      You know, I will tell you on a personal note, you

11   know, I did not fully appreciate until I was on this side of

12   the veil the magnitude of what's on a judge's plate here in

13   the Northern District of Illinois.  I mean, I -- I'm pretty

14   fast, and I cut through things pretty fast, but every judge

15   has hundreds of motions on their plate at any given time.

16      What I tell people is, you know, think about it this

17   way:  How many Target stores do you think there are in the

18   Chicago metropolitan area?  I don't know the answer.  It's a

19   rhetorical question.

20      But think, okay, in the city of Chicago, how many are

21   there?  You know, how many are in there in the burbs?  I don't

22   know.  Is it 20?  Is it 30?  Is it 40?  I don't know.  And

23   let's say you throw in Walmarts, too, and all of that.  You

24   know, let's say there are 40.  I don't know.  Well, there are

25   only 20 judges full-time in Chicago.  Only 20.  So, you know,

1    imagine if there are only 20 grocery stores in Chicago or

2    you're -- everybody in Chicago has to buy from Costco, but

3    there are only 20 checkers for the entire -- not just Chicago,

4    the Northern District of Illinois, right?

5            So what that means is, people inevitably have to wait

6    longer than they want to get a ruling on things.

7            You know, I -- you know, in the span of less than two

8    years, I have, you know, over a hundred opinions on Westlaw

9    already because we've just got to roll, roll, roll, and I

10   issue lots and lots and lots of rulings that aren't on

11   Westlaw, substantive rulings that aren't on Westlaw.  You

12   know, that's just what hits Westlaw.

13           So I appreciated your patience on the motions *in*

14   *limine*.  I hope I didn't make you folks wait too long.  If I

15   did, I'm sorry.  I get it.  But one of the issues with having

16   20 bodies with 300 cases just on your civil docket is, you

17   know, people need to -- need to wait sometimes.

18           It's like being in the world's longest deli line,

19   where you pull your number, and there's a lot of people

20   ordering food at the same time.  And so no matter how fast

21   this chef works, there's a lot of slinging back there that's

22   got to get done before you get your turn.

23           So that's a long way of saying, I hope I gave you

24   enough lead time to get ready for your trial.  I'm looking --

25   just personally and professionally, I'm looking forward to

1  this trial.  I think it's going to be fun.  I think it's going

2  to be an interesting trial.  I know that we've got

3  high-caliber lawyers on this on both sides.  I think it's

4  going to be a great experience.

5           I am open to suggestions.  If you have any bright

6  ideas between now and when we meet on the 4th, go ahead and

7  file something, and I'll listen to you.  But I want this to be

8  a good experience for you folks and get a good ruling, and the

9  jury will decide what the outcome is.  Okay?

10           I think we're adjourned.  Thank you, folks.  Take

11  care.

12           THE CLERK:  All rise.

13       (Which were all the proceedings heard.)

14                    *   *   *   *   *   *

15                         CERTIFICATE

16     I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19  /s/ *Amy Spee*                    9/23/2021

20  _____        _____
    Amy Spee, CSR, RPR, CRR          Date
    Official Court Reporter

21

22

23

24

25