665

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4    EDDIE L. BOLDEN                 )
                                     )
 5               Plaintiff,          )    Docket No. 17 C 417
                                     )
 6          vs.                      )
                                     )
 7    ANGELO PESAVENTO, et al.,      )    Chicago, Illinois
                                     )    October 12, 2021
 8               Defendants.         )    1:45 p.m.

 9

            TRANSCRIPT OF PROCEEDINGS - VOL. 3B
10      BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

11

      APPEARANCES:
12

13    For the Plaintiff:     RILEY SAFER HOLMES & CANCILA LLP
                             BY:  MR. RONALD S. SAFER
14                                MR. ELI J. LITOFF
                                  MS. SANDRA L. MUSUMECI
15                                MR. MATTHEW C. CROWL
                                  MS. VALERIE BRUMMEL
16                           70 West Madison, Suite 2900
                             Chicago, Illinois  60602
17

18    For the Defendant      GREENBERG TRAURIG LLP
      City of Chicago:       BY:  MS. TIFFANY S. FORDYCE
19                                MR. KYLE L. FLYNN
                             77 West Wacker Drive, Suite 3100
20                           Chicago, Illinois  60601

21

22    Court Reporters:       FRANCES WARD, CSR, RPR, RMR, FCRR
                             JENNIFER COSTALES, CRR, RMR, CRC
23                           Official Court Reporter
                             219 S. Dearborn Street
24                           Chicago, Illinois  60604
                             frances_ward@ilnd.uscourts.gov
25                           jennifer_costales@ilnd.uscourts.gov
```

APPEARANCES (CONT'D):

```
For the Individual       HALE & MONICO, LLC
Officer Defendants:      BY:  MR. ANDREW M. HALE
                              MS. BARRETT E. BOUDREAUX
                              MR. WILLIAM E. BAZAREK
                              MR. BRIAN J. STEFANICH
                              MS. AMY A. HIJJAWI
                         53 West Jackson Boulevard, Suite 330
                         Chicago, Illinois  60604
```

666

1    (Proceedings heard in open court:)

2            THE COURT:  A couple things real quick, folks, and

3    then we will get rolling.

4            First, Mr. Hale said something before the break

5    that I wanted to emphasize.

6            As I said in my motion *in limine* rulings, they were

7    preliminary in the sense that the rulings could change as the

8    case unfolds and I learn more about the evidence and hear it

9    in context.  You should err on the side of preserving your

10   objections.

11           So I don't want to reargue things in front of the

12   jury, but you should err on the side of repeating your

13   objection for the record.  That way you have got a nice,

14   clean record if you choose to appeal some day.  You can just

15   stand up and say, objection for the reasons stated in motion

16   X, Y, and Z.  I will just say, objection sustained or

17   objection overruled for the reasons previously stated.  Nice

18   and easy.

19           But you always want to preserve objections.  I

20   remember, as a young associate, an attorney said something

21   that had a profound impact on me.  He said, "I fear nothing

22   in the world except a waiver."  It sort of cracked me up, but

23   I have never forgotten it.

24           So err on the side of objecting.  I won't take it

25   personally if you object and say, your Honor, objection for

1    the reason -- just please tell me what the motion *in limine*

2    is so I can look it up and double-check.  But just say,

3    motion *in limine* -- objection for motion *in limine* X, Y, and

4    Z.  We will go ahead and make sure you have got it on the

5    record.

6              Second, I am going to do something that I have

7    never seen a judge do before but I always thought was a good

8    idea.  I think jurors should be able to stand up and stretch.

9              I will tell you -- and this is not a comment on

10   either side -- I saw one particular juror with some droopy

11   eyelids during both presentations.  That doesn't do anybody

12   any good.  We don't know the medical condition of these

13   folks.  Some people have a hard time sitting.  It's hard to

14   sit and listen to other people, right, especially when it's

15   not your case.

16             So what I'm going to tell them when they come in

17   is, if you find yourself feeling uncomfortable and it would

18   help you to stand, go ahead and stand up.  And just do it in

19   a discreet way that doesn't distract other people.

20             If you are feeling a little sleepy, like you are

21   losing attention, go ahead and stand up, because at the end

22   of the day, you folks want -- everybody wants an attentive

23   jury that will listen to the evidence and make the best

24   decision based on what happens in the courtroom.  I think

25   that's a mechanism that I think judges ought to do because

1    it's consistent with that.  So that's what I am going to tell

2    them.  Okay?

3           Anything else from a housekeeping matter that we

4    should do before we start?

5           You can go ahead.

6           MS. MUSUMECI:  Your Honor, just following up on

7    this morning, the parties did agree upon a stipulation for

8    the admission of PX 50.  I believe that your law clerk has

9    just printed it out.  So the parties just need to review and

10   sign it.

11          I believe Mr. Bazarek had one very minor edit to it

12   that I just learned about about a minute before your Honor

13   took the bench.

14          Would it be okay if we make that change by hand?

15          THE COURT:  Of course.  Yes.

16          I already have supplemental undisputed facts and

17   evidentiary stipulations about Plaintiff's Trial Exhibit

18   No. 5.  I assume that I will read that into the record and

19   explain to the jurors that this is a stipulation.  It's an

20   agreement of the parties, and they can adopt it as true.  Is

21   that right?

22          MS. MUSUMECI:  Yes, your Honor.

23          THE COURT:  All right.  And then you are saying

24   there is another stipulation.  Do you want me to read that in

25   now or later?

1          MR. BAZAREK:  It's 003 after the star number of

2     Officer Willis.

3          MS. MUSUMECI:  Your Honor, this is related to a

4     different stipulation.

5          THE COURT:  A different stipulation.

6          MR. BAZAREK:  I'm sorry, your Honor.

7          THE COURT:  Totally fine.

8          I guess my question is, do you want me to read that

9     stipulation in now --

10          MS. MUSUMECI:  Yes.

11          THE COURT:  -- or do you want me to read it later?

12          So I will read two stipulations.

13          MS. MUSUMECI:  That's correct, your Honor.

14          THE COURT:  Okay.  If you want to go ahead and just

15     hand up the agreed stipulation whenever you are ready.

16          You are going to be filing each of these?

17          MS. MUSUMECI:  Yes, your Honor.

18          THE COURT:  That would be great.

19          Ms. Ramos, why don't you go ahead and get people

20     lined up out there, if you would, please.  Just don't bring

21     them in until you pop your head in and make sure we are ready

22     for them.

23          (Brief pause.)

24          MS. MUSUMECI:  Your Honor?

25          THE COURT:  Yes.

1            MS. MUSUMECI:  Can I just step out to find

2    Mr. Flynn to sign this?

3            THE COURT:  Of course.  Sure.

4            MS. MUSUMECI:  Thank you.

5        (Brief pause.)

6            THE COURT:  Go ahead and hand it to my clerk.

7    Thank you.

8        (Documents tendered.)

9            THE COURT:  When the jury is ready, we will bring

10   them in.

11           MS. MUSUMECI:  Your Honor, before the jury comes

12   in, we have a binder with the exhibits.  I provided one to

13   opposing counsel.  May I put one on the stand for the

14   witness?

15           THE COURT:  That's great.  Appreciate that.  Yes.

16           Everybody ready?

17           MS. MUSUMECI:  Yes, Judge.

18           THE COURT:  Let's call the jury.

19       (Jury in at 2:00 p.m.)

20           THE COURT:  All right.  Folks, welcome back.  Have

21   a seat, please.

22           A couple housekeeping matters, folks.  I know it's

23   2:00 o'clock.  I promised you back at 1:50.  So you may be

24   saying to yourself, why are we ten minutes late?

25           Sometimes it takes a little time to save some time.

1    The bottom line is, we used that time productively when you

2    were gone.  The parties reached some agreements on some

3    things that will speed things along.

4           And the long and short of it is, the parties have

5    stipulated to a few things.  I am going to read some

6    stipulations about certain documents into the record in a

7    moment.

8           So if you are wondering, boy, why are they late?

9    Why are they ten minutes late?  It's not because people can't

10   tell time here.  I try to keep a tight running ship, but

11   sometimes to save some time, you have to spend a little time.

12   So that's why we did those stipulations.

13          So please don't blame the parties for being a

14   little late.  It's something that they should have been doing

15   in a good way.  So I encourage them to reach stipulations.

16   So we will cover that in a minute.

17          The other thing I would say is, I don't know if any

18   of you have a hard time sitting.  I know a little bit about

19   each of you.  I don't know a lot about each of you.

20          Sometimes I have a hard time sitting.  I kind of

21   sit for a living.  I sit on the bench, and I have to sit in

22   my office and write.  Sometimes it's hard for me to sit.

23   I'll be honest with you.  Sometimes I just need to stand up.

24          I don't know if any of you have a back issue or a

25   knee issue or a hip issue or you just feel uncomfortable

672

1    sitting.  I don't want you folks feeling uncomfortable.
2    Okay?

3            And the other thing is, it's hard to sit and
4    listen, especially on a lawsuit that you don't know anything
5    about.  Especially after lunch, it can be easy to feel a
6    little drowsy or a little tired.  I don't want people to zone
7    out and lose concentration because they can't move.
8    Sometimes moving helps concentration.

9            So here is what I would like the ground rules to
10   be:  If you folks are feeling uncomfortable -- physically
11   uncomfortable because you are sitting, or if you are feeling
12   like you are starting to feel a little drowsy and you are
13   losing concentration, what I will allow you to do is stand
14   up.  Go ahead and stand up.  You can do a little stretch.
15   Move around a little.  Stretch the leg.  Whatever you need.
16   And then sit back down and we will go from there.

17           Please do it in a discreet way.  Don't distract
18   each other.  I don't want you distracting your fellow jurors.
19   I know you won't do that.  But I want to give you folks the
20   freedom to stretch your legs if it would help you
21   concentrate, because at the end of the day, what all the
22   parties want is for an attentive jury that is able to listen
23   to the evidence and make the best decision they can based on
24   the facts and the law.  Okay?  Does that sound okay to
25   everybody?

673

1    So if you are feeling uncomfortable or feeling
2    drowsy, go ahead and discreetly stand up for a second and
3    then sit back down.  We won't stop the proceedings for you.
4    We will just keep rolling along.
5    Okay, folks.  Before we have the testimony, I
6    wanted to read into the record the two stipulations that I
7    talked about before.
8    The parties have stipulated to the admissibility of
9    a couple of documents.  So I am going to read two documents
10   to you -- two stipulations.
11   A stipulation is just a fancy way of saying it's an
12   agreement between the parties.  They have agreed to
13   something.  So instead of calling a witness in to say this
14   document is so and so or to explain what a document is, the
15   parties have basically agreed to what the document is and
16   whether you can hear it.
17   So here is the first stipulation.  It's about
18   Plaintiff's Trial Exhibit 5.
19   The stipulation is as follows:  Plaintiff's Trial
20   Exhibit 5 is a true and correct copy of the Chicago Police
21   Department's detective division standard operating
22   procedures, which was made at or near the time of the events
23   recorded by a person with knowledge.  The detective division
24   standard operating procedures are kept in the ordinary course
25   of the regularly conducted activities of the Chicago Police

1    Department, and it was the regular practice of the Chicago

2    Police Department to make these records.

3         In 1994, the standard operating procedures marked

4    as Plaintiff's Trial Exhibit No. 5 set forth authority,

5    responsibility, and accountability and established a

6    structure to ensure compliance with the department directives

7    and uniform crime reporting procedures.

8         Chapters 5 through 9, 17 through 21, and 23 of

9    Plaintiff's Trial Exhibit No. 5 governed the conduct of the

10   Chicago Police Department detectives who are defendant

11   officers in this case.

12        That's the first stipulation.  It's about

13   Plaintiff's Trial Exhibit No. 5.

14        Let me read you the second stipulation that the

15   parties have reached.  This one is about a different exhibit.

16   It's about Plaintiff's Trial Exhibit No. 50.

17        Here goes.  Plaintiff's Trial Exhibit No. 50 is a

18   two-page exhibit.  The first page bearing Bates No. CCSAO

19   0895 -- let me back up one second.  That sounds like

20   legalese.

21        A Bates number is just a number at the corner of a

22   document.  When you produce documents as part of a lawsuit,

23   you got to keep track of what you are producing -- keep track

24   of the numbers.  They number each page.  So if you turn 100

25   pages over, each page is marked Page 1, Page 2, Page 3.  It's

1    called a Bates number.  Okay?  So I wanted to explain that

2    sentence to you.  When it's a Bates number, it's just an

3    identification number to identify the document.

4           So let me read that sentence again so you can

5    follow along.

6           The first page bearing Bates No. CCSAO 0895 is a

7    true and correct copy of a Chicago Police Department property

8    inventory report pertaining to a .40 caliber Smith & Wesson

9    Iberia firearm, serial number 001493, and clip recovered by

10   Chicago Police Officer Maurice Willis, star number 15467,

11   Unit 003, dated January 29th, 1994, and bearing RDY 041680.

12          The property inventory report bears unique invoice

13   number 1266045.

14          The second page bearing Bates No. CCSAO 0896 is a

15   true and correct copy of a court order issued by the Circuit

16   Court of Cook County dated March 18, 1994, in a case called

17   *People of the State of Illinois v. David McCray* ordering the

18   confiscation and disposition according to law of a .40

19   caliber Iberia semiautomatic pistol bearing serial number

20   001493.

21          So that's the stipulation as to Trial Exhibit No. 50.

22          So again, that's a long way of saying those are

23   agreements between the parties for those two trial exhibits.

24          With that, it is time to start the evidence.

25          Plaintiff's counsel, call your first witness.

 1          MS. MUSUMECI:  Your Honor, the plaintiffs call

 2    James Hickey.

 3          If I may, while we are waiting for Mr. Hickey, we

 4    move Plaintiff's Exhibit 5 and Plaintiff's Exhibit 50 in

 5    evidence.

 6          THE COURT:  Any objection?

 7          MS. BOUDREAUX:  No objection.

 8          THE COURT:  So admitted.

 9       (Said exhibits were received in evidence.)

10          THE COURT:  Good afternoon, sir.  Go ahead and take

11    the witness stand, please.  Please raise your hand.

12       (Witness sworn.)

13          THE COURT:  Take a seat.

14          Go ahead, counsel.

15          MS. MUSUMECI:  Thank you, your Honor.

16          JAMES HICKEY, PLAINTIFF'S WITNESS, SWORN

17                    DIRECT EXAMINATION

18    BY MS. MUSUMECI:

19    Q.  Good afternoon, sir.

20          Would you please state your full name for the

21    record?

22          THE COURT:  I'm sorry.  One second.

23          Sir, I'm sorry to interrupt you.  I was going to

24    say, you can take your mask off if you like.  If you are more

25    comfortable keeping it on, you can.  It's up to you.  Okay.

1    No pressure from me on that.

2           Go ahead.

3    BY MS. MUSUMECI:

4    Q.   Good afternoon, Mr. Hickey.

5           Would you please state your full name for the jury.

6    A.   James K. Hickey, H-i-c-k-e-y.

7    Q.   Mr. Hickey, are you currently employed by the Chicago

8    Police Department?

9    A.   I am not.

10   Q.   And when did you -- did you at one time work for the

11   Chicago Police Department?

12   A.   I did.

13   Q.   Are you retired?

14   A.   I did.

15   Q.   And when did you retire?

16   A.   Five years ago.

17   Q.   Would that be 2016?

18   A.   2016.  I think it was November 1st.

19   Q.   Are you presently employed?

20   A.   I am not.

21   Q.   Could you describe your educational background, please?

22   A.   I have a Bachelor of Arts in history, Loyola University,

23   1971; a master in arts, Loyola University in urban studies; a

24   doctorate in public administration, Nova University in

25   Florida.

1    Q.    When did you begin working for the Chicago Police

2    Department?

3    A.    June 14th, 1971.

4    Q.    Could you please briefly walk us through your career

5    with the Chicago Police Department.

6          Where were you first assigned when you started in

7    1971?

8    A.    I will.  I may not be totally accurate on some of the

9    years, but they are close.

10         1971, appointed as a police officer.  After

11   training, I was assigned to the Englewood community at 61st

12   and Racine.

13         I was briefly assigned after that, in about '73, to

14   the juvenile court section.

15         In 1975, I was assigned to the youth division,

16   special investigations unit, concentrating on narcotic

17   investigations and child pornography.

18         I made detective in August of 1977 and was assigned

19   to the Area 1 homicide and sex unit at 51st and Wentworth.

20         After about three years, I was assigned to work for

21   the chief of detectives.  I was there through 1983.

22         In 1983, I was assigned to work in the crime

23   laboratory.

24         During that time I was promoted to sergeant.  I

25   stayed there until '87, when I made lieutenant, and I was

1    assigned again to Englewood community, the Seventh District.

2            And then I was reassigned to work for the chief of

3    patrol.  I stayed there a couple of years.  I was reassigned

4    as the commanding officer of the Midway and Meigs Field

5    Airport police unit.

6            After that, I was assigned to be the commanding

7    officer of a random drug testing unit in which we tested

8    police officers on an unannounced basis for controlled

9    substances.

10           After that, I was assigned to the Bureau of

11   Investigative Services.  I was staffed to the deputy

12   superintendent of that bureau.

13   Q.   If I may, Mr. Hickey, in terms of time frame, we are now

14   in the early to mid-1990s; is that correct?

15   A.   Correct.

16   Q.   Could you continue?

17   A.   Let's see.  I stayed there probably until about '94,

18   '95.  I went to -- I was assigned as a watch commander in the

19   Third District at 71st and Cottage Grove.

20           I stayed there about two and a half years.  I was

21   reassigned to the West Side where I was a watch commander in

22   the Harrison district, which is at Kedzie and Harrison.

23           After that, I was assigned to the research and

24   development division.  I stayed there two or three years.

25   And then I was -- I -- quote/unquote -- retired in 1999.  I

1    was rehired as a civilian member of the police department.  I

2    had been a lieutenant, and then I was an assistant director.

3    I was assigned to the records division.

4              And after that, I worked in -- I was assistant

5    director of the data systems division.  And then I returned

6    to the research and development division where I ended my

7    days as assistant director in charge of policy and

8    procedures.

9    Q.   Thank you for that.

10             That was in 2016; is that right?

11   A.   Pardon?

12   Q.   That was in 2016 when you ended the --

13   A.   Yes.  Yes, ma'am.

14   Q.   You have obviously held very many roles in the Chicago

15   Police Department.  I would like to talk about a few of them.

16             You said when you started, you were a patrol

17   officer; is that correct?

18   A.   Correct.

19   Q.   What is the role of a patrol officer in the Chicago

20   Police Department?

21   A.   The patrol officer is the most visible member of the

22   department.  They are recognizable by their blue uniforms in

23   Chicago.  They perform basic services trying to prevent

24   crime, but mostly responding to calls for service.

