796

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  EDDIE L. BOLDEN,                    )
                                       )
4                  Plaintiff,          )
                                       )  Case No. 17 CV 417
5  -vs-                                )
                                       )  Chicago, Illinois
6  ANGELO PESAVENTO, et al.,           )  October 13th, 2021
                                       )  8:53 a.m.
7                  Defendants.         )

8

         TRANSCRIPT OF PROCEEDINGS - VOL. 4A
9     BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10  APPEARANCES:

11  For the Plaintiff:      RILEY SAFER HOLMES & CANCILA, LLP
                            BY:  MR. RONALD S. SAFER
12                               MR. ELI J. LITOFF
                                 MS. SANDRA L. MUSUMECI
13                               MR. MATTHEW C. CROWL
                                 MS. VALERIE BRUMMEL
14                          70 West Madison Street
                            Suite 2900
15                          Chicago, IL  60602

16  For the Defendant       GREENBERG TRAURIG, LLP
    City of Chicago:        BY:  MS. TIFFANY S. FORDYCE
17                               MR. KYLE L. FLYNN
                            77 West Wacker Drive
18                          Suite 3100
                            Chicago, IL  60601
19

20

21

22  Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 2318A
24                          Chicago, IL  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov

```
 1   APPEARANCES (CONT'D):

 2   For the Individual      HALE & MONICO, LLC
     Officer Defendants:     BY:  MR. ANDREW M. HALE
 3                                MS. BARRETT E. BOUDREAUX
                                  MR. WILLIAM E. BAZAREK
 4                                MR. BRIAN J. STEFANICH
                                  MS. AMY A. HIJJAWI
 5                           53 West Jackson Boulevard
                             Suite 330
 6                           Chicago, IL  60604

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       (Proceedings heard in open court; jury out:)

2            THE COURT:  Good morning, folks.

3            MULTIPLE SPEAKERS:  Good morning, Judge.

4            THE COURT:  Sorry to keep you waiting a few minutes,

5   I've said this to you before, and I'll say it again, I don't

6   like keeping people waiting.  I just don't.  When I did what

7   you do for a living, my least favorite part of going to trial

8   was that it interrupted my caffeine consumption, which is near

9   and dear to my heart.  It seems like it should be fair game to

10  bring an IV bag into the courtroom just to keep pace with your

11  normal routine.

12           Okay, folks.  A couple of housekeeping matters.  I

13  got a revised set of deposition designations.  That was really

14  helpful to me.  I appreciate you folks refiling that.  It was

15  more user friendly to have the name of the witness on each

16  page and to have the heading.  So thank you for doing that.

17           I also saw that you filed a couple of things.  You

18  filed the signed stipulation.  Thank you for doing that.

19           We also have the original that you tendered to us

20  yesterday.  I'll ask my courtroom deputy to hand it back to

21  you today.  You should refile that one as well -- I'm sorry,

22  you should file that one as well.

23           I saw that you folks filed the list of admitted

24  exhibits.  Thank you for doing that.  I hope it wasn't too

25  much of a pain.

1          I think it inures to your benefit, frankly.  You

2     folks don't want to have a dispute at the end of the day about

3     what has been admitted into evidence.  And the last thing any

4     of you want is to realize on the last day of trial, oops, I

5     forgot to admit a certain exhibit.  It is actually a nice

6     recordkeeping for you folks as we go along.

7          We have a couple other housekeeping matters to cover,

8     but while I get settled, why don't we get some appearances on

9     the record.

10          So I'll start with plaintiff's counsel.

11          MR. CROWL:  Good morning, Judge.

12          I'm Matthew Crowl, representing Mr. Bolden.

13          THE COURT:  Good morning.

14          MR. SAFER:  And good morning, Your Honor.

15          Ron Safer, Eli Litoff, Sandra Musumeci.  Sorry.

16          THE COURT:  As long as somebody else has trouble with

17     her name, I don't feel so bad about myself.

18          Good morning to all of you.

19          Mr. Bolden, good morning to you, sir.  Good morning.

20          Defense counsel, go ahead, please.

21          MS. BOUDREAUX:  Barrett Boudreaux on behalf of the

22     defendants.

23          MR. HALE:  Good morning, Your Honor.

24          Andy Hale on behalf of the defendants.

25          MR. BAZAREK:  Good morning, Your Honor.

1              William Bazarek for the defendants.

2              MR. STEFANICH:  Good morning.

3              Brian Stefanich for the defendants.

4              MR. HALE:  We have our client Angelo Pesavento here

5   in court, too.

6              THE COURT:  All right.  Good morning.

7              And, Officer Pesavento, good morning to you, sir.

8              MR. PESAVENTO:  Good morning.

9              THE COURT:  Those are some of the housekeeping

10  matters that I wanted to cover.  I know we're going to have

11  Officer Oliver testify in a few minutes telephonically.  Let's

12  bracket Oliver for a second.

13             Are there other housekeeping matters that you folks

14  want to raise with me before we get rolling with Officer

15  Oliver?  Anything else?

16             I know you folks are here shining and early and ready

17  to go.  Well, why don't with go off the record for a few

18  minutes.  We can gather our thoughts, get our papers together,

19  and then we'll get rolling at about 9:00 o'clock.

20             We'll go off the record.

21        (Off the record.)

22             THE COURT:  Okay, folks.  Everybody ready to talk

23  about Officer Bolden -- I misspoke.  I'm sorry.  I looked at

24  Mr. Bolden and said that.

25             Is everyone ready to talk about Officer Oliver?

1          MR. CROWL:  Yes, Judge.

2          THE COURT:  A couple of prefatory things.  Defense

3    Counsel, did you have an opportunity to reach out to Officer

4    Oliver and tell him that we'd be calling him and that we would

5    expect him to testify under oath?

6          MR. HALE:  We did, yes.

7          THE COURT:  And he doesn't know what we're calling

8    about other than just the availability of his testimony; is

9    that right?  He doesn't know the question about his residence

10   and whatnot?

11         MR. HALE:  Correct, Mr. Stefanich and Mr. Bazarek

12   called him yesterday.

13         Can you make that representation since you were on

14   the phone?

15         MR. BAZAREK:  Yeah.

16         Your Honor, what we told Mr. Oliver was that -- to

17   expect a call from you this morning.  It will be under oath.

18   But earlier in the -- or the day before you had an order about

19   what his residence was, and the Court wanted to know

20   information about that.  So before we came to court yesterday,

21   I can tell you that was a topic.

22         THE COURT:  That's fine.

23         MR. BAZAREK:  But nothing --

24         THE COURT:  Yeah.  I hadn't prohibited you at that

25   point from sharing it, so that was fair game.

1    MR. BAZAREK:  That's exactly right.  And I was on the

2 phone with Mr. Stefanich, and he was listening to the call as

3 well.

4    THE COURT:  That's totally fine.  I appreciate that.

5    I have one other question -- set of questions for

6 defense counsel before we start.  It occurred to me as I was

7 driving home last night that Officer Oliver might -- I don't

8 know -- but he might have testimonial obligations under the

9 indemnification agreement by the City or he might have

10 testimony obligations for his pension.  I don't know if either

11 arrangement requires him to cooperate, requires him to

12 testify.

13    Do you know?  Have you looked into it?  Maybe that's

14 not a thing, but it occurs to me it could be a thing.

15    MR. HALE:  The short answer is, you're right, that

16 could be a thing.  I think we have to see, kind of take it one

17 step at a time.

18    THE COURT:  Okay.  I don't know if we're going to

19 have enough time to get into that part of it today with him,

20 but it's something I would encourage you to look into if you

21 hadn't already.  So --

22    MR. HALE:  Yes.  Thank you, Judge.

23    THE COURT:  Mr. Safer, anything from your end before

24 we start?  Or Mr. Crowl?

25    MR. SAFER:  No, Your Honor.

1    THE COURT:  You know, it's 9:05.  We're going to be

2  on time, and I do want to have a quick break before you get

3  rolling.  I will start.  I will ask some questions.  We'll,

4  you know, go for 15, 20 minutes.  If we have to break and

5  resume later, we will, but let's cover as much ground as we

6  can.

7    Here's how it's going to roll:  I'm going to ask my

8  courtroom deputy to call him momentarily.  We'll get him on

9  the line.  She'll say that we're here for a court hearing.

10  She'll put him under oath, and then I'll ask some questions,

11  and then I'll turn the floor over to plaintiff's counsel.  And

12  we'll get as far as we can, and then we'll take a break so you

13  folks can get ready for your presentation to the jury through

14  your questioning.

15    Ms. Ramos, if you'd kindly call Officer Oliver.

16    MR. OLIVER:  Hello.

17    THE CLERK:  Good morning.  Is this James Oliver on

18  the line?

19    MR. OLIVER:  This is James Oliver.

20    THE CLERK:  Hi.  I'm calling from for the District

21  Court for the Northern District of Illinois on behalf of

22  Judge Seeger.  We have a telephonic -- well, a phone call

23  pending with you.

24    Are you available to speak now?

25    MR. OLIVER:  Yes.

Oliver - voir dire examination by The Court

804

1    THE COURT:  Put him under oath.

2    THE CLERK:  I will put you under oath.

3    (Witness sworn.)

4    JAMES OLIVER, WITNESS, DULY SWORN

5    VOIR DIRE EXAMINATION

6  BY THE COURT:

7  Q.  Good morning, Officer Oliver.  This is Judge Seeger.

8    Can you hear me okay?

9  A.  Yes.  Yep.  Yep, Your Honor.  Yep.

10  Q.  All right.  Very good.  Thank you for your willingness to

11  participate by phone this morning.  We appreciate it.

12  A.  No, I appreciate you.

13  Q.  I need to ask you some questions today, Officer Oliver.

14  And I want to make sure you can hear me, so if you can't hear

15  me or any of the lawyers this morning, I want you to tell me.

16  Okay?

17  A.  All right, I will.

18  Q.  And I'd like you to speak up as loudly as you can, project

19  nice and loud because we've got a court reporter who is taking

20  it down, and I want to make sure we've got a clean record.

21    Does that sound okay?

22  A.  That's fine.

23  Q.  Do you understand that you're testifying under oath?

24  A.  Yes.

25  Q.  We have only a few minutes this morning, so I need you to

Oliver - voir dire examination by The Court

1    answer my questions squarely and directly.

2          Does that sound okay?

3    A.  That's fine.  Yes, sir.

4    Q.  What's your permanent address?

5    A.  22- -- I just moved here, so it is --

6          THE COURT REPORTER:  I'm having trouble hearing him.

7    BY THE COURT:

8    Q.  Sir, I heard you say "I just moved here," but I need you

9    to speak up.  Go ahead.

10   A.  Hold on one second.  Let me get the -- 1120 Essex, Essex

11   Drive.  E-s-s-e-x Drive.

12   Q.  Okay.  Well, it looked to me like you had to look that up.

13   Did you have to look that up on a piece of paper somewhere?

14   A.  Yes, it's here in the -- in the fold here.  I didn't

15   remember the -- the number.

16   Q.  Okay.  Officer Oliver, I didn't quite hear that.  I did

17   hear you say I couldn't remember the number.  Can you repeat

18   your answer, please.  Nice and loud.

19   A.  1122 Essex Drive, E-s-s-e-x Drive.

20   Q.  And did you have to look that up to answer my question?

21   A.  I had to look down on a piece of paper just to make sure

22   that I was giving you the correct address.

23   Q.  And what -- what piece of paper did you have to look at?

24   A.  Some closing -- my closing paper.

25   Q.  Your closing paper.  What is that?

Oliver - voir dire examination by The Court

806

1  A.  When I closed on the house.

2  Q.  Okay.  So let me ask you this:  What town do you live in?

3  A.  Benton, Arkansas.

4  Q.  Say that again.

5  A.  Benton, B-e-n-t-o-n.

6  Q.  Benton, Arkansas.

7       Okay.  How far is that from Little Rock?

8  A.  It's just a suburb, 10 minutes, 15 minutes.

9  Q.  How long have you lived in Benton, Arkansas?

10  A.  I would say -- the closing date was August the 31st.

11  Q.  Do you live with anyone else?

12  A.  Before I moved here, I was living with my sister.

13  Q.  Okay.  Do you -- you were living with your sister?

14  A.  Right, in Little Rock.

15  Q.  Okay.  How long have you lived in the Little Rock area?

16  A.  From July.

17  Q.  July of this year?

18  A.  Yes.

19  Q.  Why did you move to Little Rock?

20  A.  Well, I had a house in Monee, Illinois.  And my wife

21  passed, my kids was gone, and the bedroom was upstairs, and I

22  had knee replacement, and my health started deteriorating.  I

23  couldn't even get upstairs to go to bed.  So I sold the house

24  and moved here.  I wanted a one-level, small place.

25  Q.  Okay.  Thank you for that.

Oliver - voir dire examination by The Court

807

1    Let me say, sir, I'm sorry to hear that your wife

2  passed away.

3  A.  Yes.

4  Q.  And I'm sorry to hear about your knee replacement surgery

5  and your health.  I wish you good health, sir.

6  A.  Thank you.  I appreciate it, sir.

7  Q.  So when you moved from Illinois, did you pack up a moving

8  truck and haul all your stuff to Illinois -- I'm sorry -- from

9  Illinois to Arkansas?

10 A.  Yes, I got a -- I got a POD.

11 Q.  You got a car?

12 A.  A POD.

13 Q.  Oh, a POD.  Okay.

14 A.  Right.  Right.  Right.  I did that.

15    I've got a son and daughter in the Chicago area, and

16 I've got a daughter in Nashville and a daughter in Houston, so

17 I was kind of like alone.  And I grew up in Arkansas, in Pine

18 Bluff, Arkansas, so I've got family down here.

19 Q.  Got it.  Okay.  And you said that you closed on the house

20 on August 31st, 2021?

21 A.  Yes.

22 Q.  And that's the house you currently live in?

23 A.  That was the house in Monee I closed on.

24 Q.  Okay.  How -- what is your current address right now?

25 It's in Essex, you said?  Essex --

Oliver - voir dire examination by The Court

808

1    A.   Yes.

2    Q.   -- Street?

3    A.   Yes.

4    Q.   And --

5    A.   Yes.  Yes.  Yes.

6    Q.   -- do you own that home or rent that home?

7    A.   No, I own this home.

8    Q.   Okay.  When --

9    A.   I'm buying it.

10   Q.   When did you buy that home, sir?

11   A.   And I'm sorry when you asked me the closing.  Actually, I

12   closed on this house August the 31st.

13   Q.   Okay.  So I want to make sure I understand you, sir.  When

14   you say "this house," do you mean the house that you sold in

15   Illinois, or do you mean the house that you --

16   A.   No, the house --

17   Q.   -- purchased in Arkansas?

18   A.   No.  Yeah, the house in Arkansas.  I closed on this August

19   the 31st.

20   Q.   Okay.  So I understand you to say that you purchased a

21   home in Arkansas on August 31st, 2021.  Do I have that right?

22   A.   Right.

23   Q.   Okay.  And when exactly did you move?  Was it before or

24   after the closing of the Arkansas home?

25   A.   I had -- I was down here probably a month or so before I

Oliver - voir dire examination by The Court

809

1    closed on this house.

2    Q.   That's when you were with your sister or sisters?

3    A.   Right, I was living with my sister.

4    Q.   Okay.  Have you notified anyone that you have moved?

5    A.   No, no.

6    Q.   For example --

7    A.   I mean, who would I notify?  I mean --

8    Q.   That's a good question.  Let me ask you a better question.

9    A.   Okay.

10   Q.   Do you receive Social Security?

11   A.   Yes.

12   Q.   Have you told the Social Security Administration that you

13   moved?

14   A.   No, I have not -- I have not changed my direct deposit as

15   of yet.  My sister is coming over helping me with that today

16   or tomorrow, whatever.

17   Q.   Okay.  How about Medicare and Medicaid; are you a

18   participant in those programs, sir?

19   A.   I've got -- I've got UnitedHealthcare with Medicare.

20   Q.   Okay.  Have you notified UnitedHealthcare that you moved

21   to Arkansas?

22   A.   Yeah, UnitedHealthcare, I believe, I have.  They know I'm

23   here.

24   Q.   In other words, if I looked at the records from

25   UnitedHealthcare, would I see that you have a residence in

Oliver - voir dire examination by The Court

810

1   Arkansas?

2   A.   I'm sure that you probably -- they would be able to see

3   that.  Yeah, you should be able to see that.

4   Q.   Okay.  When you went to the hospital on September 21st of

5   24th -- and let me stop there, sir.  I'm sorry that you went

6   to the hospital and had a health issue.  Okay?

7   A.   Thank you.

8   Q.   When you went to the hospital, what address did you give

9   the hospital?

10  A.   I had to give them Essex Drive.

11  Q.   Essex Drive in Arkansas?

12  A.   Yes.

13  Q.   And how about when you see Dr. Stokes; what address did

14  you give Dr. Stokes?

15  A.   Essex Drive.

16  Q.   Okay.  So, for example, if I looked at your medical

17  records from September from Dr. Stokes and from the hospital,

18  would I see an Illinois address for you or would I see an

19  Arkansas address for you?

20  A.   No, you should see an Arkansas address for me.

21  Q.   Okay.  How about the pension; do you receive a pension

22  from the Chicago Police Department?

23  A.   Yes.

24  Q.   And do you get checks in hard copy in the mail or do you

25  get checks through direct deposit?

Oliver - voir dire examination by The Court

811

1   A.   Direct deposit.

2   Q.   Okay.  Have you notified the pension fund that you've

3   moved to Arkansas?

4   A.   I have not officially notified them.  They have sent me

5   e-mail, I -- you know, with the -- with the forms in it, and

6   that's what I was trying to get to do today --

7   Q.   Okay.

8   A.   -- sometime this week to -- I took it to the bank to get

9   it notarized.

10  Q.   Okay.  So I understand they sent you a form.  Have you at

11  least sent them an e-mail saying, hey, pension fund, I moved,

12  I need to change my address?

13  A.   Yeah, I -- I called them.

14  Q.   You called them.  And what did you say?

15  A.   They sent me the forms to my e-mail.

16  Q.   Okay.  Did you tell them when you called that you had

17  moved to Arkansas?

18  A.   Yes.

19  Q.   And when did you make that phone call, sir?

20  A.   I don't -- I don't know.  Maybe one day last week.

21  Q.   Last week?

22  A.   Yes.

23  Q.   Okay.  Let me ask you this, sir:  Have you told other

24  companies that you've moved?  For example, the gas company,

25  the power company, you know, the cable company, insurance

Oliver - voir dire examination by The Court

812

1    company, the bank, have you notified those companies that

2    you've moved and you live in Arkansas?

3    A.   The gas company and light company there, I just cut it

4    off, you know, because I didn't have a place to stay when I

5    first moved.  You know, I just had it disconnected, that's

6    all.

7    Q.   Okay.  How about your bank; did you notify the bank that

8    you had moved?

9    A.   Yes, the bank is the one that got the mortgage for me

10   here.

11   Q.   I'm sorry.  I don't mean to interrupt you, Officer Oliver.

12   I couldn't quite hear you there, and I do want to hear you.

13   Would you be kind enough to repeat what you said for me, sir.

14   A.   Yeah, sure.  Sure.

15        The bank is -- I bank at First Midwest Bank there in

16   Illinois.  They -- they got the mortgage for my house here in

17   Essex Drive.

18   Q.   Okay.  Got it.  So -- so they're the -- and do you have

19   a -- do you have a bank account or a savings account or

20   anything like that with that bank?

21   A.   Yes, First Midwest Bank.

22   Q.   And have you told them that your new mailing address is

23   Arkansas, not Illinois?

24   A.   Yeah, sure, they know that.  They got the notice.

25   Q.   Okay.  Are there any other companies that you've notified

Oliver - voir dire examination by The Court

813

1  about your move?

2          You know, I gave some examples, let's say the power

3  company, gas company, a phone company, you know, the cable

4  company, maybe an insurance company, anything like that.

5          In other words, if I have to figure out where you

6  live, would those companies know that you live in Arkansas and

7  not in Illinois?

8  A.  I'm sure they know I'm not in Illinois because I had all

9  of my -- all of my utilities, you know, disconnected, you

10 know . . .

11 Q.  Okay.  And let me ask you this --

12 A.  I don't think they know where I went, you know, where I

13 moved to.

14 Q.  Well, for example -- I'm sorry, sir.  Do you have a cell

15 phone?

16 A.  Yes, that's what I'm on now.

17 Q.  Right.  And did you tell the cell phone company where you

18 live?

19 A.  No, no, I pay that -- I pay the phone bill -- I just call

20 them up, you know, every month and pay the phone.

21 Q.  And you said call them up.  Do you call them up on the

22 phone and give them a credit card number or what?

23 A.  Right.  Right.

24 Q.  Okay.

25 A.  Right.

Oliver - voir dire examination by The Court

814

1   Q.  Did you tell the credit card company that you moved?

2   A.  No.

3   Q.  Okay.  And why not?

4   A.  Well, I pay it -- the -- that number that I've used is a

5   debit card.  So I just pay it over the phone.

6   Q.  Okay.  How about the United States Postal Service; did you

7   tell the postal service that you mailed -- did you just submit

8   a change of address form, for example?

9   A.  I did submit a change of address, but I just had it go to

10  my P.O. box.  I've got a P.O. box that's in Monee.

11  Q.  You've got a P.O. box in Monee?

12  A.  Right.

13  Q.  Okay.  So your mail now is currently going to the P.O. box

14  in Monee?

15  A.  Right, from 5139 Roberts Ridge Road.

16  Q.  Okay.  Do you receive any mail in Arkansas?

17  A.  Yes.

18  Q.  What mail do you get in Arkansas?

19  A.  I get utilities, the lights, gas, garbage.

20  Q.  Probably more mail than you want?

21  A.  Pardon me?

22  Q.  It was a joke.  I said probably more mail than you want,

23  maybe.

24  A.  Yeah, well, more than I pay for with the AT&T.

25  Q.  Okay.  What was your address in Illinois, sir, the

Oliver - voir dire examination by The Court

1  Monee --

2  A.  51 --

3  Q.  I'm sorry, the Monee address.  Go ahead, please.

4  A.  5139 West Roberts Ridge Road, Monee, Illinois 60449.

5          THE COURT:  Okay.  Mr. -- excuse me -- Officer

6  Oliver, I'm now going to give the lawyers an opportunity to

7  ask you some questions.  We're going to have to call you back

8  today to ask you a few additional questions.  I'm going to

9  confer with the lawyers.  I expect to probably do it over the

10  noon break.  If the lawyers are good with that, we'll call you

11  probably at 12:30.

12          Does that work for you, sir?

13          MR. OLIVER:  That would be fine.

14          THE COURT:  Okay.  It might be -- I've got a jury

15  here.  It might be five minutes after that, so it might be

16  closer to 12:35 or 12:40, but we'll try to be prompt about it

17  and give you a call right about then.  So if you'd be kind

18  enough to be by the phone, we sure would appreciate it.

19          MR. OLIVER:  Oh, no, I appreciate you.  I'll be

20  there.

21          THE COURT:  You know, I've got probably more Arkansas

22  questions for you today than medical questions.

23          I'm going to have the counsel now -- just stick to

24  the question of where he lives.  We're going to defer the

25  issue of any medical issues until later.  I just want to cover

Oliver - voir dire examination by Crowl

816

1  things one step at a time.

2          So if any lawyers have any questions about where

3  Officer Oliver resides and how long he lives here, you're

4  welcome to ask.

5          Sir, we're going to start with Mr. Crowl.  He is one

6  of the lawyers for Mr. Bolden.  Okay?

7          MR. OLIVER:  Thank you.

8          THE COURT:  Okay.  Go ahead, please.

9                    VOIR DIRE EXAMINATION

10 BY MR. CROWL:

11 Q.  So, Mr. Oliver, you said that you used to live at 5139

12 West Roberts Ridge Road in Monee; is that correct?

13 A.  Yes.  Yes.

14 Q.  When did you sell that property?

15 A.  It had to be the last of June, I guess the 1st of July.

16 Q.  And when you sold that property, when was it that you --

17 when was it in July that you went to Arkansas?  What was the

18 date?

19 A.  As soon as I -- I left the closing date.  When I got the

20 check, I left.

21 Q.  So I think the property record shows that it was sold on

22 July 28th of 2021.  Does that refresh your recollection that

23 you may have left after July 28th of 2021?

