968

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4    EDDIE L. BOLDEN                )
                                     )
 5                 Plaintiff,        )   Docket No. 17 C 417
                                     )
 6           vs.                     )
                                     )
 7    ANGELO PESAVENTO, et al.,      )   Chicago, Illinois
                                     )   October 13, 2021
 8                 Defendants.       )   1:30 p.m.

 9
                    TRANSCRIPT OF PROCEEDINGS - VOL. 4B
10         BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

11
      APPEARANCES:
12

13    For the Plaintiff:       RILEY SAFER HOLMES & CANCILA LLP
                               BY:  MR. RONALD S. SAFER
14                                  MR. ELI J. LITOFF
                                    MS. SANDRA L. MUSUMECI
15                                  MR. MATTHEW C. CROWL
                                    MS. VALERIE BRUMMEL
16                             70 West Madison, Suite 2900
                               Chicago, Illinois  60602
17

18    For the Defendant       GREENBERG TRAURIG LLP
      City of Chicago:         BY:  MS. TIFFANY S. FORDYCE
19                                  MR. KYLE L. FLYNN
                               77 West Wacker Drive, Suite 3100
20                             Chicago, Illinois  60601

21

22    Court Reporters:        FRANCES WARD, CSR, RPR, RMR, FCRR
                               JENNIFER COSTALES, CRR, RMR, CRC
23                             Official Court Reporter
                               219 S. Dearborn Street
24                             Chicago, Illinois  60604
                               frances_ward@ilnd.uscourts.gov
25                             jennifer_costales@ilnd.uscourts.gov
</pre>

```
 1   APPEARANCES (CONT'D):

 2   For the Individual        HALE & MONICO, LLC
     Officer Defendants:       BY:  MR. ANDREW M. HALE
 3                                  MS. BARRETT E. BOUDREAUX
                                    MR. WILLIAM E. BAZAREK
 4                                  MR. BRIAN J. STEFANICH
                                    MS. AMY A. HIJJAWI
 5                             53 West Jackson Boulevard, Suite 330
                              Chicago, Illinois  60604
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard in open court:)

2         THE COURT:  Mr. Safer, I will not hold you to this.

3    What is your expectation without holding you to it?

4         MR. SAFER:  Pretty short, your Honor.  I think 15,

5    20 minutes.

6         THE COURT:  That's perfectly fine.  I do not ask in

7    the spirit of pinning you down.

8         (Brief pause.)

9         (Jury in at 1:35 p.m.)

10        THE COURT:  Welcome back, everybody.  Have a seat,

11   please.

12        Counsel, you may proceed when you are ready.

13        MR. SAFER:  Thank you, your Honor.

14        We can start by showing just the witness

15   Plaintiff's Exhibit 100, please.

16   ANGELO PESAVENTO, A DEFENDANT HEREIN, PREVIOUSLY SWORN

17                 DIRECT EXAMINATION - Resumed

18   BY MR. SAFER:

19   Q.   Mr. Pesavento, do you recognize that as your training

20   record?

21   A.   No.

22   Q.   Do you know -- if you look at that and you look at the

23   trainings, does that look like the trainings that you have

24   received over the course of your career?

25   A.   There is an awful lot there.  I guess so, yes.

 1              THE COURT:  You might want to make sure your

 2   microphone is on, Mr. Safer.  Is your microphone on?

 3              Can everybody hear Mr. Safer?

 4              Okay.  Go ahead.  Whenever you are ready.  I want

 5   to make sure everybody can hear you.

 6              MR. SAFER:  Thank you, your Honor.

 7              THE COURT:  There you go.

 8   BY MR. SAFER:

 9   Q.   So I'm sorry.  Was that a yes, no?  Do you recognize

10   that?

11   A.   Yes.  As I'm looking at these things, they all look

12   familiar to me and things that I have done or been trained

13   in.

14              MR. SAFER:  Your Honor, we move into evidence

15   Plaintiff's Exhibit 100.

16              THE COURT:  Any objection?

17              MS. BOUDREAUX:  No.

18              THE COURT:  It's admitted.  You can publish it.

19        (Said exhibit was received in evidence.)

20              MR. SAFER:  We are not going to.

21   BY MR. SAFER:

22   Q.   Could I also show you --

23              MR. SAFER:  Just the witness, please.

24   BY MR. SAFER:

25   Q.   -- Plaintiff's Exhibit 191.

 1               Do you recognize that photo?

 2    A.   Yes, I do.

 3    Q.   Who is that?

 4    A.   That's me.

 5    Q.   When was it taken?

 6    A.   When?

 7    Q.   Yes.

 8    A.   I have no idea.

 9    Q.   Okay.

10          MR. SAFER:  Next photo, please.

11    BY THE WITNESS:

12    A.   There is a date of the photograph.  1974.

13    BY MR. SAFER:

14    Q.   And that -- do you recognize this photograph?

15    A.   Yes.

16    Q.   Who is that?

17    A.   That's George Karl.

18          MR. SAFER:  Could we have the next page of the

19    exhibit, please.

20    BY MR. SAFER:

21    Q.   Do you recognize that photograph?

22    A.   You know, I actually don't, but I see his name is Ed

23    Siwek.

24          MR. SAFER:  Your Honor, we move into evidence

25    Plaintiff's Exhibit 191.

```
 1              MS. BOUDREAUX:  No objection.

 2              THE COURT:  Admitted.

 3          (Said exhibit was received in evidence.)

 4   BY MR. SAFER:

 5   Q.   Thank you for that, sir.

 6              On the night of the shooting, Clifford Frazier told

 7   the police that someone inside J&J's called the police after

 8   he was wounded and went inside J&J's, right?

 9   A.   Yes.

10   Q.   And you did know that a 911 call was the reason that the

11   police went to J&J's that night, correct?

12   A.   Yeah.  Apparently somebody called.

13   Q.   You said in your deposition that it was either because

14   the police were hungry or they were going to a 911 call, but

15   you thought it was the latter, right, a 911 call?

16   A.   Yes.

17   Q.   You understand that 911 calls are tape-recorded by the

18   Chicago Police Department?

19   A.   Yes.

20   Q.   You did not try to get the tape of the 911 call that was

21   made from J&J's that night?

22   A.   That's correct.

23   Q.   You did not try to get that tape from J&J's at any time

24   during this investigation, did you?

