1135

08:25:33

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                               EASTERN DIVISION

 3   EDDIE L. BOLDEN,                    )
                                         )
 4                  Plaintiff,           )
                                         )  Case No. 17 CV 417
 5   -vs-                                )
                                         )  Chicago, Illinois
 6   ANGELO PESAVENTO, et al.,           )  October 14th, 2021
                                         )  9:09 a.m.
 7                  Defendants.          )

 8

 9              TRANSCRIPT OF PROCEEDINGS - VOL. 5A
          BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10   APPEARANCES:

11   For the Plaintiff:     RILEY SAFER HOLMES & CANCILA, LLP
                            BY:  MR. RONALD S. SAFER
12                               MR. ELI J. LITOFF
                                 MS. SANDRA L. MUSUMECI
13                               MR. MATTHEW C. CROWL
                                 MS. VALERIE BRUMMEL
14                            70 West Madison Street
                             Suite 2900
15                           Chicago, IL  60602

16   For the Defendant      GREENBERG TRAURIG, LLP
     City of Chicago:       BY:  MS. TIFFANY S. FORDYCE
17                               MR. KYLE L. FLYNN
                             77 West Wacker Drive
18                           Suite 3100
                             Chicago, IL  60601

19

20

21

22   Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 2318A
24                          Chicago, IL  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov
```

1136

```
 1   APPEARANCES (CONT'D):

 2   For the Individual      HALE & MONICO, LLC
     Officer Defendants:     BY:  MR. ANDREW M. HALE
 3                                MS. BARRETT E. BOUDREAUX
                                  MR. WILLIAM E. BAZAREK
 4                                MR. BRIAN J. STEFANICH
                                  MS. AMY A. HIJJAWI
 5                           53 West Jackson Boulevard
                             Suite 330
 6                           Chicago, IL  60604

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:33:55    1           (Proceedings heard in open court; jury out:)

08:33:55    2           THE COURT:  Good morning, everyone.  Let's get

09:09:13    3   everyone's appearances on the record, please, starting with

09:09:15    4   the plaintiff.

09:09:15    5           MR. CROWL:  Good morning, Judge.

09:09:17    6           Matthew Crowl on behalf of Mr. Bolden.

09:09:23    7           Ron Safer as well, Sandy Musumeci, and Mr. Bolden is

09:09:27    8   in court, Judge.

09:09:27    9           THE COURT:  And Mr. Litoff back there.

09:09:31   10           MR. CROWL:  And Eli Litoff also.  Thank you, Judge.

09:09:34   11           THE COURT:  Good morning.

09:09:34   12           MS. BOUDREAUX:  Good morning, Judge.

09:09:36   13           Barrett Boudreaux on behalf of the defendants, along

09:09:39   14   with Andy Hale, Bill Bazarek, Brian Stefanich, and our client

09:09:43   15   Phil Pesavento.

09:09:43   16           THE COURT:  Good morning, folks.  Thank you for being

09:09:45   17   here.

09:09:45   18           I'm going to start with Officer James Oliver.  I'm

09:09:50   19   going to start today with my ruling on the situation involving

09:09:53   20   the defendant officer because we need to make some plans.

09:09:56   21   Everyone knows the backstory.  I've written two orders on this

09:09:59   22   issue in the past week.

09:10:01   23           I learned for the first time on Monday, October 4th,

09:10:04   24   that Oliver did not intend to attend trial.  That's three days

09:10:09   25   before jury selection.  He's an important witness, and he is a

|          |     |                                                                          |
|----------|-----|--------------------------------------------------------------------------|
| 09:10:13 | 1   | party.                                                                   |
| 09:10:14 | 2   | On October 5th, I issued an order denying a motion                       |
| 09:10:17 | 3   | for a protective order to find Oliver unavailable to testify.            |
| 09:10:21 | 4   | That's Docket No. 480.                                                    |
| 09:10:23 | 5   | I then received and reviewed Oliver's medical                            |
| 09:10:26 | 6   | records.  Docket No. 488.                                                 |
| 09:10:28 | 7   | On October 10th I ruled that Oliver was not too sick                     |
| 09:10:32 | 8   | or too weak to attend trial based on the information that I              |
| 09:10:36 | 9   | had at that time.  Docket No. 496.  So I ordered him to appear           |
| 09:10:40 | 10  | in person in my courtroom.  And I asked defense counsel if he            |
| 09:10:46 | 11  | planned to comply.                                                       |
| 09:10:46 | 12  | On October 11th, I received a filing from defense                        |
| 09:10:51 | 13  | counsel.  I learned from that filing that Oliver did not                 |
| 09:10:54 | 14  | intend to comply with my order.  Docket No. 501.                         |
| 09:10:58 | 15  | That noncompliance got me thinking about what I can                      |
| 09:11:01 | 16  | and should do about it.  Needless to say, I expect parties to            |
| 09:11:07 | 17  | comply with my orders.  So this weekend, I started researching           |
| 09:11:11 | 18  | the possibility of a writ of body attachment, to physically              |
| 09:11:16 | 19  | force his appearance in my courtroom courtesy of the U.S.                |
| 09:11:19 | 20  | marshals.                                                                |
| 09:11:20 | 21  | But I wanted to make sure that I acted within the                        |
| 09:11:23 | 22  | scope of my authority.  It's always a good idea to read the              |
| 09:11:27 | 23  | rules.  So I read Rule 45.                                                |
| 09:11:28 | 24  | Let me tell you about how I do things as a judge.  I                     |
| 09:11:33 | 25  | obey rules.  I read the language.  I apply the plain language.           |

09:11:41  1    I follow text.

09:11:44  2          So I looked at Rule 45.  Rule 45 covers subpoenas,

09:11:48  3    including trial subpoenas.  In particular, Rule 45(c)(1)

09:11:54  4    governs a Court's power to force the appearance of a witness

09:11:57  5    at a hearing or at a trial.  Rule 45(c)(1) has the following

09:12:01  6    heading "Place of Compliance," and "For a Trial Hearing or

09:12:05  7    Deposition."

09:12:06  8          Rule 45(c)(1) provides:

09:12:10  9          "A subpoena may command a person to attend a trial,

09:12:14  10   hearing, or deposition only as follows:

09:12:17  11         "(A) within a hundred miles of where the person

09:12:20  12   resides, is employed, or regularly transacts business in

09:12:25  13   person; or

09:12:26  14         "(B) within the state where the person resides, is

09:12:32  15   employed, or regularly transacts business in person, if the

09:12:36  16   person

09:12:37  17         "(i) is a party or a party's officer; or

09:12:44  18         "(ii) is commanded to attend a trial and would not

09:12:47  19   incur substantial expense."

09:12:49  20         A couple things jumped out at me when I read the

09:12:51  21   rule.  First, the rule uses the all-encompassing word

09:12:57  22   "person."  It applies to any person, including a party.

09:13:00  23   Again, the rule begins "A subpoena may command a person to

09:13:04  24   attend a trial."

09:13:05  25         Rule 45(c)(1)(B)(1) makes clear that a party is a

09:13:13  1    subset of a person.  So the term "person" includes parties and

09:13:17  2    nonparties.  It's all inclusive.  So Rule 45(c)(1) governs the

09:13:24  3    attendance of a party at trial based on the plain language of

09:13:27  4    the text.

09:13:27  5         Second, the rule does expand the obligations of

09:13:31  6    parties to attend trial, but it does not issue a blank check.

09:13:36  7    Specifically, Rule 45(c)(1)(A) says that a trial subpoena can

09:13:40  8    compel a person to travel a hundred miles for trial.

09:13:45  9         Rule 45(c)(1)(B) expands that obligation for parties.

09:13:48  10   It provides that a trial subpoena can compel a party to go

09:13:52  11   anywhere "within the state where the person resides, is

09:13:56  12   employed, or regularly transacts business in person."

09:13:59  13        Rule 45(c)(1)(B) does not authorize District Courts

09:14:06  14   to compel a party to go anywhere in the country from sea to

09:14:11  15   shining sea.  There are geographical limits.  One limit is a

09:14:15  16   yardstick, and the other limit is sovereign territory.  A

09:14:19  17   District Court can force a party to go a hundred miles or go

09:14:23  18   anywhere within the state, but that's it.

09:14:26  19        Third, the text of Rule 45(c)(1) is limiting.  It

09:14:31  20   uses the word "only."  That word has meaning.  It suggests

09:14:37  21   exclusivity.  It says, "A subpoena may command a person to

09:14:44  22   attend a trial, hearing, or deposition only as follows."  That

09:14:51  23   word is in the text for a reason.

09:14:54  24        Fourth, I am not aware of any authority that stands

09:14:57  25   for the proposition that a District Court has inherent

authority in a civil case to compel a party to travel anywhere in the country and show up in the courthouse. That power does exist in criminal cases. It also does exist in certain civil cases, like cases brought by the SEC, because Congress has expressly authorized that power by blessing nationwide service of process.

But I don't have in front of me any case law saying that the inherent power of a District Court exists to compel someone to go anywhere in the country. And in the absence of authority in front of me that says that I have that inherent power, I must and will stick with the plain text of the rule.

So that brings us to the question of how the rule applies to James Oliver. Again, Rule 45(c)(1)(B) provides that a trial subpoena can compel a party to go anywhere "within the state where the person resides, is employed, or regularly transacts business in person."

I'll cover the last points first.

Oliver's retired. He's 77 years old. So he isn't employed, and he doesn't regularly transact business in Illinois or anywhere else. The only potential option is residence. That raises a few questions.

The first question is what's the relevant moment in time. That is, suppose a party moves and changes his or her residence during the course of a lawsuit, what time matters? In other words, what's the key moment in time for determining

09:16:36 1   a residence of a person for purposes of Rule 45(c).  Is it the

09:16:39 2   day that the lawsuit is filed?  Is it the day of the

09:16:42 3   deposition?  Is it the day when the trial subpoena is served?

09:16:46 4   Is it the day of trial?  Is it something else?

09:16:50 5        I've looked into it and so have the parties.  I have

09:16:54 6   not located any controlling authority that addresses this

09:16:58 7   question.

09:16:59 8        I do note that the text uses the present tense

09:17:02 9   "resides."  Not resided, resides.  The use of the present

09:17:06 10   tense I think tells you something.

09:17:09 11        So I think that the only plausible options are

09:17:14 12   where -- excuse me.  So I think that the only plausible

09:17:16 13   options are the moment when the trial subpoena was served or

09:17:21 14   the moment when trial takes place.

09:17:24 15        To me, the most likely answer is that residence is

09:17:29 16   determined as of the moment when the trial subpoena is served,

09:17:32 17   not when the trial takes place.

09:17:36 18        Think of a trial subpoena as a lasso.  Once a party

09:17:40 19   is served, that person is bound by the Court and is obligated

09:17:46 20   to show up and do what the Court says.  If a party wants

09:17:49 21   relief from the subpoena because they're going to move out of

09:17:53 22   state after service of subpoena but before trial, they need to

09:17:57 23   ask the Court for permission.

09:17:59 24        If the rule were different and the day of trial

09:18:03 25   mattered, it would create bad incentives.  A party could be

09:18:08   1   served with a trial subpoena and then bolt out of town, move

09:18:11   2   out of town just to avoid trial.  Moving out of state after

09:18:15   3   service of a trial subpoena does not cut the cord.  Once a

09:18:20   4   trial subpoena attaches, the party is bound unless and until

09:18:22   5   that person is freed by the Court.  That's how I see it.

09:18:26   6             But here, it doesn't matter.  The answer is the same

09:18:29   7   regardless of whether the relevant point of time is the day of

09:18:33   8   service of the trial subpoena or the day of trial.  Here it

09:18:36   9   makes no difference because Mr. Oliver did not move out of

09:18:39   10  Illinois after service of the trial subpoena.

09:18:42   11            The second question is where Oliver resided on the

09:18:47   12  day of service of the trial subpoena.  I ordered the parties

09:18:50   13  to file a copy of the trial subpoena on the docket.  It's at

09:18:54   14  Docket No. 510.  The trial subpoena is dated September 17th,

09:18:58   15  2021.

09:18:59   16            I don't know when exactly it was served, but I

09:19:02   17  understand that defense counsel accepted service around that

09:19:04   18  time, either that day or perhaps a few days later.  I don't

09:19:07   19  think it really matters.  I'll assume for sake of argument

09:19:10   20  that he was served in the moment that the trial subpoena was

09:19:13   21  issued on September 17th, 2021.

09:19:15   22            So the question is where Oliver resided on

09:19:21   23  September 17th, 2021.

09:19:24   24            Yesterday, on October 13th, this Court presided over

09:19:28   25  two evidentiary hearings with Oliver.  He participated from

09:19:31  1  Arkansas by telephone.  He testified under oath.  The first

09:19:35  2  hearing took place in the morning.  We covered his residency.

09:19:40  3  The second hearing took place over the lunch hour.  We covered

09:19:43  4  his medical condition.

09:19:46  5       Based on the sworn testimony, this Court finds that

09:19:50  6  Oliver resided in Arkansas on September 17th, 2021.

09:19:54  7       I will say that the colloquy with Mr. Oliver got off

09:19:59  8  to a bit of a clunky start.  And here's what I mean by that:

09:20:03  9  Off the bat, I asked him about his permanent residence.  I

09:20:06 10  said, "Sir, what's your permanent residence?"  At first he

09:20:09 11  didn't seem to know.  He fumbled around.  He paused.  He

09:20:13 12  seemed to have to look it up.  It was clear to me that he was

09:20:17 13  looking for some papers.  It took him some time to find out

09:20:20 14  where he resided.  That's a bit unusual.  It raised a few

09:20:25 15  questions in my mind.  Fumbling around trying to look up where

09:20:28 16  you live is consistent with someone not actually living where

09:20:31 17  they say that they're living.

09:20:34 18       However, it is also consistent with a senior citizen

09:20:37 19  not memorizing a new address and feeling pressure from a

09:20:41 20  federal judge to get it right on the spot under penalty of

09:20:44 21  perjury while testifying under oath.

09:20:46 22       So I noticed that during the hearing, but I don't put

09:20:51 23  great weight on it.

09:20:52 24       Oliver explained that he moved from Illinois to

09:20:54 25  Arkansas a few months ago.  Specifically, he testified that he

09:20:57  1    moved to Arkansas in July and stayed with his sister for a few

09:21:00  2    weeks.

09:21:01  3         He sold his home in Illinois as of July 28th, 2021.

09:21:06  4    He purchased a home in Arkansas on October 31st, 2021.  I

09:21:11  5    don't know this for sure, but based on the questioning of the

09:21:14  6    parties, I gather that they have looked at the property

09:21:16  7    records and independently confirmed that those transactions

09:21:20  8    actually took place.

09:21:20  9         Again, I was reading the room on that.  It seemed

09:21:25  10   like people had looked into it, but I don't know for sure.

09:21:27  11   That's just a hunch on my part.

09:21:29  12        But going back to the sworn testimony.  Officer

09:21:32  13   Oliver added that his bank knows that he now lives in

09:21:35  14   Illinois, and so do his doctors.  I asked him a series of

09:21:38  15   questions about notifying companies about a change of address.

09:21:41  16   I did that to try to figure out if the move was real.  I was

09:21:44  17   trying to figure out whether he actually told people that he

09:21:47  18   moved.  He said that he told his power company and the gas

09:21:50  19   company because they shut off power in Illinois and they shut

09:21:52  20   off the gas in Illinois and they turned it on in Arkansas.

09:21:55  21        We don't have time for a document production.  We

09:21:59  22   don't have time for a subpoena to get the documents.  I did

09:22:04  23   not get the sense from Oliver yesterday that he was making it

09:22:07  24   up that he moved to Arkansas.

09:22:09  25        So I find that he moved from Illinois to Arkansas on

09:22:13    1    or about July 2021 based on the information in front of me.  I

09:22:17    2    find that he bought a home in Arkansas in August 2021 to

09:22:21    3    establish a new permanent residence.  I find that he was a

09:22:24    4    resident of Arkansas as of September 2021 when he was served

09:22:27    5    with a trial subpoena through counsel.

09:22:30    6         After the hearing, I asked whether anyone thought

09:22:32    7    that Oliver moved to avoid the lawsuit, that is, the question

09:22:38    8    was whether he left Illinois to avoid the trial and to avoid

09:22:41    9    trial testimony.

09:22:42   10         Plaintiff's counsel said yes.  I saw a lot of nodding

09:22:46   11    heads on the plaintiff's side.  Defense counsel said no.

09:22:48   12         I detected some rather strong feelings on this topic

09:22:54   13    yesterday.  I detected that there was some strong views on

09:22:58   14    this topic.

09:22:59   15         I don't know the full backstory of this witness.  I

09:23:02   16    don't.  You know him; I don't.  I don't know his history.  I

09:23:07   17    don't know your prior interactions with him.  I don't know if

09:23:09   18    he's been cagey with you folks.  I don't know how he acted at

09:23:14   19    deposition.  I don't know him.  I just know what I've read,

09:23:19   20    and I know that I talked to him twice on the telephone.

09:23:21   21         Based on that call, I do not personally believe that

09:23:25   22    he moved out of state to dodge testimony.  He's a senior

09:23:32   23    citizen.  He's 77 years old.  His wife passed away.  He grew

09:23:36   24    up in Arkansas.  His sister lives in Arkansas.  He had knee

09:23:40   25    replacement surgery, and his bedroom in Illinois was on the

09:23:45  1   second floor.  He wanted a smaller place that was closer to

09:23:47  2   family and closer to his roots.  Frankly, that makes sense to

09:23:51  3   me.  I understand that.

09:23:54  4       It's asking a lot to think that a 77-year-old, a

09:24:00  5   senior citizen, sold his house, moved several states away,

09:24:04  6   bought a new house, moved all his stuff just to avoid

09:24:09  7   testimony in trial, especially when he's being indemnified.

09:24:13  8   As I understand it, Oliver will not be indemnified for

09:24:18  9   punitive damages, but he will be indemnified for compensatory

09:24:23  10  damages.  That's my understanding, anyway.  That

09:24:25  11  indemnification affects his incentives.  He has a less of an

09:24:30  12  incentive to get out of dodge, bolt town and leave if he's

          13  getting indemnified anyway.

09:24:35  14      It is a bridge too far in my judgment to conclude

09:24:38  15  that Oliver left Illinois, sold his home, bought a new home in

09:24:43  16  a different state just because he didn't want to be here in my

09:24:46  17  courtroom.

09:24:47  18      During his testimony yesterday, I did not get the

09:24:52  19  sense that Officer Oliver was being evasive or dishonest with

09:24:55  20  me.  I heard a senior citizen who was having some life

09:24:58  21  challenges who's trying to give me straight answers.  So I do

09:25:01  22  not believe that he was lying when he said that he moved to

09:25:05  23  Arkansas in July and started a new permanent residence here.

09:25:09  24      I will tell you, folks, I have to just call the balls

09:25:12  25  and strikes as I see it.  That was my read of the telephone

1148

09:25:15　1　conversation yesterday.

09:25:16　2　　　　That brings us back to Rule 45.  Again, under

09:25:20　3　Rule 45(c)(1)(B), a trial subpoena can compel a party to go

09:25:24　4　anywhere "within the state where the person resides, is

09:25:27　5　employed, or regularly transacts business in person."

09:25:30　6　　　　When the trial subpoena was served in September 2021,

09:25:34　7　Oliver did not reside in Illinois.  He was not employed in

09:25:37　8　Illinois.  And he did not regularly transact business in

09:25:40　9　Illinois.  He resided in Arkansas.

09:25:43　10　　　　So, under the plain language of Rule 45(c), I cannot

09:25:48　11　compel Oliver to travel to Chicago to testify in person.

09:25:54　12　　　　The text of Rule 45 restricts my power.  And as a

09:25:58　13　result, it moots the issue of his medical condition.  His

09:26:03　14　health does not matter for purposes of Rule 45(c).

09:26:07　15　　　　And let me explain this.  I've just got to apply the

09:26:12　16　rule.  The rule does not ask me to consider how healthy

09:26:16　17　someone is.  He could be as healthy as a horse.  He could be

09:26:19　18　as strong as Brian Urlacher.  He could be able to leap over

09:26:24　19　tall buildings in a single bound and it would not matter under

09:26:27　20　the federal rules.  I cannot compel strong, healthy,

09:26:33　21　ready-to-go, vibrant parties to travel across the country for

09:26:36　22　trial.  I just can't.

09:26:39　23　　　　Even if I thought that he was healthy enough to be

09:26:41　24　here, under the plain language of Rule 45(c)(1), I can't

09:26:45　25　compel him to be here because he doesn't reside here and

09:26:49  1   didn't reside here as of the moment of the issuance of the

09:26:52  2   trial subpoena.

09:26:52  3         So my views of his medical condition, whether I

09:26:55  4   believe him or not, whether I think his medical condition is

09:26:57  5   serious or not, at the end of the day don't matter.  They do

09:27:00  6   not determine whether I can force him to travel to Chicago.

09:27:03  7         So I'm not going to get into my views of his medical

09:27:07  8   condition here and now for purposes of today on this ruling

09:27:10  9   because I cannot force him to be here even if he is healthy

09:27:15  10  and strong.  My hands are tied.  I am powerless to compel a

09:27:22  11  healthy, out-of-state party to be here if he's more than a

09:27:26  12  hundred miles away, if he resided out of state at the time of

09:27:30  13  the issuance of the trial subpoena.

09:27:31  14        That brings us to where we go from here.  I asked

09:27:39  15  Mr. Oliver a series of questions yesterday about remote

09:27:41  16  testimony.  Oliver testified yesterday under penalty of

09:27:44  17  perjury that he would be willing to testify remotely.  He said

09:27:49  18  that he could testify by his computer or at the federal

09:27:52  19  courthouse in Little Rock, which is apparently only ten

09:27:57  20  minutes away, the town of Little Rock.  He lives in a suburb.

09:27:59  21        I will hold him to that.

09:28:04  22        I am hereby ordering Officer Oliver to participate in

09:28:08  23  this trial remotely and give testimony.

09:28:12  24        And finally, on October 11th, plaintiff's counsel

09:28:15  25  said that they want him to testify on Friday, October 15th.

09:28:18   1   That's tomorrow.  Since then, there has been several days of

09:28:22   2   testimony.  Perhaps we're on schedule; perhaps not.  I don't

09:28:26   3   know if that is still the preference of plaintiff's counsel.

09:28:29   4   I want to hear more from them on that.  Soon.

09:28:32   5          If plaintiff's counsel wants Oliver to testify

09:28:36   6   tomorrow, he's going to testify tomorrow.  One option is for

09:28:42   7   him to testify at his home with his home computer.  But,

09:28:45   8   frankly, that's asking for trouble.  I can see a train wreck

09:28:49   9   coming.

09:28:50  10          I don't know how tech savvy he is.  I know that I

09:28:54  11   have problems with technology.  Maybe he does, too.  He's a

09:28:57  12   senior citizen.  I don't know what equipment he has.  I don't

09:29:01  13   know how comfortable he is using it.  I don't know how good

09:29:04  14   his connection is.  I did notice that he said yesterday that

09:29:07  15   he had to have his sister come over to help him figure out how

09:29:10  16   to contact the Social Security Administration about the change

09:29:13  17   of address.  That gave me some pause.

09:29:15  18          He also told me that he's feeling weak.  That gives

09:29:19  19   me some pause in thinking that he might be the person in

09:29:22  20   charge of managing the technological setup.  It creates

09:29:27  21   concern.  I want this to go smoothly.

09:29:30  22          So after hours last night, I started working the

09:29:34  23   phones.  I contacted our IT department.  I contacted our Clerk

09:29:39  24   of Court.  I contacted the federal judiciary in Arkansas.  I

09:29:44  25   am in the process of making arrangements for Officer Oliver to

09:29:47   1    testify remotely by showing up at the courthouse in Little

09:29:51   2    Rock, Arkansas.

09:29:53   3            Let me tell you, folks, behind the scenes, a lot of

09:29:56   4    people from the judiciary are doing a lot of logistical work

09:30:00   5    to make this happen.  The top administrative person in the

09:30:04   6    Northern District of Illinois reached out and contacted on an

09:30:08   7    expedited basis the top administrative person in Arkansas to

09:30:12   8    make this deposition happen -- excuse me -- this testimony

09:30:16   9    happen, this trial testimony, testimony remotely.

09:30:19   10           So here's what we're going to do.  We're only going

09:30:23   11   to do this one.  First, Plaintiff's Counsel, I need you to

09:30:26   12   tell me as soon as you can when exactly you want Mr. Oliver to

09:30:33   13   testify.  We cannot tie up two resources -- excuse me, we

09:30:38   14   cannot tie up the resources of two courthouses indefinitely.

09:30:41   15   I need you to pick a day.  You do not need to tell me right

09:30:44   16   this minute.  You can momentarily if you're ready.  We'll talk

09:30:47   17   about that.  I also need from you a rough estimate of how long

09:30:52   18   it will take.

