1261

1    IN THE UNITED STATES DISTRICT COURT.
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    EDDIE L. BOLDEN,                    )
                                         )
4                   Plaintiff,           )
                                         )  Case No. 17 CV 417
5    -vs-                                )
                                         )  Chicago, Illinois
6    ANGELO PESAVENTO, et al.,           )  October 14th, 2021
                                         )  1:16 p.m.
7                   Defendants.          )

8

                 TRANSCRIPT OF PROCEEDINGS - VOL. 5B
9        BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10   APPEARANCES:

11   For the Plaintiff:     RILEY SAFER HOLMES & CANCILA, LLP
                            BY:  MR. RONALD S. SAFER
12                               MR. ELI J. LITOFF
                                 MS. SANDRA L. MUSUMECI
13                               MR. MATTHEW C. CROWL
                                 MS. VALERIE BRUMMEL
14                          70 West Madison Street
                            Suite 2900
15                          Chicago, IL  60602

16   For the Defendant      GREENBERG TRAURIG, LLP
     City of Chicago:       BY:  MS. TIFFANY S. FORDYCE
17                               MR. KYLE L. FLYNN
                            77 West Wacker Drive
18                          Suite 3100
                            Chicago, IL  60601

19

20

21

22   Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 2318A
24                          Chicago, IL  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov

