1438

1    IN THE UNITED STATES DISTRICT COURT.
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3   EDDIE L. BOLDEN,                    )
                                        )
4                    Plaintiff,         )
                                        )  Case No. 17 CV 417
5   -vs-                                )
                                        )  Chicago, Illinois
6   ANGELO PESAVENTO, *et al.*,         )  October 15th, 2021
                                        )  9:20 a.m.
7                    Defendants.        )

8

                TRANSCRIPT OF PROCEEDINGS - VOL. 6A
9        BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10   APPEARANCES:

11   For the Plaintiff:      RILEY SAFER HOLMES & CANCILA, LLP
                             BY:  MR. RONALD S. SAFER
12                                MR. ELI J. LITOFF
                                  MS. SANDRA L. MUSUMECI
13                                MR. MATTHEW C. CROWL
                                  MS. VALERIE BRUMMEL
14                           70 West Madison Street
                             Suite 2900
15                           Chicago, IL  60602

16   For the Defendant       GREENBERG TRAURIG, LLP
     City of Chicago:        BY:  MS. TIFFANY S. FORDYCE
17                                MR. KYLE L. FLYNN
                             77 West Wacker Drive
18                           Suite 3100
                             Chicago, IL  60601
19

20

21

22   Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                             Federal Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 2318A
24                           Chicago, IL  60604
                             Telephone:  (312) 818-6531
25                           amy_spee@ilnd.uscourts.gov

1439

1   APPEARANCES (CONT'D):

2   For the Individual      HALE & MONICO, LLC
    Officer Defendants:     BY:  MR. ANDREW M. HALE
3                                MS. BARRETT E. BOUDREAUX
                                 MR. WILLIAM E. BAZAREK
4                                MR. BRIAN J. STEFANICH
                                 MS. AMY A. HIJJAWI
5                           53 West Jackson Boulevard
                            Suite 330
6                           Chicago, IL  60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1440

1     (Proceedings heard in open court; jury out:)

2          THE COURT:  Good morning, folks.

3          Could you present the appearances, please, starting

4     with plaintiff's counsel.

5          MR. CROWL:  Good morning, Judge.

6          Matthew Crowl, Ron Safer, Sandy Musumeci, Valerie

7     Brummel, Eli Litoff, on behalf of Mr. Bolden.  And Mr. Bolden

8     is in court as well.  Thank you.

9          THE COURT:  Sure.  Good morning, everyone.

10         Good morning, Mr. Bolden.

11         MS. BOUDREAUX:  Good morning.

12         Barrett Boudreaux, Andy Hale, Bill Bazarek, Brian

13    Stefanich, and Phil Pesavento.

14         THE COURT:  Good morning, everyone.

15         Officer Pesavento, good morning to you, sir.

16         Okay.  Thanks for being here, everybody.  A couple of

17    housekeeping matters.

18         The jury needs to get COVID tested, so we're going to

19    break a little bit earlier today.  We're going to break at

20    10:30.  So we're going to roll for about an hour and then take

21    a break.  I've asked the COVID testers to give them top

22    priority.  I'm doing everything I can to maximize the amount

23    of time that you people have with witnesses.  Okay?  So I've

24    asked them to get ready and budge in line, in and out.  So I

25    wanted to let you know that.

1    I wanted to mention some exhibits.  Ms. Boudreaux, I

2  think there might have been a couple of exhibits that you

3  showed yesterday that had not technically been offered and

4  admitted into evidence.  And maybe you know that, maybe you

5  want to cover it today.  If we're right about that, perhaps

6  you could say something on the record, and we could just get

7  it in if you want it.  Maybe you don't care if it's admitted

8  or not, but I assume you probably do.

9    So maybe double-check your notes and make sure that

10  all of your materials are admitted into evidence if you want

11  them in evidence.

12    MS. BOUDREAUX:  Okay.  I will.

13    THE COURT:  Deposition designations.  I will tell

14  you, as a general matter, I want the jury to understand what's

15  happening, and -- just in -- that's how I want to run a trial.

16  I want the decision-makers to understand what is happening.

17    For purposes of deposition designations, I will give

18  them an overview of, you know, sometimes people aren't here,

19  it's going to be read into the record, *et cetera*.

20    I also think it would be helpful before each

21  testimony is read for me to give them a two-sentence overview

22  of who the person is and when the testimony took place.

23    So, for example, for Lee Williams, I think it might

24  be helpful to say something like, Lee Williams is the son of

25  Edna and James Williams --

1442

1     MS. MUSUMECI:  No, no.

2     THE COURT:  Oh.  Is that wrong?

3     So this is exactly why -- so little ole me typed up

4  something that may well be totally wrong -- oh, that's right,

5  because there are a lot of Williamses around.  Right?  That's

6  right.  You told me that.

7     So I will change that, but -- I typed it up because I

8  didn't want to make mistakes.  I want to show it to you folks

9  in advance here, so I'm going to ask my staff to hand it out.

10    This is very rough, folks, and I'm obviously going to

11  change the first line here.  I'm not wedded to this.  I think

12  it would be helpful to give them something that is simply a

13  one-sentence overview of who the person is and when and in

14  what context they testified.  I think it's relevant that

15  somebody testified in 1996 as opposed to 2016, just to set the

16  stage a little.

17    I'm open to ideas on this, folks.  I think it's

18  helpful to the jury to know what the testimony is.  Otherwise,

19  it's going to be a little awkward for them to just see people

20  come in.  I think they'll understand better if I say, listen,

21  folks, you're now going to hear from someone who's going to

22  read the testimony of George Karl.  George Karl was a police

23  officer -- see what I'm saying?

24    MS. BOUDREAUX:  Yes.

25    THE COURT:  Conceptionally, does that sound okay to

1443

1    everybody?

2          MS. BOUDREAUX:  Yes.

3          MR. CROWL:  Yes, Judge.

4          THE COURT:  Okay.  If you want me to add more, I'll

5    add more.  If there's important things in here that people

6    want, let me know.

7          In terms of the presentation, I wanted to

8    double-check.  My understanding is, the testimony is going to

9    be read in page order, from beginning to end, soup to nuts.

10   It's not like the plaintiff's designations will be read and

11   then defendants' designations.  It's going to be read in its

12   entirety.

13         MS. MUSUMECI:  That's right.

14         Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MS. MUSUMECI:  Yes, it's going to be read in its

17   entirety by a single lawyer and the witness, straight through,

18   no distinction whatsoever of who has designated the testimony.

19         THE COURT:  Great.  Very good.  And I will explain to

20   the jury that this is a composite set of designations.  You

21   know, sometimes the plaintiff would want to say, let's say,

22   Pages 2, 3, or 4 are something the jury wants to see.

23   Sometimes then the defendant would say, well, you've got to

24   see 23 and 24 as well.

25         The other logistical question I had is, I assume, but

1444

1    I don't know for certain, that you folks do not want to show

2    an exhibit during the deposition designations.  So, for

3    example, there was a Q and A where the witness was asked "Do

4    you see on Exhibit 4 where it says," *et cetera*, *et cetera*.

5         It's conceivable to me that you would want the

6    witness -- excuse me -- you would want the jury to see that

7    during that exam.  But I don't know if you thought about that.

8    I don't know if you've talked about it.  Go ahead.

9         MS. MUSUMECI:  Yes, Your Honor, we actually do intend

10   to show the exhibits if they're in evidence to the jury when

11   the witness is testifying.

12        THE COURT:  Okay.

13        MS. MUSUMECI:  We've coordinated that.  There are

14   some where the designations will set the foundation for

15   admission of the exhibit.

16        THE COURT:  Yes.

17        MS. MUSUMECI:  And then we would so move for the

18   exhibits to be admitted at the conclusion of the deposition

19   reading.

20        THE COURT:  That's fine.  And I remembered you

21   yesterday saying that instead of using the deposition exhibit

22   numbers, you would use the trial exhibit numbers, and that

23   makes perfect sense to me.  I didn't know if you'd want to

24   also publish it to the jury during the exam.  And if you do, I

25   think that makes a lot of sense, frankly.

1    MS. MUSUMECI:  Yes.

2    THE COURT:  It would be awkward for the jury to hear

3    about an exhibit they can't see.

4    Okay.  Is there anything else about the deposition

5    designations that we need to cover, folks?  Anybody?  I've got

6    the corrected list?

7    Perfect.  Is this okay to everybody, with Mr. Safer's

8    corrections?

9    MS. BOUDREAUX:  Yes.

10   THE COURT:  All right.  I will read that.  Thank you.

11   One clarification.  There is a motion pending about

12   the second investigatory file.  I have not ruled upon it.

13   It's not clear to me it's still a live issue.  I gather that

14   it is not, and that's why I haven't done anything about it.

15   But, Mr. Safer, from your perspective?

16   MR. SAFER:  Yes, I don't -- I don't think -- I think

17   it's not a live issue.

18   THE COURT:  But -- thank you.

19   Ms. Boudreaux, do you agree with that?

20   MS. BOUDREAUX:  I'm not sure what you're referring

21   to.

22   THE COURT:  There was a motion either -- was it a

23   motion to preclude a reference to a second investigatory file?

24   It's Docket No. 469.  I'll ask my clerk to show it to you.

25   And you don't have to decide today -- or right now,

1446

1    Ms. Boudreaux if it's a live issue, but I basically don't want

2    to hold up the works.  I want to give you folks rulings so you

3    can plan accordingly.  If it's a live issue, I'll take a close

4    look at it.  I gathered that it was not a live issue, so I

5    gave it back-burner treatment.

6                MS. BOUDREAUX:  That is correct, it is not.

7                THE COURT:  Okay.  So I'll deny it as moot.  Okay?

8                MS. BOUDREAUX:  Okay.

9                THE COURT:  All right.  So Docket No. 469 is denied

10   as moot.

11               Oliver.  The folks in Arkansas have asked for a start

12   time.  Is that something that you folks have talked about?  Do

13   you want to do it right off the bat on Monday or do you want

14   to do it later in the day?

15               MR. CROWL:  Right off the bat on Monday, Judge.

16               THE COURT:  Right off the bat.  So it will be 9:30 on

17   Monday morning?

18               MR. CROWL:  Yes, Your Honor.

19               THE COURT:  Okay.  And, Defense Counsel, you'd be

20   kind enough to communicate that to Mr. Oliver?

21               MR. HALE:  Yes, Your Honor.

22               THE COURT:  I have asked the folks in Arkansas to get

23   a room number, both for Mr. Oliver and for plaintiff's counsel

24   who's going down.  That is to be determined.  So please

25   stay -- stay tuned on that.

1447

1      I don't know if defense counsel plans to use any

2  exhibits with Mr. Oliver as well.  I don't know if you had

3  conferred with plaintiff's counsel about plaintiff's counsel

4  doing the courtesy of lugging those exhibits down to Arkansas.

5      I don't know -- have you talked about that?  Maybe --

6  I don't know if you want the witness to have a hard copy.  I

7  assume probably you do, but I don't know.

8      MR. CROWL:  If they do, Judge, we've got a person

9  flying down on Sunday, and they can bring both.

10      THE COURT:  I'd appreciate that.  I think it would be

11  a nice courtesy to do.

12      There aren't any real surprises in this case at this

13  point.  You know, you can put it in a sealed envelope if you

14  needed to, but I don't think anybody is going to be surprised

15  about what the exhibits are, I expect.  But I'll leave it to

16  you folks to work that out.

17      In terms of the logistics, in other words, how it's

18  going to go, the good news is, we are in a courtroom that is I

19  think better equipped to do video than other courtrooms.  This

20  was a -- as you can obviously see from looking around, it's a

21  remodeled courtroom that was not the traditional courtroom

22  style.  So if you had been in my courtroom on 23, it would be

23  a little bit more difficult from a technological perspective.

24  Judge Durkin's courtroom is well equipped.  It should be

25  pretty easy to display.  They said they've done this a bunch

1448

1    of times.

2             That being said, I'm going to have our IT person come

3    at about 10:45 here in the courtroom so you folks can talk to

4    him.  We can figure out logistics.  If you have any questions

5    for him about how it's going to roll, I have questions for him

6    but I want this to go smoothly for you folks.  So if anybody

7    has any questions about it, we can do it.

8             My understanding is that they are equipped to both

9    show the jury a picture of the witness as he testifies and

10   publish the exhibit itself.

11            I want to talk through how that looks.  I want to

12   make sure the exhibit is not too small, the witness is not too

13   small.  It doesn't do people any good if they can't see the

14   witness or can't see the exhibits.  We should talk about

15   whether displaying both makes things worse rather than better.

16            You know, if it's two things that the jury can't see,

17   that isn't particularly helpful.  You know, if it's especially

18   problematic, you know, perhaps we can hand out a hard copy of

19   an exhibit to the jurors, I don't know, but I want to talk

20   that through and have you folks think about it.  Okay.

21            The goal of this exercise is to have the jury

22   understand the testimony, right, understand the evidence.  So

23   I want to make sure they can publish it in a way that is user

24   friendly to them.

25            The last two things I will cover, I wanted to circle

1449

1    back to the comment that was made on Wednesday afternoon that

2    generated the discussion off the record.

3         Plaintiff's team, you used the word "mistrial" at one

4    point, I think, or at least alluded to it.  I don't know if

5    you plan to move on that.  Maybe you're still talking about

6    it.

7         Let me tell you how I view it, and then I want to

8    hear from you.

9         You know, there was a statement made on day two of

10   trial.  We're on day four of trial.  So I think you need to

11   fish or cut bait on that whether you're going to move for it

12   or not.  You don't need trial to keep rolling to decide

13   whether the whole trial was invalid based on something that

14   happened on day two.

15        In other words, you've got all the information you

16   need on day four to make a decision about whether something on

17   day two irreparably jeopardized the integrity of the

18   proceeding in some way.  So I don't know what your plan was on

19   that.  I'm not -- I'm not requiring you to commit to it right

20   now, but I'm going to require you to play your card one way or

21   the other pretty soon.

22        MR. SAFER:  Well, I agree with that, Your Honor.  The

23   trial has been irreparably damaged.  There's no question in

24   our mind about that.

25        The only question is, and the only reason we may not

1   make a motion is, we don't know when we could get a new trial.

2   And that will impact dramatically.  I mean, if we're talking

3   about six months from now, with the health of various people,

4   that's just not -- we can't do that.  And so we'll have to

5   live with an irreparably damaged trial.

6           But if we could get a trial in the next month or two,

7   then we will make that motion.

8           THE COURT:  Well, let me stop you there.

9           We know it will not be less than eight weeks.  We

10  know that for certain.  And I think I mentioned this

11  yesterday, hopefully I did, it's got to be at least eight

12  weeks.

13          Why don't we do this:  It is 9:33.  We're only going

14  to go about an hour.  This is a topic that I want to talk

15  about.  I have one other topic, too.  But the punch line is,

16  you've got to either play your card or not play your card, and

17  I'll handle the motion or won't handle the motion if it's not

18  filed.

19          But I wouldn't want to get a motion, you know, after

20  day 12 of trial or day 14 or after the verdict saying, oh, you

21  should have stopped the trial after day two because of

22  something that happened on day two.  Either you think the

23  trial needs to be stopped and restarted or you don't.  But the

24  time is going to come really soon where you've just got to

25  make a decision on that.  It's not going to be today, but it's

1451

1   going to be pretty soon.  So we'll talk more about that after

2   we break.

3           MR. SAFER:  I'm fine with that, Your Honor.  That's

4   the only data point we were waiting for.  If we can't get it,

5   we'll make a decision.

6           THE COURT:  I understand where you're coming from on

7   that, Mr. Safer.  I will circle back with the powers that be

8   here.  I think they don't always know, candidly.  It's a big

9   logistical challenge for them to schedule all these trials,

10  and they weigh first, all the inputs from all the judges in

11  the building.

12          We'll return back to that during break, but I do want

13  to get rolling here.  Give me a quick reminder of who exactly

14  we're going to see this morning, if you would, please.

15          Ms. Ramos, do you want to get the jury, if you don't

16  mind.

17          MS. BRUMMEL:  Judge, I believe our first witness is a

18  deposition designation for James Williams.

19          THE COURT:  Okay.

20          MS. BRUMMEL:  Mr. Williams is the husband of the last

21  witness from yesterday, Ms. Edna Williams.

22          THE COURT:  Okay.  Terrific.  Yeah, go ahead.

23          MR. SAFER:  And then after that, Your Honor, we will

24  have Tenesha Gatson, and then we will have the -- we're

25  planning on the deposition designation of Lee Williams, and

1    then Barbara Temple, and then a live witness of Todd Henderson
2    and Charles Baylom.

3         Depending on where we fall timewise, Your Honor, that
4    might switch a little, but those -- that's what we are --

5         THE COURT:  That's helpful, Mr. Safer.  Thank you.

6         Now, my notes are imperfect.  I did not have down
7    that Ms. Temple was going today, which is fine.  The only
8    reason I bring that up is, I have not looked at her
9    objections, so maybe I ought to do that.

10        MR. SAFER:  Okay.  There's no magic to her order,
11   Your Honor.  We could do -- we could do other -- we have
12   Jacob Jachna's designation, George Karl's designation.  So
13   there's no -- no magic to the order.

14        THE COURT:  Okay.  Fair enough.

15        MR. SAFER:  We could wait on Barbara Temple, if
16   that's more convenient.

17        THE COURT:  Okay.  I appreciate that.

18        I will tell you, as a general matter, I'm denying the
19   vast majority of the objections.  I'm letting people get their
20   evidence in.  You know, I think many of the objections were,
21   candidly, expressions of disagreement with the substance of
22   the testimony or sort of a -- you don't want the other side to
23   tell their part of the story.  I'm letting each of you tell
24   your side of the story, and I'm being evenhanded about it.
25   You're going to see my objections.  Most of the stuff is

1453

1  coming in.

2       A few of the objections were downright silly, like

3  there was an objection to somebody saying that he was with the

4  Marine Corps.  That's completely fair game to know, you know,

5  the background of a witness.  I mean, the jury is entitled to

6  know who they're talking to.

7       MR. HALE:  Your Honor, could we have -- we have one

8  thing to put on the record.

9       THE COURT:  Yeah.

10      MR. STEFANICH:  Good morning, Judge.

11      For James Williams, we did raise some objections to

12  his arrest pursuant to motion *in limine* No. 6.  So we would

13  just like to renew our objection to that based on -- based on

14  the record from his deposition.  We don't think the foundation

15  has been laid or can be laid that any defendant officer played

16  a role in his arrest.

