1766

```
 1                  IN THE UNITED STATES DISTRICT COURT.
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   EDDIE L. BOLDEN,                    )
                                         )
 4                    Plaintiff,         )
                                         )  Case No. 17 CV 417
 5   -vs-                                )
                                         )  Chicago, Illinois
 6   ANGELO PESAVENTO, et al.,           )  October 18th, 2021
                                         )  9:19 a.m.
 7                    Defendants.        )

 8

                   TRANSCRIPT OF PROCEEDINGS - VOL. 7A
 9          BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10   APPEARANCES:

11   For the Plaintiff:     RILEY SAFER HOLMES & CANCILA, LLP
                            BY:  MR. RONALD S. SAFER
12                               MR. ELI J. LITOFF
                                 MS. SANDRA L. MUSUMECI
13                               MR. MATTHEW C. CROWL
                                 MS. VALERIE BRUMMEL
14                            70 West Madison Street
                             Suite 2900
15                           Chicago, IL  60602

16   For the Defendant       GREENBERG TRAURIG, LLP
     City of Chicago:        BY:  MS. TIFFANY S. FORDYCE
17                                MR. KYLE L. FLYNN
                             77 West Wacker Drive
18                           Suite 3100
                             Chicago, IL  60601

19

20

21

22   Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                             Federal Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 2318A
24                           Chicago, IL  60604
                             Telephone:  (312) 818-6531
25                           amy_spee@ilnd.uscourts.gov
```

1767

1   APPEARANCES (CONT'D):

2   For the Individual      HALE & MONICO, LLC
    Officer Defendants:     BY:  MR. ANDREW M. HALE
3                                MS. BARRETT E. BOUDREAUX
                                 MR. WILLIAM E. BAZAREK
4                                MR. BRIAN J. STEFANICH
                                 MS. AMY A. HIJJAWI
5                           53 West Jackson Boulevard
                            Suite 330
6                           Chicago, IL  60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1768

```
 1          (Proceedings heard in open court; jury out:)
 2          THE COURT:  Good morning, everyone.  It's
 3   Judge Seeger.
 4          I hope everyone had a good weekend, got to enjoy some
 5   of that beautiful fall weather, at least a little bit even
 6   though you're on trial.
 7          Let's go ahead and get plaintiff's appearances first,
 8   and then we'll hear from defense counsel.
 9          Go ahead.
10          MR. SAFER:  Good morning, Your Honor.
11          Ron Safer, Sandra Musumeci, Matt Crowl, Eli Litoff,
12   Valerie Brummel for Mr. Bolden who is present in court.
13          THE COURT:  Good morning to each of you.
14          Mr. Bolden, good morning, sir.
15          MR. BOLDEN:  Good morning, Your Honor.
16          THE COURT:  Defense counsel, go ahead, please.
17          MS. BOUDREAUX:  Thank you, Judge.
18          Barrett Boudreaux, William Bazarek, Andy Hale, Brian
19   Stefanich, and we have our client here, Phil Pesavento.
20          THE COURT:  Good morning to each of you.  And,
21   Officer Pesavento, good morning to you, sir.
22          MR. BAZAREK:  We also have Officer Oliver in Little
23   Rock, Arkansas.
24          THE COURT:  Yes, that's exactly right.
25          Good morning, Officer Oliver.
```

1   THE WITNESS:  Good morning, Your Honor.

2   THE COURT:  Can you hear me okay?

3   THE WITNESS:  Yes, sir.

4   THE COURT:  All right.  Very good.  So we are going

5   to start today with the testimony of Officer James Oliver.  He

6   is testifying remotely pursuant to my order under Rule 43.

7   He's going to be testifying from the United States District

8   Court for the Eastern District of Arkansas.

9   I'd like to begin by thanking the good people of the

10  Eastern District of Arkansas for helping us.  They made

11  arrangements logistically and otherwise to have Officer Oliver

12  testify remotely.  They did so in a short time frame.  They

13  made their resources available to us at a moment's notice.

14  And, on behalf of everyone from the Northern District

15  of Illinois, I'd like to thank our judicial colleagues in

16  Arkansas for lending a hand and stepping up to the plate on

17  this.  We sure do appreciate it.

18  I'd also like to thank our IT staff here in the

19  Northern District of Illinois, including Mike Gombosi, Alex

20  Zeier, and everyone else.  We really appreciate everyone

21  facilitating this and making this happen.  Because a lot of

22  work happens behind the scenes that the public and the lawyers

23  and the parties never know.  So thank you for doing that.

24  Before we went on the record today, we had Officer

25  Oliver on the screen.  We practiced a little bit.  The parties

1   were able to pop up the exhibits using the ELMO as well as

2   using -- we acknowledge -- I think we have an understanding of

3   how things are going to go.  The parties know, for example,

4   that if an exhibit is displayed to the witness, then the

5   jurors will not be able to see Mr. Oliver on their little

6   screens, but he will always stay on the big screen on the

7   television to my left.

8           So basically there's a big television to my left that

9   has a video projection.  Mr. Oliver is going to be on that

10  screen the entire time.  If an exhibit is displayed to the

11  jury, that exhibit will be on their screens, including the

12  screens at the back of the courtroom.

13          The lawyers should be mindful when they're doing

14  their exam that if we have an exhibit on the screen, the

15  jurors cannot see Officer Oliver.  So it may well be when

16  you're doing your exam that you'd rather have the jurors see

17  the exhibit, fine.  But most of the time you probably want

18  them to see the witness.  I don't know.  But at least a lot of

19  the time you may want them to see the witness.

20          So just be mindful of that.  Make sure you indicate

21  to Ms. Ramos and to your technology assistant who

22  you -- excuse me -- what -- who or what you want displayed on

23  the screen.  So, please, everybody, be mindful of that.

24          As I said in my order last week, it is very important

25  that all witnesses comply with my motions *in limine*, including

1   my motions *in limine* with respect to Mr. Bolden's criminal

2   history, his gang affiliation, *et cetera*.

3          I had put that in the order that defense counsel

4   needed to remind Officer Oliver of my rulings.

5          Mr. Bazarek, has defense counsel reminded Mr. Oliver

6   of my rulings?

7          MR. BAZAREK:  Yes, Your Honor.  Mr. Oliver will say

8   nothing about plaintiff's arrests for the 1985 murder or the

9   conviction.  He will not identify Mr. Bolden as a Gangster

10  Disciple.  He will not say that.

11         Also, there was one I wanted to speak to, Judge.  He

12  will not say that he reported to Mr. Crowl and Mr. Safer

13  during the investigation of the Gangster Disciples when he was

14  on the task force, but he is going to talk about his

15  background as a member of that task force.  So it is relevant

16  to his background.

17         THE COURT:  Well, he can certainly testify about who

18  he is and what he does and what his history is with the force,

19  but it's important that he not identify Mr. Bolden as a gang

20  member at the time of the murders because I, you know, ordered

21  that he can't do so.  And I understand you to say that he's

22  not going to do that.

23         Mr. Oliver, have you had a chance to go over with

24  defense counsel my rulings on the motions *in limine*?

25         THE WITNESS:  Yes.

1772

1    THE COURT:  And do you understand, sir, that you are

2  not to raise Mr. Bolden's prior conviction, his criminal

3  history, or his gang affiliation during your testimony today?

4    THE WITNESS:  Yes, Your Honor.

5    THE COURT:  Okay.  It's very important that you

6  comply with that.  Do you understand that, sir?

7    THE WITNESS:  Yes, Your Honor.

8    THE COURT:  Okay.  Very good.

9    Are you having any trouble hearing me at all,

10  Mr. Bolden [*sic*]?

11    You're a little faint on my end.  I can hear you, but

12  I'd say overall we can hear you.  Can you hear us okay?

13    THE WITNESS:  Yes, I can hear.  Yes.

14    THE COURT:  Okay.  I will tell you, Officer Oliver, I

15  don't know what the rules are in the Eastern District of

16  Arkansas.  I see that you've got a mask on that's around your

17  chin.  I don't know if other people are in the room with you.

18  Perhaps you could take it all the way off -- well, you've now

19  put it back on.  I don't know -- there you go.  Okay.

20    It seems to me you should either wear the mask or

21  take it off your chin, but probably having it on the chin

22  doesn't probably do much, and I think it is better to be able

23  see your face.  Is that okay?

24    THE WITNESS:  That's fine with me.

25    THE COURT:  Okay.  Is there anything that anybody

1  wants to cover with Officer Oliver before we cover just a

2  couple other housekeeping matters.

3         MR. SAFER:  Just for the record, Your Honor, we renew

4  our objection to this procedure.

5         THE COURT:  To the remote testimony?  Yeah, got it.

6  Okay.

7         MR. BAZAREK:  Your Honor, I also -- today, this

8  morning, I was handed the exhibits they plan to use, but the

9  plaintiff has also included court orders regarding James

10  Oliver's health, his medical records, and court proceedings,

11  what the Court has already said that's moot.  But it appears

12  they want to question my client about his medical condition,

13  about court orders that were entered.  If that's -- I just

14  want to front that we would object to that if that's what

15  their plan is to do with Officer Oliver.

16        THE COURT:  Or maybe they just wanted to make sure he

17  had seen it.  I don't know.

18        What's the plan there, Mr. Safer?

19        MR. SAFER:  Your Honor, I mean, I don't know -- well,

20  we're not going to question him on our initial examination.  I

21  don't know what -- what defense counsel intends to do, and

22  we're in the unique circumstance that I had to include

23  everything that -- that I could think of that might come up.

24  And if it comes up during their examination, then I wanted

25  these orders to be in there.

1       THE COURT:  Totally fine.  He's hundreds of miles

2  away.  I don't see harm in having a document in a binder.  If

3  anybody sees an issue, let's front it first and have a quick

4  sidebar, but I assume it's not going to be an issue.

5       Mr. Safer, as to your objection, I'm not -- you know,

6  I've, I think, issued three pretty lengthy decisions on that:

7  two in writing, one orally.  I think I've made my preferences

8  pretty clear on this.  Needless to say, I'd prefer that he be

9  here, but I feel constrained by rules and by text.  That's how

10  I roll.  So that's where I am.

11       Anything else for Officer Oliver before we get going,

12  folks?  Anything else?

13       Let me cover just --

14       MR. BAZAREK:  Judge, if he needs a break -- or how

15  would he alert the Court or --

16       THE COURT:  Yeah, I'm glad you say that.

17       Officer Oliver, can you still hear me okay?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Okay.  Do you want to take a quick break

20  here before we get going?  Do you want to use the restroom?

21  Stretch your legs?  Get a glass of water?  Do you want to do

22  all that?  I don't think we'll start for a couple minutes

23  here, but now might be a good chance for you to stretch if

24  you'd like.

25       THE WITNESS:  Yes, I'll take a break here for a

1775

1    second.

2            THE COURT:  Okay.  Just hang loose.  And when you

3    come back and get seated, we'll probably get going.  Okay?

4            THE WITNESS:  All right.  Thank you.

5            THE COURT:  Sure.  And take whatever time you need.

6    We'll get ready when you're -- we'll get rolling when you're

7    ready.

8            THE WITNESS:  All right.  Thank you.

9            THE COURT:  All right, folks.  Let's cover anything

10   else on Officer Oliver?  Let's cover a couple other

11   housekeeping matters.

12           I don't know if there are any exhibit-related

13   cleanups that need to be done from last week.

14           MS. BOUDREAUX:  Yes, there are.

15           THE COURT:  Maybe at the very beginning of the

16   proceeding today, you could offer those into evidence.  Is

17   that what it is?

18           MS. BOUDREAUX:  Yes.

19           THE COURT:  Any objection to that, Mr. Safer?

20           MR. SAFER:  No, Your Honor.

21           THE COURT:  All right.  So let's begin today -- I'm

22   just going to say are there any exhibit-related issues that we

23   need to talk about for next week, and that will be your cue.

24   Okay?

25           All right.  Very good.  We'll start with that.

1776

1     Deposition designations.  I have minute entries ready

2  to go for the time allocation.  I just need to know the grand

3  total from you folks about what the lines were so I can divvy

4  it out for Friday.

5     MS. MUSUMECI:  Your Honor, we -- we have been -- we

6  are finalizing the calculation and intend to file that today.

7     THE COURT:  All right.  Very good.  We'll take care

8  of that.

9     Let's cover briefly, folks, while Officer Oliver is

10  using the facilities, there are a couple motions to quash that

11  were filed by the Cook County State's Attorney's Office.  I

12  don't know if you folks have conferred with that lawyer.  Have

13  you folks met and conferred on that?

14     For example, one of the documents -- excuse me -- one

15  of the subpoenas was for a document custodian from the Cook

16  County State's Attorney's Office.  I thought one objection

17  they made was at least potentially fair.  They wanted to know

18  what documents are at issue.  I'm assuming you folks have

19  sorted that out.

20     This shouldn't be rocket science.  It seemed like

21  they went -- they were looking for a reason to object, is my

22  feeling of it.  But it seems to me that you need to identify

23  for them what documents you want to use, and then they can

24  bring somebody over here.

25     Go ahead, Mr. Litoff.

1      MR. LITOFF:  Your Honor, we have agreed with defense

2  counsel to stipulations that will obviate the need for records

3  custodian testimony.  So that's a moot issue.

4      THE COURT:  All right.  Very good.  So I'll go ahead

5  and deny that motion as moot.

6      For the other witnesses, do you know on the

7  plaintiff's side when you want those witnesses to testify?

8  And the reason -- and I'm not holding you -- the reason I ask

9  is I have to make sure that I schedule a hearing in sufficient

10  time to give them an opportunity to object if they want to be

11  heard.

12      MR. LITOFF:  Yes, Your Honor.  We believe Lynda

13  Peters will be tomorrow, and I don't believe we are calling

14  any other state's attorney witnesses in our case.

15      THE COURT:  Okay.  Let's do this:  I'm going to post

16  a minute entry that says we will have a hearing on Lynda

17  Peters today at 5:00 o'clock.  That way if his attorney wants

18  to be -- if her attorney wants to be heard on that.  So I'll

19  ask my courtroom deputy to kindly put on the docket a minute

20  entry that simply says a hearing on the motion to quash will

21  be held at 5:00 o'clock today.  The witness's attorney can

22  either appear in person or participate telephonically, but

23  that way he's got an opportunity to be heard on that.

24      I did have a question, though.  There were a number

25  of privilege issues about this, and there are a couple ways

1778

1   this could go.  One could be that they are just making sure

2   that the person does not have to divulge any privilege, which

3   is fine.  It seems to me we can testify around that.

4           Another possibility is that there's a dispute between

5   one or both of the parties here and the Cook County State's

6   Attorney's Office as to what is legitimately privileged and

7   what is not privileged.

8           In other words, I don't know on my end if any of you

9   folks are challenging any assertions of privilege or if you

10  simply want them to testify within the boundaries that the

11  Cook County State's Attorney has asserted.

12          Are you following me?

13          Mr. Litoff, go ahead.

14          MR. LITOFF:  I am.  So, Your Honor, from our

15  perspective, with regard to Ms. Peters, she answered every

16  question at her deposition without any privilege objections.

17  So we intend to cover essentially those same topics.  And we

18  don't believe anything we asked or would ask would be

19  privileged.  To the extent it is, it seems to me there's a

20  waiver from her testimony without any objection.

21          THE COURT:  Okay.  And, Ms. Boudreaux, Mr. Hale,

22  anything on your end?  Where do you see things?

23          MS. BOUDREAUX:  I would defer to Mr. Stefanich on

24  this.

25          THE COURT:  Okay.

1779

1      MR. STEFANICH:  Judge, for Ms. Peters, we wouldn't be

2   asking any privilege-related questions.  So we don't think

3   that's an issue.

4      For Linda Walls, who will be called in our

5   case-in-chief either Friday or Monday, there was one objection

6   at her deposition.  I believe you already took care of that in

7   the motion *in limine* order saying that -- ruling that we

8   wouldn't be allowed into the deliberative process privilege

9   since it was asserted.  So we weren't going into that --

10      THE COURT:  Okay.

11      MR. STEFANICH:  -- based on your ruling.

12      So our position is, we don't really think this is a

13   live issue.  We sort of think this is just the State's

14   Attorney's Office making their objection known, but we don't

15   plan on getting into deliberative process.

