1877

1        IN THE UNITED STATES DISTRICT COURT.
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3   EDDIE L. BOLDEN,                    )
                                        )
4                   Plaintiff,          )
                                        )  Case No. 17 CV 417
5   -vs-                                )
                                        )  Chicago, Illinois
6   ANGELO PESAVENTO, *et al.*,         )  October 18th, 2021
                                        )  1:17 p.m.
7                   Defendants.         )

8

         TRANSCRIPT OF PROCEEDINGS - VOL. 7B
9      BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10  APPEARANCES:

11  For the Plaintiff:    RILEY SAFER HOLMES & CANCILA, LLP
                          BY:  MR. RONALD S. SAFER
12                             MR. ELI J. LITOFF
                               MS. SANDRA L. MUSUMECI
13                             MR. MATTHEW C. CROWL
                               MS. VALERIE BRUMMEL
14                        70 West Madison Street
                          Suite 2900
15                        Chicago, IL  60602

16  For the Defendant     GREENBERG TRAURIG, LLP
    City of Chicago:      BY:  MS. TIFFANY S. FORDYCE
17                             MR. KYLE L. FLYNN
                          77 West Wacker Drive
18                        Suite 3100
                          Chicago, IL  60601

19

20

21

22  Court Reporter:       AMY M. SPEE, CSR, RPR, CRR
                          Federal Official Court Reporter
23                        United States District Court
                          219 South Dearborn Street, Room 2318A
24                        Chicago, IL  60604
                          Telephone:  (312) 818-6531
25                        amy_spee@ilnd.uscourts.gov

1878

1    APPEARANCES (CONT'D):

2    For the Individual      HALE & MONICO, LLC
     Officer Defendants:     BY:  MR. ANDREW M. HALE
3                                 MS. BARRETT E. BOUDREAUX
                                  MR. WILLIAM E. BAZAREK
4                                 MR. BRIAN J. STEFANICH
                                  MS. AMY A. HIJJAWI
5                            53 West Jackson Boulevard
                             Suite 330
6                            Chicago, IL  60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1879

```
 1          (Proceedings heard in open court; jury out:)
 2              THE COURT:  Good afternoon, folks.
 3              MULTIPLE SPEAKERS:  Good afternoon, Your Honor.
 4              THE COURT:  Officer Oliver, good afternoon.  This is
 5   Judge Seeger.  I know you can't see me, but hopefully you can
 6   hear my voice.
 7              THE WITNESS:  Yes, sir.  Yes, Your Honor.
 8              THE COURT:  Sir, were you able to get lunch?
 9              THE WITNESS:  Yes.
10              THE COURT:  Okay.
11              THE WITNESS:  Yes, sir.
12              THE COURT:  Okay.  I think we will -- I'm going to
13   bring the jury down.  Do you feel like you want to use the
14   restroom or stretch your legs for a minute before we get
15   going, or are you ready to go in a minute here?
16              THE WITNESS:  I'm ready to go.
17              THE COURT:  Okay.  I'll say this again, Mr. Oliver.
18   If you -- excuse me -- Officer Oliver.  If you need to take a
19   break at any point today and you feel like you want to let me
20   know, just go ahead and speak up and we'll get you a break.
21   Okay?
22              THE WITNESS:  Yes, sir.
23              THE COURT:  Okay.  Very good.
24              The jury is going to be right in.
25              THE WITNESS:  Yes, sir.
```

1880

1    THE COURT:  Anything we need to discuss, folks?  I

2  assume not.

3    MR. SAFER:  No.  How much we dislike Aaron Rodgers.

4    THE COURT:  Oh, man.  Let's go off the record for a

5  second.

6    (Off the record.)

7    (Jury in.)

8    THE COURT SECURITY OFFICER:  All rise.

9    THE COURT:  Have a seat, everybody.

10    Good afternoon.  I hope you got a lunch to your

11  liking.  It occurred to me, I don't know how much discretion

12  we have to order lunch from you -- for you from certain

13  places.  I don't know if we're getting it from places that you

14  like or dislike, but if there's something that you like, maybe

15  you can let the CSO know and maybe we can get you more of what

16  you like and less of what you don't like.  Again, I hope

17  they're treating you well.  I saw a thumbs-up from the jurors,

18  so maybe this is a good suggestion.

19    But if there's a -- if we have discretion and if

20  there's a place that you like, let our CSO know, because I

21  want happy, attentive jurors who are well fed.  So we'll see

22  what we can do for you folks.

23    Okay, folks.  When we broke, we were in the middle of

24  the exam of Officer Oliver, and we'll continue with that.

25    Mr. Bazarek, whenever you're ready, sir.

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 5 of 154 PageID #:19147
Oliver - cross by Bazarek
1881

1         JAMES OLIVER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

2               CROSS-EXAMINATION (CONT'D)

3   BY MR. BAZAREK:

4   Q.  Officer Oliver, I want to take you back to 1994 in

5   Chicago.

6   A.  Okay.

7   Q.  In 1994, there were over 900 murders in Chicago.

8         Do you recall that?

9   A.  I don't recall the number, but I know there was a lot of

10  murders, yes.

11  Q.  Okay.  And so in January of 1994, you were a gang

12  specialist, correct?

13  A.  Yes.

14  Q.  And what's the difference between a gang specialist and a

15  detective?

16  A.  A gang specialist basically worked on gangs, you know,

17  their activity.  A detective in an area like violent crime,

18  they handle -- they're responsible for -- for the

19  investigation of, you know, murders and aggravated battery,

20  you know, stuff like that.  Violent crime.

21  Q.  So they investigate the homicides, correct?

22  A.  Yes.

23  Q.  Okay.  And then when you worked as a gang specialist in

24  January of 1994, where would your office have been?

25  A.  My office was 943 West Maxwell.

Oliver - cross by Bazarek

1882

1   Q.  So you were working in a different building than

2   detectives that would be assigned to an area, correct?

3   A.  Yes.

4   Q.  And then in this case, Area 2 was investigating the

5   homicide; is that right?

6   A.  Yes.

7   Q.  And then what was the distance from where you officed at

8   Maxwell Street to where the Area 2 detectives were?

9   A.  I think Maxwell Street is approximately 1300 South

10  Halsted, right off of Halsted, and their office is at 111th

11  and -- right near the Dan Ryan.

12  Q.  So when you would go to work each day, you would start

13  your tour at Maxwell Street; is that correct?

14  A.  Majority of the time, we -- we would start at a -- you

15  know, at Maxwell Street, but sometime the sergeant would have

16  us do roll call at a particular area, a particular location,

17  you know, that he deemed necessary.  We didn't go to the

18  office for work roll call every day; sometimes we would do

19  roll call in the street.

20  Q.  Okay.  And you also had supervisors supervising your work

21  in the gang crimes section, correct?

22  A.  Yes.

23  Q.  Okay.  And what type of vehicle would a gang crime

24  specialist have in 1994?

25  A.  There was a different kind, but I -- I drove an undercover

Oliver - cross by Bazarek

1883

1    vehicle.

2    Q.   Okay.  Who was your partner in January 1994?

3    A.   Anderson, T. Anderson.

4    Q.   And how long had you been partners at that point, Officer

5    Oliver, with Anderson?

6    A.   Probably three, four years.

7    Q.   Okay.  Can you just describe to the jury briefly what a

8    typical day would be for a gang crime specialist in 1994.

9    A.   As I recall, like I said, we -- we responded to

10   in-progress calls, you know, in different areas, but basically

11   we answered -- we responded to calls that was nearby.

12          I think that on our team, there probably was like six

13   or seven or eight of us, and basically we took -- we went

14   different ways.  Some of it was in the 5th District, probably

15   one was in 7th District.

16          You know, the area consist of, you know, three or

17   four districts, so if something happened at -- you know, that

18   was in the 3rd District, that comes under the umbrella, the

19   second -- Area 2.  So that's how it worked.

20   Q.   Okay.  So on any given night, could you be working in --

21   strike that.

22          Say on a Monday you could be working in the

23   3rd District, and on a Tuesday could you be working in the

24   5th District as a gang crime specialist?

25   A.   Yes.

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 8 of 154 PageID #:19150
Oliver - cross by Bazarek
1884

1  Q.  Okay.  So you'd see different -- you would come into

2  contact with different officers in different districts,

3  depending on what day of the week it was.

4  A.  Yes.

5  Q.  Okay.  So sometime after 8:00 p.m. on January 29th, 1994,

6  had you monitored a radio dispatch about a shooting in the

7  area of the JJ Fish?

8  A.  Yes.

9  Q.  And the JJ Fish was in the area of 64th and Cottage Grove?

10  A.  Yes.

11  Q.  And, Officer Oliver, you were familiar with that area,

12  right?

13  A.  Yes.  Yes.

14  Q.  Okay.  And I know earlier you testified about a pool hall,

15  but just can you describe to the jury what the area was like

16  on that January night.  Just describe it for the jury.

17  A.  64th and Cottage Grove, it's basically -- Cottage Grove is

18  a through street.  On one side of the street, it's J&J Fish.

19  I know at one time there was a pool hall next to that, and

20  then a vacant lot, as I recall.  That's on the west side of

21  the street.

22        On the east side, there was a Harold's Chicken

23  restaurant.  Different stores, but a Harold's Chicken was on

24  the --

25  Q.  Okay.

Oliver - cross by Bazarek

1885

1  A.  -- east side of the street.

2  Q.  And so when you monitored that radio dispatch, you were

3  inside of a covert vehicle with Officer Anderson, right?

4        THE COURT REPORTER:  I'm sorry, can you repeat that?

5  BY MR. SAFER:

6  Q.  When you monitored that radio dispatch call, you were in

7  your covert police vehicle with Officer Anderson; is that

8  right?

9  A.  Yes.

10  Q.  Okay.  And when you heard JJ Fish, that restaurant, in

11  that dispatch, you knew that Governor Anthony Williams was

12  connected to that location, correct?

13  A.  Yes.  I -- I heard that he owned -- he was the owner of

14  that J&J Fish.

15  Q.  Okay.  When you heard that there was a shooting there,

16  what was going through your mind as you monitored that call?

17  A.  I really don't recall, but I knew that -- that if it was

18  in that restaurant, he probably had something to do with it.

19  Q.  And would that also make your antenna go off about gang

20  activity involvement in that shooting?

21  A.  Of course.  That was a -- that was a high gang activity

22  area.

23  Q.  And when -- when you call it a "high gang activity area,"

24  can you describe to the jury what that means.

25  A.  That means that there was narcotics gang activity in that

Oliver - cross by Bazarek

1886

1    area.

2    Q.   So tell the jury what happened after -- strike that.

3         Tell the jury what you did and Officer Anderson did

4    after you got that radio dispatch.

5    A.   We responded to the location.  And after we got to the

6    location, we did not see nobody, see nothing.  And I believe

7    at that point the dispatcher says that the victim from that --

8    from there had been transported to Christ Hospital.

9    Q.   All right.  So when you arrived on the scene, the victim,

10   Clifford Frazier, had already been transported to the

11   hospital?

12   A.   Yes.

13   Q.   What's the next thing that happened?

14   A.   The next thing that happened, I believe the call came over

15   that we got -- they had two people shot at -- on 65th and

16   Minerva.  I don't know whether they said 65th, but said

17   Minerva.

18   Q.   Okay.

19   A.   And I know that that's a couple blocks east of where we

20   were.

21   Q.   And were you driving that night?

22   A.   Yes, I was driving.

23   Q.   Okay.  So you hear that radio transmission.  What do you

24   and Officer Anderson do?

25   A.   We was already in the car, so we just drove around to that

Oliver - cross by Bazarek

1887

1   location.

2   Q.  Okay.  Over on Minerva?

3   A.  Over on Minerva, right.

4   Q.  Okay.  And I know you've already testified that you don't

5   recall getting out of the car, but can you tell the jury what

6   your observations were when you arrived on Minerva with

7   Officer Anderson?

8           MR. SAFER:  Objection, Your Honor.  The question

9   misstates the evidence.

10          THE COURT:  Sustained.  Let's rephrase it with that

11  first part off.

12  BY MR. BAZAREK:

13  Q.  What happened after you drove to -- strike that.

14          You drove to Minerva with Officer Anderson, correct?

15  A.  Right.

16  Q.  Tell the jury what you observed after you arrived on

17  Minerva.

18  A.  When I arrived on Minerva, I saw -- we saw a lot of police

19  cars, fire department at the location.  And we didn't -- you

20  couldn't get that close because the street was all jammed with

21  everybody, different cars, different police cars and fire

22  department.

23  Q.  So you have numerous Chicago Police Department personnel

24  already at the scene before you arrive, correct?

25  A.  Right.

Oliver - cross by Bazarek

1888

1  Q.  You've got the Chicago Fire Department on the scene?

2  A.  Yes.

3  Q.  Do you recall, was there a car -- was the car on fire?

4       Do you recall anything like that?

5  A.  Yes, that's what I assume, because the fire department was

6  there.

7  Q.  Okay.  Officer Oliver, did you ever walk up to the vehicle

8  that was occupied by the two victims and remove any personal

9  property of those two individuals?

10 A.  No.

11 Q.  Did you take any key or keys out of that vehicle?

12 A.  No.

13 Q.  Did you go rifling through the pockets of Derrick Frazier

14 or Irving Clayton looking for a key?

15 A.  No.  No.

16 Q.  So -- so what do you do after you make your observations,

17 you and Officer Anderson?

18 A.  I walked back to the car.  And I actually was waiting on

19 Anderson to get back because I wanted to go to Christ to talk

20 to the victim of the shooting -- the victim from 64th and

21 Cottage Grove.

22 Q.  So why is this important for you as a gang specialist to

23 talk to the victim of the shooting at the JJ Fish?

24 A.  Well, I wanted to see exactly what had happened, what was

25 his -- you know, what was the involvement of who was doing the

Oliver - cross by Bazarek

1889

1  shooting and why was he being -- why was he shot.

2  Q.  And so then you and Officer Anderson went to Christ

3  Hospital, right?

4  A.  Right.  Right.

5  Q.  All right.  Did you make any stops along the way and pick

6  up women you've never seen before in your life, anything like

7  that?

8  A.  Oh, no.  No.  No.

9  Q.  Okay.  So tell me, when you're -- you -- ultimately you

10  come into contact with Mr. Frazier, correct?

11  A.  At the hospital.

12  Q.  And initially he is not providing you information; is that

13  right?

14  A.  Right.  He is not talking that much.  He -- you know, he's

15  not really saying too much of nothing.

16  Q.  And then once his brother -- he had learned his brother

17  was deceased, then he started giving you information, correct?

18  A.  Right.

19  Q.  Okay.

20  A.  Right.

21  Q.  Now, during -- during your conversation with Mr. Frazier

22  at the hospital, you became aware that there was a supplier

23  for the narcotics that he reported to you; is that right?

24  A.  Right.

25  Q.  And then when he mentioned this supplier, what -- strike

Oliver - cross by Bazarek

1890

1     that.

2            When Mr. Frazier talked about the supplier or meeting

3     with the supplier, was the place where he said the meeting

4     would take place, did that mean anything to you personally or

5     professionally?

6     A.  Yes.

7     Q.  Tell the jury what that was.

8     A.  He said something -- he said that they was getting their

9     cocaine from -- he was meeting with an older guy at a

10    restaurant at 116th and Western, which was about a block from

11    my house where I lived.  I lived 115th and Oakley.

12           And I would -- my wife works, I worked, so

13    Saturday -- well, she was a schoolteacher, so she was off on

14    Saturday and Sunday.  So on Saturdays, we basically would walk

15    around to the restaurant for breakfast.

16    Q.  So you were familiar with the restaurant that Mr. Frazier

17    had told you about and its connection to the drug supplier?

18    A.  Yes.

19    Q.  Mr. Frazier also gave you information about a girl, and he

20    gave you her phone number; is that correct?

21    A.  He gave me a telephone number, as I recall.  You know, it

22    had been so long ago.  I'm sure that he gave me a telephone

23    number of a person, a lady, and I thought that it was his

24    brother's girlfriend number.

25    Q.  And what was your purpose in wanting to talk to the

Oliver - cross by Bazarek

1891

1   girlfriend of the brother?

2   A.  Well, my interest -- my interest basically in this was the

3   narcotic aspect of it.  I know that Area 2 was going to be

4   handling the homicide of this, but when it comes down to it,

5   when it's all said and done, narcotics in the city of Chicago

6   is the reason for 90 -- 90 percent of the homicides.  All

7   gangs' common denominator is narcotics, is there moneys being

8   made from that.  That's how they survive, is the money that's

9   being made from narcotics.

10  Q.  And was it routine for a gang specialist to investigate

11  narcotics trafficking by Gangster Disciples?

12  A.  Yes.

13  Q.  That's something you would do routinely, correct?

14  A.  Right.  All of the time.

15  Q.  And if you can -- if you can put a dent in the narcotics

16  trafficking, it sounds like you can then help -- maybe stop

17  some murders from occurring, correct?

18  A.  Yes.

19  Q.  Ultimately you were trying to get more information from

20  Clifford Frazier about the narcotics -- the narcotics supplier

21  and that type of activity, but ultimately it wasn't fruitful;

22  would you agree?

23  A.  I think it was truthful what he was saying about who

24  was -- who he was getting the narcotics from.  I think -- I

25  don't think he was lying about that.  But he didn't give me

Oliver - cross by Bazarek

1892

1  enough, you know, to go after the guy, because I didn't -- I
2  didn't really get who that was.
3  Q.  I said the word "fruitful," thinking -- not "truthful."
4  So I think you misheard what I said.
5  A.  Oh, okay.
6  Q.  My question really is, the information that Clifford
7  Frazier provided you, what did that result in, besides that
8  there was a narcotics supplier?
9  A.  Oh, I didn't -- it didn't -- for me, it didn't go no
10  further.
11  Q.  Okay.
12  A.  I didn't -- I didn't feel.
13  Q.  Did Clifford Frazier stop providing you information after
14  he was released from the hospital?
15  A.  No, I -- I didn't really talk to him after then, you know,
16  that much.
17  Q.  Okay.  I want to go back to something you said earlier,
18  and you were referring to the narcotics recovery made by
19  Officer Willis.  And your testimony was words to the effect,
20  "I didn't want anything to do with it."
21        Do you recall that testimony?
22  A.  Yes.
23  Q.  Can you tell the jury what you meant by that.
24  A.  Well, I didn't want to -- I didn't want to get -- I wasn't
25  involved with the recover of the narcotics, so I didn't want

Oliver - cross by Bazarek

1893

1   to -- I didn't want to get involved with it no more.  You

2   know, narcotics was already recovered, so there was no need

3   for me to do anything else.

4   Q.  And, again, narcotics recovery, that was by 3rd District

5   officers, not anyone in the gang crimes section, correct?

6   A.  Right.

7   Q.  Okay.  And also I know you were asked questions about

8   whether or not Mr. Frazier should have been arrested, but

9   would you agree there's occasions where individuals commit

10  crimes, maybe they're victims of a crime, and ultimately they

11  don't get charged?

12  A.  Oh, that could happen, but in this particular case, I

13  didn't think he was going nowhere.  He was shot up, so I

14  didn't think he would be going nowhere.  If it came down to it

15  two or three days later that they had enough to arrest him,

16  I'm sure they could have found him, you know.  We could've

17  found him.

18  Q.  And, Officer Oliver, also when you have a case, whether

19  it's a double homicide or an aggravated battery or even a

20  narcotics recovery, ultimately police reports would go to the

21  Cook County State's Attorney's Office for review, right?

22  A.  Yes.

23  Q.  And Cook County State's attorneys make charging decisions

24  routinely, right?

25  A.  Yes.

Oliver - cross by Bazarek

1894

1  Q.  Separate and apart -- sorry.  Excuse me.  Sorry.  Go

2  ahead, sir.

3  A.  I've just said that's their job, right.  That's who you

4  rely on.

5  Q.  Right.  Separate and apart from police officers maybe

6  arresting someone, state's attorney can make charging

7  decisions, right?  They're prosecutors.

8  A.  Right.  Yes.  Right.

9  Q.  Can you -- now I want to take you after you're at the

10  hospital with Mr. Frazier.  At some point later on during your

11  tour of duty, you have contact with Governor Anthony Williams,

12  right?

13  A.  Yes.  During that tour, yes.

14  Q.  Okay.  And when you were at that location, you did not

15  observe his parents or any other employees inside the JJ Fish;

16  is that correct?

17  A.  Right.  I didn't see nobody but him, Anthony Williams.

18  Q.  And the discussion that you had with Anthony Williams was

19  a short conversation?

20  A.  Yeah, very short conversation.  Real short.

21  Q.  Can you describe his demeanor?  I think you said he was

22  being coy?

23  A.  Yeah.  I've stopped him on the street a couple times, so I

24  knew what kind of person -- personality he had.  He did not --

25  he wasn't going to give you nothing, but he did not talk --

Oliver - cross by Bazarek

1895

1    yeah, he wasn't giving out no information.  I knew that much.

2         So when I walked in the restaurant, he had a mop or a

3    broom in his hand, as I recall, and there was blood on the

4    floor.  And then at that point he told me someone came in

5    there bleeding and he told them to get out, that he didn't

6    want him in there.

7    Q.  And he didn't tell you about any guns or people being shot

8    or 2 --

9    A.  No.

10   Q.  -- kilos of cocaine?

11   A.  No.  No.

12   Q.  After you left the JJ Fish and this short conversation you

13   had with Anthony Williams, do you recall what you did for the

14   rest of your tour?