25   Q.   And the response to a call for service, is that referred

1    to as a -- the initial investigation that takes place, is

2    that referred to as a preliminary investigation?

3    A.   Correct.

4    Q.   As a patrol officer, would you personally respond to

5    scenes and collect information to share with detectives?

6    A.   I'm sorry.  I didn't hear that properly.

7    Q.   As a patrol officer, would you respond to scenes and

8    collect information to share with detectives?

9    A.   Yes, ma'am.

10   Q.   You said that you became a detective and spent more than

11   three years at Area 1.

12        Could you explain what the role of a detective is?

13   A.   The role of the detective is to investigate the more

14   serious crimes.  Detectives have the responsibility for

15   following up on crimes reported to the patrol division.

16   Patrol -- excuse me.

17        Detectives have the authority to reclassify cases.

18   They can solve the case and clear and close it, or they can

19   unfound it if their investigation leads to that conclusion

20   and other such dispositions of a case.

21   Q.   When you were a detective, did you personally handle

22   homicide investigations?

23   A.   I did.

24   Q.   Did you obtain experience with note-taking, report

25   writing, and the file keeping practices of a detective at

1    that time?

2    A.   Correct.

3    Q.   You mentioned that you served as a watch commander --

4    I'm sorry.

5             When you were a detective, you said that you were

6    assigned to Area 1; is that correct?

7    A.   Correct.

8    Q.   What does Area 1 mean?

9             What is a detective area?

10   A.   You are asking me geographically or --

11   Q.   Yes, just the term "area" for a detective.

12   A.   Area -- a detective area, at that time the city -- the

13   detective division was broken into six regional detective

14   areas.  Area 1 was from the Chicago River south to

15   75th Street, from the Dan Ryan to the lake.

16   Q.   You mentioned that you served as a watch commander for

17   the Third District in the mid-1990s.

18            What is the Third District?  What does that mean?

19   A.   The Third District is, at that time, one of 25

20   districts.  They obviously operate 24 hours a day.  At that

21   time they were broken into three eight-hour shifts.

22   Q.   And was that a division -- you said it was broken down

23   into different geographic areas.  Are those geographic areas

24   for the patrol officers?

25   A.   It was a specific geographical area.  The actual

1    boundaries I might be a little soft on.  But 75th Street back

2    north to Hyde Park, about 51st Street -- 55th Street

3    probably.

4    Q.   So part of the south side of Chicago?

5    A.   Yes, ma'am.

6    Q.   Can you explain what a tac team is?

7    A.   A tactical team is an assignment in the patrol division

8    specifically in each of the 25 police districts.

9            So in addition to the three watches or shifts of

10   the blue shirt officers, there is a gaggle, a number -- 20,

11   30 officers -- who are assigned to a tactical team, who

12   perform missions at the direction of the local district

13   commander, whatever their hot crime or problem might be.

14   Q.   Can you also explain the role of a gang crimes

15   specialist in the 1990s?

16   A.   A gang crime specialist is a specific title.  It is --

17   at that time it was the equivalent of a detective pay.  They

18   are the same pay grade, somewhere between a police officer

19   and a sergeant.

20           Gang crime specialists were assigned to the gang

21   crime section.  They had, I believe, three units throughout

22   the city.

23   Q.   Now, you said that you became the commanding officer for

24   the policy and procedures -- I'm sorry.

25           You became the commanding officer of a portion of

1  the research and development division; is that correct?

2  A.   Yes, ma'am.

3  Q.   Can you describe what your role was while you were

4  there?

5  A.   The Chicago Police Department, like the Army, has a lot

6  of orders, a lot of directives.  We are under the

7  administrative control of the superintendent of police.  And

8  the superintendent of police signs certain orders and puts

9  his name on other orders.  They are general orders, special

10  orders, and department notices.

11       My role was to draft those directives in the name

12  of the superintendent, get them staffed for feedback from the

13  command staff, make adjustments, and try to make the best

14  policy that we can that was requested.

15  Q.   So would it be fair to say that in the policy and

16  procedures section you oversaw, at the discretion of the

17  superintendent, of course, the policies and procedures

18  governing the Chicago Police Department at that time?

19  A.   Yes, ma'am.  I had supervisors, of course, but that was

20  my primary assignment.

21  Q.   Can you explain what a general order is?

22  A.   A general order is not specific.  It tends to identify

23  missions, goals, policy in broader statements, like the

24  protection of life.  The details will come later, but it is

25  the policy of the Chicago Police Department to preserve life,

1    to investigate crimes.  Rather broad goals.

2    Q.   And to whom does a general order apply?

3    A.   To everyone in the police department.

4    Q.   Regardless of rank?

5    A.   Regardless of rank, regardless of sworn status or

6    civilian status as an employee.

7    Q.   And was that also true in 1994, that a general order of

8    the Chicago Police Department applied to everybody, all

9    personnel of the police department, including police

10   officers, detectives, et cetera?

11   A.   Yes, ma'am.

12   Q.   I am going to talk about 1994 right now.

13        Were all members of the Chicago Police Department

14   required to maintain a level of knowledge of general orders

15   that applied?

16   A.   It is a responsibility of all sworn members to be -- all

17   members to be familiar with what has been issued.

18   Q.   Earlier you mentioned the term "special order."  Can you

19   explain to the jury what a special order is?

20   A.   A special order is perhaps a little bit more procedural

21   oriented.  You make two copies of that, and you file it in a

22   certain place, and you retain it for a certain length of

23   time.  It's a little bit more specific.

24   Q.   And to whom does a special order apply?

25   A.   Again, that would be all employees of the police

1    department.

2    Q.   If you have a particular special order, does it specify

3    to whom that order applies?

4    A.   No.  It may subject by subject assign

5    responsibilities -- specific responsibility to unique

6    divisions, allocating work and responsibility to that

7    division or sometimes by title.

8    Q.   And was that true in 1994 as well?

9    A.   It is.

10   Q.   With regard to special orders, were members of the

11   Chicago Police Department also expected to have an awareness

12   and knowledge of the special orders that applied to them?

13   A.   Correct.

14   Q.   Now I would like to go back, when you were discussing

15   your career, you mentioned that in the 1980s, after being a

16   detective, that you did some work for the chief of

17   detectives.  Could you explain what that role was?

18   A.   I would start each day -- I was a detective myself

19   working in detective headquarters.  Start each day simply

20   gathering information on crime which occurred in the last 24

21   hours throughout the city and try to put it in some

22   understandable order and brief the chief of detectives upon

23   his arrival each day.

24   Q.   When you were in that role for the chief of detectives,

25   were you assigned to work on various special projects,

1    including one related to what are known as street files?

2    A.    I was.

3    Q.    How did that project come about?

4    A.    The leadership of the detective division realized that

5    we had a vocabulary issue.  In an organization that had six

6    geographically disbursed units working 24 hours a day,

7    sometimes different terminology develops and sometimes not

8    all of the units are filing information and reports in a

9    standardized manner.  There was a recognition that we could

10   do better.

11   Q.    When you are referring to the six geographic units, are

12   those the detective areas that you were talking about

13   earlier?

14   A.    Correct.

15   Q.    What was your role on the project to try to unify the

16   terminology used by detectives across the areas?

17   A.    Initially I was part of a group -- three or four

18   people -- who was sent out to the various areas to make

19   observations about the filing of reports and the filing of

20   memoranda, the sharing of information.  We came back, and we

21   made our reports to the division leadership.  A decision was

22   made just to send me out to the six areas so we could have

23   one voice or one set of observations trying to identify what

24   our practices were.

25   Q.    And when you were sent out to the six areas, what was

1    the nature of your observations?

2    A.    Perhaps my largest takeaway was the lack of

3    standardization of terminology specifically in regards to

4    notes and to/from subject reports -- also called memoranda --

5    that was written between detectives and watch personnel,

6    different shifts.

7    Q.    So when you say there was a different terminology used

8    with respect to notes, how did that manifest itself in the

9    day-to-day of what detectives were doing?

10    A.    One unit -- one area might refer to the reports that

11    they carried around with them.  You have to understand when

12    you go out as a detective in your car, you are working from a

13    document at least for addresses and names and apartments and

14    floor numbers.

15           The individual reference for those notes sometimes

16    was called a running file.  The detectives ran with it.

17    Other areas would call it -- well, those are the personal

18    files of the detectives.  Another might call it a street

19    file.

20           So right away your head would almost cock in trying

21    to understand what they mean by those terms.

22    Q.    So with respect, then, to running files or street files,

23    were the notes in those files making it to the Chicago Police

24    Department's official file of any particular investigation?

25    A.    Some were.  Some were not.

1    Q.   And was that absence of some of the notes seen as a

2    problem?

3    A.   Could you repeat that.

4    Q.   Yes.  Was the fact that some of the notes that

5    detectives were using and creating, the fact that those notes

6    did not make it to the official Chicago Police Department

7    file, was that viewed as a problem?

8              MR. BAZAREK:  Objection, your Honor.  Foundation

9    and relevance in terms of talking about the 1980s.

10             THE COURT:  So it's passive voice.  Who are we

11   talking about in terms of "was viewed as a problem"?  Do you

12   want to just rephrase.

13   BY MS. MUSUMECI:

14   Q.   In your role, Mr. Hickey, as a special assistant to the

15   chief of detectives in doing this investigation about

16   detective filing practices, did you and your superiors view

17   the absence of notes in the formal official files as

18   problematic?

19             MR. BAZAREK:  Objection, your Honor.  Relevance.

20             THE COURT:  Overruled.

21   BY THE WITNESS:

22   A.   Let me clarify this.

23             There was almost no handwritten notes in these

24   files that were under the arms of the detectives working on

25   the street.  What there were were sometimes memoranda,

1    memoranda written from one detective, from one watch to the

2    other.  And the memoranda might actually be not quite a honey

3    do list but things that need to be done.  Will you canvas

4    that building again?  Notes like that.

5            When I say "notes," I'm referring to typewritten

6    memoranda.  At that particular time notes were considered to

7    be the personal property of the detectives.

8    Q.   Did the Chicago -- as a result of your investigation,

9    your work with the department, the detective department

10   division, did the Chicago Police Department take a position

11   with respect to the issue of detectives' handwritten notes

12   and how they should be handled?

13   A.   They did.

14   Q.   And what was the position that the Chicago Police

15   Department took?

16   A.   The detective division wrote a special order -- in other

17   words, something rather specific -- and it also standardized

18   the use of terminology.  The file that was being carried

19   around by detectives was henceforth and forever to be known

20   as investigative files.

21           It identified the type of things that could be

22   expected to be held in an investigative file: these memoranda

23   that I talked about; these inter-watch communications; but

24   also, for the first time, the handwritten notes of the

25   detectives.

1    Q.   And is that because the handwritten notes themselves may

2    have investigative value to a particular case?

3    A.   Well, certainly they may have investigative value. But

4    all relevant information from notes is supposed to be

5    summarized and placed in their official detective

6    supplementary report. A supplementary report is the report

7    written to the original crime.

8    Q.   And those would be summaries, right? The supplementary

9    report contains summaries of the handwritten notes; is that

10    right?

11    A.   They may even be more than a summary, because not every

12    facet of our witness-detective conversation was written down.

13    Detectives actually remembered part of the story that was

14    told to them. So it was placed into the supplementary

15    report.

16    Q.   The official file of the Chicago Police Department

17    detective division is what was used to provide other parties

18    with information about a case as well, right, such as the

19    State's Attorney's office, the defense attorneys, et cetera;

20    is that correct?

21    A.   The investigative file of the detective division was

22    shared when subpoenaed with the prosecutors and, therefore,

23    the defense attorneys, but I think there is an important

24    clarification. It was not the entirety of the case report.

25    The information kept in the records division and elsewhere

1    throughout the department was also shared.

2    Q.   So let's talk about -- you said there was a special

3    order that was created as a result of your investigation.

4           Was that Special Order 83-1?

5    A.   It was.

6    Q.   And when was that issued, if you know?

7    A.   In 1983, but I don't remember the month.  I'm sorry.

8    Q.   And to whom did Special Order 83-1 apply?

9    A.   To whom does it apply?

10   Q.   That's right.

11   A.   Everyone in the detective division, not outside the

12   detective division.

13   Q.   And who wrote Special Order 83-1?

14   A.   I drafted it with a lot of input, and it was signed by

15   the chief of detectives.

16   Q.   I would like to ask that you take a look at what has

17   been marked as Plaintiff's Trial Exhibit 3.  Mr. Hickey,

18   there is a binder in front of you, but I believe it's going

19   to appear on the screen, whichever is easier for you to use.

20   If you are looking at the binder, it will be Tab 2.

21   A.   Yes, ma'am.

22           MS. MUSUMECI:  Jim, can we please see it on the --

23           THE COURT:  You can go ahead and show the witness

24   and counsel Plaintiff's Exhibit 3.

25           Let me take this opportunity to explain to the

1  jurors what we do here.

2  The way it works in a courtroom is, unless it's a

3  stipulated exhibit, the lawyer calls attention of a document

4  to the witness.  They lay the foundation for it, and then I

5  have to give the go-ahead for you folks to see it.  So that's

6  why they lay the foundation first.

7  Go ahead.

8  BY MS. MUSUMECI:

9  Q.  Mr. Hickey, do you recognize what I am showing you as

10  Plaintiff's Exhibit 3?

11  A.  I do.

12  Q.  And is that Special Order 83-1 that you were just

13  discussing?

14  A.  It is.

15  Q.  And does Plaintiff's Exhibit 3 fairly and accurately

16  reflect the language of the Chicago Police Department Special

17  Order 83-1?

18  A.  The only clarification I would make, this was a

19  detective division special order and not a research and

20  development department-wide special order.

21  Yes, it does.

22  MS. MUSUMECI:  With that, your Honor, I move

23  Plaintiff's Exhibit 3 in evidence and ask to publish to the

24  jury.

25  THE COURT:  Any objection?

1    MR. BAZAREK:  No, your Honor.

2    THE COURT:  I will admit it, and you can go ahead

3  and publish to the jury.

4    (Said exhibit was received in evidence.)

5    THE COURT:  That's a fancy way of saying, folks,

6  the jury can see it.  It's called publishing it to the jury.

7    Can everybody see it, hopefully, on your screens,

8  members of the jury?  Can you folks see it on your screens?

9    (Jurors nodding.)

10    THE COURT:  Okay.

11  BY MS. MUSUMECI:

12  Q.  Mr. Hickey, could you please read the introductory

13  paragraph to Plaintiff's Exhibit 3?

14  A.  The introduction?

15  Q.  Yes, the first paragraph of the introduction.

16  A.  Okay.

17    "I.  Introduction.  This order is designed to

18  institutionalize the control of all violent crime field

19  investigation documents and files, which previously may have

20  been referred to as working files, running files, or

21  detective's personal files and notes."

22  Q.  Thank you.

23    And where it refers to the "working files, running

24  files, or detective's personal files and notes," would that

25  also include what you referred to earlier as "street files"?

1    A.    Yes, ma'am.

2    Q.    And how would Special Order 83-1 institutionalize the

3    control of these field investigation documents and notes?

4    A.    The Chicago Police Department is pretty serious about

5    their orders.  This was a major issue in the detective

6    division.  With that, we issued it.  Everyone was given

7    copies.  There was training on the issue.  It was not

8    something silently done.  It was something that everyone in

9    the detective division was aware of.

10   Q.    Can you explain to the jury what this Special Order 83-1

11   required of detectives with respect to their files and notes?

12   A.    For the first time ever, it said -- it instructed the

13   detectives that those notes that you took, they are not your

14   personal notes.  They are the work product of the Chicago

15   Police Department, and we are going to retain them.  We are

16   going to retain them in a certain way in a certain file, and

17   it also pertains not only to handwritten notes but, again,

18   those memoranda, those to/from subject reports that you wrote

19   to your fellow detectives, and other information which may --

20   you may come into possession of.

21   Q.    What are some of the types of documents that were

22   encompassed within this order?

23   A.    Perhaps the biggest new item was the introduction of an

24   8 1/2 x 11 piece of paper with lines on it, and it was called

25   a general progress report.  It had the case number up in the

1    top right-hand corner, and the rest of it was lined paper,

2    lined -- just lines.  And it had two purposes.  You were to

3    write your handwritten notes on that document.  No more back

4    of the matchbook.  You put it here on this piece of paper,

5    8 1/2 x 11.  And also, it was used -- if you were going to

6    write a memo to another detective, you would do it on this

7    piece of paper.

8    Q.   And if the detective took notes -- so just to be clear,

9    if a detective were taking notes of an interview or whatever,

10   it should have been done on a general progress report; is

11   that right?

12   A.   Correct.

13   Q.   Then if a detective generated a general progress report,

14   that document was supposed to go into the investigative file;

15   is that right?

16   A.   Correct.

17   Q.   Were other documents that a detective might receive from

18   other personnel or other units related to the investigation

19   also supposed to go into the investigative file under the

20   special order?

21   A.   The operative word there is, if they received them, yes.

22   Q.   So pertinent documents that they received or generated

23   were to go in the investigative file; is that correct?

24   A.   Correct.

25   Q.   Was Special Order 83-1 replaced with an updated version

Hickey - direct by Musumeci                                          697

1    and incorporated into the detective division standard

2    operating procedures?

3    A.    Right.  Before the SOP, I believe there was an 83-2

4    along the way.  But yes, it was incorporated and adopted

5    almost verbatim into the standard operating procedure manual

6    of the detective division.

7    Q.    And rather than go through each of the iterations, were

8    they substantively the same even though there may have been

9    stylistic differences between 83-1 and what was put into the

10   standard operating procedure?

11   A.    Correct.  They were the same.

12   Q.    I am going to -- I'm sorry.

13             And was the chapter of the standard operating

14   procedure pertaining to investigative files, was that Chapter

15   18, if you know?

16   A.    It was.

17   Q.    I am going to ask that you look at what's now in

18   evidence as Plaintiff's Exhibit 5.  That would be Tab 4 of

19   your binder.

20             MS. MUSUMECI:  If we could, please display --

21             THE COURT:  Ladies and gentlemen of the jury, this

22   is the document that we stipulated to a minute ago.  You may

23   remember when I said there was a stipulation about an

24   exhibit.  This is the exhibit we covered before.