24 A.  Yeah, yeah, that's probably correct.

25 Q.  Does that sound like the closing date?

Oliver - voir dire examination by Crowl

817

1    A.  Yes, that's probably correct.

2    Q.  And where did you head?  When you went to Arkansas, where

3    is the first place that went and you stayed?

4    A.  With my sister in Little Rock.

5    Q.  Do you yourself own any property or have you owned any

6    property in Arkansas in the last year other than the Essex

7    Drive address that you told us about?

8    A.  That's the only piece of property that I ever owned in

9    Arkansas.

10   Q.  Are you familiar with an address 201 Sezanne,

11   S-e-z-a-n-n-e, Drive in Little Rock, Arkansas?

12   A.  That's my sister's address.

13   Q.  Did you help her buy that property in any way?

14   A.  Oh, no.

15   Q.  Is your name associated with that property in any way?

16   A.  No.

17   Q.  And is that where you went to stay when you -- when you

18   went from the Chicago area down to Little Rock?

19   A.  Yes.

20   Q.  Is -- does your sister still own that property?

21   A.  Yes.

22   Q.  And you indicated that in the Chicago area -- you have a

23   son and daughter living in the Chicago area; is that right?

24   A.  Yes.

25   Q.  Do you have any other relatives living in the Chicago

Oliver - voir dire examination by Crowl

1    area?

2    A.   I've got a niece and nephew.

3    Q.   Any other relatives besides your son, daughter, niece, and

4    nephew?

5    A.   Not that I'm aware of.

6    Q.   Did you ever tell anyone words to the effect that if

7    forced to travel to Chicago, you would be staying in a hotel

8    in a city that is hundreds of miles from your treating

9    physicians and friends and family?  Did you ever state

10   anything to that effect or similar to that?

11   A.   I don't understand.  You said I'll be staying --

12   Q.   My question, sir, was:  Did you ever tell anyone that if

13   you were forced to travel to Chicago, you would be staying in

14   a hotel in a city that is hundreds of miles from your treating

15   physicians and friends or family?  Did you ever tell anyone

16   that?

17   A.   Not that I'm -- no, I'm not aware of that statement.

18   Q.   Because that would be untrue, wouldn't it?  You have

19   family in the Chicago area, correct?

20   A.   Yes, I've got a daughter and a son there.

21           MR. CROWL:  No further questions at this time, Judge.

22           THE COURT:  Okay.  I don't know if defense counsel

23   has a couple questions they would like to ask.

24           MR. HALE:  No.

25           THE COURT:  Okay.  Officer Oliver, I'm in charge of

1    keeping the wheels turning here in this courtroom, and the

2    most important thing for me to do is stay on time with the

3    jury.  It is 9:28, and we start at 9:30, and I've got to give

4    the lawyers a chance to stretch their legs one last time.  So

5    we're going to have to break.

6          So we will call you in a little more than three

7    hours.  I think it will probably be between 12:30 and 12:45.

8    If you'd be kind enough to be available then, we'll give you a

9    call then.  Does that sound okay?

10          MR. OLIVER:  That's fine with me, Your Honor.

11          THE COURT:  In the meantime, you can go back to your

12   morning cup of coffee.

13          MR. OLIVER:  Thank you.  I really appreciate you.

14          THE COURT:  All right.  Thank you, Officer Oliver.

15   Take care.

16          MR. OLIVER:  Okay.  Bye.  Bye.

17          THE COURT:  All right.  Officer Oliver, can you still

18   hear me?

19          All right.  I hear nothing.  I've confirmed the phone

20   call has ended.

21          All right.  So we've got some thinking to do, we've

22   got some talking to do on that.  Let's not do it now.  I don't

23   want to keep the jury waiting.  If there's anything anybody is

24   burning to say on this topic now, I will listen to you.  But

25   why don't we take a quick break.  That's not the event of the

1    day.   The event of the day is Officer Pesavento.   Let's take

2    five minutes, everybody hit the bathroom, take a drink.   And

3    I'll be back in five minutes, and we'll get rolling.

4         (Recess had.)

5         THE COURT:  All right.   Folks, we're about to resume.

6    When the jury gets in, I'm simply going to say we're going to

7    resume the testimony of Officer Pesavento.   "Do you

8    understand, sir, you're still under oath?"  And then we're

9    going to get rolling.

10        Officer Pesavento, why don't you come on up here so

11   we can save time in front of the jury.   Is there anything

12   anybody needs to raise before we get going?

13        MR. SAFER:  Just that there is a notebook up there of

14   exhibits, but we're also going to have Jim put it on your

15   screen blown up when we use it, so that might be easier.

16        THE COURT:  Are we waiting for anyone from anyone's

17   respective trial team?

18        It looks like we have fewer people here, but I want

19   to make sure we've got everybody.

20        Okay.   Ms. Ramos, if you'd be kind enough to tell the

21   CSO we're ready for them.

22        (Jury in.)

23        THE COURT SECURITY OFFICER:  All rise.

24        THE COURT:  Good morning, everyone.   Please have a

25   seat.

Pesavento - direct by Safer

1          Thank you, again, folks, for being here today.  I

2     appreciate you being here.

3          I see that everyone has swapped seats, so one thing I

4     already know about you people is you're good at following

5     instructions.  So thank you for doing that.

6          If at any point today anyone has any problems with

7     their seat, if it is uncomfortable to you or if you cannot see

8     the screen or if you cannot hear, I want you to tell me.

9     Because, again, the goal of this process is for you to be able

10    to be comfortable, to hear and to understand and make the best

11    decision that you can based on the facts and the law.

12         We're going to resume the testimony of Officer

13    Pesavento.

14         Officer Pesavento, do you understand, sir, that

15    you're still under oath?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  Counsel, go ahead, please.

18       ANGELO PESAVENTO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19                    DIRECT EXAMINATION (CONT'D)

20    BY MR. SAFER:

21    Q.  Good morning, Mr. Pesavento.

22    A.  Good morning.

23    Q.  When we left off, we were talking about your interrogatory

24    answer about whether or not you went to J&J Fish during -- on

25    the night in question.  Do you recall those questions?

Pesavento - direct by Safer

822

1  A.  Somewhat, yeah.

2  Q.  Okay.  Well --

3          MR. SAFER:  And, Your Honor, we did not publish, but

4  I'd like to publish Plaintiff's Exhibit 106, Answer 15, which

5  is an interrogatory answer.

6          THE COURT:  And do you want it admitted into

7  evidence?

8          MR. SAFER:  I would like to admit that answer into

9  evidence as a party admission.

10          THE COURT:  Only that answer?

11          MR. SAFER:  Yes.

12          THE COURT:  Okay.  Any objection?

13          MS. BOUDREAUX:  No objection.

14          THE COURT:  All right.  It's admitted.  You can

15  publish to the jury.

16          MR. SAFER:  Thank you, Your Honor.

17      (Plaintiff's Exhibit No. 106 was received in evidence.)

18  BY MR. SAFER:

19  Q.  So you recall it says -- You were asked:  "Please describe

20  the reason that you went to the J&J Fish restaurant on

21  January 29th, 1994, including whether you were assigned there

22  in response to a 911 call."

23          And then after some objections, you say, "Defendant

24  Pesavento did not go to the J&J Fish restaurant on January 29,

25  1994."  Correct?

Pesavento - direct by Safer

823

1    A.  Yes, if that's what's on there, then I agree with it.

2    Q.  Yes.

3    A.  Yes.

4    Q.  And you reviewed that, and you verified it to be true,

5    correct?

6    A.  And I verified what?

7    Q.  You reviewed it, and you verified that it was true?

8    A.  Yes.

9    Q.  Now, you did in fact go to J&J Fish restaurant on

10   January 29th, 1994, correct?

11   A.  I believe I did, yes.

12   Q.  And when you got there, some of the J&J employees were

13   still in the store?

14   A.  Yes.

15   Q.  You went into J&J Fish restaurant, and you brought those

16   people to the station, correct?

17   A.  Yeah, I don't know if I personally brought them.  There

18   were a lot of policemen involved and there were a lot of

19   things going on, so it's hard for me to say that I was there

20   at a certain time and so on.

21   Q.  Well --

22        MS. BOUDREAUX:  Sorry to interrupt, Judge, our

23   screens aren't on here.

24        THE COURT:  Okay.  Thank you for telling me that.

25        My screen is not currently on because I think this

Pesavento - direct by Safer

824

1   exhibit is no longer being published.

2          MS. BOUDREAUX:  I'm sorry.  When it was published,

3   ours were not working.

4          THE COURT:  Okay.  I appreciate you saying that.

5   Thank you for telling me.

6          Officer Pesavento, while we sort that out, I'll tell

7   you, you're free to take your mask all the way off, if you'd

8   like, if you'd feel more comfortable.  You've got it down on

9   your chin here.  If you'd like to take it off, it might be

10  more comfortable for you, sir.

11         THE WITNESS:  Thank you.

12         MR. SAFER:  Technology is wonderful when it works.

13         THE COURT:  Technology is wonderful when it works.

14         THE CLERK:  Let me call systems because everything

15  else --

16         THE COURT:  Okay.  It is -- is this the only screen

17  that isn't working?  Do you have any other screen for defense

18  counsel?  None of the defense counsel's screens are working?

19         MR. HALE:  This one is working.

20         THE COURT:  Okay.  In the interest of making

21  progress, Mr. Safer, do you have another hard copy that you'd

22  be kind enough to share with defense counsel?

23         MR. SAFER:  Yes, they have it.

24         MS. BOUDREAUX:  I have it.

25         THE COURT:  Got it.  Okay.

Pesavento - direct by Safer

1        MS. BOUDREAUX:  We could move forward.

2        THE COURT:  Great.

3        MS. BOUDREAUX:  I just wanted to let you know.

4        THE COURT:  Got it.  I appreciate that.  Thank you

5   for bringing that to my attention.

6        Folks, we're going to go ahead and proceed.  Defense

7   counsel is kind enough to say that we can proceed even though

8   their screens aren't working.  I want to sort that out without

9   making you folks wait.  Okay?  So we're going to keep rolling,

10  and we'll hopefully sort that out on a break.

11        So thank you, Defense counsel, for raising it.

12        MS. BOUDREAUX:  You're welcome.

13        MR. SAFER:  So the record is clear, Your Honor, I

14  have provided both defense counsel and Mr. Pesavento with a

15  notebook of all exhibits I intend to reference.

16        THE COURT:  Perfect.  And thank you for doing that.

17        MR. SAFER:  Sure.

18        THE COURT:  Okay.  When you're ready, Counsel, go

19  ahead, please.

20  BY MR. SAFER:

21  Q.  So you were saying you don't know what you did personally,

22  but you, the police, brought everybody who was in the store at

23  that time down to the station, correct?

24  A.  Yes.

25  Q.  They didn't volunteer to come down to the station, did

Pesavento - direct by Safer

826

1  they?

2  A.  It depends on what you mean by "volunteer."  Did they go

3  willingly?  Yes.

4  Q.  Well, you placed them under arrest, didn't you?

5  A.  I didn't.

6  Q.  Well, they were placed under arrest, correct?

7  A.  I've read -- read that they were, yes.

8  Q.  Well, you knew that they were, sir.  They were handcuffed,

9  right?

10  A.  Not that I know of, no.

11  Q.  You kept Mr. and Mrs. Williams in the lockup until your

12  afternoon shift the next day; isn't that right, sir?

13  A.  I didn't do that.  I don't know if that's what happened.

14  Q.  You knew that they were in the lockup till the afternoon

15  that next day?

16  A.  I'm sure at some point I did know.

17  Q.  So you knew they didn't volunteer to be in the lockup

18  overnight through the next day, did they?

19  A.  I am sure you're correct on that.

20  Q.  So they were under arrest, correct?

21  A.  I assume that they were, yes.

22  Q.  You didn't bring Lee Williams, the witness on Minerva, to

23  the station, did you?

24  A.  I didn't, no.

25  Q.  Nobody did, did they?

Pesavento - direct by Safer

1   A.   Not that I know of.

2   Q.   Now, these interviews that you conducted with these five

3   employees from J&J are detailed in your supplementary report,

4   correct?

5   A.   I'm sure they are.

6   Q.   But your conducting these interviews is not in your

7   interrogatory response when you described your role in the

8   investigation, is it?

9   A.   I'm not sure.  I haven't read it all completely, and -- I

10  don't know how to put it.

11            THE COURT:  Excuse me a second.

12            THE WITNESS:  Go ahead.

13            THE COURT:  I'm sorry, go ahead and finish your

14  answer.

15  BY THE WITNESS:

16  A.   No, I'm just not quite sure how to put it.  What was your

17  question again?  That I didn't put it in my interrogatory --

18  probably not, but I thought it was kind of vague what they

19  asked, what was my role in the -- in this homicide, and there

20  were a lot of different roles in there.  And I don't know if I

21  named every single thing that I did.

22            MR. SAFER:  Your Honor, I'd like to publish

23  Plaintiff's -- admit into evidence Plaintiff's Exhibit 106,

24  No. 3, only that answer, and publish that to the jury.

25            THE COURT:  And when you say "that answer," just to

Pesavento - direct by Safer

828

 1   be clear, which answer do you mean?

 2          MR. SAFER:  To number -- Interrogatory No. 3.

 3          THE COURT:  Yes.  Any objection?

 4          MS. BOUDREAUX:  No objection.

 5          THE COURT:  It's admitted.  You can publish to the

 6   jury.

 7      (Plaintiff's Exhibit No. 106, Answer No. 3 was received

 8      in evidence.)

 9   BY MR. SAFER:

10   Q.  This is your answer when you were asked to describe in

11   detail your role in the investigation, correct?

12   A.  Yes.

13   Q.  So you said that you interviewed Anthony Williams, for

14   example, correct?

15   A.  Yes.

16   Q.  So you knew that interviews were part of your role,

17   correct?

18   A.  Yes.

19   Q.  But you didn't put down that you interviewed these five

20   people, did you?

21   A.  I would have to look at the report again.

22   Q.  Well, you know you didn't put it down, correct, in your

23   interrogatory answer, because that's right in front of you,

24   and there's nothing about that?

25   A.  Yes, that's correct.

Pesavento - direct by Safer

829

1    Q.   Okay.  Now -- and you didn't interview just one person who

2    was inside J&J's the night of the murder, right?

3    A.   I'm sorry?  I didn't interview --

4    Q.   Just one person?

5    A.   I'm sure I didn't.  I probably talked to more people.

6    Q.   You talked to all five people, correct?

7    A.   I can't say that's correct.  I don't remember.

8    Q.   Okay.  Let me ask you if this refreshes your memory.

9    You -- at your deposition, were you asked this question and

10   did you give the -- this answer, and it refers to the

11   supplemental report, and then it says:

12            "And then it lists Edna and James Williams, true?

13            "ANSWER:  Yes.

14            "QUESTION:  David McCray?

15            "ANSWER:  Yes.

16            "QUESTION:  Marie Stewart?

17            "ANSWER:  Yes.

18            "QUESTION:  Tenesha Gatson?

19            "ANSWER:  Yes.

20            "So that question -- so that's five J&J employees

21   that you interviewed that night, true?

22            "ANSWER:  Yes.  If they were all employed by J&J

23   Fish, I don't know."

24            MS. BOUDREAUX:  I would ask for a page and line

25   number, please.

Pesavento - direct by Safer

1      MR. SAFER:  I'm sorry.  That was Page 43, Line 13

2   through Page 44, Line 1.

3      MS. BOUDREAUX:  Thank you.

4   BY MR. SAFER:

5   Q.  Were you asked those questions and did you give those

6   answers?

7   A.  Yes.

8   Q.  And does that refresh your recollection that you spoke

9   with five people that night?

10  A.  I really can't say that I personally spoke with them.  I

11  could have been getting some of the information from other

12  policemen.

13  Q.  Okay.  You said at your deposition you spoke with them,

14  correct?

15  A.  Yes.

16  Q.  Now, Tenesha -- let's talk about Tenesha Gatson.  Do you

17  recall Tenesha Gatson and talking to her?

18  A.  Yes.

19  Q.  She was the cashier at J&J's?

20  A.  Yes.

21  Q.  She was a young woman, 16, or --

22  A.  I don't recall.

23  Q.  Do you recall that she was pregnant?

24  A.  No, I don't.

25  Q.  She actually gave you Lanier's full name, that is, Eddie

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 36 of 172 PageID #:18096
Pesavento - direct by Safer
831

1    Bolden, correct?

2    A.  No.

3    Q.  Tenesha Gatson also told you that this person, Lanier, or

4    Eddie Bolden, was inside J&J's the entire time there was

5    fighting outside, correct?

6    A.  I believe she did say something along those lines.

7    Q.  And in the interrogatory response that we just looked at,

8    No. 3, you concealed the fact that on the night of the

9    murders, you talked to Tenesha Gatson, didn't you?

10                MS. BOUDREAUX:  Object to form.

11                THE COURT:  Overrule.

12   BY THE WITNESS:

13   A.  I concealed it?

14   BY MR. SAFER:

15   Q.  Yes.

16   A.  I don't know how to answer that.  I just don't recall.

17   Did I talk to her?  I mean, I'm sure I did if it's on the

18   report, but this has been 28 years ago, and I'm --

19   Q.  Right.  But you've already testified yesterday you had all

20   of your reports available to review, and you did review them

21   before you answered your interrogatories, correct?

22   A.  Yes.  That was five years ago, I think, or four.

23   Q.  Yes, four years ago.  It was in 2017.

24   A.  '17.

25   Q.  You also interviewed Edna Williams that night or early

Pesavento - direct by Safer

1    that next morning, correct?

2    A.  I believe so, yes.

3    Q.  And James Williams?

4    A.  Yes.

5    Q.  And David McCray?

6    A.  Yes.

7    Q.  And Maurice Stewart?

8    A.  Yes.

9    Q.  The fact is, sir, you lied about your role in the

10   investigation because you didn't want the parties to know what

11   your true role in this investigation was; isn't that true?

12   A.  I don't know how to answer that.  No, I didn't lie, and

13   I -- I wanted to know what my role was?

14   Q.  When you were answering, sir, what your role was, you

15   didn't tell the truth?

16   A.  I think I did.

17   Q.  You were familiar -- let's shift topics to handwritten

18   notes.  Okay.  You were familiar with general progress

19   reports, right?

20   A.  Yes.

21   Q.  General progress reports were designed to standardize the

22   reporting of handwritten notes and memoranda in an

23   investigation?

24   A.  Yes.

25   Q.  And they -- these general progress reports were supposed

Pesavento - direct by Safer

1    to include handwritten notes of witness interviews?

2    A.   They could include that, yes.

3    Q.   And these general progress reports, these handwritten

4    notes, were to be kept in the investigative file, right?

5    A.   Yes.

6    Q.   So as we just said, you interviewed Lee Williams --

7    everybody is named Williams.  But Lee Williams was the

8    gentleman at Minerva at the murder scene?

9    A.   Yes.

10   Q.   You interviewed him there that night, correct?

11   A.   Yes.

12   Q.   And you took handwritten notes out at the scene when you

13   spoke to Mr. Williams, right?

14   A.   I assume I did.  I don't recall exactly if I took notes

15   from him or if I just interviewed him briefly and remembered

16   what he said.

17   Q.   Well, you -- you assume that you took notes, right?

18   A.   I -- yes, I could have.

19   Q.   And -- well, he -- he was the only witness who you found

20   who saw someone get out of the car in which the murders

21   occurred, right?

22   A.   Yes.

23   Q.   And he was the only eyewitness at the murder scene who,

24   according to your report, saw or heard shots fired, right?

25   A.   He -- he was -- there were other people who heard shots

Pesavento - direct by Safer

834

1    fired, but that's all that they -- they could testify to -- or

2    not testify, but what -- what they could tell me, was that

3    they --

4    Q.  So --

5    A.  -- heard shots fired.

6    Q.  Sorry.  So his recollection of what he saw was very

7    important, right?

8    A.  Yeah.  Yes.

9    Q.  And your supplemental report lets --

10           MR. SAFER:  I believe this is agreed.  I don't think

11   it's in evidence yet, Your Honor.  I would move Plaintiff's

12   Exhibit 86 into evidence.

13           THE COURT:  Any objection?

14           MS. BOUDREAUX:  No.

15           THE COURT:  Admitted.

16      (Plaintiff's Exhibit No. 86 was received in evidence.)

17   BY MR. SAFER:

18   Q.  Your -- let me show you what is on the screen.  It's also

19   in your book --

20           THE COURT:  You would like to publish it to the jury?

21           MR. SAFER:  Yes, Your Honor.  Thank you.

22           THE COURT:  Go ahead.

23           MR. SAFER:  Thank you.

24   BY MR. SAFER:

25   Q.  It is also at Tab 7 of your book, but it is -- the first

Pesavento - direct by Safer

835

1   page of that, do you recognize Plaintiff's Trial Exhibit 86,

2   sir?

3   A.   Yes.

4   Q.   And that is your supplementary report, correct?

5   A.   Yes.

6   Q.   And on -- and you wrote that the day after these incidents

7   occurred, right?

8   A.   Yes.

9   Q.   That's the date -- what was just highlighted was the date

10  of original occurrence.

11          MR. SAFER:   If we could go down to the bottom of the

12  page.

13  BY MR. SAFER:

14  Q.   That will have -- the date this report was submitted was

15  January 30th at 9:34 p.m.?

16  A.   Yes.

17  Q.   And you were the author of this, correct?

18  A.   Yes.

19  Q.   Okay.

20          MR. SAFER:   If we could look at Pages 4 and 5.

21  BY MR. SAFER:

22  Q.   You talk about -- here you say Lee -- what Lee Williams

23  told you, correct?

24  A.   Yes.

25  Q.   And that's fairly detailed, right?  He tells you how many

Pesavento - direct by Safer

836

1   shots were fired, correct?

2   A.  Yes.

3   Q.  And he says what he could see from them.  That indicates

4   to you, you took handwritten notes of this interview, right?

5   A.  Apparently I did.

6   Q.  Now, you also took handwritten notes of your interview

7   with Tenesha Gatson, right?

8   A.  Sir, I'm being honest with you, I just don't remember.

9   Q.  Okay.  Let's look at Tenesha Gatson's interview.  Your

10  interview of Tenesha Gatson is also summarized on this report,

11  correct?

12  A.  Yes.

13          MR. SAFER:  If we could blow that up, Jim, please.

14  BY MR. SAFER:

15  Q.  It says that you talked about how she says she stayed

16  overtime.  She described this person, you know, gave you

17  heights.  That would indicate, again, that you took

18  handwritten notes, correct?

19  A.  Somebody did.

20  Q.  And -- yes.  And those notes of your interviews with these

21  critical witnesses should have been included in the

22  investigative file, right?

23  A.  Yes.

24  Q.  But they weren't, were they?

25  A.  I don't know if they were or not.

Pesavento - direct by Safer

837

1   Q.  Well, you've seen the investigative file in this case,

2   haven't you, sir?

3   A.  Yes.

4   Q.  You've reviewed it in preparation for your testimony

5   today, haven't you?

6   A.  I didn't review it for the last couple days or so.

7   Q.  But you've reviewed it within the last --

8   A.  I did.

9   Q.  -- couple weeks?

10  A.  I have reviewed it, yes.

11  Q.  Yes.  And your handwritten notes of Tenesha Gatson's

12  interview are not in there, are they?

13  A.  That's correct.

14  Q.  There are general progress reports that is handwritten

15  notes of other detectives' investigative file, correct?

16  A.  Yes.

17  Q.  Detective Baker's report of his interview with Clifford

18  Frazier, which is contained --

19          MR. SAFER:  Your Honor, Joint -- Joint Exhibit 4, if

20  we could move -- I would move -- before we publish this, I

21  would move Joint Exhibit 4 into evidence.  That is the

22  investigative file, Your Honor.

23          MS. BOUDREAUX:  No objection.

24          THE COURT:  I'll admit it.  You can publish it to the

25  jury.

Pesavento - direct by Safer

838

1      MR. SAFER:  Thank you, Your Honor.

2      (Joint Exhibit No. 4 was received in evidence.)

3   BY MR. SAFER:

4   Q.   That's the cover to the investigative file.  If we could

5   look at Detective Baker's report.  That is Detective Baker's

6   general progress report, his handwritten notes of his

7   interview of Clifford Frazier, correct?