25   A.   No, I didn't.
```

1    Q.   And you have said that you did not do that because you

2    never listened to 911 calls when you worked as a detective.

3    Is that true?

4    A.   Yeah, pretty much so, yes.

5    Q.   Pretty much so?

6    A.   It is true.

7    Q.   So you have never listened to a 911 call in any crime

8    that you are investigating?

9    A.   I don't think so, no.

10   Q.   You have testified that a 911 call is not a potential

11   way to identify another witness to the crime.

12            Is that your testimony today?

13   A.   Correct.  That's my opinion.

14   Q.   Now, it is important to find the people who saw the

15   crime, correct?

16   A.   Yes.

17   Q.   Those people who saw the crime are potential witnesses,

18   right?

19   A.   Yes.

20   Q.   The person who calls 911 sometimes actually witnessed

21   the crime, right?

22   A.   Possibility.

23   Q.   And sometimes the person who called the 911 call is not

24   a witness to the crime, right?

25   A.   Yes.

1    Q.   But that's something that, unless you identify the

2    person that made the 911 call, you will never know, correct?

3    A.   Correct.

4    Q.   If the 911 caller did witness the crime, it would be

5    important to know how they described it immediately after

6    witnessing it to the 911 operator, right?

7    A.   Yes.

8    Q.   But you are telling this jury that you don't care how

9    that witness describes why the police should come to the

10   scene?

11   A.   I don't care, did you say?

12   Q.   Yeah.  You never listened to it?

13   A.   It's easy to sit here and break it down like that, but

14   the matter of fact is that people don't want to get involved

15   in it.  People don't give their names.  It's almost

16   impossible to tell who did call, especially in a place like

17   that if somebody made a phone call from the store.

18   Q.   What's "a place like that," sir?

19   A.   A store where people are coming and going.

20   Q.   You have no idea whether the person identified

21   themselves to the 911 caller unless you listen to the 911

22   call, correct?

23   A.   Correct.

24   Q.   You know that if Eddie Bolden or his lawyer had told you

25   that he was the person who made the 911 call inside J&J's,

1    you would have had an obligation to seek preservation of that
2    911 call, right?
3    A.   Yes.
4    Q.   You did not seek preservation of that 911 call?
5    A.   Correct.
6    Q.   You claim that -- you do know, right, that if Eddie
7    Bolden had made that 911 call from inside the restaurant,
8    that would have excluded him as a suspect in this case,
9    correct?
10   A.   No.
11   Q.   Please explain that.
12   A.   Well, because he made the call, it doesn't mean that he
13   couldn't have been a suspect.
14   Q.   So is it your testimony that it would be possible, in
15   your view, that -- you do understand, right, that Clifford
16   Frazier said that the person who shot him ran away after
17   Clifford Frazier wrestled the gun from him, right?
18   A.   Yes.
19   Q.   He said that the person fled, in his words, right?
20   A.   Yes.
21   Q.   And that's when Clifford Frazier ran inside J&J's?
22   A.   Yes.
23   Q.   And then Clifford Frazier said somebody called the
24   police, correct?
25   A.   Yes.

1    Q.   So tell me how, if that somebody is Eddie Bolden --

2    forget about me.

3         Tell the members of the jury how, if that person

4    was Eddie Bolden, it doesn't exclude him as a suspect from

5    the crime.

6    A.   That it doesn't include him?

7    Q.   Doesn't exclude him.

8    A.   Exclude him.

9         Because you don't know how much time passed by the

10   time that shooting occurred, how far away they were.  You are

11   asking people that are in a very stressful situation for how

12   many feet they were from here to there and how much time it

13   takes and so on and so forth.  And then Clifford Frazier was

14   shot.  It doesn't mean he just jumped up and ran right in

15   there either.  So it's difficult to --

16   Q.   Let me see if I understand you.

17        Are you saying it would be, in your view as a

18   detective, possible that whoever shot Mr. Frazier could have

19   wrestled with him on the ground, fled up the street.

20   Mr. Frazier comes into the store.  He is shot.  He is getting

21   cared for.  And that person returns somehow to the store and

22   makes the 911 call for the police.  Do you think that's

23   possible?

24   A.   Once again, it depends on how soon Clifford Frazier got

25   up off the ground.  It depends on his ability to run or even

1   move that fast.  It depends on so many different things.

2   Q.   Do you think it's likely, sir, that the shooter of

3   Clifford Frazier would return, go inside the store where

4   Clifford Frazier is, and then make a phone call to the

5   police, having murdered two people and shot him and say,

6   "Please come and bring an ambulance"?

7             MS. BOUDREAUX:  I object to form.

8             THE COURT:  Overruled.

9   BY THE WITNESS:

10  A.   It's possible.

11  BY MR. SAFER:

12  Q.   Okay.  The fact is, sir, you knew that someone made a

13  call from inside J&J's to the police, correct?

14  A.   I think we were aware of that.  I don't know.  Yes.

15  Q.   If we can look at Plaintiff's Exhibit 86, which is your

16  supplemental record.  At the bottom he says -- he related he

17  did so, and the male black -- yeah, the male black with the

18  dark complexion kicked the gun under the table.  He related

19  that the people in J&J Fish then called the police.

20             You see that?

21  A.   Yes.

22  Q.   So you knew that there was a 911 call from inside J&J's,

23  right?

24  A.   Yes.

25  Q.   Now, you will agree with me, sir, I think, that it is at

1    least highly unlikely that the person who made that 911 call

2    was the person who shot Clifford Frazier, correct?

3    A.   Probably, yes.

4    Q.   And the fact is, sir, you chose not to listen to that

5    call, right?

6    A.   Yes.

7    Q.   You are not -- you worked hard as a detective, correct?

8    A.   Yes.

9    Q.   You were not a lazy man, right?

10   A.   Correct.

11   Q.   So it wasn't for lack of effort, and it wasn't because

12   you didn't know how to do your job, correct?

13   A.   Correct.

14   Q.   It was because you chose not to listen to that call,

15   right?

16   A.   Correct.

17   Q.   You chose not to listen to that call because you had

18   already decided that Eddie Bolden was going down for these

19   crimes, and you didn't want evidence that would prove you

20   wrong, right?

21   A.   No.  We didn't know it was Eddie Bolden.

22   Q.   And you didn't want to find out because that would

23   disprove your theory, right?

24   A.   No.  I don't follow you.

25   Q.   And because you did nothing to preserve that call, the

1     tape was destroyed.  You didn't destroy it, but it got

2     destroyed because you didn't preserve it, right?

3     A.   I assume so, yes.

4     Q.   And as a result, if he had made that call, you would

5     have had pretty much proof positive that he was innocent,

6     correct?

7     A.   No.

8     Q.   The fact is, sir, you didn't even listen, did you?

9     A.   I didn't listen?

10    Q.   You didn't listen, did you?

11    A.   Correct.

12              MR. SAFER:  Nothing further, your Honor.

13              THE COURT:  Thank you, counsel.

14              Defense counsel, whenever you are ready, you can

15    proceed.

16              MS. BOUDREAUX:  I just need a moment to get my --

17              THE COURT:  Of course.

18              Everyone, we will stay in the room.  We will wait

19    60 seconds here.  Everybody can stand up if they would like

20    to stretch.  It would be a good break.

21         (Brief pause.)

22              THE COURT:  Okay, folks.

23              Ms. Boudreaux, if you want to say a sentence or two

24    to test it out, I think that's a good idea.

25              MS. BOUDREAUX:  Test.  Let me take this scarf off.

1          THE COURT:  Can everybody hear Ms. Boudreaux okay?

2          MS. BOUDREAUX:  Everyone hear my scarf okay?  I

3    think I am ready.

4          THE COURT:  Whenever you are ready to proceed, go

5    for it.

6          MS. BOUDREAUX:  Thank you, Judge.

7                      CROSS-EXAMINATION

8    BY MS. BOUDREAUX:

9    Q.   Detective Pesavento, can you please tell the jury your

10   current age.

11   A.   I am 81 years old.

12   Q.   And when did you retire from the Chicago Police

13   Department?

14   A.   2003.  So it's, roughly, 18 years.

15   Q.   So it's been 18 years since you have been a police

16   officer, right?

17   A.   Yes.

18   Q.   And how long in total were you a police officer?

19   A.   Thirty-three years.

20   Q.   And what year did you become the police?

21   A.   I'm sorry.  What year?

22   Q.   Yes.

23   A.   1970.

24   Q.   Okay.  And you started as a patrol officer?

25   A.   Yes.

1    Q.   And did you have any military experience before you

2    joined the police department?

3    A.   Yes.  I was in the Marine Corps for four years.

4    Q.   Honorable discharge?

5    A.   Yes.

6    Q.   So I would like to go back to the '70s, I suppose, and

7    talk about what kind of training a person has to undergo to

8    become a police officer.

9    A.   We were in the police academy.  At the time it was

10   about -- I think it was about six months.  I came on in June

11   of '70.  I think we got out of the police academy in,

12   roughly, around Christmas, either just before or after.

13   Q.   Does your time in the academy include both classroom

14   instruction as well as sort of scenario training?

15   A.   Yes.

16   Q.   And you are trained on how to fill out police reports,

17   right?

18   A.   Yes.

19   Q.   You are trained that people have constitutional rights?

20   A.   Yes.

21   Q.   After the six months in the academy, is there a period

22   of training when you are out on the street with a more

23   experienced officer?

24   A.   Yes, there is.

25   Q.   Okay.  And what is the point of that exercise?

1    A.   They want you to be with someone who has experience.

2    You learn certain things from the person that you are with.

3    Q.   Okay.  Is that sometimes referred to as a probationary

4    period?

5    A.   Yes.

6    Q.   Okay.  Do you recall how long that lasted for you?  How

7    long were you out in the field with a more experienced

8    officer?

9    A.   I don't recall.  Two or three months.

10   Q.   Okay.  So let's talk a little bit about your assignments

11   within the Chicago Police Department.  We will break it down.

12        You became a detective in 1986, correct?

13   A.   No.  1980.

14   Q.   1980.  Okay.  My notes are wrong.

15        What did you do within the Chicago Police

16   Department before becoming a detective?

17   A.   I was in the narcotics unit for a while before I

18   became -- let me see.  I am trying to think.  I was in a

19   couple of different districts -- the Fifth District,

20   Englewood, the Seventh District, and Sixth District, too, I

21   think.

22   Q.   Okay.  So you started out as a patrol officer; is that

23   correct?

24   A.   Yes.

25   Q.   Okay.  Were you on a tactical team or anything like that

1    before becoming a detective?

2    A.   Yes.

3    Q.   You mentioned you became a detective in 1980.

4         Did you have to undergo more training at that point

5    to become a detective?

6    A.   Yes.  We were in detective school.

7    Q.   How long is detective school?

8    A.   I don't remember.  I think six weeks or five weeks.  I

9    don't recall.

10   Q.   You know, let's talk about your memory.  And I don't

11   mean to pry at all, but are you, because of your age, unable

12   to recall things as you would have before?

13   A.   Oh, yes.  That's correct.

14   Q.   Okay.  Are you having a hard time remembering all the

15   details of this investigation?

16   A.   Yes.

17   Q.   Based on my math, at the time of this -- so it's 1994 at

18   the time of this incident.  And at that point you had been a

19   police officer for 24 years?

20   A.   Yes.

21   Q.   Okay.  Now we are in 2021, right?  Which means it's been

22   27 years since you have worked on this case?

23   A.   Yes.

24   Q.   So for my examination of you, I would like to do it

25   based off the reports if that would aid you in testifying to

1    your investigation.

2    A.    Yes.

3    Q.    Okay.  I actually have a binder right here.

4              MS. BOUDREAUX:  May I approach?

5              THE COURT:  Of course.

6         (Document tendered.)

7    BY MS. BOUDREAUX:

8    Q.    I am going to put these same things on the document

9    camera, so you don't really have to look at this if you don't

10   want to, but just in case.

11             So let's talk about the time period of

12   January 29th, 1994.  Who were you partnered with that day?

13   A.    George Karl and, I think, Ed Siwek.

14   Q.    Had you worked with George Karl before this day?

15   A.    Yes, I did.

16   Q.    How about Ed Siwek?

17   A.    I don't -- I'm not sure if we were particularly working

18   together that day or if he was in a separate car, and they

19   just assigned him with us because of the homicide.  I didn't

20   work with Ed Siwek that often, no.

21   Q.    Was he less experienced than you and Detective Karl at

22   that time?

23   A.    I think he was, yes.

24   Q.    Would it be fair to say that you and Detective Karl were

25   the lead investigators?

1   A.   Yes.

2   Q.   You mentioned that other detectives assisted in this

3   investigation under Mr. Safer's questioning.  Do you recall

4   that?

5   A.   Who they were?

6   Q.   Yes, that's basically the question.  Who else assisted?

7   A.   There were different units there.  Well, there was --

8   from Area 2 there was Mike Baker, Mike Rowan, Bill Higgins.

9   That's all that comes to my mind right now.

10  Q.   Okay.  Fair enough.

11       You mentioned --

12  A.   That was just from our unit.

13  Q.   Right.

14  A.   There were other units involved.

15  Q.   That's what I was going to ask you.

16       You mentioned a few times on cross-examination that

17  there were multiple police units involved in this

18  investigation.  What did you mean by that?

19  A.   Well, there was the gang crimes unit and the Third

20  District officers, which was Grand Crossing, and I think that

21  was it.

22  Q.   So let's break this down a little bit.

23       What would, say, the patrol officers -- the Third

24  District patrol officers be doing out at the scene?

25  A.   They would generally be doing the initial investigation.

1    They probably got there, maybe, first; and they should be

2    doing, like, sealing off the area and getting any information

3    they can about it.

4    Q.   So let me take a step back.

5         What was the detective's role in terms of handling

6    a violent crime like the one we have been hearing about?

7    A.   Well, I guess you could say we were in charge to a

8    certain extent.  That doesn't mean that we outranked any

9    sergeant or lieutenant that came there, no.  But we were in

10   charge of it.

11   Q.   And I believe you mentioned gang crimes, right?

12   A.   Yes.

13   Q.   Okay.  Does gang crimes show up to shootings that they

14   believe may be gang-related?

15   A.   Yeah.  Yes.

16   Q.   So let's talk about the early evening hours or the

17   evening hours of January 29th.

18        Did there come an occasion that you got assigned to

19   go to 6546 South Minerva?

20   A.   Yes.

21   Q.   And then we have already spoken about the fact that

22   there was another shooting incident, the shooting of Clifford

23   Frazier that occurred on Cottage Grove?

24   A.   Yes.

25   Q.   Correct?  Okay.

1              So let me just show this map for a second that we

2       saw in opening statements.  So we can see that J&J Fish is in

3       the top corner, right?

4       A.   Yes.

5       Q.   And that's Cottage Grove?

6       A.   Yes.

7       Q.   And then this icon down here (indicating), that's

8       Minerva Street, correct?

9       A.   Correct.

10      Q.   Do you know approximately how far those two locations

11      are from each other?

12      A.   Actual foot distance -- I mean, how far, no, I don't,

13      but they aren't too far.  Pretty close.

14      Q.   Okay.  Would you say it was less than a mile or more

15      than a mile?

16      A.   Oh, less.

17      Q.   Less than a half a mile?

18      A.   Probably.  Probably about a half mile, maybe.

19      Q.   So I would like to look at Plaintiff's 86, which is

20      already in evidence, and direct your attention to the

21      highlighted portion of the document and ask you if that

22      refreshes your recollection as to the times the 911 calls

23      came in for each separate incident?

24      A.   The first one came in at -- on the 29th of January,

25      1994, at 2009 hours, which is nine minutes after 8:00.

1    Q.   8:09 p.m.?

2    A.   Yes.

3    Q.   Okay.  And how about the call for the aggravated battery

4    on Cottage Grove?

5    A.   At 2020 hours, which is 20 minutes after 8:00.

6    Q.   So 8:09 to 8:20?

7    A.   Yes.

8    Q.   And once -- do you recall how you got notified to go to

9    the Minerva scene?

10   A.   No, I don't.

11   Q.   But you did go there, right?  Okay.

12            And when you got to the scene, did you talk to

13   officers that were already there?

14   A.   Yes.

15   Q.   What did you learn about what had gone on at the Minerva

16   location with the men in the car?

17            MR. SAFER:  Your Honor, if we could have

18   foundation.  Objection.  Foundation.

19            THE COURT:  What did you learn about --

20            MR. SAFER:  With whom was he speaking?

21            MS. BOUDREAUX:  I can lay a foundation, Judge.

22            THE COURT:  Go ahead.

23   BY MS. BOUDREAUX:

24   Q.   Detective Pesavento, you arrived at some point at the

25   location on Minerva where two men had been shot in the back

 1    of the head, correct?

 2    A.    Correct.

 3    Q.    And when you got there, did you have occasion to see

 4    other officers that were already there?

 5    A.    Yes.

 6    Q.    Did you have a conversation with any of those officers?

 7    A.    Yes.

 8    Q.    What did you learn from those officers about what had

 9    happened at that scene?

10              MR. SAFER:   Your Honor, officers are people.

11              THE COURT:   Overruled.

12    BY THE WITNESS:

13    A.    We learned that they had gotten a call of a car on fire

14    at that location.  When they arrived there was a fire under

15    the hood of a car parked there.

16              And then they also at the same time -- not only did

17    they see the fire there, but they saw that there were two men

18    inside the car.  And they tried to knock on the door and to

19    get them to come out.  They weren't responding.  I think they

20    broke the window of the car and finally got the doors open

21    and dragged the two men out.

22              THE COURT:   If you can, elicit who "they" refers

23    to.

24              MS. BOUDREAUX:   Sure.

25              THE COURT:   That was the nature of the objection.

 1          MS. BOUDREAUX:  We can actually look at the report.
 2    BY MS. BOUDREAUX:
 3    Q.   This is Plaintiff's 86 again.  We have the highlighted
 4    version.  If you could just read this sentence right here
 5    (indicating), we can identify who you were speaking to.
 6    A.   Did you want me to read it?
 7    Q.   I just meant read it to yourself and tell the ladies and
 8    gentlemen of the jury who you spoke to.
 9    A.   Officer Harvey of the Third District.
10    Q.   Okay.  You mentioned that the car was on fire, right?
11    A.   Yes.
12    Q.   So was the fire department there?
13    A.   I think they were.
14    Q.   Were or had been there?
15    A.   Yes.
16    Q.   Okay.  I am going to show you some photographs of what
17    that scene looked like.  I am going to ask you if they fairly
18    and accurately depict the scene that you saw on January 29th,
19    1994.  Okay?
20          MS. BOUDREAUX:  These have not been -- so I guess I
21    can just show him.
22          THE COURT:  They have not been admitted in evidence
23    yet?
24          MS. BOUDREAUX:  Not yet.
25          THE COURT:  You can ask him to --

 1                MS. BOUDREAUX:  Well, actually --

 2                THE COURT:  Well, any objection?

 3                MS. BOUDREAUX:  I'm sorry.  I didn't mean to

 4      interrupt.

 5                These are actually joint exhibits.

 6                THE COURT:  Why don't you read the joint exhibits

 7      into the record.  We will see if there is an objection.  If

 8      not, we will go ahead and publish it.

 9                MS. BOUDREAUX:  Mr. Safer, do you want to just take

10      a look at these.

11                MR. SAFER:  Oh, sure.

12           (Documents tendered.)

13                THE COURT:  Folks, these are called joint exhibits.

14      The parties worked together cooperatively before trial to try

15      to agree on some of the exhibits.  It saves time.  When you

16      hear "joint exhibits," that means some cooperation has

17      happened before trial.

18                MR. SAFER:  No objection, your Honor.

19                THE COURT:  Very good.  You want to read into the

20      record which exhibit numbers, Ms. Boudreaux.

21                MS. BOUDREAUX:  Sure.  They are actually not joint,

22      but I think they are agreed to.

23                It's Plaintiff's Exhibit 73B; Defendants' Exhibit

24      C, Bates stamped 1193; Defendants' Exhibit C, Bates stamped

25      1216; Defendants' Exhibit C, Bates stamped 1201.

1          THE COURT:  No objection?

2          MR. SAFER:  No objection, your Honor.

3          THE COURT:  Admitted.  You can publish to the jury.

4          MS. BOUDREAUX:  Thank you.

5      (Said exhibits were received in evidence.)

6  BY MS. BOUDREAUX:

7  Q.   Officer Pesavento, showing you what has been marked as

8  Plaintiff's Exhibit 73B.  Do you recognize what's in that

9  photograph?

10  A.   Yes.

11  Q.   Is that the car that was on Minerva that the two men

12  were pulled out of?

13  A.   Yes.

14  Q.   And does this photograph fairly and accurately depict

15  the way the car looked when you saw it on January 29, 1994?

16  A.   Yes.

17  Q.   Could you describe the weather conditions that were

18  happening that night?

19  A.   Well, it was cold, obviously snow, and it was dark.

20  Q.   And does it appear that the windows have been smashed

21  out of this car?

22  A.   I think it does, yeah.  Yes.

23  Q.   Okay.  Let's go on to the next photograph.

24          Defendants' C, 1193, is this another photograph of

25  the same thing?

1   A.   Yes, it is.

2   Q.   And this fairly and accurately depicts the car on

3   Minerva on the night of the incident?

4   A.   Yes.

5   Q.   This is Defendants' C, 1201.  Does this photograph

6   fairly and accurately depict an approximate amount of

7   snowfall that was happening that night?

8   A.   Yes.

9   Q.   Based on your knowledge, was one of the men in the car

10  dead on the scene?

11  A.   Yes.

12  Q.   And how about the other man?  What happened to him?

13  A.   He was transported to a hospital.

14  Q.   Do you recall which hospital?

15  A.   Northwestern.

16  Q.   Okay.  So would it be fair to say that, as your duties

17  as a detective, the first thing you do is a preliminary

18  investigation of whatever crime scene you are at?

19  A.   Yes.

20  Q.   And did you do a preliminary investigation at the scene

21  on Minerva Street?

22  A.   Yes.

23  Q.   I would like to show you what's already in evidence.

24  This is Joint Exhibit 4, 13454.

25          This is a general progress report of

1    Detective Karl.  Do you recognize that?

2    A.   Yes.

3    Q.   And could you read, if you can, what this line says

4    (indicating)?

5    A.   "Facing south, west side of street."

6    Q.   And what is that a description to?

7    A.   Referring to the car that you showed the photos of.

8    Q.   Okay.  So this means the car on Minerva Street was

9    facing south on the west side of the street?

10   A.   Yes.

11   Q.   Okay.  So let me just throw up this map one more second.

12        So this is Minerva Street, right (indicating)?

13   A.   Yes.

14   Q.   And there is a compass up here (indicating).

15        So the car would be facing that way (indicating);

16   is that correct?

17   A.   Yes.

18   Q.   The west side of the street?

19   A.   West side.

20   Q.   Is that your recollection of the position of the car?

21   A.   Yes.

22   Q.   Okay.  Now, turning back to this general progress

23   report, could you read these next three highlighted lines?

24   A.   The first one is "Derrick Frazier," the second one is

25   "Clayton," and the third one is "bad guy."

1  Q.   Okay.  And what does it say in the parentheses after

2  each name?

3  A.   For Derrick Frazier, the first one is, he is on the

4  passenger side.  Clayton was driving.  And bad guy -- I don't

5  know.  I can't make that out.

6  Q.   Back?

7  A.   Back.  Oh, I am sorry.  Yes, back.

8  Q.   So that was kind of my next question.

9       Did it seem fairly obvious to you from an early

10 point that whoever had shot these two men had been in the

11 back seat of the car?

12 A.   Yes.

13 Q.   Did you request that the crime lab come out to the scene

14 on Minerva to process the scene?

15 A.   Yes.

16 Q.   What does it mean to process a scene?

17 A.   They'll take photographs, any fingerprints they can

18 find, anything to assist in the investigation.

19 Q.   So we are talking about processing the scene for

20 physical evidence?

21 A.   Yes.

22 Q.   Showing you what is already in evidence, Joint Exhibit

23 4.  Let me clear this again.

24      Can you take a look at this report and tell the

25 jury what this is?

1   A.   It's a crime scene processing report, what they did at
2   the crime scene as far as what they found and so on and so
3   forth.
4   Q.   All right.  So it looks like, if we could read the
5   narrative, that Detective Karl was requesting something.
6   Could you tell the jury what he was requesting?
7   A.   He requested them to do -- administer a GSR, which is a
8   gunshot residue test, to the two victims there.
9   Q.   Okay.  So if I'm understanding you, he wanted the
10  victims' hands, is that correct -- hands tested for gunshot
11  residue?
12  A.   Yes.
13  Q.   What would be the purpose of doing that from a police
14  perspective?
15  A.   To see if they did any of the shooting.
16  Q.   And based on your knowledge, did both of these tests
17  come back negative?
18  A.   I believe they did, yes.
19  Q.   So there was no evidence that Derrick Frazier or Irving
20  Clayton had fired a gun?
21  A.   Correct.  That plus the witnesses' account.
22  Q.   Okay.  It also looks like there is a result here for
23  whether fingerprints were found; is that right?
24  A.   Yes.
25  Q.   And what was the result of the initial --

1   A.   None were found.

2   Q.   And that was the initial try to get fingerprints from

3   that car while it was outside on Minerva?

4   A.   (No response.)

5   Q.   Now, I am going to show you another report that deals

6   with fingerprints and ask that we can take a look at this.

7            So first of all, the first section of this report

8   says "photography."

9            MS. BOUDREAUX:  I'm sorry.  This is in evidence.

10  It is Joint 4, 13438.

11  BY MS. BOUDREAUX:

12  Q.   What does this refer to, Detective Pesavento?  What are

13  the photographs here?

14  A.   Photographs of cartridge cases found in the car -- spent

15  cartridge cases.

16  Q.   All right.  Well, let me back you up.

17           This report was requested by Detective Karl,

18  correct?

19  A.   Yes.

20  Q.   And was performed by evidence technicians Tom

21  Ginnelly --

22  A.   Yes.

23  Q.   -- and I think the other name is cut off?

24           And it looks like they took some photographs of the