09:30:53   19           Second, Defense Counsel, as soon as we know when he's

09:30:58   20   going to testify, you need to get on the phone.  You need to

09:31:02   21   contact Mr. Oliver.  You need to tell him the plan.  You need

09:31:05   22   to tell him he's under court order.  You need to tell him that

09:31:08   23   bad things can happen if he does not comply.  You need to

09:31:11   24   communicate with him the gravity of the situation.  You need

09:31:13   25   to let me know that he is under court order to comply with my

09:31:17    1    order that he's going to testify remotely by participating at

09:31:21    2    the courthouse in Little Rock.

09:31:23    3          Third, and this is most important for purposes of

09:31:26    4    logistics, we need to talk about the exhibits.  Plaintiff's

09:31:31    5    Counsel, I need to know how many exhibits you plan to have,

09:31:37    6    both in terms of number of pages and how many exhibits there

09:31:41    7    are.

09:31:42    8          I am concerned about the ability to show him exhibits

09:31:46    9    electronically.  I do not want things to fumble around

09:31:50    10    tomorrow.  I'm concerned about him being able to see things on

09:31:52    11    a screen.  I think he needs to have things in hard copy.

09:31:57    12          Plaintiff's Counsel, if you want Oliver to testify

09:32:03    13    tomorrow and you want him to have a hard copy of the exhibits,

09:32:06    14    then we need to talk about how that will happen.  If it's just

09:32:09    15    a couple of pages, perhaps we can e-mail it to the courthouse.

09:32:13    16    If it's more than a couple pages, then we have an issue.  It's

09:32:17    17    too late for FedEx.  It's too late for UPS.  This is going to

09:32:21    18    go smoothly.

09:32:22    19          If plaintiff has a large collection of exhibits, then

09:32:27    20    defense counsel will get on an airplane today, fly to

09:32:33    21    Arkansas, and hand-deliver the exhibits to Oliver tomorrow.  I

09:32:36    22    don't care who does it.  I need a warm body to get in an

09:32:42    23    airplane and hand-deliver the exhibits to Oliver.

09:32:43    24          If plaintiff's counsel would like to send someone

09:32:46    25    from their team to do it, then that's up to you.  We'll talk

09:32:48 1    about that. We'll talk about who should pay for it.

09:32:51 2         I will tell you, I'm going to be real frank with you,
09:32:53 3    I don't want to hear even half an ounce of a pushback from
09:32:57 4    defense counsel about flying to Arkansas. Not for a second.
09:33:01 5    And I understand that you're right there with me, you don't
09:33:03 6    want this to be a problem, either. And I appreciate the
09:33:06 7    nodding of the heads on -- that I'm seeing here.

09:33:09 8         The simple reality is that Defendant Oliver threw a
09:33:13 9    bit of a hand grenade into the proceedings a few days before
09:33:16 10   trial. I'm not going to get into whether defense counsel
09:33:18 11   should have done more to prevent this from happening, whether
09:33:21 12   defense counsel should have kept closer tabs on Oliver.
09:33:24 13   That's not my issue. And I don't like getting into that. We
09:33:28 14   are where we are. Life happens. We're in a bad situation. I
09:33:34 15   want to be Mr. Fix-it. I'm here to fix a bad situation.
09:33:44 16   We've been handed a hand of cards, and we're going to figure
09:33:47 17   out the best way to handle it.

09:33:48 18        The situation is closer to strict liability than
09:33:52 19   negligence. It doesn't really matter to me if people should
09:33:55 20   have kept better tabs on him or seen this coming. That's
09:33:58 21   neither here nor there.

09:34:00 22        All I know is a defendant created a bad situation,
09:34:04 23   and I need defense counsel to fix it, if necessary, by getting
09:34:07 24   in an airplane.

09:34:08 25        And thank you in advance for your cooperation, folks.

09:34:11  1    I acknowledge that defense counsel may have interests
09:34:15  2 here, too.  The defendants may have an interest here, too.  I
09:34:18  3 certainly get it that defendants may have an interest in him
09:34:22  4 testifying as well, and I want you to know that I understand
09:34:24  5 that.  I'm not going to share my views of the trial or trial
09:34:27  6 strategy or what I would do.  I will simply say I understand
09:34:30  7 that perspective.
09:34:31  8    Let me end by saying two final points.  Number one,
09:34:36  9 needless to say, I'm not pleased with how it unfolded.  It was
09:34:41  10 disruptive and unfair to everyone to learn just a few days
09:34:45  11 before trial that a defendant didn't plan to show up.  None of
09:34:48  12 you wanted to spend the last few days talking about this.  You
09:34:51  13 want to talk about other issues.  It was distracting.  It took
09:34:57  14 up bandwidth.  It took up time this morning.  It took up time
09:35:02  15 over the course of the week.  It's unfortunate, but that's
09:35:08  16 where we are.
09:35:08  17    Second, and I'm speaking primarily to the plaintiff
09:35:11  18 and plaintiff's counsel on this, I fully acknowledge and I
09:35:14  19 fully appreciate that testifying remotely is not ideal.  I've
09:35:19  20 said that many times, right?  You've heard me say that.
09:35:22  21    I've already explained my views on this topic to you.
09:35:25  22 There is no substitute for in-person testimony.  Everyone who
09:35:28  23 has ever had a case knows that you want a live body in a
09:35:32  24 courtroom.  The physicality of it adds value.  It brings a
09:35:41  25 human feel to have someone walk into a courtroom.

09:35:43  1        Testifying remotely by video is second best at best.

09:35:48  2    It injects artificiality into the courtroom to have somebody

09:35:54  3    testify by video.  That said, lots of witnesses have testified

09:35:57  4    by video during the pandemic.  Many other trials in this

09:36:00  5    district have had testimony by video.  It's not unusual.  I do

09:36:05  6    think that the jury can get what they need through remote

09:36:08  7    testimony.  So, again, it is not ideal.  It is second best.

09:36:12  8    But under the federal rules, it's the best I can do.

09:36:20  9        I don't have the power to force him to be here, but I

09:36:23  10   can compel him to testify remotely.  Under Rule 43, I find

09:36:28  11   good cause and I find compelling circumstances for Oliver to

09:36:31  12   testify remotely.  Again, this is under Rule 43.

09:36:34  13       He can testify by contemporaneous transmission from a

09:36:40  14   different location, specifically from a federal courthouse in

09:36:42  15   Little Rock.  We can talk about whether I need to put any

09:36:45  16   other safeguards in place.

09:36:47  17       One final comment:  During the hearing yesterday,

09:36:50  18   plaintiff's counsel argued that I should default Oliver for

09:36:53  19   failing to appear in person and/or for failing to notify this

09:36:57  20   court and defense counsel about his health.  In other words,

09:36:59  21   for failure to comply with court orders.

09:37:02  22       Plaintiff's counsel filed something on that topic

09:37:04  23   this morning, Docket No. 522.

09:37:07  24       I'm reserving judgment on that question.  I am not

09:37:10  25   reaching that issue today.  I am not ruling on your request to

09:37:14   1   issue a ruling that is in default.

09:37:17   2       Here's what I care about:  I care about keeping this

09:37:20   3   trial on track and moving forward as best we can.  Plaintiff

09:37:23   4   can file a motion for default if they want, but what we're

09:37:29   5   going to do is, we're going to hear testimony from him

09:37:31   6   remotely first.

09:37:34   7       The bottom line is that the show must go on.  If

09:37:37   8   plaintiff's counsel wants to file a motion for me to default

09:37:40   9   him for failure to comply with court orders, for failure to

09:37:44   10  appear in person, they can do so, but that's not a reason why

09:37:47   11  I need to -- but there's no reason why I need to reach the

09:37:51   12  issue of default or any other sanctions today.

09:37:53   13      It's a long way of saying, when you folks spoke to me

09:37:56   14  yesterday, you said that I ought to declare him in default

09:38:00   15  because he has not complied with my order and he is not here.

09:38:04   16  I am not rejecting that argument as of now.  You can make a

09:38:08   17  motion on that.  I have not read all the cases that you've

09:38:10   18  submitted this morning.  Okay.  I saw that you filed it.  I

09:38:13   19  haven't read the cases.  I need to read the cases.  I'm

09:38:16   20  reserving judgment.

09:38:17   21      I'm just in a pickle here because I've got somebody

09:38:19   22  who at the last minute says he can't show up, and I have to

09:38:23   23  figure out a way to get him to testify.  So he is going to

09:38:26   24  testify remotely, and that's the plan.

09:38:28   25      Does everyone understand the plan, and does anyone

09:38:33  1   have any questions or comments?

09:38:35  2          Mr. Crowl.

09:38:36  3          MR. CROWL:  Judge, I understand and respect

09:38:39  4   Your Honor's ruling.  You know we feel strongly about that,

09:38:42  5   and we will continue to argue that default is the proper

09:38:45  6   option.

09:38:46  7          As I mentioned yesterday, I believe that this remote

09:38:52  8   testimony is in some ways kind of the worst of all worlds for

09:38:56  9   us because the jury will not be able to see him live.

09:39:00  10  Your Honor has said repeatedly in your rulings how important a

09:39:06  11  jury seeing someone live under the crucible of

09:39:08  12  cross-examination is, and you've kind of reiterated that now.

09:39:10  13         I think he has put you in this position where now the

09:39:15  14  Court's option is this.  I think that's -- default is where

09:39:19  15  the Court ultimately should go.  Or not permitting him to put

09:39:24  16  in his deposition and giving some sort of limiting instruction

09:39:27  17  that he didn't appear for testimony.  That would be a better

09:39:32  18  option than allowing him to testify before this jury as the

09:39:36  19  only witness who doesn't have to come into the courtroom.

09:39:39  20         THE COURT:  Well, let me -- let me ask you that.  Are

09:39:42  21  you saying you don't want to call him remotely?  If you want

09:39:47  22  to talk about this and tell me at a break, you can.

09:39:50  23         MR. CROWL:  Yeah.

09:39:51  24         THE COURT:  But I'd like you to tell me by the

09:39:53  25  midmorning break, if you want him to testify, and if so, how.

09:39:58  1   Okay.

09:39:58  2          MR. CROWL:  We will do that, Judge.

09:39:59  3          THE COURT:  I won't put you on the spot.  But I heard

09:40:01  4   you just say that testifying remotely is the worst option.  So

09:40:04  5   if your preference is deposition designations, you need to

09:40:09  6   tell me.

09:40:09  7          MR. CROWL:  Judge, I think not deposition

09:40:11  8   designations either because he has removed himself from live

09:40:14  9   testimony.  I think the sanction in this case, if not default,

09:40:17  10  should be that he doesn't introduce -- because he's not

09:40:20  11  available -- the deposition designations and should not

09:40:24  12  testify remotely.

09:40:25  13         THE COURT:  Well, here's what I'll tell you:  I will

09:40:32  14  compel him to testify remotely if you want me to compel him to

09:40:35  15  testify remotely.  You've got to tell me by the midmorning

09:40:39  16  break.

09:40:39  17         MR. CROWL:  We will do that, Judge.

09:40:41  18         THE COURT:  Okay.  I will tell you that I have issued

09:40:42  19  two written orders on this topic in the last week.  I have

09:40:46  20  some strong views about him being here.  I conclude under

09:40:54  21  Rule 45 that my hands are tied.  If someone is aware of

09:40:57  22  authority that says I can compel him to be here, physically

09:41:01  23  compel him to be here, you can show me that.  I haven't seen

09:41:05  24  it, and I haven't found it.

09:41:07  25         MR. CROWL:  And, Judge, we'll then come back and

09:41:09  1  argue that he should be defaulted.  And I understand you've
09:41:11  2  left the door open for that.
09:41:12  3         THE COURT:  Yeah, you -- I have not ruled on any
09:41:15  4  default requests now.
09:41:15  5         MR. CROWL:  Thank you, Judge.
09:41:16  6         THE COURT:  Okay.  Anything from defense counsel's
09:41:18  7  perspective?
09:41:19  8         MR. HALE:  Good morning, Your Honor.
09:41:21  9         I think your ruling is correct under Rule 45.  I
09:41:25  10  think it's fair.  I do want to point out I think it's also
09:41:30  11  fair to Defendant Pesavento.  It's fair to the Estate of
09:41:35  12  George Karl, and it's fair to the Estate of Ed Siwek.  It's
09:41:40  13  fair to the plaintiff.  It's fair for all the parties.  And I
09:41:44  14  think remote testimony under these circumstances is the right
09:41:47  15  ruling, and we will do everything to comply with your court
09:41:49  16  order, including we're happy to have somebody go to Arkansas
09:41:52  17  and deliver the exhibits today, and we're happy to proceed
09:41:55  18  tomorrow remotely with Mr. Oliver.  Thank you.
09:41:57  19         THE COURT:  Okay.  Thank you, folks.
09:41:58  20         Folks, it is 9:40.  My ruling now took up a little
09:42:02  21  bit more time than I had expected.  I do want to get the jury
09:42:06  22  to roll in here in a couple of minutes, but I do want to give
09:42:09  23  you folks time, if you need to argue something, want to raise
09:42:12  24  anything, anything before we get rolling.
09:42:13  25         We'll start with plaintiff's counsel.  Go ahead,

09:42:15  1  please.

09:42:15  2        MR. SAFER:  Well, Your Honor, there is the violation

09:42:17  3  of the Court's order, of course, with regard to motion *in*

09:42:22  4  *limine* 1 that happened yesterday.

09:42:28  5        Your Honor, there is no way on God's green earth that

09:42:39  6  that was a mistake, that that was some person who was tired.

09:42:47  7  Your Honor has repeatedly told all of the parties to comply

09:42:54  8  with your rulings, specifically this one.  You said, your

09:43:01  9  words, "This is the third rail.  Stay away from it."

09:43:06  10        We have -- we stopped counting at five times the

09:43:10  11  number of times the Court in Mr. Pesavento's presence said not

09:43:16  12  to violate the motions *in limine*.

09:43:17  13        At lunch, before lunch, you told defense counsel to

09:43:24  14  talk to Mr. Pesavento about -- all about complying.  And you

09:43:32  15  said this:  "But you know, for example, I've said that his

09:43:36  16  criminal history is not coming in.  So Mr. Pesavento should

09:43:41  17  steer clear of that, and he has.  So, you know, I think he

09:43:46  18  steered clear of that."

09:43:48  19        Two hours later, he said it to the jury.  We will --

09:43:56  20  you know, the -- the only remedy is mistrial because no other

09:44:02  21  remedy is -- is adequate.  Everything else -- you know,

09:44:08  22  Your Honor did, in my view, absolutely the best you could do

09:44:12  23  under the circumstance.  You struck it but did it in a -- what

09:44:17  24  the record won't reflect, but I -- but I recall, in a, you

09:44:23  25  know, nonalarmed tone so it didn't raise the temperature in

09:44:27  1  the room.  We moved on.  But there is no way it flew under the
09:44:33  2  radar screen.  It is the third rail.
09:44:35  3        We've tested that issue.  They've tested that issue,
09:44:40  4  I am sure.  Everyone knows that that one issue completely
09:44:44  5  changes jurors' attitudes.
09:44:47  6        If we could -- in the normal circumstance, I would
09:44:52  7  ask for a mistrial, and I would ask the judge to start picking
09:44:56  8  a jury tomorrow.  But I have no idea where we would be in the
09:45:10  9  queue if we did that.  So I don't know.  So I literally need
09:45:13 10  the Court's help as to what happens.  If this pushes it out
09:45:17 11  months and months, then we can't do it.  Then we are stuck
09:45:21 12  with a tainted jury pool that is irreparable.
09:45:27 13        There's no instruction -- we will propose some
09:45:29 14  instructions at the end of the case, but there is no
09:45:32 15  instruction that will remedy this, and there is no way -- I
09:45:36 16  mean, I've learned all sorts of exceptions in this trial.  You
09:45:41 17  can -- if you are older, you can flaunt the Court's rulings
09:45:48 18  with regard to reporting about your medical condition.  If you
09:45:53 19  are a drug dealer, if it's the first time, then you get a
09:45:57 20  pass.  And if you are a police officer that is 81 years old,
09:46:01 21  you can ignore the Court's repeated instructions, including
09:46:09 22  one two hours ago, two hours before your testimony, and with
09:46:16 23  impunity, and you win.  Mr. Oliver wins.  Mr. Pesavento wins.
09:46:22 24        There's nothing we could do about it except for
09:46:25 25  mistrial if we could get back in the queue, but I'm kind of

09:46:30   1   doubting that that's -- that that's going to happen any time

09:46:33   2   soon from what the Court has indicated is the reality of

09:46:38   3   trials in the COVID era.  So I don't know.

09:46:40   4           THE COURT:  Let me interject, if I can, Mr. Safer.

09:46:45   5           So I don't understand you to be currently moving for

09:46:51   6   a mistrial; that you're contemplating it, and you want to keep

09:46:54   7   your powder dry.  Maybe you want to make an informed decision

09:46:57   8   on that.

09:46:58   9           So here's what I will do, okay:  I will get on the

09:47:02  10   horn, so to speak, and I will try to figure out how soon you

09:47:06  11   could get another day in court if I declare a mistrial.  I'm

09:47:12  12   not saying that I'm declaring a mistrial.  But before you make

09:47:16  13   a motion that may affect your trial strategy, I think you

09:47:20  14   ought -- you folks ought to know what your alternatives would

09:47:27  15   be.

09:47:28  16           In other words, I'd like you to have some sense of

09:47:32  17   what's behind door No. 2, right, if you seek mistrial.

09:47:36  18           Please don't anybody read anything into what I'm

09:47:38  19   saying.  Okay.  I'm not getting into whether this is grounds

09:47:41  20   for a mistrial.  I'm not going there.  The only thing I'm

09:47:44  21   talking about is your ability to make an informed decision.

09:47:51  22           Could I stop this for one second?

09:47:53  23           I wonder if we should, Ms. Ramos, tell the CSO to

09:47:57  24   tell the jurors that we're just ruling -- we're talking about

09:48:00  25   some procedural matters, and they should view it as a good

09:48:03    1    time to relax, the jury, good time to relax.  And in my

09:48:07    2    experience, when we talk about procedural matters, it speeds

09:48:11    3    things up.  Give a positive spin on it, if you could.  That

09:48:14    4    way the jury is not just sitting back there thinking we're

09:48:17    5    wasting their time.  If that's okay.  Thank you for doing

09:48:18    6    that.

09:48:18    7              So, Mr. Safer, let me reiterate what I was saying.  I

09:48:22    8    would like you to make an informed decision about what the

09:48:25    9    decision is.  So I don't -- I don't know how long it would

09:48:31    10   take, but I will, during a break, reach out to the folks and

09:48:34    11   say, I have a party that may want to move for a mistrial.

09:48:38    12   They have not yet moved for a mistrial, but they may want to.

09:48:41    13   What is the soonest we could get a trial?

09:48:44    14             And I will talk to Mr. Bruton and the committee on

09:48:48    15   that and try to get you something so you can decide whether

09:48:51    16   you want to --

09:48:52    17             MR. SAFER:  Thank you.

09:48:53    18             THE COURT:  -- move on that.

09:48:54    19             MR. SAFER:  The other issue is the flagrant violation

09:48:59    20   of the motion *in limine* with regard to the FBI tip.

09:49:03    21             Everything that was given to Your Honor in

09:49:08    22   defendants' pleadings -- and I can cite to them, but in the

09:49:13    23   interest of time, I don't think it's in dispute -- spoke about

09:49:19    24   an anonymous tip from the FBI.  And that is nothing close to

09:49:25    25   what we received in court.  And Your Honor ruled that, well,

09:49:29  1 yes, anonymous tips can be taken part of the totality of the

09:49:35  2 circumstances.  We disagreed, but that was the Court's ruling.

09:49:38  3       But what the testimony was, was totally different

09:49:43  4 from that.  The question was a report -- which, by the way,

09:49:50  5 has nothing to do with the FBI.  It is a total fabrication

09:49:55  6 that this has anything to do with the FBI tip.

09:49:58  7       It states, "In conjunction with Gang Crimes

09:50:03  8 Specialist Oliver and Anderson, the reporting detectives

09:50:06  9 learned that the possible offender was a person by the name of

09:50:11 10 Eddie Lynier Bolden.

09:50:15 11       "Is that the information that you received from

09:50:17 12 Officer Oliver?

09:50:18 13       "ANSWER:  Yes.

09:50:19 14       "QUESTION:  And what was your understanding of where

09:50:22 15 Mr. Oliver got that information?

09:50:23 16       "ANSWER:  From the FBI."

09:50:28 17       From the FBI, not from an anonymous source or not

09:50:33 18 from somebody who talked to somebody -- a task force agent who

09:50:37 19 talked to somebody at the FBI who talked to an anonymous -- or

09:50:44 20 got an anonymous tip that we could cross-examine, but, rather,

09:50:48 21 from the FBI.  That's not what was represented to Your Honor.

09:50:53 22       What we -- we, of course, have no idea, in pursuing

09:50:59 23 this in cross-examination, as to what Mr. Pesavento will say

09:51:03 24 because he's never said this before.  It is a total

09:51:05 25 fabrication.  He was questioned at his deposition for seven

09:51:10   1   hours. The words -- or the letters "FBI" never crossed his

09:51:16   2   lips. There is nothing in the file about the FBI. It didn't

09:51:19   3   happen.

09:51:20   4   Counsel during the argument on this repeatedly said,

09:51:27   5   "Mr. Safer knows." I know, the FBI doesn't share information

09:51:31   6   with the Chicago Police Department. And there's nothing in

09:51:35   7   this record, nothing, that says it does. It says they were

09:51:38   8   both interested in investigating these murders. There is

09:51:43   9   nothing in the record that says that the FBI shared

09:51:46   10   information.

09:51:48   11   And now we have in front of the jury that the FBI

09:51:51   12   concluded, essentially, that it was Lanier. It should be

09:51:59   13   stricken. They should be instructed to disregard that. They

09:52:04   14   should be instructed that that was contrary to Your Honor's

09:52:07   15   order.

09:52:09   16   THE COURT: All right. So thank you, Mr. Safer.

09:52:10   17   Let me ask a couple questions on that. A couple

09:52:17   18   observations in no particular order. I hear you to be saying

09:52:22   19   that this was like a thunderbolt that is unsupported by the

09:52:29   20   record. To that extent, from a tactical perspective, it seems

09:52:34   21   like it helps you, the fact that it was so important you never

09:52:37   22   wrote it down kind of helps you.

09:52:40   23   When I was thinking about this last night, does

09:52:43   24   anybody remember the old story about the cross-examination

09:52:45   25   about the cook in the ship's galley who was appealing potatoes

09:52:51   1   and he saw his friend floating by?  Anybody know what I'm

09:52:54   2   talking about?  I'll get the copy at some point.

09:52:57   3          You know, he testified that he saw his friend Peck

09:52:59   4   out there floating in the water, and then he just kept -- went

09:53:01   5   back to peeling potatoes.  It was like Lloyd Stryker, I think

09:53:06   6   is the guy's the name.  It made such a mark on him that his

09:53:10   7   friend was floating by that he didn't do anything about it, he

09:53:13   8   just kept going on.  It was so important to you that you did

09:53:16   9   nothing about it.  It's not a perfect metaphor, but if I

09:53:20  10   showed it to you, you'd get the point.

09:53:22  11          But here it does strike me that he's really exposed

09:53:30  12   himself from cross-examination.  You know, if it's -- for one,

09:53:34  13   just as a tactical perspective on whether this is true because

09:53:40  14   it was not in the record.

09:53:41  15          And, number two, I think I said as a general matter

09:53:44  16   that information that the police officers knew and heard at

09:53:47  17   the time is relevant because it goes to knowledge and intent,

09:53:52  18   which is one of the things that you've put at issue from your

09:53:54  19   claims.

09:53:55  20          Let me just give you my overarching observations.  I

09:53:57  21   understand that it may be reliable, it may be a chain of

09:54:02  22   inferences, it may be someone told someone told someone told

09:54:06  23   someone told someone.  And you can point out all of those

09:54:11  24   things.

09:54:14  25          Number three, I don't know that I ruled that they can

09:54:19  1   say that -- that they can say only that it was an FBI

09:54:27  2   anonymous tip.  And I don't know that I ruled that they must

09:54:29  3   tell the jury that the FBI got the information from an

09:54:33  4   anonymous source.

09:54:34  5           MR. SAFER:  And, Your Honor, just to be clear --

09:54:36  6           THE COURT:  Yeah, yeah.

09:54:37  7           MR. SAFER:  -- I agree with that.

09:54:39  8           THE COURT:  Right.

09:54:39  9           MR. SAFER:  The only proffered testimony to you by

09:54:43  10  defendants was that there was an anonymous tip.

09:54:46  11          THE COURT:  Well -- so I will say that when I was

09:54:50  12  addressing this issue, I thought that the testimony was going

09:54:54  13  to be that the FBI received an anonymous tip, and the FBI told

09:55:01  14  the Chicago Police Department that they had received an

09:55:04  15  anonymous tip.  I'm paraphrasing, but that's the thrust of it.

09:55:10  16          The testimony yesterday said that Oliver got this

09:55:17  17  information from the FBI.  They did not elicit where the FBI

09:55:24  18  got that information from.

09:55:27  19          So I think it was fair game to say that he heard it

09:55:37  20  from Oliver who heard it from the FBI, but the back half was

09:55:40  21  left out, that the FBI had heard it from an anonymous tip.