1262

```
 1   APPEARANCES (CONT'D):

 2   For the Individual      HALE & MONICO, LLC
     Officer Defendants:     BY:  MR. ANDREW M. HALE
 3                                MS. BARRETT E. BOUDREAUX
                                  MR. WILLIAM E. BAZAREK
 4                                MR. BRIAN J. STEFANICH
                                  MS. AMY A. HIJJAWI
 5                           53 West Jackson Boulevard
                             Suite 330
 6                           Chicago, IL  60604

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 01:16:33 | 1 | (Proceedings heard in open court; jury out:) |
| 01:16:33 | 2 | THE COURT:  Have a seat, everybody. |
| 01:16:38 | 3 | One quick -- I'm bringing the jury down.  One quick |
| 01:16:43 | 4 | comment before we get rolling.  You know, some of the |
| 01:16:45 | 5 | testimony is cumulative.  I'm going to give one example.  I'm |
| 01:16:49 | 6 | not picking on anybody in particular.  You know, the point |
| 01:16:51 | 7 | about the interrogatory answers being inaccurate, incomplete, |
| 01:16:55 | 8 | you know, we hit that point quite a bit.  And after you said |
| 01:16:59 | 9 | it a number of times, I thought, boy, the target has been |
| 01:17:04 | 10 | annihilated.  I'm not sure we need anything else on that. |
| 01:17:06 | 11 | I like being good to lawyers and giving you guys |
| 01:17:09 | 12 | space and giving you room.  You know, you guys try your cases. |
| 01:17:11 | 13 | I'm not trying your case.  You certainly made your point |
| 01:17:14 | 14 | effectively. |
| 01:17:16 | 15 | Defense counsel, you've made some effective points, |
| 01:17:18 | 16 | too, along the way.  I don't mean it like that. |
| 01:17:20 | 17 | But I would just say, be mindful of the clock. |
| 01:17:25 | 18 | That's all.  I'm not inclined to tell people to move on, |
| 01:17:28 | 19 | because you guys have all sorts of trial strategy reasons, but |
| 01:17:33 | 20 | it's just a little -- a little bit of feedback.  There are a |
| 01:17:36 | 21 | couple of areas where I think you could make your point and |
| 01:17:38 | 22 | move on.  Okay?  So . . . |
| 01:17:42 | 23 | That's a modest, light suggestion; it's not a ruling. |
| 01:17:47 | 24 | Okay. |
| 01:17:48 | 25 | MS. BOUDREAUX:  Thank you, Your Honor. |

1264

01:17:48   1          THE COURT:  I assume we have don't have any

01:17:49   2   housekeeping matters to cover?

01:17:54   3          MR. CROWL:  The only thing, Judge, is, as Your Honor

01:17:58   4   asked, we checked.  We will -- we need more time to put all of

01:18:03   5   the exhibits together and make sure that they're absolutely

01:18:05   6   right.  So we will fly someone down to make sure -- Your Honor

01:18:10   7   is right.  We don't want to have to rely on FedEx or anyone

01:18:14   8   else.  We'll fly somebody down with the exhibits to be

01:18:17   9   wherever they need to be.  I assume the courthouse in Little

01:18:19  10   Rock.

01:18:20  11          And then I had a question as to whether or not the

01:18:23  12   associate or person who does that could at least be in the

01:18:27  13   courtroom or the room at the time just to observe, just to

01:18:31  14   make sure that there isn't anything happening like -- on the

01:18:36  15   phone call, at least, it sounded like he was looking at

01:18:39  16   something, something like that.

01:18:40  17          THE COURT:  Thank you for that.  I assume that's

01:18:42  18   going to be fine.  I don't control that courthouse, but I

01:18:44  19   would expect, if I request it, it should be fine.  But thank

01:18:48  20   you for that.

01:18:49  21          MR. CROWL:  Thank you, Judge.

01:18:50  22          THE COURT:  And I will tell you, I hope you folks

01:18:51  23   know that you're -- I made the suggestion about the exhibits

01:18:56  24   because I want things to go smoothly.  It doesn't help anybody

01:19:01  25   if people are fumbling around on Monday.  It doesn't make you

01:19:03  1   guys look good.  It's not effective for the jury.  So that was

01:19:06  2   the spirit in which I made the suggestion about the exhibits.

01:19:08  3       I went everyone in the courtroom to have a smooth

01:19:11  4   presentation, get your evidence in, and let the jury make the

01:19:14  5   best decision they can because if the jury sees fumbling

01:19:17  6   around by anybody, they get grumpy.  And you don't want

01:19:20  7   grumpy, distracted jurors.  You want happy, listening,

01:19:23  8   attentive jurors.  So that was the spirit in which I made my

01:19:27  9   suggestion.  Okay?

01:19:27  10      MR. CROWL:  And we'll have to think through, Judge,

01:19:29  11  if -- whether or not the jurors are going to be seeing only

01:19:35  12  Defendant Oliver on their screen, how we publish the exhibits

01:19:39  13  that we may be using with him to the jury.

01:19:42  14      THE COURT:  Yeah.  So this is not the first rodeo.  I

01:19:48  15  am meeting with our IT guy after hours to figure out the

01:19:52  16  logistics, and I'll circle back with you folks.

01:19:54  17      I don't honestly know.  I don't know if it's a split

01:19:58  18  screen.  I don't know how we do it.  You know, I don't know

01:20:03  19  how many exhibits you have.  I expect to be in a position to

01:20:06  20  report back to you folks on that tomorrow, hopefully.  Okay?

01:20:10  21      MR. CROWL:  Thank you, Judge.

01:20:19  22      Judge, one more housekeeping.  I assume that the jury

01:20:23  23  has already been called or will be called shortly?

01:20:24  24      THE COURT:  I waved them down before I came in the

01:20:25  25  room here.  So they should be good.

Pesavento - redirect by Safer

1266

1    Can it wait?

2    MR. CROWL:  Yes.

01:20:35   3    (Jury in.)

01:20:35   4    THE COURT SECURITY OFFICER:  All rise.

01:20:37   5    THE COURT:  Officer Pesavento, you can come on back,

01:21:03   6    please.

01:21:03   7    Have a seat, everybody.  I hope you had a good lunch.

01:21:06   8    I hope it was less eventful than mine.  On a personal note, we

01:21:10   9    were upstairs grabbing a quick bite and the fire alarm went

01:21:14   10   off on our floor.  So we had to get evacuated.  We spent the

01:21:16   11   better part of the lunch hour on a different floor, but I'm

01:21:20   12   happy to report we're all present and accounted for, and we're

01:21:22   13   ready to go.  I hope you folks got a break.

01:21:24   14   And, Counsel and Officer Pesavento, when you folks

01:21:29   15   are ready, we'll get rolling.

16   ANGELO PESAVENTO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

01:21:34   17   REDIRECT EXAMINATION (CONT'D)

01:21:34   18   BY MR. SAFER:

01:21:35   19   Q.  Ready, sir?

01:21:35   20   A.  Yes.

01:21:36   21   Q.  Okay.  You told the jury yesterday about information that

01:21:45   22   Officer Oliver told you he got from the FBI?

01:21:50   23   A.  Yes.

01:21:51   24   Q.  Now, as you have testified, any relevant information has

01:21:57   25   to be written in a report and kept in the investigative file,

Pesavento - redirect by Safer

1267

01:22:01   1   correct?

01:22:01   2   A.   Correct.

01:22:03   3   Q.   Now, you know that there is nothing in the investigative

01:22:09   4   file that says anything about the "FBI," using that term,

01:22:13   5   correct?

01:22:14   6   A.   Actually, I thought there was something in there.

01:22:18   7   Q.   Okay.  So you want to look through -- unless counsel will

01:22:28   8   stipulate, if you could look through and stop when you say --

01:22:33   9   when you find "FBI" in there.

01:22:39   10              THE COURT:  Counsel, for the record, what document

01:22:40   11   have you tendered to --

01:22:43   12              MR. SAFER:  Joint Trial Exhibit 4.

01:22:47   13              THE COURT:  Thank you.

01:22:47   14              MS. BOUDREAUX:  Judge, I'll stipulate to it.

01:22:49   15              THE COURT:  Okay.  Let's go ahead and recount the

01:22:51   16   stipulation on the record, if you would, please.  The

01:22:53   17   stipulation is that -- Ms. Boudreaux, the stipulation is

01:22:56   18   that --

01:22:56   19              MS. BOUDREAUX:  Is that the term "FBI" does not

01:22:59   20   appear in the investigative report.

01:23:02   21              THE COURT:  Does that satisfy you, Mr. Safer?

01:23:05   22              MR. SAFER:  Yes, Your Honor.

01:23:06   23              THE COURT:  Okay.  With that, we'll save some time.

01:23:09   24   Thank you, Counsel.

01:23:09   25   BY MR. SAFER:

Pesavento - redirect by Safer

1268

01:23:10    1    Q.   You testified in the grand jury about the evidence that

01:23:11    2    you had against Mr. Bolden, correct?

01:23:13    3    A.   Correct.

01:23:14    4    Q.   You said nothing about any information from the FBI, did

01:23:20    5    you?

01:23:20    6    A.   I don't -- I don't recall what my grand jury testimony

01:23:24    7    was.

01:23:24    8    Q.   And on the contrary, do you recall that we discussed it

01:23:28    9    yesterday, and you said that all of your information came from

01:23:32   10    Clifford Frazier?

01:23:33   11    A.   Yes.

01:23:38   12    Q.   Now, you -- you were shown by your counsel the 290 pages

01:23:44   13    of -- of deposition that you took in this case?

01:23:50   14    A.   Yes.

01:23:51   15    Q.   You said nothing in that entire deposition about any

01:23:56   16    information from the FBI, did you?

01:23:58   17    A.   I don't recall.

01:24:00   18    Q.   You were asked at your deposition:  "Please describe all

01:24:09   19    the evidence that you relied upon to arrest Eddie Bolden in

01:24:13   20    February 1994."  And you said nothing about the FBI; isn't

01:24:19   21    that correct?

01:24:19   22    A.   The FBI wasn't -- we didn't get information about them

01:24:22   23    that caused us to arrest Eddie Bolden.

01:24:24   24    Q.   Yeah.  Right.  Because -- let's look at -- and I want to

01:24:31   25    highlight that because I wanted to go over what you said

Pesavento - redirect by Safer

1269

01:24:36    1  yesterday.

01:24:36    2          MR. SAFER:  Let's look at Joint Trial Exhibit 13,

01:24:39    3  please.

            4  BY MR. SAFER:

01:24:44    5  Q.  This is the in-custody report.  Do you -- do you recognize

01:24:50    6  that?

01:24:50    7  A.  Yes.

01:24:50    8  Q.  And it is -- it's written by Detective Karl, and you are

01:25:00    9  also a reporting officer there, right?

01:25:02   10  A.  Yes.

01:25:04   11          MR. SAFER:  And now if we could back up to the next

01:25:06   12  page, please, Jim.

01:25:08   13  BY MR. SAFER:

01:25:08   14  Q.  Okay.  Let's describe what this is.

01:25:11   15          MR. SAFER:  Can we put two pages on the same screen,

01:25:14   16  please.  And then we'll zoom in a minute.  The second and

01:25:18   17  third pages.

01:25:20   18  BY MR. SAFER:

01:25:21   19  Q.  So what this describes, sir, is the events leading up to

01:25:27   20  and including the lineup, correct?

01:25:30   21  A.  I haven't read it.

01:25:35   22  Q.  Okay.  Feel free to read it.

01:25:37   23  A.  Okay.  I've read the two pages.

01:26:11   24  Q.  Okay.  This -- this report is describing how you

01:26:17   25  identified Eddie Bolden and then leading up to the lineup,

Pesavento - redirect by Safer

1270

01:26:21  1  correct?

01:26:21  2  A.  Yes.

01:26:22  3  Q.  And you testified yesterday -- and, really, that -- so

01:26:28  4  there are a bunch of events that happened, and in this report,

01:26:32  5  it details the dates of these events.  Like, on the 3rd of

01:26:41  6  February, you had the photo array, right?

01:26:43  7  A.  Yes.

01:26:44  8  Q.  And then on the 6th of February, you talked to James

01:26:50  9  Williams, correct?

01:26:51  10  A.  Correct.

01:26:54  11  Q.  And it details things that happened on specific days,

01:26:57  12  correct?

01:26:58  13  A.  Yes.

01:26:58  14  Q.  That introductory paragraph, the "in conjunction"

01:27:05  15  paragraph -- do you see where it says that right at the

01:27:07  16  beginning?

01:27:07  17  A.  Yes.

01:27:08  18  Q.  That's just an -- like an introduction to this, right?

01:27:14  19  A.  I don't know what you mean by that.

01:27:16  20  Q.  What I mean is, it talks about how, in conjunction with

01:27:22  21  these officers, you learned the following things that you've

01:27:28  22  detailed in the report, right?

01:27:29  23  A.  Yes.

01:27:30  24  Q.  This does not refer to any specific event or interview or

01:27:38  25  information, correct?

Pesavento - redirect by Safer

1271

| | | |
|---|---|---|
| 01:27:40 | 1 | A.  Correct. |
| 01:27:41 | 2 | Q.  Now, you testified that this signified that yesterday, |
| 01:27:52 | 3 | contrary to what you just said, that Officer Oliver told you |
| 01:27:57 | 4 | that someone in the FBI told him something. |
| 01:28:02 | 5 | Do you recall that testimony? |
| 01:28:03 | 6 | A.  Yes. |
| 01:28:04 | 7 | Q.  You don't know when Officer Oliver talked to somebody at |
| 01:28:10 | 8 | the FBI, do you? |
| 01:28:11 | 9 | A.  No, I don't. |
| 01:28:12 | 10 | Q.  You don't know who he talked to at the FBI, do you? |
| 01:28:15 | 11 | A.  That's correct. |
| 01:28:16 | 12 | Q.  You don't know what the source of the information that the |
| 01:28:21 | 13 | person had from the FBI, do you? |
| 01:28:23 | 14 | A.  Correct. |
| 01:28:25 | 15 | Q.  So you don't know where anybody got any information, |
| 01:28:30 | 16 | correct? |
| 01:28:33 | 17 | A.  True. |
| 01:28:34 | 18 | Q.  So -- |
| 01:28:35 | 19 | A.  Yes. |
| 01:28:36 | 20 | Q.  -- that information is worthless to you, isn't it?  I |
| 01:28:41 | 21 | mean, you have to know -- |
| 01:28:43 | 22 | A.  No, it's not. |
| 01:28:44 | 23 | Q.  -- you have to know where it came from, don't you? |
| 01:28:47 | 24 | A.  If another policeman working in this case gives me some |
| 01:28:54 | 25 | information, I don't -- I don't disregard it completely. |

Pesavento - redirect by Safer

1272

01:28:57 1  Q.  You put it down.  First, if they give you some specific

01:29:01 2  information, you write it down, right?

01:29:03 3  A.  Possibly.

01:29:04 4  Q.  If it's worth something to you, you write it down?

01:29:07 5  A.  Possibly.  Not everything everybody tells you is -- I

01:29:12 6  write down and then make a supplementary report on it.

01:29:15 7  Q.  If you have no idea where -- and I understand, you don't

01:29:25 8  dis- -- necessarily just disregard what other officers tell

01:29:29 9  you.

01:29:30 10          But the question is simple.  If you have no idea who

01:29:37 11  is saying what or what the basis of their knowledge is, you

01:29:44 12  can't put any weight on it as a detective, can you?

01:29:47 13  A.  No, you can.

01:29:50 14  Q.  You can?

01:29:51 15  A.  Yes, if you -- because you don't have firsthand knowledge

01:29:57 16  of where they got the information, it doesn't mean that the

01:30:00 17  information is false or --

01:30:02 18  Q.  Well, who provided Mr. Oliver with that information?  What

01:30:07 19  person?

01:30:08 20  A.  I don't know.

01:30:09 21  Q.  What person provided the information to the person with

01:30:15 22  whom Oliver talked?

01:30:18 23  A.  I have no idea.

01:30:19 24  Q.  How did that person learn whatever they learned?

01:30:26 25  A.  I don't know.

Pesavento - redirect by Safer

1273

01:30:27　　1　Q.　But you put value in that information?

01:30:31　　2　A.　It could have value, yes.

01:30:35　　3　　　　　　MR. SAFER:　Thank you, sir.　No further questions.

01:30:38　　4　　　　　　THE COURT:　Okay.　You may step down.　Thank you.

01:30:40　　5　　　(Witness excused.)

01:30:47　　6　　　　　　THE COURT:　All right.　Counsel, you can call your

01:30:48　　7　next witness when you're ready.

01:30:50　　8　　　　　　MR. SAFER:　Thank you, Your Honor.

01:30:50　　9　　　　　　We call Charles Ingles.

01:31:06　10　　　　　　THE COURT:　Folks, it usually takes a minute when we

01:31:08　11　get a new witness.　There's a reason for that.　You typically

01:31:10　12　don't have a party -- excuse me -- a witness listen to what

01:31:16　13　another witness has had to say.　The exception is parties.

01:31:19　14　Parties are free to be here at any time.　But that's why this

01:31:21　15　person was not already in the courtroom.　They're not supposed

01:31:24　16　to be here in the meantime.

01:31:35　17　　　　　　Good afternoon, sir.　Come on up.　Come on over to my

01:31:38　18　left.

01:31:45　19　　　　　　Watch your step there, sir.　There are two steps.

01:31:49　20　Come on up.　Can you please raise your right hand.

01:31:53　21　　　(Witness sworn.)

01:31:59　22　　　　　　THE COURT:　All right.　Good afternoon.　Watch your

01:32:01　23　step there.　Step on down.　Take a seat, please.

01:32:04　24　　　　　　THE WITNESS:　Thank you.

01:32:05　25　　　　　　THE COURT:　And if you need it, there's a pitcher of

Ingles - direct by Safer

1274

01:32:07  1   water there.  You can help yourself.

01:32:09  2              THE WITNESS:  Thank you.

01:32:11  3              THE COURT:  Counsel, whenever you're ready.

01:32:12  4              MR. SAFER:  Thank you, Your Honor.

01:32:16  5              THE COURT:  And, sir, we've got an arrangement here.

01:32:20  6   You're free to take off your mask.  That way you can better

01:32:24  7   communicate both with the lawyer and the jury.  Okay?

01:32:27  8              THE WITNESS:  Yes.  Thank you.

01:32:27  9              THE COURT:  Everyone else will wear a mask, but we

01:32:30  10  want to hear from you today, so you're going to be --

01:32:32  11             THE WITNESS:  I've got all my shots.

01:32:33  12             THE COURT:  I'm sorry?

01:32:34  13             THE WITNESS:  I've had all my shots, including the

01:32:34  14  booster, so I'm fine.

01:32:35  15             THE COURT:  Well, me, too.  Well, that's good.  So

01:32:36  16  you can go ahead and answer the lawyer's questions now.  Thank

01:32:41  17  you.

          18             CHARLES INGLES, PLAINTIFF'S WITNESS, DULY SWORN

01:32:42  19                        DIRECT EXAMINATION

01:32:42  20  BY MR. SAFER:

01:32:42  21  Q.  Good afternoon, Mr. Ingles.

01:32:43  22  A.  Good afternoon, sir.

01:32:44  23  Q.  Would you state your name and please spell your name for

01:32:47  24  the record.

01:32:48  25  A.  Charles Ingles.  Charles, common spelling.  Ingles,

Ingles - direct by Safer

1275

01:32:54  1    I-n-g-l-e-s.

01:32:56  2    Q.  Where do you live, Mr. Ingles?

01:32:57  3    A.  I live in Florida.

01:32:59  4    Q.  And with whom do you live?

01:33:00  5    A.  I live with my wife, and I have my youngest daughter

01:33:04  6    living with us temporarily.

01:33:06  7    Q.  How long have you been married?

01:33:07  8    A.  51 years this Sunday.

01:33:11  9    Q.  Oh.  Happy anniversary.

01:33:14  10   A.  Thank you.

01:33:15  11   Q.  And could you describe for the jury your family.

01:33:17  12   A.  Well, my oldest daughter's name is Jayne Ingles.  She's a

01:33:22  13   lawyer who took over the law firm after I semi-retired.

01:33:27  14        I have a son named Robert Ingles, who is 39 years

01:33:32  15   old, and he also works -- he's a lawyer.  He works at the law

01:33:36  16   office.

01:33:36  17        And my daughter Jackie who is with us temporarily

01:33:40  18   just took her bar exam, and she passed it, and she'll be sworn

01:33:45  19   in on November the 10th here in Illinois.

01:33:50  20   Q.  The holiday -- holidays must be lively conversations.

01:33:55  21        What did you do before you retired, sir?

01:33:57  22   A.  I had practiced law in Illinois for 42 years.

01:34:05  23   Q.  And what kind of law did you practice?

01:34:07  24   A.  It was almost predominantly criminal defense work.

01:34:11  25   Q.  Where did you practice?

Ingles - direct by Safer

1276

01:34:12  1    A.   Mostly Cook County.

01:34:15  2    Q.   Do you know Eddie Bolden?

01:34:18  3    A.   I do.

01:34:19  4    Q.   How do you know him?

01:34:20  5    A.   He was a client of mine at one time.

01:34:24  6    Q.   And how did he become your client?

01:34:28  7    A.   He had heard of me or found me somehow, and -- him or his

01:34:33  8    mother.  I received a phone call on my business line that two

01:34:41  9    detectives had come out to his mother's house.  They were from

01:34:45  10   Area 2 homicide.  They wanted to have a conversation with

01:34:51  11   Eddie.  They left a card with their name and phone number on

01:35:00  12   it.

01:35:00  13   Q.   And then did you speak with Mr. Bolden?

01:35:02  14   A.   I did.

01:35:02  15   Q.   And as a result of that conversation, what was your

01:35:05  16   assignment?

01:35:06  17   A.   We agreed in our lawyer-client relationship.  And based on

01:35:15  18   that, I made a phone call to a Detective Karl who was the

01:35:22  19   detective on the business card, I believe, and tried to make

01:35:25  20   an arrangement to set up an appointment for an interview.

01:35:33  21   Q.   And did you schedule a time?

01:35:34  22   A.   We did.

01:35:34  23   Q.   Did that get rescheduled?

01:35:36  24   A.   I'm sorry?

01:35:37  25   Q.   Did that get rescheduled?

Ingles - direct by Safer

1277

01:35:39    1    A.   It did.   It was supposed to be on a Wednesday, and then it

01:35:42    2    got rescheduled to a Friday.

01:35:43    3    Q.   And who rescheduled it?

01:35:45    4    A.   The police did.

01:35:47    5    Q.   And then what happened with that date?

01:35:49    6    A.   And then they rescheduled it again.

01:35:51    7    Q.   And to when?

01:35:54    8    A.   To the following day, Saturday morning.

01:35:57    9    Q.   Okay.   So on that Saturday, February 26th, 1994, did you

01:36:02   10    have a time for the appointment?

01:36:03   11    A.   9:00 o'clock in the morning.

01:36:05   12    Q.   And where did you go?

01:36:07   13    A.   I went to 737 East 111th Street, which is the 5th District

01:36:15   14    police station.   And on the second floor is the Area 2

01:36:21   15    homicide area.

01:36:22   16    Q.   And approximately what time did you arrive?

01:36:27   17    A.   About five to 9:00.

01:36:30   18    Q.   And what happened when you got there?

01:36:32   19    A.   I was with Eddie.   I went up to the front desk to check in

01:36:37   20    with the desk sergeant.   I let him know who I was, that I was

01:36:42   21    an attorney, and that I was there with my client, and that we

01:36:46   22    had an appointment for an interview with Detective Karl.

01:36:49   23    Q.   And what happened then?

01:36:52   24    A.   He told us to have a seat.   We took a seat on a metal

01:36:56   25    bench.   And about 5 or 10 minutes, Detective Karl came down

Ingles - direct by Safer

1278

01:37:01  1  from the second floor and they got us and said come on

01:37:09  2  upstairs.

01:37:10  3  Q.  So I'm going to show you what's been marked as Joint

01:37:14  4  Exhibit 7, which has been admitted into evidence, and ask you

01:37:18  5  if you recognize what's shown there.

01:37:23  6  A.  I do.

01:37:23  7  Q.  What is that?

01:37:24  8  A.  That's Area 2 up on the second floor at 737 East 111th

01:37:34  9  Street.

01:37:34  10  Q.  And that day, were there a lot of people around?

01:37:37  11  A.  No, it was like -- it was like a school room, empty, just

01:37:44  12  desks.  And these were not the desks that were there at the

01:37:47  13  time.  They were wooden desks that had typewriters on them.

01:37:52  14  Q.  As opposed to computers?

01:37:53  15  A.  Yes.

01:37:54  16  Q.  And what other detectives other than Detective Karl did

01:38:03  17  you see up there that day?

01:38:04  18  A.  The whole time that I was there, I saw what I thought were

01:38:07  19  four detectives.  I saw two white detectives, was Karl and

01:38:17  20  Pesavento, and I saw two black detectives coming and going,

01:38:20  21  passing by while I was there.

01:38:22  22  Q.  Who brought -- you said Detective Karl brought you

01:38:27  23  upstairs.  And where did he bring you?

01:38:29  24  A.  Detective Karl brought us upstairs.  We went through the

01:38:37  25  double door, which you can't see from this photo.  Basically

Ingles - direct by Safer

1279

| | | |
|---|---|---|
| 01:38:42 | 1 | we stood in the aisle that's -- the aisle that comes in |
| 01:38:48 | 2 | through.  There's an aisle going this way (indicating) if you |
| 01:38:53 | 3 | compare it to this photo, and we stood in that aisle. |
| 01:38:55 | 4 | Q.  You're saying an aisle that's perpendicular to this aisle? |
| 01:38:59 | 5 | A.  It is. |
| 01:39:00 | 6 | Q.  And what did you do while you were standing there? |
| 01:39:06 | 7 | A.  We were just standing around.  They said that they were |
| 01:39:11 | 8 | waiting for some witness, or something to that effect.  And so |
| 01:39:15 | 9 | I went around into one of the rooms that would be over on this |
| 01:39:22 | 10 | side and got myself a Styrofoam cup of coffee.  And I was |
| 01:39:29 | 11 | standing out there with Eddie.  We were just standing in the |
| 01:39:32 | 12 | aisle.  I was drinking a coffee. |
| 01:39:34 | 13 | Q.  And what happened then? |
| 01:39:35 | 14 | A.  Oh, about ten minutes later, a black detective came up, |
| 01:39:46 | 15 | and he had two guys with him, two black males.  One was a |
| 01:39:52 | 16 | bigger guy.  He had on Army fatigue jacket.  And then a |
| 01:39:55 | 17 | smaller, thinner -- I think it was even lighter skinned guy |
| 01:40:01 | 18 | who had on a dark -- a dark blue jacket. |
| 01:40:04 | 19 | Q.  And what happened then? |
| 01:40:05 | 20 | A.  Well, in order for them to get by us, because these aisles |
| 01:40:09 | 21 | are not that wide and we weren't pinned against the wall or |
| 01:40:12 | 22 | against any of the desks, we had to move aside a little, and |
| 01:40:15 | 23 | they moved aside a little, and they passed us.  They looked at |
| 01:40:20 | 24 | us.  We looked at them. |
| 01:40:22 | 25 | And then they went around the corner.  And as the big |

Ingles - direct by Safer

1280

01:40:26  1    guy in the Army jacket went around the corner, he turned back

01:40:30  2    and looked at us again, and then went into the room where I

01:40:35  3    had gotten the coffee out of, and they closed that door.

01:40:37  4    Q.   And later did you see who that -- did you see that larger

01:40:41  5    man again that day?

01:40:43  6    A.   I'm sorry?

01:40:45  7    Q.   Did you see that larger man again that day?  Who was he?

01:40:49  8    A.   I saw him again.

01:40:50  9    Q.   And who was he?  Not name, but --

01:40:56  10   A.   Oh, you mean the larger man in the fatigue jacket?

01:41:01  11   Q.   Yes.

01:41:01  12   A.   I did see him again.

01:41:02  13   Q.   And how -- when did you see him again?

01:41:05  14   A.   As they were about to conduct the lineup, they put him

01:41:10  15   into the viewing room.

01:41:11  16   Q.   Okay.  Now, shortly after those gentlemen passed, what

01:41:22  17   happened then?

01:41:22  18   A.   Shortly after they went by?

01:41:24  19   Q.   Yes.

01:41:25  20   A.   We were still standing there.

01:41:27  21   Q.   And did they --

01:41:28  22   A.   They were in the room and the door was closed.  And about

01:41:32  23   5 or 10 minutes later, Detective Karl came out and said, "We

01:41:38  24   want to put your client into an interview room and ask him a

01:41:44  25   couple questions.  We're not going to lock him up on the wall

Ingles - direct by Safer

1281

01:41:48   1   or put handcuffs on him or anything."

01:41:50   2          So the three of us went into an interview room.  And

01:41:55   3   that interview room is along this wall right here

01:41:58   4   (indicating).

01:42:00   5   Q.  I think if we show you Plaintiff's Trial Exhibit 29, which

01:42:07   6   I believe is in evidence.

01:42:08   7   A.  There you go.

01:42:09   8   Q.  Is that the interview room?

01:42:11   9   A.  That sure looks like it.

01:42:12   10  Q.  Okay.  Now -- okay.  And who was with you in the interview

01:42:19   11  room?

01:42:19   12  A.  Myself and Eddie and Detective Karl.

01:42:23   13  Q.  And what did Detective Karl say to you and Mr. Bolden, and

01:42:28   14  what did you and Mr. Bolden say to him?

01:42:30   15  A.  We told him that Eddie had nothing to do with this, that

01:42:36   16  he had been in a fish store.  He was playing a video game.

01:42:43   17  That several people were there.  There's witnesses that

01:42:47   18  somebody came in, I believe he was wounded, and Eddie went to

01:42:51   19  the pay phone and made the 911 call.

01:42:56   20         We told him that he's willing to take a lie detector

01:43:02   21  test to that.  We told him if he would just get the 911 CAD by

01:43:12   22  subpoena or whatever, you'd be able to listen in on or read

01:43:18   23  who called in, and I'm sure Eddie's name would have been on

01:43:22   24  it.

01:43:22   25  Q.  And what did Detective Karl say to you?

Ingles - direct by Safer

1282

01:43:24  1  A.  He didn't say a whole lot.  He just said, okay, well,

01:43:28  2  we're going to leave your client in here temporarily, and he

01:43:31  3  left out.  And I left out of the room and stood on the out --

01:43:37  4  pretty much on the outside of that door, leaning with my

01:43:41  5  behind up against one of the desks.

01:43:45  6  Q.  And what happened then?

01:43:46  7  A.  Oh, about another ten minutes or so, Detective Karl came

01:43:54  8  back and said, "Would your client be willing to stand in a

01:43:59  9  lineup?"

01:44:01  10       And I said, "Well, let me go ask him."

01:44:04  11       So I went back into the room, sat down with Eddie,

01:44:08  12  explained to him --

01:44:09  13       THE COURT:  Excuse me, sir, I'm sorry to interrupt

01:44:10  14  you.  We refer to last names.  So instead of Eddie, let's

01:44:16  15  call --

01:44:16  16       THE WITNESS:  Eddie Bolden.

01:44:17  17       THE COURT:  Everybody knows what you mean.  I have a

01:44:20  18  standing rule that we refer to people by their last names.  So

01:44:23  19  let's refer to him as Mr. Bolden.

01:44:25  20       THE WITNESS:  Yes, sir.

01:44:25  21       THE COURT:  You didn't do anything wrong here.  I'm

01:44:28  22  just telling you the ground rules here.

01:44:29  23       So I'm sorry to interrupt you.  Why don't you go

01:44:31  24  ahead and reorient your witness, Mr. Safer, and then he can

01:44:35  25  continue with his answer.

Ingles - direct by Safer

1283

01:44:37   1   BY THE WITNESS:

01:44:37   2   A.   So I went in, and I sat down with Mr. Bolden.  And I

01:44:41   3   explained to him the ramifications of a lineup, that they'll

01:44:46   4   try to bring in four, five, or six people out of their lockup

01:44:52   5   that they have down in the 5th District that resemble you as

01:44:56   6   close as they can, and they're going to intersperse you

01:44:59   7   somewhere in among them.  Then they're going to have someone

01:45:02   8   come into the interview room and -- I mean to the viewing room

01:45:07   9   and look through a two-way mirror.  You won't be able to see

01:45:11  10   them, but they'll be able to see you.

01:45:13  11        And I said, if they allow me to be in that viewing

01:45:16  12   room so I can see and listen and observe what the witness is

01:45:24  13   actually doing or saying or trying to -- whether he's being

01:45:28  14   coached or whatever, would you be willing to do so?  And he

01:45:31  15   said yes.

01:45:33  16   Q.   And then did you -- what did you do with that information?

01:45:37  17   A.   I went back out.  I told Detective Karl that if I'm

01:45:41  18   allowed to be present in the viewing room during the

01:45:47  19   interview, Eddie -- Mr. Bolden --

01:45:50  20        THE WITNESS:  Excuse me, Judge.

          21   BY THE WITNESS:

01:45:51  22   A.   -- would be willing to stand in the lineup.

01:45:55  23   BY MR. SAFER:

01:45:55  24   Q.   And what did -- and who did you say that to?

01:45:58  25   A.   Detective Karl.

Ingles - direct by Safer

1284

01:45:59  1    Q.  And what did Detective Karl say to you?

01:46:01  2    A.  He agreed.  He said that's fine, we'll do that.

01:46:05  3    Q.  Now, Mr. Ingles, did Mr. Bolden have to -- was he

01:46:13  4    obligated to go into that lineup?  Was he under arrest?

01:46:17  5    A.  He was not under arrest, and to the best of my knowledge,

01:46:21  6    they had -- this was not a turn-in, what I did.  This was not

01:46:26  7    where there was a warrant out for him or an investigative

01:46:30  8    alert.  He went there voluntarily for purposes of an

01:46:35  9    interview.  And I don't believe that he had to stand in that

01:46:37  10   lineup, but he was adamant that he hadn't done nothing, he was

01:46:42  11   innocent, he'll stand in the lineup, he'll take a lie detector

01:46:48  12   test, and that was it.

01:46:48  13   Q.  And since Mr. Bolden was not under arrest, did you have a

01:46:55  14   legal right, you, as a lawyer, have a legal right to be -- to

01:46:59  15   witness it?

01:47:02  16   A.  I don't understand, sir.

01:47:03  17   Q.  You did not have a legal right to be there, right?  So

01:47:08  18   he's not in custody, so right to counsel hasn't detached, so

01:47:12  19   you don't have a legal right -- they don't have to let you in

01:47:17  20   there, right?

01:47:21  21        All right.  Let's --

01:47:23  22   A.  Under the circumstances, yes, they do.

01:47:25  23   Q.  Only because they agreed, right?

01:47:27  24   A.  Because they weren't forcing the lineup, and that was part

01:47:31  25   of the agreement.

Ingles - direct by Safer

1285

01:47:31   1   Q.   Right.   Okay.   And so what happened then?

01:47:37   2   A.   So they had the people in the lineup room, and then they

01:47:44   3   brought Eddie out and put him into the lineup room and closed

01:47:51   4   that door.

01:47:52   5        And then the black detective who had brought the male

01:47:59   6   black with the Army fatigue jacket came out of that room with

01:48:06   7   Detective Karl now, the three of them, and they went into the

01:48:12   8   viewing room.   And I was close by.   I was only ten feet away

01:48:19   9   at the most.   I got up and started to walk into the viewing

01:48:23  10   room.

01:48:24  11   Q.   And what happened then?

01:48:26  12   A.   Well, just when I -- when I got to the door, Detective

01:48:30  13   Pesavento stood in the doorway with his arms folded between

01:48:37  14   the door jambs, and looked down on me a little and said,

01:48:44  15   "Where do you think you're going?"

01:48:46  16   Q.   And what did you say?

01:48:47  17   A.   I said, "I'm going in to view the lineup.   You guys

01:48:51  18   promised that if we did the lineup, I could be present."

01:48:54  19   Q.   And what did he say to you?

01:48:55  20   A.   He said, "You're present."

01:48:59  21   Q.   And what did you do then?

01:49:00  22   A.   There wasn't a lot I could do.   I was pretty angry.   I

01:49:06  23   used a few comments for him.   I told him he was a liar and

01:49:11  24   that he was a very bad man, and I was very upset about it.

01:49:18  25   Q.   And what happened then?

Ingles - direct by Safer

1286

01:49:20  1    A.  I still waited there.  And then when the lineup was

01:49:26  2    conducted and finished, they brought Eddie out of the -- I

01:49:31  3    think they -- I think they brought the witness out with Karl

01:49:36  4    and the black detective.  Then they brought Eddie out and put

01:49:41  5    him on a desk, his hands, and they said, "You're under

01:49:46  6    arrest."  They patted him down, put his hands behind his back,

01:49:51  7    handcuffed him, and took him out.

01:49:54  8    Q.  And what did you do then?

01:49:56  9    A.  I left.

01:50:00  10   Q.  Were you present for any interview by Mr. Bolden with a

01:50:06  11   state's attorney?

01:50:07  12   A.  Never.

01:50:08  13   Q.  And why didn't you wait for the state's attorney to come?

01:50:12  14   A.  Well, in Illinois, back then, the Felony Review unit that

01:50:19  15   comes out to police stations to approve felony charges, they

01:50:25  16   have 72 hours -- now it's 48 now -- but back then it was

01:50:33  17   72 hours for them to get to the police station, interview

01:50:35  18   people, and approve charges.

01:50:39  19        There's no way to gauge when or if they're ever going

01:50:43  20   to come that day, the next day, or even the next day or 2:00

01:50:47  21   in the morning.  You never know when they're going to get

01:50:51  22   there.

01:50:51  23   Q.  Were you --

01:50:52  24   A.  So that was it.  I just left.

01:50:54  25   Q.  Were you present for any other interview of Mr. Bolden

Ingles - direct by Safer

1287

01:50:58   1   other than the interview that you described with Officer Karl?

01:51:02   2   A.  No, I wasn't.

01:51:03   3   Q.  Did you represent Mr. Bolden after that?

01:51:05   4   A.  No, I did not.

01:51:06   5   Q.  Why not?

01:51:07   6   A.  Well, for one thing, I wasn't hired to go any further with

01:51:12   7   the case.  My job was to set up the interview, take him there,

01:51:19   8   protect his rights, make sure that he wasn't abused in any

01:51:25   9   way, and I did what I had to do, and I did it for him.

01:51:30   10          But when that ended, then came the next phase, which

01:51:34   11   would have been a bond hearing, a preliminary hearing,

01:51:44   12   arraignment, all of those other things are different things,

01:51:48   13   and I don't think the family could afford it to begin with.

01:51:50   14          MR. SAFER:  Your Honor, if I could have one moment.

01:51:52   15          THE COURT:  Yep.

01:51:53   16      (Counsel conferring.)

01:52:03   17          MR. SAFER:  Nothing else, Your Honor.  Thank you.

01:52:04   18          THE COURT:  We'll do a quick sidebar, if we can,

01:52:07   19   please.

01:52:08   20          Folks, we're doing a quick sidebar.  Relax for a

01:52:10   21   couple minutes.

01:52:15   22      (Proceedings heard at sidebar on the record.)

01:52:17   23          THE COURT:  Okay.  On the part about whether he had

01:52:33   24   the right to be here did not come in as cleanly as I had

01:52:37   25   hoped.  I think this illustrates the challenges the lawyers

01:52:42  1  face when you've got -- you're asking questions and people

01:52:45  2  have to abide by motions *in limine*.

01:52:48  3        I expected, and I think Mr. Safer expected, the

01:52:50  4  witness to say he did not have a right to be here but he -- to

01:52:54  5  be in the room, but he had an agreement to be in the room.

01:52:58  6        Mr. Hale had objected, and then Mr. Safer tried to

01:53:00  7  clean up the question by saying, in a leading way, in a way

01:53:06  8  that I appreciated, "You did not have the right" -- it was

01:53:10  9  suggested in a way that I appreciated -- "You did not have the

01:53:10 10  right to be there," and then he said, "Well, I did because

01:53:12 11  they agreed.

01:53:13 12        I question whether we need some cleanup work either

01:53:17 13  by you or by Mr. Hale or an instruction or a stipulation or

01:53:20 14  something to make clear for the record for everybody so the

01:53:22 15  jury is not confused, because nobody wants the jury confused,

01:53:28 16  that he did not have a constitutional right to be in the room,

01:53:31 17  but the testimony was that he had an agreement to be in the

01:53:33 18  room, or something to that effect.

01:53:34 19        I don't want anyone to have the misimpression, and

01:53:38 20  I'm sure everybody is on the same page, that he didn't have

01:53:38 21  the right to be there.

01:53:39 22        MR. SAFER:  I said that in opening.

01:53:42 23        THE COURT:  You said that in opening.  I don't want

01:53:43 24  you to be undermined by that either or anybody.  And I want

01:53:44 25  the jury to understand.

Ingles - direct by Safer

1289

01:53:45   1          Mr. Hale, you objected, so I'll let you speak first,

01:53:49   2   and then Mr. Safer.

01:53:49   3          MR. HALE:  Thank you, Your Honor.

01:53:50   4          I had the same concern you just articulated, and I

01:53:54   5   think the appropriate thing would be for Mr. Safer to just ask

01:53:57   6   that question about him not having a constitutional right to

01:54:00   7   be in the room because I think you'll get a more direct answer

01:54:03   8   to it.

01:54:04   9          MR. SAFER:  I'm afraid he can flip the answer,

01:54:08  10   Your Honor.  So I think it would be better -- we -- I think

01:54:10  11   you'd rather have, right, and we'd be happy to stipulate that

01:54:16  12   there was not a constitutional right for him to be there

01:54:18  13   because he wasn't under arrest.

01:54:20  14          THE COURT:  What I would propose --

          15          THE COURT REPORTER:  Microphone.

01:54:26  16          THE COURT:  I have the world's best court reporter.

01:54:28  17   I hope you can hear me.  There you go.

01:54:29  18          What I would propose is maybe a sentence or two

01:54:32  19   stipulation that you folks can read now before Mr. Hale takes

01:54:35  20   the floor or Ms. Boudreaux.  I don't know who is going next.

01:54:39  21          Okay.  I would like to clean that up.  Maybe you

01:54:43  22   folks can grab a notepad and just jot out a sentence or two

01:54:47  23   real quickly just so it's something you can read.

01:54:50  24          And I could read it or you could read it, whatever

01:54:52  25   you want.  If you want it to come from me so it looks neutral,

01:54:56  1  I can do that.  Yeah, so why don't you pencil out a quick

01:54:59  2  stipulation, and I'll read it.

01:55:02  3       MR. HALE:  One other thing, Judge.  He did -- once

01:55:06  4  you instructed him to use last names, the last two or three

01:55:10  5  times he used the name -- he said "Eddie."  Like after you

01:55:13  6  instructed him, he still used "Eddie" like three times after

01:55:16  7  that.

01:55:17  8       So I just want --

01:55:21  9       THE COURT:  I'll be mindful.  There were some

01:55:23  10 important questions, Mr. Safer, where I thought, boy, this is

01:55:26  11 too important to interrupt him on that.  I deliberately, very

01:55:30  12 deliberately injected myself in a kind of noninnocuous

01:55:35  13 question and answer because I want your testimony to come in

01:55:38  14 without interrupting any of you on anything.  So that's why I

01:55:42  15 injected myself when I did.

01:55:43  16      MR. SAFER:  And, Your Honor, I did instruct him.  It

01:55:47  17 is difficult.

01:55:48  18      THE COURT:  I get it.  And I certainly remember that

01:55:52  19 when you're an attorney, you're like dealing with horses in

01:55:56  20 the nicest possible way.  You only have so much control here,

01:56:01  21 right?  Right?  Everybody knows that.

01:56:03  22      So if you folks would be kind enough to -- if I walk

01:56:07  23 up onto this bench right now, everybody is going to think

01:56:10  24 we're ready to go.  So I'm just going to stay here, and we're

01:56:13  25 going to go off the record.  And maybe you could just stand

Ingles - direct by Safer

1291

01:56:18   1    here and keep me company for a minute.  But we will go off the

01:56:21   2    record and give those fast fingers a break.

01:56:23   3              So we're off the record.

01:56:25   4         (Off the record from 1:56 p.m. until 1:57 p.m.)

01:57:43   5              THE COURT:  We're back on the record before we go

01:57:46   6    back.

01:57:46   7              I'm going to read a stipulation into the record as

01:57:49   8    follows:

01:57:49   9              "Mr. Bolden did not have a constitutional right to

01:57:51   10   have an attorney present at the lineup because he was not

01:57:55   11   under arrest."

01:57:56   12             Is that acceptable to you, Mr. Safer?

01:57:58   13             MR. SAFER:  Yes.

01:57:58   14             THE COURT:  He said yes.  Okay.

01:58:00   15             Defense counsel?

01:58:00   16             MR. HALE:  Yes, Your Honor.

01:58:01   17             THE COURT:  So the battle plan, I'm going to go up

01:58:02   18   there, and I'm going to say, Mr. Safer, do you have any

01:58:04   19   further questions for your client.  You'll say no.  I'll say,

01:58:08   20   folks, we achieved a stipulation.

01:58:11   21             I always try to smooth it over with the jury to make

01:58:13   22   them feel like their time was not wasted.  So I'll say we

01:58:18   23   saved 15 minutes by having a five-minute break.  Okay?  My

01:58:22   24   goal on all this is to make the lawyers look good.  I hope you

01:58:26   25   guys are picking up on that by now.  I'm trying very hard --

01:58:27  1    I'll put the pressure on me.  I don't want people being grumpy

01:58:31  2    toward the lawyers.  So I'm making these efforts to make you

01:58:34  3    guys look -- all sides look good and take pressure off that.

01:58:47  4         (End of sidebar.)

01:58:47  5         THE COURT:  Okay, everybody.  Thank you for that.

01:58:49  6         I will tell you, sometimes it takes a few minutes to

01:58:51  7    sort a few things out, but it's a time-saving operation.  I

01:58:55  8    just saved probably 20 minutes of cross-examination by taking

01:58:58  9    a five-minute break where you got to stretch your legs.  So we

01:59:01  10   accomplished something even though it looked like it took some

01:59:04  11   time.  I'm telling you, we saved you some time here.

01:59:07  12        So, Mr. Safer, do you have any additional questions

01:59:10  13   for Mr. Ingles?

01:59:11  14        MR. SAFER:  I do not.  Thank you, Your Honor.

01:59:12  15        THE COURT:  Folks, I'm going to read into the record

01:59:15  16   a one-sentence stipulation.  When I say it's a stipulation,

01:59:18  17   that means it's an agreement both by Plaintiff Bolden and by

01:59:22  18   all of the defendants.

01:59:24  19        So it's a one-sentence stipulation.  The stipulation

01:59:28  20   is as follows:

01:59:29  21        Mr. Bolden did not have a constitutional right to

01:59:36  22   have an attorney present at the lineup because he was not

01:59:42  23   under arrest.

01:59:44  24        So let me say that one more time in case anyone is

01:59:46  25   jotting down notes.

Ingles - cross by Hale

1293

01:59:47  1        The stipulation from all parties is as follows:

01:59:51  2        Mr. Bolden did not have a constitutional right to

01:59:57  3   have an attorney present at the lineup because he was not

02:00:02  4   under arrest.

02:00:03  5        Okay?  With that, we will turn the floor over to

02:00:07  6   defense counsel.

02:00:14  7        MR. HALE:  Thank you, Your Honor.

02:00:15  8                    CROSS-EXAMINATION

02:00:15  9   BY MR. HALE:

02:00:16  10  Q.  Good afternoon, Mr. Ingles.

02:00:17  11       Can you hear me okay?

02:00:17  12  A.  Good afternoon to you, sir.

02:00:19  13  Q.  Can you hear me okay?  Can you hear me okay?

02:00:22  14  A.  I hear you fine, sir.

02:00:23  15  Q.  Okay.  So I want to walk through in a little more detail

02:00:28  16  some of the topics that were just covered.

02:00:31  17       You currently live in Florida; is that correct?

02:00:33  18  A.  Yes.

02:00:33  19  Q.  And how long have you been in Florida?

02:00:35  20  A.  Three years.

02:00:37  21  Q.  Three years.  And you came to Chicago to testify in this

02:00:41  22  trial, correct?

02:00:42  23  A.  That is correct.

02:00:44  24  Q.  Did the plaintiff's lawyers pay for you to come here?

02:00:48  25  A.  Excuse me?

Ingles - cross by Hale

1294

02:00:49  1   Q.  Did the plaintiff's lawyers pay for you to come here?

02:00:52  2   A.  They paid for my transportation only, not for food, room,

02:00:56  3   or board.

02:00:57  4   Q.  Transportation, meaning the airfare?

02:01:00  5   A.  Airfare and three limo rides.

02:01:05  6   Q.  Limo rides.

02:01:06  7   A.  Yeah.

02:01:07  8   Q.  Can you explain that?

02:01:07  9   A.  Well, I'm 55 miles away from Regional Southwest Airport,

02:01:13  10  so I needed a limo ride to get that airport.  And I'm going to

02:01:18  11  need one to get back when I get back to Regional Southwest

02:01:22  12  tomorrow.  And tomorrow, when I go back to O'Hare, I'm going

02:01:26  13  to need another limo ride.  I didn't need one from the airport

02:01:33  14  here because my son picked me up.

02:01:35  15  Q.  Okay.

02:01:36  16  A.  And I've been staying at my daughter's house, so she

02:01:40  17  provided me room and board.  That's it.

02:01:42  18  Q.  What's the approximate cost of your airfare and your limo

02:01:47  19  rides?

02:01:48  20  A.  Approximately $2,725.

02:01:54  21  Q.  Did you fly first class?

02:01:56  22  A.  Excuse me?

02:01:57  23  Q.  Did you fly first class?

02:01:59  24  A.  I flew first class here, and because I had to change

02:02:07  25  yesterday's flight -- I was supposed to be leaving today -- to

Ingles - cross by Hale

1295

| | | |
|---|---|---|
| 02:02:10 | 1 | tomorrow, I'm now flying in coach on the way back. |
| 02:02:13 | 2 | Q.   Okay.  So about $2,700 you're being paid by the |
| 02:02:17 | 3 | plaintiff's lawyers for your first class airfare and your four |
| 02:02:22 | 4 | limo rides; is that correct? |
| 02:02:23 | 5 | A.   That is correct. |
| 02:02:24 | 6 | Q.   Okay.  Did you meet with the plaintiff's lawyers before |
| 02:02:27 | 7 | you testified today to prepare for your testimony? |
| 02:02:30 | 8 | A.   We did it on the phone. |
| 02:02:33 | 9 | Q.   Have you met with the plaintiff's lawyers in person since |
| 02:02:36 | 10 | you've been in Chicago? |
| 02:02:37 | 11 | A.   Just in the room back there once I got here at 10:00 this |
| 02:02:46 | 12 | morning. |
| 02:02:46 | 13 | Q.   And you were here yesterday, too, right? |
| 02:02:48 | 14 | A.   Wrong. |
| 02:02:48 | 15 | Q.   You were not? |
| 02:02:49 | 16 | A.   No, I wasn't. |
| 02:02:50 | 17 | Q.   Did you meet with the lawyers this morning to prepare for |
| 02:02:52 | 18 | your testimony? |
| 02:02:53 | 19 | A.   I met with them, but we didn't go over my testimony this |
| 02:02:57 | 20 | morning. |
| 02:02:57 | 21 | Q.   Have you ever gone over your testimony with them? |
| 02:03:00 | 22 | A.   We went over it last night on the telephone. |
| 02:03:03 | 23 | Q.   And how long did that take? |
| 02:03:05 | 24 | A.   10, 15 minutes. |
| 02:03:08 | 25 | Q.   Did the plaintiff's attorneys ever send you any documents |

Ingles - cross by Hale

1296

02:03:10  1   to review?

02:03:11  2   A.   No.   We were on the telephone.

02:03:14  3   Q.   My question was ever.   Did they ever send you any

02:03:18  4   documents to review to prepare to testify in this court?

02:03:21  5   A.   I'm not sure where you're going with that.   Any documents?

02:03:26  6   Q.   Right, any documents --

02:03:28  7   A.   Like copies of the deposition that I took three years ago?

02:03:32  8   Q.   That's a document.   There's one.

02:03:35  9   A.   Okay.

02:03:36  10  Q.   All right.

02:03:37  11  A.   And also --

02:03:38  12  Q.   Let's pause.   Did they send you your deposition from three

02:03:41  13  years ago?

02:03:41  14  A.   I'm sorry.   I can't hear you.

02:03:43  15  Q.   Did they send you your deposition, the lawyers?

02:03:45  16  A.   They did.

02:03:45  17  Q.   When did they send you that?

02:03:48  18  A.   Oh, about a month ago.

02:03:51  19  Q.   And you read it, correct?

02:03:52  20  A.   I did.

02:03:53  21  Q.   Okay.   Did they send you any other documents to review?

02:03:58  22  A.   Yes.   I had a copy of the preliminary -- of the motion to

02:04:04  23  suppress evidence testimony that I had given over at 26th and

02:04:10  24  California back in 19 -- I think it was '95.   And also a copy

02:04:16  25  of the -- my testimony at the jury trial that followed for

Ingles - cross by Hale

02:04:23  1   Mr. Bolden.

02:04:23  2   Q.  Okay.  So let's pause there a second.

02:04:26  3        You have testified about this lineup.  You first

02:04:30  4   testified at a motion to suppress hearing, right --

02:04:34  5   A.  Yes.

02:04:34  6   Q.  -- in the criminal courts?

02:04:35  7   A.  Yes.

02:04:35  8   Q.  That was before Mr. Bolden's criminal trial, correct?

02:04:38  9   A.  Yes.

02:04:38  10  Q.  Then you testified about the lineup at Mr. Bolden's

02:04:42  11  criminal trial, correct?

02:04:43  12  A.  Yes.

02:04:43  13  Q.  Then you testified about the lineup at your deposition a

02:04:47  14  few years ago, correct?

02:04:48  15  A.  That is correct.

02:04:50  16  Q.  Okay.  And now you are testifying about the lineup here

02:04:53  17  today in court in this civil trial, right?

02:04:55  18  A.  Yes.

02:04:56  19  Q.  Okay.  And the first time you talked about it was at the

02:04:59  20  motion to suppress when you were under oath, correct?

02:05:02  21  A.  Yes.

02:05:03  22  Q.  Okay.  Were you provided with any other documents from the

02:05:07  23  plaintiff's lawyers?

02:05:08  24  A.  Not that I can recall.

02:05:11  25  Q.  Did they provide you with a list of questions they wanted

Ingles - cross by Hale

1298

| | | |
|---|---|---|
| 02:05:14 | 1 | to ask you? |
| 02:05:14 | 2 | A.  Never. |
| 02:05:15 | 3 | Q.  Did they tell you on the phone the questions they wanted |
| 02:05:17 | 4 | to ask you? |
| 02:05:17 | 5 | A.  No.  They provided me -- they asked me the questions on |
| 02:05:22 | 6 | the phone.  They didn't provide me with the questions.  They |
| 02:05:25 | 7 | said, this is the way I'm -- these are the questions I'm going |
| 02:05:29 | 8 | to ask you when you get on the witness stand. |
| 02:05:34 | 9 | Q.  Right.  So they provided you with the questions they were |
| 02:05:36 | 10 | going to ask you when you got on the witness stand, right? |
| 02:05:38 | 11 | A.  We went through it like as if we were practicing our |
| 02:05:41 | 12 | testimony. |
| 02:05:42 | 13 | Q.  Exactly.  You practiced on the telephone, correct? |
| 02:05:45 | 14 | A.  They asked me questions; I gave them the answer just like |
| 02:05:49 | 15 | I did today in open court. |
| 02:05:51 | 16 | Q.  Did they suggest any different answers to you? |
| 02:05:53 | 17 | A.  They never did. |
| 02:05:54 | 18 | Q.  You got it just right? |
| 02:05:56 | 19 | A.  They never suggested anything. |
| 02:05:58 | 20 | Q.  You got it just right? |
| 02:05:59 | 21 | MR. SAFER:  Objection, Your Honor. |
| 02:06:01 | 22 | THE WITNESS:  Pardon me? |
| 02:06:02 | 23 | MR. SAFER:  Objection, Your Honor.  That's |
| 02:06:03 | 24 | argumentative. |
| 02:06:04 | 25 | THE COURT:  Overruled. |

Ingles - cross by Hale

1299

02:06:06   1   BY THE WITNESS:

02:06:07   2   A.  I don't understand you.

02:06:09   3   BY MR. HALE:

02:06:10   4   Q.  I'll move on.

02:06:13   5        So you had said you practiced, I think, for 40 --

02:06:19   6   40-plus years?

02:06:20   7   A.  Yes.

02:06:20   8   Q.  Okay.  Was that primarily criminal defense law?

02:06:24   9   A.  Yes.

02:06:25  10   Q.  Can you explain to the ladies and gentlemen of the jury

02:06:28  11   what the category criminal defense means, what does that

02:06:33  12   encompass.

02:06:34  13   A.  Sure.  People get arrested for various crimes or

02:06:42  14   accusations, if you would, and they hire an attorney.

02:06:49  15   Sometimes they hire them right after they're arrested.

02:06:52  16   Sometimes they hire them after a few months go by and they're

02:06:57  17   not pleased with the attorney they have, whether it be a

02:07:00  18   public defender.  Sometimes after they're already almost at

02:07:06  19   trial, they'll hire an attorney.

02:07:09  20        And there's various stages in criminal defense.  It

02:07:13  21   starts with arrest where you can be at the police station with

02:07:18  22   your client.  If they're charged, the next step is to be at a

02:07:25  23   bond hearing.  If you're in federal court, it's a detention

02:07:30  24   hearing.

02:07:30  25        Okay.  In state court, it's a bond hearing, and then

Ingles - cross by Hale

1300

02:07:34  1  they give you a date for a preliminary hearing.  So that's the

02:07:36  2  next step.

02:07:37  3      Sometimes in between the time that you get a

02:07:42  4  preliminary hearing date, the government will decide to indict

02:07:47  5  the case which supersedes the preliminary hearing and you

02:07:52  6  don't get one.

02:07:54  7      If you go to a preliminary hearing and there's a

02:07:56  8  finding of probable cause or if you're indicted, either way,

02:08:02  9  it's held over, and then you're going to appear before a chief

02:08:07  10  judge for assignment to what judge the case is going to go to

02:08:11  11  in a trial courtroom.

02:08:13  12      When you get up to that trial courtroom, you're going

02:08:16  13  to begin what's called an arraignment.  You're going to have

02:08:21  14  your client enter a plea, how he is going to plead to the

02:08:26  15  charges, which is generally just enter a plea of not guilty,

02:08:30  16  waive formal reading of the documents, and filing initial

02:08:37  17  motions at that point for discovery.  And then it gets a court

02:08:41  18  date, and then the discovery process kicks in, where you're

02:08:45  19  waiting for documents and reports from -- from the

02:08:52  20  prosecution, and you're out trying to locate witnesses or

02:08:57  21  taking photographs, how you're going to defend the case.

02:09:01  22      If it's a search and seizure issue, you're going to

02:09:05  23  file a motion to quash arrest or suppress evidence which

02:09:09  24  proceeds any trial work.

02:09:11  25      If you're successful on that motion, many times

Ingles - cross by Hale

1301

02:09:14   1   that's the end of the case.  If you're not successful on that

02:09:17   2   motion, you have to reassess your case and decide whether you

02:09:21   3   want to proceed further and go to trial on the case.  And then

02:09:27   4   there's always the decision to make whether you want to take a

02:09:31   5   bench trial or a jury trial.  And there's subpoenas for

02:09:35   6   witnesses and preparations and going to crime scenes and

02:09:42   7   photographing and hiring investigators in the preparation of a

02:09:49   8   trial.

02:09:50   9           And eventually then when you have everything lined

02:09:52   10  up, you have your witnesses, you have your side of the case

02:09:56   11  ready, a trial date is picked, and then you proceed to trial.

02:10:00   12  Q.   Okay.  And in your criminal practice as of 1994, were you

02:10:07   13  practicing in all the various steps of the criminal process

02:10:10   14  that you just described?

02:10:11   15  A.   Absolutely.

02:10:12   16  Q.   Okay.  Let me go back a second.  You had said that -- when

02:10:16   17  I asked you about documents you had been provided by

02:10:19   18  plaintiff's counsel, you mentioned your motion to suppress

02:10:23   19  testimony.  You mentioned your trial -- your criminal trial

02:10:26   20  testimony, and then your civil deposition.

02:10:27   21          Were there any other documents you were provided?

02:10:30   22  A.   No.

02:10:31   23  Q.   Okay.

02:10:33   24  A.   Just my own testimony.

02:10:35   25  Q.   Right.  No photographs?  No police reports?

Ingles - cross by Hale

1302

02:10:39  1  A.  No.

02:10:39  2  Q.  Okay.  So as of 1994 when you represented Mr. Bolden for

02:10:47  3  this lineup, you had been practicing law for how many years at

02:10:52  4  that point?

02:10:52  5  A.  Approximately 18.

02:10:53  6  Q.  And would you consider yourself in 1994 to have been at

02:10:58  7  that time an experienced criminal defense attorney?

02:11:00  8  A.  Of course.

02:11:01  9  Q.  And did you feel like that was something you were -- had

02:11:05  10  an expertise in criminal law in 1994?

02:11:09  11  A.  Yes.

02:11:09  12  Q.  Did you think you were good at what you did in 1994?

02:11:13  13  A.  Humbly, yes.

02:11:18  14  Q.  Okay.  And as of 1994, had you had clients who had been

02:11:25  15  charged -- let me say this:  In 1994, had you previously had

02:11:30  16  clients before Mr. Bolden was ever a client who had been

02:11:34  17  charged with murder?

02:11:35  18  A.  Yes.

02:11:36  19  Q.  Had you actually -- had you had several cases like that?

02:11:40  20  A.  I had a number of them.

02:11:44  21  Q.  Okay.  And had you taken those cases, you know, along the

02:11:48  22  very steps of the criminal process?

02:11:49  23  A.  Yes.

02:11:49  24  Q.  Okay.  Had you actually had trials as well?

02:11:57  25  A.  Yes.

Ingles - cross by Hale

1303

02:11:57    1    Q.  And did your practice include both criminal defense work

02:12:01    2    in state and federal court?

02:12:04    3    A.  Mostly -- mostly the state, but there was a few cases we

02:12:08    4    had in federal court.

02:12:09    5    Q.  And so when you say "mostly state," would that be Cook

02:12:13    6    County?

02:12:13    7    A.  Almost all in Cook County, but not all.

02:12:16    8    Q.  And then that would be the Cook County building at 26th

02:12:20    9    and California?

02:12:21   10    A.  Well, it would be that or Markham, Bridgeview, Maywood,

02:12:27   11    Rolling Meadows, and Skokie.

02:12:29   12    Q.  Okay.  So in terms of your representation of Mr. Bolden,

02:12:37   13    who first contacted you, Mr. Bolden or somebody else?

02:12:40   14    A.  I can't recall.

02:12:41   15    Q.  You don't know if it was Mr. Bolden himself?

02:12:45   16    A.  I said I can't recall.

02:12:46   17    Q.  Yeah, I'm just asking to confirm.

02:12:50   18    A.  I'm sorry?