17      THE COURT:  Okay.  Very good.  Thank you.

18      I do think for motion *in limine* No. 6, I required a

19  linkup to the defendant officers, as I recollect.

20      And go ahead, Ms. Musumeci.

21      MS. MUSUMECI:  Yes, Your Honor.  This issue,

22  Your Honor ruled on it.  Also, the arrest of James Williams

23  was at the same time coterminous with the arrest of Edna

24  Williams.  Ms. Edna Williams testified yesterday.  Your Honor

25  denied the defense's objection to her discussing that arrest.

1454

1    She indicated that she was arrested by the officers who

2    responded to the scene.

3            I believe, respectfully, that Your Honor has already

4    ruled on this issue, and that the testimony should be

5    admitted.

6            THE COURT:  And there's going to be a link to the

7    defendant officers?

8            MS. MUSUMECI:  I'll let Mr. Safer address it.

9            MR. SAFER:  Your Honor, there already has been a link

10   to the defendant officers.  And, you know, Officer Pesavento

11   testified that he -- he knew that they were in lockup and

12   that, you know, he -- he got them out of lockup at 3:00 p.m.

13   the following day, that he interviewed all of these people who

14   had been brought down to -- to the station, not voluntarily.

15   I think that links up these defendants to those arrests.

16           THE COURT:  Go ahead.

17           MR. STEFANICH:  Judge, two things.  The difference

18   between Edna Williams and James Williams, you'll recall, for

19   Edna Williams' arrest, Officer Oliver was on the arrest

20   report.  He was listed on the arrest report.  That's not the

21   case for James Williams.  There's no defendant officer listed

22   on the arrest report.

23           Number two, the linkup that Detective Pesavento knew

24   they were in lockup is a lot different than being part of

25   their arrest.  Detective Pesavento wasn't part of the arrest.

1455

1    So I think for those reasons, there is no linkup.

2            THE COURT:  Hang on one second.  I'm hearing the

3    doors open behind me.  So . . .

4            All right.  Folks, I do want to get the jury in, but

5    you want a ruling on James Williams.  Can we start with a

6    different deposition designation?  Is that possible?  Do we

7    have that person here?

8            No, we don't have the person here.

9            Do we have your live witness here by chance?

10           MS. BRUMMEL:  (Nonverbal response.)

11           THE COURT:  Plaintiff's counsel, what do you think

12   about starting with it -- I'm throwing you a little bit of a

13   curve here, but I don't know if you're --

14           MR. CROWL:  We can do that, Judge.

15           THE COURT:  What I -- I'm sensitive to the fact that

16   the jury is 15 feet away from me behind this wall, and I

17   wanted to drill down on something defense counsel said about

18   James Williams.  Okay.  I don't want to give you a ruling

19   until I clarify that, but I don't like people to wait because

20   we're trying to hurry.  Okay.

21           MR. CROWL:  Judge, did you want to bring her in first

22   before the jury came in, or should we bring the jury in and

23   then have her come in?

24           THE COURT:  Is the jury in the hallway?

25           THE CLERK:  Yeah, the jury is in the hallway.

1    THE COURT:  I do care -- she's in a wheelchair; is

2    that right?

3    MR. CROWL:  She's in a wheelchair.

4    THE COURT:  Somebody needs to open that second door

5    to make her feel comfortable here.

6    Go ahead and bring her in.

7    Folks, thank you for accommodating.  I threw you a

8    little bit of a curve here, having you start with this

9    witness.  Okay.  Thank you.

10    Good morning, ma'am.

11    MS. BRUMMEL:  Judge, a quick logistical question.

12    Can I -- or should I have the witness who is reading for Lee

13    Williams come to follow Ms. Gatson?  Is that the new plan?

14    THE COURT:  Yes, I think so.  Yeah, sure.

15    MS. BRUMMEL:  Okay.  I will do that.

16    THE COURT:  Ms. Gatson, good morning.  I'm

17    Judge Seeger.  Good morning.  Thank you for being here.

18    Ms. Gatson, if you would like a drink of water, we've

19    got cups here for you.  You're welcome to have a drink if

20    you'd like one.

21    THE WITNESS:  Yes.

22    THE COURT:  Okay.

23    MR. CROWL:  Thank you, Judge.  We appreciate that.

24    THE COURT:  Ms. Gatson, we're waiting for the jury to

25    come in, and as soon as they're here, we'll get rolling this

1   morning.

2              THE WITNESS:  Okay.

3              THE COURT:  Just so you know, there's going to be one

4   person to your left, a couple of people in the jury box, and

5   then there are going to be a couple people -- there are going

6   to be probably a half-dozen people in the jury gallery all the

7   way in the back.  Okay?

8              THE WITNESS:  Okay.

9        (Jury in.)

10             THE COURT SECURITY OFFICER:  All rise.

11             THE COURT:  Have seat, please.

12             Well, good morning, everyone.

13             THE JURY:  Good morning.

14             THE COURT:  Thank you for being here on Friday, my

15  favorite day of the week.

16             I appreciate you being here.

17             One quick logistical item before we call our next

18  witness.  We are going to break a little bit earlier today for

19  a midmorning break.  I understand that you folks need to have

20  your COVID testing done.  So we're going to break right around

21  10:30 so you folks can go downstairs and get the testing.

22             I have had my staff reach out to the COVID testing

23  department.  I have asked them to give you people red carpet

24  treatment to budge in line to go first, to get right in and

25  get right out, for them to treat you folks like the most

Gatson - direct by Crowl

1458

1    special people in the building, and they get you up, down, and

2    on your way.  So hopefully it will go smoothly.  You can then

3    stretch your legs, get a break, and we can roll again with

4    more testimony.  Okay?

5            So we're going to go maybe 15 -- excuse me -- 45

6    minutes or so, give or take.  We'll make as much progress as

7    we can, and then we'll come back and we'll resume.  Okay?

8            Plaintiff's counsel, your next witness, please.

9            MR. CROWL:  Your Honor, we call Tenesha Gatson.

10           THE COURT:  Ms. Gatson, can you please raise your

11   right hand.

12       (Witness sworn.)

13           THE COURT:  Counsel, you may proceed.

14           MR. CROWL:  Thank you, Judge.

15       TENESHA GATSON, PLAINTIFF'S WITNESS, DULY SWORN

16                   DIRECT EXAMINATION

17   BY MR. CROWL:

18   Q.   Good morning, Ms. Gatson.

19   A.   Good morning.

20   Q.   Can you tell the members of the jury what state you

21   currently reside in.

22   A.   Iowa.

23   Q.   And do you have any children, ma'am?

24   A.   Yes, I do.

25   Q.   How many children do you have?

Gatson - direct by Crowl
1459

1   A.  I have three boys.

2   Q.  And what are their names?

3   A.  Michael, Daniel, and Joel.

4   Q.  And how old is Michael?

5   A.  27.

6   Q.  How about Daniel?

7   A.  Daniel is 24, and Joel is 22.

8   Q.  And do you have grandchildren also?

9   A.  Yes.

10  Q.  How many do you have?

11  A.  Five now.

12  Q.  In fact, you recently just had your latest; is that right?

13  A.  Yes.

14  Q.  And I want to take you back, Ms. Gatson, to January 29th

15  of 1994.  Do you recall that date?

16  A.  Yes, I do.

17  Q.  And why do you recall that date?

18  A.  Because that was the first and only time I've ever been

19  handcuffed and put in the back of a police car.

20        MR. STEFANICH:  Objection, Judge.  Relevance.

21  Foundation.

22        THE COURT:  Overruled.

23  BY MR. CROWL:

24  Q.  How old were you on January 29th of 1994?

25  A.  16.

Gatson - direct by Crowl

1460

1    Q.   And what was your condition at the time?

2    A.   I was five months pregnant with my oldest son.

3    Q.   Where were you employed at the time?

4    A.   J&J Fish.

5    Q.   And how long had you worked at J&J Fish?  How old were you

6    when you first started working there?

7    A.   14.

8    Q.   Where was J&J Fish located?

9    A.   6420 South Cottage Grove.

10   Q.   And tell the members of the jury what job you had at J&J

11   Fish.

12   A.   I was a cashier, and then I would take orders and the wrap

13   orders and bring them out to the customers once the order was

14   ready.

15   Q.   And who ran J&J Fish?

16   A.   It was ran by my godparents -- Edna Williams, James

17   Williams -- and Anthony Williams.

18   Q.   And can you tell me about your relationship with your

19   godparents, Edna and James Williams, how that came about.

20   A.   They -- well, Edna Williams and James Williams were my

21   grandmother's best friends, and they watched me when I was a

22   young girl.  And then when I turned 13, I went to go live with

23   them until I was an adult.  So they raised me from 13 till 18.

24   Q.   And where did you live with them?

25   A.   At 6420 South Cottage Grove, up over the restaurant.

Gatson - direct by Crowl

1461

1   Q.   And did you also know Eddie Bolden at that time?

2   A.   Yes, I did.

3   Q.   And how did you know Eddie Bolden?

4   A.   He was my godbrother's friend.

5   Q.   And you said your godbrother, which godbrother?

6   A.   Louis Williams.

7   Q.   I want to talk now about that evening, January 29th of

8   1994.

9           Approximately what time did you get to the

10  restaurant?

11  A.   It had to have been in between -- between 5:00 and 5:30.

12  Q.   And what was your shift that evening?

13  A.   6:00 to close.

14  Q.   And when was close?

15  A.   2:00 a.m.

16  Q.   And what was your job that evening?

17  A.   I was a cashier, and I would wrap the orders and carry

18  them out the door to customers once they was ready.

19  Q.   Who else was working in the restaurant that evening?

20  A.   We had the delivery driver, Dave McCray.  We had the cook.

21  And there was -- Jim Williams was in the front office on that

22  night.

23  Q.   And was Edna Williams working that night also?

24  A.   Yeah, she was there for a short time.

25  Q.   And you said the cook.  Is the cook Maurice Stewart?

Gatson - direct by Crowl

1462

1  A.  Yes.

2  Q.  Did you know him by a nickname or did you know him by

3  Maurice Stewart?

4  A.  No, just Maurice Stewart.

5  Q.  Okay.  During the time that you were working behind the

6  cash register, did you see Eddie Bolden in the restaurant that

7  evening?

8  A.  Yes.

9  Q.  And did you have any interactions with Anthony Williams

10  that evening?

11  A.  Yes, I did.

12  Q.  Tell the members of the jury what happened.

13  A.  He called over for me to bring him over an order of

14  chicken wings to the beeper shop side of the restaurant, which

15  is adjacent to the dining area of the restaurant.

16  Q.  Approximately what time was that?

17  A.  That had to have been around 7:00 o'clock-ish, somewhere

18  up in there.

19  Q.  And when Anthony Williams asked you to bring him some

20  wings to him in the beeper shop, what did you do?

21  A.  Once the order was ready, I carried it over there to him

22  and brought it to him through the side door that's adjacent to

23  the restaurant.

24  Q.  And what did you see in the beeper shop?

25  A.  I seen him talking to a gentleman who I had known as

Gatson - direct by Crowl

1463

1    freckle-faced Rod, Reece, and Mane.

2    Q.  And freckle-faced Rod, do you know his full name?

3    A.  At the time I did not, but I do know.

4    Q.  And what's the full name?

5    A.  Roderick Stewart.

6    Q.  And then you also said that there was a Reece.  Is that

7    the same person as Maurice Stewart, the cook, or is that a

8    different person?

9    A.  That's a different person.

10   Q.  And then you said a person named Maine; is that right?

11   A.  Yes.

12   Q.  And do you know that person's name?

13   A.  I know his first name is Jermaine.  I'm not sure what his

14   last name is.

15   Q.  Was Mr. Bolden -- was Eddie Bolden present in that meeting

16   on the beeper side?

17   A.  No.

18   Q.  What did you do after you dropped off the chicken for

19   Anthony?

20   A.  I went back to continue working my shift.

21   Q.  And now I want to draw your attention, Ms. Gatson, to

22   approximately 8:00 o'clock that evening.

23   A.  Mm-hmm.

24   Q.  Can you tell the members of the jury what happened at

25   8:00 o'clock.

Gatson - direct by Crowl

1464

1  A.  I was in the -- I was at the table wrapping the order, and

2  I was getting ready to walk the order out to the door when a

3  gentleman rushed into the back where we were working at.  He

4  had a gun in his hand.  So everybody started scrambling

5  because we didn't know what he was trying to do, but we heard

6  him say that he was shot, he was shot.  Someone shot him in

7  the back.

8  Q.  Was Eddie Bolden in the restaurant when the man ran in?

9  A.  Yes.

10  Q.  What happened after this man ran in saying that he had

11  been shot?

12  A.  I seen Eddie pick up the phone.  So I was assuming he was

13  the one who dialed 911 because I did see him pick up the

14  phone.  Everybody was just kind of scrambling at the time

15  because we all didn't know what to expect and what was going

16  on.  We just seen a gentleman charging at us with a gun in his

17  hand.

18  Q.  Did you see what happened to that gun?

19  A.  No, not at that time.

20  Q.  Later did you see what happened to the gun?

21  A.  Yes.  When the detectives came, the gun was retrieved

22  under the ICEE machine, right where the gentleman had ran into

23  the restaurant at.

24  Q.  And after the 911 call, what happened next?

25  A.  Paramedics and uniformed officers showed up to the

Gatson - direct by Crowl

1465

1    restaurant.  They asked -- they asked my godparents some

2    questions.  They told us to clean up and close down, which we

3    had started to do.

4    Q.  And then what happened after that, Ms. Gatson?

5    A.  As we was cleaning up the restaurant, we had another set

6    of officers come.  These were plain clothes officers at this

7    time.  When these particular officers came into the

8    restaurant, they were very belligerent, was swearing at

9    everyone.  They had separate -- kind of like separated all of

10   us from each other in different areas.  For myself, I was told

11   to go sit over in the booth, shut up, and don't say anything

12   at that time.

13   Q.  And what happened next?

14   A.  Then it had to have been about 20 or 30 minutes later, I

15   was told to get up.  I got handcuffed behind my back.  I was

16   asking the officer like what was going on.  Nothing was

17   explained to me.  I said I'm pregnant.  They said that's not

18   their problem.  And then I was put in the back of a police

19   car.

20   Q.  Where were you taken?

21   A.  To 111th and Michigan.

22   Q.  And what happened to you at 111th and Michigan?

23   A.  I was put in an interrogation room, and two different

24   officers was in and out of the room asking me questions.

25   Q.  And were you aware of what had happened to your godmother,

Gatson - direct by Crowl

1466

1    Edna Williams?

2    A.   I knew she had got handcuffed and was brought down, too.

3    And then I heard them talking to her, because she was in the

4    interrogation room next -- right next door to mine.

5    Q.   And what could you hear?

6    A.   I could hear them saying a lot of belligerent things, a

7    lot of cussing, swearing, asking her things about my

8    godbrother.

9    Q.   And which godbrother was that?

10   A.   Anthony Williams.

11   Q.   By the way, when you were being questioned by the

12   detectives, did any detective or did any law enforcement

13   officer take any notes as far as you could see?

14   A.   No.   Nobody had no pen, paper, no recording device,

15   nothing.

16   Q.   And during your interview at the police station, did the

17   detectives ask you about Anthony Williams?

18   A.   Yes.

19   Q.   What did they ask you?

20   A.   They asked me was he there that night.   They wanted to

21   know did I know who -- did I know, like, who he was, and I --

22   I wasn't really understanding the questions they were asking

23   me at that time.   And I asked the officer, like, what do you

24   mean by that?   And then he said, how could I live there and

25   not know what's going on.   And I'm like, I don't know what

Gatson - direct by Crowl

1467

1    you're talking about.

2    Q.   Apart from Anthony Williams, your godbrother, did they ask

3    you who was in the restaurant at the time that the man who was

4    shot ran in?

5    A.   No.

6    Q.   Did you ever tell the police officers that Eddie Bolden

7    was in the restaurant when the man who was shot was brought

8    in?

9    A.   No.

10   Q.   And did they ask you about what kind of clothing

11   Mr. Bolden had on when he came in?

12   A.   No.

13   Q.   Now, Ms. Gatson, did you give a deposition in this case?

14   A.   Yes.

15   Q.   And at one point in the deposition, you were asked:  "They

16   did interrogate and ask you questions about who was in the

17   restaurant; is that accurate?"

18        And you said "Yes."

19        And then the question was:  "And you told them that

20   Eddie Bolden was in the restaurant that night?"

21        MR. STEFANICH:  Objection.  Form.

22        THE COURT:  Sustained.

23        MR. CROWL:  It's impeaching, Judge, for her last

24   statement.

25        THE COURT:  You're impeaching your own witness?

Gatson - direct by Crowl

1468

1    MR. CROWL:  Yeah, to refresh her recollection on the
2  fact.
3    THE COURT:  Well, impeachment is different than
4  refreshing her recollection.
5    MR. CROWL:  Okay.  I'll use it to refresh her
6  recollection, Judge.
7    THE COURT:  Okay.  You can show it to her and ask
8  her -- well, first you've got to lay the foundation that she
9  doesn't remember something.
10    MR. CROWL:  Yeah.
11    THE COURT:  And then you have to show it to her and
12  see if it helps her remember something.  So it's not
13  impeachment.  Go ahead.
14  BY MR. CROWL:
15  Q.  My question is:  As you were mentioning that you did not
16  tell the police officers that Eddie Bolden was in the
17  restaurant, that you didn't tell them that during the
18  interrogation, would it refresh your recollection to be able
19  to refer to the trial testimony that you gave?
20  A.  Yes.
21    THE COURT:  Okay.  So I'm going to sustain the
22  objection that I'm going to make myself because you have not
23  laid the foundation if she does not remember something.
24    MR. CROWL:  Okay.  Okay, Judge.
25  BY MR. CROWL:

Gatson - direct by Crowl

1469

1    Q.   Let me follow up on that.

2            Do you remember whether or not for sure that you told

3    the officers that Eddie Bolden had come into the restaurant --

4    or that Eddie Bolden was in the restaurant at the time of --

5    that the man came in with the gun?

6    A.   I don't remember if I told the officers that, but I know

7    in the trial, I told them -- I do remember testifying to --

8    that he was in the restaurant.

9    Q.   Okay.  I want to show you a report of what the detectives

10   told you or reported during that interview and ask you to take

11   a look at that.