16      THE COURT:  Okay.  So, for example, if you look at

17   the motion, Docket No. 531, Page 4 of 5, there was a list of

18   questions that the Cook County State's Attorney's Office was

19   worried about.

20      For example, they would find the following questions

21   objectionable:  "What was your opinion on the guilt or

22   innocence of Mr. Bolden?"  "Why didn't you investigate this

23   alibi witness?"  "Did you consider that someone else committed

24   the shooting?"  "Why didn't you oppose the Certificate of

25   Innocence?"  *Et cetera.*

1    Do people plan to ask those questions?  They view

2    them as objectionable, so we ought to have some sense going

3    into it.

4        MR. STEFANICH:  Judge, we don't plan to ask those

5    questions.

6        THE COURT:  Okay.  Have you told that to the Cook

7    County State's Attorney's Office?

8        MR. STEFANICH:  I thought I made the position pretty

9    clear, but that was before they filed the motion.  So --

10       THE COURT:  Yeah, so apparently not.  There seems to

11   be an issue.

12       Here's what I need defense counsel to do:  I need you

13   to -- before the hearing today at 5:00 o'clock -- so somebody

14   during a break needs to contact this attorney by e-mail or

15   otherwise.  Talk through these issues.  I want you to sort out

16   as much as you can.

17       If there is an issue, I'll rule on it, but I don't

18   want to spend more time today than I have to sorting out the

19   scope of the testimony.  You know, it may well be that the

20   testimony that you all want to elicit is perfectly fine to the

21   Cook County State's Attorney's Office.  And if so, we're good

22   to go.  But if I have to decide something, I need to know, and

23   I want to you to tee it up.  Okay?

24       MR. STEFANICH:  I can contact Mr. Coyne today, Judge.

25       THE COURT:  Okay.  Thank you.  So we will have the

 1   hearing at 5:00 o'clock today.  I will tell you that my

 2   overall view is it's not at all uncommon to have a witness

 3   testify where there are potential privilege issues.  You just

 4   take it one question at a time, and if there's a privilege

 5   objection, I'll rule on it.  If not, you know, it's going to

 6   be nice and clean.  Okay?

 7           I want to talk about jurors seating.  There was a

 8   concern expressed on Friday by Mr. Hale about having members

 9   of the trial team sit in the gallery.  Yeah, I don't know if

10   you folks have talked about that with your respective teams.

11           So let me just give the lay of the land here.  I'm in

12   Judge Durkin's courtroom.  I'm looking at the public gallery

13   in front of me.  Three jurors sit in the pews on the left,

14   three jurors sit in the pews to the right.  Two of the seats

15   on each side are right by the door, so nearest the door as you

16   walk in, and one seat in the -- it looks like the second row

17   from the back of the courtroom.  So once you enter, it is in

18   the middle.  So basically people sit at the very end of the

19   aisle or there's one seat in the second pew in the middle.

20           So let me put that -- let me put it this way:  You

21   walk in the courtroom, there is a pew on the left and the

22   right, somebody sits on each side.

23           The second pew, a juror sits in the middle; and the

24   third pew, somebody sits in the aisle.  That's how it goes.

25           I had allowed one member of each respective

1    juror -- excuse me -- one member of each respective trial team

2    to sit in the gallery because I thought that they would be

3    unobtrusive, and they have been unobtrusive with one exception

4    that I'll get to.  I thought it was useful to have as many

5    people of the trial team in the courtroom as you can do

6    safely.

7           My understanding is, we were allowed to have five

8    people in the gallery on each side, so ten total.  So adding

9    those two people would bring the total to eight out of ten.

10   So we still have plenty of room.

11          It has not been an issue at all during the trial.

12   I've watched this issue like a hawk, frankly, from where I've

13   been sitting, making sure that nobody interferes with the

14   jurors.  They've had a clean line of sight.

15          The only issue was when Mr. Bazarek inadvertently sat

16   down in the first pew in the line of sight of the witness.  I

17   know these things can happen, but that's why I adjusted it,

18   had him move down.

19          So here's how we're going to do it from now on:  Each

20   of you can still have one member of the trial team in the

21   first pew if you'd like.  For the plaintiff's team, you can

22   have one person.  That person will sit, from my perspective,

23   on the far left of the courtroom.  So the first pew all the

24   way to the wall, okay, all the way over.

25          Defense team, you can have one person that's going to

1  be on the opposite end of the courtroom.  So on the right, all

2  the way to the wall.  When you do that, it's going to be

3  completely unobtrusive and out of the sight line of the

4  jurors.

5       I will tell you that if I had thought that there was

6  any concern about interfering with the jurors, I wouldn't have

7  allowed it.  I have watched this issue like a hawk, and it's

8  not been an issue at all.  I can tell you that.  I've been

9  very sensitive to making sure that the jurors are not

10 interfered with in any way, shape, or form, and I don't think

11 it's going to be an issue.

12      I just do want to double-check and make sure that the

13 pad is in the right place on the right side.  But other than

14 that, we should be good to go.

15      Anything else that we need to talk about before we

16 get rolling here this morning?

17      I see Mr. Oliver is back -- has just come back to the

18 seat, so we're going to get -- call the jury.

19      MS. MUSUMECI:  Your Honor, I would just note there

20 are a few deposition designations we intend to read after

21 Mr. Oliver, but we can address any objections after that.

22      THE COURT:  Yeah, let's do that actually right now.

23 Which ones?

24      MS. MUSUMECI:  Officer Willis.

25      THE COURT:  Mr. Willis.  Let me give you my rulings

1784

1    on Mr. Willis.

2         The only question I had about Willis is, there was

3    some testimony about whether Offi- -- excuse me -- whether

4    Frazier was arrested.  Is there a debate about whether the

5    documents reflect an arrest of Frazier?

6         MR. SAFER:  From my perspective, there isn't,

7    Your Honor.  The documents say that he's arrested.

8         THE COURT:  The documents say that he was arrested?

9         MR. SAFER:  Yeah, that's -- that's my position.

10   That's our position.

11        THE COURT:  Okay.  Is defense counsel disagreeing

12   with the notion that Frazier was arrested?

13        MS. BOUDREAUX:  Yes.

14        THE COURT:  Okay.  All right.  There you go.

15        All right.  So I went through all of the objections

16   to Willis, most of which were just relevance and 403.  They're

17   all overruled.  I thought it was all fair game.  And that

18   includes the objections that each of you raised to each

19   other's testimony.  I thought it was all fine.

20        Who's next?

21        MS. MUSUMECI:  Defendant Siwek and Officer Temple.

22        THE COURT:  Okay.  And I will tell you, folks -- you

23   folks were kind enough to give me a binder -- I went through

24   each one individually.  I'm not just saying overruled and

25   sustained, you know, just flippantly.  I can tell you that if

1785

1    you know anything about me by now, I read everything and I go

2    through line by line, I really do.

3         All right.  So Siwek -- the one thing I will say with

4    Siwek is, it looked like in my copy of the binder, 118, Lines

5    14 to 17 was not highlighted.  Maybe it is in your copy.  It

6    was not in mine.  But if plaintiff intends to offer that

7    testimony, just a heads-up that it wasn't highlighted in my

8    copy.  So just as a courtesy to you, I wanted to let you know

9    that you may want to look for that, because if it's not

10   highlighted, you may not read it.

11        MS. MUSUMECI:  I apologize.  We had withdrawn that,

12   Your Honor.

13        THE COURT:  You withdrew that.  Okay.  Fine.

14        So for Siwek, everything is overruled except 138,

15   11 -- excuse me -- Page 138, 1 to 11 is sustained.

16        I also had a question on defendants' designations for

17   Pages 138, Line 21 through 139, Line 12.  This has to do with

18   the lineup.  Was he there for the lineup?

19        MS. BOUDREAUX:  Yes, he was.

20        THE COURT:  All right.  So the foundation is laid.

21   So that's overruled.

22        And I had a question about 142, Line 22

23   through 143:4.

24        The question is:  "So was it your understanding that

25   Clifford Frazier identified Bolden as the man who got into a

1786

1  vehicle with Derrick Frazier and Ledell Clayton?

2          "ANSWER:  Yes."

3          There's an objection:  "Hearsay."

4          Was he there for that identification?

5          MS. BOUDREAUX:  He was in the station while the

6  lineup occurred, yes.

7          THE COURT:  Not in the station.  Was he there for the

8  lineup?

9          MS. BOUDREAUX:  He was right outside the door to

10  where the lineup was taking place, and as part of the

11  investigation, he was aware of the identification that was

12  made.

13          THE COURT:  Well, this -- this makes it seem like he

14  saw the ID.  It says, "Was it your understanding that Clifford

15  Frazier ID'ed Bolden?"

16          Is he repeating what somebody else saw?

17          MS. BOUDREAUX:  Yeah.  He is saying that

18  Mr. Pesavento was in the lineup room with Clifford and then

19  came out and told his fellow officers, Siwek and Karl, that

20  Clifford had made that identification.

21          THE COURT:  All right.  So why do we need -- why do

22  we need Siwek to testify about what Pesavento saw at the

23  lineup?

24          MS. BOUDREAUX:  We don't need it.  It was just in the

25  dep that way.

1    THE COURT:  Okay.  Ms. Musumeci?

2    MS. MUSUMECI:  Yes, Your Honor.  I agree that

3    Mr. Siwek was not in the room where Mr. Frazier made the

4    identification.  He was not viewing the lineup.  He was

5    outside and received the information from fellow officers.

6    THE COURT:  Okay.

7    MS. MUSUMECI:  So I do believe it's hearsay.

8    THE COURT:  I guess it -- it may or may not be

9    hearsay depending on what it's offered for.  If it's offered

10   to prove that Clifford Frazier actually did ID Bolden, you

11   know, it might be hearsay.

12   In other words, if he says what Pesavento told him

13   about what Pesavento saw, you know -- but it depends on what

14   you're offering it for.  If you're offering it for state of

15   mind or something else, it could -- it might not be hearsay.

16   It all depends.

17   MS. BOUDREAUX:  We're offering it for course of the

18   investigation.

19   THE COURT:  For what?

20   MS. BOUDREAUX:  Course of the investigation.

21   THE COURT:  Course of the investigation.  So what

22   does that mean exactly?

23   MS. BOUDREAUX:  So it's basically affect on listener

24   for a police officer that, you know, they -- they are

25   collectively relying on this information, and then they go

1    make the arrest of Mr. Bolden.

2            MS. MUSUMECI:  Your Honor, Officer Siwek wrote the

3    report, wrote a report about the lineup, and so that is

4    already in evidence.  I don't believe that his testimony about

5    it is being offered for anything other than to bolster the

6    identification.

7            THE COURT:  Okay.

8            MS. MUSUMECI:  He did not -- Officer Siwek did not

9    himself take any actions other than writing the report, which

10   is in evidence, based on the information.  So course of

11   investigation, it didn't lead him to do anything else.  He was

12   doing what Officer Pesavento was doing.

13           THE COURT:  All right.  Let's do this.  You're not

14   going to cover this before the next break, are you?

15           MS. MUSUMECI:  No, Your Honor.

16           THE COURT:  All right.  So let's -- I don't want to

17   keep the jury waiting even a minute longer than we have to.

18   All right.  So let's get the jury.

19           MS. BOUDREAUX:  Okay.

20           THE COURT:  Folks.  We need to take a break for five

21   minutes.  I need to make a phone call.  We'll be back.

22       (A brief recess was taken from 9:46 a.m. until 9:48 a.m.)

23           THE COURT:  All right.  So we're back on the record.

24           The jury is walking down.  I want to bracket this bit

25   about Siwek on the little passage there.  I just want to move

1  forward.  The rest of the objections of Siwek are overruled.

2          I will say, you know, plaintiffs objected to Siwek

3  saying that he was in the United States Marine Corps.  I don't

4  know why you would object to that.  That's totally fair game,

5  I think.  You can always learn about the background of a

6  witness.  You know, military service is certainly fair game

7  for a witness to say.  It serves all of us by serving his

8  country.  I frankly didn't understand why you objected to

9  that, but that's definitely overruled.

10          For Mr. Temple -- excuse me -- Ms. Temple, most of it

11  is overruled.  I will say I was not sure about the testimony

12  from Page 80, Line 13 to 22.  It was kind of a cumbersome

13  question.  And then the witness in the second question didn't

14  seem to understand it.

15          I will agree with you, Plaintiff, that the form

16  objection was waived.  But I don't know if that passage really

17  moves the ball, either.  So I'm going to deny the objection on

18  that.  But that one gave me pause.  Okay?

19          Are there any other passages that you need a ruling

20  on?

21          MS. MUSUMECI:  No, Your Honor, but there's just one

22  quick mechanical question.  For Officer Willis, there is

23  deposition testimony.  There was also a trial stipulation.

24  And our question is just whether Your Honor would want to read

25  the stipulation that had been read at the criminal trial or

1    whether Ms. Brummel, who will be serving as --

2         THE COURT:  If it's a stipulation, I should read it,

3    I think, to the jury, because this is what we've done before.

4    So if you hand me something, I'll read it into the record.

5         MS. MUSUMECI:  Okay.  And just to be clear, it was a

6    stipulation that was read at the criminal trial back in 1996.

7         THE COURT:  Totally fine.  If you put a Post-it on

8    there and say the stipulation was read on such and such a

9    date, that's fine.  Okay?

10        MS. MUSUMECI:  Just so I understand, so Your Honor

11   will read that?

12        THE COURT:  I will read it, yeah.

13        Are we good?

14     (Jury in.)

15        THE COURT SECURITY OFFICER:  All rise.

16        THE COURT:  Have seat, everybody.

17        Well, good morning to everyone.

18        THE JURY:  Good morning.

19        THE COURT:  I hope everyone had a good weekend.

20   October is my favorite month of the year.  I love the fall

21   weather, and we sure got some this weekend.  I love the crisp

22   fall day, the bright blue sunshine.  So I hope all of you were

23   able to enjoy some of that this weekend.  Thank you for coming

24   back.  Thank you for your service on the jury.

25        Let me give you just a bit of a refresher about where

1    we ended on Friday.  The last thing we heard on Friday was the

2    testimony of Mr. Bolden's younger sister.  She then completed

3    her testimony.  We're going to now start with the testimony of

4    Officer Oliver.

5         You remember last week, I explained to you folks how

6    there are different ways that parties can present testimony in

7    a courtroom.  A lot of times people will come right in, and

8    they'll just walk into the courtroom, and they'll take the

9    witness stand and testify.

10        I also covered how sometimes somebody isn't

11   available, so we can read testimony into the record, let's

12   say, from the trial that took place years ago.

13        There's a third way as well.  Under the federal

14   rules, sometimes a witness is not available to testify in

15   person in the courtroom, but the person can testify remotely.

16   And that's what you're going to hear today.

17        We're going to start this morning with the testimony

18   of a defendant, Officer James Oliver, a retired member of the

19   Chicago Police Department.  He resides in Arkansas.  He is at

20   the courthouse, just like this one, except he's in Little

21   Rock, Arkansas.  So we have got a video feed between our

22   courtroom and the courtroom in Arkansas, and we're going to

23   have him testify remotely from Arkansas.

24        The screen just to my left is going to always have

25   his picture up.  Hopefully everybody can see it or at least

1   most of you can see it.  I think the jury to my left may have

2   kind of an imperfect view of that.  You're welcome to get up

3   and look at it.  If you can't see Mr. Oliver and you want to

4   see him, you can move a seat over, if you'd like.  Okay?  But

5   hopefully the rest of you can see him on that screen at all

6   times.

7           We're going to share the screen, the little screen in

8   front of you or the big screen in the back of the courtroom,

9   between the witness and an exhibit.  So let's say the folks in

10  the -- the lawyers want to use Exhibit No. 1, and they want to

11  show it to Mr. Oliver.  If they display it on the screen, the

12  exhibit from time to time will appear on your screen and

13  you'll lose a picture of Mr. Oliver.  So it's an either/or

14  situation.

15          The screen in front of you will either have the

16  exhibit or will have Mr. Oliver.  And the attorneys are going

17  to be mindful about what you're looking at.  But I will tell

18  you, the screen to my left will always have Officer Oliver on

19  it.  So if you ever want to get a look at the exhibit and look

20  at Mr. Oliver, you can look at your screen for the exhibit and

21  you can look at the screen to my left to get a picture of

22  Mr. Oliver.

23          Okay?  So hopefully that's user friendly.

24          Before we get going with the testimony, are there any

25  other items related to exhibits that we ought to cover before

1   we get started?