15   A.  I don't -- I don't recall.  You know, it's been so long

16   ago.  Only thing I know, at that point Anderson and I left the

17   area.  We left the scene.

18   Q.  Okay.  So you just continued on out on patrol?

19   A.  Yes.  I don't remember.

20   Q.  Officer Oliver, I don't know if I asked you this:  Do you

21   recall what shift you would have been working on January 29th,

22   1994?

23   A.  I would assume I was working evening, which would be, I

24   think, from 5:00 to 1:00, something like that.

25   Q.  At any time during that tour of yours on January 29th --

Oliver - cross by Bazarek

1896

1    and it sounds like you would finish up work around 1:00 in the

2    morning on the 30th --

3    A.  Right.

4    Q.  -- did you have a female occupant inside the vehicle that

5    you shared with Officer Anderson?

6    A.  No.  It would have been highly unusual because of we had

7    an undercover vehicle, so we didn't really have nobody in the

8    car.

9    Q.  Would you even know who Irving Clayton's girlfriend is on

10   January 29th --

11   A.  No.

12   Q.  -- 1994?

13   A.  No.  No.

14   Q.  At any time did you and Officer Anderson go to

15   Northwestern Hospital on January 29th or into the early

16   morning hours of January 30th?

17   A.  No.

18   Q.  Okay.  Because you went to Christ Hospital, right, earlier

19   in the tour?

20   A.  Yes.

21   Q.  And are you aware that Irving Clayton was transported to

22   Northwestern Hospital after he was shot in the head?

23   A.  No, I didn't know what hospital they take him into.

24   Q.  Now, at some point after January 29th, there is an ongoing

25   homicide investigation for the double murder, right?

Oliver - cross by Bazarek

1897

1  A.  Yes.

2  Q.  And that's not something you're investigating; that's what

3  the detectives are investigating, right?

4  A.  Right.  Correct.

5  Q.  After the double murder, were there phone calls coming in

6  to the gang crimes section?

7  A.  Yes, there was phone calls coming in, people giving

8  information.

9  Q.  And can you just describe how that works, where you've got

10  a double murder and then the phone calls start coming in.

11  A.  You know, people on the street -- you know, people have a

12  different perception of people.  And just because you live in

13  a gang-infected area, that does not mean that you are bad,

14  that you -- there is a lot of good people in the city of

15  Chicago.

16  Q.  Okay.

17  A.  And they have to put up with a lot of stuff that's not

18  true.  You know, because -- because people do certain things,

19  that don't mean that everybody in that neighborhood is bad.

20  That's not true.  That's not true.

21      And they will call -- especially if they can call and

22  not -- and not be identified, not be put on the spot, they

23  will call and give up information.

24  Q.  And --

25  A.  That's what --

Oliver - cross by Bazarek

1898

1  Q.  Excuse me.  I'm sorry, sir.  Were you finished?  I'm

2  sorry.

3  A.  Yeah, I'm finished.

4  Q.  So I think what you're saying are people could be fearful

5  to give information to the police, but sometimes they do.

6          MR. SAFER:  Objection.  Leading.

7          I haven't been objecting.

8          THE COURT:  Yeah, sustained.

9  BY THE WITNESS:

10  A.  Yeah, they will call me --

11          THE COURT:  I'm sorry.  I'm sorry, I beg your pardon,

12  Officer Oliver.  I don't mean to interrupt you.  There was an

13  objection to the question, so you're going to have to wait for

14  a new question.  Bear with me.

15          Go ahead.

16          THE WITNESS:  All right.

17          THE COURT:  Go ahead, Counsel.

18  BY MR. BAZAREK:

19  Q.  Tips can be received from citizens that call up the gang

20  crimes section, correct?

21  A.  Yes.

22  Q.  Okay.  Officer Oliver, even though you were not

23  investigating the homicide, at some point did you receive a

24  tip from a member of a federal task force?

25  A.  Yes, I believe so.  I did.

Oliver - cross by Bazarek

1899

1  Q.  So what -- as best you recall, tell the jury about the tip

2  you received.

3       MR. SAFER:  Your Honor, could we have foundation

4  when -- when it happened, who he's talking to, where he was.

5       THE COURT:  Well, overruled.  The question was:  "Did

6  you receive a tip from a member of the federal task force?"

7       "Yes, I believe so," he testified.

8       And then, "Can you please tell the jury the tip you

9  received."

10      So I think that's a sufficient basis for eliciting

11 information.  You can follow up if necessary.

12      Go ahead.  Let's restate the question.

13 BY THE WITNESS:

14 A.  Yes, I received the tip.  I believe --

15      THE COURT:  I'm sorry.  Officer Oliver, this is

16 Judge Seeger.  I beg your pardon.

17      I'm going to have counsel reask the question to you,

18 and he's going to make sure he lays the foundation for your

19 knowledge, and then you can answer as best you can.  Okay.

20 Here comes the question.

21      THE WITNESS:  All right.

22 BY MR. BAZAREK:

23 Q.  Officer Oliver, at some point -- strike that.

24      Officer Oliver, at some point after the double

25 murders, did you receive a tip from a federal task force

Oliver - cross by Bazarek

1900

1   member?

2   A.  Yes.

3   Q.  Okay.  Do you know what day that tip would have come in,

4   sir?

5   A.  No.

6   Q.  As best you recall, who was the person from the federal

7   task force who gave you the tip?

8   A.  Mitch McCullough.

9   Q.  Tell the jury who Mitch McCullough was, Officer Oliver.

10   A.  Mitch was a gang specialist just like I was.  He worked in

11   the same unit.  And he was detailed to the federal task force.

12   And that's how I know him, and that's where he was.  He was

13   detailed downtown to the federal bureau.

14   Q.  Did he also work with Officer Anderson?

15   A.  Yes.  Him and Anderson had been partners before -- before

16   Anderson started working with me.

17   Q.  And you were friends with Mitch McCullough as well?

18   A.  Yes.  Yes, we was friends.

19   Q.  And how long did you work together with him in the gang

20   crimes section?

21   A.  I really don't know how long we had been together.

22   Probably three or four years.  I mean, he was there when I was

23   there.

24   Q.  Okay.  And on a federal task force like that, you could

25   have other members of the Chicago Police Department working on

Oliver - cross by Bazarek

1901

1    that same squad, right?

2    A.  Could have been, yes.

3    Q.  As best you recall, Officer Oliver, what did Mitch

4    McCullough say to you?

5    A.  He -- basically they just said that the phones down there

6    was lit up and that different calls was coming in.  And that

7    Ant was involved in this, this double homicide, and that a

8    person by the name of Lanier was the shooter, something like

9    that, as I recall.

10   Q.  What did you do with that information after you received

11   it?

12   A.  I passed it on to Area 2.

13   Q.  Do you know what detective you would have passed it along

14   to?

15   A.  You know, I'm not -- I'm not certain.  I'm not certain

16   about that.  You know, it -- it could have been Baker or

17   Pesavento.  I just knew --

18            MR. SAFER:  I object to what could have happened.

19            THE COURT REPORTER:  I can't hear you.

20            MR. SAFER:  I object to what could have happened,

21   Your Honor.

22            THE COURT:  All right.  So, Officer Oliver, I'll let

23   you testify as to your best recollection.  You don't have to

24   be certain to testify to it, but you cannot speculate, you

25   cannot guess.  You've got to give your best recollection, but

Oliver - cross by Bazarek

1902

1    no more.

2            With that instruction, you can answer.

3    BY THE WITNESS:

4    A.  Okay.  With my best recollection, you know, my best thing,

5    it would have been Baker or Pesavento.

6    BY MR. BAZAREK:

7    Q.  Now, you yourself, Officer Oliver, worked on a federal

8    task force; is that correct?

9    A.  Yes.

10   Q.  And that was a federal task force that was investigating

11   the Gangster Disciples; is that right?

12   A.  Yes.

13   Q.  And were there -- on that federal task force that you were

14   on, was it also -- strike that.

15           Were there other fellow Chicago police officers that

16   were assigned to the task force that you worked on against the

17   Gangster Disciples?

18   A.  Yes.

19   Q.  Could you just describe to the jury, when you work on a

20   federal task force, do you have contacts with, say, the Gang

21   Crimes sections or any other unit within the Chicago Police

22   Department in terms of sharing information?

23   A.  Yes.

24   Q.  Tell -- describe that for the jury.

25           MR. SAFER:  I object to the relevance, Your Honor,

Oliver - cross by Bazarek

1903

1  that something that happened later affects this.  That's --

2       THE COURT:  Well, I think the question has to do with

3  the sharing of information generally, not the sharing of

4  information in this particular case.  So if the question is

5  about the policies, procedures, and practices as to the

6  sharing of information generally, he can answer.

7       If it's going to be about this particular incident,

8  you've got to make sure you stick to the time frame.  So to

9  that extent, it's overruled.

10      Go ahead.

11      MR. BAZAREK:  Your Honor, it's just general.  Yes.

12 BY MR. BAZAREK:

13 Q.  Officer Oliver, can you describe how information is shared

14 when -- at least when you were on the task force?  Generally,

15 can you describe that.

16      Or strike that question.

17      Can you tell -- just explain to the jury how

18 information would be shared with a Chicago police officer

19 assigned to a federal task force with members of the Chicago

20 Police Department.

21 A.  Well, actually, you just didn't just talk about something.

22 You know, if somebody -- if another unit that's someone else,

23 you felt that was on a need-to-know basis, yes, you could talk

24 to them about it.  But, you know, just talking about a case

25 that that person didn't have no knowledge of or nothing, no,

Oliver - cross by Bazarek

1904

1    you would not say anything.

2    Q.   Okay.   But if, say, for instance, a hypothetical, when

3    you're working on the federal task force and there is a murder

4    that occurs and the detectives in an area are investigating

5    the murder and you're working on a federal task force.   So

6    there would be occasions where you would -- if you have

7    something relevant to share, you would communicate with the

8    detectives, right?

9             MR. SAFER:   I object to the hypothetical.   I object

10   to the leading.

11            THE COURT:   I will sustain the objection.   Let's see

12   if we can simplify it.   Okay.

13   BY MR. BAZAREK:

14   Q.   Can you just describe -- can you describe to the jury what

15   communications may occur between a federal task force member

16   who is a Chicago police officer with other members of the

17   Chicago Police Department who may be working a case.

18   A.   Well, certainly if you knew -- if you knew somebody, like,

19   in Violent Crime, and you know of a homicide that they was

20   handling, yes, you would give them the information that you

21   have received, that you know, and you would talk to them about

22   it or tell them about it.

23   Q.   And it's important for different law enforcement -- law

24   enforcement agencies to share information if the goal is to

25   apprehend criminals, right?

Oliver - cross by Bazarek

1905

1    A.   You do that all the time.

2              MR. SAFER:  Objection.

3              THE COURT:  The objection is sustained.  Let's put it

4    in a nonleading way.

5    BY MR. BAZAREK:

6    Q.   Why is it important to -- why is it important for a

7    federal task force member to share information with members of

8    the Chicago Police Department that may be investigating a

9    homicide?

10   A.   Basically to apprehend the person who committed the crime

11   or who was involved in the crime.

12   Q.   Now, at some point Area 2 contacted you for your

13   assistance to have Clifford Frazier arrive at the area to be

14   with detectives?

15   A.   Yes.  On the day of the lineup, yes.

16   Q.   And as best you can, can you recall how that worked on

17   that day?

18   A.   I don't -- I don't really know no more than I must have

19   received a call once I got to work that morning, that day,

20   and -- and probably the call was to contact him to get him to

21   Area 2 for a lineup.

22   Q.   So why do you think that the detectives contacted you to

23   do that?

24   A.   Because they had seen me at the hospital, and they

25   probably knew that I had -- was talking -- they knew I was

Oliver - cross by Bazarek

1906

1    talking to him, because Baker was there.  So -- and they knew

2    that I probably had, you know, his telephone number and stuff

3    like that.

4    Q.  Okay.  And I want to go back to, ultimately the

5    information that Mr. Frazier provided you never resulted in

6    the apprehension of the narcotics supplier, correct?

7    A.  Right.  No, never did.

8    Q.  Okay.  Do you have any -- strike that.

9         At any time on February 26, 1994, did you participate

10   in anything having to do with the lineup on that day?

11   A.  No, nothing.

12   Q.  Did you arrest Mr. Bolden on that day?

13   A.  No.

14   Q.  Did you put handcuffs on Mr. Bolden?

15   A.  No.

16   Q.  Did you tell Clifford Frazier who to pick out in the

17   lineup?

18   A.  No.

19   Q.  Did you ever watch -- strike that.

20        Did you -- did you ever see Clifford Frazier on that

21   day at the area?

22   A.  No.

23   Q.  What was your purpose in going to the area after you had

24   made the phone call about getting Clifford Frazier to come to

25   the area?

Oliver - cross by Bazarek

1907

1   A.   Basically to see that he got there.

2   Q.   Okay.  So -- but you never saw him at the area.  How did

3   you become aware that he arrived there?

4   A.   One of the detectives told me that he was in the building

5   and he was there.

6   Q.   Okay.  And so after -- do you remember what detective that

7   was, Officer Oliver?

8   A.   No.

9   Q.   Okay.

10  A.   No, I don't.

11  Q.   So after you were given that information, what did you do?

12  A.   We left.  I left.  Me and my partner left.

13  Q.   I want to talk about this -- Cynthia Steward.  And you are

14  aware that she's making allegations against you, correct?

15  A.   Yes.

16  Q.   Tell the jury what you think of the allegations that she's

17  making against you.

18  A.   Ridiculous.  I've never seen her.  And if it was that I

19  talked to her, it was on the phone and it was very limited,

20  two or three seconds.  I mean, maybe not two or three seconds,

21  but the conversation was not limit- -- you know, it was very

22  limited, and I've never seen her, that I know of, in my life.

23  Q.   On that night of January 29th, 1994, you were not the only

24  African American officer working on the South Side of Chicago,

25  right?

Oliver - cross by Bazarek

1908

1  A.  No, I -- no, I was not.

2  Q.  Tell me -- there were other officers that were from the

3  3rd District that were there that night, at least in terms of

4  the narcotics recovery?

5  A.  Yes, but they just was standing around.

6  Q.  And did some of those officers, did they work in plain

7  clothes, sir?

8  A.  Sure, yes.

9  Q.  Some of them were African American?

10  A.  Yes.

11  Q.  I believe that Mr. Safer showed you an exhibit about a

12  narcotics recovery from Clifford Frazier's apartment.

13          Do you recall that?

14  A.  He showed me an exhibit -- yes, it may be so.

15          MR. BAZAREK:  Can I have a moment, Judge?

16          THE COURT:  Of course.

17      (Counsel conferring.)

18          THE COURT:  Members of the jury, if you want to take

19  30 seconds and stretch your legs, you're welcome to stand up.

20          I'll break the ice and stand up myself.  How's that?

21          It always does a body good to stretch.

22          Counsel, whenever you're ready.

23  BY MR. BAZAREK:

24  Q.  Officer Oliver, I'm going to show you what's been marked

25  as supplementary -- it's been marked as Plaintiff's Trial

Oliver - cross by Bazarek

1909

1  Exhibit 87.

2          THE COURT:  This is in evidence?

3          MS. BOUDREAUX:  Yes, Judge.

4          THE COURT:  Okay.  Thank you.  It's now being

5  published to the jury.

6          Go ahead.

7  BY MR. BAZAREK:

8  Q.  Can you see it okay, Officer Oliver?

9  A.  Yes, I can see it.  Yes.

10  Q.  This is a recovery of narcotics from Clifford Frazier's

11  apartment.

12          Do you see that?  Or take a look at it and let me

13  know --

14  A.  Yes.

15  Q.  Okay.  And the reporting officers on here, it says

16  T. Jackson, an N. Silas, and an M. Robbins.

17          Do you see that?

18  A.  Yes.

19  Q.  And those are 3rd District officers, correct?

20  A.  Yes.

21  Q.  And those officers, Officer Oliver, would have worked in

22  plain clothes?

23  A.  I guess.  I don't remember seeing them.  The only ones I

24  remember seeing was Willis on the scene when I came back up.

25          I know Robbins.  I don't remember seeing him there at

Oliver - cross by Bazarek

1    that location at that time.

2    Q.  Right.  And I'm not talking about the night of the

3    JJ Fish.  But this is a -- it looks like an event that

4    occurred on January 31st.  So this is a --

5    A.  Oh, okay.

6    Q.  -- a couple of days after the -- after the murders.

7    A.  Right.  I didn't know anything about this.

8    Q.  Okay.  But did -- you said you -- is Robbins and Silas and

9    Jackson, were they African American officers?

10   A.  I know Robbins is black.  I can't -- I really don't know

11   the other two.

12   Q.  Okay.  Did you recall what type of clothing they would

13   have worn for work?

14   A.  No.  No, I don't know.

15   Q.  Okay.  I want to ask you, earlier you were questioned

16   about Edna Williams and her arrest.

17           Do you recall that testimony?

18   A.  Yes.

19   Q.  Okay.  And I'm going to show you Plaintiff's Trial

20   Exhibit 16 on the ELMO.

21           THE COURT:  This is in evidence?

22           MR. BAZAREK:  (Nonverbal response.)

23           THE COURT:  Yes?

24           MR. BAZAREK:  Yes, Your Honor.

25           THE COURT:  It's going to be published to the jury.

Oliver - cross by Bazarek

1911

1          Go ahead, please.

2     BY MR. BAZAREK:

3     Q.   And you see your name is on there; it has you and an

4     Officer Hampton, which was incorrect, right?

5     A.   Right.

6     Q.   I mean, do you know why Officer Willis put your name on

7     that arrest report?

8     A.   No, I don't know why, but I assume he put it on there

9     simply because he know I had been to the hospital and

10    interviewed Derrick Frazier, a Frazier.  So I don't know why

11    he did that, but I was not part of this arrest.

12    Q.   Okay.  And then you -- if you look at the box, it has

13    "First Arresting Officer," it says "M. Willis."

14          Do you see that?

15          THE COURT:  Into your microphone, Counsel.

16    BY THE WITNESS:

17    A.   Right.

18    BY MR. BAZAREK:

19    Q.   "First Arresting Officer," it says "M. Willis," right?

20    A.   Right.

21    Q.   Okay.  And then the second arresting officers are Officer

22    Kirk and an Officer Scott.

23          Do you see that?

24    A.   Yes.

25    Q.   And they're 3rd District officers, right?

Oliver - cross by Bazarek

1912

1   A.  I really don't know.  I don't know them.  You know, I --

2   Q.  But did you see --

3   A.  And I was on the --

4   Q.  Go ahead.

5   A.  I see the thing over there that says 3rd District, I

6   believe.

7   Q.  Okay.

8   A.  So they probably was in the 3rd District.

9   Q.  Right.  They're in a police district, and they work out of

10  the 3rd District, right?

11  A.  Yes.

12  Q.  They don't work out of Maxwell Street.

13  A.  No.

14  Q.  Do you recall, how did -- how did -- Willis and his team

15  members, how did they dress?

16  A.  I don't know.  I think Willis -- I don't think Willis was

17  in a uniform that night.  I don't recall --

18  Q.  Okay.

19  A.  -- seeing him in a uniform.

20  Q.  What race is Willis?

21  A.  African American.

22  Q.  Okay.  And what about Kirk and Scott?

23  A.  I don't really know them, so I'm not sure.

24  Q.  Okay.  But if Willis was in, you know, plain clothes,

25  would you agree that his teammates on 369C, they would have

Oliver - cross by Bazarek

1913

1    worked in plain clothes?

2    A.  Yes.

3    Q.  Officer Willis, over the past day or so, you were able to

4    review --

5           THE COURT:  We are getting some feedback on the line.

6    Why don't you restate the question to Officer Oliver.

7    BY MR. BAZAREK:

8    Q.  Sorry about that.

9           Officer Oliver, over the past few days, you were able

10   to review the misdemeanor complaints for Edna Williams, James

11   Williams, and David McCray.

12          Do you recall doing that, sir?

13   A.  Yes, I looked it over.

14   Q.  Okay.  And the complainant on those three complaints was

15   Officer Willis, correct?

16   A.  Yes, I believe so.

17   Q.  It was not James Oliver?

18   A.  Oh, no.  No.

19   Q.  Okay.  Did you ever arrest James Williams?

20   A.  No.

21   Q.  Did you ever arrest David McCray?

22   A.  No.

23   Q.  Did you ever arrest Edna Williams?

24   A.  No.

25   Q.  Did you arrest a woman named Tenesha Gatson?

Oliver - cross by Bazarek

1914

1   A.   No.

2   Q.   Okay.  Officer Oliver, over the past few days, were you

3   able to review your 1994 sworn time and attendance record?

4   A.   Yes.

5   Q.   Okay.

6   A.   Yes.

7   Q.   And you were looking it over, and on that time and

8   attendance record, it indicates your days where you're working

9   and days when you're off, correct?

10  A.   Yes.

11  Q.   And on February 3rd and February 4th, that was your day

12  off, right?

13  A.   Yes, that's what it appeared to me.

14  Q.   Are you aware that the photo array of -- shown to Clifford

15  Frazier occurred on February 3rd, 1994?

16  A.   No, I really don't know what date it was shown to him.

17  Q.   Okay.  But you know on February 3rd you were on your day

18  off, right?

19  A.   Yes.

20  Q.   I want to talk -- I want to go back to this individual

21  named Cynthia Steward.  Did you ever go to her home?

22  A.   No.

23  Q.   Did you ever tell her to lay down inside of the police

24  vehicle that you drove in with Officer Anderson?