25             Go ahead, counsel.

1    BY MS. MUSUMECI:

2    Q.    Turning to Page 18 of that document, which I believe is

3    Bates stamped CHI.Bolden 00468 -- 38.  The page at the bottom

4    ending with 38.

5    A.    What am I looking for?

6    Q.    Chapter 18.

7    A.    Chapter 18.  Okay.  There.

8    Q.    Is this Chapter 18 the chapter of the detective division

9    standard operating procedures that pertains to investigative

10   files that you have described to us?

11   A.    Yes, ma'am.

12   Q.    And just to be clear, to whom did this policy apply?

13   A.    Yes.

14   Q.    I'm sorry.  To whom did it apply?

15   A.    It applies to the members of the detective division

16   conducting violent crime field investigations.

17   Q.    Would that include detectives in Area 2 violent crimes

18   unit?

19   A.    Correct.

20   Q.    Back when Special Order 83-1 was first implemented, you

21   referred to it was a big deal.  There were a lot of training.

22           How were detectives notified of this new policy?

23   A.    I don't know if it was a memo, but there was the

24   announcement of training, the establishment of a training

25   program instructing all members of the detective division to

1    attend.

2    Q.   Who received that training?

3    A.   Every sworn member of the detective division.

4    Q.   Are you familiar with what the training covered?

5    A.   I was.  I am.

6    Q.   How were you familiar with that?

7    A.   I am the one who conducted the training.

8    Q.   And what did the training cover?

9    A.   The training covered the introduction of new forms.

10   There were several new forms that were part of this

11   investigative file.  But truly the message was that those

12   things you previously thought as your own personal property

13   is no more.  This is the work product of the Chicago Police

14   Department, and it must be preserved.

15   Q.   Were all detectives who were detectives when this new

16   policy came out in 1983, did they receive the training about

17   this new special order?

18   A.   Unless they were on extended medical or otherwise

19   unavailable, every person who possibly could be trained was

20   trained.

21   Q.   And was this investigative file training incorporated

22   into detective school for people who became detectives after

23   1983?

24   A.   I believe it was.

25   Q.   I would like to, just for a moment, if we could, go back

1    to Plaintiff's Exhibit 3.

2                And I apologize, Mr. Hickey.  That's back to Tab 2.

3    And if you can, turn to the third page of that exhibit ending

4    with 697.

5                If you could, look at the top of the second column.

6    At the very top of the column is B.  At B4, can you please

7    read -- do you see it says, "Detectives are required to" --

8    and the number 4 -- "assume responsibility for the contents

9    of the investigative file folder and any documents placed

10   within the folder during the tour of duty"?  Do you see that?

11   A.    Correct.

12   Q.    It says "during his tour of duty"?

13   A.    Yes.

14   Q.    And what did that requirement mean?

15   A.    When this was designed -- when the investigative file

16   procedures were designed, I believe that the investigative

17   file, like the running file before, would still be under

18   their arms and out on the street.  And the message here was,

19   don't lose anything from it.

20   Q.    Thank you.  You can put that aside.

21                I want to talk about a few specific documents.

22                Are you familiar with the document that the Chicago

23   Police Department called a general offense case report?

24   A.    I am.

25   Q.    And what is that?

1    A.    The general offense case report is the most basic

2    document filled out normally by police officers in blue, and

3    they record the information as reported to them in what they

4    discover in their preliminary investigation in their response

5    to having been called to a scene.

6    Q.    Is the patrol officer -- so it's completed normally by a

7    police officer; is that right?

8    A.    Normally.  Anyone can, but 99-plus percent are completed

9    by the officers in patrol.

10   Q.    And when a patrol officer completes a general offense

11   case report, if there is follow-up investigation required, is

12   that document then to be sent to the detective division?

13   A.    It is.

14   Q.    Is a general offense case report a document that lists

15   names and contact information for eyewitnesses?

16   A.    It does.

17   Q.    And is that the type of document that, under the

18   standard operating procedure, Chapter 18, if a detective

19   received, was required to be included within the

20   investigative file?

21   A.    Not all the time.  You would expect it to be.

22   Q.    Can you explain that?

23   A.    The investigative file was designed to capture and

24   retain those things initiated and generated by detectives.

25   So in theory, this general offense case report was prepared

1    by someone outside of their division in the patrol division.

2    It had already been sent to the records division, and then it

3    was sent to the detective division.

4         So it is possible it could not be in there, but

5    more than likely it was.

6    Q.   If it related to a crime that was being investigated by

7    the detective division -- for example, including names of

8    eyewitnesses -- should it have been included in the

9    investigative file?

10   A.   Correct.

11   Q.   Once this new investigative file policy went into

12   effect, where were investigative files maintained when the

13   detective wasn't carrying it under his arm?

14   A.   Under the administrative control of the lieutenant from

15   the violent crimes unit in a filing cabinet in the violent

16   crimes office.

17   Q.   Are you familiar with something called an investigative

18   file control card?

19   A.   I am.

20   Q.   And what is that?

21   A.   I believe it was green in color.  Filing cabinets and

22   the paper in it tends to be white.  And the green card was

23   another 8 1/2 x 11 piece of paper.  It might have been a

24   little bit bigger.  It had the RD number or the case number

25   of the file.  And it was designed so that when someone took

1      the investigative file out of the cabinet, they put a

2      placeholder in it.  It was simply to hold the place for

3      someone to make it easier to refile this batch of paper.

4      Q.   If we could look again at Plaintiff's Exhibit 5, which

5      again was Tab 4 in your binder, and if we could turn to

6      Chapter 18.3.

7             Have you found it?

8      A.   18.3?

9      Q.   Yes.

10            In Part C toward the bottom of the page it says,

11     "Detectives will," and then it goes -- it goes through a

12     number of things that detectives will do.

13            If you could go to No. 5 on the following page, do

14     you see it says, "Detectives will sign the investigative file

15     control card when removing the investigative file case folder

16     and assume responsibility for the contents of the

17     investigative file case folder and any documents placed

18     within the folder during the tour of duty."

19            Do you see that?

20     A.   I do.

21     Q.   So does that mean that the investigative file control

22     card had a place for detectives to write on as well?

23     A.   Correct.

24     Q.   And what were they writing on that control card?

25     A.   Date -- and I don't know if time was on there or not --

1    and their name.

2    Q.   So that was to track who was having access or control of

3    the investigative file at any time; is that right?

4    A.   Correct.

5    Q.   And then if you could look down to the last sentence of

6    that Paragraph No. 5, it says, "Upon return of the file, the

7    investigative file control card will become part of the

8    investigative file."

9         Do you see that?

10   A.   I do.

11   Q.   So do you agree that the investigative file control card

12   was intended to track who had possession of the file, and

13   that in itself was supposed to become part of the

14   investigative file?

15   A.   If it was taken or removed from the violent crimes

16   office.

17   Q.   Thank you.

18        I would like to just ask you again for a moment

19   about gang crimes specialists.

20        In 1994, would you agree that gang crime

21   specialists were organizationally separate from the detective

22   division?

23   A.   Correct.

24   Q.   So they were not subject to detective division standard

25   operating procedures, right?

1   A.   Correct.

2   Q.   And just to be clear, are you aware that there were two

3   different titles of Chicago police officers: gang crime

4   specialists and gang crime police officers?

5   A.   I am aware.

6   Q.   Can you briefly describe the difference between the two?

7   A.   I don't know exactly what year this was, but once upon a

8   time, gang crime specialists, who were making a little bit

9   more money than police officers, were working in the same

10  unit as gang crime officers -- specialist officers.

11        In the workplace, that doesn't play well -- two

12  different pay grades for similar work.  A decision was made

13  by the department of which I have no knowledge, but they were

14  divided.  The gang crime specialists remained in the gang

15  crimes section; whereas, the gang crime officers were

16  assigned to one of those 25 patrol division tactical teams.

17  So they worked hand in hand with the tactical teams in the

18  patrol districts.

19  Q.   Now, relating this back to the investigative file policy

20  that we have been talking about, if a gang crimes officer

21  wrote a report related to, let's say, a homicide

22  investigation and provided that report to a -- to the

23  detective, would that report become part of the investigative

24  file under the policies applicable in 1994?

25  A.   A report written by anyone in the Chicago Police

1    Department requires a supervisor's approval, but I'm not here

2    to say that information on uncompleted reports was not

3    occasionally shared with a detective.  Do you want a copy

4    even though it's not signed by my boss yet?  Yeah.  Yeah.  I

5    just need whatever it is you want to tell me.

6    Q.   So if a gangs crime specialist produced a report,

7    whether it was signed by a supervisor or it was not signed by

8    a supervisor, if it went to the detective related to their

9    homicide investigation, should it have been part of the

10   investigative file?

11   A.   Yes.

12   Q.   And if a gang crimes specialist was working on a

13   homicide investigation and interviewed an eyewitness without

14   any detectives present, would that gang crimes officer have

15   any obligation to write a report to reflect that interview?

16   A.   If the information was of value.  I mean, they interview

17   a lot of people.  Everyone interviews a lot of people, trying

18   to help the detective solve a case.  But there is a very

19   explicit process by which any member of the Chicago Police

20   Department who is sworn can write a report, including the

21   gang crimes specialist, and their obligation is to write a

22   supplementary report, have their supervisor sign it.  That

23   report would go to the records division.

24   Q.   You used the term "of value."  What do you mean by if

25   the information obtained is "of value"?

1    A.   If I am interviewing someone who says they may or may

2    not have information about a particular homicide, and after

3    talking to that individual for a short period of time I

4    realize they are not lucid, they are not consistent, I may

5    well disregard that information.

6    Q.   But if you are talking to somebody who has something

7    relevant to say, that would be of value; is that right?

8    A.   Correct.

9    Q.   Thank you.

10           I am going to ask if you'll look at what has been

11   marked as Plaintiff's Exhibit 21.  It is not yet in evidence.

12   This is under Tab 5 of your binder, sir.

13   A.   Yes.

14   Q.   Plaintiff's Exhibit 21.  Do you recognize, Mr. Hickey,

15   what this document is?

16   A.   I do.

17   Q.   And what is this document?

18   A.   This is a Chicago Police Department form.  The title is

19   "Gang Specialist Daily Activity Summary."

20   Q.   Is this a fair and accurate representation of the

21   document that was used by the gang crimes unit in the 1994

22   time frame?

23   A.   I honestly don't know what they were using at that

24   particular time.  I have no personal knowledge.  But the CPD

25   number on the form tells me it's an authentic form.

1    Q.   And the CPD number on the form -- so there is -- if you
2    look at Plaintiff's Exhibit 21, it's actually a two-page
3    document.  Do you see that?
4    A.   What is the question?
5    Q.   Do you see that it's a two-page document?  If you flip
6    it over, there is a second page?
7    A.   I didn't know that, but yes.
8    Q.   When you look at the second page, do you see again the
9    CPD form notation to indicate that it's an official Chicago
10   Police Department form?
11   A.   Correct.
12   Q.   And does that indicate that that daily assignment and
13   activity report went into effect in February of 1993?
14   A.   Yes.
15   Q.   Is this form a document for gang crime specialists to
16   record their activities?
17   A.   This is the daily activity report, yes.
18   Q.   Thank you.
19             MS. MUSUMECI:  I move Plaintiff's Exhibit 21 in
20   evidence.
21             THE COURT:  Any objection?
22             MR. BAZAREK:  No objection.
23             THE COURT:  That's admitted.
24        (Said exhibit was received in evidence.)
25   BY MS. MUSUMECI:

Hickey - direct by Musumeci 769

1    Q.   You can put that aside.

2              I am now going to ask that you look at what has

3    been marked and in evidence as Plaintiff's Exhibit 50.

4              MS. MUSUMECI:   This is in evidence.   It can be

5    shown to the jury.

6              THE COURT:   Folks, this is the other document that

7    we covered a minute ago, the stipulation.

8              Go ahead.

9    BY MS. MUSUMECI:

10   Q.   Mr. Hickey, do you recognize this as a completed Chicago

11   Police Department property inventory form?

12   A.   Correct.

13   Q.   And just from how it's filled out, does it appear to

14   pertain to a .40 caliber firearm, an Iberia --

15   A.   Yes.  Yes, ma'am.

16   Q.   I would like to just direct your attention to a stamp at

17   the top -- it's at two places on the top of the form, in the

18   center at the top and toward the right on the top -- that

19   says, "A/2 VIOL crimes."  Do you see that?

20   A.   I do.

21   Q.   What does that stamp signify to you?

22   A.   Area 2 violent crimes.

23   Q.   And what is Area 2 violent crimes?

24   A.   Area 2 violent crimes is a unit.  It's one of the six

25   detective areas.  They have property crimes, and they have

1    violent crimes in each of the detective areas.

2    Q.   And does the presence of the stamp on a document such as

3    an inventory report signify anything, the fact that the stamp

4    is there?

5    A.   I honestly don't know what -- it's not part of the form.

6    Obviously someone has, for their own convenience and

7    necessity probably, have stamped this.  But I'm not aware of

8    who puts the stamp on it.  It could be ERPS.  It could be the

9    firearms section.  I don't know.

10   Q.   Thank you.  You can put that document aside.

11         I am going to ask if you'll look at Plaintiff's

12   Exhibit 24, which is not yet in evidence.  This is Tab 7 of

13   the binder.

14         MS. MUSUMECI:  This would not be shown to the jury

15   yet.

16   BY MS. MUSUMECI:

17   Q.   Looking at Plaintiff's Exhibit 24 -- I'm sorry.  Going

18   back one moment, Mr. Hickey.

19         You just mentioned some -- and I apologize.  You

20   mentioned the stamp, and you didn't know where it came from.

21   And you mentioned something called ERPS.

22   A.   Pardon?

23   Q.   You mentioned something called ERPS.

24         Could you just explain to the jury what ERPS is?

25   ERPS.  Did you say ERPS, E-R-P-S?

1    A.    No.  It's a stamp.

2    Q.    No.  I believe when I was asking you about the stamp,

3    you said you didn't know what unit of the police department

4    it may have come from, and one of the things you mentioned

5    was ERPS, E-R-P-S.

6    A.    Oh, I'm sorry.  That's my error.

7    Q.    I apologize.

8    A.    ERPS is an acronym.  It's the letters of a unit in the

9    Chicago Police Department.  That's what happens when you have

10   been in a place too long.  What it stands for is Evidence and

11   Recovered Property Section, ERPS.

12   Q.    Would ERPS stamp something with its own stamp to

13   indicate that they had access to a document?

14   A.    Again, I don't know who stamped it.

15   Q.    Now we can move to Plaintiff's Exhibit 24.

16          Do you recognize this document to be a general

17   offense case report, like we were discussing earlier?

18   A.    Correct.

19   Q.    Does this appear to be a general offense case report

20   completed on January 29th, 1994?

21   A.    Correct.

22   Q.    And involving an incident near 6415 Cottage Grove?

23   A.    Yes, ma'am.

24   Q.    And does the report appear to have been completed by a

25   police officer B. Temple?

1    A.    Yes.

2    Q.    And does this appear to be a fair and accurate

3    representation of a completed Chicago Police Department

4    general offense case report?

5    A.    Yes.

6              MS. MUSUMECI:  Your Honor, at this time I move

7    Plaintiff's Exhibit 24 in evidence.

8              THE COURT:  Any objection?

9              MR. BAZAREK:  No, your Honor.

10             THE COURT:  It's admitted.  You can publish to the

11   jury.

12         (Said exhibit was received in evidence.)

13   BY MS. MUSUMECI:

14   Q.    Do you see, Mr. Hickey, about midway down the page again

15   on the right side there appears to be another -- a stamp that

16   says, "Data entered DD Area 2"?

17   A.    Correct.

18   Q.    And what does that stamp signify to you, if anything?

19   A.    I have -- I'm not recalling, but someone entered

20   information into a computer.  I don't know who actually did

21   it.

22   Q.    Based on your experience at the Chicago Police

23   Department, does DD Area 2 mean anything?

24   A.    Detective division Area 2.

25   Q.    Thank you.

1          And if you could turn to the third page of this

2   document, again on the right about midway down do you see a

3   similar stamp that again says, "Data entered DD Area 2"?

4   A.   I see a circle with 620 on it, the number 620.  Am I on

5   the right page?

6   Q.   I'm sorry.  We are on the third page.

7   A.   This is the third page -- one, two, three.

8   Q.   Look at the screen in front of you perhaps.

9   A.   Okay.  I see it in yellow highlighted.

10  Q.   Yes, the yellow highlighted.  Do you see the stamp that

11  says, "Data entered DD Area 2"?

12  A.   Correct.

13  Q.   And does that signify that Area 2 of the detective

14  division was somehow involved with this document?

15  A.   Involved, but, again, I don't know who stamped it.

16  Q.   Thank you.

17          MS. MUSUMECI:  We can put that exhibit aside.

18  BY MS. MUSUMECI:

19  Q.   Mr. Hickey, to be clear, in 1994, was it a violation of

20  Chicago Police Department detective division policy for a

21  detective to throw away or discard of handwritten notes that

22  had relevant information to an investigation?

23  A.   They should keep it.

24  Q.   So it was a violation?

25  A.   Yes.

1    Q.   Thank you.

2         Did the investigative file policy in 1994 allow

3    detectives to maintain their own personal working files for

4    an investigation?

5    A.   No.  They had documents that they carried or made copies

6    of, but they were not supposed to have a separate set of

7    reports.

8    Q.   And if they had copies but were making additional

9    notations related to the investigation, those too were

10   supposed to go in the investigative file; isn't that right?

11   A.   Correct.  If it's generated by a detective, they are

12   supposed to preserve it.

13   Q.   And if it is received by a detective, they are also

14   supposed to preserve it; isn't that right?

15   A.   That's correct.

16   Q.   Thank you.

17             MS. MUSUMECI:  Nothing further.

18             THE COURT:  Okay.  Defense counsel, when you are

19   ready.

20                      CROSS-EXAMINATION

21   BY MR. BAZAREK:

22   Q.   Good afternoon, Mr. Hickey.

23   A.   Mr. Bazarek.

24   Q.   Mr. Hickey, you, as a detective, investigated homicides

25   that occurred within Chicago; is that correct?

1    A.    Correct.

2    Q.    You investigated homicides that occurred on the south

3    side of Chicago; is that correct?

4    A.    Correct.

5    Q.    In fact, separate and apart from when you were a

6    detective, you were also a lieutenant within the Third

7    District, correct?

8    A.    Correct.

9    Q.    Mid '90s?

10   A.    Mid '90s, right.  Three Bulls celebrations.

11   Q.    As a detective, there would be occasions, I would

12   imagine, where you would go to a hospital to interview a

13   victim?