8   A.   Yes.

9   Q.   And Detective Karl's general progress reports with

10  handwritten notes are in the investigative file, correct?

11  A.   Yes.

12  Q.   From -- in fact, the next seven pages of the investigative

13  report -- we could flip through -- are Detective Karl's

14  general progress reports, right?

15  A.   Yes.

16  Q.   And Detective Siwek's general progress reports with

17  handwritten notes are in the investigative file, correct?

18  A.   Yes.

19  Q.   Again, several pages.

20      So those handwritten notes, those general progress

21  reports are all in the investigative files?

22  A.   Yes.

23  Q.   But none of your general progress reports are in the

24  investigative file, are they?

25  A.   Apparently not.

Pesavento - direct by Safer

839

1   Q.  In your supplementary report, you note that Clifford

2   Frazier said his assailant was light-complected.

3           Do you recall that?

4   A.  Yes.

5   Q.  Mr. Bolden is not light-complected, is he, sir?

6   A.  No, but I don't put too much faith in when people tell me

7   about someone's complexion, especially when it's at night.

8   Q.  I appreciate that, sir.  The question was pretty simple.

9           Mr. Bolden is not light-complected, is he?

10  A.  No.

11  Q.  He is medium-complected, correct?

12  A.  That's your opinion.

13  Q.  No, sir, it's not my opinion.

14  A.  Okay.  He is --

15  Q.  You put it in --

16  A.  -- medium-complected.

17  Q.  -- your arrest report, didn't you, sir?

18  A.  Yes.

19          MR. SAFER:  You put in -- Joint Exhibit 13, Your

20  Honor, which I would move into evidence.

21          THE COURT:  Any objection?

22          MS. BOUDREAUX:  No.

23          THE COURT:  Admitted.  You can publish it.

24          MR. SAFER:  Thank you, Your Honor.

25       (Joint Exhibit No. 13 was received in evidence.)

Pesavento - direct by Safer

840

1   BY MR. SAFER:

2   Q.  Joint Exhibit 13, your arrest report of Mr. Bolden, you

3   put down that he is medium-complected, correct?

4   A.  Yes.

5   Q.  But, in fact, Tenesha Gatson -- and your supplementary

6   report, by the way, says that Tenesha Gatson said that Lanier,

7   Eddie Bolden, was light-complected?

8   A.  Yes.

9   Q.  But, in fact, sir, she told you that Mr. Bolden was

10  medium-complected, didn't she?

11  A.  You know, you're confusing me now with --

12  Q.  I don't want to confuse you.

13  A.  No, Tenesha Gatson said he was light-complected?

14  Q.  In your report -- let's -- I'll show you your report at

15  Plaintiff's Exhibit 86.  In your supplementary report, you

16  write that Tenesha Gatson said that this person was

17  light-complected?

18  A.  Yes.

19  Q.  But, in fact, sir, she told you that Mr. Bolden was

20  medium-complected, didn't she?

21  A.  Yes.

22  Q.  Now, you interviewed Lee Williams the night of the

23  murders, right?

24  A.  Is that Lee Williams?

25  Q.  Yes, yes.

Pesavento - direct by Safer

1   A.  Yes.

2   Q.  I'm sorry.  The guy on Minerva.  Okay.

3          And you wrote in your supplementary report that

4   Lee -- you know, that Lee Williams said that he saw a black

5   man get out of the backseat of the car.  Do you see that?

6   A.  Yes.

7   Q.  But, in fact, sir, Lee Williams told you he could not see

8   whether this person was a man or a woman, didn't he?

9   A.  No, he told me it was a man.

10  Q.  Well, you understand that Mr. Williams testified at trial

11  that he could not see whether this was a man or a woman,

12  right?

13  A.  I didn't know that he testified to that.

14  Q.  Well -- and he testified that he told you that he could

15  not see whether this person was a man or a woman?

16          MS. BOUDREAUX:  Objection.  Foundation.

17  BY MR. SAFER:

18  Q.  Do you know that?

19          THE COURT:  Overruled.

20  BY THE WITNESS:

21  A.  I think that he --

22          THE COURT:  Overruled.  Go ahead.  He's asking if you

23  know that, so go ahead.

24  BY MR. SAFER:

25  Q.  Let me try again.

Pesavento - direct by Safer

842

1    A.  Did he testify to that at trial?

2    Q.  Yeah.

3    A.  I don't know.

4    Q.  Okay.  Your handwritten notes would tell us what he

5    actually said because you took those notes as he was talking

6    to you, right?

7    A.  Yes, I assume I did.

8    Q.  It was critically important that your handwritten notes of

9    the Lee Williams interview be in this investigative file,

10   right?

11   A.  Yes.

12   Q.  But they are not, are they?

13   A.  No.

14   Q.  In fact, there is not a single general progress report

15   with your handwritten notes in the entire investigative file,

16   right?

17   A.  I don't know.

18   Q.  Have you seen any?

19   A.  Not that I recall.

20   Q.  Okay.  New topic.  Let's talk about some standard

21   operating procedures, and what I'm going to ask you about is

22   the issue of the testing of the gun.

23   A.  Testing of what?

24   Q.  Testing of the gun.  I'm just trying to -- I just want to

25   orient you to what I'm about to ask.

Pesavento - direct by Safer

843

```
1         It was your responsibility as a detective to be aware
2    of the requirements of the detective division's standard
3    operating procedures?
4    A.  Yes.
5    Q.  And you were trained by the Chicago Police Department on
6    the detective division's standard operating procedures when
7    you were going through detective school?
8    A.  Yes.
9         MR. SAFER:  Plaintiff's Exhibit 5 is in evidence.
10   Your Honor, if I could publish that.
11        THE COURT:  Yes, absolutely.
12   BY MR. SAFER:
13   Q.  Those are the detective division's standard procedures
14   that were in effect in 1994, right?
15   A.  Yes, I assume that.
16   Q.  And Section 8.1 is entitled "Function of a Detective."
17        Do you see that?
18   A.  Yes.
19   Q.  And it reads that "Detectives are a select group of
20   Department members who are given the task of investigating
21   crimes reported to the Department," right?
22   A.  Yes.
23   Q.  And in -- 8.1(B) requires you to be diligent, correct?
24   A.  Yes.
25   Q.  Thorough?
```

Pesavento - direct by Safer

844

1   A.  Yes.

2   Q.  Careful?

3   A.  Yes.

4   Q.  And objective?

5   A.  Yes.

6   Q.  What does objective mean to you, sir?

7   A.  To report not -- what is not -- not your opinion, but what

8   is there in fact.

9   Q.  Okay.  And Section 8.3 contains the standard operating

10  procedures for conducting a field investigation, right?

11  A.  Yes.

12  Q.  And it says that detectives have considerable freedom, but

13  there are certain investigative procedures that must be

14  accomplished in each follow-up investigation, right?

15  A.  Yes.

16  Q.  And one of the things is to submit a request for latent

17  fingerprint comparison to the identification section, if

18  prints suitable for comparison were recovered from the scene,

19  right?

20  A.  Yes.

21  Q.  Okay.  Now, let's pause there.  You knew that in the night

22  in question that Clifford Frazier carried a gun into J&J Fish,

23  right?

24  A.  Yes.

25  Q.  And you didn't know whether that was his gun or the

Pesavento - direct by Safer

845

1  assailant's gun, right?

2  A.  I was -- I was told from -- by Clifford Frazier's account

3  that it was his gun.

4  Q.  Well, you learned that he -- that Clifford Frazier claimed

5  that he was able to wrestle the assailant's gun away from him,

6  right?

7  A.  Yes.

8  Q.  And then -- that he -- he said that the two of them were

9  struggling over these guns, right?

10  A.  Yes.

11  Q.  So he says that he picked up his gun and left the

12  assailant's gun on the street, right?

13  A.  Yes.

14  Q.  But he also told you that at some point the assailant

15  picked up the gun that Clifford Frazier brought to the drug

16  deal, right?

17           MS. BOUDREAUX:  Objection.  Mischaracterizes.

18           THE COURT:  Overruled.

19  BY MR. SAFER:

20  Q.  Well, I don't want to mischaracterize anything.  If we

21  could look and --

22           MR. SAFER:  If we could -- Ms. Ram- -- Your Honor, if

23  we could do this not to the jury, but only to the witness --

24           THE COURT:  Sure.

25           MR. SAFER:  -- so that he can see it.  Thank you,

Pesavento - direct by Safer

846

1   Your Honor.

2          So this is Tab 4.  And this is Cliff- -- no, I'm

3   sorry, Jim, if we could go to the trial testimony.  Tab 4, a

4   hundred -- Page 111, Line 18 to Page 111, 24.

5          THE TECHNICIAN:  Which --

6          MR. SAFER:  Okay.  We'll come back to that.  No --

7   this is -- I'm sorry, this is at Tab 4.  What is it?  Okay.

8   We'll come back to that.

9   BY MR. SAFER:

10  Q.  Did you request that the gun that Clifford Frazier had be

11  fingerprinted to see if there were prints suitable for

12  comparison?

13  A.  Did I personally do it?  No.

14  Q.  Did anybody do it?

15  A.  I don't know.  There was three different units involved in

16  this.

17  Q.  Sir, you were one of the lead detectives, correct?

18  A.  Yes.

19  Q.  Did you see --

20  A.  That doesn't -- that doesn't mean I have complete control

21  over everybody.

22  Q.  Did you see to it, sir, that that gun was fingerprinted?

23  A.  Did I -- I would say, no, I didn't personally.

24  Q.  Do you know if anybody else did?

25  A.  No, I don't.

Pesavento - direct by Safer

847

1   Q.  Did you see a fingerprint report for that gun?

2   A.  No.

3   Q.  This was a double murder investigation, correct?

4   A.  Yes.

5   Q.  It is really important to solve this crime, right?

6   A.  Of course.

7   Q.  You have to find the guy that did it and get him off the

8   streets, right?

9   A.  Yes.

10  Q.  And there were two guns recovered from the scene, right,

11  one at J&J Fish and one in Mr. Frazier's car, correct?

12  A.  Yes.

13  Q.  Now, let's stick with the gun that Clifford Frazier

14  carried into J&J's after he wrestled with the assailant.

15         Was there any reason that you can tell the ladies and

16  gentlemen of the jury not to have that gun fingerprinted?

17  A.  Well, a number of people had touched it, for one thing.

18  And the other -- the other thing is that, when it was

19  recovered, I don't know who recovered it.  I mean, I know the

20  police department did, but I -- I don't know which group

21  recovered it.

22  Q.  Does that -- could you find that out, sir, if you needed

23  to?

24  A.  Yes.

25  Q.  Okay.  So that's not a reason to not have it

Pesavento - direct by Safer

848

1   fingerprinted, right?

2   A.   No.

3   Q.   So why wouldn't you have the fingerprinted --

4   fingerprint -- the gun fingerprinted?

5   A.   Because generally the -- the unit that recovers it, the --

6   they automatically do that.

7   Q.   But they didn't, right?

8   A.   I guess not.

9   Q.   So why wouldn't you as a detective who is trying to

10  solve -- if you were trying to solve this crime, why wouldn't

11  you get the gun fingerprinted?

12  A.   Fingerprints seldom solve anything in general.  And we're

13  working on the evidence that we had and trying to locate a

14  person by the name of Lanier.  We were trying to identify him.

15  Q.   Wouldn't you want to know whether his fingerprints were on

16  the gun?

17  A.   Yes.

18  Q.   And you said a number of the people who touched this gun

19  including the assailant, correct?

20  A.   I don't know --

21  Q.   Right.

22  A.   -- if he did.

23  Q.   So maybe, correct?

24  A.   Maybe?

25  Q.   Yeah.  Why wouldn't you want to find out if you were

Pesavento - direct by Safer

849

1  trying to solve this crime?

2          MS. BOUDREAUX:  Objection.  Asked and answered.

3          THE COURT:  Overruled.

4  BY THE WITNESS:

5  A.  Because, like I said, we're following the evidence that we

6  have at the time.

7  BY MR. SAFER:

8  Q.  Well, the -- and a gun is -- is evidence, right?

9  A.  The gun that was recovered there was with Clifford

10  Frazier, not with Lanier.

11  Q.  Plaintiff's Exhibit 50, and that -- I believe --

12          THE COURT:  I think that's been admitted.

13          MR. SAFER:  That's in evidence, Your Honor.

14          THE COURT:  Yes.

15          MR. SAFER:  Thank you.

16          THE COURT:  Correct.

17          MR. SAFER:  If that could be published.

18          THE COURT:  Yes.

19  BY MR. SAFER:

20  Q.  That is the property report for this weapon, correct?

21  A.  I assume it is, yes.

22  Q.  And that is the gun that Clifford Frazier carried into J&J

23  Fish, right?

24  A.  Yes.

25  Q.  Now, you used this report, Plaintiff's Trial Exhibit 50,

Pesavento - direct by Safer

1   in preparing your supplementary report, right?

2   A.  I'm sure it's on there as something that was recovered,

3   yes.

4   Q.  No, no.  The question is:  You used this report, this --

5   Plaintiff's Exhibit 50 in preparing your supplementary report,

6   right?

7   A.  Yes.

8   Q.  So -- and you got the serial number for the gun from this

9   supplementary report, correct?

10  A.  Yes.  I don't -- wait a minute.  I'm sorry.  This is from

11  the 3rd District.  It's not from the detective division.

12  Q.  I'm just asking you, sir, if you got the serial number

13  from -- of the gun from your -- for your supplementary report

14  from this exhibit?

15  A.  I assume so.

16  Q.  Where else would you have gotten the serial number, right?

17  A.  Yes.

18  Q.  Okay.  Now, when you saw that there was blood on this

19  weapon, did you have the lab division test that blood?

20  A.  I didn't, no.

21  Q.  Did anybody?

22  A.  I don't know.  Like I said, the problem with this was that

23  there were three different units involved.

24  Q.  Did you -- I'm asking about --

25              THE COURT:  Hang on.  Hang on.

Pesavento - direct by Safer

851

1    BY THE WITNESS:

2    A.   Like, the 3rd District didn't keep me informed about

3    everything that -- that they were doing.

4    BY MR. SAFER:

5    Q.   Did you ever see a report of the blood -- about the type

6    of the blood on the weapon?

7    A.   No, I don't think I did.

8    Q.   Wouldn't you want to know whether -- if you were trying to

9    solve this crime, whether the blood on the weapon matched

10   Clifford Frazier, the person you ultimately find as Lanier, or

11   a third person?

12   A.   Would I like to know that, yes.

13   Q.   Yes.  Well, why didn't you find out?

14   A.   As I told you, we're following the evidence that we have

15   at that time, and we're sort of in a rush, too.  You can't let

16   a long period of time go by before you follow up on something.

17   So you --

18   Q.   How long -- I'm sorry.  I'm sorry.

19   A.   No, go ahead.

20   Q.   Were you -- I interrupted you.  Were you finished?

21   A.   I -- no, just what I was saying is that you follow the

22   evidence that you have at the time.  You don't want a lot of

23   time to go by because in talking to people, they change their

24   minds about things, they recall or don't recall something, and

25   a lot of the witnesses are not -- are not happy with the

Pesavento - direct by Safer

852

1   position that they're put in.  They don't want to be a witness

2   to a gang shooting or something like that.

3   Q.   The only evidence you had at that point about what was

4   going on out on the street was Clifford Frazier's word,

5   correct?

6   A.   Yes, and -- yeah, Clifford Frazier, basically.

7   Q.   This blood is objective evidence, correct?

8   A.   Yes.

9   Q.   Witnesses -- as we'll discuss later, witnesses can lie,

10  right?

11  A.   Yes.

12  Q.   Witnesses can be wrong?

13  A.   Yes.

14  Q.   But this kind of forensic evidence is scientific evidence,

15  right?

16  A.   Yes.

17  Q.   And so the blood -- how -- you said you didn't want to

18  wait.  How long, sir, would it take to test the blood on the

19  weapon and get a type?

20  A.   I'm not sure.

21  Q.   That could be done instantly -- almost instantly, correct?

22  A.   I'm not sure how long it takes them.

23  Q.   Well, you know it doesn't take more than a day, right?

24  A.   I don't know.

25  Q.   So you mean to tell me that as a detective in the Chicago

Pesavento - direct by Safer

853

1    Police Department, you don't know how long it would take to

2    get a type, just a type for the blood?

3    A.   That's correct.  I'm not part of the -- the unit that

4    tests blood.

5    Q.   If you wanted to find out who committed this crime, sir,

6    wouldn't you have submitted this for testing no matter how

7    long it took?  And then you didn't have to wait on the results

8    of it for the rest of your investigation, did you?

9    A.   No.

10   Q.   Did you request that the police lab do DNA testing on the

11   gun?

12   A.   I don't recall.

13   Q.   Now, you don't recall whether you did or not?  You might

14   have?

15   A.   I don't know.  Maybe not.

16   Q.   You didn't see any, did you?  You didn't see any DNA

17   results, did you?

18   A.   That's correct.

19   Q.   Now, DNA testing takes a little bit longer than blood

20   type, right?

21   A.   Like I said, I'm -- I'm not familiar with that.

22   Q.   At any rate, you did not ask that this weapon be tested

23   for DNA by the lab -- by the lab division, right?

24   A.   Correct.

25   Q.   The standard operating procedures regarding conducting an

Pesavento - direct by Safer

854

 1   immediate follow-up investigation at the scene of a serious

 2   crime, we looked at Plaintiff's Exhibit 5, 8.4.

 3            MR. SAFER:  If we could look at 8.4(D) of Plaintiff's

 4   Exhibit 5.

 5   BY MR. SAFER:

 6   Q.  That says that detectives will obtain the assistance of

 7   appropriate support units, such as the crime laboratory

 8   division.

 9            Do you see that, sir?

10   A.  Yes, I do.

11   Q.  You have called on the crime laboratory division to do

12   testing in many of your cases, correct?

13   A.  I assume I did, yes.

14   Q.  And that crime laboratory division, they would -- are the

15   ones that would do the blood analyses, right?

16   A.  Correct.

17   Q.  They would do the DNA analyses, right?

18   A.  I think that's what they did, yes.

19   Q.  And they would do the fingerprint analyses, right?

20   A.  Yes.

21   Q.  But you didn't call on them to do any of that in this

22   case, right?

23   A.  That's correct.

24   Q.  Now, Clifford Frazier brought a 9 -- so now we're -- I'm

25   done for the moment with that gun that he brought into J&J's.

Pesavento - direct by Safer

855

1      He also brought a 9mm gun to this drug deal, right?

2    A.   I believe so, yes.

3    Q.   And that was the same caliber of gun that was used at the

4    murder scene, right?

5    A.   Yes.

6    Q.   And, in fact, on the night of the murders, Clifford

7    Frazier talked about -- you know, gave a very specific detail

8    about the gun that he says the assailant had.  To refresh your

9    recollection, we'll look at Plaintiff's Exhibit 86.

10      Clifford Frazier said that the gun he wrestled away

11   from the assailant was a 9mm gun that looked just like the

12   MAC-11 gun that he had in his car, right?

13   A.   Yes.

14   Q.   And that's a very specific description, isn't it?

15   A.   Somewhat, yes.

16   Q.   More specific than the description he gave of the

17   assailant, right?

18   A.   Yes.

19   Q.   Okay.  Now, I'm going to ask you about Officer Barbara

20   Temple's report, that she did at the preliminary -- the --

21   what do you call it? -- the initial report in her preliminary

22   investigation.

23      You were familiar with the Chicago Police

24   Department's preliminary investigations policy at the time of

25   the investigation, right?

Pesavento - direct by Safer

856

1   A.  Yes.

2   Q.  And you knew that according to that policy, it was the

3   detectives division's responsibility for the follow-up

4   investigation after the preliminary investigation was

5   complete, right?

6   A.  Yes.

7   Q.  And to conduct the follow-up investigation, you'd need to

8   know the information gathered in the preliminary

9   investigation?

10  A.  Yes.

11  Q.  You reviewed Officer Temple's report of her preliminary

12  investigation at J&J's the night of these crimes.

13          MR. SAFER:  That is in evidence, Your Honor.

14  Plaintiff's Exhibit 24, if we may publish.

15          THE COURT:  Absolutely.

16          MR. SAFER:  Thank you.

17  BY MR. SAFER:

18  Q.  You reviewed Officer Temple's report, which is Plaintiff's

19  Exhibit 24, of her preliminary investigation at J&J's shortly

20  after it was written, right?

21  A.  I assume I did, yes.

22  Q.  You know, if that report -- if you hadn't gotten that

23  report, if it wasn't in the case file, you knew to ask for it,

24  right?

25  A.  Yes.

Pesavento - direct by Safer

857

1    Q.   And you are familiar with general offense case reports,

2    right?

3    A.   Yes.

4    Q.   It is filled out initially in a violent crimes matter as

5    part of the preliminary investigation?

6    A.   Yes.

7    Q.   The form is supposed to identify eyewitnesses on the scene

8    when a patrol officer arrives?

9    A.   Yes.

10   Q.   And that's important information for any detective who is

11   interested in solving the crime, right?

12   A.   Yes.

13   Q.   So you would review the general offense reports at the

14   beginning of your investigation, correct?

15   A.   Yes, if it's -- if it's been prepared already.

16   Q.   Yes.  And this -- this was prepared on January 29th, if we

17   look at the very bottom, at 23 -- at 11:30 at night, right?

18   A.   Yes.

19   Q.   Okay.  And your -- your name and badge number is on this

20   report, right?

21   A.   I don't see it, no.

22   Q.   Okay.  We'll show it to you.

23   A.   Oh, yes, up there.

24   Q.   That's your name and badge number --

25   A.   Yes.

Pesavento - direct by Safer

858

1   Q.   -- correct?

2           Okay.  Now, let's talk for a moment about what you

3   chose not to do in your investigation.  You were a detective

4   for 23 years all in, right?

5   A.   Yes.

6   Q.   And in 1994, you had been a detective for 14 years?

7   A.   Yes.

8   Q.   You investigated many crimes?

9   A.   Yes, they weren't all in -- I spent about six years in the

10  auto theft unit.

11  Q.   But you still investigated many crimes, correct?

12  A.   Yes.

13  Q.   And many murders, right?

14  A.   Yes.

15  Q.   Two items, motive and opportunity, are important to

16  virtually all investigations, correct?

17  A.   To a certain extent they are, yeah.

18  Q.   Well, you want to know why a person might have committed a

19  crime and whether they had the opportunity to commit the

20  crime, right?

21  A.   Yes.

22  Q.   Motive was relevant to this investigation, wasn't it?

23  A.   Yes.

24  Q.   The murder related to a drug deal, correct?

25  A.   Yes.

Pesavento - direct by Safer

859

1   Q.  A large drug deal?

2   A.  Yes.

3   Q.  Two kilos is a large quantity of cocaine?

4   A.  Yes, it is.

5   Q.  It had a street value of over $200,000?

6           MS. BOUDREAUX:  Objection.  Foundation.

7   BY THE WITNESS:

8   A.  I'm not sure what the street value is.

9           THE COURT:  So overruled.  I took that question to

10  mean you're asking him if that is correct.

11          MR. SAFER:  Yes, Your Honor.

12          THE COURT:  All right.  You can ask him if he knows.

13  BY MR. SAFER:

14  Q.  Have you seen in the police reports that the street value

15  of the cocaine seized was over $200,000?

16  A.  I'm not sure.  I'm not sure if it was that or not.

17  Q.  At any rate, you did -- you did nothing to investigate

18  whether Mr. Bolden was involved in selling drugs in this kind

19  of quantity in this drug deal, did you?

20  A.  You know, investigating one of these things is very

21  complicated.

22  Q.  I appreciate --

23          THE COURT:  Hang on.  Let's let him finish, and then

24  you can ask whatever question you want.

25          Go ahead.

Pesavento - direct by Safer

860

BY THE WITNESS:

A.   You can't pin it down to one thing, and you have to go with what you have at the time.  So was I really interested in finding out whether he was involved in the drug deal?  Yes and no.  It's not -- it's not the -- what we want to do is find out who killed the people, not what their motive -- not so much their motive or how they feel about it or is it right or wrong, no.