25  car, right?

1  A.   Yes.

2  Q.   A/Os -- I'm sorry.  "O/As of scene."  Do you know what

3  that refers to?

4  A.   You know, I don't remember right now.  I'm sure I did.

5  Q.   And then it goes on, "exterior of vehicle."  I think

6  that's supposed to be into vehicle.  "Cartridge casings in

7  front seat"?

8  A.   Yes.

9  Q.   "Metal fragment in front seat," and it goes on.  "Photos

10  of the victims, ID photos."

11        So based on your understanding of these reports,

12  the evidence technicians were taking photographs of the scene

13  in its entirety?

14  A.   Yes.

15  Q.   And then if we read the narrative section, it says that

16  a search for -- "A search of the scene for relevant physical

17  evidence met with the above-noted results."

18        So then we go back up to the fingerprints box.

19  A.   "Negative results."

20  Q.   Well, this says "above-noted results."

21        So up here it says that there were no fingerprints

22  found, right?

23  A.   Right.

24  Q.   And then there is an additional line in the narrative

25  that says, "Cartridge cases examined for possible

 1    fingerprints but with negative results"?

 2    A.   Yes.

 3    Q.   So would you agree with me that when they say "none"

 4    here, they are referring to no fingerprints found anywhere in

 5    the car?

 6    A.   Correct.

 7    Q.   And then they specifically talk about the fact that they

 8    examined the small cartridge casings found in the car for

 9    fingerprints and none were found on those either?

10    A.   Yes.

11    Q.   Okay.  So let's take a look at what the inside of that

12    car looked like and the conditions under which these

13    fingerprints were trying to be obtained.

14              (Counsel conferring.)

15    BY MS. BOUDREAUX:

16    Q.   Showing you Exhibit C -- Defendants' Exhibit C, Bates

17    stamped 1197.

18              THE COURT:  This is in evidence?

19              MR. SAFER:  We have no objection, your Honor.

20              THE COURT:  It's admitted.

21              MS. BOUDREAUX:  I move to admit Defendants' Exhibit

22    C, 1197, 1196, and 1207.

23              THE COURT:  Admitted.

24              MR. SAFER:  No objection.

25         (Said exhibits were received in evidence.)

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 34 of 168 PageID #:18266
Pesavento - cross - by Boudreaux
1000

1    BY MS. BOUDREAUX:

2    Q.   Can you tell the jury what we are looking at here,

3    Detective?

4    A.   You are looking at the front seat of the car there,

5    driver's side.

6    Q.   Is this an accurate depiction of the way that car looked

7    after the men were taken out of it?

8    A.   Yes.

9    Q.   And this photograph was taken by the evidence

10   technicians?

11   A.   Yes.

12   Q.   On the report that we just saw, correct?

13   A.   Yes.

14   Q.   I am going to show you another -- Defendants' C, Bates

15   stamped 1196.  I think this is the right way to put the

16   photograph.

17        Could you tell us what we are looking at?

18   A.   The same scene basically from the other side of the car.

19   Q.   So that's the view from the passenger side?

20   A.   Yes.

21   Q.   You can see all this white stuff on the front seat.  Do

22   you know if -- was that snow, or was that from the fire

23   extinguishers?

24   A.   You know, I'm not sure.

25   Q.   Do you see the broken glass on the floor?

1    A.   Yes.

2    Q.   Is that what you recall it looking like?

3    A.   Yes.

4    Q.   The last photo, Defendants' C, Bates stamped 1207.  This

5    is a view of -- partial view of what the back seat looked

6    like?

7    A.   A view into the car from the back rear window.

8    Q.   You can see the window has been smashed out?

9    A.   Yes.

10   Q.   So these were the conditions under which the evidence

11   technicians were looking for fingerprints?

12   A.   Correct.

13   Q.   Now, outside from getting the crime scene processed on

14   Minerva, you also did a canvas; is that right?

15   A.   Yes.

16   Q.   Could you explain what a canvas is?

17   A.   Knocking on doors, seeing if people answer their door to

18   ask them if they saw anything that would assist us.  We

19   identified ourselves, of course, as being detectives, and

20   there was a shooting out in front.

21   Q.   And did you personally participate in this canvas?

22   A.   Yes, I did.

23   Q.   And did Detective Karl as well?

24   A.   I believe he did, yeah.

25   Q.   You mentioned on cross-examination that most people

1    reported only hearing the sound of shots being fired?

2    A.   Correct.

3    Q.   Or seeing the car on fire?

4    A.   Yes.

5    Q.   And there was one person that knew more than that,

6    correct?

7    A.   Yes.

8    Q.   All right.  So let's look at first what the other people

9    had to say quickly.

10         So right here it says, "witnesses interviewed."  Do

11   you see that?

12   A.   Yes.

13   Q.   So Lee Williams, who we will talk to -- talk about in a

14   moment.  Okay.

15         So the next person you found, Ralph Vallott.  What

16   information did he have?

17   A.   Nothing.

18   Q.   Renee Peterson?

19   A.   She heard a car engine racing and nothing else.

20   Q.   Do you have an understanding of why the car engine would

21   have been racing?

22   A.   Yeah.  The person who was sitting on the driver's seat

23   and got shot, it's very likely his foot went down on the gas

24   pedal.

25   Q.   Naomi Dean?

1    A.    She heard gunshots and the motor racing.

2    Q.    Carol Wells?

3    A.    Heard gunshots and nothing else.

4    Q.    Okay.  And then we get into the people at the J&J Fish.

5    So we will get to them in a moment.

6          So you had occasion to talk to Lee Williams; isn't

7    that right?

8    A.    Yes.

9    Q.    And what do you recall about what he had to say about

10   the night of the incident?

11   A.    He said he happened to be standing up, looking out the

12   window, and saw a car pull up in front of his house.  He saw

13   two people sitting in the front seat, and he saw somebody in

14   the back seat.  The person in the back seat shot the two men

15   in the front seat.  And then --

16   Q.    So --

17   A.    Oh, I'm sorry.

18   Q.    No.  I'm sorry.

19         So he told you he actually witnessed the shooting?

20   A.    Yes.

21   Q.    And was he able to give a description of that person?

22   A.    Yes, not a real good one, but he said he was a black

23   male dressed in dark clothing.  I don't know if there was

24   anything else.

25   Q.    Let's take a look at it.  This is Plaintiff's 86 again.

1        So this is the description?

2   A.   Early 20s, wearing dark clothing.

3   Q.   Male black in his early 20s, wearing dark clothing.

4   That's what he told you.  Is that what you wrote down?

5   A.   Yes.

6   Q.   Did you type this report?

7   A.   I think I did, yes.

8   Q.   Could you explain -- are there instances where multiple

9   detectives contribute to typing the same report?

10  A.   Yes.

11  Q.   I'm sorry.  I misspoke.

12       Do multiple detectives contribute to reports?

13  A.   Yeah.

14  Q.   And does that include different people typing at

15  different times?

16  A.   Right.

17  Q.   So how does that work?

18  A.   They take turns doing it.

19  Q.   Back -- I'm so sorry.  I keep interrupting you.

20       Back then, were you typing on a typewriter or a

21  computer?

22  A.   I'm trying to think of here.  This was 1994.

23  Q.   If you don't know, you don't know.

24  A.   I don't know if we had the computers yet or not.  Might

25  have.  I don't recall.

1    Q.   There was one thing that I forgot to ask you about Lee
2    Williams.
3         I would like to draw your attention to the first
4    paragraph of what he said.  If you could read it out loud,
5    that would be great.
6    A.   "Williams was questioned as to the identity" --
7    Q.   I'm sorry.  That was my fault.
8         Right here (indicating), the first paragraph.
9    A.   "After firing the shots, the man in the back seat exited
10   the vehicle and calmly walked northbound on Minerva.
11   Williams said that at this time he heard the car engine
12   racing very loudly."
13   Q.   So let me ask you this, Detective:  Is northbound on
14   Minerva toward the area of the J&J Fish and the Harold's
15   Chicken?
16   A.   Yes.
17   Q.   So he would be heading in that direction.  True?
18   A.   True.
19   Q.   So that brings us to Cottage Grove, which is the second
20   crime scene in the investigation?
21   A.   Yes.
22   Q.   You mentioned that you went to that crime scene?
23   A.   Yes.
24   Q.   And did you go to the Minerva crime scene first and then
25   go there?

1   A.   Correct.

2   Q.   Just as a reminder, this was the crime scene based on

3   the call that had come in at 8:20 p.m.?

4   A.   Correct.

5   Q.   When you got to that crime scene, did you and your team

6   make any formulations as to whether these incidents were

7   related or not?

8   A.   Yes.

9   Q.   And did you believe that they were?

10  A.   Yes.

11  Q.   Why?

12  A.   Because of the -- I think at this point we had talked to

13  one of the witnesses, and she talked about them meeting for a

14  dope deal.

15  Q.   Was there anything about the timing of the incidents or

16  the distance between the two incidents that caused you to

17  believe they might be related?

18  A.   Yeah.  They were fairly close, and the timing was right

19  there.

20  Q.   When you arrived at Cottage Grove, did you learn that

21  there was a surviving victim named Clifford Frazier?

22  A.   Yes, we did.

23  Q.   And what was your understanding of where he was at the

24  time you arrived?

25  A.   He was transferred -- not transferred.  He was brought

1    to, I think it was Christ Hospital.

2    Q.   And did you assign a detective to interview him at

3    Christ Hospital?

4    A.   Yes.  That was Mike Baker, I believe.

5    Q.   We will get to that in a moment.

6         Did you also assign a crime lab to come out and

7    process the Cottage Grove scene?

8    A.   Yes.

9    Q.   So let's just set the scene here.

10        This is Joint Exhibit 23, Bates stamped 1227, 1228;

11   Plaintiff's 46; and Plaintiff's 132 -- I'm sorry; I am going

12   to add one more -- and Joint Exhibit 23, 1226.

13        MR. SAFER:  No objection, your Honor.

14        THE COURT:  They are admitted.  You may publish.

15        (Said exhibits were received in evidence.)

16   BY MS. BOUDREAUX:

17   Q.   Detective, showing you a photograph.  I know this is

18   kind of overexposed.  But do you recognize the restaurant

19   that's depicted in that photograph?

20   A.   Yeah.  I think that's -- is that J&J Fish?

21   Q.   Yes.  I mean, is that your understanding of what it is?

22   A.   Yes.

23   Q.   Does that comport with your memory of how J&J Fish

24   looked back in 1994?

25   A.   Yes.

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 42 of 168 PageID #:18274
Pesavento - cross by Boudreaux
1008

1   Q.   So I am going to now show you Joint Exhibit 23, Bates

2   stamp 1228.  Can you tell the jury what we are looking at in

3   this photograph?

4   A.   I think that's the interior of it.

5   Q.   So it's a fairly small restaurant.  Would you agree with

6   that?

7   A.   Yes.

8   Q.   And does this look the way you recall it looking in

9   1994?

10  A.   Yes.

11  Q.   Here is another view of the inside of J&J Fish,

12  Plaintiff's 46.  Does this fairly and accurately depict a

13  portion of the inside of the restaurant?

14  A.   Yes.

15  Q.   I talked a little bit about the apartments yesterday.

16  So I wanted to show you Plaintiff's Trial Exhibit 132.  And

17  I'm not representing that this is from 1994.  But does this

18  appear to be the same building that housed J&J Fish in 1994?

19  A.   Yes.

20  Q.   And can you see four apartments above the storefront?

21  A.   Yes.

22  Q.   Thank you.

23          Showing you now what's marked as Joint Exhibit 23,

24  1226.  What are we looking at in this picture, sir?

25  A.   It's Harold's Chicken.

1    Q.    And where --

2    A.    That's across from J&J Fish.

3    Q.    Thank you.

4          At some point in your investigation did you learn

5    that Anthony Williams owned the beeper store and his family

6    owned the J&J Fish store?

7    A.    Yes.

8    Q.    Do you recall how you learned that information?

9    A.    No, I don't.

10   Q.    When you arrived at the Cottage Grove scene, the J&J

11   Fish, were there officers from other units present?

12   A.    Yes.

13   Q.    Who?

14   A.    The Third District and the gang crimes.

15   Q.    Okay.  So patrol officers and officers from the gang

16   crimes unit?

17   A.    Yes.

18   Q.    Did you speak to them when you arrived at the J&J Fish?

19   A.    I'm sure we did.

20   Q.    At some point did you learn that Anthony Williams was a

21   Gangster Disciple?

22   A.    Yes.

23   Q.    So I would like to now turn to what Detective Baker

24   learned from Clifford Frazier at Christ Hospital.  Okay?

25   A.    Yes.

1   Q.   If you want to look at a hard copy, it's Tab 7 of your

2   notebook, but I could also put it on the screen.

3   A.   Put it on the screen.

4   Q.   Okay.

5        MS. BOUDREAUX:   These are in evidence, Judge.   This

6   is Joint Trial Exhibit 25.

7        THE COURT:   Okay.   Thank you.

8   BY MS. BOUDREAUX:

9   Q.   So this is what I will call Page 1 of 2 of

10  Detective Baker's interview with Clifford Frazier.

11       So the first paragraph, it looks like his

12  identifying information.   Would you agree with that?

13  A.   Yes.

14  Q.   And then it says, "CFD 57, Christ Hospital,

15  Dr. Holevar."

16       Do you know what that's in reference to?

17  A.   He was transferred to Christ Hospital by Chicago Fire

18  Department ambulance, and Dr. Holevar, I assume, is the one

19  that was tending to him.

20  Q.   And then it says, "Gunshot wound to middle of the back

21  (entrance)."   And then it says, "(exit) right shoulder."

22       Is that your understanding of one of the two

23  locations where he was shot?

24  A.   Yes.

25  Q.   And then it says, "Gunshot wound to the left leg (flank)

1   (entrance); (exit) left inner thigh"?

2   A.   Yes.

3   Q.   That's your understanding of the second gunshot wound,

4   correct?

5   A.   That's correct.

6   Q.   And then the next line says, "Multiple lacerations to

7   the top of the head"?

8   A.   Yes.

9   Q.   What was your understanding of how that happened?

10  A.   We found out that was when he got into the fight with

11  the person who was shooting at him.

12  Q.   And then the next line says, "J&J Fish, 6422 South

13  Cottage Grove - Anthony 'Ant' Williams."

14          Does that -- from the looks of this progress

15  report, does it look like that is information that is going

16  from Clifford Frazier to Detective Baker?

17  A.   Yes.

18  Q.   And then it says "aggravated battery" with an RD number.

19          We learned about RD numbers yesterday, right?

20          So this would be the RD number -- records division

21  number -- from the aggravated battery to Clifford Frazier,

22  correct?

23  A.   I believe so, yes.

24  Q.   And then down here it says, "Maroon Caddy, 1983,

25  four-door."

1    Do you have an understanding of whose car that is?

2    A.   That's the one that was parked out there.  I can't

3    recall right now.

4    Q.   All right.

5    And then it says, "Beat 6111, T. Anderson and J.

6    Oliver"?

7    A.   Yes.

8    Q.   What is your understanding of who those people were and

9    why their names are on this progress report?

10   A.   Well, that BT 6111 was their beat number.  That means

11   the unit they were assigned to, and that's what they were on.

12   And their names and the numbers after that -- the numbers

13   after that are their star numbers.

14   Q.   Does the fact that their names appear on this progress

15   report lead you to believe that they were there at the

16   hospital at the time Mike Baker was interviewing Clifford?

17   A.   Yes, I would think so.

18   Q.   And this is Michael Baker's signature, correct?

19   A.   Correct.

20   Q.   Okay.  So the next page of the general progress report

21   is longer and messier.  You have seen this before, right?

22   A.   Yes.

23   Q.   So for convenience, this has been typed up.  So I think

24   we are going to look at that version.  All right?

25   A.   Okay.

1   Q.   This is the entirety, based on your understanding, of

2   what Clifford Frazier said to Michael Baker on the night of

3   the incident in the emergency room, correct?

4   A.   Correct.

5   Q.   All right.  So let's take a look at this.

6             "Went to sell drugs with my brother Derrick and

7   cousin Irving (Ledell Clayton)."  And then it says, "Three

8   cars."  I am going to stop there.

9             Based on your investigation, there were three cars

10  that were there that night, correct?

11  A.   Yes.

12  Q.   "I drove the maroon Caddy, '83, four-door.  Derrick

13  drove a light gray Chevy.  No plates.  Irving, dark gray

14  Chevy.  Two kilos in the car."

15            Did you see all three of those cars at the scenes

16  of the crimes that night?

17  A.   I'm sure we did, but I can't picture it right now in my

18  head.

19  Q.   And you verified that there were in fact two kilos of

20  cocaine in one of the cars, correct?

21  A.   Yes.

22  Q.   Then it says, "Derrick gave me two guns.  Said to hold

23  them.  And if any MFer came by the car, pop him.  Car in

24  front of Harold's."

25            So it is true that this car was in front of

1    Harold's, correct?

2    A.    Yes.

3    Q.    It says, "Two victims met in J&J."

4          So by "victims," who are we talking about?

5    A.    Derrick and Ledell.

6    Q.    Derrick and Irving?

7    A.    Or Irving.

8    Q.    It's Irving Ledell Clayton.

9          "Two victims met in J&J.  Came out with one male

10   black.  Said they were going to take a ride.  Blast anyone

11   who came by a car."

12         So this is something that Clifford said to

13   Detective Baker, correct?

14   A.    Yes.

15   Q.    And then Clifford gives a description of this third male

16   black.  It says, "One" -- and is it your understanding that

17   sometimes numbers are used to designate races in police

18   reports?

19   A.    Yeah, sometimes.

20   Q.    So like "M1" would mean male black; is that correct?

21   A.    Yes.

22   Q.    So it says, "One tall; skinny; light complexion; 20 to

23   21; six feet; clean-shaven; heavy, light-colored coat."  Is

24   that correct?

25   A.    Yes.

1  Q.   Would you say that this description given by Clifford

2  Frazier is consistent with many of the features of

3  Mr. Bolden's appearance?

4  A.   Yes.

5  Q.   Then it says, "They left.  I pulled my car into Harold's

6  lot.  Got me chicken from Harold's."

7       So Clifford Frazier is now inside the Harold's,

8  right?

9  A.   Yes.

10 Q.   "Two guys get out of pool hall.  I'm in my car eating.

11 They came by me and watching car.  Got out with one gun,

12 popped hood.  The kept watching, gun in hand."

13      So let me ask you this:  When you found Clifford

14 Frazier's car when the incident was over, was the hood up?

15 A.   Was the hood up?  I believe it was.

16 Q.   "Little later male black out of vacant lot yelling,

17 'Don't move.'  Had a 9mm.  Started shooting.  I got hit, fell

18 up, shot back, trading shots, out of bullets.  Guys got out

19 with gun.  Didn't do anything."

20      So this is the part where Clifford Frazier is

21 describing that he got hit with the bullets, correct?

22 A.   Yes.

23 Q.   And that he fell and got back up.  Is that your

24 understanding of this, Mr. Pesavento?

25 A.   Yes.

1    Q.   "Defendant caught up with me, pistol-whipping me.  I got
2    his gun away, tossed it down, silver 9mm on the ground by
3    J&J."
4         So let's pause there.
5         So Mr. Safer asked you a lot of questions about why
6    you did not test Clifford's gun, correct?
7    A.   Yes.
8    Q.   Now, I want to look at this statement and see if there
9    was any indication that the offender touched Clifford's gun?
10   A.   No.
11   Q.   So it says, "Defendant caught up to me, pistol-whipping
12   me.  I got his gun away," meaning the offender's, right?
13        Was it your understanding that the offender was
14   pistol-whipping Clifford with the offender's own gun?
15   A.   No.  Yes, with the offender's own gun, yes.
16   Q.   And then Clifford is saying he got the offender's gun
17   away and tossed it down, right?
18   A.   Yes.
19   Q.   Is there anything in this statement at all that would
20   alert you to the idea that the perpetrator of this crime
21   touched Clifford's gun?
22   A.   No.
23   Q.   Okay.  "I got his gun away.  Tossed it down.  Silver 9mm
24   on ground by J&J.  Went into J&J.  Dropped the gun."
25        So is Clifford talking about his own gun at that

1   point?

2   A.   Yes.

3   Q.   "They kicked it under the table.  They called police."

4        Okay.  So no specificity about who calls police,

5   right?

6   A.   Right.

7   Q.   And then the final line.  "Guy who shot me is the same

8   guy my brother and cousin left with."

9        That was Clifford Frazier's statement, correct?

10  A.   Yes.

11  Q.   And then there is a description of possibly the store

12  manager.  It says, "Dark skin, 5'7", 29 years old, blue cap

13  (store manager?)"?

14  A.   Correct.

15  Q.   So this was the entirety of what Clifford Frazier told

16  Mr. Mike Baker at Christ Hospital on the night of the

17  incident?

18  A.   Yes.

19  Q.   Is it your understanding that Clifford Frazier has given

20  further statements about this incident not in the police

21  investigation but at the criminal trial?

22  A.   Yes.

23  Q.   And is it your understanding that is when he testified

24  that he was in Harold's Chicken with Eddie Bolden?

25  A.   Yes.

1    Q.   And he also testified that he was in the J&J Fish with

2    his brother and cousin and Anthony?

3    A.   Correct.

4    Q.   So you are aware that he has given statements with

5    further detail than this?

6         MR. SAFER:  Objection, your Honor.  He has not.  He

7    gave testimony.  He gave no statements.

8         MS. BOUDREAUX:  I'm happy to rephrase the

9    statement.

10        THE COURT:  I understood the word "statements" to

11   mean testimony, but why don't you rephrase.

12        MS. BOUDREAUX:  Sure.

13   BY MS. BOUDREAUX:

14   Q.   So you are aware that Clifford Frazier has testified

15   further about details about this incident?

16   A.   Yes.

17   Q.   And he did so at the criminal trial of Eddie Bolden,

18   right?

19   A.   Yes.

20   Q.   And Eddie Bolden was present during that trial, correct?

21   A.   Yes.

22   Q.   And based on your understanding -- you have testified in

23   criminal trials before, right?

24   A.   Yes, I have.

25   Q.   That's part of your job as a police officer?

1    A.    Yes.

2    Q.    And do you have an understanding as to whether a State's

3    Attorney meets with a witness before putting that witness on

4    the stand?

5             MR. SAFER:  Objection, your Honor.  Relevance

6    and --

7             THE COURT:  I am going to overrule with a caveat.

8    I want to see where you are going, but go ahead.  Overruled.

9    BY MS. BOUDREAUX:

10   Q.    Do you know that State's Attorneys meet with witnesses

11   before they put the witness on the stand?

12   A.    Yes.

13   Q.    And do you know that State's Attorneys have an

14   obligation not to put on perjured testimony?

15            MR. SAFER:  Objection, your Honor.  That's

16   improper.

17            THE COURT:  All right.  So I am going to sustain it

18   because an attorney cannot vouch for the -- personally vouch

19   for testimony.  So I will sustain that objection.

20            MS. BOUDREAUX:  I am going to try to rephrase.

21   BY MS. BOUDREAUX:

22   Q.    Based on your experience in courtrooms,

23   Detective Pesavento, you know that a person cannot purger

24   themself.  They are committing a crime if they purger

25   themselves on the stand, correct?

 1    A.    Correct.

 2    Q.    Let's talk about why you did not arrest Clifford

 3    Frazier.  Okay?

 4    A.    Yes.

 5    Q.    So would it be fair to say that Clifford Frazier

 6    admitted to having two guns?

 7    A.    Yes.

 8    Q.    And Clifford Frazier admitted to participating in a

 9    multikilogram drug deal?

10    A.    Yes.

11    Q.    Does a police officer have to arrest every single person

12    that commits any crime?

13    A.    No.

14    Q.    Is there discretion involved in your job as a police

15    officer or as a detective?

16    A.    Yes.

17    Q.    And are there some times when you think it is better not

18    to arrest somebody?

19    A.    Correct.

20    Q.    In this scenario, how did you -- did you consider

21    Clifford Frazier to be a victim?

22    A.    Yes, he was.

23    Q.    Explain why.

24    A.    Why?  Well, he got shot twice, for one thing.  We never

25    really knew his total involvement in this drug deal, whether

1    he did it this one time as a favor to his brother or if he
2    was part of a drug ring that they always did that.
3    Q.    So Clifford Frazier was shot twice during this incident?
4    A.    Yes, he was, and beaten.
5    Q.    And beaten.  And his brother and his cousin were killed?
6    A.    Yes.
7    Q.    And isn't it true that when Clifford -- once this ordeal
8    was over, he told the police everything -- that, "The gun is
9    in my car," right?
10   A.    Yes.
11   Q.    "I dropped the gun at J&J Fish"?
12   A.    Yes.
13   Q.    "There is two kilos of cocaine in the car"?
14   A.    Correct.
15   Q.    "And there is a bunch more cocaine in my apartment
16   because my brother stored it there"?
17   A.    Yes.
18   Q.    So did you get the impression that he was hiding
19   anything from you?
20   A.    No, not at that point, no.
21   Q.    And what is your experience -- what do you think would
22   have happened in terms of Clifford's ability to come forward
23   with the information -- do you think Clifford would have
24   continued to give information in this case had you
25   immediately put him under arrest?

1           MR. SAFER:  I object, your Honor.  It's conjecture.

2           THE COURT:  Overruled.

3    BY THE WITNESS:

4    A.   No, I don't think he would have talked to us again.

5    BY MS. BOUDREAUX:

6    Q.   Have you had that experience where people stop giving

7    information if they are put under arrest?

8    A.   Oh, yes.

9    Q.   Okay.  Now, I know I am kind of jumping around, but I am

10   back at the Cottage Grove scene.  You told us that you

11   arranged for that scene to be processed as well?

12   A.   Correct.

13   Q.   Okay.  So the crime lab came out?

14   A.   Yes.

15   Q.   All right.  Let's look at this general progress report,

16   which is a joint exhibit in evidence, Joint 4, 13457.

17           So this looks like a GPR filled out by

18   Detective Karl?

19   A.   Yes.

20   Q.   All right.  And the first line says, "6415 South

21   Cottage."  And then it says, 1980 something -- 1983 or 7,

22   Cad.  Do you believe that's short for Cadillac?

23   A.   Yes.

24   Q.   And it says, "In parking lot," right?

25   A.   Yes.

1  Q.  And here it says, "1982" -- all right; that says 2
2  then -- "Cadillac, four-door, maroon."
3          Is that your understanding, that was Clifford
4  Frazier's car?
5  A.  Yes.
6  Q.  And then the next few lines seem to list bullet holes
7  that were in Clifford Frazier's car.  Do you see that?
8  A.  Yes.
9  Q.  So it says, "Hole bullet, left front; hole bullet, left
10 driver's side door; hole bullet, left rear panel."  Correct?
11 A.  Correct.
12 Q.  And then it talks about the evidence that was recovered
13 in terms of shell casings and a fragment.
14 A.  Yes.
15 Q.  So the fact that there was all this gun damage to
16 Clifford Frazier's car, did that corroborate what he was
17 saying about the gun fight between him and Eddie Bolden?
18 A.  Yes.
19 Q.  So let's look at some photographs.