09:55:45  22          I am curious to know from defense counsel if you plan

09:55:48  23  or planned to elicit that.  I mean, Mr. Safer is saying that

09:55:52  24  he was surprised that I allowed this testimony to come in with

09:55:56  25  the understanding that you were going to lay the foundation

1168

09:55:58    1    that the FBI got it from an anonymous tip, and that part of

09:56:01    2    the story was not told yesterday.  So -- go ahead.

09:56:04    3          MR. SAFER:  And, Your Honor, that's why I objected to

09:56:06    4    foundation.  First, we needed the foundation to come in, how

09:56:12    5    did he know that, so that we can see the chain.  Because I

09:56:16    6    have no idea -- if I -- if I on recross ask Mr. Pesavento,

09:56:21    7    where did you get that from, he could say a special agent said

09:56:25    8    that the FBI concluded that, that's what Mr. Oliver told me.

09:56:30    9    I had no idea.

09:56:31   10          He's not of record.  When he was asked all about his

09:56:35   11    investigation, he didn't say a word about this, so he can make

09:56:39   12    up whatever he wanted.

09:56:40   13          THE COURT:  Okay.  Thank you, Mr. Safer.  This is not

09:56:42   14    your last word on this.  You can address this some more.

09:56:46   15          But, Defense Counsel, go ahead, please.

09:56:50   16          MS. BOUDREAUX:  Thank you, Judge.

09:56:52   17          I believe that I comported with your order

09:56:57   18    100 percent.  The minute order you issued on October 11th, I

09:57:02   19    think, said that the motion to bar a tip from the FBI was

09:57:11   20    denied.  I understand what Mr. Safer might want to bring out

09:57:15   21    in cross-examination.  I don't think that bounded me to ask a

09:57:21   22    particular question in a certain way.

09:57:23   23          If Your Honor would like me to go back to this topic

09:57:26   24    and ask him if he knows it was an anonymous tip, I'd be happy

09:57:30   25    to do so.

09:57:31  1      THE COURT:  Well, can I say -- if you ask him, "Do

09:57:34  2  you know where the FBI got the information?"  "Answer:  It was

09:57:38  3  from an anonymous tip," is he going to say that?

09:57:41  4      MS. BOUDREAUX:  I don't think he knows that.

09:57:42  5      THE COURT:  Okay.  So I guess -- I guess that creates

09:57:46  6  a question in my mind because the whole framework of the

09:57:50  7  motions *in limine* back and forth was that there's going to be

09:57:56  8  testimony about an anonymous tip.

09:57:58  9      MS. BOUDREAUX:  Yes, and that --

09:58:04  10     THE COURT:  And --

09:58:05  11     MS. BOUDREAUX:  I'm sorry.

09:58:05  12     THE COURT:  And that's why I thought people were

09:58:08  13  mentioning it in the briefs to me.

09:58:10  14     MS. BOUDREAUX:  That is going to be the testimony

09:58:12  15  from Oliver.

09:58:15  16     THE COURT:  So are you sure that Oliver will say that

09:58:18  17  it was based on an anonymous tip?

09:58:22  18     I mean -- so, I mean, there's a lot of briefing about

09:58:25  19  whether they can say that the FBI got something from an

09:58:28  20  anonymous tip.  The -- I thought somebody was going to say

09:58:37  21  that the information that the FBI heard came from an anonymous

09:58:40  22  tip.

09:58:40  23     And so which warm body is going to say under penalty

09:58:43  24  of perjury that the information that the FBI got was from an

09:58:47  25  anonymous source?

09:58:48  1    MS. BOUDREAUX:  Well, we believe that Dale Tipton can

09:58:51  2  say that if allowed.  I mean -- so that part of the briefing,

09:58:56  3  I don't think, had been decided yet.

09:58:57  4    But this is, we believe, contained within the FBI

09:59:01  5  documents, and that he is able to glean from the reports, even

09:59:05  6  the redacted reports, that this information came from a

09:59:09  7  confidential informant.  And he's able to do so based on the

09:59:15  8  other verbiage, sort of, used in the same paragraph, the

09:59:19  9  pronoun designations.  When they use a confidential informant,

09:59:24 10  they'll say he/she in referring back to that type of

09:59:29 11  information.

09:59:30 12    So we've spoken to him about that, and I believe

09:59:35 13  Oliver is going to say the same thing.

09:59:38 14    MR. BAZAREK:  Your Honor, to summarize Oliver's

09:59:39 15  testimony, the plaintiff already knows what he said because

09:59:41 16  they took Oliver's deposition.  The gist of what Oliver says

09:59:45 17  is there were phone calls coming in, and he also recalls a

09:59:53 18  discussion with a police officer that was assigned to a task

09:59:58 19  force.  His name is McCullough.  And the tip, Your Honor, was

10:00:03 20  that Lanier did the shooting.  That's the tip.  Lanier did the

10:00:09 21  shooting.

10:00:11 22    THE COURT:  I'm focused on the anonymous source bit

10:00:14 23  right now.  Is anybody going to say, either Oliver or anybody

10:00:18 24  else, that the FBI relied on an anonymous tip?

10:00:21 25    MS. BOUDREAUX:  He calls it a tip.

1171

10:00:24    1          THE COURT:  "He" Oliver?

10:00:26    2          MS. BOUDREAUX:  Yes.

10:00:26    3          THE COURT:  Okay.  Mr. Safer, let me ask you this:

10:00:29    4   Do you want defense counsel to cover this ground?  I mean, do

10:00:31    5   you want them to hear about FBI stuff again?  I don't think

10:00:34    6   you probably want that.

10:00:35    7          MR. SAFER:  We can't.  He doesn't know.  So he has no

10:00:39    8   knowledge.

10:00:39    9          THE COURT:  So I guess my question is:  Do you want

10:00:41   10   her to cover this topic -- so here's where we are:  It's

10:00:44   11   10:00 o'clock.  I'm in the interest of rolling.  The question

10:00:46   12   is:  What do you want me to do right now, if anything, to fix

10:00:51   13   this?  Do you want her to go -- hang on one second.

10:00:53   14          Do you want me to go back and ask her to ask another

10:01:01   15   Q and A?  It sounds like you want me to bring up the topic and

10:01:06   16   then strike it.  I will tell you, I'm not inclined to strike

10:01:09   17   until I've read everything slowly, and I would need to do

10:01:12   18   that.  And I'm not a hundred percent sure that it is going to

10:01:15   19   be stricken.  But -- let me put it this way:  Do you propose

10:01:19   20   her to have a Q-and-A now to address this issue?

10:01:23   21          MR. SAFER:  No, he doesn't -- he has no foundation --

10:01:27   22          THE COURT:  Do you want her --

10:01:29   23          MR. SAFER:  -- to testify.

10:01:30   24          THE COURT:  My question is:  Do you want her to

10:01:31   25   elicit that he has no foundation for that?

10:01:33     1          MR. SAFER:  No, no.  I'll do that, Your Honor.

10:01:35     2          THE COURT:  Okay.  If you -- if you are asking me to

10:01:44     3     strike the testimony and go back with the jury on that, you

10:01:47     4     can tell me.  I will tell you, I don't know if that makes it

10:01:51     5     better or worse for you, frankly, to bring the topic up again.

10:01:54     6     And I'm not a hundred percent sure that what she elicited was

10:01:58     7     outside the bounds of my ruling, either.  I just have to

10:02:01     8     reread what I did before.  Okay?  So --

10:02:03     9          MR. SAFER:  Yes, I'm moving to -- that you strike the

10:02:07    10     testimony and instruct them to disregard it.

10:02:09    11          THE COURT:  Okay.  I will take that under advisement.

10:02:13    12     I am not prepared to issue a ruling on that right this second.

10:02:16    13     Okay.  Okay.  But thank you for addressing this.

10:02:23    14          Mr. Safer, do you have any other housekeeping matters

10:02:25    15     before we get rolling here this morning?

10:02:27    16          MR. SAFER:  No, Your Honor.

10:02:28    17          THE COURT:  Okay.  Ms. Boudreaux, anything else?

10:02:31    18          MS. BOUDREAUX:  No, Judge.

10:02:32    19          THE COURT:  Okay, folks.  Folks, why don't we take

10:02:35    20     five minutes.  Why don't you folks stretch, take a drink of

10:02:38    21     water.  We'll come back.

10:02:41    22          (Recess taken from 10:02 a.m. until 10:19 a.m.)

10:19:30    23          THE COURT:  Have a seat, folks.

10:19:34    24          A couple quick things.  Number one, during the break,

10:19:37    25     I reached out to the powers that be here, sent an e-mail to

10:19:42  1    figure out how long it would take if we get a new trial date.
10:19:46  2    I don't want anybody reading anything into what I just said.
10:19:50  3    Okay.  All we're doing now is getting an estimate if we had to
10:19:54  4    redo the trial, what it would look like.

10:19:57  5            My courtroom deputy reminded me that there is an
10:20:02  6    eight-week wait time.  So it's at least eight weeks.  You know
10:20:06  7    it's not going to be anything before then because you've got
10:20:10  8    to put things in the queue.  It also depends on what happens
10:20:13  9    with the criminal trials because they go first.  So the wait
10:20:16  10   would be at least eight weeks, maybe more, I don't know.

10:20:19  11           Second, I also wanted to put on the record how much I
10:20:22  12   appreciate the hard work of the staff here at the Northern
10:20:27  13   District who are doing a lot of things behind the scenes.  We
10:20:29  14   have not one, not two, but three court reporters who are
10:20:32  15   working to get you folks transcripts.

10:20:36  16           My courtroom deputy got here very early yesterday
10:20:39  17   morning.  She went home very late.  She worked probably a
10:20:44  18   14-hour day in the courthouse.  I just want you to folks to
10:20:47  19   know that an awful lot happens behind the scenes.  Things
10:20:50  20   don't just happen.  But we've got a lot of really hardworking,
10:20:54  21   dedicated public servants here at the Northern District of
10:20:59  22   Illinois that really do try to make this a good environment
10:21:01  23   for you folks.

10:21:01  24           So I just wanted you folks to know all of that, and I
10:21:04  25   wanted to put on the record how much I appreciate the hard

10:21:06  1   work of everybody on my staff in the Northern District that

10:21:08  2   are trying their level best to make a courthouse that is open

10:21:14  3   and available to you folks.  So thank you to them.

10:21:16  4          With that, when the jury is ready, we'll get going.

10:21:21  5   I brought them down.

10:21:26  6          Officer Pesavento, come on up, sir.

10:21:47  7          The last thing I'll say, folks, before the jury

10:21:51  8   comes, I know that yesterday ended on a certain note and today

10:21:56  9   started with a certain note.  I will just say personally I'm

10:21:59  10  hoping that today will go smoothly.

10:22:02  11         You know, as a judge, I am like a captain on a ship,

10:22:07  12  so to speak.  The ship is the trial.  I can't control the

10:22:10  13  seas.  I am trying to navigate the ship as best I can with

10:22:14  14  whatever the ocean throws at me.  I am rooting for a smooth

10:22:18  15  trial day.  Okay.  So thank you in advance for your

10:22:23  16  cooperation.

10:22:35  17         The last housekeeping reminder, folks.  Please blow

10:22:39  18  up the demonstratives or the pictures as best as you can so

10:22:42  19  they can see it.  I want them to be able to see.

10:22:45  20         MS. BOUDREAUX:  Yes.

10:23:03  21      (Jury in.)

10:23:03  22         THE COURT SECURITY OFFICER:  All rise.

10:23:05  23         THE COURT:  Good morning, folks.  Have a seat,

10:23:35  24  please.

10:23:35  25         Good morning, everyone.

10:23:37   1          THE JURY:  Good morning.

10:23:38   2          THE COURT:  It is 10:23.  You folks got here

10:23:42   3   undoubtedly at about 9:00 o'clock, and you've been sitting in

10:23:46   4   that room for about an hour, an hour and a half.  I wouldn't

10:23:48   5   fault you some if you said what in the living world is going

10:23:51   6   on in there down in the courtroom, why did they get me in here

10:23:55   7   at 9:00 o'clock and it's about 10:30 and we still haven't

10:23:58   8   gotten going yet.  I will tell you if you feel that way, if

10:24:01   9   you think that way, I get it.  I think that way, too.

10:24:03  10          I will tell you that I served as a juror once.  I

10:24:06  11   served as a juror, and I remember sitting in a conference room

10:24:09  12   in the middle of trial while trial was going on and the

10:24:12  13   trials -- the lawyers were talking about stuff, and I was

10:24:14  14   wondering why we couldn't get rolling.

10:24:17  15          Here's just what I'll tell you about what happens

10:24:20  16   behind the scenes.  A lot of stuff happens behind the scenes

10:24:22  17   where we talk about what witnesses are going to go in what

10:24:27  18   order, what exhibits, *et cetera*.  We have these conversations

10:24:29  19   because it tends to speed things up.  The conversation that we

10:24:33  20   just had is not going to lengthen the overall length of the

10:24:36  21   trial.  So if you think that we lost time by talking about

10:24:40  22   things right there, we didn't lose any time by talking about

10:24:44  23   things right there.  I can tell you that the trial is not

10:24:46  24   going to be any longer because of the conversation we just

10:24:49  25   had; it might actually be shorter.

10:24:51  1        So you folks didn't lose any time.  Hopefully, if

10:24:54  2  anything, you gained some relaxation time.  Hopefully, it was

10:24:58  3  more relaxing to hang out and hang loose in the courtroom down

10:25:02  4  the hall than to sit in the courtroom with me for the last

10:25:03  5  hour.

10:25:04  6        So if anyone was feeling frustrated the last hour

10:25:06  7  that you had sat in the courtroom wondering what's going on

10:25:09  8  and waiting and figuring out when you're going to get going, I

10:25:11  9  understand that.  I really truly do.  Thank you for your

10:25:14  10  patience.  And I just want you folks to know that you didn't

10:25:18  11  lose anything because you had to wait.  Okay.  You didn't lose

10:25:22  12  anything because you had to wait.

10:25:23  13        And please don't blame the lawyers or the parties for

10:25:26  14  the fact that you waited.  It's not their fault that we had

10:25:28  15  that little break this morning, we're getting off to a little

10:25:31  16  later start.  Okay.

10:25:32  17        That's a long way of saying, thank you for being

10:25:35  18  here.  Okay.  Thank you for being here.

10:25:36  19        Folks, when we ended yesterday, we had Officer

10:25:40  20  Pesavento on the stand.  We're going to resume the testimony

10:25:43  21  of Officer Pesavento.

10:25:44  22        Officer Pesavento, do you understand, sir, that

10:25:46  23  you're still under oath?

10:25:47  24        THE WITNESS:  Yes, I do.

10:25:48  25        THE COURT:  All right.  Thank you.

Pesavento - cross by Boudreaux

1177

10:25:49  1    Counsel, whenever you're ready.

10:25:52  2    ANGELO PESAVENTO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10:25:52  3    CROSS-EXAMINATION (CONT'D)

10:25:54  4  BY MS. BOUDREAUX:

10:25:58  5  Q.  Detective, I forgot to ask you some sort of background

10:26:02  6  questions about yourself yesterday, and I'd like to do that

10:26:05  7  now.

10:26:07  8    Are you from Chicago?

10:26:08  9  A.  Yes, I am.

10:26:09  10  Q.  Do you currently live in Chicago?

10:26:10  11  A.  Yes.

10:26:10  12  Q.  Did you go to high school in Chicago?

10:26:13  13  A.  Yes, I did.

10:26:14  14  Q.  Are you married?

10:26:16  15  A.  Yes.

10:26:16  16  Q.  Do you have any children?

10:26:19  17  A.  I have three children and nine grandchildren.

10:26:21  18  Q.  Thank you for sharing that information with us.

10:26:26  19    So yesterday we finished off talking about the photo

10:26:32  20  array and how Clifford Frazier couldn't pick anyone out from

10:26:35  21  the photo array, right?

10:26:37  22  A.  Yes.

10:26:37  23  Q.  And I believe we were talking about that the next logical

10:26:41  24  step was to do a lineup; is that correct?

10:26:43  25  A.  Correct.

Pesavento - cross by Boudreaux

1178

10:26:44   1   Q.   Is there anything unusual about putting the same suspect

10:26:49   2   in a photo array and then in a lineup?

10:26:53   3   A.   Yes, the availability of the people.

10:26:58   4   Q.   Okay.  Let me -- I think you might have misunderstood my

10:27:01   5   question.

10:27:01   6           So we established yesterday that a photograph of

10:27:05   7   Eddie Bolden was in the photo array shown to Clifford Frazier.

10:27:11   8   A.   Yes.

10:27:12   9   Q.   Was there anything wrong with then doing a lineup with

10:27:16   10  Eddie Bolden in the lineup?

10:27:17   11  A.   Oh.  No.

10:27:18   12  Q.   Is it unusual to have the same person in a photo array

10:27:23   13  later appear in a lineup?

10:27:25   14  A.   No.

10:27:25   15  Q.   In order to do a lineup, do you have to have the suspect

10:27:32   16  participate in the lineup?

10:27:33   17  A.   Yes.

10:27:34   18  Q.   So you told us yesterday that an officer does not need

10:27:42   19  probable cause to put someone in a photo array, right?

10:27:45   20  A.   Correct.

10:27:46   21  Q.   Does an officer need probable cause to put someone in a

10:27:50   22  lineup?

10:27:51   23  A.   No.

10:27:51   24  Q.   All right.  Let's talk about the actual lineup in this

10:27:58   25  case.  Okay?

Pesavento - cross by Boudreaux

1179

10:27:59    1    A.  Yes.

10:27:59    2    Q.  We talked about the fact, I believe, that the -- you had a

10:28:07    3    phone conversation with Charles Ingles?

10:28:09    4    A.  Yes.

10:28:10    5    Q.  And he called you, right?

10:28:13    6    A.  Yes, he did.

10:28:15    7    Q.  Okay.  And what conversation with him did you have on the

10:28:19    8    phone?

10:28:20    9    A.  I didn't actually talk to him.  It was one of my partners,

10:28:25   10    but it was basically we told him -- we asked him if he'd be

10:28:30   11    willing to bring his -- if he would be willing to bring Edward

10:28:39   12    Bolden in to stand in a lineup.

10:28:41   13    Q.  And did he ultimately tell you whether Edward Bolden would

10:28:46   14    stand in a lineup?

10:28:47   15    A.  He first told us that he would check with Edward Bolden

10:28:51   16    first and get back to us.

10:28:52   17    Q.  And did he get back to you?

10:28:53   18    A.  He did.

10:28:54   19    Q.  And what did he say?

10:28:55   20    A.  He said he would stand in a lineup.

10:28:57   21    Q.  Okay.  So this was something that Eddie Bolden was

10:29:02   22    agreeing to do voluntarily; is that correct?

10:29:05   23    A.  Yes.

10:29:05   24    Q.  He wasn't under arrest?

10:29:07   25    A.  Right.

Pesavento - cross by Boudreaux

1180

10:29:07  1   Q.   Okay.  So tell us a little bit more about how you get

10:29:15  2   fillers to stand alongside of the suspect in a lineup?

10:29:20  3   A.   That's sometimes difficult.  We generally go down to the

10:29:28  4   lockup and see if there's anybody down there that meets the

10:29:31  5   physical requirements that we're looking for.  And if not,

10:29:36  6   sometimes you'll ask a policeman, which we did in this case,

10:29:39  7   to stand in.

10:29:41  8   Q.   So I gathered what you were saying yesterday is that you

10:29:46  9   really have to find the fillers the day of the lineup; is that

10:29:49  10  correct?

10:29:49  11  A.   Correct.

10:29:50  12  Q.   Because you can't ask someone to stay in lockup for days?

10:29:55  13  A.   Correct.

10:29:55  14  Q.   Okay.  Thank you.

10:29:57  15       So in this scenario, is it correct that you got three

10:30:03  16  people to participate from the lockup?

10:30:08  17  A.   Yes.

10:30:08  18  Q.   And -- I'm sorry.  And then you asked a police officer

10:30:12  19  who -- who worked in the same building as you --

10:30:14  20  A.   Yes.

10:30:14  21  Q.   -- to stand in the lineup; is that correct?

10:30:16  22  A.   Correct.

10:30:17  23  Q.   And what was that police officer's name?

10:30:18  24  A.   My brain is freezing.

10:30:24  25  Q.   It's okay.  Take your time.

Pesavento - cross by Boudreaux

1181

| | | |
|---|---|---|
| 10:30:28 | 1 | A.  He's a friend of mine, too.  I can't believe this. |
| 10:30:34 | 2 | Q.  It's okay. |
| 10:30:35 | 3 | A.  Barnes.  Joseph Barnes.  Joe Barnes. |
| 10:30:38 | 4 | Q.  Yes.  So was Joe Barnes a detective or was he some other |
| 10:30:43 | 5 | kind of police officer? |
| 10:30:44 | 6 | A.  He was a detective, I believe. |
| 10:30:47 | 7 | Q.  Okay.  So we were talking before about the characteristics |
| 10:30:59 | 8 | that the fillers have to have to be put alongside of the |
| 10:31:04 | 9 | suspect in a lineup. |
| 10:31:05 | 10 | How would you describe the type of similarity that |
| 10:31:09 | 11 | the fillers have to have to the suspect for a lineup? |
| 10:31:13 | 12 | A.  Well, obviously you want the same race, height, weight, as |
| 10:31:22 | 13 | close as you can get it, agewise. |
| 10:31:24 | 14 | Q.  Thank you. |
| 10:31:26 | 15 | So in this particular lineup, did you have a hard |
| 10:31:29 | 16 | time finding people with the right height? |
| 10:31:34 | 17 | A.  Yes. |
| 10:31:34 | 18 | Q.  Okay.  So can you tell the jury what you did in order to |
| 10:31:41 | 19 | compensate for the height difference for this lineup? |
| 10:31:43 | 20 | A.  We decided to go with a sitting lineup, just men sitting |
| 10:31:50 | 21 | next to each other. |
| 10:31:51 | 22 | Q.  And then I think you mentioned already that you got Joe |
| 10:31:58 | 23 | Barnes, the police officer, because he was tall? |
| 10:31:59 | 24 | A.  Yes. |
| 10:31:59 | 25 | Q.  So let's talk about where this lineup took place.  Can you |

Pesavento - cross by Boudreaux

1182

10:32:07 1   just describe -- describe where Area 2, the detective

10:32:12 2   division, is within -- where was it within the building you

10:32:15 3   worked and what else was in that building?

10:32:20 4   A.  Well, it's at -- the address of it is 727 East 111th

10:32:28 5   Street.  The first floor is mostly jail and the 5th District.

10:32:35 6   The second floor, there's a detective division, a youth

10:32:44 7   division.  There is a small gym up there and a few other

10:32:48 8   rooms.

10:32:49 9   Q.  Okay.  So if I'm following what you're saying, you walk

10:32:53 10  into the building, and the 5th District police station is

10:32:57 11  downstairs?

10:32:58 12  A.  That's correct.

10:32:58 13  Q.  And then if you go up a flight of stairs, you're in the

10:33:01 14  Area 2 detective division?

10:33:04 15  A.  A part of it is, yes.

10:33:06 16  Q.  Okay.  So I'm going to show you what is already in

10:33:12 17  evidence as Joint Exhibit 7, 19372.

10:33:19 18          MS. BOUDREAUX:  And I've shown everything to counsel.

10:33:22 19          THE COURT:  Go ahead.

10:33:23 20          MS. BOUDREAUX:  Thank you.

10:33:24 21  BY MS. BOUDREAUX:

10:33:25 22  Q.  Can you tell the jury what we're looking at in this

10:33:27 23  picture.

10:33:27 24  A.  You're looking at the Area 2 detective division roughly

10:33:32 25  from the -- the main office where the sergeants and the

Pesavento - cross by Boudreaux

1183

| | |
|---|---|
| 10:33:38 | 1 |
| 10:33:43 | 2 |
| 10:33:49 | 3 |
| 10:33:55 | 4 |
| 10:33:55 | 5 |
| 10:33:58 | 6 |
| 10:34:01 | 7 |
| 10:34:02 | 8 |
| 10:34:04 | 9 |
| 10:34:04 | 10 |
| 10:34:09 | 11 |
| 10:34:09 | 12 |
| 10:34:11 | 13 |
| 10:34:14 | 14 |
| 10:34:17 | 15 |
| 10:34:21 | 16 |
| 10:34:24 | 17 |
| 10:34:29 | 18 |
| 10:34:30 | 19 |
| 10:34:37 | 20 |
| 10:34:39 | 21 |
| 10:34:44 | 22 |
| 10:34:50 | 23 |
| 10:34:55 | 24 |
| 10:34:59 | 25 |

lieutenant is and looking out.  And the two rooms that you see

to your right here (indicating), you only see -- yes, those

are interview rooms and also the room where the lineup was

held.

Q.   Okay.  So we'll --

A.   That's also the room with the -- that's separated by the

mirror.

Q.   The one-way mirror?

A.   Yes.

Q.   Or two-way mirror.  What's the right thing to call it?  I

don't know.  Do you know?

A.   No, I don't.

Q.   Okay.  We'll call it a one-way mirror.

         This is Area 2.  And you've just pointed out that

these two doors are -- one of them is the door to the witness

observation room, and one of them is the door to the room

where the participants stand for the lineup, correct?