02:12:51   19    Q.  I'm just asking to confirm that, that you can't remember

02:12:54   20    if it was Mr. Bolden or --

02:12:55   21    A.  I can't recall if his mother called me or he called me.

02:12:58   22    Q.  Okay.  And do you remember where you got the call, how it

02:13:10   23    came about that you got the call?

02:13:12   24    A.  I got it at my law office.

02:13:15   25    Q.  You do remember that?

Ingles - cross by Hale

1304

02:13:17    1    A.   I'm sorry?

02:13:18    2    Q.   You do remember that, getting the call at your law office?

02:13:21    3    A.   Well, I would have either gotten it on my pager, because

02:13:26    4    that's what was going on back then, or I would have gotten it

02:13:29    5    on my business phone.

02:13:30    6    Q.   Now, why do you say it might have been his mother?  Why do

02:13:34    7    you think that was a possibility?

02:13:35    8    A.   Because she had -- she had the card at her house from the

02:13:40    9    detective.  So it might have been her.

02:13:41   10    Q.   Okay.  So what do you recall about the person you spoke

02:13:46   11    with about the card?  What do you recall about that

02:13:49   12    conversation?

02:13:49   13    A.   That the police had come out, they were looking to talk to

02:13:53   14    Eddie, they were from Area 2 homicide, and they had wanted to

02:13:59   15    question him.

02:13:59   16    Q.   Okay.  Is there anything else you remember about that

02:14:02   17    initial phone call about the person who received the card?

02:14:05   18    A.   Not that I can recall.

02:14:06   19    Q.   Have I exhausted your memory on that topic?

02:14:09   20    A.   Excuse me?

02:14:11   21    Q.   Have I exhausted your memory here today on that topic?

02:14:14   22    A.   I can't understand you, sir.

02:14:15   23    Q.   Have I exhausted your memory today here on that topic,

02:14:19   24    sir?

02:14:19   25    A.   I believe you have.

Ingles - cross by Hale

1305

02:14:20   1   Q.   Okay.  So, for instance, nobody ever told you when they

02:14:24   2   first talked to you that they got a card and the detectives

02:14:29   3   said, we want to talk to Eddie Bolden, and you better talk to

02:14:34   4   us or we're going to blow his brains out?  Nobody ever told

02:14:38   5   you that, right?

02:14:38   6   A.   I didn't hear that.

02:14:39   7   Q.   Right.  And if somebody told you that, it's probably

02:14:45   8   something you'd remember, right?

02:14:46   9   A.   I'm not going to answer that.

02:14:49   10  Q.   Why are you not going to answer that?

02:14:51   11  A.   Because I don't -- I don't know what would have happened

02:14:55   12  in your scenario here, what if this would have happened.  I

02:15:01   13  don't know what would have happened.

02:15:02   14  Q.   No, my question was simply:  If somebody told you, hey,

02:15:06   15  the police came by, they gave us a card, and they said if we

02:15:10   16  don't talk to them, they're going to blow my brains out, I'm

02:15:14   17  saying, isn't that something you think you would remember,

02:15:16   18  sir?

02:15:16   19  A.   You know, frankly, I wouldn't have been all that surprised

02:15:19   20  because that's the way it went back in the day.

02:15:21   21  Q.   That's what happened all the time, right?

02:15:24   22  A.   It was common.

02:15:25   23  Q.   Okay.  And you don't remember this specific -- anybody

02:15:30   24  saying this to you, correct, sir?

02:15:32   25  A.   I already answered that.  I said no.

Ingles - cross by Hale

1306

02:15:35   1   Q.  All right.  What else did -- so the person told you -- you

02:15:40   2   don't know if it's the mother or Eddie Bolden, but somebody

02:15:43   3   talked to you about receiving a card, right?

02:15:45   4   A.  Yes.

02:15:46   5   Q.  Okay.  What do you do next?

02:15:49   6   A.  I told them what I would charge them to arrange for an

02:15:58   7   interview with the police to escort him down there, to protect

02:16:01   8   him there, and to bring him in and see what it was all about.

02:16:09   9   Q.  And what was the amount you decided to charge?

02:16:12   10  A.  Pardon me?

02:16:13   11  Q.  What was the amount you decided to charge?

02:16:15   12  A.  $1500.

02:16:18   13  Q.  Pardon me?

02:16:18   14  A.  $1500.

02:16:19   15  Q.  $1500?

02:16:21   16  A.  Yes, sir.

02:16:22   17  Q.  That was a flat rate?

02:16:23   18  A.  That's what I wanted to do it, okay.  That's what I

02:16:31   19  thought it was worth under the circumstances of the case.

02:16:33   20  Q.  What do you mean under the circumstances of the case?

02:16:36   21  A.  Well, they came out claiming that they wanted to talk to

02:16:39   22  him about a double homicide.

02:16:42   23  Q.  Okay.

02:16:42   24  A.  And so that's what I thought it would be worth to

02:16:45   25  represent somebody under those circumstances and take them in

Ingles - cross by Hale

1307

02:16:50  1    for an interview.

02:16:53  2    Q.  Okay.  You actually -- well, we're going to get to this in

02:17:01  3    a second.

02:17:01  4             You had an understanding the police wanted to talk to

02:17:04  5    Mr. Bolden about a double homicide, right?

02:17:07  6    A.  That was my understanding.

02:17:08  7    Q.  Okay.  Were you given any other information at that time

02:17:12  8    about this double homicide?

02:17:15  9    A.  Not at that time.

02:17:16  10   Q.  Okay.  But you knew at that point, right, that if the

02:17:20  11   police wanted to talk to Mr. Bolden about a double homicide,

02:17:25  12   this was potentially a pretty serious matter?  Right?

02:17:29  13   A.  Well, I think that would be a correct assumption, you're

02:17:35  14   right.

02:17:35  15   Q.  In 1994, if somebody, in your experience, was convicted of

02:17:40  16   a double homicide, what kind of prison sentence were they

02:17:44  17   potentially facing?

02:17:45  18   A.  What kind of what?

02:17:46  19   Q.  What kind of prison sentence were they potentially facing

02:17:49  20   if they were convicted?

02:17:50  21   A.  I can't hear you.

02:17:52  22   Q.  I'm sorry.  I'll try to speak slower and better.  My --

02:17:56  23   A.  What kind of what?

02:17:58  24   Q.  I'm sorry.  I'm adjusting my microphone.  I apologize.

02:18:03  25             Let me start over.  Can you hear me better now?

Ingles - cross by Hale

1308

02:18:06   1    A.   I hope so.

02:18:07   2    Q.   Is that better?

02:18:09   3    A.   So far.

02:18:11   4    Q.   Okay.  So my question is this:  In 1994, you were an

02:18:15   5    experienced criminal defense lawyer.  So what I'm asking you

02:18:19   6    is, in 1994, what was your understanding of what kind of

02:18:27   7    prison sentence a person faced who might get convicted of a

02:18:32   8    double homicide?

02:18:34   9    A.   I think it was 20 to 40 for a single homicide with a

02:18:42  10    firearm, and it could be double, obviously.  So it could go as

02:18:50  11    high as 40 to 80.  That was my understanding.

02:18:52  12    Q.   Pretty serious potential prison time, right?

02:18:57  13    A.   That is serious.

02:19:00  14    Q.   Okay.  Was the death penalty available as an option in

02:19:04  15    Illinois in 1994?

02:19:06  16    A.   I don't recall right now.  It might have been, but I don't

02:19:10  17    recall.

02:19:10  18    Q.   And if it was, that would make the case even more serious,

02:19:14  19    right?

02:19:14  20    A.   Well, obviously there's more potential of danger, yeah.

02:19:21  21    Q.   Had you handled any cases as of 1994 where a client was

02:19:27  22    charged -- well, faced potentially the death penalty?

02:19:30  23    A.   No.

02:19:30  24    Q.   Had you ever in your career?

02:19:32  25    A.   Well, I never represented a client that got the death

Ingles - cross by Hale

1309

| | | |
|---|---|---|
| 02:19:45 | 1 | penalty, let's put it that way. |
| 02:19:47 | 2 | Q.  Okay.  So once you learn about the fact that there's a |
| 02:19:55 | 3 | double murder, when do you get more information about this -- |
| 02:20:00 | 4 | about the double murder? |
| 02:20:02 | 5 | A.  When I met with Eddie -- I mean, Mr. Bolden. |
| 02:20:06 | 6 | THE WITNESS:  Excuse me, Judge. |
| 02:20:08 | 7 | BY MR. HALE: |
| 02:20:08 | 8 | Q.  So tell me the approximate time frame between -- let me |
| 02:20:13 | 9 | back up. |
| 02:20:14 | 10 | When you said when you met with Mr. Bolden, was that |
| 02:20:17 | 11 | face to face or was that over the phone? |
| 02:20:18 | 12 | A.  We met face to face somewhere.  I'm not positive where, |
| 02:20:23 | 13 | but we met face to face. |
| 02:20:25 | 14 | Q.  You're sure you met face to face? |
| 02:20:27 | 15 | A.  I walked him into the police station.  We were face to |
| 02:20:32 | 16 | face.  So I know I met him face to face. |
| 02:20:35 | 17 | Q.  No, I'm talking about prior to going to the police |
| 02:20:38 | 18 | station, did you meet Mr. Bolden face to face? |
| 02:20:40 | 19 | A.  I don't recall exactly. |
| 02:20:41 | 20 | Q.  You don't know? |
| 02:20:42 | 21 | A.  I said I can't recall. |
| 02:20:44 | 22 | Q.  Okay.  Prior to going to the police station, though, did |
| 02:20:47 | 23 | you talk to Mr. Bolden about this double murder that the |
| 02:20:52 | 24 | police -- |
| 02:20:53 | 25 | A.  Yes. |

Ingles - cross by Hale

1310

02:20:53    1   Q.    -- wanted to talk to him about?

02:20:54    2   A.    Yes, I did.

02:20:55    3   Q.    Okay.  And was that over the phone or in person?

02:20:58    4   A.    I can't recall.

02:20:59    5   Q.    Okay.  How many times do you think, would you approximate,

02:21:04    6   you talked to Mr. Bolden before going to the police station on

02:21:09    7   the day of the lineup?

02:21:10    8   A.    Three or four times.

02:21:12    9   Q.    Okay.  So let's walk through -- do you remember -- in

02:21:17   10   those three or four times, do you remember any of those being

02:21:21   11   in person?

02:21:22   12   A.    I believe so.

02:21:25   13   Q.    Okay.  Do you remember where?

02:21:26   14   A.    I'm not positive.

02:21:30   15   Q.    Okay.  Was anybody else present?

02:21:32   16   A.    Pardon me?

02:21:33   17   Q.    Was anybody else present?

02:21:34   18   A.    No, not that I can recall.

02:21:36   19   Q.    So let's walk through the first contact you had with

02:21:40   20   Mr. Bolden.

02:21:40   21         What did you say to him, and what did he say to you?

02:21:43   22   A.    Well, the first time we talked about the case is what I

02:21:48   23   testified to on my direct examination.  Basically he told me

02:21:51   24   that he was in a fish store.  I think it was a J&J Fish store.

02:21:57   25   That they have video games there.  He was playing in the

Ingles - cross by Hale

1311

02:22:02    1    store.  Someone came running in.  I think he was shot.  He

02:22:05    2    went to the phone and made a phone call to the 911 to report

02:22:10    3    it.  Okay.  That's what he told me.

02:22:16    4    Q.  Okay.

02:22:16    5    A.  He told me he didn't do anything.  He's not guilty.  He

02:22:20    6    hasn't done anything wrong.  And with that in mind, that

02:22:24    7    was -- he never altered or changed from that position at all,

02:22:27    8    he was adamant about it, and he was willing to go in and have

02:22:32    9    an interview.  And then once he got to the station, he was

02:22:39    10   requesting a lie detector test.

02:22:42    11   Q.  Okay.  So let's walk through that.

02:22:43    12        So the very first time you spoke to Mr. Bolden, you

02:22:48    13   are saying -- you're claiming that he told you he called 911;

02:22:51    14   is that correct?

02:22:51    15   A.  That is correct.

02:22:52    16   Q.  Okay.  The very first time you talked to him.

02:22:56    17        How much time would you approximate elapsed between

02:22:59    18   the time you first talked to somebody about getting this

02:23:04    19   business card and then first talking to Mr. Bolden?  How much

02:23:08    20   time in between?

02:23:12    21        Let me say that again.  Did you want me to rephrase

02:23:14    22   it?

02:23:15    23   A.  Yeah, I'm not following you.

02:23:16    24   Q.  Okay.  You had said the first way you got involved was you

02:23:20    25   had talked to somebody, either Mr. Bolden's mom, maybe him,

Ingles - cross by Hale

1312

02:23:24 1 you don't know, about a card being left with his mother,

02:23:26 2 right?

02:23:26 3 A.  Correct.

02:23:26 4 Q.  Okay.  And then the next -- then you said at some point

02:23:30 5 you talked to Mr. Bolden, correct?

02:23:31 6 A.  Yes.

02:23:32 7 Q.  Okay.  For the first time.

02:23:34 8        Approximately how much time elapsed between having

02:23:38 9 the conversation about the card being left at the house and

02:23:42 10 talking to Mr. Bolden?

02:23:42 11 A.  Not much time.

02:23:44 12 Q.  Days?

02:23:45 13 A.  Maybe a day.

02:23:46 14 Q.  Okay.  How did you get in touch with Mr. Bolden?

02:23:49 15 A.  By telephone.

02:23:52 16 Q.  How did you get his number?

02:23:53 17 A.  I don't recall.  We talked on the phone, and I think we

02:24:01 18 met -- I'm not positive, but we might have met at a

02:24:04 19 restaurant.  I'm not sure.

02:24:05 20        And then the next times I talked to him were

02:24:10 21 Wednesday and Friday.  Each time the officers canceled for the

02:24:18 22 interview, I had to let him know, it's not on, they canceled.

02:24:22 23 Q.  Okay.

02:24:22 24 A.  And now it's going to be on Friday.  And then on Friday, I

02:24:26 25 told him again they canceled, now it's going to be Saturday

Ingles - cross by Hale

1313

02:24:29  1  morning.  And that accounts for the times that I talked to him

02:24:34  2  other than when we got to the station at like five to 9:00 in

02:24:38  3  the morning, and then we were sitting together.

02:24:40  4  Q.  When you first spoke to Mr. Bolden about this -- this

02:24:45  5  double murder, did you have any understanding of where he was

02:24:48  6  residing at that time?

02:24:50  7  A.  I don't know where he was residing.

02:24:55  8  Q.  Did Mr. Bolden ever tell you why he was not home when the

02:24:59  9  police were looking for him?

02:25:00  10  A.  I'm not sure that that was his home.  All I know is they

02:25:07  11  dropped the card off by his mother's house.  So, no, I don't

02:25:11  12  know.

02:25:11  13  Q.  Did Mr. Bolden ever say anything to you -- words to the

02:25:15  14  effect about a reason he did not want to stay at his own

02:25:18  15  apartment?

02:25:20  16  A.  Not that I recall.

02:25:21  17  Q.  So you claim that you're taking Mr. Bolden in for an

02:25:27  18  interview, right, to the police station?

02:25:30  19  A.  Yes.

02:25:31  20  Q.  It's your testimony that -- it's your testimony that you

02:25:40  21  had no idea the police were going to want to do a lineup until

02:25:44  22  they asked you that when you got to the police station, right?

02:25:47  23  A.  That is absolutely correct.

02:25:48  24  Q.  Okay.  So we're going to get to that in a minute.

02:25:50  25         But your version is, you're taking him in for an

Ingles - cross by Hale

| | | |
|---|---|---|
| 02:25:55 | 1 | interview, right? |
| 02:25:56 | 2 | A.  And that's what it was. |
| 02:25:57 | 3 | Q.  Okay. |
| 02:25:57 | 4 | A.  They wanted to ask him questions.  There was no warrant |
| 02:26:00 | 5 | out for his arrest.  There was no investigative alert out for |
| 02:26:06 | 6 | him.  So it was not a turn-in.  That would have been a |
| 02:26:12 | 7 | turn-in.  This was they wanted to ask him some questions, |
| 02:26:15 | 8 | which means it was an interview. |
| 02:26:18 | 9 | Q.  Well, sir, you actually have testified that it was a |
| 02:26:26 | 10 | turn-in, right? |
| 02:26:28 | 11 | A.  Well -- |
| 02:26:29 | 12 | Q.  You were going in for a turn-in, your words, right? |
| 02:26:34 | 13 | A.  Okay, semantics, it's a turn-in, but in effect it was |
| 02:26:39 | 14 | nothing more than setting up for an interview. |
| 02:26:41 | 15 | Q.  Well, let's look at your deposition, sir, that took place |
| 02:26:44 | 16 | on March 19th, 2018. |
| 02:26:47 | 17 | You remember giving a deposition? |
| 02:26:49 | 18 | A.  Yes. |
| 02:26:50 | 19 | Q.  And you remember being under oath? |
| 02:26:52 | 20 | A.  Yes. |
| 02:26:53 | 21 | Q.  And you're a lawyer, right, at the time? |
| 02:26:56 | 22 | A.  Yes. |
| 02:26:56 | 23 | Q.  You're obligated to tell the truth, right? |
| 02:26:59 | 24 | A.  Yes. |
| 02:27:00 | 25 | Q.  Okay. |

Ingles - cross by Hale

1315

02:27:02  1           MR. HALE:  Page 22, Lines 5 through 10.

02:27:05  2  BY MR. HALE:

02:27:05  3  Q.  "QUESTION:  How much were you paid to represent

02:27:08  4  Mr. Bolden?

02:27:09  5           "ANSWER:  $1500.

02:27:11  6           "QUESTION:  And what was the scope of the

02:27:15  7  representation?

02:27:16  8           "ANSWER:  To arrange a turn-in, to be with him until

02:27:21  9  he was either released or charged."

02:27:24  10          Were you asked those questions, and did you give

02:27:26  11  those answers?

02:27:26  12  A.  Absolutely.

02:27:27  13  Q.  And did you discuss the concept of turn-in with

02:27:31  14  plaintiff's lawyers before you came here today?

02:27:34  15  A.  No.  Listen, lawyers, when we're taking someone in, we use

02:27:40  16  the term "turn-in."  We're turning him in, okay.  For whatever

02:27:48  17  reason, okay, if they're wanted, if they want to be in for

02:27:52  18  questioning, it's just a general word that we all use,

02:27:57  19  "turn-in."

02:27:59  20          But in this particular case, even though I said a

02:28:03  21  turn-in, it was really for purposes of an interview.

02:28:05  22  Q.  Didn't you just tell us --

02:28:08  23  A.  He wasn't wanted.  There was no warrant.  There was no

02:28:11  24  investigative alert.  I was taking him there for an interview.

02:28:15  25  Q.  Didn't you just tell me two minutes ago before I read your

Ingles - cross by Hale

1316

02:28:19　1　deposition testimony words to the effect, like, "This wasn't a

02:28:22　2　turn-in"?  Didn't you just tell me that?

02:28:25　3　A.  I did.  Does that make you feel good?  Okay, I did.  But

02:28:29　4　it was an interview.

02:28:30　5　Q.  What do you mean does it make me feel good?  What do you

02:28:34　6　mean by that?

02:28:35　7　A.  You know what I mean.

02:28:37　8　Q.  No, I don't know what you mean.

02:28:38　9　A.  If you've ever practiced criminal law, you'd know that a

02:28:42　10　turn-in is the same thing.  You say it -- you say that word to

02:28:46　11　cover whatever reason you're going to the police station with

02:28:48　12　a client; but, in this case, it wasn't like he was under

02:28:54　13　arrest, a warrant out for his arrest, investigative out for

02:28:59　14　his arrest.  I wasn't turning him in like that.  I was turning

02:29:04　15　him in for an interview.

02:29:05　16　Q.  But I think you're missing my point.

02:29:07　17　　　　My point was, what you just told this jury was -- you

02:29:10　18　specifically made the distinction that this was not a turn-in.

02:29:15　19　You specifically told this jury it was not a turn-in, correct?

02:29:19　20　A.  Correct.

02:29:20　21　Q.  And then I just showed you in your deposition you called

02:29:23　22　it a turn-in.

02:29:24　23　A.  I did.

02:29:24　24　Q.  Okay.  So why did you say in your deposition it was a

02:29:28　25　turn-in?

Ingles - cross by Hale

1317

| | | |
|---|---|---|
| 02:29:29 | 1 | A.   That's the word I used. |
| 02:29:34 | 2 | Q.   And why are you saying it's not a turn-in here today? |
| 02:29:37 | 3 | A.   Because since the time that I took that deposition and |
| 02:29:45 | 4 | refreshed everything and refreshed my recollection and went |
| 02:29:48 | 5 | over things, I realized it was not a turn-in in the sense that |
| 02:29:56 | 6 | I was turning him over to the police.  I was bringing him in |
| 02:30:00 | 7 | for an interview. |
| 02:30:02 | 8 | Q.   What did you use to refresh your recollection? |
| 02:30:05 | 9 | A.   I went over three documents that were tendered to me. |
| 02:30:11 | 10 | Q.   What? |
| 02:30:13 | 11 | A.   The preliminary hearing transcript, the trial transcript, |
| 02:30:18 | 12 | and the deposition. |
| 02:30:19 | 13 | Q.   And you had read -- before you gave a deposition, right, |
| 02:30:24 | 14 | you had read your motion to suppress testimony to prepare, |
| 02:30:27 | 15 | right? |
| 02:30:28 | 16 | A.   I did. |
| 02:30:28 | 17 | Q.   And before your deposition, you had read your criminal |
| 02:30:32 | 18 | trial testimony to prepare, right? |
| 02:30:34 | 19 | A.   I did. |
| 02:30:35 | 20 | Q.   And as a practicing lawyer, you went into your deposition |
| 02:30:39 | 21 | in this case fully prepared to answer questions, right? |
| 02:30:42 | 22 | A.   Listen, a lot of years have -- |
| | 23 | Q.   Right? |
| 02:30:44 | 24 | A.   -- gone by. |
| 02:30:45 | 25 | Q.   Right? |

Ingles - cross by Hale

1318

02:30:46  1    A.   Yes.

02:30:47  2    Q.   Okay.

          3    A.   A lot of --

02:30:47  4    Q.   Thank you.

02:30:48  5    A.   -- years have gone by, and I hadn't thought about

02:30:51  6    Mr. Bolden's case for a long time, and it's been on my mind,

02:30:57  7    and I've been thinking about it in my spare time.

02:31:00  8    Q.   But this is my point:  What you just said was, you

02:31:04  9    refreshed your memory with your motion to suppress and your

02:31:07  10   criminal trial testimony, okay, and so now you said it

02:31:10  11   wouldn't be a turn-in.

02:31:11  12        What I'm saying is, before you gave your deposition,

02:31:14  13   you had prepared and reviewed your motion to suppress

02:31:18  14   testimony, you had prepared and reviewed your criminal trial

02:31:20  15   testimony and, nonetheless, when you were asked an open-ended

02:31:25  16   question about the scope of the representation, you, yourself,

02:31:28  17   described it as a turn-in, right, sir?

02:31:30  18   A.   Didn't you just ask me that about four or five times, and

02:31:34  19   I said yes to it?

02:31:36  20   Q.   It's a different question.  I'm explaining --

02:31:38  21   A.   The answer is yes.

02:31:40  22   Q.   Yes.

02:31:40  23   A.   I said turn-in before.

02:31:41  24   Q.   Right.  But I want you to make -- I want to make this

02:31:46  25   point.  You had prepared with the same documents before giving

Ingles - cross by Hale

1319

02:31:49  1  your deposition testimony, right?

02:31:50  2  A.  I had looked at two documents before the deposition.

02:31:52  3  Q.  Okay.  So let's go with, for now, your version of events,

02:31:56  4  which is, you're taking Mr. Bolden to the police station, not

02:32:01  5  for a lineup, but to be questioned, correct?

02:32:04  6  A.  There was never a mention of a lineup --

02:32:06  7  Q.  Okay.

02:32:07  8  A.  -- correct.

02:32:07  9  Q.  We're going to get to that.  We're going to get to that.

02:32:11  10        But if your version is, I'm taking him there to be

02:32:14  11  questioned about a double murder -- and you're going to let

02:32:19  12  him talk to the police; is that right?

02:32:20  13  A.  Correct.

02:32:21  14  Q.  You're going to let him answer all the questions, right?

02:32:23  15  A.  Correct.

02:32:24  16  Q.  That was your intent going in?

02:32:25  17  A.  Because his answers were not incriminating.

02:32:29  18  Q.  Okay.

02:32:30  19  A.  I was absolutely going to let him talk to the police.

02:32:32  20  Q.  Because he told you that he denied any involvement, you as

02:32:36  21  his criminal defense attorney were going to let him just

02:32:40  22  answer whatever the police wanted to ask him; is that your

02:32:42  23  testimony?

02:32:42  24  A.  He also knew where he was, he knew what he was doing, he

02:32:45  25  knew that he had made the call to the police, and there was a

Ingles - cross by Hale

1320

02:32:48    1    way to verify that with getting a copy of the 911 call-in --

02:32:52    2    Q.   Right.

02:32:52    3    A.   -- which we alerted to Detective Karl while we were in the

02:32:57    4    interview room.

02:32:58    5    Q.   We're going to get to that.

02:32:59    6    A.   And he wanted to take a lie detector test.

02:33:01    7    Q.   I understand all that, sir.

02:33:03    8         So my point is simply:  Your understanding is you're

02:33:06    9    taking him to Area 2 to be questioned and to answer all of the

02:33:10   10    detective's questions, correct?  Right?

02:33:12   11    A.   Yes.

02:33:13   12    Q.   Okay.  So in order to do that, as an experienced criminal

02:33:17   13    defense lawyer, you're going to want to know as much about

02:33:22   14    this incident as you can, correct?

02:33:24   15    A.   As much as I could know about it from my client.

02:33:29   16    Q.   Right.  You're not going to just show up at Area 2 and

02:33:32   17    say, "Hey, Detective Pesavento, Detective Karl, how you doing?

02:33:36   18    Fire away, ask my guy any questions you want," without knowing

02:33:39   19    anything yourself, right?  You're going to want to get as much

02:33:45   20    information from Mr. Bolden as you can, right?

02:33:47   21    A.   I got the information from him.

02:33:49   22    Q.   Did you have a file?  Did you take notes?

02:33:53   23    A.   If I did, I don't have them anymore.

02:33:56   24    Q.   Yeah, but when you met with him, would you have written

02:33:59   25    things down?

Ingles - cross by Hale

1321

| | | |
|---|---|---|
| 02:33:59 | 1 | A.  I don't recall. |
| 02:34:01 | 2 | Q.  Okay.  Would it have been your practice to write things |
| 02:34:05 | 3 | down? |
| 02:34:05 | 4 | A.  Oftentimes I wrote things down. |
| 02:34:07 | 5 | Q.  And sometimes you didn't? |
| 02:34:09 | 6 | A.  Correct. |
| 02:34:10 | 7 | Q.  Okay.  Did Mr. Bolden ever mention the name Anthony |
| 02:34:14 | 8 | Williams to you? |
| 02:34:15 | 9 | A.  Not that I recall. |
| 02:34:17 | 10 | Q.  Did Mr. Bolden ever mention a person nicknamed Ant? |
| 02:34:25 | 11 | A.  I don't remember that. |
| 02:34:25 | 12 | Q.  Did Mr. Bolden ever mention a person named Clifford |
| 02:34:34 | 13 | Frazier? |
| 02:34:34 | 14 | A.  Not that I recall. |
| 02:34:34 | 15 | Q.  Did Mr. Bolden ever mention a man named Roderick Stewart? |
| 02:34:39 | 16 | A.  Not that I recall. |
| 02:34:41 | 17 | Q.  Did Mr. Bolden ever mention a woman named Edna Williams? |
| 02:34:46 | 18 | A.  Not that I recall. |
| 02:34:48 | 19 | Q.  Did Mr. Bolden ever mention a man named James Williams? |
| 02:34:51 | 20 | A.  I don't recall. |
| 02:34:54 | 21 | Q.  Did Mr. Bolden ever mention a woman named Tenesha Gatson? |
| 02:34:58 | 22 | A.  What's the name? |
| 02:35:01 | 23 | Q.  Tenesha Gatson. |
| 02:35:03 | 24 | A.  I don't recall that. |
| 02:35:05 | 25 | Q.  Did Mr. Bolden ever mention a woman named Octavia Jackson? |

02:35:09  1  A.  I don't recall.

02:35:12  2  Q.  Did Mr. Bolden ever mention these double murders involving

02:35:17  3  a drug deal?

02:35:19  4  A.  No.

02:35:19  5  Q.  Did Mr. Bolden ever mention these double murders involving

02:35:24  6  a Gangster Disciples gang hit?

02:35:27  7  A.  No.

02:35:27  8  Q.  Did Mr. Bolden ever mention how the victims were killed?

02:35:33  9  A.  No.

02:35:36  10  Q.  Did Mr. Bolden ever tell you where this double murder took

02:35:42  11  place?

02:35:42  12  A.  Vaguely I heard it was down the street or something from

02:35:48  13  the fish place, but that's about all I recall.

02:35:52  14  Q.  Did Mr. Bolden ever tell you the names of any alibi

02:35:56  15  witnesses?

02:35:56  16  A.  No.

02:35:57  17  Q.  Did Mr. Bolden ever tell you he saw two guys fighting?

02:36:02  18  A.  I don't recall that.

02:36:04  19  Q.  Did Mr. Bolden ever tell you he saw a guy fighting wearing

02:36:11  20  a ski mask?

02:36:13  21  A.  I don't remember.

02:36:14  22  Q.  Did Mr. Bolden ever tell you, you know what, there was a

02:36:17  23  guy fighting, a real guy, and he pulled down his ski mask and

02:36:22  24  he looked into J&J Fish and I saw him?

02:36:26  25  A.  I don't recall.

Ingles - cross by Hale

1323

02:36:27  1    Q.  Did Mr. Bolden ever tell you, you know what, Mr. Ingles, I

02:36:32  2    saw the whole thing, two guys were fighting, and the real

02:36:36  3    killer pulled down his ski mask, and he was Roderick Stewart?

02:36:41  4    A.  I don't recall.

02:36:43  5    Q.  Did Mr. Bolden ever tell you he heard gunshots?

02:36:51  6    A.  It's possible.

02:36:52  7    Q.  That, you do remember?

02:36:54  8    A.  Possible.

02:36:55  9    Q.  Okay.  And you remember that he called 911; is that right?

02:37:00  10   A.  Yes.

02:37:00  11   Q.  Okay.  So we're going to get to that.

02:37:03  12        Now, you said you had a few contacts with Mr. Bolden

02:37:10  13   before going to Area 2 for -- when you went to the police

02:37:14  14   station.

02:37:14  15        Were -- other than the first conversation with

02:37:20  16   Mr. Bolden, were any of the other subsequent conversations,

02:37:23  17   before you go to Area 2, substantive in nature about the

02:37:27  18   double murder?

02:37:28  19   A.  I don't think so.

02:37:29  20   Q.  They were not.

02:37:31  21        How long would you estimate that first conversation

02:37:33  22   was with Mr. Bolden?

02:37:34  23   A.  Pardon me?

02:37:35  24   Q.  How long would you estimate that first conversation with

02:37:38  25   Mr. Bolden was?

Ingles - cross by Hale

1324

| | | |
|---|---|---|
| 02:37:38 | 1 | A.  Maybe 20, 30 minutes. |
| 02:37:43 | 2 | Q.  20, 30 minutes? |
| 02:37:46 | 3 | A.  Possibly. |
| 02:37:46 | 4 | Q.  Did you press Mr. Bolden to give you more information? |
| 02:37:52 | 5 | A.  I don't recall. |
| 02:37:55 | 6 | Q.  Did you feel like you were -- you had all the information |
| 02:37:59 | 7 | you needed in order to take Mr. Bolden to be -- to Area 2 to |
| 02:38:04 | 8 | be questioned by the detectives for a double murder? |
| 02:38:06 | 9 | A.  I thought I did at the time. |
| 02:38:10 | 10 | Q.  Is it your practice to try to learn as much as you can |
| 02:38:18 | 11 | about the underlying crime when you represent somebody in a |
| 02:38:21 | 12 | criminal matter? |
| 02:38:22 | 13 | A.  Of course. |
| 02:38:23 | 14 | Q.  And when you represent a client, do you do sometimes your |
| 02:38:27 | 15 | own investigation? |
| 02:38:29 | 16 | A.  I'm sorry? |
| 02:38:31 | 17 | Q.  When you represent a client in a criminal matter, do you |
| 02:38:35 | 18 | sometimes do your own investigation? |
| 02:38:36 | 19 | A.  I do. |
| 02:38:36 | 20 | Q.  Okay.  What types of things do you do? |
| 02:38:39 | 21 | A.  Well, I subpoena 911 tapes.  I subpoena police reports.  I |
| 02:38:44 | 22 | go to the crime scene, usually.  I take an investigator with |
| 02:38:49 | 23 | me oftentimes.  We do measurements.  We take photographs.  We |
| 02:38:57 | 24 | check what the weather conditions were at that particular |
| 02:39:06 | 25 | time.  Sometimes we subpoena the videos that are up in -- in |

Ingles - cross by Hale

1325

02:39:17  1  the blue light flashing that are on the street.  We contact

02:39:25  2  witnesses.  We go out and interview them.  We like to see what

02:39:30  3  they have to say, whether they're true witnesses or not, what

02:39:34  4  they might have seen.  We evaluate them as witnesses, if

02:39:40  5  they're able to actually communicate and get on a witness

02:39:46  6  stand and have any credibility.

02:39:49  7        Those are some of the things we do.

02:39:50  8  Q.  So prior to representing Mr. Bolden, you had had occasion,

02:39:55  9  right, to subpoena 911 tapes before, correct?

02:39:59  10  A.  Many times.

02:40:01  11  Q.  Many times.  How many times?

02:40:04  12  A.  Hundreds.

02:40:06  13  Q.  Hundreds?

02:40:07  14  A.  Probably, yeah.

02:40:08  15  Q.  Tell the ladies and gentlemen of the jury of the process

02:40:13  16  you would use to subpoena 911 tapes.

02:40:16  17  A.  Okay.  I'd come into a case.  I get hired.  I listen to

02:40:26  18  what my client has to say.  I file an appearance, and I get my

02:40:30  19  hands on the arrest report.

02:40:34  20        Any case that has anything to do with a chase or a

02:40:40  21  search, shots fired, would indicate to me that I'd like to get

02:40:49  22  a play by play on the 911 disk that they provide you where it

02:40:56  23  shows what the people are saying, what the officers are doing.

02:41:04  24        And how you do that is you prepare a subpoena.  Every

02:41:08  25  arrest that takes place in the city of Chicago gets what's

Ingles - cross by Hale

1326

02:41:11 1 known as an RD number.  And that gets that number.  When the

02:41:16 2 officer who is making the arrest and filling out his report,

02:41:21 3 he calls in the communications and requests an RD number for

02:41:27 4 the type of case he has.  So if it's a gun case, they get a

02:41:32 5 certain RD number.  If it's a drug case, they get a certain RD

02:41:36 6 number.  And it also gets a CB number, which is their number

02:41:40 7 that they give for the person at the time they were arrested.

02:41:50 8      And on the arrest report, it's got the name of the

02:41:54 9 defendant.  It's got the time of arrest, the date of arrest,

02:42:01 10 the address of arrest, and it's got a summary of what took

02:42:07 11 place.

02:42:07 12      And from there, you plug in all of those numbers that

02:42:11 13 I just told you, including the case number, which is a

02:42:17 14 municipal number at the time of arrest even if it's a murder

02:42:20 15 case, and they have a form.  You put it into the form.  You

02:42:24 16 take it down to communications, which back in the day, in

02:42:30 17 1994, if I'm not mistaken, was still at 1121 South State.  I'm

02:42:36 18 not sure.  If it wasn't there, they then moved it to 3510

02:42:40 19 South Michigan, and from there, they moved it over to 1401

02:42:43 20 West Madison to the new communications center.

02:42:46 21      You take the subpoena there in duplicate.  You

02:42:51 22 time-stamp it.  You drop their one copy to them, and you keep

02:42:54 23 your one copy to prove you filed the subpoena within 30 days.

02:42:59 24      The ramification of that is that if you don't file

02:43:01 25 the subpoena within 30 days, you're not going to get the disk,

Ingles - cross by Hale

1327

02:43:07  1  the play-by-play disk with all the officers out on the street

02:43:10  2  calling in, because they claim that they destroy them or erase

02:43:17  3  them after 30 days.

02:43:19  4        Instead, you get what's known as the CAD report,

02:43:22  5  which is a computer -- it's a computer disk -- dispatch report

02:43:33  6  where it's written out.  It's not word for word, but it's

02:43:39  7  written out.  It shows what unit is calling in and a short

02:43:44  8  statement about what they have to say and what's going on.

02:43:47  9        You get that instead if you're past 30 days.

02:43:52  10 Q.  Okay.  So I appreciate that.  Thank you.

02:43:55  11       So let's talk about this.  You had -- prior to

02:43:59  12 representing Mr. Bolden, you had subpoenaed 911 tapes hundreds

02:44:03  13 of times, right?

02:44:04  14 A.  Yes.

02:44:04  15 Q.  Okay.  You were very familiar with the process, correct?

02:44:09  16 A.  Yes.

02:44:09  17 Q.  You had done it so many times, it was probably very simple

02:44:14  18 for you to do, correct?

02:44:15  19 A.  It was -- I knew how to do it.

02:44:21  20 Q.  And in fact, it's probably something you could have your

02:44:23  21 staff do, right?

02:44:25  22 A.  Well, my son does them now, actually, and he's five years

02:44:32  23 into being a lawyer.  So he does them all the time.

02:44:35  24 Q.  In 1994, did you have like a secretary or anybody in your

02:44:40  25 office working?

Ingles - cross by Hale

1328

02:44:40  1    A.   My wife was my secretary.

02:44:41  2    Q.   Would your wife do the 911 subpoenas?

02:44:45  3    A.   She'd type them for me.

02:44:47  4    Q.   She'd fill them out, right?

02:44:48  5    A.   I'd fill them out in pen, and then she'd get them on the

02:44:53  6    typewriter because they weren't computers back then, and she'd

02:44:56  7    have to type them out on a blank form that had -- that was

02:44:59  8    preprinted but blank, she'd fill in the blanks.

02:45:01  9    Q.   And how long would it take to fill it out?  Ten minutes?

02:45:04  10   A.   Ten, 20 minutes.

02:45:07  11   Q.   Okay.  All right.  And so Mr. Bolden told you the very

02:45:13  12   first time you talked to him, according to you, that he called

02:45:17  13   911, right?

02:45:18  14   A.   That is correct.

02:45:19  15   Q.   All right.  So you knew as an experienced criminal defense

02:45:22  16   lawyer, aha, I've got this great evidence that's going to

02:45:27  17   prove this guy's innocence, I've got these 911 tapes, right?

02:45:31  18   A.   Well, if it were on there, that might be correct.

02:45:34  19   Q.   All right.  So -- that's what Mr. Bolden, according to

02:45:38  20   you, is telling you, right?

02:45:39  21   A.   Pardon me?

02:45:40  22   Q.   That's what, according to you, Mr. Bolden is telling you,

02:45:43  23   right?

02:45:45  24   A.   That's what he told me.

02:45:46  25   Q.   Yeah, that's your version.  Okay.

Ingles - cross by Hale

1329

02:45:47　　1　　　　　　And so he had that conversation with you before you

02:45:53　　2　went to Area 2 the day of the lineup, right?

02:45:56　　3　A.　That is correct.

02:45:59　　4　Q.　That is several weeks before you go to Area 2, right?

02:46:02　　5　A.　Oh, no.　No, no, no, no.

02:46:06　　6　Q.　A week before?

02:46:07　　7　A.　That was only a few days.

02:46:09　　8　Q.　The -- your appointment got canceled a couple of times,

02:46:13　　9　right?

02:46:14　　10　A.　Yeah, but it was only a couple days.

02:46:16　　11　Q.　Wasn't your first appointment like February 12th?

02:46:19　　12　A.　Not that I recall.

02:46:21　　13　Q.　Wasn't it more than a couple weeks?

02:46:24　　14　A.　Not that I recall.　But let's assume for your argument

02:46:28　　15　that it was a week or two.　Make your point.

02:46:31　　16　Q.　Yeah, my point is, you understood when you talked to

02:46:34　　17　Mr. Bolden that after -- you knew that those 911 tapes are

02:46:40　　18　only available for 30 days, right?

02:46:41　　19　A.　They're only available for 30 days after the arrest.

02:46:47　　20　Q.　30 days after the --

02:46:49　　21　A.　After -- after an arrest.

02:46:51　　22　Q.　You were aware that those tapes were likely not going to

02:46:56　　23　be around 30 days after the incident, correct?

02:46:59　　24　A.　After an arrest, I said.

02:47:01　　25　Q.　So the City of Chicago bases it on 30 days from the time

Ingles - cross by Hale

1330

02:47:07  1   of the call, right?  They don't just keep things until

02:47:13  2   somebody is arrested, right?

02:47:14  3   A.  You're wrong.  I'm trying to tell you, you're wrong.

02:47:19  4   Q.  Had you ever had --

02:47:21  5   A.  30 days after there's an arrest, the time starts running

02:47:25  6   for the 911.

02:47:27  7   Q.  Had you ever had a situation where tapes were no longer

02:47:33  8   around, 911 tapes, 30 days after an incident occurred?

02:47:39  9   A.  Not that I can recall.

02:47:41  10  Q.  Were you ever aware of there being a retention policy

02:47:45  11  around 1994 that the 911 tapes are only kept for 30 days from

02:47:49  12  the time that the call was made?

02:47:51  13  A.  No.

02:47:51  14  Q.  You were not ever aware of that?

02:47:54  15  A.  No.  It's 30 days from the time of an arrest.

02:47:58  16  Q.  That's your understanding?

02:47:58  17  A.  Yes, it is.

02:47:59  18  Q.  Okay.  We can decide to disagree on that.

02:48:02  19          But there's -- would it be fair to say there is no

02:48:05  20  reason to wait to request 911 tapes if you think they're

02:48:10  21  helpful, right?

02:48:10  22  A.  You mean in this particular case with me and Mr. Bolden?

02:48:14  23  Q.  In any case.

02:48:15  24  A.  Yeah, there was an absolute reason to wait.

02:48:17  25  Q.  Why would you wait?

Ingles - cross by Hale

1331

02:48:18  1    A.  Okay.  It didn't have an RD number.  It didn't have a CB

02:48:24  2    number.  It didn't have a case number.  And there was no

02:48:28  3    arrest.

02:48:28  4    Q.  Okay.

02:48:29  5    A.  So how are you going to get a subpoena over to

02:48:34  6    communications with absolutely no identifiers whatsoever?

02:48:38  7    Q.  Can't you still request a 911 call about a specific event

02:48:43  8    on a certain day and time?  January 29th, 1994, 8:00 o'clock

02:48:49  9    p.m.?

02:48:49  10   A.  I needed to know what it was, frankly.

02:48:51  11   Q.  Couldn't you try to do that?

02:48:53  12   A.  I'm sure -- I'm sure Detective Karl would have told me.

02:49:00  13   He would have given me that information.  Are you serious?

02:49:03  14   Q.  I'm saying couldn't you have gone somehow and tried to get

02:49:07  15   a 911 tape of an event that took place at J&J Fish on

02:49:12  16   January 29th about 8:00 o'clock at night?

02:49:14  17   A.  No.

02:49:14  18   Q.  You don't think you could?

02:49:16  19   A.  No.

02:49:16  20   Q.  Okay.  So let's go with your version.

02:49:18  21        When you walk out of the police station after

02:49:22  22   Mr. Bolden has been arrested, there's now an RD number, right?

02:49:27  23   A.  Well, there would be one within 72 hours.

02:49:31  24   Q.  Yeah, you knew when you left Area 2, Mr. Bolden had been

02:49:35  25   arrested, right?

Ingles - cross by Hale

1332

| 02:49:36 | 1 | A.  That is correct. |

02:49:36  2  Q.  All right.  And you know the clock is ticking now at this

02:49:40  3  point for sure on the potential for 911 tapes to be around,

02:49:44  4  right?

02:49:44  5  A.  Somewhere within 72 hours when they would get felony

02:49:50  6  approval, charges would be approved, the case would be written

02:49:54  7  up, and the officer would call in to get an RD number.  That's

02:49:58  8  when the time would start running.

02:50:00  9  Q.  So let's talk about the lay of the land at Area 2 after

02:50:05  10  Mr. Bolden's arrested.  Okay.  He walks out of the interview

02:50:09  11  room.  You see him get arrested in front of your own eyes,

02:50:12  12  right?

02:50:12  13  A.  I was there when he was arrested.

02:50:15  14  Q.  Right.  So you know now -- you now know he's been

02:50:18  15  arrested, correct?

02:50:20  16  A.  I said I was there when he was arrested.

02:50:23  17  Q.  And you know that the police wanted to question him about

02:50:26  18  a double murder, right?

02:50:27  19  A.  They had already questioned him.

02:50:29  20  Q.  Yeah.  And so now you know he's been arrested for a double

02:50:33  21  murder, right?

02:50:34  22  A.  Correct.

02:50:35  23  Q.  This man could be facing the rest of his life in prison at

02:50:39  24  this point, right?

02:50:40  25  A.  Absolutely.

Ingles - cross by Hale

1333



02:50:41  1  Q.  All right.  And you knew, if it was true -- if it was true

02:50:48  2  that Mr. Bolden told you he called 911, you would have made

02:50:52  3  every effort to get those records for him, wouldn't you have,

02:50:56  4  sir?

02:50:56  5  A.  That's wrong, because I was no longer on the case when

02:51:02  6  that stage of the proceedings was over and I left the police

02:51:06  7  station.  I was not the attorney of record.  He was appointed

02:51:11  8  within a day or two a public defender from murder task force

02:51:16  9  to start representing him on the case.

02:51:18  10  Q.  What do you mean you were no longer attorney of record?

02:51:23  11  A.  I was never the attorney of record.  I never filed an

02:51:26  12  appearance on the case.  I had an attorney-client relationship

02:51:30  13  with Mr. Bolden.

02:51:31  14  Q.  Okay.

02:51:32  15  A.  And I satisfied that relationship with what I had been

02:51:36  16  hired to do.

02:51:37  17  Q.  All right.  And so you were paid $1500, right?

02:51:41  18  A.  Yes.

02:51:42  19  Q.  And according to your testimony, you were at Area 2 from

02:51:46  20  9:00 o'clock until 10:30, right?

02:51:47  21  A.  Correct.

02:51:48  22  Q.  You were there an hour and a half, right?

02:51:50  23  A.  Yes.

02:51:50  24  Q.  So that comes to, according to my math, a thousand dollars

02:51:54  25  an hour you got for that engagement, correct?

Ingles - cross by Hale

1334

02:51:57  1  A.   Really?  A thousand dollars an hour?  Well, what about me

02:52:02  2  meeting with him and what about --

02:52:04  3  Q.   Right.

02:52:04  4  A.   -- phone calls.

02:52:06  5  Q.   Let's add the 20 minutes.  All right.  Keep going.

02:52:09  6  A.   What about all the other stuff I did on the case?

02:52:11  7  Q.   What's all the other stuff?

02:52:14  8  A.   Getting ahold of the detectives.

02:52:15  9  Q.   All right.  That's ten minutes?

02:52:17  10  A.   Setting up appointments.

02:52:18  11  Q.   All right.

02:52:18  12  A.   Getting phone calls back from them canceling.  Setting up

02:52:23  13  appointments.  Getting it canceled again.

          14  Q.   How many calls --

02:52:27  15  A.   I did all that I could do to allow for us to go in and be

02:52:32  16  interviewed.

02:52:32  17  Q.   All right.  And so let me just get this straight.

02:52:36  18  Mr. Bolden is arrested for a double murder.  You know that

02:52:42  19  these 911 calls, if this is true, are critically important to

02:52:46  20  Mr. Bolden's life, and your position is, ah, it's not the

02:52:53  21  scope of my representation.  I'm done here.  Out the door.

02:52:56  22  See you later, Mr. Bolden.  Adios.  That's your testimony?

02:53:01  23  A.   No, that's your testimony.  My testimony is that the --

02:53:06  24  what I was supposed to do and what I agreed to do for him I

02:53:10  25  had done.  At that point, he had a new attorney.

Ingles - cross by Hale

1335

02:53:15    1        I had no access to the court file.  I had no

02:53:19    2   obligation -- I didn't -- it would have been wrong for me to

02:53:23    3   even go forward to do something on the case when he's got an

02:53:27    4   attorney and I'm no longer his attorney.  I cannot do that.

02:53:30    5   Q.  He didn't -- when he got handcuffed at Area 2, he didn't

02:53:34    6   have a new attorney at that point, right?

02:53:35    7   A.  And he also didn't --

02:53:37    8   Q.  No, listen to my question.  When he got handcuffed at

02:53:39    9   Area 2, he didn't have a new attorney at that point, right?

02:53:42   10   A.  That is correct.

02:53:42   11   Q.  You're there, right?

02:53:44   12   A.  I was there.

02:53:45   13   Q.  And isn't it true, sir, the reason you never got any 911

02:53:50   14   tapes is because Mr. Bolden never told you he called 911?

02:53:57   15   A.  That's a lie.

02:53:58   16   Q.  That's a lie?

02:53:59   17   A.  That's a lie.

02:54:00   18   Q.  Okay.  So, sir, how hard is it to file an appearance?  Can

02:54:04   19   we talk about that?  What does that entail?

02:54:06   20   A.  It's a single piece of paper where you put People versus

02:54:12   21   Eddie Bolden, the case number, that you're representing him.

02:54:16   22   You sign your name, and then you put all your information on

02:54:20   23   the lower left side, Charles David Ingles, law firm, phone

02:54:26   24   number, and these days I think they want your e-mail as well.

02:54:30   25   And then you file it.

Ingles - cross by Hale

1336

02:54:31　1　Q.　And that takes about, what, ten minutes to fill that out?

02:54:34　2　A.　You have to go to a courtroom where the case is up --

3　　　　　MR. SAFER:　Your Honor --

4　BY THE WITNESS:

02:54:39　5　A.　-- and you have to file an appearance.

02:54:40　6　　　　　MR. SAFER:　Your Honor, objection.　Foundation, like

02:54:42　7　when can an appearance be filed.　Without that, this is very

02:54:47　8　misleading.

02:54:49　9　　　　　THE COURT:　So the question was how hard is it to

02:54:52　10　file an appearance?　I think that's the question that I saw.

02:54:55　11　So to that extent, it's overruled.　You're free to cover it in

02:54:59　12　redirect if you'd like.　Go ahead.　Overruled.

02:55:02　13　BY MR. HALE:

02:55:03　14　Q.　So how long does it take to fill out an appearance?

02:55:06　15　A.　Ten minutes.

02:55:06　16　Q.　Okay.　And when could you have filed an appearance for

02:55:10　17　Mr. Bolden if you wanted to?

02:55:11　18　A.　No.

02:55:11　19　Q.　I said, when could you have filed an appearance for

02:55:16　20　Mr. Bolden if you wanted to?

02:55:16　21　A.　Could I have?

02:55:17　22　Q.　Yeah, when?

02:55:18　23　A.　You mean like *pro se* or *amicus curiae*, friend of the

02:55:22　24　Court?

02:55:22　25　Q.　I'm just saying in terms of timing.　Let's assume

Ingles - cross by Hale

1337

02:55:26  1   Mr. Bolden walked out of the lineup room, he has his handcuffs

02:55:29  2   on, and he says to you, hypothetically, "Mr. Ingles, I would

02:55:33  3   now like you to continue your representation of me."  Okay?

02:55:36  4   Could you have filed your appearance that day?

02:55:37  5   A.  No.

02:55:38  6   Q.  When can you file it?

02:55:40  7   A.  You'd have to wait until the case came to a courtroom

02:55:43  8   where the body was there and the file was there.

02:55:46  9   Q.  Okay.

02:55:46  10  A.  And then you could file an appearance.

02:55:48  11  Q.  Okay.

02:55:49  12  A.  Which would be about three or four days down the road.

02:55:52  13  Q.  After Mr. Bolden got arrested, did you talk to his family

02:55:58  14  again?

02:55:59  15  A.  I believe I talked to them right afterward.

02:56:03  16  Q.  Who did you talk to?

02:56:04  17  A.  I believe it was his mother.

02:56:06  18  Q.  What did you say to her?

02:56:08  19  A.  I told them that they charged him with the double murder.

02:56:11  20  Q.  Okay.  Did you say anything else to her?

02:56:14  21  A.  I told her that if she wanted me to continue on with the

02:56:17  22  case, that it's a double murder, it's going to be a lot of

02:56:21  23  money --

02:56:22  24  Q.  Okay.

02:56:23  25  A.  -- without saying exactly how much.

Ingles - cross by Hale

| | | |
|---|---|---|
| 02:56:25 | 1 | Q.   Yeah. |
| 02:56:26 | 2 | A.   And she did not have the funds. |
| 02:56:28 | 3 | Q.   Did you tell her that, hey, there's this 911 tape, you |
| 02:56:33 | 4 | guys better make sure you get it? |
| 02:56:35 | 5 | A.   I doubt if I told her that. |
| 02:56:36 | 6 | Q.   Right. |
| 02:56:37 | 7 | A.   I told her that if she didn't have the funds, that murder |
| 02:56:43 | 8 | cases that go over to the building are automatically appointed |
| 02:56:48 | 9 | an attorney from the murder task force, and most of them are |
| 02:56:54 | 10 | very experienced and seasoned attorneys.  They have the |
| 02:56:58 | 11 | wherewithal to have investigators and all type of things that |
| 02:57:02 | 12 | they can do at no charge to her. |
| 02:57:05 | 13 | Q.   Is there any way to file an appearance before that first |
| 02:57:07 | 14 | court date?  If it's like some kind of emergency, can you do |
| 02:57:11 | 15 | it? |
| 02:57:11 | 16 | A.   You can't do it because you don't have the file and you |
| 02:57:13 | 17 | don't have a case number. |
| 02:57:14 | 18 | Q.   It's impossible? |
| 02:57:16 | 19 | A.   Not that I know of.  I don't know how to do that.  How |
| 02:57:20 | 20 | would you do it? |
| 02:57:21 | 21 | Q.   I'm asking you. |
| 02:57:24 | 22 | A.   How are you going to do it when there's no case number? |
| 02:57:26 | 23 | You don't get the case number until that file that the |
| 02:57:31 | 24 | detectives prepare over at Area 2 and ship along with the |
| 02:57:36 | 25 | defendants to bond court -- when the file gets there, the |

Ingles - cross by Hale

1339

02:57:40  1  clerk then puts a case number on it.  That's the first time

02:57:46  2  you can file an appearance.

02:57:47  3  Q.  When does -- after you left Area 2, did you talk to

02:57:52  4  Mr. Bolden again ever?

02:57:53  5  A.  I think I did talk to him after that one time.

02:58:02  6  Q.  When?

02:58:03  7  A.  When he was released, he called me and said that he had

02:58:07  8  been released.

02:58:09  9  Q.  Oh, like in -- like just within the last few years?

02:58:13  10  A.  Correct.

02:58:13  11  Q.  Okay.  So what I meant was, once you see him get arrested

02:58:17  12  at Area 2, let's just talk about the year 1994, do you have

02:58:22  13  any more conversation with him in 1994?

02:58:24  14  A.  No, I didn't.

02:58:25  15  Q.  Okay.  And you didn't make -- after you left Area 2, you

02:58:29  16  didn't discuss 911 tapes with anybody, correct?

02:58:32  17  A.  Well, that's not correct, because I got a phone call from

02:58:39  18  his attorney that was now representing him, Kevin Foster, I

02:58:44  19  believe his name was, and he's in the murder task force.  And

02:58:50  20  I told him everything that I testified to today, and I also

02:58:55  21  told him about the conversation as to the 911 tape.  And I

02:59:01  22  told him that he needs to get a subpoena on file because even

02:59:05  23  if it's too late to get the disk, he could get the CAD part,

02:59:09  24  the computer-aided dispatch report.  That's what I told him.

02:59:17  25  Q.  So I'm going to get to the lineup in a bit.

Ingles - cross by Hale

1340

02:59:20   1      I want to ask you about -- after Mr. Bolden comes out

02:59:23   2  of the lineup room, you said -- can you just describe what you

02:59:30   3  visually saw with your eyes.  What did you observe?

02:59:32   4  A.  I'm sorry, after --

02:59:33   5  Q.  After Mr. Bolden -- when the lineup was over --

02:59:37   6  A.  Yeah.

02:59:37   7  Q.  -- he came out.  Tell me what you observed.

02:59:39   8  A.  What did I observe?

02:59:41   9  Q.  Yes.

02:59:43  10  A.  They brought him out of the room and brought him a little

02:59:47  11  bit further south down to almost where the door was at for the

02:59:52  12  interview room.  They told him he was under arrest.  They put

02:59:58  13  his hands on the desk.  They patted him down, put his arms

03:00:02  14  behind his back, handcuffed him, and took him out.

03:00:06  15  Q.  And how far away were you from him at that point, sir?

03:00:10  16  A.  Closer than me to you.

03:00:13  17  Q.  Okay.  So estimate it for me.  How far were you from him

03:00:18  18  at that point?

03:00:20  19  A.  I don't understand.

03:00:20  20  Q.  Ten feet?  How far are you from Mr. Bolden when you

03:00:24  21  observe that?  Ten feet?

03:00:26  22  A.  I don't --

03:00:27  23      THE COURT:  He said how far were you from Mr. Bolden,

03:00:29  24  the distance between you and Mr. Bolden.

03:00:30  25  BY MR. HALE:

Ingles - cross by Hale

1341

03:00:31  1  Q.  When you saw him get arrested, how far were you from him?

03:00:34  2  A.  Maybe from myself to that young lady in the blue mask.

03:00:39  3  Q.  All right.  Can you estimate the distance that you're

03:00:41  4  pointing to?

03:00:42  5  A.  Ten feet.

03:00:45  6  Q.  Okay.

03:00:46  7  A.  Ten, 15 feet at most.

03:00:47  8  Q.  And there was no conversation between you and Mr. Bolden

03:00:49  9  at that point, correct?

03:00:50  10  A.  Correct.

03:00:50  11  Q.  He leaves -- you see him get arrested, and then he is

03:00:55  12  taken somewhere else, and then you leave Area 2, right?

03:00:58  13  A.  That's when I left Area 2.

03:01:01  14  Q.  Yeah.  So let's be clear about this.  When Mr. Bolden came

03:01:05  15  out of the lineup room, he did not say to you, "Mr. Ingles, I

03:01:08  16  need to talk to you," right?

03:01:11  17  A.  Not that I recall.

03:01:12  18  Q.  Mr. Bolden made no requests to talk to you when he came

03:01:16  19  out of the lineup room, right?

03:01:17  20  A.  I don't recall that.

03:01:18  21  Q.  Yeah.  Mr. Bolden, when he came out of the lineup room,

03:01:22  22  didn't say to you, "Hey, Mr. Ingles, I saw the witness pick

03:01:28  23  out the wrong guy and then he picked me"?  He never said that

03:01:34  24  to you, right?

03:01:34  25  A.  I never heard that.

Ingles - cross by Hale

1342

03:01:36  1    Q.  Mr. Bolden didn't say to you when he came out of the

03:01:38  2    lineup room, "Hey, I had to change seats in there because the

03:01:41  3    guy first picked out the guy in No. 1, and I switched seats

03:01:45  4    because they were trying to rig this lineup on me"?  He never

03:01:47  5    said that, right?

03:01:48  6    A.  I never heard that.

03:01:49  7    Q.  Yeah.  He never said, "I saw the officer" -- "I saw the

03:01:53  8    witness shake his head no, and they told him to pick me"?  He

03:02:00  9    never told you that, right?

03:02:01  10   A.  I don't recall that, no.

03:02:02  11   Q.  He didn't say anything to you when he came out of the

03:02:05  12   lineup of being able to see through the mirror, right?

03:02:08  13   A.  I didn't hear that.

03:02:09  14   Q.  He didn't make any complaints to you when he came out of

03:02:12  15   the lineup about anything that happened in that lineup, right?

03:02:14  16   A.  That's what I recall.

03:02:16  17   Q.  He got handcuffed, and they took him away, right?

03:02:21  18   A.  That's what I recall.

03:02:22  19   Q.  Okay.

03:02:26  20       MR. HALE:  Judge, I'll keep going as long as you

03:02:27  21   want, but I just want to be cognizant of your schedule.

03:02:30  22       THE COURT:  We've been going about an hour and a

03:02:33  23   half.  You want to go a little bit more, and then we'll take a

03:02:35  24   break?

03:02:36  25       MR. HALE:  Sure, that's fine.

Case: 1:17-cv-00417 Document #: 639 Filed: 11/16/21 Page 83 of 177 PageID #:18609
Ingles - cross by Hale
1343

03:02:37  1  BY MR. HALE:

03:02:37  2  Q.  So let's talk a little bit about the lineup.  You get --

03:02:45  3       THE COURT:  Unless this is a natural stopping point

03:02:47  4  for you, in which case --

03:02:47  5       MR. HALE:  It kind of is.

03:02:49  6       THE COURT:  Folks, like I joked before, I've never

03:02:52  7  seen a jury that objects to a break.  So we're going to take a

03:02:57  8  quick midafternoon break.  We'll come back in 10 or 15

03:03:00  9  minutes, and then we'll get rolling again.

03:03:28  10      THE COURT SECURITY OFFICER:  All rise.

03:03:30  11      (Jury out.)

03:03:30  12      THE COURT:  Sir, before we go off the record, do not

03:03:34  13  discuss the substance of your testimony with anyone during the

03:03:38  14  break --

03:03:38  15      THE WITNESS:  Yes, sir.

03:03:38  16      THE COURT:  -- until you are completely off the

03:03:41  17  witness stand.

03:03:42  18      THE WITNESS:  Yes, sir.

03:03:43  19      THE COURT:  We'll take a break.

          20      (Recess taken at 3:03 p.m.)

          21

          22

          23

          24

          25

1     (A change in court reporters was had.)

2     (Jury in at 3:22 p.m.)

3          THE COURT:  All right, folks.  Welcome back.  Have

4     a seat.

5          We will resume the cross-examination.

6          Counsel, whenever you are ready.

7          MR. HALE:  Thank you, your Honor.

8     BY MR. HALE:

9     Q.   Mr. Ingles, before I get into the lineup, I just had a

10    couple of follow-up questions about the 911 tapes.

11         You had mentioned something along the lines of,

12    once Mr. Bolden gets arrested, there is an RD number, right,

13    for that arrest, I think is what you said?

14    A.   Not exactly.  Once they say you are under arrest, they

15    then put him somewhere waiting for felony review to come in.

16    And that could be anywhere from an hour to 72 hours.  During

17    that time felony review has to show up.  They go over all the

18    evidence, whatever they do to prepare the case.

19         The detective then has to type up an arrest report.

20    And on that arrest report is a provision for an RD number,

21    which he then -- when he is ready for that, he has to call in

22    to communications or whenever he calls on the Pax line.  I

23    don't know what phone he uses.  But they give him an RD

24    number.  It gets a CD number.  That's put onto the arrest

25    report.

1    And then when the arrest report is ready and

2    complete, the next time that it's available, they transport

3    the defendant to bond court, and that file goes along to bond

4    court as well, not exactly with him, but the clerks bring

5    over the files.

6        And then when the clerks at 26th and California get

7    those files, they have to put a number on it.  In this case,

8    let's say it would have been 94 MC 1 -- 123456.  And then

9    that's the case number in the municipal branch court.

10       And now, at that point you could do a subpoena.  If

11   you filed an appearance and they gave you that file --

12   because you can't just go in there and rummage through their

13   files; you have to file an appearance to get that file -- you

14   could then get the information you needed to prepare a 911

15   subpoena.

16   Q.   Okay.  So criminal defense lawyers aren't the only

17   people in the city of Chicago that could seek 911 tapes,

18   right?

19   A.   I have no idea.  I don't know of anyone who else can get

20   them besides the State's Attorney, public defender, the

21   detectives, and the defense attorneys.

22   Q.   Can you get them through FOIA, through the Freedom of

23   Information Act request?

24   A.   I can't hear you.

25   Q.   Can you get 911 tapes from the city of Chicago through a

1  Freedom of Information Act request?

2  A.   I have no idea.

3  Q.   Can you send a preservation letter to the City of

4  Chicago for a 911 tape?

5  A.   You can do a preservation letter.  You can do that.