12           MR. CROWL:  Judge, this is Plaintiff's Exhibit 86.

13   And it's in evidence, Judge.

14           THE COURT:  Yeah, go ahead.

15           I'd like counsel to move out of line of sight of the

16   jurors.

17           Mr. Bazarek, you've got to move down.  Yeah, thank

18   you.

19           MR. STEFANICH:  Judge, I will object to the form of

20   it.

21           THE COURT:  There's no question pending.  Go ahead.

22   BY MR. CROWL:

23   Q.   So, Ms. Gatson, I'm showing you a police report of your

24   interview that evening.  And I want to show you on Page No. 4

25   what the police officers wrote about what you told them at the

Gatson - direct by Crowl

1470

1    police station.

2         First of all, it says, "Ms. Gatson stayed overtime to

3    work on the special order."

4         Do you see that?

5    A.  Yes.

6    Q.  Did you tell the officers that you stayed overtime to work

7    on the special order?

8    A.  No, I did not.

9    Q.  It then says, [as read] "She said that a male black that

10   she only knows as Lanier came into the store about 6:30 or

11   7:00 o'clock, stating that his pager was broken and he wanted

12   to see Anthony Williams."

13        Did you tell the officers that?

14   A.  No, I did not.

15   Q.  In fact, did you know Mr. Bolden only as Lanier or did you

16   know his full name?

17   A.  I knew his full name because he worked at the restaurant

18   for a short period of time.

19   Q.  And then it states in here, you went on -- "She went on to

20   say that Lanier and Anthony Williams entered the fishery shop

21   sometime later and talked about 15 minutes."

22        Did you say that to the police officers?

23   A.  No, I did not.

24   Q.  And then it says, "Williams then left and Lanier stayed in

25   the shop."

Gatson - direct by Crowl

1471

1      Did you say that?

2  A.  No, I did not.

3  Q.  And, Ms. Gatson, it says that you described Lanier as

4  being in his early 20s, about 5'10" to 6', slender and

5  light-complected.

6      Do you say that he was light-complected?

7  A.  No, I did not.

8  Q.  And how do you know that you didn't say that?

9  A.  Because I wouldn't describe him as light-complected.  He

10 is brown-skinned; he is not light-complected.

11     (Counsel conferring.)

12 BY MR. CROWL:

13 Q.  And, Ms. Gatson, also on that -- on that first line, when

14 it says you stayed overtime to work on the special order, how

15 do you know you didn't tell them that?

16 A.  Because my shift started at 6:00 o'clock, so it wasn't --

17 there is no record to stay over.  It is my regular shift.

18 Q.  And, Ms. Gatson, tell the members of the jury, did the

19 police officers who interviewed you at the police station on

20 that night, did they ever reach back out to you at a later

21 date to ask you additional questions about Eddie Bolden?

22 A.  No.

23 Q.  Did the police officers who interviewed you that night

24 ever reach back to you to ask additional questions about

25 anything that happened that evening?

Gatson - cross by Stefanich

1472

1    A.   No.

2             MR. CROWL:  May I have one moment, Judge?

3             THE COURT:  Of course.

4             MR. CROWL:  No further questions, Judge.

5             THE COURT:  All right.  Thank you.

6             Defense, any cross?  Whenever you're ready.

7                       CROSS-EXAMINATION

8    BY MR. STEFANICH:

9    Q.   Good morning, Ms. Gatson.

10   A.   Good morning.

11   Q.   Is it your testimony that at 7:00 p.m. on January 29th,

12   1994, that Anthony Williams is in the beeper store?

13   A.   Yes.

14   Q.   And Mr. Bolden is in the J&J Fish at that time?

15   A.   Correct.

16   Q.   And you mentioned someone that you knew by the nickname

17   freckle-faced Rod; is that correct?

18   A.   Correct.

19   Q.   And you know now that his real name is Roderick Stewart;

20   is that correct?

21   A.   Correct.

22   Q.   How did you learn his real name?

23   A.   From my godsister and my sister, just knowing his name --

24   just -- because they're in his age group, so that's how I

25   learned his real name.

Gatson - cross by Stefanich

1473

```
1    Q.   Who is your godsister?

2    A.   Tanya Williams.

3    Q.   I'm sorry.  I couldn't hear you.

4    A.   Tanya Williams.

5    Q.   Tanya Williams?

6    A.   Mm-hmm.

7    Q.   And when did you learn that freckle-faced Rod's real name

8    was Roderick Stewart?

9    A.   I found that out like in 1997 or '8 or something like

10   that.

11   Q.   And how did that come up?

12   A.   I think they went to, like, a picnic down on 39th Street,

13   and they seen him and they was all talking.  So I was with

14   them at this picnic, and they was like, oh, there go -- they

15   called him by his name.  So that's how I knew his government

16   name.

17   Q.   And when you spoke to the police on January 29th, 1994,

18   you didn't tell the police about freckle-faced Rod; is that

19   correct?

20   A.   No, I wasn't asked.  No.

21   Q.   And you didn't tell the police about going into the beeper

22   shop to deliver food to Anthony Williams, correct?

23   A.   No, I don't recall telling them anything like that.

24   Q.   And when you testi- -- you did testify at Mr. Bolden's

25   criminal trial; is that correct?
```

Case: 1:17-cv-00417 Document #: 640 Filed: 11/16/21 Page 37 of 126 PageID #:18740
Gatson - cross by Stefanich
1474

1    A.   Yes, I did.

2    Q.   And when you testified at Mr. Bolden's criminal trial, you

3    didn't mention anything about freckle-faced Rod; is that

4    correct?

5    A.   Correct.

6    Q.   And you didn't mention anything about going into the

7    beeper shop at 7:00 o'clock to deliver food to Anthony

8    Williams; is that correct?

9    A.   Correct.

10   Q.   When was the first time that you mentioned to anybody that

11   freckle-face Rod was in the beeper shop at 7:00 o'clock with

12   Anthony Williams?

13   A.   I think it was in an affidavit.  When I was asked -- when

14   I was asked more questions about that night.

15   Q.   And when was that?  When were you asked more questions?

16   A.   I think that was in 2000 -- I think it might have been '12

17   or '13.

18   Q.   And who was asking you these questions?

19   A.   It was the investigator, I believe.

20   Q.   Was that an investigator for Mr. Bolden?

21   A.   I believe so, yes.

22   Q.   And prior to -- strike that.

23        That investigator's name was Susan Carlson; is that

24   correct?

25   A.   I'm not sure.  I don't remember exactly what her name was,

Case: 1:17-cv-00417 Document #: 640 Filed: 11/16/21 Page 38 of 126 PageID #:18741
Gatson - cross by Stefanich
1475

1 but --

2 Q. It was a female investigator, correct?

3 A. Yes.

4 Q. And she was white, correct?

5 A. Correct.

6 Q. And prior to talking to that investigator, Mr. Bolden

7 wrote to you while he was incarcerated; is that correct?

8 A. I wrote to him initially.

9 Q. You wrote to him initially?

10 A. Yes.

11 Q. When did you write to him initially?

12 A. I don't remember what year it was.  I don't remember

13 exactly what year it was.

14 Q. Why did you write to him initially?

15 A. Because I found out, like, the results of his case, and I

16 always knew that he was in the restaurant.  And so I always

17 felt bad that he was incarcerated for a crime I knew he didn't

18 commit.

19 Q. So you found out the results of his case in 1996; is that

20 correct?

21 A. No, I didn't find out then.  I think I found out sometime

22 in the early 2000s, but I'm not sure exactly what year it was.

23 I think by this time I think I was -- I lived in Minnesota at

24 the time when I found out.

25 Q. So you testified at Mr. Bolden's trial in 1996, correct?

Gatson - cross by Stefanich

1476

1  A.  Correct.

2  Q.  And then you didn't know the results of that case in 1996,

3  correct?

4  A.  No.

5  Q.  And were you still living with the Williams family when

6  you testified at Mr. Bolden's trial?

7  A.  No, I was not.

8  Q.  Were you still talking to Edna Williams?

9  A.  No, not -- not a whole lot then, no.

10  Q.  Where were you living in 1996?

11  A.  I was living on 6214 South Cottage Grove in Chicago.

12  Q.  6214 South Cottage Grove --

13  A.  Mm-hmm.

14  Q.  -- in 1996?

15  A.  Yeah, Apartment 2E.  Yes.

16  Q.  And is that the time you were living there when Mr. --

17  when you testified at Mr. Bolden's trial?

18  A.  Yeah, because I got a -- I got subpoenaed to come to his

19  trial.

20  Q.  So 6214 South Cottage Grove, is that the J&J Fish?

21  A.  No.

22  Q.  Is that just down the block from the J&J Fish?

23  A.  That's at Woodlawn Gardens.

24  Q.  How far away is 6214 from the J&J Fish?

25  A.  About -- what is it? -- four blocks, five blocks.

Gatson - cross by Stefanich

1477

1  Q.  And you said you were still communicating -- you were

2  still talking to Edna Williams at the time of Mr. Bolden's

3  trial, just not every day; is that correct?

4  A.  At that time I might have talked to her like once or --

5  like twice a year, maybe.

6  Q.  And after you testified at Mr. Bolden's trial, you didn't

7  learn the results of his case until the early 2000s; is that

8  correct?

9  A.  Correct.

10  Q.  Who told you the results of Mr. Bolden's case?

11  A.  I think I asked -- I think I asked my godsister -- or

12  somebody had -- somebody who they -- I believe it was somebody

13  they went to school with, my godsister was with, and I asked

14  my godsister did they ever knew, like, whatever happened to

15  Eddie's case, did he beat his case or did he -- like what

16  happened with the situation.  And then that's when she said

17  she didn't know.  So I looked him up on the IDOC website.

18  Q.  And when you refer to your godsister, is that Tanya

19  Williams again?

20  A.  Correct.

21  Q.  And you looked Mr. Bolden up on the IDOC website in the

22  early 2000s; is that correct?

23  A.  Correct.

24  Q.  And isn't it true that you didn't write to Mr. Bolden

25  until 2011?  Is that correct?

Gatson - cross by Stefanich
1478

1   A.  I don't recall what -- exactly what year it was.

2   Q.  Was it later than 2010?

3   A.  I'm not sure.

4   Q.  About how long after you learned that Mr. Bolden was

5   convicted did you write to him?

6   A.  I think it was like within a month, I believe.

7   Q.  You think it was within a month?

8   A.  Yeah, when I found out, then I wrote him a later.

9   Q.  And so you wrote to Mr. Bolden; is that correct?

10  A.  Mm-hmm.

11  Q.  And he wrote you back, correct?

12  A.  Yes.

13  Q.  And when he wrote you back, he told you about an

14  investigator, correct?

15  A.  No, not -- he didn't tell me about an investigator

16  initially.  He did not.

17  Q.  When he wrote you back, did he ask you if you would -- if

18  he could put you on his IDOC phone call list?

19  A.  No, not the first time he wrote me, he did not.

20  Q.  What did he say -- what did he write you the first time

21  that he wrote to you?

22  A.  He just said like thanks for reaching out to him.  He --

23  because he always looked at me like a little sister.  So he's

24  like thanks for reaching out to him.  He -- he was shocked

25  that I had three kids at the -- you know, at the time.  What

Gatson - cross by Stefanich

1479

1    else?  It was just kind of real general stuff, nothing --
2    nothing related to anything legal at all.
3    Q.   At some point did Mr. Bolden write to you about meeting
4    with an investigator?
5    A.   I don't remember if he wrote to me and told me about it or
6    if he told me in a phone call.
7    Q.   You did have phone calls with Mr. Bolden while he was
8    incarcerated; is that correct?
9    A.   Yeah, I think I had like two or three.
10   Q.   And in those two or three phone calls, he talked to you
11   about his criminal case, correct?
12   A.   No, he didn't -- no, he just -- he just was saying he was
13   trying to get back in court or something for an appeal.  Yeah,
14   so he said something along those lines, I believe.
15   Q.   And at some point he -- either in a phone call or in a
16   letter, he mentioned that he had a private investigator; is
17   that correct?
18   A.   No.  How I actually found out about that is when the
19   person showed up at my door.  I didn't even know that he had
20   all that going on until the person tracked me down.  Because
21   when I moved to Wisconsin, I had no contact with him then.  So
22   he wanted to know where I lived.  This person tracked me down
23   and showed up at my door.
24   Q.   Well, the investigator called you on the phone first,
25   correct?

Gatson - cross by Stefanich

1480

1   A.   I believe -- no, I don't believe she called me first.   I

2   think she drove out to my house, I believe.

3   Q.   Okay.   So she drove out to your house, and you were living

4   in Wisconsin; is that correct?

5   A.   Yes.

6   Q.   What city in Wisconsin?

7   A.   Hartford, Wisconsin.

8   Q.   And she asked you questions about Mr. Bolden's case when

9   she was at your house in Hartford, Wisconsin?

10  A.   Correct.

11  Q.   How long did she talk to you about Mr. Bolden's case?

12  A.   It might have been like an hour or hour and a half,

13  something like that.

14  Q.   Was anyone else present when she was talking to you about

15  Mr. Bolden's case?

16  A.   No, it was just her.

17  Q.   Did this investigator take notes when she was talking to

18  you about Mr. Bolden's case?

19  A.   Yes.

20  Q.   And were those handwritten notes?

21  A.   Yes.

22  Q.   Did you ever read those notes?

23  A.   No.   I didn't read the notes that she took down, no.   I

24  just read -- once the affidavit was typed up, I read

25  everything that was put in it before I signed it.

Gatson - cross by Stefanich

1481

1    Q.  I want to make sure I understand you.

2           You didn't read the notes of your interview when she

3    was at your house; is that correct?

4    A.  I don't recall.

5    Q.  Okay.  Did you ever read those notes?

6    A.  I read -- I read a summary that she gave me.  I read that.

7    So if that's what you want to call notes, then . . .

8    Q.  Well, the summary was typewritten, correct?

9    A.  I'm sorry?

10   Q.  The summary was a typewritten document, correct?

11   A.  Yeah, it was typed up.  Yeah.

12   Q.  And the notes that she was taking when she was talking to

13   you were handwritten, correct?

14   A.  Correct.

15   Q.  Okay.  Did you ever see those handwritten notes?

16   A.  No.  I didn't read no handwritten notes, no.

17   Q.  Do you know what happened to those handwritten notes?

18   A.  No, I do not.

19   Q.  The investigator also audio-recorded this interview; is

20   that correct?

21   A.  I don't recall if she did or did not.

22   Q.  And, Ms. Gatson, you were deposed in this case; is that

23   correct?

24   A.  I'm sorry?  What was the question?

25   Q.  You were deposed, you gave a deposition in this case,

Gatson - cross by Stefanich

1482

1    correct?

2    A.  Yes, I did.

3    Q.  And that was April 12th, 2018; is that correct?

4    A.  Correct.

5           MR. STEFANICH:  Counsel, Page 33.

6    BY MR. STEFANICH:

7    Q.  And at the deposition, you took an oath, correct?

8    A.  Yes.

9    Q.  And that oath was to tell the truth, correct?

10   A.  Correct.

11   Q.  And at the deposition, were you asked this question, and

12   did you give this answer:

13          "QUESTION:  Did she use any recording devices or cell

14   phone or anything to record your conversation?

15          "ANSWER:  Yeah, she used a -- yeah, she recorded it.

16          "QUESTION:  How did she record it?

17          "I think she had a -- what you call it?  Recorder.

18          "QUESTION:  Tape?

19          "ANSWER:  Yeah."

20          Were you asked those questions, and did you give

21   those answers?

22   A.  If it says I did, then yeah.

23   Q.  Did you ever listen to the audio-recording of the

24   interview that you had with the investigator?

25   A.  No.

Gatson - cross by Stefanich

1483

1    Q.  Do you know what happened to the audio-recording of your

2    interview?

3    A.  No, I do not.

4    Q.  And during this interview that you had with Mr. Bolden's

5    investigator at your house in Wisconsin, is that the first

6    time you mentioned freckle-faced Rod being in the beeper shop

7    with Anthony Williams on January 29th, 1994?

8    A.  Yes, because I was asked more questions about that night.

9    In my initial questions, I wasn't even asked a lot of

10   questions about that night.

11   Q.  And you also testified on direct that another person in

12   the beeper shop was a man named Reece; is that correct?

13   A.  Mm-hmm.

14   Q.  And is his name Maurice Stewart also?

15   A.  I don't know his government name.  I just knew the

16   nickname.

17   Q.  Do you recall what Reece looked like?

18   A.  Yeah, he was -- he was kind of -- he was broad a little.

19   Q.  I'm sorry, did you say broad?

20   A.  I said he has a broad, like, stature.

21   Q.  Okay.

22   A.  He was brown-skinned.  What else I can tell you?

23   Q.  How tall was he?

24   A.  He had to be about 5'10" or 5'11", maybe.

25   Q.  Approximately how much did he weigh?

Gatson - cross by Stefanich

1484

1   A.  I'm not quite sure because he was kind of stocky.

2   Q.  He was stocky?

3   A.  Yeah.

4   Q.  What about his hair?  What was his hair like?

5   A.  I can't remember exactly like what his hair was like.

6   Q.  Did he have any facial hair?

7   A.  Yeah.

8   Q.  Okay.  What facial hair did he have?

9   A.  He had like this right here (indicating).  I don't know

10  what you call that.

11  Q.  A beard?

12  A.  It wasn't a full beard.

13  Q.  Okay.  Do you recall anything else about Reece?

14  A.  No, not right off the top of my head.

15  Q.  And another person that was in the beeper shop with

16  Anthony Williams and freckle-faced Rod was a man that you know

17  by his nickname Maine; is that correct?

18  A.  Yes.

19  Q.  And you believe his first name is Jermaine; is that

20  correct?

21  A.  Yes.

22  Q.  And you don't know his last name?

23  A.  No.

24  Q.  Can you describe what Jermaine looked like?

25  A.  Jermaine had long hair.  I remember that.  Because he

Gatson - cross by Stefanich

1485

1  would braid it sometimes.  And that wasn't my first time

2  seeing him.  I've seen him before.

3  Q.  Did he have braids that night that you saw him in the

4  beeper shop?

5  A.  Yes.

6  Q.  And can you approximate how tall he was?

7  A.  About -- he was about 5' -- 5'10", 5'11".  He wasn't a

8  real tall guy.  And he had like a football type of build.  He

9  was, like, real cocky.