2           MS. BOUDREAUX:  Yes, there is, Judge.

3           THE COURT:  Okay.  Go ahead.

4           MS. BOUDREAUX:  Defendants would move into evidence

5   Plaintiff's 85, Defendants' No. 1, Plaintiff's 72B, and

6   Defendants' 117, which was marked during the trial, and that's

7   Bates-stamped EB19375.

8           THE COURT:  Okay.  Any objection?

9           MR. SAFER:  No objection, Your Honor.

10          THE COURT:  All right.  Very good.

11      (Plaintiff's Exhibit No. 85, Defendants' No. 1,

12      Plaintiff's No. 72B, and Defendants' 117 were received

13      in evidence.)

14          THE COURT:  Folks, let me tell you what just

15  happened.  What we basically just accomplished is, the

16  defendant moved into the record, moved into evidence some of

17  the documents that you already saw last week.  So defense

18  counsel formally moved to admit exhibits that you've already

19  seen in the record, okay, that way you can consider it when

20  you deliberate.

21          Plaintiffs, you may call your next witness.

22          MR. SAFER:  Thank you, Your Honor.

23          The plaintiff calls James Oliver.

24          THE COURT:  Mr. Oliver, can you hear me okay?

25          THE WITNESS:  Yes, sir, Your Honor.

Oliver - direct by Safer

1794

1       THE COURT:  Mr. Oliver, can you raise your right

2  hand.

3       (Witness sworn.)

4       THE COURT:  All right.  Thank you, Officer Oliver.

5  And, Officer Oliver, I can hear you okay.  I would ask you to

6  go ahead and speak nice and loudly when you can today so that

7  everybody in the courtroom can hear you.

8       Does that sound okay.

9       THE WITNESS:  Yes, sir.

10      THE COURT:  And if at any point today you can't hear

11 us because you're testifying remotely, I want you to speak up

12 and tell us.  Okay?

13      THE WITNESS:  Yes, sir.

14      THE COURT:  And if you need a break at any time

15 today, you just tell me.  And we'll go ahead and take a break.

16 Does that sound okay?

17      THE WITNESS:  That's fine, Your Honor.

18      THE COURT:  I'll keep an eye on the time, too, but I

19 want you to know that if you need a break, we'll take one.

20 Okay?

21      THE WITNESS:  Thank you, Your Honor.

22      THE COURT:  All right.  Counsel, whenever you're

23 ready.

24      MR. SAFER:  Thank you, Your Honor.

25        JAMES OLIVER, PLAINTIFF'S WITNESS, DULY SWORN

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 30 of 111 PageID #:19061
Oliver - direct by Safer
1795

1           DIRECT EXAMINATION

2     BY MR. SAFER:

3     Q.   Good morning, Mr. Oliver.

4     A.   Good morning.

5     Q.   Would you state your name for the record, please.

6     A.   James Oliver, O-l-i-v-e-r.

7     Q.   You and your partner were working on January 29th, 1994,

8     correct?

9     A.   Yes.

10    Q.   And at that time, you were a gang crimes specialist with

11    the Chicago Police Department?

12    A.   Yes.

13    Q.   A gang crimes specialist is at the same grade in the

14    Chicago Police Department as detectives; is that right?

15    A.   Yes, I believe so.

16    Q.   Now, you received a radio transmission about a shooting at

17    Minerva Street, correct?

18    A.   We -- a gang crime officer responds to in-progress calls,

19    and the first call that I received that I recall was at 64th

20    and Cottage Grove.

21    Q.   And then you also received a radio transmission about a

22    shooting at Minerva, correct?

23    A.   Yes.  Yes, I heard the call.

24    Q.   And you drove to that scene, right?

25    A.   Yes.  Yes.

Oliver - direct by Safer

1796

1  Q.  You claim that you never got out of the car at Minerva?

2  A.  As my -- what I remember, I didn't get out of the car, but

3  if I did get out the car, it was only for a couple minutes,

4  two or three minutes.

5  Q.  Okay.  And you went over to the crime scene, correct?

6  A.  On Minerva?

7  Q.  Yes.

8  A.  Yes, I did -- I would have walked out of the car, I would

9  assume so.

10  Q.  Okay.  And you went and you took a safe deposit key from

11  Derrick Frazier's dead body, correct?

12  A.  No.

13  Q.  You understand that Clifford Frazier has given sworn

14  testimony that you came to him with Derrick Frazier's safe

15  deposit box key and told him you could get him into it, right?

16  You understand that?

17  A.  No, I did not do that.

18  Q.  No, the question is:  You understand that Mr. Frazier has

19  given that testimony, correct?

20          MR. BAZAREK:  Object to the form of the question.

21          THE COURT:  Well, he can testify to the extent that

22  he knows.

23          Why don't you restate the question, if you would,

24  please.

25          MR. SAFER:  Thank you, Your Honor.

Oliver - direct by Safer

1797

1    BY MR. SAFER:

2    Q.  You understand that in this case, Clifford Frazier has

3    given -- well, let's back up.

4            You're a defendant in this case, correct?

5    A.  Yes.  Okay.  Yes.

6    Q.  And you have reviewed material in this case, correct?

7    A.  Yes.  Yes.

8    Q.  And you understand that Clifford Frazier has given sworn

9    testimony that you came to him with Derrick Frazier's safe

10   deposit key and told him that you could get him into it?  You

11   understand that's what he claims, right?

12   A.  Yes.  Yes.

13   Q.  And have you been to Clifford Frazier's home?

14   A.  No.

15   Q.  You've never gone to Clifford Frazier's home; is that your

16   testimony?

17   A.  That's my testimony.  I don't -- I don't recall going to

18   his house.

19   Q.  You may have or you know that you did not?

20   A.  I don't recall going to his house.

21   Q.  And -- so can you tell the ladies and gentlemen of the

22   jury, from your knowledge of the -- of all of the

23   circumstances, a reason why Clifford Frazier would make up

24   this story about you?

25           MR. BAZAREK:  Object to the form of the question.

Oliver - direct by Safer

1798

1 Foundation.  It calls for speculation.

2          THE COURT:  Overruled.

3 BY MR. SAFER:

4 Q.  So the question, Officer Oliver, is:  In your view, from

5 your mind, why would Clifford Frazier make up this story about

6 you?

7 A.  I have no idea.

8 Q.  Okay.  At any rate, you did go to Minerva, and you got out

9 of your car?

10 A.  I could have, yes.

11 Q.  And -- well, you could have or you did?

12 A.  I could have.  I don't recall something 25, 30 years ago.

13 I don't recall.

14 Q.  And from the Minerva scene, you went to the hospital to

15 talk to Clifford Frazier, correct?

16 A.  Right.

17 Q.  You spoke with him in the emergency room, right?

18 A.  Yes.

19 Q.  And you spoke with him for about 10 to 15 minutes,

20 correct?

21 A.  I would say so, yes.

22 Q.  He was in an area in the emergency room separated by

23 curtains?

24 A.  Yes.

25 Q.  And it was just you and your partner and Mr. Frazier,

Oliver - direct by Safer

1799

1   correct?

2   A.  Yes.

3   Q.  Clifford Frazier was not getting any treatment while you

4   were talking to him, right?

5   A.  I don't recall no one else being in the room but the three

6   of us.

7   Q.  Okay.  So there were no doctors in there with you, right?

8   A.  No, not that I recall.

9   Q.  No nurses, correct?

10  A.  No, I don't recall.

11  Q.  And you asked him some questions, right?

12  A.  Yes, I did.

13  Q.  And at first, he was not really giving you answers,

14  correct?

15  A.  Right.

16  Q.  But then your partner told Clifford Frazier that his

17  brother had been shot, right?

18  A.  Yes, you know, I -- I would assume that he told him that

19  his brother was dead.

20  Q.  Well, I'm not asking you to assume.  You know that he --

21  that your partner told Clifford Frazier that his brother was

22  dead, right?

23  A.  Yes.

24  Q.  And that -- and then, as soon as he heard that his brother

25  and Ledell -- and Irving Clayton were dead, he started

Oliver - direct by Safer

1800

1    talking, correct?

2    A.  Yes, he was talking more.

3    Q.  He was -- well, he was -- started talking to you freely,

4    correct?

5    A.  Okay.  Freely.

6    Q.  As you put it, he was then talking nonstop, right?

7    A.  Yes, he was.  He was.

8    Q.  So his immediate reaction to your partner telling him that

9    his brother had been killed was to start telling you what had

10   happened that night, right?

11   A.  Yes.

12   Q.  He was not overcome with emotion, was he?

13   A.  I don't recall.

14   Q.  He did not break down crying when he heard that his

15   brother was dead, right?

16   A.  I don't remember him breaking down and crying.

17   Q.  Right.  All he did was he started talking to you about the

18   details of that evening, right?

19   A.  Yes.

20   Q.  And he gave you a lot of information about their drug

21   operation, didn't he?

22   A.  He gave me some -- you know, what he was up there for,

23   what they was up there for.

24   Q.  He told you that they were selling those 2 kilos of drugs

25   that night to Anthony Williams, correct?

Oliver - direct by Safer

1801

1  A.  Yes.

2  Q.  And he identified the drug buyer as Anthony Williams for

3  you, correct?

4  A.  Yes, he says that -- that he was there -- they was there

5  to sell the cocaine to Anthony Williams.

6  Q.  And he told you that he, his brother, and Irving Clayton

7  bought their drugs from an older guy, right?

8  A.  Right.  Right.

9  Q.  The older guy was their -- their drug supplier, correct?

10  A.  Right.  Right.

11  Q.  And he told you they were getting the -- their drugs from

12  an older guy at a restaurant at 116th and Western, right?

13  A.  Yes, that's where they would meet.

14  Q.  That's where Clifford Frazier -- what Clifford Frazier

15  said was that's where Clifford Frazier, Irving Clayton, and

16  Derrick Frazier would meet to get the drugs that they were

17  using to sell, correct?

18  A.  Right.  Right.

19  Q.  And from what he told you, it was clear to you that

20  Clifford Frazier was deeply involved with this drug operation,

21  right?

22  A.  Yes, they was involved -- he was involved.

23  Q.  He never said that this -- to you that this was the first

24  time that he was out on a drug deal, right?

25  A.  No, no, he didn't say that.

Oliver - direct by Safer

1802

1  Q.  To the contrary, he made it clear to you that he was --

2  that he knew not only who the drug buyer was in this case, but

3  also who their larger drug connection was, right?

4  A.  Yes.

5  Q.  Now, Clifford Frazier never told -- never told you that he

6  knew the name or nickname of the person who shot him, did he?

7  A.  No, he didn't say the name.

8  Q.  You are very certain that Clifford Frazier said nothing

9  about a person named Lanier, correct?

10 A.  Right, not to me.

11 Q.  Clifford Frazier did not tell you that his brother

12 referred to anyone named Lanier, correct?

13 A.  No.  No.  Never did.

14 Q.  Clifford Frazier did not tell you that anyone said

15 anything that night about Lanier, right?

16 A.  Right.

17 Q.  Clifford Frazier never uttered the word "Lanier" when he

18 was talking to you, did he?

19 A.  No.

20 Q.  Okay.  Now, he told you what happened that night, correct?

21 A.  Yes.  Somewhat, yes.

22 Q.  Okay.  If we can -- now, you didn't take -- we'll discuss

23 this in a minute, but you don't have notes of your

24 conversation with Mr. Frazier, right?

25 A.  No.

Oliver - direct by Safer

1803

1  Q.  Okay.  So let's -- now, right after you got through

2  discussing the events with Mr. Frazier, Detective Baker came

3  to the hospital, correct?

4  A.  Yes.

5  Q.  And you talked to Detective Baker, and then Detective

6  Baker came in and talked to Mr. Frazier, right?

7  A.  Yes.  Yes.  I left.  When I left, he was in the room -- in

8  the area with Frazier.

9  Q.  Okay.  Let's -- let's look at Detective Baker's notes of

10 his interview with Clifford Frazier and see if what Clifford

11 Frazier told you was the same story.

12      MR. SAFER:  Your Honor, if we could look at Joint

13 Exhibit 25, which is in evidence.

14      THE COURT:  Completely fine.  Go ahead.

15      MR. SAFER:  Thank you.  If we could look at the typed

16 version of that, of those handwritten notes.

17      THE COURT:  All right.  So just for the record, it's

18 now being displayed on the screen.  And the video screen in

19 the courtroom, I think, cannot any longer show Officer Oliver,

20 but he is on the screen hopefully to my left that I can't see.

21      Is he still displayed there?

22      MR. SAFER:  He is, Your Honor.

23      THE COURT:  Okay.  Very good.  Go ahead and proceed.

24 BY MR. SAFER:

25 Q.  Now, Clifford Frazier told you that he went to sell drugs

Oliver - direct by Safer

1804

1  with his brother Derrick and with Irving Clayton, correct?

2  A.  Yes.

3  Q.  Okay.  And he told you that he had two guns, right?

4  A.  No, he didn't tell me nothing about he had no guns.

5  Q.  He didn't tell you that he had two guns?

6  A.  No.

7  Q.  He didn't tell you that his job was to act as security for

8  the drugs?

9  A.  No.

10  Q.  What did he tell you about that?

11  A.  He told me that they was there to -- to sell some drugs to

12  Ant, some kilos of cocaine to Ant, and that his brother and

13  something, one of his friends, went into the J&J Fish, and

14  they came out.  When they came out --

15  Q.  Okay.  I'm sorry.  Let me stop you right there, Officer

16  Oliver.

17        When -- it was your -- he told you that his brother

18  and Irving Clayton went in to meet with Ant, correct?

19        MR. BAZAREK:  Judge, I object he -- I object to -- he

20  cut the witness off as he was speaking.

21        THE COURT:  Well, I did not hear him cutting off.  If

22  he did, I missed that.

23        Officer Oliver, were you done with your answer?

24        THE WITNESS:  No, no.

25        THE COURT:  All right.  So go ahead and finish your

Oliver - direct by Safer

1805

1 answer, and then plaintiff's counsel will ask you the next

2 question. Go ahead.

3 BY THE WITNESS:

4 A. They went into the restaurant. Him and his brother and a

5 friend went into the restaurant, and they came out and got

6 into a car and left. When they left, it was three of them

7 that left in the car. And the one guy came back. And that's

8 when he got out of the car and confronted the guy and wanted

9 to know where were the other -- his brother and his friend.

10 And that's what he told me.

11 BY MR. SAFER:

12 Q. Okay. I apologize for interrupting you. Are you done,

13 sir?

14 A. Yes. Yes, basically. You know, he just told me then

15 there was a fight, you know, between him and the guy, and I

16 guess shots were fired up, whatever. But he wind up going

17 into the J&J Fish. And that's all what -- basically what he

18 told me.

19 Q. Okay. Thank you.

20         So he -- so let's take that one step at a time.

21         He told you that his brother and their friend went

22 into the restaurant to meet with Anthony Williams, correct?

23 A. Right.

24 Q. He -- only those two, not him. In other words, he didn't

25 say that he, Clifford Frazier, went into that meeting, right?

Oliver - direct by Safer

1806

1  A.  No, no, no.  He said he was in a car in front of the

2  Harold's Chicken.

3  Q.  Right.  And he stayed in that car, right?

4  A.  Right.  On the east side of the street, yes.

5  Q.  And then when the three people left, he never told you

6  about anybody going into Harold's Chicken, did he?

7  A.  No, no, no.  He didn't say nothing to me about nobody

8  going into Harold's, no.

9  Q.  So he didn't tell you that he was standing in Harold's

10  eyeballing this third person, did he?

11  A.  No.

12  Q.  He didn't tell you that that third person got change of a

13  dollar at Harold's Chicken, did he?

14  A.  No.

15  Q.  Okay.  Now, when -- he told you that when the person --

16  this third person came back, Clifford Frazier confronted him

17  about where his brother and the other -- his friend were,

18  right?

19  A.  Yes.

20  Q.  What did he say about that?

21  A.  He says that he -- he walked up on him or something and

22  asked him where the -- his brother and this other guy were,

23  you know, and then that's when the fight started, you know,

24  they started tussling and -- whatever, you know.