25  A.   No.

Oliver - cross by Bazarek

1915

1  Q.  Did you -- did you ever go to her house and ask her for a
2  set of keys and then leave with the keys?
3  A.  No.
4  Q.  Did you ever threaten to arrest her and take her children
5  away?
6  A.  No.
7  Q.  Did you ever ask her about a safety-deposit box or
8  anything like that?
9  A.  No.
10 Q.  Did you ever go to her house and go through paperwork?
11 A.  No.
12 Q.  Officer Oliver, are you aware that Mr. Bolden was given a
13 Certificate of Innocence?
14        Were you aware of that?
15 A.  No, I wasn't aware of that.
16 Q.  Okay.  Did anyone from the Cook County State's Attorney's
17 Office ever contact you about a petition for Certificate of
18 Innocence, anything like that?
19        MR. SAFER:  I object, Your Honor.
20 BY THE WITNESS:
21 A.  No.
22        MR. SAFER:  It's irrelevant.  It doesn't have
23 standing.
24        THE COURT:  The question is simply whether he was
25 contacted.  Overruled.

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 40 of 154 PageID #:19182
Oliver - cross by Bazarek
1916

1    BY MR. SAFER:

2    Q.  Officer Oliver, you never -- strike that.

3          Officer Oliver, did you testify at Mr. Bolden's

4    criminal trial?

5    A.  No.

6          MR. BAZAREK:  If I could have a moment, Judge.

7          THE COURT:  Yeah.

8        (Counsel conferring.)

9    BY MR. BAZAREK:

10   Q.  Officer Oliver, Mitch McCullough was on a federal task

11   force that was investigating Anthony "Ant" Williams, correct?

12   A.  I can't say that he was on a task force investigating Ant;

13   I just know that he was -- he was at the federal building

14   working on some task force.

15   Q.  Okay.

16   A.  But was it physically Ant William, I don't know that.

17   Q.  Okay.  And did you have any involvement in a sketch

18   regarding the suspect of the double murders on Minerva?

19   A.  No.  Not that I recall, no.

20          MR. BAZAREK:  No further questions.

21          THE COURT:  Thank you, Counsel.

22          Mr. Safer, I don't know if you have more than a

23   couple minutes?  If you do, maybe we should take a break,

24   allow the witness to stretch his legs.  Is that okay?

25          MR. SAFER:  That's fine.

1    THE COURT:  Okay.  Folks, we're going to take an

2  earlier break.  We've been going about an hour and 15 minutes.

3    Officer Oliver, I know you can't see me, but

4  hopefully you can hear me okay.  We're going to go ahead and

5  take a quick break, and we'll come back in about ten minutes,

6  maybe a little shorter than normal.  Okay?

7    THE WITNESS:  Thank you.

8    THE COURT SECURITY OFFICER:  All rise.

9    (Jury out.)

10    THE COURT:  Officer Oliver, the jury has now left the

11  room.  You're welcome to use the restroom, stretch your legs,

12  whatever you'd like, sir.

13    THE WITNESS:  All right.  Thank you.

14    THE COURT:  We're off the record for purposes of you.

15  We'll come back in a few minutes.

16    (Recess had at 2:27 p.m.)

17

18

19

20

21

22

23

24

25

1    (A change in court reporters was had.)

2    (Proceedings heard in open court; Jury out.)

3            THE COURT:  We will go on the record.

4            Two quick things.

5            I took an earlier break than normal because we have

6    got a senior citizen as a witness.  He has got some medical

7    issues.  I try to treat witnesses well in my courtroom,

8    especially people who are older.  So that was the reason for

9    the earlier break.

10            Hopefully, Mr. Safer, didn't interrupt your flow.

11            In terms of objections on leading, there have been

12   a number of leading questions during the trial, many of which

13   people have not objected to.  I totally get that.  When I was

14   in your seat, a lot of times I didn't care if there were

15   leading questions because sometimes I think witnesses to

16   jurors are a lot more interesting than lawyers.  If lawyers

17   are saying it, people kind of tune out.  So I didn't always

18   object.

19            If you think it's important and you want to object

20   if it's leading, I will rule on it.  But I will try to be

21   evenhanded to you folks.  If one side is making leading

22   questions and the other is objecting, I will try to do the

23   same treatment the other way.  But a lot of times during

24   trial there is a certain level of détente on that, but I will

25   rule on any objection you throw my way one way or the other.

1          Everybody ready?

2          Mr. Safer, you are ready?

3          MR. SAFER:  Yes, your Honor.

4          THE COURT:  Whenever you are ready.  Come on in.

5       (Jury in at 2:39 p.m.)

6          THE COURT:  All right, folks.  Welcome back.  Take

7    a seat, please.

8          Counsel, whenever you are ready.

9          MR. SAFER:  Thank you, your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. SAFER:

12   Q.   Mr. Oliver, you were just asked a lot of questions about

13   the Gangster Disciples.

14          Do you remember that?

15   A.   Yes, I was asked some questions about the Gangster

16   Disciples.

17   Q.   You were asked about the structure of the gang, correct?

18   A.   Yes.

19   Q.   You were asked about the leadership of the gang,

20   correct?

21   A.   Yes.

22   Q.   And then you testified, sir, that you knew on

23   January 29th, 1994, that Anthony Williams was a governor in

24   the Gangster Disciples, right?

25   A.   That's the information that I recall.

1  Q.  And, in fact, a lot of the questions that you were asked

2  were Governor Williams this and Governor Williams that.

3          Do you recall those questions?

4  A.  I didn't -- I may not have paid that much attention to

5  that, but I was only giving out what I was aware of.

6  Q.  Well, but the fact is, sir, not only did you not know

7  whether Anthony Williams was a governor in the Gangster

8  Disciples, you didn't even know whether Anthony Williams was

9  a Gangster Disciple or an El Rukn?

10  A.  I didn't -- I had not did any work on his structure in

11  the Gangster Disciples or the El Rukn.  In that area there

12  were two gangs.  There was the El Rukns and Gangster

13  Disciples.

14  Q.  Did you understand my question, sir?

15          My question is:  Not only did you not know whether

16  or not Anthony Williams was a governor on January 29th, 1994,

17  of the Gangster Disciples, you didn't even know whether he

18  was a Gangster Disciple or an El Rukn, right?

19  A.  Per se, I did not know exactly what he was.

20  Q.  Right.  So when you told the jury just a few moments ago

21  that you knew that he was a governor in the Gangster

22  Disciples, that was just a lie, wasn't it?

23  A.  Not necessarily.  You know, I'm not lying.  These

24  guys -- these guys, when they in that position, their

25  position is wherever the money is.  That's where they -- you

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 45 of 154 PageID #:19163
Oliver - redirect by Safer
1921

1    know, that's where they lay their hat at.

2    Q.   I appreciate that, sir.

3         What I'm interested in is --

4         THE COURT:  Mr. Oliver, this is Judge Seeger.

5         Were you done with your answer, sir?

6         THE WITNESS:  Yes.

7         MR. SAFER:  He put his head down, your Honor.  He

8    was done.

9    BY MR. SAFER:

10   Q.   I appreciate that, sir.

11        My question is, what you told this jury not a few

12   minutes ago, you told them that you knew on that day that

13   Anthony Williams was a governor, and that's just not -- in

14   the Gangster Disciples.  That's just not true, is it?

15   A.   I can't say 100 percent that's not true.

16   Q.   Were you asked this question and did you give this

17   answer at your deposition on December 21st, 2017, almost four

18   years ago when you were under oath:

19        "Question" --

20        MR. BAZAREK:  Page, please.

21        MR. SAFER:  159, 21.

22   BY MR. SAFER:

23   Q.        "Did the people involved in this January 29th,

24   1994, shooting -- were any of them, to your knowledge,

25   involved with the Gangster Disciples?

1              "A.  Not really.  I didn't know any -- I didn't

2  know nobody, nobody but Anthony Williams.

3              "Now, was he the Gangster Disciples or El Rukn?  I

4  didn't know.  I do know for you to sell dope at that level,

5  he had some affiliation somewhere."

6              Was that your testimony, sir?

7  A.  Yes.

8  Q.  So you didn't know whether he was a Gangster Disciple or

9  an El Rukn, right?

10  A.  Right.  I did not know exactly what he was.

11  Q.  So you clearly didn't know whether he held some office

12  with the Gangster Disciples, right?

13  A.  I did not know, but I know that in order to be the dope

14  dealer that he was, that he had some affiliation with

15  somebody.

16  Q.  He was in some gang?

17  A.  Right.

18  Q.  That's a long way from saying that he is a governor of

19  the Gangster Disciples, right?

20  A.  No, I wouldn't put it that way.  That's what you are

21  saying.  I didn't put it that way.  I wouldn't put it that

22  way.

23  Q.  Having an affiliation with a gang is very different from

24  being a governor in a gang, isn't it?

25  A.  Yes, that's different, but -- okay.  Go ahead.

1    Q.   You end as you said earlier.  You did not investigate

2    whether this crime had anything to do with a gang, correct?

3    A.   I did not investigate.  Yes, I did not do that, yes.

4    Q.   Okay.  So all of that stuff about the Gangster Disciples

5    has nothing to do with this investigation, does it, as far as

6    you are concerned?

7    A.   No, I didn't -- right.  Right.  I didn't -- I did not.

8    Q.   Okay.  Now let's talk about narcotics.

9         You said that the homicides were the responsibility

10   of the detectives to investigate, correct?

11   A.   Yes.

12   Q.   And you said that you -- in gang crimes, you investigate

13   the narcotics sales, right?

14   A.   Yes.  That's what I -- that's my -- that's what I was

15   looking at.

16   Q.   Yes.  And you said that -- I believe that you said that

17   narcotics were the reason for 90 percent of the homicides in

18   Chicago, right?

19   A.   I believe.

20   Q.   And you and I can agree on one thing.  You said that the

21   good people and -- all of the people on the south and west

22   sides of Chicago are entitled to protection from these kind

23   of narcotic sales, right?

24   A.   Yes.  That's my belief.

25   Q.   Okay, sir.  You had Clifford -- you knew that Clifford

1    Frazier was a multikilo drug dealer, correct?

2    A.   No, I didn't know that.

3    Q.   You knew that he was involved in a two-kilo drug sale,

4    right?

5    A.   Yes, I knew he was there on the street.

6    Q.   You knew that he went there -- as you testified, he went

7    there to sell the drugs with his brother and Irving Clayton,

8    right?

9    A.   The three of them went there, right.

10   Q.   Yes.  And you knew that Clifford Frazier knew who the

11   drug connection was; that is, who this drug operation got its

12   drugs from, right?  This old man in a restaurant at 116th --

13   A.   Yeah, yeah, yeah.  He told me that, yes.

14   Q.   Yes.  And you knew that he had -- that on this day he

15   had two weapons, two automatic weapons, right?

16   A.   No, I didn't know that.

17   Q.   You are telling this jury, sir, that you didn't know

18   that Clifford Frazier had two automatic weapons that day?

19   A.   Yes, I'm telling -- he never told me that.

20   Q.   Weren't you listening to the radio dispatches that

21   night?

22   A.   Yes.

23   Q.   You didn't hear a dispatch that a MAC-11 was recovered

24   from Clifford Frazier's car?

25   A.   Oh, no.  I didn't know that.

1  Q.  So you didn't know anything about this.  The jury knows

2  more about this crime than you do.  Is that what you are

3  telling us?

4  A.  I don't know what the jury know.  I'm telling you what I

5  know.

6  Q.  Well, you --

7  A.  I did not know that.

8  Q.  You knew that Clifford Frazier emptied one of his

9  automatic weapons on a busy street on the south side of

10  Chicago where the good people of the south side of Chicago

11  are entitled to protection from people like Clifford Frazier,

12  right?

13  A.  I didn't know -- I didn't know that Clifford did no

14  shooting.  He did not tell me.

15  Q.  He told you he was in a gun battle, didn't he?

16  A.  No.  He told me there was a fight between him and that

17  guy, and that guy shot him.

18  Q.  So again, you are telling this jury that you didn't know

19  that Clifford Frazier shot a gun?

20  A.  No.  Right.  He didn't tell me that.

21  Q.  Okay.  And you didn't arrest Clifford Frazier, right?

22  A.  No.

23  Q.  You didn't protect anybody from Clifford Frazier, did

24  you?

25  A.  I was not there to protect him.  I answered the call

1    after it had happened.

2    Q.   You took a confession from Clifford Frazier.  He told

3    you that he was a drug dealer, and you didn't arrest him, did

4    you?

5    A.   He didn't tell me he was no drug dealer.  He told me

6    that the three of them went up to that location.

7    Q.   To sell drugs?

8    A.   To sell drugs, right.

9    Q.   What is your definition of a drug dealer, sir?

10        Is somebody going to that location to sell drugs a

11   drug dealer?

12   A.   Yes, I guess.  Possibly, yes.

13   Q.   You guess?

14   A.   If he had drugs, yes.

15   Q.   Now, you were asked, did the Cook County State's

16   Attorney's Office get these police reports?

17        Do you remember that question?

18   A.   Yes.

19   Q.   The Cook County State's Attorney's Office don't

20   investigate crimes, do they?

21   A.   No.  That's left up to the police department.

22   Q.   Yes.  The police department investigates crimes, right?

23   A.   Yes.

24   Q.   The Cook County State's Attorney's Office doesn't make

25   arrests, do they, sir?

1   A.   No.

2   Q.   The police does that, right?

3   A.   Yes.

4   Q.   The Cook County State's Attorney's Office don't initiate

5   charges.  They approve charges that the police initiate,

6   correct?

7   A.   Yes.

8   Q.   Okay.  Now let's talk about this alleged tip.

9        You told this jury that you got a tip from Mitch

10  McCullough.  Well, you got a call from Mitch McCullough, who

11  worked with the FBI, who said that they got a tip that Ant

12  was involved and Lanier was the shooter.  That's what you

13  told this jury, right?

14  A.   That's -- as I recall, that's where I got the

15  information.

16  Q.   Just to be clear, you said the phones lit up.

17       This was one tip that he told you about, right?

18  A.   That came from Mitch, yes.

19  Q.   Okay.  Now, the fact is, sir, first of all, you are not

20  sure that that came -- that that alleged tip came from Mitch

21  McCullough at all, are you?

22  A.   No, I'm not 100 percent sure.

23  Q.   It sounds pretty bad, doesn't it?

24       A tip comes in from the FBI that Lanier was the

25  shooter.  That sounds bad, doesn't it?

1  A.  I don't know what you mean by "bad," but yes, that's

2  what I can recall.

3  Q.  But the fact is, you don't know whether it came from

4  Mitch McCullough at all, do you?

5  A.  No.  I 100 percent -- I cannot say 100 percent that it

6  came from Mitch.  The only thing I remember, talking to him

7  during that time.

8  Q.  Maybe about other things, right?

9  A.  Could have been, but he did say something to me about

10  that date.

11  Q.  Okay.  Well, when you told this jury that testimony, you

12  didn't tell them that you weren't sure of this, did you?

13  A.  If I didn't, that's what I meant to say.  I was not 100

14  percent sure that it came from Mitch.

15  Q.  Well, you said it may have come from Mitch McCullough.

16  Well, you didn't say -- you didn't say this, but the fact is,

17  it may have come from Mitch McCullough, and it just may have

18  been a random caller to the telephone in your office,

19  correct?

20  A.  Could have been.  Could have been.

21  Q.  You don't know?

22  A.  No, I don't know.

23  Q.  So it may not have come from this FBI task force at all,

24  correct?

25  A.  You are right.

1   Q.   Second, you were mistaken about what you told the jury
2   that tip was, weren't you?
3   A.   I'm not sure what the question is.
4   Q.   Well, you said that -- you said that the tip was
5   whether -- now we know it may not have been from the FBI.  It
6   may have just been a random call to the gang crimes.  That
7   that tip was that Ant was involved and that Lanier was the
8   shooter.  That is just wrong, isn't it, sir?
9   A.   No, I don't say that's wrong.
10  Q.   Okay.
11  A.   I got it from somebody.
12  Q.   So did you give this -- were you asked this question,
13  and did you give this answer:
14          "So your recollection is that McCullough got a tip
15  through his work at the FBI that Ant was involved with
16  somebody named Lanier that night?
17          "A.   I don't think he mentioned Ant.  He may have
18  just said that this tip he got may have been Lanier did the
19  shooting."
20          Was that your answer to that question on Page 76,
21  Line 6 through 11 at your deposition?
22  A.   That could have been.  You know, this is 20-some years
23  ago -- 25 years, 30 years ago.  And to the best of my
24  recollection, that's the way I answered that question.
25  That's what I remember.

1    Q.   Yeah, but you didn't say to this jury that it may have

2    been -- well, first of all, you said that the tip was that

3    Ant was involved.  But the fact is, he didn't mention Ant,

4    did he?

5    A.   You said he did mention Ant?

6    Q.   Did not.  Did not.  Sorry.

7    A.   I don't recall exactly what the conversation was.

8    Q.   And not that Lanier was the shooter.  The tip may have

9    been that Lanier may have been the shooter, right?

10              MR. BAZAREK:  I am going to object under the

11   doctrine of completeness to these questions.

12              THE COURT:  Which passage are you referring to?  Is

13   there another passage?

14              MR. BAZAREK:  There is a --

15              THE COURT:  I will give you a chance to do your own

16   exam on that.

17              Go ahead, Mr. Safer.

18              Do you want to restate the question, Mr. Safer,

19   please.

20   BY MR. SAFER:

21   Q.   It's a tip that -- he may have gotten a tip that it may

22   have been that Lanier did the shooting, right?

23   A.   Yes.  I'm certain that that's -- it may have been.

24   Q.   Yeah.  Okay.

25              Now, who did this tip come from?  Who called in the

Oliver - direct by O'Keefe 1931

1  tip?

2  A.   I don't know what you mean, "Who called in the tip?"

3  Q.   Well, somebody gave the tip, right?  Somebody gave the

4  tip -- may have given a tip that Lanier may have done the

5  shooting.  Who was that person who gave the tip?

6  A.   I don't know.

7  Q.   Excuse me?

8  A.   I don't know.

9  Q.   So you have no idea who that person is, right?

10  A.   No.

11  Q.   Nobody has ever interviewed that person, right?

12  A.   No, not that I'm aware of.

13  Q.   So, sir, what was the basis of that person's knowledge?

14  A.   I don't know.

15  Q.   So you have no idea who the person was who gave the tip,

16  and you have no idea whether or not they had any firsthand

17  knowledge, correct?

18  A.   Right.

19  Q.   And you have no idea -- that is, you have no idea of

20  whether this person who made the call saw anything related to

21  these crimes, right?

22  A.   Right.

23  Q.   You have no idea whether this person heard anything

24  related to these crimes, right?

25  A.   No.

Q.    You have no idea whether this person had secondhand
knowledge, right?

A.    Right.

Q.    That is, you do not know whether they heard this from
someone who said they saw something, right?  You don't know
that?

A.    No.

Q.    And you don't know whether they heard it from someone
who heard it from someone else who heard it from someone else
who heard it -- who said that they saw something, right?

A.    You are right.

Q.    And you have no idea whether this person is completely
making this up, correct?

A.    Right.

Q.    You don't know whether it was a friend or relative of
the real murderer, who's trying to throw law enforcement off
the trail, right?

A.    Right.

Q.    So this information is completely worthless, isn't it?

A.    I wouldn't say that, you know.  When you start getting
calls with the same information, you know, then that's when
it cause you to look at that particular thing.

Q.    You had one call about -- you got information about one
call about Lanier, correct?

A.    The one call that I got -- the one conversation that I

1    had, but there was calls coming into gang crimes about it.

2    Q.   And you have never testified about any calls from gang

3    crimes, have you?

4    A.   I don't know if I testified to that, no.  I had no

5    reason to testify to that.

6    Q.   And you have never written a report about any tip that

7    you got?

8    A.   No.

9    Q.   And you have never seen a Chicago Police Department

10   report about this alleged tip, did you?

11   A.   Did I what now?

12   Q.   Have you ever seen a Chicago Police Department report

13   that says anything about this kind of alleged tip?

14   A.   No.

15   Q.   So this tip that was based -- that may have come in

16   either through McCullough or through a gang crimes phone,

17   that you have no idea who made it, that you have no idea what

18   the basis is of, that's what you are here to testify about,

19   sir, about that tip?

20   A.   Yes, that's what I'm saying, yes.

21               MR. SAFER:  I have nothing further, your Honor.

22               THE COURT:  Okay.  I will give defense counsel an

23   opportunity under the rule of completeness to point out any

24   other passage of testimony that rounds out the picture.

25               And then, Mr. Safer, I will give you one final

1    chance to elicit something, if necessary.

2            Mr. Bazarek, do you want to come to the microphone

3    in the spirit of the rule of completeness.

4                          RECROSS-EXAMINATION

5    BY MR. BAZAREK:

6    Q.   Officer Oliver, at your deposition you were asked

7    questions by Mr. Bolden's counsel, correct?

8    A.   Yes.

9    Q.   Okay.  And then beginning on Page 74, Line 21, were you

10   asked these -- 21 through -- I'm sorry.  Page 74, Line 21

11   through Page 76, Line 11.  Were you asked these questions,

12   and did you give these answers?  I will just read it to you.

13           "Q.  Can you tell me how you assisted in the

14   discovery of Mr. Bolden as a possible suspect?

15           "A.  Well, when there is a homicide such as this,

16   especially a double homicide such as this taking place there,

17   Anthony Williams, although he is a big dope dealer -- was a

18   big dope dealer, he still had a lot of enemies.  So we get a

19   lot of calls.  We get a lot of calls.