14   A.    Correct.

15   Q.    And would you agree there were times where you go to a

16   hospital, you might have another department member who was

17   already there before you arrived?

18   A.    Quite likely, yes.

19   Q.    And if the other department member interviewed, say, the

20   victim, would you have occasion where that member who

21   interviewed the victim would brief you on what the victim

22   said?

23   A.    It's a possibility.

24   Q.    Okay.  As a detective investigating murders, would you

25   have occasion to try and identify the offender?

1    A.   Correct.

2    Q.   And one way to identify an offender, you would want to

3    find out the name of the person, correct?

4    A.   Of course.

5    Q.   And you would learn the name of a person by talking to

6    witnesses or whatever information you receive, correct?

7    A.   Correct.

8    Q.   And that could also include information that you could

9    receive from a fellow police officer, correct?

10   A.   Correct.

11   Q.   In fact, that's something police officers do all the

12   time.  They talk to each other, right?

13   A.   Absolutely.

14   Q.   And when you are investigating a homicide, a homicide

15   detective will talk to patrol officers, right?

16   A.   Yes, sir.

17   Q.   Talk to gang crime specialists, right?

18   A.   If they are there.

19   Q.   And information is being shared by various members of

20   the department, and it's provided to you so you can continue

21   on with the investigation; is that correct?

22   A.   Correct.

23   Q.   And not everyone works -- you don't work in the same

24   building, all these different members of the department,

25   right?

1    A.   We are -- there are a lot of units in the police

2    department.  We are separated by time and space.

3    Q.   So I know you have department members who work and

4    patrol that work in blue shirts, right?

5    A.   Correct.

6    Q.   And then you also have department members who are

7    assigned to a particular district.  I think you said like

8    tactical officers, right?

9    A.   Correct.

10   Q.   And there were, like, gang officers that were assigned

11   to the specific districts, right?

12   A.   Correct.

13   Q.   For instance, in this case, there was an officer named

14   Willis, who was a Third District officer, right?

15            MS. MUSUMECI:  Objection.  If this witness knows.

16            THE COURT:  Overruled.  You can ask him if he

17   knows.  Why don't you repeat the question.

18   BY THE WITNESS:

19   A.   I read that name on a report.

20            THE COURT:  Hang on.

21            THE WITNESS:  I'm sorry.

22            THE COURT:  Go ahead and repeat the question.

23            MR. BAZAREK:  Sure.

24   BY MR. BAZAREK:

25   Q.   There was an officer who was a Third District officer

 1    named Willis that you have read about, correct?
 2    A.   Correct.
 3    Q.   In fact, plaintiff's attorney showed you an inventory
 4    slip that was prepared by Officer Willis, right?
 5    A.   Correct.
 6    Q.   Now, Willis was not a detective, right?
 7    A.   Right.
 8    Q.   He was not a gang specialist?
 9    A.   Right.
10    Q.   He would have worked in a different building even than
11    where the detectives work, right?
12    A.   That is correct.
13    Q.   Different building than where a gang specialist would
14    work, right?
15    A.   Yes.
16    Q.   Okay.  I want to go back to when you are trying to
17    identify a suspect in a case.  Would you want to perhaps get
18    a photograph of that person to use in a photo array to show a
19    victim or a witness?
20              MS. MUSUMECI:  Objection.
21              THE COURT:  What's your objection?
22              MS. MUSUMECI:  Outside the scope of the direct.
23              THE COURT:  What's the foundation, counsel?  I
24    didn't remember any testimony about photo arrays in the
25    direct.

 1              MR. BAZAREK:  Judge, there was -- there has been
 2    testimony about detective division procedures, SOP, how
 3    detectives do their job.  So I think it is --
 4              THE COURT:  Sustained.  Objection sustained.
 5    BY MR. BAZAREK:
 6    Q.   When detectives are doing homicide investigations, will
 7    they do something known as a name check?
 8    A.   Yes, sir.
 9              MS. MUSUMECI:  Objection.  Same objection, your
10    Honor.
11              THE COURT:  Sustained.
12    BY MR. BAZAREK:
13    Q.   Mr. Hickey, can you just describe for the jury -- there
14    has been testimony about investigative files and where they
15    are stored.
16              Could you describe a little bit about the records
17    division and what their role is in maintaining documents
18    prepared by the Chicago Police Department?
19    A.   The records division is the official keeper of the case
20    reports of the police department, the general offense case
21    report prepared by the officers in patrol, as well as all the
22    supplementary reports which are prepared for that same case
23    number no matter who in the city prepared or generated the
24    report.  So they are the keeper of records.
25    Q.   And let's take a step back.

1          Say a homicide has occurred.  You have various

2    units that are working on the case.  Some are detectives.

3    You have patrol officers.  You have different members of the

4    department.

5          Can you just describe for the jury how the

6    paperwork flows inside the police department?

7    A.   Well --

8          MS. MUSUMECI:  Objection.

9          THE COURT:  Overruled.

10   BY THE WITNESS:

11   A.   We know the officers prepare the first report, the

12   general offense case report.  It is assigned an RD number.

13   That's the primary case file number.  Interestingly enough,

14   records division.  The RD number is the primary case number.

15         But the other officers who are there also write

16   reports sometimes.  Certainly the laboratory techs from the

17   mobile crime lab when they are at the scene, they will go

18   back to their office and write a crime scene processing

19   report using that RD number, the case number, and sending it

20   to the records division for retention and sending a copy to

21   the appropriate detective area.

22         The gang crimes specialist or the patrol gang

23   officer could prepare a supplementary report using that

24   primary RD number, say what they are going to say, have their

25   supervisor send it -- excuse me -- sign it, and then it's

1    sent to the records division for retention.

2            1994, this is a very paper intensive process.

3    Everything is form sets.  So at the records division, the

4    clerk in the records division gets the original general

5    offense case report, makes about four or five copies.

6    Everybody needs a copy, right?  Sends it out -- at least two

7    or three -- to the respective detective area for their use.

8    So too with the supplementary reports.  As these reports come

9    in -- and they can literally come in from any sworn member in

10   the police department.

11           We don't have a rule against anyone not writing a

12   report.  If they learn information anywhere in the city, they

13   can write a supplementary report provided their supervisor

14   approves it.  It will go to the records division for

15   retention.

16           Now, they don't make as many copies of the

17   supplementary report.  They are supposed to send it to the

18   area of investigative responsibility, the detective area.

19   This is done by clerks, not the highest members -- highest

20   paid members of the police department.

21   BY MR. BAZAREK:

22   Q.   When something could be sent from the records division

23   or another unit to the detective division, would the practice

24   be it would go to just the unit and not an individual

25   detective?

1   A.   Absolutely.  We don't send things to Detective Hickey.

2   We send it to the investigative unit of responsibility.

3   Detective Hickey may be on furlough.

4   Q.   So the detective division, then, they would have

5   administrative staff that would receive the mail, and it was

6   their responsibility to make sure it gets into the

7   investigative folder?

8   A.   Correct, if it merited an investigative folder.  Again,

9   the only cases that merited an investigative folder were the

10  violent crime field investigations.  There is a lot of other

11  crimes that didn't merit an investigative folder.

12  Q.   So going back to Plaintiff's Trial Exhibit 50, this

13  inventory slip filled out by Willis --

14       THE COURT:  Do you want to publish to the jury?  Do

15  you want it published to the jury?

16       MR. BAZAREK:  No, your Honor.  I am just referring

17  to it.

18       THE COURT:  Go ahead.

19  BY THE WITNESS:

20  A.   What tab was that?  Do we know?  I have it.  Yes, sir.

21  BY MR. BAZAREK:

22  Q.   I just want to understand how this -- the flow of this

23  particular inventory slip, where would it go after Third

24  District Officer Willis filled it out?

25  A.   It is signed by his supervisor.  There is hard evidence

1   with this.  In this case, it's a gun.

2         The ERPS section, the Evidence and Recovered

3   Property Section, daily sends a courier out to every unit in

4   the police department to see if they had anything that needed

5   to be picked up.  When they got there, they will sign for the

6   chain of custody a document, and then they will hand-carry

7   that evidence to where it belongs.  Guns go to the crime lab

8   firearms section.

9   Q.   And this particular inventory slip --

10  A.   I'm sorry.  Yes.  The inventory -- the original stays

11  with the evidence.  Guess what?  We have form sets, copies.

12  A copy below stays in the unit that inventoried it.  In this

13  case, the Third District.  It would stay in the Third

14  District.

15  Q.   It would not stay necessarily in a detective division

16  investigative file, correct?

17  A.   They may never have received it.

18         MS. MUSUMECI:  Objection.

19         THE COURT:  Overruled.

20  BY THE WITNESS:

21  A.   They may never have received it.

22  BY MR. BAZAREK:

23  Q.   Mr. Hickey, the Chicago Police Department was a big

24  bureaucracy when you were there working, right?

25  A.   I suspect it still is, but yes.

1    Q.    You would agree sometimes paperwork just does not end up

2    in a particular file, not because of malice or some willful

3    intent on behalf of an officer, but just because it didn't

4    make it to the area?

5                MS. MUSUMECI:  Objection.

6                THE COURT:  Sustained.  Rephrase, counsel.

7    BY MR. BAZAREK:

8    Q.    Also, this Exhibit 50, Mr. Hickey, it has a particular

9    numbering.  It's called RD number.  Do you see that?

10   A.    I do.

11   Q.    And then what's the RD number for this firearm?

12   A.    The RD means the records division case number, and the

13   number is Y as in "young" 041680.

14   Q.    Tell the jury, if you have a homicide criminal act and

15   you also have an ag battery, could those have separate RD

16   numbers?

17               MS. MUSUMECI:  Objection.

18               THE COURT:  I will give you a little leash on this.

19   Go ahead.  Overruled.

20   BY THE WITNESS:

21   A.    It depends upon the scene.  I could envision one scene

22   where two people are murdered and someone is shot and lived

23   in the same scene.  That would have one RD number.  But if it

24   is separated in time and location, it probably is going to

25   get two different case numbers because at the very beginning

1    of the investigation, you just don't know if there is

2    crossover.

3    BY MR. BAZAREK:

4    Q.   So, for instance, if you have a double murder occurring

5    over on South Minerva, and then after that there is an

6    aggravated battery that occurs in a J&J Fish, they would have

7    separate RD numbers, right?

8    A.   They would.

9    Q.   In terms of the way the paperwork would flow, at least

10   as it went to the records division, when that paperwork is

11   coming in from whatever the various units are in the police

12   department, if the RD number is for the aggravated battery,

13   that information would go with the aggravated battery RD

14   file?

15   A.   The clerks who hand-filed this worked with one number.

16   They were pretty good getting -- matching the supplementary

17   report or whatever it might be to that particular RD number

18   it's associated with.  But it's -- they don't read the

19   reports.  They look at the case number and file.

20   Q.   Mr. Hickey, in the Chicago Police Department, you have

21   different forms, and they have different numeric numbers

22   identifying the form; is that correct?

23   A.   Yes, sir.

24   Q.   For instance, an arrest report has a very specific -- it

25   has its own specific numeric number, correct?

```
1    A.   Yes, sir.
2              THE COURT:  Go about another minute or two,
3    Mr. Bazarek, and we will take a break.
4    BY MR. BAZAREK:
5    Q.   In fact, the arrest report, the form number for that is
6    Form No. 11.420; is that right?
7    A.   I would have to look at one, but yes.
8    Q.   Okay.  And then a supplementary report would have its
9    own unique form number, correct?
10   A.   Correct.
11   Q.   Okay.  Can you just generally describe what type of
12   documents would be contained in the investigative file that's
13   maintained by the detective areas?
14   A.   Generally speaking --
15   Q.   Generally speaking.
16   A.   -- those documents, which were created by the
17   detective -- handwritten notes, inter-watch memos that they
18   wrote to their fellow detectives asking for work to be done
19   or telling them what they did that day.  It may well have
20   inventories, copies of a property inventory if it showed up.
21   It would have a crime scene processing report from the crime
22   lab.  It may well have a Cook County Medical Examiner's
23   report on the autopsy.  Obviously not done on day one, but
24   soon.  It could have mugshots.  It could have criminal
25   histories.  It's not unusual to run a name check on the
```

1    victim.  It's more paper you acquire, but it might be the
2    type of thing you find in an investigative file.  Things you
3    gather, things you acquire in the performance of routine
4    duties.  Really, the detectives are doing their due
5    diligence, and they are filling out forms, and they are
6    taking notes.
7    Q.   And it's for the documents that they prepare during
8    their tour of duty, correct?
9    A.   Correct.
10   Q.   But also paperwork could be received by the unit, right,
11   that may be relevant to the investigation?  You talked about
12   the administrative people would open up the envelope with
13   that, and they are the ones that would be getting it to where
14   it needs to go in terms of the file?
15   A.   Correct.
16              THE COURT:  Unless you are done with the witness,
17   Mr. Bazarek, we will take a quick midafternoon break.
18              MR. BAZAREK:  Yes, your Honor.
19              THE COURT:  Folks, we are going to take a
20   midafternoon break.  We are going to try to keep it
21   relatively short.  We are going to keep it about ten minutes.
22   But I do want you folks to get to use the facilities, stretch
23   your legs, get a swig of water.  So we will return into about
24   ten minutes.  Okay?
25              (Jury out at 3:34 p.m.)

Hickey - cross by Bazarek                                    728

1      THE COURT:  Before you leave the stand, Mr. Hickey,

2    I will say this to you, and I will say this to all witnesses.

3    During breaks do not talk to anyone about the substance of

4    your testimony.

5           THE WITNESS:  Yes, your Honor.

6           THE COURT:  We are off the record for ten minutes.

7       (A brief recess was taken at 3:35 p.m.)

8       (A change in court reporters was had.)

Hickey - cross by Bazarek

729

1          (Jury out)

2               MR. BAZAREK:  Your Honor, I just have an exhibit that

3     I will use.

4               THE COURT:  We'll go on the record.

5               Folks, as I just said off the record a minute ago, we

6     are going to go ahead and proceed even though my realtime

7     isn't working.

8               I would like to thank all members of the court staff,

9     including the trio of court reporters who have been kind

10    enough to help in this building.  That's great public service

11    that they do, and I'd like to thank each and every one of them

12    for assisting the parties and assisting the Court.

13              Okay.  Go ahead, counsel.

14              MR. BAZAREK:  Your Honor, this is an exhibit that's

15    agreed by the parties is in.  I just want to give a hard copy

16    to Mr. Hickey as I continue my examination.

17              THE COURT:  Yeah, that's fine.  Do you want to give

18    it to him now, you're saying?

19              MR. BAZAREK:  Yes.

20              THE COURT:  Yeah, that's fine.  Go ahead.  Do you

21    want to just say what it is.

22              MR. BAZAREK:  It is Plaintiff's Trial Exhibit No.

23    18.

24              THE COURT:  Okay.  And you'll put that on the record

25    obviously?

Hickey - cross by Bazarek

730

 1          MR. BAZAREK:  Yes, Your Honor.

 2          THE COURT:  Okay.  And you've got a copy yourself?

 3          MR. BAZAREK:  Yes.

 4          THE COURT:  Okay.  Go ahead.

 5          MR. HALE:  Your Honor, I just wanted to, I talked to

 6   plaintiff's counsel on the break, I just wanted to make the

 7   Court aware, we have agreed witnesses will only be called

 8   once.  We have agreed witnesses will only be called once.

 9          THE COURT:  Okay.

10          MR. HALE:  Technically they used the word "scope" in

11   one of their objections.  It wasn't actually meant to be scope

12   of their exam.  It was I think they just didn't want to

13   mention it was like a motion in limine type issue.  So I just

14   wanted the Court to be aware.  We're now on the same page --

15          THE COURT:  I see.

16          MR. HALE:  -- with the terminology we'll use on an

17   objection.

18          THE COURT:  When I heard that objection, I thought it

19   was because you folks were covering something that wasn't in

20   the direct, and that's typically fair game.

21          MR. HALE:  Right.

22          THE COURT:  But maybe you had some other arrangement

23   that -- go ahead.

24          MR. HALE:  And that's what it sounded like, and

25   that's what caught me off guard.  We have agreed our

1    examination can go beyond the scope.

2              THE COURT:  I see.

3              MR. HALE:  And I told counsel if they think there is

4    a question that is close to covering like a motion in limine

5    issue, they could say something like, "Objection, Court's

6    previous order" or however they want to phrase it, you know --

7              THE COURT:  Okay.

8              MR. HALE:  -- as opposed to using the word "scope,"

9    because that's not what it is.

10             THE COURT:  Got it.

11             Mr. Safer or Ms. -- and I'm sorry, I try so hard to

12   get your name right and I just can't do it.

13             MS. MUSUMECI:  Musumeci.  It's just like music.  That

14   should help.

15             THE COURT:  Okay.  Appreciate it.

16             Is there an objection on your end to the questions

17   now with that clarification about the lineup and what not?

18             MR. SAFER:  No, Your Honor.  In general, we are not

19   objecting to scope.  The question that was objected to was the

20   name check.  And Ms. Musumechi used the shorthand of "scope."

21   But what that was getting at is did they use a rap sheet,

22   which would have been an inappropriate question.

23             THE COURT:  All right.  So have we sorted this out

24   now?

25             MR. HALE:  Yeah.

Hickey - cross by Bazarek

732

1        THE COURT:  Okay, got it.  Is there anything else
2  people want to cover before we call back the jury?  I assume
3  not.
4        MR. HALE:  No.
5        THE COURT:  Okay.  We'll go ahead and get the jury.
6     (Pause)
7        THE COURT:  Counsel, how much more time do you have
8  with this witness yet?  I'm not going to hold you to it.  I'm
9  just wondering.
10        MR. BAZAREK:  Fifteen minutes, Judge.
11        THE COURT:  Okay.
12        MS. BOUDREAUX:  Fifteen minutes more?
13        MR. BAZAREK:  Do you think more?
14        MS. BOUDREAUX:  No.  I think it should be less.
15        MR. BAZAREK:  Okay.  It will be brief, Judge.
16        THE COURT:  Okay.
17        MR. BAZAREK:  Judge, could I ask a question while --
18        THE COURT:  Sure.
19        MR. BAZAREK:  I think plaintiff's objection, there
20  was an inquiry not about Mr. Bolden or about his case, it was
21  about being a detective --
22        THE COURT:  Yeah.
23        MR. BAZAREK:  -- and the types of things that you
24  would do to identify a suspect, so not talking about
25  Mr. Bolden's case, but what a detective would do in terms of

Hickey - cross by Bazarek

733

1    identifying a suspect.

2            THE COURT:  Okay.

3            MR. BAZAREK:  Meaning you are going to do a name

4    check.