BY MR. SAFER:

Q.   Finding somebody who had a motive to commit the crime helps you find who did it, correct?

A.   Sometimes it does.

Q.   You did not even ask anyone if Mr. Bolden was involved in a narcotics deal, did you?

A.   I don't recall.

Q.   At your deposition, Page 201, Line 15 to 17, were you asked this question -- these questions, and did you give this answer:

         "Did you ask anyone if Mr. Bolden was involved in a narcotics deal?

         ANSWER:  I don't recall -- I don't -- I don't recall that, no."

         MS. BOUDREAUX:  Object to not impeaching.

         THE COURT:  The question is whether he recalls him giving that testimony?

Pesavento - direct by Safer

861

1          MR. SAFER:  Yes.

2    BY MR. SAFER:

3    Q.  Did you give -- were you asked that question, and did you

4    give that answer?

5          THE COURT:  So with that understanding, I overrule.

6    BY THE WITNESS:

7    A.  I assume I did.

8    BY MR. SAFER:

9    Q.  You talked to a number of witnesses during this

10   investigation, right?

11   A.  Yes.

12   Q.  The supposed buyer of the drugs was Anthony Williams?

13   A.  Yes.

14   Q.  And you interviewed Anthony Williams three days after the

15   shooting, right?

16   A.  Yes.

17   Q.  You didn't ask him about the drug deal, did you?

18   A.  We were interested in finding out who -- who did the

19   killing.  That's what our main objective was.

20         MR. SAFER:  Your Honor, I move to strike that answer

21   as unresponsive.

22         MS. BOUDREAUX:  Object to that motion.

23         THE COURT:  So the question was:  "You didn't ask him

24   about the drug deal, did you?"

25         So I will grant the motion to strike.  Why don't you

Pesavento - direct by Safer

862

1    reask the question.

2    BY MR. SAFER:

3    Q.  You did not ask Anthony Williams about the drug deal, did

4    you?

5    A.  I honestly don't remember.

6    Q.  Well, looking at --

7            MR. SAFER:  I believe, Your Honor, this is not in

8    evidence yet, but -- so if we could only publish to the

9    witness.

10           THE COURT:  That's fine.

11           MR. SAFER:  Looking at JX9.

12   BY MR. SAFER:

13   Q.  Do you see that?  That is your supplementary report of

14   February 1, 1994, talking about your interview of Anthony

15   Williams.  Do you recognize that?

16   A.  Yes.

17           MR. SAFER:  Your Honor, I'd move into evidence Joint

18   Exhibit 9.

19           THE COURT:  Any objection?

20           MS. BOUDREAUX:  None.

21           THE COURT:  It's admitted.  You can publish to the

22   jury.

23       (Joint Exhibit No. 9 was received in evidence.)

24   BY MR. SAFER:

25   Q.  You wrote your report summarizing your interview with

Pesavento - direct by Safer

863

1    Anthony Williams, right?  This is that report?

2    A.  Yes.

3    Q.  There is nothing in that report at all about your asking

4    him about the drug deal, is there?

5    A.  Probably not.  And I'm just guessing now or looking back

6    on things, I would probably not ask him -- I mean, not only

7    him, but for any case, I'm interested in finding out who did

8    the killing.  I'm not interested in finding out who is dealing

9    drugs.  So I don't want to ask him -- excuse me.  I don't want

10   to ask him a question like that.  I'm afraid it's going to

11   turn him off if I start asking him specific questions about

12   the drug -- the drug deal.

13   Q.  Well, did you check his -- Anthony Williams' phone

14   records?

15   A.  No, I didn't.

16   Q.  That wouldn't turn him off, right?  He wouldn't know about

17   that, would he?

18   A.  Would he?

19   Q.  Yeah.

20   A.  No.

21   Q.  If you subpoenaed his phone records, he wouldn't know

22   that, right?

23   A.  Not that I know of, no.

24   Q.  You are not aware of anyone checking Anthony Williams'

25   phone records, correct?

Pesavento - direct by Safer

864

1    A.   That's correct.

2    Q.   You didn't ask Anthony Williams about what he talked about

3    with Eddie Bolden at the fish store, did you?

4    A.   I guess not.  I didn't.

5    Q.   Now, you have -- understood that phone records could show

6    whether there were -- are connections between people, right?

7    A.   I guess they would, yeah.

8    Q.   You have used phone records in investigations before,

9    correct?

10   A.   No.

11   Q.   You've never used phone records in investigations?

12   A.   I don't think so.

13   Q.   You didn't use them in this investigation, correct?

14   A.   Correct.

15   Q.   Did you do anything at all to investigate whether

16   Mr. Bolden had any communications with Irving Clayton or

17   Derrick Frazier or Clifford Frazier before these shootings?

18   A.   Well, we did -- you mean before the shootings?

19   Q.   Yes.

20   A.   Well, we -- we did -- Mr. Bolden was identified as being

21   the person that beat -- or was in a gun fight with Clifford

22   Frazier and also the person that Clifford Frazier saw his

23   brother leave --

24   Q.   Yeah, we'll get to that.  That's all from Clifford

25   Frazier, correct?

Pesavento - direct by Safer

865

1   A.   Yes.

2   Q.   What I'm asking you is, did you ever get -- did you ever

3   do anything to investigate whether Mr. Bolden had any

4   communications with Irving Clayton or Derrick Frazier or

5   Clifford Frazier before these shootings?

6   A.   No.

7   Q.   By the way, you also did nothing to investigate whether

8   these victims were in a gang, correct?

9   A.   I think that was given to us.

10  Q.   On Page -- did you do anything to investigate whether

11  these victims were in a gang?

12  A.   I don't recall.

13  Q.   Okay.  You don't recall.  And you didn't recall it at your

14  deposition; you don't recall now?

15  A.   I don't recall.

16  Q.   And you don't recall because -- you didn't -- you don't

17  recall, and you wouldn't ask them because that would give you

18  no indication of who shot them, correct?

19        MS. BOUDREAUX:  Object to form.

20        THE COURT:  Why don't you rephrase that question, if

21  you would, please.

22  BY MR. SAFER:

23  Q.   You believe --

24        THE COURT:  Sustained.

25        MR. SAFER:  Thank you, Your Honor.

Pesavento - direct by Safer

866

BY MR. SAFER:

Q.  You believe that ask- -- finding out whether these victims were in a gang would give you no indication of who shot them, right?

A.  Right.

Q.  But when you were seeking an indictment against Mr. Bolden, you told the grand jury something completely different, didn't you?

A.  Yeah, but it's a different situation there, too.  When I'm going back to the -- to -- I don't want to put pressure on people that I'm talking to when I'm trying to solve a crime that would turn them off to talking to me.

Q.  Well, these are, sir, the victims.

A.  I'm sorry, what?

Q.  We're talking about the victims.  The victims are dead.

A.  Yes, yes, I know that.

Q.  So that's not why you didn't investigate that, is it?

A.  I don't know how to answer that.  I don't.

Q.  At the time you placed Mr. Bolden under arrest, you had done absolutely nothing to investigate whether Mr. Bolden had a motive to commit the crimes, right?

A.  Well --

        MS. BOUDREAUX:  Judge, object to motion *in limine*, I think.

        THE COURT:  Overruled.

Pesavento - direct by Safer

867

1    BY THE WITNESS:

2    A.   The motive would have been the drug deal, yeah.

3    BY MR. SAFER:

4    Q.   But you did nothing to investigate whether he had any role

5    in the drug deal, right?

6    A.   We had nothing to go on as far as that goes.

7    Q.   You didn't investigate it, sir.

8              MS. BOUDREAUX:   Objection.   Asked and answered.

9              THE COURT:   Overruled.

10   BY THE WITNESS:

11   A.   Yes.

12   BY MR. SAFER:

13   Q.   Okay.   Now, let's talk about opportunity.

14             If Mr. Bolden was inside J&J's when Clifford Frazier

15   came in, he could not have been the person that shot Clifford

16   Frazier, right?

17   A.   If he was inside there --

18   Q.   Yes --

19   A.   -- yes.

20   Q.   -- that's what I'm saying.

21   A.   Yes.

22   Q.   You agree with that, right?

23   A.   Yes.

24   Q.   And because you learned that the same gun was involved in

25   the murders, if Mr. Bolden was inside J&J's at the time that

Pesavento - direct by Safer

868

1  Clifford Frazier came in, he didn't commit the murders either,

2  correct?

3  A.   That's correct, but we didn't have any information that he

4  was there the entire time.

5  Q.   Okay.  Well, that's not true, is it, sir?

6  A.   No, it is true.

7  Q.   Well, you had testified earlier this morning that Tenesha

8  Gatson told you that --

9  A.   Yes.

10  Q.   -- correct?

11        And --

12  A.   That she saw him in there, yes.

13  Q.   And that he was there the whole time?

14  A.   Yes.

15  Q.   And Mr. Williams told you that, too, correct?  Anthony

16  Williams.

17  A.   Yes, I believe so.

18  Q.   So your investigation revealed that both Tenesha Gatson

19  and Anthony Williams were inside J&J's at the time Clifford

20  Frazier came in and that both of them said that Mr. Bolden was

21  inside J&J's when Clifford Frazier came in, correct?

22  A.   No, they didn't say that he was inside there.

23  Q.   Excuse me?

24  A.   They didn't say that Mr. Bolden was -- was inside.

25  Q.   Yes, Tenesha Gatson told you that Mr. Bolden was inside

Pesavento - direct by Safer

869

1   the J&J restaurant when Mr. Frazier came in, correct?

2   A.   If that's on the -- on the paper, then it's correct.

3   Q.   And so did Anthony Williams, correct?

4   A.   Yes.

5   Q.   You do not know of anything that was done in your

6   investigation to draw the conclusion that either of those two

7   statements to you were inaccurate, right?

8   A.   Correct.

9   Q.   So let's take them one at a time.

10          In JX9, Anthony Williams told you that Mr. Bolden was

11  with them -- with him the entire time, correct?

12  A.   I'm looking here.

13          Well, it says that he -- he saw Clifford Frazier

14  fighting with an individual out in -- in front of his

15  business.

16          MR. SAFER:  Your Honor, if we could publish this,

17  please.  This is in evidence.

18          THE COURT:  Yeah, absolutely.

19          MR. SAFER:  Thank you, Your Honor.

20  BY MR. SAFER:

21  Q.   I'm sorry.  I was distracted, sir.  Do you see where it

22  says Anthony Williams said that while all of this was going

23  on, that Lanier was in J&J Fish?

24  A.   Yes.

25  Q.   And you did nothing to investigate whether what Anthony

Pesavento - direct by Safer

1   Williams told you was the truth, correct?

2   A.  Correct.

3   Q.  Now, at your deposition, you testified that you could not

4   do anything to investigate what Anthony Williams told you

5   about Mr. Bolden being in J&J was accurate.  Is that still

6   your testimony today?

7   A.  I assume so.

8   Q.  So let's discuss whether that is so.

9           As a detective, one of the things you do is -- to

10  test whether a witness is telling the truth is to compare it

11  first to what other witnesses say, right?

12  A.  Yes.

13  Q.  And also to objective evidence, correct?

14  A.  Yes.

15  Q.  And that's why it's important to gather all of the

16  objective evidence, right?

17  A.  Yes.

18  Q.  And all of those things are important in determining

19  whether or not a witness is reliable, right?

20  A.  Yes, except that if they're involved in a dope deal, they

21  don't always give you the exact truth or the truth.

22  Q.  Yeah, that's really important, isn't it, sir?  It's really

23  important.

24  A.  Yes.

25  Q.  That -- when people are involved in a drug deal, they

Pesavento - direct by Safer

871

1   really -- your experience is, they're not very reliable,

2   right?

3   A.  Most of the times, no.

4   Q.  Yeah.

5   A.  Sometimes they are.

6   Q.  Clifford Frazier was involved in a drug deal, correct,

7   sir?

8   A.  Yes.

9   Q.  A big drug deal, right?

10  A.  Yes.

11  Q.  Two automatic weapons, right?

12  A.  Yes.  The one thing about Clifford Frazier, though, is,

13  when he talks to us, he's telling us about his brother and his

14  cousin were -- well, not his cousin, but his brother and his

15  friend were killed.  So this murder means more to him than

16  just any murder that goes on.

17  Q.  We'll talk about Mr. Frazier and what you knew about him

18  at that time, sir, in time.

19          The fact is, he was involved in a huge drug deal,

20  correct?

21  A.  Yes.

22  Q.  Okay.  Now, Tenesha Gatson, as we've discussed -- you

23  know, so -- so now Tenesha Gatson and Anthony Williams have

24  both told you that Eddie Bolden was inside J&J's while

25  Clifford Frazier was outside fighting, right?

Pesavento - direct by Safer

872

1   A.   Yes.

2   Q.   And the standard operating procedures required you to

3   conduct a thorough investigation, correct?

4   A.   Yes.

5   Q.   You received training in conducting a thorough

6   investigation?

7   A.   Yes.

8   Q.   And you had received that training by 1994?

9   A.   That's correct.

10  Q.   You learned that in a thorough investigation, you

11  thoroughly interview the witnesses, right?

12  A.   Yes.

13  Q.   And in order to be thorough, it's important to try to

14  learn if there are any other witnesses, right?

15  A.   Correct.

16  Q.   Now, once you focused on Mr. Bolden as a suspect, you knew

17  that whether he was inside J&J's at the time Clifford Frazier

18  came in was critically important, right?

19  A.   Yes.

20  Q.   Because if he was inside J&J's at the time, he couldn't

21  have committed the crime, right?

22  A.   Yes.

23  Q.   Now, you knew that Edna Williams was inside J&J's while

24  Clifford Frazier -- when Clifford Frazier came in, correct?

25  A.   Correct.

Pesavento - direct by Safer

1    Q.   And you interviewed Edna Williams the night -- we talked

2    about -- the night back at the station, right?

3    A.   Yes.

4    Q.   And you wrote that she didn't really have anything to add,

5    correct?

6    A.   Correct.

7    Q.   Because you were asking her that night, and you were

8    asking all the witnesses, what did you see that happened

9    outside, right?

10   A.   Yes.

11   Q.   You wanted to find out who the perpetrator was who was out

12   on the street, correct?

13   A.   Correct.

14   Q.   And that was the focus of your questions, right?

15   A.   Correct.

16   Q.   Now, when you started to focus on Mr. Bolden, and then you

17   understood that whether or not he was inside the restaurant

18   was critically important at the time that Clifford Frazier

19   came in, did you go back and talk to Edna Williams and ask her

20   whether Mr. Bolden was inside the restaurant at J&J's?

21   A.   Did we go back?  No.

22   Q.   And did you go -- you didn't go back and ask her anything,

23   right?

24   A.   No.

25   Q.   You interviewed Mr. Williams, James Williams, that night.

Pesavento - direct by Safer

874

1    He was inside J&J's when Clifford Frazier came in, correct?

2    A.   I believe so, yes.

3    Q.   And after you focused on Eddie Bolden as a suspect, did

4    you go back to him and ask him who was inside the restaurant

5    at the time Clifford Frazier came in?

6    A.   No.

7    Q.   And is the same true of Maurice Stewart?  You didn't go

8    back and ask him either, did you?

9    A.   Correct.

10   Q.   Now, on Plaintiff's Exhibit 24, Barbara Temple lists Todd

11   Henderson and Octavia Jackson as witnesses.  Do you see that?

12   A.   Yes.

13   Q.   So we -- and she lists Edna Williams as well as a witness,

14   right?

15   A.   Yes.

16   Q.   We've already talked about Edna Williams.

17          Did you ask Octavia Jackson to tell you who was in

18   J&J's when Clifford Frazier came in?

19   A.   I don't recall.

20   Q.   Did you ask Octavia Jackson to describe the people who

21   were in J&J's when Clifford Frazier came in?

22   A.   To describe the people that were in there?

23   Q.   Yeah.  Tell me who was inside the restaurant, what they

24   looked like.

25   A.   No, there were people coming and going and, you know --

Pesavento - direct by Safer

1  Q.  Yeah, but she's there.

2  A.  Yeah.

3  Q.  We know she's there.  Did you ask her who was inside the

4  restaurant at the time Clifford Frazier came in?

5  A.  I don't recall.

6  Q.  The fact is, sir, you never even tried to contact Octavia

7  Jackson, did you?

8  A.  I thought we did, but we couldn't make contact with her.

9  Q.  Did you try?

10  A.  I think we did.

11  Q.  What do you think you did?

12  A.  Went to her house.

13  Q.  You went to her house?

14  A.  No, I'm saying that -- like I said, there were different

15  detectives involved in this thing.  There were different

16  units.  Some of them went out and did some of the -- trying to

17  interview people.

18  Q.  Do you --

19  A.  You're generally not successful with that.

20  Q.  With -- is there anything in the investigative file that

21  indicates that -- that there was an attempted contact with

22  Octavia Jackson?

23  A.  Not that I know of.

24  Q.  Who told you that they tried to contact Octavia Jackson?

25  A.  I don't recall.

Pesavento - direct by Safer

876

1    Q.  The fact is, sir, no one contacted Octavia Jackson from

2    the Chicago Police Department, right?

3    A.  I don't know.

4    Q.  Well, you don't see any witness statement from her, do

5    you?

6    A.  That's -- that's -- that's correct.

7    Q.  Now, how about Todd Henderson; the fact is, you did not

8    interview Todd Henderson either, did you?

9    A.  I assume that's correct.

10   Q.  And you did not try to interview him, did you?

11   A.  I don't recall.

12   Q.  No one on your team interviewed them, did he -- did you?

13   A.  I assume not if there's no paperwork on it.

14   Q.  So after -- after you know that it's critically important

15   to find out whether Mr. Bolden is in the restaurant at the

16   time Clifford Frazier came in and you know that there are at

17   least seven people who you could ask about that, you ask

18   nobody, right?

19   A.  That's correct.

20   Q.  And according to detective division policies at the time,

21   you or someone else on your investigative team should have

22   interviewed these eyewitnesses, Octavia Jackson and Todd

23   Henderson, right?

24   A.  Correct.

25   Q.  Now -- and it's not just at the scene, right?  The

Pesavento - direct by Safer

877

1   standard operating procedures for detectives require that

2   before -- well -- and in fairness, let's put this up on the

3   screen for you, sir, so that you could read along.

4           This is Plaintiff's Exhibit 5, Section 8.8(C).  So

5   that you can see what I'm referring to.

6           THE COURT:  You can publish it to the jury.  Go

7   ahead.

8           MR. SAFER:  Thank you, Your Honor.

9   BY MR. SAFER:

10  Q.  The standard operating procedures require that before

11  calling the assistant state's attorney for Felony Review, the

12  assigned detective will gather and review all available

13  evidence and will determine what additional information is

14  necessary and obtainable to support the felony charge and

15  initiate steps to gather the additional information.

16          Do you see that?

17  A.  Yes.

18  Q.  So after choosing not to interview any of these witnesses

19  who knew -- who you knew were inside J&J's at the time of the

20  shooting, what exactly did you do to investigate whether Eddie

21  Bolden had the opportunity to commit these crimes?

22  A.  Mostly we talked to Clifford Frazier.

23  Q.  Only talked to Clifford Frazier, not mostly, only, right?

24  A.  Not only.  We had talked to other people before that, too,

25  but they --

Pesavento - direct by Safer

1    Q.   Who else told you that Mr. Bolden had an opportunity to

2    commit that crime other than Clifford Frazier?

3    A.   I didn't say that somebody else told us that Mr. Bolden

4    had the opportunity.

5    Q.   So only Mr. Bolden -- only Mr. Frazier told you that

6    Mr. Bolden had the opportunity to commit that crime, correct?

7    A.   Correct.

8    Q.   So you did nothing to investigate whether Eddie Bolden had

9    a motive, and you did nothing besides talk to Clifford Frazier

10   to investigate whether Mr. Bolden had an opportunity to commit

11   this crime, correct?

12   A.   That Mr. Bolden had the opportunity?

13   Q.   Yes.

14   A.   It depends on how you look at it.

15   Q.   Well, how do you look at it, sir?

16   A.   Well, the way I look at it is, when people say that

17   somebody was -- when they told me that somebody was in their

18   restaurant, they didn't keep an eye on them all the time.

19   They weren't staring at them, and they didn't know if they

20   were there all the time.  It takes two seconds to walk outside

21   and do something and come back in.

22   Q.   Is it your testimony, sir, that it would take two

23   seconds --

24   A.   Not two seconds.

25   Q.   -- for somebody to go between half and a mile away to

Pesavento - direct by Safer

1    Minerva to kill two people, run back, come and engage in a gun

2    fight in front of J&J's, shoot Mr. Frazier, pistol-whip him,

3    and then run off the street?  That takes more than a few

4    seconds --

5    A.  Yes.

6    Q.  -- doesn't it, sir?

7    A.  I agree with you, it does -- it takes more than a few

8    seconds.

9    Q.  And despite all of that, sir, Eddie Bolden was the only

10   suspect that you ever investigated; isn't that a fact?

11   A.  True, considering he was the one that I was ID'ed.

12   Q.  Now -- okay.  Well, you didn't investigate anybody else,

13   right?

14   A.  No, but if the evidence points this way (indicating), I

15   don't go this way (indicating), then.  I don't go the opposite

16   way.

17   Q.  Well --

18   A.  Just to have some paperwork.

19   Q.  -- as we've established, sir, the only evidence that

20   pointed this way was Clifford Frazier, correct?

21   A.  Correct.

22   Q.  And you didn't investigate anybody else, did you?

23   A.  That's where the evidence was going.

24   Q.  Sir, did you investigate any other subject?

25   A.  I don't recall, but, yeah, probably not.

Pesavento - direct by Safer

880

1    Q.  Were you asked this question, and did you give this answer

2    at your deposition at Page 203, Line 11:

3              "Other than kind of that general 'it could be

4    anyone,' did you do anything to look at any particular person

5    other than Mr. Bolden?

6              "ANSWER:  No, I don't -- I don't believe so."

7    A.  Right.

8    Q.  That's the truth, isn't it, sir?

9    A.  Yes.

10   Q.  Okay.  New topic.

11             THE COURT:  That sounds like a good opportunity for a

12   break.  I have been keeping an eye on the clock.  It sounded

13   to me like you were wrapping up this topic.

14             Folks, it's time for our midmorning break.  I'm going

15   to try to be timely in general and break at about 10:45.

16   Because we were handling a housekeeping matter, we started at

17   9:40 this morning.  That was the reason for a little bit later

18   break.  We adjusted it back for ten minutes.

19             We're going to take a ten-minute break.  I'll say the

20   same thing to you now I'm going to say throughout the trial.

21   Don't talk about this case with anyone, even each other, and

22   keep an open mind because you haven't heard all the evidence

23   yet.  We'll take ten minutes.

24             THE COURT SECURITY OFFICER:  All rise.

25         (Jury out.)

Pesavento - direct by Safer

1        THE COURT:  All right, folks, 30 seconds of

2  housekeeping, and I'll let you take a break.

3        For publishing exhibits, just to speed things along

4  for you folks, if it's already been admitted into evidence,

5  you can just ask the technician to pull it up and just say

6  it's been admitted into evidence.  That will be nice and

7  smooth.

8        And I can proactively say -- whenever you folks offer

9  something to be admitted into evidence, I'll just say, "It's

10  admitted.  You can publish it to the jury," that way you

11  don't -- it saves you one question, but that saves us some

12  time if it's one question.  So I'll go ahead and do that.  But

13  I do want to give you folks an opportunity to be fast and

14  smooth and all of that with the exhibits.

15        And then the only thing I'll say, and you can take a

16  break, we do have an empty seat here.  It looks like only one

17  member of the trial team is using this seat.  If you'd like --

18  go ahead.

19        MR. HALE:  Mr. Stefanich was going to do that.  He

20  had to run to the office to do some work, but he will be back.

21        THE COURT:  Completely fine.

22        MR. HALE:  We will use the seat.

23        THE COURT:  I just wanted to make sure you folks know

24  you have that opportunity.

25        And is anybody being locked in and out?  It looked

Pesavento - direct by Safer

 1  like at one point today somebody -- or the other day, they

 2  couldn't get in, but --

 3           MR. SAFER:  I think the door locks.

 4           THE COURT:  Okay.  If that's an issue, let me know,

 5  and we'll get a door stop for you folks because I don't want

 6  anybody locked out.  Let's take ten minutes.  Okay?