20          MS. BOUDREAUX:  I'm sorry.  One moment, Judge.
21      (Brief pause.)
22          MS. BOUDREAUX:  If I could just have one minute?
23          THE COURT:  Of course.
24      (Brief pause.)
25          THE COURT:  Folks, we will take a break in a few

1    minutes.

2              We will take a break right at 3:00 o'clock unless,

3    Ms. Boudreaux, you are at a logical stopping point, in which

4    case we will stop at any time.  We will ballpark it about

5    3:00 o'clock unless now is a good time.

6              MS. BOUDREAUX:  Yes.  I would like to go forward a

7    few more minutes.

8              THE COURT:  A few more minutes.  That's great.  Go

9    ahead.

10   BY MS. BOUDREAUX:

11   Q.   All right.  So we are talking about the processing of

12   the Cottage Grove scene.  I would like to show you what's

13   been marked as Plaintiff's Exhibit 122.

14              Does that look like a bullet hole to Clifford

15   Frazier's car?

16   A.   Yes.

17   Q.   Does this look like Clifford Frazier's car with the hood

18   up?

19   A.   Yes.

20   Q.   And you saw that -- you saw this that night, correct?

21   A.   Correct.

22              MS. BOUDREAUX:  I'm sorry.  For the record, that

23   was CCSAO 043.

24   BY MS. BOUDREAUX:

25   Q.   Is this another photograph of Clifford Frazier's car

1   where it was parked originally with the hood up?

2   A.   Yes.

3   Q.   Okay.  And you could see J&J Fish in this picture very

4   much illuminated, correct?

5   A.   Correct.

6   Q.   The next one is CCSAO 45.  This appears to be another

7   photograph of where Clifford Frazier's car was parked --

8   A.   Yes.

9   Q.   -- in the vacant lot next to Harold's?

10  A.   Correct.

11  Q.   And does it have the hood up?

12  A.   Yes, it does.

13  Q.   CCSAO 0040.  Fair to say that you could see more bullet

14  damage on the rear quarter panel of the driver's side of the

15  car?

16  A.   Yes.

17  Q.   Last one.  CCSAO 046.  Another apparent bullet hole?

18  A.   Yes.

19          MS. BOUDREAUX:   I think this is a good stopping

20  point, Judge.

21          THE COURT:   Okay, folks.  We are going to take our

22  midafternoon break.  We will reconvene in 10 or 15 minutes or

23  so, and then we will do our last session of the day.

24          (Jury out at 2:56 p.m.)

25          THE COURT:   Folks, we will reconvene in ten minutes

1    or so, unless there is a housekeeping matter.

2              We will come back shortly.

3              MS. BOUDREAUX:  Thank you.

4         (A brief recess was taken at 2:57 p.m.)

5         (A change in court reporters was had.)

Pesavento - cross by Boudreaux

1027

1       (Jury out)

2           THE COURT:  All right, folks.  I will note that when

3   Article III of the Constitution uses the phrase "the judicial

4   power," it includes the inherent power to bring a cup of

5   coffee into the courtroom.  I am caffeinated and ready to go.

6   I am more likely to reach the right resolution on an objection

7   for better or for worse, if I have an injection of caffeine.

8           I think, by the way, that having the jurors stand up

9   is really an effective thing.  I don't know what -- I did that

10  off the cuff.  I didn't forewarn you folks of that.  But I

11  think it's a great idea to have -- you know, where I

12  practically said you can stand up, you can stretch.  You know,

13  nobody's taken advantage of that so far, but anything we can

14  do to any jury to keep them involved, engaged and listening, I

15  think it's a good idea.

16          One housekeeping matter.  My astute staff noted that

17  there were a couple of exhibits being used.  You didn't say on

18  the record what they were or admit -- I'm sorry.  You didn't

19  admit them into evidence expressly.  I'd like you to do that

20  at the beginning so we've got a clean record.

21          MS. BOUDREAUX:  Okay.

22          MR. SAFER:  Your Honor, I think we're going to have

23  to do a little repair work on these exhibits because I think

24  some of them were prior versions.  So we're going to get

25  together.

Pesavento - cross by Boudreaux

1028

1       THE COURT:  Totally fine.

2       MR. SAFER:  We're going to get a clean --

3       MS. BOUDREAUX:  It's my fault.

4       THE COURT:  It's totally fine.  And I'll tell you,

5   folks, there are some things like this that are rolling along

6   and I'm not sure about.  Like I hear an exhibit number that

7   doesn't ring familiar to me.  I don't want to interrupt you

8   folks, because I want both sides to be as smooth as you can in

9   front of the jury.  I just like lawyering that way.  So I

10  figured we'd clean it up off line and have you folks present

11  your best position.

12      MS. BOUDREAUX:  That would be much appreciated.  And

13  I promise you, I will clean it up --

14      THE COURT:  Okay.

15      MS. BOUDREAUX:  -- and figure out what the current --

16      THE COURT:  Do you want to do it at the beginning of

17  your examine, just to move into evidence the documents you've

18  already used?

19      MS. BOUDREAUX:  I'll move into evidence what Jessica

20  just told me to.

21      THE COURT:  Fine.

22      MS. BOUDREAUX:  And then I want to go back through

23  everything tonight and make sure I was calling it by the right

24  exhibit number.

25      THE COURT:  Fine.  We've asked for the jury, by the

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 63 of 168 PageID #:18295
Pesavento - cross by Boudreaux
1029

1    way.

2            MS. BOUDREAUX:  Oh, okay.

3            THE COURT:  We're not losing time here.

4            Come on in.

5        (Jury in)

6            THE COURT:  Welcome back, everyone.  You can have a

7    seat.

8            Counsel, whenever you're ready, you can resume.

9            MS. BOUDREAUX:  Thank you, Your Honor.

10           I was remiss in admitting some exhibits.  I'd like to

11   do that now and admit Plaintiff's Exhibit 122 and 123.

12           THE COURT:  Any objection?

13           MR. SAFER:  No, Your Honor.

14           THE COURT:  Admitted.

15       (Plaintiff's Exhibits 122 and 123 were received in

16       evidence)

17           MS. BOUDREAUX:  Thank you.

18   BY MS. BOUDREAUX:

19   Q.   Detective Pesavento, we were talking a few questions back

20   about how Clifford Frazier sort of admitted to having the guns

21   and the drugs.  Do you recall that testimony?

22   A.   Yes.

23   Q.   All right.  I would just like to show you the portion of

24   the report that deals with that topic area.  That's on

25   Plaintiff's Trial Exhibit 86.

Pesavento - cross by Boudreaux

1030

1     And just bring your attention to this paragraph,

2  which states, "Armed with the information supplied by Clifford

3  Frazier, 3rd District gang unit, Officer Willis and co,"

4  company, "returned to the area of 64th and Cottage Grove

5  locating both the Cadillac containing the MAC-11 automatic

6  weapon parked in the lot at 6415 and the Chevy containing the

7  2 kilos of suspect cocaine parked at 6419 South Cottage Grove.

8  This evidence was brought into Area 2 and inventoried."

9     So this is based on information provided by Clifford

10  Frazier, is that right?

11  A.  Yes.

12  Q.  Is that what the first sentence of this paragraph says?

13  A.  I'm sorry, what?

14  Q.  Is that what the first sentence of this paragraph says?

15  A.  Yes.

16  Q.  Okay.  And then it continues by stating, "These same

17  officers also entered J&J Fisheries and recovered a .40

18  caliber pistol left at this location by Clifford Frazier after

19  he engaged in a running gun fight with an armed assailant as

20  described in his statement."

21     Is that correct?

22  A.  That's correct.

23  Q.  Okay.  And we'll talk more about that .40 caliber gun

24  later, okay?

25  A.  Yes.

Pesavento - cross by Boudreaux

1  Q.  So we're at the point in the investigation now where

2  you've canvassed for witnesses at the J&J Fish store.  And I

3  believe you located the people that were employees there, is

4  that correct?

5  A.  Yes.

6  Q.  Did you, did you or someone else bring them to Area 2 for

7  interviews?

8  A.  Yes.

9  Q.  At any time were you involved in an arrest of James

10 Williams, Edna Williams or David McCray?

11 A.  No.

12 Q.  Did you have any knowledge that they were under arrest at

13 the time that they were being interviewed by the detectives at

14 Area 2?

15 A.  No.

16 Q.  Do you have any reason to dispute that they were arrested

17 after they were already interviewed?

18 A.  No.

19 Q.  Okay.  But as you sit here today, can you tell this jury

20 100 percent that you did not arrest any of those people?

21 A.  Yeah, I would say I wouldn't have.

22 Q.  Okay.  So they were brought to the detectives' division

23 for interviews by you or someone on your team, correct?

24 A.  Yes.

25 Q.  Okay.  So let's now talk about what information you

Pesavento - cross by Boudreaux

1032

1   gathered as part of those interviews, okay?

2           So the first, it says right here, "Employees of the

3   J&J Fisheries were brought into Area 2 for interviews.  The

4   following statements are summations of their interviews."

5           Could you please read to the jury what Edna and James

6   Williams had to say?

7   A.  "They could add nothing to the investigation and denied

8   witnessing anything."

9   Q.  Okay.  So did you take that to mean that they didn't even

10  see a commotion outside of the J&J Fish?

11  A.  You can take it how you want to take it, either they

12  didn't, actually didn't see or hear anything, or they just

13  don't want to get involved.

14  Q.  They did not tell you any substantive information that

15  would further your investigation, is that right?

16  A.  Correct.

17  Q.  All right.  The next person is David McCray.  He stated

18  that "at the time of the shooting he was not on the premises

19  and returned following Clifford's entry into the shop

20  requesting help."

21          So would it be fair to say that he did not add

22  anything substantive to your investigation?

23  A.  Correct.

24  Q.  Okay.  And the next person interviewed is Maurice Stewart.

25  "He is the cook for the J&J Fisheries and could only say that

Pesavento - cross by Boudreaux

1033

1  they were preparing a special order and he was busy cooking.

2  He could add nothing significant to the investigation."

3          Is that your recollection of that interview?

4  A.  Correct.

5  Q.  All right.  So the last person is Tenesha Gatson.  And you

6  know her to be sort of the cashier that was working that

7  night?

8  A.  Yes.

9  Q.  All right.  "Ms. Gatson stayed overtime to work on the

10  special order.  She stated that a male black that she only

11  knows as Lanier (phonetic spelling) came into the store about

12  1830 or 1900 hours, stating that his pager was broken and that

13  he wanted to see Anthony Williams.  Lanier was directed next

14  door to Anthony Williams' pager business."  She went on to say

15  that "Lanier and Anthony Williams entered the fishery shop

16  some time later and talked for about 15 minutes.  Williams

17  then left and Lanier stayed in the shop."

18          Is that accurate so far?

19  A.  Yes.

20  Q.  All right.  So Ms. Gatson did say that Lanier was in the

21  shop at the time the offender was having this physical

22  struggle with Clifford Frazier, correct?

23  A.  Yes.

24  Q.  Okay.  And then the next paragraph says, "Gatson described

25  Lanier as being in his early 20s, about five ten to six feet,

1    slender and light complected."

2            So Mr. Safer was asking you questions about what

3    Tenesha Gatson said about Lanier's complexion.  Do you recall

4    that?

5    A.  Somewhat, yes.

6    Q.  Okay.  Well, he pointed to another area in the report, not

7    in the interview of Tenesha Gatson, but another area in the

8    report that said Eddie, "Eddie Lynier Bolden medium

9    complexion."

10           MR. SAFER:  Objection, Your Honor.  Not what I did at

11   all.  That's just not correct.

12           THE COURT:  Well, overruled.  There's no question

13   pending as I understand it.  So why don't you ask the

14   question.

15           And then you can object if you need to, okay.

16           MS. BOUDREAUX:  Okay.

17           THE COURT:  Let's get a question first.

18           MS. BOUDREAUX:  Okay.

19   BY MS. BOUDREAUX:

20   Q.  Did Ms. Gatson describe Lanier as having a light

21   complexion?

22   A.  Yes.

23   Q.  Is that why it's written in your report?

24   A.  Yes.

25   Q.  Did you make up that she said "light complexion"?

Pesavento - cross by Boudreaux

1035

1  A.  No.

2  Q.  Now, would you agree with me that there is no notation

3  here of either Anthony Williams being interviewed by the

4  detectives or Eddie Bolden being interviewed by the

5  detectives, correct?

6  A.  Correct.

7  Q.  You had worked on other homicides before this one,

8  correct?

9  A.  Yes.

10  Q.  Okay.  Did it surprise you that many of the witnesses

11  didn't have much to say?

12  A.  No, it didn't surprise me at all.

13  Q.  And do you believe that had something to do with Anthony

14  Williams being involved?

15       MR. SAFER:  Well, objection, Your Honor.  He can't

16  testify to their state of mind.

17       THE COURT:  Why don't you rephrase that question if

18  you would, please.

19       MS. BOUDREAUX:  I'm trying to -- okay.

20       THE COURT:  And you asked, "And do you believe that

21  that had something to do with Anthony Williams being

22  involved?"  That's what you said.

23     (Discussion off the record)

24  BY MS. BOUDREAUX:

25  Q.  Do you think that sometimes people are reluctant to talk

Pesavento - cross by Boudreaux

1036

1  when they believe a gang member is involved in orchestrating a

2  shooting?

3  A.  Oh, absolutely.

4  Q.  And had you had that experience before in prior homicide

5  investigations?

6  A.  Yes.

7  Q.  So along those same lines, let's turn back to the general

8  offense case report that Mr. Safer showed you in his

9  examination, this is in evidence, Plaintiff's 24.

10         Okay.  So this is the box up here that pertains to

11  witnesses.  And I know it's really hard to see.  I can maybe

12  try to find a better copy of it somewhere.

13         But do you see the -- we've been talking about

14  Octavia Jackson and Todd Henderson during this trial, correct?

15  A.  Yes.

16  Q.  All right.  And I would like to just point you to the

17  portion of the narrative when they said what they had to say.

18  So it says, "Witnesses related there was a commotion outside

19  location."

20         Do you believe that refers to what Octavia Jackson,

21  Todd Henderson and Edna Williams told the reporting patrol

22  officer?

23  A.  Yes.

24  Q.  Okay.  And I would just like to draw your attention to

25  these words right here.  Can you make out that that says

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 71 of 168 PageID #:18303
Pesavento - cross by Boudreaux
1037

1    "reported offense"?

2    A.  Yes.

3    Q.  Okay.  And you see that there's an X in the box next to

4    the words "reported offense"?

5    A.  Yes.

6    Q.  All right.  And this is hard to see because of the

7    photocopies, but there would be the same boxes next to Octavia

8    Jackson's name and Todd Henderson's names, and those boxes are

9    not checked, correct?

10   A.  No, but they have the number 3 all the way to the left

11   there.  It's three people then.

12   Q.  Okay.  But so my question is that their boxes for

13   "reporting offense" is not checked, correct?

14   A.  Right, right.

15   Q.  Okay.  And then I'm trying desperately to see what --

16   because there's another box by their name, and I cannot make

17   out what that box is.  But I will try to.  I can't make it

18   out.

19            But you do agree with me that there's an X next to

20   the box on Edna Williams' name for reported offense, correct?

21   A.  Yes.

22   Q.  All right.  So, again, Mr. Henderson and Ms. Jackson had

23   nothing substantive to say that would further the police

24   investigation into this matter, true?

25   A.  Correct.

Pesavento - cross by Boudreaux

1038

1  Q.  They were not able to, able or willing to supply any

2  description of the combatants?

3  A.  Right.

4  Q.  Or say who was involved?

5  A.  Yes.

6  Q.  Or give any other knowledge they might have had?

7  A.  Correct.

8  Q.  So was there anything on this report that jumped out at

9  you as something to have to follow up with immediately as your

10 duties as a detective?

11 A.  No.

12 Q.  Let me ask you this.  If Clifford Frazier had not picked

13 Eddie Bolden out of a lineup, would your investigation have

14 continued?

15 A.  Yes.

16 Q.  And would you have possibly talked to other witnesses?

17 A.  We'd have probably started it all all over again.

18 Q.  Start looking at it from scratch?

19 A.  Yes.

20 Q.  Was that your typical practice to do?

21 A.  It is.  And it's a difficult -- it's difficult, because

22 when you go back and talk to people a second time and ask them

23 if they have a change of heart or an opinion, you usually --

24 it's harder and harder to get them to talk.

25 Q.  Based on the passage of time?

Pesavento - cross by Boudreaux

1039

1   A.  Yes.

2   Q.  Something unique about this case was that you had a

3   surviving victim, right?

4   A.  Correct.

5   Q.  So did that make -- well, you don't always have that,

6   right?

7   A.  Correct.

8   Q.  So you had someone that was face to face with an offender

9   that could identify him, true?

10   A.  Yes.

11   Q.  Now, let's turn back to that same report, Plaintiff's 86,

12   and see what was going on with trying to locate Anthony

13   Williams.

14        So I'm going to direct your attention to this last

15   paragraph.  So this is in the early days of the investigation.

16   It says, "All efforts to contact Anthony Williams failed.  He

17   has not responded to pagers on his beeper."

18        Do you see that?

19   A.  Yes.

20   Q.  Okay.  So it is true that you and your team were trying to

21   get in touch with Anthony Williams, correct?

22   A.  Correct.

23   Q.  And that would make sense given that you were interviewing

24   all the other employees of the J&J Fish?

25   A.  Yes.

Pesavento - cross by Boudreaux

1040

1    Q.   All right.  So you were not able to locate Anthony

2    Williams for at least a few days after this incident, right?

3    A.   I'm not sure what the exact time was, but yes, it was a

4    while.

5    Q.   So we will get to Anthony Williams in a moment, but I

6    would like to show you two other progress reports called cause

7    of death reports, if I may.

8         This is in the investigative file.  My record is

9    Joint Exhibit 413413.

10        THE COURT:  Is that in evidence?

11        MS. BOUDREAUX:  No, it is not in evidence.  It is, it

12   is.

13        THE COURT:  Great.

14        MS. BOUDREAUX:  I'm sorry, yes.

15        THE COURT:  I'll admit it again just in case.

16        MS. BOUDREAUX:  Okay.  Thank you.

17   BY MS. BOUDREAUX:

18   Q.   Detective, can you tell the jury what kind of report this

19   is?

20   A.   It's a report, it's the medical examiner's cause of death

21   report.

22   Q.   Okay.  This is a Chicago police report filled out with

23   information from the medical examiner, is that fair?

24   A.   Yes.

25   Q.   Okay.  Because you can see from the top it's a

Pesavento - cross by Boudreaux

1041

1    supplementary report by the Chicago Police Department, right?

2    A.  Yes.

3    Q.  All right.  And who does this report pertain to?

4    A.  Derrick Frazier.

5    Q.  Okay.  And I would like to -- well, first, can you explain

6    what the purpose of having a report like this in the

7    investigative file is?  Why is it important to document this

8    type of thing?

9    A.  Well, it shows what the person died from, his cause of

10   death.

11   Q.  Okay.  So let's turn to the next page.  And this describes

12   his gunshot wounds, correct?

13   A.  Yes.

14   Q.  "External and internal examination revealed the presence

15   of two gunshot wounds:  One gunshot wound, entrance to the

16   back of the head, 4 and a half below the top of the head and

17   at the midline, through and through, with exit to the face at

18   the bridge of the nose.

19          "Number 2 gunshot wound, entrance to the top of the

20   head, 1 and a half right of the midline -- well, 1 and 1/4

21   right of the midline, through and through, with exit to the

22   left side of the face.

23          "Upon completion of the autopsy, Dr. Kirschner has

24   determined that the cause of death was due to multiple gunshot

25   wounds and the manner is homicide."

Pesavento - cross by Boudreaux

1042

1    Did I read that correctly?

2  A.  Yes.

3  Q.  Okay.  So I would like to show you the medical examiner's

4  diagrams of where these gunshots were.

5    So fair to say this is gunshot wound number 1, right

6  to the back of the head?

7  A.  Yes.

8  Q.  And gunshot wound number 2, more towards the top of the

9  head, correct?

10 A.  Correct.

11 Q.  Was this consistent with what Lee Williams said about the

12 shooter being in the back seat of the car?

13 A.  Yes.

14    MS. BOUDREAUX:  Judge, this is also in evidence,

15 Joint Exhibit 413442.

16    THE COURT:  Thank you.

17    MS. BOUDREAUX:  This is the death report of Ledell

18 Clayton.  And I would like to do the same thing with this

19 report, if I may.

20 BY MS. BOUDREAUX:

21 Q.  Detective, you recognize this to be another death report

22 that is relevant to this case, correct?

23 A.  Yes.

24 Q.  All right.  And you can see this is for Ledell Clayton?

25 A.  Yes.

Pesavento - cross by Boudreaux

1043

1   Q.  All right.  This one is a little bit different.

2          So this states, "Upon the completion of the autopsy,

3   the pathologist listed the cause and manner of death as

4   indicated above.  The victim sustained four associated gunshot

5   wounds to the head and face.  Dr. Lipschultz recovered two

6   small caliber lead bullets, and one of which was badly

7   deformed."

8          Did I read that correctly?

9   A.  Yes.

10  Q.  Okay.  And here we can see at least three of the gunshot

11  wounds that were inflicted upon Irving Ledell Clayton, is that

12  correct?

13  A.  Correct.

14  Q.  And that's the right side of his head?

15  A.  Yes, it is.

16  Q.  Okay.  So would that still be consistent with someone

17  sitting in the back seat of the car and firing forward?

18  A.  Yes.

19  Q.  All right.  Let's get back into the investigation, okay.

20         So at this point you had been to Minerva, talked to

21  Lee Williams, right?

22  A.  Correct.

23  Q.  Been to Cottage Grove and talked to all of the employees

24  of the JJ Fish?

25  A.  Yes.

Pesavento - cross by Boudreaux

1044

1   Q.  Okay.  And you had heard the name Lanier from Tenesha

2   Gatson, is that right?

3   A.  Yes.

4   Q.  Okay.  Oh, I'm sorry, I think I skipped one thing.

5           MS. BOUDREAUX:  This is not in evidence, Judge, so

6   I'd like to show it to the other side.

7           THE COURT:  Sure.

8           MS. BOUDREAUX:  Can I get the screen just for him, or

9   does that not work with --

10          THE CLERK:  Yes, it should be.

11          MS. BOUDREAUX:  Okay.  Thank you.

12  BY MS. BOUDREAUX:

13  Q.  Okay.  Detective, I'm showing you a crime scene processing

14  report.  And I'd like you to read this narrative section and

15  tell me if this is a report that you saw in your investigation

16  of this case?

17  A.  Yes.  Do you want me to read it out loud?

18  Q.  No.  Just read it to yourself.

19  A.  Okay.

20  Q.  Is that a crime scene processing report that pertains to

21  one of the vehicles involved in this case?

22  A.  Yes.

23  Q.  Okay.

24          MS. BOUDREAUX:  I would move to admit Joint Exhibit

25  413477.

Pesavento - cross by Boudreaux

1045

1     MR. SAFER:  No objection.

2     THE COURT:  Admitted.

3     MS. BOUDREAUX:  Thank you.

4     THE COURT:  You may publish to the jury.

5     MS. BOUDREAUX:  Okay.

6     (Said exhibit was received in evidence)

7  BY MS. BOUDREAUX:

8  Q.  Okay.  So, Detective, we already talked about the fact

9  that crime lab personnel attempted to get fingerprints off of

10  the vehicle in Minerva but were unable to do so when the car

11  was out at the scene, correct?

12  A.  Correct.

13  Q.  And there's a process by which they sort of dust the car

14  for fingerprints.  Are you familiar with that?

15  A.  Yes.

16  Q.  Okay.  But that's kind of their thing, like they do like

17  the scientist type stuff, all right.

18     So this report indicates that Detective Karl asked

19  for another round of looking for fingerprints to be done, is

20  that correct?

21  A.  This report here?

22  Q.  Yeah.  Look under details of the case, and let's talk

23  about that.

24  A.  Okay.

25  Q.  "RI assigned to auto pound 4 to prepare the above vehicle

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 80 of 168 PageID #:18312
Pesavento - cross by Boudreaux
1046

1   for a PPX," which is slang for fingerprints, "which will be

2   completed after the vehicle interior dries from being exposed

3   to inclement weather."

4   A.  Yes.

5   Q.  Okay.  So down here it says that Detective Karl --

6   A.  Right.

7   Q.  -- is the investigating officer's name?

8   A.  Yes.

9   Q.  Okay.  So he wanted another round of looking for

10  fingerprints in that car, correct?

11  A.  Correct.

12  Q.  And that included the interior rear, interior front and

13  anywhere else on the car that is suitable for a latent

14  fingerprint to be left?

15  A.  Yes.

16  Q.  Okay.  And I would just like to show you two photographs

17  of what the car looked like.

18          MS. BOUDREAUX:  Ron, I already showed this to you.

19  I'm not sure if these are in or not, so I am just going to lay

20  the foundation, I guess.

21          THE COURT:  Any objection to the --

22          MR. SAFER:  No, Your Honor.

23          THE COURT:  To save time, they're admitted.

24          MS. BOUDREAUX:  Thank you.

25          THE COURT:  Just say for the record what they are, if

Pesavento - cross by Boudreaux

1047

1     you would, please.

2              MS. BOUDREAUX:  Okay.  They are Defendant's Exhibit

3     C1211 and Defendant's Exhibit C1209.

4              THE COURT:  Admitted.

5          (Said exhibits were received in evidence)

6              MS. BOUDREAUX:  Okay.

7     BY MS. BOUDREAUX:

8     Q.  So, Detective Pesavento, showing you 1211, is that a fair

9     and accurate depiction of the car after it's been moved to the

10    auto pound?

11    A.  Yes.

12    Q.  Okay.  Can you tell it's inside rather than outside?

13    A.  Yes, it is inside.

14    Q.  Okay.  And another photograph of the same, 1209, is that a

15    fair and accurate depiction of how the car looked while it was

16    at the auto pound?

17    A.  Yes.

18    Q.  All right.  So if we go back to this report, we can see

19    the results of whether or not fingerprints were found even on

20    this second try.  And the results were none, correct?

21    A.  Correct.

22    Q.  All right.  So there was no fingerprints to be found at

23    all from anyone, is that fair?

24    A.  Correct.

25    Q.  Okay.  Detective Pesavento, were you aware that 3rd

Pesavento - cross by Boudreaux

1048

1  District officers went to Clifford Frazier's house the next

2  day to recover the additional cocaine that he had talked

3  about?

4  A.  Yes, I was.

5  Q.  Okay.  And at that time did you -- around that time, did

6  you learn that they had another opportunity to talk to

7  Clifford Frazier when they were at his apartment?

8  A.  Possibly, I don't recall right now.

9  Q.  Okay.  Okay.  I would like to now show you what's already

10  been admitted into evidence Joint Exhibit 413402.  And this is

11  the Higgins Rowan report.

12          Are you familiar with that?

13  A.  No.

14  Q.  Okay.

15  A.  Or maybe I am.

16  Q.  We'll go through it.  Okay.

17          Okay.  So this is a progress report, correct?

18  A.  Yes.