A.   (Nonverbal response.)

Q.   Okay.  So do you remember what time Mr. Ingles and

Mr. Bolden arrived that day?

A.   I think it was around 1:00 o'clock, I think.

Q.   Okay.  And do you remember -- when was the first time you

saw them that day?  Were you -- did you go downstairs to let

them in or did you see them once they came up to Area 2?

A.   When they came up to Area 2.

Pesavento - cross by Boudreaux

1184

| Time | Line | Text |
|---|---|---|
| 10:35:03 | 1 | Q.  And did you greet them when they came to Area 2? |
| 10:35:07 | 2 | A.  Yes. |
| 10:35:09 | 3 | Q.  Let me back up for a second.  Who was running this lineup? |
| 10:35:13 | 4 | Was it you? |
| 10:35:14 | 5 | A.  Yeah, I was one of the people that was -- one of the |
| 10:35:18 | 6 | detectives. |
| 10:35:18 | 7 | Q.  Who else was involved? |
| 10:35:21 | 8 | A.  George Karl, I think, Ed Siwek.  I think that was it. |
| 10:35:26 | 9 | Q.  So would it be fair to say that gang crimes officers would |
| 10:35:32 | 10 | not be involved in a detective's lineup? |
| 10:35:35 | 11 | MR. SAFER:  Your Honor, leading. |
| 10:35:37 | 12 | THE COURT:  Sustained. |
| | 13 | BY MS. BOUDREAUX: |
| 10:35:39 | 14 | Q.  Were gang crimes officers involved in this lineup? |
| 10:35:41 | 15 | A.  No. |
| 10:35:41 | 16 | Q.  Would you have allowed a gang crimes officer to be |
| 10:35:46 | 17 | involved in this lineup? |
| 10:35:48 | 18 | A.  If -- if he really met the physical requirements that we |
| 10:35:53 | 19 | were looking for. |
| 10:35:54 | 20 | Q.  I'm sorry. |
| 10:35:55 | 21 | A.  If he was available. |
| 10:35:56 | 22 | Q.  I didn't mean as a filler.  I meant participate in putting |
| 10:36:01 | 23 | on the lineup. |
| 10:36:02 | 24 | A.  Oh.  Oh, no. |
| 10:36:04 | 25 | Q.  Was this a function of the detective division? |

Pesavento - cross by Boudreaux

1185

10:36:06    1    A.  Yes, it was.

10:36:07    2    Q.  So when Mr. Bolden and his lawyer, Mr. Ingles, came into

10:36:17    3    Area 2, did you have any conversation with them immediately?

10:36:22    4    A.  No, I just brought them back to the -- there's a large

10:36:27    5    room in the back, if you look at the picture.  If you walked

10:36:31    6    right down this hall -- or pathway and took a right and

10:36:36    7    turned, there's a large room back there, and I put them back

10:36:41    8    there.

10:36:41    9    Q.  Is that called the conference room?

10:36:42   10    A.  Yes.

10:36:43   11    Q.  Okay.  I would like to show you what has been marked as

10:36:46   12    Joint Exhibit 7, 19380.

10:36:54   13         Is this the conference room you're talking about,

10:36:56   14    Mr. Pesavento?

10:36:57   15    A.  Yes.

10:36:57   16    Q.  And you can actually see it says the word "conference"

10:37:01   17    there if you look closely?

10:37:02   18    A.  Yes.

10:37:03   19    Q.  Okay.  So you placed Mr. Bolden and Mr. Ingles in this

10:37:07   20    room for what purpose?

10:37:08   21    A.  So they couldn't be seen by anyone else at the time.

10:37:13   22    Q.  Was there ever a time where Mr. Bolden and Mr. Ingles were

10:37:19   23    just out in the open space of the area that day, outside of

10:37:26   24    walking to the conference room?

10:37:27   25    A.  No.

Pesavento - cross by Boudreaux

10:37:27    1    Q.  And what's the reason you put Mr. Bolden and Mr. Ingles in

10:37:31    2    a conference room?

10:37:32    3    A.  Because the person we had to view the lineup hadn't gotten

10:37:36    4    there yet, and we didn't want them to see each other.

10:37:40    5    Q.  Approximately how long after Mr. Bolden and Mr. Ingles got

10:37:58    6    to the lineup did Clifford Frazier arrive at the lineup?

10:38:03    7    A.  You know, I'm not sure.  I think it was probably about an

10:38:06    8    hour or so.

10:38:07    9    Q.  Okay.  And as you sit here today, do you recall how

10:38:11    10   Clifford Frazier got to the lineup?

10:38:13    11   A.  I believe he got a ride through some other policeman.  I'm

10:38:21    12   not sure who it was.

10:38:22    13   Q.  Okay.  So I'd like to talk about a conversation you had

10:38:27    14   with Mr. Ingles once you began talking to him about the

10:38:34    15   lineup.  Okay?

10:38:35    16   A.  Yes.

10:38:35    17   Q.  Did he ever tell you that he wanted to go into a certain

10:38:42    18   room during the lineup?

10:38:43    19   A.  Yes, he did.

10:38:44    20   Q.  Can you tell the jury what -- what he said and what you

10:38:49    21   said in return.

10:38:50    22   A.  Well, he said he wanted to be in the lineup -- in the same

10:38:55    23   room with the person who was going to view the lineup.

10:38:58    24   Q.  The witness?

10:38:59    25   A.  The witness.  Excuse me.  I'm sorry.  And I told him no,

Pesavento - cross by Boudreaux

1187

10:39:06  1  he couldn't do that.

10:39:07  2  Q.  Okay.  Let's --

10:39:08  3  A.  He could be in the room with his client if he wanted, the

10:39:12  4  same room.

10:39:12  5  Q.  So we'll break this down.  There's a witness room and a

10:39:17  6  participant room --

10:39:18  7  A.  Yes.

10:39:18  8  Q.  -- right?

10:39:19  9       Okay.  And I'll just show you this photograph now.

10:39:22  10 This is Joint Exhibit 7, 19378.

10:39:27  11      One of these is the witness room and one of these is

10:39:30  12 the participant room, and then the one-way glass would be

10:39:34  13 where this column is --

10:39:37  14 A.  Yes.

10:39:37  15 Q.  -- right?

10:39:38  16      Okay.  So Mr. Ingles asked you if he could be in the

10:39:45  17 room where Clifford Frazier was going to be; is that right?

10:39:47  18 A.  Yes.

10:39:47  19 Q.  Okay.  And why did you -- what did you say?

10:39:51  20 A.  I said no.

10:39:52  21 Q.  Why?

10:39:52  22 A.  Why?  Because we don't want him to intimidate the -- the

10:39:59  23 witness at all.

10:40:00  24 Q.  So was it your understanding that an attorney that was

10:40:08  25 representing someone that was going to be in the lineup had a

Pesavento - cross by Boudreaux

1188

| | | |
|---|---|---|
| 10:40:11 | 1 | right to be in the witness room -- |
| 10:40:16 | 2 | A.  No. |
| 10:40:16 | 3 | Q.  -- with the witness? |
| 10:40:17 | 4 | A.  No. |
| 10:40:17 | 5 | Q.  Okay.  So that was not something that you -- had you ever |
| 10:40:21 | 6 | allowed an attorney to be in a witness room with the witness |
| 10:40:27 | 7 | in your entire career as a Chicago police officer? |
| 10:40:30 | 8 | A.  No. |
| 10:40:30 | 9 | Q.  Do you know any other City of Chicago detective that would |
| 10:40:35 | 10 | allow a suspect's attorney into the witness room during a |
| 10:40:39 | 11 | lineup? |
| 10:40:39 | 12 | MR. SAFER:  Objection.  Foundation. |
| 10:40:42 | 13 | THE COURT:  Overruled.  He said "do you know" -- she |
| 10:40:45 | 14 | said "do you know." |
| 10:40:47 | 15 | Go ahead. |
| 10:40:47 | 16 | BY THE WITNESS: |
| 10:40:48 | 17 | A.  Not that I know of, no. |
| 10:40:49 | 18 | BY MS. BOUDREAUX: |
| 10:40:49 | 19 | Q.  Okay.  So you mentioned that you offered to Mr. Ingles |
| 10:40:53 | 20 | that he could go into the participant room with his client? |
| 10:40:58 | 21 | A.  Yes. |
| 10:40:59 | 22 | Q.  Okay.  What was your understanding of -- was that |
| 10:41:02 | 23 | something that sometimes attorneys did with their clients? |
| 10:41:06 | 24 | A.  Yeah.  Yes. |
| 10:41:08 | 25 | Q.  What was your rationale for not allowing him to be in the |

Pesavento - cross by Boudreaux

1189

10:41:13   1   witness room with Mr. Frazier but allowing him to stay with

10:41:17   2   his client, Mr. Bolden?

10:41:18   3          MR. SAFER:  Objection.  Asked and answered.

10:41:20   4          THE COURT:  Overruled.

10:41:23   5   BY THE WITNESS:

10:41:24   6   A.  I didn't want him to be in the same room with the witness.

10:41:29   7   I felt that that might intimidate the -- a witness, and I --

10:41:35   8   he was welcomed to go into the room with his client, though.

10:41:40   9   BY MS. BOUDREAUX:

10:41:40   10  Q.  Have you ever heard the expression "the attorney stays

10:41:43   11  with the client"?

10:41:44   12  A.  Yes.

10:41:44   13  Q.  Okay.  So, in essence, you told Mr. Ingles that if he'd

10:41:49   14  like to stay with his client every step of the way, that would

10:41:53   15  be fine with you, right?

10:41:53   16  A.  Yes.

10:41:54   17  Q.  So when you told him he could go in the participant room,

10:41:58   18  what was his reaction?  What did he say?

10:42:00   19  A.  He said no.

10:42:03   20  Q.  Was he upset?

10:42:05   21  A.  Yes, he was.

10:42:06   22  Q.  Okay.  What -- what did he say to you about that?

10:42:09   23  A.  I don't recall his exact words, but I know he was

10:42:14   24  argumentative to a certain extent.

10:42:16   25  Q.  Okay.  So he wasn't happy about not being allowed in the

Pesavento - cross by Boudreaux

1190

10:42:20    1    witness room with Clifford Frazier?

10:42:22    2    A.   That's correct.

10:42:23    3    Q.   Okay.  So did he take you up on your offer to go into the

10:42:27    4    participant room with Mr. Bolden?

10:42:28    5    A.   No, he didn't.

10:42:30    6    Q.   Did he say anything about that?

10:42:32    7    A.   No, he was angry about it.

10:42:36    8    Q.   Okay.  Let me ask you this, Mr. Pesavento:  Was there ever

10:42:44    9    a time where you put your hands over your chest and physically

10:42:49   10    blocked Mr. Ingles from entering the witness room?

10:42:53   11    A.   No.

10:42:54   12    Q.   Did he ever try to get into the witness room after you

10:42:58   13    said he couldn't go in there?

10:43:00   14    A.   No, he didn't -- we didn't have to stop him.

10:43:02   15    Q.   Okay.  So he didn't physically try to barrel through the

10:43:06   16    door?

10:43:06   17    A.   No, no.

10:43:07   18    Q.   Okay.  And did you ever have a conversation with

10:43:10   19    Mr. Ingles in which he said "I wanted to be present in the

10:43:16   20    witness room" and you said "You are present"?

10:43:21   21    A.   No.

10:43:22   22    Q.   So that never happened, right?

10:43:27   23    A.   Correct.

10:43:27   24    Q.   All right.  So at some point Clifford Frazier arrives at

10:43:38   25    the area, correct?

Pesavento - cross by Boudreaux

1191

10:43:38    1    A.   Yes.

10:43:39    2    Q.   And where is he put when he first arrives?

10:43:45    3    A.   In one of the interview rooms.  I believe it was Room

10:43:51    4    No. 2.  It was -- it was back in the corner, close to where

10:43:57    5    the actual -- oh, God -- where the viewing took place, but it

10:44:06    6    wasn't in the same room.

10:44:08    7    Q.   Okay.  Well, we could look at this photo and see that

10:44:16    8    there are numbers above the doors.

10:44:21    9    A.   Yes.

10:44:22   10    Q.   And it looks like 1 and 3?

10:44:24   11    A.   I think it's 4 and 3.

10:44:25   12    Q.   Oh, 4 and 3.  Yeah, I know.  I'm sorry.  This is Joint

10:44:30   13    Exhibit 7, 19378.

10:44:32   14         Yes, I believe you're right, 3 and 4.

10:44:35   15         And are you telling us that to the best of your

10:44:40   16    recollection, Mr. Frazier would have been put in Interview

10:44:43   17    Room 2 to wait?

10:44:44   18    A.   Yes.

10:44:44   19    Q.   Okay.  And I'm not sure if this is going to give you the

10:44:50   20    space you need, but is there any -- can you see where Area

10:44:57   21    2 -- Interview Room 2 would be?

10:44:59   22    A.   No, you can't see it from here, but if you can imagine

10:45:02   23    yourself standing there and then turning to the right, there

10:45:07   24    is a short hallway, and then turning to the right again,

10:45:10   25    there's another short hallway, and that room would be back in

Pesavento - cross by Boudreaux

1192

10:45:14   1   there.

10:45:14   2   Q.  Okay.  So it's not on the same hallway as the two rooms

10:45:18   3   that the lineup took place?

10:45:19   4   A.  No.

10:45:20   5   Q.  Got it.  Okay.

10:45:29   6        MS. BOUDREAUX:  So, Your Honor, I have to lay the

10:45:31   7   foundation for this exhibit.  It was inadvertently left off

10:45:37   8   the list, but I cleared it --

          9        THE COURT:  No worries.

10:45:38  10        MS. BOUDREAUX:  -- with plaintiff.  Okay.

10:45:39  11        THE COURT:  Say what it is for the record.

10:45:41  12        MS. BOUDREAUX:  Sure.  This is now marked as

10:45:43  13   Defendants' 117.  Can I just show it --

10:45:46  14        MR. SAFER:  No objection.

10:45:47  15        THE COURT:  It's admitted.  You can publish to the

10:45:49  16   jury.

10:45:49  17        MS. BOUDREAUX:  Thank you.

10:45:50  18      (Defendants' Exhibit No. 117 was received in evidence.)

10:45:51  19   BY MS. BOUDREAUX:

10:45:52  20   Q.  Mr. Pesavento, can you describe what is seen in this

10:45:54  21   photograph?

10:45:54  22   A.  Well, this is one of the interview rooms, the dark -- big

10:46:00  23   dark thing there, that's the mirror, the two-way mirror.

10:46:03  24   Q.  Okay.

10:46:04  25   A.  If you're in this room now and the lights are on and you

Pesavento - cross by Boudreaux

1193

10:46:07    1    look into that mirror, you don't see -- you will only see

10:46:12    2    yourself.

10:46:12    3    Q.   That was going to be my next question, just sort of how

10:46:16    4    this works in terms of the lighting.  Like, can you explain to

10:46:23    5    the jury -- well, first of all, could you -- could you put the

10:46:25    6    participants on either side of that wall and still have this

10:46:31    7    function?

10:46:31    8    A.   Yes.

10:46:31    9    Q.   Okay.  So how do you -- how do you make sure that only the

10:46:40    10   witness can see into the participant room but not *vice versa*?

10:46:44    11   A.   By controlling the lights.

10:46:47    12   Q.   Explain.

10:46:47    13   A.   The room where the participants are in, the lights would

10:46:54    14   be on.  The room where the --

10:46:58    15   Q.   Witness?

10:47:00    16   A.   -- where the witness is going to be in, the lights are off

10:47:03    17   there.

10:47:03    18   Q.   Okay.  And that allows only -- vision to only go one way

10:47:10    19   through the glass?

10:47:11    20   A.   Correct.

10:47:12    21   Q.   Okay.  So tell us how you brought the participants of the

10:47:23    22   lineup in the room and how they were seated.

10:47:32    23   A.   They were brought into the room.  We had chairs there.

10:47:35    24   They were told -- or I shouldn't say "they."  Mr. Bolden was

10:47:39    25   told to take whatever chair he wanted, whatever seat he

Pesavento - cross by Boudreaux

1194

10:47:43  1   wanted.

10:47:44  2   Q.  So -- let me stop you here.  Do you have an independent

10:47:46  3   recollection of this?  Do you remember this?

10:47:48  4   A.  Yes.  In general, yes.

10:47:52  5   Q.  Generally.  Okay.  Okay.  So you -- well, let me back up

10:47:57  6   for one second.

10:47:59  7         Once you told Mr. Ingles that he could not go into

10:48:02  8   the witness room, he didn't say, well, then we're leaving,

10:48:06  9   right?

10:48:06  10  A.  Correct.

10:48:07  11  Q.  Okay.  And they were there voluntarily?

10:48:10  12  A.  Yes.

10:48:10  13  Q.  Okay.  And you've heard the opening statements in this

10:48:16  14  case, and you've heard that plaintiff is going to allege that

10:48:23  15  Clifford Frazier was walked by Mr. Bolden on purpose before

10:48:27  16  the lineup started?

10:48:29  17  A.  Yes, that's not true.

10:48:30  18  Q.  Okay.  That never happened?

10:48:31  19  A.  No.

10:48:31  20  Q.  Okay.  And Mr. Ingles never said anything about not

10:48:38  21  wanting to go through with the lineup because of that walk-by,

10:48:41  22  right?

10:48:42  23  A.  No.

10:48:43  24  Q.  So at some point you have to get the participants along

10:48:50  25  with Mr. Bolden into that room, right?

Pesavento - cross by Boudreaux

1195

| 10:48:52 | 1 | A.   Yes. |

10:48:52   2   Q.   Okay.  So do you get the fillers from lockup first or do

10:48:59   3   you put Mr. Bolden in first?  How did that work?

10:49:01   4   A.   I think we got the fillers from the lockup first, and then

10:49:05   5   we asked Joe Barnes if he'd be willing to, you know, stand in

10:49:10   6   there, too.

10:49:10   7   Q.   Okay.  And so did they all go into the participant room

10:49:13   8   together?

10:49:13   9   A.   Yes, we brought them in there.

10:49:16  10   Q.   Okay.  And then you were saying something about picking

10:49:19  11   the seats.

10:49:20  12   A.   Yes.  Mr. Bolden was allowed to take any chair he wanted.

10:49:26  13   Q.   And --

10:49:27  14   A.   I mean, any position of the -- in the lineup.

10:49:30  15   Q.   So were there five seats lined up?

10:49:32  16   A.   Yes.

10:49:33  17   Q.   And you told Mr. Bolden that he could choose his position?

10:49:36  18   A.   Yes.

10:49:37  19   Q.   Okay.  Do you recall which position he chose?

10:49:40  20   A.   He chose position No. 4.

10:49:41  21   Q.   Okay.  Do you recall him switching seats with anybody at

10:49:46  22   any time?

10:49:46  23   A.   I'm sorry, what?

10:49:47  24   Q.   Did he ever switch seats with one of the fillers at any

10:49:50  25   time?

Pesavento - cross by Boudreaux

1196

10:49:50    1   A.  I don't recall that.

10:49:53    2   Q.  So once the participants were seated in the chairs, was

10:50:02    3   Clifford Frazier brought into the witness room at that point?

10:50:05    4   A.  Yes, he was.

10:50:09    5   Q.  Okay.  So tell us who was going to be in the witness room

10:50:12    6   with Clifford Frazier and who was in the participant room with

10:50:14    7   Mr. Bolden.

10:50:15    8   A.  George Karl was in the room with the men in the lineup.  I

10:50:21    9   was in the room with the -- Mr. Frazier.

10:50:25   10   Q.  Was there anyone else in the lineup room -- the witness

10:50:29   11   room besides you and Mr. Frazier?

10:50:32   12   A.  No.

10:50:32   13   Q.  What was the purpose of having Detective Karl in the other

10:50:38   14   room with the participants?

10:50:40   15   A.  It was a combination of things.  We want them to stay

10:50:47   16   seated and have some control over them.

10:50:51   17   Q.  So just make sure nothing -- no funny business is going

10:50:56   18   on --

10:50:56   19   A.  Right.

10:50:56   20   Q.  -- in that room?

10:50:57   21       Okay.  So once the participants were in their room

10:51:05   22   and once Clifford Frazier was in the witness room, were both

10:51:11   23   doors to the rooms closed?

10:51:13   24   A.  Yes.

10:51:13   25   Q.  Did either door open at any point during Clifford

Pesavento - cross by Boudreaux

1197

10:51:20    1    Frazier's viewing of the lineup?

10:51:22    2    A.  No.

10:51:22    3    Q.  Was there any point in time when someone yelled out the

10:51:29    4    name "Eddie Bolden" during the lineup?

10:51:34    5    A.  No.

10:51:35    6    Q.  Please describe for the jury what happened when Clifford

10:51:42    7    Frazier had the opportunity to view the lineup.

10:51:45    8    A.  He was brought into the room there, turned around, faced

10:51:50    9    the lineup, the lineup in the next room.  He identified

10:51:55   10    Mr. Bolden immediately.

10:51:55   11    Q.  And do you remember the words he said?

10:52:02   12    A.  No, I don't.

10:52:03   13    Q.  Okay.  Detective Pesavento, did you ever force Clifford

10:52:14   14    Frazier to pick out Eddie Bolden from the lineup?

10:52:17   15    A.  No.

10:52:17   16    Q.  Did you ever direct Clifford Frazier towards Eddie Bolden

10:52:23   17    in the lineup?

10:52:23   18    A.  No.

10:52:24   19    Q.  Did you ever coach Clifford Frazier in any way as to who

10:52:29   20    he should pick out in the lineup?

10:52:30   21    A.  No.

10:52:31   22    Q.  Did Clifford Frazier identify Mr. Bolden as the person

10:52:41   23    that left with his brother and cousin?

10:52:43   24    A.  Yes.

10:52:43   25    Q.  And did Clifford Frazier identify Mr. Bolden as the person

Pesavento - cross by Boudreaux

1198

10:52:47  1  that then came back and shot him?

10:52:49  2  A.  Yes.

10:52:49  3  Q.  Was there any waffling or equivocation when Mr. Frazier

10:52:57  4  made his identification?

10:52:58  5  A.  No, it was very direct and to the point.

10:53:04  6  Q.  So after Mr. Bolden was picked out of the lineup, where

10:53:13  7  did he go next?  Where did Mr. Bolden go next?

10:53:16  8  A.  We brought him into another room and -- or with -- he was

10:53:24  9  placed under arrest, told him he was under arrest with his

10:53:27  10 lawyer and sat him in there for a while until we got the

10:53:30  11 people -- other people out of there.  And then we informed him

10:53:35  12 that he was under arrest and informed -- his lawyer was there,

10:53:39  13 too.

10:53:39  14 Q.  Okay.  So was -- was he reunited with his lawyer

10:53:47  15 immediately after the lineup?

10:53:48  16 A.  Yes.

10:53:48  17 Q.  Did you witness Mr. Bolden saying anything to his lawyer

10:53:53  18 about what had just happened in the lineup room?

10:53:56  19 A.  No, I didn't.

10:53:57  20 Q.  Did Mr. Bolden say anything to his lawyer about being able

10:54:02  21 to see through the glass?

10:54:04  22 A.  No.

10:54:04  23 Q.  Did Mr. Bolden say anything to his lawyer about him --

10:54:13  24 about Clifford Frazier being forced to pick him?

10:54:16  25 A.  No.

Pesavento - cross by Boudreaux

1199

10:54:16  1   Q.  Did Mr. Ingles ever tell you at any time that there --

10:54:25  2   something went wrong in this lineup?

10:54:28  3   A.  No, he didn't.

10:54:28  4   Q.  Did he ever say, "My client saw you force Clifford Frazier

10:54:33  5   to pick him out"?

10:54:35  6   A.  No.

10:54:35  7   Q.  Was there any conversation like that whatsoever?

10:54:38  8   A.  No.

10:54:38  9   Q.  Was Mr. Ingles upset about anything after the lineup?

10:54:43  10  A.  No, I don't think so.

10:54:44  11  Q.  He was upset before for not being allowed in that room?

10:54:48  12  A.  Yes.

10:54:48  13  Q.  Okay.  But was there any other complaint ever voiced by

10:54:55  14  Mr. Ingles about the lineup outside of not being let into that

10:55:01  15  witness room?

10:55:02  16  A.  No.

10:55:02  17  Q.  Did Mr. Ingles ever say the types of fillers you used were

10:55:12  18  bad?

10:55:12  19  A.  No, he didn't.

10:55:14  20  Q.  Did Mr. Ingles say anything about someone yelling out

10:55:20  21  Eddie Bolden's name during the lineup?

10:55:22  22  A.  No, he didn't.

10:55:23  23  Q.  Did Mr. Ingles ever say that someone opened the door to

10:55:26  24  either one of these rooms during the lineup?

10:55:28  25  A.  No.

Pesavento - cross by Boudreaux

1200

10:55:29　1　Q.　So would it be fair to say that after the lineup, there

10:55:34　2　was no huge fight or fight at all with Mr. Ingles and you?

10:55:40　3　A.　No.