6  Uh-huh.

7  Q.   And, in fact, the double murder, do you know what date

8  it took place?

9  A.   No, I don't know.

10  Q.   I will represent to you it was January 29th, 1994.

11          There would have been an RD number assigned to that

12  double murder the night of the double murder, right?

13  A.   I don't think so.

14  Q.   Why not?

15  A.   Because there wasn't an arrest made.

16  Q.   Your understanding as the criminal defense lawyer in

17  1994, there is no RD number until there is an arrest?

18  A.   When the officer calls in and says, I have an arrestee

19  here.  These are the charges.  I need an RD number.  I have

20  heard that on the 911 tapes many a time where they said,

21  okay, here is your number.  RD so and so and so and so, and

22  the officer prints that onto the arrest report.

23  Q.   We will have someone else talk about that.

24          But your understanding is there would be no RD

25  number for the double murder the day of or shortly after the

1    double murder; is that right?

2    A.    That's my understanding.

3    Q.    Okay.  So what I want to ask you about is the time -- we

4    are getting to the lineup.

5            So once you get the detective's card, you call the

6    detective, right?

7    A.    I didn't get the card.

8    Q.    Okay.

9    A.    I got his name and phone number.

10   Q.    Thank you.

11           So you called the name and phone number, right?

12   A.    Yes.

13   Q.    Okay.  Do you remember who that was?

14   A.    I believe I spoke to Detective Karl.

15   Q.    Okay.  And what did you say to him and what did he say

16   to you?

17   A.    I told him who I was, that I'm an attorney, that I have

18   been retained to represent Mr. Bolden, and that my

19   understanding was that he wanted to have some questioning

20   done for him, and that we are willing to come in and set up

21   an appointment to let that happen.

22   Q.    Okay.  So how many -- can you estimate how many phone

23   calls you had with a detective, whoever it might be, from the

24   Chicago Police Department before you came to Area 2 for

25   that -- what ultimately took place as a lineup?

1   A.   The initial phone call would be one, and then I believe

2   a second phone call from them to me canceling, and we reset

3   it -- I think we reset it at that time, and then another

4   phone call from them canceling again.  So I would say all

5   totaled, three or four phone calls.

6   Q.   All right.  So let's walk through that.

7        So it sounds like what you are saying is that the

8   detectives canceled this meeting a couple times, right?

9   A.   Yes.

10  Q.   So it sounds like it wasn't, like, something that was

11  urgent that had to happen in the next day or so, right?

12       It was rescheduled a couple times, right?

13  A.   We reset it.

14  Q.   What did the detectives tell you the first time they had

15  to reschedule?

16  A.   They said they couldn't locate a witness.

17  Q.   All right.  They couldn't locate a witness.  Isn't that

18  consistent with the idea that they expect there to be a

19  lineup, and you were told there was going to be a lineup?

20  A.   Not necessarily.

21  Q.   They couldn't locate a witness.  Isn't that consistent

22  with, we can't do the lineup, sir, because we can't locate

23  the witness?

24  A.   That's what you say, but that's not what I say.

25  Q.   Did that make you think at all that maybe there is going

1    to be a lineup?

2            Did that at least raise a little -- let me finish

3    the question, and I will let you answer.

4            When they said they couldn't get the witness, did

5    that make you think at all that --

6    A.   They were having --

7    Q.   Let me finish my question.

8            -- make you think at all like, huh, maybe they are

9    expecting this is going to be a lineup?  Did that cross your

10   mind?

11   A.   I did not think that.

12   Q.   Didn't cross your mind?

13   A.   I did not think that.

14   Q.   Okay.  The next time the meeting -- you call it a

15   meeting -- gets canceled, what was the reason?

16   A.   They said they couldn't make it.

17   Q.   They said they couldn't make it?

18   A.   Yes.

19   Q.   Any further discussion?

20   A.   No.

21   Q.   Okay.  When you were told the witness wasn't available,

22   you were told the witness wasn't available --

23   A.   That's not what I was told.

24   Q.   You thought there was a possibility, right, that there

25   might be a lineup, right?

1    A.    Didn't you just ask me that a couple questions ago?  I

2    said no, and that's not what they told me.

3    Q.    All right.

4    A.    They said to me they were having a difficulty locating a

5    witness, period.  I didn't know what that meant.

6    Q.    Okay.  So let me go to your deposition taken on

7    March 19th, 2018.  Page 62, Line 18 through Page 63, Line 2.

8         "Q.  I thought that I heard you saying -- and

9    correct me if I'm wrong -- that this appointment had been

10   rescheduled on a number of occasions, correct?

11        "A.  I think it was rescheduled two other times.

12        "Q.  And on one of the occasions, was it your

13   testimony that it was rescheduled because someone was

14   unavailable?  A witness, for example, was unavailable to

15   appear?

16        "A.  Yes.

17        "Q.  So did that tell you, in your experience, that

18   there might be in fact a witness who was coming that day to

19   make an identification?

20        "A.  Possible."

21        Were you asked those questions and did you give

22   those answers?

23   A.    Yes.

24   Q.    Okay.  And what we do know is a lineup did take place

25   the day you went to Area 2, right?  We can agree on that?

1    A.    Yes.

2    Q.    Okay.  So let's talk about participating in the lineup.

3              Mr. Bolden and yourself were going to Area 2

4    voluntarily, correct?

5    A.    Yes.

6    Q.    You were not obligated to be there, right?

7    A.    Correct.

8    Q.    You were free to leave at any time, correct?

9    A.    Yes.

10   Q.    Okay.  Mr. Bolden was not under arrest, obviously,

11   right?

12   A.    Correct.

13   Q.    And when Mr. Bolden -- at the time of the lineup when

14   you went to Area 2, what is your understanding of how much

15   time had elapsed from the double murder -- the date of the

16   double murder?

17   A.    A couple weeks maybe.

18   Q.    You don't know what Mr. Bolden's hair looked like at the

19   time of the double murder, right?

20   A.    No.

21   Q.    You don't know whether Mr. Bolden had any facial hair or

22   not at the time of the double murder, right?

23   A.    No.

24   Q.    Okay.  So you get there and, according to you, you are

25   just in the hallway; is that right?  Like an aisle?

1   A.   Say it again.

2   Q.   When you get to Area 2, according to you, you are just

3   standing, like, in the hallway?

4   A.   That's exactly correct.

5   Q.   Isn't it true, sir, what happened is, when you got

6   there, the detectives took you down the hall and put you and

7   Mr. Bolden in a conference room?

8   A.   In where?

9   Q.   In a conference room.

10  A.   That's a lie.

11  Q.   Okay.  You have testified to this version of events, I

12  think we established earlier, at the motion to suppress

13  hearing, right?

14  A.   Yes.

15  Q.   Can you explain to the jury what a motion to suppress

16  hearing is?

17  A.   You want me to do that?

18  Q.   Yes.

19  A.   Okay.  When there is an illegal arrest or illegal search

20  or obtaining statements from somebody illegally, you can file

21  a pretrial motion moving to suppress that evidence to prevent

22  it from coming into trial.  And if the court that hears the

23  motion agrees with you that the person's rights were violated

24  in order to obtain that evidence, that evidence will then be

25  excluded and not become part of the trial.

1    Q.   Okay.  So you testified at a motion to suppress hearing

2    in Mr. Bolden's criminal case, correct?

3    A.   Kevin Foster asked me to -- would I please be a witness

4    on a motion to suppress, and I did.

5    Q.   And I will represent to you that was on February 15th,

6    1995.

7              So there was a hearing where Mr. Bolden and his

8    lawyer were seeking to suppress his identification; is that

9    correct?

10   A.   You would have to ask them.  All I did was testify to

11   exactly what I knew and what happened, just like I did today.

12   Q.   You testified --

13   A.   I didn't read their pleadings.  I have no idea what they

14   were doing.

15   Q.   You testified at the motion to suppress hearing on

16   February 15th, 1995, about what you claim you observed at

17   Area 2, correct?

18   A.   That is correct.

19   Q.   Okay.  To this jury what you described was, if I got

20   this right, they walked -- a detective -- an African-American

21   detective walked two African-American men by you and

22   Mr. Bolden while you are in the aisle.  They looked at you

23   and you looked at them, right, so you said?  Right?

24   A.   The two people that came in with the detectives?

25   Q.   Yes.  Yeah.  They looked at you and Mr. Bolden and you

1    looked at them, right?

2    A.   They were walking by us.  We looked at them.  They

3    looked at us.

4    Q.   And you said the guy -- the bigger guy was wearing an

5    Army jacket, right?

6    A.   Yes.

7    Q.   And then you said to the members of the jury, the big

8    guy, as he kind of rounded the corner, looked back over his

9    shoulder and looked back at you guys again, right?

10   A.   Yes.

11   Q.   That's not at all the way you described it at the motion

12   to suppress hearing, right?  Right?

13   A.   I think it is.

14   Q.   You read the motion to suppress hearing, right?  You

15   read it before you testified here today, right?

16   A.   I mean, I remember giving testimony.

17   Q.   So tell me what's missing in the motion to suppress

18   testimony that you testified in this court.

19   A.   I don't understand.

20   Q.   You read the motion to suppress testimony that you gave

21   before coming into this courtroom today to prepare, right?

22   A.   I did.

23   Q.   You know what you said, right?

24   A.   I believe I know what I said.

25   Q.   Okay.  So tell me what is missing from your motion to

1    suppress testimony about that event in the aisle that you

2    testified to in this courtroom to these people.

3    A.   I don't know what you are talking about.

4    Q.   Do you think you testified here today consistent with

5    your motion to suppress testimony when you were under oath?

6    A.   I think so.

7    Q.   Okay.  Let's take a look at your motion to suppress

8    testimony.  It's dated February 15th, 1995.  This is Page 7,

9    Lines 17 through 23.

10          "Q.  Now, what happened after that point when you

11   and Eddie were standing in the waiting room?  Did you see

12   anyone come in?

13          "A.  Yes, I saw two black males come in escorted by

14   a black detective, and they walked right by myself and Eddie

15   Bolden.  They walked right in front of us, went down that

16   little corridor, and turned right into a room."

17          Is that what you testified to?

18   A.   Yes.

19   Q.   You didn't say anything about, we looked at them and

20   they looked at us, right?

21   A.   I guess I didn't say that.

22   Q.   You didn't say anything about one of the guys is wearing

23   an Army jacket, right?

24   A.   I think somewhere later in the testimony I mentioned the

25   guy had an Army jacket on.

1    Q.   Yeah.   That was when you testified the next time at the

2    criminal trial a year later, sir.   That's what you are

3    thinking of.

4    A.   Okay.

5    Q.   All right.   And you said nothing about a guy having a

6    blue coat, right, in that testimony in the motion to

7    suppress?

8    A.   Okay.

9    Q.   And you said nothing, I think most importantly, about a

10   guy -- a big guy looking back over his shoulder at you and

11   Mr. Bolden.   You didn't say any of that in the motion to

12   suppress either, right?

13   A.   I guess I didn't say it.

14   Q.   So when you read the --

15   A.   It happened.

16   Q.   When you read the motion to suppress testimony --

17   A.   Yes.

18   Q.   -- to prepare to testify today --

19   A.   Yes.

20   Q.   -- did you realize what you said back under oath in

21   1995?   Right?   You saw what you said?

22   A.   And I also saw what I said at trial, and I also saw what

23   I said at the deposition.

24   Q.   Right.   And it was different every time, wasn't it?

25   A.   No.

1    Q.   You put more meat on the bones every time, didn't you,

2    sir?  Right?  Because the first time is, they walked right by

3    myself and Eddie Bolden.  They walked right by.

4            And the motion to suppress was denied, right?

5    Right?

6    A.   Which question do you want me to answer?

7    Q.   You said in the motion to suppress they walked right by,

8    correct?

9    A.   Yeah, they walked right by us.

10   Q.   And you said nothing about this dramatic, we looked at

11   them and they looked at us, right?

12   A.   They were looking at us.  We were looking at them.  We

13   were the only people up there.

14   Q.   You are testifying -- let's put this in context.

15   A.   Okay.

16   Q.   You are testifying at a motion to suppress hearing where

17   Mr. Bolden is claiming there has been a suggestive lineup

18   procedure, right, because the guys walked by, right?  Right?

19   A.   Yes.

20   Q.   And you knew you were going to be called to testify in

21   the motion to suppress hearing, correct?

22   A.   Yes.

23   Q.   You prepared to testify, correct?

24   A.   Possibly.  I don't recall preparing, but okay.

25   Q.   You might not have prepared?

 1   A.   I don't know.  Kevin Foster didn't really get up with me
 2   and go over my testimony.  I think I told him what happened
 3   over the phone, and he put me on the witness stand.
 4   Q.   And you knew this was important.  This event was
 5   important, right?
 6   A.   What are we talking about?
 7   Q.   What you claim you witnessed at Area 2, right?
 8   A.   Yes, it was important.
 9   Q.   Yeah.  And this was your opportunity under oath, right?
10   Right?  You are under oath?
11   A.   Yes.
12   Q.   Your opportunity to tell the court what you observed,
13   correct?
14   A.   And I did.
15   Q.   Right.  You said they walked right by, correct?
16   A.   That's correct.
17   Q.   And you said nothing about, they looked at us and we
18   looked at them, correct?
19   A.   I didn't say it.
20   Q.   You didn't say, the big guy turned around and looked
21   back at us, right?
22   A.   I didn't say it at that time.
23   Q.   And you didn't say one guy is wearing an Army coat and
24   one guy is wearing a blue coat, right?
25   A.   I didn't say it at that time, but I said it at the

1   trial.

2   Q.   Well, let's look at the trial.

3   A.   Okay.

4   Q.   The trial would have been -- I'll get you the exact

5   date.   The trial would have been October 29th, 1996.   I will

6   represent that to you.

7          That's when you say -- this is Page 13, Line 11

8   through 23.

9          So this is at the trial a year later.   Actually,

10  the motion to suppress is February of 1995.   Now we are on

11  October 29th, 1996.   The motion to suppress has already been

12  denied.   So this is kind of round two.   This is your second

13  attempt at testifying.

14         At Page 13, Line 11.

15         "Q.   Now, after you had come back with your coffee

16  and you were standing there with Eddie, what happened after

17  that?

18         "A.   After awhile the door opened up, and there was

19  another black detective who was coming through with a gun."

20         Now you are saying there was a gun.

21         "And he had two black guys with him and walked

22  directly by us.   They had to go right by us, and they looked

23  at us and we looked at them and they turned the corner.   The

24  big guy, as he turned the corner, kind of looked back a

25  little bit.   I think he had an Army jacket on.   They took him

1    to the area where their office had been and where I got the

2    coffee at."

3              Right?  Right?

4    A.   Is that what it says?

5    Q.   That's what it says.

6              Were you asked those questions and give those

7    answers?

8    A.   That's what I said.

9    Q.   And can you tell me why you didn't put any of those

10   details in the motion to suppress testimony back a year and a

11   half earlier?

12   A.   Can I tell you what?

13   Q.   Why you didn't put any of those details in your motion

14   to suppress testimony a year and a half earlier?

15   A.   I don't know.  Kevin Foster was the lawyer that prepped

16   me for the motion, and I think we even did it out in the

17   hall, right out before we went into the courtroom, and I

18   answered the questions and that was that.

19   Q.   So he is just asking you what you observed, right?

20   A.   He asked me what I observed.

21   Q.   Yeah.  So it's not Kevin Foster's fault, right, that you

22   testified differently?

23              The question at the motion to suppress on Page 7,

24   Line 17 was:

25              "Now, what happened after that point when you and

1    Eddie were standing in the waiting room?"

2         You could say whatever you wanted, right?

3    A.  I said the truth.

4    Q.  Okay.  And the second time you testified when you now

5    talk about a guy in an Army jacket, you don't say the other

6    guy has got a blue jacket on, do you?

7    A.  I guess I didn't say it.

8    Q.  So when did you realize that the second guy had the blue

9    jacket on?

10   A.  Probably at the deposition.  I might have recalled that

11   he might have had a blue -- my mind went back, and I started

12   recalling more things.  So I think the guy had on a blue

13   jacket.

14   Q.  So your deposition is March 19th, 2018.  You are telling

15   this jury that, although in 1995 and 1996 you said nothing

16   about the little guy wearing a blue jacket, when you are

17   deposed in 2018, over 20 years later, you now think the

18   little guy, who isn't even the guy that goes into the witness

19   room -- you are thinking this obscure little guy had a blue

20   jacket on.  You remember that now?

21   A.  He had a blue jacket on is what I said.  He might have.

22   Q.  You remember that now?

23   A.  I think I remembered it back when I did the deposition.

24   I got a picture of it in my mind.

25   Q.  You do.  Okay.

1    So when you get to Area 2, you say at some point

2    after you claim these guys walked by you are put in a small

3    room with Mr. Bolden; is that right?

4    A.   I'm sorry?

5    Q.   At some point before the lineup you are put in a small

6    room with Mr. Bolden; is that right?

7    A.   Correct.

8    Q.   Let me go back.

9         In all the testimony I have read, when the guys

10   walked by you, under your version, at Area 2, there is no

11   conversation between you and Mr. Bolden, correct?

12   A.   At that moment?

13   Q.   Yeah.

14   A.   No.

15   Q.   Right.  The guys walk by you, but there is nothing

16   between you and Mr. Bolden.

17        So Mr. Bolden never said to you right there in the

18   hallway, hey, that's the -- that's the guy that was outside

19   the J&J Fish fighting that just walked by me.  He never said

20   that to you, right?

21   A.   He didn't say that to me.

22   Q.   He never said to you, like, hey, I recognize that guy.

23   I saw him at J&J Fish.  Right?

24   A.   He didn't say anything to me.

25   Q.   He said nothing to you, right?

1    A.   Correct.

2    Q.   And you never tried to pull his sweatshirt down so he

3    couldn't -- these guys couldn't see Mr. Bolden, right?

4    A.   We didn't even know who that guy was.  He could have

5    been coming out there for a different case completely.  I

6    didn't know who the detective was.  I didn't know who those

7    people were.

8    Q.   I just want to be clear on this, though.

9         When the guys walked by -- when you claim the guys

10   walked by in the hallway, you didn't run over and pull

11   Mr. Bolden's sweatshirt down so they couldn't see his face,

12   did you?

13   A.   No, I didn't.

14   Q.   Yes.  Okay.

15        So at some point you end up -- before the lineup

16   you end up in a small room on the second floor at Area 2,

17   right?

18   A.   That is correct.

19   Q.   Okay.  And you went in there initially with Mr. Bolden,

20   correct?

21   A.   Yes.

22   Q.   Okay.  And then you left that little room, right?

23   A.   Eventually I did, yes.

24   Q.   And you left it because you said, "I'm not family.  Why

25   would I stay in that room with him?  I'm not a relative."

1  A.  I didn't have anything more to say to Eddie, and the

2  detective went out and I went out and he stayed in there.

3  Q.  The whole comment of, "I'm not a relative.  Why would I

4  stay in there with him?"  What did you mean by that?

5  A.  He's my client.  He's not my brother or my friend.  I

6  got out of the room, period.

7  Q.  Why wouldn't you just stay in the room with Mr. Bolden?

8  He is your client.

9  A.  That's what I wanted to do.

10  Q.  I'm asking you why?

11  A.  Excuse me?

12  Q.  I'm asking you, they put -- they put --

13       MR. HALE:  Let me ask my question, and you can

14  object if you want.

15  BY MR. HALE:

16  Q.  They put you and Mr. Bolden in a room together.  I'm

17  saying, why wouldn't you stay in the room with him?

18       MR. SAFER:  Objection.  Relevance, your Honor.

19       THE COURT:  Overruled.

20  BY THE WITNESS:

21  A.  When the detectives said, "I don't have anymore

22  questions; I'm going to go out," I went out with him.

23  BY MR. HALE:

24  Q.  Mr. Bolden stayed in the room, right?

25  A.  Yes.

1   Q.   Why didn't you -- I'm saying, why did you not just stay

2   with your client?

3   A.   Why should I?

4   Q.   Well, one reason is, he is your client.

5   A.   Yes.

6   Q.   Did you not want to be in the room with Mr. Bolden?

7   A.   I didn't want to stay in there at that moment.  I was

8   done.  I walked out.

9   Q.   Okay.  So I heard your testimony on direct examination

10  that you claim you asked Detective Pesavento if you could be

11  in the room where the witness is, right, the person viewing

12  the lineup, right?

13  A.   Actually, it was Detective Karl and I had an agreement

14  to that.

15  Q.   I'm sorry.  Thank you.  It's Detective Karl, well,

16  according to your testimony.

17         So isn't it true, actually, that you spoke to -- do

18  you recognize the gentleman sitting here (indicating)?

19  A.   I see him.

20  Q.   Do you recognize him?

21  A.   Vaguely.  The gray hair, the face a little bit.  He's

22  the guy that stood in the doorway with his arms crossed

23  from -- it's a narrow door to begin with.  So he was like all

24  the way between the door jambs, and he just said, "Where do

25  you think you are going?"

1    Q.   And you described that guy who allegedly blocked the

2    door as big and tall, right?

3    A.   He was thin and tall.

4    Q.   Big and tall?

5    A.   Excuse me?

6    Q.   You said he was big and tall, right?

7    A.   Thin and tall.

8    Q.   I said big and tall.

9    A.   Okay.  Big and tall.

10            MR. HALE:  Can you stand up, Mr. Pesavento.

11   BY MR. HALE:

12   Q.   Is this the big, tall guy that blocked the door with his

13   arms for you?

14   A.   That's the guy, but he was different shape back then, 25

15   years ago.

16   Q.   Was he a lot taller back then?

17   A.   I don't know.  Maybe he stood up straighter.

18   Q.   Okay.  So you were told by the detectives, right, that

19   they are not going to let you be in the room with the person

20   viewing the lineup, but they would let you be in the room

21   with Mr. Bolden, correct?

22   A.   That's a lie.  He never told me that.

23   Q.   Everybody is lying here today.

24   A.   No.  Your questions are lying.  That's not what was told

25   to me.  They never told me anything silly like I could be in

1    the room where the witness is -- where the people standing in

2    the lineup were going to be.  Now, why would I want to be in

3    that room?  Could I hear or see whether the witnesses that

4    are looking through the double window are being coached or

5    whether they can't make a positive identification?  Maybe

6    they say, "I'm not sure," or, "I think it's No. 2.  No.  Wait

7    a minute."  I wanted to see that.  I wanted to be in the room

8    with the so-called witness.

9    Q.   Right.  Because if --

10   A.   They never told me I could be in any other room at all.

11   They put those people in there.  They brought Eddie and put

12   him in -- Mr. Bolden in.  They closed that door.  Then they

13   brought the other people to go into the viewing room, and

14   that's when I got up to go into the viewing room, as you

15   know, and then I was blocked, and I couldn't go in.  And I

16   was told, "Where do you think you are going?"

17   Q.   Okay.  So let's break that down.

18             So isn't it true that you were told by the

19   detectives you could be in the room with Mr. Bolden?

20   A.   No.

21   Q.   You deny that?

22   A.   Yes.

23   Q.   Okay.  And you didn't want to be in the room with

24   Mr. Bolden because you can't see through the mirror on that

25   side, right?

1    A.    I wasn't in the room, but my understanding is you can't.

2    Q.    Correct?

3    A.    I didn't actually inspect that room and see if you could

4    see through it, but the other lineups and other lineup rooms

5    I have been in, it's a one-way mirror or two-way mirror.

6    Excuse me.

7    Q.    Okay.  So at some point after you claim you were

8    allegedly blocked, Mr. Bolden goes into the room, and what we

9    call the fillers went in there, too, right?

10    A.    What they call what?

11    Q.    Fillers, the other people that are going to participate

12    in the lineup.

13    A.    Right.  He was in the lineup room.

14    Q.    You saw Mr. Bolden go into that room, right?

15    A.    They took him in there, yes.

16    Q.    You saw the other men go into the room as well, right?

17    A.    Correct.

18    Q.    Okay.  And then you saw the guy that you are claiming is

19    the big guy in the Army jacket go into the viewing room,

20    right?

21    A.    Correct.

22    Q.    All right.  So what were you thinking at that point?

23    A.    With Karl?

24    Q.    Yeah.

25    A.    And the other black detective?

Case: 1:17-cv-00417 Document #: 639 Filed: 11/16/21 Page 109 of 177 PageID #:18635
Ingram - cross - by Hale
1369

1    Q.    Yeah.

2          So what were you thinking at that point when you

3    saw, under your version, the big guy in the Army jacket goes

4    into the viewing room that came by in the hallway earlier and

5    looked at you guys?  What were you thinking at that point?

6    A.    I thought he was going to view a lineup.

7    Q.    What?

8    A.    I thought he was going to view a lineup.

9    Q.    Right.

10   A.    And so I got up to go in, the agreement we had.  And I

11   got up and started walking in, and that's when I got my -- my

12   way to go in was totally blocked.  "Where do you think you're

13   going?" I heard.

14   Q.    But here is my point.

15   A.    "I'm going into the lineup room."

16         And he goes, "You're not going in."

17         And I said, "Well, wait a minute.  Our agreement

18   was I could be present in the lineup room."

19         He said, "You're present."  That was his words.

20   "You're present."

21   Q.    Okay.  So here is what I want to ask you about.  You are

22   saying that the guy in the -- the big guy in the Army coat,

23   who looked at you and Mr. Bolden and walked by, who then

24   looked back at you, you are saying you now see him go into

25   the viewing room like he is going to be viewing the lineup,

1    right?

2    A.    Correct.

3    Q.    So what were you thinking at that point?

4    A.    Okay.  Let's go.  Let's do the lineup.  What am I

5    thinking?  My client said he is willing to do it.

6    Q.    Well --

7    A.    He is adamant he is not involved.  They are going to do

8    a lineup that he agreed to.  As long as I could be present, I

9    went in there to be present.

10   Q.    Under your version of events, what you are saying

11   happened is, the guy who's going to view the lineup, before

12   the lineup has walked by you and Mr. Bolden, looked at you

13   and Mr. Bolden, turns his head back and looks back again at

14   you and Mr. Bolden, and then goes in eventually to view the

15   lineup, right?

16          So didn't that concern you, sir?

17   A.    Well, at the time I didn't know who this person was, and

18   I thought he might be one of the people that were actually in

19   the restaurant and was going to say, yeah, that's the guy.

20   He was at the phone.  He's the guy that was in there playing

21   at the video game.  He's the guy that made the phone call.

22   Q.    Okay.  So you thought he was there.  It was a lineup to

23   see who the guy making the phone call was.  Is that what you

24   thought, sir?

25   A.    I didn't know who he was, and he could have been that,

1    sir.

2    Q.   Let me ask you this:  Is it your testimony to this jury

3    that you think the lineup was not to try to see who the

4    killer was but to see, hey, can anybody pick out who the guy

5    in the fish store was?  Is that what you think the lineup

6    was?

7    A.   I didn't know, but I wanted to be present in the event

8    that he was somebody other than that.  They didn't tell me

9    who he was.  They didn't explain to me and say, this is an

10   occurrence witness who's going to try to identify your client

11   as being the wrongdoer.  They didn't tell me that.

12   Q.   Well, did you think about maybe asking?

13   A.   No, I didn't ask him.

14   Q.   I mean, you're there.  You're an experienced criminal

15   defense attorney.  If there was any confusion, why didn't you

16   just say, hey, you want to do a lineup.  What kind of lineup

17   do you want to do?

18          Did you ask him anything about the lineup?

19   A.   I didn't ask him that.

20   Q.   So you are this experienced criminal defense attorney,

21   and you are just going to say, I don't know.  Go ahead,

22   Mr. Bolden.  Whatever.  You didn't care anything about the

23   logistics?

24   A.   Those are your words that I don't care.  I thought

25   that -- I didn't think he was going to be identified,

1   frankly.

2   Q.   Well, you saw -- putting aside who he was, his name or

3   whatever, you're saying you saw the big guy in the jacket

4   walk right by you and Mr. Bolden, make eye contact. He turns

5   around, and then you see him walk into the lineup room. You

6   know he is going to be the guy viewing the lineup. Why

7   didn't you just stop the lineup at that point?

8   A.   I didn't want to stop the lineup. Why should I stop it?

9   Q.   Because it could potentially be suggestive if what you

10   are saying is true.

11   A.   I was going to be present to see what was going to be

12   said, which I was not allowed to do, and there is a reason

13   why I wasn't allowed to do it. It's pretty obvious to me.

14   Q.   Well, let's just see if we can agree on a couple things.

15         Can we agree on, you did not try to stop the

16   lineup? Correct?

17   A.   I did not what?

18   Q.   You did not try to stop the lineup, correct?

19   A.   I did not try to stop the lineup. Once Pesavento over

20   there (indicating) kept me from going in, I could do nothing.

21   How was I going to stop it? They have the guns and the

22   badges. There is four or five police up there and I'm by

23   myself. What am I going to do to stop it?

24   Q.   Well, how about saying, "I object to the lineup going

25   forward because you are bringing in a guy who we just saw in

1    the hallway.  I object.  I don't want to proceed with the

2    lineup.  We're out of here"?

3    A.   I didn't do that.

4    Q.   I know.  I am asking why?

5    A.   Again, they were in the lineup room.  They got the guns

6    and the badges, and they are going to conduct that lineup at

7    that point.  And I could have sat there and objected.  I

8    might as well have just gone out and had a cigarette.  It

9    wasn't going to make any differences because they do what

10   they want to do.

11   Q.   You made no objection to those officers --

12   A.   I objected -- I didn't object --

13   Q.   Let me finish my question.

14            THE COURT:  Hang on, counsel.

15   BY MR. HALE:

16   Q.   Your objection was that you wanted to be in the room.

17   Your objection was not that the guy viewing the lineup has

18   just seen your client in the hallway, right?

19   A.   That's correct.

20   Q.   Okay.  And the reason you didn't object to the lineup

21   going forward is because all these things you claim happened

22   in the hallway didn't actually happen; isn't that correct,

23   sir?

24   A.   That's a lie.  You're a liar.

25            THE COURT:  I am going to strike the last sentence.

1    BY MR. HALE:

2    Q.    Okay.  So let's continue to talk about the lineup, sir.

3              Is there anything else you remember about what the

4    guys were wearing in the hallway besides the blue jacket and

5    the Army jacket that's come to your mind today?

6    A.    They had pants on.

7    Q.    Do you remember what color?  Is there something that you

8    can remember?

9    A.    I don't recall.

10   Q.    Can you remember today what the color of the pants were?

11   A.    I don't recall.  I think they were dark, but I don't

12   recall.

13   Q.    Okay.  Do you remember what Mr. Bolden was wearing?

14   A.    Pardon me?

15   Q.    Do you remember what Mr. Bolden was wearing?  Do you

16   remember what Mr. Bolden was wearing?

17   A.    No, I don't.

18   Q.    So after -- well, you also saw the gentlemen go into the

19   lineup room with Mr. Bolden who were going to be in the

20   lineup room with him, right?

21   A.    Say it again.

22   Q.    You saw -- what's your understanding of how many people

23   were in the lineup?

24   A.    My guess is five and one.  Five and Mr. Bolden is my

25   guess.  About that.

1    Q.   Well, I will represent to you it was five people.  Okay.
2    Mr. Bolden and four others.
3             You saw the four other guys go into the room,
4    right?
5    A.   Yes.
6    Q.   Okay.  And you had a chance to see those guys, right?
7    You had a chance to see those men, right?
8    A.   I could see them.
9    Q.   You were close by to the door where they went in, right?
10   A.   Close as me to you.
11   Q.   Okay.  You never objected to any detective that you felt
12   those men were too dissimilar to Mr. Bolden for a lineup to
13   proceed, correct?
14   A.   No, I didn't.
15   Q.   Okay.  How many lineups do you think you have -- before
16   Mr. Bolden's lineup, how many times would you estimate you
17   had brought clients into a police station to participate in a
18   lineup?
19   A.   A couple times.
20   Q.   A couple times.
21             So after Mr. Bolden is arrested -- we talked about
22   he comes out of the room, and he is put under arrest.  You
23   understood, correct, that the next step in the criminal
24   process was a felony review Assistant State's Attorney would
25   have to approve the murder charges, right?

1   A.    Correct.  They have to process the case.  They have to

2   type up reports.  And they have to wait for felony review to

3   get there to look the whole case over and decide if they are

4   going to give approval for the charges.

5   Q.    Right.  So just to make sure -- I want to walk through

6   the procedure.

7         The police officers charged Mr. Bolden with the

8   double homicide based on the witness identification, right?

9   He was put under arrest, right?

10        This is just foundation.

11  A.    He was put under arrest.

12  Q.    But the next step is the State's Attorney's office has

13  to approve those charges through their felony review

14  division, correct?

15  A.    That's correct.

16  Q.    And your experience as a criminal defense attorney is

17  that involves a felony review State's Attorney talking to the

18  person that has just been arrested, right?

19  A.    Well, they could try to talk to him.

20  Q.    Right.

21  A.    And also, they have to come out to the police station

22  from wherever they are at.  If they are at home or if they

23  are at another police station or if they are at 26th and

24  California, they have to drive to the police station whenever

25  they are free and then assess the case.  They will try to

1   talk to the defendant, and they will talk to the detectives,

2   and they will pretty much view the whole case and make a

3   ruling on it.

4   Q.   Right.  And sometimes the State's Attorneys are right

5   there in the building, right?

6   A.   Sometimes what?

7   Q.   Sometimes the State's Attorneys, the felony review

8   people, are right there in the building already, right?

9   A.   It's possible they could be there.

10  Q.   Yeah.  You didn't know -- once Mr. Bolden got handcuffed

11  and taken down the hallway, you didn't know how long it would

12  take for a felony review Assistant State's Attorney to come

13  talk to Mr. Bolden, right?

14  A.   I knew it would be within 72 hours.

15  Q.   Right.  And it could be 10 minutes or it could be 72

16  hours, correct?

17  A.   Correct.

18  Q.   All right.  You had no further discussions with the

19  detectives once Mr. Bolden got handcuffed and taken down the

20  hall, right?

21  A.   They left.  They took him away.

22  Q.   And you left, too, right?

23  A.   I did.

24  Q.   Okay.  And my question, sir, is, if we can pause at this

25  moment in time, you now know Mr. Bolden has been arrested.

1    You now know that the next step in the process is going to be

2    he is going to be interviewed by a felony review Assistant

3    State's Attorney.  Why wouldn't you want to be present for

4    that?

5    A.   Well, if he would have had the felony review person

6    there at that moment, I might have done it, but that wasn't

7    the case, and so I left.  Besides, at that point I went no

8    further with the case.  I had done what I had agreed to do.

9    Q.   In fact, what happened, sir, isn't it, that Mr. Bolden

10   was interviewed by the felony review State's Attorney that

11   same day, right?

12   A.   I don't really know.

13   Q.   You were there, right?

14   A.   That's a lie.

15   Q.   You were there when the State's Attorney interviewed

16   Mr. Bolden at Area 2, weren't you?

17   A.   That's a lie.  I never went back to the police station.

18   I left about 10:30, and I never went back.  They can make up

19   any reports they want with the typewriter to say whatever

20   they want to do, but that's not true.  That's an absolute

21   lie.  I never talked to the felony review.  I wasn't present

22   at all.

23   Q.   How many times would you say you have used the word

24   "lie" here in your examination?

25   A.   I don't know.  Count them up.  Ask the court reporter.

1    Q.   I'm asking you.  What do you think?

2    A.   Why don't you ask the court reporter?

3    Q.   No.  Can you give me a guess?

4    A.   Well, you keep making lies, and I keep correcting you.

5    Q.   Okay.  So let's just get this straight.  Under your

6    version, you go to the police station.  They walk -- the

7    lineup, you were right by you and your client, according to

8    you.  They let that person view the lineup.  You don't

9    object.  You let it go by.  Your client gets arrested.  You

10   don't talk to him.  He doesn't talk to you.  You know he is

11   going to talk to a State's Attorney.  And then you just leave

12   the building; is that right?

13              MR. SAFER:  Objection, your Honor.  Compound --

14              MR. HALE:  I will break it down, your Honor.

15              MR. SAFER:  -- argumentative, and asked and

16   answered approximately 15 times.

17              THE COURT:  You withdraw the question?

18              MR. HALE:  I do.

19   BY MR. HALE:

20   Q.   Let's see if we can just agree upon this.  After your

21   client, Mr. Bolden, was arrested, you had no discussion with

22   the detectives, correct?

23   A.   They left and I left.  They went their way, and I went

24   back down the stairs the way I came up.

25   Q.   So is the answer, I'm right?  You had no conversation

1    with the detectives, correct?

2    A.   That's correct.

3    Q.   And you didn't try to talk to the detectives, correct?

4    A.   I had no conversation with them.  The only

5    conversation -- the last thing I had said to them was what I

6    said to Pesavento when I told him, "You're a liar.  You're a

7    bad person.  And I'll never turn another person in to you or

8    your partner or anyone else in Area 2 ever again."

9    Q.   So my question, sir, was --

10   A.   That's the end of my conversation with the detectives.

11   Q.   My question was, you didn't try to talk to the

12   detectives after Mr. Bolden got arrested, right?  You didn't

13   try to talk to them?

14   A.   They walked away and went down -- out the building, out

15   that part of the building down to the lockup, and I walked

16   out of the building.

17   Q.   You didn't ask them, for example, hey, do you have any

18   idea when a felony review Assistant State's Attorney is going

19   to be coming to talk to Mr. Bolden, right?

20   A.   I didn't ask them anything.  I had no conversation with

21   them.

22   Q.   You didn't ask them, hey, can you give me a call if the

23   State's Attorney gets to the building because I want to be

24   here, right?

25   A.   I had no conversation with them.

 1    Q.   You didn't try to find out when the State's Attorney was
 2    coming, right?
 3    A.   That's correct.
 4    Q.   Okay.
 5              MR. HALE:  One second.
 6         (Brief pause.)
 7    BY MR. HALE:
 8    Q.   I'm almost done, sir.
 9              And you claim you were at the station for an hour
10    and a half, right?
11    A.   About an hour and a half, yes.
12    Q.   And you charged $1500 for that; is that right?
13              MR. SAFER:  Asked and answered, your Honor, several
14    times.
15              THE COURT:  All right.
16              MR. HALE:  I will withdraw it, your Honor.
17              I'm done.  No further questions.
18              THE COURT:  Okay.  Mr. Safer, did you need a minute
19    before you go?
20              MR. SAFER:  No.
21                     REDIRECT EXAMINATION
22    BY MR. SAFER:
23    Q.   Mr. Ingles, just a couple questions.
24              THE COURT:  Mr. Safer, you are welcome to speak
25    into the mic, too, on the podium if you'd like.  Whatever you

1    prefer.

2                 MR. SAFER:  Let's just keep this mic.

3                 THE COURT:  You are welcome to do that.

4                 MR. SAFER:  Thank you.

5    BY MR. SAFER:

6    Q.   Mr. Ingles, did you study the fillers as they walked

7    into the room?  Were you studying them, or were you yelling

8    at Mr. Pesavento?

9                 MR. HALE:  Objection to form.

10                THE COURT:  Overruled.

11   BY THE WITNESS:

12   A.   We were standing around.  The double doors opened.

13   BY MR. SAFER:

14   Q.   I'm sorry.

15                When the people were going into the lineup --

16   A.   Oh, into the lineup.  I'm sorry, Ron.

17   Q.   -- were you studying all of those people, or were you

18   occupied with Detective Pesavento?

19   A.   I was a few desks down, sitting there.  They brought

20   them in through the way we had entered, single file, and they

21   just walked by.  I saw the left side of their faces.

22                THE WITNESS:  Like, Judge, if you face forward,

23   that's what I saw, them putting them in like that.

24   BY MR. SAFER:

25   Q.   Now, one other -- just one other question.

1    You don't -- when do you start to have subpoena

2    power in a case?

3    A.    Say that again, Ron.

4    Q.    When do you start to have subpoena power in a case?

5         In other words, before there is an indictment, can

6    you subpoena anything?

7    A.    Yes.

8    Q.    How?

9    A.    Once there is an arrest and the defendant is taken to

10   bond court, a file goes along from the -- the clerks pick him

11   up at the police station and take him down to the clerk's

12   office at 26th and California, the bond department, the bond

13   room, if you would.  And the clerks there then prepare them

14   by putting them on a half sheet and putting a number on them,

15   a stamp like 94 MC 123456.  And they write them out on a half

16   sheet for the judge.

17   Q.    Okay.  So at that point you could --

18   A.    And then if you go in there and you file an appearance,

19   they will give you that file momentarily for you to read it

20   over, take whatever information off it you want, and then

21   return it to them so they can get it into the courtroom and

22   call out the defendants one at a time for a bond hearing.

23   That's the first time that you can get the information you

24   need to do a subpoena.

25   Q.    Thank you.

 1              MR. SAFER:  I have no further questions, your

 2    Honor.

 3              THE COURT:  You may step down.  Thank you, sir.

 4              THE WITNESS:  Thank you, Judge.

 5              THE COURT:  Watch your step as you go down.  There

 6    are a couple steps there.

 7         (Witness excused.)

 8              THE COURT:  Counsel, when you are ready.

 9              MR. CROWL:  Yes, Judge.  The plaintiff calls Edna

10    Williams.

11              THE COURT:  Good afternoon, Ms. Williams.  Please

12    watch your step, ma'am.  There are a couple steps there.

13              Can you please raise your right hand, ma'am.

14         (Witness sworn.)

15              THE COURT:  Sit down.

16              Ma'am, there is a glass of water there for you.

17              You are the only person in the courtroom that gets

18    to be mask-free.  You can take your mask off there and make

19    yourself comfortable.

20              When you are ready, I will let counsel ask you some

21    questions.  Okay?

22              THE WITNESS:  Okay.

23              EDNA WILLIAMS, PLAINTIFF'S WITNESS, SWORN

24                        DIRECT EXAMINATION

25    BY MR. CROWL:

1    Q.   Good afternoon, Ms. Williams.

2    A.   Good afternoon.

3    Q.   Thank you for traveling here for the trial.

4    A.   Okay.

5    Q.   Would you please tell the members of the jury your name.

6    A.   My name is Edna Williams.

7    Q.   And can you tell them what town you live in.

8    A.   Kenosha, Wisconsin.

9    Q.   And where do you currently work, Ms. Williams?

10   A.   Currently?

11   Q.   Or at least what has been your employment -- what has

12   been your business over the last few years?

13   A.   Oh, the last few years I have been a foster grandparent

14   because I'm retired.

15        THE COURT:  Ms. Williams, I am going to move your

16   microphone if I can, if you don't mind.  I just want to make

17   sure everybody can hear you.  Bear with me.

18        THE WITNESS:  Okay.

19        THE COURT:  Is that okay?

20        THE WITNESS:  Yes.

21        THE COURT:  I want to make sure everybody can hear

22   you, so I wanted to adjust the microphone.

23        Counsel, whenever you are ready.

24        MR. CROWL:  Thank you, Judge.

25   BY MR. CROWL:

1    Q.    So you have been working as a foster grandparent; is
2    that right?
3    A.    Yes, for ten years -- the last ten years.
4    Q.    Can you tell us what it means to be a foster
5    grandparent?
6    A.    Well, we get to be mentors to children, and I work in a
7    public school.
8    Q.    How do you like that?
9    A.    I love doing it.
10   Q.    Are you married, ma'am?
11   A.    Yes.
12   Q.    What's your husband's name?
13   A.    James Williams.
14   Q.    How long have you and Mr. Williams been married?
15   A.    Fifty-four years.
16   Q.    Do you have any children together?
17   A.    We have six.
18   Q.    Can you tell the members of the jury their names,
19   please.
20   A.    The oldest one's name is Willie, Rudy, Anthony, Louis,
21   Tonya, and Gregory.
22   Q.    And, ma'am, I understand that Anthony Williams, he
23   passed away; is that right?
24   A.    Yes.
25   Q.    What year did he pass away?

1    A.    In 2000.

2    Q.    And prior to that, for about six years what was his

3    condition?

4    A.    He had went into, like, a coma, like a vegetative state.

5    He couldn't talk or anything.

6    Q.    Ms. Williams, can you tell us where you were living when

7    you raised your six children?

8    A.    I lived in Chicago -- here in Chicago at 3739 Federal.

9    Q.    And what is that housing area called?

10   A.    It was like a project.

11   Q.    Do you remember the name of the project?

12   A.    Stateway Gardens.

13   Q.    Do you have any grandchildren, ma'am?

14   A.    I have 12.

15   Q.    And do you have any great-grandchildren?

16   A.    I am waiting on the 23rd one next month.

17   Q.    I want to take you back to between 1990 and 1994.

18         During that time frame from '90 to '94, did you and

19   your husband own a restaurant?

20   A.    Yes.

21   Q.    What was the name of that restaurant?

22   A.    J&J Fish.

23   Q.    Where was it located?

24   A.    6422 South Cottage Grove.

25   Q.    And we are going to show a picture.  I think it's

1    Plaintiff's Exhibit 189.

2              MR. CROWL:  Judge, I believe that this is in

3    evidence.  If not, I would offer it into evidence.

4              THE COURT:  I think it's in, too, but we will

5    doubly admit it just in case.  189 is in evidence.

6              (Said exhibit was received in evidence.)

7              MR. CROWL:  Jim, could you focus in on the building

8    that has a circle around it as close as you can get.

9    BY MR. CROWL:

10   Q.    Ms. Williams, what is that a photograph of?

11   A.    J&J Fish, the building.

12   Q.    I'm sorry.  Please?

13   A.    The storefront for J&J Fish.

14   Q.    And what is the address of that restaurant?

15   A.    6422 South Cottage Grove.

16   Q.    So when we are looking at that building, it looks like

17   there are two doors -- actually, more than two doors, but two

18   business doors, one on the left-hand.  Is that the door that

19   goes into J&J Fish?

20   A.    Yes.

21   Q.    And is there also -- or was there also back in 1994, was

22   there a business on the right-hand side right adjacent to J&J

23   Fish?

24   A.    Yes.

25   Q.    What was that business?

1   A.   A beeper shop.

2   Q.   And who owned the beeper shop?

3   A.   My son Anthony.

4   Q.   Above the J&J Fish on the left side and the beeper shop

5   on the right side, what's on the second and third floor?

6   A.   Two tenants lived up there.  Dave McCray lived on the

7   third floor; and Eddie Bolden, he stayed there for a few

8   months.  About five months.

9   Q.   When you say David McCray, who is David McCray?

10   A.   He was a tenant.  He rented from us, but he also worked

11   for us.  He delivered orders.

12   Q.   And you said Eddie Bolden also lived in this building

13   for approximately four to five months, you said?

14   A.   Yes.

15   Q.   Do you recall when that was?

16   A.   Not offhand.  I just know he was up there.

17   Q.   And did you also live in this building?

18   A.   Yes.  I lived on the 6422 side on the third floor.

19   Q.   And who did you live there with?

20   A.   My husband.

21   Q.   I also want to show you a couple photographs of the

22   inside.

23          MR. CROWL:  We will start with Joint Exhibit 23,

24   Judge.  It's in evidence.  May we show the jury?

25          THE COURT:  Yes.  Absolutely.

1    Blow it up nice and big so the jury can see it.

2    BY MR. CROWL:

3    Q.   So, Ms. Williams, this photograph has already been shown

4    to the jury, I believe.

5    My question is, are there differences between this

6    photograph and how your restaurant looked back in January of

7    1994?

8    For example, were those low tables and chairs, were

9    they right in front of the front door of the restaurant?

10   A.   No, I don't think so.

11   Q.   Do you recognize that space at least to be the door that

12   opens into the restaurant?

13   A.   Yes.

14   Q.   And then to the right there is a -- it looks like a

15   booth or a box; is that right?

16   A.   It's like a little booth.

17   Q.   And that's what booth?

18   A.   Like a little booth.

19   Q.   Yes, a little booth?

20   A.   Down there, yeah.

21   Q.   In 1994, what was that booth used for?

22   A.   My husband did paperwork and stuff in there when he

23   wasn't delivering.

24   Q.   After you sold the restaurant or you were done with the

25   restaurant in 1994, do you know who moved into the restaurant

1   or what it was used for?

2   A.  We didn't sell it.  We just closed.  And then we rented

3   it out to a nonprofit organization, which was like a daycare.

4   But I can't think of her name right now.

5   Q.  Does it look to you a little bit like that photograph

6   might have been taken after the daycare center might have

7   gone in?

8   A.  I think so.  I'm not sure.

9   Q.  Let's look at the next photograph.

10              MR. CROWL:  Your Honor, it's Plaintiff's Exhibit

11  46.  It's in evidence, Judge.

12              THE COURT:  Go ahead.

13  BY MR. CROWL:

14  Q.  Again, I am going to ask you whether or not this is at

15  least a photograph of your -- the inside of your space, the

16  inside of the building that you owned?  Is that right?

17  A.  Yes.

18  Q.  Does it also look to you a little bit like it's changed

19  since its appearance in January of 1994?  For example, were

20  those tables there right in front of the counter?

21  A.  I don't think so.

22  Q.  And when we are looking here, are we looking -- we have

23  come in the front door of the restaurant.  We are looking

24  toward the back door of the restaurant; is that right?

25  A.  Yes.

1   Q.   And in 1994, what was on the counter there where it
2   looks like now they have got some flowers?
3   A.   Well, we -- they had glass here (indicating) facing the
4   counter.
5   Q.   And when you say "here," you are talking about that
6   front wall actually was glassed in; is that right?
7   A.   Yes, this was glass here (indicating) where the register
8   and everything was at.
9   Q.   So that counter had a register.  It had some glass.  So
10  it looks like this picture may have been taken after the
11  events of the night of the shooting, which we are going to
12  talk about later; is that right?
13  A.   Yes, it looks like it.
14  Q.   In addition to owning --
15       MR. CROWL:  You can take that down, Jim.  Thank
16  you.
17  BY MR. CROWL:
18  Q.   In addition to owning J&J Fish, did you work there,
19  ma'am?
20  A.   Yes, I did.
21  Q.   What were your job responsibilities?
22  A.   Basically I was the overseer of the peoples that worked
23  there and to make sure that the orders and stuff were
24  correctly.
25  Q.   Did you like running a restaurant?

1    A.   Yes, I did.

2    Q.   Did your husband work there?

3    A.   Yes, he did.

4    Q.   What did he do?

5    A.   He picked up the stock.  He delivered orders.  He was

6    the first one in and the last one out.

7    Q.   How many days a week was your restaurant open?

8    A.   Every day.

9    Q.   What were the hours usually?

10   A.   Well, he usually went in, like, 6:00 in the morning to

11   set up everything and stuff, and we started out with orders,

12   like, at 11:00 o'clock to 12:00.

13   Q.   When you say 12:00, that means --

14   A.   12:00 at night.

15   Q.   -- midnight?

16        Did your son Anthony ever help in the restaurant?

17   A.   Yeah.

18   Q.   And how --

19   A.   He usually would come in and work the night shifts.

20   Q.   And how about Mr. Bolden?  Did Eddie Bolden ever work in

21   the restaurant?

22   A.   Yes.  He help us out a lot, too.

23   Q.   And how is it that you knew Eddie Bolden?

24   A.   Well, we all lived in the same project.  I lived on the

25   3739 Federal side, and he lived on the other side.  I knew

1  him as a child because he grew up there, too, and went to

2  school with my children.

3  Q.  Now, Ms. Williams, I want to take you to the night of

4  January 29th of 1994.  Do you remember that night?

5  A.  Yes.

6  Q.  And why is it that you remember that night?

7  A.  Because I had a great big catering order that I was

8  doing, and I wasn't going to work that Saturday, but I had

9  that order.  So I had to come in and make sure the order was

10  correct.

11      So I came in about 6:00 o'clock, getting my order

12  together and everything.  And then later on, around 8:00

13  o'clock, I think, we was getting things together.  We just

14  about finished everything.  And then somebody come running in

15  the door -- the front door, saying, "I've been shot in the

16  back.  Close the door."

17  Q.  When that man came into the restaurant and said, "Close

18  the door," who was in the restaurant at the time?

19  A.  At that time I was there, Eddie Bolden was there, my

20  husband was there, and a boy named Maurice.  I think the last

21  name is Stewart.  And then I had about five or six customers

22  in there sitting down eating.

23  Q.  And do you know a person by the name of Tenesha Gatson?

24  A.  Yeah, Tenesha was there.

25  Q.  Can you tell the members of the jury who Tenesha Gatson

Case: 1:17-cv-00417 Document #: 639 Filed: 11/16/21 Page 135 of 177 PageID #:18661
Gatson - Williams - direct - by Bowman
1395

1   is?

2   A.   Tenesha Gatson is my godchild.  I have known her from

3   day one when she was born.  I used to babysit her.  Later on,

4   she came to live with me until she was of that age.

5   Q.   And you said that this man came into your restaurant

6   saying that he had been shot?

7   A.   Yes.

8   Q.   At about 8:00 o'clock?

9   A.   Uh-huh.

10  Q.   Tell the members of the jury what happened next.

11  A.   Well, then he came running, and he just didn't stop.  He

12  just headed straight for the kitchen area, which we usually

13  have the door locked so nobody can just walk through the

14  kitchen -- come through the kitchen, but we didn't have it

15  closed.  So he just came on there.  And he was constantly

16  saying, "Close the door.  I've been shot in the back."

17           So he came on back there.  And everybody else who

18  was in the restaurant, even the customers, they ran back

19  there, too.  Everybody just came in the back.

20           So somebody pulled a chair out for him.  I don't

21  know whether it was my son Anthony or Lynier, because I guess

22  by that time Anthony had came from the beeper shop.

23  Q.   When you say "Lynier," who are you referring to?

24  A.   Eddie Bolden.  That's what I'm used to calling him.

25  Q.   And is his middle name Lynier?

1    A.    Yeah, I guess so.

2    Q.    At any point did someone inside J&J Fish call 911?

3    A.    Yes.  It was either Anthony or Lynier, because Lynier

4    was standing near the phone by the steam table.  We had,

5    like, a counter that -- like off from the -- you know, where

6    the register and stuff, right there.  Somebody called -- one

7    of them called the police.  I don't know which one.

8    Q.    And after 911 was called, did the police arrive?

9    A.    They came about 10 or 15 minutes, I think.

10   Q.    We are going to talk about two different sets of

11   officers who came.  I am talking about the first set.

12         The first ones who came, were they in police

13   uniforms or were they plain clothes?

14   A.    They was in plain clothes, I think.  I'm pretty sure

15   they were.

16   Q.    And when the first set of officers came, was Eddie

17   Bolden still in the restaurant?

18   A.    Yes, he was.

19   Q.    And then after the first group of officers left, what

20   did you do?

21   A.    Well, they told us to close.  They said, "Close up."  So

22   we was preparing to close and stuff.

23   Q.    Tell the members of the jury what happened next.

24   A.    And then, I guess, around about 10:00 or 10:30 they came

25   back.  Some polices came back.

1    Q.    And was it the same set or a different set of officers

2    who came back?

3    A.    I know this time it was some in plain clothes and some

4    in uniform.

5    Q.    And when the second set of officers came back, what did

6    they do?

7    A.    Well, they was looking for something, and they looked.

8    I guess they found what they was looking for, which was the

9    gun.

10    Q.    And how did they treat you, Ms. Williams?

11              MR. HALE:   Objection, Judge, based on motion *in*

12    *limine* No. 6.

13              THE COURT:   Overruled.

14    BY MR. CROWL:

15    Q.    Ms. Williams, you can answer the question.

16    A.    Oh, they was very rude.   They asked me about the gun,

17    and I told them I didn't know anything about it.

18    Q.    And when you said you didn't know anything about the

19    gun, what did they say?

20    A.    "I don't know anything about this gun."

21              So they said, "Okay.   You don't know anything about

22    the gun?"

23              I said, "No, I don't know anything about this gun.

24    I told you when the man came in, he had a gun in his hand."

25              And so they said, "Well, we'll just put the gun on