10 Q.  A football type of build, do you mean like big and

11 muscular?

12 A.  Yeah, like cocky.  Yeah.

13 Q.  Do you recall anybody else being in the beeper shop when

14 you walked in there on January 29th, 1994, at approximately

15 7:00 p.m.?

16 A.  It was Roderick.  Roderick would be somebody that's -- he

17 had light skin and like freckles in his face, and his hair was

18 like a sandy brown or blondish brown, whatever you want to

19 call it.

20 Q.  So besides Roderick, Reece, Maine, and Anthony, do you

21 recall anybody else being in the beeper shop when you went in

22 there?

23 A.  I think there was another person, but I can't recall his

24 name.

25 Q.  You think there was another person, you just can't recall

Gatson - cross by Stefanich

1486

1  the name; is that correct?

2  A.  Yeah.

3  Q.  And that other person was male; is that correct?

4  A.  Yes.

5  Q.  How familiar were you with freckle-faced Rod in January of

6  1994?

7  A.  I've seen Roderick and Maine plenty of times come to the

8  restaurant or to the beeper shop.  So their faces wasn't

9  unfamiliar to me.

10  Q.  How often would they be -- how often would you see

11  freckle-faced Rod at the beeper shop or the restaurant?

12  A.  Probably a few times a month I might see him.

13  Q.  And you would see Mr. Bolden at the restaurant every day,

14  correct?

15  A.  Just about, yeah.

16  Q.  What would you observe freckle-faced Rod doing when you

17  saw him a couple times a month at the beeper shop or at J&J?

18  A.  He'll come and grab food, and he'll be just -- he'll be

19  talking to my godbrother.  I don't know about what.  It's --

20  the way my godparents raised me, you don't get in -- I

21  don't -- you don't get in grown folks' business.  So if my

22  godbrother was talking to someone or another adult, it's not

23  like I'm sitting in their face or staring in their mouth.

24  That wasn't allowed in the household I grew up.

25  Q.  So freckle-faced Rod would come in sometimes and order

Gatson - cross by Stefanich

1487

1   food; is that correct?

2   A.  Yes.

3   Q.  And he would sometimes talk to your godmother, is that

4   what you said?

5   A.  Godbrother.

6   Q.  Godbrother.  Anthony?

7   A.  Yes.

8   Q.  And when you saw Mr. Bolden in the J&J almost every day,

9   what would he be doing?

10  A.  Well, he worked in there for a period of time.  So he

11  worked there before.

12  Q.  When did he work there?

13  A.  I don't recall exactly, like the month and the year he

14  started, but he worked there for a period of time.  And on

15  that particular night, I know when I came -- before I started

16  my shift, I was playing the video game with him.  We had a

17  sit-down Pac-Man machine, and I was playing the Pac-Man

18  machine game with him that night before my shift started.

19  Q.  Was Mr. Bolden working at the J&J on January 29th, 1994?

20  A.  No.

21  Q.  He had stopped working there; is that correct?

22  A.  I believe so, yeah.

23  Q.  And even when Mr. Bolden had stopped working at the J&J,

24  you would still see him almost every day, correct?

25  A.  Yeah, I think -- I believe -- if I recall, I think he

Gatson - cross by Stefanich

1488

1  lived -- I can't exactly remember for sure or be certain, but

2  I think he lived over top of the restaurant during this time

3  or either next door, but I can't -- I can't be for sure about

4  that.

5  Q.  So he may have lived --

6  A.  But I know he did at one point.  So I'm not quite sure if

7  it was then on this particular date.

8  Q.  So he may have lived above the J&J at the time of the

9  shooting; is that correct?

10 A.  Yeah, but I can't be certain about that because I'm not

11 sure on the dates.

12 Q.  So when Mr. Bolden stopped working at the J&J, you would

13 still see him at the fish shop almost every day; is that

14 correct?

15 A.  Just about, yeah.

16 Q.  Okay.  What would he be doing at the fish shop when you

17 would see him almost every day and he wasn't working?

18 A.  Well, he would talk to my godparents.  He might do

19 something for her or just sit and chat with us or do things,

20 like help out if she needed him to or something.

21 Q.  And he would talk to Anthony Williams, too, correct?

22 A.  Sometimes, yeah.

23 Q.  Did you ever see Mr. Bolden talking to freckle-faced Rod?

24 A.  Not that I've ever seen.

25 Q.  Did you ever see Mr. Bolden talking to Reece?

Gatson - cross by Stefanich

1489

1   A.  Not that I've ever seen.

2   Q.  Did you ever see Mr. Bolden talking to Maine?

3   A.  Not that I've ever seen.

4   Q.  You testified that on January 29th, 1994, you brought some

5   food over to Anthony Williams' beeper shop, correct?

6   A.  Mm-hmm.

7   Q.  And you used the interior door to go from the J&J to the

8   beeper shop; is that correct?

9   A.  Mm-hmm.

10  Q.  How often would you bring food to Anthony Williams in his

11  beeper shop?

12  A.  A lot of the time.  So I would -- if he's busy on the

13  other side or he's doing something or there's a customer in

14  the store and he can't come over, he'll have me bring it to

15  him.

16  Q.  So you would bring over food to him a lot of times; is

17  that correct?

18  A.  Mm-hmm.  Yes.

19  Q.  During those a lot of times that you would bring over food

20  to Anthony Williams at his beeper shop, did you ever see

21  Mr. Bolden in the beeper shop with Anthony Williams?

22  A.  Have I?  Yeah, I think I might have seen him over there

23  before with him.  Yeah.

24  Q.  How often would you see Mr. Bolden with Anthony Williams

25  in the beeper shop?

Gatson - cross by Stefanich

1490

1    A.   I didn't see him over there a lot.  I might have seen him

2    over there maybe twice that I've seen with my eyes, yeah.

3    Q.   Do you recall -- strike that.

4         You testified --

5         MR. STEFANICH:  Judge, is this a decent time for a

6    break?

7         THE COURT:  Are we going to wrap up with this witness

8    before we break?

9         MR. STEFANICH:  Say that again.

10        THE COURT:  Are you going to wrap up with this

11   witness before our break?  How much more time do you have with

12   this witness?

13        MR. STEFANICH:  I would not be wrapping up soon.

14        THE COURT:  You would not be?

15        MR. STEFANICH:  Correct.

16        THE COURT:  Okay.  Folks, it is 10:33.  We are going

17   to be taking our midmorning break a little bit early.  We're

18   going to get you folks to the COVID testing.

19        Let me say one thing about COVID testing, folks.  I

20   know it can be a little awkward to get in a room with people

21   that you just know a little bit and drool into a cup together.

22   You don't normally do that, right?  It's not something you

23   normally do.  I want you to know I get that.  I really do.

24   I've done it, too.  I felt a little funny when I was doing it.

25        Here's the spirit of it, folks:  We're trying to keep

Gatson - cross by Stefanich

1491

1   you folks safe.  Okay.  We're trying to keep you folks safe.

2   We've brought you folks down here to the Dirksen Federal

3   Building.  The Court feels a responsibility to you folks to

4   make sure that you're protected in this environment, and we

5   want to make sure that you're staying healthy the whole time.

6           So that's the spirit of it.  So I hope that makes

7   sense to everybody.  If it seems awkward to have to do it --

8   maybe some of you don't like drooling into a cup.  I can tell

9   you I don't like drooling into a cup either.  So I hear you on

10  that.  But thank you for doing it.  We're trying to keep you

11  folks safe.

12          Okay.  So that's a long way of saying, go drool into

13  a cup, we'll come back, and we'll get rolling again.  Okay?

14          Thanks, folks.

15          THE COURT SECURITY OFFICER:  All rise.

16      (Jury out.)

17          THE COURT:  Ms. Gatson, I'll tell you what I tell

18  every witness.  You're still on the witness stand, so to

19  speak.  So it's important that you not talk to anybody about

20  the testimony until it's all over.  Okay.  So just hang loose.

21  Relax.

22          During breaks like this, Ms. Gatson, I usually talk

23  with the lawyers.  There's a lot of housekeeping stuff that

24  goes on.  What I'd like the lawyers for the plaintiff to do is

25  to take you to a spot where you can be comfortable.  They

Gatson - cross by Stefanich

1492

1    could show you to the restroom facility.  And they'll, I'm

2    sure, take good care of you during the break.  But we'll put

3    you in a comfortable spot.  You can chillax and unwind for a

4    little bit, and we'll let you know when it's time to go.  Is

5    that okay?

6              All right.

7              Thank you, Ms. Gatson.

8         (Ms. Gatson exits the courtroom.)

9              THE COURT:  I've got a couple housekeeping things.

10   We can talk now or we can talk in a minute.

11             Do you guys want to use the restroom and then come

12   back?

13             So, Mr. Bazarek, you sat right in the line of the

14   sight of the jurors.  I asked you to move.  You then moved in

15   the line of sight of the other juror.  So that's why I was

16   going like this (indicating).  You moved from blocking one

17   juror to blocking another juror.

18             It is critically important that the jurors see and

19   hear the witnesses and the evidence.  The rest of you are here

20   to sort of observe, but we can't get in the way.  It's really,

21   really important that you not do that again.  And I'll

22   remind -- Mr. Safer, if you could remind everyone.

23   Ms. Brummel was not in the way.  I actually am probably going

24   to pull that screen down now that I see it.  I was wondering

25   if we could move that down.  I'll take care of that during the

Gatson - cross by Stefanich

1493

1  break.  But please be careful that you don't do that.

2          MR. BAZAREK:  I'm sorry.

3          THE COURT:  That's okay.  I know it was not on

4  purpose.

5          So, folks, in a couple of minutes, Alex Zeier is

6  going to come.  He's going to talk to us about the logistics

7  for the video presentation with Mr. Oliver.  So he's going to

8  be up in a minute.

9          I will just say this on time.  I don't dictate how

10  you folks use the fuel in the lunar lander, but be mindful of

11  the time, okay.  Every minute you spend is a minute you cannot

12  get back.  If you want to spend your time asking a witness

13  what freckle-faced Rod typically did in the beeper shop during

14  the month, you can.  You're not getting that time back.  So

15  just be mindful of that.  Beyond that, it's trial strategy,

16  it's up to you folks.  But we are going to have a hard stop of

17  the evidence probably, you know, what, a week from Tuesday,

18  something like that.  So be mindful of that.

19          I have been keeping close tabs with my courtroom

20  deputy on the time.  I'm going to be putting minute entries in

21  that say exactly when the testimony started, when it stopped

22  by party.  We've tallied it up where you folks are in terms of

23  how much -- how many minutes Mr. Safer spent and his team,

24  Ms. Boudreaux and her team, and we'll be getting that on file

25  so you guys know where you stand.  Okay.  But I wanted to say

Gatson - cross by Stefanich

1494

1    stay tuned on that, but we have been keeping close tabs on

2    that.  Okay?  Beyond that, it's trial strategy.  It's up to

3    you.  Use the fuel however you like.

4        So I expect Mr. Zeier to come back in five minutes.

5    If you can be here, and we'll talk to him off the record.

6    Okay?

7        MR. CROWL:  Thank you, Judge.

8        (Recess taken from 10:29 a.m. until 10:59 a.m.)

9        THE COURT:  All right.  So we were starting to hear

10   some objections on James Williams, and then I felt like I

11   needed to get them to do COVID testing.

12       So, Mr. Stefanich, why don't you come to the

13   microphone, restate your objection, and then I'll let the

14   plaintiff respond, and we'll go from there.

15       MR. STEFANICH:  Thank you, Judge.

16       Our objection to part of the designated testimony of

17   James Williams is when he is describing his interactions with

18   unnamed officers and -- describing his interactions with

19   unnamed officers and the treatment that he received from those

20   unnamed officers.  He doesn't describe it as an arrest, but he

21   does say he was handcuffed and taken to a lockup.

22       Based on Your Honor's ruling to defendants' motion *in*

23   *limine* No. 6, we believe it has to be tied up to the specific

24   defendants in this case.  And based on the designated

25   testimony, we don't think that's tied up to any specific

Gatson - cross by Stefanich

1495

1   defendant.  So we would be objecting based on foundation and

2   relevance.

3           THE COURT:  Mr. Safer, go ahead.

4           MR. SAFER:  Mr. Pesavento admitted that he "Brought

5   the J&J Fish employees" -- he didn't say the "J&J Fish

6   employees" -- he didn't say "employees"; he said the people

7   who were there --

8           THE COURT:  Yep.

9           MR. SAFER:  -- "to the station and interviewed them."

10          And he testified that the detectives were in charge

11  of the scene, that he had them brought down.  Pesavento and

12  Karl's progress report confirms that they interviewed the

13  witnesses.  Pesavento said that he interviewed the witnesses,

14  Mr. Pesavento.

15          Mr. Pesavento said that he -- or after being

16  confronted with the report that showed that he had them moved

17  from lockup, the next afternoon, that he knew that they were

18  there.  And it is certainly relevant to explain Mr. Williams'

19  statements and reaction to the police officers.  So it is --

20  it is relevant for a number of reasons.  But it is in

21  satisfaction of the motion *in limine* ruling directly tied to

22  these defendants.

23          THE COURT:  Do you expect to elicit testimony from

24  Officer Oliver that he arrested James Williams?

25          MR. SAFER:  James Williams?  No, I don't think so.

Gatson - cross by Stefanich

1496

1     THE COURT:  Okay.  Who arrested James Williams?  Do

2  we know?

3     MR. SAFER:  We have -- we don't know.

4     THE COURT:  Do you think it's one of these officers

5  in question?

6     MR. SAFER:  Physically?  I mean -- you mean who

7  physically put them in handcuffs?  We --

8     THE COURT:  Well, I mean, was it one of the

9  defendants?

10     MR. SAFER:  Who physically put them in handcuffs?

11     THE COURT:  Right.

12     MR. SAFER:  I don't know.  We will not establish

13  that.  We have just established that the detectives are in

14  charge of the scene, that Mr. Pesavento brought them to the

15  station and interviewed them, understood that they were not

16  there voluntarily.  They were put in lockup.  I think it's --

17  it is beyond belief to say that they did not have them

18  arrested and brought down to the -- to the station.

19     THE COURT:  All right.  We're going to take five

20  minutes.  I need to take a break.  We'll come back.  Let me

21  think about it.  We'll get rolling when the jury is ready.

22  Okay.

23     (Recess taken from 11:03 a.m. until 11:14 a.m.)

24     THE COURT:  All right.  Folks, have a seat.

25     They're done with the COVID testing.  They will be

Gatson - cross by Stefanich

1497

1    done momentarily.

2              On the deposition designations of James Williams, the

3    objection is overruled.

4              Here's how I see things:  There was testimony from

5    yesterday about the arrest of Edna Williams.  The arrest

6    report for Edna Williams showed that Officer Oliver arrested

7    her.  According to the arrest report for Edna Williams, she

8    was arrested at the same time as others.  It said three people

9    were arrested.

10             Similarly, the arrest report for James Williams shows

11   that three people were arrested.  They involve arrests at the

12   same time, the same place, on the same day.

13             That is enough of a foundation to create a reasonable

14   inference that the same officers were involved in both

15   arrests.  That piece of evidence in conjunction with the

16   testimony about the events and time from Officer Pesavento are

17   enough to allow a reasonable jury to create an inference that

18   the defendant officers were involved.  So for that reason, the

19   objection is denied.

20             Okay.  So for Officer -- I beg your pardon.  For

21   James Williams, all of the other objections are denied with

22   the following exception:

23             There was a relevance objection to Page 22, Lines 9

24   and 10, that is sustained.

25             There was an objection on Page 37, Lines 14 to 19 and

Gatson - cross by Stefanich

1498

1    Lines 21 to 23, that is sustained.

2           All of the other objections to James Williams'

3    testimony for both sides, meaning the testimony proffered by

4    both sides, all other objections are denied.

5           For Lee Williams, I previously ruled yesterday.  I'll

6    say again for the record, the objection on hearsay is denied.

7    That objection is overruled.

8           Do you need any other objections on the record now

9    for the remaining -- I don't know how long it will go.  I'm

10   happy to do it if you want.

11          Who is the next person in the lineup?  James --

12          MR. SAFER:  It will be -- James Williams will be

13   next.

14          THE COURT:  James Williams and then Lee Williams and

15   then --

16          MR. SAFER:  And then we would -- depending on the

17   time --

18          THE COURT REPORTER:  I'm sorry, I need you by a mic.

19          MR. SAFER:  We'll have Todd Henderson live, Charles

20   Baylom live, Jacob Jachna.

21          THE COURT:  Yeah, okay.

22          MR. SAFER:  He was the photographer.  And George

23   Karl.

24          THE COURT:  Totally fine.  Here's what we'll do:

25   When the jury is here, we'll bring him in, we'll get rolling.

Gatson - cross by Stefanich

1499

1    And then I can give you on the lunch hour the objections to

2    the other deposition designations.

3              MR. SAFER:  Thank you, Your Honor.

4              THE COURT:  We can bring the witness in whenever

5    she's ready.

6              MR. CROWL:  Thank you, Judge.

7              MR. HALE:  Your Honor, can I ask a quick

8    clarification?

9              THE COURT:  Yeah, go ahead.

10             MR. HALE:  Just for purposes of preserving the

11   record --

12             THE COURT:  Yeah.

13             MR. HALE:  -- you indicated, you know, before James

14   Williams is read, would that be an appropriate time just to

15   renew our objection to his testimony that's coming in?

16             THE COURT:  You certainly can, yeah.

17             MR. HALE:  Okay.

18             THE COURT:  I won't -- I won't hold it against you at

19   all to say, "Objection, you know" --

20             MR. HALE:  Yeah.

21             THE COURT:  -- "motion *in limine* No. 6."  Is that

22   what you mean?

23             MR. HALE:  I didn't want to interrupt the flow.  I

24   just wanted to know any suggestions on like how and when you

25   wanted us to do that at that time.

Gatson - cross by Stefanich

1500

1          THE COURT:  When we're about to start the testimony

2     of James Williams, just stand up and say, "Objection as

3     previously stated on motion *in limine* No. 6."  And that's how

4     you can preserve it.  Okay?

5          MR. HALE:  Okay.

6          THE COURT:  Nice and -- or you can do it now.  Do you

7     just want to just object now?