25  Q.  Okay.  Now, who is it who asked about Clifford -- Derrick

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 42 of 111 PageID #:19073
Oliver - direct by Safer
1807

1    Frazier and Irving Clayton?  Was it this third person or was

2    it Clifford Frazier?

3    A.  It's Clifford, the one that got shot.  That's the one who

4    asked this third person.

5    Q.  And did he say what the third person said?

6    A.  No, I -- no, no.  I don't think he had nothing to -- you

7    know, there -- he didn't tell me anything about what he said.

8    Q.  But this --

9    A.  He just said at that point --

10   Q.  I'm sorry.

11   A.  He just said at that point it was -- that they started

12   fighting and shooting or whatever, you know.

13   Q.  Okay.  So they're having this conversation by the car

14   where Mr. -- where Clifford Frazier was; is that correct?

15   A.  I thought that the way he explained it to me at that

16   point, that it was across the street near a vacant lot, you

17   know, right by a pool hall.  There was a pool hall and then

18   J&J Fish.  So I assumed that it was over by that vacant lot.

19   Q.  Okay.  So he had this conversation with this third person

20   in the vacant lot, and then --

21   A.  Yeah.

22   Q.  -- shootings started; is that right?

23   A.  Right.  Right, or whatever, correct.

24   Q.  Did Mr. Frazier tell you -- Clifford Frazier tell you

25   anything else about what happened that night?

Oliver - direct by Safer

1808

1   A.  He said that he went into the J&J Fish, I believe.

2   Q.  And did he tell you what happened then?

3   A.  I don't know that he -- did he say that he talked to

4   Anthony William or whatever, but I don't -- I don't recall

5   what he said, did he talk to Anthony William or not.

6   Q.  Okay.  So he may have told you he talked to Anthony

7   Williams; you don't recall?

8   A.  Yeah, he may have.  He may have.  But he was -- at that

9   point he had already been shot a couple times, I guess, two or

10  three times.

11  Q.  Okay.  And did he tell you anything else about what

12  happened at -- that night?

13  A.  I don't recall, no.

14  Q.  Okay.  Now, he wasn't having any difficulties speaking

15  with you, correct?

16  A.  No, he didn't have no -- you know, he was in pain.  He was

17  hurt, you know, he was shot, you know, but he was able to

18  communicate.

19  Q.  Okay.  Now, before we leave the topic of what happened in

20  the hospital, if you did not go through Derrick Frazier's

21  pockets at the scene of the -- his murder and see his

22  identification, how did you know that Derrick Frazier was

23  Clifford Frazier's brother?

24  A.  I didn't know.  When we got to the hospital, my partner,

25  Anderson, recognized that this -- this guy looked just like

Oliver - direct by Safer

1809

1    the guy that was shot in the car.  He told him that -- he

2    asked him who he was with, and he told him that he was with

3    his brother, you know, and some friend.

4    Q.  Well --

5    A.  And then that's when he informed him his brother was dead.

6    Q.  Isn't it your testimony that Mr. Anderson told him -- told

7    his -- Clifford Frazier that his brother was dead because he

8    looked like the person who was on the scene who was dead,

9    correct?

10   A.  Right, right.  That's my testimony.

11   Q.  Right.  So it's your testimony that the -- your partner

12   told Clifford Frazier, who neither of you had ever met, that

13   his brother had been shot because Mr. Anderson thought from

14   looking at his dead body for a few seconds, that they looked

15   similar?

16   A.  Yes, that's what he said.  That's what he said when he got

17   to the -- the emergency room.

18   Q.  And you never saw Derrick Frazier's ID at the scene of the

19   crime?

20   A.  Oh, no.  No.

21   Q.  Okay.  Let me shift topics now to the topic --

22              MR. SAFER:  Thank you, Jim.

23              So now we have the exhibit off, Your Honor.

24              THE COURT:  Okay.  Do we have the video of Officer --

25   there we go.  Officer Oliver is now back on the screen.  Thank

Oliver - direct by Safer

1810

1    you.

2                    MR. SAFER:  Thank you, Your Honor.

3    BY MR. SAFER:

4    Q.  So now I'd like to talk to you, sir, about the 2 kilograms

5    of cocaine.

6                    When you talked to Clifford Frazier, in addition to

7    talking about his drug operation, he told you that there were

8    2 kilograms of cocaine in a car parked outside of Harold's,

9    correct?

10   A.  Yeah.

11   Q.  And he told you that the cocaine was in the trunk of the

12   car?

13   A.  Yes.

14   Q.  Now, as a result of that, when you got back to your car,

15   you told the police dispatcher that there was cocaine in a car

16   outside of Harold's Chicken, correct?

17   A.  Yes.

18   Q.  And you told the dispatcher that you needed somebody to

19   watch the car, right?

20   A.  Yes.

21   Q.  You didn't want the car to leave the scene with the drugs

22   in it, correct?

23   A.  Yes.  Right.

24   Q.  And then from the hospital, you drove back to Harold's

25   Chicken, right?

Oliver - direct by Safer

1811

1    A.   64th and Cottage, yes.

2    Q.   And what did you see when you got to the area of Harold's

3    Chicken?

4    A.   When I got to the -- when we got to the scene, back to

5    Harold's Chicken, I saw the car and I saw policemens there.

6    And the one guy that I recognized was Officer Willis who I

7    know that had been one time assigned to the gang crime

8    tactical side.  And I could see the cocaine on the trunk of

9    the car and him sitting there -- standing by it.

10    Q.   And what did you do when you saw the cocaine sitting

11    outside the car with Officer Willis sitting -- or standing

12    nearby?

13    A.   I spoke to him basically about, you know, why did they

14    take the cocaine out of the trunk, you know, because I wanted

15    to get -- my thing was to get the evidence tech over there to

16    process that whole scene after I done found out that both

17    Minerva and this one was basically related, and I know over

18    there they had to have an evidence tech there.  So it wasn't

19    that far away.

20    Q.   Okay.  Now, you said that this was a -- you talked to him.

21    But the fact is, you were very upset, weren't you?

22    A.   Yeah, I -- you know, I did get a little upset because what

23    I had relayed to the dispatcher is that I wanted the car

24    watched, you know, and not to be touched.  But I didn't want

25    Ant to figure it out that the cocaine was across the street

Oliver - direct by Safer

1812

1  and be gone, you know.  So that was my take on it.

2  Q.  Right.  So you were upset with Officer Willis, and you let

3  him know that you were upset with him, right?

4  A.  Yeah, I did -- I may have said some things, you know, yes.

5  Q.  And let's talk for a minute about why you were upset.  You

6  wanted to have the cocaine -- the package of cocaine

7  fingerprinted, correct?

8  A.  Yes.

9  Q.  Because fingerprints are really important evidence in any

10  investigation, correct?

11  A.  Yes.  Yes.

12  Q.  They are --

13  A.  I wanted it to be processed.  I wanted it to be processed

14  by the evidence technician.

15  Q.  Fingerprints are objective evidence, right?

16  A.  It's good evidence, yes.

17  Q.  Because fingerprints don't lie, right?

18  A.  Right.  Right.

19  Q.  A witness can lie or be incorrect, right?

20  A.  Yes.

21  Q.  But fingerprints are objective evidence and important in

22  any investigation?

23  A.  Yes.

24  Q.  So whenever you find physical evidence on the scene,

25  important physical evidence involved in the crime, the first

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 48 of 111 PageID #:19079
Oliver - direct by Safer
1813

1    step anyone investigating the crime who is interested in

2    bringing the two -- true perpetrator to justice would take is

3    to preserve that for the evidence technicians so that they

4    could come and fingerprint it, right?

5    A.   Yes.

6    Q.   And then they would ask the lab division to run the

7    fingerprints through a database, correct?

8    A.   Yes.

9    Q.   And they would analyze the results of that, right?

10   A.   Yes.

11   Q.   That's basic police investigations, correct?

12   A.   Yes.

13   Q.   Now, in this case, no one needed the fingerprints on the

14   cocaine -- Clifford Frazier's fingerprints on the cocaine to

15   arrest or prosecute Clifford Frazier, right?

16   A.   Clifford was the one that got shot, right?

17   Q.   Yes.

18   A.   At this point, no, I had no reason to, you know -- I had

19   no reason to arrest Clifford, but if his fingerprints -- I got

20   back there and his fingerprints was on the narcotics and then

21   what he was telling me at the hospital was not the truth, you

22   know, two or three days later, you know, he backs out of it,

23   and then I've got something to take to the state's attorney to

24   show that -- that he was involved and he did this or, you

25   know, he had this, and then now I've got something over his

Oliver - direct by Safer

1814

1    head.  You can't just take the word of somebody saying

2    something and not be able to back it up, you know.

3    Q.   And --

4    A.   So that was my thinking.

5    Q.   And you certainly can't just take the word of somebody

6    who's involved in a drug deal, correct?

7    A.   Right, you've got to have -- you've got to have -- you

8    know, you've got to have something in your pocket.  You just

9    can't take the word of a dope deal.

10   Q.   Right.  You've got to corroborate that evidence with

11   objective evidence before it can be reliable, right?

12   A.   Right.  Right.

13   Q.   Okay.  But -- now, let's -- let's talk a little bit --

14   when you say you had nothing -- no reason to arrest Clifford

15   Frazier, let's talk a little bit about that.

16        He told you at that scene -- at the hospital that he

17   was involved in a -- or he was there to sell 2 kilograms of

18   cocaine to Anthony Williams, correct?

19   A.   Yes, his brother and his friend was.

20   Q.   Yeah, and him, right?

21   A.   Yeah, all three of them --

22   Q.   Right.

23   A.   -- came up there.

24   Q.   Right.  And 2 kilograms of cocaine is a lot of drugs,

25   right?

Oliver - direct by Safer

1815

1  A.  Yes, sir.

2  Q.  That's a very, very serious crime, correct?

3  A.  Yes, sir.

4  Q.  Now, he told you that they were selling these 2 kilograms,

5  and then he told you where the 2 kilograms of drugs were,

6  correct?

7  A.  Yes, sir.

8  Q.  And the 2 kilograms of drugs were exactly where he told

9  you they were, right?

10  A.  Yes, sir.

11  Q.  And so that's pretty powerful evidence that corroborates

12  that Clifford Frazier was involved in a 2-kilogram drug deal,

13  correct?

14  A.  Yes.

15  Q.  So that's pretty -- so now you have evidence to arrest and

16  prosecute Clifford Frazier, right?

17  A.  I don't know that I have the evidence to arrest him.  You

18  know, he's shot up in the emergency room.  I didn't think that

19  he was going nowhere.  You know, he wasn't going nowhere.

20  Q.  Okay.  So the question of whether you had to arrest him to

21  stop him from going is -- is one thing.

22          My question is:  You had enough evidence to arrest

23  Clifford Frazier if you so -- if you felt that it was

24  advisable, correct?

25          MR. BAZAREK:  Object to the form of the question and

1    also relevance.

2              THE COURT:  Overruled.

3    BY MR. SAFER:

4    Q.  You had enough evidence to arrest Clifford Frazier,

5    correct, for dealing 2 kilograms of cocaine?

6    A.  He -- he was -- he was there, you know, to deal the

7    cocaine.  I don't know that he was the main one of the two

8    ones -- the two that got killed.  He was sitting in a car

9    across the street.  So he didn't go into the restaurant to

10   make the deal with Ant.  So that's why I was not that

11   concerned with him.

12   Q.  Okay.  But, Officer Oliver, you're not testifying that you

13   need to be the main person in a drug deal in order to be

14   convicted -- in order to be arrested for and prosecuted for a

15   drug deal, right?

16             MR. BAZAREK:  Object to the form of the question.

17             THE COURT:  Overruled.

18   BY THE WITNESS:

19   A.  What I'm saying is, is that he was not the main person

20   that was doing the deal, as far as I could see.  He -- he was

21   outside, and the other two guys was -- went in there, in the

22   restaurant to make the deal with Ant.

23             Now, as far as how much evidence he handled, did he

24   handle the dope and all of that, that's why I wanted the

25   evidence tech.  So if his fingerprints was on the kilos of

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 52 of 111 PageID #:19083
Oliver - direct by Safer
1817

1  cocaine, yes, now you could take that to the state's attorney

2  and then get a warrant and stuff like that, you know.  But as

3  far as -- I could see the initial thing here was not, you

4  know, that I was going to arrest him while he was in the

5  hospital.  He was already shot up a couple of times, so I

6  didn't see the urgency of arresting him right that day.

7  BY MR. SAFER:

8  Q.  Okay.  So let me just see if I understand your testimony.

9       So even though Clifford Frazier told you that he was

10  there along with his brother and their friend to sell drugs,

11  and even though he told you where the drugs were, that is, he

12  knew where the drugs were, you believe you did not have

13  probable cause to arrest him because you didn't have

14  corroborating physical evidence, right?

15  A.  Right.  At that point when he was talking, I didn't even

16  know that the cocaine was there.

17  Q.  Okay.  Once you knew that the --

18  A.  I --

19  Q.  -- cocaine was there, did you believe you had probable

20  cause to arrest him?

21       THE COURT:  Excuse me, Counsel.

22       Mr. Oliver, I think we lost the audio for one second.

23  I couldn't hear you.  Could you repeat your answer for me,

24  please, sir.

25       I saw your lips move, but I couldn't hear -- I'm

Oliver - direct by Safer

1818

1   sorry, sir.  I saw your lips move, but I could not hear the

2   audio.  So if you could repeat your answer, please, sir.

3   BY THE WITNESS:

4   A.  I did not -- I did not see -- I did not know about the

5   cocaine until I got back to the scene.

6   BY MR. SAFER:

7   Q.  Okay.  So once you knew that the cocaine was there, did

8   you believe you had probable cause or did you -- to arrest

9   Mr. Frazier or did you need to have the fingerprints to

10  corroborate that he had touched the drugs?

11  A.  I didn't -- I didn't need anything at that point because I

12  didn't recover the cocaine.  So I would assume that the 3rd

13  District, you know, since they had gotten the cocaine, had

14  recovered it, they would do whatever backup, you know, that

15  needed to be handled.

16  Q.  Okay.  I appreciate that, but that's not my question.

17          My question is:  Once Clifford Frazier -- you've

18  testified that Clifford Frazier telling you that he was

19  involved in a 2-kilo drug deal was not enough to have probable

20  cause, right?

21  A.  Yeah -- well, he said that he was there, he came up there

22  with, you know, his brother and friend to sell cocaine.  I did

23  not -- I did not -- I did not arrest him.  I did not think at

24  that point that there was enough to arrest him.

25  Q.  Okay.  And you believed you needed -- even when you got to

Oliver - direct by Safer

1819

1    the scene, you know, in your mind -- not what the 3rd District

2    is doing, in your mind, you didn't have enough probable -- you

3    didn't have probable cause to arrest Mr. Frazier for this

4    2-kilo drug deal unless you had some corroborating physical

5    evidence like fingerprints, correct?

6    A.   Right.  I didn't see the need to arrest him.

7    Q.   Okay.  The need to arrest him is different than probable

8    cause to arrest him, sir.

9          You didn't believe you had probable cause to arrest

10   him until you had this corroborating fingerprint evidence;

11   that's why you were so upset?

12          MR. BAZAREK:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14   BY MR. SAFER:

15   Q.   Right?

16   A.   I didn't -- I did not -- I did not arrest him, and I did

17   not -- that did not -- that did not come across my mind.

18   Q.   Okay.  Now, your testimony is that after Officer Willis,

19   in your mind, messed things up with the drugs, you took a step

20   back from this entire investigation, right?

21   A.   Yes.

22   Q.   In fact, you know, you -- you said that what happened was,

23   the sequence of events is, you called Officer Willis some

24   names, correct?

25   A.   Yes, I may have.

Oliver - direct by Safer

1820

1    Q.   And he tried to say something to you, right?

2    A.   Could have, yes.

3    Q.   And you turned your back on him, and you went into J&J's

4    restaurant, correct?

5    A.   Yeah.  Yes.

6    Q.   So your testimony is that after Officer Willis, in your

7    mind, messed things up with the drugs, you took a step back

8    from this entire investigation, right?

9    A.   Yes.

10   Q.   After that night, you claim that you essentially had no

11   role in investigating these crimes, correct?