20           "And during this time there was one gang specialist

21   that was assigned to the FBI, and his name was Mitch

22   McCullough.  And I'm sure -- I'm not 100 percent positive

23   that, but I'm sure that someone had called the FBI with the

24   name Lanier.

25           "Q.  So Mitch McCullough was part of CPD but was

1    detailed to the FBI?

2            "A.  Right.

3            "Q.  And he worked with you in gang crimes?

4            "A.  Yes, before he left there.

5            "Q.  Would you -- in a case like this, a double

6    homicide, would you be reaching out to the other gang crime

7    specialists or to the FBI to try to generate leads?

8            "A.  Oh, no, no.  They will come to you.  All you

9    got to do is sit there.  They will come to you.

10           "Q.  How would Mitch McCullough have known that you

11   were the person to tell about this, that you were involved

12   with this investigation?

13           "A.  I'm not certain.  We was friends.  I mean, we

14   worked in the same unit.  Did he call us and say, 'Hey,

15   Oliver'?  You know, before he left and before T and I worked

16   together, they worked together.  So the information may have

17   went to T first.  But singly, I talked to him, too.

18           "Q.  So your recollection is that McCullough got a

19   tip through his work at the FBI that Ant was involved with

20   somebody named Lanier that night?

21           "A.  I don't think he mentioned Ant.  He may have

22   just said that the tip he got may have been Lanier did the

23   shooting."

24           And then when you, on Page --

25           THE COURT:  Let's ask him if that was his

1  testimony, and then you can go to a new page.

2  BY MR. BAZAREK:

3  Q.  Sir, were you asked those questions, and did you give

4  those answers during your deposition?

5  A.  Yes.  Yes.

6  Q.  Okay.  And then going to Page 97, beginning on -- I'm

7  sorry.

8       Going to Page 96, beginning on Line 20 through Page

9  98, Line 5, were you asked these questions, and did you give

10 these answers?

11      Officer Oliver, you can -- I will just read it to

12 you.  You don't have to read right now.

13 A.  Okay.

14      THE COURT:  State again for the record what page

15 and line numbers.

16      MR. BAZAREK:  Sure.  So it begins on Page 96, Line

17 20 through Page 98, Line 5.

18      THE COURT:  Go ahead.

19 BY MR. BAZAREK:

20 Q.  Were you asked these questions, and did you give this

21 answer:

22      "Q.  Earlier I asked you about how the name Lanier

23 came into this investigation, and you said, to your" -- the

24 word in the deposition says "acknowledge," but I believe it

25 was "knowledge" -- "it came through Mitch McCullough, who was

1    with the FBI.  Do you remember that?"

2    A.   Yes.

3    Q.        "A.  Yes.  I said he may have been the one that

4    came up with that.  And it may have come over the telephone

5    in the office, but I'm not certain.

6         "So when you say 'may have,' are you speculating,

7    or do you have some reason to believe that McCullough -- or

8    some recollection that McCullough --

9         "A.  I remember speaking to Mitch during that time.

10        "Q.  Okay.  And when you got the tip from

11   McCullough that Lanier did the shooting, what did you do with

12   that information?

13        "A.  I probably called Baker and told him.

14        "Q.  So was Baker your main liaison to this

15   investigation?

16        "A.  Yes, I would have spoken to him because I saw

17   him at the hospital, and I know that he was handling this

18   case -- was part of it.

19        "Q.  You don't recall sharing that information with

20   Detective Rowan, for example?

21        "A.  I don't think so.  Like I said, I would have

22   talked to Baker.

23        "Q.  How about Karl or Pesavento?

24        "Well, let me break that down.

25        "How about Detective Karl?

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 62 of 154 PageID #:19264
Oliver - further redirect - by Safer
1938

1           "A.  I didn't talk to Karl that much.

2           "Q.  How about Detective Pesavento?

3           "A.  I know him.  I would have spoken to him, but I

4    think it was Baker."

5           Sir, were you asked those questions, and did you

6    give those answers at your deposition?

7    A.  Yes.

8    Q.  Okay.

9           Officer Oliver --

10          THE COURT:  So this is supposed to be limited to

11   the rule of completeness.

12          Is there anything about the rule of completeness

13   that we need to cover?

14          MR. BAZAREK:  I'm sorry, your Honor?

15          THE COURT:  Your bonus exam here is limited to the

16   rule of completeness.

17          Is there any other passage that you wanted to read?

18          MR. BAZAREK:  No, your Honor.

19          THE COURT:  Okay.  Very good.  Thank you.

20          Mr. Safer?

21                  FURTHER REDIRECT EXAMINATION

22   BY MR. SAFER:

23   Q.  Mr. Oliver, you were just read about a conversation that

24   you may have had with Detective Baker.

25          In that passage, you are saying who you probably

 1    talked to, right?

 2    A.    Yes.

 3    Q.    You don't remember who you talked to, did you?

 4    A.    No.

 5    Q.    And then when you were read that first passage, it said

 6    someone called the FBI, correct, on Page 75, Line 9.

 7    Someone.  One person, correct, sir?

 8    A.    Yes, that's what I was saying there.

 9                MR. SAFER:  Nothing further, your Honor.

10                THE COURT:  All right.  Thank you.

11                Officer Oliver, we have completed -- this is

12    Judge Seeger.  We have completed your examination today.  So

13    you can step down, both literally and figuratively.

14                I wanted to thank you, sir, for testifying remotely

15    today.

16                I also wanted to thank the good people of the

17    United States District Court for the Eastern District of

18    Arkansas -- the federal courthouse in Little Rock,

19    Arkansas -- for all of the behind-the-scenes, logistical work

20    that they did to make this possible.  So thank you to our

21    colleagues in the judiciary in Arkansas for allowing the

22    remote testimony.

23                With that, Officer Oliver, we are going to end the

24    video line.

25                Thank you, sir, for testifying today.

1    THE WITNESS:  Thank you.  Thank you, your Honor.

2    Thank you for everything.

3    (Witness excused.)

4    THE COURT:  All right.  Let me just confirm.

5    Officer Oliver, are you there?

6    I hear no one, which is exactly what I expected.

7    Plaintiff's counsel, whenever you are ready.  You

8    may call your next witness.

9    MR. CROWL:  Judge, the plaintiff calls Cynthia

10   Steward.

11   THE COURT:  Great.

12   Actually, why don't we take a two-minute break

13   because we have to move the video screen out.  Otherwise, the

14   jurors aren't going to be able to see this witness.  So

15   everybody just hang loose for two minutes, and we will get

16   that fixed.

17   (Jury out at 3:12 p.m.)

18   (A brief recess was taken at 3:14 p.m.)

19   THE COURT:  Go ahead, counsel.  We are on the

20   record.

21   We have moved the video screen out of the way.  The

22   jury is taking a quick break.  We are ready to go.  But I

23   understand that counsel has an issue about the testimony of

24   Cynthia Steward.  She is going to testify shortly.  He wants

25   to reiterate a point made in a motion *in limine*.

1           Go ahead.

2           MR. BAZAREK:  Yes, your Honor.  In the Court's

3    ruling on Bolden's motion *in limine* No. 5 in the Court's

4    order of 9-22-21, Document 467, the Court wanted to hear

5    further information after learning more from the parties on

6    the issue about how much -- or what Ms. Steward will be

7    allowed to say.  So that's what I want to follow-up with the

8    Court on.  I can --

9           THE COURT:  Remind me which motion *in limine* No. 5

10   is.

11          MR. BAZAREK:  It was testimony about Steward's

12   knowledge of Eddie Bolden before the murders and information

13   that would have been provided to her from Ledell and maybe

14   Derrick.

15          So in a nutshell, Judge, here is what it is.

16   Mr. Bolden is going to say that he was not involved in any

17   narcotics activity, and he didn't know -- did not know the

18   victims Derrick Frazier and Irving Clayton.

19          Well, according to --

20          THE COURT:  Did not know them at all, or did not

21   know they were doing narcotics?

22          MR. BAZAREK:  Did not know them at all.

23          THE COURT:  Did not know them at all.

24          MR. BAZAREK:  I believe his testimony is going to

25   be, I don't know these guys.  I never saw them that night.  I

1942

1    know nothing about them.

2            Ms. Steward has testified at deposition that Irving

3    told her when Ant was not available to do the narcotics

4    transactions, that there were occasions when other

5    individuals would step in for Ant because he wasn't

6    available, and one of those individuals was Bolden.

7            So for the plaintiff to present to this jury that,

8    "Hey, I don't know these guys," Steward has direct -- can

9    give direct evidence to refute what Mr. Bolden is saying.

10           THE COURT:  Hang on one second.  Bear with me.

11           So you think Cynthia Steward is going to testify

12   about what Ant said about Bolden's involvement?

13           MR. BAZAREK:  No, no.  I am sorry, your Honor.

14           THE COURT:  No?

15           MR. BAZAREK:  What she has already testified to

16   under oath at her deposition was that there were occasions

17   where Ant was not available to do the narcotics transactions

18   with Derrick and Irving.

19           THE COURT:  Excuse me one second.  Our IT person is

20   here.  Bear with me.

21           Let's go off the record a second.

22        (A discussion was had off the record.)

23           THE COURT:  Take a step back and tell me what you

24   think she is going to testify to and why it should or

25   shouldn't come in.

1          Go ahead.

2          MR. BAZAREK:  Steward, if allowed, will testify

3   that in conversations that she had with Irving, the murder

4   victim, that he told her there were occasions when Ant was

5   not available to do the narcotics transactions at the J&J

6   Fish, that Eddie Bolden would sometimes step in along with

7   Roderick Stewart and one other individual.

8          So the whole notion of, Mr. Bolden doesn't know who

9   these guys are and all that is totally refuted by this

10  testimony.

11         And the other point, Judge, too.  They weren't

12  strangers to Mr. Bolden.  That's why they got into a car with

13  him.

14         I think the plaintiff would make the point that,

15  why would these two criminals let a complete stranger get

16  into their vehicle?  Well, he wasn't a complete stranger.

17         Ms. Steward has also testified -- and I know we are

18  prohibited, Judge, from this testimony coming in -- that she

19  knew of Bolden as a killer before these murders.  So she knew

20  of that.  That's her testimony.

21         THE COURT:  Well, let me stop you now.  I want to

22  make sure that we have covered the motion *in limine*.

23         Does she know she can't say that on the witness

24  stand?

25         MR. BAZAREK:  That's what she testified to.  No, I

1    have not -- I'm assuming -- it's their witness, Judge.

2              THE COURT:  Have you covered --

3              MR. CROWL:  I absolutely have, Judge, and she does

4    not know that he is a killer.  She is not going to say

5    anything about that.  I told her, including this morning,

6    that she is not to say anything about that, and it should not

7    be elicited.

8              THE COURT:  Okay.  All right.  Well, that's one

9    problem solved.

10             Go ahead.

11             MR. BAZAREK:  But anyway, the Court had already

12   allowed us to hear testimony from Steward that she had heard

13   the name Eddie Bolden from Irving, and it is important

14   because it shows they were not strangers.

15             So the picture that the plaintiff is going to say

16   is that he didn't know these individuals.  So if she gets on

17   the stand today -- Mr. Bolden has not testified.  I mean,

18   obviously we would have to bring her back for that and go

19   over her testimony that she gave on that.

20             So that's in a nutshell, Judge.  And I think we are

21   entitled to this information.

22             THE COURT:  All right.  So let me take a step back.

23             Under your view, she should be -- let me take this

24   one by one.

25             Under your view, she should be able to testify that

1   she heard from Irving, the decedent --

2                    MR. BAZAREK:  Yes.

3                    THE COURT:  -- that Bolden sometimes did drug

4   dealing?

5                    MS. BOUDREAUX:  Yes.

6                    MR. BAZAREK:  Yes.

7                    THE COURT:  So explain the hearsay issue.  Does it

8   follow within -- it's offered for its truth, right?  You want

9   to offer it for the truth that he really did do drug dealing,

10  right?  So it's offered for its truth.

11                   So is there an exclusion for a decedent or what?

12                   MR. BAZAREK:  It's a statement against interest.

13  He is describing to her the narcotics transactions that he is

14  engaging with Mr. Bolden when Ant is not available.

15                   THE COURT:  Well, is Irving saying that Bolden

16  sometimes does drug transactions with Bolden, or is Irving

17  saying Bolden sometimes does drug transactions?  Because --

18                   MR. BAZAREK:  No, no.  It would be -- the

19  testimony, as I understand it, would be that when Ant was not

20  available to do the drug transactions with Derrick and

21  Irving, you could have Mr. Bolden step in or Mr. Roderick

22  Stewart step in, and then there was another individual.

23                   Basically if the boss, the governor, is not

24  available, he has got a trusty aide-de-camp who can engage in

25  the narcotics transactions with Irving and Derrick.

1346

```
1    THE COURT:  That doesn't sound like a statement
2    against interest.  That sounds like a statement against
3    Bolden.
4         In other words, it would be one thing if the
5    decedent said, "I'm the world's worst person, and I sell a
6    lot of drugs."  That's a statement against interest.  But if
7    Irving says something bad against Bolden, that's not a
8    statement against interest.  It's a statement against Bolden.
9         As I understand a statement against interest, it's
10   got to be against the speaker's interest.
11       (Counsel conferring.)
12        THE COURT:  I am happy to have anyone correct me as
13   a general matter on all things large and small.
14        MR. BAZAREK:  Judge, could I have a moment?
15        THE COURT:  Of course.
16        Is she local, too?  Is she local?
17        MR. CROWL:  Yes, Judge.  She lives on the south
18   side.  She has been here since 9:30.
19        THE COURT:  Okay.  Thanks.
20       (Brief pause.)
21        THE COURT:  Could plaintiff's counsel clarify your
22   position about whether Bolden knew these individuals?  I want
23   to make sure I understood what defense counsel said.
24        What do you expect the position to be in your camp
25   about whether Mr. Bolden knew the two victims?
```

1        MR. CROWL:  He did not, Judge.

2        THE COURT:  Did not.  Okay.  That's what I thought.

3        MS. BOUDREAUX:  I'm sorry.  I think the position,

4    Judge, is that Irving Ledell Clayton is making a statement

5    against his own interest --

6        THE COURT:  Right.

7        MS. BOUDREAUX:  -- by admitting to engaging in

8    narcotics activities.  So it has trustworthiness based on

9    that.  I think that's the cornerstone of that hearsay

10   exception.

11       THE COURT:  Well, as I understand the exception --

12   and I'm happy to have you correct me if I have this wrong, or

13   we can bring her back.  If I'm wrong today and you tell me

14   that I'm wrong, she is on the south side.  It's easy to fix.

15       As I understand the rule, an exception applies when

16   someone is speaking against their own self-interest.  It's

17   reliable because people don't like to say bad things about

18   themselves.  That's how humanity works.  Right?  So if you

19   say something against your own interest, it's presumed to be

20   reliable.

21       I don't think that's what this is, because here the

22   decedent is saying something negative about someone else, not

23   about himself.

24       So I don't think that hearsay exception would

25   apply.

1          MS. BOUDREAUX:  Okay.

2          And then there is another argument here, that it's

3     not for the truth of the matter asserted, but it is relevant

4     to show that if officers had followed up with Cynthia Steward

5     regarding Eddie Bolden, she would have given them this

6     information.  The fact that it was said is enough.  It

7     doesn't have to be true because it shows her state of mind.

8          THE COURT:  Well, is her state of mind at issue?  I

9     don't think so.

10          MS. BOUDREAUX:  I think that this is --

11          THE COURT:  I don't mean to interrupt you.

12          The officer's state of mind is obviously at issue.

13     So that can be a gaping hole for admissibility, so to speak.

14     Don't quote that back at me.  I am just thinking out loud

15     here.  That can be an avenue for getting stuff into evidence,

16     because state of mind is at issue.

17          I don't think Cynthia Steward's state of mind is at

18     issue.

19          MS. BOUDREAUX:  I think this is tied to -- they are

20     going to allege that the police officers failed to follow-up

21     with Cynthia Steward about who may have committed the murder.

22     And this is the business about going through her papers and

23     her pointing out other drug dealers -- other Gangster

24     Disciples that could have ordered the hit.

25          THE COURT:  Well, it doesn't seem to me like it was

1     enough just -- sometimes statements are not hearsay because
2     it was enough that it was said.  I don't think that's what
3     this is.  I think it is, as I understand it, being offered to
4     prove that Eddie Bolden really did deal drugs.  So I think
5     it's offered for the truth unless it's hearsay.  I don't hear
6     that an exception applies.

7              MS. BOUDREAUX:  Well, I think the argument that was
8     in my mind outside of what's on this paper is that it is not
9     for the truth of the matter asserted, but it's for knowledge,
10    knowledge of Bolden's relationship with Derrick and Irving,
11    which rebuts their assertion that Derrick and Irving would
12    not have allowed a stranger to get into the car.

13             THE COURT:  Well, I will tell you how I am
14    currently thinking of this.  And I will tell you, I have got
15    to think about this some more.

16             I don't think her knowledge is at issue in a
17    lawsuit like it is with the defendant officers.  The
18    defendant officers' stuff can come in because what they knew
19    and what they didn't know is at issue in litigation.  I don't
20    think that's true the same way -- I don't think her knowledge
21    is at issue in the same way as the knowledge of the officers
22    is at issue.

23             So that's going to be my ruling.  I will tell you
24    perhaps my view will change as I think about this some more
25    and hear the evidence.  If necessary, it seems like we can

1    always bring her back.

2            MS. BOUDREAUX:  That would be fine, Judge.

3            Just so we are in safe waters, we can still elicit

4    that she had heard the name Bolden before?

5            THE COURT:  I think I said that that is

6    permissible, didn't I?  Didn't I say that before?

7            Any objection to that on the plaintiff's side?  She

8    had heard the name Bolden before.

9            MR. CROWL:  If they can lay a foundation for that.

10           THE COURT:  She just says, "I" -- gets on the

11   witness stand and said, "I have heard this name before."

12   That's foundation.

13           MR. CROWL:  But the reason, Judge, that the

14   foundation -- there is two kinds of foundation.

15           One is, does she have personal knowledge?

16           THE COURT:  Did she hear it?  Yeah.

17           MR. CROWL:  The foundation I'm talking about is:

18   When did she hear it?  From whom?  And where?  The foundation

19   for a conversation.

20           The reason that's important, Judge, is, if she

21   heard the name Bolden after his arrest from the police

22   officers --

23           THE COURT:  I think the only point of this is not

24   she heard the name Bolden because she got a subpoena.  She

25   heard the name -- I assume you are going to say that during

1    this period of time, you heard the name Bolden, like before

2    the key events.

3                MS. BOUDREAUX:  Correct.

4                THE COURT:  Yes.

5                MR. CROWL:  And that's when I object on foundation,

6    Judge.  I will make very clear:  When?  Where?  Who else was

7    present?

8                THE COURT:  Right.

9                MR. CROWL:  And then, what was said?

10               THE COURT:  Well, although I don't know that those

11   are really foundation objections in the traditional sense.

12   People can have a sense that it happened.  They may not know

13   all the details.

14               In other words, I don't know that it requires

15   exacting scrutiny as to all the particulars.  I know that I

16   have seen a Patriots game at some point in the last year.  I

17   don't know when it was exactly or where I was, per say, but I

18   know I have seen a game.  I could testify that I saw a game

19   even though I may not know the particulars.

20               Go ahead.

21               MR. CROWL:  My understanding, Judge, of the rules

22   of evidence is, if you are going to put in a conversation

23   like that, that you heard something, even if the person can't

24   give a good foundation, they need to at least say:  When was

25   it?  Where was this?

1352

```
 1          THE COURT:  What rule?  What rule?

 2          MR. CROWL:  Judge, I can look at that more.  But

 3   foundation for conversation is:  When was it?  Where was it?

 4   Who else was present?

 5          THE COURT:  So I'm satisfied that there is enough

 6   here for her to testify that she heard the name.  I'm sure

 7   defense counsel is going to elicit as much details on it.

 8   And if you think it's too abstract, it sounds like a fruitful

 9   avenue for -- you have got your cross already written.  This

10   is going to be easy for you.  Okay.

11          MR. CROWL:  Thank you, Judge.

12          THE COURT:  Anything else on this, folks, motion *in*

13   *limine*?

14          MS. BOUDREAUX:  No, Judge.

15          THE COURT:  Folks, we did not give you all a break.

16   The jury has had a break.

17          Would you like five minute to go to the restroom,

18   get a drink of water?

19          MS. BOUDREAUX:  Yes.

20          THE COURT:  Can we keep this, like, five minutes on

21   the nose, so to speak?  Is that good?

22          MS. BOUDREAUX:  Yes.  Thank you.

23      (A brief recess was taken at 3:30 p.m.)

24      (Jury in at 3:35 p.m.)

25          THE COURT:  All right, folks.  Welcome back.
```

1933

1    That was a little bit longer of a break than I had

2  expected.  I will tell you, in general, in my experience,

3  juries tend to not mind when breaks are a little longer than

4  expected.

5    I will tell you that when we broke there, the

6  parties raised a procedural issue.  And I will tell you that

7  when procedural issues are raised outside the presence of the

8  jury, it speeds things along.  So if the parties take a

9  minute to raise an issue outside your presence, it speeds

10  things along.  And that's exactly what they should be doing,

11  folks.  Instead of you folks sitting here and listening to

12  the lawyers argue certain points in your presence, it's best

13  to give you guys a break, relax a little bit, and just do it

14  privately with me.  So that's why that went on a little bit

15  longer.