5            THE COURT:  Yep.

6            MR. BAZAREK:  It's going to lead to a -- give you a

7    CV number.  You get a booking photo, so you can do a photo

8    array.

9            THE COURT:  Yeah.

10           MR. BAZAREK:  If you have a CB number, you can get a

11   rap sheet.

12           THE COURT:  Right, I understand.

13           MR. BAZAREK:  So I was asking general questions

14   not --

15           THE COURT:  And I sustained that because I thought it

16   was beyond the scope of the direct as I understood the lay of

17   the land.

18           But what is your response to that?

19           MS. MUSUMECI:  Well, Your Honor, I want to address

20   that.  But also the witness is here.  I don't know if you want

21   to have this conversation with him here.

22           THE COURT:  That's a good argument.

23           Do you mind stepping out for us?  Do you want to go

24   out in the hallway, sir, if you don't mind.  Don't take it

25   personally.

1          (Witness exited the courtroom)

2          THE COURT:  That was a good point, Ms. Musumeci.

3          MS. MUSUMECI:  Your Honor, I would, if that's the

4   line of questioning that Mr. Bazarek is going to go, I would

5   make objections as well as to the foundation and basis of

6   knowledge.  This witness is being proffered to talk about

7   investigative file policy and policies and procedures of the

8   department.  He is not an investigative expert.

9          THE COURT:  So I hear that.  He may not know.  You've

10  got to lay the foundation.  You've got to ask him if he knows.

11  I mean, maybe he doesn't know.  You see what I mean?

12         I mean, if the agreement is that you can cover topics

13  that are beyond the scope of what the other side has covered,

14  then you are entitled to ask whatever questions you want.  But

15  you can't have him spout off on stuff he doesn't know.  So

16  you've got to lay the foundation that he has knowledge about

17  topic X before you ask him to offer what he knows about topic

18  X.

19         MR. BAZAREK:  I believe he knows and the foundation

20  will be laid.

21         THE COURT:  Okay.

22         MR. SAFER:  Your Honor, he's seeking to use him as an

23  expert witness in being a detective.  That's not --

24         THE COURT:  Well, I don't understand him to be an

25  opinion witness.  I understand him to testify about the

Hickey - cross by Bazarek

1   policies, procedures, et cetera, within the Chicago Police

2   Department.

3           Is that correct?

4           MR. BAZAREK:  Just how you go about, you do a name

5   check, you can get a rap sheet, you can get booking photos.

6   That's all going to be evidence in this case.  I'm not talking

7   about Mr. Bolden's rap sheet.  I'm not talking about

8   Mr. Bolden's name check.  I'm talking about how a police

9   detective --

10          THE COURT:  Right.

11          MR. BAZAREK:  -- would go about doing that.  And

12  Mr. Hickey will be able to testify how you would accomplish

13  that during 1994.

14          THE COURT:  Okay.  Anything?

15          MR. SAFER:  What is the relevance, Your Honor, as to

16  what a detective might do to get a rap sheet?  This is the

17  issue that we --

18          THE COURT:  All right.  So here is how I see it.

19  Thank you.  I'm sorry to cut you off.  So here is how I see

20  it.  The plaintiff offered this witness to talk about the

21  policies and procedures of the Chicago Police Department with

22  respect to document retention.

23          Defendants now want to broaden the scope of the

24  testimony by covering other topics about the policies and

25  procedures.  I think that is fair game.  But it's got to be

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 73 of 132 PageID #:18001
Hickey - cross by Bazarek
736

1   within the scope of this witness's personal knowledge.  This

2   is not a corporate representative that doesn't have personal

3   knowledge, right?  This is somebody with personal knowledge,

4   is that right?

5           MR. BAZAREK:  Yes.

6           THE COURT:  So if you can lay the foundation, you can

7   cover it to the extent that it covers the policies and

8   procedures.

9           I will tell you though Mr. Safer's point is good in

10  the following standpoint, he's not an expert witness, he's a

11  fact witness, so he has to understand as to his personal

12  knowledge about the facts, meaning the facts about the

13  policies and procedures that were used within the Chicago

14  Police Department for conducting investigations or organizing

15  files, handling personnel, et cetera, okay.

16          MR. BAZAREK:  I would just add, Your Honor, that also

17  the entire detective division SOP is in.  So it's what

18  detectives do.

19          THE COURT:  Got it.  Let's get the witness back in.

20  And I guess we don't have a jury quite yet.

21          Come on back up, Mr. Hickey.

22          Everybody ready?

23          MR. BAZAREK:  Yes, Your Honor.

24          THE COURT:  Here we go.  Bring in the jury.

25       (Jury in)

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 74 of 132 PageID #:18002
Hickey - cross by Bazarek
737

1        THE COURT:  All right, folks.  Have a seat.

2        Before we resume, I want to make sure that all

3   members of the jury can see the exhibits that are on the

4   screen.  Some of you have personalized screens that are right

5   in front of you.  Other people in the gallery have screens

6   that are a little bit further away.

7        If anyone cannot see the exhibits, we'll fix the

8   problem.  We can fix the problem either by blowing it up

9   bigger so everybody can see it or we could have you adjust

10  your seat, either we can swap with somebody or we can move you

11  down the row.

12       So if anyone cannot see the exhibit, I just want you

13  to raise your hand and let me know, because it's important you

14  be able to see and hear all the evidence, okay.  Thank you.

15       Counsel, go ahead.

16  BY MR. BAZAREK:

17  Q.  Mr. Hickey, I want to go back to your time as a detective

18  investigating homicides and certain investigative steps that

19  you would take as a detective in terms of identifying a

20  suspect in a case.  And just tell the jury, how long were you

21  actually a homicide detective?

22  A.  I was a working homicide detective about three and a half

23  years, but I was a detective in rank for like another three

24  years beyond that, but in administrative positions.

25  Q.  And during your time as a detective, would you have

1  occasion to do what is called a name check?

2  A.  Yes.

3  Q.  Tell the jury what a name check is.

4  A.  In that time to get a name check and possibly a photo, you

5  literally had to drive down to 11th and State.  That's where

6  the headquarters was.  That's where the records division was.

7       And so literally you get out of the car and go up to

8  the second floor in the records division, the records inquiry

9  section.  And if you have, if you are lucky enough to have a

10 name to run, you run that -- you ask that this name be run.

11 And they'll come back and say record yes or no.

12      But if there is a yes, they'll provide you with very

13 basic information, the name, another number called a central

14 booking number that every arrest in the Chicago Police

15 Department has a unique identifier, and that's the central

16 booking number.

17      So with the -- if there is a yes or a positive on

18 your name check, you get the name, the central booking number

19 and the last -- the charges for the last arrest of that

20 individual.

21      With that you have enough information -- there is

22 also an IR number on this result.  An IR number is an

23 identification records number.  It's fingerprint based so we

24 know who it is.  He may have multiple names.  This person may

25 have multiple names, but the IR number says it's a unique

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 76 of 132 PageID #:18004
Hickey - cross by Bazarek
739

1    individual.

2         With that, you have enough to get a photograph of the

3    individual.

4    Q.   Okay.  So then a CB number, that is unique to a particular

5    arrest, is that correct?

6    A.   Yes, sir.

7    Q.   Okay.  And then when individuals get arrested, there could

8    be a photograph taken of them, is that correct?

9    A.   Yes, sir.

10   Q.   That's called a booking photo?

11   A.   Central booking photo, CB.

12   Q.   So I just want the jury -- or strike that.

13        So the jury can understand, so when the name check is

14   being done, a detective or detectives are going to

15   headquarters at 11th and State, and they're providing another

16   unit within the police department with a name, and then that

17   unit is doing the check, is that correct?

18   A.   And at that time it was a paper check.

19   Q.   Okay.

20   A.   It was a large machine, alphabetized, a lot of paper.

21   Q.   And that would include the time of 1994, is that correct?

22   A.   Yes, sir.

23   Q.   Okay.  Now, once you have a -- all right.  So you're a

24   detective.  We talked about your experience.  Once you have

25   the CB number, this IR number, what else could you obtain with

Hickey - cross by Bazarek

740

1    that information?

2              MS. MUSUMECI:  Objection, foundation.

3              THE COURT:  Why don't you lay the foundation.  Ask

4    him if he knows.

5    BY MR. BAZAREK:

6    Q.   Okay.  As a detective, would you request from -- strike

7    that.

8              As a detective, would you have occasion to request

9    arrest histories?

10   A.   Absolutely.

11   Q.   Okay.  As a detective, what would you need to request an

12   arrest history of a suspect?

13   A.   A name and specifically an IR number.

14   Q.   And where would you obtain the arrest history?

15   A.   In the same office as the name check, records inquiry.

16   Q.   Okay.  So is it like the same desk you walk up to?

17   A.   It's a large room with an L-shaped counter.

18   Q.   And then on -- once you obtain an arrest history -- by the

19   way, is that also known as a rap sheet?

20   A.   The criminal history record, yes, sir.

21   Q.   What type of information would be included on an arrest

22   history, also known as a rap sheet?

23   A.   It would be all the arrests that were made in Chicago

24   which are positively related to a particular individual by

25   fingerprints.  In other words, each of these arrests have been

Hickey - cross by Bazarek

1  fingerprint verified.  And there would be different arrests on

2  different dates.  And if available, the information would also

3  include the disposition of these criminal charges from these

4  various arrests, the court disposition.

5  Q.  So the arrest history would actually contain what the

6  individual was arrested for, is that correct?

7  A.  Yes, sir.

8  Q.  And if there was a disposition in the case, that would

9  also be contained on the rap sheet, is that correct?

10  A.  If it was posted, yes.

11  Q.  Now, also you talked about gathering a booking photo that

12  you would use.  Where would you obtain the booking photo or

13  photograph?

14  A.  You would have to go up to graphic arts on the fourth

15  floor.  A lot of legwork to get a photo.  So with the original

16  name check you get a CB and an IR number.  Then you have the

17  time, you get the criminal history record, and go up to get a

18  photograph of the mugshot, the most recent photograph

19  available.

20  Q.  Okay.  And you yourself had the steps that you just

21  described, you've done that yourself as a homicide detective?

22  A.  Many times.

23  Q.  Okay.  And also you obtained the booking photo of a

24  suspect because you may need to use it in a photo array, is

25  that correct?

Hickey - cross by Bazarek

742

1    A.  It certainly can be.

2    Q.  What's a photo array?  Tell the jury.

3              MS. MUSUMECI:  Objection, Your Honor.

4              THE COURT:  Why don't you lay the foundation that he

5    knows what it is.

6    BY THE WITNESS:

7    A.  A photo array --

8              THE COURT:  Hang on.  Excuse me.  Excuse me, sir.

9              You need to lay the foundation, ask him if he has

10   personal knowledge of what a photo array is.

11             MR. BAZAREK:  Yes, Your Honor.

12   BY MR. BAZAREK:

13   Q.  Mr. Hickey, as a homicide detective, have you ever heard

14   the phrase "photo array"?

15   A.  I do.

16   Q.  What is a photo array?

17   A.  A photo array is a technique used by detectives when they

18   have a name of a person of interest, they would get an

19   available photograph, oftentimes the easiest photograph to

20   obtain is a mugshot, and get mugshots that looks -- of other

21   people who look similar, not a white guy and a black guy,

22   but --

23             THE COURT:  Hang on.

24             MS. MUSUMECI:  May I be heard at sidebar?

25             THE COURT:  Sure.

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 80 of 132 PageID #:18008
Hickey - cross by Bazarek
743

1        Counsel, this is our first -- I'm sorry, counsel?

2    Members of the jury, beg your pardon.

3        Counsel has requested a sidebar.  This is the thing

4    that we alerted to, I alerted you to before where we're going

5    to put the white noise machine.  I am going to talk with

6    counsel privately.

7        It's frankly a good opportunity for you to stand up,

8    stretch your legs and relax for a minute.  So we are going to

9    go do a sidebar.

10        Usually, I said this before, I'll say it again,

11    usually it speeds things along.  So you should view these as

12    kind of a welcome break and accelerating the testimony, okay.

13        (Discussion at sidebar on the record)

14        THE COURT:  All right, folks.  I am going rogue

15    again.  I am doing it by microphone partly out of pattern.  It

16    just seems easier.  I don't know.  Maybe we'll revert back to

17    it.

18        But you asked to be heard on sidebar.  Go ahead.

19        MR. SAFER:  Your Honor, he just --

20        THE COURT:  Mr. Safer, go ahead.

21        MR. SAFER:  Your Honor, he just essentially just

22    violated your Court's ruling on a prior record.  They said --

23    on Mr. Bolden's prior record, because they --

24        THE COURT:  His criminal record?

25        MR. SAFER:  Yes.

Hickey - cross by Bazarek

744

1          THE COURT:  Okay.

2          MR. SAFER:  Because they just said, "Where do you get

3    a photo array?"

4          "Well, you get a booking photo."  That's because the

5    person has a record.

6          And they have, you know, now just told the jury that

7    Mr. Bolden has a record, contrary to your ruling.  And all of

8    these questions about "What do you get, a rap sheet?" and all

9    of that circumvents the Court's motion in limine ruling.

10          THE COURT:  All right.  So here is my thought on

11    this.  I think if that was the inference, it went over the

12    jury's head, because I did not necessarily appreciate that

13    there was a suggestion to the jury that because of this, these

14    officers knew or should have known that he had a criminal

15    record.

16          Maybe that was the inference.  Maybe if I thought

17    about it more carefully I would have drawn that up, too.

18          I will tell you this topic is sufficiently obtuse and

19    dry from the perspective of the jurors that I don't know that

20    they are going to read that into it.

21          But I will say again I don't think that the parties

22    should get anywhere near his criminal record.  I don't want

23    there to be any suggestion in the questioning that based on

24    these records these individuals should have known.

25          So I don't want you to get anywhere near the

Hickey - cross by Bazarek

745

1    suggestion these officers knew that there was a criminal

2    record for Mr. Bolden, because I've ruled on that.  That's

3    where we are.

4         Okay.  So go ahead.

5         MR. BAZAREK:  And I'm done with the category.  I'm

6    done with the category, Judge.  But it was general questions

7    about how they go about doing their job.

8         THE COURT:  All right.  So I'll say again if that was

9    the suggestion, I don't think it landed with the jury.  So

10   from plaintiff's perspective, I wouldn't worry about it too

11   awful much.

12        Here is the one thing I will say, folks.  We're at

13   over two hours on basically a document custodian type.  We're

14   burning a lot of time on this witness.  And I'll stay this on

15   the record in front of everybody when the jury is gone, but

16   it's up to you guys how you use your time, but the clock is

17   ticking, okay.

18      (End of discussion at sidebar)

19        THE COURT:  Okay, folks, we're back.  I promised you

20   that you would welcome those, right?  Didn't it feel good to

21   take a quick break and stand up?

22        Counsel, go ahead, please.

23   BY MR. BAZAREK:

24   Q.  Mr. Hickey, showing you what has been marked as

25   Plaintiff's Trial Exhibit No. 18.  Can you take a look at that

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 83 of 132 PageID #:18011
Hickey - cross by Bazarek
746

1    document.

2    A.  Yes, sir.

3    Q.  And can you tell the jury what that is?

4    A.  This is a Chicago Police Department supplementary report.

5    Q.  It is not an arrest report, correct?

6    A.  It is not an arrest report.

7    Q.  And on this report, it's prepared by Officer Willis, is

8    that right?

9    A.  And a couple other people whose names are on the report,

10   correct.

11   Q.  That's an Officer Kirk and an Officer Scott, is that

12   correct?

13   A.  Yes, sir.

14   Q.  Okay.  And they're all third district officers, right?

15   A.  Yes, sir.

16   Q.  Okay.  And the victim number one in this report is

17   Clifford Frazier, is that right?

18   A.  Yes, sir.

19   Q.  Mr. Hickey, if you go toward, if you look at the --

20             THE COURT:  Has this been admitted into evidence?

21             MR. BAZAREK:  I think there is no objection.

22             THE COURT:  Has it been admitted?

23             MR. BAZAREK:  I don't think so, Your Honor.

24             MS. MUSUMECI:  No.

25             THE COURT:  Okay.  Go ahead.

Hickey - cross by Bazarek

747

1      MR. BAZAREK:  Okay.

2  BY MR. BAZAREK:

3  Q.  Mr. Hickey, I just want to, it's really hard to -- I just

4  want to show you something on this exhibit.  Do you see there

5  is a numerical number at the bottom?  Can you read it?

6  A.  I do, I see it.

7  Q.  Okay.  Can you tell, read it out for the jury, please?

8  A.  It's the RD number.  It's Y-041680.

9  Q.  All right.  And that is the RD number for the aggravated

10  battery, is that correct?

11  A.  Correct.

12  Q.  Okay.  Also if you look at the bottom of the page --

13  remember we were talking about form numbers within the Chicago

14  Police Department?

15  A.  Yes, sir.

16  Q.  That they have different form numbers, okay.

17      That one looks like it is CPD form number 11.411A,

18  correct?

19  A.  Yes, sir.

20  Q.  Okay.  Also on this report, do you see there is a section

21  there for supervisor and signature and date approved?  Do you

22  see that?

23  A.  I do.

24  Q.  Okay.  And that, it's blank, is that right?

25  A.  Yes, sir.

Hickey - cross by Bazarek

748

1    Q.   And also if you look at, it looks like it's a different

2    box, it says "extra copies."  Do you see that?

3    A.   I do.

4    Q.   And "recipient" is box number 90 and it's blank, is that

5    right?

6    A.   That is correct.

7    Q.   What does that mean?

8    A.   When a report, a supplementary report is written to a case

9    that already occurred, there is a box that says "extra

10   copies."  The author, the officer involved submitting the

11   report, is supposed to direct where the extra copy should be

12   sent, to the crime lab, to Area 2 Violent Crimes, to the third

13   district, whatever it might be.

14          They normally wouldn't get it in distribution.  It's

15   drawing the attention of the records division to make a copy

16   and send it per the request of the author.

17   Q.   So on this document, the Officer Willis and Kirk and

18   Scott, they're not indicating that it should go somewhere

19   else, correct?

20   A.   They are not.

21   Q.   Okay.  And also we've already discussed that there is no

22   supervisor's signature and there is no supervisor approval on

23   this report, correct?

24   A.   Correct.

25   Q.   And also if you go to page 2 of this document, if you look

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 86 of 132 PageID #:18014
Hickey - cross by Bazarek
749

1    at the bottom of the page where it has "supervisor's

2    signature," it's blank, right?