 7           MR. SAFER:  Thank you, Your Honor.

 8       (Recess taken from 10:59 a.m. until 11:10 a.m.)

 9           THE COURT:  We'll go on the record for 30 seconds.

10           On the point about the motion *in limine*, I was -- my

11  opening-the-door sensors were starting to come on a little bit

12  when some of these topics were coming on.  Maybe we can talk

13  about that later.

14           Let me tell you why I denied that motion, and if you

15  want to raise it later, you can.  But I understood the

16  question to be did you investigate motive, not did he have a

17  motive.  So there is a difference as I heard it between an

18  investigation of motive and a fact of motive.

19           Now, I'm doing this in realtime listening and doing

20  the best I can.  But that was the reason for my ruling.  If

21  there's something else you want to take -- excuse me -- talk

22  about later, we can.  I encourage obviously the plaintiff's

23  side to be careful and mindful of this, as I'm sure you

24  obviously are.  But I just wanted to put on the record the

25  reason for my denial on that.  If there's something else you

Pesavento - direct by Safer

1    want to say on that later, you can.  The jury is coming down,

2    so -- go ahead.

3              MS. BOUDREAUX:  We would like to talk about that

4    later.

5              THE COURT:  Okay.  Very good.

6              Anything else from your end?

7              MR. SAFER:  (Nonverbal response.)

8         (Jury in.)

9              THE COURT SECURITY OFFICER:  All rise.

10             THE COURT:  All right.  Welcome back, everybody.

11   Have a seat, please.

12             Counsel, whenever you're ready.

13             MR. SAFER:  Thank you, Your Honor.

14   BY MR. SAFER:

15   Q.  Mr. Pesavento, let's talk about the state of the evidence

16   before the lineup.

17             So just to orient you, you arrested Mr. Bolden on

18   February 26th, 1994; is that right?

19   A.  That's correct.

20   Q.  Officer Oliver was one of the arresting officers, correct?

21             Would you like to look --

22   A.  You know, he -- he was part of the entire team, you might

23   call it.  Was he there at the time?  I'm not sure.  Was he --

24   Q.  You've listed him in your report as one of the arresting

25   officers?

Pesavento - direct by Safer

1    A.   Yeah, we would list him.

2    Q.   Okay.

3    A.   But it doesn't necessarily mean that he was right there at

4    the time.

5    Q.   Okay.  Let's -- now, let's talk about the state of the

6    evidence on -- on that morning before the lineup.

7         You had no physical evidence that Mr. Bolden

8    committed this crime, correct?

9    A.   That is correct.

10   Q.   You had no evidence that Mr. Bolden owned or had a weapon

11   at all during that time period?

12   A.   No.

13   Q.   You had no evidence that Mr. Bolden had clothes that

14   matched what Mr. Frazier had described on his attacker on the

15   day of the shooting?

16   A.   I'm sorry, what?

17   Q.   You had no evidence that Mr. Bolden had clothes that

18   matched the clothes that Mr. Frazier described the day of

19   that --

20   A.   That's correct.

21   Q.   You had no evidence that Mr. Bolden had clothes that

22   matched what Lee Williams said he saw on the man who left the

23   backseat of the murder car?

24   A.   That's correct.

25   Q.   You have no physical evidence of any kind that linked

Pesavento - direct by Safer

885

1    Mr. Bolden to this crime, correct?

2    A.  Correct.

3    Q.  And you had no forensic evidence that linked Mr. Bolden to

4    these crimes, correct?

5    A.  That's correct.

6    Q.  You did have forensic evidence that linked the two crime

7    scenes, but no forensic evidence that linked Mr. Bolden to the

8    crime, correct?

9    A.  Correct.

10   Q.  There were no fingerprints of Mr. Bolden inside the murder

11   car?

12   A.  That's correct.

13   Q.  There is no DNA of Mr. Bolden inside the murder car?

14   A.  Yes, that's correct.

15   Q.  There's no fingerprints of Mr. Bolden outside the murder

16   car?

17   A.  That's correct.

18   Q.  And -- or anyone?  They couldn't find fingerprints,

19   right --

20   A.  Yes.

21   Q.  -- because it had rained?

22          No DNA of Mr. Bolden outside the murder car?

23   A.  That's correct.

24   Q.  No DNA from Mr. Bolden on either of the murdered men?

25   A.  Correct.

Pesavento - direct by Safer

886

1   Q.   No hair fibers from Mr. Bolden in the car?

2   A.   Correct.

3   Q.   No hair fibers --

4           MS. BOUDREAUX:  I'm going to object to the form of

5   these questions.

6           THE COURT:  I think he's shorthanding it.

7           Do you mean did you have -- why don't you ask the

8   full question --

9           MR. SAFER:  Okay.

10          THE COURT:  -- so you have a clean record.  Go ahead.

11          MR. SAFER:  Thank you.

12  BY MR. SAFER:

13  Q.   At the time -- you know, at the time of Mr. Bolden's

14  arrest, you did not have any hair fibers from Mr. Bolden on

15  the deceased, correct?

16  A.   Correct.

17  Q.   At the time of Mr. Bolden's direct, there were no -- you

18  did not have any fingerprints of Mr. Bolden on Clifford

19  Frazier's gun, correct?

20  A.   Correct.

21  Q.   You -- at the -- I'm sorry.  At the time of his arrest,

22  you did not have any DNA from Mr. Bolden on Mr. Frazier's gun,

23  correct?

24  A.   Correct.

25  Q.   At the time of his arrest, you did not have any DNA from

Pesavento - direct by Safer

1    Mr. Bolden on Mr. Frazier's clothes, correct?

2    A.   Correct.

3    Q.   And you had no information that Derrick Frazier or Irving

4    Clayton or Clifford Frazier had ever communicated with Eddie

5    Bolden before January 29th, 1994, correct?

6    A.   Correct.

7    Q.   Okay.  So you know that under the United States

8    Constitution, you need to have evidence that adds up to

9    probable cause that a person has committed a crime, correct,

10   before you can arrest them?

11   A.   Correct.

12   Q.   And whoever committed these crimes was extremely violent,

13   right?

14   A.   I'm sorry, could you -- could you repeat that.

15   Q.   Well, you felt a sense of urgency about this

16   investigation, right?  You told us earlier you didn't -- you

17   know, you didn't want to wait, correct?

18   A.   No.  We didn't have a sense of urgency, no.

19   Q.   Wasn't it important to you to try to get that person who

20   committed these crimes off the street?

21   A.   Yes, it was important.

22   Q.   And you didn't want to let a violent person stay on the

23   streets for a single day longer than necessary, right?

24   A.   Correct.

25   Q.   So as soon as you believed you had probable cause, you

Pesavento - direct by Safer

888

1    arrested him, right?

2    A.   Yes.

3    Q.   And that was on February 26th, 1994?

4    A.   Yes.

5    Q.   After the lineup?

6    A.   Correct.

7    Q.   Now, let's talk for a few minutes about what you knew

8    about Clifford Frazier when you arrested Mr. Bolden.  You knew

9    there was lots of evidence that Clifford Frazier had committed

10   a whole host of crimes leading -- both leading up to and on

11   the day of the shootings, correct?

12   A.   I'm not aware of what his past record was.

13   Q.   I'm not talking about his past record.  I'm just talking

14   about you knew he was -- we've established he was involved in

15   a multi-kilogram drug deal that night, right?

16   A.   Yes.

17   Q.   And that's a crime, correct?

18   A.   Correct.

19   Q.   Attempting -- and attempting to sell 2 kilos of drugs is a

20   serious felony, right?

21   A.   Yes.

22   Q.   It violates state law, correct?

23   A.   Correct.

24   Q.   It violates federal law?

25   A.   Yes.

Pesavento - direct by Safer

889

1    Q.   And that crime alone could have landed Clifford Frazier in

2    jail for many years, correct?

3    A.   Correct.

4    Q.   Clifford Frazier had two automatic weapons with him,

5    correct?

6    A.   Correct.

7    Q.   At that time, it was illegal for anybody to carry any

8    weapon in Chicago -- any handgun in Chicago, correct?

9    A.   I believe so at that time, yeah.

10   Q.   But an automatic weapon was illegal, correct?

11   A.   Yes.

12   Q.   So -- and it's a far more serious crime to carry a weapon

13   in furtherance of a drug deal, right?

14   A.   Correct.

15   Q.   Those are state crimes, correct?

16   A.   Yes.

17   Q.   Those are federal crimes, correct?

18   A.   I believe so, yes.

19   Q.   For the guns, there is a federal mandatory five-year

20   consecutive sentence to any other sentence, correct?

21   A.   I don't know.

22   Q.   Well, you know that he would have been in jail for a long

23   time if he were arrested and convicted of those crimes,

24   correct?

25   A.   Yes.

Pesavento - direct by Safer

1    Q.  And Clifford Frazier fired every bullet that was in one of

2    those guns in a city -- on a city street, correct, or so he

3    said?

4    A.  Correct.

5    Q.  And you had absolute proof that he had committed every one

6    of those crimes, right?

7    A.  He had committed every one of what crimes?

8    Q.  Of those crimes that we just discussed.

9    A.  Oh.  Yes.

10   Q.  You had the guns that Clifford Frazier brought to the drug

11   deals, right?

12   A.  Yes.

13   Q.  You found the drugs he was trying to sell?

14   A.  Yes.

15   Q.  And having been caught red-handed, Clifford Frazier

16   confessed to other felonies, correct?

17   A.  I don't recall.

18   Q.  Well, he said that there was another stash of drugs in his

19   house, right?

20   A.  Yes, I wasn't involved in that part of it.

21   Q.  But you know that he said that, correct?

22   A.  Yes.

23   Q.  And you know that those drugs were recovered, right?

24   A.  Correct.

25   Q.  And he said that he had 30 other guns in his house,

Pesavento - direct by Safer

891

1   correct?

2   A.  I'm not sure whether that was it.

3   Q.  At any rate -- yeah, so he -- and he could have been --

4   so, again, it is a felony to store drugs and guns for

5   distribution, correct?

6   A.  I believe so, yes.

7   Q.  So -- and, Detective, you never arrested Clifford Frazier

8   for a single one of these crimes, did you?

9   A.  Correct.

10  Q.  You never referred Clifford Frazier to a narcotics officer

11  for any of these crimes, did you?

12  A.  They were involved in it already.

13  Q.  Did you -- did you see to it that Clifford Frazier was

14  arrested for any of these crimes?

15  A.  Did I see to it?

16  Q.  Yes.

17  A.  No.

18  Q.  Did you request that a state's attorney review charges

19  against Clifford Frazier?

20  A.  No, I didn't.

21  Q.  Detectives initiate charges, right?

22          MS. BOUDREAUX:  Object to form.

23          THE COURT:  Overruled.

24  BY THE WITNESS:

25  A.  Yeah, generally.

Pesavento - direct by Safer

892

BY MR. SAFER:

Q.   The assistant state's attorney doesn't investigate crimes,

right?

A.   Correct.

Q.   So you -- detectives investigate the crime, correct?

A.   Yes.

Q.   And you propose charges and then call on them to review

them, correct?

A.   Yes.

Q.   But you have to initiate this process or nobody is

arrested and nobody is prosecuted, right?

A.   Correct.

Q.   And that's what happened here.  You -- now, you know that

drug dealing is not a victimless crime, right?

A.   Correct.

Q.   At the time you were relying on Clifford Frazier as a

witness in this case, as the witness in this case, you were

well aware of the havoc that drugs were bringing on the South

Side of Chicago, correct?

A.   Yes.

Q.   But you chose to leave him out on the streets, didn't you?

A.   Correct.

Q.   Well, you could have arrested him at any time during this

investigation, correct?

A.   I'm not sure.

Pesavento - direct by Safer

893

1   Q.  Well, he told you, or he told somebody, a police officer,

2   that he was involved as acting security for a 2-kilo drug deal

3   on --

4   A.  Yes.

5   Q.  -- January 29th, right?

6   A.  Yes, he did.

7   Q.  So you could have arrested him for that crime that night,

8   correct?

9   A.  Correct.

10  Q.  And any time thereafter until the statute of limitations

11  ran, right?

12  A.  Correct.

13  Q.  You could have arrested him before he testified at Eddie's

14  trial, correct?

15  A.  Correct.

16  Q.  And you knew that he knew that, right?

17  A.  I don't know what he knew.

18  Q.  Well --

19  A.  Well --

20  Q.  -- you know, sir, that he knew that he committed these

21  crimes and that you had the power to put him in jail for

22  years?

23  A.  Did I know that he knew that?

24  Q.  Yes.

25  A.  I don't know if he knew that.

Pesavento - direct by Safer

894

1  Q.  Oh, yes.  So, now, Clifford Frazier was the -- I think

2  we've established that Clifford Frazier was the only witness

3  in your investigation who committed the shootings of the

4  murder that happened on January 29th, right?  He is the only

5  eyewitness you know of, correct?

6  A.  Right.

7  Q.  You heard the opening statements in court here yesterday,

8  didn't you?

9  A.  Yes.

10  Q.  Okay.  Now -- and you are familiar with what Clifford

11  Frazier said to the police, to -- that is in your

12  supplementary report, right?

13  A.  Yes.

14  Q.  And whether Clifford Frazier was telling the truth was

15  really important to you, wasn't it?

16  A.  Of course, yes.

17  Q.  Okay.  Now, let's talk about -- he -- Clifford Frazier

18  talked to Officer Baker while he was at the hospital, correct?

19  A.  Correct.

20        MR. SAFER:  And if we could look at Plaintiff's

21  Exhibit 86, which has been admitted into evidence.

22  BY MR. SAFER:

23  Q.  You have in your supplementary report that that is from

24  Detective Baker's interview of Clifford Frazier, correct?

25  A.  Yes.

Pesavento - direct by Safer

1    Q.  And Clifford Frazier told Detective Baker that he, Irving

2    Clayton, and his brother arrived at Cottage Grove.

3         Do you recall that?

4    A.  Yeah.  Yes.

5    Q.  And that his brother gave him two guns and told him to

6    shoot anyone who came by the car with the drugs, right?

7    A.  Correct.

8    Q.  And then Clifford Frazier told Detective Baker that

9    Derrick Frazier and Irving Clayton went into J&J's, right?

10   A.  Yes.

11   Q.  He did not tell Detective Baker that he went into J&J's,

12   right?

13   A.  That he, Clifford Frazier?

14   Q.  Yes.

15   A.  Right.

16   Q.  So two people went into J&J's according to Clifford

17   Frazier's statement:  Irving Clayton and Derrick Frazier --

18   A.  Yes.

19   Q.  -- right?

20   A.  Yes.

21   Q.  So when -- counsel said once the men arrived at the J&J

22   Fish, all three of them went in.  There they met with Ant.

23   Ant took one look at Clifford and saw Clifford had a gun and

24   said to him, no, you've got to get out of here with the gun on

25   you.  Clifford Frazier didn't say anything like that, did he?

Pesavento - direct by Safer

896

 1              MS. BOUDREAUX:  Object to form.

 2              THE COURT:  Can you rephrase that question, Counsel,

 3    if you don't mind, please.

 4              MR. SAFER:  Can I reference the predicate,

 5    Your Honor?

 6              THE COURT:  Sure.  Go ahead.

 7    BY MR. SAFER:

 8    Q.  So Clifford Frazier did not say that to Detective Baker,

 9    did he?

10              MS. BOUDREAUX:  Objection.  Time.  Time frame.

11              MR. SAFER:  At -- well, okay.  I'll start again,

12    Your Honor.

13              THE COURT:  Go ahead.

14    BY MR. SAFER:

15    Q.  Clifford Frazier never said to any police officer that you

16    know of that he went inside J&J Fish, correct?

17    A.  That Clifford Frazier went in?  Correct, I guess.

18    Q.  At any time, correct?

19    A.  You know, I'm -- there's an awful lot of stuff that's

20    written down here and -- when people were interviewed.  As far

21    as I can recall right now, no, I don't.

22    Q.  Okay.  And then Mr. Frazier said that the -- Derrick

23    Frazier, Irving Clayton, and the third person came out, got

24    into a car, and drove away, correct?

25    A.  Right.

Pesavento - direct by Safer

897

1    Q.  And then Mr. Frazier said after they drove away, he went

2    into Harold's Chicken for the first time, correct?

3    A.  Correct.

4    Q.  He went in there alone, correct?

5    A.  Yes.

6    Q.  So when counsel says, "Derrick, Irving, and Bolden crossed

7    the street and walked into Harold's Chicken where Clifford

8    was," Clifford Frazier didn't say that to you -- or to Officer

9    Baker or any other police officer, right?

10            MS. BOUDREAUX:  Object to form.

11            THE COURT:  The question is if you know, yeah.  Go

12   ahead.

13   BY THE WITNESS:

14   A.  I don't know.

15   BY MR. SAFER:

16   Q.  Well, you -- you are familiar with all of Clifford

17   Frazier's statements, correct?

18   A.  I think I am, yes.

19   Q.  And he didn't say anything like that to a police officer,

20   did he?

21   A.  Not that I can recall right now.

22   Q.  He said he was in Harold's by himself, he purchased some

23   chicken and then went back to his car to eat it, correct?

24   A.  Yes.

25   Q.  So this stuff about him eyeballing Mr. Bolden, he -- in

Pesavento - direct by Safer

1  Harold's Chicken, he never said that to a single police

2  officer during the investigation, did he?

3  A.  Not that I know of, no.

4  Q.  And then he says that -- or your counsel said, "Bolden

5  then got change for a dollar at the counter of Harold's

6  Chicken, and Clifford was steady staring at him the whole

7  time."

8          Mr. Frazier never said anything like that to any

9  police officer during this entire investigation, did he?

10 A.  Not that I know of.

11 Q.  And then -- then he says -- he says that's Lanier, that

12 Clifford Frazier -- or your counsel says that Clifford turns

13 to his brother and says, "Who the hell is this guy?"  And

14 Derrick Frazier says, "That's Lanier.  We're going to count

15 the money," that he names the person.

16          Clifford Frazier never said anything like that to any

17 police officer during this investigation, did he?

18 A.  No, I guess not.

19 Q.  And Mr. Frazier talked to Detective Baker while he was in

20 the hospital, correct?

21 A.  Yes.

22 Q.  He talked to Officer Oliver, correct?

23 A.  I don't know if he talked to Oliver or not.

24 Q.  He talked to Willis, correct?

25 A.  I don't know.  I --

Pesavento - direct by Safer

899

1    Q.  He talked to the state's attorney on the day of

2    Mr. Bolden's arrest?

3    A.  Yes.

4    Q.  He talked to -- and you were present for that, right?

5    A.  Yes.

6    Q.  And he never said at any of those times that he went into

7    J&J's with his brother, did he?

8    A.  I don't recall.

9    Q.  And he never said that these people came into -- at any of

10   those times, never said that he came into Harold's Chicken --

11   that they came into Harold's Chicken with him, did they?

12   A.  I don't recall.

13   Q.  And he never said -- and you would recall this, wouldn't

14   you? -- that his brother told him that it was Lanier?

15   A.  I don't recall.

16   Q.  Wouldn't you recall that, sir?

17          Are you telling these -- are you telling us that you

18   wouldn't remember if your only witness said that he had the

19   person's name?

20   A.  Well, names, they have -- we had Lanier.

21   Q.  No, no, no.

22          THE COURT:  Let him finish his answer.

23          Go ahead.

24   BY THE WITNESS:

25   A.  We had Lanier.  We didn't have Eddie Bolden.

1    BY MR. SAFER:

2    Q.  That's not the question.

3            The question is:  If Clifford Frazier had said that

4    his brother told him in the midst of this drug deal that this

5    person's name is Lanier, that would have been in some report

6    in flashing red lights, correct?

7    A.  I guess so, yes.

8    Q.  And it's -- he never said that, did he?

9    A.  I don't know.  If it's not on the paper, I guess he

10   didn't.

11   Q.  Because if he had said it, it would be in a report,

12   explicitly in there, correct?

13   A.  Correct.

14   Q.  So whatever story was told to this jury, it is completely

15   different than the story that Clifford Frazier told to

16   Officer -- Detective Baker and others during this

17   investigation, correct?

18   A.  I'd have to compare -- compare the notes.  I don't know.

19   Q.  Did you do anything, anything whatsoever, to corroborate

20   the statement that Clifford Frazier gave about what happened

21   the night of January 29th?

22   A.  I don't follow what you're --

23   Q.  Okay.  Did you do anything to corroborate the statement

24   that Clifford Frazier gave about what happened the night of

25   January 29th?  Anything?

Pesavento - direct by Safer

1   A.  You mean the -- oh, gosh.  I don't know.  I'd have to go

2   through all the . . .

3   Q.  Well, let me -- let me ask you, were you asked this

4   question, did you give this answer, Page 194, Line 12:

5           "Did you do anything yourself to corroborate the

6   statement of Clifford Frazier that he gave about the events of

7   January 29th?

8           "ANSWER:  Just that he was there at the scene."

9           Did you give -- were you asked that question, and did

10  you give that answer?

11  A.  I guess I did if it's on the paper there, yes.

12  Q.  So nothing other than that he was there?

13  A.  Correct.

14  Q.  Now, Clifford Frazier told the police officers that he

15  fired all of the bullets in his gun during the gun fight with

16  the assailant, right?

17  A.  Yes.

18  Q.  And you had -- we've discussed that you had the gun that

19  Clifford Frazier said he had, which was a .40-caliber Iberia,

20  right?

21  A.  Yes.

22  Q.  Was there any evidence that Clifford Frazier actually

23  fired that gun where -- when he said he did?

24  A.  I think there was shells around there, spent shells.

25  Q.  There were.  There were lots of shells, right?

Pesavento - direct by Safer

902

1   A.  Yes.

2   Q.  Not a single one of them was fired from a .40-caliber gun,

3   right?

4   A.  I don't recall.

5   Q.  Well, let's look at your report.

6          MR. SAFER:  I think it's 86.  And we should have an

7   inventory.

8          If we keep going.  Oh, wait.  Evidence, there it is.

9   Okay.

10  BY MR. SAFER:

11  Q.  You see that there are three 9mm cartridge cases and then

12  five different 9mm cartridge cases?  Do you see that?

13  A.  Yes.

14         MR. SAFER:  And then we could go to the next page

15  just to show that I don't think there are any other

16  inventory -- there are any other -- yeah, the only next thing

17  is the gun.

18  BY MR. SAFER:

19  Q.  So the only cartridges were 9mm cartridges, correct?

20  A.  Yes.

21  Q.  Well -- so he said that he fired eight bullets from a --

22  what he said he used, the .40-caliber gun, but there are no

23  .40-caliber cartridges out there.  Didn't that strike you as

24  strange, Detective?

25  A.  No, I didn't -- no.

Pesavento - direct by Safer

903

1    Q.  It didn't?  Why not?

2    A.  I'm not familiar with a 9mm and a .40-caliber.

3         Was that it?

4    Q.  Well, you know that a .40-caliber gun has .40-caliber

5    cartridges; a 9mm has 9mm cartridges, right?

6    A.  Yes.

7    Q.  What did you do when you discovered that the physical

8    evidence contradicted what Mr. Frazier said?

9    A.  I don't recall if we did anything.

10   Q.  Okay.  Now, Clifford Frazier told Detective Baker that he

11   wrestled the offender's gun away from him.  That's -- that

12   is -- do you recall that?

13   A.  Yes.

14   Q.  Okay.  And Clifford Frazier told Detective Baker that

15   after he wrestled the gun away, he dropped this gun on the

16   street, right?

17   A.  Yes.

18   Q.  And he said that the gun he wrestled away from him looked

19   like the gun that he had in the car, a MAC 9mm, right?

20   A.  Yes.

21   Q.  And no one ever found that gun, did they?

22   A.  No, not that I know of.

23   Q.  So no physical evidence was found at all to support

24   Clifford Frazier's story about that gun, was there?

25   A.  Yes.

Pesavento - direct by Safer

1   Q.   And which gun belonged to whom was important in figuring

2   out who committed the murders, right?