19  Q.  Okay.  And I think that all the parties agree that there

20  is a typographical error in this report.  So I'm going to make

21  that correction and you tell me if I'm right when we're done

22  reading it.

23  A.  Yes, Clifford, not Derrick.

24  Q.  Right, because at this point Clifford -- Derrick's dead?

25  A.  Derrick was dead already.

1 Q.  Right, okay.

2         THE COURT:  Do you want to just read into the record

3 what you've done there, Counsel.

4         MS. BOUDREAUX:  Yes, I have crossed out the name

5 "Derrick" and replaced it with "Clifford."

6         THE COURT:  In handwriting.

7         MS. BOUDREAUX:  In handwriting in two separate

8 locations.

9         THE COURT:  Yes.  Thank you.

10        MS. BOUDREAUX:  Thank you.

11 BY MS. BOUDREAUX:

12 Q.  Okay.  So let's take a look at what this report says,

13 Detective.  And, again, I'm going to read it with my

14 handwritten correction.

15        It says, "Clifford Frazier informed officers from the

16 3rd District that Anthony Williams was involved in this

17 incident and that, quote, Lanier, end quote, was with Williams

18 prior to the double murder.  The R/Ds, reporting detectives,

19 went to Williams' beeper service, which is located at 6420

20 South Cottage Grove.  The premise was closed."

21        So let's pause there and we'll go through the rest of

22 the report in a second, in a second.  But this is, this is a

23 report that says that 3rd District officers informed the

24 detective division of this information, is that correct?

25 A.  Yes.

Pesavento - cross by Boudreaux

1    Q.   Okay.  And who are Detective Higgins and Detective Rowan?

2    A.   They're two more detectives up in Area 2.

3    Q.   Did you know them?

4    A.   Yes.

5    Q.   And did they assist with this investigation?

6    A.   Yes, they did.

7    Q.   Okay.  Okay.  So the pieces of information was, one, that

8    Anthony Williams was involved, and two, Lanier was with

9    Williams prior to the double murder, is that right?

10   A.   That's correct.

11   Q.   Okay.  So would it be fair to say that this was the second

12   time in the investigation that the name "Lanier" was coming

13   up?

14   A.   Yes, at least that.

15   Q.   Okay.  Because Tenesha Gatson mentioned Lanier, right?

16   A.   Yes.

17   Q.   Okay.  So let's keep going with this report.

18        "The reporting detectives went to Williams' beeper

19   service."  So that's the beeper store right next to J&J Fish,

20   correct?

21   A.   Yes.

22   Q.   "And it was closed."

23   A.   Correct.

24   Q.   "The reporting detectives then went to the 3rd District to

25   learn if they had an emergency address card on Williams."

Pesavento - cross by Boudreaux

1          What's an emergency address card?

2    A.  I don't know.  I mean, I assume it's a card that somebody

3    has in case something happens to their business when they're

4    not there.

5    Q.  Okay.

6    A.  Somebody to call --

7    Q.  So that might contain what type of information?

8    A.  No.

9    Q.  Might it contain another phone number or an address?

10   A.  Yes.

11   Q.  Something like that?

12   A.  Right.

13   Q.  Okay.  "...if they had an emergency address card on

14   Williams.  They only had a non-published telephone number.

15   While in the 3rd District, the reporting detectives learned

16   that Clifford Frazier was out of the hospital and that he had

17   taken officers from the 3rd District to a large cache of

18   suspected cocaine.  The R/Ds went to Clifford Frazier's home

19   at" -- we don't need to know the address I guess.  "Clifford

20   Frazier was not there.

21          "A business card was left requesting that he contact

22   this office as soon as possible.  A request was submitted for

23   Anthony Williams' phone records on the number.  The

24   investigation continues."

25          So, Detective, this was contained in your

Pesavento - cross by Boudreaux

1052

1    investigative file, correct?

2    A.  Yes.

3    Q.  Okay.  So you were aware of this information during your

4    investigation, true?

5    A.  Yes.

6    Q.  Okay.  So the next part of the investigation was

7    interviewing more witnesses, and by "more witnesses," I mean

8    Cynthia Stewart and James and Jeffrey Ferguson?

9    A.  Yes.

10   Q.  Okay.

11        MS. BOUDREAUX:  This is in evidence as well, Joint

12   Exhibit 413409.

13   BY MS. BOUDREAUX:

14   Q.  Okay.  So this is another progress report, correct?

15   A.  Correct.

16   Q.  Okay.  And at the bottom of the page here you see persons

17   interviewed, Cynthia Stewart and James Ferguson, correct?

18   A.  Correct.

19   Q.  All right.  Let's see what these witnesses had to say.

20        So this says that Cynthia Stewart was interviewed by

21   the R/Ds, reporting detectives, at the Area 2 office on

22   January 31st, '94.

23        So that's two days after the incident, correct?

24   A.  Yes.

25   Q.  "The following is a summation of that interview.  Cynthia

Pesavento - cross by Boudreaux

1053

1    Steward stated she lived with the victim, Ledell Clayton

2    Irving, at 368 East 55th Street -- 58th Street.  She went on

3    to say that Irving and Derrick Frazier were involved in the

4    sale of drugs.  Ant, Anthony Williams, was one of the people

5    that purchased drugs from Irving and Derrick.

6              "She admitted that on a couple of occasions she

7    accompanied Irving and Derrick on the drug sales to Ant.  When

8    making these drug sales, Irving and Derrick always took more

9    than one vehicle.  Irving would go into either the fish house

10   or the beeper store located on the 6400 block of South Cottage

11   Grove.  While the transaction was being conducted, Derrick and

12   her would wait outside in the parked car."

13             So let's pause there.  So this tracks what Clifford

14   Frazier was saying to Detective Baker, correct?

15   A.  Was that to Baker or --

16   Q.  This -- I was asking, is this consistent with what --

17   A.  Consistent, yes.

18   Q.  Okay.  So, because Clifford Frazier was saying there was a

19   drug deal, right?

20   A.  Yes.

21   Q.  With Ant?

22   A.  Correct.

23   Q.  And she is saying that they were in the business of

24   selling drugs and they sold to Ant, correct?

25   A.  Yes.

Pesavento - cross by Boudreaux

1054

1  Q.  Okay.  And she had actually accompanied them on the drug

2  sales on certain occasions?

3  A.  Yes.

4  Q.  All right.  So then she says, "On January 29th, 1994, she

5  was informed by Irving that he and Derrick were going to drop

6  some stuff off to Ant.  Having knowledge of prior drug sales

7  to Anthony Williams, she knew this meant they were going to

8  make a drug sale to Ant.  Derrick, Irving and two of Irving's

9  brothers, James and Jeffrey, left her apartment between 6:30

10  and 7 o'clock that evening.  That was the last time she had

11  seen Derrick and Irving.  She was informed of the shooting

12  later that night by the police."

13       Is that accurate?

14  A.  Yes.

15  Q.  Okay.  And this was the girlfriend of Irving Ledell

16  Clayton, correct?

17  A.  Correct.

18  Q.  Okay.  And then Jeffrey and James Ferguson, let's see what

19  they had to say.  I believe this is another victim -- another

20  relative of Irving Clayton, but we'll read it.

21       "Jeffrey Ferguson was interviewed.  In summary, he

22  stated that on January 29th, 1994, he left this apartment with

23  Irving, Derrick and his twin brother James.  They all left in

24  the gray two-door Chevy.

25       "He felt that something was wrong because Derrick and

Pesavento - cross by Boudreaux

1055

1    Irving were acting strangely.  They seemed nervous.  He and

2    his twin brother James were dropped off at a barber shop in

3    the area of 59th and Halsted.  That was the last time that

4    they had seen Irving and Derrick.

5             "Jeffrey was aware that Irving and Derrick were

6    selling drugs.  He also admitted that he went along with the

7    victims on several occasions to sell drugs to Ant on 64th and

8    Cottage Grove.  He was never allowed to go inside during the

9    transactions.  He always stayed in the car.  Jeffrey stated he

10   did not know that Irving and Derrick were going to conduct a

11   drug sale on that date."

12            Okay.  So this is another person saying that Derrick

13   and Irving had sold drugs to Ant before?

14   A.   Yes.

15   Q.   Okay.  And that was consistent with what Clifford Frazier

16   had told Detective Baker?

17   A.   Yes.

18   Q.   Okay.  Now, you were asked questions about your grand jury

19   testimony by Mr. Safer.  Do you recall that?

20   A.   Yes.

21   Q.   And you stated that you developed information that this

22   was actually not a drug robbery but a gang hit.  Do you recall

23   that?

24   A.   Yes.

25   Q.   Okay.  And you mentioned something that it was for a

Pesavento - cross by Boudreaux

1056

1  failure to pay a street tax, right?

2  A.  Correct.

3  Q.  What's a street tax?

4  A.  Something that someone who is selling, selling the dope,

5  has to give to the local whatever gang controls that area.

6  It's like paying rent in a house.  You have to pay so much to

7  be able to deal in that area.

8  Q.  So relevant to this case, it would be if Derrick Frazier

9  and Irving Clayton were selling drugs in Ant's territory, they

10  would have to pay him money to do so peacefully?

11  A.  Yes.

12  Q.  Okay.  Let's talk about Ant.

13          MS. BOUDREAUX:  This is Defendants' Exhibit X, not in

14  evidence.  If I could just show it to the witness first.

15  BY MS. BOUDREAUX:

16  Q.  Detective Pesavento, you interviewed Anthony Williams

17  during this investigation, correct?

18  A.  Yes.

19  Q.  And is this a fair and accurate depiction of what Anthony

20  Williams looked like?

21  A.  Yes.

22  Q.  Okay.

23          MS. BOUDREAUX:  I move to admit Defendants' Exhibit X

24  into evidence.

25          MR. SAFER:  No objection, Your Honor.

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 91 of 168 PageID #:18323
Pesavento - cross by Boudreaux
1057

1        THE COURT:  Admitted.  You can publish to the jury if

2  you choose.

3        MS. BOUDREAUX:  Thank you.

4     (Said exhibit was received in evidence)

5  BY MS. BOUDREAUX:

6  Q.  Okay.  So I know this is not the best photograph, but as I

7  said, you met face-to-face with Anthony Williams at some point

8  in this investigation, correct?

9  A.  Yes.

10  Q.  Okay.  And this is a fair and accurate depiction of what

11  he looked like at the time you met with him?

12  A.  Yes, correct.

13  Q.  And is it your understanding that he has since died?

14  A.  That's my understanding, yeah.

15  Q.  Okay.  So I would like to now look at your interview with

16  Anthony Williams, okay.

17        Oh, before I do that, I'm sorry, I forgot to show you

18  something.

19        MS. BOUDREAUX:  This is in evidence, Joint Exhibit

20  413468.

21  BY MS. BOUDREAUX:

22  Q.  This is a general progress report that your name is

23  actually on, okay?

24  A.  Yes.

25  Q.  All right.  Did you typically type your general progress

Pesavento - cross by Boudreaux

1058

1    reports?

2    A.  I don't think I did that, no.  I'm guessing that Karl did

3    that.

4    Q.  Okay, all right.  So this general progress report says,

5    "Please pull CB's on Anthony Williams with his IR number."

6            We learned about those yesterday, right?

7    A.  Yes.

8    Q.  "And see if he was ever arrested with a person by the name

9    of Lenair.  Also related RD numbers."

10           Do you see that?

11   A.  Yes.

12   Q.  And then it says, "Anthony Williams' parents are in

13   lockup.  Get them out and have them try to contact Anthony."

14           So this is all happening before you have made any

15   contact with Anthony, right?

16   A.  Yes.

17   Q.  All right.  And can you tell the jury what it means to

18   "Please pull CB's on Anthony Williams?"

19   A.  Well, a CB number is a number, it's called a CB, it's

20   central booking.  And it's just a number that's assigned to

21   that particular arrest.

22   Q.  Okay.  And why were you looking to see if he was ever

23   arrested with a person by the name of Lenair?

24   A.  I know what Lenair's name was.

25   Q.  Okay.

Pesavento - cross by Boudreaux

1059

1   A.  See if there is some connection there.

2   Q.  So you had heard the name Lenair from Tenesha Gatson,

3   right?

4   A.  Yes.

5   Q.  And Clifford Frazier so far?

6   A.  Yes.

7   Q.  Okay.  So is it fair to say that this was an attempt to

8   find out more information about Lenair?

9   A.  Correct.

10  Q.  And you were going to do that by pulling Anthony Williams'

11  prior arrests with the Chicago Police Department, correct?

12  A.  Correct.

13  Q.  And see if there was any person he was arrested with that

14  could help further identify the true identity of Lenair?

15  A.  Yes.

16  Q.  And the date of this report is January 30th, 1994,

17  correct?

18  A.  Yes.

19  Q.  Okay.  So a day after the murders, you're focused on

20  Lenair, true?

21  A.  Yes.

22  Q.  Okay.  All right.  Let's look at the report of your

23  interview with Anthony Williams, all right?

24  A.  Okay.

25          MS. BOUDREAUX:  This is Joint Trial Exhibit 9 in

Pesavento - cross by Boudreaux

1060

 1    evidence.

 2            THE COURT:  All right.

 3    BY MS. BOUDREAUX:

 4    Q.  Okay.  So you could see your name at the bottom of this?

 5    A.  Yes.

 6    Q.  And that's your signature, right?

 7    A.  Yes.

 8    Q.  All right.  And the date of this report is February 1st,

 9    1994, correct?

10    A.  Yes.

11    Q.  Okay.  So this says, "The interview with Anthony Williams

12    was conducted in the Area 2 office on February 1st, 1994, at

13    2000 hours.  The following is a summation of that interview:

14            "Williams stated that on January 29th, 1994, he was

15    in his place of business, which is a beeper company located at

16    6418 South Cottage Grove.  He said that he was in the store

17    with a male black that he only knows as Lenair.  He described

18    him as being about 25 years, six two, thin, with close cropped

19    hair and medium-light in complexion.

20            "Williams went on to say when" -- there's a typo, I

21    think -- "that when in closed his shop at about 1930 hours, he

22    and Lanier went next door to the J&J Fisheries where Williams

23    cooks on the evening shift.  He stated that this fish

24    restaurant belongs to his mother and father, Edna and James

25    Williams."

Pesavento - cross by Boudreaux

1061

1      Okay.  So let's pause there and then we'll read the

2   rest of it, okay.

3      So Anthony Williams is telling you that on the night

4   of the incident he was with a person he knows only as Lanier,

5   correct?

6   A.  Correct.

7   Q.  And he provides a description -- did you ask him to

8   provide a description of Lanier?

9   A.  I'm sure we did.

10  Q.  And what he provided was a male black, 25 years, six two,

11  thin, with close cropped hair, and medium-light in complexion.

12      Would you say that this was largely consistent with

13  the description that Clifford Frazier gave of the offender?

14  A.  Yes.

15  Q.  Now, let's talk about hair for a second, hair and facial

16  hair.  Is that something that's easily changeable?

17  A.  Yes.

18  Q.  Okay.  Can a person have hair one day and then not have

19  hair the next day?

20  A.  Correct.

21  Q.  Can a person be clean shaven one day and non-clean shaven

22  in the next few days?

23  A.  Correct.

24  Q.  Okay.  I'm on the second paragraph now.

25      "Williams went on to say that Derrick Frazier and a

1    man he knows only as Irving entered the store sometimes around

2    2000 hours.  He said that he spoke briefly with them and then

3    went to the rear of the store where he was engaged in his

4    duties preparing fish.  He stated that he never saw Derrick or

5    Derrick Frazier or Irving again."

6            So the fact that Anthony Williams is saying that he

7    met with Irving and Derrick corroborates what Clifford is

8    saying, correct?

9    A.  Yes.

10   Q.  So there was a meeting in the J&J Fish?

11   A.  Yes.

12   Q.  "Williams said that about 20 minutes later he heard

13   gunshots coming from the street and observed Clifford Frazier

14   fighting with an unknown individual on the street directly in

15   front of his business.

16           "Williams stated that Frazier broke away from this

17   person and then ran into the store with a gun in his hand

18   announcing that he was shot and asking for help.  Frazier

19   dropped the gun to the floor.  This gun was placed on a shelf

20   and later recovered by the Chicago Police Department.

21           "Williams also said that while all of this was going

22   on, Lanier was in J&J Fisheries."

23           Do you see that part?

24   A.  Yes.

25   Q.  So no doubt Anthony Williams is trying to give Lanier an

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 97 of 168 PageID #:18329
Pesavento - cross by Boudreaux
1063

1    alibi, true?

2         MR. SAFER:  Objection, Your Honor.  He can't say

3    what -- he can't say what Anthony Williams is trying to do.

4         MS. BOUDREAUX:  I can rephrase.

5         THE COURT:  You can rephrase it.  Go ahead.

6         MS. BOUDREAUX:  Okay.

7    BY MS. BOUDREAUX:

8    Q.  And --

9         MR. SAFER:  I don't think we should be leading

10   either.

11        THE COURT:  Rephrase the question.  Go ahead.

12   BY MS. BOUDREAUX:

13   Q.  Did Anthony Williams say that Lanier was in the fish shop

14   at the time Clifford Frazier was fighting with the offender?

15   A.  Yes.

16   Q.  Do you have to believe everything a person says when you

17   are doing an investigation as a police officer?

18   A.  No.

19   Q.  Do people lie a lot?

20   A.  Yes, they do.

21   Q.  Does anyone like to admit to committing crimes?

22   A.  No.

23   Q.  So let's finish this report.

24        "Williams was asked specifically if he had any

25   conversations via the telephone with either Derrick Frazier or

Pesavento - cross by Boudreaux

1064

1   Irving prior to their arrival at the store on January 29th,

2   1994.  He replied that he did not.  He said that their last

3   time, the last time he saw Derrick Frazier was about three to

4   four days before he was murdered."

5           So Mr. Safer asked you whether or not you ever got

6   Anthony Williams' telephone number -- telephone records,

7   right?

8   A.  Correct.

9           MR. SAFER:  I didn't ask that, Your Honor.  Whether

10  he got Mr. Bolden's telephone records.

11          MS. BOUDREAUX:  Okay.  I'll rephrase.

12  BY MS. BOUDREAUX:

13  Q.  Well, let me just ask you this:  Would getting Anthony

14  Williams' phone records tell you anything more about this

15  investigation even if it did show that he talked to Derrick

16  Frazier and Irving Clayton?

17  A.  No, I'd say.

18  Q.  And then it says, "Williams supplied the reporting

19  detectives with the page number assigned to Lanier.  This

20  number is the following.  He had no further information that

21  would aid the R/D in identifying Lanier.

22          "It should be noted that Williams sells the pager to

23  his clients and then rents them the air time."

24          So is this an accurate summary of your interview with

25  Anthony Williams on February 1st?

Pesavento - cross by Boudreaux

1065

1   A.   Yes.

2   Q.   So would it be fair to say that this is the third time the

3   name "Lanier" is coming up in the investigation?

4   A.   Yes.

5   Q.   And this is in the first three days of the investigation,

6   correct?

7   A.   Correct.

8   Q.   Okay.  Let's look at a general progress report that is

9   from the same date, February 1st, 1994.

10          MS. BOUDREAUX:  And this is in evidence, Joint

11   Exhibit 413463.

12   BY MS. BOUDREAUX:

13   Q.   This has your name on the bottom, Karl Pesavento and

14   Siwek.  And let's go through this.

15          "There is a trap on 747-5908.  Trap was started at

16   2300 hours, February 1, 1994.  We have a beeper number of

17   791-0073, which is supposed to be to Lanier.  We are looking

18   for his address.  We only beeped him one time tonight.  If a

19   call comes in from him, please call 0441 and tell them the

20   time of the call."

21          Can we talk about this and you can -- can you explain

22   what a trap is?

23   A.   You know what, I've never actually used one myself, but

24   apparently it's a system where they can tell when the call is

25   made, you know, and get information off of it.

Pesavento - cross by Boudreaux

1066

1   Q.   Like trace the call?

2   A.   I guess so, yes.

3   Q.   Okay.  And so a trap was started on Lanier's beeper number

4   at 2300 hours on February 1st, is that correct?

5   A.   Yes.

6   Q.   All right.  So does this mean that Lanier was a person of

7   interest at this time?

8   A.   Oh, yes, he was.

9   Q.   And then it says, "We're looking for his address.  We've

10  only beeped him one time tonight.  If a call comes in, please

11  call 0441."

12       Do you remember, do you know what 0441 is?

13  A.   No.  It's got to be a number obviously with the police

14  department.

15  Q.   Okay.  So you mentioned that gang crimes was also

16  investigating certain parts of this incident?

17  A.   Yes.

18  Q.   What was your understanding of what gang crimes was

19  investigating as opposed to what the detectives were

20  investigating?

21  A.   Well, they were interested in the gang crimes section, I

22  mean, the gangs that were involved.

23  Q.   Okay.  Would they also be interested in the narcotics?

24  A.   Yeah, they could be.  Yeah.

25  Q.   So you mentioned this already, that the focus of your

Pesavento - cross by Boudreaux

1   investigation was finding out who the shooter was, correct?

2   A.  Correct.

3   Q.  Well, were you terribly interested in the drug deals that

4   were going on or the amounts of money that the -- what the

5   cocaine would have been worth, that kind of thing?

6   A.  No.

7   Q.  So did you know Officer James Oliver before this incident?

8   A.  Yes.

9   Q.  And you knew him to be a gang crimes specialist?

10  A.  You know, I think, if I remember right, him and I worked

11  in the same district at one time as patrolmen.

12  Q.  Okay.  So many years before this incident?

13  A.  Yes.

14  Q.  Okay.  Now, you had communication with Mr. Oliver about

15  this incident, correct?

16  A.  Yes.

17  Q.  And Mr. Oliver supplied you with information that he got

18  from the FBI, isn't that right?

19          MR. SAFER:  Object to leading, Your Honor.  Object to

20  the hearsay.

21          THE COURT:  Why don't you rephrase it in a

22  non-leading way.  Go ahead, please.

23          MS. BOUDREAUX:  Okay.

24          THE COURT:  Sustained.

25  BY MS. BOUDREAUX:

Pesavento - cross by Boudreaux

1068

1    Q.  Did you receive information from Mr. Oliver in this case?

2    A.  Yes.

3    Q.  And what was the information that you received from

4    Oliver?

5            MR. SAFER:  Foundation --

6    BY THE WITNESS:

7    A.  Concerning the --

8            MR. SAFER:  Foundation, please, Your Honor.

9            THE COURT:  Well, this is information that he --

10   you're asking him what information he personally received from

11   Oliver?

12           MS. BOUDREAUX:  Correct.

13           THE COURT:  What's the objection?

14           MR. SAFER:  At what time?  How?

15           THE COURT:  Okay.  Go ahead.  At what time are we

16   talking about?

17           MS. BOUDREAUX:  Okay.

18           THE COURT:  Or maybe you're saying at any time.  Are

19   you saying at any time?

20           MS. BOUDREAUX:  It's only this one time, so yeah.

21           THE COURT:  Okay.  With that caveat, overruled.  Go

22   ahead.  Go ahead and restate the question.

23           MS. BOUDREAUX:  Okay.

24   BY MS. BOUDREAUX:

25   Q.  Did you receive information from Officer Oliver with

1  regard to this investigation?

2  A.  Yes.

3  Q.  What information did you receive from Officer Oliver?

4  A.  That the FBI had information that Lanier was Eddie Lynier

5  Bolden who had been arrested already for a murder --

6  Q.  Oh, no --

7       THE COURT:  We're going to strike that from the

8  record.  We're going to -- I want you to disregard everything

9  he just said.  That's not something that you should consider

10 in any way, shape or form in the testimony that you're hearing

11 today or throughout the trial.

12      With that, Counsel, why don't you go ahead.

13      MS. BOUDREAUX:  Okay.

14 BY MS. BOUDREAUX:

15 Q.  So did you document in your report the information that

16 you learned from Mr. James Oliver?

17 A.  Yes.

18 Q.  Okay.  So showing you what's in evidence as Joint Trial

19 Exhibit 13, let's discuss this paragraph.  And this is the in

20 custody report of Eddie Bolden, okay.  And I'll show you the

21 front in a minute.

22      It states, "In conjunction with gang crimes

23 specialists Oliver and Anderson, the reporting detectives

24 learned that the possible offender was a person by the name of

25 Eddie Lynier Bolden."

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 104 of 168 PageID #:18336
Pesavento - cross by Boudreaux
1070

1    Is that the information that you received from

2 Officer Oliver?

3 A.  Yes.

4 Q.  Okay.  And what was your understanding of where Mr. Oliver

5 got that information?

6 A.  From the FBI.

7    MR. SAFER:  Your Honor, I object and move to strike

8 that from the record.

9    THE COURT:  So were you eliciting what Mr. Oliver

10 told him, what Mr. Oliver told him about where he got the

11 information?

12    MS. BOUDREAUX:  Yes.

13    THE COURT:  If that's the question, it's overruled.

14 Go ahead.

15 BY MS. BOUDREAUX:

16 Q.  Okay.  I'd like to change topics, okay?

17 A.  Okay.

18 Q.  And talk about the photo array.

19    MR. SAFER:  Your Honor, can we be heard briefly,

20 please?

21    THE COURT:  Sure.

22    (Discussion at sidebar on the record)

23    THE COURT:  Okay.  So we've got a few things to talk

24 about.  I would propose talking about the significant issue

25 that came up a minute ago, potentially significant, about the

Pesavento - cross by Boudreaux

1071

1  attempted murder.  Let's talk about that separately, unless

2  you think we can talk about that now.

3          I assume that's not what you want to talk about.  You

4  want to talk about the last topic.  Okay, go ahead.

5          MR. SAFER:  Yes, Your Honor, I do certainly want to

6  talk about that, but not now.

7          So what now is in the record is that the FBI has said

8  that the possible offender was Eddie Lynier Bolden.  That's

9  not anything that we briefed yet.  All that means --

10          THE COURT:  I'd ask you to speak into the mic.

11          MR. SAFER:  So what we previously were going to hear

12  was that there was an anonymous tip that was relayed without

13  anybody's knowing who the person was who said that Mr. Bolden

14  was a possible offender.

15          Now he's saying through telephone, because he didn't

16  talk to the FBI, that the FBI had said that the possible --

17  the FBI, not an anonymous tip, but the FBI has said that there

18  is a -- that the possible offender is Eddie Bolden.  That is

19  one, absolutely they know that that's not the evidence.  And

20  that's not consistent with what they said in the pleadings

21  about what they were going to try to admit about the tip.

22          MS. BOUDREAUX:  This has been briefed ad nauseam.

23  This is Detective Pesavento's understanding of where this

24  information came from.  He's not going to know the intricacies

25  of the fact that it came from a confidential informant to the

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 106 of 168 PageID #:18338
Pesavento - cross by Boudreaux
1072

1   FBI.

2           This is what he knows and this is consistent with

3   what is in the report.  And this is going to be consistent

4   with what Oliver testifies to or -- I don't think I did

5   anything wrong.

6           MR. SAFER:  I'm not saying anybody did anything