10:55:42　4　Q.　So the next step was getting Mr. Bolden's statement to a

10:55:56　5　state's attorney; is that correct?

10:55:57　6　A.　Yes.

10:55:58　7　Q.　Okay.　So why don't you explain what happens when someone

10:56:05　8　is placed -- well, let me back up.　I just want to show these

10:56:09　9　photographs.

10:56:10　10　　　　　　　This is Plaintiff's 41.

10:56:15　11　　　　　　　Is this a fair and accurate depiction of the lineup

10:56:19　12　that proceeded on February 26th, 1994?

10:56:24　13　A.　Yes.

10:56:24　14　Q.　Okay.　So fair to say these three are fillers from lockup?

10:56:30　15　A.　Yes.

10:56:31　16　　　　　　　THE COURT:　And you pointed at the three people at

10:56:34　17　the left?

10:56:34　18　　　　　　　MS. BOUDREAUX:　Correct, to the left side of the

10:56:36　19　photograph.

10:56:36　20　BY MS. BOUDREAUX:

10:56:36　21　Q.　And then in the fourth seat is Eddie Bolden?

10:56:38　22　A.　Correct.

10:56:38　23　Q.　And the fifth seat is Joe Barnes, who is the police

10:56:42　24　officer?

10:56:42　25　A.　Correct.

Pesavento - cross by Boudreaux

1201

| | | |
|---|---|---|
| 10:56:42 | 1 | Q. Did he have any insignia of the police on his clothing |
| 10:56:46 | 2 | that day? |
| 10:56:46 | 3 | A. No. |
| 10:56:47 | 4 | Q. Okay. So it appears that this photo was taken outside of |
| 10:56:56 | 5 | the room that -- |
| 10:56:58 | 6 | A. Yes. |
| 10:56:58 | 7 | Q. -- the lineup actually happened? |
| 10:57:00 | 8 | Do you know why that is? |
| 10:57:02 | 9 | A. The photographer said that he needed more room -- |
| 10:57:05 | 10 | MR. SAFER: I object to what the photographer said, |
| 10:57:07 | 11 | Your Honor. This has nothing to do with his state of mind. |
| 10:57:10 | 12 | It's hearsay. |
| 10:57:12 | 13 | THE COURT: Overruled. |
| 10:57:18 | 14 | BY THE WITNESS: |
| 10:57:18 | 15 | A. He needed more room because the space in the room where |
| 10:57:23 | 16 | the actual lineup was was too narrow, and he couldn't get -- |
| 10:57:27 | 17 | and the room wasn't big enough, he couldn't get, I guess, far |
| 10:57:30 | 18 | enough back to cover them all. |
| 10:57:33 | 19 | BY MS. BOUDREAUX: |
| 10:57:33 | 20 | Q. Okay. So there was a photographer that came -- like an |
| 10:57:39 | 21 | evidence technician -- |
| 10:57:40 | 22 | A. Yes. |
| 10:57:40 | 23 | Q. -- photographer? |
| 10:57:41 | 24 | Okay. And they took photographs of the lineup? |
| 10:57:43 | 25 | A. Yes. |

Pesavento - cross by Boudreaux

1202

| | | |
|---|---|---|
| 10:57:44 | 1 | Q.  And they took this photograph of Eddie Bolden once he was |
| 10:57:51 | 2 | picked out of the lineup?  This is Defendants' Group 3. |
| 10:57:55 | 3 | A.  Yes. |
| 10:57:56 | 4 | Q.  Okay.  So this was a photograph that was taken after he |
| 10:57:59 | 5 | was identified; is that correct? |
| 10:58:00 | 6 | A.  Correct. |
| 10:58:01 | 7 | Q.  Okay. |
| 10:58:04 | 8 | MS. BOUDREAUX:  I believe -- I should move this into |
| 10:58:08 | 9 | evidence. |
| 10:58:08 | 10 | THE COURT:  Do you want to say what it is? |
| 10:58:10 | 11 | MS. BOUDREAUX:  Yes.  It is Defendants' Group 3, |
| 10:58:13 | 12 | Bates-stamped EB1186. |
| 10:58:16 | 13 | THE COURT:  Any objection? |
| 10:58:17 | 14 | MR. SAFER:  No objection. |
| 10:58:18 | 15 | THE COURT:  It's admitted. |
| 10:58:19 | 16 | MR. SAFER:  No objection to Defendants' Group 3. |
| 10:58:21 | 17 | THE COURT:  All right.  It's admitted. |
| 10:58:23 | 18 | MS. BOUDREAUX:  Thank you. |
| 10:58:23 | 19 | THE COURT:  Group 3 is admitted into its entirety. |
| 10:58:26 | 20 | MS. BOUDREAUX:  Thank you. |
| | 21 | (Defendants' Group Exhibit No. 3 was received in |
| 10:58:28 | 22 | evidence.) |
| 10:58:28 | 23 | BY MS. BOUDREAUX: |
| 10:58:31 | 24 | Q.  So, actually, before I get to the state's attorney part, I |
| 10:58:34 | 25 | would like to go over the paperwork that was generated as a |

Pesavento - cross by Boudreaux

1203

10:58:40  1   result of this lineup.  Okay?

10:58:42  2   A.  All right.

10:58:49  3        MS. BOUDREAUX:  Plaintiff's 91.  I believe this is

10:58:51  4   already in evidence, Judge.

10:58:53  5        THE COURT:  Okay.  Go ahead.

10:58:54  6        MS. BOUDREAUX:  Okay.

10:58:56  7   BY MS. BOUDREAUX:

10:58:59  8   Q.  Mr. Pesavento, can you tell us what we're looking at here.

10:59:03  9   A.  The people that were in the lineup and their positions in

10:59:12  10  the lineup.

10:59:12  11  Q.  Okay.  So this is a general progress report.  We've

10:59:15  12  already heard that those are a type of note-taking report for

10:59:21  13  detectives, right?

10:59:22  14  A.  Yes.

10:59:22  15  Q.  Okay.  And it looks like this was filled out by -- I think

10:59:29  16  that says Siwek.  Do you know --

10:59:31  17  A.  I think it was.  I can't . . .

10:59:34  18  Q.  Okay.  And as you pointed -- well, first of all, there's a

10:59:39  19  time up here, 1420.  What time is that?

10:59:42  20  A.  That's 20 minutes after 2:00 in the afternoon.

10:59:45  21  Q.  Okay.  And the date of the lineup was February 26th, 1994,

10:59:51  22  correct?

10:59:52  23  A.  Yes.

10:59:52  24  Q.  Okay.  And can you -- you said that these were the

10:59:59  25  participants in the lineup?

Pesavento - cross by Boudreaux

1204

11:00:00    1    A.   Yes.

11:00:00    2    Q.   Okay.  And what kind of information is listed for each

11:00:04    3    participant?

11:00:05    4    A.   Height and weight and race and -- what else is on there?

11:00:14    5    I think that's about it.

11:00:15    6    Q.   All right.  So it looks like there's some addresses, too?

11:00:18    7    A.   Yeah, there's a couple of addresses on there.

11:00:20    8    Q.   Okay.  And then at the bottom of the form, it says Siwek

11:00:25    9    and Pesavento.

11:00:29   10         Do you believe that pertains to who was orchestrating

11:00:32   11    this lineup?

11:00:33   12    A.   Yes.  And names of police officers and detectives are

11:00:40   13    sometimes thrown in there.  It doesn't mean that they're

11:00:43   14    actually doing everything there, just that they want their

11:00:48   15    names added on.

11:00:49   16    Q.   Okay.  And then for Joseph Barnes, we see that you put

11:00:56   17    005.

11:00:56   18    A.   Yeah, you know, he is in the 5th District.

11:00:59   19    Q.   Okay.  So you weren't trying to conceal the fact that you

11:01:02   20    were using a police officer for this lineup, right?

11:01:03   21    A.   No.

11:01:04   22    Q.   Okay.  Showing you Joint 12, which is in evidence.

11:01:15   23         This is an Area 2 violent crimes lineup report,

11:01:23   24    correct?

11:01:23   25    A.   Correct.

Pesavento - cross by Boudreaux

1205

| | | |
|---|---|---|
| 11:01:23 | 1 | Q. All right. And, again, can you tell us the date and time |
| 11:01:26 | 2 | that is listed on this? |
| 11:01:27 | 3 | A. 26 February 1994 at 1420 hours, which is 2:20 in the |
| 11:01:35 | 4 | afternoon, at 727 East 111th Street. |
| 11:01:38 | 5 | Q. Which is Area 2 violent crimes? |
| 11:01:41 | 6 | A. Yes. |
| 11:01:41 | 7 | Q. Okay. |
| 11:01:42 | 8 | A. The upstairs part, yeah. |
| 11:01:43 | 9 | Q. And then it says, "Persons conducting the lineup." Can |
| 11:01:47 | 10 | you tell us who was listed there? |
| 11:01:48 | 11 | A. Siwek, Karl, and Pesavento. |
| 11:01:52 | 12 | Q. And that is consistent with your memory of the lineup that |
| 11:01:55 | 13 | day? |
| 11:01:56 | 14 | A. Correct. |
| 11:01:56 | 15 | Q. So on Page 2 of this report, it says, "Persons viewing |
| 11:02:13 | 16 | lineup." Who is that? |
| 11:02:15 | 17 | A. Clifford Frazier. |
| 11:02:18 | 18 | Q. And then, again, we have the people participating in the |
| 11:02:26 | 19 | lineup, correct? |
| 11:02:26 | 20 | A. Yes. |
| 11:02:27 | 21 | Q. And everyone's height and weight is there. |
| 11:02:31 | 22 | A. I'm sorry, what? |
| 11:02:32 | 23 | Q. And the heights and weights -- |
| 11:02:33 | 24 | A. Oh, yes. |
| 11:02:34 | 25 | Q. -- are listed? |

Pesavento - cross by Boudreaux

1206

11:02:35   1          All right.

11:02:35   2   A.   Yes.

11:02:35   3   Q.   Okay.  And then it says, "Person identified in the

11:02:38   4   lineup."  Can you read what that says?

11:02:40   5   A.   Eddie Bolden No. 4.

11:02:42   6   Q.   All right.  And then it lists the evidence tech that came

11:02:46   7   and took the photographs of the lineup?

11:02:49   8   A.   Correct.

11:02:50   9   Q.   Okay.  And this is a summary of what happened during the

11:02:55  10   lineup; is that correct?

11:02:56  11   A.   Yes.

11:02:56  12   Q.   Could you read that out loud, please.

11:02:59  13   A.   [As read] "In summary, Clifford Frazier viewed the lineup

11:03:02  14   consisting of the above-listed subjects.  Frazier positively

11:03:06  15   identified No. 4 Eddie Bolden as a subject that he observed on

11:03:12  16   29 January 1994 leave a location with the victims, Frazier,

11:03:19  17   Derrick, and Clayton" -- "Ledell Clayton, a short time later

11:03:24  18   returned and shot him."

11:03:28  19   Q.   So that was the identification that Clifford Frazier made

11:03:32  20   on this date, correct?

11:03:34  21   A.   Correct.

11:03:34  22   Q.   Okay.  And the date of this report is February 27th, 1994,

11:03:44  23   true?

11:03:44  24   A.   Yes.

11:03:54  25          MS. BOUDREAUX:  Then we have Plaintiff's 92.  I don't

Pesavento - cross by Boudreaux

1207

11:03:57   1    think it's in yet, but it's agreed to.

11:03:59   2              THE COURT:  Any objection?

11:03:59   3              MR. SAFER:  No, Your Honor.

11:04:00   4              THE COURT:  It's admitted.  You can publish.

11:04:02   5              MS. BOUDREAUX:  Thank you.

11:04:03   6         (Plaintiff's Exhibit No. 92 was received in evidence.)

11:04:03   7    BY MS. BOUDREAUX:

11:04:04   8    Q.  Okay.  This is called a crime scene processing report.

11:04:09   9    A.  Yes.

11:04:10   10   Q.  And it's -- this report was written by a Jacob Jachna.

11:04:19   11         Do you know him to be an evidence technician?

11:04:22   12   A.  I believe he is.

11:04:22   13   Q.  Okay.  And up at the top of the report, he says that he

11:04:30   14   took some photographs, is that correct --

11:04:32   15   A.  Yes.

11:04:33   16   Q.  -- of the lineup?

11:04:33   17   A.  Yes.

11:04:34   18   Q.  All right.  And under "Details of the Case" -- it's cut

11:04:45   19   off a little bit -- but he again lists the participants in the

11:04:48   20   lineup with the heights and weights, correct?

11:04:49   21   A.  Yes.

11:04:50   22   Q.  And then for "investigating officers," it's Siwek and

11:04:56   23   Pesavento?

11:04:56   24   A.  Yes.

11:04:57   25   Q.  Okay.  Okay.  So that's -- one, two -- three reports so

Pesavento - cross by Boudreaux

1208

| | |
|---|---|
| 11:05:10 | 1 |
| 11:05:14 | 2 |
| 11:05:19 | 3 |
| 11:05:21 | 4 |
| 11:05:22 | 5 |
| 11:05:37 | 6 |
| 11:05:41 | 7 |
| 11:05:50 | 8 |
| 11:05:53 | 9 |
| 11:05:56 | 10 |
| 11:06:01 | 11 |
| 11:06:05 | 12 |
| 11:06:07 | 13 |
| 11:06:11 | 14 |
| 11:06:16 | 15 |
| 11:06:18 | 16 |
| 11:06:18 | 17 |
| 11:06:19 | 18 |
| 11:06:19 | 19 |
| 11:06:23 | 20 |
| 11:06:23 | 21 |
| 11:06:27 | 22 |
| 11:06:27 | 23 |
| 11:06:37 | 24 |
| 11:06:42 | 25 |

1  far on the lineup.  And then you also included the fact that

2  Mr. Bolden was picked out of the lineup in your in-custody

3  report of Mr. Bolden, correct?

4  A.  Correct.

5  Q.  Let's see.  This is Joint 13 in evidence.

6      If you could read this paragraph, Mr. Pesavento.

7  A.  "On the 26th of February 1994, at approximately

8  1420 hours, a lineup was conducted at Area 2.  Mr. Bolden was

9  positively identified by Clifford Frazier as the person who

10  left with Derrick Frazier and Ledell Clayton.  Clifford

11  Frazier also related that Bolden is the same person that shot

12  him."

13  Q.  Thank you.

14      So fair to say that after Mr. Bolden was picked out

15  of the lineup, he was placed under arrest?

16  A.  Yes.

17  Q.  Okay.

18  A.  Yes.

19  Q.  Was he read his *Miranda* rights?

20  A.  Yes.

21  Q.  And his attorney was present at that time, correct?

22  A.  Correct.

23  Q.  So what happens in terms of -- how does a police officer

24  initiate criminal charges against a person that they have

25  arrested?

Pesavento - cross by Boudreaux

1209

11:06:43  1   A.  We notify the State's Attorney's Office and tell them what

11:06:49  2   we have, and on a case like this, they'll send the state's

11:06:53  3   attorney out.  And a state's attorney did come out, and

11:06:58  4   charges were approved.

11:06:59  5   Q.  Okay.  So before he approves charges, is there -- did he

11:07:08  6   interview Mr. Bolden?

11:07:09  7   A.  Yes, he -- he'll attempt to interview him, anyway.

11:07:12  8   Q.  Okay.  And he -- he looks at the facts of the case

11:07:17  9   himself, right --

11:07:18  10  A.  Yes.

11:07:18  11  Q.  -- the state's attorney?

11:07:19  12  A.  He goes through -- he goes through everything.

11:07:23  13  Q.  And did the state's attorney also interview Clifford

11:07:33  14  Frazier on the date of this lineup?

11:07:34  15  A.  I believe he did.

11:07:35  16  Q.  So let's talk about when the state's attorney interviewed

11:07:43  17  Mr. Bolden.  Where did that interview take place?

11:07:47  18  A.  You mean which room did it take place in?

11:07:53  19  Q.  Yes.  If you know.

11:07:59  20  A.  I think it was -- for some reason I think it was on the

11:08:03  21  property crime side across the room, one of those rooms there.

11:08:07  22  Q.  Okay.  So does that mean that Mr. Bolden had not been

11:08:10  23  taken to lockup?

11:08:13  24  A.  Correct.

11:08:14  25  Q.  Okay.  And who was present at the time Mr. Bolden gave his

Pesavento - cross by Boudreaux

1210

| | | |
|---|---|---|
| 11:08:22 | 1 | statement to the State's Attorney's Office, to the state's |
| 11:08:28 | 2 | attorney that was there? |
| 11:08:28 | 3 | A.  The state's attorney -- |
| 11:08:34 | 4 | Q.  Were you there? |
| 11:08:35 | 5 | A.  You know, I don't remember right now. |
| 11:08:39 | 6 | Q.  Okay. |
| 11:08:40 | 7 | A.  Can I view the -- |
| 11:08:42 | 8 | Q.  Yes.  Well, let me ask you this, though:  Was Mr. Ingles |
| 11:08:48 | 9 | present when Mr. Bolden gave his statement to the State's |
| 11:08:52 | 10 | Attorney's Office? |
| 11:08:52 | 11 | A.  Yes, he was. |
| 11:08:53 | 12 | MR. SAFER:  Objection, Your Honor.  Foundation.  He |
| 11:08:56 | 13 | doesn't even remember whether he was there. |
| 11:08:58 | 14 | THE COURT:  You've got to lay the foundation.  Ask |
| 11:09:00 | 15 | him if he knows one way or the other. |
| 11:09:04 | 16 | MS. BOUDREAUX:  Okay. |
| 11:09:05 | 17 | BY MS. BOUDREAUX: |
| 11:09:05 | 18 | Q.  Do you know who was present at the time Mr. Bolden gave |
| 11:09:08 | 19 | his statement to the state's attorney? |
| 11:09:10 | 20 | A.  The state's attorney and -- |
| 11:09:12 | 21 | THE COURT:  The question is:  Do you know?  The |
| 11:09:15 | 22 | question is the foundation, whether you have personal |
| 11:09:18 | 23 | knowledge about this topic. |
| 11:09:19 | 24 | So reask the question, frame it in the form of |
| 11:09:21 | 25 | whether he has personal knowledge of this question. |

Pesavento - cross by Boudreaux

1211

11:09:23   1            Go ahead.

11:09:24   2    BY MS. BOUDREAUX:

11:09:25   3    Q.  Do you have personal knowledge of who was in the room at

11:09:30   4    the time Mr. Bolden gave his statement to the state's

11:09:31   5    attorney?

11:09:31   6    A.  Yes, the state's attorney and --

11:09:36   7            THE COURT:  Hang on.  Sorry.  I'm going to strike

11:09:38   8    that.

11:09:38   9            The question is simply whether you have personal

11:09:44  10    knowledge, meaning you were there, maybe you participated by

11:09:47  11    telephone, something like that.

11:09:48  12            So reask the question.  The question is going to be

11:09:51  13    about whether you have personal knowledge.

11:09:53  14            Go ahead.

11:09:55  15    BY MS. BOUDREAUX:

11:09:56  16    Q.  Do you recall if you were there or not at the time

11:09:59  17    Mr. Bolden gave his statement to the state's attorney?

11:10:01  18    A.  I believe I was, yes.

11:10:04  19    Q.  Okay.  And do you have personal knowledge as to whether

11:10:10  20    Mr. Bolden's attorney was present during that statement?

11:10:14  21    A.  Yes.

11:10:16  22    Q.  And was he present?

11:10:18  23    A.  Yes.

11:10:18  24    Q.  Thank you.

11:10:19  25            So let's first look at the arrest report for

Pesavento - cross by Boudreaux

1212

11:10:34   1   Mr. Bolden, and then we'll turn to the -- the statement he

11:10:38   2   gave to the state's attorney.  Okay?

11:10:40   3   A.  Yes.

11:10:40   4   Q.  I'm showing you Joint Trial Exhibit 5, which is in

11:10:58   5   evidence.

11:11:05   6          Is this a copy of the arrest report for Eddie Bolden?

11:11:11   7   A.  Yes.

11:11:12   8   Q.  Okay.  And this says, "In summary, the above subject was

11:11:22   9   arrested after he was identified in a lineup by witness/victim

11:11:29   10  Clifford Frazier, as the subject he observed leave with the

11:11:32   11  above-listed victims and a short time later returned and shot

11:11:36   12  him two times.  Physical evidence recovered from both scenes

11:11:40   13  revealed that all three victims were shot with the same

11:11:43   14  weapon.  After being advised of his constitutional rights in

11:11:47   15  the presence of his attorney, C. Ingles, this subject admitted

11:11:53   16  to being at the location" -- I'm sorry -- "the subject

11:11:58   17  admitted to being at the location that Clifford Frazier was

11:12:00   18  shot but denied any participation."

11:12:02   19          Is that correct?

11:12:03   20  A.  Correct.

11:12:04   21  Q.  Okay.  So Mr. Bolden at no time said to you that he was

11:12:10   22  at -- involved at all in these murders, right?

11:12:12   23  A.  Correct.

11:12:13   24  Q.  Okay.  So he denied participation, and you wrote down that

11:12:17   25  he denied participation, true?

Pesavento - cross by Boudreaux

1213

11:12:25  1        THE COURT REPORTER:  I'm sorry, I didn't hear an
11:12:27  2   answer.
11:12:27  3   BY THE WITNESS:
11:12:28  4   A.  Yes.
11:12:29  5   BY MS. BOUDREAUX:
11:12:29  6   Q.  And at any time did Mr. Bolden complain of any police
11:12:34  7   misconduct or mistreatment by the police?
11:12:36  8   A.  No.
11:12:36  9   Q.  Okay.  And showing you Joint Exhibit 14, which there's no
11:12:46  10  objection to, I don't believe.
11:12:47  11       THE COURT:  Any objection?
11:12:47  12       MR. SAFER:  No, Your Honor.
11:12:48  13       THE COURT:  It's admitted.
11:12:49  14       MS. BOUDREAUX:  Thank you.
11:12:51  15     (Joint Exhibit No. 4 was received in evidence.)
11:12:51  16  BY MS. BOUDREAUX:
11:12:51  17  Q.  This is the way Eddie Bolden looked at the moment he was
11:12:55  18  arrested, correct?
11:12:56  19  A.  Yes.
11:12:56  20  Q.  Okay.  So the state's attorney arrived at the area,
11:13:12  21  correct?
11:13:12  22  A.  Correct.
11:13:12  23  Q.  And do you recall that that was a state's attorney by the
11:13:15  24  name of James Beligratis?
11:13:18  25  A.  Yes, that's correct.

Pesavento - cross by Boudreaux

1214

| | | |
|---|---|---|
| 11:13:19 | 1 | Q.  Okay.  And he sat down in a room with Mr. Bolden, correct? |
| 11:13:25 | 2 | A.  Correct. |
| 11:13:25 | 3 | Q.  And at that point Mr. Bolden gave him his statement as to |
| 11:13:34 | 4 | what happened that night, correct? |
| 11:13:35 | 5 | A.  Correct. |
| 11:13:36 | 6 | Q.  Okay.  And Ingles was there? |
| 11:13:38 | 7 | A.  Yes, he was. |
| 11:13:39 | 8 | Q.  And was Detective Siwek there? |
| 11:13:43 | 9 | A.  There -- was he in the room with us?  I don't recall. |
| 11:13:49 | 10 | Q.  Okay.  So let's look at what Mr. Bolden said to the |
| 11:13:57 | 11 | state's attorney on the night of the -- about the night of the |
| 11:14:00 | 12 | incident. |
| 11:14:01 | 13 | So this is a general progress report signed by |
| 11:14:06 | 14 | Mr. Siwek, correct? |
| 11:14:07 | 15 | A.  Yes. |
| 11:14:07 | 16 | Q.  Okay. |
| 11:14:08 | 17 | THE COURT:  Counsel, could you say for the record |
| 11:14:09 | 18 | what document you've published, please. |
| 11:14:11 | 19 | MS. BOUDREAUX:  Yes, I'm sorry.  This is in evidence, |
| 11:14:13 | 20 | Joint 11, Bates-stamped 13435. |
| 11:14:18 | 21 | THE COURT:  Thank you. |
| 11:14:18 | 22 | MS. BOUDREAUX:  Okay. |
| 11:14:19 | 23 | BY MS. BOUDREAUX: |
| 11:14:23 | 24 | Q.  So the top of the document says, "1645 rights lawyer plus |
| 11:14:35 | 25 | ASA Lynier." |

Pesavento - cross by Boudreaux

1215

| | |
|---|---|
| 11:14:38 | 1 |

          Can you tell us what that's supposed to signify?

11:14:41  2  A.  He was read his rights in front of the lawyer.

11:14:44  3  Q.  And the ASA?

11:14:46  4  A.  And ASA.

11:14:48  5  Q.  So "ASA" stands for assistant state's attorney?

11:14:51  6  A.  State's attorney, yes.

11:14:53  7  Q.  Okay.  So 1645, don't make us do the math, what time is

11:14:57  8  that?

11:14:58  9  A.  It's a quarter to 5:00.

11:14:59  10  Q.  Okay.  And then let's go through what the notes are.

11:15:07  11        "Was not in rest."

11:15:11  12        Do you believe that's short for restaurant?