```
 1    so and so," you know.
 2              I'm like, "Okay."
 3              "Well, sign these papers."
 4              I said, "I'm not signing any papers without a
 5    lawyer."
 6    Q.   And did you sign any papers?
 7    A.   I didn't sign anything.
 8    Q.   And when they said they were just going to put the gun
 9    on so and so, is that the word they used?
10    A.   Yes, that's the word they used, "so and so."
11    Q.   Who did you understand that to mean?
12    A.   Well, I was the only one there, so I'm assuming they was
13    talking about me.  There was nobody there but just me,
14    Tenesha, and my husband at that time.
15    Q.   What happened next, Ms. Williams?
16    A.   And then they said they was going to arrest me, and they
17    did.  They was gonna put the gun on me.
18    Q.   And what did they do to you?
19    A.   Well, they took me to 111th precinct captain -- station.
20    Q.   How did they take you?
21    A.   They took us in the police car.
22    Q.   And were you handcuffed, ma'am?
23    A.   Yes, I were.
24    Q.   Once you got to 111th Street police station, what
25    happened?
```

1    A.   Well, I don't know.  I'm not sure what happened after

2    that because I was so furious with myself then.  All I know

3    is that they kept me there overnight.

4    Q.   Did they put you in a room?

5    A.   Yeah, they took me to a room.

6    Q.   Do you remember what that room was?

7    A.   I'm not sure.  I just know I was in a holding room,

8    whatever you call it.  Then later on they locked me up in the

9    cell.

10   Q.   And when you were at the 111th Street police station,

11   were you interviewed by police officers?

12   A.   Some talked to me.  I don't know.

13   Q.   And did they ask you about your son Anthony?

14   A.   I don't think so.  I don't remember them saying nothing

15   to me about him.

16   Q.   During the interview with the police officers,

17   Ms. Williams, did the officers ever ask you who was in the

18   restaurant at the time the man with the gun came in?

19   A.   No, I don't think they did.

20   Q.   Did they ever ask you who was in the restaurant after

21   the man with the gun came in?

22   A.   No.

23   Q.   If they had asked you who was in the restaurant at the

24   time the man with the gun came in, would you have told them?

25   A.   Yes, I would have.

1    Q.   You said that they interviewed you and then they put you

2    in a cell; is that right?

3    A.   Yes.

4    Q.   When did they let you leave?

5    A.   I got out the next day around 3:00 o'clock.

6    Q.   And were you charged with crimes?

7    A.   Yes.

8              MR. CROWL:  Judge, I would like to show an arrest

9    report only to your Honor and to the attorneys first,

10   Plaintiff's Exhibit 16.  And we would offer this into

11   evidence.

12             THE COURT:  Any objection?

13             MR. STEFANICH:  I don't have the report.

14             MS. BOUDREAUX:  It's not on our screen.

15             MR. STEFANICH:  Judge, objection based on our prior

16   motion *in limine*.

17             THE COURT:  Any other objection?

18             MR. STEFANICH:  No, Judge.

19             THE COURT:  It's admitted.  You can publish to the

20   jury.

21             MR. CROWL:  Thank you, Judge.

22        (Said exhibit was received in evidence.)

23             THE COURT:  Can we do a quick sidebar for five

24   seconds?

25             MR. CROWL:  Yes, Judge.

1    THE COURT:  When I ruled on the motion *in limine*, I

2    did say that you are going to need to establish a link

3    between the defendant officers and the arrest of Williams.

4    Are you going to do that?

5    MR. CROWL:  Yes, Judge.  We have done that.  We

6    have and we will.  We know that Defendant Oliver is one of

7    the people who is responsible for this arrest.

8    THE COURT:  Why don't you do that.

9    MR. CROWL:  Yes, Judge.

10    THE COURT:  The real reason for the sidebar is,

11    it's 4:35.

12    MR. CROWL:  I'm done.

13    THE COURT:  I am not hurrying you.  Do we need to

14    get this witness on her way today?  I just wanted everybody

15    to be mindful of the time.  We can go a little later than

16    normal if we can.

17    I don't know, Ms. Boudreaux, if you are handling

18    the cross.  I don't know if you have much on cross, but I

19    wanted to call you folks over to make sure you're -- you got

20    grandma on the witness stand here, and we want her to get

21    off.

22    MR. CROWL:  I will be fast.

23    THE COURT:  I'm not rushing anybody, but you don't

24    want to go on too long with grandma anyway, I would think.

25    So let's just be mindful of the clock.

1           With that, we are going to get rolling.

2        (End of sidebar proceedings.)

3           THE COURT:  Okay.  Thank you, folks.  Appreciate

4    you bearing with us.

5           Counsel, whenever you are ready.  Go ahead, please.

6           MR. CROWL:  Thank you, Judge.

7    BY MR. CROWL:

8    Q.   Ms. Williams, can you see the screen here with this

9    document?  It shows your name and "arrest report" at the top?

10   A.   Yes.

11   Q.   It says, "Edna Williams," and then that's your address

12   of your fish restaurant, 6422 South Cottage; is that right?

13   A.   Yes.

14   Q.   And then it shows the offenses that you were charged

15   with.  It shows UUW, unlawful use of a weapon.  Do you see

16   that?

17   A.   Uh-huh.

18   Q.   And then it says underneath it, "No firearm's owner

19   identification card."  Do you see that?

20   A.   Yes.

21   Q.   It says you were charged with no city registration.  Do

22   you see that?

23   A.   Yes.

24   Q.   And then it says in the text that, "The offender

25   shooter" -- it's the third line down -- "The offender shooter

1    was given permission to hide his weapon inside the fish

2    shop."

3              Do you see that?

4    A.   Yes.

5    Q.   Did you ever give anyone permission to hide a gun inside

6    your restaurant?

7    A.   No, I did not.

8    Q.   And then it says below that, "Offender also signed for

9    license violations inside the store."  Do you see that?

10   A.   Yes.

11   Q.   So here they are claiming you were the offender.

12             Did you ever sign for license violations inside

13   that store?

14   A.   No, I did not.

15   Q.   And then you also see that at the second to the bottom

16   line it says, "J. Oliver."  Do you see that?

17   A.   Yes.

18   Q.   Do you remember any of the names of the officers who

19   arrested you, and in particular, do you remember a James

20   Oliver?

21   A.   I don't remember any of their names.

22             MR. CROWL:  May I have one moment, Judge?

23             THE COURT:  Yes.

24        (Brief pause.)

25             MR. CROWL:  No further questions, your Honor.

1       THE COURT:  Thank you.

2       Cross-examination.

3                           CROSS-EXAMINATION

4    BY MR. STEFANICH:

5    Q.   Ms. Williams, you stated that you have known Mr. Bolden

6    since he was a little boy; is that correct?

7    A.   Yes, from ten years old.  He was ten.

8    Q.   Was Mr. Bolden childhood friends with your son Anthony?

9    A.   Pardon me?

10   Q.   Was Mr. Bolden childhood friends with your son Anthony?

11   A.   Was Mr. Williams what?

12   Q.   Was Mr. Bolden childhood friends with your son Anthony?

13   A.   I'm not understanding.

14       THE COURT:  Why don't you, for purposes of this

15   question, take your mask off.  Speak nice and loud right into

16   the microphone.  And we will ask Ms. Williams if she can hear

17   you.

18       MR. CROWL:  Judge, may I help on this?

19       Is it all right, at least with Ms. Williams, to

20   call him Eddie Bolden?

21       THE COURT:  That would help.

22       Ms. Williams, when we refer to Mr. Bolden, we mean

23   Eddie Bolden.

24       THE WITNESS:  Oh, okay.

25       THE COURT:  Would you be more comfortable referring

1    to him as Eddie?

2            THE WITNESS:  It's okay.

3            THE COURT:  You may hear "Mr. Bolden."  It's Eddie

4    Bolden, the plaintiff.  Okay?

5            THE WITNESS:  All right.

6            THE COURT:  Speak nice and loud.

7    BY MR. STEFANICH:

8    Q.   Was Eddie childhood friends with your son Anthony?

9    A.   They grew up together.

10   Q.   Were they friends?

11   A.   I guess.

12   Q.   And I believe you testified that Eddie lived above the

13   J&J Fish; is that correct?

14   A.   Yes.

15   Q.   Do you recall when he lived there?

16   A.   I don't know exactly what month that he moved in there.

17   Q.   Did he live there in January of 1994 on the night of the

18   shooting?

19   A.   I'm not sure.

20   Q.   You testified that Eddie worked at the J&J, too; is that

21   correct?

22   A.   Yes.

23   Q.   Do you recall when he began working at the J&J?

24   A.   No, not exactly.

25   Q.   Was he working at the J&J in January of 1994?

1    A.   He was there.  He helped me out that night.  I don't
2    think that was his day to be there, but he was there.
3    Q.   He was there helping with the big order?
4    A.   Yes.
5    Q.   Was Eddie often in the J&J?
6    A.   Pardon me?
7    Q.   Was Eddie often in the J&J?
8    A.   Was he often in there?
9    Q.   Correct.
10   A.   Yes.
11   Q.   About how often would he be there?
12   A.   Well, I saw him every day.
13   Q.   You would see him every day in the J&J?
14   A.   Yes.
15   Q.   In January of 1994, was Tenesha Gatson living with you?
16   A.   Yes.
17   Q.   And that was above the J&J; is that correct?
18   A.   Yes.
19   Q.   And would you see Ms. Gatson every day as well?
20   A.   Yes.  She stayed with me.
21   Q.   And she worked at the J&J, too, correct?
22   A.   Yes.
23   Q.   Do you recall about how many tables were in the J&J in
24   1994?
25   A.   I'm not sure.  I know we had, like, booths going around

1    in the back like.  I don't know.  Was it five or six?  I'm
2    not sure.
3    Q.   Would you say it was a pretty small restaurant?
4    A.   Not too small.  Not too big either.  You could sit.
5    Like five or six booths for people to sit down and eat.
6    Q.   Do you recall what time you arrived at the J&J on
7    January 29th, 1994?
8    A.   Me?  I arrived there at 6:00 o'clock.
9    Q.   When you arrived, I think you said your husband was
10   there; is that correct?
11   A.   Yes.
12   Q.   And Eddie was there; is that correct?
13   A.   Yes.
14   Q.   And Maurice Stewart was there; is that correct?
15   A.   Yes.
16   Q.   And Tenesha Gatson was there; is that correct?
17   A.   Right.
18   Q.   And you knew Maurice Stewart from Stateway Gardens; is
19   that correct?
20   A.   Yes.
21   Q.   Did you know Maurice's brother Roderick Stewart?
22   A.   Not that well.
23   Q.   Did you know what Roderick Stewart looked like, though,
24   in 1994?
25   A.   I'm not even sure, no.

1   Q.   And your son Anthony was not present when you arrived at

2   6:00 o'clock at the J&J; is that correct?

3   A.   No, he wasn't over there in the restaurant.

4   Q.   What was Mr. Bolden doing when you arrived at the

5   restaurant?

6   A.   He was out there, like, in the sit down area with a Pac

7   machine -- Pac-Man machine or something was at.

8   Q.   When did Mr. Bolden begin helping with the big order?

9   A.   I can't say exactly what time, but I know he came back

10  there and started helping me.

11  Q.   He started helping you?

12  A.   Yeah.

13  Q.   Did you ever see Mr. Bolden leave the J&J restaurant?

14  A.   No, I did not.

15  Q.   Did you ever see him go to the beeper shop?

16  A.   No, I did not.

17  Q.   Did you see your son Anthony in the restaurant prior to

18  the man that ran in was there?

19  A.   Yes, when whoever called the police, he came in, because

20  you could come from one side of the restaurant -- from the

21  beeper shop through to the restaurant without coming through

22  the front door.

23  Q.   There was an interior door, correct?

24  A.   Yes.

25  Q.   So did Anthony come through that interior door?

1    A.    I guess.  I couldn't see him, not from where I'm working
2    at, because that's on the side around where the sit down area
3    at and the washroom and stuff back there.  So he could come
4    out his door and come through.
5    Q.    Did Anthony come in before or after the man that was
6    shot came in?
7    A.    I just remember seeing him near the phone and stuff when
8    the man was hollering about he was shot.
9    Q.    And you don't know who called 911; is that correct?
10   A.    I don't know who called.  I know somebody called.  One
11   of those peoples.
12   Q.    When the man that ran in that said he was shot, where
13   were you when that happened?
14   A.    I was in the kitchen area.
15   Q.    Were you by the steam tables?
16   A.    Yes.
17   Q.    What are the steam tables?
18   A.    Okay.  You come in the restaurant -- you come in the
19   kitchen like this door here (indicating).  My steam tables
20   are back this way (indicating).  I am actually standing
21   behind the steam tables.  We had a counter over top of the
22   steam tables, and I was sitting over there, and Tenesha was
23   sitting down in a seat where she took the orders at.
24   Q.    And Eddie was with you at the steam tables; is that
25   correct?

1    A.    Yes, he was standing near me on the steam tables.

2    Q.    He was not playing the Pac-Man game, correct?

3    A.    Not at that time.

4    Q.    And he was not talking to two female customers at that

5    time, correct?

6    A.    I don't remember him doing that.  He could have been.

7    Q.    And he was not standing next to the front door talking

8    to Tenesha Gatson, correct?

9    A.    Not that I know of.

10   Q.    I believe you said there were five to six customers in

11   the restaurant?

12   A.    Yes.

13   Q.    Were they regular customers?

14   A.    I don't know.  I just know it was five or six customers

15   in there.

16   Q.    Your son Anthony owned the beeper shop, correct?

17   A.    Pardon me?

18   Q.    Your son Anthony owned the beeper shop, correct?

19   A.    Yes.  Yes.

20   Q.    Did a person by the name of Octavia Jackson work at the

21   beeper shop?

22   A.    I don't know.

23   Q.    Do you know a person named Octavia Jackson?

24   A.    No, I don't.

25              He worked there at night with Anthony when I wasn't

1    there.  So I don't know.  He didn't work with me.

2    Q.   I believe you testified that when the man ran in,

3    everyone ran into the kitchen; is that correct?

4    A.   Correct.

5    Q.   And all the customers also ran into the kitchen; is that

6    correct?

7    A.   Yes.

8    Q.   None of the customers ran to the bathroom area; is that

9    correct?

10    A.   No.

11    Q.   No, they didn't run to the bathroom area?

12    A.   No, not that I know of.

13    Q.   The man that ran into the kitchen, he was bleeding,

14    correct?

15    A.   Yes.

16    Q.   You could see that he was bleeding?

17    A.   He was saying, "I'm shot in my back."  Once he got in

18    there, yes, I could see that he had been shot in the back.

19    Q.   And you said that -- you testified on direct that

20    someone pulled up a chair for him; is that correct?

21    A.   Yes.

22    Q.   Do you recall who that was?

23    A.   I don't know.

24    Q.   When the man ran into the kitchen, did he still have a

25    gun?

1   A.   I don't even know at that point.

2   Q.   Did you see him with a gun?

3   A.   No, not when he got in the kitchen, I didn't.

4   Q.   Prior to the man running into the restaurant, did you

5   hear any gunshots?

6   A.   No.  Actually, I couldn't hear anything back there where

7   I was working at with those fryers and things.

8   Q.   When you are at the steam tables, are you facing the

9   front of the restaurant?

10  A.   Yes.  I can look out to the front.

11  Q.   At the front of the restaurant are the glass windows,

12  correct?

13  A.   Correct.

14  Q.   And you could look out onto Cottage Grove, correct?

15  A.   Yes, but not that good.

16  Q.   When you were in the restaurant at the steam tables, did

17  you see two men fighting outside on the sidewalk?

18  A.   No, I did not.

19  Q.   Did you see a man in a ski mask outside of the J&J Fish?

20  A.   No, I did not.

21  Q.   Did you see a man pull up a ski mask and look into the

22  J&J Fish?

23  A.   No, I did not.

24  Q.   Did you see Roderick Stewart outside of the J&J Fish

25  that night?

1   A.   No, I did not.

2   Q.   When the man ran into the restaurant, did you hear that

3   man talk to your son Anthony?

4   A.   No, I didn't.

5   Q.   Did you hear Anthony talk to that man?

6   A.   No.

7   Q.   Did the restaurant have a robbery alarm system in 1994?

8   A.   We had a system that they turn on at night, but they

9   didn't have no system that you could push no button or

10  anything.

11  Q.   So there was no system that you could push a button to

12  alert the police?

13  A.   No.

14  Q.   Eventually a first set of police officers arrived at the

15  J&J; is that correct?

16  A.   Yes.

17  Q.   And they were all in plain clothes; is that correct?

18  A.   No.

19  Q.   That is not correct?

20  A.   It was two in plain clothes, and the others had on

21  uniforms.

22  Q.   Did you speak to any of those officers that arrived at

23  the J&J?

24  A.   Yes, they actually talked to me.  Somebody did.  I'm not

25  sure who it was.

1    Q.   Was the officer a male officer or a female officer?

2    A.   I'm not even sure.

3    Q.   Was the officer African-American or white or Hispanic?

4    A.   I know two of them was white mens.

5    Q.   Two white men?

6    A.   Yes, two.

7    Q.   Those two white men are the officers that you spoke to?

8    A.   I'm not even sure.

9    Q.   Do you recall what you told any of the officers that

10   arrived at the J&J Fish?

11   A.   Yes.  I know I talked to some of them when they was

12   talking to me about the gun and stuff.

13   Q.   One of the officers asked you about the gun?

14   A.   Yes.

15   Q.   What did you say?

16   A.   I told him I didn't know anything about it.

17   Q.   Did you see Eddie Bolden speak to any of the officers

18   during that -- during the first set of officers that arrived?

19   A.   No, I did not.

20   Q.   Did you hear Eddie Bolden identify himself to any

21   officer?

22   A.   No.

23   Q.   Those officers told you to start closing up the

24   restaurant; is that correct?

25   A.   Yes.  When they came -- when the ambulance finally came

1    and got the man, they told us to close.

2    Q.   And you began to close up the restaurant, right?

3    A.   Yes.

4    Q.   At some point the person that ordered -- that had the

5    big order arrived; is that correct?

6    A.   Yeah.

7    Q.   And then I believe you testified that at 10:00 or 10:30

8    a second set of officers arrived; is that correct?

9    A.   Yes.

10   Q.   And how many officers were there in that second set?

11   A.   I'm not sure.

12   Q.   Some of those officers were in uniform, correct?

13   A.   I'm not even sure.

14   Q.   Can you recall whether the officers were

15   African-American or white?

16   A.   I don't know.

17   Q.   Can you recall anything that they looked like?

18   A.   No.

19   Q.   Was Eddie Bolden still in the restaurant when that

20   second set of officers arrived?

21   A.   No.

22   Q.   Was Anthony still in the restaurant when that second set

23   of officers arrived?

24   A.   No.

25   Q.   When did Eddie Bolden leave the restaurant?

1    A.    I guess -- I think when they told us to close, they

2    left, too.

3    Q.    When the first set of officers told you to close, both

4    Eddie and Anthony told you to leave?

5    A.    Yes.    I don't remember seeing them after that.

6    Q.    And you eventually talked to police detectives at

7    111th Street; is that correct?

8    A.    Yes.

9    Q.    I believe you testified the detectives didn't ask you

10   any questions about Anthony; is that correct?

11   A.    Correct.

12   Q.    Did they ask you what you knew about the shooting?

13   A.    No.

14   Q.    What did they ask you?

15   A.    They didn't ask me anything about that.

16   Q.    So they didn't ask you about Anthony, correct?

17   A.    No.

18   Q.    They didn't ask you about the shooting?

19   A.    No.

20   Q.    Did they ask you about a fight outside the J&J?

21   A.    No.

22   Q.    So what did they talk to you about?

23   A.    Basically the gun.

24   Q.    They talked to you about the gun?

25   A.    Yeah.

1    Q.   Did they talk to you about anything else?

2    A.   Not that I can remember.

3    Q.   Ms. Williams, do you know an individual by the name of

4    Robert Dougherty?

5    A.   Robert who?

6    Q.   Dougherty.

7    A.   No.

8    Q.   Do you know an individual by the name -- nickname Cold

9    Black?

10   A.   No.

11   Q.   You testified that one of your children is Louis

12   Williams; is that correct?

13   A.   Yes.

14   Q.   After you spoke with the detectives on the night of the

15   shootings, did Louis ever tell you that you should provide

16   testimony for Mr. Bolden?

17   A.   Pardon me?

18   Q.   After you spoke with the detectives on the night of the

19   shooting, did your son Louis ever tell you that you should

20   provide testimony for Mr. Bolden?

21   A.   No.  My son Louis wasn't even there.

22   Q.   At some point you learned that Eddie was arrested; is

23   that correct?

24   A.   Yeah, at some point when I had to go to court for him.

25   Q.   The first time you learned that Eddie was arrested was

1    when you went to court?

2    A.   Yes.

3    Q.   And that's when you testified, correct?

4    A.   Yes.

5    Q.   Do you recall talking to Eddie's attorney prior to

6    testifying?

7    A.   Like when?

8    Q.   August 7th, 1995, did Eddie's attorney come and see you?

9    A.   I guess.  I think so.

10   Q.   And when he came to see you, was your husband James

11   present?

12   A.   I'm not sure.

13   Q.   You recall telling Eddie's attorney what you had seen

14   the night of the shooting, correct?

15   A.   I guess, yes.

16   Q.   And you agreed to testify for Eddie, correct?

17   A.   Yeah.

18   Q.   Are you aware that Tenesha Gatson also testified for

19   Eddie?

20   A.   Yes.

21   Q.   Did you guys go to court together?

22   A.   No.

23   Q.   Did you and Tenesha Gatson ever talk about the shooting?

24   A.   No.

25                THE COURT:  How are we doing on time, counsel?

1           MR. STEFANICH:  Five minutes.

2           THE COURT:  Okay.

3    BY MR. STEFANICH:

4    Q.   And you testified at Eddie's trial, correct?

5    A.   Yes.

6    Q.   And you testified that Eddie was in the J&J when the man

7    came in saying he was shot, correct?

8    A.   Yes.

9    Q.   And you are aware that Eddie was convicted, correct?

10   A.   Yes.

11   Q.   After January 29th, 1994, when was the next time that

12   you saw Mr. Bolden?

13   A.   In court.

14   Q.   So you didn't see him at all in February of 1994?

15   A.   No.

16   Q.   The next time you saw him was when you testified at

17   trial; is that correct?

18   A.   Correct.

19           MR. STEFANICH:  Nothing further, Judge.

20           MR. HALE:  Wait.

21           MR. STEFANICH:  One second, Judge.

22           THE COURT:  Watch your microphone.

23       (Counsel conferring.)

24   BY MR. STEFANICH:

25   Q.   Ms. Williams, in late 1993, early 1994, did your son

1   Anthony and Eddie socialize together?

2   A.   I guess.  I wouldn't know.

3   Q.   And how did it come about that Eddie lived above the J&J

4   Fish?

5           THE COURT:  Mr. Bolden.  Restate the question with

6   Mr. Bolden.  Go ahead.

7           MR. STEFANICH:  Sorry.

8   BY MR. STEFANICH:

9   Q.   How did it come about that Mr. Bolden lived above the

10  J&J Fish?

11  A.   He needed somewhere to stay.

12  Q.   And did you charge Mr. Bolden rent?

13  A.   No, I did not.

14  Q.   Why not?

15  A.   Pardon me?

16  Q.   Why didn't you charge him rent?

17  A.   I didn't.

18  Q.   You did not charge him rent, correct?

19  A.   I did not.

20  Q.   Why didn't you charge him rent?

21  A.   Because my son said he needed a place to stay for a

22  while.

23  Q.   And that was your son Anthony?

24  A.   Yes.

25  Q.   When Mr. Bolden came to the J&J every day, was that to

1    see Anthony?

2    A.    I don't know anything about that.

3    Q.    Did you see him talk to Anthony?

4    A.    I don't know whether he did or not.  I'm sure he did.

5              MR. STEFANICH:  No further questions, Judge.

6              THE COURT:  Mr. Crowl, anything?

7              MR. CROWL:  Nothing, Judge.

8              THE COURT:  Ms. Williams, you are dismissed.  Thank

9    you for being here today.

10             Before you step down, ma'am, I'm going to tell you

11   that we have got a couple steps here.  I don't want you to

12   trip on them.  So I am going to ask the court security

13   officer to come down and make sure that you get down okay.

14             THE WITNESS:  Thank you.

15             THE COURT:  Watch yourself.

16             THE WITNESS:  I have bad knees.

17             THE COURT:  That's all right.  They are a little

18   hard to spot with that carpet.

19             Thank you, ma'am.

20         (Witness excused.)

21             THE COURT:  All right, folks, we are going to end

22   for the day.

23             Let me say at the outset, we are a little later in

24   our ending point today.  It's 5:03.  I do try to be on time

25   and end promptly at 4:45.  So thank you for bearing with us

1    today.  I hope it didn't throw anybody off that we are later.

2           Let me explain why I let the questioning go a

3    little bit later than normal.  Ms. Williams lives in

4    Wisconsin.  And if I had ended right at 4:45 today, you folks

5    would have left, and then she would have had to go all the

6    way home to Wisconsin and then come back for 15 more minutes

7    of testimony and then come back tomorrow.  And given that she

8    is a senior citizen, we wanted to accommodate that and just

9    finish and let her be done for the day.

10          So thank you, folks, for your flexibility and your

11   willingness to stay just a little bit later today.  Going

12   forward, I am going to really try to stop at the appropriate

13   time so you folks can get on your way.  So thank you again

14   for today.

15          We will start promptly tomorrow at 9:30.  Be here a

16   little bit earlier.

17          I do understand that you folks have to have your

18   testing, I think, in the morning.  Hopefully that's going

19   okay.  Ms. Ramos is taking good care of you folks.  Hopefully

20   you can get your breakfast and testing, and we will start

21   promptly, and we will get rolling tomorrow.  Okay?

22          Hope everybody has a good evening.  We will talk to

23   you in the morning.

24          (Jury out at 5:05 p.m.)

25          THE COURT:  Folks, have a seat.  Couple things.

1423