8          MR. HALE:  Sure.

9          Brian, you can do that now.

10          MR. STEFANICH:  Judge, objection to the testimony of

11     James Williams for the reasons previously stated in

12     defendants' motion *in limine* No. 6.

13          THE COURT:  All right.  I don't know if the mic

14     picked up that up, but there was an objection to the upcoming

15     testimony of Officer -- excuse me -- of Witness James Williams

16     pursuant to motion *in limine* No. 6.  That objection is

17     overruled.  The objection is heard and preserved.

18          MR. HALE:  Thank you, Your Honor.

19       (Jury in.)

20          THE COURT SECURITY OFFICER:  All rise.

21          THE COURT:  Have seat, everybody.

22          Welcome back, everyone.  I hope the testing went

23     well, and they treated you well down there.  Thank you for

24     doing that again.  I appreciate your patience with everything.

25          We're going to resume with the cross-examination.

Gatson - cross by Stefanich

1501

1     Go ahead, Counsel, when you're ready.

2     MR. STEFANICH:  Thank you, Judge.

3  BY MR. STEFANICH:

4  Q.  Ms. Gatson, I wanted to clarify one thing with the -- your

5  testimony about freckle-faced Rod and seeing him in the beeper

6  shop.

7     I believe you testified that the first time you said

8  that was to the investigator at your house in Wisconsin; is

9  that correct?

10 A.  I believe so.

11 Q.  Okay.  And before you testified at Mr. Bolden's trial, you

12 met with Mr. Bolden's attorney; is that correct?

13 A.  I think so, if I'm not mistaken.

14 Q.  And you would have told Mr. Bolden's attorney everything

15 that you saw that night, correct?

16 A.  Those questions weren't specifically asked to me.  Only

17 things was asked to me was the questions I was asked in court.

18 Q.  So did you meet with Mr. Bolden's attorney before you

19 testified in court for Mr. Bolden?

20 A.  I don't believe -- I don't remember for the first time --

21 for his first -- when he first went to trial, I don't think I

22 did.  I think I was just subpoenaed to court, but I don't

23 recall meeting with someone prior to.

24 Q.  You don't recall meeting Mr. Bolden's attorney prior to

25 you testifying in his case?

Gatson - cross by Stefanich

1502

1   A.  Correct.  Not his initial trial, no.

2             THE COURT:  Which case are we talking about, Counsel?

3   This case or the criminal case?

4             MR. STEFANICH:  I'm sorry.

5   BY MR. STEFANICH:

6   Q.  Did you meet with Mr. Bolden's attorney prior to

7   testifying in Mr. Bolden's criminal case in 1996?

8   A.  Correct, I don't recall meeting with somebody prior to

9   testifying for the --

10  Q.  Your testimony is you were just subpoenaed to trial?

11  A.  I believe so, yeah.

12  Q.  And you just went to the courthouse, correct?

13  A.  Yeah, I think that's how --

14  Q.  And you testified?

15  A.  Correct.

16  Q.  You did not talk to Mr. Bolden's attorney prior to

17  testifying?

18  A.  I don't believe so.  I don't recall if I did.

19  Q.  Okay.  Ms. Gatson, when did you first meet Mr. Bolden?

20  A.  I met him a year prior to the incident that happened.  So

21  it was in 1993, I think it was.

22  Q.  So is it fair to say early 1993?

23  A.  Yeah.  Somewhere around there, yeah.

24  Q.  And where did you meet him?

25  A.  I met him at the restaurant.

Gatson - cross by Stefanich

1503

1    Q.   Who introduced you to Mr. Bolden?

2    A.   My godparents did.

3    Q.   And did they introduce him as Eddie Bolden or Lanier?

4    A.   They introduced him as Lanier.

5    Q.   And that's what you would call him, correct?

6    A.   Yeah, I call him that.  Mm-hmm.

7    Q.   And other people would call him Lanier; is that correct?

8    A.   Yeah.  Yes.

9    Q.   And I believe you testified that prior to living above the

10   J&J, you lived in Stateway Gardens; is that correct?

11   A.   Yeah, that's where I grew up at initially.

12   Q.   Okay.  Did you know Mr. Bolden when you lived in Stateway

13   Gardens?

14   A.   No.  I left Stateway Gardens when I was eight years old.

15   Q.   Okay.

16        MR. STEFANICH:  Judge, if I could approach the

17   witness and show her this exhibit.

18        THE COURT:  Yes.

19   BY MR. STEFANICH:

20   Q.   Ms. Gatson, I'm handing you -- Ms. Gatson, I just handed

21   you what's been marked -- what was marked as Defendants'

22   Exhibit 2.

23   A.   Mm-hmm.

24   Q.   Do you recognize the person in this photograph?

25   A.   Yes.

Gatson - cross by Stefanich

1504

1    Q.  Who do you recognize it to be?

2    A.  Eddie Bolden.

3           MR. STEFANICH:  Judge, I would move Defendants'

4    Exhibit 2 into evidence.

5           THE COURT:  Any objection?

6           MR. CROWL:  No, Your Honor.

7           THE COURT:  Admitted.  You can publish if you choose.

8        (Defendants' Exhibit No. 2 was received in evidence.)

9    BY MR. STEFANICH:

10   Q.  And, Ms. Gatson, is this how Mr. Bolden looked when you

11   met him in early 1993?

12   A.  Yeah.  Yes.

13   Q.  And is this how Mr. Bolden looked on January 29th, 1994?

14   A.  I believe -- I think he might have had a haircut or

15   something then.  I think his head was bald.

16   Q.  You believe his hair was bald on January 29th, 1994?

17   A.  I think so.

18   Q.  Isn't it true that on January 29th, 1994, that

19   Mr. Bolden's haircut was that he was balding in front?

20   A.  I don't recall.

21   Q.  Well, you testified at Mr. Bolden's criminal trial,

22   correct?

23   A.  Yeah.

24   Q.  And when you testified at Mr. Bolden's criminal trial,

25   were you asked these questions, and did you give these

Gatson - cross by Stefanich

1505

1    answers --

2              MR. STEFANICH:   Counsel, Page 66, Lines 15

3    through 18.

4    BY MR. STEFANICH:

5    Q.   -- "QUESTION:  Was he balding in front?

6              "ANSWER:  Right, like a receding hairline.

7              "QUESTION:  Was his haircut as short as it is now?

8              "ANSWER:  Yes."

9              Were you asked those questions, and did you give

10   those answers?

11   A.   Yes.  If it says it, yes.

12   Q.   And in January of 1994, Mr. Bolden was tall and skinny; is

13   that correct?

14   A.   Yes.

15   Q.   Could you approximate how tall Mr. Bolden was?

16   A.   He had to have been like 6 feet, 6'2".

17   Q.   Can you briefly describe the layout of the J&J Fish in

18   January of 1994.

19   A.   Okay.  So when you come into the restaurant, you have your

20   open area.  It is -- there was a pay phone attached to the

21   wall.  You have two pop machines sitting like on this wall

22   right here (indicating).  Next to the two pop machines is a

23   sit-down Pac-Man machine.

24             You have around that -- around that corner, you have

25   a dining area where you have booths and tables.

Gatson - cross by Stefanich

1506

1    You have the front glass window -- like it's a

2 bullet-proof glass window where the cashier is at.  And then

3 you have like four or five seating -- like, chairs sitting

4 alongside the wall.  And then you have the front office door

5 that has blackened-out windows and a door attached.

6 Q.  Would you describe it as a pretty small office -- or a

7 pretty small restaurant?

8 A.  Yes, it was like midsized.

9 Q.  And where were the restrooms?

10 A.  The restrooms were on the dining side area.  It consists

11 of, like, three doors.  You have the door that leads you to

12 the back office of the beeper shop.  You have the restroom,

13 and then you have like a utility closet.

14 Q.  And you worked at the -- you were the cashier, correct?

15 A.  Yes.

16 Q.  And the kitchen would have been behind where you would

17 stand as the cashier; is that correct?

18 A.  Yes.

19 Q.  And I believe you testified that on January 29th, 1994,

20 you arrived at the restaurant between 5:00 and 5:30; is that

21 correct?

22 A.  Correct.

23 Q.  And when you arrived between 5:00 and 5:30, you saw

24 Mr. Bolden; is that correct?

25 A.  Correct.

Gatson - cross by Stefanich

1507

1    Q.  When you testified at Mr. Bolden's criminal trial, were

2    you asked these questions and did you give these answers --

3              MR. STEFANICH:  Counsel, Page 55.

4    BY MR. STEFANICH:

5    Q.  -- "QUESTION:  Now, again, on January 29th, 1994, did you

6    see Eddie Bolden?

7              "ANSWER:  Yes.

8              "QUESTION:  At the J&J Fish store?

9              "ANSWER:  Yes.

10             "And do you know, did you see him in the early

11   evening hours?

12             "ANSWER:  I seen him right -- a little bit after my

13   shift had started.  It was like about -- within 30 minutes

14   after my shift started.

15             "QUESTION:  Your shift started about 6:00 o'clock on

16   the 29th?

17             "ANSWER:  Right.

18             "QUESTION:  And you saw Eddie around 6:30 maybe?

19             "ANSWER:  Right."

20             Were you asked those questions, and did you give

21   those answers?

22   A.  Yes.

23   Q.  I believe you testified before the break that when you

24   first arrived at the J&J Fish, you actually played the Pac-Man

25   game with Mr. Bolden; is that correct?

Gatson - cross by Stefanich

1508

1   A.  That's correct.

2   Q.  And you played that game with him until your shift started

3  at 6:00; is that correct?

4   A.  That's correct.

5   Q.  And the man that ran in with a gun, he ran in at

6  approximately 8:00 o'clock; is that correct?

7   A.  I'm not sure exactly the time, but it was somewhere around

8  then.

9   Q.  Okay.  From -- when you arrived at the J&J between 5:00

10  and 5:30 until when the man ran in with the gun, was

11  Mr. Bolden sitting at the Pac-Man game the entire time?

12   A.  From what I seen, yes.

13   Q.  I'm sorry, I didn't hear you.

14   A.  I said from what I seen -- I seen him during the whole

15  time of my -- my shift.  If he left or something, I wouldn't

16  know.  Because I seen him the whole time I was present.

17   Q.  So if he left, you wouldn't know if he left.  Is that what

18  your testimony is?

19   A.  That's correct.

20   Q.  Okay.  And when the man ran in with a gun, he was yelling

21  "I'm shot, I'm shot"; is that correct?

22   A.  When he got back to the back where we were, he started

23  yelling he was shot, he shot, he was shot in the back, is what

24  he said.

25   Q.  Could you see that the man was bleeding?

Gatson - cross by Stefanich

1509

1   A.   No.  Everybody was scrambling, so I couldn't see any

2   blood.  We was just -- we was just startled with the gun just

3   pointed at us as he was running back there where we were

4   working.

5   Q.   Did you ever see any blood?

6   A.   I don't recall.

7   Q.   Ms. Gatson, you testified at a deposition in this case; is

8   that correct?

9   A.   Yes.

10  Q.   And in that deposition, were you asked this question, and

11  did you give this answer --

12          MR. STEFANICH:  Counsel, Page 127, Lines 8

13  through 11.

14  BY MR. STEFANICH:

15  Q.   -- "QUESTION:  In any event, when the man came in, was it

16  obvious to you that he was injured?

17          "ANSWER:  Yeah, he had blood.  I mean, you could see

18  it."

19          Were you asked that question and did you give that

20  answer?

21  A.   Yes, I gave that answer.

22  Q.   And people inside the fish shop gave the man assistance;

23  is that correct?

24  A.   Yes.

25  Q.   Okay.  Who helped him?

Gatson - cross by Stefanich
1510

1    A.  It was -- I believe it was Anthony because he was there,

2    my godparents, and I think the cook.

3    Q.  And the cook was Maurice Stewart?

4    A.  Yes.  Yeah.

5    Q.  When did Anthony arrive at the J&J?

6    A.  He was over there -- I'm not sure exactly what time, but I

7    know he came to get change in the register.  That's why he was

8    back -- in the back part on that side at that time.

9    Q.  Do you recall if Anthony was there when the man ran into

10   the restaurant?

11   A.  Yeah, he was there in the back.

12   Q.  Approximately 30 minutes before the man ran into the

13   restaurant, did you see Anthony Williams speaking with two

14   African American men in the restaurant?

15   A.  I don't recall.

16   Q.  Did you see -- the man who ran into the restaurant, did

17   you see that man earlier that night trying to get into the

18   restaurant?

19   A.  I think I remember him try to order something earlier in

20   the day -- earlier in the night, but --

21   Q.  So my -- I'm sorry, go ahead.

22   A.  -- I'm not totally sure.  But I thought I remembered his

23   face from earlier in my shift.

24   Q.  Can you approximate how much earlier you recall seeing him

25   trying to order something?

Gatson - cross by Stefanich

1511

1    A.   It might have been like an hour -- a little over an hour.

2    So after I started my shift.

3    Q.   And you started your shift at 6:00?

4    A.   Correct.

5    Q.   So a little bit after 7:00 o'clock; is that correct?

6    A.   Yeah.

7    Q.   Okay.  Did you hear any gunshots that night?

8    A.   No.  You can't hear -- you can't hear what's going on

9    outside from back in the kitchen.  With the fryer going and

10   the noise, you can't hear what's going on outside on the

11   street.

12           MR. STEFANICH:  Judge, I'm going to show Defendants'

13   Exhibit No. 31.  There's no objection to that being shown to

14   the witness --

15           THE COURT:  Is it in evidence?

16           MR. STEFANICH:  I don't believe it's in evidence,

17   Judge.

18           THE COURT:  Do you want to move it into evidence?

19           MR. STEFANICH:  Yes, Judge, I would like to move

20   Defendants' Exhibit 31 into evidence.

21           THE COURT:  Any objection?

22           MR. CROWL:  No objection, Judge.

23           THE COURT:  It's admitted.  You can publish to the

24   jury.

25       (Defendants' Exhibit No. 31 was received in evidence.)

Gatson - cross by Stefanich

1512

BY MR. STEFANICH:

Q.   Ms. Gatson, showing you what's been marked as Defendants' Exhibit No. 31, do you recognize the restaurant that's depicted in this picture?

A.   Yes.

Q.   And what do you recognize it to be?

A.   It's the front of the restaurant, and I could see part of the beeper shop.

Q.   And this picture was taken across from Cottage Grove, looking at the front of the store; is that correct?

A.   Yes, this look like the vacant lot across the street.

Q.   Okay.  And you can see the glass windows on the J&J; is that correct?

A.   Yeah, I can see.

Q.   Now, where you're standing at the cash register, you're facing Cottage Grove; is that correct?

A.   That's correct.

Q.   Okay.  And you can see through the glass windows onto Cottage Grove; is that correct?

A.   You can't see out -- when you're behind the -- when you're behind the cash register, you can't see all the way out to the street.  You can't even see out to the door in front of the sidewalk.  You can't see that far.

Q.   You can't see out onto Cottage Grove; is that your testimony?

Gatson - cross by Stefanich

1513

1   A.  That's correct.

2   Q.  And on January 29th, 1994, did you see any shooting

3   outside on Cottage Grove?

4   A.  No, I did not.

5   Q.  Did you see any individuals fighting right in front of the

6   glass of the J&J Fish?

7   A.  No, I don't recall.

8   Q.  Did you see any individual with a ski mask right outside

9   the windows of the J&J Fish?

10  A.  No.

11  Q.  Did you see any individual pull down a ski mask to reveal

12  his face while looking inside the J&J Fish?

13  A.  Not that I recall.

14  Q.  Did you see Roderick Stewart outside the J&J Fish moments

15  before the man ran into the store?

16  A.  Not that I recall.

17  Q.  Now, when the man ran into the restaurant, where were you?

18  A.  When the man ran in the restaurant, I was -- okay.  We

19  have like a kitchen area where tables are, where I would wrap

20  the orders at.  So I was in between the -- walking an order

21  out to the door and almost by the ICEE machine as he was

22  rushing in.  So it caused me to like run back because I seen

23  him rushing in.

24  Q.  And where was Mr. Bolden when the man came into the

25  restaurant?

Gatson - cross by Stefanich

1514

1    A.   He was already back in, like, the kitchen area.

2    Q.   So he was in the kitchen?

3    A.   Yeah, he was back by the kitchen area, like near the

4    tables where I was wrapping the order.

5    Q.   So he was by you; is that correct?

6    A.   He was not that far from where I was.

7    Q.   He was not at the Pac-Man machine; is that correct?

8    A.   Not when the gentleman ran in with the gun.  No, he was

9    back in the back, I believe.

10   Q.   And Mr. Bolden wasn't talking to two female customers when

11   the man ran in; is that correct?

12   A.   Not right at that time that I believe -- I know he was

13   talking to two girls when I took an order out prior to this

14   incident happening.

15   Q.   But when the man ran in, Mr. Bolden was not talking to two

16   female customers, correct?

17   A.   No.

18   Q.   And that's because you were talking to Mr. Bolden,

19   correct?

20   A.   I wasn't talking to him at that time.  I was wrapping an

21   order.  Saturday nights are like one of our busiest nights, so

22   it be really busy around this part -- this time of the night.

23   Q.   At Mr. Bolden's trial, were you asked this question, and

24   did you give this answer --

25           MR. STEFANICH:  Counsel, Page 67, Lines 18

Gatson - cross by Stefanich

1515

1   through 20.

2   BY MR. STEFANICH:

3   Q.  -- "QUESTION:  You were talking to him face to face when

4   the man came running in saying 'I was shot'?

5              "ANSWER:  Right."

6              Were you asked that question, and did you give that

7   answer?

8   A.  I don't recall, but . . .

9   Q.  I'm sorry, I --

10  A.  I said I do not recall.

11             THE COURT:  How are we doing on time, Counsel?

12             MR. STEFANICH:  15 minutes, Judge.

13             THE COURT:  Okay.

14  BY MR. STEFANICH:

15  Q.  When the man came into the store, how many customers were

16  in the store?

17  A.  I think it was maybe three to four, I believe.

18  Q.  Three to four customers.  And there were three female

19  customers sitting at a table; is that correct?

20  A.  I think so, in the booth -- in one of the booths.  And

21  then I know -- I know there was a gentleman waiting on like a

22  three-piece chicken order, because he was a regular customer

23  that came in all the time.

24  Q.  Okay.  So there are three female customers sitting at a

25  booth, correct?

Gatson - cross by Stefanich

1516

1    A.   I believe so.

2    Q.   And one male customer waiting to pick up an order; is that

3    correct?