12   A.   Yes, I didn't do no investigation.

13   Q.   I'm sorry.  I didn't catch that.

14   A.   I did not do no investigation past that.

15   Q.   Okay.  You gathered no physical evidence about this crime,

16   correct?

17   A.   No.

18   Q.   You didn't order any forensic evidence to be acquired

19   about this crime, correct?

20   A.   No.

21   Q.   No circumstance -- you didn't investigate any

22   circumstantial evidence, right?

23   A.   No.

24   Q.   You didn't investigate whether these murders were gang

25   related, right?

Oliver - direct by Safer

1821

1      THE COURT:  Excuse me, Counsel.  The question was

2  "You didn't investigate any circumstantial evidence," and the

3  answer is "No."  So let's double-check to make sure that we

4  don't have a double-negative issue here.

5      Take it a question or two back, if you would, please.

6      MR. SAFER:  Okay.  Thank you.

7  BY MR. SAFER:

8  Q.  So did you gather circumstantial evidence to investigate

9  regarding these crimes?

10 A.  No.

11 Q.  Did you investigate whether these murders were gang

12 related?

13 A.  No.

14 Q.  Your assumption was that this was a stickup, correct?

15 A.  No, I don't know how it would be a stickup, no.  I don't

16 know.

17 Q.  Well, let me ask you if you -- you gave a deposition in

18 this case, didn't you?

19 A.  Yes.

20 Q.  The deposition was on December 21st, 2017.  Does that

21 sound about right?

22 A.  Yes.

23 Q.  And were you asked these questions, and did you give

24 this -- these answers:

25      "QUESTION:  Did Clifford Frazier tell you anything

Oliver - direct by Safer

1822

1  about who shot him?

2      "ANSWER:  No, no, no, no.  He just said that he did

3  say that his brother and his friend came out of the restaurant

4  with a third person, and from what I gather -- is -- is that

5  two of them got in the front seat and the other guy got in the

6  backseat -- and, actually, I don't know who's brains behind

7  all of this, but they came in more than one car.  The dope was

8  never with who it was, you know, who they thought it was.  And

9  my assumption is, what happened was, they went on Minerva,

10  they thought that this was going around there to get the money

11  to pay for this, and it actually is just a stickup.  And that

12  was, you know -- Ant did that."

13      Do you recall giving that answer to that question?

14  A.  Yes, yes, that's probably what I said.

15  Q.  Okay.  So that refreshes your recollection that your

16  assumption was that this was a robbery, correct?

17  A.  Right.  On Minerva Street, right.

18  Q.  Yes.  And you did nothing to investigate anything to the

19  contrary -- well, let me phrase that in the affirmative so

20  that we don't run into that same problem.

21      Did you investigate anything to the contrary?

22  A.  No.

23  Q.  And just to close the loop on Officer Willis, you did

24  not -- you did not recover drugs from Clifford Frazier's

25  apartment, correct?

Oliver - direct by Safer

1823

1   A.   No.

2   Q.   Okay.

3           MR. SAFER:  Your Honor, I would like to show Officer

4   Oliver Plaintiff's Exhibit 87, which has not been admitted

5   into evidence, but I believe there's no objection.

6           THE COURT:  Okay.  Any objection?

7           MR. BAZAREK:  Can I see it, Your Honor?

8           MR. SAFER:  It's in the notebook that I have provided

9   to counsel before this examination at Tab 3.

10          MR. BAZAREK:  No.  No objection, Your Honor.

11          THE COURT:  All right.  And it's no objection to the

12  admission, not just the publication; is that right?

13          MR. BAZAREK:  No objection, Judge.

14          THE COURT:  All right.  So it's deemed admitted, and

15  you can publish to the jury.

16      (Plaintiff's Exhibit No. 87 was received in evidence.)

17          MR. SAFER:  Thank you, Your Honor.

18  BY MR. SAFER:

19  Q.   Mr. Oliver, I'm showing you what has been marked as

20  Plaintiff's Exhibit 87.

21          This is the report on the seizure of drugs from

22  Clifford Frazier's home.

23          Do you recognize that?

24  A.   Yeah.  I know what a supplemental report is, yes.

25  Q.   Yeah, you've seen this before, correct?

Oliver - direct by Safer

1824

1  A.  Yes, you know --

2  Q.  I'm sorry.  Did I interrupt you?

3  A.  No, no, no, no.  It was -- I've seen it, you know,

4  maybe -- I don't know when I seen it, but I've seen the

5  report.

6  Q.  Okay.  It was -- if you look at the bottom, you will see

7  that it was -- this was done by the 3rd District police

8  officers, correct?

9  A.  Yes.

10  Q.  And it was sent to Area 2 detectives, right?

11  A.  Right.

12  Q.  And to gangs -- gang intelligence, which would have been

13  gang crimes, correct?

14        MR. BAZAREK:  Objection.

15  BY THE WITNESS:

16  A.  Correct.

17        THE COURT:  Overruled.

18  BY MR. SAFER:

19  Q.  I'm sorry, you said "correct," Mr. Oliver?

20  A.  Yes.

21  Q.  And you believed that the 3rd District officers sent this

22  over to gang crimes, in essence, to show you up that they, not

23  you, recovered these drugs, right?

24  A.  Yeah, it was -- you know, I guess, yeah, they just -- they

25  just -- they did this report.  They did this, and I had

Oliver - direct by Safer

1825

1 nothing to do with it.

2 Q.  And you believe that they sent this as sort of chest

3 pounding on their part, right?

4 A.  Oh, I don't -- I don't know that.  They could have, but I

5 think they sent it to gang intelligence -- gang crimes simply

6 because they know that I had been to the hospital to talk to

7 Frazier.

8 Q.  Okay.  Well, let me ask you if at your deposition you were

9 asked these questions, and did you give these answers at

10 Page 83, Lines 8 through 16:

11        "QUESTION:  Do you know why a copy of this report was

12 shared with the gang unit?

13        "ANSWER:  Oh, I didn't curse them out because I get

14 loud with it, and they basically probably was to send this up

15 to show me off, you know, to show that they recovered this.

16 That's all it's used for.

17        "QUESTION:  There's a little bit of chest pounding on

18 their part?

19        "ANSWER:  Probably.  Probably."

20        That was your view of this, right?

21        Well, did you give those -- were you asked -- did you

22 give those answers to those questions?

23 A.  Yes, I probably did.

24 Q.  And that was your view of this, right?

25 A.  Yes.  Yes.

Oliver - direct by Safer

1826

1   Q.  Okay.  Now I would like to ask you --

2        MR. SAFER:  So, Your Honor, we'll pull down that

3   exhibit.

4        THE COURT:  The exhibit is coming off the screen, and

5   the jurors will be able to see the witness.

6        MR. SAFER:  Thank you, Your Honor.

7   BY MR. SAFER:

8   Q.  Now, Mr. Oliver, when you went to J&J's -- so let me back

9   up for a second.

10        After you -- after you got through with Mr. -- with

11  Officer Willis, you turned and went into J&J's, correct?

12  A.  Yes.

13  Q.  And you participated in Edna Williams' arrest, didn't you?

14  A.  No.

15  Q.  Okay.

16        MR. SAFER:  I could -- Your Honor, can I show

17  Mr. Oliver Plaintiff's Trial Exhibit 16, which has been

18  admitted into evidence.

19        THE COURT:  Okay.  You absolutely can.

20        MR. SAFER:  Thank you, Your Honor.

21        THE COURT:  It's in evidence.

22        So the screen now shows Exhibit 16.  Go ahead,

23  please.

24  BY MR. SAFER:

25  Q.  Do you see this as an arrest report of Edna Williams on

Oliver - direct by Safer

1827

1   September 29th, 1994?

2   A.  Yes.

3   Q.  And you are listed as one of the arresting officers,

4   right?

5   A.  Yes, I -- I'm listed also arresting -- yeah, yeah, I see

6   that.  Yeah, I'm on the list.

7   Q.  So there are people -- if you go further on on that same

8   line, there are people who are listed as on scene, correct?

9   A.  Yeah, I see that.  Yeah.

10  Q.  But you are not listed as being on scene; you are listed

11  as being part of the arrest, correct?

12  A.  Yes, it shows that -- that Hampton and Oliver, which is

13  his boss -- Hampton, I was not working with Hampton.

14  Q.  Right.

15  A.  I was working with [inaudible].

16          MR. SAFER:  He was working with T. Anderson, he said.

17          THE WITNESS:  Right.

18  BY MR. SAFER:

19  Q.  So, yeah, Officer Willis gets your partner's name wrong,

20  right?  He thinks your partner was Hampton when your partner

21  in fact was T. Anderson, correct?

22  A.  Right.  Right.

23  Q.  But you are listed as participating in Edna Williams'

24  arrest, correct?

25  A.  That's what this arrest lists, but I was not there.

Oliver - direct by Safer

1828

1   Q.   Okay.  Now, let's talk about your conversation with

2   Anthony Williams at J&J.

3            When you went to J&J's restaurant, Anthony Williams

4   was there, correct?

5   A.   Right.

6   Q.   And you were familiar with Anthony Williams because you

7   had stopped him a couple of times on the street, correct?

8   A.   Yes.

9   Q.   You stopped him because word was that he was a dope

10  dealer, correct?

11  A.   Yes.

12  Q.   But you didn't know anything more about him, that there

13  was a rumor that he was a dope dealer, correct?

14  A.   Right.

15  Q.   Had he done anything to cause you to stop him when you

16  stopped him?

17  A.   I don't recall.  I don't recall.

18  Q.   But at any rate, you had stopped him a couple of times, so

19  you knew who he was, correct?

20  A.   Yes.  Yes.

21  Q.   And when you came in to J&J's restaurant, Anthony Williams

22  was cleaning up blood, correct?

23  A.   Yes.

24  Q.   And you -- he was alone?

25  A.   Yes, I did not see anyone else there in the restaurant.

Oliver - direct by Safer

1829

1    Q.  So it was you, your partner T. Anderson, and Anthony

2    Williams, correct?

3    A.  I don't think T came into the restaurant.

4    Q.  Okay.

5    A.  It was just me and --

6    Q.  So it's just --

7           THE COURT REPORTER:  I'm sorry?

8    BY THE WITNESS:

9    A.  It was just me and Ant -- Anthony William.

10   BY MR. SAFER:

11   Q.  Okay.  By this time, you knew that there had been two

12   people murdered, correct?

13   A.  Yes.

14   Q.  You knew that there was a third person, Clifford Frazier,

15   who had been shot, correct?

16   A.  Yes.  Yes.

17   Q.  You knew that Anthony Williams was the drug buyer in this

18   2-kilo drug deal, right?

19   A.  I assumed that, yes.

20   Q.  Well, you had -- Clifford Frazier told you that, right?

21   A.  Right.  Right.  Right.

22   Q.  Did you ask Anthony Williams about what he did that night?

23   A.  No.  No.  No.

24   Q.  Did you ask Anthony Williams about whether he met with

25   anybody that night?

Oliver - direct by Safer

1830

1   A.  No.

2   Q.  Did you ask Anthony Williams about whether he knew

3   Clifford Frazier?

4   A.  No.

5   Q.  Did you ask Anthony Williams whether he knew Derrick

6   Frazier?

7   A.  No.

8   Q.  Did you ask Anthony Williams whether he knew Irving Fraz-

9   -- Irving Clayton?  Sorry.

10  A.  No.

11  Q.  You said that you went into J&J because you wanted to see

12  what had transpired that night, correct?

13  A.  Yes, could have.

14  Q.  Did you ask Anthony Williams whether he had any

15  involvement that night?

16  A.  No.

17  Q.  Did you ask Anthony Williams what he saw that night?

18  A.  No.  No.  I don't think so.

19  Q.  Did you ask Anthony Williams who he was with that night?

20  A.  No.

21  Q.  Why not?

22  A.  Well, Anthony William was a -- a very coy person.  You

23  just wasn't going to get answers out of him like that, you

24  know, he wasn't going to tell you nothing, and I knew that.

25  So --

Oliver - direct by Safer

1831

1   Q.  So you --

2   A.  So when I -- when I walked into the restaurant and

3   started, you know -- I asked him what had happened, and he

4   just told me that a guy came in bleeding, and he told him he

5   had to get out of there.  And that's -- that's the only thing

6   that -- that he said to me.

7   Q.  Did you ask him what he was doing earlier that evening?

8   A.  No.  No.  No.

9   Q.  So you didn't ask him because you didn't think he would

10   tell you; is that right?

11   A.  Right.

12   Q.  But isn't part of police investigation asking questions

13   and getting answers whether they are true or not?

14   A.  That could be.  That's the way some policemen do it.

15   Q.  In fact, if Anthony Williams had told you things that you

16   could later prove to be false, that would be powerful evidence

17   against Anthony Williams, correct?

18   A.  I assume.

19   Q.  It is important, you have said, to lock interviewees into

20   a story, right?

21   A.  Yeah, I -- I didn't interview him.  I didn't -- you know,

22   he didn't tell me nothing.  And I didn't ask him no more than,

23   you know -- basically, you know, that when I walked in, I saw

24   him cleaning up blood.  So that's -- that was the extent of

25   the conversation.

Oliver - direct by Safer

1832

1  Q.  Right.  So I understand that.  Now I'm asking you

2  questions about why.

3        You have testified that it is important to lock

4  interviewees into a story, correct?

5  A.  Right.

6  Q.  Because that way, even if they tell you a lie, it helps

7  the investigation, correct?

8  A.  Yes.  Yes, but --

9  Q.  You can --

10  A.  -- I was not -- I was not the -- the investigator.  I was

11  not responsible for this investigation.  You know, that was --

12  that did not fall in -- fall on me, you know, when you're

13  talking about homicides, you know, of this nature, and I knew

14  that Area 2 was there and on the scene.  You know, so I -- I

15  was not that much concerned with it.

16  Q.  You were talking to Anthony Williams, correct?

17  A.  Yes.

18  Q.  What was your purpose in talking to Anthony Williams?

19  A.  I went there -- I went across the street basically to see

20  who was there and what had happened.

21  Q.  Right.  And so if you asked Anthony Williams a question,

22  and he told you something that was false, you could test that

23  against objective evidence, right, sir?

24  A.  I assume.

25  Q.  So, for example, if Anthony Williams said he didn't know

Oliver - direct by Safer

1833

1   Clifford Frazier, and then Anthony Williams' phone records

2   showed that he talked to him all the time, that would be

3   helpful evidence against Anthony Williams, right?

4   A.  Yeah, I didn't think about no phone records or nothing

5   like that.

6   Q.  Yeah, but did you think about locking him into a story

7   that could be used later?

8   A.  No, I didn't -- I didn't think about -- I didn't think

9   that -- locking Anthony William into anything.

10  Q.  Okay.  Because it wasn't -- in your view, this

11  investigation wasn't your responsibility.  Is that what you're

12  telling the ladies and gentlemen of the jury?

13  A.  No.  No, it was not my responsibility.  No, it didn't

14  fall -- it was not my responsibility.

15  Q.  Okay.

16  A.  I was not --

17  Q.  Where are your notes, sir, of your interview of Anthony

18  Williams?

19  A.  I didn't take any notes.

20  Q.  How were you going to remember months later, let alone

21  years later, what Anthony Williams told you?

22  A.  You know -- yeah, I remember what he said, I mean,

23  about -- basically because he didn't say anything, you know.

24  Q.  Where are your notes of your interview with Clifford

25  Frazier who did say things?

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 69 of 111 PageID #:19100
Oliver - direct by Safer
1834

1  A.  I didn't have to -- I didn't take any notes, didn't have

2  to take no notes.  What Clifford was -- what he told me, I

3  relayed that to Baker.

4  Q.  In fact, sir, you have not written --

5          THE COURT:  I'm sorry, I think his lips were still

6  moving there.  I think he was saying something.

7          Go ahead, sir.  Were you done?

8          THE WITNESS:  Yes.  Yes, I'm done.

9          THE COURT:  Go ahead.

10          MR. SAFER:  Sorry, Your Honor.

11          THE COURT:  That's okay.

12  BY MR. SAFER:

13  Q.  In fact, sir, you did not write a single report about

14  anything you did related to any of these crimes, right?

15  A.  Right, I did not.

16  Q.  And you didn't take a single note of a single witness

17  interview, did you?