16    So here we are for the last session of the day.

17    Mr. Crowl.

18    MR. CROWL:  Thank you, Judge.

19    The plaintiff calls Cynthia Steward.

20    THE COURT:  Come on back, Ms. Steward.  Come on

21  back.  Come on up by me, if you would, please.

22    Hi there.  Come on up and just watch your step.

23  There are a couple stairs there.

24    If you could, raise your right hand.  Put your

25  water down one second and raise your right hand and repeat

 1  after me.

 2        (Witness sworn.)

 3              MR. CROWL:  Judge, may Ms. Steward remove her mask?

 4              THE COURT:  I am sorry?

 5              MR. CROWL:  May Ms. Steward remove her mask, your

 6  Honor?

 7              THE COURT:  Oh, yes.  Absolutely.  Thank you.

 8              You are the only person in the courtroom that gets

 9  to be here without a mask.  The purpose of it is, we want the

10  jury to be able to see you and to listen to you.  That way we

11  get a clean record.  So you are welcome to take your mask off

12  and just be nice and natural.

13              THE WITNESS:  Okay.

14              THE COURT:  Okay.  There is a pitcher and some cups

15  of water to your left.  If you need something to drink, help

16  yourself.

17              Counsel, whenever you are ready.

18              MR. CROWL:  Thank you, Judge.

19              CYNTHIA STEWARD, PLAINTIFF'S WITNESS, SWORN

20                        DIRECT EXAMINATION

21  BY MR. CROWL:

22  Q.   Good afternoon, Ms. Steward.

23  A.   Good afternoon.

24  Q.   I notice you have a hoarse voice a little bit.  You can

25  turn that microphone a little bit closer to you so you don't

1    have to --

2    A.    Okay.

3    Q.    There you go.  That's easier, I think, for everyone to

4    hear.

5          Could you state your full name and spell it for his

6    Honor's court reporter, please?

7    A.    Cynthia Steward.

8    Q.    And how do you spell Steward?

9    A.    S-t-e-w-a-r-d.

10   Q.    Do you live in Chicago, Ms. Steward?

11   A.    Yes.

12   Q.    How long have you lived in Chicago?

13   A.    Fifty-four years.

14   Q.    That's your entire life, right?

15   A.    Yes.

16   Q.    What do you do as an occupation?

17   A.    I'm a registered nurse.

18   Q.    Do you have any children?

19   A.    Yes.

20   Q.    How many?

21   A.    Two.

22   Q.    And what are their names?

23   A.    Donnell Walker and Irving Clayton, Jr.

24   Q.    And is Irving Clayton, Jr. named after Irving Ledell

25   Clayton?

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 80 of 154 PageID #:19232
Steward - direct by Crown
1356

1   A.   That is correct.

2   Q.   And Irving Clayton -- Irving Ledell Clayton, what

3   relationship did you have with him back in 1994?

4   A.   He was my fiancé.

5   Q.   Do you have any grandchildren, ma'am?

6   A.   I have 11.

7   Q.   Now, Ms. Steward, I want to take you back to January

8   29th of 1994.  You remember that night, right?

9   A.   Yes.

10  Q.   And you mentioned that at the time you and Irving

11  Clayton -- you were his fiancée; is that right?

12  A.   Yes.

13  Q.   How long had you known Irving Clayton?

14  A.   Approximately five years.

15  Q.   And at the time were you living together?

16  A.   Yes.

17  Q.   Where?

18  A.   At my home on 58th Street.

19  Q.   On that evening, tell the members of the jury what you

20  were planning.

21  A.   That day I had Irving a surprise birthday party, and I

22  was having a surprise birthday party that day.

23  Q.   How old was he going to be?

24  A.   How old was he?

25  Q.   Yes.

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 81 of 154 PageID #:19238
Steward - direct by Crown
1357

1   A.   He would have been 24.  Well, he was 24 on the 26th.

2   I'm sorry.  But I had him a surprise birthday party three

3   days after his birthday.

4   Q.   So you were planning a birthday party for him at what

5   time of the day on the 29th?

6   A.   The party was supposed to start at 10:00.

7   Q.   I want to ask you, Ms. Steward, about some telephone

8   calls that you received before the birthday party.

9        Did you receive some telephone calls from Clifford

10  Frazier?

11  A.   Yes.

12  Q.   Did you know Clifford Frazier?

13  A.   Yes.

14  Q.   How long had you known Clifford Frazier?

15  A.   About the same amount of time I had known Irving.  Five

16  years.

17  Q.   Tell the members of the jury what Mr. Frazier did in

18  terms of phone calls to you on that day.

19  A.   I received a total of three telephone calls.  Each time

20  Cliff called he asked was Irving and Derrick there.  And I

21  said, "No, they outside.  I'll let them know that you

22  called."  And that was around the first call, somewhere

23  around afternoon, after like 2:00 or 3:00.

24       MR. BAZAREK:  Objection.  Hearsay, your Honor.

25  Move to strike.

1          THE COURT:  Overruled.

2     BY MR. CROWL:

3     Q.   You may answer.

4     A.   Then he called back about around 7:00 o'clock that

5     evening.  And he asked me where was Irving and Derrick?  I

6     said, "They outside moving around, doing something."

7               He said, "Well, did you tell them I called?"

8               I said, "No, I actually forgot when they came in."

9     I said, "I'll let them know when they come back in."

10              Then he called back about 8:00 o'clock that

11    evening.  And each time he called, he kept asking for them.

12    And he kept letting me know that he was in Wisconsin.  So I

13    said, "Okay.  I'll let them know."

14    Q.   And were these calls where Mr. Frazier called you three

15    times and said he was in Wisconsin, were those unusual?

16    A.   Yes.

17    Q.   Why?

18    A.   Because Irving and Derrick had beepers.  So he could

19    have paged them.

20    Q.   And then that afternoon, on the 29th, did you see Irving

21    and Derrick -- Irving, your fiancé, and Derrick -- what's his

22    relationship to Mr. Frazier?

23    A.   Can you repeat that, please.

24    Q.   I am going to ask you whether or not you saw Irving and

25    Derrick leave your house that afternoon, but I want to remind

1    us, Irving is your fiancé; is that right?

2    A.   Yes.

3    Q.   And Derrick is what relationship to Clifford?

4    A.   They are brothers.

5    Q.   So did you see your fiancé and Clifford Frazier's

6    brother leave -- leave your house?

7    A.   That evening?

8    Q.   Yes.

9    A.   Yes.

10   Q.   Tell us about that, please.

11   A.   Irving and Derrick, they had came in from taking the --

12   my two sons and Irving and Derrick went to the barbershop.

13   They all went and got haircuts.

14        Irving and Derrick dropped my two sons off.  Then

15   they went outside.  They said they will be back.  They gonna

16   make a few runs.

17        When they came back in, I'd say around about 6:00

18   or 7:00 o'clock that evening, they said that it was a lot of

19   people on Cottage Grove, and they came in and got some guns.

20   Q.   And then the evening of January 29th, where did you go?

21   A.   Where did who go?

22   Q.   Where did you go?

23   A.   Well, I left for the party around about 9:00 o'clock

24   that night.

25   Q.   And tell the members of the jury what happened to you

1    when you went to Irving's birthday party.

2    A.   It was a couple of friends of mine, Monica and Loretta,

3    they took me to the birthday party.  And when we arrived at

4    the lounge, it was detective cars was just lined up in the

5    middle of the street on Racine.  And we didn't really think

6    anything of it, you know.

7          So we started getting out of the car, going in the

8    trunk, taking the food out.  And one of the detectives said,

9    "What's your name?"  And I just looked some kind of way.  And

10   then they asked again.  "What's your name?"  And I said,

11   "Cynthia.  Why?"  And everybody just started jumping out of

12   they cars.

13   Q.   And after the officers jumped out of their cars, what

14   did you do?

15   A.   Well, they walked over to me and said there has been a

16   shooting.  And I said, "Well, I figured something because you

17   all got the streets all blocked, you know, where you can

18   almost barely pass, you know."

19          And that's when one of the officers said Derrick

20   has been shot.  He has been killed.

21   Q.   And after the officer said that Derrick -- this is

22   your -- this is Clifford's brother, right?

23   A.   Yes.

24   Q.   -- had been shot and killed, what did you do?

25   A.   Out of shock, I just took off running.

1   Q.   And what happened next?

2   A.   I believe I ran maybe about -- maybe two or three blocks

3   before I just collapsed.  And when I was getting the -- when

4   I was running, I just -- it was like people were coming out

5   of the lounge.  The police chasing me.  I should say

6   detectives.  And the crowd is chasing them to find out why

7   they were chasing me.  They didn't know what they had just

8   told me.

9   Q.   What happened after that, Ms. Steward?

10  A.   When everybody got caught up with me, the detectives

11  was, like, helping me up because I had fell down in the snow.

12  And that's when they told me that Irving was at Northwestern

13  Hospital.

14  Q.   Let me stop you for one second.

15       Who told you that Irving -- that's your fiancé; is

16  that right?

17  A.   Yes.

18  Q.   Who told you that Irving is at the hospital?

19  A.   Detective Oliver told me that Irving was at Northwestern

20  Hospital in critical condition.

21  Q.   And what happened next?

22  A.   Then they got me to the car, and they started asking me

23  a lot of questions.

24  Q.   Whose car were you in?

25  A.   The detective car.

1    Q.   Who was in the driver's seat of that car?

2    A.   Detective Oliver and another detective.

3    Q.   And where were you in that car?

4    A.   I was in the back seat.

5    Q.   And what was said in that conversation, Ms. Steward?

6    A.   They asked me did I know what was going on.  They asked

7    me questions of, what were they doing?  Where were they

8    headed?  And do I have any knowledge of who could have shot

9    them and killed them?  So I just started giving them

10   information.

11   Q.   What did you tell Police Officer Oliver and this other

12   person in the car as to who might have done this?

13   A.   I told them that we were told that Irving and Derrick

14   had a hit from the GDs on them.  And they said, "Do you know

15   who could have called the hit?"  And I just gave them names

16   of ranking gang members.

17            And I explained to them that I had left Andre

18   Kimbrough house, and Andre Kimbrough had told Irving and

19   myself that the GDs wanted him to do it, but he said he told

20   them that he couldn't do it.

21   Q.   And you told this to Officer Oliver and the other police

22   officer?

23   A.   And his partner, yes.

24   Q.   In that conversation did anyone ask you whether or not

25   Clifford Frazier might have had anything to do with this?

1    A.    Yes.

2    Q.    Who asked you that?

3    A.    Detective Oliver.

4    Q.    What did you tell him?

5          What did you tell him when he asked if Clifford

6    Frazier could have had anything to do with this?  What was

7    your answer to that?

8    A.    "No.  You got to be crazy.  No, Cliff would never do

9    something like this to his brother."

10   Q.    And why did you say that?

11   A.    Because Clifford wasn't here in Chicago.  He was calling

12   me, telling me he was in Wisconsin.  So I didn't understand

13   why he would ask me something like that.

14   Q.    And did you tell Officer Oliver and the other police

15   officer that Clifford Frazier said he was in Wisconsin?

16   A.    They never asked me the question.  I didn't know

17   Clifford was shot that night.

18   Q.    So you mentioned that you gave the names of people that

19   you thought could be associated or could have done the hit.

20   What names did you give, if you remember now?

21   A.    Ant, Andre Kimbrough, Charlie B., Jay, Big Kenny, Dog,

22   Byron.  I believe that's it.  May have been more.

23   Q.    Did they ask you at any point why there might have been

24   a hit out?

25   A.    Well, when they asked me, I said, well, I was told by

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 88 of 154 PageID #:19284
Steward - direct by Crown
1964

1    Irving and Derrick that it was a lot to do with drugs and

2    dues that you pay on the street.

3    Q.   And you said dues that you pay on the street?

4    A.   Yes.

5    Q.   What happened after this conversation with Police

6    Officer Oliver and the other officer?

7    A.   They asked me did I know where any of these people hung

8    out at and did I know where any of them lived.

9    Q.   At any point did you say that you wanted to go to the

10   hospital?

11   A.   Yes.

12   Q.   And what was their answer to that?

13   A.   "We need you to answer some questions.  We need you to

14   ride around so we can find out who may have done this."

15   Q.   And so what happened next?

16   A.   So then we started riding around different areas and the

17   addresses that I was giving to them.

18   Q.   How long were they driving you around looking at these

19   areas and addresses?

20   A.   About two hours.

21   Q.   During that time frame, did anything strange happen?

22   A.   Yes.  We rode different areas.  As we was riding down

23   58th Street, which I lived on 58th right off of Calumet and

24   King Drive, we was headed east on 58th.  And like when we got

25   to, like, Indiana, they saw another detective car going west,

1    coming toward us.  We got to, like, Prairie, and they started

2    saying, "Get down.  Lay down.  Get down.  Get down.  Get down

3    on the back seat.  Get down on the back seat.  We don't

4    want" -- whoever the other officers was -- "to see you."  So

5    I just hurried up and laid down on the back seat.

6    Q.   When you were lying down on the back seat of this car

7    being driven by Officer Oliver, what happened?

8    A.   The officer that was going westbound down 58th was

9    talking to the -- you know, because we were heading

10   eastbound.  So they were like this, and they were just having

11   conversations.  They were just talking to each other about

12   cases and where were they headed and things like that.

13   Q.   How long were you lying on the back seat of that car?

14   A.   About 15 to 20 minutes.

15   Q.   And what happened after that, Ms. Steward?

16   A.   I was terrified.  I mean, why y'all -- I didn't

17   understand why I should be laying down on the back seat.  Why

18   didn't they want other officers to see me?  I didn't

19   understand it.

20   Q.   So after that 15- or 20-minute period, what happened

21   then?

22   A.   We went riding around some more.  We went down 61st,

23   61st and Prairie.  We went down -- we went from 61st and

24   Prairie all the way to State.  We rode down State to 59th

25   and -- 59th and State, because all of these locations was

1    spots that, you know, these high-ranking members were -- like
2    pool halls, lounges, and things like that.  So I was pointing
3    out different places.
4         Then we came back to, like, 57th, and I was telling
5    them that's where Andre Kimbrough live.  So I was giving them
6    locations where people were meeting up.
7    Q.   And you mentioned that you gave a whole series of names.
8    Did you ever give the name Eddie Bolden or Lanier?
9    A.   No.
10   Q.   Did you even know an Eddie Bolden or Lanier at that
11   time?
12   A.   No.
13   Q.   During your conversations in the car with Police Officer
14   Oliver and the other officer, were questions ever asked about
15   where Irving was getting the drugs from?
16   A.   Yes.
17   Q.   What did you say?
18   A.   I didn't know the person that Irving was getting the
19   drugs from.
20   Q.   Were any questions asked about how much the drug deal
21   that night on Cottage Grove was going to be?
22   A.   Say that again.
23   Q.   Did they ask any questions about how much money or the
24   amount of drugs were going to be for that drug deal that
25   evening?

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 91 of 154 PageID #:19037
Steward - direct by Crown
1967

1    A.   I didn't know exactly how much drugs went up there that
2    evening.  I didn't know.  But they asked me.
3    Q.   Did the officers ask you anything about money?
4    A.   Yes.
5    Q.   Tell the members of the jury what they asked about money
6    and which officer asked it.
7    A.   I was asked, were they any money -- was there any money
8    in my house?  Was there any drugs in my house?  Was there any
9    guns in my house?  I told them none of this was in there.
10        They asked me where is any money hid, drugs, guns,
11   or anything like that.  I said, "Drugs is not hidden at my
12   house."
13   Q.   Who asked you those questions?
14   A.   Detective Oliver.
15   Q.   And this was for about a two-hour period -- is that what
16   you said -- in terms of the amount of time you were in the
17   car?
18   A.   Yes.
19   Q.   At the end, did they take you to the hospital?
20   A.   Yes.
21   Q.   I am going to take you now from January 29th, the night
22   that we were just talking about, to the next day,
23   January 30th.
24        My understanding, ma'am, is that Irving passed on
25   the morning of January 30th; is that right?

1   A.   Yes.

2   Q.   And were you with him?

3   A.   Yes.

4   Q.   After that occurred, did you get a telephone call from

5   Clifford Frazier?

6   A.   Yes.

7   Q.   Tell the members of the jury what was said in that call.

8   A.   Cliff said he wanted me to give the police all the drugs

9   that Irving and them had.  And I told him, "I don't have no

10  drugs at my house."

11  Q.   Was anything else said that you remember in that

12  conversation?

13  A.   Yes.  I mean, I told him -- I said, "The drugs at your

14  house."  I told him I didn't have nothing.

15       I told Clifford over the phone that I had just

16  transported -- the day before the shooting I had just took

17  $100,000 to Derrick mom's house.

18  Q.   And do you know why Clifford Frazier was calling you to

19  ask you to give any drugs to the police?

20       MR. BAZAREK:  I object to the form of the question.

21  Also calls for speculation.

22       THE COURT:  The question is, "Do you know?"  So

23  overruled.

24  BY MR. CROWL:

25  Q.   Do you know?

1    A.    Do I know why Clifford --

2    Q.    Yes.  Do you have any idea why he would be asking you to

3    give any drugs that you might have to the police?

4    A.    No, because the drugs was at his house.  So I didn't --

5    I told him over the phone that I took $100,000 to his mom

6    house.  So I didn't understand why he asked me about it and

7    the drugs are stored at his house.

8    Q.    That same day, did officers come to your house?

9    A.    Yes.

10   Q.    Which officers came to your house?

11   A.    Officer Oliver, George Karl, and it was another one.  I

12   don't know the other one name.

13   Q.    And did you have a conversation with Officer Oliver at

14   the beginning of the time when he came to your house?

15   A.    Yes.  They came in, and they started asking me questions

16   and asking was there any drugs.  And I said, "No, there's no

17   drugs here."

18         And Oliver said, "Well, you lied.  You didn't tell

19   us about it was a gun here."

20         And I said, "I did not know the gun was here

21   because I called myself looking."

22         And Detective Oliver said, "Well, you gave Reggie

23   his gun.  You gave Reggie a gun," I should say.

24         And I said, "I found that gun."  And I said, "I

25   remember Reggie giving Derrick a gun."  I said, "That's why I

1    returned it to him.  I gave him his gun back."

2              And he said, "What else is in here?"

3              I said, "Nothing else."  And my baby started

4    crying.

5    Q.   And when you say your baby, this is who?

6    A.   Irving, Jr. start -- was crying.

7    Q.   How old was he at the time?

8    A.   He was two.

9    Q.   And what happened when Irving, Jr. started crying?

10   A.   I tried to reach for him and pick him up.  My dad was

11   coming down the hallway.  And he was like, "No, no, no, no."

12   He said, "No."  And my father was like trying to get my son.

13   I was like, "No.  Come on, baby."

14             And he said, "Let him get the baby," he said,

15   "because I'm going to hold you."  He said, "I'm going to have

16   you charged with conspiracy to murder."

17   Q.   Who said that to you?

18   A.   Officer Oliver.

19   Q.   During the -- well, the time when the officers were in

20   your home, what else did Officer Oliver or any of the other

21   officers ask you?

22   A.   Officer Oliver was asking me do they have any keys.  And

23   Karl was asking, you know, was there any drugs or do I know

24   the name of anybody?  The third officer, he left out.  I

25   never got his name.  And he left out.  He went -- I don't

 1    know.  He just left out the door.

 2            And they wanted to know -- they wanted keys, you

 3    know, keys to doors or whatever.  They asked, you know, where

 4    are the keys at?  Is it any lockboxes?  Safe deposit boxes?

 5    Bank accounts?

 6            I said, "No."  I said, "The only thing that I know

 7    about is that they be at a bowling alley.  They have, like,

 8    lockers at the bowling alley."

 9            And then I explained that I had took $100,000 to

10    Derrick's mom house.

11            So they asked me -- they wanted to -- I went and

12    got the keys.  And they said, take off anything -- just your

13    house keys and leave everything back -- leave everything else

14    on the key ring.  So I took my house keys off, and I handed

15    them the key rings.

16            So Karl asked was there anything I was able to

17    identify, like certain keys.  And I was like, no.  I said

18    they might be Derrick keys to his mom house, because I just

19    knew the keys after, you know, trying to use them, not just

20    by looking at them.

21            And they just wanted to know was there any bank

22    accounts?  Where was the drugs coming from?  So I said, "I

23    don't know the big man that they get the drugs from."

24            And they said, "Well, you got any books -- any

25    phone books with anything Irving and Derrick has written

1    down?"

2         So I was like, "Well, they really don't have a

3    phone book."

4         And they said, "Well, you got papers with receipts

5    or anything like that with -- bank account receipts or

6    deposit box statements or something?"

7         So I just let them go through the papers.  They

8    just went through the papers on my bed, and they just went

9    through them.

10   Q.   Did they take any papers?

11   A.   They took receipts, papers.  I mean, I didn't see which

12   exact papers they took, but I can just see them just taking

13   like several different papers; and, of course, I gave them

14   the keys.

15   Q.   And you mentioned that there was a locker in a bowling

16   alley.  Can you tell us what that locker was?

17   A.   Well, they had -- Irving and Derrick both had lockers at

18   the bowling alley.  Irving locker key was on that key ring.

19         And they asked me, do I think any money in there?

20         I was like, "I don't know."  I said, "I can't say

21   if any money was in there or not.  I just know what I took to

22   Derrick's mom house."

23   Q.   Did they ever return any of these keys to you?

24   A.   No.

25   Q.   Did they ever return any of the paperwork to you?

1  A.  No.

2  Q.  Did they ever give you an inventory for the keys?

3  A.  No.

4  Q.  Did they ever give you an inventory for the paperwork?

5  A.  No.

6  Q.  Did they ever show you a search warrant?

7  A.  No.

8  Q.  Did they ever tell you whether or not money was found in

9  that locker?