3    A.   Yes, sir.

4    Q.   Okay.  So also this document, Plaintiff's Exhibit Trial

5    Exhibit 18, it has some lettering at the number, it says

6    EB-FBI, EB-FBI000041.  Do you see that?

7    A.   0042.  I'm sorry, page 2 is --

8    Q.   I'm sorry.  Yeah, I should have directed you back.  Okay.

9         But nowhere on this -- and that's just numbering for

10   the litigants in this case.  But on this, on this document,

11   Plaintiff's Trial Exhibit No. 18, there is no Bates stamp on

12   it that shows when it was received by the FBI.  You don't see

13   that on there, do you?

14   A.   I do not.

15        MS. MUSUMECI:  Objection.  Assumes facts not in

16   evidence, Your Honor.

17        THE COURT:  Overruled.

18   BY MR. BAZAREK:

19   Q.   Mr. Hickey, you worked for the Chicago Police Department

20   for nearly half a century, correct?

21   A.   Yes, sir.

22   Q.   Sometimes paperwork didn't end up in the file that it may

23   have or should have gone to, would you agree?

24   A.   I totally agree.

25   Q.   And detectives would not be able to include relevant

Hickey - cross by Bazarek

1  reports in an investigative file that they did not prepare or

2  that they did not receive.  Would you agree with that?

3  A.  I do.

4  Q.  And supervisors are also responsible to review and ensure

5  relevant reports are included in the investigative file,

6  right?

7  A.  Well, depending which supervisor you're talking about.

8  The supervisor is required to review and sign or approve of

9  these reports.  And then there was routing.  And the unit that

10  received, in this case if it was Area 2 Violent Crimes,

11  normally an administrative person would place it into the

12  appropriate investigative file.

13  Q.  Okay.  And the fact that a report was not included in an

14  investigative file doesn't mean that a detective did anything

15  wrong, right?

16  A.  Correct.

17  Q.  And the fact that a report was not included in an

18  investigative file does not mean that a detective violated the

19  SOP or any department order, true?

20  A.  That is true.

21  Q.  According to the SOP, it is the mission of the detective

22  division to identify and apprehend criminal offenders, is that

23  right?

24  A.  Yes, sir.

25  Q.  And some criminal offenders are murderers, right?

Hickey - cross by Bazarek

751

1   A.   Are what?

2   Q.   Some criminal offenders are murderers?

3   A.   Correct.

4   Q.   According to the SOP, the function of a detective,

5   detectives are a select group of department members who are

6   given the task of investigating crimes reported to the

7   department.  And the objective of their investigative efforts

8   are to determine if a crime actually occurred, gather evidence

9   of the crime, identify and arrest the person responsible for

10  the criminal acts; is that correct?

11  A.   Correct, yes, sir.

12  Q.   That's part of the SOP?

13  A.   Yes, sir.

14  Q.   Identifying and apprehending an individual who murdered

15  two people and attempted to murder a third person was a

16  function of the detective who worked the case and they were

17  also fulfilling the mission of the detective division, is that

18  correct?

19  A.   Yes, sir.

20          MR. BAZAREK:  Thank you, Mr. Hickey.

21          THE COURT:  Thank you, counsel.

22          Any redirect?

23          MS. MUSUMECI:  Very briefly, Your Honor.

24          THE COURT:  Okay.  Members of the jury, let me

25  explain how this works.  Whenever someone calls a witness, the

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 89 of 132 PageID #:18017
Hickey - redirect by Musumeci
752

1    other side gets to cross-examine.  And then the person that

2    called the witness gets to ask a few follow-up questions

3    before letting the witness leave the witness stand.  So that's

4    why I'm giving her an opportunity to ask any final questions,

5    to clear up any final points before this witness is excused

6    for the day.  Okay.

7            Go ahead, counsel.

8            MS. MUSUMECI:  Thank you.

9                      REDIRECT EXAMINATION

10   BY MS. MUSUMECI:

11   Q.  Mr. Hickey, you were asked by defense counsel about in

12   your experience you went to -- you at times interviewed

13   witnesses at hospitals and perhaps another member of the

14   service, another officer may have interviewed that person

15   first.  Do you remember asking about that?

16   A.  I do.

17   Q.  And you said that you might get briefed about what that

18   person had to say?

19   A.  Pardon?

20   Q.  You might get briefed about what that person had to say,

21   what the witness told your fellow officer?

22   A.  I would be briefed, yes.

23   Q.  Right.  And if another officer told you something that was

24   important, under the policies that were in place in 1994,

25   there was an obligation to document that information, isn't

Hickey - redirect by Musumeci

753

1    that right?

2    A.   If they find it relevant and credible, absolutely.

3    Q.   And that relevant, credible, documented information that

4    you had would be put in the investigative file, right?

5    A.   Correct.

6    Q.   You were asked some questions about the detectives,

7    detectives running name checks.  And you said that was a paper

8    process in the 1990s, right?

9    A.   Yes, ma'am.

10   Q.   That means it would generate a paper report, is that

11   correct?

12   A.   Would the detectives --

13   Q.   If the detectives went to --

14   A.   Yes.

15   Q.   -- 11th and the location you said, 11th and State or

16   whatever and ran a name check, they would get a paper report

17   with the results of that name check, is that right?

18   A.   Yes.  It was the size of an index card.

19   Q.   But it was on paper nevertheless, right?

20   A.   Yes, a very flimsy, chemically-treated paper like

21   microfilm.  It was certainly a dated product.

22   Q.   And so under the 1994 policies, that also should have been

23   included in an investigative file, right?

24   A.   I honestly don't know if that was the intent, to fill out

25   or to keep a form that you filled out requesting information.

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 91 of 132 PageID #:18019
Hickey - redirect by Musumeci
754

1    It's a form.

2    Q.   But the results that you received back should be -- came

3    on paper and should be included in the investigative file,

4    should they not?

5    A.   It's a form.  When we designed the investigative files, we

6    did so for important information, so note taking and

7    memoranda.  This is really a bureaucratic function, filling

8    out a form to request a name check.  I drafted it and I could

9    argue both sides of that to be honest with you.

10   Q.   Okay.  You were asked about an RD number, right?  That's a

11   record division number?

12   A.   Yes, ma'am.

13   Q.   And Mr. Bazarek asked you if there was a homicide at one

14   location and an aggravated battery at another location, might

15   those receive different RD numbers?  Do you remember that?

16   A.   Yes, I did.

17   Q.   And you said that that would be reasonable, right, that

18   they would?

19   A.   Very reasonable.

20   Q.   And they might have different investigative files, is that

21   correct?

22   A.   Correct.

23           MS. MUSUMECI:  Your Honor, at this time I'm going to

24   ask if Your Honor would read --

25           (Discussion off the record)

Hickey - redirect by Musumeci

755

BY MS. MUSUMECI:

Q.   I'm sorry.  If I may, can you look, Mr. Hickey, at Exhibit

24, PX-24, which I showed you earlier.  That was 7, I believe.

Again, this is the general offense case report from

Officer Temple.  You remember we spoke about this earlier,

right?

A.   We did.

Q.   Thank you.  And let me just direct you on the third page

of this four-page report, do you see at the top right corner

there is an RD number, and the RD number is Y-041680?

A.   Correct.

Q.   Okay.  I would ask if you would turn to the fourth page of

this document.  And do you see at the top of the fourth page

it says "cross-reference Y-041669"?  Do you see that?

A.   I do.

Q.   Does the Y-041669 appear to be another RD number?

A.   Correct.

Q.   And the "cross-reference" there means that the two cases,

the RD numbers were correlated, they were connected to each

other, associated with each other, is that right?

A.   Yes, ma'am.

MS. MUSUMECI:  Your Honor, I have no further

questions.  But I would ask Your Honor to read the

supplemental undisputed facts and evidentiary stipulation

number 4 at this time.

Hickey - redirect by Musumeci

756

1          THE COURT:  About Joint Trial Exhibit No. 4?

2          MS. MUSUMECI:  The stipulation.

3          THE COURT:  I have a supplemental undisputed facts

4    and evidentiary stipulations, paragraph number 4 about Joint

5    Trial Exhibit No. 4, is that correct?

6          MS. MUSUMECI:  That is correct, Your Honor.

7          THE COURT:  Any objection?

8          MR. BAZAREK:  No, Your Honor.

9          THE COURT:  All right.  Folks, I am now going to read

10   a stipulation into the record.  It's another agreement between

11   the parties.  It speeds things along.  It's a way of getting

12   documents admitted to evidence.

13         So the way it goes under the Federal Rules of

14   Evidence, you've got to have a foundation for something to

15   come into evidence.  You have to make sure it is what it

16   purports to be and is sufficiently reliable.  This is a way of

17   the parties agreeing to something.  So it's basically an

18   agreement about evidence.

19         So here is the parties' agreed stipulation:

20         Joint Trial Exhibit No. 4 is a true and correct copy

21   of the detective division investigative file for the shootings

22   of Derrick Frazier, Irving Ledell Clayton and Clifford

23   Frazier.

24         Joint Trial Exhibit No. 4 was made at or near the

25   time of the events recorded by a person with knowledge.  It

Hickey - redirect by Musumeci

757

1   was kept in the ordinary course of the regularly conducted

2   activities of the Chicago Police Department and it was the

3   regular practice of the Chicago Police Department to make

4   these records.

5         Although there were two different records division,

6   so that's RD numbers created for these shootings, Y-041669 and

7   Y-041680, a single investigative file was used by the

8   detectives investigating these shootings, and the records

9   related to both RD numbers were combined into this single

10   investigative file.

11         The pages bearing Bates labels CHI.Bolden013396 and

12   CHI.Bolden013397 are the investigative file inventory.  The

13   investigative file inventory lists the documents that are in

14   the investigative file.  The investigative file marked as

15   Joint Trial Exhibit No. 4 contains all of the documents listed

16   in the inventory.

17         So that was the stipulation between the parties.

18         Plaintiff's counsel, anything else for this witness?

19         MS. MUSUMECI:  No, Your Honor.  Thank you.

20         THE COURT:  All right.  You are excused.  Thank you,

21   sir.

22      (Witness excused)

23         THE COURT:  We'll do a 10-second sidebar with

24   counsel, please.

25      (Discussion at sidebar on the record)

1       THE COURT:  Folks, just as a courtesy, it's 4:25,

2  we're going to stop at 4:45.  So just be mindful of the clock.

3  I didn't want to surprise anybody.  I know you're going to be

4  in a time warp up there.  But we've got about 20 minutes.

5  I'll give you a nudge a couple minutes ahead of time just so

6  you know.  I just wanted everybody to be aware.

7       I'll do the same courtesy to you folks too, okay.

8     (End of discussion at sidebar)

9       Okay.  Be seated, everyone

10       Plaintiff's counsel.

11       MR. SAFER:  Thank you, Your Honor.  We call Angelo

12  Pesavento.

13       THE COURT:  Okay.

14       Officer Pesavento, if you would please come to the

15  stand, sir.  Please raise your right hand.

16     (Witness duly sworn)

17       THE WITNESS:  I do.

18       THE COURT:  Have a seat, please.

19       There should be a pitcher of water there for you,

20  Officer Pesavento, if you need it.

21       THE WITNESS:  Right.

22       THE COURT:  And I encourage you to speak into the

23  microphone so everybody can hear you, okay.

24       THE WITNESS:  I'm sorry?

25       THE COURT:  Go ahead, I encourage you to speak into

Pesavento - direct by Safer

1  the microphone when you speak today.  So I want to make sure

2  that all the members of the jury can hear you, okay.

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  Mr. Safer, go ahead, please.

5          MR. SAFER:  Thank you, Your Honor.

6          ANGELO PESAVENTO, A DEFENDANT HEREIN, SWORN

7                   DIRECT EXAMINATION

8  BY MR. SAFER:

9  Q.  Would you state your name, please.

10  A.  My name is Angelo Pesavento.

11  Q.  On the evening of January 29th, 1994, you and your

12  partners were assigned to investigate the shootings of Derrick

13  Frazier, Ledell Clayton and Clifford Frazier, correct?

14  A.  Yes.

15  Q.  And who were your partners?

16  A.  George Karl, Ed Siwek.  And then there were other people

17  involved too, Mike Baker, Mike Rowan.  I can't think of

18  anybody else right now.

19  Q.  You understand that you are being sued about this

20  investigation, right?

21  A.  Yes.

22  Q.  And, sir, you have lied to minimize your role in the

23  investigation in these murders, haven't you?

24  A.  No.

25  Q.  Well, you gave answers to Mr. Bolden's interrogatories,

Pesavento - direct by Safer

760

1    didn't you?

2    A.  I gave answers to --

3    Q.  Mr. Bolden's written interrogatories, correct?

4    A.  I'm not quite sure if I follow what you're saying.

5              MR. SAFER:  Your Honor, we will have a notebook

6    tomorrow, but if I could approach the witness?

7              THE COURT:  Yes.

8    BY MR. SAFER:

9    Q.  Sir, I've showed you what has been marked as Plaintiff's

10   Exhibit 106.  And that is Defendant Angelo Pesavento's

11   Responses to Plaintiff's First Set of Interrogatories.

12             You've seen this before, correct?

13   A.  Yes.

14   Q.  In fact, you provided the answers to these questions,

15   correct?

16   A.  Yes.

17   Q.  If you would turn to page 4, please, the question number

18   3.  So what this is is a document where you are asked written

19   questions and you provide written answers, correct?

20   A.  I don't know.  I haven't read this thing at all.

21   Q.  Excuse me?

22   A.  I haven't -- you just handed this to me.  I haven't read

23   it.  I haven't -- I don't know what question 3 is and what the

24   answer was.

25   Q.  I'm asking you, in general, you provided the answers to

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 98 of 132 PageID #:18026
Pesavento - direct by Safer
761

1   these written questions, correct?

2   A.  Yes.

3   Q.  And if you turn to the last page of that exhibit, that is

4   a verification, correct?

5   A.  Yes.

6   Q.  And that is your signature, right?

7   A.  Yes, yes.

8   Q.  And it says, "I, Angelo Pesavento, verify that I sign the

9   foregoing document, my response to plaintiff Eddie L. Bolden's

10  first interrogatory, and that the statements set forth in the

11  foregoing response are true and accurate to the best of my

12  knowledge, information and belief"?

13  A.  Yes.

14  Q.  You provided these answers, and you read them carefully

15  and you verified that they were correct, right?

16  A.  Yes.

17  Q.  So question number 3 says, "Please describe in detail your

18  role in the investigation."  Do you see that?

19  A.  Yes.

20  Q.  And after some objections, you say, "Defendant Pesavento

21  interviewed Anthony Williams.  Defendant Pesavento also

22  interviewed Mr. Bolden after his arrest."

23  A.  Wait.  You are losing me here.  After that, the answer,

24  are you talking about the answer here?

25  Q.  Yes.

Pesavento - direct by Safer

762

1   A.  That's not what I -- do we have the same --

2   Q.  So it has some objections.  Do you see those?  The first

3   sentence has objections.

4           MS. BOUDREAUX:  Judge, I would ask that the

5   objections be read because they're relevant to the answer.

6           THE COURT:  What was the nature of the objection?

7           MR. SAFER:  They're objections by lawyers, Judge.

8           THE COURT:  Let's do a sidebar.

9       (Discussion at sidebar on the record)

10          THE COURT:  Boilerplate objections are no objections

11  at all.  What does this mean, "Incorporates the foregoing

12  general responses and objections," what does it mean?

13          MS. BOUDREAUX:  I think it means to incorporate the

14  other answers in the interrogatories.

15          THE COURT:  Well, I don't know what other answers

16  there are.  So if you want to draw out any other responses in

17  your examination of this witness, you can.

18          MS. BOUDREAUX:  Okay.

19          THE COURT:  Overruled.

20          MS. BOUDREAUX:  Okay.

21      (End of discussion at sidebar)

22          THE COURT:  Mr. Safer, objection overruled.

23          MR. SAFER:  Thank you.

24  BY MR. SAFER:

25  Q.  So you see that there is a first sentence of objections,

Pesavento - direct by Safer

1    do you see that?

2    A.   No.   Are we on page 4?

3    Q.   Yes.   It says, "Please describe in detail your role in the

4    investigation"?

5    A.   Yes.

6    Q.   Do you see that?

7    A.   Yes.

8    Q.   Then there is an answer?

9    A.   Yes.

10   Q.   Do you see that?

11   A.   Yes.

12   Q.   If you go down like three or four lines after the

13   objections, it says, "Defendant Pesavento interviewed Anthony

14   Williams."   Do you see that?

15   A.   Yes.

16   Q.   "Defendant Pesavento also interviewed Mr. Bolden after his

17   arrest and assisted in conducting the lineup."

18   A.   Yes.

19   Q.   Do you see that?

20   A.   Yes.

21   Q.   Those are the only three things that are listed as your --

22   for the answer to please describe in detail your role in the

23   investigation, correct?

24   A.   Yes.

25   Q.   And before you answered these questions, you had access to

Case: 1:17-cv-00417 Document #: 635 Filed: 11/16/21 Page 101 of 132 PageID #:18029
Pesavento - direct by Safer
764

1    all of your police reports, correct?

2    A.  Yes.

3    Q.  And you went over your reports before preparing these

4    interrogatory answers?

5    A.  I assume I did, yes.

6    Q.  You had access to other officers' reports as well,

7    correct?

8    A.  Yes.

9    Q.  You had access to your testimony in Mr. Bolden's trial

10   before you prepared these answers, right?

11   A.  Yes.

12   Q.  And you went over transcripts of your testimony before

13   preparing your answers to this interrogatory?

14   A.  I'm sure I did.

15   Q.  You refreshed your memory about your investigation before

16   you answered your interrogatories, right?

17   A.  Yes.

18   Q.  But that answer to interrogatory number 4 is not either --

19   is not complete at all, is it, sir?

20   A.  Number 4?

21   Q.  No.  Number 3 on page 4.  What we've just discussed, that

22   doesn't begin to describe your role in the investigation, does

23   it?

24   A.  I don't know, I think it does.

25   Q.  Okay.  Well, let's explore that.  You actually went to the

Pesavento - direct by Safer

765

1   scene of the murders that day, didn't you?

2   A.  Yes.

3   Q.  That night?

4   A.  Yes.

5   Q.  That isn't in your interrogatory answer, is it?

6   A.  I'm not quite sure what you're --

7   Q.  When you described your role in the investigation, sir,

8   did you say that you went to the scene of the murders?