3   A.   Yes.

4   Q.   If Clifford Frazier ended up with the assailant's gun,

5   isn't it possible that the assailant ended up with Clifford

6   Frazier's 9mm gun?

7   A.   Not according to what we had.

8   Q.   Not according to what Mr. Frazier told you?

9   A.   Correct.

10  Q.   Which is contradicted by the physical evidence?

11  A.   I'm not sure how many guns were out there.

12  Q.   Okay.  Let's take a step back from the guns, and let's

13  think about Mr. Frazier's story for a minute.

14        He says that he sees Anthony Williams, his brother,

15  and Irving Clayton and an unknown person talking in J&J's,

16  right?

17  A.   Yes.

18  Q.   And he says that Anthony Williams is the buyer of the

19  drugs, right?

20  A.   Correct.

21  Q.   And Clifford Frazier says that this unknown person gets in

22  a car with his brother and Ledell Clayton, correct?

23  A.   Yes.

24  Q.   And the unknown person is supposedly connected to this

25  drug deal in some way, right?

Pesavento - direct by Safer

1   A.  We assumed that, yeah.

2   Q.  So Clifford Frazier says that they go off to count the

3   money and that the third person who is connected to this drug

4   deal obviously kills these people, right?

5   A.  Two people, yeah.

6   Q.  Yeah, two people.

7        So -- but they're going off to count the money,

8   that's what Clifford Frazier says, right?

9   A.  Yes.

10  Q.  Did you ask Clifford Frazier -- now, 2 kilos costs a lot

11  of money, right?

12  A.  Yes.

13  Q.  Did you ask Clifford Frazier whether the buyer of these

14  drugs -- whether this guy who they were going off to count the

15  money had anything in his hands?

16  A.  If he had anything in his hand?

17  Q.  Like a briefcase full of money, a sack full of money.

18  A.  We didn't ask him that specifically, no.

19  Q.  Was there any evidence that his story made any sense?  Did

20  you -- did anybody say that this person who supposedly is

21  buying 2 kilos of drugs had a bag or anything else that could

22  hold that much money?

23  A.  No, there was no evidence of that, but it doesn't mean

24  that -- that they had the money with them.  These are all

25  gang-related things.

Pesavento - direct by Safer

906

1    Q.  And then -- well, you didn't do anything to investigate

2    that, did you, sir?

3    A.  Did we search for the money?  Or what?

4    Q.  Yeah, or whether the guy had anything.

5    A.  No.

6    Q.  And then Clifford Frazier says that this unknown person

7    who is connected to Anthony Williams comes back and shoots at

8    him, right?

9    A.  Yes.

10   Q.  So after the person who is associated with Anthony

11   Williams who, according to Clifford Frazier, comes back and

12   tries to kill him, where does Clifford Frazier run to?

13   A.  He runs into the fish store.

14   Q.  And who does he present his gun to?

15   A.  I'm not sure who it was.

16   Q.  Anthony Williams, right?

17   A.  I don't recall that, whether it was Anthony Williams.

18   Q.  That's what Clifford Frazier testifies to, right, that

19   Anthony Williams takes -- he is in that store.  You know he's

20   in that store, right?

21   A.  Yes.

22   Q.  Didn't that strike you as odd that Clifford Frazier is

23   running into Anthony Williams' restaurant when he says that

24   this person connected to Anthony Williams is the one that's

25   shooting at him?

Pesavento - direct by Safer

907

1   A.   There was so much going on there that they -- you know, he

2   said he runs into the store.  I think one account says that

3   he's told to throw the gun on the ground, and he kicks it

4   under a table.  Another account is somebody takes the gun and

5   puts it under the table or machine, yeah.

6   Q.   My point is, sir:  Does the story make any sense that he

7   runs into Anthony Williams' place of business?

8   A.   No.

9   Q.   And there's a pool hall right there, correct?

10  A.   I think so, yes.

11  Q.   And he had -- right across the street is his car with a

12  9mm gun, right?

13  A.   Correct.

14  Q.   And Harold's is right across the street, correct?

15  A.   Correct.

16  Q.   Did you ask Mr. Frazier about this?  Did you ask him, wait

17  a minute, you're telling me that this guy who is connected to

18  Anthony Williams is supposedly the guy that killed you, but

19  you ran into Anthony Williams' restaurant?  Did you ask him

20  about that?

21  A.   No.  He was shot twice, and I think he needed help real

22  quick.  He went to the closest probably --

23  Q.   He ran, right, he ran in there?

24  A.   Shot in the back and the leg.

25  Q.   But he ran into the store.  He could've run the ten yards

Pesavento - direct by Safer

1    across the street, right?

2    A.  You have to ask him that, then.

3    Q.  But you -- my point in all of this is, you didn't -- you

4    didn't ask him, did you?

5    A.  No.  Specifically that, no.  No.

6    Q.  Now, if we look at your report on 86, he says that -- he

7    related -- let's see.  He goes into J&J Fish.  "He related he

8    did so and a male black with a dark complexion kicked the gun

9    under the table."  Do you see that?

10   A.  I see where he talks about the male black -- or somebody

11   kicking a gun under a table.

12   Q.  He didn't say that it was Anthony Williams, right?

13   A.  No, he didn't say that.

14   Q.  He didn't say that it was the drug buyer, right?

15   A.  Correct.

16   Q.  He didn't say that it was the person he saw talking to his

17   brother, correct?

18   A.  Correct.

19   Q.  And he told Officer Williams that it was David McCray who

20   took his gun and he went into J&J's, right?

21   A.  He went and talked to Officer Williams?

22   Q.  Willis.

23   A.  Willis.  I don't know.

24   Q.  Did you ask Clifford Frazier why he didn't identify

25   Anthony Williams when he talked to the police?

Pesavento - direct by Safer

909

1   A.   No.

2   Q.   Now, sir, you understood the stakes involved in this

3   investigation, didn't you?

4   A.   Of course.

5   Q.   You understood that whoever you arrested in these murders

6   was eligible to receive a life sentence, correct?

7   A.   Correct.

8   Q.   So before you arrested Mr. Bolden for a crime that carried

9   a life sentence, you knew that Clifford Frazier was a drug

10  dealer, correct?

11  A.   Correct.

12  Q.   And before you arrested Eddie Bolden for these crimes,

13  your experience had taught you that drug dealers often lie to

14  cover themselves, correct?

15  A.   Correct.

16  Q.   And before you arrested Eddie Bolden, you knew that there

17  were real problems with his stories, at least the ones we just

18  discussed, correct?

19  A.   Correct.

20  Q.   And you did not do a single thing to corroborate any of

21  Clifford Frazier's statements about what happened on

22  January 29th except that he was present at the scene, correct?

23  A.   Correct.

24  Q.   Okay.

25  A.   But that's what we're faced with, though.

Pesavento - direct by Safer

1   Q.   Okay.  Now, let's talk about the lineup.  Before the

2   lineup, you -- way before the lineup, I think a couple of

3   weeks before the lineup, you showed Clifford Frazier a group

4   of photographs that included Eddie Bolden, right?

5   A.   You know, Eddie Bolden's picture was in there, but

6   Clifford Frazier didn't even -- he said, no, I've got to see

7   the person -- or I have to see the man in person.  He didn't

8   even look at them.

9   Q.   That was on February 3rd, 1994?

10  A.   I'm not sure what day it was.

11  Q.   Did you record in your report that he didn't look at the

12  photographs?

13  A.   Barely looked at them.

14  Q.   What you recorded was he said he could not identify anyone

15  from the photographs, right?

16  A.   Right, meaning --

17  Q.   And -- and that's fair that he --

18          THE COURT:  Sorry, Counsel.  He was still talking.

19  So let's --

20          MR. SAFER:  Oh, sorry.

21          THE COURT:  Go ahead.

22  BY THE WITNESS:

23  A.   Meaning that he -- he couldn't -- he wanted to see the

24  person in person --

25  BY MR. SAFER:

Pesavento - direct by Safer

1   Q.   Right.

2   A.   -- not by looking at pictures, not that he couldn't

3   identify a picture.

4   Q.   Right.  And hard to identify people from pictures at

5   times, correct?

6   A.   I'm sorry?

7   Q.   It's difficult.

8   A.   Oh, yes.

9   Q.   Now, before February 26, 1994, you had received training

10  on how to avoid tainting lineups, correct?

11  A.   Yes.

12  Q.   And lineups are really important, aren't they?

13  A.   Yes.

14  Q.   Most of the training that you received was common sense?

15  A.   Correct.

16  Q.   You know, don't point anything out to the witness,

17  correct?

18  A.   Yes.

19  Q.   Don't allow the witness to see the suspect before the

20  lineup?

21  A.   Correct.

22  Q.   Find people who are about the same age, height, weight,

23  and other physical characteristics?

24  A.   Yes.

25  Q.   Don't tell the witness that you believe the suspect was in

Pesavento - direct by Safer

1    the lineup?

2    A.   Correct.

3    Q.   And you were trained on all of those things, correct?

4    A.   Yes.

5    Q.   You were involved in arranging for the fillers for the

6    lineup with Mr. Bolden, right?

7    A.   Yes.

8    Q.   And that -- that's a very important part of the lineup, to

9    get those fillers, right?

10   A.   Yes.

11   Q.   And fillers are the people in the lineup who will stand

12   with the suspect who are not the suspect, right?

13   A.   That's correct.

14   Q.   And there are procedures in the general order that address

15   the selection of the right fillers, correct?

16   A.   I think there are.  I can't recall what they are exactly.

17           MR. SAFER:  Plaintiff's Exhibit 13.  I don't know if

18   that's in evidence, but, Your Honor, could we look at that

19   just with the witness for the moment?

20           THE COURT:  Yes, absolutely.

21   BY MR. SAFER:

22   Q.   So we're going to show you -- that's Plaintiff's

23   Exhibit 13.

24           MR. SAFER:  And if we could look at that at the very

25   top, Jim, please.  That is -- thank you.

Pesavento - direct by Safer

913

1    BY MR. SAFER:

2    Q.  That's the general order of the -- of the lineup

3    procedures.  Do you see that?

4    A.  Yes.

5    Q.  And you're familiar with that general order, correct?

6    A.  Yes.

7            MR. SAFER:  All right.  Your Honor, I move

8    Plaintiff's Exhibit 13 into evidence.

9            THE COURT:  Any objection?

10           MS. BOUDREAUX:  Only subject to the objections we

11   made earlier, but --

12           THE COURT:  It is admitted.  So overruled, as

13   previously stated.

14           You can publish to the jury.

15           MR. SAFER:  Thank you, Your Honor.

16      (Plaintiff's Exhibit No. 13 was received in evidence.)

17   BY MR. SAFER:

18   Q.  If we look at Section G, with regard to the -- that talks

19   about the fillers, and it talks about -- to some extent, about

20   what happens when there are two suspects, but it confirms your

21   training and common sense that the fillers have to have the

22   same general physical characteristics as the subjects, like

23   weight, height, skin color, and the rest, correct?

24   A.  Correct.

25           MR. SAFER:  Okay.  Now, if we could look at Joint

Pesavento - direct by Safer

914

1   Exhibit 12, Your Honor.  And I'd move Joint Exhibit 12 into

2   evidence.

3          THE COURT:  Any -- I'm sorry.  Go ahead, Counsel.

4   Finish, please.

5          MR. SAFER:  I thought there was no objection,

6   Your Honor.

7          THE COURT:  Any objection?

8          MS. BOUDREAUX:  No.

9          THE COURT:  I'll go ahead and admit it.  You can

10  publish it.

11      (Joint Exhibit No. 12 was received in evidence.)

12  BY MR. SAFER:

13  Q.  Do you recognize Joint Trial Exhibit 12 as the report that

14  Detective Siwek wrote about the lineup?

15  A.  Yes.

16  Q.  And the persons conducting the lineup are you, Detective

17  Karl, and Detective Siwek, correct?

18  A.  Yes.

19  Q.  And then on the next page, it says the heights and weights

20  of all of the people?

21  A.  Yes.

22  Q.  Now, the person viewing the lineup, Mr. Frazier, he

23  doesn't get that information, right?  Nobody else tells him,

24  hey, here are the heights and weights; he just looks at them,

25  correct?

Pesavento - direct by Safer

915

1   A.  Yes.

2   Q.  But you -- looking at this, No. 1 and No. 3 are five

3   inches shorter than Mr. Bolden, correct?

4   A.  Correct.

5   Q.  Almost half a foot, correct?

6   A.  Yes.

7   Q.  And No. 2 is nine inches shorter, right?

8   A.  Yes.

9   Q.  That's not very close, is it, nine inches?

10  A.  No.

11  Q.  And Mr. Barnes is pretty close, right?  6'4" is pretty

12  close to 6'2", don't you think?

13  A.  Yes.

14  Q.  But Mr. Barnes weighed over a hundred pounds more than

15  Mr. Bolden; is that right?

16  A.  Correct.

17  Q.  So -- now, you said -- or did you recognize that this was

18  an issue, the heights of these people?

19  A.  Yes.

20  Q.  And so when -- what did you do about that?

21  A.  We didn't do a standup lineup.  We had them sit.

22  Q.  Okay.  Now, are you certain that everyone was sitting down

23  the entire time that Clifford Frazier saw them?

24  A.  Yes.

25  Q.  Now, you did a sit-down lineup because you knew that if

Pesavento - direct by Safer

1    you did a standing up lineup, it wouldn't be fair, correct?

2    A.   Correct.

3    Q.   It would be unfairly suggestive of Mr. Bolden, right?

4    A.   Yes.

5            MS. BOUDREAUX:   Object to form.

6            THE COURT:   Overruled.

7    BY MR. SAFER:

8    Q.   And I'm sorry, your answer was "yes," correct?

9    A.   Yes.

10   Q.   Now, the lineup took place on February 26th, 1994, right?

11   A.   Yes.

12   Q.   Mr. Ingles -- you know who Mr. Ingles is, right?

13   A.   Yes, I do.

14   Q.   He's -- he was acting as Eddie Bolden's lawyer that day?

15   A.   Correct.

16   Q.   And he had contacted Detective Karl a little over a week

17   before to set up the lineup?

18   A.   Yeah, it was -- there was a cancellation once or twice.

19   We had to set it up again.

20   Q.   But you had over a week to arrange for this lineup, right?

21   A.   We had -- no, we had -- yes, but we didn't have -- we

22   didn't have -- the people who stood in the lineup, that

23   doesn't mean that they were available.

24   Q.   Well --

25   A.   We had to use whoever was available that day.

Pesavento - direct by Safer

917

1   Q.  And you were not limited to the people who were available

2   to the 5th District lockup, correct?

3   A.  Just about, yes.

4   Q.  Well, were you -- at your deposition, were you asked this

5   question, and did you give this answer at Page 154, Line 12 to

6   Line 14:

7       "QUESTION:  Were you limited to the 5th District

8   lockup?

9       "ANSWER:  I guess not."

10  A.  That's because we had a policeman standing there, too.

11  Q.  Well -- but you could've used -- you could've gotten

12  people from any lockup in this city, couldn't you?

13  A.  I don't know.

14  Q.  You don't know?  I don't understand that.

15      You could have gone to another lockup and asked, hey,

16  I need -- do you have somebody there that's about 6'2", 150?

17  You could've asked that, right?  Nothing stopped you from

18  doing it, did it?

19  A.  Correct.

20  Q.  You could've done the lineup at Cook County Jail if you

21  had wanted to, correct?

22  A.  Possibly.

23  Q.  And there are about --

24  A.  I don't know if Mr. Ingles would have been happy with

25  that.

Pesavento - direct by Safer

1  Q.  You could've asked him, right?  And there are about 8,000

2  people, men, in Cook County Jail, correct?

3  A.  Yeah, they're in prison uniforms.

4  Q.  Well, you could've gotten them clothes, correct?

5  A.  We could've gotten the prisoners clothes?

6  Q.  You could've given them a sweatshirt for the lineup,

7  right?

8  A.  No.

9  Q.  You could have used any lockup in this city, correct?

10  A.  I imagine so.

11  Q.  But you never checked the other lockups, did you?

12  A.  No, part of it was because Mr. Ingles was there, and he

13  wanted to get things going.  They wanted to get it done.  We

14  checked the lockup.  We couldn't do it as far as height goes,

15  so we did it with them sitting down.

16  Q.  Did you say to Mr. Ingles, we'd like to check the other

17  lockups so that we could get appropriate fillers?

18  A.  I don't recall asking him that, no.

19  Q.  You used a police officer, Officer Barnes, as a filler,

20  correct?

21  A.  Correct.

22  Q.  And using Officer Barnes as a filler violated Chicago

23  Police Department policy, didn't it?

24  A.  Not that I was aware of.

25          MR. SAFER:  If we could look back at Plaintiff's

Pesavento - direct by Safer

919

1   Exhibit 13.

2   BY MR. SAFER:

3   Q.  It says, "Police officers should not be used unless other

4   alternatives have been exhausted."

5           Do you see that?

6   A.  Yes.

7   Q.  You didn't exhaust any other alternative, did you?

8   A.  Well, it depends on what you mean by "exhaust."

9   Q.  Did you ask another --

10  A.  Did we go through every other lockup in the city?  No, we

11  didn't.  I admit that.

12  Q.  Did you go through any other lockup in the city?

13  A.  No, we went through the 5th District and Area 2.

14  Q.  In preparation for this lineup, there are -- okay.  So you

15  didn't -- you didn't.

16          Once you decided to use a police officer, did you

17  make any effort in advance of the lineup to find a police

18  officer that was closer in height and weight to Mr. Bolden?

19  A.  We were really limited as far as that goes.

20  Q.  Why?

21  A.  We can't go down to, like, the 5th District or the 22nd

22  District -- those are fairly close -- or the 6th District and

23  tell the watch commander there we want to pick out certain

24  policemen to stand in a lineup, but -- oh, I thought you

25  were --

Pesavento - direct by Safer

1  Q.  I was.  I'm sorry, but I didn't want to interrupt you.

2  A.  Yeah, we can't do that.

3  Q.  You had a week to plan this.  Couldn't you have called?

4  Somebody had said hey, look, call another district and say,

5  hey, look, do you have a police officer who is roughly -- an

6  African-American police officer who is roughly 6'2", 150,

7  160 pounds?

8  A.  And if they're in uniform, then -- I mean, if they did and

9  if their watch commander allowed it.  Would they take them off

10 the street to change his clothes and stand in a lineup?  I

11 don't think so.

12 Q.  You didn't try, did you?

13 A.  No, I didn't.

14 Q.  Mr. Barnes was wearing a white dress shirt, correct?

15 A.  I think so.

16 Q.  And he was wearing black dress pants, correct?

17 A.  Yeah, I think so.

18 Q.  The fact is, Detective, you will agree, he looks just like

19 a police officer, doesn't he?

20 A.  No.

21 Q.  Why didn't you ask him to bring a change of clothes?

22 A.  We did the lineup at the time when Mr. Ingles brought in

23 Clifford Frazier.  Okay.  We didn't -- this wasn't set up days

24 ahead of time or anything.

25 Q.  Well, you had as much time as you needed to set this up,

Pesavento - direct by Safer

921

1    correct?

2    A.   No.

3    Q.   Really?  You couldn't have -- you picked the day, correct?

4    You rescheduled this twice, didn't you?

5    A.   It was -- it was rescheduled once or twice.  I don't know

6    if that was because of us or Mr. Ingles.

7    Q.   Well, you know that lineups are critically important,

8    right?

9    A.   Yes.

10   Q.   So why didn't you take a couple of extra days and get

11   people who looked approximately like Mr. Bolden?

12   A.   I don't follow you.  You mean we should have taken people

13   who are in custody and held them for two or three days or so

14   longer?

15   Q.   Find a police officer, find people who are in lockups

16   anywhere in the city.  Did you do that, sir?

17   A.   No, we didn't.

18   Q.   Okay.  Now, you had shown -- we talked about the photo

19   lineup.  How many people were in both the photo lineup and

20   the -- and the in-person lineup?

21   A.   Five, I believe.

22   Q.   And how many people were in both of them?  In other words,

23   were in the photo array and also in the in-person array.

24   A.   Five.

25   Q.   Was there anybody who was in both?

Pesavento - direct by Safer

1   A.   Yeah, I think all five of them were.

2   Q.   The five people who were in the photo array were not the

3   same five people who were in the lineup, were they?

4   A.   Oh, the photo array?

5   Q.   Yes.

6   A.   Oh, yeah, I'm sorry.  Are you talking about the photo

7   array that I had?  Oh, no, no, no.

8   Q.   Okay.

9   A.   Those were only pictures.

10  Q.   Right.  So we know it's pictures.  How many people were in

11  both the photo array and in the in-person lineup?

12  A.   One.

13  Q.   Who was that?

14  A.   Mr. Bolden.

15  Q.   And there's not a single time in your entire career as a

16  detective where you remember showing a witness a photo lineup

17  containing the suspect and then showing them an in-person

18  lineup with the same suspect; is that correct?

19  A.   I don't recall, no.

20  Q.   Could you describe the second floor of Area 2?

21  A.   I don't know where to start.

22  Q.   Well, it's a big area, right, a big open room?

23  A.   Yes.

24  Q.   With a lot of desks?

25  A.   A lot of desks and a lot of rooms.

Pesavento - direct by Safer

1  Q.  And there were --

2  A.  A lot of doors.

3  Q.  Sorry.  There were very few people up there on Saturday,

4  February 26th, right?

5  A.  I don't recall.  A Saturday is no fewer people than any

6  other day.

7  Q.  Do you recall who was there the morning before Mr. Bolden

8  and his lawyer arrived?

9  A.  No.

10 Q.  Were there any other lawyers on the second floor that

11 morning?

12 A.  Oh, I'm sorry.  Before Mr. Bolden arrived?

13 Q.  (Nonverbal response.)

14 A.  No, not that I know of.

15 Q.  You brought Mr. Bolden and his lawyer up to the second

16 floor?

17 A.  Yes, they -- they came up there.

18 Q.  And what does Mr. Ingles look like -- or what did he look

19 like?  Do you remember?

20 A.  Mr. Ingles?

21 Q.  (Nonverbal response.)

22 A.  It's been a long time.  A little shorter than me, I think,

23 dark hair, not heavy.

24 Q.  Okay.  And at some point before the lineup Mr. Bolden and

25 his attorney, Mr. Ingles, were standing in the open area,

Pesavento - direct by Safer

924

1    weren't they?

2    A.   When they walked in, they were, but we took them back to

3    the conference room.

4    Q.   Weren't they -- weren't they in the open area when

5    Mr. Frazier came by?

6    A.   No.

7    Q.   You would agree that it would be improper to allow a

8    witness to see the suspect standing with his attorney before

9    the witness viewed the suspect in the lineup, right?

10   A.   Yes.

11   Q.   It would be a violation of your training, correct?

12   A.   Correct.

13   Q.   And it would be unfairly suggestive, correct?

14   A.   Right.

15   Q.   Okay.  Now, you told -- Mr. Ingles told you that he wanted

16   to be in the participant room with Mr. Frazier -- or he didn't

17   know his name, but with the witness, correct?

18   A.   Correct.

19   Q.   And he told you that Mr. Bolden would stand in the lineup

20   if he could be in the participant room, correct?

21   A.   I don't know if he said that or not, but I -- I told him

22   that he could be in the room with Mr. Bolden, but he couldn't

23   be in the room with the witness.

24   Q.   And what did he say about that?

25   A.   He said no, he wanted to be in -- with the witness.

Pesavento - direct by Safer

925

1   Q.   And what did you say?

2   A.   I said no.

3   Q.   And was this before the lineup that you said that?

4   A.   Yes.

5   Q.   So it's your testimony that he did not say to you that

6   Mr. Bolden would stand in the lineup only if he could be in

7   the participant room?

8   A.   No.

9   Q.   Okay.  Who was in the room with Mr. Frazier when he viewed

10  the lineup?

11  A.   I was.

12  Q.   Was there anybody else?

13  A.   No.

14  Q.   So the only two people in the world who can tell us what

15  happened in that interview -- in the viewing room during that

16  lineup is Clifford Frazier and you?

17  A.   Correct.

18  Q.   Okay.  Now I'd like to ask you a few questions about your

19  grand jury testimony.