7   wrong.  All I'm saying is that the record as it stands is

8   totally different than what we were -- what Your Honor has

9   ruled on because -- and it's why it should not come in at all

10  through Detective Pesavento because we're playing telephone.

11  And it got amplified.  So the only information is --

12          THE COURT:  Let's go off the record.  Let's break and

13  stay on the record.

14          MS. BOUDREAUX:  Stay on the record, yeah.

15      (End of discussion at sidebar)

16          THE COURT:  Hi, folks.  You know, one of the jurors

17  had an astute point.  Given that the lawyers are spending a

18  bunch of time talking, why don't you folks have a chance to

19  stretch your legs and use the restroom and get a drink.

20          So one of you has requested to use a restroom, and I

21  think I should have been smart enough to think of that on my

22  own.  So why don't we adjourn for a couple minutes, let you

23  guys go down the hall, stretch your legs, relax.  We'll come

24  back in a few minutes.  We'll come get you when we're ready.

25          Does that sound okay?

Pesavento - cross by Boudreaux

1      (Jury out at 4:22 p.m.)

2      THE COURT:  Do you want to speak from the microphones

3  here, folks?

4      MR. SAFER:  Sure, Your Honor.  So what I was in

5  the --

6      THE COURT:  You're welcome to stand or sit, whatever

7  makes you comfortable.

8      MR. SAFER:  So, Your Honor, what I was in the process

9  of saying is --

10      THE COURT:  Go ahead.

11      MR. SAFER:  -- that the source of the information is

12  Mr. Oliver, as we briefed as counsel said ad nauseam, is that

13  Oliver talked to McCullough, who talked to somebody who said

14  that there was an anonymous tip that Lanier or somebody might

15  have -- might be the shooter.

16      Your Honor has ruled that should come into evidence.

17  We moved to the contrary.  We respect the Court's ruling.

18      What happened now is that because we are one step

19  removed, all of that, all of the maybes is whitewashed, and

20  what the jury just heard is that the FBI said that he, that

21  Eddie Bolden is the possible shooter.

22      That is an absolute distortion of the evidence.  It

23  is totally contrary to what we, what we have briefed.  And now

24  it has the imprimatur of the FBI.  So it seems like the -- and

25  they've elicited that the FBI was doing an investigation of

Pesavento - cross by Boudreaux

1074

1  Ant.  So now it has the imprimatur of the FBI, that the FBI

2  has said to them that they have determined that he's a

3  possible suspect, which is just not true.

4          THE COURT:  Thank you, Mr. Safer.

5          Go ahead.

6          MS. BOUDREAUX:  I mean, I'd be happy to rephrase it

7  for a confidential informant, but I just don't know if that's

8  going to work here.

9          THE COURT:  Let me tell you how I see things on this.

10  I'd have to go back and check the transcript.  I was living in

11  live as everyone else.  I have to check the transcript.  I

12  have to double-check my ruling.

13          As a general matter, when I thought about the motions

14  in limine, I allowed in evidence about what the officers knew,

15  because their knowledge is relevant, their intent is relevant.

16          I thought that I had ruled that if they knew

17  something, it didn't have to be hearsay -- excuse me, it

18  didn't have to be non-hearsay to be germane.  You could

19  consider a rumor, for example, something that you heard from

20  somebody else who heard it from somebody else.

21          I think that I ruled that that was germane because it

22  went to the person's knowledge.  I did not hear anything that

23  was inconsistent with that.

24          Now, Mr. Safer is touching his head now.  He thinks

25  that may be different.  But, you know, when you say it's a

Pesavento - cross by Boudreaux

1075

1    distortion of the evidence, and you said it was inconsistent

2    with their pleadings, it sounds like you've got a great cross

3    block coming because if, you know --

4            MR. SAFER:  I can't cross-examine him.  I don't

5    know -- there's no foundation of the conversation.  So I can't

6    cross-examine him --

7            THE COURT:  Hang on one second.  Hang on one second.

8    Officer Pesavento just testified about what he heard from

9    Officer Oliver.  And Officer Oliver heard that from someone

10   else.  So it is relevant to Mr. -- excuse me, Officer

11   Pesavento's knowledge and intent at the time.  Even if it

12   was -- and you're welcome to say this is telephone.  This is

13   REO Speed Wagon's heard it from a friend who heard it from a

14   friend who -- on cross-examine you can go to town on the

15   notion that this is attenuated, a string of inferences, not to

16   be believed.

17           You'll get all the rope in the world to make that

18   point, but, you know, his --

19           MR. SAFER:  I know.

20           THE COURT:  When he's conducting an investigation,

21   he's not confined to the Federal Rules of Evidence.  He is

22   entitled, as far as I understand, to consider anonymous tips

23   and hearsay.

24           Go ahead.

25           MR. SAFER:  But he doesn't -- that's not what came

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 110 of 168 PageID #:18342
Pesavento - cross by Boudreaux
1076

1   into evidence.  That's fine, Your Honor.  Your Honor has ruled

2   that that -- and we accept that.  That's not what just

3   happened.

4          Nobody has heard about an anonymous tip.  Nobody has

5   heard about hearsay.  Nobody has heard about that.  What

6   they've just heard was that the FBI said, because we don't

7   have any foundation, we don't know who or what or where, none

8   of that was elicited, and they heard that the FBI said it,

9   that Eddie Lynier Bolden, not an anonymous tip, which is what

10  you ruled, not that the telephone.  I can't cross-examine that

11  because that's not in the record because he's testifying

12  fourth hand.

13         THE COURT:  Well, here is what -- I will say when we

14  teed this up before it was in the context of an FBI anonymous

15  tip.  You know, it was live bullets at the time, so to speak.

16  Wrong metaphor, I'm sorry.  But like live bullets, to me,

17  meaning question and answer, I'm going a long time.

18         I don't remember it being framed in the terms of an

19  anonymous tip.  But I have to check the transcript.  You know,

20  it went in pretty fast.  And frankly, when I heard it, I was

21  thinking about the other topic that we need to talk about.

22  And that's frankly, to be perfectly candid, where my mind was

23  when this most recent Q and A happened, because a larger issue

24  in my mind came up when this question was posed.

25         So, Mr. Safer, you might be right in your depiction

1   of the transcript.  I'm going from my best memory at the time

2   because I was listening in one ear and the other ear was

3   devoted to listening to myself think through that other issue.

4   So I'm being just real candid with you on that.

5           MR. SAFER:  Oh, I am empathetic, Your Honor.  I was

6   in such a state of shock myself.

7           But if you search the transcript for "anonymous" and

8   "tip," it will come up empty.

9           THE COURT:  Okay.  I will look at that.

10          Let me say as a broader matter, it's 4:30.  We've got

11  some more things to talk about here on these whole topics.  Do

12  you want to bring them back and go forward?  I mean, I need to

13  look at the transcript candidly.

14          MR. SAFER:  Yes.

15          THE COURT:  I need, I need to look at the transcript,

16  see if I need to strike something.  I don't know.  I've got to

17  check.  I mean, that's essentially what you're doing is you're

18  moving to strike something.

19          MR. SAFER:  Yes.

20          THE COURT:  Something has been said.  I've got to

21  look at the transcript anyway, right, so...

22          MR. SAFER:  Thank you.  Yes.

23          THE COURT:  So I think that if we broke for the day

24  it might accentuate what has happened recently.  I think we

25  ought to make progress, try to bury things like Chernobyl as

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 112 of 168 PageID #:18344
Pesavento - cross by Boudreaux
1078

1  best we can here for the next 15 minutes, cover ground that we

2  can and then end at our normal time.

3       I want to use all the gas in the can that we can in

4  terms of time, so to speak.  So I would propose that we bring

5  the jury back.  We've got some other things to talk about.

6       Is that okay?

7            MS. BOUDREAUX:  Yeah.

8            MR. SAFER:  Yeah.

9            THE COURT:  Do you have an understanding of what

10  you're going to do when they come back, what you're going to

11  cover?  I don't want to --

12            MS. BOUDREAUX:  Yeah, I'm not -- I'm done with that

13  topic.

14            THE COURT:  Done with that topic, okay.

15       So, Mr. Safer, you've preserved your objection.

16  There's nothing I can do now to preserve it that I couldn't do

17  in the morning.  I'd like to reserve judgment on your

18  objection, okay?

19            MR. SAFER:  Yes.

20            THE COURT:  I'll reserve judgment on it.  I've got to

21  see the transcript.

22            MR. SAFER:  Yes, Your Honor.

23            THE COURT:  That's the best I can do on the fly.

24       We'll bring the jury back, is that good?

25            MS. BOUDREAUX:  Sure.

Case: 1:17-cv-00417 Document #: 637 Filed: 11/16/21 Page 113 of 168 PageID #:18345
Pesavento - cross by Boudreaux
1079

1    THE COURT:  Okay.  I will intentionally say something

2    light to the jury when they come in so it does not encourage

3    them to dwell unnecessarily and imaginatively about what we've

4    been talking about here, okay?

5    MS. BOUDREAUX:  Okay.

6    THE COURT:  It may help smooth things over.

7    (Pause.  Jury in at 4:33 p.m.)

8    THE COURT:  Thank you, folks.  Have a seat.

9    I'd like to thank all the court security officers in

10   the building who have been kind enough to help escort you

11   folks today.  We've got a great collection of people here.

12   So thank you, sir, for your assistance.

13   And I'll say as a general matter, I've never met a

14   jury who is disappointed at getting a break.  So thank you.  I

15   hope you folks were able to stretch your legs, get a drink of

16   water, relax and unwind a little bit.

17   We've got a little bit of time left on the clock and

18   what we'd like to do today is go ahead and continue to make

19   progress.  We've made a lot of progress today in getting in a

20   lot of testimony in the record.  But we want to make best use

21   we can of whatever time we've been allotted.

22   So we'll go about another 10 or 15 minutes or so, and

23   at a natural stopping spot, we'll stop for the day.  Okay?

24   That's the battle plan.

25   So, Ms. Boudreaux, whenever you're ready.

Pesavento - cross by Boudreaux

1080

1       MS. BOUDREAUX:  Thank you.

2    BY MS. BOUDREAUX:

3    Q.  Okay.  Detective Pesavento, we've established at this

4    point in the investigation that Lanier was a suspect, correct?

5    A.  Correct.

6    Q.  Okay.  And then you learned that Lanier was Eddie Lynier

7    Bolden, correct?

8    A.  Yes.

9    Q.  So once you had the full name of a person, did that allow

10   you to get a photograph of that person?

11   A.  Yes.

12   Q.  And let me back up for a second.  We talked about the term

13   "probable cause" in opening statements.

14       Is it fair to say that a police officer needs

15   probable cause to make an arrest?

16   A.  Yes.

17   Q.  Okay.  But does a police officer need probable cause to

18   put someone in a photo array?

19   A.  No.

20   Q.  So at some point you put together a photo array that

21   contained a photograph of Mr. Bolden and four other

22   individuals, correct?

23   A.  Correct.

24   Q.  And what was -- what did you -- did you call up Clifford

25   on the phone to tell him to come look at these photos?

Pesavento - cross by Boudreaux

1081

1    A.   No.   I don't know why he was there.   I'm not sure now.

2    Maybe he did come down.   I don't know.

3         But I told him that I wanted him to look at his photo

4    array.   And I handed them to him.   They were all stacked up.

5    He said no.   He says, "I'm going to have to see them, see them

6    in person."

7    Q.   Okay.   So he paid short attention to the photo array?

8    A.   Little attention.

9    Q.   Okay.   And is it true that the photograph you had of Eddie

10   Bolden was about nine years old?

11   A.   Yes.

12   Q.   Okay.

13        MS. BOUDREAUX:   I'm going to show counsel.   This is

14   what I used in opening.

15        MR. SAFER:   Okay.

16        MS. BOUDREAUX:   This is not in evidence, Judge.

17   Thank you.

18        THE COURT:   Are you going to publish it to the

19   witness?

20        MS. BOUDREAUX:   Yes.

21        THE COURT:   Okay, fine.

22   BY MS. BOUDREAUX:

23   Q.   I'm going to show you, Detective, this is Defendant's

24   Exhibit A.

25        Is this a fair and accurate depiction of the

Pesavento - cross by Boudreaux

1082

1   photographs that were used in the photo array?

2   A.  Yes.

3   Q.  Okay.

4          MS. BOUDREAUX:  I'd like to admit Defendant's A into

5   evidence.

6          THE COURT:  Any objection?

7          MR. SAFER:  No objection.

8          THE COURT:  Admitted.

9       (Said exhibit was received in evidence)

10         THE COURT:  You're free to publish it to the jury if

11  you choose.

12         MS. BOUDREAUX:  Thank you.

13  BY MS. BOUDREAUX:

14  Q.  Detective Pesavento, is this a fair and accurate depiction

15  of the people that were in the photographs in the array shown

16  to Clifford Frazier?

17  A.  Yes.

18  Q.  Okay.  And is this Eddie Bolden right here, this first

19  photograph?

20  A.  Yes.

21  Q.  Okay.  And tell us again what Clifford said when presented

22  with the photos.

23  A.  He kind of pushed his hand away and said "No."  He said,

24  "I'm going to have to see the person in person."

25  Q.  And you documented that in your police reports, correct?

Pesavento - cross by Boudreaux

1083

1    A.  Yes, I did.

2    Q.  All right.  Let's take a look at that.

3           MS. BOUDREAUX:  We are back to Joint Trial Exhibit

4    13.

5    BY MS. BOUDREAUX:

6    Q.  Let's look at this second paragraph.

7           "On the 3rd of February 1994, the reporting

8    detectives showed a group of photos to the witness Clifford

9    Frazier.  Clifford Frazier at this time related he could not

10   make an identification from the photo spread, that he would

11   have to see the offender in person."

12          Is that an accurate description of what happened?

13   A.  Yes.

14   Q.  Okay.  So Clifford Frazier is saying that he needs to see

15   the person in person.

16          Does that mean the next logical step was to do a

17   lineup?

18   A.  Yes.

19   Q.  And did that mean you had to find Eddie Bolden, make

20   contact with him?

21   A.  Yes.

22   Q.  Was there a time when you went to Mr. Bolden's mom's house

23   looking for Eddie Bolden?

24   A.  I didn't.  I didn't go personally, but one of the others,

25   other detectives did.

Pesavento - cross by Boudreaux

1084

1    Q.  Okay.

2    A.  A couple times I think.

3    Q.  So it was more than once?

4    A.  I believe so.

5    Q.  Okay.  And do you know what, if anything, they told

6    Mr. Bolden's mom about why they wanted to talk to him?

7          MR. SAFER:  Objection.  Foundation, hearsay.  This is

8    not now his state of mind.  He's going to elicit what they

9    told Mr. Bolden's mother, and he doesn't know.

10         THE COURT:  Well, the question is phrased "do you

11   know what."  Why don't you rephrase the question, and I would

12   like you to define who "they" is so I can have a clean Q and

13   A, and then I can -- and, Mr. Safer, you're welcome to repeat

14   the objection if you want, please.

15         Go ahead.

16         MS. BOUDREAUX:  Okay.

17         THE COURT:  So to that extent it's sustained.

18         MS. BOUDREAUX:  Okay.

19   BY MS. BOUDREAUX:

20   Q.  Detective Pesavento, do you know which detectives went to

21   Eddie Bolden's mom's house looking for Eddie Bolden?

22   A.  I'm sorry, who they were?

23   Q.  Yes.

24   A.  I'm not sure which ones they were.

25   Q.  Okay.  So at some point -- well, let me back up.

Pesavento - cross by Boudreaux

1085

1     They went more than one time looking for him,

2   correct?

3   A.  I think at least two times.

4   Q.  And there was no immediate response from the Bolden

5   household to the detective division, correct?

6   A.  Correct.

7   Q.  All right.  So I'd like to talk about what happened on

8   February 6th.  And I'm talking about the time when you brought

9   a photograph of Eddie Bolden to James Williams at the JJ Fish.

10    Do you recall that?

11  A.  Yes.

12  Q.  I'll show you the report, okay?

13  A.  I'm sorry, what?

14  Q.  I'll show you the report.

15  A.  Okay.

16    MS. BOUDREAUX:  So this is the same exhibit, Joint

17  13.

18  BY MS. BOUDREAUX:

19  Q.  All right.  Let's take a look at this.

20    "On the 6th of February 1994, Mr. James Williams who

21  works at J&J Fish, 6420 South Cottage Grove, was shown the

22  photo of Eddie Lynier Bolden.  He identified Mr. Bolden as the

23  person who lived in the apartment which is located above the

24  J&J Fish Restaurant with a female known to him as Pamela

25  Johnson."

Pesavento - cross by Boudreaux

1   A.   Yes.

2   Q.   Do you recall that?

3   A.   Yes.

4   Q.   Okay.  So James Williams confirmed that Lanier is Eddie

5   Bolden and Eddie Bolden is Lanier, correct?

6   A.   Correct.

7   Q.   And he stated, "Oh, yeah, he lived right upstairs,"

8   correct?

9   A.   Yes.

10  Q.   Did that make you think it was strange that Anthony

11  Williams said a man he only knows as Lanier?

12  A.   Yes.

13  Q.   Did that make it -- did that seem strange to you that

14  Tenesha Gatson was describing a man she only knows as Lanier?

15  A.   Yes.

16  Q.   So I'd like to talk about the ballistics evidence now,

17  okay?  So we've referenced this in this trial already.  But

18  you requested forensic firearms testing on the shell casings

19  that were found at the Minerva scene in comparison to the

20  shell casings that were found around the J&J Fish, correct?

21  A.   Correct.

22  Q.   And on February 18th, you received the results of that

23  forensic testing, true?

24  A.   Yes.

25  Q.   And the result was that it was a match, correct?

Pesavento - cross by Boudreaux

1087

1    A.   I'm sorry, it was what?

2    Q.   A match.  The bullets --

3    A.   Oh, a match.  Yes, I'm sorry, I didn't --

4    Q.   Yes?

5    A.   Yes.

6    Q.   Okay.  And so that meant that the gun that fired the

7    bullets on Minerva and the gun that fired the bullets at

8    Cottage Grove was the same gun to the exclusion of all other

9    guns, correct?

10   A.   Yes.

11   Q.   Okay.  Was that consistent with what Clifford Frazier was

12   telling you in terms of him saying, "The guy that left with my

13   cousin and brother is the same guy that came back and shot

14   me?"

15   A.   Yes.

16        MS. BOUDREAUX:  I'm about to start another whole big

17   area.  Should I --

18        THE COURT:  That sounds like a good time for a break.

19        Okay, folks, we are going to end for the day.  I

20   wanted to give you a couple quick housekeeping matters and

21   then we will adjourn.  I also have an anecdote for you.

22        One small housekeeping matter.  You'll notice there's

23   a drinking fountain along the hallway here in the back

24   hallway.  And there's also big gallons, big 5-gallon jugs of

25   water with a water thingamabob below it.

Pesavento - cross by Boudreaux

1    You're welcome to get the water from the thingamabob

2  if you like, if you want to have a water bottle and you want

3  to fill that up.

4    This may surprise you, but they don't actually

5  encourage people to drink out of the drinking fountains, as

6  primitive as that may seem.  I think there are lead pipes in

7  this building, and so they encourage people to drink water out

8  of the thingamabob.  I can't think of what you call it.

9    So go ahead, if you have a water bottle and want to

10  drink out of that, you certainly can.

11    The anecdote for you is when you walk down the back

12  hallway here, those are the judge's private offices.  They're

13  called chambers.  So you've got four judges who share this

14  hallway back here.

15    Right out along the way just immediately to my right

16  is the chambers of Judge Pacold.  And do you want to guess

17  what Judge Pacold did yesterday?  She had jury duty.  And I

18  don't mean she sat up here as a judge and picked a jury and

19  decided which members of the community would serve on the

20  jury.  No.  She personally received a jury summons.

21    And you may be saying to yourself, well, she's a big

22  shot, right, she clearly got out of it.  Oh, no.  No.  She got

23  a state court jury summons to go to 26th and California.

24    And, again, you're probably thinking, well, she got

25  out of it.  No, she did not.  She went to 26th and California.

Pesavento - cross by Boudreaux

1089

1  She did her duty as an American citizen to show up.  It's a

2  beautiful thing, the jury system.  Presidents of the United

3  States have served on juries, too.

4       So I just -- when I called her yesterday and said

5  "How did your day go," she said she sat in a big room waiting

6  all day to be called as a juror, and she was excused at the

7  end of the day because she wasn't called.  So I thought you

8  folks of all people might get a chuckle out of knowing that

9  even federal judges can get served with a jury summons.

10      Now, with that we'll start at 9:30 tomorrow.  Let's

11 everybody please be here at 9 o'clock and we'll get you

12 breakfast and then we'll get rolling at 9:30.  Thank you,

13 folks.

14      (Jury out at 4:47 p.m.)

15           THE COURT:  Sir, you may step down.

16      Anybody need a break before we chat?  Do you want to

17 bring down your respective trial teams.  I don't know,

18 Mr. Safer, Ms. Boudreaux, if you want to text your teams.

19           MR. SAFER:  I'm sure they'll be on their way.

20           THE COURT:  Yeah, I'm sure they're coming on down.

21 We'll wait for them to come on in before we get going here.

22           MR. HALE:  The witness can be excused for the day,

23 Your Honor?

24           THE COURT:  The witness can be excused for the day,

25 yes.

1          We're still on the record.

2          Officer Pesavento, I'm sorry, sir, I'd remind you

3   you're still under oath.  You are still on the witness stand.

4   You can't talk with anyone about the substance of your

5   testimony.  Okay?

6          THE WITNESS:  Yes, Your Honor.

7        (Witness stands down)

8          THE COURT:  Okay.  Is everybody here who's going to

9   be here?

10         MR. SAFER:  Yes.

11         THE COURT:  Well, I've got a couple things I want to

12  talk about.  You probably do, too.  Why don't we start with

13  the big topic, the testimony that came out in the last half

14  hour.

15         The blurb disappointed me, to put it mildly.  I had

16  told you folks to make sure that witnesses exercise care and

17  obey my motion in limine rulings.  I said that not only before

18  trial, but I said it today, I think this very afternoon.  I

19  believe that was on the record.  Everybody heard it, right?  I

20  see nodding heads.

21         I said on the record, you've got to stick with my

22  rulings on that.  I directed counsel to ensure that their

23  witnesses knew and would follow my motion in limine rulings.

24         I have to go back to the transcript and see what

25  happened.  I will tell you that based on my memory, I heard

1   Officer Pesavento say that Mr. Bolden had been arrested, not

2   convicted, but arrested for murder.  That's what I heard.

3          It happened very quickly.  I would have to go back

4   and look at the transcript.

5          I will, I will tell you I as I sit here today don't

6   have any reason to think that defense counsel intentionally

7   elicited that.  In fact, I thought I heard an audible ugh from

8   Ms. Boudreaux, a very audible -- it's not going to be on the

9   record, but I heard a reaction that was a very human

10  expression of disappointment and surprise from you,

11  Ms. Boudreaux.  Based on your excited utterance, so to speak,

12  I did not in the moment think that you were expecting that.

13         But I would like to talk about what happened, how it

14  happened, and what do we do about it.  And I know that you

15  folks may need to think about it, talk with your trial teams,

16  look at the transcript, think it over.

17         Ms. Boudreaux, why don't you start.  Why don't you

18  just say -- and, you know, it's not a memory test here.  I

19  know we were living things live.  But I would like to get your

20  perspective and then Mr. Safer's perspective about what

21  happened on this this afternoon.  What happened, how it

22  happened, and what to do about it.

23         Go ahead.

24         MS. BOUDREAUX:  Sure, Judge.

25         THE COURT:  Just speak into the mic if you would,

1   please.

2          MS. BOUDREAUX:  Yes.  I would like to start off by

3   saying he has been advised of all of your rulings a number of

4   times.  He was in the courtroom when you said it yesterday

5   and/or today.  So I have no idea why that happened.

6          I think he's exhausted.  I could tell, because I've

7   been working with him.  He was losing it towards the end of

8   the day, I felt.

9          THE COURT:  And he knew he couldn't bring up the

10  prior criminal history of Mr. Bolden?

11         MS. BOUDREAUX:  Yes, absolutely.

12         THE COURT:  Okay.

13         MS. BOUDREAUX:  Yes.  So I believe he said that in

14  response to "what information did you learn from Officer

15  Oliver," which doesn't even make sense to me.  So I honestly

16  just think he is totally overextended with what he's doing

17  here.

18         And as you can see I've been basing my entire

19  examination on reports, because that's the only way to do it

20  with him based on his current memory issues.

21         So, you know, I asked an open-ended question at that

22  moment, and it just -- it surprised me as much as anyone in

23  this courtroom.  And I was dismayed.  But I do believe that

24  was the question.  It was "What did you learn from gang

25  crimes?  Or what did you learn from Oliver?"

1    I haven't had a chance to talk to my team about it,

2    so I don't know if they have a different iteration of this,

3    but that's my understanding.

4         THE COURT:  Okay.  Before I turn the floor over to

5    plaintiff's counsel, I want to ask you what, if anything, do

6    you think we ought to do about it?

7         And I know that you folks may want to confer on that.

8    And if your answer is, "We've got to think it over and then

9    we'll get back to you," that's an acceptable answer.

10        But as you stand here, do you think that there's

11   anything that can or should be done by me or anyone else to

12   remedy this situation?  I want to hear your perspective first.

13   Go ahead.

14        MS. BOUDREAUX:  I've tried a lot of cases and this

15   has happened before to either side.  And usually the best

16   thing to do is do nothing, because then it sort of goes under

17   the radar.

18        I mean, I think we have a chance here, based on what

19   Your Honor said, that he said it was an arrest for murder

20   rather than a conviction, that sometimes doing anything about

21   it, like a limiting instruction, just draws more attention to

22   it.

23        And when I've been presented with this, I always said

24   no to the limiting instruction because I did not want to

25   re-raise the issue.

1    THE COURT:  Okay.  Thank you.