11:15:13  13  A.  I believe so.

11:15:13  14        MR. SAFER:  Your Honor, this process --

11:15:16  15        THE COURT:  So that's sustained.  You can ask him

11:15:18  16  what -- if he knows what "rest" stands for, and he can give an

11:15:22  17  answer, but we've had a couple leading questions here, and we

11:15:25  18  may or may not object to it.  But why don't you just elicit

11:15:28  19  what his understanding is of the term.

11:15:31  20        MR. SAFER:  Your Honor, I don't think the record is

11:15:32  21  clear.  This isn't his report.  He should be asked what he

11:15:34  22  remembers happens.  If his memory is exhausted, then she can

11:15:39  23  try and refresh.

11:15:39  24        THE COURT:  Well, this document is in evidence,

11:15:41  25  right?

Pesavento - cross by Boudreaux

1216

| | | |
|---|---|---|
| 11:15:41 | 1 | MS. BOUDREAUX: Yes. |
| 11:15:42 | 2 | THE COURT: So you can ask him about it, and you can |
| 11:15:45 | 3 | ask him if he has an understanding what the terms mean in a |
| 11:15:49 | 4 | nonleading way. |
| 11:15:50 | 5 | MS. BOUDREAUX: Will do. |
| 11:15:51 | 6 | THE COURT: You should ask him, as a foundation, has |
| 11:15:54 | 7 | he seen this before, does he know what it is. Set the table |
| 11:15:58 | 8 | for the jury. |
| 11:15:59 | 9 | BY MS. BOUDREAUX: |
| 11:15:59 | 10 | Q. Okay. Have you seen this general progress report before? |
| 11:16:01 | 11 | A. I'm sure I have. |
| 11:16:02 | 12 | Q. Okay. Can you -- can you make out the words on the page? |
| 11:16:08 | 13 | A. Some of them I can. |
| 11:16:12 | 14 | Q. Okay. So let's start at the first dash right there. |
| 11:16:15 | 15 | A. "Was in" -- like you said, "rest" I assume is restaurant. |
| 11:16:21 | 16 | "Was in restaurant when Cliff was" -- I'm not sure what that |
| 11:16:29 | 17 | word is. |
| 11:16:29 | 18 | Q. Okay. So skip that word and keep going. |
| 11:16:34 | 19 | A. "Off and pushed alarm from" -- for -- "from police. Seen |
| 11:16:46 | 20 | victim aided by Williams' family. My brother in trouble." |
| 11:16:54 | 21 | Q. Okay. The next paragraph. |
| 11:16:58 | 22 | A. "Arrived at beeper shop about 4:00, came back at 5:30, ran |
| 11:17:06 | 23 | errands for Mr. Williams." |
| 11:17:08 | 24 | Q. Okay. |
| 11:17:10 | 25 | A. Keep going? |

Pesavento - cross by Boudreaux

1217

11:17:11  1   Q.  Yes, please.

11:17:12  2   A.  "Never involved in confrontation" -- I don't know -- "with

11:17:21  3   any other subjects."

11:17:22  4   Q.  Okay.  And then --

11:17:30  5       (Counsel conferring.)

11:17:30  6   BY MS. BOUDREAUX:

11:17:35  7   Q.  And then can you read this line, please.

11:17:37  8   A.  "Saw flashes but didn't hear shots."

11:17:41  9   Q.  Okay.  And can you make out the last two words?

11:17:46  10  A.  I don't know what that is.

11:17:47  11  Q.  Okay.  Thank you.

11:17:48  12      Is this consistent with your memory of what

11:17:55  13  Mr. Bolden said at the time he was being interviewed by the

11:17:58  14  state's attorney?

11:17:59  15  A.  Yes.

11:17:59  16  Q.  Okay.  So he denied any involvement with the murder?

11:18:03  17  A.  Correct.

11:18:04  18  Q.  And you wrote that in this report and in your in-custody

11:18:09  19  report, correct?

11:18:09  20  A.  Yes.

11:18:10  21  Q.  Now, you were here for opening statements the other day,

11:18:20  22  right?

11:18:20  23  A.  Yes.

11:18:20  24  Q.  And you heard plaintiff's counsel say that you addressed

11:18:30  25  Mr. Bolden on this day that the lineup was happening and

Pesavento - cross by Boudreaux

1218

11:18:34   1   called him the "N" word two times.

11:18:37   2   A.   That's what I -- yes.

11:18:39   3   Q.   Did you ever say that to him?

11:18:40   4   A.   No.

11:18:40   5   Q.   Would you ever say that to him?

11:18:42   6   A.   No.

11:18:43   7   Q.   And Mr. Safer didn't ask you about that in his examination

11:18:48   8   of you, right?

11:18:48   9   A.   Correct.

11:18:49  10   Q.   So I want to ask you one more time:  Did you ever say that

11:18:53  11   and would you ever say that?

11:18:55  12   A.   No.

11:18:55  13   Q.   Did Mr. Bolden at any time tell you that the true offender

11:19:13  14   of this crime was Roderick Stewart?

11:19:16  15   A.   No.

11:19:16  16   Q.   Did that ever come up?

11:19:19  17   A.   At -- no, not during the -- during the investigation, no.

11:19:23  18   Q.   Okay.  So I'd like to talk a little bit about what would

11:19:41  19   have happened if Mr. Bolden wasn't picked out of a lineup.

11:19:45  20   What would have happened with the investigation?

11:19:48  21             MR. SAFER:  Objection, Your Honor --

11:19:50  22             THE COURT:  Hang on.  Overruled only because there's

11:19:53  23   no question pending.

11:19:56  24             MS. BOUDREAUX:  Okay.

11:19:58  25   BY MS. BOUDREAUX:

Case: 1:17-cv-00417 Document #: 638 Filed: 11/16/21 Page 85 of 126 PageID #:18485
Pesavento - cross by Boudreaux
1219

| | | |
|---|---|---|
| 11:19:58 | 1 | Q.  Okay.  Have you had other investigations where you put |
| 11:20:01 | 2 | together a lineup and no one is picked out of the lineup? |
| 11:20:04 | 3 | A.  Yes. |
| 11:20:04 | 4 | Q.  And what happens in those cases after no one is picked out |
| 11:20:09 | 5 | of the lineup? |
| 11:20:10 | 6 | A.  You have to start over again, I mean, start your |
| 11:20:16 | 7 | investigation, see if there's some -- something that was |
| 11:20:19 | 8 | missed, and you go over all your notes and the people you |
| 11:20:25 | 9 | interviewed. |
| 11:20:27 | 10 | Q.  So you continue investigating -- |
| 11:20:28 | 11 | A.  Yes. |
| 11:20:30 | 12 | Q.  -- right? |
| 11:20:32 | 13 | Okay.  And do police officers or detectives get |
| 11:20:35 | 14 | promotions based on how many cases they close? |
| 11:20:38 | 15 | A.  No, they don't. |
| 11:20:40 | 16 | Q.  So I'd like to discuss some of the things that came up in |
| 11:20:50 | 17 | your cross-examination yesterday.  Okay? |
| 11:20:54 | 18 | You were shown your answers to interrogatories.  Do |
| 11:21:00 | 19 | you remember that? |
| 11:21:01 | 20 | A.  Yes. |
| 11:21:04 | 21 | MS. BOUDREAUX:  May I approach? |
| 11:21:06 | 22 | THE COURT:  Absolutely. |
| 11:21:06 | 23 | BY MS. BOUDREAUX: |
| 11:21:07 | 24 | Q.  And you were shown the answer to Question No. 3, which |
| 11:21:13 | 25 | said, "Describe in detail your role in the investigation," |

Pesavento - cross by Boudreaux

1220

| | | |
|---|---|---|
| 11:21:18 | 1 | right? |
| 11:21:19 | 2 | A.   Question 3? |
| 11:21:27 | 3 | Q.   Yes. |
| 11:21:28 | 4 | A.   Yes. |
| 11:21:31 | 5 | Q.   Okay.  And then you were accused of minimizing your role |
| 11:21:36 | 6 | or trying to hide the actual role that you played in this |
| 11:21:42 | 7 | investigation.  Do you remember those questions? |
| 11:21:43 | 8 | A.   Yeah, somewhat. |
| 11:21:44 | 9 | Q.   Okay.  So, first of all, were those answers prepared by an |
| 11:21:48 | 10 | attorney? |
| 11:21:48 | 11 | A.   No. |
| 11:21:49 | 12 | Q.   The answers were typed by you? |
| 11:21:55 | 13 | A.   Yes. |
| 11:21:55 | 14 | Q.   Okay.  And you gave not only answers to interrogatories, |
| 11:22:02 | 15 | but you gave a deposition in this case, didn't you? |
| 11:22:04 | 16 | A.   Yes, I did. |
| 11:22:05 | 17 | Q.   And this is your deposition (indicating), right? |
| 11:22:13 | 18 | A.   Correct. |
| 11:22:15 | 19 | Q.   Let me show it to you. |
| 11:22:20 | 20 | A.   Yes. |
| 11:22:21 | 21 | Q.   So this deposition is 290 pages.  Okay.  And it happened |
| 11:22:29 | 22 | on January 9th, 2018, correct? |
| 11:22:32 | 23 | A.   Correct. |
| 11:22:32 | 24 | Q.   And the deposition went from 9:00 a.m. to 4:26 p.m.; is |
| 11:22:40 | 25 | that correct? |

Pesavento - cross by Boudreaux

1221

11:22:40  1   A.  Yes.

11:22:40  2   Q.  And did you answer questions this entire time about your

11:22:46  3   role in this investigation?

11:22:48  4   A.  I believe so, yes.

11:22:48  5   Q.  Now, I'd like to talk to you about -- Mr. Safer showed you

11:23:10  6   an inventory about the .40-caliber pistol, right?

11:23:13  7   A.  Yes.

11:23:13  8   Q.  Okay.  Sorry.  And that was Plaintiff's Exhibit 50.  And I

11:23:27  9   believe that he asked you whether this was in the

11:23:31  10  investigative file, and you said yes, right?

11:23:34  11  A.  Yes.

11:23:35  12  Q.  Well, I'd like to --

11:23:39  13      MR. SAFER:  Your Honor, for the record, I didn't ask

11:23:42  14  him that, and he didn't say that.

11:23:47  15      THE COURT:  Well, why don't -- I don't have that

11:23:50  16  transcript in front of me, so it's hard to say.  I think you

11:23:53  17  can reask the question and lay the foundation.  You know,

11:23:57  18  lawyers obviously don't testify; witnesses do.  So if you'd

11:24:01  19  like to lay the foundation, you can.

11:24:02  20      MS. BOUDREAUX:  Okay.

11:24:03  21  BY MS. BOUDREAUX:

11:24:04  22  Q.  Do you recall being asked whether this was in the

11:24:07  23  investigative file?

11:24:08  24  A.  I think --

11:24:09  25  Q.  Okay.

Pesavento - cross by Boudreaux

1222

11:24:09　　1　A.　-- I think I do.

11:24:11　　2　Q.　Well, at this point I would like to hand you a copy of the

11:24:14　　3　investigative file, and tell us if you see that document in

11:24:19　　4　here.　Okay?

11:24:19　　5　　　　　MR. SAFER:　Well, Your Honor, first of all, we don't

11:24:22　　6　need to do that.　We'll stipulate this exhibit is not in the

11:24:27　　7　investigative file.

11:24:27　　8　　　　　THE COURT:　Okay.

11:24:28　　9　　　　　MS. BOUDREAUX:　That works.

11:24:29　　10　　　　　THE COURT:　We'll stipulate -- I'll reflect the

11:24:31　　11　stipulation that Plaintiff's Exhibit 50 is not in the

11:24:34　　12　investigative file.

11:24:34　　13　　　　　MS. BOUDREAUX:　Thank you.　Okay.

11:24:36　　14　BY MS. BOUDREAUX:

11:24:36　　15　Q.　So this is not something that you would have seen in the

11:24:40　　16　course of your investigation; is that correct?

11:24:41　　17　　　　　MR. SAFER:　Objection, Your Honor.

11:24:42　　18　　　　　THE COURT:　Yeah, sustained.　That's leading.　We'll

11:24:46　　19　go ahead and rephrase the question in a nonleading way.

11:24:51　　20　　　　　MS. BOUDREAUX:　Will do.

11:24:51　　21　BY MS. BOUDREAUX:

11:24:52　　22　Q.　Is this something you saw during the course of your

11:24:53　　23　investigation into these homicides?

11:24:56　　24　A.　No, not that I remember.

11:24:58　　25　Q.　Okay.　And what is the name of the officer that created

Pesavento - cross by Boudreaux

1223

| | | |
|---|---|---|
| 11:25:04 | 1 | this inventory, if you can see? |
| 11:25:06 | 2 | A.   It looks like Willis or Wills. |
| 11:25:12 | 3 | Q.   Okay.  And this says "blood on weapon."  If you had seen |
| 11:25:18 | 4 | this, whose blood would you believe to be on this weapon? |
| 11:25:26 | 5 | A.   Well -- |
| 11:25:34 | 6 | Q.   Let me ask you like this -- |
| 11:25:37 | 7 | A.   Bolden or Clifford Frazier. |
| 11:25:39 | 8 | Q.   Who was shot during this incident? |
| 11:25:41 | 9 | A.   Clifford Frazier. |
| 11:25:42 | 10 | MR. SAFER:  Objection. |
| 11:25:43 | 11 | THE COURT:  Hang on a second.  So the question |
| 11:25:45 | 12 | pending is, who was shot? |
| 11:25:48 | 13 | All right.  So the question is, who was shot?  An |
| 11:25:53 | 14 | objection to that question is denied.  Go ahead. |
| 11:25:57 | 15 | BY THE WITNESS: |
| 11:25:57 | 16 | A.   All right.  Clifford Frazier. |
| 11:26:01 | 17 | BY MS. BOUDREAUX: |
| 11:26:01 | 18 | Q.   Thank you. |
| 11:26:01 | 19 | 911 calls.  Was there ever a time when Mr. Bolden |
| 11:26:13 | 20 | said to you that he called 911 on the date of the incident? |
| 11:26:17 | 21 | A.   No. |
| 11:26:17 | 22 | Q.   And we just looked at his -- the notes about his |
| 11:26:21 | 23 | statement.  He said he pushed an alarm; isn't that right? |
| 11:26:23 | 24 | A.   Correct. |
| 11:26:24 | 25 | Q.   All right.  So you close this case after you arrested |

Pesavento - cross by Boudreaux

1224

| | | |
|---|---|---|
| 11:26:47 | 1 | Mr. Bolden? |
| 11:26:47 | 2 | A.  Yes. |
| 11:26:47 | 3 | Q.  And then there was a criminal trial that happened, right? |
| 11:26:52 | 4 | A.  Correct. |
| 11:26:53 | 5 | THE COURT:  Excuse me, Ms. Boudreaux, I don't mean to |
| 11:26:55 | 6 | interrupt you.  In a couple minutes, we do want to give these |
| 11:26:58 | 7 | folks a chance to take a midmorning break.  We'll keep it |
| 11:27:02 | 8 | short.  I don't know if you're changing subjects.  Do you want |
| 11:27:05 | 9 | to break now or do you want to go on for another couple |
| 11:27:06 | 10 | minutes? |
| 11:27:06 | 11 | MS. BOUDREAUX:  I'm very close to being done. |
| | 12 | THE COURT:  Okay.  That's fine.  Go ahead. |
| 11:27:09 | 13 | MS. BOUDREAUX:  Unless -- |
| 11:27:09 | 14 | MR. HALE:  I would take a break. |
| 11:27:11 | 15 | MS. BOUDREAUX:  We'll take a break. |
| 11:27:12 | 16 | THE COURT:  Okay, folks.  People never turn down |
| 11:27:15 | 17 | breaks in life.  We're going to take a midmorning break. |
| 11:27:19 | 18 | We're going to try to keep it on the short side, folks.  We're |
| | 19 | going to try to do five to ten minutes.  Let's let everybody |
| 11:27:23 | 20 | stretch their legs, get a drink of water, use the restroom, |
| 11:27:25 | 21 | and we'll come back probably, hopefully, no less than ten |
| 11:27:28 | 22 | minutes.  Okay?  We'll be right back. |
| 11:27:33 | 23 | MS. BOUDREAUX:  Thank you. |
| 11:27:45 | 24 | (Jury out.) |
| 11:27:46 | 25 | THE COURT:  Okay, folks, let's take five minutes. |

1225

| | | |
|---|---|---|
| 11:28:06 | 1 | We'll come right back.  If there's anything you want to say, |
| 11:28:10 | 2 | we can talk then. |
| 11:28:10 | 3 | MS. BOUDREAUX:  Okay. |
| 11:28:17 | 4 | (Recess taken from 11:28 a.m. until 11:43 a.m.) |
| 11:43:52 | 5 | THE COURT:  Folks, while we wait for the jury -- I'm |
| 11:43:54 | 6 | not going to get into any particulars -- there were a number |
| 11:43:57 | 7 | of leading questions, some of which were objected to, some of |
| 11:44:02 | 8 | which were not.  You know, when I was on the other side of |
| 11:44:06 | 9 | this, sometimes I would let leading questions go for tactical |
| 11:44:11 | 10 | reasons.  You know, sometimes it's just quicker, easier.  You |
| | 11 | decide sort of a détente between the parties.  You'll give |
| 11:44:14 | 12 | each other some room.  Other times I thought, you know, it's |
| 11:44:17 | 13 | less effective if it's leading.  Sometimes it just doesn't |
| 11:44:20 | 14 | matter. |
| 11:44:20 | 15 | You know, if it's important and you want to object, |
| 11:44:23 | 16 | you can.  If it's unimportant and you want to object, you can. |
| 11:44:28 | 17 | But that was just my back -- back-of-the-envelope reaction to |
| 11:44:32 | 18 | that.  So we'll wait for the jury. |
| 11:45:19 | 19 | MR. HALE:  Only because of the timing issue, I just |
| 11:45:33 | 20 | want to see if the plaintiffs do know if they would like to |
| 11:45:36 | 21 | have Mr. Oliver Friday.  So if they do know, we can start |
| 11:45:39 | 22 | making arrangements. |
| 11:45:43 | 23 | THE COURT:  And it's fine if you want to talk about |
| 11:45:46 | 24 | this in an hour, too.  We'll talk about it at lunch. |
| 11:45:50 | 25 | (Jury in.) |

Pesavento - cross by Boudreaux

1226

| | | |
|---|---|---|
| 11:45:52 | 1 | THE COURT SECURITY OFFICER:  All rise. |
| 11:46:27 | 2 | THE COURT:  Please be seated, everybody. |
| 11:46:28 | 3 | Counsel, when you're ready. |
| 11:46:35 | 4 | MS. BOUDREAUX:  Thank you, Judge. |
| 11:46:40 | 5 | BY MS. BOUDREAUX: |
| 11:46:46 | 6 | Q.  Mr. Pesavento -- |
| 11:46:48 | 7 | A.  Yes. |
| 11:46:49 | 8 | Q.  -- do you still have those interrogatories in front of |
| 11:46:51 | 9 | you? |
| 11:46:51 | 10 | A.  Yes, I do. |
| 11:46:51 | 11 | Q.  Okay.  Can you please -- |
| 11:46:53 | 12 | MS. BOUDREAUX:  This is Plaintiff's Trial Exhibit |
| 11:46:56 | 13 | 106. |
| 11:46:56 | 14 | BY MS. BOUDREAUX: |
| 11:46:56 | 15 | Q.  -- flip to the last page called "Verification." |
| 11:47:03 | 16 | A.  Did you say the last page? |
| 11:47:05 | 17 | Q.  Yes. |
| 11:47:07 | 18 | A.  Okay. |
| 11:47:08 | 19 | Q.  Do you see that your handwritten signature is on that |
| 11:47:13 | 20 | page? |
| 11:47:14 | 21 | A.  No. |
| 11:47:16 | 22 | MS. BOUDREAUX:  May I approach? |
| 11:47:17 | 23 | THE COURT:  Of course. |
| 11:47:18 | 24 | MS. BOUDREAUX:  Okay.  Thank you. |
| 11:47:26 | 25 | BY THE WITNESS: |

Pesavento - cross by Boudreaux

1227

11:47:26  1   A.  Oh.

11:47:26  2   BY MS. BOUDREAUX:

11:47:27  3   Q.  That's your signature, right?

11:47:28  4   A.  Yes, it is.

11:47:28  5   Q.  Okay.  And is it fair to say that you did not type up the

11:47:32  6   answers to these questions --

11:47:34  7   A.  Correct.

11:47:35  8   Q.  -- yourself?

11:47:36  9        So an attorney did that --

11:47:37  10  A.  Yes.

11:47:37  11  Q.  -- right?

11:47:39  12       Okay.  Mr. Pesavento, you testified in the criminal

11:47:49  13  trial, correct?

11:47:50  14  A.  Yes, I did.

11:47:51  15  Q.  Okay.  And at the end of that trial, Mr. Bolden was found

11:47:54  16  guilty, correct?

11:47:54  17  A.  Correct.

11:47:55  18  Q.  Okay.  Have you been made aware that Mr. Bolden has

11:48:04  19  petitioned for a Certificate of Innocence and received a

11:48:08  20  Certificate of Innocence?

11:48:09  21  A.  Yes.

11:48:09  22  Q.  When did you become aware of that?

11:48:12  23  A.  I'm not sure what the date was.

11:48:18  24  Q.  Were you ever given notice that Mr. Bolden was petitioning

11:48:26  25  a court for a Certificate of Innocence?

Pesavento - cross by Boudreaux

1228

| | | |
|---|---|---|
| 11:48:28 | 1 | A.  No.  No, I wasn't. |
| 11:48:29 | 2 | Q.  Were you ever given an opportunity to object to |
| 11:48:35 | 3 | Mr. Bolden's petition for a Certificate of Innocence? |
| 11:48:39 | 4 | MR. SAFER:  Objection, Your Honor. |
| 11:48:40 | 5 | THE COURT:  Overruled. |
| 11:48:42 | 6 | BY THE WITNESS: |
| 11:48:43 | 7 | A.  No. |
| 11:48:43 | 8 | BY MS. BOUDREAUX: |
| 11:48:45 | 9 | Q.  Were you given any ability to participate in a hearing for |
| 11:48:51 | 10 | Mr. Bolden's petition for a Certificate of Innocence? |
| 11:48:54 | 11 | A.  No. |
| 11:48:54 | 12 | Q.  Mr. Pesavento, you're being sued for maliciously |
| 11:49:08 | 13 | prosecuting Mr. Bolden in this case.  You know that? |
| 11:49:11 | 14 | A.  Yes, I do. |
| 11:49:12 | 15 | Q.  Did you maliciously prosecute Mr. Bolden in this case? |
| 11:49:16 | 16 | A.  Absolutely not. |
| 11:49:17 | 17 | Q.  Did you frame him for murder? |
| 11:49:19 | 18 | A.  No. |
| 11:49:20 | 19 | Q.  Did you know Eddie Bolden before this incident? |
| 11:49:25 | 20 | A.  No, I didn't. |
| 11:49:25 | 21 | Q.  Did you arrest Mr. Bolden because you believed he was the |
| 11:49:33 | 22 | perpetrator of these crimes? |
| 11:49:35 | 23 | A.  Yes, that's where the evidence led us to. |
| 11:49:40 | 24 | MS. BOUDREAUX:  That's all the questions I have. |
| 11:49:42 | 25 | Thank you. |

Pesavento - redirect by Safer

1229

| | | |
|---|---|---|
| 11:49:43 | 1 | THE COURT:  Thank you, Counsel. |
| 11:49:45 | 2 | MS. BOUDREAUX:  Thank you. |
| 11:49:46 | 3 | THE COURT:  Reminder for everyone, the person who -- |
| 11:49:48 | 4 | the attorney who calls the witness has an opportunity to get |
| 11:49:51 | 5 | the last word with the witness.  So we're now going to allow |
| 11:49:56 | 6 | plaintiff's attorney to question Mr. -- excuse me -- Officer |
| 11:50:00 | 7 | Pesavento again. |
| 11:50:00 | 8 | Counsel, go ahead. |
| 11:50:13 | 9 | MR. SAFER:  Thank you, Your Honor. |
| 11:50:34 | 10 | THE COURT:  Make sure your mic is on. |
| 11:50:34 | 11 | When you're ready, maybe you can say something in the |
| 11:50:37 | 12 | microphone.  We'll make sure you're live, and then we'll get |
| 11:50:38 | 13 | rolling. |
| 11:50:38 | 14 | MR. SAFER:  Testing. |
| 11:50:39 | 15 | THE COURT:  I think we've got you know. |
| 11:50:41 | 16 | Counsel, whenever you're ready, go ahead. |
| 11:50:43 | 17 | MR. SAFER:  Thank you. |
| 11:50:44 | 18 | Jim, could we put up Plaintiff's Exhibit 50, please. |
| 11:50:49 | 19 | REDIRECT EXAMINATION |
| 11:50:50 | 20 | BY MR. SAFER: |
| 11:50:53 | 21 | Q.  Mr. Pesavento, you just testified under oath before this |
| 11:50:57 | 22 | jury, under counsel's questions, that you never saw that |
| 11:51:03 | 23 | during the course of the investigation.  Do you recall that |
| 11:51:06 | 24 | testimony? |
| 11:51:06 | 25 | A.  I'm sorry, could you repeat that? |

Pesavento - redirect by Safer

1230

11:51:09    1    Q.  You just testified about five minutes ago under your

11:51:14    2    counsel's testimony that you didn't see Plaintiff's Trial

11:51:18    3    Exhibit 50 during the investigation because it wasn't in the

11:51:24    4    investigative file?