```
 1        I wanted to give the jury a little explanation why
 2   they are getting a late departure so they are not frustrated
 3   with any of you all.  I wanted to let them know that we are
 4   accommodating a grandmother.  That way they will not feel
 5   irked when they leave the building today.  They will feel
 6   uplifted because an elderly person was accommodated.  So I
 7   thought that would be a good note to end on.  So I hope you
 8   were okay with that.
 9        A couple small things.
10        Be careful if you are wearing a mobile microphone
11   if you whisper to each other.  Nothing was said of any
12   consequence.  I did at one point hear Mr. Hale say to
13   Ms. Boudreaux, "Anything else?" or something like that.
14   Nothing was picked up.  It's not a hot mic situation, but we
15   are going to be here for another couple weeks.  I don't want
16   you all to say anything that anybody else could hear.  So
17   just word to the wise on that.
18        I let counsel take off the mask because this
19   witness was having a hard time.  I thought that was
20   appropriate.  I hope you were okay with that.
21        I did want to follow-up super briefly, not real
22   long, but on the FBI tip.
23        Defense counsel, do you expect to elicit testimony
24   from a witness that the FBI received an anonymous tip or just
25   a tip?  Is that what you expect Mr. Oliver to say?  We had
```

1    some colloquy about this before.

2              Is there anybody here that can speak to that?

3              MS. BOUDREAUX:  I am going to let Mr. Bazarek speak

4    to that.

5              THE COURT:  Because when we were doing the briefing

6    on this, I expected someone to say FBI provided information

7    based on an anonymous tip.  I heard the first part of it.  I

8    haven't heard the second part of it yet.

9              Mr. Safer did some cross on that.  We will bracket

10   all that for now.

11             But I wanted to know what your expectations are

12   about what the future testimony will be on that.

13             Mr. Bazarek, if you want to come to a microphone so

14   I can hear you.  What's your expectation about what the

15   testimony will be on it?

16             MR. BAZAREK:  Yes, your Honor.  And plaintiff knows

17   this as well because --

18             THE COURT:  Excuse me.  Is that microphone on?

19             MR. BAZAREK:  -- Oliver testified to it.  The

20   testimony is, he -- Oliver talked about a tip coming in over

21   the phone.  I mean, you have to read the whole testimony,

22   Judge.  I can make it available to you.

23             THE COURT:  Okay.

24             MR. BAZAREK:  And then there was a Chicago police

25   officer assigned to a federal task force working for the FBI.

1  In particular, working on this ANT-BAN investigation.

2  And what Oliver testified to -- and you could tell

3  he is thinking about something from 20-some years ago -- that

4  he spoke with McCullough, and the tip was from McCullough

5  that the shooter may have been Lynier.  Something like that.

6  I don't have it in front of me right now, Judge, but that's

7  how -- he's repeating something he learns from a law

8  enforcement officer to another law enforcement officer.  So

9  that's how the message is going in.

10  THE COURT:  Okay.  And is he going to say that

11  the -- just to clarify that.  Is he going to testify that the

12  FBI got an anonymous tip?

13  MR. BAZAREK:  His testimony is what I just said,

14  sir.  The tip came from a person assigned to the FBI.  So he

15  is the equivalent of an FBI agent.

16  Dale Tipton will say that McCullough was the cocase

17  agent in operation ANT-BAN.  And there were multiple police

18  officers -- Chicago police officers working on that task

19  force, not just McCullough.

20  THE COURT:  Okay.  I can take a look at that.  I

21  appreciate it.  I don't know that we need to hear argument on

22  this or anything.  I just wanted to know what the expectation

23  would be.

24  Could we talk about the lineup for tomorrow?

25  Thank you, Mr. Bazarek.

1426