4    A.   Yeah, he was waiting on an order.

5    Q.   And that male customer was a regular customer, correct?

6    A.   Yes.

7    Q.   Did one of the three female customers work at the beeper

8    shop?

9    A.   I'm not sure.

10    Q.   Do you know a person named Octavia Jackson?

11    A.   I don't recall that name.

12    Q.   When the man came in who was shot, he had a gun; is that

13    correct?

14    A.   Yes, he did.

15    Q.   Did you see what happened to the gun?

16    A.   No.

17    Q.   I believe you testified that you thought Mr. Bolden called

18    911; is that correct?

19    A.   Yes, because I seen him pick up the phone.

20    Q.   Okay.  So you saw Mr. Bolden pick up the phone, correct?

21    A.   Mm-hmm.

22    Q.   Did you hear what Mr. Bolden said?

23    A.   No, because there was so much chaos going on.

24    Q.   So you don't know if Mr. Bolden gave his name when he was

25    speaking on the phone, correct?

Gatson - cross by Stefanich

1517

1   A.   Correct.

2   Q.   And once the man who was shot came into the restaurant,

3   did you see that man speaking with Anthony?

4   A.   You're talking about when he was shot?

5   Q.   Yeah, when he came in shot, did you see that man talk to

6   Anthony?

7   A.   No, he was just yelling that he was shot.  He didn't speak

8   to anybody specifically.  He was just screaming he was shot,

9   he was shot.

10  Q.   And the three female customers that were in the

11  restaurant, when the man came in screaming, they ran to --

12  towards the bathroom, correct?

13  A.   I wouldn't know because I was in the kitchen area.  So if

14  I'm in the kitchen area, I wouldn't know what was going on

15  outside in the restaurant part of it because I'm behind a door

16  and a glass.

17  Q.   When you testified at the deposition -- at your deposition

18  in this case, were you asked this question, and did you give

19  this answer --

20       MR. STEFANICH:  Counsel, Page 81, Lines 4 through 8.

21  BY MR. STEFANICH:

22  Q.   -- "QUESTION:  The customers that were in the restaurant,

23  when the man came in the door, what did they do when the man

24  ran in?

25       "ANSWER:  The girls freaked out and ran.  They ran,

Case: 1:17-cv-00417 Document #: 640 Filed: 11/16/21 Page 81 of 126 PageID #:18784
Gatson - cross by Stefanich
1518

1    like, towards the bathroom, the bathroom."

2         Were you asked that question, and did you give that

3    answer?

4    A.  Yeah.

5    Q.  And after the man ran in, your godfather, James Williams,

6    he locked the door, correct?

7    A.  Yes.

8    Q.  Mr. Bolden did not lock the door, correct?

9    A.  Yes.  I -- I don't know if he locked the -- no, he

10   wouldn't have locked the door because he was in the back.  So,

11   no, I think it had to have been my godfather because he was in

12   the front office when the gentleman ran in.

13   Q.  And then I believe you testified eventually that police

14   officers arrived at the restaurant; is that correct?

15   A.  The first -- from the first initial call, yes, it was

16   uniformed officers who arrived.

17   Q.  Okay.  So initially uniformed officers arrived --

18   A.  Correct.

19   Q.  -- is that correct?

20   A.  Mm-hmm.

21   Q.  And prior to the uniformed officers arriving, the three

22   female customers left, correct?

23   A.  Yeah, they made everybody get out and told us to close the

24   restaurant.

25   Q.  Who made everybody get out?

Gatson - cross by Stefanich

1519

1    A.  I don't remember if it was the police that told everybody

2    to get out or my godparents, but I know they told us we need

3    to close.

4    Q.  So my question is:  Prior to the police arriving --

5    A.  Mm-hmm.

6    Q.  -- the three female customers left, correct?

7    A.  I'm not sure.

8            MR. STEFANICH:  Counsel, Page 129 of Ms. Gatson's

9    deposition.

10   BY MR. STEFANICH:

11   Q.  Ms. Gatson, at your deposition, were you asked these

12   questions, and did you give these answers:

13           "QUESTION:  And when you said -- I think you told us

14   when the police arrived and the ambulance arrived, all the

15   customers had already left the store?

16           "ANSWER:  Uh-huh.

17           "QUESTION:  Is that a "yes"?

18           "ANSWER:  Yes."

19           Were you asked those question, and did you give those

20   answers?

21   A.  Yes.

22           MR. CROWL:  Judge, I'm not sure the microphone is

23   working at this moment.  Can you test it real quick?

24           We may have a battery issue.  May we switch?

25           THE COURT:  Absolutely.  Sure.

Case: 1:17-cv-00417 Document #: 640 Filed: 11/16/21 Page 83 of 126 PageID #:18786
Gatson - cross by Stefanich
1520

1        Thank you for raising it.

2        Ms. Gatson, why don't we test your microphone by

3   proudly saying the name of the town you live in in Iowa.

4        Go ahead, I want to hear you.

5        THE WITNESS:  I'm sorry, what was the question?

6        THE COURT:  I wanted to make sure your microphone was

7   working, so I wanted to get you to say something, so I was

8   going to say, why don't you say the town you're from in Iowa.

9        THE WITNESS:  Okay.  Manchester.

10       THE COURT:  There you go.  It sounds like the

11  microphone is working.  So, Counsel, go ahead.

12       MR. CROWL:  Thank you, Judge.

13  BY MR. STEFANICH:

14  Q.  Ms. Gatson, when the first set of uniformed police arrived

15  at the store, they spoke to your godparents; is that correct?

16  A.  Yes.

17  Q.  And did you hear that conversation?

18  A.  I don't recall if I heard everything in its entirety.

19  Q.  What do you recall hearing?

20  A.  I can't really -- I can't give you a definite verbatim at

21  the moment.

22  Q.  Did those officers speak to you?

23  A.  I don't recall the first set of officers speaking to me

24  about anything.

25  Q.  All right.  Did you see if those first officers spoke to

Gatson - cross by Stefanich

1521

1  Mr. Bolden?

2  A.  Not that I'm aware of.

3  Q.  Okay.  And those officers told you to close up the

4  restaurant; is that correct?

5  A.  Yes.

6  Q.  And you began to clean up the restaurant, correct?

7  A.  Correct.

8  Q.  And those uniformed officers left while you were cleaning

9  up the restaurant, correct?

10 A.  Correct.

11 Q.  Anthony left after that first set of uniformed officers

12 left, correct?

13 A.  Correct.

14 Q.  When did Mr. Bolden leave?

15 A.  I'm not sure when he left.

16 Q.  Did Mr. Bolden leave after the first set of uniformed

17 officers left?

18 A.  I believe so because he wasn't there when the second set

19 of officers came.

20 Q.  So after the first set of officers left, Anthony left and

21 Mr. Bolden left, approximately 20 minutes later, a second set

22 of officers came?

23 A.  Somewhere up in there, yeah, 20, 30 minutes, yep.

24 Q.  And they were uniformed officers; is that correct?

25 A.  No, the second set were plain clothes officers,

Gatson - cross by Stefanich

1522

1    detectives.

2    Q.  How do you know they were detectives?

3    A.  Because they announced themselves as detectives.

4    Q.  And how many plain clothes detectives were present?

5    A.  I believe this was four to six, somewhere between four to

6    six.

7    Q.  And how many of those plain clothes detectives were male?

8    A.  I think three or four, I believe.

9    Q.  And that means either one to two were female; is that

10   correct?

11   A.  I know it was definitely one female.

12   Q.  One female?

13   A.  Yeah.

14   Q.  And you don't know the names of these plain clothes

15   officers, correct?

16   A.  No, I do not know.

17         THE COURT:  You have three more minutes, Counsel.

18   BY MR. STEFANICH:

19   Q.  You don't remember the race of these plain clothes

20   officers, correct?

21   A.  No.

22   Q.  You can't approximate the ages of these plain clothes

23   officers, correct?

24   A.  No.

25   Q.  You don't remember anything else about what these plain

Gatson - cross by Stefanich

1523

1    clothes officers looked like, correct?

2    A.  No, I do not.

3    Q.  And you eventually spoke to detectives at the police

4    station; is that correct?

5    A.  Correct.

6    Q.  The detectives that you spoke to at the police station,

7    were they -- those officers were different than the detectives

8    that were at the restaurant, correct?

9    A.  I can't remember because there was so many of them.

10   Q.  And you can't remember what the detectives that you spoke

11   to at the police station looked like, correct?

12   A.  No.  That night was very traumatic for me, so, no, I do

13   not.

14   Q.  And you can't remember the race of the detectives you

15   spoke to at the police station, correct?

16   A.  No.

17   Q.  When you spoke with the detectives at the police station,

18   did the detectives tell you that two people had been murdered

19   a few blocks away from the J&J Fish?

20   A.  Yeah, I did -- yeah, they did say that.

21   Q.  Okay.

22   A.  I believe.  Yeah.

23   Q.  And you left the police station later that morning; is

24   that correct?

25   A.  Yeah, I got home at like 5:00 something in the morning.

Gatson - cross by Stefanich

1524

1    Q.  And when you got home, did you talk to your godmother

2    about the -- what happened at the J&J Fish the night before?

3    A.  No, because she was still at the police station.  I got

4    home before she did.

5    Q.  When you got home, did you talk to your godfather about

6    what happened at the J&J Fish the night before?

7    A.  No.

8    Q.  And when your godmother returned home, did you speak to

9    her about what happened at the J&J Fish?

10   A.  No, we didn't -- she didn't -- the way -- the way I was

11   raised, like, stuff like that, they didn't talk -- adult

12   things didn't get talked to me about.  If it was something

13   discussed about that night, they might have talked to each

14   other, but not to me.

15   Q.  So is it fair to say that you never talked to your

16   godmother about what happened at the J&J -- outside the J&J

17   Fish that night?

18   A.  Yeah, I did like at some point, but I don't remember,

19   like, when.

20   Q.  Was that before or after you testified at Mr. Bolden's

21   criminal trial?

22   A.  It was before, because I still was -- I was, like, waking

23   up having dreams and stuff like that, so it was before.

24   Q.  Did you ever talk to Anthony about what happened at the

25   J&J Fish on January 29th, 1994?

Gatson - cross by Stefanich

1525

1    A.  Oh, no.  I don't -- uhm-uhm.

2    Q.  Why not?

3    A.  Because he -- I don't -- he is like a big brother to me,

4    but I don't have those -- it's like I'm a -- like a little

5    sister to them.  So certain things -- like, they don't talk to

6    me about certain things.  I'm a child; they adults.  So they

7    don't talk to me about, like, personal things or things in

8    their life like that.  So that's not something that he'll have

9    a conversation with me about.

10   Q.  Did you ever talk to Anthony -- did you ever learn that

11   Mr. Bolden was arrested for this case?

12   A.  I learned about that probably like months down the line.

13   I didn't know like initially he was.

14   Q.  You --

15              THE COURT:  30 seconds.

16   BY MR. STEFANICH:

17   Q.  Where did you think -- Mr. Bolden, you said, was in the

18   J&J almost every day, correct?

19   A.  Mm-hmm.

20   Q.  Where did you think he was for those months that you

21   didn't know he was arrested?

22   A.  Well, he had just had a baby not too long ago, so I

23   thought he could have been spending time with his child.

24              MR. STEFANICH:  Okay.  No further questions, Judge.

25              THE COURT:  Thank you, Counsel.

1    Any redirect?

2    MR. CROWL:  No redirect, Judge.  Thank you.

3    THE COURT:  Ms. Gatson, you are excused.  Thank you

4  for traveling to be here.  I hope you have a safe travel back

5  to Iowa.

6    THE WITNESS:  All right.  Thank you.

7    THE COURT:  I'm sure someone will help you with the

8  microphone.

9    (Witness excused.)

10    THE COURT:  All right.  Please be seated, everybody.

11    All right, folks.  We're now going to do a little

12  different part of the trial.  It's a new part that you haven't

13  seen before.

14    We've now come to the part of the trial where the

15  parties are going to read prior testimony into the record so

16  that you can hear what some witnesses had testified to before.

17    Let me give you a brief explanation of what you're

18  about to hear and how we're going to do it.

19    Parties can present testimony to jurors a couple of

20  different ways.  One of the ways is the way that you folks

21  have seen a number of times already.  Someone will come into

22  the courtroom, a live witness.  They'll take the witness

23  stand.  They'll testify in front of you.  You'll see question

24  and answer right here in your physical presence, and then

25  they'll leave, and they'll go about their business.

1       That's how it often works, but sometimes it happens
2   differently.  Sometimes a witness can't be here.  The person
3   could be sick, the person could live overseas or be out of
4   town, live far away.  Sometimes the witness has passed away.
5   So the bottom line is, sometimes a witness is unavailable at
6   trial.
7       In that case, parties can present the testimony by
8   reading prior testimony into the record.  For example,
9   sometimes a witness has testified in a prior case, a prior
10  lawsuit, maybe a prior criminal trial, maybe a prior hearing.
11  Sometimes a person has testified in a deposition.
12      In those situations, the parties can read the
13  testimony into the record.
14      Now, let me explain what a deposition is.  We've
15  heard that term a number of times already, and maybe everyone
16  knows what it is, but let me give you just a reminder.
17      A deposition is simply the taking of testimony
18  outside of a courtroom.  It is part of a legal proceeding,
19  though, however.  Usually depositions take place in the
20  conference room of the lawyers.  The judge does not
21  participate, but the lawyers for each side are there.  The
22  person will take an oath under penalty of perjury that they're
23  going to be telling the truth.  And the lawyers will ask
24  questions to the witness.  Each side gets an opportunity to do
25  examination and cross-examination.

1528

1    And we have a court reporter that takes everything

2  down.  So at the end of the day, you've got a transcript just

3  like what we have here.  The main difference is, it doesn't

4  take place in a courtroom and the judge isn't there.

5    If a deposition takes place and the witness is

6  unavailable, the parties can read the sworn testimony into the

7  record.

8    You're about to hear some of that.  You're about to

9  hear testimony from people who cannot be here at trial for

10 whatever reason.  Some of the testimony you're going to hear

11 is from people who were deposed, so they sat for deposition in

12 this lawsuit.  They were asked questions by these lawyers.

13   You're also going to hear some testimony by people

14 who testified in Mr. Bolden's criminal trial or a related

15 hearing.  So that's what's going to happen.

16   Let me explain to you how exactly the parties are

17 going to present the testimony to you.

18   A lawyer will come to the podium and read the

19 questions that were posed to the person either at the

20 deposition or at the criminal trial.  And another person is

21 going to take the witness stand.  And think of that person as

22 an actor or an actress.  That person is going to read into the

23 record the answer that the witness gave at the time.

24   So if it looks to you like the person is just reading

25 something, they are reading something.  They're reading

1    something that someone else said.  So the actor or actress,

2    it's usually somebody associated with one of the law firms

3    involved.  The actor or actress is going to basically read

4    into the record the testimony given by somebody else.

5         Do not focus on the fact that the person is reading.

6    Focus on their words.  Focus on the substance of the

7    testimony.  Focus on what they said.

8         Do not place any significance on the tone or behavior

9    of the person that's going to take the witness stand in front

10   of you.

11        I've instructed the witnesses to just play it as

12   straight as you can.  Give a realistic depiction, but not ham

13   it up.  They're just going to read for you exactly what is on

14   the page.

15        And this is an important point that I'd like to make

16   sure I say to you folks.  Testimony is not entitled to less

17   weight simply because the witness couldn't be here in person.

18   So you shouldn't say to yourselves, boy, this person isn't

19   here, so that witness's testimony is entitled to less weight.

20        Testimony that is read into the record is entitled to

21   the same consideration as testimony that you hear when the

22   person walks into the courtroom.  Evaluate the testimony in

23   the same way as if the person had been available to testify in

24   person.

25        To save time, which I've repeatedly encouraged the

1530

1   parties to do, we're going to do it like this:  The parties

2   are not going to read the entire transcript into the record.

3   They're not.  They're going to read select passages.  They've

4   gone through, and they've selected passages that they want to

5   read.

6           So when you hear the testimony, if it sounds like

7   they hopped from topic to topic to topic in a brief fashion,

8   that's to save all you folks time.  I don't want you to hear

9   testimony that you don't need to hear.  We're going to be

10  focusing on the stuff that the parties want you to hear.

11          Each side has had an opportunity to present

12  testimony.  So the plaintiff's side has had an opportunity to

13  pick pages, and the defense side has had an opportunity to

14  pick pages.

15          They are going to read it all together.  So, for

16  example, let's say, just by way of illustration, Mr. Bolden's

17  team wants you to hear Pages 2, 3, and 5.  And then Officer

18  Pesavento's team and the team representing the other officers

19  wants you to read Pages 23, 24, and 25.  The question and

20  answer that you're about to hear is going to be the whole

21  thing all together.  So you're not going to hear one side

22  present and then another side present from the same witness.

23  We're going to have one attorney and one actor or actress

24  reading the whole thing.

25          I hope that's a helpful overview of what you're about

1531

1    to hear.

2              Here's the bottom line:  If may seem a little

3    artificial because we're going to be reading into the record

4    what someone else said at a different proceeding, but the key

5    thing is that it's under oath, it's sworn testimony, and I'd

6    like you to focus on the words that were said by the witness.

7    Okay?  So that's my best shot at explaining to you what's

8    about to happen.

9              Counsel, with that windup, who would you call as your

10   first deposition designation?

11             MS. BRUMMEL:  We call Mr. James Williams.

12             THE COURT:  Okay.  Very good.

13             Good afternoon.  Come on up and take the witness

14   stand.

15             MR. KING:  Good afternoon.

16             THE COURT:  Good afternoon.  So, again, folks I'm not

17   going to put this person under oath because this person here

18   isn't testifying.  He's going to be reading testimony that

19   someone else gave.

20             Why don't you say your name, though, for the record,

21   sir, please.

22             MR. KING:  My name is Alan King, A-l-a-n K-i-n-g.

23             THE COURT:  Great.  Thank you.

24             And, folks, what I'm going to do, before we start

25   with each witness, I'm going to read one or two sentences into

J. Williams (deposition) - direct by Brummel

1532

1    the record just so you folks have an idea of who this person

2    is supposed to be.  Okay?

3              So he is going to be reading the testimony from James

4    Williams.  James Williams is the former owner of J&J Fish.  He

5    is the husband of Edna Williams who testified yesterday.