18  A.  No.

19          THE COURT:  Officer Oliver, we take -- this is

20  Judge Seeger.  We take a midmorning break every day, and it's

21  11:00 o'clock now.  It's time for our midmorning break.  So

22  what we typically do is, stretch our legs for 10 or 15

23  minutes, we get a drink of water, and then we get rolling

24  again.

25          So why don't you stretch your legs, sir, take a

1835

1    minute, and we'll come back shortly.  Okay?

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  All right.

4            THE COURT SECURITY OFFICER:  All rise.

5        (Jury out.)

6            THE COURT:  All right.  A couple quick things, and

7    then we can take our break.

8            A couple times, but only a couple times, I think he

9    was still giving his answer.  It's difficult by audio and

10   video to time it.  Overall, I think it -- overall, I think

11   that worked pretty smoothly and seamlessly.  There was just

12   like a time or two.  I didn't mean to interrupt you there, but

13   it looked to me like he was still answering.

14           It's hard enough to do this in person, let alone

15   audio.  So that was the reason for interjecting there.

16           I don't typically interject to critique questions.

17   There were just a couple questions in a row where there was a

18   double negative baked in, and you want a clear record, you

19   want a clear record, everybody wants a clear record.  So that

20   was the reason for that.

21           I think -- overall, though, I think this is going

22   pretty smoothly and seamlessly.  People may disagree with

23   that.

24           Mr. Safer, any -- I know that you want him here, and

25   I understand that.  But from a logistical or presentation

1836

1    perspective, is there any way this could go better, do you

2    think?  Because I'm all ears.

3         MR. SAFER:  I don't -- I don't have any suggestions

4    to make it better, Your Honor.  I think -- you know, I

5    appreciate the -- you stopping me from interrupting him.  I'll

6    try and do a better job of waiting.  And I appreciate your

7    correcting my bad questions.

8         THE COURT:  Well, the -- the questions were good.

9    There was just a question or two where it was potentially

10   unclear.  And I think you've done a very effective job at

11   pausing between each question and answer.  It's very difficult

12   for lawyers when you get in a flow, when somebody is

13   answering, you're thinking about the next question, and

14   it's -- it's hard not to kick it out.  I think overall,

15   though, you did not trip him up very many times, and I thought

16   Mr. Bazarek rightly noted that one time that he was still

17   answering.

18        So let's be mindful of that going forward.  But,

19   overall, I think that's going smoothly.  So let's take ten

20   minutes, folks, and then we'll come back.

21        (Recess had from 11:03 a.m. until 11:17 a.m.)

22        THE COURT:  One quick suggestion.  I'm always leery

23   of injecting myself too much in a Q and A because it's

24   distracting for the lawyer.  All of a sudden a judge is

25   talking, and it's distracting for the jurors.  I think it

1837

1 would be useful for you to tell your technician to take the

2 exhibit down when you're done with using it, because I do

3 think the default rule should be the jurors see the witness on

4 their screen unless you're actively using the exhibit.

5 They'll be more engaged that way anyway because they want to

6 see the person, not the exhibit.

7      I thought about saying more on the record the jury is

8 now seeing this, the jury is now seeing that.  But that's not

9 too often, and I don't want to knock you off, and I don't want

10 to inject myself because you're trying to have a

11 back-and-forth with the witness.  But that might be a good

12 thing to do.  Maybe you and your technician could get in a

13 rhythm or you could just be in charge of telling the

14 technician.  But I didn't want to say too much because I

15 thought it would throw things off.

16      MR. SAFER:  Thank you.

17      THE COURT:  The other thing I would say, I need to

18 correct myself on one thing, when I talked about the seating

19 in the courtroom, I said somebody from the plaintiff should

20 sit in the first row all the way to the left, somebody from

21 the defendants should sit all the way on the right in the

22 first row.  I forgot that that's right in front of the video

23 screen on the right.  So if the defense team wants to have one

24 person for an overflow, you can sit immediately to my right

25 underneath the thermometer six feet behind Ms. Boudreaux, but

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 73 of 111 PageID #:19104
Oliver - direct by Safer
1838

1     not in front of that video screen.

2          So, in other words, the gallery on the left will have

3     three jurors plus one person all the way to the left.  The

4     gallery on the right will have three jurors and only three

5     jurors.  The extra overflow seat will be right next to the

6     technician, right next to the thermostat and behind

7     Ms. Boudreaux.

8          That sounds like a Berenstein Bears book there,

9     through the fence, down the -- you know what I'm talking

10    about?

11         MR. SAFER:  Yes.

12       (Jury in.)

13         THE COURT SECURITY OFFICER:  All rise.

14         THE COURT:  All right.  You may be seated.  Welcome

15    back.

16         Counsel, whenever you're ready.

17         MR. SAFER:  Thank you, Your Honor.

18         Your Honor, I would move into evidence Plaintiff's

19    Exhibit 99, which are Mr. Oliver's training records and are

20    not objected to.

21         THE COURT:  Any objection?

22         MR. BAZAREK:  No, Your Honor.

23         THE COURT:  Admitted.  You can publish to the jury.

24       (Plaintiff's Exhibit No. 99 was received in evidence.)

25    BY MR. SAFER:

Oliver - direct by Safer

1839

1  Q.  Mr. Oliver, I am showing you what has been marked as

2  Plaintiff's Exhibit 99.  And if you want to see -- I think

3  it's only one page.

4         Are those your training records from the Chicago

5  Police Department?

6  A.  Yes, I assume.  Yes.

7  Q.  Okay.  And then one other odd and end.  You understood

8  that if you observed police misconduct, you had a duty to

9  report it; is that correct?

10  A.  Police misconduct?

11  Q.  Yes, sir.

12  A.  Yes.

13  Q.  And you did not do that at any time related to this

14  investigation, correct?

15  A.  No, I did not report anything.

16  Q.  Okay.  Let me ask you a few questions about Cynthia

17  Steward.  Clifford Frazier gave you Cynthia Steward's phone

18  number when you talked to him at the hospital the night of

19  these murders, correct?

20  A.  I'm not certain was it Cynthia Steward or not.

21  Q.  It was the fiancée of Irving Clayton, correct?

22  A.  No, I don't know that.  I assumed it was his brother's

23  girlfriend number that I got.

24  Q.  Okay.  Well, you got the number -- he gave you the number

25  of one of their girlfriends, correct?

Oliver - direct by Safer

1840

1   A.   Right, I would say that.

2   Q.   And you spoke with her, correct?

3   A.   Yes, I believe I spoke to her the next day or so.  Yes.

4   Q.   You claim that you never saw her in person?

5   A.   No, I never saw her.

6   Q.   But, in fact, sir, after you left J&J's, you went to

7   Cynthia Steward's home, didn't you?

8   A.   No.

9   Q.   Cynthia Steward told you that this may have been a gang

10  hit against Ledell Clayton and Derrick Frazier, right?

11  A.   No.

12  Q.   And Cynthia Steward gave you the names of people who might

13  have carried out the hit, correct?

14  A.   No.

15  Q.   You had her point out the addresses of those people,

16  right?

17  A.   No.

18  Q.   And you had her lay on the backseat of the car when you

19  passed other police officers, didn't you?

20  A.   No.

21  Q.   You asked Cynthia Steward if there was money or drugs at

22  her home?

23  A.   No.

24  Q.   She told you there was $100,000 at Derrick Frazier's

25  mother's house, right?

Oliver - direct by Safer

1841

1    A.  No.

2    Q.  She also told you that Clifford Frazier used to shoot dice

3    with Anthony Williams, right?

4    A.  No.

5    Q.  Please tell the members of the jury what a gang specialist

6    daily activity summary report is.

7    A.  It's just basically activity showing what you did, you

8    know, basically that day, what district you was in.

9    Q.  And what you did that day, correct?

10   A.  Right, what you did, what -- you know, what activity that

11   you was in and what district that you was in, really.

12        MR. SAFER:  All right.  Your Honor --

13   BY THE WITNESS:

14   A.  What calls did you answer.

15   BY MR. SAFER:

16   Q.  I'm sorry, I didn't catch that last part partially because

17   I interrupted you.  Sorry.  Could you repeat that one more

18   time.

19   A.  What calls -- what in-progress call that you -- that you

20   responded to.

21        MR. SAFER:  Your Honor, I would move into evidence

22   and ask to publish Plaintiff's Exhibit 21, which, I believe --

23   to which I believe there's no objection.

24        THE COURT:  Any objection?

25        MR. BAZAREK:  No objection, Your Honor.

Oliver - direct by Safer

1842

1    THE COURT:  All right.  It's admitted.  You can

2    publish.

3        (Plaintiff's Exhibit No. 21 was received in evidence.)

4    BY MR. SAFER:

5    Q.  I'm showing you what has been marked as Plaintiff's Trial

6    Exhibit 21.  Is that a gang specialist daily activity summary

7    report?

8    A.  Yes, I guess.  Yes.

9    Q.  And for -- it talks about the tour of duty, the date.  Do

10   you see that?

11   A.  Yes.

12   Q.  And then "Assigned Target/Objective," right?

13   A.  Yes.  Yes.

14   Q.  And then for activity, it says, [as read] "Briefly

15   describe the nature of any investigations, either assigned or

16   self-initiated, including arrests or other activity."  Right?

17   A.  Yes.

18   Q.  And it says, "This is not an investigative report and will

19   not include information normally contained on official

20   Department reporting documents.  Attach copies of any

21   initiated reports and submit to the supervisor at the

22   conclusion of the tour of duty," right?

23   A.  Yes.

24   Q.  And then it leaves a bunch of spaces for you to complete

25   that report, right?

Oliver - direct by Safer

1843

1  A.  Yes.

2  Q.  And then there's signatures at the bottom -- or --

3  A.  Yes.

4  Q.  -- rather, a place for signatures at the bottom, correct?

5  A.  Yes.  Yes.

6  Q.  And it is to be completed each day, right?

7  A.  Yes, basically.  Yes.

8  Q.  You did not complete a gang crimes activity report for

9  January 29th, 1994, did you?

10        MR. SAFER:  We could take that down now.

11  BY THE WITNESS:

12  A.  No, I wouldn't have -- I would not have completed it no

13  way.  My partner Anderson would have.

14  BY MR. SAFER:

15  Q.  Your partner did not complete a gang crimes activity

16  report for January 29th, 1994, did he?

17  A.  I don't know.  I don't know did he --

18  Q.  Well, you would sign that report if he -- if he created

19  it, wouldn't you?

20  A.  Well, he would have signed it.  You know, if he turned in

21  a report, he would have signed it.  He probably would have

22  signed my name to it, I guess.

23  Q.  Oh, so you -- is it your testimony you didn't sign the

24  reports yourself; he signed for you?

25  A.  I don't recall -- I don't recall me signing that many

Oliver - direct by Safer

1844

1   reports.  Whoever did -- you know, we was partner, and if he

2   signed -- if he made the report, he would sign it, and that's

3   basically what I recall about it.

4   Q.  You didn't see -- you don't recall signing or seeing that

5   many reports because neither you nor your partner submitted

6   reports, did you?

7             MR. BAZAREK:  Objection.  Foundation.

8             THE COURT:  Overruled.

9   BY THE WITNESS:

10  A.  I did not -- I don't recall seeing or signing that report.

11  BY MR. SAFER:

12  Q.  So you don't -- you didn't see or sign any report for

13  January 29th, 1994, right?

14  A.  I don't recall --

15  Q.  You didn't --

16  A.  -- seeing or signing no report.

17  Q.  You did not see or sign any report for January 30th, 1994,

18  did you?

19  A.  I don't recall.

20  Q.  You don't recall seeing or signing any activity report for

21  anything related to this investigation; isn't that true?

22  A.  I don't recall, no.

23  Q.  Was there a reason why you didn't want anyone to know what

24  you were doing on January 29th and 30th, 1994?

25  A.  No.

Oliver - direct by Safer

1845

1   Q.  The next day, January 30th, 1994, you and Detective Karl

2   returned to Cynthia Frazier -- Cynthia Steward's home,

3   correct?

4   A.  Me and who?

5   Q.  Detective Karl.

6   A.  No, no.

7   Q.  You went to her home, and you asked her about a safe

8   deposit or a locks box key, right?

9   A.  No.

10   Q.  She gave you the keys and told you that she believed they

11   were keys to a lockbox, right?

12   A.  No.

13   Q.  And she gave you the location of that lockbox, didn't she?

14   A.  No.

15   Q.  She gave you keys to a lockbox in Derrick Frazier's

16   mother's house that had a hundred thousand dollars in it,

17   right?

18   A.  No.

19   Q.  And you don't recall filling out a gang crimes activity

20   report for January 30th, 1994, that day, right?

21   A.  No.

22   Q.  And you have never seen a gang crimes activity report for

23   January 30th, 1994, right?

24   A.  No, I don't recall.

25   Q.  Okay.  Let me talk to you about photographs for a minute.

Oliver - direct by Safer

1846

1    You understood that in 2018, in this case, we

2    requested a photograph of you as you appeared around -- in or

3    around January 29th, 1994, or as close to that date as

4    possible, right?

5    A.   I don't know that.  I'm uncertain about that.

6    Q.   Okay.  Well, let me ask you to look in your book at Tab 9.

7    And behind that tab will be Plaintiff's Trial Exhibit 139.

8    A.   Okay.  I'm at 139.

9    Q.   Okay.  Do you see that as a -- as your response to a

10   second set of requests for production of documents?  Do you

11   see that?

12   A.   "Defendant Oliver had been unable to locate any photograph

13   in here."  Yes.  Yes.

14   Q.   Okay.  Does that refresh your recollection that you were

15   asked to look for photographs of you in and around that time?

16   A.   Yes.

17   Q.   But you did not provide such a picture, did you?

18   A.   No, I didn't have one.

19   Q.   You had no photograph of yourself, personal, professional,

20   of any time in 1993, 1994, 1995, 1996?  Is that your

21   testimony?

22   A.   Yes, I don't recall having a photo back then.

23   Q.   Nothing --

24   A.   I didn't have that in my possession.  I didn't have that

25   in my possession.

Oliver - direct by Safer

1847

1    Q.  You have no family photographs during that time period?

2    A.  I don't recall, no.

3    Q.  Isn't it a fact, sir, that you did not want witnesses like

4    Cynthia Steward to be able to identify you?

5    A.  I didn't -- I didn't care anything about anybody

6    identifying me.  I just didn't have a photo.

7    Q.  Okay.  If you could take a look at Plaintiff's

8    Exhibit 191, which is in evidence.

9    A.  Where would I find that?

10   Q.  It would be behind Tab 10.

11   A.  Tab 10.

12   Q.  But we could show it on the screen for you.

13   A.  Okay.  Yes.

14   Q.  That last page of that exhibit is your personnel record,

15   correct?

16   A.  Right.

17   Q.  And that's the photograph that the personnel department

18   had of you, correct?

19   A.  Right.

20   Q.  A pretty bad picture, right?

21   A.  Yeah.

22   Q.  You can't really tell who that is, correct?

23   A.  Right.

24   Q.  Okay.  Now, if you would look at Plaintiff's Exhibit --

25   just behind your tab in -- behind Tab 11, Plaintiff's

Oliver - direct by Safer

1848

1  Exhibit 67.

2  A.  Right.

3  Q.  Is that you in that photograph to the far right?

4  A.  Yes.

5  Q.  Is that how you appeared in 1996 or 1997?

6  A.  I don't know that, but -- I don't know when it was taken,

7  but, yeah, that's me.

8  Q.  Yeah.  And is that -- did you appear -- is that about --

9  is that how you appeared in about this time frame?

10 A.  I would assume.  I have not changed no more, you know, now

11 that I've lost a lot of weight, but, yes, that's me.  And I

12 don't know when that was taken.

13 Q.  You didn't provide this photo, did you, sir?

14 A.  No.

15 Q.  Okay.  You believe that Clifford Frazier was not

16 prosecuted because the police officers who dealt with him that

17 night did not know what they were doing.  Is that your

18 testimony?

19 A.  I don't know -- my testimony is, is that they was not

20 handling the evidence correctly.  That's my testimony.

21 Q.  And you didn't want to do anything -- you didn't want to

22 have anything to do with that arrest, correct?

23 A.  No.  No.  At that point, no.

24 Q.  No -- or did you want to have anything to do with that

25 arrest?