10  A.  No.

11  Q.  Had you ever seen Irving, your fiancé, with a car alarm?

12  A.  Yes.

13  Q.  Can you describe that for us, please?

14  A.  It's like a regular, you know, alarm keypad, black --

15  like a dark gray but more on the black side.  And it was a

16  car alarm beeper that would alert you in the house that

17  somebody was trying to break in your car or hit your car.  It

18  wouldn't -- like car alarms would sound outside.  If that

19  happened, the alarm would not sound outside.  The keypad

20  would make the noise.

21  Q.  Do you know whether or not that gray car alarm -- you

22  said it also had some black in it also; is that right?

23  A.  Yes.

24  Q.  Do you know whether or not that was in the house at the

25  time, or did you see it that evening?

1  A.  No.

2  Q.  So, Ms. Steward, I want to take you to the next day.  So

3  we talked about the 29th.  We have now talked about the 30th.

4       I want to talk to you about the 31st, which would

5  have been two days after when you were supposed to be going

6  to that birthday party.  Do you have that date in mind?

7  A.  Say that again, sir.

8  Q.  I will direct your attention to January 31st.

9       On January 31st, were you taken to the police

10  station?

11  A.  Yes.

12  Q.  And when you got to the police station, who was there?

13  A.  A lot of -- about 15 or more people.  I would say no

14  more than 20, but we was seated at a long table with some

15  people on each side of the table.

16  Q.  And did you know the names of any of those police

17  officers?

18  A.  George Karl was there.  Oliver was there.

19  Q.  And how did you know George Karl's name?

20  A.  Because George Karl came.  He gave me a card.  And he

21  told me if I had any update, you know, I could -- if I

22  figured out anything else or knew anything else, to call that

23  number.  So that's how I remember George Karl name.

24  Q.  During that interview what were you asked and what did

25  you answer?

1  A.  I was asked do I know where the drugs was coming from?

2  Because there were kilograms of cocaine.  I was asked

3  kilograms -- they asked me about who did it, who was a

4  possibility of doing it?  The same information that I gave

5  Oliver.  So I was asked the same questions.

6  Q.  And did you give the same answers?

7  A.  Yes.

8  Q.  Did there come a time, Ms. Steward -- I'm sorry.

9      How long did that interview last?  Do you remember?

10  A.  Probably two and a half to three hours.

11  Q.  Did there come a time when officers told you that Eddie

12  Bolden had been arrested for the murders of Derrick and

13  Irving?

14  A.  Yes.

15  Q.  Approximately when was that that they told you that he

16  had been arrested?

17  A.  I want to say about a month later.

18  Q.  And where did they tell you this?

19  A.  They told me at the jail -- at the police station.

20  That's the thing, not the jail.  They told me at the police

21  station.  They said that they had someone that they had

22  arrested for Irving and Derrick's murder.

23  Q.  And did -- when you say "they," this was which officers?

24  A.  Oliver.

25  Q.  Just Oliver?

1    A.    It was other officers that I didn't know.

2    Q.    Okay.  Did they show you anything at the police station?

3    A.    Yes.  They showed me a sketch of the person that Cliff

4    was supposed to have been identified, I guess.

5    Q.    And what did you say when they showed you that sketch?

6    A.    I just said he don't look familiar.  It seem like I

7    should know somebody that got in the back seat, considering

8    they killed him.  I just told them -- I said the face didn't

9    look familiar.  And that's when the detective said, "We got

10   him."  You know, "We know this guy did it."

11   Q.    And did they show you anything other than a sketch?

12   A.    They showed me a picture.

13   Q.    And who did they say the picture was?

14   A.    Edward Bolden, the person that they had arrested.

15   Q.    What did you say?

16   A.    I just said, he don't look familiar.  I mean, it seemed

17   like I should know the person that got in the back seat of

18   the car, considering it was a hit on them.

19   Q.    Now, after Eddie Bolden was arrested, did you have some

20   communications with him?

21   A.    Did I have a conversation with who?

22   Q.    With Edward Bolden, Eddie Bolden.

23   A.    Yes.  Yes, I did.

24   Q.    How did that conversation take place?

25   A.    Through Irving's niece uncle.  His sister's son.  His

1    sister lived in the entrance before me.  So her brother was

2    incarcerated with Edward Bolden.  So Gerald Earl was arrested

3    with Edward Bolden.  And he said, "I'm gonna give this guy

4    this phone."  He said, "He want to tell you something."

5    Q.   So you had a conversation while he was in the Cook

6    County Jail; is that right?

7    A.   I can't remember what jail that they were in.  I don't

8    know what jail that they were in.

9    Q.   And were there also letters that Mr. Bolden sent you as

10   well?

11   A.   Yes.

12   Q.   I want to talk a little bit more, Ms. Steward, about

13   Clifford Frazier.

14          In the early 1990s, you said you had known him for

15   about the same amount of time you had known Irving; is that

16   right?

17   A.   Yes.

18   Q.   So in the early 1990s, how often would you see Clifford

19   Frazier?

20   A.   Probably every other day.

21   Q.   And were you aware that Irving and Derrick were selling

22   drugs to Anthony Williams?

23   A.   Yes.

24   Q.   And were you aware as to where those drugs were being

25   stored?

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 102 of 154 PageID #:19244
Stewart - direct by Crown
1978

1    A.    Yes.

2    Q.    Where were they being stored?

3    A.    At Clifford's house.

4    Q.    How do you know that?

5    A.    Because I was the one that talked to my landlord when I

6    stayed on 77th and Stewart and Clifford needed an apartment.

7    Clifford ended up renting out a unit in the next entrance

8    from us.

9    Q.    How much drugs did Clifford store in his apartment?

10   A.    It was lots of cocaine in his stove.

11   Q.    You said in the stove?

12   A.    Yes.

13   Q.    And when you say "lots of cocaine," how much?

14   A.    Two, three, or four keys.

15   Q.    When you say "keys," is that kilograms?

16   A.    Kilograms of cocaine.

17   Q.    Do you know if Clifford Frazier was also storing cash in

18   his house?

19   A.    Yes.

20   Q.    How much?

21   A.    Lots of money.  I don't know the exact amount, but it

22   was lots of money.  Irving would take money to Clifford's

23   house.

24   Q.    Do you know if Clifford Frazier stored guns in his

25   house?

1    A.    Yes.

2    Q.    How many guns?

3    A.    Several guns.

4    Q.    Do you know whether or not Clifford Frazier knew Anthony

5    Williams?

6    A.    I was told.

7    Q.    What relationship did Mr. Frazier and Mr. Williams have?

8    A.    Irving and Derrick said that Clifford used to be down on

9    39th shooting dice with Ant.  That's why a lot of the

10   money -- well, Clifford used to go in and take money that

11   belonged to Irving and Derrick gambling.

12   Q.    And what was the relationship like between Clifford

13   Frazier and his brother Derrick?

14   A.    Derrick verbalized that he was jealous, but he had to

15   put things in Clifford's name because Clifford had a job and

16   Irving and Derrick didn't.

17   Q.    Do you know whether or not Clifford Frazier attended

18   your fiancé Irving's funeral?

19   A.    Yes.

20   Q.    What happened during that funeral?

21   A.    Clifford came in looking down at Irving and kept saying,

22   "Why, man?  Why, man?  Why, Irving?"  And we were just --

23   people were looking.  We didn't know how to process that.

24   Q.    Do you know whether or not Clifford Frazier attended his

25   own brother's funeral?

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 104 of 154 PageID #:19246
Stewart - direct by Crowl
1980

```
1    A.   No, he didn't.
2    Q.   In 2019, did an investigator who was representing Eddie
3    Bolden, did this investigator show you a photograph and ask
4    if you recognized anyone?
5    A.   Yes.
6              MR. CROWL:  I want to show Plaintiff's Exhibit 67
7    only to the Court, Judge, if I may?
8              THE COURT:  Only to the witness or only to me?
9              MR. CROWL:  Only -- not to the jury yet.
10             THE COURT:  Right.  You said show it only to the
11   Court.
12             MR. CROWL:  You got me, Judge.  You are right.
13             To everyone other than the jury.  Thank you.
14             THE COURT:  That's all right.
15   BY MR. CROWL:
16   Q.   Is this the photograph that you were shown?
17   A.   Yes.
18             MR. CROWL:  Judge, I offer Plaintiff's Exhibit 67
19   into evidence.
20             THE COURT:  Any objection?
21             MR. BAZAREK:  No objection.
22             THE COURT:  It's admitted.  You can publish to the
23   jury.
24        (Said exhibit was received in evidence.)
25   BY MR. CROWL:
```

Case: 1:17-cv-00417 Document #: 643 Filed: 11/16/21 Page 105 of 154 PageID #:19247
Stewart - direct by Crowl
1981

1  Q.   So you indicated that the investigator showed you the

2  photograph and asked if you recognized anyone; is that right?

3  A.   Yes.

4  Q.   And what did you tell the investigator?

5  A.   I told her -- I said that was the same detective that I

6  was -- picked me up the night that all of this happened, came

7  back to my house telling me he was going to have me charged

8  with conspiracy to murder for Irving and them death.  That's

9  the one that told us that he locked up the person that killed

10  Irving and Derrick.

11  Q.   And tell the members of the jury which officer that was

12  in that photograph.

13  A.   That was Officer Oliver.

14  Q.   And which person is that?  I think you might be able to

15  touch your screen actually, and it might make a mark.  Can

16  you try that and see if it works.  You can just touch the

17  screen.

18  A.   Okay.

19  Q.   Can you touch the screen and just circle the officer you

20  are talking about.

21       MR. CROWL:  For the record, Judge, she has

22  indicated the gentleman on the far right-hand side.

23       THE COURT:  Yes.

24       MR. CROWL:  May I have one moment, Judge?

25       THE COURT:  Yes.

1    (Brief pause.)

2         MR. CROWL:  No further questions, your Honor.

3         THE COURT:  Thank you.

4         Defense counsel, when you are ready.

5                    CROSS-EXAMINATION

6    BY MR. BAZAREK:

7    Q.   Good afternoon, Ms. Steward.

8    A.   Good afternoon.

9    Q.   On January 29th, 1994, your fiancé and the father of

10   your two-year-old son was shot execution style as he sat in a

11   car with his friend Derrick Frazier, correct?

12   A.   Yes.

13   Q.   And Irving was unarmed, and he was shot at point blank

14   range while he sat in the car on Minerva, right?

15   A.   Yes.

16   Q.   He was murdered only a few minutes after he had left the

17   J&J Fish where he had gone with Derrick Frazier to sell two

18   kilos of cocaine to Anthony "Ant" Williams, correct?

19   A.   Yes.

20        MR. CROWL:  Judge, I am going to object as to

21   foundation for personal knowledge.

22        THE COURT:  You can ask her if she knows that.  So

23   overruled.

24   BY MR. BAZAREK:

25   Q.   And your fiancé Irving, he was taken to Northwestern

1    Hospital where he died the next day.  But was it at 11:00

2    p.m. at night or was it in the morning?

3    A.    When he died?

4    Q.    Yes.

5    A.    I can't remember the specific time because we had talked

6    to the neurologist the day before.

7    Q.    He was on life support, right?

8    A.    Yes.

9    Q.    There was no brain activity?

10   A.    That's what I was told.

11   Q.    Okay.  And you stayed there with him at the hospital at

12   Northwestern the following day, on January 30th, right?

13   A.    Yes.

14   Q.    And did you stay there the whole day with him?

15   A.    No, we didn't stay the whole day.  We stayed about four

16   or five hours.

17   Q.    Okay.  You are also aware that on Minerva, Irving's

18   friend Derrick died on the scene, correct?

19   A.    I was told that, yes.

20   Q.    Okay.  And Irving was your fiancé, and you had a

21   two-year-old son with him, right?

22   A.    Yes.

23   Q.    And, in fact, you were engaged to be married to Irving

24   in July of 1994, right?

25   A.    Yes.

Steward - cross by Bazarek                    1984

1    Q.   And you had a wedding date planned?

2    A.   Yes.

3    Q.   You were busy planning the wedding that year, right?

4    A.   Previously, yeah, because I started planning the wedding

5    about November.

6    Q.   And because of the murder of your fiancé, the July

7    wedding to Irving never took place, right?

8    A.   That's right.

9    Q.   The killer destroyed your dreams of marriage and a life

10   together with Irving and your two-year-old son, right?

11   A.   Yes.

12   Q.   In fact, Irving was a great father, wasn't he?

13   A.   Yes.

14   Q.   And, in fact, he even -- he was very close with -- you

15   had a son, older son, correct?

16   A.   Yes.

17   Q.   He was a father figure to your older son?

18   A.   Yes.

19   Q.   And because of the murderer, your son grew up without a

20   father, right?

21   A.   Yes.

22   Q.   And Irving loved his son, right?

23   A.   Yes.

24   Q.   And Irving -- and your son loved Irving?

25   A.   Yes.

1   Q.   And your older child loved Irving, and Irving loved your

2   older child, right?

3   A.   Yes.

4   Q.   The murderer robbed your two sons of the most important

5   man in their lives, right?

6   A.   Yes.

7   Q.   It had to be the worst day of your life, and we express

8   our condolences because I know how painful it must be for you

9   to even talk about this all these years later.

10  A.   Yes.

11  Q.   Now I want to go back to 1996.

12       You actually testified at Mr. Bolden's criminal

13  trial, correct?

14  A.   Yes.

15  Q.   And in the criminal trial, you talked about the fact

16  that you had gone on narcotics delivery with Irving and

17  Derrick when they were selling narcotics at the J&J Fish,

18  right?

19  A.   Say that again.

20  Q.   You had testified during the criminal trial in 1996 that

21  you would actually go on some of the drug deals at the J&J

22  Fish with Irving and Derrick, right?

23  A.   Yes.

24  Q.   In fact, sometimes you would even act as a lookout when

25  you would stay outside when the narcotics transactions were

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 110 of 154 PageID #:19256
Steward - cross - by Bazarek
1986

1    occurring within the J&J Fish, right?

2    A.   Yes.

3    Q.   There were occasions when you even entered the J&J Fish

4    when the drug deals would occur between Irving and Derrick

5    and Ant, correct?

6    A.   Yes.

7    Q.   But they would go to -- they would go behind a closed

8    door, and you wouldn't actually see the transaction?

9    A.   Yes.

10   Q.   You would agree, your fiancé Irving, he was a drug

11   dealer, right?

12   A.   Yes.

13   Q.   And Derrick Frazier, he was a drug dealer, right?

14   A.   Yes.

15   Q.   And they had a supplier somewhere out in the suburbs?

16   A.   You're asking me or you're saying?

17   Q.   Did they have a supplier, or do you know anything about

18   where they would get the drugs from?

19   A.   I knew it was in the suburbs somewhere, but I didn't

20   know exactly who.  I just speculated who it could have been,

21   but no, I didn't know.

22   Q.   But to be clear, Derrick and Irving were the drug

23   dealers.  Clifford's role was storing the narcotics at the

24   apartment, right?

25   A.   Yes.

1    Q.   Clifford was not a drug dealer, correct?

2    A.   Correct.

3    Q.   I want to go back to your testimony in 1996.

4         Do you recall you were questioned by a State's

5    Attorney named Neera Walsh?  Does that ring a bell?  Do you

6    remember that?

7    A.   No, I don't remember the name.

8    Q.   Okay.  Well, during your testimony at the 1996 trial,

9    you never mentioned anything about James Oliver placing you

10   inside his police vehicle, did you?

11   A.   Nobody never asked me the detective's name.

12   Q.   You never testified at the criminal trial that

13   Officer Oliver came to your house and took some keys, did

14   you?

15   A.   No.

16   Q.   You never testified that Officer Oliver threatened you

17   with arrest or he would take your child away during the 1996

18   trial, did you?

19   A.   No.

20   Q.   You never testified during the 1996 trial that

21   Officer Oliver was looking for a lockbox or a locker that

22   contained cash or anything like that?

23   A.   No.

24   Q.   The name James Oliver never came up during your

25   testimony, did it?

1    A.   I testified for time frames.  Nobody asked me anything

2    like that, no.

3    Q.   But what you did testify at the 1996 trial was your

4    personal involvement in the narcotics activity that was

5    occurring between Derrick and Irving and Anthony Williams,

6    correct?

7    A.   Yes.

8    Q.   And you know who Anthony Williams is, right?

9    A.   Yes.

10   Q.   What was his rank in the Gangster Disciples?

11   A.   He was a governor.

12   Q.   And, in fact, you knew Anthony Williams from way back,

13   from Stateway Gardens, right?

14   A.   No.

15   Q.   Where did you know Anthony Williams from?

16   A.   Wabash, 59th and Wabash.

17   Q.   What is that area at 59th and Wabash?

18   A.   GD's area.

19   Q.   Okay.  You knew Anthony Williams was a Gangster

20   Disciple, right?

21   A.   Yes.

22   Q.   You also knew back in 1994 that J&J Fish, that was a

23   Gangster Disciple hangout, right?

24   A.   Yes.

25   Q.   And, in fact, on January 29th, the night of the murders,

1    Irving and Derrick came back to the apartment where you lived

2    because something they had seen at the J&J Fish frightened

3    them, right?

4    A.    Yes.

5    Q.    And when they came back, they told you there was a

6    Gangster Disciple meeting going on at the J&J Fish, right?

7    A.    Yes.

8    Q.    And something really frightened them, and that's why

9    they came back to get guns, right?

10   A.    Yes.

11   Q.    And the guns that they came to get back were guns that

12   were stored in your apartment, right?

13   A.    Yes.

14   Q.    And that's the same apartment that you lived with your

15   two-year-old son, right?

16   Q.    And your older son, right?

17   A.    Yes.

18   Q.    In fact, your father lived in that same apartment?

19   A.    Yes.

20   Q.    Where were the guns stored in the apartment in relation

21   to where your children played and slept?

22   A.    In a closet on a shelf.

23   Q.    Okay.  So they were up high so the kids couldn't reach

24   them?

25   A.    Yes.

1    Q.   Were they kept in any type of lockbox or anything like

2    that?

3    A.   No.

4    Q.   Okay.  And they were fully loaded firearms, right?

5    A.   I don't know if they were loaded.

6    Q.   Okay.  So those guns were brought into the house by

7    Irving and Derrick, right, not by Clifford?

8    A.   That's correct, yes.

9    Q.   Okay.

10        Now, in your criminal court testimony from 1996,

11   you testified in terms of your contact with the police that

12   the police drove you to Northwestern Hospital to be with

13   Irving, correct?

14   A.   Yes.

15   Q.   There wasn't any testimony about you driving around the

16   south side of Chicago going to different spots, anything like

17   that, correct?

18   A.   The question was never asked did I do it, but yes, I

19   did.

20   Q.   Right.  But what you testified in Mr. Bolden's trial was

21   the police took you to Northwestern Hospital, right?

22   A.   That's all they asked me.  They didn't ask me about

23   anything else.

24   Q.   Now, Governor Ant Williams, he could have people killed,

25   correct?

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 115 of 154 PageID #:19057
Steward - cross - by Bazarek
1957

1    A.   Say that again.  I'm sorry.

2    Q.   Governor Ant Williams could have people killed, right?

3    A.   Yes.

4    Q.   Murdered?

5    A.   Yes.

6    Q.   Okay.  And he could have people murdered if they weren't

7    paying a street tax, right?

8    A.   Yes.

9    Q.   And I know that there was a hit out on Irving and

10   Derrick at least from a month before, and that would make it

11   December of 1993, right?

12   A.   Yes.

13   Q.   And that made -- strike that.

14            Earlier in your testimony you spoke of names to the

15   officers about who could have murdered Derrick and Irving,

16   right?

17   A.   Yes.

18   Q.   And you were giving them the names of the higher-ups in

19   the Gangster Disciples, right?

20   A.   Yes.

21   Q.   You weren't giving them the names of the foot soldiers

22   or the enforcers.  You were talking about the people who had

23   the power to order the execution of people, right?

24   A.   I gave them all names.

25   Q.   But they were the higher-ups in the gangs that you gave

1    them those names?

2    A.   Up and down.

3    Q.   Okay.  Well, let me ask you -- so we have already talked

4    about Ant.  We know what his ranking was in the Gangster

5    Disciples.

6              What about Andre Kimbrough, what was his rank?

7    A.   I believe he was a regent.

8    Q.   What's a regent in relation to a governor?

9    A.   Well, they are under a governor.

10   Q.   Okay.  Is that the next level?

11   A.   Yes.

12   Q.   Okay.  And then what about Charlie B.?  What was --

13   A.   Not the next level because you got lieutenant governors,

14   too.  So, no, that wouldn't be --

15   Q.   Okay.  So Andre was a regent?

16   A.   Yes.

17   Q.   He had some rank within the Gangster Disciple

18   organization?

19   A.   Yes.

20   Q.   Okay.  And how about Charlie B., what was his rank in

21   the Gangster Disciples?

22   A.   I believe he was a lieutenant governor.

23   Q.   Okay.  Is lieutenant governor, is that below governor?

24   A.   Yes.

25   Q.   Okay.  And then how about Jay, what was his rank in the

1   Gangster Disciples?

2   A.   Just a regular GD.

3   Q.   Okay.  And then what about Big Kenny, Dog, what was his

4   rank?

5   A.   Regular GD.

6   Q.   Okay.  And what about Byron?

7   A.   He got a high position, but I can't -- I don't know what

8   Byron rank was, but I know it wasn't governor.  He was under

9   governor and under lieutenant.