9   A.  No.  But I don't know how this question was being put to

10  me either.  They didn't ask me if I started my car that

11  morning to get to work and go on from there.

12  Q.  Do you think, sir, that starting your car is the same

13  thing as going to the scene of the murders?

14  A.  No.

15  Q.  Is that what you are telling the jury, sir?

16  A.  I am not trying to be funny, I'm not.  But what I'm saying

17  is that there are a lot of things that happen from the time we

18  get assigned this thing to different times in there.

19  Q.  Yes, I understand that.  And you didn't put those things

20  down in the answer.  That's my point.

21        You started to do a canvass of the homes in the area

22  of the murder scene, right?

23  A.  Yes.

24  Q.  That isn't in your interrogatory answer, is it?

25  A.  No.

Pesavento - direct by Safer

766

1    Q.   You interviewed the person who according to your reports

2    was the only eyewitness to that shooting, right?

3    A.   Yes.

4    Q.   The witness who actually saw someone get out of the back

5    seat of the car in which the murders occurred, right?

6    A.   Yes.

7    Q.   That's a really important witness in the investigation,

8    correct?

9    A.   That's correct.

10   Q.   And you interviewed him, didn't you?

11   A.   Yes, I did.

12   Q.   That isn't in your interrogatory answer, is it?

13   A.   No, it's not.

14   Q.   And perhaps most importantly, you went to the crime scene

15   at J&J Fish Store, didn't you, that night?

16   A.   Yes.

17   Q.   You actually went into J&J Fish restaurant, right?

18   A.   I'm sure I did.  I don't exactly --

19   Q.   You didn't put that in your interrogatory answer, did you?

20   A.   No, I didn't.

21   Q.   But it's worse than leaving that out, sir, isn't it,

22   because if you look at page 7 of that same exhibit and look at

23   number 15, interrogatory 15.

24          THE COURT:  Five more minutes, counsel.

25          MR. SAFER:  Thank you.

Pesavento - direct by Safer

1  BY MR. SAFER:

2  Q.  It says, "Please describe the reason that you went to the

3  J&J Fish restaurant on January 29, 1994, including whether you

4  were assigned there in response to a 911 call."  Do you see

5  that?

6  A.  Yes.

7  Q.  And your answer after the objections says, "Defendant

8  Pesavento did not go to the J&J Fish restaurant on January

9  29th, 1994."  Do you see that?

10 A.  Yes, I do.

11 Q.  That's just wrong, isn't it, sir?

12 A.  Yes.

13 Q.  You affirmed that to be the truth, didn't you?

14 A.  I assume I did.

15 Q.  Well, you can look at that back page again and see your

16 signature.

17 A.  Yes.

18 Q.  But it's not true, is it?

19 A.  That's true.

20 Q.  You did go to J&J's restaurant, right?

21 A.  Yes.

22 Q.  And when all the police reports were finally produced in

23 that case, it became very clear that you went to J&J's Fish

24 restaurant, didn't you?

25 A.  Yes.

Pesavento - direct by Safer

1          MR. SAFER:  Your Honor, we can discuss what happened

2   at J&J's Fish next, but it will take a little time.

3          THE COURT:  Is this a natural stopping point?

4          MR. SAFER:  I think so.

5          THE COURT:  Okay, folks, well, that's good news.

6   We're stopping a couple minutes early.

7          Folks, we are going to end for the day.  Let me give

8   you a couple of final housekeeping matters.  We are going to

9   start tomorrow morning as usual at 9:30.  Please be here in

10  the courthouse no later than 9:00.

11         Hopefully you folks got some breakfast this morning.

12  Did they give you breakfast?  I hope it's good.  I don't know

13  what they're feeding you.  I hope it's something to your

14  liking.

15         But I'd ask you to kindly be here by 9:00 o'clock

16  tomorrow morning.  It's important that everybody be here on

17  time.  And thank you for doing that.

18         One other thing, I don't know if any of you need or

19  would like to have a letter to your respective employers.  I

20  don't know if the employers have given you guys any pushback

21  or if it would help.  I know that some of you are missing work

22  to be here.  Thank you for doing that.

23         If it would help grease the wheels with your

24  employer, I personally can send them a letter.  I can let them

25  know that you are doing your public service as an American

Pesavento - direct by Safer

769

1    citizen. Sometimes that helps to get a letter from a judge.

2          So if it helps you, I will send it. Just let my

3    courtroom deputy know and we'll get you a letter.

4          Finally, folks, please don't talk about this case

5    amongst yourselves or with anyone else in your family, friends

6    or anything like that. And please keep an open mind until all

7    the evidence is in, because you haven't heard all the evidence

8    yet.

9          With that, folks, thank you for being here today.

10    We'll see you tomorrow morning.

11      (Jury out)

12          THE COURT: You can step down, sir. I'll give you

13    the same instruction that I gave the prior witness. You

14    cannot talk about the substance of your testimony with anyone

15    until I excuse you from the witness stand, okay.

16          THE WITNESS: Yes.

17          THE COURT: Officer Pesavento, you're welcome to go

18    sit at the counsel table.

19      (Witness stands down)

20          THE COURT: We were handed a note, folks. It just

21    simply says that a certain juror would like a letter to her

22    employer. So we'll get the information about her employer.

23    It's Flora Pagan would like a letter for her employer. So I'm

24    going to go ahead and facilitate that.

25          You are welcome to see the letter if you want. It's

1    pretty generic.  If anybody wants to see it, let me know.

2         Okay, folks, you can have a seat.  I have got a

3    couple housekeeping matters to cover, and then we'll cover

4    whatever you folks want to cover.

5         In the interest of consistency, I'll cover the jury

6    note that I mentioned last week.  This is the individual who

7    asked permission to use a room to conduct an interview.

8         I've not dealt with that yet.  I'm going to tell

9    Dionne Braddix that she's welcome to use a room to conduct

10   interviews so long as it does not interfere with the court

11   time.  So I wanted to let you know that I am going to be doing

12   that.

13        Don't forget no later than the start of court

14   tomorrow morning, I'd like the plaintiffs to file a brief

15   summary of the admitted exhibits.  You will thank me when this

16   trial is done that we've been keeping a running total.  Nobody

17   likes a big train wreck on the last day of trial.  So thank

18   you in advance.

19        What I would like you to do is email the list to the

20   other side, get their blessing.  We only had a couple of

21   exhibits come in today, so it should be pretty easy.  But by

22   day 12 of trial you'll be glad we have this.

23        Don't forget, everyone, by the end of the day I'm

24   going to need an electronic copy of the exhibits for the JERS

25   system, J-E-R-S.  Are you folks all familiar with that?  I

1   don't want there to be any snafus.  I want to make sure that

2   the jury gets the stuff.

3          I don't know if each side submits an electronic copy

4   or I get one composite list from both of you.  Maybe you can

5   sort that out and confer with my courtroom deputy on that.

6          But just everybody be mindful at the end of the day

7   when all is said and done and the jury walks back there, they

8   have to have an electronic copy of all the exhibits so they

9   can review things.

10         MS. BOUDREAUX:  But you're not saying file them by

11  the end of the day today, are you?

12         THE COURT:  No, no, no.

13         MS. BOUDREAUX:  Okay.

14         THE COURT:  The JERS is something that the jury can

15  plug into a machine and look at the stuff in the jury

16  deliberation room.  That's all.  You don't have to do it

17  today.  So you can wait a couple weeks on that.

18         MS. BOUDREAUX:  Okay.

19         THE COURT:  My courtroom deputy has been keeping

20  track of the time.  I will file something short that just

21  reflects our records of who is using time for what.

22         I was thinking about this on the drive to work this

23  morning, and I think about it this way.  When I was a kid, I

24  played a video game named Lunar Lander.  Does anyone remember

25  Lunar Lander?  I'm so old I can remember when video games were

1    in black and white.  Lunar Lander.

2         Here this poor little hapless spaceship that's trying

3    to land on this little thing.  And I was terrible at this

4    game.  But, you know, the Lunar Lander has a budget of fuel.

5    You only have so much fuel to land this poor spacecraft under

6    the landing pad.  Do you remember this?  And you can move back

7    and forth.  And every time you move the accelerator button you

8    had a jolt of umph, right.  You could go into space to land

9    the spaceship.  But when you ran out of fuel, you crashed.

10        It's a metaphor, people.  You all have only so much

11   time budgeted to you.  I was reminded by Tom Bruton that in

12   the last day of trial, we are literally kicked out of our

13   space.  We are at a hard stop, a concrete wall.  I can't do

14   anything about it.  I wish I could, folks.  I hope you know

15   that I really wish I could give you time, you guys whatever

16   time you want to try this case.  I can't.  That is not my

17   mission.

18        My mission is to fit you folks in a time box, right.

19   So I am forced, I have no choice but to keep track of how much

20   time you folks are spending and to make adjustments

21   accordingly especially on the back end.

22        You folks can spend whatever time you want with each

23   individual witness.  But just please, please be mindful that

24   any minute you spend is a minute that you have spent.  It is

25   time that is off your, out of your budget.  It is fuel that

1    you are using.  So think of yourself as a little spacecraft

2    trying to land the plane, right.  Are you with me?  So just

3    please be mindful of that, folks, because I don't want this to

4    be problematic for people.  I'm trying to let you know from

5    day one that I can foresee issues down the road.  I want you

6    folks to budget your time accordingly, okay.  So just be

7    please mindful of that.

8         We do need to talk about Officer Oliver.

9         I guess before we get there, for the beyond the scope

10   issue that we talked about, I want to make sure that I

11   understand the agreement between the parties.  Suppose

12   plaintiff covers topic A with a witness.  And certainly the

13   defense can cross and try to establish the opposite, you know,

14   like cross them with leading questions.  It could well be that

15   the defendant wants to proactively raise topic B with the

16   witness, something that wasn't raised before that was

17   something that we did with the first witness, with Mr. Hickey.

18        It is my understanding that you are going to be doing

19   so with non-leading questions.  In other words, it seems to me

20   that you can ask leading questions if you are crossing the

21   person, but if you are really calling them affirmatively to

22   cover some other topic, it's going to be non-leading

23   questions.  And that's how I thought that it went here today.

24   I thought to that respect in the leading and non-leading

25   thing, it tended to go pretty smoothly.  Is that the

1    understanding?

2          MS. BOUDREAUX:  That's my understanding.

3          THE COURT:  Yeah.  And I will tell you, when I was a

4    lawyer, I didn't always care when people asked leading

5    questions because a lot of time I thought it was less

6    effective, frankly, than getting a witness to talk.

7          The jury wants to hear from witnesses.  So if you are

8    leading the person -- I don't mean you folks.  I just mean in

9    general -- if lawyers are talking, people zone out.  But if a

10   witness is listening, the jury kind of perks up.  But I still

11   wanted to cover that anyway.

12         I want to talk about Oliver.  But I want to make sure

13   that you folks have covered any other housekeeping matters

14   other than Oliver that we want to cover today.

15         Mr. Safer, is there anything on your end?

16         MR. SAFER:  No, Your Honor.

17         THE COURT:  Anything on the defense end?  This is not

18   your last opportunity, but --

19         MR. HALE:  Does this mic work?  Is this okay?

20         THE COURT:  Yep.

21         MR. HALE:  Your Honor, I mentioned after the openings

22   that there were a couple topics I wanted to address about

23   potentially opening the door.  My suggestion is, if you will

24   allow it, I think it will be more effective and efficient if I

25   first get the transcript, file something in writing.  This is

1    not an issue that we need to address today, probably not even

2    tomorrow.  I hope to file something tonight or tomorrow

3    morning on those issues.  I just wanted to let you know that

4    that's how I would prefer to do it.

5              THE COURT:  Okay, that's fine.  That's totally

6    appropriate.  I'd need to review the transcript as well.  So

7    thank you for that.

8              Okay, folks, we need to talk about Mr. Oliver.

9              I issued my ruling on Sunday.  I've got certain views

10   on this topic.  I appreciated defense counsel doing your

11   filing on that.  I asked you to tell me what Mr. Oliver's

12   position was.  It looks like he's not in a cooperative spirit.

13   I don't know if he woke up on a different side of the bed this

14   morning, but it looks like he's not willing to come.

15             I was thinking about how to address that, what my

16   tools are.  I will say as a general matter a District Court

17   Judge has a toolbox the size of a small hardware store, a lot

18   of things a District Court Judge can do to address this

19   situation.

20             But one thing I always do is think about what am I

21   authorized to do?  What can I do?  What am I empowered to do?

22             And I was doing a little poking around on this, and I

23   decided to read the rules, which is always a good place to

24   start.

25             So I picked up Rule 45(c).  Specifically this is the

1    rule about compelling attendance at a trial.  And here is the

2    punch line, folks.  I am not a hundred percent certain that I

3    can compel a party who resides out of state, who is also more

4    than 100 miles away, to appear in person.

5        I will tell you that for the last 10 years of my

6    career before taking the bench I was a trial attorney at the

7    SEC.  So I was living in SEC land.  SEC has nationwide service

8    of process.  So it's just like the criminal situation, I can

9    make anybody show up any time anywhere, because that's the

10   rule that Congress had.

11       That is not the standard rule for civil cases.  And

12   I'm glad I looked this up before I issued an order.

13       My understanding from Rule 45(c)(1) is that if there

14   is a trial subpoena for a person, and a person includes a

15   party, I can command them to physically appear if they're

16   within 100 miles and if they reside in the state.

17       There is an open question in my mind about where

18   Mr. Oliver resides.  And I will tell defense counsel I do not

19   want you to front this issue with Mr. Oliver.  I'm going to

20   ask him some questions under oath under penalty of perjury.

21   I'm going to expect clear answers from him.

22       No one can give him a sense of what I want to talk to

23   him about, okay.  So I'm prohibiting all defense, members of

24   the defense team from telling him what I want to ask him.

25       It sure looked to me like he resided in Illinois.  He

1   may have moved to Arkansas.  I'm not sure about that.  I did

2   notice on page 30 of his medical records, 30 of 49, he told

3   Dr. Stokes that he was from Illinois.  I'm paraphrasing.  And

4   he didn't have a primary care physician.

5       I don't know if, I don't know if he moved to

6   Arkansas.  I don't know when he moved to Arkansas, if he

7   moved.  Maybe he moved a month ago.  Maybe he got a trial

8   subpoena and decided, you know what, I want to get out of

9   dodge.  I'm going to go live with some family members in

10  Arkansas.

11      Maybe he's playing it straight.  Maybe he moved there

12  two months ago, and he's getting mail there.  He's getting a

13  cable bill there.  He's got a water bill there.  He's got a

14  lease.  Maybe he's got a new license plate.  Maybe he's got a

15  new license.  Maybe he's legitimately in Arkansas.  I don't

16  know.  I don't know what the story is.

17      I have some concerns.  So it's a long way of saying

18  this, I have to figure out what I am going to do with

19  Mr. Oliver.  But I also, most importantly, I have to play by

20  the rules too as a District Court Judge.  I've got to make

21  sure that I stay within the limits of my authority.  And I

22  don't want to issue a writ of a body attachment if I don't

23  have the authority to do so.

24      So I need to investigate the factual foundation.  I

25  need to make sure that I'm on good footing.  I need to figure

1   out if he resided in Illinois within the meaning of the trial

2   subpoena -- excuse me, within the meaning of Rule 45 before I

3   take any steps that may be more coercive.

4          I also don't know for certain what the operative time

5   is for purposes of Rule 45(c).  I assume it is probably where

6   this person resided at the moment that the trial subpoena was

7   issued and served.  It is conceivable to me that it is

8   earlier.  But that frankly makes sense to me.  In other words,

9   if someone is sued in 2019, moves somewhere in 2020 and is

10  served with a trial subpoena in 2021, I would think that the

11  residence as of the issuance of the trial subpoena would

12  control.  But I don't know that.  So I'm flagging that for you

13  folks to think about.

14         That's a long way of saying a couple of things.

15  Number one, I think I need to figure out where he resides.  I

16  need to pin down the facts on that point before I can figure

17  out if I'm even authorized to force him to be here.

18         If for sake of argument, I don't know this to be

19  true, if he does reside in Arkansas, if he did reside in

20  Arkansas at the time of issuance and service of the trial

21  subpoena, then I would need more authority from the plaintiff

22  team for whether I can physically compel him to be here.

23         It looks to me based on the rule, the plain language,

24  and I'm a plain language, go-by-the-text kind of guy, it looks

25  like on the plain language of the text I cannot compel him to

1    be here.

2           But, you know, I've not researched it to death

3    either.  This is something that I independently came up with

4    when I was researching this yesterday.  This is the research

5    that resulted in the pop-up ad for Mr. Hale's legal services,

6    which gave me a chuckle.  I researched Rule 45 and all of a

7    sudden Andy Hale is on my screen.

8           So it's a long way of saying I think we need to have

9    a phone call with Mr. Oliver.  I think we need to get him to

10   testify under penalty of perjury, answer my questions, answer

11   plaintiff's counsel's questions.  And defense counsel, you are

12   free to ask whatever questions you want.

13          I will go first.  If he resides in Arkansas and if I

14   cannot physically force him to be here, the question is what

15   do we do?  What do we do?

16          Do I compel him to testify remotely by some other

17   Zoom or some other means?  Do I, you know -- is it appropriate

18   for there to be an adverse inference of some kind?  I'm not

19   sure if that's appropriate if the rule doesn't require me,

20   doesn't allow me to force him to be here, can there be an

21   adverse inference if he isn't here?  I don't know.  I've got

22   to think this through.

23          I am very sensitive to the no sandbagging point.  And

24   I'm substantially unhappy that Mr. Oliver has told all of you

25   folks that he's not here.  I think it's disruptive to

1    everybody.

2          It seems like plaintiff was sure counting on him

3    being here.  I was counting on him being here.  I experienced

4    heartburn over this topic for a year, you know, because as a

5    judge, you know, I have to make the best decisions I can.  I

6    didn't allow the plaintiff to go forward with the second

7    deposition because I put some faith into my early warning

8    system.

9          I am surprised and unhappy to hear on Monday of last

10   week, so just a week ago, that he was not planning to attend.

11         And I will say I am not faulting defense counsel for

12   that, okay.  I don't have reason to believe that you folks

13   were playing games here.  It sounds to me like you want him

14   here, too.  And frankly, given what I've heard so far, if I

15   were in your shoes, I'll simply say I can understand that

16   perspective.

17         I also don't know if Mr. Oliver has any skin in the

18   game.  I don't know if he's indemnified 100 cents on the

19   dollar.  I assume that there could be an award of punitive

20   damages for which he would not be indemnified.