20       In deciding whether you had probable cause to arrest

21  Mr. Bolden, you would only rely on witnesses who you found to

22  be reliable, correct?

23  A.   Correct.

24  Q.   And you had not -- I mean, obviously you wouldn't rely on

25  witnesses who you found to be unreliable, right?

Pesavento - direct by Safer

926

1   A.  Correct.

2   Q.  And you testified before a grand jury that was being asked

3   to consider whether there was probable cause to issue an

4   indictment in the criminal case against Mr. Bolden, right?

5   A.  Yes.

6   Q.  And an indictment is the formal charge, correct?

7   A.  Correct.

8   Q.  If the grand jury doesn't issue an indictment, everything

9   stops, right?

10  A.  Yes.  As far as I know, yeah.

11  Q.  There's no charge, there's no trial, correct?

12  A.  Right.

13  Q.  And you were the only witness who testified before the

14  grand jury, correct?

15  A.  I'm not sure.  I don't remember.

16  Q.  Well, if you look at Plaintiff's Exhibit 153, that's at

17  Tab 2 in your book.  For this question, you might have to look

18  at the tab because -- that's a transcript of your grand jury

19  testimony, isn't it?

20  A.  Yes.

21  Q.  And at the beginning of the transcript, the assistant

22  state's attorney introduces the case, correct?

23  A.  Correct.

24  Q.  And at the end of the transcript, the grand jury returns a

25  true bill, right?

Pesavento - direct by Safer

927

1   A.   Right.

2   Q.   No one else's testimony is reflected here, right?

3   A.   No.

4   Q.   That would indicate to you you're the only witness who

5   testified before the grand jury, correct?

6   A.   As far as I know, yes.

7           MR. SAFER:  Your Honor, I'd move Plaintiff's

8   Exhibit 153 into evidence.

9           THE COURT:  Any objection?

10          MS. BOUDREAUX:  No objection.

11          THE COURT:  It's admitted.  You can publish to the

12  jury.

13          MR. SAFER:  Thank you, Your Honor.

14      (Plaintiff's Exhibit No. 153 was received in evidence.)

15  BY MR. SAFER:

16  Q.   Mr. Pesavento, before you testified before the grand jury,

17  you took an oath, didn't you?

18  A.   Yes.

19  Q.   It was an oath to tell the whole truth, correct?

20  A.   Correct.

21  Q.   And that's the same oath that you took today, isn't it?

22  A.   Yes, it is.

23  Q.   When you testified before the grand jury, you told them

24  that all of the information that you had acquired was from

25  interviewing Clifford Frazier, correct?

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 133 of 172 PageID #:18193
Pesavento - direct by Safer
928

1          MR. SAFER:  If we could look at Page 6, Line 18.

2    BY MR. SAFER:

3    Q.  We popped that up on the screen for you --

4    A.  Oh.

5    Q.  -- if that's better.

6    A.  Yes.

7    Q.  Okay.  Now, at the beginning, you were asked --

8          MR. SAFER:  If we could go to Line 3 -- Page 3, Line

9    22, and start there.

10   BY THE WITNESS:

11   A.  Page 3?

12   BY MR. SAFER:

13   Q.  We'll pop it up.  This might be easier on the screen.

14          So it says, "Did your" --

15          THE TECHNICIAN:  Hang on.  I'm sorry.

16          MR. SAFER:  That's okay.

17   BY MR. SAFER:

18   Q.  It says at the bottom there, "Did your investigation

19   reveal that Derrick Frazier and Ledell Clayton were seen

20   outside of J&J Fish House in the 6400 block of South Cottage

21   Grove by Clifford Frazier, as well as Derrick Frazier and

22   Ledell Clayton were seen with a person by the name of Eddie

23   Bolden?"

24          And you said, "Yes, sir, it did."

25          Do you see that?

Pesavento - direct by Safer

929

1    A.   Yes.

2    Q.   And then you were asked, "And did your investigation

3    reveal that Eddie Bolden went with Derrick Frazier and Ledell

4    Clayton to conduct a drug transaction?"

5                And you said, "Yes."

6                "Did your investigation reveal that approximately 20

7    minutes later, Clifford Frazier saw Eddie Bolden coming back

8    in the location of the vicinity of 6416 -- 15 South Cottage

9    Grove in Chicago?

10               "Yes, sir, it did.

11               "And did your investigation reveal that at some point

12   in time Eddie Bolden was armed?

13               "ANSWER:  Yes.

14               "QUESTION:  And can you tell the ladies and gentlemen

15   of the grand jury, Detective, what Eddie Bolden was armed

16   with?

17               "ANSWER:  He was armed with a 9mm handgun.

18               "QUESTION:  Did your investigation reveal that at

19   that point in time Eddie Bolden shot Clifford Frazier?

20               You said, "Yes, sir, it did."

21               Do you believe that was the whole truth?

22   A.   Yes.

23   Q.   What is your definition, sir, of the whole truth?

24               MS. BOUDREAUX:  Object to form.

25               THE COURT:  Overruled.

Pesavento - direct by Safer

930

1   BY THE WITNESS:

2   A.  What we knew at the time.

3   BY MR. SAFER:

4   Q.  And isn't it to give a complete story about what you're

5   testifying to?

6   A.  No, but the questions are -- are very limiting.  They are

7   limited.  They're -- they don't -- you're not allowed to go on

8   and on about anything.

9   Q.  Right.  You told the grand jury, sir, that Derrick and

10  Ledell Clayton were seen outside of J&J Fish House by Clifford

11  Frazier.  That's what you told them, right?

12  A.  Yes.

13  Q.  You think that was the whole truth?

14  A.  I'm not sure what you're driving at.

15  Q.  Well, from -- the grand jury would have -- from your

16  testimony, would have no idea that Clifford Frazier was there

17  to do a drug deal, right?

18  A.  Correct.

19  Q.  All you told them -- or that he was armed with two

20  automatic weapons, would they?

21  A.  Right.

22  Q.  No one listening to this testimony would know that

23  Clifford Frazier had any involvement with these people,

24  correct?

25  A.  Correct.

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 136 of 172 PageID #:18196
Pesavento - direct by Safer
931

1    Q.   They would think he was an innocent bystander who saw his

2    brother and Irving Clayton then get shot, right?

3    A.   Correct.

4    Q.   That's misleading, isn't it?

5    A.   I'm just answering the questions the way the state's

6    attorneys present it to you.

7    Q.   So, sir, is it your testimony that you cannot tell the

8    whole truth if the questions are not good?

9              MS. BOUDREAUX:  Objection.  Form.  Argumentative.

10             THE COURT:  Overruled.

11   BY THE WITNESS:

12   A.   The way the grand jury is, you're sort of limited as to

13   what you say.  They ask you yes-and-no questions.

14   BY MR. SAFER:

15   Q.   Is it your testimony that -- well, let me start again.

16             You took the oath, correct?

17   A.   Correct.

18   Q.   The state's attorney didn't tell the -- take the oath,

19   right?

20   A.   Correct.

21   Q.   You took the oath.  You had to tell the whole truth,

22   correct?

23   A.   Correct.

24   Q.   And when you left the grand jury with the impression that

25   Clifford Frazier saw these people out on the street and had

Pesavento - direct by Safer

1   nothing to do with the drug deal, that's not the whole truth,

2   is it, sir?

3   A.   Correct.

4   Q.   Now, you told the grand jury that Clifford Frazier

5   identified Eddie Bolden in a lineup, right?

6   A.   Yes.

7   Q.   You had access to the pictures of the lineup, correct?

8   A.   The pictures of the lineup?

9   Q.   The pictures that were taken by the police photographer

10  outside the lineup.

11  A.   Do I have access to them now?

12  Q.   You had them then, correct?

13  A.   Then when --

14  Q.   When you testified before the grand jury.

15  A.   Oh.  I don't know.  Probably.

16  Q.   Did you share those with the grand jury so they could

17  judge whether it was a fair lineup?

18  A.   No.

19  Q.   Now, you testified that your investigation revealed that

20  Eddie Bolden went with Derrick Frazier and Ledell Clayton to

21  conduct a drug transaction.  That's what you testified to,

22  right?

23  A.   Yes.

24  Q.   Did you tell the grand jury that you did nothing to

25  investigate whether Mr. Bolden was involved in a narcotics

Pesavento - direct by Safer

933

1   deal?

2   A.  I don't know how to put that --

3   Q.  Well, did you tell --

4   A.  No, I'm -- go ahead.

5   Q.  Did you tell the grand jury that in fact you did not ask

6   anyone if Mr. Bolden was involved in a narcotics deal?

7   A.  We don't do an investigation when you go to the grand

8   jury.  I mean, you don't go through the whole process.

9   Q.  You told them that your investigation revealed that Eddie

10  Bolden went with Derrick Frazier and Ledell Clayton to conduct

11  a drug transaction.

12          Did you tell the grand jury that you never got --

13  that you never asked anyone if Mr. Bolden was involved in a

14  narcotics deal?

15  A.  I don't recall.

16  Q.  You were asked by a grand juror whether this was a holdup.

17  Do you recall that?

18  A.  I don't recall that question.

19          MR. SAFER:  If we could look at Page 7, Lines 4

20  through 5.

21  BY MR. SAFER:

22  Q.  The grand jurors get to ask questions; is that right, sir?

23  A.  Occasionally they do.  It's very, very rare.

24  Q.  So here, a grand juror asked, "Did this Bolden -- was he

25  holding up these guys or what?"

Pesavento - direct by Safer

934

1      And your answer was:  "No, it was a -- there was a
2  drug transaction that was set up for that night for 2 kilos of
3  cocaine.  The information that we received is that it wasn't
4  actually a rip-off for the drugs, but it was a retaliation
5  because they weren't -- the two people who were killed were
6  not paying their -- what is called a street tax to one of the
7  local gangs there."
8      That was your sworn testimony?
9  A.  Yes.
10 Q.  You didn't tell the grand jury the source of that
11 information, did you?
12 A.  I didn't.
13 Q.  You had told the grand jury that all of your information
14 came from Clifford Frazier, right?
15 A.  Yes.
16 Q.  But that information came from Cynthia Steward, correct?
17 A.  I'm not sure if it was Cynthia Steward.
18 Q.  Who did that information come from?
19 A.  I said I'm not sure if it was her.
20 Q.  Do you know if it was anybody else?
21 A.  No, I don't.
22 Q.  And did you tell the grand jury that you did nothing to
23 investigate this?
24 A.  I don't know.
25 Q.  Well --

Pesavento - direct by Safer

935

1      MR. SAFER:  Do you want to pan out to the page?

2  Thank you, Jim.

3  BY MR. SAFER:

4  Q.  You didn't tell them anything other than that, right?  You

5  did not tell them --

6  A.  Right.

7  Q.  -- that you did nothing to investigate that claim and that

8  you had no idea whether it was accurate?

9  A.  Correct.

10  Q.  Okay.  New topic.

11      Detective Pesavento, you're aware that in 1994 the

12  Chicago Police Department had procedures for officers to

13  report any misconduct by a fellow officer, right?

14  A.  Yes.

15  Q.  And, in fact, the Chicago Police Department policy

16  required you to report misconduct by other officers, right?

17  A.  I believe it does, yes.

18      MR. SAFER:  If we could look, Your Honor, just for

19  the witness for the moment --

20      THE COURT:  Yep.

21      MR. SAFER:  -- at Plaintiff's Exhibit 137.

22      THE COURT:  Totally fine.

23  BY MR. SAFER:

24  Q.  Do you recognize that as General Order 93-3 which define

25  the responsibilities of the department members when

Pesavento - direct by Safer

936

1    allegations of misconduct come to their attention?  Do you

2    recognize that as the general order?

3    A.  Yes.

4            MR. SAFER:  Your Honor, I move into evidence

5    Plaintiff's Exhibit 137.

6            THE COURT:  Any objection?

7            MS. BOUDREAUX:  No.

8            THE COURT:  It's admitted.  You can publish it.

9        (Plaintiff's Exhibit No. 137 was received in evidence.)

10   BY MR. SAFER:

11   Q.  And I just -- just a couple of questions about this, sir.

12   If you observed misconduct, you had an obligation to

13   immediately notify a supervisor and prepare a written report,

14   correct?

15   A.  I guess so.  I haven't read the whole thing.

16   Q.  Right.

17           MR. SAFER:  Well, we can look at 2(A)(4).

18   BY MR. SAFER:

19   Q.  It says, "When misconduct is observed or

20   complaints/information relative to misconduct are received by

21   a nonsupervisory member, such member will immediately notify a

22   supervisory member and prepare a written report to his

23   commanding officer containing the information received,

24   observations, and/or actions taken."

25           That was the policy at the time, correct?

Pesavento - direct by Safer

937

1    A.   Yes.

2    Q.   You didn't report any misconduct by fellow officers in

3    Eddie Bolden's case, right?

4    A.   No.

5    Q.   Okay.  After the lineup, you arrested Mr. Bolden, correct?

6    A.   Correct.

7    Q.   And you declared the case cleared and closed, correct?

8    A.   Yes.

9    Q.   That means no further investigation, right?

10   A.   It's closed, but it doesn't mean that -- that it can't be

11   further -- further investigated.

12   Q.   Did you do any further investigation?

13   A.   No.

14   Q.   You proposed charges against Mr. Bolden, correct?

15   A.   Yes.

16   Q.   You proposed murder charges against Mr. Bolden, right?

17   A.   Correct.

18   Q.   You did not propose attempted murder charges against

19   Mr. Bolden, did you?

20   A.   I don't know if they were -- that's -- that would be the

21   state's attorney's office.

22   Q.   Okay.  You -- well -- no, I'm asking what you proposed.

23   A.   Right.  Right.

24   Q.   Do you recall?

25   A.   No, we were looking for the charges for the two homicides.

Pesavento - direct by Safer

1    Q.   Okay.  You initiated the process for Mr. Bolden's charge,

2    right?

3    A.   Correct.

4    Q.   And you called Felony Review, the assistant state's

5    attorney, to review those charges, right?

6    A.   Yes.

7    Q.   And you provided them with the investigative file,

8    correct?

9    A.   Yes.

10   Q.   And any other information that he wanted -- do you recall

11   whether he requested anything other than the investigative

12   file?

13   A.   I don't recall.

14   Q.   Okay.  Now, in the investigative file, everything needs to

15   be documented, correct?

16   A.   Correct.

17   Q.   The invest- -- and the investigative file is where

18   everything relative to the case is kept, correct?

19   A.   Correct.

20   Q.   And you understood that anything that happened in an

21   investigation that's relevant had to be in a written report

22   and maintained in the investigative file, right?

23   A.   Yes.

24   Q.   Okay.  Mr. --

25            MR. SAFER:  I don't know what Your Honor's preference

1  is.

2          THE COURT:  Yeah, I didn't want to interrupt you.

3  We'll go for about five more minutes and then take a break

4  unless you're at a logical stopping point now, and we can stop

5  now.

6          MR. SAFER:  I think that's probably best, Your Honor.

7          THE COURT:  Okay.  For the second time today, folks,

8  we're going to break a couple minutes early.  We are going to

9  take a break.  So we're going to have lunch.

10         As I said before, I don't know what they're feeding

11  you folks, but I hope it's good.  So I hope it's to your

12  liking.

13         We will take a break.  Don't discuss the case amongst

14  yourselves and keep an open mind because you haven't heard all

15  the evidence yet.

16         THE COURT SECURITY OFFICER:  All rise.

17     (Jury out.)

18         THE COURT:  All right.  Officer Pesavento, you can

19  step down.  Thank you.

20         A couple of quick housekeeping matters, folks.  I

21  want to keep it real short because I know we've got Officer

22  Oliver cued up here.

23         Ms. Boudreaux, you made an objection, and you said,

24  "Objection that we made earlier."  I assume by that you meant

25  the motions *in limine*.

1          MS. BOUDREAUX:  Yes.

2          THE COURT:  And I -- I construed your objection there

3     to be incorporating by reference the motions *in limine* on the

4     topic.

5          You know, I -- I like dealing with lawyers.  I want

6     you all to have a clear record at the end of the day.  I think

7     it's probably best, if you want to object on the basis of a

8     motion *in limine*, to say "Objection based on the motion *in*

9     *limine*," or words to that effect.  Use the phrase "motions *in*

10    *limine*."  That way you've got a clear record.

11         If you can say what motion *in limine* it was, you can.

12    It's a good idea if you can.  But it's very hard on the fly to

13    know which motion *in limine*.  There are about 30 motions *in*

14    *limine*, so it's hard to do that.

15         If you can -- if you see it coming and you know what

16    it's going to be and you want to reference, I think that's a

17    good idea.  Otherwise, I'll accept you to just say "Objection

18    based on the motion *in limine*," or words to that effect.

19         I did not clarify that with you folks before, but I

20    thought it would be a good opportunity to clarify that.

21         MS. BOUDREAUX:  No, that's fine.  You actually did

22    clarify it, and I forgot.  But I just didn't want to be in a

23    position where I was making an objection every time "general

24    order" came up.  So --

25         THE COURT:  Yeah.

1     MS. BOUDREAUX:  I mean, I feel like we've

2  sufficiently objected to those motions and briefed them.  I

3  was kind of going off your cue that I should continue to

4  object during the examination, but if it's not necessary, I'd

5  prefer not to.

6     THE COURT:  Well -- so that's a good question.

7     You don't need to object every time a particular

8  document is used or asked about.  I think the first time an

9  exhibit comes up, if you think it ought not be presented to

10  the jury because you think it's objectionable for the reasons

11  stated on the motion *in limine* --

12     MS. BOUDREAUX:  Okay.

13     THE COURT:  -- I would just say "Objection for the

14  reasons stated in the motion *in limine*," you know, something

15  to that effect.

16     MS. BOUDREAUX:  Okay.

17     THE COURT:  I don't -- I don't want people making the

18  same objection over and over and over again once you've made

19  your record, but I think it's good to err on the side of

20  making the record.  And I think for purposes of that exam,

21  Ms. Boudreaux, you did make your record.  So I construed what

22  we just did as preserving your objection.

23     MS. BOUDREAUX:  Okay.

24     THE COURT:  That's how I treated it.  I think going

25  forward it never hurts to say "Objection.  Motion *in limine*."

1    Nice and short.

2            Does that make sense to everybody?  Or do we have

3    clear direction?

4            I want you folks to preserve whatever you folks feel

5    like you need to preserve.  I don't want you all interrupting

6    each other unnecessarily.

7            If there's anything else to clarify on this, we can,

8    but that's the lay of the land.  If I think things start

9    getting off, I'll tell you.

10           One last reminder, and then we'll talk about anything

11   you want to talk about, and then we'll talk about Mr. Oliver.

12           As a quick reminder -- I assume everybody has done

13   this -- has everybody reminded the witnesses about the

14   boundaries in the motion *in limine*?  I assume you have, but

15   it's your responsibility with your offering witness to make

16   sure they know what they can and cannot say.

17           So, for example, I wouldn't want somebody here to

18   blurt out and say, you know, Mr. Bolden has this criminal

19   record, for example, because I've said that's got to come out.

20   I know we've covered this before.  I think we covered it at

21   the pretrial conference and maybe a couple days before trial.

22   Just a gentle reminder to make sure it's your responsibility

23   as the offering attorney to make sure that your witnesses know

24   the appropriate boundaries.

25           MR. HALE:  Does Your Honor mind if we --

1          THE COURT:  Go ahead to the mic, if you would,

2    please.

3          MR. HALE:  Your Honor, I know Mr. Pesavento is still

4    on the stand.  Do you mind if we just remind him -- we know

5    Mr. Pesavento is still on the stand, but is it okay if we

6    remind him some of those rulings on the lunch break?

7          THE COURT:  I think that would be fine as long as you

8    don't get into the substance of the testimony, as long as you

9    tell him what he can and cannot --

10          MR. HALE:  Yeah.

11          THE COURT:  -- you know, blurt out.

12          MR. HALE:  Yeah, I'm even happy to have one of

13    plaintiff's counsel there when we tell him.  I mean, just

14    to --

15          THE COURT:  Yeah, that's fine.  It sounds like it's

16    not necessary.

17          MR. HALE:  Okay.  Yeah, I just wanted to make

18    sure because I don't want that to happen.

19          THE COURT:  Yeah, and I know it's -- it's tricky for

20    you all to remember what the boundaries are.  It's tricky for

21    me.  It's tricky for a witness, too.

22          But, you know, for example, I've said that his

23    criminal history is not coming in.  So Mr. Pesavento should

24    steer clear of that, and he has.  So, you know, I think he's

25    steered clear of that.

1        Okay.  Is there any other housekeeping matter that we

2   need to cover before we talk about Officer Oliver?

3        MR. LITOFF:  I have one thing just briefly,

4   Your Honor.  It looks like one juror left their notes there,

5   maybe back there, I just wanted to let you know.  I don't know

6   if those should be sitting around.

7        THE COURT:  Okay.  Thank you.  When we take our lunch

8   break, I'll ask the CSO to come and gather it and take it to

9   the jurors.

10        Anything else?

11        Mr. Hale, go ahead.

12        MR. HALE:  I just wanted to raise the issue, we don't

13   have to talk about it right now, but I want to do -- address

14   it at some point before Ms. Boudreaux does her exam, I think

15   they've opened the door to some topics.  So that's something I

16   want to address with the Court.

17        THE COURT:  Okay.  We can certainly address that.  I

18   don't want to do that now because we've got Officer Oliver

19   coming.

20        What I would like you to do, though, is, after we

21   break with Officer Oliver, I'd like you to tell Mr. Safer

22   where you think he has opened the door, have a little dialogue

23   on it, that way, when you talk to me about it, he'll see the

24   pitch coming, and you'll know what the issue is.

25        Okay.  Does anyone need a quick break to gather their

1    thoughts before we talk to Mr. Oliver?

2         Anybody?

3         MR. CROWL:  No, Your Honor.

4         MR. BAZAREK:  Your Honor, I would only say that based

5    on this morning's proceedings, there is some follow-up for

6    Officer Oliver that defense counsel would like to review with

7    him.

8         THE COURT:  Okay.  On the topic of residence?

9         MR. BAZAREK:  On the topic of -- there was an

10   assertion about a hotel, that would be the topic.

11        THE COURT:  Okay.  That's fine.

12        MR. BAZAREK:  Thanks.

13        THE COURT:  Let's go off the record for a second.

14      (Off the record.)

15        MR. OLIVER:  Hello.

16        THE CLERK:  Good afternoon.  Mr. Oliver?

17        MR. OLIVER:  Yes.

18        THE CLERK:  Hi, I'm calling from the Northern

19   District, and I'm about to connect the judge.

20        THE COURT:  Good afternoon, Officer Oliver.  This is

21   Judge Seeger.

22        MR. OLIVER:  Yes, sir.

23        THE COURT:  Thank you for taking our phone call.

24        MR. OLIVER:  No, thank you for calling.

25        THE COURT:  So it's a phone call, but it's more than

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 151 of 172 PageID #:18211
Oliver - voir dire examination by Bazarek
946

1    a phone call.  You know, as before, this is a telephonic court

2    proceeding.  So we're proceeding just like you were -- just

3    like you would proceed if you were here in the courtroom.

4    You're, once again, under oath.

5             Do you understand that, sir?

6             MR. OLIVER:  Yes, sir.

7             THE COURT:  You understand you've got to give

8    truthful answers to everyone's questions, including mine?

9             MR. OLIVER:  Yes, sir.

10            THE COURT:  Okay.  We have a few follow-up questions

11   for you about your residence, and then we need to talk about

12   your health condition.

13            So let's go ahead and ask the follow-up questions

14   that I think defense counsel said that they had about your

15   recent move.  So if you'll wait one moment, he'll come to the

16   microphone, and he'll ask the questions that he has for you.

17            MR. BAZAREK:  Yes, Your Honor --

18            THE COURT:  This is Mr. Bazarek.

19            MR. BAZAREK:  -- it was questions of the hotel that

20   came up this morning.

21            JAMES OLIVER, WITNESS, PREVIOUSLY SWORN

22                 VOIR DIRE EXAMINATION

23   BY MR. BAZAREK:

24   Q.  Mr. Oliver, in terms of logistics, if you were ordered to

25   travel to Chicago, do you recall that it was discussed that

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 152 of 172 PageID #:18212
Oliver - voir dire examination by Bazarek
947

1    you could stay at a hotel close to the courthouse where it

2    would be not as burdensome for you to get to the courthouse?