2    Mr. Safer, I want to hear your perspective.  And I'll

3    say, everybody, this is not your one and only chance to talk

4    about it.  You are free to talk among your trial team and get

5    back to me.  You know, you've not had a chance to consult with

6    your team.  And you may want to have a stiff drink and think

7    it over.

8    So but I want to get your perspective while we're

9    still here this afternoon.  Go ahead.

10   MR. SAFER:  Yeah, I would say first, Your Honor, what

11   happened was that is what he said, that there had been a prior

12   murder, murder arrest.

13   THE COURT:  That's what I remember, too.

14   MR. SAFER:  You know, the reaction of everybody made

15   it clear I think, you know, because there's no way to not

16   react to that, it made clear to everybody in this room that he

17   wasn't supposed to say that.

18   THE COURT:  There were audible -- just can I build on

19   that?  There were audible gasps not only from Ms. Boudreaux

20   but others, too.  So I certainly -- you could feel in the room

21   that there were excited utterances that weren't so excited

22   about what they heard.

23   Go ahead.

24   MR. SAFER:  Which is a natural reaction --

25   THE COURT:  Right.

1        MR. SAFER:  -- that only highlights it for the jury.

2        And so I don't, you know, I don't understand it,

3   because Mr. Pesavento was here for every, in court for every

4   admonition the Court has given.  And the Court has repeatedly

5   given admonitions.

6        You've done everything that I could possibly imagine

7   to make this a fair trial and have it -- have your rulings be

8   abided by.  And this is the biggest, it's motion in limine

9   number one.

10       THE COURT:  For a reason, for a reason.

11       MR. SAFER:  It's the biggest issue that we've been --

12  so I frankly don't know how you remedy that.  I have to -- I

13  don't know if it can be remedied.  I have to think about that.

14       I think it was in conjunction, you know, the reason,

15  you know, with the FBI stuff, so it's a little bollixed in my

16  mind and I have to look at the record too, I think.

17       THE COURT:  Yeah.  I will say it did happen quickly.

18  And, you know, I don't always have a perfect read of what

19  exactly is resonating with the jury.  I will tell you I felt

20  very surprised to hear it and I heard gasps.  But it did come

21  out quickly, I will say that.

22       I made a spur of the moment decision to give them an

23  immediate instruction that they ought to disregard what they

24  heard.  I very deliberately did not take a break.  I did not

25  do a sidebar.  I did not break for the afternoon.

1     I thought -- and I did that on purpose because I had
2 thought about this coming into the trial, what if a witness
3 screws up and says something they don't do.
4     I always thought if you, in prior experience, when
5 you take a break like that after something bad happens, it
6 accentuates it from the jury.  It's the last bell they heard,
7 and that's not good.  I decided to plow it over like
8 Chernobyl, bury it and plow forward in the hopes that it would
9 kind of go over their heads a little and they would forget
10 about it.
11     I'm not saying that that's what happened.  I'm just
12 saying that I as the trial judge heard something I didn't like
13 hearing and I tried to think about what do I do about it?  And
14 the only remedy I could think of was to instruct them
15 immediately to disregard it and plow forward in the hopes that
16 they would forget it or at rest that it wouldn't be impactful
17 for them.
18     I don't -- I was not looking at any jurors' face.  I
19 was looking at either my notes or Ms. Boudreaux.  I don't
20 remember exactly.  I was not looking at any jurors' faces, so
21 I don't know if there were reactions by them.  I don't know if
22 it resonated with them.
23     Maybe if anybody has something they want to add to
24 the record this afternoon on that, they can.  I didn't see any
25 reaction from anybody because I wasn't looking at them, and I

1097

1    don't know that we know.

2         MR. SAFER:  You know, it's neither here nor there,

3    Your Honor.

4         There's no way that flies under the radar screen.

5         THE COURT:  Yeah, I just --

6         MR. SAFER:  I think it was the best strategy.  I

7    think your strategy is a hundred percent right and it was the

8    best thing to do with an impossible situation.  But there's no

9    way that that flies under the radar screen.

10        THE COURT:  So we all need to look at the transcript

11   and sleep on it, figure out what to do.

12        On a related note, on the stuff about the FBI that

13   had come up 5 or 10 minutes later, maybe, frankly, and

14   Mr. Safer, it was to your advantage that that side issue came

15   up and we did a sidebar on that, because maybe now the jury is

16   thinking the issue is what they learned from the FBI and not a

17   murder arrest.  Maybe that had a way of back-dooring it,

18   giving it lesser importance through the back door.  I don't

19   know.

20        But I will tell you that even though I continued to

21   try to listen, my mind, to some extent, was focused on what do

22   I do with a jury that I think just heard a statement that they

23   weren't supposed to hear?  So I was trying to listen to the

24   question and answering because I have a duty to give you

25   objections on the spot when I can.

1    But it may well be that the testimony was elicited

2  that was objectionable on that issue.  I know I said this

3  before, I just felt like saying it again.  I need to check the

4  transcript on that.

5    So it's possible I missed a pitch on that, so to

6  speak.  And if so, we'll fix it to the extent we can.

7    MR. SAFER:  Thank you.

8    THE COURT:  I will say, before we leave the topic of

9  objections in general, let me give you an example of the

10  challenges that a trial court faces on managing a trial with

11  objections.

12    There was one point where Mr. Safer elicited

13  testimony from a witness about whether Mr. Bolden was light

14  complexion, had a light complexion or a medium complexion.

15  And Ms. Boudreaux showed a document that I think said it was a

16  light complexion.  And then she made a statement about what

17  Mr. Safer had said about there being a medium complexion.

18    So I've got an astute lawyer on the defense side

19  saying, "Didn't you hear plaintiff's counsel say something

20  about a medium complexion with this document?"  I think that

21  was the frame of reference.

22    And Mr. Safer, another astute lawyer said, "That's

23  not what I -- objection.  That's not what I did at all," et

24  cetera.

25    So I as the trial judge am faced with that.  I

1   remember that there had been a document used by Mr. Safer.  I

2   remember him pointing out testimony with a medium complexion.

3       I did not know on the fly right then and there

4   whether that particular document was the same document or some

5   other document.  It is difficult on the fly when there is a

6   knowledge disparity between you and me to know whether what

7   she says about what you said is exactly correct.

8       So I as the trial judge have a choice.  I can give

9   you a more perfect ruling here in the more perfect union by

10  going over to that microphone, having a sidebar, talking it

11  over, looking at the transcript, comparing the documents.

12      If we do that for all these objections, it's going to

13  burn the clock.  You're going to lose time.  The jury's going

14  to get aggravated.  They do like breaks.  We're standing up

15  for sidebars every now and again.  But if you do it

16  repeatedly, they get grumpy.

17      So my strategy for you folks has been I do the best I

18  can when I hear it.  I don't call a sidebar unless I think I

19  need to, unless I think it really matters.  I don't want to

20  waste time.  We've got so little time with this trial.  And I

21  don't want to burn any time on sidebars that are not

22  necessary.

23      You can have more perfect rulings and less testimony

24  time if anybody wants to volunteer for that.  Nobody wants to

25  volunteer for that.  So the down side of that is there could

1  be some pitches that I miss along the way.  But the benefit is

2  you get a cleaner, smoother trial presentation.

3         And I hope you folks are detecting that I'm giving

4  each side, I think, a fair bit of latitude and rope on your

5  questioning.  So if it's a close call, I'm probably erring on

6  the side of giving you some rope.  I did that for each of you

7  a couple times.

8         That's my theory of objections as a youngish judge

9  who's still trying to learn how to do this.  Okay?  That's how

10  I do things.

11         We also have to talk about Officer Oliver.  I don't

12  know if people want to talk with their team about it.  I do

13  want to hear from you folks if you want to address the Court

14  on this again, if anybody wants to summarize what you heard,

15  either we can do it now or we can do it later.

16         If you want to submit something in writing, I'm sure

17  at this point in the trial nobody is thrilled about submitting

18  something in writing, but I always tell people I read what you

19  submit to me.

20         If people want to talk about it now briefly, I am

21  certainly interested in a couple of topics.

22         Number one, where was he a resident at the time of

23  the service of the trial subpoena?

24         Number two, is the time of the issuance of the trial

25  subpoena, the issuance and service of the trial subpoena, the

1 relevant time?

2 So under Rule 45(c)(1), going from memory here,

3 Number one: Where was he a resident at the time of the

4 issuance of the trial subpoena? Number two: Is that the

5 relevant point in time? Or was it when the lawsuit was filed?

6 Was it when he was deposed?

7 I'm assuming it's probably when he was served with

8 the trial subpoena, but I don't know that for sure.

9 The third topic would be, based on what you heard

10 today, do people have any different views about whether he is

11 medically able to come?

12 We didn't I think learn a whole lot of new

13 information on that. We got some -- well, let me back up.

14 What I mean by that is we heard about his kidney and

15 his heart. I think we did learn a lot from tone and energy

16 level and a lot of intangibles from hearing a human voice. I

17 think you can learn a lot from a human voice that you can't

18 get from a collection of words on a page. So I got a vibe

19 from this witness that was helpful to me.

20 So with that, I'll hear from Mr. Crowl. Go ahead.

21 MR. CROWL: Thank you. Thank you, Judge.

22 I'd like to take up the trial subpoena question first

23 as Your Honor had suggested.

24 It's our position that the trial subpoena date is not

25 relevant to Your Honor's consideration. And the reason for

1　　that is because I believe Your Honor should impose a default

2　　sanction on Defendant Oliver based upon your powers under Rule

3　　55, not your powers under Rule 45.

4　　　　　　　Rule 55, Judge, authorizes you to enter a default

5　　judgment when a party against whom a judgment for affirmative

6　　relief is sought has failed to plead or otherwise defend, and

7　　that failure is shown by affidavit or otherwise.  And there is

8　　a lot of Seventh Circuit and other case law directly on point.

9　　　　　　　And let me give Your Honor just some of those key

10　　cases.  One of the cases is *Feury versus the City of Chicago*.

11　　That's the Seventh Circuit case.  It's 900 F.3d at 463.  And

12　　it talks about how you have, Judge, inherent authority to

13　　sanction those who show willful disobedience of a court order,

14　　which I think the record now is replete with Defendant

15　　Oliver's willful disobedience of Your Honor's court orders.

16　　　　　　　And it cites a Supreme Court case that says, "Courts

17　　traditionally have broad authority through means other than

18　　contempt such as entering a default judgment to penalize a

19　　party's failure to comply with the rules of conduct governing

20　　the litigation process."

21　　　　　　　I had given Your Honor, Judge, yesterday the *Grossman*

22　　*versus Smart* case.  That was a Seventh Circuit case, and that

23　　was 1995, Westlaw, 767893.

24　　　　　　　But Ms. Brummel found last night a case which looks

25　　strikingly on point.  I know it's the Eighth Circuit, Judge,

1    but it's Peter Kiewit, K-i-e-w-i-t.  I'm from Iowa, so I know

2    the Kiewit Construction Company.  It's *Peter Kiewit versus*

3    *Wall Street*.  It's 809 F.3d at 1022.

4         And listen to the facts of this case, Judge.  The

5    Court had ordered the parties to be present in the courtroom.

6    And in response, the defendant claimed medical problems and

7    sought a continuance.  He filed a letter from a

8    psychotherapist who opined that, quote, "A stressful one-day

9    trial could be life threatening."

10        He submitted a letter from another doctor saying that

11   the defendant had hypertension for over a decade and that

12   participation in a high pressure court proceeding could place

13   him at increased risk for a major cardiovascular event.

14        He provided a letter from a psychiatrist who said the

15   defendant had, quote, "severe depression and that a court

16   appearance would be deleterious to him and his mental status."

17        The Judge denied his motion for relief noting that

18   each of the medical issues identified in the letters was

19   long-standing.

20        The defendant ultimately decided not to attend or

21   participate in the hearing.  The district judge then moved

22   forward without him, held that the plaintiff had stated a

23   claim that the defendant should be personally liable, and that

24   they would be awarded based upon profits generated.

25        In essence, the judge defaulted based upon Your

1  Honor's powers.  You have the power, Judge, under 55, Rule 55.

2            THE COURT:  Okay.  Keep that thought.

3            MR. CROWL:  Yes, Judge.

4            THE COURT:  I don't like to interrupt you.  Bear with

5  me.

6            The case that you just mentioned, was that an

7  in-state defendant or out-of-state defendant?

8            MR. CROWL:  I don't know the answer to that, Judge.

9  And I would say it doesn't make a difference.

10            THE COURT:  Well, it might under -- I guess the --

11  and I don't want to get too far into the weeds on this, but I

12  am not sure -- let's bracket for a second whether he's a

13  resident of Illinois or Arkansas, okay.

14            Let's just for the sake of argument assume he's a

15  resident of Arkansas at the time of the issuance of the trial

16  subpoena just for the sake of argument.

17            As I understand Rule 45(c)(1), I cannot compel an

18  out-of-state party who is more than a hundred miles away to

19  attend trial as I understand the rule.

20            So if I can't compel that person --

21            MR. CROWL:  I'm sorry, Judge.

22            THE COURT:  You're doing fine.  I always have this

23  issue when I'm talking on the phone on somebody and somebody

24  talks to me while I'm trying to talk to somebody on the phone,

25  it's hard to listen to two people, so I totally get it.

1    I'm not sure if I could enter a default against

2  someone for not attending trial if I could not lawfully compel

3  their attendance at trial.  I don't know, but that would

4  surprise me, is my intuitive gut reaction.

5    MR. CROWL:  I think your power, Judge, will surprise

6  you.  I think the answer to that is yes.  And Ms. Brummel just

7  mentioned that in that case, the Peter Kiewit case, the person

8  was out of state in Florida.

9    THE COURT:  Okay.

10    MR. CROWL:  And, Judge, here is why we believe that

11  default is the only viable option in this case.

12    Defendant Oliver is flouting this Court's authority.

13  And I think it's clear from what he's done in the past and

14  what he's continuing to do that he's seeking to manipulate the

15  Court so he doesn't have to testify in person.  And there

16  couldn't be now a more important witness to testify in person,

17  especially now that the jury has heard the FBI hearsay, than

18  James Oliver.

19    He's not only a party to the case, he is a central

20  witness to the case.  And he's thinking, I'm going to be able

21  to get away with a Zoom call by pulling what I think are

22  shenanigans here.

23    I think it's a willful violation of Your Honor's

24  court order that he was to advise you of any materially

25  declining health.  That was the first order, that he

1  repeatedly denied you the information you needed in order to

2  allow us to do a deposition.

3          And his deposition in 2017 --

4          THE COURT:  You mean his second deposition?

5          MR. CROWL:  His second deposition.

6          THE COURT:  Correct.

7          MR. CROWL:  Because his first one, as Your Honor

8  knows, was taken before the City gave us key documents.  They

9  said some of them had been destroyed.  They hadn't been.

10         So it was so important when he raised, at the

11 rescheduling of the trial date, that he might be sick.  And

12 Your Honor went ahead and entered the order to keep him

13 advised.  That was a year ago.

14         And what has he told you?  In that time period, he

15 moved three months before trial.  He testified under oath that

16 his health deteriorated, that it's changed in a serious way in

17 response to Your Honor's questions under oath, that he cannot

18 walk, that he has lost 90 pounds.

19         Now, granted, that was over two to three years, but I

20 don't think he dropped all of those pounds in the first two

21 and not the last year.

22         That he has not been feeling well, that he has not

23 been feeling right.  He's not been feeling up to par.  His

24 blood pressure is way up.  He tells you for the first time,

25 and this all occurred as Your Honor pointed out in your

1   earlier ruling within days of the start of the trial, two days

2   before, that he now has Stage 4 kidney disease, which is not

3   an acute, but it's a chronic disease, and he said that that

4   took place in the last year or two.

5           Again, I think this is open defiance of Your Honor's

6   order.

7           His kidney doctor told him that he has this disease.

8   And we know that his kidney doctor is the Illinois doctor.

9           He cannot stand well.  He cannot walk.  He does not

10  feel well.  He has high blood pressure and a kidney problem.

11  He is unable to stay awake.  He sleeps 50 percent of his day.

12          That's what Your Honor elicited in two very short

13  15-minute question and answer with a police officer, a former

14  police officer, under oath.

15          The potential prejudice here is extraordinary.  He

16  did not notify you of his change of health until three days

17  before.

18          And what else he did, Judge, two days before trial,

19  he told you this:  If forced to travel to Chicago, he will be

20  staying at a hotel in a city that is hundreds of miles from

21  his treating physicians.

22          And you know, Judge, that is just wrong.  He would be

23  traveling to his treating physicians.  Today he was asked

24  about his doctors.  His doctors, Judge, are all in Illinois.

25  But he told you two days before trial that he would have to be

1108

1    in a city that is hundreds of miles away from his treating

2    physicians, his friends and his family.

3           He tells you today that he has a son, a daughter, a

4    niece and a nephew, all in Chicago.

5           He's trying to dodge you, Judge.  He said two days

6    before the trial starts that he'll be putting his health at

7    grave risk if he's forced to travel to Chicago to participate

8    in the trial or to testify remotely.

9           That's what he had Your Honor know two days before

10   trial.  He said he cannot safely testify even by remote means

11   due to his extremely poor medical condition.

12           THE COURT:  And just to be clear, what you're doing

13   here is not saying what the officer said today.  You're

14   recounting what was summarized in defense counsel's filing,

15   which they apparently got from the doctor which they --

16           MR. CROWL:  Right.

17           THE COURT:  -- the doctor apparently had spoken to

18   Officer Oliver, maybe it was a contemporaneous conversation.

19   But you're recounting not what Officer Oliver testified to

20   today, but, rather, what was summarized in defense counsel's

21   filing based on an earlier conversation with the doctor.

22           MR. CROWL:  That's right.  I'm quoting directly,

23   Judge, what is put in a court pleading to you --

24           THE COURT:  Right.

25           MR. CROWL:  -- based upon what Defendant Oliver and

1    his doctor conveyed.

2           THE COURT:  Right.

3           MR. CROWL:  He is behind this.  It is clear.  And

4    here is why I say that, Judge.  I almost fell out of my chair

5    when the explanation for all of this, that he cannot testify

6    remotely was because -- did you hear this?  Because his doctor

7    didn't know that punitive damages were at issue.

8           And if she had known, Judge, that punitive damages

9    were at issue, then she would have given a different medical

10   diagnosis?

11          THE COURT:  I will tell you I did not understand that

12   at all.  That seemed really odd to me that someone's medical

13   health depends on whether somebody is seeking punitive damages

14   or not.  Those seem dissonant or uncorrelated is maybe a

15   better way to put it.

16          MR. CROWL:  Judge, you are very judicious.  I think

17   what Defendant Oliver is doing is he's concocting a medical

18   diagnosis, either giving one or not giving one, either giving

19   it honestly or giving it dishonestly, so that he can finagle

20   his way into a Zoom deposition in this case or a Zoom hearing

21   in this case so he doesn't have to look these jurors in the

22   eye, so that we can't do under the crucible of

23   cross-examination what's necessary to show this jury the

24   truth.

25          That's what he's doing.  And, Judge, I believe that

1    unless you default him, he will get what he's trying to do.

2    He will get his Zoom dep.  He'll be the only witness in this

3    case who gets to testify from a Federal courthouse miles away

4    or from the comfort of his home.  Today he was reading off of

5    some sort of note while you were talking to him.

6            It is virtually impossible to control a witness in

7    terms of cross-examination with exhibits and having the jury

8    understand and be able to watch them on Zoom.  Zoom is a

9    powerful, a powerful tool, but we know the limits.

10           And in a courtroom, in a case, a civil case where the

11   stakes are this high, where he is accused of conspiring with

12   others to put an innocent man in prison for 22 years, he

13   should not be rewarded for what he has done in this record,

14   which is replete with I think him trying to manipulate this

15   Court so he didn't have to sit for that second deposition.

16           Well, he won on that.  Giving us an order to go down

17   and depose him in the middle of trial while we've got all of

18   these witnesses and we're trying to land the lunar module with

19   just the right amount of fuel?  He wins again on that.  Having

20   him testify on Zoom?  He wins on that.

21           He does, Judge, have skin in the game.  Your Honor

22   was absolutely right to raise that yesterday.  He's on the

23   hook for punitive damages.  That is skin in the game.

24           He, by our records, had a very impressive home in

25   Monee.  I don't know why he would choose to sell that home and

1  relocate right before trial.  But, I mean, I can show Your
2  Honor his home in Monee.
3       THE COURT:  Well, you don't need to show it to me.
4  We'll say it's a nice house.
5       MR. CROWL:  Yeah, it's extraordinary.  And he sold it
6  a couple months before trial.  He's now put himself, he
7  thinks, outside of Your Honor's power.
8       THE COURT:  Do you think he moved to evade this
9  trial?
10      MR. CROWL:  Yes, I do.
11      He also, Judge, as you know, may have put his
12  indemnification right with the City at risk by pulling this
13  trick.  He perhaps has put his pension at risk by pulling this
14  trick.  He has skin in the game.  He's not going to -- if Your
15  Honor said, "You need to be in court by a certain day or I
16  will default you," my prediction is you will see Defendant
17  Oliver in your courtroom.
18      THE COURT:  So let me ask you this.  Thank you for
19  all that.
20      The presentation you just gave was in the context of
21  default.  I have the power to declare someone in default and I
22  ought to do it.
23      I'd like to focus first on Rule 45(c)(1).  What is
24  the plaintiff's position about where Officer Oliver resided at
25  the moment of service of the trial subpoena?

1    MR. CROWL:  The trial subpoena shows that he -- that

2    it was issued on October 4th.

3    THE COURT:  I thought it was September 21st.

4    MR. CROWL:  Was it September 21st?  I'm sorry.

5    That's the trial date.  September 21st.

6    And it sounds like he had left, based upon his

7    testimony, right prior to that, Judge.

8    THE COURT:  All right.  So just to be clear, is it

9    the plaintiff's position that Officer Oliver was a resident of

10   Arkansas as of September 21st, 2021?  I'm not saying that's

11   dispositive, but I -- and if you folks need to look at the

12   transcript, talk things over as a team, you can do that.  If

13   the answer is "I don't know," I accept that, okay.

14   So I'll give each side a little bit of wiggle room

15   because you haven't had a chance to confer over dinner here.

16   But go ahead.

17   MR. CROWL:  It's always a bad sign when Mr. Safer

18   turns to me, because it means I'm about ready to say something

19   that I might not know the answer to.  I don't know the answer

20   to that one.

21   THE COURT:  Okay, that's fine.

22   MR. CROWL:  But I do believe, Judge, that under Rule

23   45 the relevant time for residence is the time of the trial,

24   not the date of the issue.

25   THE COURT:  Oh, so, well, that's probably worse for

1    you.

2              MR. CROWL:  That's even worse.

3              THE COURT:  Okay.  That's interesting.

4              MR. CROWL:  But, Judge, again, where I started I'll

5    finish.  I think your power comes from Rule 55 and your power,

6    Judge, with a party to enter a default which I think the case

7    law shows in spades.

8              THE COURT:  Sorry.  Every now and again I get

9    interested in something more than I should.  It strikes me as

10   it can't be right that somebody can be served with a trial

11   subpoena living across the street from the courthouse and they

12   can move after service of the trial subpoena and evade the

13   trial subpoena.

14             I view a subpoena as a lasso, I think.  And once

15   you've been lassoed, you're stuck, I think.  I don't know if

16   that's right, but that's kind of how I think about it.

17             MR. CROWL:  I hope you're right, Judge.  That's what

18   it should be.

19             THE COURT:  I think it's like service of process.

20   Once you're tagged, you're tagged.  You can move wherever you

21   want, but you're in.  That's kind of how I think about a trial

22   subpoena.  I might be wrong, though.  I don't know.  I've

23   never looked into it.

24             It looks like you've got reinforcements coming.

25             MR. CROWL:  I do, Judge.

1       THE COURT:  You're also welcome to speak too if you

2   would like to speak to something.

3       MR. LITOFF:  Yes.  We just want to make sure I read

4   the note correctly.  It's Ms. Brummel is the brains behind the

5   operation.

6       THE COURT:  Well, she should get up here.  Why aren't

7   I hearing from Ms. Brummel?

8       MR. CROWL:  Seriously.  She should come up.

9       THE COURT:  Go ahead, Ms. Brummel.