11:51:26    5    A.  Correct.

11:51:26    6    Q.  But, in fact, you know that's untrue?

11:51:34    7    A.  I don't know that --

11:51:37    8    Q.  Well, let's go back over -- so I didn't ask you whether it

11:51:43    9    was in the investigative file, but you and I did discuss this

11:51:47   10    the other day, didn't we?

11:51:48   11    A.  If you say so.

11:51:53   12    Q.  Well, let me see if I can refresh your memory.

11:51:58   13         There is a serial number on this property inventory

11:52:03   14    report, correct?

11:52:04   15    A.  Yes.

11:52:04   16    Q.  And that is the serial number of the gun that Clifford

11:52:10   17    Frazier brought into the J&J's Fish, correct?

11:52:18   18    A.  I believe so, yes.

11:52:19   19    Q.  Okay.  Now, if we can look at your supplementary report,

11:52:25   20    Plaintiff's Trial Exhibit 86.  You have a serial number --

11:52:28   21    well, first of all, do you recognize this --

11:52:31   22         MR. SAFER:  Can we back up, Jim, to the first page.

11:52:35   23    Thank you.

11:52:35   24    BY MR. SAFER:

11:52:35   25    Q.  Do you recognize this as the supplementary report, this is

Pesavento - redirect by Safer

1231

11:52:39  1  Plaintiff's Trial Exhibit 86, that you wrote the night after

11:52:43  2  the murder?

11:52:44  3  A.  Yes.

11:52:44  4  Q.  Okay.

11:52:46  5       MR. SAFER:  Now, if we could go to the part about the

11:52:51  6  gun.

          7  BY MR. SAFER:

11:52:52  8  Q.  You have a serial number.  Do you see that?

11:52:54  9  A.  Yes.

11:52:55  10  Q.  And I believe you testified yesterday that the only place

11:53:01  11  you would have gotten that serial number from is the property

11:53:06  12  form, which is Plaintiff's Trial Exhibit 50, correct?

11:53:11  13  A.  Yes.

11:53:11  14  Q.  And so you did see Plaintiff's Trial Exhibit 50 during the

11:53:20  15  investigation, didn't you?

11:53:21  16  A.  Yes, I did.

11:53:22  17  Q.  Okay.  Now, when you were just asked whose blood -- well,

11:53:32  18  let me back up one.

11:53:33  19       Clifford Frazier said that he -- claimed that he shot

11:53:38  20  his gun -- he emptied his gun on the street at the person who

11:53:44  21  he was engaging in a gun battle with, right?

11:53:47  22  A.  Yes.

11:53:47  23  Q.  And he said he thought he hit him, correct?  He fired at

11:53:52  24  him, and he saw the guy fall, thought he hit him, right?

11:53:55  25  A.  I don't recall that, if he said he thought he hit him.

Pesavento - redirect by Safer

1232

11:53:59    1    Q.   You just testified when you were asked whose blood would

11:54:05    2    you expect to be on that, and you said Eddie Bolden or

11:54:08    3    Clifford Frazier.  Do you recall that testimony?

11:54:10    4    A.   Yes.

11:54:10    5    Q.   So what you really meant was -- because you didn't know,

11:54:16    6    this is right after -- you meant the assailant, whoever it was

11:54:21    7    that shot him -- shot Clifford Frazier, or Clifford Frazier,

11:54:25    8    correct?

11:54:27    9    A.   Yeah, I'm getting these -- I know it's strange with all

11:54:31   10    these names and that going back and forth.

11:54:33   11    Q.   So no names, just -- well, you know Clifford Frazier,

11:54:36   12    right?

11:54:37   13    A.   Yes, no, I know.

11:54:38   14    Q.   And whoever it was who shot him, one of those -- you know,

11:54:41   15    he's struggling with the gun.

11:54:45   16    A.   Right.

11:54:45   17    Q.   So one of those two people's blood is on the gun, right?

11:54:48   18    A.   Yes.

11:54:49   19    Q.   And so this was a critical clue perhaps to finding out who

11:54:58   20    that person was, right?

11:55:00   21    A.   Right.

11:55:01   22    Q.   But you didn't test the gun or the blood on the gun, did

11:55:07   23    you?

11:55:07   24    A.   No.

11:55:09   25    Q.   Okay.  Now, let's talk --

Pesavento - redirect by Safer

11:55:12    1    A.  I didn't.

11:55:12    2    Q.  And nobody else did, either?

11:55:15    3    A.  Apparently not.

11:55:16    4    Q.  And you worked together as a team, right, you, Detective

11:55:22    5    Karl, Detective Siwek?  Correct?

11:55:26    6    A.  Yes, we worked in the same unit.

11:55:28    7    Q.  But on -- in investigating this crime, you worked as a

11:55:32    8    team?

11:55:32    9    A.  Yes.  Yes.

11:55:33   10    Q.  Okay.  Now, let's talk about your interrogatory response.

11:55:40   11         MR. SAFER:  I believe that's Plaintiff's Exhibit 106,

11:55:43   12    Jim.  If we could bring that up, please.  If we could look at

11:55:49   13    Question 3.

11:55:50   14    BY MR. SAFER:

11:55:52   15    Q.  Now, first of all, you were asked whether you typed this

11:55:59   16    answer.  Do you see that?  You were asked whether you typed

11:56:04   17    it.  You didn't type it, correct?

11:56:05   18    A.  Correct.

11:56:06   19    Q.  But you did provide the information, correct?

11:56:10   20    A.  Correct.

11:56:11   21    Q.  And then you signed a verification that said that this was

11:56:17   22    true, right?

11:56:19   23    A.  Yes.

11:56:19   24    Q.  And you did that, as you explained yesterday to the jury,

11:56:24   25    after reviewing all of your reports, after reviewing all of

Pesavento - redirect by Safer

1234

11:56:29  1  the trial testimony that you had given, correct?

11:56:31  2  A.  Correct.

11:56:32  3  Q.  And that's just not true.  In other words, No. 3 is just

11:56:39  4  not accurate, correct?

11:56:42  5  A.  No, I'm not saying that it's not accurate.

11:56:56  6  Q.  Well, you did a whole lot more than you said, correct?

11:57:01  7  A.  I did a lot -- a whole lot more than what?

11:57:04  8  Q.  You did a whole lot more in the investigation than this

11:57:09  9  says, correct?  I mean, the jury has heard about this now for

11:57:13  10  two days.

11:57:15  11  A.  Yes.

11:57:15  12  Q.  Okay.  Now, you were asked whether you gave a deposition,

11:57:20  13  and it was a long deposition, right?

11:57:21  14  A.  Yes.

11:57:23  15  Q.  You didn't volunteer to have that deposition taken; you --

11:57:29  16  as a party, you had to sit for that deposition, right?

11:57:32  17  A.  Yes.

11:57:33  18  Q.  You didn't choose to give the information that you gave in

11:57:38  19  that deposition; you were asked questions by Mr. Bolden's

11:57:43  20  lawyer, correct?

11:57:43  21  A.  Correct.

11:57:45  22  Q.  And at the very -- at the beginning of the deposition, you

11:57:50  23  took an oath, correct?

11:57:51  24  A.  Correct.

11:57:52  25  Q.  And towards -- do you recall that at the very beginning of

Case: 1:17-cv-00417 Document #: 638 Filed: 11/16/21 Page 101 of 126 PageID #:18501
Pesavento - redirect by Safer
1235

| | | |
|---|---|---|
| 11:57:58 | 1 | that long day, you were given a copy of your answers to the |
| 11:58:03 | 2 | interrogatories, right? |
| 11:58:05 | 3 | A.  I don't recall. |
| 11:58:06 | 4 | Q.  Okay.  If -- |
| 11:58:08 | 5 | MR. SAFER:  Your Honor, if we could show this just to |
| 11:58:11 | 6 | Mr. Pesavento. |
| 11:58:13 | 7 | THE COURT:  Yep. |
| 11:58:14 | 8 | MR. SAFER:  I will look at your deposition at |
| 11:58:19 | 9 | Page 29, Line 6 to 30, Line 2. |
| 11:58:28 | 10 | THE TECHNICIAN:  Do I have -- where is my -- |
| 11:58:28 | 11 | THE COURT:  26, I think.  I'm sorry, Page 29, Lines 6 |
| 11:58:34 | 12 | to 30.  He also then said Line 2. |
| 11:58:43 | 13 | MR. SAFER:  Yeah, Page 30, Line 2. |
| 11:58:48 | 14 | BY MR. SAFER: |
| 11:58:53 | 15 | Q.  So you recognize that -- you were given those documents, |
| 11:58:57 | 16 | and you were asked, "Do you recognize that as answers, |
| 11:59:01 | 17 | interrogatory answers that Mr. Bolden's attorney sent to your |
| 11:59:05 | 18 | attorneys, and you were supposed to answer the questions in |
| 11:59:08 | 19 | here," and you said, "Yes." |
| 11:59:13 | 20 | So you were shown it right at the beginning of your |
| 11:59:15 | 21 | deposition, correct? |
| 11:59:16 | 22 | A.  Correct. |
| 11:59:16 | 23 | Q.  And then you were read -- on Page 31, Lines 14 through 17, |
| 11:59:26 | 24 | you were read the answer to Interrogatory No. 3, correct? |
| 11:59:33 | 25 | You were asked the question and answer.  So -- I'm |

| | | |
|---|---|---|
| 11:59:38 | 1 | sorry -- Line 30 -- Page 31, Line 10. |
| 11:59:41 | 2 | "Let's review your interrogatory response to No. 3, |
| 11:59:45 | 3 | which is on Page 4 of the document. |
| 11:59:48 | 4 | "ANSWER: Okay. |
| 11:59:49 | 5 | "QUESTION: So the question states, please describe |
| 11:59:52 | 6 | in detail your role in the investigation. Did I read that |
| 11:59:55 | 7 | correctly? |
| 11:59:56 | 8 | "ANSWER: Yes." |
| 11:59:59 | 9 | And then you were read the answer that you supplied, |
| 12:00:06 | 10 | correct? |
| 12:00:07 | 11 | A. Correct. |
| 12:00:07 | 12 | Q. And then you were asked, "Does the answer to Interrogatory |
| 12:00:17 | 13 | No. 3 that I just read fully describe your role in this |
| 12:00:24 | 14 | investigation," and you said, "Yes." |
| 12:00:32 | 15 | MR. SAFER: That's on the next page, Jim. |
| 12:00:43 | 16 | THE COURT: Is the question whether that's what it |
| 12:00:45 | 17 | says? |
| 12:00:45 | 18 | MR. SAFER: Yes. |
| 12:00:46 | 19 | BY MR. SAFER: |
| 12:00:46 | 20 | Q. Were you asked that question, did you give that answer? |
| 12:00:48 | 21 | A. Yes. |
| 12:00:48 | 22 | Q. And that just simply isn't true. Your testimony under |
| 12:00:56 | 23 | oath was false, wasn't it? |
| 12:00:58 | 24 | A. No, I'm not -- I don't quite understand where I'm lying or |
| 12:01:05 | 25 | something. |

Pesavento - redirect by Safer

1237

12:01:05   1    Q.  Well, you were asked to fully describe your role in the

12:01:11   2    investigation, and you said that you did three things:  that

12:01:17   3    you interviewed Mr. Williams, that you interviewed Mr. Bolden

12:01:22   4    after arrest, and you assisted in conducting a lineup.

12:01:27   5    A.  Yes.

12:01:27   6    Q.  Do you think that is a complete answer to your role in the

12:01:30   7    investigation?

12:01:32   8    A.  No, it's not the complete role.  No.

12:01:35   9    Q.  Well, that's what you were asked to do --

12:01:38   10   A.  No.

12:01:38   11   Q.  -- correct?

12:01:39   12         And so both your interrogatory answer and your sworn

12:01:43   13   testimony were not true and correct, right?

12:01:51   14   A.  I'm getting more confused with this thing.

12:01:59   15   Q.  Okay.

12:01:59   16   A.  You're asking me if the only things that I did was talk to

12:02:04   17   Mr. Bolden?

12:02:05   18   Q.  I think we all know the only things -- that's not the only

12:02:09   19   things you did.

12:02:09   20         What I'm asking you is:  When you said that those

12:02:12   21   were the only things you did, describing in detail your role

12:02:18   22   in the investigation, you gave three things.  That is not your

12:02:23   23   role in the investigation.  That does not adequately describe

12:02:26   24   your role in the investigation, right?

12:02:28   25   A.  Right.

Pesavento - redirect by Safer

1238

| | | |
|---|---|---|
| 12:02:29 | 1 | Q. Okay. Let's talk about -- you were asked yesterday why |
| 12:02:40 | 2 | you exercised your discretion not to charge Clifford Frazier. |
| 12:02:46 | 3 | Do you recall those questions? |
| 12:02:47 | 4 | A. Yes. |
| 12:02:47 | 5 | Q. And you were asked whether police officers have to arrest |
| 12:02:53 | 6 | anyone for any crime, and you said they did not. Do you |
| 12:02:57 | 7 | recall that? |
| 12:02:58 | 8 | A. Yes. |
| 12:03:01 | 9 | Q. I just want to orient you to the area that I'm going to |
| 12:03:04 | 10 | ask you about. |
| 12:03:06 | 11 | The crimes that Clifford Frazier committed are not |
| 12:03:10 | 12 | just any crimes, right? |
| 12:03:16 | 13 | A. I don't know how to read that. I -- |
| 12:03:18 | 14 | Q. They were major crimes, correct? |
| 12:03:21 | 15 | A. Yes. |
| 12:03:27 | 16 | Q. I mean, we went over it, but he was a multi-kiloed drug |
| 12:03:32 | 17 | dealer with two semiautomatic weapons who emptied an automatic |
| 12:03:37 | 18 | weapon on the busy city street and also stored drugs and an |
| 12:03:42 | 19 | arsenal of weapons for a drug operation in his house, right? |
| 12:03:46 | 20 | A. Yes. |
| 12:03:46 | 21 | Q. That's pretty serious, correct? |
| 12:03:49 | 22 | A. Yes. |
| 12:03:50 | 23 | Q. Did you frequently allow people who committed crimes of |
| 12:03:54 | 24 | that magnitude to go free? |
| 12:03:57 | 25 | A. No. |

Pesavento - redirect by Safer

1239

12:03:57  1    Q.  Have you ever let someone who you knew committed crimes of

12:04:03  2    that magnitude go uncharged?

12:04:07  3    A.  No.

12:04:07  4    Q.  You said you exercised your discretion to let Mr. Frazier

12:04:13  5    go uncharged and in part because he said this was the first

12:04:17  6    time that he had ever done a drug deal, right?

12:04:21  7    A.  Yes, that's what he said.  I believe so.

12:04:24  8    Q.  You've heard that before from drug dealers who get caught,

12:04:28  9    haven't you, sir?

12:04:29  10   A.  That it was their first time to do a drug deal?

12:04:33  11   Q.  Yeah.

12:04:35  12   A.  No.

12:04:36  13   Q.  No, nobody who's gotten caught in a drug deal -- you've

12:04:41  14   worked narcotics, right?

12:04:41  15   A.  Years ago, yes.

12:04:43  16   Q.  Nobody who ever got caught in a drug deal said "I never

12:04:47  17   did this before"?

12:04:48  18   A.  I don't recall, sir.

12:04:48  19   Q.  At any rate, is there a first-time exception to the drug

12:04:52  20   laws?

12:04:52  21   A.  No.

12:04:53  22   Q.  As a trained detective, if someone's participating in a

12:05:00  23   major drug deal for the first time, and they're watching a

12:05:05  24   large amount of drugs with two semiautomatic weapons and this

12:05:12  25   is the first time they participated in a drug deal, they'd be

Pesavento - redirect by Safer

1240

| | | |
|---|---|---|
| 12:05:14 | 1 | pretty nervous, don't you think? |
| 12:05:16 | 2 | A.  I don't know how they would feel. |
| 12:05:19 | 3 | Q.  Well, as a detective, wouldn't you think they'd feel |
| 12:05:21 | 4 | pretty nervous? |
| 12:05:22 | 5 | A.  I still don't know how they would feel. |
| 12:05:24 | 6 | Q.  Okay.  Is it consistent with that -- that with -- |
| 12:05:31 | 7 | participating in a major drug deal for the first time ever |
| 12:05:35 | 8 | with two semiautomatic weapons, that after Derrick Frazier, |
| 12:05:43 | 9 | Ledell Clayton, and this third person drive away, he goes into |
| 12:05:49 | 10 | Harold's and orders some wings to eat.  Is that consistent |
| 12:05:53 | 11 | with somebody who is doing this for the first time? |
| 12:05:56 | 12 | A.  It could be. |
| 12:05:57 | 13 | Q.  Okay.  And that's your sworn testimony? |
| 12:06:00 | 14 | A.  Yes.  Yes. |
| 12:06:01 | 15 | Q.  Okay.  Let's assume for the sake of argument that he, |
| 12:06:08 | 16 | unlike the rest of the world who claims that they were a |
| 12:06:12 | 17 | first-time drug dealer -- you know, they -- let me stop. |
| 12:06:19 | 18 | A kilo is a lot of drugs, right? |
| 12:06:24 | 19 | A.  Yes. |
| 12:06:24 | 20 | Q.  I mean, selling an ounce of cocaine is a lot of drugs, |
| 12:06:29 | 21 | right? |
| 12:06:29 | 22 | A.  Yes. |
| 12:06:30 | 23 | Q.  And there are 35 ounces in a kilogram, correct? |
| 12:06:34 | 24 | A.  I believe so. |
| 12:06:36 | 25 | Q.  And here they were selling 2 kilograms, correct? |

Pesavento - redirect by Safer

1241

12:06:41    1    A.    Correct.

12:06:41    2    Q.    And he testified that he was -- he stored many more than

12:06:44    3    that at his home over nine months, correct?

12:06:47    4    A.    I believe so.

12:06:49    5    Q.    But you didn't -- you thought that it was appropriate to

12:06:54    6    exercise your discretion not to arrest him for any of this,

12:06:57    7    right?

12:06:58    8    A.    Correct.

12:07:02    9    Q.    Now, you also said that -- you said that he was doing

12:07:08   10    this, he said, to protect his brother, right?

12:07:11   11    A.    Yes.  You mean with the guns?

12:07:16   12    Q.    Yes.

12:07:16   13    A.    Yes.

12:07:17   14    Q.    They brought those guns so that he could protect his

12:07:20   15    brother, right?

12:07:21   16    A.    Right.

12:07:22   17    Q.    And even though his brother is a major drug dealer, that

12:07:25   18    has a certain appeal to it, right?  He's there for his

12:07:30   19    brother?

12:07:31   20    A.    I don't know what the appeal is.

12:07:33   21    Q.    Okay.  Well, we can sympathize with somebody who wants to

12:07:37   22    protect his brother, correct?

12:07:38   23    A.    Yes.

12:07:38   24    Q.    Okay.  The problem is, that doesn't quite add up, either,

12:07:42   25    does it, Detective?

Pesavento - redirect by Safer

1242

12:07:43  1   A.  I don't know what you mean by "quite add up."

12:07:47  2   Q.  Well, Clifford Frazier did not stay with his brother, did

12:07:51  3   he?

12:07:51  4   A.  Correct.

12:07:53  5   Q.  He wasn't there to guard his brother; he was there to

12:07:59  6   guard the drugs, correct?

12:08:01  7   A.  I'm not sure exactly what his role was.

12:08:04  8   Q.  He stayed and guarded the drugs, correct?

12:08:08  9   A.  Correct.

12:08:09  10  Q.  And his brother drove away, right?

12:08:14  11  A.  Correct.

12:08:14  12  Q.  He didn't say, let me go, and I -- because I'm interested

12:08:19  13  in protecting you, my brother; he stayed with the drugs?

12:08:29  14  A.  Yes.

12:08:29  15  Q.  Now, you also said that his being shot and his brother,

12:08:36  16  Irving -- and Irving being shot played into your decision to

12:08:40  17  exercise your discretion when you were asked by your counsel.

12:08:44  18  Do you recall those -- that?

12:08:45  19  A.  Yes.

12:08:46  20  Q.  I mean, drug dealing in this amount of quantity of drugs

12:08:53  21  is a dangerous business, isn't it?

12:08:54  22  A.  Yes, it is.

12:08:55  23  Q.  People get shot, don't they?

12:08:58  24  A.  Yes.

12:08:58  25  Q.  The drug dealing associates get killed at times, right?

Pesavento - redirect by Safer

1243

| | | |
|---|---|---|
| 12:09:04 | 1 | A.  Yes. |
| 12:09:05 | 2 | Q.  And sometimes those drug dealing associates are friends or |
| 12:09:09 | 3 | relatives, right? |
| 12:09:10 | 4 | A.  Correct. |
| 12:09:10 | 5 | Q.  Getting shot or having your friend shot doesn't get you a |
| 12:09:15 | 6 | pass on the -- on violating the drug laws, does it? |
| 12:09:22 | 7 | A.  No. |
| 12:09:22 | 8 | Q.  You've said to these people that if you had charged him, |
| 12:09:29 | 9 | he would stop talking to you, and so that's one of the reasons |
| 12:09:33 | 10 | that you didn't charge him.  Do you recall that testimony? |
| 12:09:38 | 11 | A.  Yes. |
| 12:09:39 | 12 | Q.  You know that's not true, Detective, don't you? |
| 12:09:41 | 13 | A.  No, I don't know. |
| 12:09:46 | 14 | Q.  When someone is involved in and gets caught in serious |
| 12:09:51 | 15 | criminal activity, the proper procedure is to charge them and |
| 12:09:56 | 16 | have the State's Attorney's Office work out a cooperation plea |
| 12:10:02 | 17 | agreement, correct? |
| 12:10:03 | 18 | A.  I guess so. |
| 12:10:03 | 19 | Q.  That's done all the time, right? |
| 12:10:07 | 20 | A.  I don't know if it's done all the time. |
| 12:10:09 | 21 | Q.  Well, Detective -- how long have you been a detective? |
| 12:10:14 | 22 | A.  Me being a detective, I don't try cases. |
| 12:10:18 | 23 | Q.  You know, sir, that people are given plea -- cooperating |
| 12:10:25 | 24 | witnesses are -- who are involved in criminal activities are |
| 12:10:29 | 25 | given plea agreements, and they get a reduction in their |

Pesavento - redirect by Safer

1244

| | | |
|---|---|---|
| 12:10:33 | 1 | sentence for cooperating with law enforcement, correct? |
| 12:10:37 | 2 | A.  I've heard of that, yes. |
| 12:10:38 | 3 | Q.  And -- so, for example, if they were going to be sentenced |
| 12:10:42 | 4 | to 30 years, the plea agreement would say, you know, that they |
| 12:10:47 | 5 | would -- in exchange for their truthful testimony, they would |
| 12:10:50 | 6 | go down to 20 years or something like that, right?  That's how |
| 12:10:54 | 7 | it works? |
| 12:10:55 | 8 | A.  I don't know. |
| 12:10:55 | 9 | Q.  And that's a powerful incentive for somebody to keep |
| 12:10:59 | 10 | talking to law enforcement, right? |
| 12:11:02 | 11 | A.  It could be, yes. |
| 12:11:03 | 12 | Q.  Because those are years off their prison sentence, |
| 12:11:08 | 13 | correct? |
| 12:11:08 | 14 | A.  Correct. |
| 12:11:09 | 15 | Q.  But the difference is, the critical difference is, in |
| 12:11:14 | 16 | those arrangements, it is the judge in the state court -- |
| 12:11:22 | 17 | because that's where you're familiar -- it's the judge that |
| 12:11:26 | 18 | decides whether or not the testimony is truthful, not you, |
| 12:11:29 | 19 | correct? |
| 12:11:31 | 20 | A.  Correct. |
| 12:11:31 | 21 | Q.  But in this case, Clifford Frazier gets the benefit as |
| 12:11:39 | 22 | long as you're happy, right? |
| 12:11:41 | 23 | MS. BOUDREAUX:  Object to form. |
| 12:11:45 | 24 | THE COURT:  Spell out what you mean by "gets the |
| 12:11:48 | 25 | benefit as long as you're happy." |

Pesavento - redirect by Safer

1245

| | | |
|---|---|---|
| 12:11:50 | 1 | MR. SAFER:  Okay. |
| 12:11:50 | 2 | THE COURT:  Rephrase if you would, please. |
| 12:11:52 | 3 | MR. SAFER:  Thank you, Your Honor. |
| 12:11:53 | 4 | BY MR. SAFER: |
| 12:11:53 | 5 | Q.  All you have to do to land Clifford Frazier in jail for a |
| 12:11:57 | 6 | long time is initiate charges, correct? |
| 12:12:01 | 7 | A.  I don't know.  We didn't arrest him for the dope.  That |
| 12:12:07 | 8 | was a different unit. |
| 12:12:08 | 9 | Q.  I know that, sir.  You didn't arrest him.  You chose not |
| 12:12:12 | 10 | to arrest him. |
| 12:12:13 | 11 | What I'm exploring is, as -- |
| 12:12:16 | 12 | A.  We didn't recover the dope, either. |
| 12:12:18 | 13 | Q.  But the drugs were recovered, and your detectives talked |
| 12:12:22 | 14 | to him about his role in the offense, correct? |
| 12:12:24 | 15 | A.  Brie- -- yes. |
| 12:12:31 | 16 | Q.  Okay.  If you initiated charges -- and we've been through |
| 12:12:38 | 17 | this already -- you understood Clifford Frazier was going to |
| 12:12:43 | 18 | go to jail for a long time, correct? |
| 12:12:45 | 19 | A.  No, I didn't.  I didn't know that, that he would go to |
| 12:12:52 | 20 | jail for a long time. |
| 12:12:53 | 21 | Q.  You know that he -- he confessed to participating in a |
| 12:13:00 | 22 | multi-kilo drug deal with -- right? |
| 12:13:06 | 23 | A.  Yes. |
| 12:13:06 | 24 | Q.  With two unlawful automatic weapons, right? |
| 12:13:11 | 25 | A.  True, yes. |

Pesavento - redirect by Safer

1246

12:13:13    1    Q.   And he confessed to that, right?