```
1          Could we talk about the lineup for tomorrow,
2    Mr. Crowl and Mr. Safer?  What do you expect to happen
3    tomorrow?
4          Another way of putting it is, what do you need from
5    me before I show up tomorrow?  Do you need a ruling on
6    anything?  If you don't need a ruling, what do you expect me
7    to hear tomorrow?
8          MS. MUSUMECI:  Your Honor, good afternoon.
9          THE COURT:  Musumeci.
10          MS. MUSUMECI:  Yes.  Very good.  Thank you, your
11    Honor.
12          THE COURT:  I have been practicing.
13          MS. MUSUMECI:  We do expect to read some deposition
14    designations tomorrow.  And I believe a few of those
15    witnesses have outstanding objections that your Honor needs
16    to rule on.
17          THE COURT:  Yes.
18          MS. MUSUMECI:  Tomorrow I think we expect to read
19    Lee Williams.  There is just one hearsay objection in that.
20          THE COURT:  That's denied.  Objection denied.
21          MS. MUSUMECI:  James Williams, there are multiple
22    objections there.  That would probably be in the morning
23    depending on how we are moving.
24          THE COURT:  Bear with me, Ms. Musumeci.
25          Have you practiced this?  Do you have a sense of
```

1    how long it will go?

2            MS. MUSUMECI:  We have practiced it.  I don't have

3    the times of each of them.  None of them are very long.

4            Lee Williams I would say would be 10 minutes

5    maximum.

6            James Williams perhaps more like 20 to 25 minutes.

7    That's maybe a little bit on the longer side.

8            THE COURT:  Okay.

9            MS. MUSUMECI:  Jacob Jachna there are no objections

10   pending.  That one I think should be about 10 minutes.

11           George Karl there are objections.  That one

12   probably should be less than 10 minutes, but there are

13   objections to that.

14           And then the next two, which I doubt we would --

15   very much we would get to tomorrow but are still coming up,

16   your Honor, would be Defendant Siwek where there are many

17   objections and Maurice Willis where there are some

18   objections.

19           Defendant Siwek will be a longer witness, even

20   though -- with designations, I would say that probably will

21   be maybe a half-hour.

22           And Maurice Willis is probably more like 10

23   minutes.

24           THE COURT:  Okay.  So you have just given me six

25   names.  Thank you.  Those are all six deposition

1428

1  designations?

2          MS. MUSUMECI:  That's correct.

3          THE COURT:  That's the lineup for tomorrow as you

4  expect in the queue.

5          Do you expect there would be a live witness in

6  there?

7          MR. SAFER:  Yes, your Honor.  We will have

8  Tenesha -- I think we will start with Tenesha Gatson.

9          THE COURT:  Is the leadoff hitter before Lee

10  Williams?

11          MR. SAFER:  Yes.

12          THE COURT:  Okay.  Tenesha Gaston or Gatson?

13          MR. SAFER:  Gatson.

14          THE COURT:  Gatson.  Okay.

15          MR. SAFER:  I am not sure where the deposition

16  designations will fit in there.

17          But then -- so I don't know the order.  We had

18  Cynthia Steward in there, but she is going to come out

19  because it makes sense to have her after Oliver.

20          THE COURT:  And, again, she is live, obviously.

21          MR. SAFER:  She is live.

22          Tomorrow in some form we will have live Tenesha

23  Gatson, Todd Henderson.  I only have last names for Baylom

24  and Hansbrough and Ricquia LaNore.

25          THE COURT:  Okay.  Sounds like we have got a full

1    plate for tomorrow.

2          From your perspective, Mr. Safer, is there anything

3    that you need a ruling on other than the deposition

4    designations?

5          MR. SAFER:  No, your Honor.

6          THE COURT:  Okay.  Loftus is not tomorrow.

7          MR. SAFER:  No, your Honor.

8          Your Honor, we filed something.  We are going to --

9    we are going to move Loftus to -- we thought two things.  One

10   is, we are going to move Loftus to our rebuttal case if we

11   need him.

12         THE COURT:  Did you file something today on that?

13   I didn't see it.

14         MR. SAFER:  I think late last night.  Maybe this

15   morning by the time it got filed.

16         THE COURT:  I saw this morning the filing on the

17   Oliver situation.  I don't think I've seen -- I didn't know

18   you had a filing on this issue.

19         So Loftus you think is a rebuttal person, not a

20   case-in-chief person.

21         MR. SAFER:  Rebuttal if we call him.

22         And the pleading also makes clear that we are

23   not -- in light of the concern that your Honor raised -- I

24   know your Honor didn't rule.  But we are not going to ask him

25   directly about the reliability of the identification.  This

1    is spelled out in the pleading.

2              THE COURT:  Okay.

3              MR. SAFER:  But we are going to ask him about the

4    factors for reliability and how they apply in this case.

5              THE COURT:  Got it.  I haven't read that yet.  I

6    didn't even know you filed it.

7              I have a logistics question for you folks on the

8    deposition designations.  Have you all talked about how it

9    would go in terms of the flow of presenting your designations

10   and your counter-designations in terms of, are we going to

11   present all of your designations and then all of your

12   counter-designations, or is it going to be in the order of

13   the testimony?  How would you like to do it?  Have you talked

14   about it?

15             MS. MUSUMECI:  We have.  We were just going to read

16   it all straight through.

17             THE COURT:  Okay.  Is that okay with you folks,

18   too?  Nice and smooth.

19             MS. MUSUMECI:  Your Honor, the one thing that we

20   haven't conferred about -- we have in theory but not in

21   practice -- is just the division for time calculation

22   purposes, but we can talk about that off-line.  I don't know

23   if that actually needs to be done this moment, right away.

24   But we will confer on that.

25             THE COURT:  What I would like you to do is, for

1431

1    each witness, I need you to file something that says
2    plaintiff is presenting X number of lines, the defendant is
3    presenting Y number of lines, and the total number of lines
4    is Z.  That way if I have to get into a time allocation, I
5    can say, well, this whole nine yards took two and a half
6    hours.  You presented 100 lines of testimony.  You presented
7    40 lines of testimony.  So, therefore, I am going to allocate
8    the time accordingly.  Does that make sense?
9            So just go through on each side.  Add up how many
10   lines you have got.
11           I am not going to factor in the objections.  If you
12   propose something that's objectionable, it's on you.  So just
13   count up how many lines you are proposing, and that will be
14   your shot on that.
15           Can I make a comment on the presentation?  There is
16   a certain artificiality to these deposition designations.
17   The person isn't here.  We have got an actor and actress
18   essentially up here.
19           I have a little script that I will read them that I
20   have put together to explain to the jury.  I really am trying
21   to get these people to understand what's going on, so I am
22   going to try to explain to them in just layman's terms what a
23   deposition designation is, how it's entitled to the same
24   weight as any other testimony.
25           I think if somebody comes in and they just read the

1  testimony not knowing what's going on, it's going to seem

2  really weird, and they are not going to credit it.  I want to

3  make sure they understand what's happening.

4          I need everyone's cooperation on this, especially

5  from the person doing the reading.  And what I mean by that

6  is, I want them to play it straight.  I don't want anybody to

7  ham it up when it's one side and then be a total dud when

8  it's the other side's stuff.  Do you see what I'm saying?

9  Just play it straight.

10          They don't have to be a robot.  If these people are

11  a robot, we are going to have, like, nap time for everybody.

12  None of you folks want that.  You want the jury to listen to

13  your testimony.

14          So the person can be natural and read it.  You can

15  have inflection, but you got to be evenhanded.  So

16  plaintiff's side, if you are having somebody roam in to be

17  the presenter for a deponent, I want the same level of life

18  and inflection and good faithness when you are reading the

19  counter-designations as when you are reading their

20  designations.

21          And conversely, I know defense side will do the

22  same courtesy when they get to present whatever testimony.  I

23  want people to just play it as straight as you can.  I know

24  you folks would do that anyway.

25          But I will tell you, I just keep having this

1433

1    thought.  Being on this side of the bench, I'm always
2    reminded of things that I didn't like when I was on your side
3    of the bench, and I try to prohibit those things.  I have
4    been on the wrong end of some Shakespearean performances
5    where somebody would get up there, and Lady Macbeth herself
6    has taken the stand.  And when it's my turn to have my stuff
7    read, it's just a total flat robot.  Right?  And that's no
8    good.  That's not fair.  We are going to play fair in my
9    courtroom.  Okay?
10            Anything else on the deposition designations?  I
11   don't know if there is anything else that needs to be said on
12   this.  It should be nice and smooth.
13            Go ahead.
14            MS. MUSUMECI:  Just one thing, your Honor.
15            I just wanted to let your Honor know -- and we have
16   already raised this with the defense -- we have substituted
17   in -- obviously it's mostly deposition testimony.  So we have
18   substituted in the trial exhibit numbers for any deposition
19   exhibits.
20            THE COURT:  Good idea.
21            MS. MUSUMECI:  We shared all of those with the
22   defense.  We haven't heard any objections.  They will let us
23   know if there are, but I don't expect any.
24            THE COURT:  The answer may be yes, we did this
25   yesterday.  I don't know.

1          Have you folks given me highlighted copies?

2 Because I have not personally seen them.

3          MS. MUSUMECI:  Yes.

4          THE COURT:  Did you deliver it to Ms. Ramos perhaps

5 or chambers?

6          MS. MUSUMECI:  Yesterday morning.

7          THE COURT:  Okay.  We have a copy of that?  We have

8 a highlighted copy somewhere in chambers.  I bet I can find

9 it.

10          MS. MUSUMECI:  It was a binder that looks like this

11 (indicating).

12          THE COURT:  I am sure we have got it.

13          MS. MUSUMECI:  I can furnish another one.

14          THE COURT:  No, we tend to hang on to things.  I'm

15 sure we have it.  I have just exposed the fact that I haven't

16 read it yet.  I'm sure we have got it, though.  Oh, here it

17 is actually.  Deposition binder.  I have been caught

18 red-handed, as it were.

19          Okay.  Does that make sense, everybody, on the

20 deposition designations?  Thank you for your cooperation on

21 that.

22          Is there anything else that we need to say on any

23 topic?

24          MS. BRUMMEL:  Judge, may I ask two questions?

25          THE COURT:  Sure.

1    MS. BRUMMEL:  So the first one is, Tenesha Gatson

2  who is one of our live witnesses tomorrow, is a

3  wheelchair-bound individual largely.

4    THE COURT:  Okay.

5    MS. BRUMMEL:  Would it be okay for her to remain in

6  the wheelchair?

7    THE COURT:  Of course.  Sure.  Absolutely.  I am

8  glad you proactively raised that.

9    I will make arrangements for there to be a

10  microphone.  Perhaps we can move this microphone over here.

11  But we want her to be comfortable, and we want this to be a

12  welcoming environment for her so that she doesn't feel out of

13  place.  Okay?  So thank you.  That was astute of you to raise

14  that.  We will talk to our systems department and make sure

15  this is --

16    THE COURT REPORTER:  Maybe a lavaliere mic.

17    THE COURT:  We will get maybe a lavaliere mic.

18  That's a good idea.  We will get a microphone so that she can

19  feel comfortable and testify in a way that presents well.

20    MS. BRUMMEL:  Thanks, Judge.

21    A second question is, another one of our witnesses

22  that we have scheduled for tomorrow is Mr. Bolden's sister.

23  I was wondering whether we could similarly refer to him by

24  his first name when speaking about him to his sister?

25    THE COURT:  You want the sister to refer to him as

1436