6              James Williams testified at deposition in this

7    lawsuit on April 10th, 2018.

8              Okay, Counsel, whenever you're ready.

9                    JAMES WILLIAMS, WITNESS, DULY SWORN

10                   DIRECT EXAMINATION (Via Deposition)

11   BY MS. BRUMMEL:

12   Q.  Can you state your name, including your middle name, and

13   give us your date of birth, please.

14   A.  James Williams, 11/10/44.

15   Q.  Let's go through your children.  Can we go through from

16   the oldest to the youngest, their names.

17   A.  The oldest, Willie James Lee, then Rudy Lee --

18   Q.  Okay.

19   A.  -- Anthony Williams --

20   Q.  Okay.

21   A.  -- Louis Williams.  After Louis was Tanya Francis

22   Williams, then Gregory Williams.

23   Q.  Okay.  Where did you go to after Robert Taylor?

24   A.  We moved into a building, J&J Fish, what we bought.

25   Q.  And the address?

J. Williams (deposition) - direct by Brummel

1533

1   A.  64- -- 6220 and 6420, the same building, twin buildings,

2   like . . .

3   Q.  What year was that that you moved to Cottage Grove?

4   A.  I don't know.  I just ain't good on going back that far on

5   years.  It had to be -- should have been -- guessing, I would

6   say, '81, maybe.

7   Q.  '81?

8   A.  Guessing.  I'm not sure.  I just can't keep up with stuff

9   like that.  That's why everything -- I have to go back.  I

10   have to ask.

11   Q.  I hear you.

12   A.  Because I went through so much health issues till I just

13   lost a lot of stuff, just lost it.

14   Q.  So how old was Anthony when you moved into the Cottage

15   Grove building?

16   A.  I have no idea, and that's the truth.

17   Q.  Was he a little kid?

18   A.  No, he was out of high school.

19   Q.  Okay.  And Anthony, when he passed away, he was a grown

20   man, correct?

21   A.  Correct.

22   Q.  Anthony was in a coma for a long time before he --

23   A.  For a long time.  I forget how many years.

24   Q.  You met with Ms. Hayes here, correct, the attorney here?

25   A.  Yes.

J. Williams (deposition) - direct by Brummel

1534

1   Q.   How many times did you talk to her?

2   A.   I think twice, counting today.

3   Q.   When you talked to counsel here, did she explain what a

4   deposition was?

5   A.   I don't remember.  She might have.  My memory is really

6   bad.

7   Q.   Okay.  When did you first meet Eddie Bolden?

8   A.   I have no idea about meeting him.  I just remember him

9   being around the store.

10   Q.   Were you aware that your sons were in street gangs?

11   A.   I don't believe that.  I believe I would have known it.

12   Q.   And to clarify, you are not aware that Anthony was selling

13   drugs?

14   A.   No.  Never seen any.  Never seen no money.  And definitely

15   didn't have them around the store or the house.

16   Q.   How long were you living in the building on Cottage Grove?

17   A.   Probably five or six years.  I don't remember.

18   Q.   Who lived with you when you lived --

19   A.   No, longer than that.

20   Q.   Who lived with you when you lived there?

21   A.   In the building or with me?

22   Q.   Okay.  Did you live in the building?

23   A.   Yes.

24   Q.   Did you live in the building the entire time that you

25   owned it?

J. Williams (deposition) - direct by Brummel

1535

1   A.   Yes.

2   Q.   Did you live in one of the apartments?

3   A.   Yes.

4   Q.   Which apartment did you live in?

5   A.   Third floor north.

6   Q.   Who lived in that apartment with you?

7   A.   My wife and grandkids and different kids, daughter.

8   Q.   Wasn't your son Anthony living with Lala when you were

9   living on Cottage Grove?

10            MS. BRUMMEL:  Page 35.

11            MR. KING:  Thank you, Counsel.

12            MS. BRUMMEL:  Line 25.

13            MR. KING:  I'm sorry, can you repeat the question.

14   BY MS. BRUMMEL:

15   Q.   Wasn't your son Anthony living with Lala when you were

16   living on Cottage Grove?

17            MR. KING:  What line, Counsel?  It's not highlighted

18   for me.

19            MS. BRUMMEL:  Oh, I'm sorry.  It should be Page 35;

20   Line 23 is the question, Line 25 is the answer.

21            MR. KING:  Okay.  Do you want to ask the question

22   again?

23            MS. BRUMMEL:  Yes, let's do it again.

24   BY MS. BRUMMEL:

25   Q.   Wasn't your son Anthony living with Lala when you were

J. Williams (deposition) - direct by Brummel

1536

1    living on Cottage Grove?

2    A.  Yes.

3    Q.  What about the beeper shop; who ran that?

4    A.  Anthony.

5    Q.  How many apartments were above JJ Fish?

6    A.  How many?

7    Q.  Apartments were in your building?

8    A.  Four three-bedrooms.

9    Q.  I'm sorry?

10   A.  Four three-bedroom apartments.

11   Q.  Who lived there in 1994, January of 1994?

12   A.  Let's see.  There was me, Dave, Eddie, Gloria, me.  Let's

13   see.  On the night -- underneath me was -- I'm trying to think

14   who was underneath me.  I was on the third.  I'm trying to

15   think who was on the second.  I know Gloria was on the south

16   side of the building.  I don't even remember who was under me.

17   Q.  You named Dave.  Who is Dave?

18   A.  That was my driver.

19   Q.  He worked --

20   A.  Delivery.

21   Q.  In the store?

22   A.  He was my delivery guy.

23   Q.  You named Eddie.  Who is that?

24   A.  Eddie Bolden.  He lived in one of the apartments.

25   Q.  Which one?

J. Williams (deposition) - direct by Brummel

1537

1    A.  He was on the south.  I think the second floor.

2    Q.  Now, Eddie was friends with your son Anthony, correct?

3    A.  I don't know about that.  I just know he was there, and he

4    helped in the kitchen.  I don't know if my wife hired him or

5    who he was working for.  I didn't hire nobody unless it was a

6    delivery guy.  All the other stuff, she took care of that.  I

7    don't really know what.

8    Q.  How long did he work in the kitchen?

9    A.  The same time he stayed there, three, four, five years,

10   whatever it was.

11   Q.  Years or months?

12   A.  Months, I mean.

13   Q.  The pager store, beeper store, how did that get started?

14   Whose idea was that?

15   A.  I guess Anthony's.

16   Q.  How old was he when he started the beeper shop?

17   A.  Oh, man.  I don't know.

18   Q.  He was out of high school, right?

19   A.  Yes, out of high school.

20   Q.  Drawing your attention to January of 1994, there was an

21   incident, and you and your wife and one of your employees were

22   ultimately arrested, correct?

23   A.  The wife and the employee, I would say.  Mine was

24   confusion.

25   Q.  Well, there was a shooting outside in front of your store

J. Williams (deposition) - direct by Brummel

1538

1    in January of 1994?

2    A.   Correct.

3    Q.   What's the first thing that you remember about the night

4    that there was a shooting in front of your store?

5    A.   Two men wrestling outside.  This is like the front window.

6    Q.   Where were you when the two men were wrestling?

7    A.   Sitting here in the office.

8    Q.   Was the wall of the office that faced the streets, was

9    that glass?

10   A.   No, it was blocked.

11   Q.   Okay.  Then you have written on it -- there's a -- would

12   that be glass facing inside?

13   A.   Two-way glass facing this area.

14   Q.   What is that area?

15          MS. BRUMMEL:  For the record, Mr. Williams is

16   pointing toward the main portion of the restaurant.

17   BY THE WITNESS:

18   A.   This is the main portion.  This is the front door in this

19   area.  This is the main portion going right straight through.

20   BY MS. BRUMMEL:

21   Q.   And that would be where the customers would come in and

22   order?

23   A.   Right.  You've got the two-way mirror this way and that

24   way, but I could sit here and look out of this.  In the

25   daytime, I could see people.  At night, I couldn't make out

J. Williams (deposition) - direct by Brummel

1539

1   anybody.

2   Q.  Mr. Williams, you also said that your view was on an angle

3   from the two-way glass toward the outside?

4   A.  Correct.

5   Q.  Okay.  So do you remember what time of day the men were

6   wrestling outside the restaurant?

7   A.  No idea.  I don't.

8   Q.  Do you remember if it was light or dark out?

9   A.  Oh, it was dark.

10  Q.  So you just said when it was dark out, you couldn't see?

11  A.  I could see the people.  I couldn't recognize them.

12  Q.  Okay.  In your own words, what's the first thing you

13  noticed something unusual that night?

14  A.  The first thing was I figured -- the first thing I noticed

15  about horseplay.  So I got up and went -- started to the

16  window to stop them because they did it -- they done it all

17  the time.  I didn't want them to break my glass.  They had

18  done that all the time.

19       I seen them holding each other's hands, and the other

20  hand had a gun in it.  So I went back to my office because

21  they could shoot through the window, which they did.

22  Q.  You got up.  And what happened next?

23  A.  When I saw the gun, wrestling with the gun, I went back to

24  my office.

25  Q.  Describe again how you saw the gun.  Who --

J. Williams (deposition) - direct by Brummel

1540

A. He come -- the gun -- when they was wrestling, it ended up like this, wrestling.

Q. So the two men were both grabbing onto the gun and shaking it?

A. Wrestling over it, not shaking it.

Q. Okay. What happened next?

A. I went back to the office, and the next thing I knew, this big guy was coming in there with a pistol in his hand, into the back.

Q. He came through the back door?

A. He came through the front here going to the back.

Q. So you say the next thing you knew. About how much time passed between seeing the men struggling over a gun and the big guy coming in?

A. Probably a minute, a minute and a half. It was pretty quick.

Q. When you were sitting in your office, did you hear any gunshots?

A. I cannot remember hearing gunshots.

Q. So the first thing you noticed that was off or unusual were the two guys wrestling, right?

A. Right, with the gun, wrestling over a gun.

Q. But you had to leave the office and take a few steps outside to see that there was a gun?

A. Just outside my office, not outside the building. You've

J. Williams (deposition) - direct by Brummel

1541

1    got a big glass mirror that, once I walked out, I could see

2    them in front of my mirror.

3    Q.   About how far in feet would you say you were from the men

4    when you saw the gun?

5    A.   Probably 8 feet.

6    Q.   But you know that the guy came in the restaurant?  Was he

7    a large man?

8    A.   Uh-huh.

9    Q.   Approximate height?

10   A.   Probably -- I'm 5'11".  Probably close to 6 feet,

11   guessing.  I was 5'11".  He was a little taller than me.

12   Q.   And what about his build; was he skinny?

13   A.   He was heavyset, stocky.

14   Q.   Stocky?

15   A.   A big guy.

16   Q.   He was a big guy?

17   A.   Yeah.

18   Q.   Did you notice whether or not the man who came in the

19   restaurant was injured?

20   A.   No.

21   Q.   You didn't see him bleeding?

22   A.   No.  He had a jacket on or a sweater or something on.  I

23   didn't see anyone -- any -- when he came -- when he come by

24   me.

25   Q.   What do you remember about his clothing?

J. Williams (deposition) - direct by Brummel

1542

1  A.  I don't know.  Blue jeans or other pants, a swaggy coat or

2  jacket.  Real big and fluffy, floppy.

3  Q.  Was it like a puffy coat, like a down coat?

4  A.  I don't remember.  I just know he had a jacket, some kind

5  of something, whatever.

6  Q.  Was it light-colored?

7  A.  Dark.  All his clothes was dark, as far as I remember, I

8  guess.

9  Q.  So where was the other guy?

10  A.  I never seen the other guy, another guy.

11  Q.  You never seen another guy?

12  A.  No.

13  Q.  You didn't see the second guy?

14  A.  No, he didn't come in.

15  Q.  You didn't see his face?

16  A.  No.  In fact, when I saw the gun, that was it.

17  Q.  Going back to the second guy, did you see him run away?

18       MS. BRUMMEL:  You have to answer out loud.

19  BY THE WITNESS:

20  A.  No, I'm sorry.

21  BY MS. BRUMMEL:

22  Q.  So you watched him come in your restaurant and go right

23  back to the kitchen?

24  A.  Yes.  Right.

25  Q.  Were you in the office when you observed him go through?

J. Williams (deposition) - direct by Brummel

1543

1   You were back in your office, right?

2   A.   Oh, yes.

3   Q.   What happened next?

4   A.   All the commotion, and then through over there, somebody

5   hollering "lock the door," all this.  I had went to see what

6   happened.  That's when I found out he was shot, but I didn't

7   even hear the shot.  Then all of the customers and everybody

8   ran to the back in case he ran through the front door before

9   they got it locked.

10  Q.   So other customers ran to the back?

11  A.   Two or three.

12  Q.   Let's go back a little bit.  How many people were -- how

13  many customers were in your restaurant when you saw the guys

14  with the gun?

15  A.   As far as I can remember, two, three, maybe four.  I don't

16  remember.

17  Q.   Do you remember who those customers were?

18  A.   No.  I didn't know half the customers that came in there.

19  Q.   Do you remember any details about the customers at all?

20  A.   No, I -- I never paid customers that much attention.  They

21  was in and out all the time.  They was there for the eating,

22  not seeing me.

23  Q.   How many employees were visible to you from your office

24  while the man was coming through your restaurant?

25  A.   There was my wife, Tenesha, and Lanier, we called him, and

J. Williams (deposition) - direct by Brummel

1544

1    somebody else was back there.  I don't remember.  A family

2    member, I think, but I don't remember.

3    Q.   Now, Tenesha Gatson, what was your relationship to her?

4    A.   Adopted -- what do you call it?  We raised her.

5    Q.   Goddaughter?

6    A.   Goddaughter, right.  It wasn't adopted.

7    Q.   About how old was she when you took her in?

8    A.   I don't remember.  She wasn't too far over a baby.  She

9    was very young.

10   Q.   But she lived with you at Stateway and through different

11   homes that you had, correct?

12   A.   Correct.

13   Q.   Well, so you're saying that after that night, Tenesha

14   moved out with some relative of hers and never lived with you

15   again?

16   A.   She came in and out, but not permanently.

17   Q.   How long did she come in and out?

18   A.   Still do.

19   Q.   She still comes and stays with you?

20   A.   Yeah, she comes and stays and go.

21   Q.   So that happened in 1994.  From '94 until today's date,

22   Tenesha comes to visit and stays with you?

23   A.   She comes to see about papa.  I'm papa all over Kenosha.

24   Q.   After the man went -- who was struggling with the gun,

25   went in the kitchen, and the customers ran back there, too,

J. Williams (deposition) - direct by Brummel

1545

1    who was --

2    A.   Two, three, four, something like that.

3    Q.   Who was back in the kitchen that worked there?

4    A.   The wife, Tenesha, Lanier, and somebody else back there, a

5    family member.  I couldn't say who it was.  It may have been

6    David, the delivery guy.

7    Q.   Did an ambulance eventually come for the guy that came in?

8    A.   I guess so.  I'm pretty sure it did.  I think the

9    paramedics.  I don't know if the paramedics or the police took

10   him out.

11   Q.   What's the next thing you remember after everybody was in

12   the back in the restaurant?  What did you do?

13   A.   After they got him out, I think he told the wife to close

14   up or something.

15   Q.   Do you remember anything else between what you've just

16   described where the man was taken away in the ambulance and

17   closing up the restaurant that night?

18   A.   Well, after they started closing up, getting stuff ready

19   to close up, I think the police came back that same night.

20   Q.   You don't remember?

21   A.    I'm pretty sure they came back and went to the freezer and

22   got the gun out.  Evidently the guy that took in -- evidently

23   the guy they took in told them because they went straight to

24   the freezer.  He had kicked it underneath there, so evidently

25   he told where the gun was.  We didn't see what -- what he did,

J. Williams (deposition) - direct by Brummel

1    you know, with it.

2    Q.   What happened next?

3    A.   Well, he took -- got that and come to my office and then

4    had words with the wife.  I wasn't back there.  I don't know.

5    They ended up taking her, and I don't know who all was back

6    there, I guess to jail, arrested them, or however you call it.

7    Q.   Do you remember who was arrested?

8    A.   Yeah, the wife and -- I don't know.  Was Tenesha back

9    there?  I don't know who all he took.  I really don't.  Some

10   they let out right away; some they kept.

11   Q.   Do you remember that on the same date that the man ran

12   into your store, the incident you just described, do you

13   remember that you and your wife were both taken to the station

14   and arrested that night?

15   A.   Right.  They came back.  After they took him out, they

16   came back.

17   Q.   Did they arrest you and your wife?

18   A.   They arrested her and took somebody else back there.  I

19   went to the station, but they didn't arrest me.

20          What happened, the police back there took all of

21   whoever he took.  Then the lieutenant told me to lock up and

22   everything.  I think I went upstairs to check something, came

23   back, and locked the store and everything and rode with him

24   down there.

25   Q.   To the station?

J. Williams (deposition) - direct by Brummel

1547

1    A.   To where they were.

2    Q.   The lieutenant?

3    A.   The lieutenant and the driver.  Before we left, he got a

4    call, came through, somebody was breaking in on Maryland,

5    which was straight across from me, my place, the next street

6    over.  So he went there first and inspected the neighborhood,

7    didn't find nothing.  Then they drove me to the station.

8         Once I got to the station, they dropped me off and

9    got a call out.  They both left.  And then somebody in the

10   station came and handcuffed me.  And then they put me in the

11   lockup.

12        When the lieutenant come back looking for me, he came

13   back and got me.  So I really wasn't under arrest.  Another

14   policeman -- I was in the arrest area, so he threw the cuffs

15   on me.  That's all confusing.  That's how it went.

16   Q.   Do you remember what the officer looked like that grabbed

17   you in the station and threw you in the lockup?

18   A.   Just a big, heavyset, dark guy.

19   Q.   Okay.  Dark hair?  Dark skin?

20   A.   Dark skin.

21   Q.   Was he African American?

22   A.   Oh, yes.

23   Q.   Okay.  Did he say anything to you when he locked you up?

24   A.   I tried to explain to him why I was there.  He said, "No,

25   you're under arrest."  I said, "That's news to me."

J. Williams (deposition) - direct by Brummel

1548

1    He carried me back there.  Then the lieutenant, gone

2    about an hour, that drove me down there, he came in.  I guess

3    he asked about me, so he came back there and got me.