Oliver - direct by Safer

1849

1   A.   No.

2   Q.   Okay.  You have worked with cooperating witnesses who have

3   been charged with crimes, right, sir?

4   A.   I would think over the years, yes.

5   Q.   And in those situations, the state's attorney or the

6   Assistant United States State's Attorney in the federal system

7   works out a plea agreement with that cooperating witness,

8   right?

9   A.   Yes.

10  Q.   And then everybody knows what the deal is, and the witness

11  has to -- gets a -- if they tell the truth, they get a

12  decrease in their sentence, correct?

13  A.   Yes.

14  Q.   And that is a powerful incentive to get these cooperating

15  witnesses to continue to cooperate with law enforcement,

16  right?

17  A.   Yes.

18  Q.   But the benefit of that, doing it that way, is that then

19  the judge decides whether or not the witness has told the

20  truth, and the judge imposes the sentence, correct?

21  A.   Yes, the judge basically got the final say-so.

22  Q.   Right.  If the person is never charged but could be

23  charged -- well, let me -- let's take it out of the

24  hypothetical range.

25          The only persons Clifford Frazier had to please in

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 85 of 111 PageID #:19116
Oliver - direct by Safer
1850

1    this situation was the police officers because they could

2    charge him whenever they felt like it, correct?

3              MR. BAZAREK:  Object to the form of the question.

4    Foundation.

5              THE COURT:  Overruled.

6    BY THE WITNESS:

7    A.   The police officer could charge him, but they got to come

8    through the state's attorney --

9    BY MR. SAFER:

10   Q.   Right.

11   A.   -- because it's a felony.

12   Q.   But nothing gets -- nobody gets charged unless the police

13   initiate the charge, correct?

14   A.   Right.  Right.  Right.

15   Q.   And any of the detectives in this case could have

16   initiated charges against Clifford Frazier, correct?

17   A.   Yes, I guess.  Yes.

18   Q.   And so the only person -- the only people in that

19   situation with Clifford Frazier being uncharged that he had to

20   please are those officers, correct?

21   A.   Okay.  Yes.

22   Q.   Okay.  Now, let me ask you, sir, have you ever in -- how

23   long have you -- were you with the police force?

24   A.   20-something years, 29, 28, 29 years.

25   Q.   Have you ever seen a person who committed the magnitude of

Oliver - direct by Safer

1851

1  the crimes that Clifford Frazier committed, that is, engaging

2  in a 2-kilo deal, bringing two automatic weapons to that deal,

3  emptying an automatic weapon on a city street, storing kilos

4  of drugs and 30 guns for a drug operation, all with the

5  knowledge of the police?  Have you ever seen such a person go

6  free?

7         MR. BAZAREK:  Object to the form of the question.

8  Foundation.  Speculation.

9         THE COURT:  Overruled.

10  BY THE WITNESS:

11  A.  No, but I did not see all of that.  I did not know all of

12  that.  He did not tell me that he was -- he had guns and all

13  of that.  I didn't know anything about that.

14  BY MR. SAFER:

15  Q.  Understood.  But the answer to the question was no, you've

16  never seen that happen, correct?

17  A.  No.

18  Q.  Have you ever seen that happen?

19  A.  No, no.

20  Q.  Okay.  Another topic now.  Were you ever present at a

21  police station when you saw Clifford Frazier talking to an

22  Internal Affairs officer?

23  A.  No.

24  Q.  Did you threaten Clifford Frazier if you saw him talking

25  to an Internal Affairs officer?

Oliver - direct by Safer

1852

1    A.   No.

2    Q.   Now, let's talk, sir, about the lineup.

3         You said earlier you had -- after the first night,

4    you had nothing to do with this investigation, correct?

5    A.   Basically, no.

6    Q.   But you called Clifford Frazier to come to the lineup,

7    right?

8    A.   Yes, I called -- I called him, but I don't think -- I know

9    I didn't talk to him, but whoever answered the phone, and he

10   was not there.  They say he wasn't there.

11   Q.   So he wasn't there?  Who did you talk to?

12   A.   I don't know.  I don't know.

13   Q.   And what did you say to that person?

14   A.   I asked for Frazier.

15   Q.   And what happened?

16   A.   They said he wasn't there.

17   Q.   But you were given the assignment to call him and get him

18   to come to the lineup, right?

19   A.   Well, I was asked to -- to get in touch with him, yes.

20   Q.   Who asked you to do that?

21   A.   I'm not sure, but it was somebody from Area 2, you know --

22   Q.   Who did you talk to --

23   A.   -- violent crimes.

24        I don't know who I spoke with now, you know, but it

25   was someone, an investigator from there.  It could have been

Oliver - direct by Safer

1853

1    Baker, Pesavento, you know, or someone.

2    Q.   Do you --

3    A.   They said that there was a lineup, and they wanted him

4    there.

5    Q.   And they asked you to make that call?

6    A.   Yes, they asked me to --

7    Q.   Even though --

8    A.   -- get him.

9    Q.   -- according to you, you had no contact with this

10   investigation after the first day?

11   A.   Right, I didn't have anything to do with it past then.

12   Q.   Who at Area 2 do you recall talking to at any time about

13   anything regarding this investigation?

14   A.   If I talked to anybody, it would have more than likely

15   been Baker or Pesavento.

16   Q.   Okay.  Now, had you talked to Clifford Frazier since you

17   talked to him at the hospital?

18   A.   I don't recall talking to him, you know, past that.  I saw

19   him once in person at the grand jury.  That was about it.

20   Q.   How did -- at the regular jury; is that right?

21   A.   At the what now?

22   Q.   At the jury trial, correct?

23   A.   No, no.  I saw him at the grand jury.

24   Q.   Did -- do you believe that he testified in front of the

25   grand jury?

Oliver - direct by Safer

1854

1   A.  Well, I would assume.  He was there.  I don't know did he

2   testify or not.

3   Q.  And you didn't testify in front of the grand jury, right?

4   A.  No, no.

5   Q.  So you don't know who testified in front of the grand

6   jury?

7   A.  No, no.

8   Q.  Okay.  How did you know how to contact Clifford Frazier?

9   A.  I had a telephone number that he had given me I guess when

10  we was at the hospital.

11  Q.  But this is the only time you used that, to call him for

12  the lineup?

13  A.  I believe so, yes.

14  Q.  Did you tell -- so you never talked to Clifford Frazier;

15  is that your testimony?

16  A.  Yes, I didn't talk to him that day.  I did not talk to

17  him.

18  Q.  Now, you -- did you ever tell Clifford Frazier that the

19  police had a suspect that they had arrested?

20  A.  Oh, no.  No.

21  Q.  You say it like that; why wouldn't you tell him that?

22  A.  Why would I tell him that?

23  Q.  Why would you not tell him?

24  A.  I didn't tell him.  I didn't tell him.

25  Q.  At your deposition you said that you did not tell him that

Oliver - direct by Safer

1855

1   there was a suspect because you didn't know there was a

2   suspect that had been arrested, right?

3   A.  I didn't -- I didn't know.

4   Q.  But you knew that there had been a suspect that you wanted

5   Clifford Frazier to view a lineup for, right?

6   A.  Yes.

7   Q.  Police don't hold lineups unless there's a suspect,

8   correct?

9   A.  Yes.  Yes, you're right.

10  Q.  Okay.  How far in advance of the lineup did you call

11  Clifford Frazier?

12  A.  I don't know.  I don't recall.

13  Q.  What time were you instructed to tell Clifford Frazier to

14  come to Area 2?

15  A.  Right away.  I didn't -- what I assume, the lineup -- they

16  just told me to make contact with him and see if we could get

17  him -- could I get him there for the lineup.

18  Q.  And did you have a time to give -- to have him come?

19  A.  No, no.  I don't recall that.

20  Q.  So you just said come to the -- or you were just

21  instructed to say come to the police station whenever?

22  A.  Yeah, tell him to come down to Area 2.

23  Q.  But you had a date and a time, right?

24  A.  Well, the date was the date that I called him, that I

25  would have -- you know, that I was making the call.

Oliver - direct by Safer

1856

1  Q.  So is it your --

2  A.  But what time -- what time was the lineup, I don't know.

3  I didn't recall that.  I don't -- I didn't know.

4  Q.  Is it your testimony that you called him on the day of the

5  lineup to tell him to come to view the lineup?

6  A.  Yes.  Yes.  Yes.

7  Q.  Okay.  Who do you believe -- did you drive Clifford

8  Frazier to the lineup?

9  A.  No.

10  Q.  Who did drive Clifford Frazier to the lineup, to your

11  knowledge?

12  A.  I -- I don't know.

13  Q.  If -- you believe that Charlie Williams drove Clifford

14  Frazier to the police station for the lineup, right?

15  A.  Could have been.  I did not see either one.

16  Q.  Right.  But that's your belief, correct?

17  A.  Yes.

18  Q.  And Charlie Williams is an Internal Affairs -- or was an

19  Internal Affairs Division officer, correct?

20  A.  I believe so.

21  Q.  You did take Clifford Frazier upstairs to Area 2 for the

22  lineup, didn't you?

23  A.  No.

24  Q.  The fact is, you told Clifford Frazier, "We got the guy,"

25  didn't you?

Oliver - direct by Safer

1857

1  A.  No.

2  Q.  And then you walked Clifford Frazier right by Eddie Bolden

3  who was standing with his lawyer, right?

4  A.  No.

5  Q.  Did you talk to -- let me ask you:  You came to Area 2 the

6  day of the lineup, correct?

7  A.  Yes.

8  Q.  So you had had nothing to do with this case since the

9  first day of the investigation, but you came to the lineup,

10  right?

11  A.  I came to Area 2 that morning, that day.

12  Q.  Did you talk to Clifford Frazier the day of the lineup?

13  A.  No.

14  Q.  Did you see Clifford Frazier the day of the lineup?

15  A.  No.

16  Q.  Did you view the lineup?

17  A.  No.

18  Q.  Okay.  So let me see if I understand this.  You called

19  Clifford Frazier to bring him -- to get him to come to the

20  lineup the day of the lineup, right?

21  A.  Yes.

22  Q.  And you came to Area 2 the day of the lineup, right?

23  A.  Yes.

24  Q.  But you didn't talk to Clifford Frazier, right?

25  A.  No.

Oliver - direct by Safer
1858

1    Q.   That's your --

2    A.   No, I did not.

3    Q.   That's your testimony?  You didn't talk --

4    A.   Yes.

5    Q.   -- to him?

6             And you wouldn't talk to a single detective about the

7    lineup, right?

8    A.   No, I didn't -- I didn't talk to him about the lineup.

9    Q.   And you didn't see Mr. Bolden there at all, right?

10   A.   No.

11   Q.   The fact is, sir, you were in that lineup room with

12   Clifford Frazier, weren't you?

13   A.   No.

14   Q.   And you came to Area 2 that day to be included in the

15   arrest of Eddie Bolden, didn't you?

16   A.   No.

17   Q.   Because you knew in advance of the lineup -- excuse me.

18   Let me start again.

19            Because you knew in advance of the lineup that the

20   detectives were going to make sure that Clifford Frazier

21   identified Eddie Bolden, right?

22   A.   No.

23   Q.   And that's why you were there, you were there to be

24   included in the arrest report, weren't you?

25   A.   No.

Oliver - cross by Bazarek

1859

1  Q.  And you were included in the arrest report, weren't you?

2  A.  I don't think so.

3  Q.  Let's look at Joint Trial Exhibit No. 5, which is in

4  evidence.

5       MR. SAFER:  Can we go -- if we can go up to the top,

6  please.

7  BY MR. SAFER:

8  Q.  This is the arrest report for Eddie Bolden, correct?

9  A.  Right.

10  Q.  Okay.

11       MR. SAFER:  Now if we could go down.

12  BY MR. SAFER:

13  Q.  It says -- it describes that Mr. Bolden was arrested that

14  day after he was identified in a lineup, right?

15  A.  Okay.  Yes.

16  Q.  And you are listed as an arresting officer, correct?

17  A.  Yeah, I see my name -- my partner and my name.

18  Q.  And that's what you were doing there that day, because you

19  knew that this arrest was going to happen before it happened,

20  correct?

21  A.  No, I didn't know anything about it.

22       MR. SAFER:  I have nothing further, Your Honor.

23       THE COURT:  Okay.  All right.  Thank you.

24       Defense counsel, whenever you're ready.

25                 CROSS-EXAMINATION

Oliver - cross by Bazarek

1860

BY MR. BAZAREK:

Q.  Good morning, James Oliver.

A.  Good morning, sir.

Q.  How is the weather today in Little Rock, Arkansas?

A.  I don't know.  I didn't pay no attention getting here.

Q.  Mr. Oliver, how old are you?

A.  77.

Q.  Tell the jury where you were born.

A.  Pine Bluff, Arkansas.

Q.  And can you explain where that is in Arkansas, Pine Bluff?

A.  It's about 35, 40 miles, I guess, south from Little Rock, and I was born on a farm.

Q.  So you grew up on a farm, sir?

A.  Yes.

Q.  And what are your parents' names?

A.  My father was named Willie.  My mother was named Ernestine.

Q.  And what did your father do for a living?

A.  He was a farmer.

Q.  Do you come from a big family, sir?

A.  Yes.  I had about 13 sisters and brothers.

Q.  And are you married, sir?

A.  I'm a widow.

Q.  Okay.  And what was your wife's name?

A.  Leonell, L-e-o-n-e-l-l.

Oliver - cross by Bazarek
1861

1    Q.  And when did your wife pass away, sir?

2    A.  '18, 2018.

3    Q.  And your father, he was also a sharecropper in Arkansas;

4    is that right?

5    A.  Yes.

6    Q.  And your mom passed away in 2020, and she lived to be 96

7    years old, right?

8    A.  Right.  Right.

9    Q.  James, you attended school in Arkansas?

10   A.  Yes, I went to Southeast Junior Senior High School in Pine

11   Bluff, Arkansas.

12   Q.  And what year did you graduate from high school, sir?

13   A.  1963.

14   Q.  And sometime in the summer of 1963, you came to Chicago;

15   is that right?

16   A.  Yes.

17   Q.  Had you ever been in the big city before at that time?

18   A.  No.  No.

19   Q.  Tell the jury why it was that you came to Chicago back in

20   1963.

21   A.  I wanted to get a job, and there was not -- there was not

22   nothing to do in Pine Bluff.

23   Q.  So the job prospects in Arkansas weren't that good?

24   A.  Right, back then.

25   Q.  And did you have any relatives living in Chicago back in

Oliver - cross by Bazarek

1862

1    1963 that brought -- that had something to do with you coming

2    here?

3    A.   Yeah, I had an old brother.

4    Q.   And what was his name?

5    A.   William.

6    Q.   And what did William do in the city of Chicago?

7    A.   He was a bus driver.

8    Q.   He worked for the Chicago -- CTA?

9    A.   CTA, yes.

10   Q.   Okay.  So -- and so you just -- you left in 1963, you just

11   graduated from high school, came to Chicago; is that right?

12   A.   Right.

13   Q.   So what happened when you came to Chicago?  What did you

14   do for employment?

15   A.   I worked at Illinois Bell I think until I got 21,

16   something, and then I -- I worked at CTA driving a bus.

17   Q.   Okay.  I didn't ask you this question:  How did you arrive

18   from Arkansas to Chicago back in 1963?

19   A.   Greyhound.

20   Q.   Did you travel by yourself?

21   A.   Yes.

22   Q.   Okay.  James, I know your wife passed away --

23            THE COURT:  I'm sorry, Counsel, your options are

24   Officer Oliver, Mr. Oliver, or sir.  Those are your three

25   options.  Not James.

Oliver - cross by Bazarek

1863

1      MR. BAZAREK:  Okay.

2  BY MR. BAZAREK:

3  Q.  Officer Oliver, I know your wife passed away.  You have

4  children; is that right?

5  A.  Yes.

6  Q.  How many kids do you have?

7  A.  I have four -- we have -- it was five.  One passed.

8  There's four living.

9  Q.  Okay.  Do you have grandchildren, sir?

10  A.  Yes.

11  Q.  Okay.  Did your -- your kids -- when you came to Chicago,

12  did your kids all go to Chicago Public Schools?

13  A.  Yes.

14  Q.  You raised your family in Chicago when you were a police

15  officer?