10  Q.   Okay.  Was Irving a Gangster Disciple?

11  A.   He used to go to the meetings.

12  Q.   So he would associate with Gangster Disciples?

13  A.   Yes.

14  Q.   Okay.  Was Derrick a Gangster Disciple?

15  A.   He used to attend the meetings.

16  Q.   Okay.  So he would associate with Gangster Disciples?

17  A.   Yes.

18  Q.   Okay.  And let me ask you, do you know what a street tax

19  is in narcotics?

20  A.   Who?

21  Q.   A street tax is in terms of narcotics trafficking?

22  A.   Yes.

23  Q.   What's a street tax?

24  A.   It's dues of how much you have made on sales that I

25  guess they keep up with how much you sell in a week or month.

Case: 1:17-cv-00417 Document #: 642 Filed: 11/16/21 Page 118 of 154 PageID #:19360
Steward - cross by Bazarek
1994

1    I don't know how they tally it.

2    Q.   So did Derrick and Irving, did they pay a street tax?

3    A.   Yes, they paid street taxes.

4    Q.   Okay.  Who would they pay the street tax to?

5    A.   A guy named Jermaine sometimes would come by and pick up

6    money from them.

7    Q.   What if you don't pay a street tax?  What -- can you get

8    in trouble for that?

9    A.   Violation.

10   Q.   What does that mean?

11   A.   That they will take you to a secluded place and have a

12   couple of guys to beat you.

13   Q.   If you continue not to pay the street tax, can things

14   get worse for you?

15   A.   Yes.

16   Q.   Okay.  Could you get murdered?

17   A.   Possibly.

18   Q.   Okay.  Now, is it a fact that you testified in the 1996

19   trial that you were taken immediately to Northwestern

20   Hospital after you had learned about the shooting?

21   A.   No.

22   Q.   Were you asked -- you testified under oath during the

23   1996 trial; is that right?

24   A.   Yes.

25   Q.   And you swore to tell the truth, right?

1   A.   Yes.

2   Q.   And were you asked these questions and did you give this

3   answer.

4              Question --

5              THE COURT:  Page and line number, counsel.

6              MR. BAZAREK:  Sure, Judge.  It's on Page 65.  It's

7   Joint Exhibit 018.  And I will give you the -- the number in

8   the right is EB 0006644.

9              THE COURT:  Thank you.

10  BY MR. BAZAREK:

11  Q.        "Q.  Ma'am, sometime after January 29th, 1995, were

12  you contacted by the police later that evening?

13             "A.  Yes.

14             "What did the police tell you?

15             "A.  They told me outside of the party that there

16  had been a shooting.

17             "Did you go anywhere after that?  Did you go to the

18  hospital?

19             "A.  Yes, I was taken to the hospital to see

20  Irving.

21             "Q.  That was at Northwestern Hospital?

22             "A.  Yes."

23             Were you asked those questions, and did you give

24  that answer?

25  A.   That was the answer that I gave, yes.

1     MR. CROWL:  Objection, Judge.  Not impeaching.  He

2     said "immediately."  That did not say "immediately."

3          THE COURT:  Sustained.

4     BY MR. BAZAREK:

5     Q.   Were you driven that evening at all to Christ Hospital?

6     A.   No.

7     Q.   I want to understand the -- can you describe what

8     Officer Oliver looked like on January 29th, 1994?

9     A.   He was a tall, average, strong guy in jeans, T-shirt,

10    badge, Afro -- like Afro, not a big Afro, but medium Afro.

11    Q.   So he had jeans on and a T-shirt?

12    A.   Yes.

13    Q.   And his partner, did he have jeans on and a T-shirt?

14    A.   Yes.

15    Q.   How old would you say Officer Oliver was at the time?

16    A.   Probably 39.  Between 35 and 40.

17    Q.   I am going to show you -- it's already in evidence --

18    Plaintiff's Trial Exhibit 67.

19          You have identified Officer Oliver as the

20    individual in this far right picture.  Do you see where I am

21    pointing?

22    A.   Yes.

23    Q.   Okay.  And you see he has a suit on.  Do you see that?

24    A.   Yes.

25    Q.   And he has got a white shirt on?

1    A.   Yes.

2    Q.   He has got a tie?

3    A.   Yes.

4    Q.   All right.  So when you were with him on January 29th,

5    your testimony is that he wasn't dressed like that, correct?

6    A.   He was dressed in jeans.  He wasn't dressed like that,

7    no.

8    Q.   Okay.  And it was wintertime.  Did he have a coat on or

9    just jeans and a T-shirt?

10   A.   He had a regular -- like just a plain, like, sports

11   jacket, like a Bulls jacket but no writing on it, just like

12   dark blue and T-shirts and jeans.

13   Q.   What did the other officer look like who was with

14   Officer Oliver?

15   A.   He was light-skinned.  He was lighter than I am.  Him

16   and Oliver was about the same -- about the same size.  Maybe

17   he was about 20 pounds lighter than him -- than

18   Officer Oliver.

19   Q.   And was the other officer African-American?

20   A.   Yes.

21   Q.   How old would you say he was?

22   A.   They may have been around about the same age, 30 -- in

23   they 30s -- in their early 30s, between 35 and -- they didn't

24   look over 40.

25   Q.   Did you observe either of those officers with a key

1    while inside that car?

2    A.   Did I observe them -- I'm sorry.  I didn't hear you.

3    Q.   Did you observe either of those officers that you were

4    in the car with with a key in their hand?

5    A.   No.

6    Q.   Okay.  They weren't asking you any questions about --

7    strike that.

8         They weren't -- they didn't hold up a key and say,

9    hey, do you know where this key could be used where I could

10   open something?

11   A.   No.  I don't remember.

12   Q.   What time is it that you were taken to Northwestern

13   Hospital?

14   A.   It had to have been somewhere like 11:00, maybe 11:30 at

15   night.

16   Q.   What time was it when you entered Officer Oliver and the

17   other officer's vehicle?

18   A.   Right -- I would say about -- when I got to the lounge,

19   it was between, like, 9:15, somewhere in there.

20   Q.   Okay.  Did you observe other African-American officers

21   in the area that evening?

22   A.   On Racine or --

23   Q.   Outside the party you said there were a lot of police

24   cars, right?

25   A.   Yes.

1    Q.   Were there other African-American officers there?
2    A.   Yes.
3    Q.   The other African-American officers, did they have on
4    jeans, T-shirts, too, that type of thing?
5    A.   I can't verify that.
6    Q.   Okay.  Did you ever hear of the phrase a tac officer,
7    tac officer in the Chicago Police Department?
8    A.   Say that again.  I'm sorry.
9    Q.   Have you ever heard a phrase, that officer is a tactical
10   officer, a tac officer?
11   A.   Yes.
12   Q.   And those are the officers that wear plain clothes,
13   right?  Not blue uniforms, blue pants, right?
14   A.   Yes.
15   Q.   You know what a tac officer is?
16   A.   Yes.
17   Q.   Okay.  All I'm asking, that evening whether it's outside
18   the party and you are observing police -- and I know you ran
19   a few blocks -- did you observe other African-American
20   tactical officers?
21   A.   No.
22   Q.   Okay.  So describe -- how many officers did you see?
23   And please describe the races that you recall as you --
24   A.   It was about -- it was between four to six detective
25   cars in the middle of Racine.

1   Q.   Were there any uniformed marked cars?

2   A.   No.

3   Q.   Okay.  Four to six detective cars?

4   A.   Yes.

5   Q.   And how were the four to six detective cars, they had --

6   strike that.

7        Could you describe the detectives that you saw at

8   that time that came in these four to six cars?

9   A.   They were all in they cars when we arrived.  Everybody

10  was in their car.

11       When Oliver and his partner got out to tell me --

12  well, they asked me my name first.  But when they got out and

13  told me that there was a shooting, I'm talking to them.  I'm

14  like, well, I figured that.

15       When they initially gave me the shocking news, when

16  I got to running, I can't tell you what the other officers

17  had on because I didn't deal with all of the other ones.

18  Q.   So can you describe any clothing that any of these

19  detectives wore other than the clothing that you described

20  for Officer Oliver and his partner?

21  A.   I don't recall any suits or uniforms, no.

22  Q.   Okay.  So then all the officers were in jeans and

23  T-shirts?

24  A.   I can't speak for all of them.  I said, I don't recall

25  seeing anyone in a suit.

1    Q.   Okay.  So the only article of clothing that you saw the

2    officers wearing, if any, were jeans and T-shirts, right?

3    A.   Jeans and T-shirts, yeah.

4    Q.   Okay.  Other than Officer Oliver and his partner, were

5    any of the other officers, detectives African-American?

6    A.   Say that one more time.

7    Q.   Separate and apart from Officer Oliver and his partner,

8    were any of the other officers African-American?

9    A.   Yes.

10   Q.   Okay.  Were the rest of the officers all

11   African-American?

12   A.   No.

13   Q.   Can you tell -- what was the breakdown, if you recall?

14   A.   Out of the officers that came to my house --

15   Q.   No, no.  I'm sorry.  I'm still talking about the night

16   of the shooting.

17   A.   The night of the shooting.  The first two cars was the

18   ones that caught my attention, because when we first drove

19   up, we were parking where the first two, not the last

20   detective cars were.  So, I mean, no, I couldn't tell you who

21   was in all of the other cars.  No.

22   Q.   Okay.  Do you know if they were black or white, or you

23   have no idea?

24   A.   I have no idea.

25   Q.   Okay.  And do you know if they had jeans and T-shirts

1    on?  And again, I'm talking the night of the shooting with

2    the officers that you had encountered.

3            Anything else other than jeans and T-shirts?

4    A.   Not with all the cars, no, I can't say that.

5    Q.   Okay.

6            THE COURT:  When you are at a good stopping point,

7    it will be a good stopping point.  It sounds like we are at a

8    good stopping point.

9            Okay, folks.  It's 4:50 in the afternoon, which

10   means that we are done for the day.

11           I will tell the witness, do not discuss the

12   substance of your testimony with anyone until I dismiss you

13   tomorrow.  So you can't talk about what we talked about today

14   with anyone else.  Okay?

15           THE WITNESS:  Okay.

16           THE COURT:  Members of the jury, I am going to say

17   the two things that you have heard me say a number of times.

18           Do not discuss this case with anyone.  That means

19   amongst yourselves or any friends or family.  Your time will

20   come where you can say a lot, but you can't say anything now.

21   Don't talk about it with anybody.

22           And please keep an open mind.  We are starting our

23   second week of trial hearing testimony.  You have heard a lot

24   of testimony already, but there is a lot to come.  You are

25   going to hear more testimony later this week.  Please keep an

1  open mind until you have heard all of the evidence.

2          With that, folks, I hope you enjoy the evening, and

3  we will see you tomorrow.

4          (Jury out at 4:51 p.m.)

5          THE COURT:  Ma'am, you can be dismissed for the

6  day, too.  Thank you for coming.  We will see you tomorrow.

7          THE WITNESS:  Tomorrow, what time?

8          THE COURT:  We start at 9:30.  You probably want to

9  come earlier than that.  I am sure plaintiff's counsel has

10 been working the logistics for you to be here.

11         Is that right?

12         MR. CROWL:  Yes, Judge.  We will have her here

13 whenever your Honor wishes.

14         THE COURT:  We will start promptly at 9:30

15 tomorrow.  So you should be here in plenty of time so we can

16 get started promptly.

17         Okay?

18         MR. CROWL:  Yes, Judge.

19         THE COURT:  You can be dismissed for the day.

20 Thank you, ma'am.

21         Okay, folks.  In the meantime, I think I had set

22 5:00 o'clock as a hearing on the Cook County State's

23 Attorney's Office.

24         Do you folks want to break for two minutes before

25 we get rolling on that issue?

1              MR. SAFER:  I would love to just run across the

2    hall.

3              THE COURT:  That's what I mean.  Let's break for

4    five minutes.  We will come back a couple minutes before

5    5:00.  Okay?

6              MS. BOUDREAUX:  Thank you.

7         (A brief recess was taken at 4:52 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Change of reporter.)

2          THE COURT:  All right.  Have a seat, everybody.  We

3     are reconvening.

4          We've ended the testimony for the day.  We are here

5     for a hearing to discuss the two trial subpoenas issued to the

6     Cook County State's Attorney's Office as well as specific

7     prosecutors.

8          My understanding is that before the hearing today, we

9     resolved some of the issues, maybe not all of them.  But let's

10    go ahead and get appearances of counsel for the Cook County

11    State's Attorney's Office on the line, please.

12         MR. COYNE:  Your Honor, John Coyne, C-o-y-n-e, on

13    behalf the Cook County State's Attorney's Office, which in

14    this context is a subpoena respondent, a records custodian.

15         THE COURT:  Yep.

16         MR. COYNE:  Judge, can I just let you know, I -- I'm

17    sorry.  Go ahead.

18         THE COURT:  I was going to say good afternoon,

19    Mr. Coyne.

20         MR. COYNE:  Yes, good afternoon, Your Honor.

21         Judge, I just wanted to let you know, I'm actually in

22    a parking lot.  I was with a client out in the western

23    suburbs.  So I just wanted to let Your Honor I'm sitting in my

24    car, I have the motion in front of me, but I just wanted to

25    let you know it's a little bit less than ideal circumstances.

2006

1    I just wanted you to know I'm in a car, not at a desk or

2    anything, but perfectly ready to proceed.

3            THE COURT:  All right.  As long as you're not

4    driving, I'm happy.  So that sounds like it's good enough.  So

5    put it in park and we'll get rolling, except not with your

6    car.

7            So let's talk about the subpoenas.  There were two

8    subpoenas.  One was a subpoena to the Cook County State's

9    Attorney's Office itself.  I understand that you were seeking

10   a document custodian, but it looks like the parties have

11   resolved that issue.  They're going to get the documents in by

12   stipulation, and so that subpoena is now mooted.

13           Is that correct, Counsel?

14           MR. LITOFF:  Yes, Your Honor.

15           THE COURT:  All right.  So the motion with respect to

16   the document custodian for Cook County State's Attorney's

17   Office is denied as moot.  There is no longer a need for a

18   custodian, so there is no longer an active subpoena to quash.

19           That leaves us the other subpoena.  There was a

20   subpoena out to, I think, three prosecutors.  I don't know

21   since the time this morning if you folks have had a chance to

22   talk about what you expect the testimony to be and whether

23   there's any issue with it.

24           I think both sides issued subpoenas to the

25   prosecutors, if memory serves.  I don't know which side would

1    like an opportunity to explain first where we are and whether

2    there is any issues to discuss.

3           The punch line is, I've got a motion in front of me

4    to quash some subpoenas.  Who wants to try to save the

5    subpoenas?  Go ahead.

6           MR. STEFANICH:  Judge, Brian Stefanich.

7           So the defense issued subpoenas to Linda Walls, James

8    Beligratis, and former assistant state's attorney and current

9    judge Neera Walsh.

10          As I said in the morning session, I don't believe

11   we're really at issue with the motion.  I don't intend on

12   asking these three state's attorney's witnesses any questions

13   that would potentially go towards the deliberative process or

14   work product.

15          I intend to ask factual questions based on what they

16   did in their investigation, what they did when they had the

17   petition for Certificate of Innocence in front of them, but

18   I'm not going to be going into their deliberations or their

19   work product.

20          So I just don't see this as an issue from the defense

21   point of view.

22          THE COURT:  All right.  Since the hearing this

23   morning, have you had a chance to talk with counsel for the

24   prosecutors about the motion that they filed?

25          MR. STEFANICH:  I did call him and left Mr. Coyne a

2008

1     message.  I did not hear back today.

2          THE COURT:  Totally fine.

3          Mr. Coyne, I appreciate you being here on short

4     notice.  I know that when you woke up this morning, you

5     weren't expecting to have a telephonic hearing this morning.

6          Let me give you a punch-line summary, and someone

7     correct me if I have this wrong.  But in your motion on

8     Page 4, you put in italics a list of questions that you

9     thought would be inappropriate and would be privileged.

10         My understanding from defense counsel is that they do

11    not intend to ask those questions; in other words, they did

12    not intend to get into whether the Cook County State's

13    Attorney's Office had an opinion about the guilt or innocence

14    of Mr. Bolden or why they didn't investigate this or that,

15    *et cetera*.

16         So they have packaged this to me as an issue about --

17    let me rephrase that.

18         They have packaged this as testimony that they expect

19    to elicit that will not involve privilege.

20         Mr. Stefanich, is that correct?

21         MR. STEFANICH:  Correct, Judge.

22         THE COURT:  Okay.  Why don't you give a proffer to me

23    and to counsel for the Cook County State's Attorney

24    prosecutors about the types of topics that you expect to cover

25    so that we can see if we have any live dispute or whether we

1      can just take it question by question.

2             Go ahead.

3             MR. STEFANICH:  Sure, Judge.

4             For Linda Walls, I think the topics would be, she was

5      the prosecutor that handled Mr. Bolden's -- the majority of

6      Mr. Bolden's post-conviction petitions.  So the topics would

7      be some of the procedural history on the post-conviction

8      petition, correspondence that Mr. Bolden sent directly to her,

9      the evidentiary hearing on Mr. Bolden's post-conviction

10     petition, the --

11            THE COURT:  In front of the Cook County Circuit

12     Court?

13            MR. STEFANICH:  Correct, Judge --

14            THE COURT:  Okay.

15            MR. STEFANICH:  -- that resulted in a new trial.

16            The steps that she took to -- the steps that

17     Ms. Walls took after a new trial was granted, such as

18     interviewing witnesses, preparing for the retrial, getting

19     information from her supervisor that the State's Attorney's

20     Office was not going to retry Mr. Bolden.

21            I will not ask why that decision was made.  I think

22     Your Honor has already ruled on that.

23            And then the Certificate of Innocence.  She's --

24     Ms. Walls is the one that stepped up at the petition for a

25     Certificate of Innocence hearing.  I would ask Ms. Walls the

1    State's petition that she said at the Certificate of Innocence

2    hearing and ask whether or not the State took a position on

3    whether Mr. Bolden was innocent or not.  And those would be

4    the topics that I would cover with Ms. Walls.

5            THE COURT:  All right.  And, Mr. Coyne, did you hear

6    all that?

7            MR. COYNE:  I believe I did hear all of it, Judge.  I

8    have six -- actually six topics.  The last one, to the extent

9    I heard it correctly, would be that the State's -- question

10   Ms. Walls on the fact that the State did not take a position

11   on the Certificate of Innocence.  That's the only one that I

12   would just -- subject to Your Honor's approval, want to just

13   explore a little bit further.

14           I assume it's a matter of record.  Or maybe it's not.

15   I don't have that document in front of me.  Is there -- can I

16   just ask, is there a transcript that the parties are in

17   possession of that states that the State's Attorney's Office

18   literally takes no position on the Certificate of Innocence?

19           Does that exist?

20           MR. STEFANICH:  That transcript exists, and the --

21           MR. COYNE:  Okay.  So the transcript itself states

22   that the State's Attorney's Office -- somebody said, I

23   presume, that -- somebody said on behalf of the office, "the

24   State's Attorney's Office hereby takes no position on the

25   Certificate of Innocence."

1           Is that the language that appears in the transcript?

2           MR. STEFANICH:  Ms. Walls states at the petition for

3    Certificate of Innocence hearing that the State takes no

4    position.

5           THE COURT:  I bet you Mr. Stefanich would be kind

6    enough to e-mail that to you tonight.  Do you have his e-mail

7    address?

8           MR. STEFANICH:  I've already sent to it to him,

9    Judge.

10          THE COURT:  All right.  Great.  So it sounds,

11   Mr. Coyne, like you have in your inbox a copy of the

12   transcript that hopefully should put you to ease on that --

13   put you at ease on that.

14          MR. COYNE:  That's fine.  So it sounds like -- and I

15   have spoken to Mr. Stefanich, and I've also spoken to one of

16   the attorneys, Mr. Litoff, so we have them in concert.

17          I didn't receive Mr. Stefanich's most recent

18   voicemail, but regardless, I just hope that the reasons

19   underlying that will not be explored; it will be a simple

20   statement of a fact that the State's Attorney Office, number

21   one, took no position on the Certificate of Innocence; and,

22   number two, that there will be no inquiry into the reasons why

23   the State's Attorney took that position or any of the

24   deliberations or decision-making or analysis that preceded

25   that statement on the record; is that correct?

2012

1          MR. STEFANICH:  There will be no inquiry into the

2    reasons why the State's Attorney's Office took that position.

3          MR. COYNE:  Okay.  And whatever else I said, any --

4    not only the reasons, but any communications between Ms. Walls

5    and Mr. Valatini [phonetic] or anyone else, those

6    communications will not be asked about; is that fair?

7          MR. STEFANICH:  To an extent, Judge.  In the

8    transcript, Ms. Walls says she received communication from her

9    supervisor, and this is the office's position.  So I would

10   elicit that her supervisor told her to take this position.

11         THE COURT:  Is that already in record -- in the

12   record?

13         MR. COYNE:  Yeah, that's in the record.  That's in

14   the record.

15         MR. STEFANICH:  Okay.

16         MR. COYNE:  That's in the record and that's --

17         THE COURT:  Well, that's -- I don't know.  Is that in

18   the record already?  Is it out?

19         MR. STEFANICH:  Yes.

20         THE COURT:  From the deposition testimony?  Is this

21   what she said?