21         I don't know if the indemnification covers 100

22   percent of the compensatory damages, if any.  I assume it

23   probably does, but I don't know.  I'm curious to know if there

24   is any skin in the game.

25         I would like to know from defense counsel if you have

1    exhausted all of your persuasive abilities to get him here.

2    You're a persuasive group of people with a lot of rhetorical

3    skills.  And so is your client.  Maybe you feel like your

4    toolbox has been exhausted and you've done everything you can

5    to get him here.  I don't know.

6              Needless to say, this is a problem that goes away if

7    he comes here, right.  I know all of you folks would like to

8    focus on other things for trial.

9              So what I would propose is we have a telephone call

10   with Mr. Oliver where he testifies under penalty of perjury.

11   I would like to do it, I would propose 9:00 o'clock tomorrow

12   morning.  If you would rather do it over the lunch hour

13   tomorrow, we can.  But that's just my suggestion that we do it

14   at 9:00 o'clock, just get the foundation laid, because the

15   sooner we figure this out, the better it is for everyone.

16             I did read plaintiff's submission that they would

17   like him here on Friday.  Today is Tuesday.  So the clock is

18   ticking, all sorts of clocks are ticking, including the clock

19   for Mr. Oliver.

20             So unless I hear a different proposal, I would like

21   defense counsel to reach out to Mr. Oliver and tell him that I

22   would expect him to be available for a phone call tomorrow

23   morning, where he's going to testify under oath under penalty

24   of perjury.  He's going to answer my questions and answer

25   defense counsel's questions, too.

1          That's a long way of saying I put some thought into

2     how to deal with the Oliver situation.  Those are my current

3     thoughts.  I'm always receptive to constructive ideas from all

4     of you people.  I really am.

5          Mr. Safer, I'll let you go first if you would like,

6     or Mr. Crowl, if you would like to address the Court on this,

7     whoever wants from the plaintiff side, and then I'll listen to

8     anything defense counsel has to say.

9          I'm looking for creative, constructive solutions from

10    all you people, okay.

11          Plaintiff's counsel.

12          MR. CROWL:  So, Judge, as you know, it was very

13    important for us to be able to have him here live.  Doing Zoom

14    is much different and not nearly as effective.  And I would

15    not want to reward Mr. Oliver for his behavior by saying:

16    Okay, you're the only witness in the case who doesn't have to

17    be in front of the jury live, as we all are, as the other

18    witnesses are.

19          And frankly, Judge, in terms of what some of your

20    options can be, one of them is, and you have the power to do

21    this, is you could default him.  And I will cite some cases,

22    and we can file something as well, Judge, but I would cite

23    Grossman versus Smart, which is 1995 Westlaw 767893.

24          That's a Seventh Circuit case, 1995, that says,

25    "Trial courts have the inherent power to impose default as a

1   sanction where a litigant interferes with the efficient

2   administration of justice. This includes failure to defend by

3   not appearing at trial. Smart's unannounced departure and

4   subsequent failure to reappear" -- in that instance was after

5   a jury was seated and opening statements were made -- "was

6   willful, bad-faith conduct. It's precisely the sort of

7   extreme abuse which warrants an entry of default."

8           THE COURT: Does that case involve an out-of-state

9   defendant or party who was more than 100 miles away?

10          MR. CROWL: I don't know the answer, Judge. I assume

11   probably --

12          THE COURT: That's the key thing.

13          MR. CROWL: It probably doesn't.

14          THE COURT: I would say the dividing line I think is

15   going to be how do you handle an out-of-state witness who is

16   more than 100 miles away? In other words, can I default a

17   defendant who is 100 miles away who is out of state if I

18   cannot compel him to be here with a trial subpoena?

19          I don't know the answer to that. I assume the answer

20   is probably no. In other words, it seems odd to me to say if

21   I can't compel him to be here, I can nonetheless default him

22   for not being here. But I could be wrong on that.

23          MR. CROWL: And we'll look at that as well, Judge.

24          THE COURT: Okay.

25          MR. CROWL: I think that's an important question. I

1  do think that maybe Rule 45, and which certainly applies to

2  defendants, but it, you know, more broadly applies to just

3  getting witnesses to court, I think that when you have a

4  party, you may have more powers than if you were just trying

5  to get a third party in.  But we can look at that and see if

6  we can answer that question for Your Honor.

7          THE COURT:  I mean, the text of Rule 45, and I know I

8  am just hitting you with this now, but the text of Rule 45(c)

9  suggests to me that the rule applies to any person.  And a

10 party is a subset.  In other words, it does extend my

11 authority to a party, because if the party is more than 100

12 miles away, but still in the state, so let's say you're in

13 Cairo, Illinois, more than 100 miles away, I can force him to

14 be here because you are in the state.

15         I don't think my authority though extends to, you

16 know, from sea to shining sea as it were.  Go ahead.

17         MR. CROWL:  Judge, we'll take a look at that.  I was

18 under the impression that Rule 45 wasn't for parties.  It was

19 for, it was for others.  But I can take a look.  I've got it

20 in front of me as well, Judge.  And I understand Your Honor's

21 point, because it does say "a person."

22         THE COURT:  And just for the record let me just read

23 it.  Rule 45(c)(1) is entitled "Place of Compliance for a

24 Trial, Hearing or Deposition."  And it begins, quote, "A

25 subpoena may command a person to attend a trial, hearing or

1   deposition only as follows:"  And then it gives requirements

2   about being within 100 miles and within the state.

3          It looks to me like subpart (b)(2) -- excuse me,

4   (b)(1) gives me added authority when the person is a party.

5   In other words, it gives me the authority to compel the person

6   who is more than 100 miles away, but as long as they're in the

7   state.  But I could be wrong on that.  I'm just reading the

8   rule here.

9          Go ahead.

10         MR. CROWL:  So, Judge, we'll look more at your powers

11  in terms of default.  I also think another one of your

12  potential remedies is to give an instruction.  I think that

13  would be more of a slap on the wrist in this instance.  But it

14  would certainly be in Your Honor's powers to give an

15  instruction like a missing witness instruction.

16         We had started to look at some language which we can

17  tender to Your Honor and defense counsel as well, just to kind

18  of start thinking about this.  Hang on one second.

19      (Discussion off the record)

20         MR. CROWL:  So we've got some language, we'd like to

21  take a look at it, Judge.  But, you know, in our view, I think

22  default is where Your Honor should go.

23         THE COURT:  Okay.  Here is the other thing that I

24  thought about.  And I will preface this by saying maybe no one

25  in the room is interested in this idea.  So maybe that's a

1  possibility.  But I could order him to be deposed again.  He's

2  a party.  And under Rule 30 I can reopen discovery any time I

3  want.  I can order him to sit for deposition.

4       If I'm the plaintiff, I probably don't want to

5  interrupt my trial to take a deposition over a weekend.  I

6  always disliked it when I was trying cases to talk about

7  depositions in the middle of trial.  I think it's very

8  disruptive.

9       But it is a tool in the toolbox.  I could say, "Hey,

10  guess what, Mr. Oliver?  You don't want to come to Chicago?

11  Okay.  Well, plaintiff's counsel is going to have all day to

12  ask you whatever they want.  And they can videotape it.  And

13  you are going to testify twice."

14       You know, it's something I can do to make him think

15  about, like I said, and I think this was prescient for me to

16  say this, maybe no one in the room is excited about this idea,

17  and if plaintiff counsel is saying, "I have no interest in

18  interrupting my trial preparations to take a deposition

19  again," I get it.  But I just wanted to flag that if that's

20  something you're interested in, you know, I know that's in my

21  toolbox.  So think about it, okay.

22       MR. CROWL:  We will do that.

23       THE COURT:  So, defense counsel, I'm happy to hear --

24  before you sit down, Mr. Crowl, I will say I certainly

25  understand the inadequacies of a Zoom or Zoom equivalent trial

1    presentation.  I think I've been very clear in my rulings that

2    I think that there is no real substitute for in person

3    testimony.

4              You all are trial lawyers.  You're experienced

5    people.  You love the blood and guts and flesh and bones and

6    nose to nose in person in the room action of a courtroom.  You

7    can't replace it.

8              There is no -- you know, a video screen is no

9    replacement.  It sucks all the humanity out of the room,

10   right.  You want him here.  So I want you to know I get that.

11             But I have to be faithful to the rules.  And I'm not

12   a hundred percent sure if I can order him to be here on a

13   nose-to-nose basis.  I don't know if I can issue a writ of

14   body attachment to get him here.  That's why I need your help

15   to figure that out, okay.

16             MR. CROWL:  Understood, Judge.

17             THE COURT:  Defense counsel, I'm happy to hear

18   anything you want to say on this topic.

19             MR. HALE:  Your Honor, I think your approach is

20   exactly right.  Let's find out the facts.  Let's find out all

21   the information you want to ask him.  Let's get all of that

22   knowledge.  And then based on that, we can have an intelligent

23   conversation about what we think is appropriate.

24             Until we do that, I mean, you know, I mean, we can

25   speculate on all these drastic remedies.  I agree with Your

1    Honor, let's find out all the facts to see what the situation

2    is.  I think the phone call is a great idea.  Let's do that

3    and take it one step at a time.

4              THE COURT:  Okay.  Let me ask you this.  And if you

5    don't know the answer, that's fine.  I don't know to what

6    extent he is willing to put any details about his medical

7    situation on the record.  I thought one of you mentioned what

8    I called organ X.  You know, I did that to be extra protective

9    of him.  I thought one of you put it on the record, but I

10   didn't want to put it in my order just in case.

11             I don't know how sensitive he is.  Some people may be

12   like, "I don't care.  I'll tell you what I've got going on."

13   Or maybe he's hyper -- I don't mean -- "hyper" is the wrong

14   word.  Maybe he is sensitive to his privacy, which he is

15   entitled to do to some extent.

16             Go ahead.

17             In other words --

18             MR. HALE:  I don't think he's going to be sensitive

19   to it.  And I would suggest Your Honor ask him when you ask

20   your questions, you know, "Would you, you know -- can I ask

21   you some questions about your medical issues?"

22             THE COURT:  Yeah.

23             MR. HALE:  I think he'll say, "Go ahead."

24             THE COURT:  Okay.

25             MR. HALE:  So I would encourage it.

1       THE COURT:  That's what I gathered, but I wanted to

2  err on the side of being sensitive to that, especially when

3  it's something that's on the docket.  I didn't want to probe

4  into it and mention individual things.

5       So I do not want to keep the jury waiting tomorrow.

6  We're going to start at 9:30.  So I don't expect this to be

7  the world's quickest -- excuse me, the world's longest phone

8  call.  We're going to get going.  We're going to ask some

9  questions and we're going to get rolling at 9:30, okay.

10      MR. HALE:  Sounds good.

11      THE COURT:  Anything else on the topic of Defendant

12  Oliver?

13      MR. SAFER:  No, Judge.

14      THE COURT:  I think we should as before be here at

15  8:45, just in the off chance there are other housekeeping

16  matters, we can tidy those up.  Worst thing that can happen is

17  you get to the Dirksen federal building a little early, we

18  have nothing to cover, and you can chillax for fifteen

19  minutes.

20      Are there any other topics that you folks need to

21  cover today?

22      MR. HALE:  No.  I just would -- maybe we can do this

23  on the record, just to get the witness order for the next

24  couple days so we can keep it going smooth.

25      THE COURT:  Okay, yes.  And I think something that I

1  would like to know from the plaintiff's team is I want it to

2  be a smooth operation for you folks, so I want to make sure

3  that I know what deposition designations I need to rule on,

4  because it doesn't do anybody any good if I am fumbling

5  through things.

6         Also, if you think there are any particular disputed

7  exhibits that you foresee, any train wrecks that you want to

8  avoid, I would like to know about the disputed exhibits in

9  advance.  That way I can give you folks a ruling one way or

10 the other, everybody can adjust and proceed.

11        MR. SAFER:  Your Honor, we have provided this to the

12 defense counsel already.  I did that, I think, on Sunday.  I

13 gave them our witness order to the extent that we can

14 determine it.

15        We'll continue with Mr. Pesavento.

16        Lee Williams is the next trial designation.  He

17 testified at trial.  You heard defense counsel refer to him

18 quite a bit in her opening.

19        Charles Ingles will be next.

20        THE COURT:  That's the lawyer?

21        MR. SAFER:  Yes.

22        THE COURT:  And he's live?

23        MR. SAFER:  Yes.

24        THE COURT:  Yep.

25        MR. SAFER:  And after that, if we have time tomorrow,

1    we will call Tenesha Gatson.

2              THE COURT:  And she was in J&J Fish?

3              MR. SAFER:  Yes, Your Honor.

4              THE COURT:  That's another live witness?

5              MR. SAFER:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MR. SAFER:  Then the next two people are

8    designations, George Karl and Jacob Jachna.  Jacob Jachna is

9    the person that filmed -- that took the pictures of the

10   lineup.

11             Thursday we will start the day with Edna Williams.

12             THE COURT:  You've got an ambitious day tomorrow,

13   counsel.

14             MR. SAFER:  We do.

15             THE COURT:  Yeah, okay.

16             MR. SAFER:  But, you know, but Edna Williams has to

17   start a day because she's caring for her ill husband.

18             THE COURT:  Okay.

19             MR. SAFER:  She needs to get in and out.

20             THE COURT:  Okay.

21             MR. SAFER:  So we will --

22             THE COURT:  I'm sorry to hear that, by the way.

23             MR. SAFER:  Thank you.  So if we end up not getting

24   some of those people on, we're going to start Thursday with

25   Edna Williams.  And, again, I've explained all of this to

1    defense counsel.

2          And then we'll have James Williams by designation.

3    And then we'll take stock.

4          THE COURT:  Well, it looks to me like you have more

5    than doubled your obligations.  You've given them I think six

6    or seven, maybe eight names in the queue here.  So it looks

7    like we've got a smooth running operation here.

8          Are there any other housekeeping matters that anybody

9    wants to raise?  Anybody wants to raise?

10          It looks like you are standing up.  Go ahead.

11          MS. MUSUMECI:  Your Honor, I just wanted a

12   clarification of your minute order this morning about the dep

13   designations and I guess just tell you that the defense and

14   plaintiffs, we have conferred.  You had -- I don't have it in

15   front of me right now, but you had asked a question about

16   counter-designations.

17          THE COURT:  Yep.

18          MS. MUSUMECI:  Given the understanding between the

19   parties, for example, about the scope of direct, et cetera,

20   our agreed proposal is that we just read all of the

21   designations straight through, so that whether it's a counter

22   or whether it is designated testimony for the defense case

23   that's being read on the plaintiff's case should not make a

24   difference.

25          THE COURT:  Okay.

1    MS. MUSUMECI:  With respect to the timing, as Your

2    Honor had requested, we're providing transcripts, highlighted

3    transcripts to you where it will be very clear what was the

4    plaintiff's designation and what is the defense designation.

5    And I think that we've agreed that the proposal would be that

6    we just do by percentage of the number of lines effectively

7    and divide the time that way.

8    THE COURT:  That's fine.  And do you have any -- and

9    I don't have the sheet in front of me.  Do you have objections

10   to any of their counter-designations?

11   MS. MUSUMECI:  Yes.  Those are noted on the chart.

12   There are not too many, but there are a few.

13   THE COURT:  Okay.

14   MS. MUSUMECI:  Those are going to be, they will be

15   reflected in what we will be submitting to you this evening.

16   THE COURT:  Okay.  That's great.  What I would like

17   you to do, folks, is to bring the highlighted copies in hard

18   copy tomorrow morning, if you can, if that's still doable on

19   your end.

20   I don't know if you filed the highlighted copies, if

21   that's going to look legible.  I don't know if the

22   highlighting will prevent it from being legible.  I don't know

23   if you thought about that.  Maybe it's probably not going to

24   be a color filing, right?  So maybe it would be.  I don't

25   know.

1      MS. MUSUMECI:  We can look into that, Your Honor.

2      THE COURT:  It's a long way of saying if you would be

3  kind enough to bring a hard copy tomorrow morning, I'll

4  certainly read it and I'll be good to go.  Does that sound

5  okay?

6      MS. BOUDREAUX:  Yes.

7      THE COURT:  Any other housekeeping matters?

8      MS. BOUDREAUX:  I just wanted to put on the record

9  that we had made an objection to the designation of this Lee

10  Williams we've been talking about.

11      THE COURT:  Yep.

12      MS. BOUDREAUX:  We withdraw our objection to that

13  testimony coming in.

14      THE COURT:  Okay.  Is that all of your objections or,

15  in other words, a long way of saying do I need to look at any

16  of the objections or --

17      MS. BOUDREAUX:  Great question.

18      Are there other objections?

19      MR. STEFANICH:  Brian Stefanich, Judge.

20      There is one other objection to Lee Williams.  It's a

21  hearsay objection.

22      THE COURT:  It's a hearsay objection?

23      MR. STEFANICH:  Correct.

24      THE COURT:  Okay.  Do you know off the top of your

25  head what the line and page number is?  I can just figure that

1    out when I read it.

2                MR. STEFANICH:  I think it's like 92, page 92.

3                THE COURT:  All right.  It sounds like there is one

4    hearsay objection for Lee Williams.  Do I take it that the

5    other objections are waived or removed, withdrawn?

6                MR. STEFANICH:  Yeah, we withdraw the --

7                THE COURT:  Withdrawn?

8                MR. STEFANICH:  -- global objection to Lee Williams.

9                THE COURT:  Okay.  I will look at the hearsay

10   objection, and we'll go from there, okay.

11               Okay.  Counsel, anything else on that?

12               Anything else for the day, folks?  Going once, going

13   twice.  I know you folks, I know this is a great time of the

14   day for trying cases to finally break and get some actual food

15   and take a break and take stock and go from there.

16               So, Mr. Safer, anything else you want to raise?

17               MR. SAFER:  No.

18               THE COURT:  Have a good evening, everybody.  We'll

19   see you first thing tomorrow morning.

20               MS. BOUDREAUX:  Thank you, Judge.

21          (Adjournment 5:20 p.m. to 8:45 a.m., October 13, 2021)

22                     C E R T I F I C A T E
             We, Frances Ward and Jennifer Costales, do hereby
23   certify that the foregoing is a complete, true, and accurate
     transcript of the proceedings had in the above-entitled case
24   before the Honorable STEVEN C. SEEGER, one of the judges of
     said Court, at Chicago, Illinois, on October 12, 2021.
25                       /s/ Frances Ward, CSR, RPR, FRCC, RMR
                         /s/ Jennifer Costales, CRR, RMR, CRC