3    Do you recall that?

4          MR. SAFER:  Your Honor -- I'm sorry -- I know we're

5    not in the rules of evidence, but I think in the spirit of

6    this proceeding, these should not be leading questions.

7          THE COURT:  Why don't you ask him in general whether

8    he'd stay at a hotel or somewhere else.  Let's just ask him

9    what the story is there.

10   BY MR. BAZAREK:

11   Q.  All right.  Mr. Oliver, do you recall any discussion about

12   staying at a hotel, specifically the Union League Club, right

13   next door to your attorney's building where they worked, and

14   also that it would be very close to the federal courthouse?

15   A.  Yes.

16   Q.  And the reason why that came up in the discussion was to

17   assure you at least that if we got you into town, we could put

18   you up somewhere that was close to the courthouse and close to

19   your attorney's firm, correct?

20   A.  Yes.  Yes.

21   Q.  And also, you recall that the topic came up as to whether

22   or not your sister who lives with you in Arkansas could travel

23   with you and stay at that same hotel.  Do you recall that?

24   A.  Yes.

25   Q.  And you -- do you recall that you said that your sister is

Oliver - voir dire examination by Bazarek

948

1   a very busy person; is that correct?

2   A.  Yes.

3   Q.  And that she would not be able to travel with you.  Do you

4   recall that?

5   A.  Yes.

6   Q.  And at no time when we were talking about the logistics

7   and where you would stay if you came to Chicago was it ever

8   discussed about the availability of any adult children to care

9   and monitor your medical needs?

10  A.  I don't recall that -- that part of it, and I'm not

11  understanding the question.

12  Q.  Okay.  Also, you -- your physicians right now are in

13  Arkansas, correct?

14  A.  Yes.

15  Q.  You have a primary care physician named Dr. Stokes; is

16  that right?

17  A.  Yes.

18          THE COURT:  Hang on.  We're talking about residence

19  now.

20          Is there any --

21          MR. BAZAREK:  No, I'm sorry, Judge.

22          THE COURT:  Yeah.  Anything else on the residence

23  topic?

24          MR. BAZAREK:  No, sir.

25          THE COURT:  Okay.  Anything else on the residence

Oliver - voir dire examination by The Court

949

 1    topic?

 2              MR. CROWL:  No, Your Honor.

 3              THE COURT:  All right.  Very good.

 4              Officer Stokes, this is Judge Seeger again.  I have a

 5    couple questions for you about your -- your health condition.

 6    I know that you've seen some back-and-forth on that.  You've

 7    seen some orders on that.  And I want to talk to you a little

 8    bit more about that.

 9                     VOIR DIRE EXAMINATION

10    BY THE COURT:

11    Q.  Let me start with this, though:  First things first, I

12    want you to be healthy, sir.  I was sorry to see that you had

13    some health challenges, and I want you to know that I

14    personally am rooting for you.  I think everybody in this

15    courtroom is rooting for you, and we want you to be safe and

16    healthy, and we don't like you being uncomfortable.

17              So just --

18    A.  Thank you.

19    Q.  -- at a very human level, I want you to know that, sir.

20    Okay?

21    A.  Thank you.

22    Q.  Okay.  The other thing I'd say is, you know, I understand

23    that we've had some back-and-forth on this issue, and I said

24    you need to be here in court, and there was a statement by

25    your lawyers and your doctor that you should testify not in

Oliver - voir dire examination by The Court

950

1    person but remotely by video.

2            In other words, the position as I understand it was

3    that you shouldn't have to travel to Chicago, you shouldn't

4    have to walk into my courtroom, instead, you should have to

5    testify remotely through a computer, either at your house or

6    through the federal court there in Arkansas.

7            Am I right in understanding that you are willing to

8    testify remotely if I order you to do so?

9    A.  Yes, sir.

10   Q.  So, in other words, if I issued an order saying you

11   personally have to testify by computer, by video from

12   Arkansas, you'd be willing to do that?

13   A.  Yes, sir.

14   Q.  You'd either go to the courthouse or you would use your

15   own computer?

16   A.  Yes, sir.

17   Q.  Do you have a computer?

18   A.  Yes, sir.

19   Q.  Does it have a video camera?

20   A.  Yes.

21   Q.  Do you know how to use a video camera on your computer?

22   A.  I don't know how to use it, but my sister could set it up.

23   Q.  Okay.  If I directed you to go to the federal courthouse

24   to participate in a court proceeding by video -- and by

25   "courthouse," I mean the courthouse in Little Rock,

Oliver - voir dire examination by The Court

951

1   Arkansas -- would you comply with my order and do it?

2   A.  Yes, sir, I have to.

3   Q.  From a health perspective, is there any reason why you

4   could not go to the federal courthouse in Little Rock,

5   Arkansas, and participate in the proceeding by video?

6   A.  I don't -- I don't think so.  I think I could get there,

7   you know, with some help.  You know, I've got a brother here,

8   and I've got a couple of other people, you know, family

9   members here.

10  Q.  And they could help you?

11  A.  Yes, make sure I get down there.

12  Q.  I understand you're only ten minutes from Little Rock; is

13  that right?

14  A.  Yes, 10 or 15 minutes.

15  Q.  Okay.

16  A.  Benton is right outside of Little Rock.

17  Q.  So I want to be a hundred percent clear on this, if I

18  order you to go to the federal courthouse to participate by

19  video and testify remotely, you'd do that, right?

20  A.  Yes, sir.

21  Q.  And if I ordered you to testify using your home computer,

22  you would do that, right?

23  A.  Yes, sir.

24  Q.  Okay.  Well, I will tell you, I don't yet know that that's

25  what I am ordering.  I have to talk through some things with

Oliver - voir dire examination by The Court

952

1  the lawyers, and I have to learn more about your health

2  condition, but I wanted to start from square one that you'd be

3  willing to testify remotely.  Do I have that right?

4  A.  Yes, sir.

5  Q.  Okay.  We need to ask you some questions, sir, about your

6  health, and I want you to understand this from the get-go.

7  Nobody is exploring your medical condition to invade your

8  privacy.  Okay.  We don't want to invade your privacy any more

9  than we need to.  Okay?

10 A.  All right.

11 Q.  And I want you to know that from the get-go.

12        I don't know what you're willing to say on the public

13 record.  Let me tell you, in the room here we just have the

14 legal teams and my staff.  So it's probably, I don't know, 15,

15 20 people, at the most, probably not even that many.  Probably

16 more like -- well, probably 15 to 20 people are in the room

17 right now.

18        I'm going to ask you some questions that are just

19 general questions where you can talk about your health.  If

20 there are details that you don't want to put on the public

21 record, we can do one of two things.  We can seal the record

22 so nobody can see it or if it's something that you're just

23 really not comfortable telling anybody except me and your

24 lawyer and somebody from the plaintiff's side, we can do a

25 sidebar, and I'd ask everyone else to leave the room except

Oliver - voir dire examination by The Court

953

1   those people.  Okay?

2          So I want you to know and I want you to understand

3   that we respect you and we respect your privacy.

4          Do you understand all that?

5   A.  Yes, sir.

6   Q.  So if you feel uncomfortable and want to talk to me on the

7   side, I want you to tell me.  Okay?

8   A.  Yes, sir.

9   Q.  Okay.  My understanding is that you went to the hospital

10  on September 21st and September -- through September 24th.  So

11  you were there about three days; is that right?

12  A.  Yes, sir.

13  Q.  Okay.  And since you got home from the hospital on

14  September 24th, have you left the house at all?

15  A.  I've gone to the doctor.

16  Q.  Okay.  That's Dr. Stokes?

17  A.  Yes, Dr. Stokes.  Heart doctor.

18  Q.  Got it.

19  A.  And to the lab.

20  Q.  Got it.  And the heart doctor is different than

21  Dr. Stokes, obviously, it's a cardiologist?

22  A.  Yes.

23  Q.  Okay.  Any other reason you've left the house since then?

24  A.  Gone and picked up some medicine.  I probably went with my

25  sister to pick up some medicine.

Oliver - voir dire examination by The Court

954

1   Q.   Okay.  Like to Walgreens or something like that?

2   A.   Yes, CVS.

3   Q.   CVS.

4   A.   CVS.

5   Q.   Okay.  Okay.  Have you gone out to eat or gone out with

6   friends or gone out to --

7   A.   No.  No.

8   Q.   -- movies?  Gone to a Razorbacks game or anything like

9   that?

10  A.   No, no, no.

11  Q.   Okay.  How is your health?

12  A.   My health -- my health has kind of deteriorated in the

13  last three, four years, I guess.  You know, it's -- it's been

14  going down, down.  And after my wife passed, I guess I'm

15  living by myself, and I probably have never been eating right

16  in the last 20 years, 30 years, and it just started going

17  down.

18  Q.   Has your health changed in the last year in any

19  significant way?

20  A.   Yes.

21  Q.   How so?

22  A.   In the sense that I have not been able to walk, stand up.

23  I just haven't been able to stand up right and walk.  I've

24  lost -- I've lost 90 pounds in the last couple years, two or

25  three years.  It's been -- I just ain't been doing well.  And

Oliver - voir dire examination by The Court

955

1   I'm --

2              THE COURT REPORTER:  I'm sorry?

3   BY THE COURT:

4   Q.  Can you repeat that last sentence, sir?

5   A.  I have lost 90 pounds in the last three years, two or

6   three years, and I have not been -- I have not been feeling

7   well for the last two or three years.

8   Q.  Can you stand up and walk now?

9   A.  Yes, I could stand up and walk sometimes.

10  Q.  All right.  Suppose I ask you to -- this is just a

11  hypothetical.  I'm not asking you to do this.  This is just an

12  example.

13             But suppose I asked you to get up from where you're

14  sitting right now and go touch the front of the curb and then

15  come back, is that something you could do?

16  A.  The front curb?

17  Q.  The front curb outside the house.  You know, you've got --

18  I assume you live on a street with a curb on it.  Could you go

19  out and touch the street and come back?  Is that something

20  hypothetically you're physically able to do?

21  A.   I won't be able to bend down and touch the curb.  I could

22  walk out there to the curb and walk back.

23  Q.  Okay.  How much trouble do you have walking?

24  A.  Some days it's -- it's hard, but, I mean, some days it's

25  medium.  I mean, it's -- you know, I can walk -- I can walk.

Oliver - voir dire examination by The Court

956

1   Q.  I asked you about how your health has changed in the last

2   year, and you mentioned walking.

3           Apart from walking, has your health changed in any

4   other significant way in the past year?

5   A.  In the past year?  I'm not feeling -- I'm not feeling

6   right.  I'm not feeling up to par.  I guess my blood pressure

7   has been up, way up, and I know that's not from eating or from

8   food.  I don't eat food with salt in it.

9   Q.  So you're not supposed to eat food with salt in it?

10  A.  Right, you know, salt.

11  Q.  Okay.  When did you -- I'm sorry.  Go ahead, sir.

12  A.  And, you know, when your blood pressure is, you know, over

13  around 180, 90, and 200, you know, salt is a killer, you know.

14  Q.  When did you start having high blood pressure?

15  A.  I've been having high blood pressure for a long time,

16  probably in my 30s and 40s, but not like this.

17  Q.  When you say "not like this," how recently did you start

18  experiencing the high blood pressure that you're experiencing

19  now?

20  A.  Probably two or three years ago.

21  Q.  Okay.  All right.  So I just am trying to figure out how

22  your health has changed in the last year, so bear with me on

23  that.  We talked about standing and walking.  And we talked

24  about the blood pressure challenges that seem to have gotten

25  worse in the last two or three years.

Oliver - voir dire examination by The Court

957

1    Has your health changed in any other significant way,

2  any way at all, in the past year?

3  A.   My kidney -- I've got Stage IV kidney disease.

4  Q.   And how --

5  A.   That came on probably in the last year or two.

6  Q.   Year or two.  Are you taking dialysis?

7  A.   I'm a step from it.  I mean, it looks like that's what

8  it's going to be in the next week or two, this month, it's

9  going to be dialysis.

10  Q.   In the next week or two?

11  A.   Right.

12  Q.   And is that something your primary physician told you?

13  A.   No, the kidney doctor.

14  Q.   The kidney doctor.  Okay.

15    Has your health changed in the last year in any other

16  significant way?

17  A.   No more than my kidney and my walking, my knees, getting

18  around and about.

19  Q.   Okay.  You mentioned your heart.

20    And I'll repeat again, sir, if you feel like you're

21  getting uncomfortable and it's getting into private business,

22  I want you to tell me.  Because I just you --

23  A.   I'm not concerned about that.  I'm 77 years old, so I

24  ain't concerned about --

25  Q.   I just want you to know, sir, everybody in this room

Oliver - voir dire examination by The Court

958

1  respects you, that's all.  Okay?  So we're not trying to pry

2  into your business.

3          Tell me about your how your heart is doing, sir.

4  You've been to the cardiologist recently.  Just tell me how

5  you're doing.

6  A.  I've been to the cardiology.  They gave me an EKG or

7  something like that, and then I go back -- I think I'm looking

8  at it now.  It says November the 3rd -- November -- actually,

9  November the 11th.  And I go back for two tests.  They said

10  it's going to take like five hours, four or five hours.

11  Q.  I want to hear what you said, sir, but I couldn't quite

12  hear you.  And bear with me.  It's not your fault, but I'm

13  going to ask you to say it again because we want to hear you.

14  So go ahead, please.

15  A.  Okay.  I go back to the heart doctor on the 11th of

16  November.  And he ordered two tests.  I know one is a stress

17  test.  I don't know what the other one is.  But they told me

18  it was going to take about four or five hours.  And he did --

19  he did give me a medication to take, you know, so . . .

20  Q.  Okay.  So let me just throw open a broad question I want

21  you to answer as best you can.  We've been talking about your

22  health and whether you should have to be compelled to travel

23  to Chicago to testify.  That's the decision I have to make,

24  and that's the thing we've been talking about.

25          Why do you think you shouldn't have to travel to

Oliver - voir dire examination by The Court

959

1    Chicago to testify in person in my courtroom?

2    A.   Because of my health.

3    Q.   And can you elaborate on that, sir.  I want you to give me

4    your best summary of why your health prohibits you from coming

5    to Chicago.

6    A.   I'm not able to stand as well.  I cannot walk that well.

7    I don't feel that well.  And the doctor says that -- that

8    my -- things could really change in a hurry with me.  It could

9    change in a matter of minutes with me.

10   Q.   And when you say "things could change," do you mean your

11   heart?  Your kidney?  Something else?  What do you mean?

12   A.   My blood pressure and my kidney could change.

13   Q.   Okay.  And you said, "I don't feel that well."  You know,

14   all of us sometimes don't feel well, and you can't exactly put

15   your finger on it, you just don't feel great.

16   A.   Right, right.

17   Q.   What do you mean when you say you don't feel well?

18   A.   That's it.  I just don't -- I don't feel well.  I just

19   don't -- I don't feel like doing nothing.  I don't even feel

20   like standing up, walking to the bathroom.

21   Q.   How is your energy level?

22   A.   That's probably what it is.  My energy level is just not

23   there.

24   Q.   Are you getting sleep these days?  I know some people have

25   trouble sleeping.  And I don't mean to pry into your business

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 165 of 172 PageID #:18225
Oliver - voir dire examination by Crowl
960

1  here, but how are you sleeping?

2  A.  I probably stay in the bed 50 percent of the time.

3  Q.  You mean 50 percent of the day?

4  A.  Right.

5         THE COURT:  Okay.  Well, you know, you've answered

6  some questions for me, and I don't want to go on too long.  I

7  know sometimes I do that.

8         So I'm going to give you to the other people in the

9  room to ask you a few questions.  We're not going to try to

10  try your patience here, but we're going to give each of them

11  about five minutes to cover whatever topics they want to

12  cover.  Okay?

13         So we're going to start with Mr. Crowl.  He

14  represents Eddie Bolden.  So the next voice you're going to

15  hear -- I'll encourage him to introduce himself, and then

16  we'll go from there.  Go ahead, please, sir.

17                  VOIR DIRE EXAMINATION

18  BY MR. CROWL:

19  Q.  So, Mr. Oliver, over the past year, have you visited or

20  been treated by any physician or other medical professionals

21  in Illinois?

22  A.  In the last -- what, last year?

23  Q.  In the last year.

24  A.  Yes, I -- my primary care doctor in Illinois was

25  Dr. Pitayo (phonetic).  He is in Kankakee.

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 166 of 172 PageID #:18226
Oliver - voir dire examination by Crowl
961

1  Q.  So you have a primary care doctor in Kankakee, in

2  Illinois, that you have visited within the last year; is that

3  right?

4  A.  Yes, that was before I moved.

5  Q.  And do you have other doctors in Illinois besides your

6  primary care doctor?

7          THE COURT:  Have or had?

8  BY THE WITNESS:

9  A.  My kidney doctor, he is in Kankakee also.  His name is

10  Hizon.

11  BY MR. CROWL:

12  Q.  So -- so in the last year you've had a primary doctor and

13  a kidney doctor.

14          My next question is:  Have you ever had any other

15  doctors in Illinois other than the primary care doctor and the

16  kidney doctor?

17  A.  Eye doctor, but he's in -- his name is Kaufman, and he is

18  in Dyer, Indiana.

19  Q.  And, Mr. Oliver, it has been represented to this Court, to

20  Judge Seeger, that you would be putting your health at grave

21  risk if you were forced to travel to Chicago or to participate

22  in this trial or to testify remotely.

23          Do you believe that it would be putting your health

24  at risk -- at grave risk to be forced to travel to Chicago or

25  to participate in this trial or to testify remotely?

Oliver - voir dire examination by Crowl

1  A.  Testify remotely, my doctor says that -- that she would

2  approve that.

3  Q.  It's been represented to this Court that you cannot safely

4  testify even by remote means due to your extremely poor

5  medical condition.  Is that the case?

6  A.  My doctor says that I can testify remotely.  My doctor

7  said I can testify remotely.

8          THE COURT:  On that topic, I think we've heard

9  enough.

10         MR. CROWL:  Enough?  Yes, Judge.  And that's fine.

11         THE COURT:  You can ask other questions, I'm just

12 saying on the health of the remote testimony, I think we've

13 covered.

14         Do you have other questions you want to ask?

15 BY MR. CROWL:

16 Q.  Mr. Oliver, how long have you been treated by your doctor

17 in Arkansas, Dr. Stokes?

18 A.  Since I got down here.

19 Q.  And when was that?

20 A.  I guess it was August.  I've got -- I knew when I got down

21 here I was needing a primary care doctor.

22         MR. CROWL:  No further questions, Judge.

23         THE COURT:  That was Mr. Crowl, the counsel for Eddie

24 Bolden.

25         Mr. Bazarek, counsel for the defendants, is going to

Case: 1:17-cv-00417 Document #: 636 Filed: 11/16/21 Page 168 of 172 PageID #:18228
Oliver - voir dire examination by Bazarek
963

1  potentially ask you a few questions.  They're just conferring
2  here.  Hang loose here, Mr. -- excuse me, Officer Oliver.  I
3  beg your pardon.
4        THE WITNESS:  Yes, no problem.
5        THE COURT:  Here comes defense counsel.
6        Go ahead.
7        MR. HALE:  Your Honor, Mr. Bazarek has a question,
8  and then I have a question.
9        THE COURT:  All right.  Fair enough.  So I am going
10  to allow tag team, even though that's not normal practice.
11        So we've got a couple different people.  Mr. Bazarek
12  is going to ask a question to you first.
13        THE WITNESS:  Thank you.
14                  VOIR DIRE EXAMINATION
15  BY MR. BAZAREK:
16  Q.  Mr. Oliver, recall when -- that Friday afternoon when you
17  put me on the phone with your doctor.  Do you recall that?
18  A.  Yes.
19  Q.  Okay.  And at that time, I asked the doctor about you
20  coming to Chicago or testifying remotely or doing it by a
21  deposition, and she said no.  Do you recall that?
22  A.  Yes.
23  Q.  And then what happened was, your doctor was informed that
24  Mr. Bolden is seeking punitive damages against you and you may
25  not have -- be able to put on any defense in this case, and

Oliver - voir dire examination by Hale

964

1   was there any way that it would work remotely.

2           Do you recall that?

3   A.  Yes.

4   Q.  And so at that point when Dr. Stokes knows you have no

5   defense, that she at that point approved remotely under

6   certain conditions as long as you would be able to stay

7   healthy.  Do you recall that?

8   A.  Yes.  She said I need to take breaks.  I remember her

9   saying something like that.

10          THE COURT:  Say that one more time, Mr. Bold- --

11  excuse me.  I beg your pardon.  Officer Oliver, I didn't quite

12  hear you.  Please say it again.  "I need to take breaks"?

13  BY THE WITNESS:

14  A.  Yes, she said about breaks.  That's it.

15          THE COURT:  Breaks.  Well, good news for you,

16  Mr. Oliver, we're a break-friendly operation here.  We allow

17  breaks.

18          So I think Mr. Hale, defense counsel, has a question

19  for you, and then we'll wrap up soon.

20          Go ahead.

21                      VOIR DIRE EXAMINATION

22  BY MR. HALE:

23  Q.  I'll be brief, Mr. Oliver.

24          Can you hear me okay?

25  A.  Yes, I can hear you, Counsel.

Oliver - voir dire examination by Hale

965

1  Q.  Can you tell us what symptoms you had that led to your

2  hospitalization from August 21st to 24th?

3  A.  I couldn't stand.  I couldn't -- I just couldn't stand, I

4  couldn't walk, and I was feeling terrible.

5  Q.  Still what, I'm sorry?

6  A.  Pardon me?

7  Q.  I missed the last part.  Can you repeat it, please.

8  A.  I couldn't stand.  I couldn't walk, and I was feeling

9  very, very bad.

10  Q.  And do you recall what kind of -- do you recall any of the

11  tests or things that happened during your three-day

12  hospitalization?

13  A.  No, I just know they gave me a lot of tests, you know,

14  they -- they were almost -- at first I guess they -- they

15  thought that -- that they will have to start dialysis right

16  then and there, but they didn't.

17           MR. HALE:  Okay.  Thank you, sir.

18           THE COURT:  Okay.  Does anybody have any final

19  questions for the officer?

20           MR. CROWL:  No, Your Honor.

21           THE COURT:  Anything else from the defense?

22           MR. HALE:  No, Your Honor.

23           THE COURT:  Okay, Officer Oliver.  We have asked you

24  a number of questions, and you answered those questions today,

25  not once, but twice.

1    So we appreciate your willingness to hop on the phone

2  here on short notice.  I will talk to the lawyers, and I'm

3  sure counsel will reach out to you.  But I'm going to repeat

4  again, thank you for the phone call.  And I hope you feel

5  better, sir, and get back on your feet and get back to your

6  old self.

7         THE WITNESS:  Thank you.  I really appreciate it,

8  Your Honor.

9         THE COURT:  Thank you, sir.  Take care now.

10        THE WITNESS:  Okay.  Bye.

11        THE COURT:  Officer Oliver, are you there?

12        So I've confirmed we've end the phone call.

13        Folks, I want to get you some nourishment.  It's one

14 after 5:00.  We could talk about Officer Oliver now.  I would

15 propose you folks stretch your legs, get a bite to eat.

16        Any reason we can't adjourn now?

17        MR. CROWL:  No reason, Judge.

18        THE COURT:  What time is an appropriate time for you

19 folks to come back?  I want to make sure you folks get a bite.

20        MR. SAFER:  We'll be here whenever you want.

21        THE COURT:  Do you guys have food with you?  Is 1:30?

22 Okay.

23        MR. HALE:  Oh, yeah, absolutely.

24        THE COURT:  That's 25 minutes.  Is that too much

25 time?  Is that okay?  Like, I can go all day, whatever you

967

1  folks want.

2       MR. SAFER:  1:30 is great.

3       THE COURT:  1:30 okay?

4       MS. BOUDREAUX:  Yes.

5       THE COURT:  1:30.  We're off the record.

6     (Luncheon recess taken at 1:05 p.m.)

7                    *  *  *  *  *  *  *

8                       CERTIFICATE

9     I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.

11

12  /s/ *Amy Spee*                    *10/14/2021*

13  Amy Spee, CSR, RPR, CRR           Date
    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25