10      MS. BRUMMEL:  I'll just stand here.

11      THE COURT:  I haven't bitten anyone in the trial yet,

12  but give me time.  You're welcome to come to the front

13  microphone if you'd like.

14      MS. BRUMMEL:  Okay.

15      THE COURT:  I promise you I'm not more scary and not

16  more impressive up close.  So go ahead.

17      MS. BRUMMEL:  Judge, the note just say that the word

18  "resides" is not defined under the Federal rules, but case law

19  has -- other Federal courts have interpreted the word

20  "resides" to mean where you spend the majority of the year,

21  not necessarily your domicile at the moment.

22      And so there are cases under Rule 37 and 55 that have

23  enforced someone's residence as where they lived the majority

24  of the year as opposed to, for example, a move immediately

25  before the time of a hearing or the time of a trial or in some

1    cases under a 37 deposition.

2           THE COURT:  Got it.  So if someone lives in Illinois

3    through August, and they sell their house in August and they

4    move to Alaska, and they buy a house in Alaska.  And they open

5    a store in Alaska.  And they really do genuinely, you know,

6    pull up roots and stake down new territory in Alaska.  Do you

7    think they would still be considered a resident within the

8    meaning of 45(c)(1) of Illinois in a trial, let's say, that

9    took place in November of that year?  Because for most of the

10   year, a 12th of the year, they were in Illinois.  What do you

11   think?

12          In other words, it strikes me as it's probably not a

13   month counting operation.

14          MS. BRUMMEL:  Sure.  I think that's probably right.

15          THE COURT:  But I don't know.  These are new

16   imponderable questions that I've not thought about before.

17          MS. BRUMMEL:  Sure.  I think the lawyer's answer to

18   that is:  It depends.

19          THE COURT:  It depends, yeah.  Okay.

20          MS. BRUMMEL:  So that being said, there are examples.

21   And I could run and grab a case, for example, that I

22   circulated to our team that shows an immediate move right

23   before something is happening when there is a notice of that

24   deposition or that hearing already having been scheduled even

25   if at the time that person has already moved, that is where

1     the courts typically interpret the residence as being the

2     prior location before the move.

3          That being said, of course Your Honor has discretion.

4     If it's a legitimate move that seems to be a complete

5     relocation, and it was completely independent of pending

6     events and just happens to, as in the example, just happens to

7     occur at that point, I'm sure the Court would be able to

8     exercise its discretion in not enforcing that.

9          THE COURT:  Got it.  You know what would help me from

10    the plaintiff's side, if you could file a one paragraph thing

11    tonight that just says, "Judge, look at these cases" and just

12    give the cites.  I don't know anything fancy.  You don't have

13    to feel pressure from me to explain them.  I'll read them

14    either way.  But just a list of research.  It's good to have

15    it on the record anyway.

16         You know, I'm in the business of trying to get things

17    right.  And I want to read whatever you send me and I'll look

18    at it and see how the chips fall on this, okay.

19         MS. BRUMMEL:  Will do, Your Honor.

20         THE COURT:  Anything else from the plaintiff's side

21    on this?

22         MR. CROWL:  Nothing, Judge.  Thank you for your time.

23         THE COURT:  So we covered, I think, where are you as

24    a resident, what time matters, and were there anything

25    medically changed.

1    Anything else on the medical front that we covered

2  kind of briefly?

3    MR. CROWL:  No, Judge.  I think you have an abundant

4  record that it deteriorated in violation of your Court's

5  order.  He did not bring that to Your Honor's attention.

6    THE COURT:  Okay.  Thank you, counsel.

7    Defense counsel, there is a lot there.  I'll hear

8  anything you've got to say on that.

9    I'm assuming, by the way, as the day rolls on, and

10  I've worn you folks out, that nobody has any desire to submit

11  anything in writing, right?  So we're just going to do this

12  today.

13    I don't want to deny people an opportunity.  If

14  anybody in this room has a burning desire to file something, I

15  will read it.  I can tell you from your faces you don't.  But

16  I just want people to know that I will read it if you want.

17  But I understood this colloquy to be sufficient for everybody.

18    So, Mr. Hale, I'm happy to hear anything you want to

19  say.  Go ahead.

20    MR. HALE:  I would say we would only feel the need to

21  file something in writing if Your Honor decided to do what the

22  plaintiff is proposing, which I think is not appropriate.

23    I will say this, respectfully, I think the least

24  credible thing I've heard in everything Mr. Oliver has said

25  and everything he's filed and everything in court today is

1    what counsel just said, that Mr. Oliver moved to avoid this

2    trial.  I think that's completely non-credible.

3         We all heard the same thing.  This man lost his wife.

4    This man has health issues he's had for years.  They've gotten

5    worse.  They're ignoring he had a hospital stay for three days

6    in August when he had trouble walking and getting up, you

7    know.

8         And you heard him on the phone, Judge, just like you

9    said, I think you called it right, the vibe.  The man is 77.

10   He has admitted health issues.  He had a three-day hospital

11   stay in late August.  He still has trouble walking.

12        And then hearing all the testimony about moving to

13   Arkansas, where he's from, living with his sister, selling his

14   house, he's got family there.  He hasn't left his house except

15   to go to the doctor and to go to CVS to get his medicine.

16   This man has a very poor quality of life.  It's sad.  I feel

17   bad for him.

18        And for plaintiff's counsel to tell you that he moved

19   to Arkansas to avoid being here for the trial is the least

20   credible thing I've heard in the last month.

21        With all due respect, Judge, we wish he could be here

22   too.  He's integral to our case.  We need him more than they

23   do.  Let me make this clear.  We, the defendants, our table is

24   going to suffer more prejudice from the jury not seeing him

25   and feeling him than the plaintiffs will.

1    We need him.  They're going to make some very

2  scandalous allegations about Oliver.  We need him to refute

3  those.  We need Oliver more than they do.

4    So for them to act like a default judgment is simply

5  silly, Judge.  I think on everything you heard, and I'm just

6  trying to be calm and reasonable about this, I think you took

7  the right approach, you got information, a lot of information

8  on those two phone calls.

9    I think the record is clear.  I think you're right on

10  Rule 45(c)(1).  I don't think you can compel him.

11    I think the appropriate time of service, you know, is

12  the residency when the subpoena was served.  He moved in July.

13  So I don't think that remedy would be appropriate, you know,

14  we can't compel him here.

15    I do think what is appropriate is having him testify

16  remotely by Zoom.  He will still be a live witness.  He can

17  still be cross-examined.  We can still see him on the screen.

18    I think as a society in the last year and a half we

19  have learned you can do a lot of things on Zoom.  We all have

20  done a lot on Zoom.  We've taken depositions on Zoom.  We've

21  had trials on Zoom.

22    Zoom is going to be a pretty good alternative.  I get

23  it.  I wish he was here, too.  I think Zoom is a pretty good

24  alternative.

25    The other thing I think we're kind of ignoring,

1120

1    Mr. Oliver didn't bring it up I think, but, you know, with his

2    conditions and his age, if I was his sister or his brother, I

3    would be extremely worried about this man with COVID right

4    now.

5        He's not going anywhere.  He's not even really

6    leaving his house.  I would be, if I was him, extremely

7    nervous about that.  And I don't think we could ignore it.  He

8    didn't say it, but I don't think we could ignore it.

9        But at the end of the day, Judge, I would simply say

10   this.  We would respectfully ask, we think the appropriate

11   remedy is to do testimony by Zoom.  I think both parties are

12   going to suffer from that equally.  They're not going to

13   suffer any more than we will.  We both have the burden of not

14   having him here.

15       Mr. Pesavento would love to have him here too as

16   well.  And so I think under the circumstances, which were not

17   ideal, and we understand that, we would respectfully ask that

18   your court allow him to participate by Zoom.  And we think

19   that's the appropriate remedy.  Thank you.

20       THE COURT:  Thank you, Mr. Hale.

21       MR. HALE:  One last comment.  The case they cited,

22   the Kiewit case, I would be curious, I've got a feeling that's

23   a case that predated the revisions to Rule 45 when they

24   changed it to a hundred miles in in-state residency.

25       THE COURT:  I noted it was -- I'm going from memory.

1     I think 809 F3d and we're now into F4th, so --

2              MR. HALE:  Yeah, I think it's the old rules.

3              THE COURT:  I think Rule 45(c)(1) was changed in 2015

4     or 2017, give or take, last five years I think give or take.

5              MR. HALE:  Yeah.

6              THE COURT:  So I don't know if it predates.  And

7     maybe the revisions didn't change the analysis.  I don't know.

8     Ms. Brummel has got a Johnny on the spot point right here.

9              MS. BRUMMEL:  It's 2016, Your Honor.

10             THE COURT:  2016.  All right.  True to my --

11             MR. HALE:  That point's not relevant to my argument,

12    but I just wanted to note that for the record, but anyway.

13             THE COURT:  Can I ask you, I did think it was really

14    odd that the doctor's medical evaluation changed based on the

15    type of damages that would be sought.  I don't know if we've

16    got a flaky doctor, okay.  I don't know.  I'm not holding you

17    folks responsible for whether we've got a flaky physician or

18    not.

19             It just struck me as really odd that I got a filing

20    that said, "According to the doctor, he cannot testify even

21    remotely or it will put his very health, his existence into

22    question.  It's just too stressful for him.  It may be system

23    overload, his cardiac system or what not.  He can't take the

24    stress.  He cannot testify by any way, shape or form, period."

25             You know, so I heard that.  And then I then got a

1    letter from her a couple days later saying, "Oh, he can

2    testify remotely."  And the dissonance of that was really

3    unsettling for me.  And I'm not holding you folks responsible

4    for it.

5        But, you know, maybe we've got a flaky doctor here or

6    I don't know what the story is.  But I want to tell you as an

7    audience, that was very jarring for me to get a filing that

8    says "you may kill this guy if you have him testify at all,

9    including remotely."  And then two days later to get a filing

10   based on the very same doctor that says, "you should let him

11   testify remotely."

12       What do you say to that?

13       MR. BAZAREK:  Could I speak to that, Judge?

14       THE COURT:  Yes, please.

15       MR. BAZAREK:  Maybe I didn't articulate it properly.

16       On that Friday, the doctor --

17       THE COURT:  This is Friday, October 1st.

18       MR. BAZAREK:  -- she's in the office with Oliver.

19       THE COURT:  October 1st.

20       MR. BAZAREK:  Under no circumstances --

21       THE COURT:  This is during your personal oral call

22   with Dr. Stokes --

23       MR. BAZAREK:  Correct.

24       THE COURT:  -- his general physician and Officer

25   Oliver.

1       MR. BAZAREK:  Yes.

2       THE COURT:  Go ahead, tell me what happened.

3       MR. BAZAREK:  In-person Zoom deposition, under no

4  circumstances.  That was relayed to me in that phone call on

5  that Friday afternoon.

6       We go into the week, and now it's the Court could

7  order it that maybe it will be a default.  He'll have no

8  defense if he doesn't testify at trial.  So it was, call it a

9  pitch, Your Honor, to the doctor.  Imagine the phone calls.

10      Doctor, he's not going to be able to defend himself.

11  If he cannot, if he cannot testify remotely, he would not be

12  able to defend himself.  They are --

13      THE COURT:  She doesn't give him legal opinions.  She

14  gives medical opinions.

15      MR. BAZAREK:  No.

16      THE COURT:  Excuse me.  Either he's medically capable

17  of testifying remotely or he isn't.

18      MR. BAZAREK:  I guess --

19      THE COURT:  And so when I hear a doctor saying he

20  can't --

21      MR. BAZAREK:  Yeah.

22      THE COURT:  -- and then he can, it's jarring to me.

23      MR. BAZAREK:  But also that was our urging that the

24  man had to defend himself, Judge.

25      THE COURT:  Well, if your nudging for legal tactical

1    reasons was enough to change a medical opinion, I find it very

2    hard to put any credence in what the doctor says, because

3    she's supposed to be giving medical opinions, medical

4    judgments based on science, and not making tactical legal

5    decisions about how somebody ought to defend a lawsuit.

6           I mean, I feel like I'm being played by the doctor,

7    like she's in control, like she can issue a get out of court

8    free card, you know.

9           It's real simple.  Can the guy testify from a medical

10   standpoint or not?  It shouldn't matter if the damages are a

11   gazillion dollars or a dollar.  Either he can do it or he

12   can't.  It's a binary thing.

13          So for the doctor to say, "Oh, now that punitive

14   damages are at stake, my opinion is different," I just lose

15   all credibility in that person because I feel like I'm getting

16   played.  Go ahead.

17          MR. BAZAREK:  It wasn't just punitive damages.  He

18   was not able to defend himself.

19          THE COURT:  Well, I don't care what it was.

20          MR. BAZAREK:  Right.

21          THE COURT:  It doesn't matter.

22          MR. HALE:  Right.  Your point is well taken.

23          MR. BAZAREK:  Yes, Judge.

24          THE COURT:  I mean, I'd like to think everybody in

25   this room thinks that's a flaky opinion by the physician.

1    That's not -- it doesn't do defense -- she did not do defense

2    counsel -- I'm going to adopt your version of what happened, I

3    mean, I have no reason to doubt it.  She's not doing you any

4    favors by flapping in the wind like that.  That's not helpful

5    to you.

6              MR. BAZAREK:  Judge, can I say one other thing?

7              THE COURT:  All right.  Yeah, go ahead, yeah.

8              MR. BAZAREK:  And I know there has been talk, and now

9    I'm not sure where the plaintiff was talking about taking a

10   deposition of --

11             MR. HALE:  We're good.

12             MR. BAZAREK:  Okay.

13             THE COURT:  I think the deposition, that was raised a

14   year ago.  And like so many other things, I floated that -- it

15   was a bad idea that I had floated the other day just to gauge

16   the room about whether anybody had an interest in it.  I

17   didn't think anybody had any interest in doing that at this

18   point and I wouldn't either.

19             I always disliked it when trials were disrupted for

20   depositions.  Every time I rolled into a courtroom in a trial

21   and a judge thought about doing a deposition in the middle of

22   trial, I thought, has that judge ever gone to trial before?

23   Honest to goodness, that's the last thing anybody wants.

24             But, you know, I'm still learning you folks.  I don't

25   know, maybe somebody in the room was interested in that, so I

1126

1  thought I would raise it.  But I knew what I would think.

2          MR. BAZAREK:  Yes, Your Honor.

3          THE COURT:  Okay, folks.  This is not our last word

4  on Officer Oliver.  You have given me a lot to think about.

5          Defense counsel, I'll say the same thing to you that

6  I said to them.  If there are any cases you want me to read

7  tonight, I'll read them.  Don't feel pressure.  I'm doing my

8  own research, too.

9          If you want a paragraph that says, "Judge, look at

10  these cases," I'll look at them.  But if you want me to just

11  rest on what I've got and my own research and what they have,

12  that's fine too.  So I'm just trying to say I'm receptive to

13  anything you folks have to say to me at any time, I'll listen

14  to them, okay?

15          Okay.  Just looking at my notes, folks.  Let's talk

16  about tomorrow if we can.  Tomorrow will be a new day.  The

17  sun will come up.

18          Edna Williams, I think, rolls in first as I

19  understand.  My understanding from Mr. Safer, just going from

20  memory here, is that she had a limitation, she needs to be

21  your first batter first thing Thursday morning.  Do I have

22  that right?

23          MR. SAFER:  Well, it seems we've got a hang-over

24  witness.  So she'll probably be then first thing after --

25  well, after lunch.  So we'll put on Ingles.  And then assuming

1    that he's off, that is, after lunch, then Edna Williams.

2          But if there are little down periods, we'll fill that

3    with the designations that we said, Lee Williams, George Karl,

4    Jacob Jachna, and then Tenesha Gatson is in there too.

5          THE COURT:  Okay.  I know there's a lot to cover.

6    I'm not going to hold you folks to it.  I'm just curious.

7          What are people's best estimates for how much longer

8    Officer Pesavento has on the stand?

9          And, again, I'm not going to cut you off, folks, so

10   don't feel pressure.  But do you think collectively we're at

11   less than an hour?  Or maybe you need more time,

12   Ms. Boudreaux, I don't know.

13         MS. BOUDREAUX:  No.  I don't think I have any more

14   than a half hour left.  I'm sorry, a half hour.

15         THE COURT:  Okay.

16         MR. SAFER:  Redirect will be brief, Your Honor.

17         THE COURT:  Okay.  Okay.  I will try to keep the

18   trains rolling as fast as we can tomorrow.  When I go in the

19   hallway now, and I always tell the -- or down the hall, I

20   always tell the court security officer to bring them down.

21   You know, they do need to take turns to use the restroom so

22   it's not as quick of an operation as it can be.  But I do

23   encourage them to use the bathroom, stretch their legs and get

24   rolling.

25         I want to maximize the amount of trial time you folks

1128

1    have for live witnesses.

2            We almost covered 45 minutes of housekeeping matters

3    on a couple of topics.  Are there other topics that people

4    want to raise?  Maybe people feel like they are a bit spent

5    and can kind of can use a walk outside at this point.

6            On a lighter note, I wanted to end with that lighter

7    note with the jury about the Judge Pacold situation.  Isn't

8    that truly astounding?  I did that very -- I hope you folks

9    know I did that very deliberately given the vibe of how the

10   day ended.  But I thought it was a striking thing that she had

11   jury duty yesterday.

12           MR. HALE:  I have one issue, Judge.

13           THE COURT:  Yeah, go ahead.

14           MR. HALE:  We did file today a brief in support of

15   our argument about why we think plaintiff opened the door in

16   their opening statement.

17           THE COURT:  Okay.

18           MR. HALE:  I think it's better to have a transcript,

19   to have it in writing, so you can digest it.  We are going to

20   do the same thing, file a brief in writing, hopefully by

21   tomorrow morning about why we think Mr. Safer's -- some of his

22   questions to Detective Pesavento opened door.

23           I did meet and confer with them and I told them, and

24   I'll just give you a quick 15-second version.

25           There were some very specific questions about:  You

1  did not investigate Eddie Bolden's motive.  You did not

2  investigate Eddie Bolden's potential motive and involvement.

3          So we'll put this in writing for you.  We think that

4  opens the door to some things.  I just wanted to give you a

5  heads up that we filed one.  We're filing another.

6          I don't think this needs to be ruled on until

7  Mr. Bolden hits the stand, which sounds like it's not this

8  week.  So, but I just wanted to give you that logistical --

9          THE COURT:  And I appreciate that.

10          Would that impact your questioning of Officer

11  Pesavento?  The good news is he's a party, he's not going

12  anywhere.  If it would, you know, we could bring him back.

13          But I see Ms. Boudreaux nodding her head negative, or

14  shaking her head rather.

15          MS. BOUDREAUX:  Yeah, it won't impact my questioning.

16          THE COURT:  Okay.  Either way, even if there was an

17  opening of the door hypothetically?

18          MS. BOUDREAUX:  Correct.

19          THE COURT:  Okay, fair enough.

20          MS. BOUDREAUX:  Well, I guess I should restate that.

21  I guess if the prior conviction comes in, I would get that out

22  of him, but nothing about gangs.

23          THE COURT:  Yeah, got it.  Okay.  Well, the good news

24  is, again, he's here.  If in a hypothetical we were to open

25  the door, he's 20 feet away from me.  So I'll look at what you

1130

1  file.

2         Mr. Safer, you can look at it, you can digest it,

3  your team can respond to it as appropriate and we can go from

4  there.

5         You folks undoubtedly need some nourishment and some

6  rest and a walk.

7         Does anybody see a need to come in before, let's say,

8  9:00 o'clock as a group tomorrow?  We can come in later if you

9  want.  Do you want to have a later start?

10        MR. SAFER:  We'll be here at 9:00, Your Honor.

11        THE COURT:  Okay.  I'll be here at 9:00.  And I'll

12 come in, check in with you folks.  If there's nothing to talk

13 about, you can mill around and enjoy the last sips of coffee

14 and then we'll get rolling at 9:30.  Okay?

15        MS. BOUDREAUX:  Can I ask you one more thing, Judge?

16        THE COURT:  Yes.

17        MS. BOUDREAUX:  Any update on the ruling on expert

18 Loftus?

19        THE COURT:  That's a good question.  That's not going

20 to be a this week thing either way it sounds like.

21        MR. SAFER:  Yeah, yeah.  It probably won't.  Yeah.

22        MS. BOUDREAUX:  Because I thought it was going to be

23 the 15th or not.

24        MR. SAFER:  It would have to be, but because

25 everything is moved --

1    MS. BOUDREAUX:  Okay, got it.

2    MR. SAFER:  -- he'll have to go --

3    THE COURT:  Yeah, I was concerned about that

4  because -- you'll have to remind me, Mr. Safer, is he able to

5  be here next week?  I know he had conflicting testimony.

6    MR. SAFER:  Yes, he's able to be here certain days

7  next week.  And we'll update the Court and defense counsel on

8  that.

9    THE COURT:  Great.

10    MR. SAFER:  Maybe tomorrow.

11    THE COURT:  Got it.

12    I will tell you, Ms. Boudreaux, that I read the

13  motion in limine and the report when it came in.  I brought it

14  home with me last night and I read it again.  So it's in the

15  pipeline in terms of my thinking on it.  I don't have a ruling

16  for you.  I want to be careful on something like this, so.

17    MS. BOUDREAUX:  Yeah, no problem.  I just wanted to

18  know if I had to be ready by Friday.

19    THE COURT:  Nope.  Got it.  Okay.

20    Okay, folks.  You're obviously undoubtedly ready for

21  a walk.  Thank you for your time today.  We'll hit it hard

22  tomorrow, okay?

23    MR. SAFER:  Thank you.

24    MS. BOUDREAUX:  Thank you.

25    MS. BRUMMEL:  Judge, can I ask a logistical --

1    THE COURT:  I'm sorry, Mr. Safer, can we go back on

2    the record one second?  I'm sorry to do that to you.

3    MR. SAFER:  Not at all.

4    THE COURT:  I'm sorry, Ms. Brummel.

5    Are we on the record?

6    I did want to put on the record that a note was

7    handed to me from a CSO, a CSO at 4:24 this afternoon.  It's

8    in my hand.  I have not yet read it, but I wanted to put it in

9    there that I got the note.  Let me read it now.

10    This is from a juror.  I am not going to identify the

11    juror, unless people think that it needs to be.  But it's just

12    a comment that I think is probably useful.  It says, "Please,

13    screenshots should be made larger to see better."

14    MS. BOUDREAUX:  Okay.

15    THE COURT:  So you folks were putting pictures up.  I

16    know ELMO is maybe not as easy to use, but I think this

17    particular juror would like bigger shots.  So you're welcome

18    to see the note if anybody wants to read it.  I am going to

19    give it to my courtroom deputy.

20    And, Ms. Brummel, did you have something else you

21    wanted to say?

22    MS. BRUMMEL:  Just a question.

23    Do the individuals who are reading designations with

24    us as kind of the acting roles have to wear suits when they

25    come?  Or is that your preference?

1       THE COURT:  So the person who's going to be showing

2   up as?

3       MS. BRUMMEL:  Lee Williams, for example.

4       THE COURT:  Lee Williams.  So that's a good question.

5   I will not personally view it as disrespectful to me

6   or to the Court if the person does not wear a suit.

7       Who do you have planning to do it?

8       MS. BRUMMEL:  They are lawyers from our firm,

9   associates largely from our firm.

10      THE COURT:  Okay.  Is the concern about wearing a

11  suit that it doesn't fit with the vibe of the witness?  Like

12  this type of witness isn't going to -- it's like there's going

13  to be an air of artificiality about it?

14      MS. BRUMMEL:  I think that's right.  For example, for

15  the designations of police officers, I think those readers are

16  planning to wear suits, for example.  But for a layperson like

17  Mr. Lee Williams, it maybe would be more normal for him to

18  wear normal clothes.

19      THE COURT:  Okay.  I would say that I will not

20  personally view it as disrespectful to me or to the Court if

21  someone does not show up in a suit to present deposition

22  designations as a witness.

23      The same for defense counsel.  Your person can wear

24  whatever you deem appropriate for the type of witness who is

25  going to be presented.  I'll give you latitude on that.  As

1    they say, no jeans, no mesh shirts.  But other than that,

2    those of you who remember the '70s are laughing with me.

3           Ms. Brummel, you don't know what a mesh shirt is.

4           But wear whatever you deem appropriate and that will

5    be fine with me.  Okay.

6           MR. SAFER:  Thank you.

7           THE COURT:  We're adjourned.  Thank you, folks.

8           MS. BOUDREAUX:  Thank you, Judge.

9        (Adjournment 5:49 p.m. to 9:00 a.m., October 14, 2021)

10

11              C E R T I F I C A T E

12           We, Frances Ward and Jennifer S. Costales, do hereby

13   certify that the foregoing is a complete, true, and accurate

14   transcript of the proceedings had in the above-entitled case

15   before the Honorable STEVEN C. SEEGER, one of the judges of

16   said Court, at Chicago, Illinois, on October 13, 2021.

17

18                          */s/ Frances Ward, CSR, RPR, FCRR, RMR*

19                          */s/ Jennifer Costales, CRR, RMR, CRC*

20                          Official Court Reporter

21                          United States District Court

22                          Northern District of Illinois

23                          Eastern Division

24

25