12:13:15    2    A.   Yes.

12:13:17    3    Q.   And he was caught red-handed, right?  The drugs were in

12:13:24    4    the car?

12:13:25    5    A.   Yes.

12:13:25    6    Q.   His gun was in his hand?

12:13:30    7    A.   Yes.

12:13:30    8    Q.   Are you telling the ladies and gentlemen of this jury that

12:13:34    9    you didn't know that if you initiated charges, he was going to

12:13:39   10    go to jail for a long time?

12:13:42   11    A.   I don't know.

12:13:44   12    Q.   But all you had to do to get him prosecuted was initiate

12:13:57   13    charges.  You had the power to initiate charges, right?

12:14:00   14    A.   Like I said, we didn't recover the drugs.  That wasn't

12:14:09   15    our -- our unit -- my unit was we were looking at the

12:14:13   16    homicide.

12:14:13   17    Q.   You are a law enforcement -- you were a law enforcement

12:14:19   18    officer, weren't you, sir?

12:14:20   19    A.   Yes.

12:14:20   20    Q.   You're not telling the ladies and gentlemen of this jury

12:14:25   21    that you ignore huge crimes if it's -- because it's not in

12:14:30   22    your column, are you?

12:14:32   23    A.   No.

12:14:33   24    Q.   Okay.  Then you understand that you had the power to

12:14:40   25    arrest Clifford Frazier, correct?

Pesavento - redirect by Safer

1247

12:14:44   1   A.  I guess so.

12:14:45   2   Q.  And you had the power to initiate proceedings against

12:14:49   3   Clifford Frazier, correct?

12:14:51   4   A.  Apparently yes, but so did the policemen that recovered

12:14:55   5   the drugs.

12:14:56   6   Q.  Absolutely.  Nobody did it.

12:15:00   7        But the point is, sir, now he's -- all he has to do

12:15:06   8   is keep you satisfied enough to not initiate charges and all

12:15:14   9   of the other police officers.

12:15:16   10        No judge is involved, are they?

12:15:19   11   A.  No.

12:15:20   12   Q.  Okay.  New topic.  You were asked whether it is typical

12:15:34   13   for a witness to provide more detail in trial testimony

12:15:44   14   than -- than they necessarily give to a police officer in a

12:15:50   15   statement.

12:15:50   16        Do you recall that questioning by your counsel?

12:15:53   17   A.  Yes.

12:15:53   18   Q.  I mean, she asked you if you were familiar with Clifford

12:15:56   19   Frazier's trial testimony and that he said certain things.  Do

12:16:00   20   you recall that?

12:16:00   21   A.  Yes.

12:16:01   22   Q.  Okay.  But in this case, it wasn't that Clifford

12:16:08   23   Frazier -- well, Clifford Frazier provided plenty of detail to

12:16:13   24   the officers, correct?

12:16:15   25   A.  Correct.

Pesavento - redirect by Safer

1248

12:16:16   1   Q.  It was that -- it wasn't that he provided more detail or

12:16:21   2   that he was in the hospital.  He provided detail.  It was that

12:16:25   3   he changed his story, right?

12:16:28   4   A.  I don't recall whether he changed his story or not.

12:16:34   5   Q.  Okay.  Well, he told the detectives -- we could go -- go

12:16:38   6   over it, if you'd like, but he told the detectives that he

12:16:41   7   watched his brother and Irving Clayton go into the store, he

12:16:48   8   watched it from across the street, right?

12:16:50   9   A.  Yeah, he watched it.  Yes.

12:16:52   10  Q.  He didn't say he went in, right?

12:16:54   11  A.  Correct.

12:16:55   12  Q.  So that's not a detail.  You know, that's a change of a

12:17:00   13  story.  If he then says, oh, I did go in, that's not providing

12:17:05   14  additional detail, that's changing a story, correct?

12:17:09   15  A.  Yes.

12:17:10   16  Q.  And the same thing, he says -- he told the police, told

12:17:15   17  Detective Baker and others, that he went into Harold's Chicken

12:17:24   18  after the three of them drove off, correct?

12:17:26   19  A.  Correct.

12:17:27   20  Q.  And -- so it's not a detail, it's a change of story that,

12:17:33   21  no, in fact, all of these people came in here, the assailant

12:17:39   22  got a change of a dollar, and he eyeballed him.  That's not an

12:17:44   23  additional detail.  That's a complete change of story, right?

12:17:47   24  A.  Yes.

12:17:49   25  Q.  Remember when you were talking about why -- under your

12:18:05   1    counsel's examination, you were talking about why you didn't

12:18:10   2    fingerprint the gun, and she asked you, well, did you have any

12:18:15   3    information that the assailant touched the gun.

12:18:20   4              Do you remember those questions?

12:18:20   5    A.   Yes.

12:18:21   6    Q.   Okay.  You did know that there was struggles over these

12:18:26   7    guns, correct?

12:18:28   8    A.   Correct.

12:18:28   9    Q.   And you knew that Clifford Frazier said that he was

12:18:33  10    wrestling with this guy and trying to get his gun, correct?

12:18:37  11    A.   Correct.

12:18:37  12    Q.   And Clifford Frazier told you, didn't he, at one point

12:18:42  13    that the assailant picked up his gun?

12:18:48  14    A.   I don't recall right now.

12:18:50  15    Q.   Okay.  Let's see if his trial testimony with which you

12:18:55  16    said to your counsel was -- will refresh your recollection.

12:19:00  17              MR. SAFER:  And that is at Page -- if we could show

12:19:02  18    this just to the witness, please -- at Page 111, Line 18 to

12:19:11  19    111, 24.

12:19:13  20    BY MR. SAFER:

12:19:13  21    Q.   And he's asked [as read]:

12:19:14  22              "What happened in front of J&J?

12:19:17  23              "Pointed his gun at me and told me to drop my gun.

12:19:20  24              "What did you do?

12:19:21  25              "I dropped it.  My gun.

Pesavento - redirect by Safer

1250

| | | |
|---|---|---|
| 12:19:25 | 1 | "What happened then? |
| 12:19:26 | 2 | "He walked up on me, picked the gun up." |
| 12:19:30 | 3 | Do you see that? |
| 12:19:30 | 4 | A.  Yes. |
| 12:19:31 | 5 | Q.  And that's consistent with what he told you, right? |
| 12:19:37 | 6 | A.  Yes. |
| 12:19:37 | 7 | Q.  Okay.  So you did know that the assailant picked up |
| 12:19:44 | 8 | Clifford Frazier's gun, right? |
| 12:19:45 | 9 | A.  Yes. |
| 12:19:46 | 10 | MS. BOUDREAUX:  I'm going to object to time frame, |
| 12:19:49 | 11 | foundation. |
| 12:19:50 | 12 | THE COURT:  Overruled. |
| 12:19:51 | 13 | Just to be clear, though, that was the criminal trial |
| 12:19:54 | 14 | testimony and not this trial? |
| 12:19:55 | 15 | MR. SAFER:  Yes, Your Honor. |
| 12:19:56 | 16 | THE COURT:  Okay. |
| 12:19:57 | 17 | MR. SAFER:  Thank you. |
| 12:19:58 | 18 | BY MR. SAFER: |
| 12:19:58 | 19 | Q.  But you didn't get the gun fingerprinted, did you? |
| 12:20:01 | 20 | A.  No. |
| 12:20:02 | 21 | Q.  Okay.  Let's talk about the lineup.  You -- and I want to |
| 12:20:15 | 22 | make sure I've got the versions straight. |
| 12:20:17 | 23 | So you couldn't force Mr. Bolden to participate in a |
| 12:20:20 | 24 | lineup; he had to do it voluntarily, right? |
| 12:20:23 | 25 | A.  Correct. |

Pesavento - redirect by Safer

1251

| | | |
|---|---|---|
| 12:20:23 | 1 | Q. Because he wasn't under arrest, right? |
| 12:20:26 | 2 | A. Right. |
| 12:20:26 | 3 | Q. There was no probable cause at that time? |
| 12:20:28 | 4 | A. Right. |
| 12:20:29 | 5 | Q. And so what you're saying is that Mr. Ingles said, "I want |
| 12:20:38 | 6 | to be in the room with the participant," and before the lineup |
| 12:20:42 | 7 | for which he and his client are there voluntarily, you told |
| 12:20:46 | 8 | him, "No, you can't"; is that right? |
| 12:20:51 | 9 | A. Yes. |
| 12:20:51 | 10 | Q. And so before the lineup, he throws a temper tantrum, he's |
| 12:20:55 | 11 | upset, right? |
| 12:20:56 | 12 | A. I don't know if it was a temper tantrum. He was a little |
| 12:21:03 | 13 | upset, you know. |
| 12:21:04 | 14 | Q. Yeah, I think your words were "really angry." |
| 12:21:07 | 15 | A. Oh. |
| 12:21:08 | 16 | Q. And he didn't have to be there, right? |
| 12:21:12 | 17 | A. Who? Who didn't have to be there? |
| 12:21:15 | 18 | Q. Neither him, Mr. Ingles, nor Mr. Bolden. |
| 12:21:18 | 19 | A. Correct. |
| 12:21:18 | 20 | Q. So if your version of the story is true, he -- if he's |
| 12:21:23 | 21 | that upset, he could've just walked out of the police station, |
| 12:21:27 | 22 | correct? |
| 12:21:27 | 23 | A. Correct. |
| 12:21:28 | 24 | Q. Okay. Now, you were -- you were shown like several |
| 12:21:36 | 25 | reports which listed the heights and weights of the |

12:21:40   1   participants, right?

12:21:40   2   A.   Yes.

12:21:41   3   Q.   That's a requirement of the general order involving

12:21:47   4   lineups, right?  You have to photograph the lineups, and you

12:21:51   5   have to record the heights and weights of those people,

12:21:56   6   correct?

12:21:56   7   A.   Correct.

12:21:57   8   Q.   It's not something you initiated.  I mean, it's part of

12:22:02   9   the general order, right?

12:22:03   10  A.   Correct.

12:22:03   11  Q.   All right.  Now, let's talk about two things you said

12:22:12   12  during your -- your testimony about what was said, and let's

12:22:18   13  talk about the whole truth again.

12:22:19   14          You talked to the jury about a report in the

12:22:26   15  investigative file.

12:22:29   16          MR. SAFER:  I think it's JTX4 CHI.BOLDEN 013400.

12:22:47   17          I'm sorry.  I must have gotten the wrong page.  Maybe

12:22:50   18  the very next page, Jim, if we can keep going.  Keep going,

           19  please.

12:23:10   20          I told you, Your Honor, it takes a big team to make

12:23:12   21  up for my mistakes.

12:23:14   22          But it's 13- --

12:23:14   23          THE COURT:  Mine, too.

12:23:15   24          MR. SAFER:  -- it's 13405.

12:23:18   25          And, Your Honor, could we -- this is in evidence.

Pesavento - redirect by Safer

1253

12:23:19  1    Could we show this to the jury?

12:23:21  2         THE COURT:  Yes, absolutely.

12:23:23  3    BY MR. SAFER:

12:23:23  4    Q.  You went over this with your counsel yesterday.

12:23:33  5         MR. SAFER:  Can we go to the next page.  No, I'm

12:23:37  6    sorry.  So this isn't it.  So I'll have -- can I have one

12:23:41  7    moment --

12:23:41  8         THE COURT:  Of course.

12:23:43  9         MR. SAFER:  -- to consult with the people who know.

12:23:59  10        (Counsel conferring.)

12:23:59  11        MR. SAFER:  Okay.  We're looking for Detective

12:24:02  12   Rowan's report.

12:24:03  13   BY MR. SAFER:

12:24:05  14   Q.  In there, do you recall -- it was the report -- and we'll

12:24:08  15   get it up in a minute, but it was the report that says Derrick

12:24:13  16   Frazier reported so-and-so.  Do you remember that?

12:24:16  17   A.  No, I don't.

12:24:17  18   Q.  You remember yesterday that your counsel crossed out

12:24:22  19   "Derrick" and put in --

12:24:24  20   A.  Oh, yes.  And Clifford, yeah.

12:24:25  21   Q.  Yeah, it was that report.  And those detectives -- okay.

12:24:34  22   Those detectives --

12:24:36  23        MR. SAFER:  Are you looking for the investigative

12:24:38  24   file, Eli?  Here it is.

12:24:48  25   BY MR. SAFER:

Pesavento - redirect by Safer

1254

12:24:48    1    Q.  So those detectives were writing what they were told by

12:24:54    2    some 3rd District officer, correct?

12:24:58    3    A.  I'm not sure what they were told by it.

12:25:01    4    Q.  Yeah.  That's the point.

12:25:03    5            Okay.  I'll tell you what, we'll go on to something

12:25:07    6    else, and we'll come back from -- back to this.

12:25:11    7            Let's talk about what you said --

12:25:22    8            THE COURT:  In about five minutes, we'll take a lunch

12:25:26    9    break, and I think when we get back from lunch break, I'm sure

12:25:30   10    we'll have the document ready to go so you can see it and

12:25:31   11    we'll have questions about it, unless Mr. Safer has it now.

12:25:33   12            MR. SAFER:  I apologize.

12:25:34   13            THE COURT:  Totally fine.

12:25:35   14            MR. SAFER:  I think it's Defense Exhibit 9, I'm told.

12:25:39   15            There we go.

12:25:40   16            THE COURT:  All right.  Do you want it published to

12:25:41   17    the jury?

12:25:42   18            MR. SAFER:  Yes, Your Honor, please.

12:25:43   19            THE COURT:  We'll go ahead and publish that.

12:25:45   20            MR. SAFER:  Thank you.

12:25:45   21    BY MR. SAFER:

12:25:46   22    Q.  Okay.  This is a report by Detectives Higgins and Rowans.

12:25:53   23    Do you see that?

12:25:53   24    A.  Yes.

12:25:54   25    Q.  Now -- and this is big stuff, right, because it says

12:26:01  1  Derrick Frazier, but it says, you know, informed the officers

12:26:09  2  that -- and it says the name Lanier.  That's pretty important,

12:26:14  3  right?

12:26:14  4  A.  Yes, I haven't really --

12:26:17  5  Q.  Well, you implied to the jury yesterday that this was

12:26:20  6  Derrick Frazier using the term "Lanier," right?

12:26:23  7          MS. BOUDREAUX:  Object to form.

12:26:31  8          THE COURT:  Overruled.

12:26:42  9  BY THE WITNESS:

12:26:43  10  A.  I'm sorry, what's your question?

12:26:44  11  BY MR. SAFER:

12:26:45  12  Q.  You were implying to the jury yesterday that this showed

12:26:49  13  that Clifford Frazier used the term "Lanier."

12:26:55  14  A.  I don't know if it was Clifford Frazier or officers in the

12:27:03  15  3rd District.

12:27:04  16  Q.  Right.  Yeah.  Yeah.  That -- okay.  You're -- you're --

12:27:09  17  you're right there.

12:27:10  18          You have no idea whether this was officers from the

12:27:15  19  3rd District saying that or whether Clifford Frazier said it,

12:27:20  20  right?

12:27:24  21  A.  I guess that's correct, yes.

12:27:26  22  Q.  So -- and let's get clear what just -- what happened here

12:27:31  23  yesterday.  You didn't write this report, right?

12:27:34  24  A.  Correct.

12:27:34  25  Q.  You didn't -- you didn't talk to the 3rd District

Pesavento - redirect by Safer

1256

| | | |
|---|---|---|
| 12:27:39 | 1 | officers, right? |
| 12:27:40 | 2 | A.   That's correct. |
| 12:27:40 | 3 | Q.   Apparently Higgins and/or Rowan talked to the 3rd District |
| 12:27:48 | 4 | officers, right? |
| 12:27:48 | 5 | A.   Yes. |
| 12:27:49 | 6 | Q.   And you don't know when they talked to the 3rd District |
| 12:27:55 | 7 | officers, do you? |
| 12:27:56 | 8 | A.   No. |
| 12:27:58 | 9 | Q.   And you don't know who they talked to? |
| 12:28:02 | 10 | A.   Correct. |
| 12:28:02 | 11 | Q.   And you don't know what those officers said? |
| 12:28:07 | 12 | A.   Correct. |
| 12:28:08 | 13 | Q.   And you don't know what the basis of the officers' |
| 12:28:12 | 14 | information was, correct? |
| 12:28:13 | 15 | A.   Correct. |
| 12:28:14 | 16 | Q.   But you were asked to read this into the record without |
| 12:28:18 | 17 | any knowledge of any of that, right? |
| 12:28:23 | 18 | A.   Correct. |
| 12:28:30 | 19 |         MR. SAFER:  Your Honor, I'm about to go into a |
| 12:28:32 | 20 | different area. |
| 12:28:33 | 21 |         THE COURT:  Folks, we are now at a good stopping |
| 12:28:35 | 22 | point.  So we are going to go ahead and take our lunch break. |
| 12:28:38 | 23 | We will come back in about 45 minutes or so. |
| 12:28:40 | 24 |         I will note for the record that the courtroom is a |
| 12:28:43 | 25 | bit chilly in here today.  I hope everybody is staying |

12:28:46    1    reasonably comfortable.  I'm sorry if it's cold.  I have

12:28:50    2    spotted by a member of the jury a Costco hoodie.  I know this

12:28:54    3    because I own the very same Costco hoodie.  And so I hope

12:29:01    4    people aren't too chilly today.  So hang in there.  We'll get

12:29:05    5    you lunch, and we'll get you back in a little bit.

12:29:37    6            (Jury out.)

12:29:38    7            THE COURT:  Okay, folks.  Does anybody need a

12:29:42    8    two-minute break before we talk about Officer Oliver?  I want

12:29:47    9    to make sure everyone has had a chance to talk with their

12:29:49   10    respective teams on this issue.

12:29:53   11            MR. CROWL:  Yeah, Judge -- is the mic on?

12:29:55   12            Thank you, Jessica.

12:29:57   13            For logistical reasons, we would request to call him

12:30:02   14    on Monday.

12:30:03   15            THE COURT:  Okay.

12:30:05   16            MR. CROWL:  It's very difficult obviously to put

12:30:08   17    everything together in time to have it be for tomorrow.

12:30:12   18    Monday will do it.

12:30:13   19            THE COURT:  Okay.  That is fine, assuming that it

12:30:18   20    works logistically, which I expect that it will.

12:30:22   21            I don't want to force someone to fly to Little Rock

12:30:26   22    if I can avoid someone flying to Little Rock.  Can you get

12:30:32   23    your documents together today?

12:30:35   24            You would expect to call him tomorrow anyway, right?

12:30:38   25    Can we FedEx the documents out today?

1258

12:30:41    1        MR. CROWL:  I think we could FedEx the documents over
12:30:43    2   the weekend so that they're there in time, Judge.
12:30:46    3        THE COURT:  Okay.  So you would FedEx it when to
12:30:49    4   when?
12:30:49    5        I mean, if --
12:30:51    6        MR. CROWL:  They'll be able to do overnight delivery,
12:30:54    7   Judge, and could have the documents, I assume, by Sunday.
12:30:59    8        THE COURT:  Okay.  Who are you going to FedEx the
12:31:01    9   documents to on a Sunday?
12:31:04   10        MR. CROWL:  Do you want it to go directly to the
12:31:06   11   courthouse, Judge.
12:31:06   12        THE COURT:  Well, nobody is going to be there on a
12:31:08   13   Sunday.  So I was thinking if you FedExed it out today, it
12:31:13   14   could arrive to somebody tomorrow in the courthouse.
12:31:17   15        And, look, believe me, I've been there.  I get the
12:31:21   16   logistics of this.  I know you folks weren't necessarily going
12:31:24   17   to FedEx stuff out today, but you were going to be ready to
12:31:28   18   call him today -- I'm sorry, call him tomorrow if I said he
12:31:32   19   was forced to physically be here, right?  So, you know, if I
12:31:35   20   had ruled today he was coming today, you would have examined
12:31:37   21   him tomorrow, right?  So you've got to be ready to go, I
12:31:40   22   imagine.
12:31:41   23        MR. CROWL:  Judge, I mean, it's very difficult
12:31:42   24   because we had rescheduled all of our witnesses because --
12:31:45   25        THE COURT:  No, no.  I'm saying if I had flicked my

| | | |
|---|---|---|
| 12:31:48 | 1 | wrist and said, okay, he is coming here tomorrow courtesy of |
| 12:31:52 | 2 | the U.S. marshals, you would have rolled. |
| 12:31:54 | 3 | MR. SAFER:  Your Honor, he said he's not coming. |
| 12:31:55 | 4 | THE COURT:  Well, it wasn't ever up to him.  Let's be |
| 12:31:59 | 5 | clear on that. |
| 12:32:00 | 6 | MR. SAFER:  Well -- yeah, I mean -- |
| 12:32:01 | 7 | THE COURT:  So -- |
| 12:32:02 | 8 | MR. SAFER:  We scheduled -- well -- okay. |
| 12:32:04 | 9 | THE COURT:  So here's what I would say:  I want |
| 12:32:09 | 10 | things to go smoothly.  I want to avoid somebody getting on a |
| 12:32:14 | 11 | plane if we can.  I don't want people to fly down unless they |
| 12:32:18 | 12 | have to. |
| 12:32:19 | 13 | I am nervous about you FedExing something out this |
| 12:32:25 | 14 | weekend to be delivered to somebody Monday morning and what -- |
| 12:32:32 | 15 | you're going to start with him Monday morning? |
| 12:32:35 | 16 | I want you to talk about this during the break and |
| 12:32:37 | 17 | figure out what you want to do.  Because here's the train |
| 12:32:40 | 18 | wreck that I can foresee that I want to avoid:  You send the |
| 12:32:45 | 19 | documents out Saturday night.  You send it to, I don't know, |
| 12:32:48 | 20 | my buddy in the federal courthouse.  It's supposed to get |
| 12:32:50 | 21 | delivered Monday morning.  It's got to go through the U.S. |
| 12:32:53 | 22 | marshals.  They've got to scan it, inspect it.  You're ready |
| 12:32:57 | 23 | to roll, but the exhibits aren't here.  Where are they?  I |
| 12:33:02 | 24 | don't know.  It creates an issue. |
| 12:33:03 | 25 | Maybe somebody is going to have to get on a plane, I |

12:33:05  1    don't know.  But I'd like you to talk about this.

12:33:07  2            So the position of the plaintiff is, you want him,

12:33:10  3    you don't want him tomorrow, you want him on Monday?

12:33:13  4            MR. CROWL:  Monday, Judge, yes.

12:33:14  5            THE COURT:  Okay.  I want you to talk about the

12:33:16  6    exhibits during lunch.  We'll figure out a plan.

12:33:18  7            Anything else on the Oliver point?

12:33:19  8            MR. CROWL:  No, Judge.

12:33:20  9            THE COURT:  The one thing I will say is, if we are

12:33:23 10    calling Oliver remotely, no one is calling him live,

12:33:27 11    obviously.  There can be no magic cures.  And I know you folks

12:33:29 12    don't expect that.  I understand that you prefer to have him

12:33:32 13    here, too.

12:33:33 14            Is there anything else from a housekeeping

12:33:36 15    perspective from the defense side that you want to raise?

12:33:38 16            MR. HALE:  No, Your Honor.

12:33:38 17            THE COURT:  Okay.  Why don't we try to get back at

12:33:40 18    about 1:15.  Okay?  Is that okay?  We're off.

12:33:45 19        (Luncheon recess taken at 12:33 p.m.)

         20                    *   *   *   *   *   *

         21                        CERTIFICATE

         22        I certify that the foregoing is a correct transcript from

         23    the record of proceedings in the above-entitled matter.

         24    /s/ *Amy Spee*                      *10/15/2021*

         25    _____      _____
               Amy Spee, CSR, RPR, CRR          Date
               Official Court Reporter