```
 1   Eddie?
 2           MS. BRUMMEL:  Yes.
 3           THE COURT:  I think it is going to be unnatural for
 4   a sibling to refer to somebody as a Mr. and Mrs.  That's just
 5   not something that people do.  So that is fine.
 6           MS. BRUMMEL:  Thank you, your Honor.
 7           THE COURT:  That would be odd, I think.
 8           Do people have siblings?  Do you refer to them as
 9   Mr. and Mrs. or Ms.?  I don't do that.  So I don't think the
10   jury should hear that.  Actually, that's substantively
11   important.  They will lose track of the fact that this is the
12   sister.  Do they not get along?  Why are they referring to
13   him as Mr. Bolden, right?  They are going to think they are
14   not getting along.  That's another good point.
15           Two good points for you, Ms. Brummel.
16           MS. BRUMMEL:  Thank you, your Honor.
17           THE COURT:  Is there anything else that we need to
18   raise today?
19           Anything else on Officer Oliver?
20           I know you are going to fly somebody down.  Defense
21   counsel, I don't know if you plan on flying somebody down.  I
22   assume not.  I don't know that you really need to, per se.
23           MS. BOUDREAUX:  No, Judge.
24           THE COURT:  Okay.  There is nothing else to be said
25   on that, I think.
```

1437

```
 1            Get some rest.  We have got one day to go.  We will
 2    start promptly tomorrow.  I will look forward to getting your
 3    filing, and we will take it from there.
 4            Thank you, folks.
 5            MS. BOUDREAUX:  Thank you.
 6            MR. SAFER:  Thank you, your Honor.
 7       (An adjournment was taken at 5:22 p.m.)
 8
 9                        *    *    *    *    *
10    We certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
11
12
      /s/ Amy Spee                          October 15, 2021.
13    Official Court Reporter
14
      /s/ Frances Ward                      October 15, 2021.
15    Official Court Reporter
16
17
18
19
20
21
22
23
24
25
```