4    Q.  Do you remember what police station you were taken to by

5    the lieutenant?

6    A.  I think it was 111th.  I think.  I'm not sure.  I think

7    so.

8    Q.  Okay.  Do you remember going to court, branch court,

9    Branch 28 in 1994?

10   A.  Does it say for what?

11   Q.  For possessing bullets that you didn't have a card for?

12   A.  No, I've never been to court for either one of those.

13   Q.  Okay.  This, again, would be in 1994, which was the same

14   time --

15   A.  I never got arrested over there for nothing.

16   Q.  Okay.  Do you remember making admissions to a police

17   officer that the ammunition found in the -- at the Cottage

18   Grove address belonged to you?

19   A.  No.

20   Q.  This would be in the same time frame.

21   A.  No.  That was probably the one that was in that -- it was

22   in the shirt at that desk when they got there.  I didn't want

23   to throw them away.  There wasn't no gun for them.  They

24   wasn't all the same size.

25   Q.  Was that coat with the ammunition in it, was it in the

J. Williams (deposition) - direct by Brummel

1549

1  outer lobby?  The office?  Was it in your office hanging up

2  there?

3  A.   No.

4  Q.   Do you remember where the coat was with the ammunition?

5  A.   The coat?

6  Q.   The one you just described.  You just threw the stuff in

7  the coat, the bullets.

8  A.   The coat?

9  Q.   Right, where was that?

10 A.   Hanging there in the office.

11 Q.   The little office?

12 A.   My little office, yes.

13 Q.   All right.

14 A.   They were all different sizes.  Didn't fit nothing.

15 Q.   Do you remember about how many bullets there were?

16 A.   Probably four or five.

17 Q.   When did you learn that Lanier, or Eddie Bolden, was

18 arrested for murder as a result of the incident on the night

19 that we just talked about?

20 A.   Let me see.  All I know that he went -- they took him to

21 jail, and I never did know he went to prison or nothing.

22 Q.   Do you know if your wife -- how long was your wife held in

23 lockup?

24 A.   I don't know what time at night they got there, but they

25 stayed I think until 2:00 or 3:00 that evening.

J. Williams (deposition) - direct by Brummel

1550

1    Q.   In the evening?  You mean the next day?

2    A.   The next day because it was almost morning when they got

3    there.   I think it was after lunch she was released.

4    Q.   Mr. Williams, have you ever met anybody who you knew or

5    suspected to be a member of the Gangster Disciples street

6    gang?

7    A.   No.

8    Q.   When Lanier lived in the apartment -- I guess it's at

9    6422 South cottage; is that right?

10   A.   Right.

11   Q.   Did Lanier pay you rent?

12   A.   Not to me, no.  He may have paid Anthony.

13   Q.   Tenesha Gatson worked in the restaurant, too?

14   A.   Yes.

15   Q.   What were her responsibilities?

16   A.   Probably just a cook helper.

17   Q.   Who was the cashier?

18   A.   We had different ones.  I don't remember who was running

19   it that night.

20   Q.   So you don't remember who the cashier was that night?

21   A.   Not that night.  Everybody was in the kitchen.

22   Q.   Now, when Clifford Frazier first came into your restaurant

23   that night, do you recall where Tenesha Gatson was?

24   A.   No.

25   Q.   Okay.  Do you recall where your wife was?

J. Williams (deposition) - direct by Brummel

1551

1    A.   I'm going to rephrase it.  They was all in the back.

2    Q.   Where was Lanier in the store at that time?

3    A.   He was back there helping with an order.

4    Q.   And at this time, during this time frame in January of

5    1994, Lanier spent -- how often did he perform work in the

6    restaurant?

7    A.   I couldn't say.

8    Q.   Do you know a gentleman named Maurice Stewart?

9    A.   No.

10   Q.   Do you know somebody named Roderick Stewart?

11   A.   No.

12   Q.   Now, in addition to all of these people, your son Anthony

13   was in the restaurant that evening as well, correct?

14   A.   I believe after that commotion, he came over to that side.

15   I think he was in the beeper shop.

16   Q.   Okay.  Did -- what were the hours of the beeper shop, if

17   you recall?

18   A.   Really not a special time.  I think they opened around

19   9:00 or 10:00, and he closed probably about the same time as

20   the restaurant did, 10:00, 11:00, 12:00 o'clock.

21   Q.   Okay.  So is it your testimony that at no time that

22   evening prior to the shooting that you saw Anthony in the

23   restaurant?

24   A.   I can't say.  I'm in and out.  I'm there just long enough

25   to pick up orders, and I'm gone again.

J. Williams (deposition) - direct by Brummel

1552

1  Q.  So Anthony might have been in the restaurant that evening,

2  you just didn't see him?

3  A.  I didn't pay no attention.  I was in and out.

4  Q.  Do you know if anybody called 911?

5  A.  That was either Lanier or Anthony.  I don't know which one

6  because both of them headed to the telephone on the wall.  I

7  don't know which one made the call.

8  Q.  You're saying Anthony was there shortly after?

9  A.  He heard the commotion, and he came over.

10 Q.  Did you have any discussions with any detectives at the

11 station concerning what happened that evening?

12 A.  No.

13 Q.  Did you observe Anthony interacting at all with any of the

14 police officers?

15 A.  No.

16 Q.  Did you observe Lanier interacting with -- at all with any

17 of the police officers?

18 A.  No.

19 Q.  How long did you remain at the restaurant after you closed

20 it?

21 A.  Probably around 30 minutes or so.  Then the police was

22 back.  I'm not sure about the time, but it wasn't long before

23 they was back.

24 Q.  That was when they picked up Edna on the gun charge?

25 A.  Right.

J. Williams (deposition) - direct by Brummel

1553

1   Q.   And those were plain clothes officers?

2   A.   And uniform, yes.  They went in blocks.

3   Q.   When the police officers came back, where was Anthony?

4   Was he still at the restaurant?

5   A.   No, I'm not even sure he was in the beeper shop when they

6   came back.

7   Q.   What about Lanier; where was Lanier?

8   A.   I don't know.  Like I say, I was back in my office.

9   Q.   Do you know where either of them went?

10  A.   No.

11  Q.   Do you recall seeing Anthony meeting two young men,

12  meeting with two young men at the restaurant earlier that

13  evening?

14  A.   No.

15  Q.   What did Eddie Bolden look like back on the night of

16  January '94?

17  A.   I couldn't describe him.

18  Q.   Do you recall how he wore his hair?

19  A.   No.

20  Q.   Let me ask you, either next door or down the block from

21  you, there was a billiard parlor, is that correct, a pool

22  hall?

23  A.   A pool hall was next to me, yes.

24  Q.   Do you know the gentleman who operated the pool hall?

25  A.   All I know is Asian.

J. Williams (deposition) - direct by Brummel

1554

1    Q.   Okay.  And there was a father?

2    A.   The father is the one I knew.

3    Q.   You testified a few minutes ago that Lanier was helping in

4    the kitchen when the big guy who had been shot ran in, right?

5    A.   Right.

6    Q.   Did you see Lanier earlier that evening in the store?

7    A.   Yes, he was in there.  Before he started helping, he was

8    playing the Pac-Man machine.

9    Q.   Is the Pac-Man machine designated on Plaintiff's

10   Exhibit 78 that we've been looking at?

11   A.   Right here.  There we go, right here.

12   Q.   It says P-a-c-k man?

13   A.   Yes.  Yes.

14        THE COURT:  Let me say for the record, Plaintiff's

15   Trial Exhibit 78 has now been published to the jury; is that

16   right?

17        MS. BRUMMEL:  I believe that's correct, Your Honor.

18        THE COURT:  Okay.  Go ahead.

19        THE CLERK:  Do you want me to publish it?

20        THE COURT:  Would you like it published, Ms. Brummel?

21        MS. BRUMMEL:  Let me ask.

22        Yes.

23        THE COURT:  Okay.  We'll publish it to the jury.  I

24   want to make sure that you folks can see the document that

25   they're referring to in the deposition.

J. Williams (deposition) - direct by Brummel

1555

1    Go ahead, Ms. Brummel, when you're ready.

2    BY MS. BRUMMEL:

3    Q.   It says P-a-c-k man?

4    A.   Yes, yes.

5    Q.   There's a box that's the Pac-Man machine?

6    A.   Right.  This is the doorway to the other side, like this

7    one up here.

8    Q.   Could you see the Pac-Man machine from inside your office?

9    A.   All of this is glass, see right there through, right

10   through there -- excuse me.

11        All of this is glass, see right through there, right

12   through here, through this, see all that.

13   Q.   When you saw Lanier playing Pac-Man earlier that evening,

14   were you in fact inside your office at that time?

15   A.   Yes.

16   Q.   How frequently did you see Lanier playing Pac-Man that

17   evening?

18   A.   Off and on.  In fact, I think when he wasn't busy, that's

19   what he come down for, to play the Pac-Man machine.

20   Q.   Was there a point in time when you went in your office

21   that evening and stayed there for a while?

22   A.   That evening?

23   Q.   Yes.

24   A.   After the shift change, I go in there every evening to do

25   the other shift.

J. Williams (deposition) - direct by Brummel

1556

1   Q.   What time does the shift change?

2   A.   5:00, I believe.

3   Q.   5:00 p.m.?

4   A.   I believe it's 5:00 or 6:00.  I don't remember.

5   Q.   So would it be fair to say that you were at J&J Fish from

6   5:00 p.m. up through the time the guy ran in who was shot?

7   A.   Every day I was in and out, but I was there in and out all

8   day seven days a week.

9   Q.   Did you ever tell the man who ran in who was shot that he

10  could hide his gun somewhere in the restaurant?

11  A.   I never even spoke to him.

12  Q.   To your knowledge, did Edna ever tell the man that he

13  could hide the gun in the restaurant?

14  A.   She don't know what happened to it.  Nobody knew what

15  happened to the gun.  As he come in, he dropped it and took

16  his foot and kicked it under the freezer.  The freezer about

17  that high.  Nobody knew what happened to the gun.

18  Q.   So you didn't actually see him kick it; you learned that

19  later after the police found it?

20  A.   I think he told them because when they came back, they

21  went straight to the freezer -- freezer and reached under and

22  got it.

23  Q.   And at the time they reached under there and got it, that

24  was the first time you knew it was under there?

25  A.   Correct.

J. Williams (deposition) - direct by Brummel

1557

1  Q.  When the second group of law enforcement officers came in

2  a little while after the first group, did one of the officers

3  or detectives go inside your office?

4  A.  I believe so, yes.

5  Q.  Do you remember, was it a plain clothes detective or a

6  uniformed officer?

7  A.  It was a little short plain clothes.

8  Q.  How long was he in your office?

9  A.  Two, three minutes, maybe, looking around, some paper and

10  stuff.  A couple minutes, maybe.

11  Q.  When he came out, did he have anything?

12  A.  He had that coat with them five or six bullets in it.

13  Q.  Do you know where the bullets came from?

14  A.  They came from the desk when we bought the building.  I

15  just never did throw them out.  That old coat was hanging up

16  there, too.  I never threw it out.  I just took the bullets

17  out and put them in the coat pocket.  Been there ever since

18  I've been there.

19  Q.  Did he at that time or any other law enforcement officers

20  ever tell you that they were going to arrest you for those

21  bullets?

22  A.  No.

23  Q.  Then lastly, you were asked questions about if you

24  remember what the guy outside who was fighting with Clifford

25  Frazier, what he was wearing.  Do you have a clear

J. Williams (deposition) - direct by Brummel

1558

1  recollection 20-plus years later of what he was wearing that

2  night?

3  A.  Just dark clothes, no.

4  Q.  When you say dark clothing, are you talking about pants?

5  A.  The whole thing.

6  Q.  What did you do after you saw the man with the gunshot

7  wound go back into the kitchen?

8  A.  I went back into the kitchen, too.

9  Q.  How long did you stay?

10  A.  Just a few minutes because he had an asthma attack.

11  Q.  Who had an asthma attack?

12  A.  The guy who was shot, and I went -- left right away, went

13  and got him an inhaler.

14  Q.  Oh, okay.  Did that help him?

15  A.  Oh, yes.

16  Q.  Previously when you described to us what happened that

17  night when Clifford Frazier came in, you did not testify that

18  you saw anybody calling 911, correct?

19  A.  No, I don't know who called.  I know it was one of them,

20  Anthony or Lanier.  I keep calling him Lanier.

21  Q.  That's fine.

22  A.  That's what the wife said.  I was still there in the

23  crowd, and she said it was either Eddie or Anthony who called

24  the police.

25  Q.  When did she say that to you?  Recently?

J. Williams (deposition) - direct by Brummel

1559

1  A.  No, no, that was that same day.  I asked that same night.

2  I knew that.

3  Q.  So you remember from 1994 that your wife said somebody,

4  maybe Lanier, called 911?

5  A.  She mentioned it that night.  I said, "Well, who called

6  911?"  She said, "Either Anthony or Lanier."  I didn't see

7  which one.  They used a pay phone up there by the door.

8  Q.  Did you also personally observe both Lanier and Anthony

9  walking toward the pay phone that evening?

10  A.  No.  There was too many people.  There was a crowd back

11  there.  I couldn't see who went where.

12  Q.  In the diagram, there's a back door in the lower left-hand

13  corner?

14  A.  Right.

15  Q.  There's a door that says "other side"?

16  A.  Okay.

17  Q.  Do you see where I'm looking at?

18  A.  This here is the dining room, right?  This -- that's the

19  bathroom.  This is the door to the beeper shop.

20  Q.  Okay.

21  A.  The other back door is from the kitchen to the outside.

22  Q.  So this door leads directly to the beeper shop?

23  A.  Yes.

24  Q.  It's an inner door to the beeper shop?

25  A.  Right.

1    MS. BRUMMEL:  That's all we have.

2    THE COURT:  All right.  Thank you, Counsel.

3    Folks, to put that in perspective, that took maybe --

4    what do you think? -- 20, 30 minutes, something like that, give or

5    take.  The deposition itself took three hours.  So by focusing

6    only on the highlights, the parties saved us two and a half

7    hours this morning.

8    It is now 12:35.  And we are going to take our noon

9    break, unless there was a different discussion going on.  It

10   looks like that's -- nobody wants to stand between us and

11   lunchtime.  So it's lunchtime.  We're going to take our break.

12   We'll come back in about 45 minutes, and we'll get rolling

13   from there.

14   THE COURT SECURITY OFFICER:  All rise.

15   (Jury out.)

16   THE COURT:  Okay.  A couple quick things, and then

17   I'll let you guys take a break.

18   I interrupted you, Ms. Brummel, on that exhibit

19   because I noticed that document flashed up on my screen in the

20   corner of my eye, which is totally fine.  Maybe there had been

21   other exhibits that you had put up on the screen along the way

22   that I didn't notice, but that was the one in my line of

23   sight.

24   Here's what I'd like you folks to do:  When you walk

25   up with a new deposition designation, say, Your Honor, during

1561

1    the exam here, I'd like permission to present to the jury --

2    publish to the jury exhibits X, Y, and Z.  And I'll say

3    totally fine, and then you can do it.  That way you folks have

4    a record.  It's in the transcript of what the jury is seeing,

5    right?  Because at the end of the day, you guys want a record

6    that an important document was shown to the witness and the

7    jury got to see it.  Right?

8            So please do that.  It's not so much that I need to

9    give you permission.  I'd give you permission.  I think you

10   know that by now.  But I want you folks to have a clear record

11   of what you're doing and what the jury is seeing.

12           Also, Ms. Brummel, I don't know from the end of the

13   exam if you intended to offer any of those documents into

14   evidence.  I didn't ask you when you were in front of the jury

15   because I didn't want to put you and your team on the spot.

16   But if you want to offer any of those documents into evidence

17   that aren't in evidence yet, when we get back in front of the

18   jury, I'd like you to say, Your Honor, I move into evidence

19   document No. X, Y, and Z, okay?  And that way -- we'll say,

20   any objection?  That way each side can get all their documents

21   in evidence.  We can have a clean record.

22           So I thought that went smoothly.

23           There was a time or two where I was not sure if you

24   had said one of the Qs and As.  Are you reading everything

25   that has been highlighted?  I will tell you that I might have

1  missed it because maybe -- maybe I missed something, but there

2  was a time or two where I thought maybe a question wasn't

3  read.

4          And don't be worried if I'm saying this because I

5  was -- I was going in and out there.

6          Did you expect that everything was being read that's

7  highlighted.

8          MS. BRUMMEL:  Yes.  If that happened, I apologize.

9  It was a mistake.

10          THE COURT:  No, I could have -- I really hesitated to

11  say that because maybe you folks are worried that there was

12  something important.  I was not sure that the passage on

13  Page 89 in yellow was read.  It could have been, and I

14  could've missed it, okay?  So I want to be real up front on

15  that.

16          MS. MUSUMECI:  Your Honor, I noticed that as well.  I

17  was following along the transcript.  And so over the break,

18  I'm going to confirm that Ms. Brummel has the identical

19  transcripts to what you and defense counsel have as well.

20          THE COURT:  That's fine.  And I put a question mark

21  on Page 78 as well.  I will tell you, I was listening a little

22  better on Page 89 than I was on Page 78.  I was sort of making

23  notes on some other things, but I did just notice a time or

24  two.

25          You know, at the end of the day, if you don't read

1563

1  it, it's not in evidence, right?  So I wanted to make sure

2  that you folks have a clean record for both sides about what

3  evidence comes in.

4        So that's what we'll do for each witness, folks.

5  When you come up, I'd like you to say, Your Honor, during the

6  examination, I'd like permission to publish to the jury X, Y,

7  and Z.  I'll say fine.  At the end of each exam when you're

8  done reading, say, Your Honor, I move into evidence exhibits

9  X, Y, and Z.  Any objection?  Admitted.  Okay?  That way you

10  guys got a clean record.  Does that make sense to everybody?

11  You guys look nice and smooth that way.  Okay?

12        We'll take about 45 minutes, everybody.  Does that

13  sound okay?  Everybody good?

14     (Luncheon recess taken at 12:41 p.m.)

15                    *   *   *   *   *   *

16                         CERTIFICATE

17     I certify that the foregoing is a correct transcript from

18  the record of proceedings in the above-entitled matter.

19

20  /s/ *Amy Spee*                    *10/15/2021*

21  _____          _____
   Amy Spee, CSR, RPR, CRR          Date
   Official Court Reporter

22

23

24

25