16  A.  Yes.

17  Q.  When did you leave Chicago, sir?  Or strike that.  Strike

18  that.

19      I'm going to continue on with your employment,

20  Officer Oliver.

21      You became a Chicago police officer over 50 years

22  ago; is that correct?

23  A.  Yes.

24  Q.  And what year was it when you became a police officer?

25  A.  I think it was 1971.

Oliver - cross by Bazarek

1864

1    Q.   Okay.  And then you ended your employment with the Chicago

2    Police Department in 1999; is that correct?

3    A.   Yes.

4    Q.   Okay.  And so you were a police officer for about 28

5    years; is that right?

6    A.   Yes.

7    Q.   And then tell the jury, when you first became a police

8    officer in 1971, did you go to the training academy?

9    A.   Yes.  I went to the training academy at -- I think the

10   address was 720 O'Brien Street.  That's where the academy was

11   then.  And as I recall, my class was the longest one that they

12   had had.  I think we was in the academy about nine months.

13   Q.   And can you just generally describe the training you

14   received in the academy back then.

15   A.   Well, you took a lot of courses, you know, in Illinois

16   Chapter 3rd -- and the law, physical training, and firearm

17   training.  You know, that's basically what the academy consist

18   of.

19   Q.   And so then after the nine months -- what happened after

20   the nine months?

21   A.   I was assigned to the 5th District.

22   Q.   Where is --

23   A.   115th and Indiana.

24   Q.   So the 5th District was your first assignment?

25   A.   Yes.

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 100 of 111 PageID #:19131
Oliver - cross by Bazarek
1865

1   Q.  And then, Officer Oliver, how long did you work in the 5th
2   District?
3   A.  I'm not certain, but I think about six months, seven
4   months.
5   Q.  Okay.  And then when you were in the 5th District, were
6   you a uniform patrol officer?
7   A.  Most of the time, I would say maybe three or four months,
8   I was just regular patrol, and then I went to the tact team.
9   Q.  Okay.  Can you just describe what a uniformed patrol
10  officer does in the Chicago Police Department.
11  A.  The uniform officer is basically assigned different job,
12  like burglary or auto theft, and you just go out and take
13  reports and interview the victim in those type of crime.
14  Q.  So after you spent time, Officer Oliver, as a uniformed
15  officer, you testified that you became a tactical officer in
16  the 3rd District; is that right?
17  A.  In the 5th District, yes.
18  Q.  I'm sorry.  The 5th District.
19          What does a tactical officer do?  How is that
20  different than a uniformed patrol officer?
21  A.  A tact officer basically responds to in-progress calls and
22  -- that's basically what he do, respond to in-progress call
23  and do little follow-up investigation as far as, you know,
24  crime that had been committed, like a burglary, a robbery,
25  stuff like that, try to gather information like that.

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 101 of 111 PageID #:19132
Oliver - cross by Bazarek
1866

1  Q.  Okay.  So advancing in your career, after you served as a

2  tact officer, what would have been your next assignment within

3  the Chicago Police Department?

4  A.  I was assigned to the vice unit, you know, downtown.

5  Q.  Okay.  And then before you -- before you went to vice, how

6  long did you work as a 5th District officer, whether it was

7  tact or uniform patrol?

8  A.  I would say about a year, I guess.

9  Q.  Okay.  So then you're now working in the vice section in

10  the 1970s.  What would have been your next assignment within

11  the Chicago Police Department?

12  A.  Gang intel- -- gang crime.

13  Q.  Gang crime section?

14  A.  Yes.

15  Q.  Okay.  Is there a difference in the police department --

16  there's a gang crime section, but there's also a gang

17  intelligence unit; is that correct?

18  A.  I don't really recall that.  I think that gang

19  intelligence, basically they just changed the name over to

20  gang crime.

21  Q.  Okay.

22  A.  So I just think it was the same thing.

23  Q.  Okay.

24  A.  It was just different.

25  Q.  So tell me, what does -- what does a gang crimes

Oliver - cross by Bazarek

1867

1    assignment entail?

2    A.   You gather information on the different gangs that's in

3    the city of Chicago, and where they operate and where they're

4    located and, you know, things like that.

5    Q.   And what is it that you have to learn about gangs to help

6    you do your job?  What does that mean?

7    A.   Well, you've got to know who is involved.  You've got to

8    know, you know, what they located and what they're doing, you

9    know, how they -- how they operating.

10   Q.   And who -- who was the biggest gangs in the city of

11   Chicago?

12   A.   Gangster Disciple.

13   Q.   Okay.  And who were the Gangster Disciples?

14   A.   They were the biggest gang in the city of Chicago.  The

15   leader of the Gangster Disciple was a guy called Larry Hoover.

16   Q.   What were the Gangster Disciples known for?

17   A.   Narcotics, murder, extortion, basically anything illegal

18   to make money, that's what they was known for.

19   Q.   And was -- were the Gangster Disciples a dangerous and

20   violent street gang?

21   A.   Yes.

22   Q.   Tell me, in the -- with Gangster Disciples, is there --

23   they have different hierarchies in terms of who sits at the

24   top and then below that person?

25   A.   Yes.  You have Larry Hoover, who was the leader of that;

Oliver - cross by Bazarek

1868

1   but from that point down, there was different sections.  You

2   know, let's say from 79th and Ashland to 79th and Damen over

3   to 87th Street, you know, that block would be controlled by,

4   let's say, a governor.  And it's all about them blocking off

5   an area where they would sell narcotics.

6   Q.  So, Officer Oliver, if -- at the top, you'd have Hoover;

7   he'd be the chairman.  Is that correct?

8   A.  Right.

9   Q.  And then under the chairman, you would have a board of

10  directors.  Do I have that right?

11  A.  Board of directors or governors, whatever you call them.

12  Q.  Right.  And the board of directors, they'd be separated by

13  board of directors for street, things that are going on in the

14  street, and also board of directors for what's going on in the

15  prisons, correct?

16          MR. SAFER:  Your Honor --

17          THE COURT REPORTER:  I can't hear you.

18          MR. SAFER:  Your Honor, this is irrelevant.

19          THE COURT:  Let's have a sidebar.

20      (Proceedings heard at sidebar on the record.)

21          THE COURT:  All right.  Folks, so I could be wrong

22  about this.  I don't remember a lot of gang-related testimony

23  on the organizational structure in the direct.  I could be

24  wrong on that.  But why don't you state your objection, and

25  you can respond.

Oliver - cross by Bazarek

1      MR. SAFER:  Thank you, Your Honor.

2      He testified -- there was nothing in the direct about

3   the gangs except to say that he did not investigate and did

4   not know whether this had any -- these crimes had any relation

5   to the gang, which closes the door to all of this evidence.

6      MR. BAZAREK:  Judge, I don't think that's quite right

7   that -- first I'm showing his expertise, and Officer Oliver

8   testified at his deposition that he knew Ant was a big-time

9   dope dealer, and he just couldn't remember at the time

10  whether -- at the deposition, whether he was a Gangster

11  Disciple governor or he was in the El Rukns.  He will testify

12  that he knew that Ant was a governor in the Gangster Disciple.

13  And also, a governor can have someone killed.  This was a gang

14  hit, and it was orchestrated by Anthony Williams, who was a

15  governor, by Eddie Bolden.

16      MR. SAFER:  Your Honor, that's -- I understand that's

17  their theory.  There's no evidence of that.  And more

18  importantly, from this witness, he said affirmatively he did

19  nothing to investigate that.  He didn't know that.  He

20  thought -- his assumption was that it was a robbery, and he

21  did nothing to investigate to the contrary.

22      THE COURT:  Okay.  There are a couple things here.

23  One is whether this is within the scope of the exam from the

24  plaintiff.  Have we talked about whether this person can go

25  beyond the scope?  I mean, is there an issue there?  I mean,

Oliver - cross by Bazarek

1870

1    there's no -- you're okay with that?

2              MR. SAFER:  (Nonverbal response.)

3              THE COURT:  Okay.  Well, he is a gang crimes

4    specialist, so I do think it's fair play for him to talk as a

5    general matter about his understanding of gangs in Chicago and

6    the neighborhood.  I do think that you need to tie it someway,

7    somehow to this particular incident.  I think so far it's been

8    fine because it's part of who this person is.  A general

9    understanding of the gangs in the area, I think that's

10   sufficiently in evidence to be fair play.  But I don't know

11   how much further you can go into it before you can tie it up

12   to this particular -- before you can tie it up to this

13   particular incident.  Okay?

14             The other thing I'd say, and part of the reason I

15   wanted to call a break, we need a break for the senior citizen

16   here relatively soon.  I don't know what the arrangement is in

17   Arkansas for lunch.  So let's go about another ten minutes,

18   okay, or so, give or take.  He's 77 years old.  He's got a

19   medical condition.  You know, that's about an hour.  I just --

20   I don't know what his situation is with medicine.  You know,

21   we don't know the situation.

22             Let's go about ten more minutes.  Okay?  So what

23   you've laid so far is fine, but you've got to tie it up if you

24   want to go much further into it.  Okay.

25        (End of sidebar.)

Oliver - cross by Bazarek

1871

1    THE COURT:  Counsel, you may proceed when you're

2    ready.

3    MR. BAZAREK:  Your Honor, I wasn't sure if we had an

4    answer to the last question.

5    THE COURT:  Why don't you go ahead and restate the

6    question, if you would, or we can have it read back, if

7    necessary.

8    MR. BAZAREK:  Can we read it back, please.

9    (The record was read as requested.)

10   BY MR. BAZAREK:

11   Q.  You can answer.

12   A.  I didn't hear it too good.  I didn't hear the question.

13   (The record was read as requested.)

14   BY THE WITNESS:

15   A.  Yes, I would say yes.

16   BY MR. BAZAREK:

17   Q.  Officer Oliver, under the board of directors, you would

18   have a -- you would have governors; is that correct?

19   A.  Yes, they'll -- they be lower -- top, yes.

20   THE COURT:  Let's get Officer Oliver on the screen so

21   everyone can see him.

22   BY THE WITNESS:

23   A.  I answered the question "yes."

24   THE COURT:  Go ahead, Counsel.

25   BY MR. BAZAREK:

Oliver - cross by Bazarek

1872

1 Q. Officer Oliver, a governor in the Gangster Disciples could

2 order someone killed, correct?

3 A. Yes.

4 Q. Can you just tell the jury just a little bit more about

5 how a governor would control certain geographic areas so they

6 understand that.

7 A. Well, basically that comes from the higher-up. They give

8 them a territory, you know, whatever, a certain area that they

9 could operate in. And they are responsible for selling

10 narcotics in that area. And if someone -- some other gang or

11 whatever intrude on that area, then there's a problem.

12 Q. What's a street tax?

13 A. That's basically what have to be paid back up -- you know,

14 back to the -- you know, get back to Larry Hoover or get back

15 to whoever he's got in charge up above a governor.

16 Q. So if you're a drug dealer and you're not paying a street

17 tax, what could result from that?

18 A. Well, they coming after you. You know, if you -- if you

19 selling dope, you know, you selling narcotics in that area and

20 you're responsible for it and you're not paying, you know,

21 your duties, your street tax, then they going to -- they

22 coming after you.

23 Q. And when you say they're coming after you, what does that

24 mean?

25 A. That means that they could -- if you don't pay, you could

Oliver - cross by Bazarek

1873

1  wind up dead or you could be beat up pretty bad.

2  Q.  As a gang specialist, Officer Oliver, it was your job to

3  learn the inner workings of the Gangster Disciple street gang,

4  correct?

5  A.  Yes.

6  Q.  And could you just tell the jury what you would do to

7  study up on the Gangster Disciples?

8  A.  Well, basically you would do surveillance.  You know, you

9  would -- you know, you would do surveillance and see who was

10  doing what in a certain area, where they was selling narcotics

11  at, what location, and what time they was out there and

12  basically who was involved.

13  Q.  And you knew in 1994 Anthony Williams was a Gangster

14  Disciple, correct?

15         MR. SAFER:  Objection, Your Honor, to the leading.

16         THE COURT:  Sustained.

17  BY THE WITNESS:

18  A.  Yes, I heard that, that he was a Gangster Disciple.

19         THE COURT:  Hang on.  I'm sorry.  So, Officer Oliver,

20  there was an objection to the question, and I sustained it.

21  So that means defense counsel is going to reask you the

22  question in a different format, and then you can answer it

23  again.  Okay?

24         Go ahead, Counsel.

25         THE WITNESS:  Thank you.  Yes, Your Honor.

Oliver - cross by Bazarek

1874

1    BY MR. BAZAREK:

2    Q.   Who was Anthony Williams?

3    A.   He was -- information that we had he was a big dope

4    dealer, and he was a part of it, of the Gangster Disciple.

5    Q.   To your knowledge, what rank did Anthony Williams hold in

6    the Gangster Disciples?

7    A.   A governor.

8    Q.   So Anthony Williams could order someone be executed,

9    correct?

10   A.   Yes.

11       THE COURT:  Mr. Oliver and members of the jury, we

12   are now going to take our midmorning break.  We've been going

13   about an hour, and it's time to give everybody time for some

14   nourishment.  We're going to take about the normal time that

15   we typically take, but with one caveat.

16       Here in the Dirksen Federal Building, we have a nice

17   big cafeteria, as you know, on the second floor that any

18   member of the public could go to.  And for members of the

19   jury, we've been bringing in catered lunch for you folks, and

20   I hope it's something you've found to your liking during the

21   course of the trial.

22       I have to talk offline with Officer Oliver.  He's in

23   a smaller courthouse.  There may not be a cafeteria.  It may

24   surprise you, but a lot of courthouses around the country

25   don't have cafeterias.  You know, for example, in Detroit, I

1875

1    had a case once in Detroit.  You think Detroit, Michigan, big

2    city, right?  They don't have a cafeteria in Detroit.  They've

3    got a little a snack shop where you can go and get some potato

4    chips, but you can't get a meal.

5           The most important person in any courtroom is the

6    witness during testimony.  So we have to make sure that

7    Officer Oliver gets some lunch.  So I'll talk to him offline.

8    Hopefully, there's something pretty close to the courthouse.

9           But my expectation is, we will get rolling about the

10   normal time, maybe just a little bit longer.  But that's a

11   long way of saying enjoy your lunch, we'll be back soon.

12   Okay.

13           THE COURT SECURITY OFFICER:  All rise.

14       (Jury out.)

15           THE COURT:  All right.  We are still on the record.

16           Officer Oliver, this is Judge Seeger.  I'm assuming

17   that the courthouse does not have a cafeteria.  I'm not a

18   hundred percent sure on that.  Maybe it's a newer building

19   with one, but I don't know.  But the main thing that I care

20   about is that you have an opportunity to eat some food here,

21   sir.  So do you know what arrangements are available to you?

22           THE WITNESS:  No, there is no cafeteria here.

23           THE COURT:  Okay.  That's what I expected.  So is

24   there a sandwich shop or something nearby where you can get

25   some food?

1876

1       THE WITNESS:  They're saying there is a sandwich

2   shop.

3       UNKNOWN SPEAKER:  Yeah, there's a lot of restaurants

4   around, fast food.

5       THE COURT:  Okay.  Why don't we do this, Officer

6   Oliver:  Why don't we try to reconvene in about an hour.  If

7   you eat and you're done and you can be back sooner, we'll

8   start sooner.  But I know you've got to leave the building and

9   come back.  So why don't we try to be back and get rolling

10  maybe 1:15 or a little bit later.  If you're back sooner than

11  that, great.  If you leave for lunch and there's a long line,

12  and you don't get your food until 1:05, you know, don't go

13  down.  We want you to have a decent lunch here, sir, and then

14  we'll get rolling when you come back.  Okay?

15      THE WITNESS:  Thank you, Your Honor.

16      THE COURT:  Okay.  Thank you.

17      Anything else we need to cover, folks, before we

18  break for lunch?  Anybody?  We are off the record.

19   (Luncheon recess taken at 12:21 p.m.)

20                *  *  *  *  *  *

21                  CERTIFICATE

22   I certify that the foregoing is a correct transcript from

23  the record of proceedings in the above-entitled matter.

24  /s/ *Amy Spee*                    *10/19/2021*
    _____    _____
25  Amy Spee, CSR, RPR, CRR          Date
    Official Court Reporter