22         MR. STEFANICH:  Yes, Judge.

23         THE COURT:  All right.  So it seems to me that either

24   no privilege was asserted over that or the privilege was

25   already waived.  I'm not sure that --

2013

1          MR. COYNE:  Correct.

2          THE COURT:  -- it's anything new.

3          MR. COYNE:  I see that, Judge.  Okay.

4          THE COURT:  So, Mr. Coyne, here's what I -- here's

5    what I would say:  I like things going smoothly in my

6    courtroom, and I don't like wasting time when the jury is

7    here.  So I would like you to have a telephone call with

8    Mr. Stefanich.  I'd like him to give you a preview in greater

9    detail about what he expects to elicit.

10         And I need you folks to notify me in advance if you

11   think that there is something that I need to do in advance.

12         It is conceivable that there could be a question or

13   two along the way that you think goes near the edges of it,

14   but we can handle that at the time.

15         What I care about is if there is a category of

16   questions, a topic that you think ought not be explored, I

17   should know that in advance.  So -- because otherwise we're

18   going to have a sidebar, the jury is going to feel like their

19   time is not being respected, and I don't like that at all.

20   Okay?

21         MR. STEFANICH:  Understood, Judge.

22         MR. COYNE:  I understand, Judge.

23         THE COURT:  All right.  And then --

24         MR. COYNE:  Judge, could I just ask -- I'm sorry.

25   I'm sorry, Your Honor.

1        THE COURT:  Go ahead, Mr. Coyne.  Go ahead.

2        MR. COYNE:  Well, I was just going to say, I just --

3   this will be Your Honor's ruling, and the position that's

4   going to come from this conversation will be equally as

5   applicable to the plaintiff questioning of the witness as to

6   the defense, I would presume.

7        THE COURT:  Well -- yes, thank you for that.  I was

8   going to get to that.

9        Plaintiff is going to call the same witness or a

10  different witness from the Cook County State's Attorney's

11  Office?  It's a different witness, I thought.

12       MR. LITOFF:  Yes, Your Honor.  At this point we don't

13  intend to call any of the witnesses represented by Mr. Coyne.

14  We will be calling Lynda Peters.  She is being represented by

15  Hale.

16       THE COURT:  Okay.  Fair enough.

17       And, Mr. Safer, go ahead.

18       MR. SAFER:  Your Honor, just one thing to say about

19  Ms. Walls' testimony at the moment.  I mean, I think we'll --

20  we can talk to you, Your Honor, about that I think very little

21  of this is admissible.  But it sounds like she's -- the

22  Certificate of Innocence instruction is in the record.

23       But it sounds like for the post-conviction, that

24  she's going to testify that she was ready and raring to go,

25  and she got instructions from on high that they were not going

1    to retry the case.  And the record should be clear that that

2    sounds like what they're trying to elicit.

3            We're not going to be able to elicit why, and that

4    testimony, I think, gets into the deliberative privilege and

5    also --

6            THE COURT:  Of course, it's not yours to assert; it's

7    up to them.  And if they assert it, then I've got to figure it

8    out, but --

9            MR. SAFER:  True.  I just want to raise that specter

10    because it is in the record for the Certificate of Innocence.

11    It is not in the record for that -- for the *nolle*, their

12    dismissal.

13            THE COURT:  Okay.

14            MR. COYNE:  I didn't -- I'm sorry, Judge, I didn't

15    catch what counsel -- first of all, who was speaking; and

16    secondly, the last point that counsel made about the

17    Certificate of Innocence.

18            THE COURT:  Yeah, okay.  That was Ron Safer for the

19    plaintiff.

20            Mr. Safer, why don't you maybe come to the front

21    microphone and give him a summary of what you said there, if

22    you would, please.

23            MR. SAFER:  Your Honor, what I was saying was the --

24    for the Certificate of Innocence, the instruction that

25    Ms. Walls received to take no position is in the record.

1          What is not in the record, and what I heard or

2   understood defense counsel to be saying, is that they intend

3   to elicit from Ms. Walls that she was preparing to retry the

4   case, that she was ready and willing and able to retry the

5   case, and she got told from her superior that they were

6   dismissing the charge.

7          You know, I just raise that because if that's going

8   to be an issue, we should deal with it before she hits the

9   stand.

10          THE COURT:  Okay.

11          MR. COYNE:  Can I address that, Judge?

12          THE COURT:  Yeah, go ahead.

13          MR. COYNE:  What Mr. Safer just said, as far as the

14   phrase "ready, willing, and" -- "ready and raring to go,"

15   those were not in my notes from what Mr. Stefanich said,

16   number one.  And he may have just been speaking generally.

17          But, you know, "prepared to proceed," you know, we're

18   getting a little bit into a gray area because I don't see how

19   you can elicit testimony from a prosecutor that you were, just

20   to use Mr. Safer's words, "ready and raring to go."

21          Just assume you would use -- that would obviously

22   reflect the mental state of the prosecutor, which is --

23          THE COURT:  Isn't every prosecutor -- hang on.

24          Isn't every prosecutor ready and raring to go?  It's

25   part of the job description, I think.  That's not exactly an

1   earth-shattering revelation that a prosecutor wants to bring a

2   case, you know.

3           MR. COYNE:  Right.  I guess I'm just --

4           THE COURT:  It's not particularly -- no one in the

5   room will be shocked to hear a prosecutor is ready to

6   prosecute somebody again.

7           Go ahead.

8           MR. COYNE:  Right.  "Prepared to," Judge, is one

9   thing, but if you're eliciting -- if Mr. Stefanich wants to

10  elicit testimony from Ms. Walls that she was enthusiastic, for

11  example, which seems to me to be an analogy to "raring to go,"

12  the obvious import is that, you know, you believed that this

13  person was guilty, which, again, a prosecutor has to have a

14  good-faith basis to proceed; I understand that.  But anything

15  that would elicit -- anything other than anticipating -- prior

16  to the instruction not to proceed, you were anticipating

17  proceeding to trial to retry this individual, that's one

18  thing.

19          But if you're getting -- any -- attempting to elicit

20  testimony that said you were extremely confident in the

21  evidence, your appraisal of the evidence was that there was,

22  you know, more than sufficient evidence to proceed, to meet

23  the State's burden, I just -- just make the observation,

24  Judge, I think you're getting a little bit far afield from

25  just saying that it was her intention, notwithstanding --

2018

1  holding aside this instruction, it was her intention to

2  proceed to trial.

3       I don't have a problem with that.  I think when you

4  get to the degree of enthusiasm, then it's something a little

5  different.  I just wanted to make that point.

6       THE COURT:  Well, I didn't hear anyone saying that

7  they want the prosecutor to put on the excitement-o-meter of

8  how excited she was to prosecute the case.

9       I understood him to be saying that the decision was

10 vacated, the prosecutor fully intended and was preparing to

11 retry the case, and then the decision was made not to retry

12 the case.  I don't see that as deliberative process.  It's

13 public record that it wasn't retried.  I don't think --

14      MR. COYNE:  Understood.

15      THE COURT:  I don't think any of that is internal.

16 It's -- it is what it is.

17      Mr. Stefanich, anything on that?  Do you have any

18 issue with what Mr. Coyne said?  Do we have an understanding

19 of what the parameters are?

20      MR. STEFANICH:  I do, Judge.  And I think -- like I

21 said, I don't think this is actually an issue, so -- but I

22 will talk to Mr. Coyne this week and make sure that we have an

23 understanding.  And then if there's anything that, you know,

24 we need you to decide, I will raise that with the Court.

25      THE COURT:  Yeah, that's -- that's fine with me.  I

2019

1    think that -- that sounds good.  I mean, prosecutors by their

2    nature are hard-wired to prosecute cases until someone tells

3    them otherwise or they conclude they don't have a good-faith

4    basis to do.  So I don't think it would be earth-shattering to

5    anyone that this prosecutor was prepared to retry somebody.  I

6    don't think that's . . .

7         MR. SAFER:  Or relevant in any way to the facts of

8    this case.

9         THE COURT:  Well, I don't know about that, because

10   it's part of the procedural history of the case that, you

11   know, there was a conviction, it was appealed, it was

12   affirmed, it was appealed again, it went all the way up to the

13   Illinois Supreme Court, it was later vacated.  You know, the

14   fact that the State was going to retry it and then decided not

15   to, that's just part of the history.  We're not going to get

16   deeply into it, but that's what happened.

17        I don't see anybody -- I don't see any reason to shy

18   away from the procedural history, because that's just what

19   happened.  It's backstory for -- the path to the Certificate

20   of Innocence, it seems to me, is relevant.

21        I don't think we have to go from criminal trial to

22   Certificate of Innocence.  The jury has already heard some of

23   the appellate stuff.  They can hear enough on the decision

24   about vacating it to understand the procedural history, and

25   we'll just leave it at that and move on.

2020

1       So, Mr. Stefanich, please talk to Mr. Coyne and make

2   sure we've got a smooth plan for later in the week so we don't

3   have any misunderstandings, as we'll go from there.

4       MR. STEFANICH:  Will do, Judge.

5       THE COURT:  Okay?  Anything on this issue before we

6   let Mr. Coyne go?

7       MR. COYNE:  One other issue, Your Honor.  I just

8   wanted to ask, just in terms of plaintiff -- and, again, this

9   goes to scope of cross and whatnot, but in terms of -- did

10  you -- and, again, I don't know since I'm not a party --

11  attorney for a party, I don't know enough about the current

12  context of the evidence of the case to -- kind of

13  specifically.  But just in general, I just wanted to make sure

14  that in terms of the attorney work product, any questions

15  about "Did you consider this alibi witness" or "Did you have

16  any doubt as to the veracity of an alibi witness," "Did you

17  evaluate whether the witness had a clear and unobstructed view

18  of the defendant," those sort of questions, I just wanted to

19  see, is there any intention of plaintiffs in going into that

20  line of questioning, or is that off the table?

21      THE COURT:  I don't hear anyone in this courtroom say

22  they want to dive into that.

23      MR. COYNE:  Okay.

24      THE COURT:  Yeah, I see people shaking their heads,

25  and I don't see any nodding, so I think we're good to go.

1      MR. COYNE:  Okay.  Gotcha.  Gotcha, Judge.

2      THE COURT:  Have a conversation offline.

3      Anything else for Mr. Coyne before we let him go?

4      I'm going to deny both motions as moot.  I'm not

5  convinced that there is an issue for either motion, so it's

6  going to be denied as moot, because it sounds like we've

7  reached an understanding.

8      Mr. Coyne, if you think that there is an issue, you

9  can re-raise it in front of me, but it sounds like this is

10  going to go smoothly to me.  Okay?

11      MR. COYNE:  I agree, Your Honor, and I thank you for

12  fitting me in.

13      THE COURT:  Well, thank you for dropping what you're

14  doing, pulling over the car, and taking the call here.  I

15  appreciate you doing that.

16      MR. COYNE:  Okay, Judge.

17      THE COURT:  You can sign off now, Mr. Coyne.  Thank

18  you, sir.

19      MR. COYNE:  Thank you again.

20      THE COURT:  All right.  Take care.

21      Okay.  Anything else that needs to be said on that?

22  I assume not.

23      Any housekeeping matters that you all want to raise?

24  Anything you want to do?

25      MR. SAFER:  I don't think so, Your Honor.

2022

1          THE COURT:  Okay.  I will look forward to getting

2     your line summaries.

3          I don't know if I got a list of exhibits that were

4     admitted on Friday.  Did you file that today?

5          MR. LITOFF:  Yes, Judge.

6          THE COURT:  I didn't check the docket yet today.  So

7     thank you for that.  I'll look forward to getting that.

8          Soon we are going to have to talk about jury

9     instructions.  We've got a lot to do.

10          I will tell you folks, too, on a personal note, I

11     have to leave at 3:45 on Friday.  I will tell you I am flying

12     out of town for a wedding that we had scheduled a long, long

13     time ago.  I was scheduled to fly back on Monday morning.  I'm

14     taking the last flight back Sunday night to accommodate you

15     folks.

16          I do not want to be in a situation where there is a

17     problem with weather or otherwise, and I have 20 people in the

18     courtroom, so I'm going to come back Sunday night to make sure

19     that you folks get what you need from me on Monday morning.

20     Okay?  I just wanted to let you --

21          MR. SAFER:  Thank you, Your Honor.

22          THE COURT:  I thought about not telling you that, but

23     I wanted to tell you, I'm making a commitment to make sure you

24     folks get as much time as you need to try your case.

25          MR. SAFER:  Thank you.

1           MS. BOUDREAUX:  Thank you.

2           THE COURT:  But I do need -- I am taking the last

3    flight out on Friday night, which is like at 6:00-something,

4    so I have to end at 3:45 to get there in time.  Okay?

5           MS. BOUDREAUX:  Yes.

6           THE COURT:  Get some rest, everybody.

7           Mr. Hale, did you have anything?  Go ahead.

8           MR. HALE:  Can you hear me okay, Your Honor?

9           THE COURT:  Yes.

10          MR. HALE:  I have just two issues.  I believe the

11   plaintiff will testify, well, obviously sometime this week.

12          We have -- we have three separate motions that were

13   filed about opening the door:  one after the opening

14   statement, one after the examination of Detective Pesavento,

15   and then one after the examination of the plaintiff's sister.

16          We would just like to see, respectively, if we could

17   get -- talk about that before Mr. Bolden hits the stand so we

18   know if anything has changed.  You know, we want to at least

19   call your attention that those are open.

20          The second was, you had asked about scheduling and to

21   start thinking about closing arguments.  So I just wanted to

22   give you my thoughts on that, if I could.

23          THE COURT:  Sure.

24          MR. HALE:  I e-mailed plaintiff's counsel over the

25   weekend, and I said -- I suggested having closing arguments

1    Tuesday morning, because I think the jury needs to get

2    Wednesday and Thursday to deliberate.

3          Having said that, if we backtrack, I think the --

4    based on the schedule -- and Mr. Safer was kind enough to give

5    me his whole lineup over the weekend, so that was -- I really

6    appreciated that.

7          Based on them calling, you know, more people than we

8    thought, I think the defense case is probably -- can be done

9    in two days.  So let's just backtrack and say Monday, Friday,

10   which would mean if the plaintiff rests by the end of

11   Thursday, I think we'd be on track.

12         Based on the schedule Mr. Safer sent me, we

13   definitely went a lot slower today, but he was proposing

14   finishing on Wednesday, so it did build in one more day for

15   him.

16         So I just wanted to tell you that's kind of my

17   thoughts and that's where we're at, and just make sure you're

18   aware of it.

19         THE COURT:  Okay, thank you.  And I don't mind you

20   raising any point at all.

21         I'll tell you, I jotted some notes down, and I

22   intended to discuss the "opening the door" point with you

23   today.  I'll just do it in the morning, given how late we are

24   today.

25         Let's talk about the closing, though.  I'm not -- and

1    I will say plaintiff's counsel has been very accommodating to

2    defense counsel on previewing their witnesses, so thank you

3    for continuing to do that.  Every time I've asked for three

4    witnesses in order, you've given me six.  So I appreciate your

5    forthcomingness on that.

6          We should talk, just for my own purposes, about what

7    we're going to do tomorrow.  And then any sense from the

8    plaintiff's team about what your timeline looks like?

9          MR. SAFER:  Your Honor, we'll continue on with our

10   list.  I'm not sure that this is the most current, but --

11   yeah, we'll have -- in terms of readings, we'll have Siwek,

12   Temple, and Sadler and Willis.

13         In terms of live witnesses, Vondell Goins, who we've

14   been having logistical challenges with, Octavia Jackson, Steve

15   Maris -- Maris is very short -- Kevin Foster, Lynda Peters,

16   Harlan Hansbrough.

17         THE COURT:  So the --

18         MR. SAFER:  And we have to -- you know, we're going

19   to -- every day we look at this and think, can we cut some of

20   these.

21         THE COURT:  I understand.  I've been there, done

22   that.  I get you.

23         So I want to ask you a question, and I'll tell you,

24   you don't have to give me a definitive answer on this.  If

25   it's a game-day decision, that's fine.  But do you expect to

1  call Bolden?

2        MR. SAFER:  Oh, yes.  So at the end, then it is going

3  to be Brenda Lee, Mr. Bolden's aunt; Mr. Bolden; and then our

4  expert Gaut.  It's G-a-u-t, pronounced "Gaut."  And that's it.

5        THE COURT:  Got it.

6        MR. SAFER:  You know, I would -- we have our own

7  informal calculations of the witnesses.  You know, in our

8  case, our hour examinations have been much shorter than the

9  defense examinations.  So the length of our case has been much

10  more determined by the -- by defendants' input than ours.

11        THE COURT:  I understand that.  And for that reason,

12  we've been keeping log to the minute, which, as soon as I get

13  your line summary -- which I may have already on the docket; I

14  don't know.  If not, I'll get it soon -- I'll put it on.

15        You know, there were some days last week where

16  plaintiff used more time; there were some days where the

17  defendants used more time, but you'll have a better sense of

18  that.

19        Do you -- and I'm not holding you to this.  I'm just

20  wondering if being done by Thursday is realistic for you.  Do

21  you think you can get through all those people?  I mean, a lot

22  of them are dep designations.  It will take a couple hours.

23        MR. SAFER:  Yes, Your Honor.  I think so.  The

24  directs will -- you know what, the directs will be short.

25        THE COURT:  Okay.

1         MR. SAFER:  So I think it's very doable.  It depends

2  on the length of the crosses.

3         THE COURT:  Do you think that closing on Tuesday,

4  from your perspective, is realistic?  Do you think that's -- I

5  know it's hard -- you don't know how long the defense is going

6  to go, so it's hard to say, but . . .

7         MR. SAFER:  I think so.  I don't see any -- for our

8  purposes, I don't see any long crosses of the witnesses that

9  they would take.  I would think the direct should be very

10  short.

11         THE COURT:  Yeah.  You've got to think from this

12  perspective at this point, the jury has heard things for about

13  a month -- I'm sorry, "about a month."  They've heard things

14  for about a week.

15         MR. SAFER:  Right.

16         THE COURT:  You know, you've got to think, what is

17  the marginal benefit of each additional ten minutes?  Is it

18  just repeating what they've already heard?  I don't know.

19  It's up to you all.  We'll have a better sense of this in a

20  day or two, I think.  We'll reconvene on this on Wednesday.  I

21  mean, I think if we close on Tuesday, we're probably in good

22  shape.

23         MR. SAFER:  Agreed.

24         THE COURT:  You know, I have no idea how long the

25  jury will take to deliberate in a case like this.  I don't

1  know if it's -- I mean, who knows, but I think if we close on

2  Tuesday -- I think we should pencil in we're going to close on

3  Tuesday, and if we have to push it back a little, we can.  But

4  I think that's a good thing to shoot for.

5          MR. SAFER:  Your Honor -- and I don't -- I don't ask

6  this -- in an emergency -- I know it's not ideal, but in an

7  emergency, could the jury deliberate in a different courtroom

8  or -- you know, we would vacate this room --

9          THE COURT:  Right.

10         MR. SAFER:  -- but you could -- you could, of course,

11 take the verdict in whatever courtroom.

12         THE COURT:  One would think.  There are two people in

13 this building.  I do whatever they tell me.  It's Chief

14 Judge Pallmeyer and Tom Bruton.  So he says I have to leave

15 this courtroom on a specific day, so I'll leave this

16 courtroom.

17         I would think that there would be a place we could go

18 to receive a verdict.  You would think.

19         MR. SAFER:  I -- hopefully we won't need that.  We'll

20 be right on target, everything will be good.  I think we're

21 steaming towards it.

22         THE COURT:  Yeah.  I mean, what are you going to do,

23 not have a room and then say, "Well, I'll tell you what, why

24 don't we do it all over again?"  That's a great solution.

25 Nobody thinks that's a great solution.  I think everybody is

1    incentivized to get a verdict, right?

2         So, Mr. Hale, it was constructive of you to bring

3    that up.  Thank you for doing that.

4         I appreciate plaintiff's counsel reading the list of

5    witnesses.  It sounds like there's been a lot of proactive

6    full disclosure, so thank you for doing that.  I think you've

7    been very straightforward with them.

8         We'll circle back with you on that, and then I'll

9    also get back to you on -- on the "opening the door" point.

10        Why don't we plan on talking about the "opening the

11   door" point tomorrow.  It's after 5:30 here, and people are

12   tired, and you want to get your witnesses ready for tomorrow

13   and get -- I see a lot of nodding heads here.

14             MR. SAFER:  Thank you.

15             THE COURT:  Why don't we end for the day.  We'll take

16   that up tomorrow.  Okay?  Anybody else have anything?

17        Have a good evening, everybody.  We're adjourned.

18             MR. SAFER:  What time would you like us?

19             THE COURT:  Oh, yeah.  Good question.  Is 9:15

20   sufficient, people?

21             MS. BOUDREAUX:  Yes.

22             THE COURT:  Does anybody need to talk about the

23   "opening the door" point before we get rolling tomorrow?

24   Because I think it will take more than 15 minutes, probably.

25             MS. BOUDREAUX:  No, that's fine.

2030

1      THE COURT:  Okay.  Well, we'll let you guys have a

2  little extra prep time.  9:15 it is tomorrow.  Take care,

3  everyone.

4      (Proceedings adjourned at 5:33 p.m.)

5                    *  *  *  *  *  *  *

6              C E R T I F I C A T E

7      We, Amy Spee and Francis Ward, do hereby certify that

8  the foregoing is a complete, true, and accurate transcript of

9  the proceedings had in the above-entitled case before the

10  Honorable Steve C. Seeger, one of the judges of said Court, at

11  Chicago, Illinois, on October, 19th, 2021.

12

13  /s/ *Amy Spee*_____    October 19th, 2021
    Official Court Reporter

14  /s/ *Francis Ward*_____    October 19th, 2021

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25