2676

```
 1              IN THE UNITED STATES DISTRICT COURT.
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3  EDDIE L. BOLDEN,                 )
                                     )
 4                  Plaintiff,       )
                                     )  Case No. 17 CV 417
 5  -vs-                             )
                                     )  Chicago, Illinois
 6  ANGELO PESAVENTO, et al.,        )  October 21st, 2021
                                     )  9:21 a.m.
 7                  Defendants.      )

 8
                 TRANSCRIPT OF PROCEEDINGS - VOL. 10A
 9        BEFORE THE HONORABLE STEVEN C. SEEGER, and a jury

10  APPEARANCES:

11  For the Plaintiff:    RILEY SAFER HOLMES & CANCILA, LLP
                          BY:  MR. RONALD S. SAFER
12                             MR. ELI J. LITOFF
                               MS. SANDRA L. MUSUMECI
13                             MR. MATTHEW C. CROWL
                               MS. VALERIE BRUMMEL
14                          70 West Madison Street
                            Suite 2900
15                          Chicago, IL  60602

16  For the Defendant     GREENBERG TRAURIG, LLP
    City of Chicago:      BY:  MS. TIFFANY S. FORDYCE
17                             MR. KYLE L. FLYNN
                            77 West Wacker Drive
18                          Suite 3100
                            Chicago, IL  60601
19

20

21

22  Court Reporter:       AMY M. SPEE, CSR, RPR, CRR
                          Federal Official Court Reporter
23                        United States District Court
                          219 South Dearborn Street, Room 2318A
24                        Chicago, IL  60604
                          Telephone:  (312) 818-6531
25                        amy_spee@ilnd.uscourts.gov
```

2677

1   APPEARANCES (CONT'D):

2   For the Individual      HALE & MONICO, LLC
    Officer Defendants:     BY:  MR. ANDREW M. HALE
3                                MS. BARRETT E. BOUDREAUX
                                 MR. WILLIAM E. BAZAREK
4                                MR. BRIAN J. STEFANICH
                                 MS. AMY A. HIJJAWI
5                           53 West Jackson Boulevard
                            Suite 330
6                           Chicago, IL  60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2678

```
 1              (Proceedings heard in open court; jury out:)
 2              THE CLERK:  Good morning, everyone.
 3              MULTIPLE SPEAKERS:  Good morning.
 4              THE COURT:  Have a seat, please.
 5              I hope everyone is doing well this morning.  Let's
 6    get everyone's appearances on the record, if you would,
 7    please.  Start with counsel for the plaintiff.
 8              MR. SAFER:  Good morning, Your Honor.
 9              Ron Safer, Matt Crowl, Sandra Musumeci --
10              THE COURT:  That's better than I do.
11              MR. SAFER:  -- Mr. Litoff, and Ms. Brummel.
12              THE COURT:  All right.  Good morning to everyone on
13    the plaintiff's legal team.
14              Mr. Bolden, good morning to you, sir.
15              MR. BOLDEN:  Good morning.
16              THE COURT:  Good morning.
17              Defense team, go ahead, please.
18              MS. BOUDREAUX:  Good morning.
19              Barrett Boudreaux, Andy Hale, William Bazarek, Brian
20    Stefanich on behalf of defendant officers with Phil Pesavento
21    here in court.
22              THE COURT:  All right.  Good morning to everyone.
23              Officer Pesavento, good morning to you, sir.
24              MR. PESAVENTO:  Good morning.
25              THE COURT:  I don't have a lot to cover with you
```

1   folks by way of housekeeping.  I wanted to start by, once

2   again, thanking the very capable, hard-working, dedicated

3   public servants on my staff and others who are working on this

4   trial.

5          You know, just by way of anecdote, you know, at

6   8:00 o'clock last night, my courtroom deputy was still here

7   with me.  She was in the process of ordering the food for the

8   jurors, processing invoices, all this.  None of that just

9   magically happens at the courthouse.  If anybody has food, a

10  human has to do it, and she was that human last night.  It's a

11  lot of work just to make all the logistic things go and have

12  things go smoothly.

13         You know, a lot of things happen, you know, behind

14  the scenes.  A lot of really dedicated public servants that

15  makes things happen.  So I just wanted to express my

16  appreciation for everybody in the courthouse that's made this

17  trial possible for you folks.

18         I did want to talk about time entries.  We are

19  putting on the docket this morning the allocations of time,

20  the running totals through yesterday.  I saw the entries for

21  yesterday and the day before, and I just did a quick

22  back-of-the-envelope math, but I believe this is correct.  I

23  think the totals up to this point are 17 hours and seven

24  minutes for the plaintiff, and 18 hours and three minutes for

25  the defendant.

1          So defendants, by my count, have used about an hour

2    additional time beyond what the plaintiff has used, and that

3    includes the loss of time from day one of trial through the

4    slide.  So defendants, by our count, have used more time than

5    the plaintiff.

6          I wanted to talk a little more about what the battle

7    plan is going to be through the close of trial.

8          This is not a ruling at this point, this is an

9    inclination.

10         I've got to assess how long I think the jury is going

11   to need to decide this case.  And I see, what, seven claims

12   against four defendants with some complicated facts to work

13   through.  We've got a jury of ten people, which is great, but

14   that's more ears and more mouths, more people to listen to

15   each other, so to speak, right?  More people are going to

16   talk.  I don't know if that makes the process go longer or

17   shorter.  I think it probably makes it go a little longer the

18   more people that are speaking, but I don't know.

19         I also want to make sure you folks have enough time

20   to get your time in consistent with my obligation to be done

21   by Thursday.

22         So here's what I am inclined to do, and I want you to

23   folks to think about it and we can talk about it later as

24   necessary, but I'm inclined to think that we should probably

25   have all the evidence in by our lunch break on Tuesday.  So

1   have everything in the can on Tuesday at noon.  Tuesday

2   afternoon, do closings, and then I would instruct the jury.

3   And then they probably would not start deliberating on

4   Tuesday.  I assume it would be a little late, but maybe they

5   can.  Maybe they can deliberate for half an hour.  I don't

6   know.  So maybe they do a little deliberating on Tuesday

7   afternoon.  Probably start the meat of it on Wednesday.

8           I'm hopeful that's doable.  I think we should

9   continue to talk about this and see where we are at the end of

10  the day on Friday.  If that is still my inclination, I may

11  have to say on Monday morning, look, folks, we're going to be

12  done on Tuesday at noon.  You know, this team has so many

13  hours left, this team has so many hours left.  In other words,

14  we've got, let's say, X hours of total trial time left.  This

15  side gets these numbers of hours, this side gets that number

16  of hours.  I don't care how much time you devote to what, but

17  I would let you know how much fuel is left in your lunar

18  lander, so to speak, and then the lunar lander needs to land

19  and we need to be done.

20          I'm hopeful this will just work out organically and

21  naturally and we won't have to get into, you know, me saying

22  you've got 20 minutes and then your case is over for either

23  side.  But I just -- I want to remain in front of this.  I

24  know we've talked about the time issue probably more than

25  anybody wanted during the trial.  But I wanted to make sure

2682

1   that we don't have any disappointed people on the back end.  I

2   want to make sure we continue to talk about it as we roll

3   along.

4           I don't know if you have any reactions to what I've

5   just said on this, but that's my inclination.  You guys don't

6   have to tell me anything now.   But if you want to -- what's

7   that?

8           MR. HALE:  No, sounds fine to me, Judge.

9           THE COURT:  I'm hopeful that will work.

10          Mr. Safer?

11          MR. SAFER:  Yeah, we're working on it.

12          THE COURT:  I know.  And I have noted that there have

13  been some really short exams, and I know each of you, I'm

14  sure, have had more points you want to cover with some of the

15  witnesses, and you've shortened it on each side because of the

16  time restrictions, and I've appreciated that.

17          We'll talk more about it tomorrow, but I just wanted

18  to make sure we -- everybody is on the same page.

19          I have a little bit to say on jury instructions, but

20  it's also 9:27, so I don't want to dive into it too deeply

21  here.

22          Is there anything that you folks want to talk about

23  before we start the day here today?

24          MR. SAFER:  The only issue that I think will come --

25  the only issue that I think will come up today, Your Honor, is

2683

1    the -- the prior opinions.  And I think one way that we could

2    deal with it is --

3             THE COURT:  Excuse me, the judicial opinions,

4    obviously?

5             MR. SAFER:  Yes.

6             So we've -- so, of course, we have the element -- we

7    have to prove that the proceedings ended in a manner

8    indicative of innocence.

9             Under the Illinois Supreme Court *Beaman* case, the

10   Court said that the -- that the prior opinions of the Court

11   are relevant to that.

12            We had a lot of examination about Mr. Foster on

13   cross-examination yesterday about how he's a great attorney,

14   he's vigorous, but the fact is that the Court found him

15   constitutionally deficient.

16            So we propose, after Your Honor ruled, a stipulation

17   back in September to which we've received no response, which I

18   think is fairly antiseptic, but gets in the parts of the

19   opinion that we must have for -- to prove our element but

20   eliminates all of the discussion about the credibility of

21   Clifford Frazier, *et cetera*, and how -- anyway.

22            The second proposal is to propose redacted opinions

23   which redacts just the credibility determinations.  I think

24   that's less good, but -- well, and the third is just to admit

25   the opinions.

2684

1          We need it as proof of our case.  So we've been

2     trying to resolve this since September, but we haven't had

3     much --

4          THE COURT:  I hear that.  You all may be aware of

5     this.  I am not -- are there examples of Courts committing

6     judicial opinions as judicial -- I'm sorry -- as trial

7     exhibits?  That would surprise me, but maybe they do.  I don't

8     know.

9          MR. SAFER:  Yeah, they do.  I think in the *Beaman*

10    case, the opinions, I believe, came into evidence.

11         THE COURT:  That would not be my inclination because

12    I would think the jury would read the opinions and they could

13    read all sorts of things and misunderstand all sorts of

14    things.  And it seems like it's asking for trouble, but you

15    all have more experience in this area than I do, so . . .

16         MR. SAFER:  I agree, Your Honor.  And our fourth

17    alternative was to move the Court for judicial notice of

18    the -- again, the fairly antiseptic things that we need.  But

19    the opinions came out in Mr. Bolden's favor, so -- and, again,

20    it's not a perfect balance here.  Fairness is not going to be

21    equal time in this case because, one, we have the element that

22    we have to prove they do not.

23         Two, the opinions that affirmed Mr. Bolden's

24    conviction, although we don't -- you know, we just say in our

25    judicial notice it was affirmed, but those have been found to

2685

1   be constitutionally defective records, and those are the

2   facts.  Again, we don't comment on that in our proposal either

3   for judicial notice or in stipulations, but it's not -- you

4   know, again, fairness in this case is not they get to put in

5   this, we get to put in the same amount, because it's not

6   parallel.

7           THE COURT:  So I understand your position on that.

8   Why couldn't you have a sentence about the post-conviction

9   ruling that simply says something along the lines of, the

10  Court vacated the conviction and ordered a new trial because

11  it found that counsel was constitutionally ineffective, and

12  without including the sentence about it being thin evidence or

13  whatnot.  It seemed to me we could excise those sentences.

14          MR. SAFER:  Because, Your Honor, that is the exact

15  type of evidence that the Supreme Court in *Beaman* looked --

16  the Illinois Supreme Court in *Beaman* looked to, that is, that

17  kind of language in the opinions, for proof of the prong --

18  sorry -- proof of the prong that the proceedings ended in a

19  way indicative of innocence.

20          THE COURT:  Well, whether -- I'm not sure about that.

21  Isn't the key point for purposes of post-conviction

22  proceedings simply whether the lawyer was good or bad,

23  adequate or not?  I don't know that we need to get into what

24  that Court thought about the underlying evidence.  But go

25  ahead.

2686

1          MR. SAFER:  The Court in *Beaman* said, yes, that is

2     true, but then when the state's attorney dismisses charges,

3     you have to look to what the Court said about the evidence

4     that remained that was constitutional to see whether that

5     dismissal, which is, of course, silent about the causes,

6     whether that dismissal was indicative of evidence -- of

7     innocence, and in that, they look to the Court's statement

8     about the record.  I mean, that's the Illinois Supreme Court

9     on malicious prosecution.

10          THE COURT:  Okay.  Do you -- thank you for that.

11          Do you all have -- and it's fine if you don't.  Do

12     you have cites handy for -- maybe you've cited it in your

13     submissions.  I don't have the cites in front of me in terms

14     of what I need to look at.  Maybe at a break somebody can give

15     me the cites of -- I'm sure if I Google it, I can find it,

16     but -- or Westlaw it, you know.

17          MR. SAFER:  We will -- we will get that for you,

18     Your Honor.

19          THE COURT:  Okay.

20          MR. SAFER:  It's in -- *Beaman* is prominent in our --

21     you know -- in our -- we -- post-briefing submission because

22     it's a recent opinion.

23          THE COURT:  How much runway do I have before you

24     think I need to -- is this a "before the end of the day"

25     thing?  Is this a "before lunch" thing?  Is it before

2687

1    tomorrow?

2         MR. SAFER:  What we could do -- I think it's an after

3    lunch thing.

4         THE COURT:  Okay.

5         MR. SAFER:  But I think what we could do is identify,

6    you know, the examination is -- of Mr. Bolden, did you -- "Did

7    you get an opinion that said that you were -- you know, that

8    you could get a new trial?"  Yes.

9         THE COURT:  That seems fine.

10        MR. SAFER:  You know, and that's -- and that stuff,

11   and we could --

12        THE COURT:  "Did the Court find that you had a

13   constitutionally inadequate lawyer?"  That's fine.

14        MR. SAFER:  Yeah, I -- I mean, I think --

15        THE COURT:  That conclusion is fine, I'm sure.

16        MR. SAFER:  So we can sort of gloss over this issue,

17   but at some point we're going to need to --

18        THE COURT:  Got it.  I appreciate that.

19        Defense Counsel, you don't have to say anything on

20   this.  You're always welcome to say whatever you want.  I'm

21   happy to listen to you if you want to -- have you folks talked

22   about this issue?  I know that they tendered some judicial --

23   some proposed judicial admissions or asked me to take judicial

24   notice of some things.  I know there's been a lot of things

25   going on.  So if you folks just frankly have not had a chance

2688

1    to talk about this, that's fine.  Go ahead.

2         MS. BOUDREAUX:  We've talked about it briefly, but I

3    agree that I haven't been able to look at it as closely as I'd

4    like, but our basic position is that the Court has already

5    ruled on this.  We agree with the Court's ruling that this is

6    all fair game in broad strokes; but these issues -- the issues

7    in this case is for the jury to decide, and we think that by

8    sending back lengthy court opinions with a disparity of issues

9    from the issues that exist in this case will invite extreme

10   confusion and prejudice to the defendants.  And, frankly, it's

11   not even really in dispute that the prosecution ended it in a

12   manner indicative of innocence.  So I don't even really see

13   the relevance of sending back opinions of this nature.

14        MR. SAFER:  Your Honor, we can obviate that if they

15   will stipulate that the proceedings ended in a manner

16   indicative of innocence.  We don't need to put any of this on.

17   I just heard her say it's not in dispute.  That's right.

18        THE COURT:  That's what I heard.

19        MR. SAFER:  We could obviate the issue.

20        MS. BOUDREAUX:  We would like some more time to talk

21   about this.

22        THE COURT:  Yeah, that's fine.  I know we're getting

23   into the weeds here a little bit.  Maybe talk it over.  If you

24   can craft a stipulation, I'll certainly hear it.  I'm not

25   pressuring you to do it.  It might be better for -- you guys

1    got to -- you know, sometimes the stipulation is better for

2    both sides.  Maybe it's better for one side or the other.  I

3    don't know.  But talk about it.  Let me know if I need to

4    decide something, and if I have to decide it, I'll just make

5    the best decision I can.

6              MR. SAFER:  Your Honor, Docket No. 536 that we filed

7    has the cite to *Beaman*.

8              THE COURT:  Perfect.  Thank you for that.

9              MR. SAFER:  And the point of -- ineffective

10   assistance of counsel, of course, in and of itself is not

11   enough to overturn unless the Court finds that the outcome

12   would have been different with effective counsel.

13             THE COURT:  Okay.  I appreciate that.

14             Is there anything else that people want to cover for

15   housekeeping?

16             MR. SAFER:  No, Your Honor.

17             MS. BOUDREAUX:  No.

18             THE COURT:  Okay.  Does anybody need a quick break

19   before we call in the jury?  Everybody ready to go?

20             Can you get the jury.

21         (Jury in.)

22             THE COURT SECURITY OFFICER:  All rise.

23             THE COURT:  Have a seat, everybody.  Good morning.

24             THE JURY:  Good morning.

25             THE COURT:  Good morning to you.

1          One observation about the -- this group of jurors

2     here, you know, I've asked you folks to rotate seats.  You do

3     that dutifully every single morning.  No one ever forgets,

4     nobody bats an eye, and everybody always seems to know exactly

5     where they need to go.  I probably wouldn't do that.  I think

6     I'd be one of those people looking around wondering where I

7     should go, but you folks go to your right seat every single

8     morning.  So thank you for doing that.

9          Thank you again for being here.  We've got some more

10    witnesses that we're going to have the lawyers present to you

11    today.  So I just want to start the day by welcoming you again

12    to the courthouse, and thank you again for your public

13    service.

14          Plaintiff's Counsel, you can call your next witness.

15          MR. LITOFF:  Thank you, Judge.  The plaintiff calls

16    Brenda Lee.

17          THE COURT:  Good morning.  Come on up, please.

18          Come up to the witness stand on my left, and there

19    are a couple stairs there, so please watch your step.

20          THE WITNESS:  Good morning.

21          THE COURT:  Good morning.  Can you please raise your

22    right hand.

23       (Witness sworn.)

24          THE COURT:  Can you please have a seat.  Ma'am, you

25    are -- you're welcome to take off your mask, if you would

Lee - direct by Litoff

2691

 1    like.  There's no pressure from me on that.  But that way the

 2    jury can see you and hear you and the court reporter can get a

 3    good transcription.

 4              THE WITNESS:  Okay.

 5              THE COURT:  There's also a pitcher water, if you need

 6    it.  You've got a water bottle I know, too, but help yourself.

 7    Okay.

 8              THE WITNESS:  Yes.

 9              THE COURT:  Thank you.

10              Counsel, you may proceed.

11              BRENDA LEE, PLAINTIFF'S WITNESS, DULY SWORN

12                        DIRECT EXAMINATION

13    BY MR. LITOFF:

14    Q.  Good morning, Ms. Lee.

15    A.  Good morning.

16    Q.  Can you please state and spell your name for the record.

17    A.  Brenda Lee, B-r-e-n-d-a.  Last name Lee, L-e-e.

18    Q.  Where are you from, Ms. Lee?

19    A.  Chicago.

20    Q.  And where do you live now?

21    A.  In Maywood.

22    Q.  How long have you been in Maywood?

23    A.  For 21 years.

24    Q.  Can you tell us a little bit about your educational

25    background.

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 17 of 133 PageID #:19636
Lee - direct by Litoff
2692

1   A.  I grew up in Chicago.  So I went to Orr High School, and I

2   went to -- I graduated college from Long Island University.

3           THE COURT:  Ms. Lee, I'm sorry to interrupt you.

4   You're doing fine.  Let's pull the microphone a little closer

5   to you, if you would, please.  We want to make sure all the

6   members of the jury can hear you.

7           THE WITNESS:  Okay.

8           THE COURT:  There you go.  Now I've got you.

9           Do you want to repeat your answer?  Give your

10  educational background again so everybody can hear.

11  BY THE WITNESS:

12  A.  Orr High School, and I graduated with a bachelor's degree

13  from Long Island University.

14  BY MR. LITOFF:

15  Q.  And are you currently employed?

16  A.  Yes.

17  Q.  And where -- where do you work?

18  A.  Philadelphia Insurance Companies.

19  Q.  And what do you do?

20  A.  I'm a claims adjuster.

21  Q.  How long have you been a claims adjuster?

22  A.  Oh, wow.  20-plus years.

23  Q.  Ms. Lee, do you know Eddie Bolden?

24  A.  Yes.

25  Q.  And how do you know him?

Lee - direct by Litoff

2693

1    A.   He's my nephew.

2    Q.   And how long have you known Mr. Bolden?

3    A.   All of his life.

4    Q.   What's the age difference between the two of you?

5    A.   I think I'm seven years older than him.

6    Q.   Okay.  So because of that age difference, do you consider

7    yourself more like an aunt?  More like a big sister to him?

8    A.   He's like my little brother.  We kind of grew up together.

9    Q.   I'd like to turn your attention to the 1993-1994 time

10   period.  Was Mr. Bolden married at the time?

11   A.   No.

12   Q.   Was he in a serious relationship?

13   A.   Yes.

14   Q.   And who was he in a relationship with?

15   A.   Pamela Johnson.

16   Q.   And did Mr. Bolden and Ms. Johnson live together?

17   A.   Yes.  To my knowledge, yes.

18   Q.   And did they have any children?

19   A.   Yes.

20   Q.   How many children did they have?

21   A.   They had three.

22   Q.   And what were their names?

23   A.   Dominique, Bryana, and Tony.

24   Q.   And are those all Mr. Bolden's biological children?

25   A.   No, only Dominique, but he's always claimed all three of

Lee - direct by Litoff

2694

1   them as his.

2   Q.  And which child is the youngest?

3   A.  Dominique.

4   Q.  During that 1993-1994 time period, what was -- what was

5   Mr. Bolden's relationship with Ms. Johnson like?

6   A.  Whenever I saw them, happy.  They joked around a lot and

7   always had the kids with them.

8   Q.  And you said Dominique was the youngest child.  He was

9   born in 1993; is that right?

10  A.  Yes.

11  Q.  When Dominique was -- was born, describe what -- what

12  Mr. Bolden was like as a father.

13  A.  He was a very proud father.  Whenever I saw them, he'd

14  always be holding Dominique.  And, you know, it's an infant so

15  other people would be, like, "Let me hold the baby," and "You

16  could hold him for a few seconds," but he'd always take him

17  back.  So he's a very caring, loving father.  Proud.

18  Q.  Proud.  I want to turn your attention to the time period

19  right around Mr. Bolden's arrest in February of 1994.  Did you

20  see him a couple weeks prior to his arrest?

21  A.  Yes.

22  Q.  And where was that?

23  A.  At my house.

24  Q.  And who was there when he came to your house?

25  A.  Myself.  I think he was with Pam.

Lee - direct by Litoff

2695

1    Q.  And can you describe what his emotions were that day when

2    he came over?

3    A.  Give me a minute.

4    Q.  You can have a second.

5    A.  He was really nervous.  He was scared.  You could look at

6    his face and see that he was disturbed, something was wrong.

7    And he came and he -- he told me that the police was looking

8    to question him for something that happened in a J&J

9    restaurant.  And he was afraid, and he said, I want to go and

10   have them -- let them ask whatever questions, but I'm afraid

11   to go by myself.  I need an attorney.

12   Q.  And did you do anything to help him?

13   A.  Yes, I did.  I told him I didn't really have money for an

14   attorney, but I had some money, and we could talk to my mom

15   and see if -- what money she had and we'll get him an

16   attorney.

17   Q.  And did you and your mother put your money together and

18   hire an attorney?

19   A.  Yes.  She -- she sent me to the bank, and I took out some

20   money and I added whatever I had with it, and we hired an

21   attorney.

22   Q.  And what was his name?

23   A.  Chuck Ingles or Charles Ingles.

24   Q.  And did you speak to Mr. Bolden after you hired

25   Mr. Ingles, within the next couple days?

Lee - direct by Litoff

2696

1   A.   Yes.

2   Q.   And was he feeling a little better after you hired

3   Mr. Ingles?

4   A.   He was happy that we were able to get him an attorney.  So

5   he said he was anxious to go in and have them question him so

6   this could be all over with.

7   Q.   And he did go into the police station?

8   A.   Yes.

9   Q.   And what happened after he went to the police station?

10  A.   He never came home.  It's just hard to talk about him.

11  I'm sorry.

12  Q.   That's okay.  I want to ask you about the time period

13  after his arrest.  Do you remember about how long it was

14  before his case went to trial?

15  A.   A couple years.

16  Q.   And where was he -- Mr. Bolden during that time period?

17  A.   He was at 26th and California.

18  Q.   And did you go and visit him there on occasion?

19  A.   Yes.

20  Q.   Can you tell the jury what the -- the visiting area is

21  like at Cook County Jail.

22  A.   There was a glass that separated the two of us and it had

23  like a mic in the middle, and we could only talk through the

24  glass, and there were other people that were to each side of

25  us that were visiting their relatives as well.

Lee - direct by Litoff
2697

1   Q.   In addition to visiting him, did you speak on the phone --

2   A.   Yes.

3   Q.   -- while he was in Cook County Jail?

4   A.   Yes, I did.

5   Q.   Do you remember each of those conversations individually

6   or kind of all together?

7   A.   Kind of all together.

8   Q.   Okay.  And how did he seem during those conversations

9   leading up to his trial?

10  A.   He was scared.  We was trying to figure out how -- what we

11  have to do to get him out of the situation.  He was really

12  scared and frustrated, angry.

13  Q.   And despite that, did he maintain some optimism about the

14  trial?

15  A.   Yeah, he was hopeful.

16  Q.   And you attended Mr. Bolden's trial?

17  A.   Yes.

18  Q.   What was he like during those few days that the trial was

19  taking place?

20  A.   Worried, nervous, still scared.

21  Q.   And were you there when the verdict came in?

22  A.   Yes, I was.

23  Q.   Can you tell the jury what Mr. Bolden's reaction was when

24  the verdict came in.

25  A.   I remember his -- just jumping up and saying, "I didn't do

Lee - direct by Litoff

2698

1     this," trying to figure out how in the world was he being

2     accused of this, and he didn't do it.  So he was scared,

3     devastated, I would say.

4     Q.  And there was a sentencing hearing after that?

5     A.  Yes.

6     Q.  And did you attend that as well?

7     A.  Yes, I did.

8     Q.  What was Mr. Bolden's sentence?

9     A.  Life.

10    Q.  Can you describe what his reaction was when that sentence

11    was handed down.

12         And you can take a second.  It's no problem.

13    A.  He -- what was your question?  I'm sorry.

14    Q.  How did he react to the sentence?

15    A.  He was devastated.  And, again, he kept screaming "I

16    didn't do anything."

17    Q.  So after that, he was transferred to a prison.  Do you

18    remember which prison he went to first?

19    A.  He went to Menard.

20    Q.  And where is Menard located?

21    A.  I guess it's in Menard, Illinois.  I just know it's a good

22    maybe five, six hours away.

23    Q.  Five, six hours away.

24         Did you ever visit him there?

25    A.  Yes, I did.

Lee - direct by Litoff

2699

1   Q.  And were you able to go often?

2   A.  No, it was too far, so I went like once or twice.

3   Q.  And do you know if other family members were able to go

4   often given how far away it was?

5   A.  No, they weren't.

6   Q.  So the -- and do you know how long, approximately,

7   Mr. Bolden was at Menard?

8   A.  Well, maybe four years.  I'm not sure of exactly how long

9   he was there.

10  Q.  Okay.  And during those years, it's your understanding

11  that he -- he didn't have more than a couple of visits from

12  family members?

13  A.  Yes.  Correct.

14  Q.  So you said you went once or twice.  Do you recall

15  approximately when that was?

16  A.  No, actually, it -- it was one time.  I don't know exactly

17  when it was, though.

18  Q.  Okay.  And what was the visiting area like at Menard?  Was

19  it like the Cook County Jail or was it different?

20  A.  To my recollection, it was just a large room.  We sat at a

21  table.  At least the glass didn't divide us.

22          So we just sat at a table.  You couldn't hug him or

23  touch him or anything like that, just sit there.  And they

24  probably had vending machines in there.

25  Q.  And how did he seem during that visit that you had at

Lee - direct by Litoff

2700

1   Menard?

2   A.   He was happy to see me.  But he talked a lot about getting

3   legal counsel to, again, try to get him out of the situation.

4   Q.   So then after several years, was he transferred to a

5   different prison?

6   A.   Yes.

7   Q.   And where was that?

8   A.   He was transferred to Stateville in Joliet.

9   Q.   And is that much closer to where you were living?

10  A.   Yes, it is.

11  Q.   And so because of that, were you able to visit more often?

12  A.   Yes.

13  Q.   How often did you visit?

14  A.   I would go once a month because that's -- he could only

15  get one visit on weekends.  So I made it a point to go at

16  least every weekend that I could go, and that was just one

17  time out of a month, though.

18  Q.   And could you describe to the jury what the visiting area

19  at Stateville is like?  Is it similar to Menard?

20  A.   Yeah, it's a large room with, again, tables.  And there

21  was a security guard that was maybe where you walked in at.

22  And there were vending machines in there as well.

23  Q.   And did you -- when you visited once a month, did you

24  always go alone or did you sometimes bring others?

25  A.   I would sometimes take his kids with me and Pam.  And his

Lee - direct by Litoff

2701

1   brother also.  I took his brother and nephew also a few times

2   with me.

3   Q.   In addition to visiting him, did you talk to Mr. Bolden on

4   the phone often while he was at Stateville?

5   A.   I did.

6   Q.   Can you estimate about how often?

7   A.   Probably once a week, whenever he had an opportunity to

8   use the phone.  So I would say at least once a week.

9   Q.   And do you recall those conversations individually or sort

10  of collectively over all the years?

11  A.   Collectively.

12  Q.   Okay.  And how would you describe Mr. Bolden's emotional

13  state during those conversations?

14  A.   Scared, worried.  He was frightened, always trying to

15  figure out again how did I get here and how do I get home.

16  Q.   Did he talk about fears regarding his children?

17  A.   He did.  He spoke a lot about not being able to raise

18  them.  He was very concerned that they knew what he was there

19  for, was something that he didn't do.

20  Q.   Did he ever talk to you about a fear of dying in prison?

21  A.   Quite often.  He would say, "Aunty, I didn't do this.  I'm

22  not going to die here."  And there were a few times he spoke

23  about suicide.

24  Q.   I'd like to talk to you about a few of the things that

25  happened in your family while Mr. Bolden was in prison.

Lee - direct by Litoff
2702

1      When he was in Menard, did anything happen to your
2  mother?
3  A.   So -- yes, she passed away.
4  Q.   And your mother, that would be Mr. Bolden's grandmother?
5  A.   Yes.
6  Q.   What was his relationship like with your grandmother?
7  Were they close?
8  A.   They were very close.  And when she passed away, I
9  remember our having to call him, put a call through to the
10 prison to let him know that she passed away.  And he cried.
11 He was hurt.  And afterwards, for a couple times, he would --
12 he'd still call home and ask to speak to her, and we had to
13 keep telling him she passed away.  So it was -- it was rough.
14 Q.   Was he able to attended the funeral?
15 A.   No, he wasn't.
16 Q.   Did you -- did you all make efforts to try to get him
17 permission?
18 A.   We did, but if I remember correctly, we had to, like, pay
19 for the marshal or whomever would escort him.  And I think
20 they said that he could view the body and then that would be
21 it; but we didn't have money to pay for the service -- for
22 them to -- the expenses for him to come home.
23 Q.   How did that affect him not being able to attend his
24 grandmother's funeral?
25 A.   He was really hurt.  What he did was, he -- he sent a

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 28 of 133 PageID #:19647
Lee - direct by Litoff
2703

1    letter to be read at her funeral.  And a friend of the family

2    read the letter, and he spoke about how he loved her and how

3    he would do everything he could to get home and make her proud

4    of him.

5    Q.  Does -- did Mr. Bolden continue to talk about his

6    grandmother afterwards, even to this day?

7    A.  Almost every day.

8           MR. LITOFF:  I'd like to show just the witness

9    Plaintiff's Exhibit 22, please.

10          THE COURT:  That's fine.

11          MR. LITOFF:  And, Jim, if we could flip through the

12   pages to let the witness see all of them.

13   BY MR. LITOFF:

14   Q.  Do you recognize these documents, Ms. Lee?

15   A.  Yes.

16   Q.  Are these letters that Mr. Bolden wrote to you while he

17   was in prison?

18   A.  Yes.

19   Q.  And there's dates on each of the letters?

20   A.  Yes, there is.

21   Q.  And did you receive them, you know, at or around the time

22   that they're dated?

23   A.  Yes.

24   Q.  And these are -- these are just a small sampling of the

25   letters he sent you over the years; is that right?

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 29 of 133 PageID #:19648
Lee - direct by Litoff
2704

1    A.  Yes.  He sent quite a few.

2         MR. LITOFF:  Your Honor, we'd ask to admit and

3    publish Plaintiff's Exhibit 22.

4         THE COURT:  Any objection?

5         MR. HALE:  No, Your Honor.

6         THE COURT:  It's admitted.  You can publish to the

7    jury.

8       (Plaintiff's Exhibit No. 22 was received in evidence.)

9         MR. LITOFF:  I'd like to turn to -- Jim, it's 19419.

10   BY MR. LITOFF:

11   Q.  Ms. Lee, looking at this first letter, this is

12   December 13th, 2007.  And looking toward the middle of the

13   letter, I believe Mr. Bolden is talking about calling you all

14   the time, and he says, "When Ma Dear was alive, I'd do the

15   same thing, and her voice alone would make me feel like

16   everything was all right."  And then he says, "I miss her,

17   Aunty.  Sometimes I think about her and I'll start crying and

18   laughing at the same time."

19        Do you see that?

20   A.  Yes.

21   Q.  Now, this is 2007, this is about ten years after she

22   passed, right?

23   A.  Yes.

24   Q.  And he still talked about her all the time?

25   A.  Yeah.  Pretty much every day now.

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 30 of 133 PageID #:19649
Lee - direct by Litoff
2705

1   Q.   And what did he say?  Did he express any, you know, dismay

2   about not being able to be there?

3   A.   He did because there aren't a lot of males in our family,

4   so he's always felt that he needed to be there to -- you know,

5   for guidance for the young ones in our family and be

6   supportive.

7              MR. HALE:  Could I have a sidebar, Your Honor.

8              THE COURT:  Yep.

9        (Proceedings heard at sidebar on the record.)

10             MR. HALE:  I'm sorry, I want to see if I can renew an

11  objection to admitting these in evidence because I thought he

12  was just going to show -- I haven't had a chance to look at

13  all these, but there's language in here on some of these

14  letters about the U.S. Attorney Patrick Fitzgerald,

15  investigating cases.  I don't know what else is in here.  But

16  Steve Mills investigating the case.  I mean, I think there's a

17  lot of improper stuff in here.

18             I thought it was just going to be a letter to his

19  aunt saying, you know, he missed his mom.

20             I object to the letters going in.  I want to -- I

21  want to change my position, if I can.  I think there's a lot

22  of things in here that are not appropriate, and I don't think

23  these should be admitted into evidence.  And I'm surprised

24  they didn't redact them in some fashion anyway, but I don't

25  think these should go into evidence and to the jury.  It's

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 31 of 133 PageID #:19650
Lee - direct by Litoff
2706

1    improper.

2          THE COURT:  All right.  So a couple things.  What of

3    those letters do you intend to use?  And was this objection

4    raised in the exhibit lists statement of objections?  If it

5    was, that's great, and I'll deal with it; but if not, they

6    might be waived.  So go ahead.

7          MR. LITOFF:  There I believe was an objection in the

8    in the exhibit list.  I think it was relevance and maybe 403.

9          THE COURT:  Do you intend to use any of the letters

10   that have the references that the U.S. Attorney's Office?

11         MR. HALE:  I think -- can I say something?

12         THE COURT:  Yes.

13         MR. HALE:  I don't -- to be clear, I don't mind him

14   asking the -- Ms. Lee about the letters, you know, what

15   Mr. Bolden said to her about family matters.  The letters

16   should not be admitted into evidence.  There's a lot more in

17   here than just those types of conversations.  It's consistent

18   with our objections in the pretrial order.  The jury shouldn't

19   see these.  He can -- he can ask her questions about it, but I

20   object to them being admitted into evidence in any fashion.

21         THE COURT:  All right.  So I'll tell you what, I have

22   not read every line of every letter here, so I don't know what

23   I'm not reading here.  So go ahead.

24         MR. LITOFF:  Your Honor, we're offering -- I'm asking

25   her about select portions of the letter that go to his state

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 32 of 133 PageID #:19651
Lee - direct by Litoff
2707

1   of mind that's being shown for damages.  That one letter that

2   references Patrick Fitzgerald, I was going to talk about a

3   separate part of the letter, not that portion.

4        THE COURT:  Okay.  So I only want to give this 30

5   more seconds here, and then we've got to get rolling in front

6   of the jury.

7        So I don't know what the reference is to the U.S.

8   Attorney's Office, but it's not scandalous or prejudicial or

9   otherwise to reference the U.S. attorney, unless there's

10  something specific about that that's particularly problematic.

11       I mean, is it -- I don't know if it's a political

12  commentary?  I don't know if it's -- does it have anything to

13  do about this case, or is it just commentary generally about

14  the U.S. attorney?

15       MR. LITOFF:  He says that the U.S. attorney appointed

16  someone to investigate a set of cases.  It's not clear to me

17  if this case is included.

18       THE COURT:  So here's my ruling, because I want to

19  get rolling:  It's going to be overruled with a caveat.

20       Mr. Hale, if you, during a break, want to highlight

21  specific portions that you think ought to be redacted, have a

22  new version admitted, you can propose something and I'll

23  listen to you.  But I don't know exactly what references

24  you're objecting to.  And I'm not faulting you for that, but

25  it seems to me we ought to get rolling with the jury, and what

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 33 of 133 PageID #:19652
Lee - direct by Litoff
2708

1    I've heard isn't a sufficient basis for keeping it out.  So

2    it's overruled

3         (End of sidebar.)

4         THE COURT:  Counsel, you may proceed when you are

5    ready.

6         MR. LITOFF:  Thank you.

7    BY MR. LITOFF:

8    Q.  Ms. Lee, I want to ask you about the last sentence of this

9    letter.  He says, "Bren, I'm going to make her proud of me one

10   day."

11        Is that something he talked about a lot?

12   A.  Yes, he does.  He still do.

13   Q.  I'm sorry, I didn't --

14   A.  Yes.

15   Q.  All right.  I need to ask you about one -- one more

16   passage from this letter.

17        In the first paragraph, he says, "If it wasn't for

18   you, I probably would have given up and committed suicide."

19        Did Mr. Bolden talk to you about taking his own life?

20   A.  He did.

21   Q.  And did that happen more than once?

22   A.  A few times, yes.

23   Q.  What did he say about that?

24   A.  How difficult it was to be in the situation that he was

25   in, and I guess there were times when he felt like giving up.

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 34 of 133 PageID #:19653
Lee - direct by Litoff
2709

1          MR. LITOFF:  We could take that down, Jim.

2   BY MR. LITOFF:

3   Q.   About a year after Mr. Bolden's grandmother passed, did

4   his father also pass away?

5   A.   Yes.

6   Q.   And what was his reaction to -- what was Mr. Bolden's

7   reaction to that?

8   A.   He was devastated.  He was losing members -- his dad and

9   he lost his grandmother, and he wasn't able to get any closure

10  with them.

11  Q.   And then the following year, did Mr. Bolden's mother also

12  pass away?

13  A.   No --

14  Q.   I'm sorry.  I've got my timeline wrong.  Go ahead.

15  A.   -- his grandfather passed away after his dad.  My father

16  passed away.  And his mom passed away after that.

17  Q.   Thank you.  I'm sorry.  I've got my timeline wrong.

18          Did his mother pass away in about 2009?

19  A.   Yes.

20  Q.   And had she been ill for a while before that?

21  A.   Yes, she was.  She was wheelchair bound from her

22  illnesses.

23  Q.   And did Mr. Bolden ever talk to you about his -- his

24  mother's illness and how that affected him?

25  A.   He did.  He -- he talked about her being ill and just

Lee - direct by Litoff

2710

1   having younger siblings and his not being out here to be able

2   to help the family, help his mom, help his sisters, and that

3   always was bothersome for him.

4   Q.   And when she passed away, how did he react?

5   A.   He was -- he was devastated.  A lot of things that

6   happened during the time that he was there, he lost a lot of

7   people.  And now he -- now he lost his grandmother, he lost

8   his dad, his grandfather, and then his mother passed away, and

9   he was saying, like, everybody is dying and I'm not -- I can't

10  be there.

11  Q.   I'd like to ask you a little bit about Mr. Bolden's

12  interactions with his children.  You said you would bring

13  Dominique and Tony to Stateville to visit sometimes?

14  A.   Yes, I did.

15  Q.   Were you able to bring them often?  Were there any

16  difficulties with that?

17  A.   Yeah, sometimes.  They were involved with school

18  activities and things like that, so I couldn't bring them all

19  the time, but I brought them as much as I could.

20  Q.   And since you weren't their parent, did that present any

21  difficulties?

22  A.   Yes.  I had to get an affidavit -- their mom, Pam, had to

23  sign an affidavit to allow me to bring them because they were

24  minors and I wasn't their mom.

25  Q.   And during these visits, did you get to see Mr. Bolden

Lee - direct by Litoff

2711

1   interacting with his children?

2   A.  I did.

3   Q.  Tell the jury a little bit about what you observed.

4   A.  When he knew that they were coming, he would always be

5   happy.  I noticed that he would try to be upbeat and joyful

6   and playful with them.

7           I would -- the room, again, was a -- just a large

8   room with -- you couldn't touch.  Again, you couldn't hug.  So

9   we'd just sit at the table and he would talk to them about

10  school.  And as they got older, he'd talk to them about

11  dating.

12          And -- what else can I tell you?  There was -- the

13  vending machine was there.  So I would always -- you had to

14  have a card to get anything out of the vending machine.  So

15  I'd give the card to him and he'd give it to the kids so that

16  they could get something out of the machine.  And I guess that

17  was the only way he could -- he could do something for them,

18  is to get them some chips and soda out of the machine, but he

19  wanted them to feel like your dad did that for you.  So I'd

20  slip him the card, and he'd give it to them.

21  Q.  Did you sometimes talk with Mr. Bolden on the phone after

22  these visits with his children?

23  A.  Yes.

24  Q.  How -- what did he say about how those visits affected

25  him?

Lee - direct by Litoff

2712

1  A.  So it was -- he'd be happy when we were there in the

2  visiting room, but then afterwards, it would be sad over the

3  phone because it's a reminder of what -- "I can't raise them.

4  I'm not out there with them."

5          MR. LITOFF:  Going back to Plaintiff's Exhibit 22.

6  Jim, if we could put up Page 19422.

7  BY MR. LITOFF:

8  Q.  This is a letter that Mr. Bolden wrote to you in

9  March 2009.

10  A.  Yes.

11  Q.  And in the middle, he says, "Guess what?  Bryana wrote to

12  me today!  She made my day!"

13  A.  Yes.

14  Q.  That's his daughter, right?

15  A.  Yes.

16  Q.  And then he says, "I told you that I sent the kids a copy

17  of my petition so they may know what was done to me."

18          Was that something that Mr. Bolden expressed to you

19  that he wanted his kids to believe in his innocence?

20  A.  Yeah, he talked about that a lot.  He wanted them to know,

21  regardless of this situation, "I didn't do this."  And as they

22  got older, he would send copies of, you know, material, like,

23  in this case, the petition, so that they could read it for

24  themselves and see that this was a mistake, an error, he

25  shouldn't have been there.  And it was really important that

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 38 of 133 PageID #:19657
Lee - direct by Litoff
2713

1   they knew that their father didn't do this.

2   Q.  And that was one of the, you know, big motivations for him

3   to keep working on his case?

4   A.  Yes.

5   Q.  And he was -- Mr. Bolden was constantly working on his

6   case, wasn't he, Ms. Lee?

7   A.  Yes, he was.  I can tell you that he would often ask me to

8   purchase law books, which I would buy and bring to him.  I

9   couldn't hand it to him, but I would give it to the facility

10  and they would give it to him, because he was trying to learn

11  the law and figure out how -- what could he do to correct the

12  situation.

13  Q.  Looking at a December 2nd, 2008, letter, he tells you:

14  "I've used my $75 wisely, and not on frivolous stuff.  I spent

15  37.20 on copies of my petition.  I need some money to copy all

16  of my appeal briefs and decisions and the petition that's in

17  court now.  I can't call nobody, not even you, because of the

18  phone bill.  Would you call Taryn, and check on my mother, and

19  call my boys?  Let them know that I love them, and miss them."

20          So you sent him a little bit of money every month?

21  A.  I did.  Initially I was able to send him -- I'd send him

22  about a hundred dollars a month; and as time went on, it went

23  down to maybe $75.  So it was tight.  And sometimes I couldn't

24  send him money to do everything.

25  Q.  And so in this letter -- and you also had to pay for the

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 39 of 133 PageID #:19658
Lee - direct by Litoff
2714

1  phone calls that he made, right?

2  A.  I did.

3  Q.  And so in this letter, he's talking to you about whether

4  to pay for his -- his legal work or to pay for the phone

5  calls?

6  A.  Yeah, he had to -- I guess money was tight, and now he had

7  to make a decision to get hygiene stuff or take care of his

8  legal paperwork.  And so he would do whatever he could to --

9  to file whatever documents he needed to -- to file.

10  Q.  All right.

11          MR. LITOFF:  You can take that down, Jim.

12  BY MR. LITOFF:

13  Q.  So let's talk a little bit about once all that hard work

14  paid off.

15          You testified that the last time you saw him,

16  Mr. Bolden, as a free man was February of 1994.  When was the

17  next time you saw him as a free man?

18  A.  April 19th of 2016.

19  Q.  And where did you see him?

20  A.  He came out of the building at 26th and California.

21  Q.  And what did he seem like then?

22  A.  He was happy.  I remember him, like, just standing and

23  looking up at the sky and speaking of how good it was to

24  breathe free air.  And there was some news reporters around,

25  he spoke with them.  And a lot of family members were there

Lee - direct by Litoff

2715

1    and some friends.  We left, and we went to Giordano's to

2    celebrate and have pizza.

3    Q.   And tell me about Giordano's.

4    A.   Well, by the time we got there -- he rode with me to

5    Giordano's, and he's looking around, the whole while and he's,

6    like, where's his kids.

7              Dominique was in college by now, and we didn't know

8    he was going to be released that day.  So they weren't there.

9    A friend of Dominique's -- he went to school in Iowa, a

10   college in Iowa.  So a friend of his that was from Chicago

11   brought him home.  Tony, I don't know where he was at, but I

12   remember going to pick up -- I left Giordano's and I went to

13   pick up Dominique and Tony.  I don't know where Bryana was at

14   on that day.  And I brought them back to the restaurant

15   because he was, like, where are my kids at?  It's like it

16   wasn't complete until he saw them.  And I brought them, and he

17   grabbed them and hugged them, and it was a good day.

18   Q.   Now, after his release, have you spent a lot of time with

19   Mr. Bolden?

20   A.   Yes.

21   Q.   And, in fact, have you lived together for most of the time

22   since his release?

23   A.   Yes.  He initially was in Galesburg with his sister.  I

24   want to say that was less than a year, and then he moved in

25   with me.

Lee - direct by Litoff

2716

1  Q.  And was there a reason that he came back to Chicago to

2  move in with you?

3  A.  Yes.  He had an opportunity to -- there was a work program

4  that he got in.  And so -- and it was in the city, I think, or

5  in the suburbs.  So he came back to live with me.

6  Q.  And he eventually got a job?

7  A.  Yes, he did.

8  Q.  How did he feel about getting a job?

9  A.  He was proud.  He -- he'd get his first check or whatever

10 and asked me what did I need -- what bill could he help with?

11 Just as any man would be, just proud to be able to carry his

12 own weight.

13 Q.  Since his release from prison, he's been living with you a

14 lot of the time.

15 A.  Mm-hmm.

16 Q.  Have you had a chance to observe him at all and have you

17 seen him struggle to life outside of prison at all?

18 A.  Wow.  Yes, he -- when he first came home, and sometimes

19 even now, he was withdrawn.  He would stay in his room.  I

20 don't know.  He probably was at home for a couple of years

21 before I would see him do things outside of the bedroom.  I'd

22 say, "You know you don't have to stay in this room?  You do

23 know you have room to -- this house is yours.  You can walk

24 around and whatever."

25          But he had a lot of problems with being around people

Lee - direct by Litoff

2717

1    in society.  He had to learn pretty much everything.  We

2    didn't have the computers.  There wasn't the Internet.  There

3    was a lot of things that were new that he had to -- to learn

4    to function in society.

5    Q.  Can you give the jury just an example of a little thing he

6    had to learn again or for the first time.

7    A.  Going to get gas.  I'll use that one.  He -- you know, now

8    we use a credit card to pay for gas, and when he went in

9    there, you'd go in and pay for gas with money.  So I think he

10   would be, like, embarrassed because he didn't know how to do

11   normal things, everyday living things.  So pretty much

12   everything I'd walk him through it a few times, and then after

13   that, he'd say, okay, I can do it.

14        When he worked, he had to catch the bus.  He didn't

15   know how to get a bus card.  Simple something for me and you.

16   But he didn't know how to get a bus card, so I had to take him

17   and show him how -- this is how, you know, you pay for it, it

18   comes out, you use the card.

19        The same thing with going, like I said, to get gas.

20   I would go with him, and I'd say, "You don't pay for it in

21   there.  You use your credit card and you slide it through."

22   To get a bank account.  To -- things that -- it blew my mind

23   because it's like he did not know how to do anything.  It was

24   like raising, showing a teenager or someone how to do certain

25   things.

Lee - direct by Litoff

2718

1    Q.   Since he's been released, have you ever been in a

2    situation with him where you've seen him where police officers

3    were present?

4    A.   Yes, a couple of times.

5    Q.   Is there any incident that sticks out in your mind?

6    A.   Yes.  There was one time when I'm driving and he's a

7    passenger and I made a U-turn, and he freaked out and he was

8    like "Aunty, you can't do that."  And I'm like it was a

9    U-turn, it's okay."  So he was like, "No, the police stop you

10   for that."

11            And there was one other time, we were on our way

12   home -- and this was really sad to me -- we were on our way

13   home, and the police pulled me over.  I was driving.  And I

14   pulled over and I looked over at him and he's like broke out

15   in sweat and he's nervous, and I'm like it's just the police

16   stopping us.  And so they asked for my ID.  And they told me

17   that there was some crime or something happened in that area,

18   and the car that this individual, whoever did whatever, it met

19   the description of my car.  So that's why they pulled me over.

20            So they apologized and said, you know, you can go on,

21   we're sorry, but your car met the description of whatever had

22   just occurred.  And so I looked over at him, and I was like,

23   see, it's okay.  And so --

24   Q.   And that was a simple, short, respectful interaction with

25   the police?

Lee - cross by Hale

2719

1    A.   Yes.

2    Q.   But you saw it affect him differently?

3    A.   Simple for me, yeah.  He was sweating and nervous and --

4    so . . .

5    Q.   Does Mr. Bolden still talk to you about his time in

6    prison?

7    A.   Yes.

8    Q.   And does he say that it still impacts him today?

9    A.   Yes.  I mean, you could see certain things that -- I guess

10   if you live with him, you would notice things that -- you

11   could tell it's still over from when he was there.

12              MR. LITOFF:  Thank you, Ms. Lee.  No further

13   questions.

14              THE COURT:  Thank you, Counsel.

15              Defense Counsel.

16                       CROSS-EXAMINATION

17   BY MR. HALE:

18   Q.   Good morning, Ms. Lee.

19   A.   Good morning.

20   Q.   You loved Mr. Bolden very much, right?

21   A.   Yes, I do.

22   Q.   And he loved you very much, right?

23   A.   Yes.

24   Q.   I'm not going to ask you any questions about that

25   relationship.  I appreciate that.

Lee - cross by Hale

2720

1        And I just want to ask you some more background type

2  of questions.  Okay?

3  A.  Okay.

4  Q.  You talked about the 1993 to 1994 time period in some

5  questions.  You were close with Mr. Bolden during 1993,

6  correct?

7  A.  I've been close to him all of his life, yes.

8  Q.  Where was Mr. Bolden living in 1993?

9  A.  On the South Side.

10  Q.  Do you know where?

11  A.  Well, I would always see him at my mom's house, so no.

12  Q.  Did you -- did you have any knowledge of any place he

13  lived in 1993?

14  A.  I could just tell you it was on the south side.

15  Q.  And can you be any more specific than that?

16  A.  No.  I never went to visit him.  He would always come to

17  my mom's house.

18  Q.  Okay.  You had mentioned his three kids.

19  A.  Yes.

20  Q.  Do you know where they live today?

21  A.  Today?

22  Q.  Yeah.

23  A.  Yes.  Dominique is -- Dominique and Tony lives here in

24  Chicago, and Bryana is in Atlanta.

25  Q.  Okay.  The two boys are in Chicago?

Lee - cross by Hale

2721

1    A.   Yes.

2    Q.   Okay.  Do you know if Mr. Bolden was working in 1993?

3    A.   I do not.

4    Q.   Do you know how he -- you don't know.  Okay.

5         Do you know how he supported his family?

6    A.   I know my mom used to help him out.

7    Q.   Okay.  He never talked with you about work?

8    A.   No.

9    Q.   That was a topic you wouldn't discuss?

10   A.   It wasn't that we didn't want to discuss it.  He would

11   come over on weekends, and it would be family time, so we

12   didn't talk about work, no.

13   Q.   Okay.  I understand.

14        In 1993, who did Mr. Bolden hang out with?

15   A.   I don't know.

16   Q.   Who were some of his friends?

17   A.   I didn't know his friends.  I didn't know his friends.  I

18   would always see him at my mom's house.

19   Q.   Would Mr. Bolden, whenever you saw him in 1993, would he

20   ever be with any friends?

21   A.   He would -- whenever I saw him, he was with his kids and

22   Pam.

23   Q.   Okay.  Did Mr. Bolden ever talk to you about any of his

24   friends?

25   A.   No.

Lee - cross by Hale

2722

1   Q.  Did he ever mention to you the name Anthony Williams?

2   A.  No.

3   Q.  And let me use a nickname.  Did Mr. Bolden ever mention to

4   you a person by the name of Ant?

5   A.  No.

6   Q.  Okay.  So I understand that -- isn't it true that -- let's

7   take the time period maybe -- well, from 2008 through 2016 --

8   so let's talk about maybe the five years before Mr. Bolden was

9   released from prison.

10  A.  Mm-hmm.

11  Q.  You talked to him very frequently during that time period,

12  right?

13  A.  Yes.

14  Q.  You talked to him on the phone all the time during those

15  five years, right?

16  A.  Whenever he called, yes.

17  Q.  Probably several times a week?

18  A.  No, I wouldn't say several times a week.  I don't think

19  he'd get the phone that often.  But I don't remember exactly.

20  Q.  But you talked to him a lot during that five-year period,

21  right?

22  A.  Yes.

23  Q.  Okay.  And Mr. Bolden would often talk about his court

24  case, right?

25  A.  Yes.

Lee - cross by Hale

2723

1   Q.  And he'd often talk about things he was trying to do to

2   get out of prison, right?

3   A.  Yes.  We talked about his case, yes.

4   Q.  Right.  And at some point, did Mr. Bolden ever tell you

5   what he was doing at the time of the murders?

6   A.  At the time of the murders, what he was doing?

7   Q.  Yeah.

8   A.  I could tell you he told me when he came to my house that

9   he was in a J&J restaurant.  Someone stumbled into the

10  restaurant that was hurt, shot or something; that he -- he

11  called 911, and there was some, I guess, customers in the

12  restaurant, a couple of young ladies and a guy and --

13  Q.  Let's talk about the customers.  Did he talk -- did he

14  talk to you about the customers he claims was in J&J Fish?

15  A.  Nothing in detail other than he told them to -- if I

16  recall right, something like "get down" or something was going

17  on, and he called 911.

18  Q.  He told the girls to get down?

19  A.  I don't know if he told them.  Maybe he just blurted it

20  out.  I can't say exactly.

21  Q.  Mm-hmm.

22  A.  But he did say that he told them to get down or whatever,

23  and he called 911.  And that's -- he didn't understand why

24  they were looking for him.

25  Q.  What do you mean he didn't understand why they were

Lee - cross by Hale

2724

1    looking for him?

2    A.  The police --

3    Q.  Yeah, what did --

4    A.  -- looking for him.

5    Q.  Okay.  Did he tell you why he was at the J&J Fish that

6    night?

7    A.  No.  He just told me he was in there playing Pac-Man.

8    Q.  Did he tell you if he -- is that a place that you

9    understood that he hung out?

10   A.  No.

11   Q.  Did you understand that J&J Fish -- so he told you he was

12   playing Pac-Man that night?

13   A.  Yes, he did.

14   Q.  Did he tell you he was playing Pac-Man for three hours

15   straight?

16   A.  No.  He just said he was in the restaurant playing

17   Pac-Man.

18   Q.  Okay.  Did he ever tell you -- did Mr. Bolden ever tell

19   you that he thought Anthony Williams had something to do with

20   the murders?

21   A.  No.

22   Q.  Did Mr. Bolden ever tell you that he thought it had

23   something to do with a drug transaction?

24   A.  No.

25   Q.  Did Mr. Bolden ever tell you that he thought the murders

Lee - cross by Hale

2725

1   had something to do with some kind of a gang hit?

2   A.  We didn't talk about that.  He just spoke about that night

3   and his playing Pac-Man and calling 911.  We didn't go into

4   details with anything else.

5   Q.  The one thing you do remember him telling you, though, is

6   that he was playing Pac-Man?

7   A.  Yes.

8   Q.  That's something you do remember?

9   A.  Yes, because I thought it was funny.

10  Q.  Okay.  So at some point in, let's say, maybe around

11  2010 -- if I'm wrong, you can correct me -- did you -- you or

12  Mr. Bolden retain a private investigator?

13  A.  I don't know what year, but yes, we did.

14  Q.  And what's your best estimate of what -- what year it was

15  that the private investigator was retained?

16  A.  I'm not sure.  I don't know.  I could tell you her name,

17  but --

18  Q.  Let's do it this way.  Can we try to backtrack it, like,

19  how many years before Mr. Bolden was released from prison

20  would you estimate the private investigator was retained?

21  A.  Maybe ten.

22  Q.  Ten?

23  A.  Yeah.

24  Q.  Okay.

25  A.  And I'm guessing.  I don't know exactly.

Lee - cross by Hale

2726

1    Q.  I understand.  I understand.  All of this is a long time

2    ago.

3    A.  Yeah.

4    Q.  What was her name?

5    A.  Susan Carlson.

6    Q.  And how did she come about?  Like, did somebody know her?

7    A.  No, I think Eddie gave me her name.

8    Q.  So Mr. Bolden gave you the name of this investigator that

9    he wanted to use?

10   A.  Yes.

11   Q.  Okay.  And were you the one who actually paid the

12   investigator?

13   A.  For a short period of time, yes.  After a while, she did

14   it for free.

15   Q.  Okay.  And what -- I'm sorry if you answered this.  What

16   was her name?

17   A.  Susan Carlson.

18   Q.  Susan Carlson.  Okay.

19          Is one of the things Mr. Bolden wanted Susan Carlson

20   to do is to try to locate and talk to Octavia Jackson?

21   A.  I know he said that there were a couple of young ladies

22   that was in the restaurant and that he wanted her to locate

23   those witnesses.

24   Q.  Right.  And do you remember one of the ladies' names being

25   Octavia Jackson?

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 52 of 133 PageID #:19671
Lee - cross by Hale
2727

1    A.  I do now from --

2    Q.  And you and Mr. Bolden had a lot of conversations over a

3    year or two period, didn't you, about Octavia Jackson?

4    A.  About Octavia Jackson?

5    Q.  Yes.

6    A.  No.  He would talk about the fact that she was in the

7    restaurant, and if they located her, she could testify that

8    she was there and knew he was there.

9    Q.  Right.  And so the investigator -- you talked to

10   Mr. Bolden quite a bit --

11   A.  Mm-hmm.

12   Q.  -- about trying to locate Octavia Jackson, right?

13   A.  About trying to locate witnesses in general, yes.

14   Q.  Right.  And Octavia Jackson, isn't it true, that when she

15   was first contacted by the investigator, she couldn't identify

16   Mr. Bolden?  Isn't that right?

17              MR. LITOFF:  Objection, Your Honor.  Foundation.

18              THE COURT:  You're asking her what she heard from

19   Mr. Bolden or from --

20              MR. HALE:  Let me ask it --

21              THE COURT:  -- someone else?

22              MR. HALE:  Let me ask it a different way.

23              THE COURT:  Okay.

24   BY MR. HALE:

25   Q.  Did you ever come to an understanding that Octavia Jackson

could not identify Mr. Bolden?

A. No.

MR. LITOFF: Objection, Your Honor. Foundation and hearsay to the extent that's the basis of any knowledge.

THE COURT: Overruled.

BY MR. HALE:

Q. You can answer the question.

THE COURT: You can answer the question.

BY THE WITNESS:

A. Can you repeat the question?

BY MR. HALE:

Q. Yeah, sure.

Didn't you come to learn at some point that Octavia Jackson could not identify Mr. Bolden?

A. No.

Q. You never learned that?

A. No.

Q. Okay. Did you ever see an affidavit that Ms. Jackson signed?

A. No.

Q. Did you ever hear about an affidavit that Ms. Jackson signed?

A. I don't recall.

Q. Did you ever see an affidavit where Ms. Jackson talked about what happened at the J&J Fish but it made no mention of

Lee - cross by Hale

2729

1  Mr. Bolden?

2  A.  No.

3  Q.  Okay.  Did you ever come to an understanding that Octavia

4  Jackson was -- was basically not offering any helpful

5  information to Mr. Bolden?

6  A.  No.

7  Q.  You had a lot of discussions with Mr. Bolden about Octavia

8  Jackson; isn't that true?

9  A.  No.

10  Q.  You did not?

11  A.  Not a lot, no.

12  Q.  Let's talk about -- do you remember the other young lady

13  that Mr. Bolden wanted to locate and have the investigator

14  talk to?

15  A.  Yes.  There was one other young lady and a gentleman, a

16  guy.

17  Q.  Pardon me?

18  A.  There was one other young lady, and there was also a guy,

19  a gentleman that --

20  Q.  Right.  Right.

21  A.  Yeah.

22  Q.  So there were three people Mr. Bolden was interested in

23  the investigator talking to, the two ladies and the gentleman,

24  right?

25  A.  Yes.

Lee - cross by Hale

2730

1    Q.  All right.  So we've talked about one of the young ladies.

2    That was Octavia Jackson.

3            Do you remember the other young lady's name?

4    A.  No, but if you say it, I can tell you if that's the

5    correct name.

6    Q.  Yeah, I'm happy to do that.  Vondell Goins?

7    A.  Yes.

8    Q.  Okay.  And what do you remember Mr. Bolden saying about

9    Vondell Goins?

10   A.  Other than her being in the restaurant, nothing.

11   Q.  Yeah.  And these are conversations you're having with

12   Mr. Bolden probably at least 15 years after the murders took

13   place, right?

14   A.  No.  He mentioned them in the very beginning.  Not by

15   name, but that they were there.

16   Q.  Yeah, I'm sorry.  Let me ask my question a different way.

17   A.  Okay.

18   Q.  The conversations you had with Mr. Bolden about having an

19   investigator try to locate and talk to the two women and the

20   gentleman --

21   A.  Mm-hmm.

22   Q.  -- that would have been at the time -- you know -- I think

23   you said the investigator was hired maybe around 2010, right?

24   A.  Yes, roughly.

25   Q.  So my question was:  The conversations you were having

Lee - cross by Hale

2731

1    with Mr. Bolden --

2    A.   Mm-hmm.

3    Q.   -- about trying to locate these witnesses were

4    conversations that were not taking place until at least 15

5    years after he had been arrested, right?

6    A.   No.  He spoke about them all the time.

7    Q.   Right.  But my question was in the context of the

8    investigator.  You know, conversations about having this

9    investigator, Susan Carlson, talk to these people.  Those were

10   conversations that were taking place, like, 15 years or more

11   after the murders, right?

12   A.   Yes, as soon as we got the investigator, he spoke to her

13   about it.

14   Q.   Okay.  So Vondell Goins, do you recall -- did you come to

15   an understanding that she could not -- when she was contacted,

16   she couldn't identify Mr. Bolden either?

17   A.   No.

18   Q.   Did you ever come to learn that she claims she wanted to

19   hear his voice?

20   A.   Vondell Goins wanted to --

21   Q.   Yes.

22   A.   -- hear his voice?

23        No.

24   Q.   Did you ever learn about her, you know, being taken to

25   court so she could hear Mr. Bolden's voice?

Lee - cross by Hale

2732

1   A.   No.

2   Q.   Mr. Bolden never discussed that with you?

3   A.   Not to my recollection.

4   Q.   Did Mr. Bolden ever discuss with you Octavia Jackson's and

5   Vondell Goins' inability to identify him?

6   A.   No.

7   Q.   Did you ever get photographs of Mr. Bolden and provide

8   those to Ms. Carlson so she could show those photographs to

9   witnesses?

10  A.   I don't recall doing it.

11  Q.   Do you remember trying to find photographs of Mr. Bolden,

12  old photographs, and give to Ms. Carlson?

13  A.   I don't recall doing that, no.

14  Q.   Do you have any understanding of whether Ms. Carlson

15  showed photographs to Octavia Jackson and Vondell Goins?

16  A.   No, I don't know what she showed them.

17  Q.   Do you ever have a recollection of Mr. Bolden wanting to

18  darken the photograph that was going to be sent to the

19  investigator so he would look darker?

20  A.   Can you repeat that?

21  Q.   Yeah.  Do you ever have a recollection of Mr. Bolden

22  wanting -- saying he wanted the photo to be darkened before it

23  was sent so he had a darker-looking complexion?

24  A.   No.

25  Q.   You don't remember any discussion like that?

Lee - cross by Hale

2733

1  A.  No.

2  Q.  Okay.  And did you discuss with Mr. Bolden his desire to

3  have the investigator talk to Todd Henderson?

4  A.  Yes.

5  Q.  Did you ever see an affidavit from Todd Henderson that the

6  investigator had him sign where it made no mention of

7  Mr. Bolden?

8  A.  No.

9  Q.  Did Mr. Bolden ever discuss with you Todd Henderson's

10  inability to identify him?

11  A.  No.

12  Q.  You had mentioned the attorney that you hired initially

13  was Charles Ingles; is that correct?

14  A.  Yes.

15  Q.  Did Mr. Bolden ever tell you that he felt Mr. Ingles set

16  him up?

17  A.  I don't recall that, no.

18  Q.  Do you remember Mr. Bolden ever telling you he felt

19  Mr. Ingles was in on it?

20  A.  No.

21  Q.  Do you remember Mr. Bolden ever being critical of

22  Mr. Ingles in any way?

23  A.  No.

24  Q.  Do you remember Mr. Bolden ever being critical of his

25  attorney that tried his criminal case in any way?

Lee - cross by Hale

2734

1    A.   Which attorney are you referring to?

2    Q.   Kevin Foster.

3    A.   Yes.

4    Q.   What did he say about him?

5    A.   I guess he wasn't filing documents on time or something,

6    and he didn't feel that he was investigating things thoroughly

7    enough.

8    Q.   Did you talk to Mr. Bolden before his criminal trial?

9    A.   By phone, yes.

10   Q.   Did he ever tell you that he knew Octavia Jackson?

11   A.   No.  Not to my recollection, no.

12   Q.   Did he ever tell you to try to find and locate Octavia

13   Jackson?

14   A.   Me --

15   Q.   Before his criminal trial.

16   A.   Myself personally?

17   Q.   Yeah.

18   A.   No.

19   Q.   And did Mr. Bolden before his criminal trial ever tell you

20   to try to locate and find Vondell Goins?

21   A.   No.  He just would always mention if the -- if his public

22   defendant would do further investigation, if he could find

23   them, that he felt they could prove that he was in the

24   restaurant.

25   Q.   Did Mr. Bolden before his criminal trial ever ask you to

Lee - cross by Hale

2735

1   try to locate and talk to Todd Henderson?

2   A.  No.  How would . . .

3   Q.  Was there a time -- do you recall a time where Susan

4   Carlson reached out to Mr. Ingles and he was refusing to talk

5   to her?

6   A.  I don't know about anything like that, no.

7   Q.  Do you recall any other witnesses Mr. Bolden wanted to try

8   to have the investigator talk to?

9   A.  Not in particular, no.

10  Q.  And you would have a lot of conversations yourself with

11  the investigator, right, with Ms. Carlson?

12  A.  Sometimes she'd tell me the status of what was -- what she

13  was doing.

14  Q.  She would -- she would keep you apprised of the status of

15  her investigation, right?

16  A.  Somewhat.

17  Q.  You and Ms. Carlson would talk on the phone frequently,

18  right?

19  A.  Not frequently, but I did speak with her.

20  Q.  Ms. Carlson would also e-mail you, correct?

21  A.  A few times she did, yes.

22  Q.  And is it your understanding that Mr. Bolden was released

23  from prison based on Mr. Foster's inability to call Octavia

24  Jackson, Vondell Goins, and Todd Henderson as witnesses at

25  trial?

Lee - cross by Hale

2736

1   A.  Can you repeat the question?

2   Q.  Is it your understanding that Mr. Bolden was released from

3   prison based on Mr. Foster's inability to get Octavia Jackson,

4   Vondell Goins, and Todd Henderson to trial?

5              MR. LITOFF:  Objection.  Foundation.

6              THE COURT:  Overruled.  It's requesting her

7   understanding of the reason for the release.  Go ahead.

8   BY THE WITNESS:

9   A.  No.

10  BY MR. HALE:

11  Q.  That's not your understanding?

12  A.  I -- no.

13             MR. HALE:  I have no further questions, Your Honor.

14             THE COURT:  Thank you, Counsel.

15             MR. LITOFF:  Nothing further.

16             THE COURT:  Okay.  Ms. Lee, you may step down.  Thank

17  you.

18             THE WITNESS:  Thank you.

19         (Witness excused.)

20             THE COURT:  Folks, now is a good time for a

21  midmorning break.  We're going to take a quick break this

22  morning, and we're going to get rolling when you come back.

23  So please stretch your legs, take a drink, and we'll be back

24  shortly.

25             THE COURT SECURITY OFFICER:  All rise.

2737

1          (Jury out.)

2               THE COURT:  Mr. Litoff, you look like you want to say

3     something.

4               MR. LITOFF:  Yes, I understand counsel has no

5     objection.  Ms. Lee is not going to be recalled.  Is it all

6     right if she would -- is able to watch the remainder of the

7     trial in the overflow room?

8               THE COURT:  I think that's fine.

9               MR. HALE:  Can I just talk -- confer for one second?

10              THE COURT:  Yeah, sure.

11         (Counsel conferring.)

12              THE COURT:  So a moment ago I said you were released

13    from the trial subpoena.  That may or may not be correct.  So

14    bear with me.

15              Can I raise a different -- I want to give you a

16    chance to talk.  I'm sorry.  Why don't we address this point

17    first, and I'll move on.

18              MR. HALE:  We would like to keep Ms. Lee under

19    subpoena because -- potentially to call her in rebuttal to

20    what Mr. Bolden says.

21              THE COURT:  So that's fine.  So may not watch the

22    trial in the public viewing room.  You can read the transcript

23    afterwards, but you can't watch it during the testimony of

24    Mr. Bolden.  Okay?

25              THE WITNESS:  Okay.

2738

1          THE COURT:  So you remain under trial subpoena.

2          THE WITNESS:  All right.

3          THE COURT:  Let me raise a different issue, folks.  I

4   know you are anxious probably to take a less break.  It

5   occurred to me -- you can step down, ma'am.  Watch your step.

6   Thank you for coming.

7          THE WITNESS:  Thank you.

8          THE COURT:  One brief thought.  I know that your

9   respective members of the trial team are probably anxious to

10  watch the rest of the testimony, as I would be if I were a

11  member of the team.  It occurred to me that when someone from

12  the plaintiff's camp is going to take the exam of Mr. Bolden,

13  there are going to be a couple of free seats at the counsel

14  table.  And *vice versa*, when there's a cross-examination,

15  there's an empty seat over there.

16          You folks are welcome, if you want, to fill those

17  seats with extra people.  So, for example, I don't know who is

18  planning to do the exam on plaintiff's camp.  Mr. Crowl.  So

19  if you want Ms. Brummel to sit there, if you want Ms. Musumeci

20  to have Mr. Bolden's seat, that's certainly fine with me.  You

21  know, I think you know my inclinations on filling the room.

22          And conversely, if you want a member of your trial

23  team to take your seat when you do the cross, you're welcome

24  to do that.  I want to be as inclusive as I can without

25  upsetting the powers that be, if you understand what I mean.

```
1              MR. CROWL:  Thank you, Your Honor.

2              THE COURT:  Is there anything else that we need to

3     cover?  We'll take about ten minutes.  We'll try to start just

4     shy of 11:00.

5          (Recess taken from 10:47 a.m. until 11:02 a.m.)

6              THE COURT:  All right, folks.  Have a seat.

7              No additional evidentiary issues to raise, obviously?

8     It seems like it's going to be smooth.

9              MR. CROWL:  It will be smooth, Judge.

10             THE COURT:  And do you expect Ms. Brummel or anybody

11    else from your team to take a seat when you come in?

12             MR. CROWL:  Yes, Ms. Brummel will.  Yes.

13         (Brief pause.)

14         (Jury in.)

15             THE COURT:  All right.  Welcome back, everybody.

16             Plaintiff's counsel, call your next witness.

17             MR. CROWL:  Judge, we call Edward Bolden.

18             THE COURT:  Okay.  Mr. Bolden, come on up, please.

19             Sir, please watch your step.

20             THE WITNESS:  Good morning.

21             THE COURT:  Good morning.

22             Could you please raise your right hand.

23         (Witness sworn.)

24             THE COURT:  Have a seat, Mr. Bolden.

25             Mr. Bolden, you know the drill by now.  You're
```

Bolden - direct by Crowl

2740

1    welcome to take off your mask if you want.  It's up to you.

2              THE WITNESS:  Thank you.

3              THE COURT:  Good morning.

4              THE WITNESS:  Good morning.

5              THE COURT:  You're also welcome to help yourself if

6    you need a glass of water.  There's a Kleenex box next to you,

7    too.  Okay?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  All right.  And make sure you speak

10   directly in the microphone so all the members of the jury can

11   hear you.

12             THE WITNESS:  Okay.

13             THE COURT:  Okay.  Thank you.

14             Counsel, you may proceed.

15             MR. CROWL:  Thank you, Judge.

16        EDDIE L. BOLDEN, PLAINTIFF'S WITNESS, DULY SWORN

17                      DIRECT EXAMINATION

18   BY MR. CROWL:

19   Q.  Good morning, Mr. Bolden.

20   A.  Good morning.

21   Q.  Would you please state your full name.

22   A.  Eddie Lynier Bolden.

23   Q.  And, Mr. Bolden, how old are you, sir?

24   A.  52.

25   Q.  Do you have children?

Bolden - direct by Crowl

2741

1   A.   Yes, I do.

2   Q.   How many?

3   A.   Three.

4   Q.   I want to talk with you about that in a few minutes.  But

5   first, Mr. Bolden, did you commit the shootings for which you

6   were imprisoned --

7   A.   No, sir.

8   Q.   -- for 22 years?

9   A.   No, sir.

10  Q.   Did you murder Derrick Frazier?

11  A.   No, I did not.

12  Q.   Did you murder Ledell Clayton?

13  A.   No, I did not.

14  Q.   Did you shoot Clifford Frazier?

15  A.   No, I did not.

16  Q.   Where were you at 8:00 o'clock on the evening of

17  January 29th?

18  A.   In J&J Fishery on 64th and Cottage Grove.

19  Q.   Where were you at 8:09?

20  A.   Inside J&J Fishery.

21  Q.   Where were you at 8:20 on the evening of January 29th,

22  1994?

23  A.   Inside J&J Fishery.

24  Q.   Did you have anything to do with the murders of Derrick

25  Frazier and Ledell Clayton or the shooting of Clifford

Bolden - direct by Crowl

2742

1    Frazier?

2    A.   No, I did not.

3    Q.   Did you help plan the shootings?

4    A.   No, I did not.

5    Q.   Did you know about the shootings before they took place?

6    A.   No, I did not.

7    Q.   Have you denied being involved in these shootings?

8    A.   Yes, sir.

9    Q.   How long have you denied that?

10   A.   Since the very beginning.

11   Q.   Mr. Bolden, I want to talk with you a little bit about

12   your background.

13          Can you tell the members of the jury where you grew

14   up?

15   A.   In Chicago, Illinois, Stateway Gardens.

16   Q.   Where was the Stateway Gardens?

17   A.   From 35th and State Street to 39th and Federal, Federal,

18   Dearborn, and State.

19   Q.   And these were housing projects; is that right?

20   A.   Yes, sir.

21   Q.   How long did you live in the Stateway Garden housing

22   projects?

23   A.   From the age of 4 till 15, I believe.

24   Q.   And for a while did you also live in another part of town?

25   A.   Yes, I did.

Bolden - direct by Crowl

2743

1   Q.   What part of town?

2   A.   Englewood.

3   Q.   With whom did you live when you were in Englewood?

4   A.   My grandparents.

5   Q.   And which grandparents were those?

6   A.   My mother's parents, Grover Knight and Amry Knight.

7   Q.   Where did your grandparents live?

8   A.   65th and Marshfield.

9   Q.   And tell us about your family in 1994.

10  A.   Which part?  My family or my parents or what?

11  Q.   Yeah, your parents.

12  A.   My father, Eddie Bolden, he lived with my grandmother,

13  Mary Lee, his mother, on the West Side of Chicago.  And my

14  mother lived -- my mother, Malinda Bolden, lived on the South

15  Side in Englewood on -- I believe it's Englewood, 52nd and

16  Honore.

17  Q.   And how many kids are there in your family?

18  A.   Four.

19  Q.   What are their names?

20  A.   Raphael Taylor, myself; and my sister, Taryn Griffin; and

21  my sister, Ricquia LaNore.

22  Q.   And we heard from Ms. LaNore in this trial, didn't we?

23  A.   Yes.

24  Q.   And you mentioned your grandparents.  In 1994, how many of

25  your grandparents were living?

Bolden - direct by Crowl

2744

1   A.   All four of them.

2   Q.   And they were whom?

3   A.   Joe Lee, Mary Lee, Grover Knight, and Amry Knight.

4   Q.   And when you were growing up in Stateway Gardens, how was

5   your family life?

6   A.   It was -- it was -- it was hard.  We were poor.

7   Q.   How so?

8   A.   We were extremely poor.

9   Q.   Did you attend elementary school?

10  A.   Yes, I did.

11  Q.   Where did you go to grade school?

12  A.   Crispus Attucks, and then later on, I went to Charles W.

13  Earle.

14  Q.   And did you attend high school?

15  A.   Yes, I did.

16  Q.   And eventually did you get your GED?

17  A.   Yes, I did.

18  Q.   Did you like school?

19  A.   I loved it.

20  Q.   Were you involved in any sports or activities?

21  A.   Yes, baseball and basketball.

22  Q.   Where did you play baseball?

23  A.   Park district, Dunbar Park.

24  Q.   What was your position?

25  A.   First base in outfield, main right field.

Bolden - direct by Crowl
2745

1   Q.   How about basketball?  Where did you play basketball?

2   A.   Park district.  Yeah, park district.  Street ball.

3   Q.   What was your position when you played basketball?

4   A.   Shooting guard/small forward.

5   Q.   And for those of us aren't big basketball fans, what's a

6   shooting guard/small forward?

7   A.   Shooting guard is Michael Jordan.  Small forward is

8   Scottie Pippen.

9   Q.   You mentioned that you have three children.  Are all three

10  of them your biological children?

11  A.   No, sir.

12  Q.   Which of them is your biological child?

13  A.   The baby, Dominique.

14  Q.   How old is Dominique now?

15  A.   28 years old.

16  Q.   And what does Dominique do for a living?

17  A.   He's a dean at Perspectives Charter School.  He's a youth

18  counselor for youth advocacy, and he's a youth counselor at

19  Gary Comer.

20  Q.   And when you were -- back in 1994, you also say you had

21  two other children?

22  A.   Yes.

23  Q.   And why do you say that they're your children?

24  A.   Because I loved them just like I love Dominique.  I mean,

25  he was -- they were here before Dominique was here.

Bolden - direct by Crowl

2746

1   Q.  And who are they the children of?

2   A.  Pamela Johnson.

3   Q.  And in 1994, what was your relationship with Ms. Johnson?

4   A.  That was my girlfriend.  We lived together.

5   Q.  And who are those two additional children?

6   A.  Bryana Johnson and Antonio Johnson.

7   Q.  And where is Bryana living these days?

8   A.  She stays in Georgia.

9   Q.  How about Antonio?

10  A.  He lives in Chicago.

11  Q.  And, Mr. Bolden, are you on any medications today?

12  A.  Yes, I am.

13  Q.  Are you on a medication known as an alfuzosin?

14  A.  Yes.

15          MR. CROWL:  And I'll spell that for Ms. Spee.

16  A-l-f-u-z-o-s-i-n.

17  MR. CROWL:

18  Q.  Is that the medication that you're on?

19  A.  Yes, I am.

20  Q.  And what's that medication for?

21  A.  Prostate problems.

22  Q.  And does it have any side effects?

23  A.  Yes, it does.

24  Q.  And what are the side effects?

25  A.  Dizziness, tiredness, headaches, nausea.

Bolden - direct by Crowl
2747

1    Q.   How are you feeling now?

2    A.   I feel all right.

3    Q.   And at times you also need, because of your prostate

4    issue, to use -- to leave to use the facilities?

5    A.   Yes.

6    Q.   I'm sure that if you need a break at any point, you can

7    let me or you can let Judge Seeger know, and he can decide

8    whether or not it's time to take a break.

9    A.   All right.

10            THE COURT:  Just let me know, Mr. Bolden, if you need

11   a break.

12            THE WITNESS:  Okay.  Thank you.

13   BY MR. CROWL:

14   Q.   Mr. Bolden, I want to take you back to January 29th of

15   1994.

16            On the morning of January 29th of 1994, what were you

17   doing?

18   A.   I was in Stateway Gardens with a guy named DeJuan Brown

19   celebrating his birthday.

20   Q.   And when you were in Stateway Gardens with DeJuan

21   celebrating his birthday, did you have a conversation with

22   somebody who you knew from J&J's Fish?

23   A.   Yes, I did.

24   Q.   Who was that person?

25   A.   Maurice Stewart.

Bolden - direct by Crowl

2748

1   Q.   And what did Maurice Stewart tell you?

2   A.   He told me that I needed to talk to Anthony, Anthony was

3   talking crazy, trying to get him to stick some people up and

4   kill 'em.

5   Q.   And you mentioned that he was mentioning this about

6   Anthony.

7   A.   Mm-hmm.

8   Q.   Did you understand who Anthony was?

9   A.   Yes.

10  Q.   Who was he?

11  A.   He was my childhood friend.

12  Q.   Is this Anthony Williams?

13  A.   Yes.

14  Q.   And how did you know Mr. Williams?

15  A.   I had grown up with him in Stateway Gardens.  I've known

16  him since I was four.

17  Q.   Did you also know members of his family?

18  A.   Yes, I did.

19  Q.   Who?

20  A.   I knew his parents, James and -- Jim, James Williams and

21  Edna Williams.  I knew his siblings Willie.  We called him

22  Lee.  His brother, Louis.  That was my best friend.  Sister

23  Tanya, and then brother Greg, Gregory.

24  Q.   And did you know at the time that Anthony owned a beeper

25  shop?

Bolden - direct by Crowl

2749

1   A.   Yes, I did.

2   Q.   And what was the beeper shop?

3   A.   6420 South Cottage Grove.

4   Q.   And it was right next door to what?

5   A.   J&J Fishery.

6   Q.   Did you try to talk to Anthony a couple times that day?

7   A.   Yes, I did.

8   Q.   And why did you want to talk with him?

9   A.   To try and stop him from doing whatever he was about to

10  do.

11  Q.   I'm going to take you to about 6:30 in the evening on

12  January 29th of 1994.

13          Before 6:30, had you been able to get ahold of

14  Anthony?

15  A.   No, I hadn't.

16  Q.   At around 6:30, where were you?

17  A.   I was inside J&J Fishery.

18  Q.   And why had you gone to J&J Fishery?

19  A.   To talk to Anthony.

20  Q.   What were you doing at J&J Fish?

21  A.   Playing Ms. Pac-Man.

22  Q.   And why were you playing Ms. Pac-Man?

23  A.   That's what I did every time I came in.  I'm a Ms. Pac-Man

24  wizard.  I was.

25  Q.   And that evening, did there come a time that Tenesha

Bolden - direct by Crowl

2750

1   Gatson told you something?

2   A.  Yes.

3   Q.  What did she tell you?

4   A.  She got -- she received a phone call over the intercom

5   phone, and she told me that Anthony was next door.

6   Q.  And who is Ms. Gatson?

7   A.  She was the cashier of J&J Fishery.

8   Q.  So what did you do when Ms. Gatson said that Anthony was

9   next door?

10  A.  I got up from the game and went and knocked on the door.

11  There's a door inside that leads to J&J Fishery.  So I knocked

12  on the door.

13  Q.  Were you able to speak with Anthony Williams?

14  A.  Yes.  He answered the door.

15  Q.  And what was said?

16  A.  He told me to hold on for a minute, and I waited for him

17  to open the door.  He opened the door.  I came in and closed

18  it.  And he said he had to go and relieve his parents next

19  door in J&J Fishery.  So he went -- he set the alarm and went

20  straight out the door.  He put the bars on.  We went back

21  inside J&J Fishery.

22  Q.  And when you were back inside J&J Fishery, at some point,

23  did you hear a commotion?

24  A.  Yes.

25  Q.  What did you hear?  What did you see?

Bolden - direct by Crowl

2751

1    A.   The door opened.  A guy -- a young guy ran in saying they

2    going at it across the street.  And --

3    Q.   And when he said "they're going at it across the street,"

4    what did you understand that meant?

5    A.   That somebody was fighting across the street.

6    Q.   And then what did you see?

7    A.   I saw some -- some blue flashes.  When I looked towards

8    the glass, I saw blue flashes towards the left.

9    Q.   And after you saw some blue flashes, what did you see?

10   A.   I saw two men move in front of the window of J&J Fishery,

11   struggling, fighting, tussling.

12   Q.   Were you able to see what they were doing?

13   A.   Yeah, they were -- the thinner guy had the big guy by the

14   collar, beating him across the head with a gun.

15   Q.   And after that, what did you see?

16   A.   The big guy fell -- no, he dropped his gun or fell.  I saw

17   the light -- the big -- the thinner guy pick up the gun, throw

18   it back down, pull his face mask down and walk away.

19   Q.   And what happened after that?

20   A.   The big guy got up off of the ground, picked his gun up

21   and came inside J&J Fishery.

22   Q.   When the thin guy pulled his mask down and looked in the

23   restaurant, were you able to recognize him?

24   A.   Yes, I was.

25   Q.   And who was that?

Bolden - direct by Crowl

2752

1   A.   Roderick Stewart.

2   Q.   Did you know Roderick Stewart?

3   A.   Yes, I did.

4   Q.   How did you know him?

5   A.   He grew up inside Stateway Gardens with us.

6   Q.   And what else did you know about Mr. Stewart?

7   A.   That he was a Gangster Disciple.

8   Q.   What happened with the big guy after that?

9   A.   When he came in, he said, "Where is Ant?"  And Anthony was

10  behind me.  Anthony said, "You've got to get out of here with

11  that gun."  And the big guy said, "Lock the door."

12  Q.   And when the big guy said "Lock the door," what did you

13  do?

14  A.   I got that backwards.  The big guy said, "Call the

15  police."  And Anthony said, "Get out of here with that gun."

16  And the big guy said it again, "Call the police."  And then

17  Anthony turned to me and said, "Lock the door."

18  Q.   And did you lock the door, Mr. Bolden?

19  A.   Yes, I did.

20  Q.   And what did you see next?

21  A.   When I came back to where they was standing, they were

22  talking.  The big guy asked Anthony, did you -- excuse my

23  language -- he said, "Did you get the shit?"  And Anthony

24  said, "No."  He pulled out a gray car alarm remote, it had a

25  black button on it, a red button, and he wiped his

Bolden - direct by Crowl

2753

1    fingerprints off and gave it to the big guy.

2    Q.   And at some point was a 911 call made?

3    A.   Yes, it was.

4    Q.   Who made the 911 call?

5    A.   I did.

6    Q.   And during that 911 call, what was said?

7    A.   Excuse me.  I asked the lady -- when she answered the

8    phone, I say, "Do send the police and ambulance to J&J Fishery

9    at 64th and Cottage Grove."  I said, "A guy came in he's

10   saying he's been shot."  She asked me was he conscious.  I

11   said yeah, yes.

12        She asked me my name.  I told her Eddie Bolden.  She

13   asked me -- well, she asked me "Where was he shot" first

14   before that.  And I had heard -- overheard him tell

15   Ms. Williams when she was putting the towel on his head that

16   he was shot in the back.  So I said, "He's shot in the back."

17   She asked me my name.  Then I told her Eddie Bolden.  She

18   asked me his name.  I said, "Just send the ambulance and the

19   police."  And I hung up.

20   Q.   And after you made this 911 call in the J&J Fish, were you

21   able to see what happened with the gun?

22   A.   Yes, I was.

23   Q.   What happened with the gun?

24   A.   When I was -- I was at the cash -- well, the phone is on

25   the counter on a -- like a shelf behind the counter.  So I

Bolden - direct by Crowl

2754

1  called -- I dialed 911, and I turned around and the cord was

2  this way and I was talking.  I'm facing the cash register.

3        Anthony came and stood beside me, and the big guy

4  came and stood beside him, and he tried to hand Anthony his

5  gun.  Anthony grabbed big guy's wrist with his left hand and

6  shook it and said, "Drop it."  The big guy dropped the gun.

7  Anthony kicked the gun under the ICEE machine.

8  Q.  At some point did you also push a silent alarm?

9  A.  Yes, I did.

10 Q.  And you heard Ms. Williams testify in court that they had

11 an alarm system, but it wasn't an alarm for the police.  Do

12 you recall that?

13 A.  Yes, I do.

14 Q.  What's your recollection?

15 A.  She has that incorrect.  She had an alarm -- an alarm, a

16 robbery alarm.

17 Q.  And what did you do?

18 A.  I pushed the robbery alarm.

19 Q.  At some point did the police come into the restaurant?

20 A.  Yes, they did.

21 Q.  And what happened when the police came in the restaurant?

22 A.  I looked up and saw the police at the front door.  I went

23 and opened the door.  There was several of them.  I only -- I

24 focused on one, a light-skinned African American cop.  He had

25 brown eyes and he had a short afro.  And he had a silver

Bolden - direct by Crowl

2755

1  revolver pointed in my face.  He said, "Back up and get down."

2  Q.  And what did you do?

3  A.  I backed up and he searched me, and they came in.

4  Q.  At any point while you were at J&J Fish, did you see

5  somebody who -- you know, you've now seen the trial in this

6  case -- that you now know to be Police Officer Oliver?

7  A.  Yes, I did.

8  Q.  Where did you see Police Officer Oliver?

9  A.  Inside the J&J Fishery.

10  Q.  And what did he do?

11  A.  He came in, went into the kitchen, looked around, came

12  back out, went -- opened the door to the security booth and

13  left.

14  Q.  And had you seen Police Officer Oliver before in your

15  life?

16  A.  Yes, I had.

17  Q.  When?

18  A.  Well, several times, from me being a kid, he worked in

19  Stateway Gardens.  I saw him a lot there, working there.

20  Q.  Did you hear anything that was called out over the radio

21  during the time the police officers were in J&J Fish?

22  A.  Yes, I did.

23  Q.  What did you hear?

24  A.  A call came through over one of their radios saying that

25  the gray Chevy without license plates was registered to

Bolden - direct by Crowl

2756

1   someone named Robert something, 5900 something South Wabash.

2   Q.   And were you questioned by the police?

3   A.   Yes, I was.

4   Q.   Do you remember if it was a male or female officer?

5   A.   It was an African American female.

6   Q.   And what information did you provide to that police

7   officer?

8   A.   I gave her my name.

9   Q.   Did you give her anything more than your name?

10  A.   I told her I didn't see anything.

11  Q.   Why did you tell the police officer you didn't see

12  anything?

13  A.   Because when I saw Roderick Stewart pull that ski mask

14  down, he wasn't afraid of anybody seeing him.  I saw him.  He

15  know I saw him.  And he's a Gangster Disciple.  And if I would

16  have told, I would have been killed.

17  Q.   Did the police officers tell you that you had to stay?

18  A.   No.

19  Q.   So what did you do?

20  A.   When they put the big guy on the stretcher and left out

21  with him, I walked out of the door behind them.

22  Q.   And where did you go?

23  A.   I stood on the sidewalk for a while watching the cops go

24  through a car that was across the street in a vacant lot.

25  Q.   And then after that, where did you go?

Bolden - direct by Crowl

2757

1    A.   I went home.

2    Q.   So, Mr. Bolden, I want to ask you about something that

3    happened a while later.

4            Did you learn in a conversation with your mother

5    something about the police?

6    A.   Yes.

7    Q.   What did you learn?

8    A.   I learned that the police had come to my mother's home and

9    told her they were looking for me because I had killed some

10   people over on 63rd, and if they caught me, they were going to

11   blow my brains out.

12   Q.   And how did you hear that?

13   A.   My mother told me.

14   Q.   And did your mother have information from any of those

15   police officers?

16   A.   Yes.

17   Q.   What did she have?

18   A.   She had a card from Detective George Karl.

19   Q.   What did you do after your mother told you that the police

20   said they were going to blow your brains out if they catch

21   you?

22   A.   I went to my grandmother's home, Mary Lee.

23   Q.   And where did your grandmother, Mary Lee, live?

24   A.   On the West Side of Chicago.

25   Q.   Why did you go there?

Bolden - direct by Crowl

2758

1  A.  I was afraid.

2  Q.  Afraid of what?

3  A.  The situation.  I mean, it's one thing for them to say I

4  killed these people, but it's something totally different to

5  say, you know -- tell my mom you're going to blow my brains

6  out if you catch me.

7  Q.  And when you went to your grandmother's house on the West

8  Side, did she help you with anything?

9  A.  Yes, she did.

10 Q.  What did she help you do?

11 A.  She hired an attorney for me.

12 Q.  And who was the attorney that she hired for you?

13 A.  Charles Ingles.

14 Q.  Why did you stick around as opposed to just leaving the

15 area?

16 A.  Excuse me?

17 Q.  Why did you stick around in Chicago as opposed to just

18 leaving the area?

19 A.  I didn't do anything.  Why would I run and leave?  I

20 didn't do anything.

21 Q.  Did you meet with Mr. Ingles, the lawyer?

22 A.  Yes, I did.

23 Q.  And when you spoke with Mr. Ingles, what did you discuss?

24 A.  I told them what the -- my mother had told me the police

25 said.  And he asked me did I know anything about it.  I said,

Bolden - direct by Crowl
2759

1  yeah, I was in J&J Fishery when the guy came in saying he was

2  shot.  So I know about it, yeah, I know.  And that I was -- I

3  called the police.  I called 911.  You know, that's what I

4  told him.

5  Q.  Did you give him anything during that conversation?

6  A.  Yes, I gave him the card from George Karl -- Detective

7  George Karl.

8  Q.  Mr. Bolden, did there come a time when you went to the

9  police station?

10  A.  Yes.

11  Q.  Do you remember the date that you went to the police

12  station?

13  A.  Yes, sir, I do.  February 20th -- February 26th, 1994.

14  Q.  Why do you remember that date, sir?

15  A.  That was the day -- that was the day I lost my freedom.

16  Q.  Were you supposed to go to the police station before

17  February 26th --

18  A.  Yes.

19  Q.  -- of 1994?

20       Tell us about that.

21  A.  My grandmother hired Mr. Ingles, and I met with him at

22  McDonald's in Cicero on, I believe, the 12th or the 13th.

23       Excuse me.  My mind drifted.  Can you repeat the

24  question?

25  Q.  Yeah.

Bolden - direct by Crowl

2760

1          So I guess my question is, did you believe that you

2    were going to be going to the police station at any time

3    before February 26th?

4    A.   Yes.

5    Q.   How many times did you think you were going to be going?

6    A.   It was at least two other times.

7    Q.   And why didn't you go on those occasions?

8    A.   Mr. Ingles told me that the -- the detective had to

9    postpone because they couldn't find their witness.

10   Q.   And you heard Mr. Ingles testify that it was his memory

11   that he didn't know that you were going in for a lineup.  Is

12   that your recollection?

13   A.   No.

14   Q.   What is your memory?

15   A.   They wanted me to come down -- he told me that they wanted

16   me to come down for a lineup.  Over the phone, he called and

17   told me that.

18   Q.   Did you think that your appearance was voluntary or

19   involuntary?

20   A.   It was voluntary.

21   Q.   And why did you think that?

22   A.   Because there was no warrant out for me, and they told me

23   that I didn't have to participate in it if I didn't want to.

24   Q.   At the time that you went to the police station for the

25   lineup, what did you think was going to happen?

Bolden - direct by Crowl

2761

1   A.  I thought they were going to put me in a lineup and ask me

2   what I saw and I would come home.

3   Q.  Why did you want a lawyer to go with you?

4   A.  I wanted to make sure that my -- they didn't make this guy

5   point me out.

6   Q.  And when you got to the police station, where were you and

7   Chuck Ingles taken?

8   A.  I waited for him.  He came, and we -- my next memory is

9   being upstairs on the second floor, Area 2.

10  Q.  And what does the second floor of Area 2 look like?

11  A.  Honest, there was a large room with a lot of desks.

12  Q.  And did you meet with any officers?

13  A.  Yes, I did.

14  Q.  Which officers?

15  A.  Detective George Karl and Detective Pesavento.

16  Q.  At the time did you know that it was Karl -- Detective

17  Karl and Detective Pesavento?

18  A.  He -- they introduced themselves.  Well, I remember

19  Detective Karl introduced himself.  I don't remember if

20  Detective Pesavento said anything.

21  Q.  And was there a discussion with you and Mr. Ingles and

22  Detective Karl and Detective Pesavento while you were in the

23  area?

24  A.  Yes.

25  Q.  And what was discussed?

Bolden - direct by Crowl

2762

1   A.   They discussed the lineup and whether or not I would

2   participate in it, if I wanted to participate in it, they

3   said.

4   Q.   And what did you say?

5   A.   I said, "Yeah, I'll participate in it if you allow my

6   attorney to be in there to make sure that the police didn't

7   make this guy point me out."

8   Q.   And what was said about whether or not that could happen?

9   A.   They said, fine, your attorney can be in the room.

10  Q.   And what happened after that?

11  A.   I'm standing -- like, the room -- it's a big room, and it

12  has a -- I guess a walkway that goes this way [indicating] and

13  turns, you know, down a long hall.  So I'm standing --

14  Q.   And let me ask, you're there, and you're there with

15  Mr. Ingles; is that right?

16  A.   Yes, standing in the -- on the path, the walkway.

17  Q.   And at that point, is there anyone else with you?

18  A.   No.

19  Q.   Is it just the two of you?

20  A.   Yes.

21  Q.   And what did you see?

22  A.   I saw a detective -- well, a plain clothes officer who

23  did -- Oliver.  He was with the guy that got shot, and he had

24  a -- there was another person with them.  I didn't pay much

25  attention to that person.

Bolden - direct by Crowl

2763

1    Q.   And when you saw on the person you now know -- well, you

2    knew him at the time to be Officer Oliver, another officer,

3    and the man from J&J Fishery who had been shot, what did you

4    see them do?

5    A.   They walked right past me, right in front of me.

6    Q.   And when they walked past you, what happened?

7    A.   I told Chuck Ingles, I said, "That's the guy right there

8    that came into J&J Fishery."

9    Q.   And what did he do?

10   A.   Turned me around and tried to pull the hood of my coat on

11   my head.

12   Q.   And you heard Mr. Ingles testify that he didn't remember

13   that part; is that right?

14   A.   Yes.

15   Q.   What is your recollection?

16   A.   That's my recollection, that he turned me around and tried

17   to pull the hood on my head.

18   Q.   Were you able to see --

19               MR. HALE:  I have an objection to the prior question,

20   the form and the characterization of the question, just for

21   the record.

22               THE COURT:  Overruled.  The question was, "What's

23   your recollection?"

24   BY MR. CROWL:

25   Q.   Were you able to see, Mr. Bolden, the man who had been

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 89 of 133 PageID #:19708
Bolden - direct by Crowl
2764

1   shot in J&J when he walked by you?

2   A.  Yes.

3   Q.  Was he able to see you?

4   A.  Yes.

5   Q.  Were you concerned at that point?

6   A.  No.

7   Q.  Why not?

8   A.  He -- I mean, I knew he knew I didn't shoot him, so I

9   wasn't concerned with him seeing me.  It didn't bother me.

10  Q.  Okay.  And after that, what happened?

11  A.  I was taken to a room, a holding room for a while.

12  Q.  And -- I'm sorry.  Go ahead.

13  A.  For a while, I'm saying.

14  Q.  And after you were taken to the holding room, did there

15  come a time when you were taken to the lineup room?

16  A.  Yes.

17  Q.  Who took you to the lineup room?

18  A.  Excuse me.  Detective George Karl.

19  Q.  And when you were taken to the lineup room, what did you

20  see when you saw the lineup room?

21  A.  He opened the door to the lineup room, and there were

22  four -- five chairs lined up with four people sitting in them,

23  and he told me to sit in chair No. 1.

24  Q.  And after Detective Karl told you to sit in the first of

25  those five chairs, what did you do?

Bolden - direct by Crowl

2765

1   A.  I sat down in chair No. 1.

2   Q.  Did you stay in chair No. 1?

3   A.  No.

4   Q.  Why not?

5   A.  The guy that was sitting next to me started talking to me,

6  making small talk, and I didn't want to talk.  So I asked the

7  guy in chair No. 4 if he would switch with me.

8   Q.  And did you switch from chair No. 1 to chair No. 4?

9   A.  Yes, I did.

10   Q.  And as you were sitting there, what were you looking at?

11   A.  There was a mirror, a glass -- a window or a mirror in

12  front of you.

13   Q.  And were you able to see through the mirror a little bit?

14   A.  Yes.

15   Q.  And how were you able to see through the mirror?

16   A.  The -- someone in that room had opened the door, and it

17  was ajar about this much.  And I could see -- the light came

18  in and I could see people's silhouettes.  And I saw someone

19  standing beside the door inside the room.  He had a white

20  shirt on.  All I could see was his arm.

21   Q.  And when you were able to see the silhouettes in that

22  room, what did you see happen?

23   A.  I saw two people walk up to the window and stop in front

24  of the guy in chair No. 1.  The guy pointed at chair No. 1 and

25  walked away.

Bolden - direct by Crowl

2766

1    Q.  And after the person pointed at chair No. 1 and walked

2    away, what happened next?

3    A.  The person that was standing there with him pulled him

4    back to the window and moved down in front of -- they stood in

5    front of me.

6    Q.  And then what happened, Mr. Bolden?

7    A.  The person in the room with them -- the person that was

8    standing by the door with the white shirt stuck his head out

9    of the door, and I guess he said something because Detective

10   George Karl opened the door to the room that I was in, and he

11   looked at the guy in chair No. 1 and he looked down at me, and

12   he said, "Eddie Bolden, right?"  I didn't say nothing.  He

13   said, "You're Eddie Bolden, right?"  I didn't say anything.

14   Then he said, "Eddie Bolden, 5249 South Honore, right?"  And I

15   looked at him and I shook my head yes.  Then he said, "Stand

16   up."  And we all stood up.  And --

17   Q.  And after all five of you stood up, what happened after

18   that?

19   A.  The guy that was standing in front of me, he shook his

20   head yes and walked away.

21   Q.  And when you say the person -- that's the person that you

22   were able to see through the two-way glass; is that right?

23   A.  Yes.

24   Q.  Were you able to see any article of clothing that the

25   person who was at the glass had on?

Bolden - direct by Crowl

2767

1    A.  Yes, I was.

2    Q.  What were you able to see?

3    A.  He had on a sweatshirt with the cartoon character Garfield

4    on the front, and he had a gold chain on with the capital

5    letter D.

6    Q.  Were you placed under arrest, sir?

7    A.  Yes, I was.

8    Q.  Who placed you under arrest?

9    A.  I think it was George Karl.

10   Q.  What did you do when you were placed under arrest?

11   A.  I didn't say it nicely, but I asked Chuck Ingles -- I

12   said, "Man, what happened?"  And he said he didn't know.  They

13   locked him out of the lineup, and he was cursing and I was

14   cursing.  He was cursing at them, though.

15   Q.  Mr. Bolden, were you taken to an interview room?

16   A.  Yes, I was.

17   Q.  And who was in that interview room?

18   A.  Detective George Karl, Detective Pesavento, Detective Ed

19   Siwek.  Those are the ones I remember.

20   Q.  And what did you tell those three detectives?

21   A.  I told them that I was the one that called 911 for them,

22   get the 911 tape.

23   Q.  At any point when you were in that interview room, did you

24   see someone else walk by?

25   A.  Yes, I did.

Bolden - direct by Crowl

2768

1  Q.  Who did you see walk by?

2  A.  Detective Oliver.

3  Q.  When you saw Detective -- or Officer Oliver walk by --

4  A.  Yeah, sorry.

5  Q.  -- what did you say?

6  A.  I told Detective Karl, I said, "He was in the restaurant

7  that night.  Call him in here.  He knows I was in the

8  restaurant."

9  Q.  And after you said "He should know I was in the

10  restaurant," what happened?

11  A.  Detective George Karl got up, kicked the door closed and

12  said, "He don't remember you."

13  Q.  Did you tell the officers that Roderick Stewart was the

14  man that you saw fighting outside J&J?

15  A.  No.

16  Q.  Why not?

17  A.  I would have been killed.

18  Q.  Were you then taken to a small holding cell?

19  A.  Yes.

20  Q.  Who took you there?

21  A.  Detective George Karl.

22  Q.  And what happened after you were placed in the small

23  holding cell?

24  A.  After I was there for a while, a detective opened the

25  door -- I guess he was a detective.  He was plain clothes, a

Bolden - direct by Crowl

2769

1    Caucasian guy.  He opened the door, looked in at me, laughed,

2    and said, "He's bald," and closed the door.

3    Q.  Were you taken to a booking area?

4    A.  Yes.

5    Q.  Who took you to the booking area, Mr. Bolden?

6    A.  Detective Karl and Detective Pesavento.

7    Q.  On the way to the booking area, did you have a

8    conversation with the two of them?

9    A.  Yes.

10   Q.  What did you say?

11   A.  I said, "You all know I didn't do this.  You're not going

12   to get away with it."

13   Q.  And after you said "You all know I didn't do this, you're

14   not going to get away with it," what happened?

15   A.  Detective Pesavento looked at me, and he said -- pardon my

16   language -- he said, "You're just another nigger.  No one

17   gives a fuck about a nigger."

18   Q.  Was that the last day of your freedom for a period of

19   time?

20   A.  Yes, sir.

21   Q.  For how long?

22   A.  22 years, two months, two weeks.

23   Q.  Did you have a court appearance, Mr. Bolden, after that

24   date?

25   A.  Yes, I did.

Bolden - direct by Crowl

2770

1   Q.   Who represented you?

2   A.   A public defender.

3   Q.   Why didn't you have a private lawyer represent you?

4   A.   I had no money to afford one.

5   Q.   And at that hearing, was that like a bond hearing?  Is

6   that right?

7   A.   Yes.

8   Q.   Did you have a conversation with the public defender prior

9   to that hearing?

10  A.   It was actually after the hearing, after I had -- the bond

11  had been set -- well, when I came there, the public defender

12  was already, like, speaking to the judge, so I didn't get a

13  chance to speak with them before they set the bond.  They set

14  the bond and took me in the back, and then the public defender

15  came back there and spoke with me.

16  Q.   And where did the public defender meet with you?

17  A.   In the holding cell.

18          THE COURT:  There is a Kleenex box to the left if you

19  need it.

20          THE WITNESS:  Thank you.

21  BY MR. CROWL:

22  Q.   And the holding cell, what is -- what was that?

23  A.   They call it a bullpen.  It's really a cage with -- it

24  like sits -- it has bars on all four sides.  And they have

25  like walkways.  And it's filled with prisoners and the -- like

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 96 of 133 PageID #:19715
Bolden - direct by Crowl
2771

1  the attorneys, they would come to the outside of the bars and

2  call your name out, and you would come over to the bars and go

3  in the corner and speak with them.

4  Q.  And were you able to go in the corner and speak with the

5  public defender that day?

6  A.  Yes.

7  Q.  Now, is that the same public defender, Mr. Foster, who

8  represented you later during your trial?

9  A.  No, it was not.

10  Q.  What did you tell this public defender?

11  A.  I told him that if they got the 911 tape, it will prove

12  that I called the police for them.  I was innocent.

13  Q.  And did you see him write anything down after you told him

14  about the 911 tape?

15  A.  Yes.

16  Q.  What did you see him write?

17  A.  I saw a check -- put a check beside "911" and write

18  "important" on a form.

19        MR. CROWL:  Judge, may we show the jury and

20  Mr. Bolden Plaintiff's Exhibit 30, which is in evidence?

21        THE COURT:  Yes, it's in evidence.  Go ahead, please.

22        MR. CROWL:  Thank you, Your Honor.

23  BY MR. CROWL:

24  Q.  I'm showing you what is marked and in evidence,

25  Mr. Bolden, as Plaintiff's Exhibit 30 and ask you to look at

Bolden - direct by Crowl

2772

1    the lower right-hand corner.

2         What did you see in the lower right-hand corner?

3    A.   It says "911 tapes" with a line -- with an "X" on it and

4    it says "important".

5    Q.   And is that what you had indicated to the public defender

6    that day, that it would be important to get those tapes?

7    A.   Yes.

8    Q.   Mr. Bolden, where were you imprisoned after your arrest?

9    A.   Cook County Jail, Division 1.

10   Q.   And what is Division 1?

11   A.   It's a maximum security.

12   Q.   And do you know why you were in Division 1?

13   A.   Yes, because of the nature of the offenses I was charged

14   with.

15   Q.   You were charged with a double murder; is that right?

16   A.   Yes.

17   Q.   And you were moved to the Division 1 of the Cook County

18   Jail on what date?

19   A.   February 27th, 1994.

20   Q.   Tell the members of the jury how long you were in prison

21   in the Cook County Jail.

22   A.   Two years and ten months, I believe.

23   Q.   And can you describe what it was like when you first were

24   taken to Division 1 of the Cook County Jail.

25   A.   It's a nightmare.  As soon as you step in the door,

Bolden - direct by Crowl

2773

1   they -- they tell us -- they told us -- you know, line us up,

2   and then a bunch of sheriff deputies come and they screaming

3   at you, telling you to strip.  And once you strip, they make

4   you lay on this filthy floor.  And they're screaming, and they

5   have the drug -- it's to -- to search you for drugs, like

6   you're bringing drugs in.  And they have the drug dog, like

7   barking like -- you're laying on the ground, the dog is

8   barking in your face, and they're yelling, "Don't move, don't

9   move."

10        So it's -- that -- it was the beginning of a

11  nightmare.

12  Q.  And were you placed in a cell?

13  A.  Yes.

14  Q.  And can you describe that for the members of the jury.

15  A.  It's -- it's a small -- a cell with steel -- steel walls,

16  two steel walls and a steel door, and the back wall is bars.

17  So when the deputy comes around to check, he don't have to

18  come in the cell.  He can see from outside.

19  Q.  Did the cell doors lock?

20  A.  No, they do not.

21  Q.  How could the cell doors not lock?

22  A.  Division 1 was extremely old, and they didn't fix the

23  doors until right before I went to trial.  They didn't fix the

24  lights or the doors until right before I went to trial.

25  Q.  Isn't that a good thing that the cell doors don't lock?

Bolden - direct by Crowl

2774

1    A.   No, it's the opposite.  I mean, if you -- you might not be

2    locked in, but nobody is locked out, either.  You can't

3    protect yourself.  Anybody can come in there and do anything

4    to you.

5    Q.   Is there a way you tried to stop that from happening?

6    A.   Yes.  We would jam our toothbrushes in the lock to prevent

7    people from just opening the door.

8    Q.   Because you were concerned that anybody could come at any

9    point, how did that affect you?

10   A.   I couldn't sleep.

11   Q.   Why not?

12   A.   Because I was afraid.

13   Q.   Did you have cellmates while you were there at the Cook

14   County Jail?

15   A.   Yes, I did.

16   Q.   How many different cellmates did you have during that

17   almost three-year period?

18   A.   I don't know.  I can't -- I don't know.

19   Q.   And what was daily life like in the Cook County Jail?

20   A.   It was -- it was hell.  I mean, we -- I think at like

21   8:00 o'clock, they tell us we can come in the dayroom.  And

22   when you come in the dayroom, it's -- I mean, a riot could

23   happen about somebody turning the television, you know, or

24   over the phone.  So just -- I mean, just sitting in the

25   dayroom, you don't know if you're going to get killed sitting

Bolden - direct by Crowl

2775

1    out here or something is going to happen to you.

2    Q.   And did you see riots happen while you were there?

3    A.   Yes, I did.

4    Q.   How often?

5    A.   I was on the tier when two happened, but they happened,

6    like -- in other -- in other decks.  One happened at least

7    every day.

8    Q.   Were you the victim of violence while you were there at

9    the Cook County Jail?

10   A.   Yes, I was.

11   Q.   Tell us what happened to you.

12   A.   I was in the shower, and a guy snatched the curtain

13   back -- well, it's a sheet, not a curtain actually.  But he

14   snatched the curtain back and he had his head wrapped up.  And

15   he had an ice pick and he just started stabbing at me, and he

16   was trying to stab in my chest, and I fell back and -- I fell

17   back and he stabbed me in my arm.  And I started trying to

18   fight him off, he stabbed me in my finger, and I was able to

19   grab it, and I fell and he ran.

20   Q.   Where were the guards when this happened?

21   A.   When I stepped out of the -- when I got up, the guard was

22   standing in the guard booth looking at me.

23   Q.   What did the guard do?

24   A.   Nothing.

25   Q.   What did you do?

Bolden - direct by Crowl

2776

1    A.   I got my stuff and went in my cell.

2    Q.   Why didn't you report it?

3    A.   I mean, you can't -- this is maximum security.  If you

4    snitch on anybody in there, you will be the victim of more

5    violence.

6    Q.   And how common were acts of violence while you were in the

7    Cook County Jail?

8    A.   Oh, it was -- that was the way of life for them.  Every

9    day something happened.

10   Q.   During the two years and ten months that you were in the

11   Cook County Jail, Mr. Bolden, did something happen with your

12   mother's health?

13   A.   Yes.  My mother had a massive stroke and a heart attack, I

14   believe.

15   Q.   I want to show you -- just a second, Mr. Bolden.

16            MR. CROWL:  Judge, may I show just the witness and

17   counsel Plaintiff's Exhibit 188.  And this has a point 1

18   behind it because it was a group exhibit, Judge.

19            THE COURT:  You may.

20   BY MR. CROWL:

21   Q.   Who is that a picture of?

22   A.   That's my mother.

23            MR. CROWL:  We offer Plaintiff's Exhibit 188.1.

24            THE COURT:  Any objection?

25            MR. HALE:  No objection.

Bolden - direct by Crowl

2777

1          THE COURT:  Admitted.

2          MR. CROWL:  May we publish?

3          THE COURT:  You may publish.

4     (Plaintiff's Exhibit No. 188.1 was received in evidence.)

5  BY MR. CROWL:

6  Q.  Tell the members of the jury what happened to your mother

7  while you were in the Cook County Jail.

8  A.  She had a stroke and a heart attack and . . .

9  Q.  And how did you learn that she had a stroke and a heart

10 attack?

11 A.  I called my grandmother.

12 Q.  Did you have a conversation with your grandmother?

13 A.  Yes.

14 Q.  And what was said?

15 A.  They said she just kept talking about me being locked up,

16 and she -- her speech started slurring, and they took her to

17 the hospital.  And she had a stroke and a bleeding on the

18 brain.  Yeah.

19 Q.  And how did that affect you, Mr. Bolden?

20 A.  I can't even describe it.  I can't describe the emotion.

21 But it -- it hurt.  I couldn't be there.

22 Q.  Mr. Bolden, how about your grandfather; did he have --

23 while you were in the Cook County Jail, did he pass?

24 A.  Yes, he did.

25          MR. CROWL:  Judge, we would show PX -- Plaintiff's

Bolden - direct by Crowl

2778

1    Exhibit 188.3 just to counsel.

2              THE COURT:  You may.  Counsel and the witness.

3    BY MR. CROWL:

4    Q.  Mr. Bolden, what's that a photograph of?

5    A.  That's my grandfather, Grover Knight.

6              MR. HALE:  I'm sorry.  Our screens aren't working

7    again.  Can we just take a minute to . . .

8        (Brief pause.)

9              MR. HALE:  Thanks, Jim.  I appreciate that.

10             THE COURT:  We're all set?

11             MR. CROWL:  Yes, Judge.

12             THE COURT:  Go ahead, please.

13             MR. CROWL:  Judge, we offer and request to publish

14   Plaintiff's Exhibit 188.1 [*sic*].

15             THE COURT:  Any objection?

16             MR. HALE:  No objection.

17             THE COURT:  Admitted.  You can publish.

18      (Plaintiff's Exhibit No. 188.3 was received in evidence.)

19   BY MR. CROWL:

20   Q.  What's this a photograph of?

21   A.  That's my grandfather, Grover Cleveland Knight, Jr.

22   Q.  And did you have a conversation with anyone about your

23   grandfather where you learned that he had passed?

24   A.  Yes.

25   Q.  Who told you this?

Bolden - direct by Crowl

2779

1    A.   My grandmother.

2    Q.   And how did you feel when you lost your grandfather while

3    you were in the Cook County Jail?

4    A.   Sad.

5    Q.   Were you able to attend his funeral?

6    A.   No, I wasn't.

7    Q.   And why not?

8    A.   They didn't allow that, I don't believe, but my

9    grandmother talked to him.  I don't know the details of that.

10   Q.   Were there times when you were able to see your children

11   while you were in the Cook County Jail?

12   A.   Yes.

13   Q.   Who brought your children?

14   A.   Pamela Johnson.

15   Q.   And describe for the jurors the room where you were able

16   to visit your children.

17   A.   There is -- it's a long, narrow room on one side -- I

18   mean, with fiberglass in the middle separating the sides, a

19   steel table that goes all the way down, and you sit -- steel

20   stools.  And the window -- the fiberglass has like a screen

21   that you could speak through or a phone receiver.

22   Q.   How was it for you seeing your children through that

23   screen and that hole?

24   A.   The first time they came, the visiting room door opened,

25   and my son, Dominique, came running through the door.  And I

Bolden - direct by Crowl

2780

1    had never seen him -- he wasn't walking when I left, so I had

2    never seen him take a step.  So it -- I was just smiling, and

3    he ran around the visiting room.

4            And then Antonio came and Bryana, Pam.  And it was --

5    I was happy for the -- I think it's 45 minutes.  And when they

6    left, it was like -- I realized that you ain't -- you not

7    going to go there with them, so you can't go home.  And it's

8    hard looking at your kids walking out the door and you can't

9    go home with them, you know.

10           MR. CROWL:  Judge, we would show to counsel

11   Plaintiff's Exhibit 53.

12           THE COURT:  Okay.  That's fine.  Counsel and the

13   witness.

14           MR. CROWL:  Yep.

15   BY MR. CROWL:

16   Q.  And, Mr. Bolden, is that a photograph of your children?

17   A.  Yes.

18           MR. CROWL:  We offer and would seek to show the jury.

19           THE COURT:  Any objection?

20           MR. HALE:  No objection.

21           THE COURT:  Admitted.  You can publish.

22       (Plaintiff's Exhibit No. 53 was received in evidence.)

23   BY MR. CROWL:

24   Q.  Can you tell the members of jury approximately what

25   time -- or what year that photograph was taken?

Bolden - direct by Crowl

2781

1   A.   This was in September of 1993.

2   Q.   And can you point out each of those children?

3   A.   The girl is Bryana.  The bigger boy is Antonio.  And the

4   baby is Dominique.

5              MR. CROWL:  And then I'd like to show just to the

6   witness Plaintiff's Exhibit 54, please.

7   BY MR. CROWL:

8   Q.   Is that a photograph of your kids later?

9   A.   Yes.

10             MR. CROWL:  We would offer Plaintiff's Exhibit 54,

11  Judge.

12             THE COURT:  Any objection?

13             MR. HALE:  No objection.

14             THE COURT:  It's admitted.  You can publish.

15        (Plaintiff's Exhibit No. 54 was received in evidence.)

16  BY MR. CROWL:

17  Q.   When was this photograph taken, Mr. Bolden?

18  A.   This was in 1995, because Dominique was two years old.

19  Q.   And can you point out which is Dominique and which is

20  Antonio?

21  A.   Antonio is the bigger kid at the top with the funny smile,

22  and Dominique is the one -- the smaller one that's laying --

23  lying down.

24  Q.   Now, Mr. Bolden, I want to talk with you about your case

25  while you were in the Cook County Jail.

Bolden - direct by Crowl

2782

1       Who represented you on your case?

2  A.   Kevin Foster.

3  Q.   And he was the public defender; is that right?

4  A.   Yes.

5  Q.   And when you were preparing for your case, did you have an

6  understanding as to whether or not there was any physical

7  evidence against you?

8  A.   Yes, I had an understanding that there were -- were -- was

9  no physical evidence against me.

10 Q.   And was there any forensic evidence against you?

11 A.   No, there was not.

12 Q.   Was there any fingerprint evidence linking you to the

13 murders?

14 A.   No, sir.

15 Q.   Was there any DNA evidence linking you to the murders?

16 A.   No, there was not.

17 Q.   Was there any witness who said that you had shot the two

18 people on January 29th of 1994?

19 A.   No, there was not.

20 Q.   What's your understanding of the case against you?

21 A.   That Clifford Frazier had pointed me out as the person

22 that left J&J Fishery with the two men that were shot, were

23 murdered, and that I came back on foot and shot him.

24 Q.   And he pointed you out in that lineup; is that right?

25 A.   Yes.

Bolden - direct by Crowl

2783

1   Q.  Mr. Bolden, have you seen the FBI sketch that was made

2   based on conversations with Clifford Frazier as the

3   description of the person he said shot him on January 29th of

4   1994?

5   A.  Yes, I have.

6           MR. CROWL:  Judge, this is in evidence.  May we show

7   Plaintiff's Exhibit 19?

8           THE COURT:  You may.

9   BY MR. CROWL:

10  Q.  Mr. Bolden, is that you?

11  A.  No, that is not.

12  Q.  What are the differences, sir?

13  A.  The person on the sketch has a complete head of hair.  I

14  didn't at the time.  The person -- his eyebrows are flat and

15  short.  My eyebrows are arched.  The person has light eyes.  I

16  don't have light eyes.  And the person appears to be

17  light-skinned.  I'm not light-skinned.  And the person doesn't

18  have facial hair, and I had facial hair.

19  Q.  How do you describe your skin color?

20  A.  Medium brown.

21  Q.  Mr. Bolden, the trial took place in October of 1996; is

22  that right?

23  A.  Yes.

24  Q.  How did you feel throughout the trial, sir?

25  A.  I just -- I was confident that I was going to prove my

Bolden - direct by Crowl

2784

1    innocence.  And my attorney told me I didn't have to prove my

2    innocence, so I -- I didn't understand it, but I just knew I

3    was going to -- I was going to prove I didn't do this.  And I

4    was optimistic.

5    Q.  And then you heard the verdict; is that right?

6    A.  Yes.

7    Q.  And what happened after the verdict?

8    A.  I exploded.  I jumped up saying, "I didn't do this.  I had

9    nothing to do with this."  And I used profanity.  And next

10   thing I know I was being whisked out of the courtroom by a

11   bunch of sheriff deputies.

12   Q.  And were you sentenced in December of 1996?

13   A.  Yes, I was.

14   Q.  What was your sentence, sir?

15   A.  Natural life plus an additional 30 years.

16   Q.  And what was going through your mind when you heard that

17   sentence?

18   A.  That I'd never see my kids again.

19   Q.  After you were sentenced, Mr. Bolden, were you transferred

20   from the Cook County Jail?

21   A.  Yes, I was.

22   Q.  Where were you imprisoned after the Cook County Jail?

23   A.  Menard Correctional Center.

24   Q.  Tell the members of the jury how many years you were

25   imprisoned in the Menard Correctional Center.

Bolden - direct by Crowl

2785

1   A.   Approximately six years.

2   Q.   Where is the Menard Correctional Center?

3   A.   It's in Chester, Illinois -- southern Illinois.  It sits

4   on the Mississippi River.

5   Q.   How far from Chicago?

6   A.   Like seven -- six to seven hours' drive, I believe.

7   Q.   How were you transported from Chicago to Chester,

8   Illinois?

9   A.   They had -- like I was handcuffed with a chain connected

10  to the handcuffs around my waist.  I had shackles on my feet,

11  and they sat me on the bus and they ran a chain -- they

12  connected a chain to my chain on my waist and it was connected

13  to every prisoner all the way to the back of the bus.  And

14  then they connected the chain to a wall, I believe.

15  Q.   And what was your reaction when you saw Menard for the

16  first time?

17  A.   It was -- first of all, the drive down the road to Menard

18  was scary.  It was pitch-black.  I was used to streetlights.

19  There was no streetlights.  It's a bunch of trees.  And you

20  can't see anything.  You're just going down this winding road.

21  And it's like -- it take like -- it seemed like five minutes

22  to get to the bottom of this road.  And once you get to the

23  bottom of the road, they turned left and then they go into the

24  prison gate.

25  Q.   Does Menard have a nickname?

Bolden - direct by Crowl

2786

1   A.   Yes.

2   Q.   What's the nickname?

3   A.   The pit.

4   Q.   And what's your understanding as to why Menard is known as

5   the pit?

6   A.   It was built in a rock quarry.

7   Q.   And when you first got to Menard, where were you taken?

8   A.   To the prison chapel where they searched us.  They -- the

9   same thing, they made us strip.  A bunch of large prison

10  guards yelling "strip."  They didn't make us lie down on the

11  floor, though.  They made us hold our hands up and wiggle our

12  fingers to make sure we didn't have anything.  Even though I

13  didn't have any hair, they made me run my fingers through my

14  hair.  Then wiggle your toes, and they make you bend over so

15  they could look at you with a flashlight to make sure you're

16  not bringing any contraband into the prison.

17  Q.   When you first went to Menard, which part of the prison

18  were you imprisoned in?

19  A.   The east house.

20  Q.   And what is east house?

21  A.   It's like the -- the prison system has different

22  aggression levels.  The east house was high aggression.

23  Q.   And what was it like in east house?

24  A.   Total madness.  Total madness.  When -- I came -- my first

25  day out of the cell in east house, we were walking, leaving

Bolden - direct by Crowl

2787

1   the gallery, and I walked past a guy, a guy's cell, and he was

2   in the top bunk crying saying, "Would you please tell the

3   guard to come get me; he told me not to get out of the bunk."

4   And the guy on the bottom bunk, he was busy painting, he

5   didn't even look up.  He called him a b-i, you know, -t-c-h

6   and told him, "You better stay up there."

7          And that was -- that was troubling to me.  I -- yeah,

8   that was -- so --

9   Q.  And how were the cells arranged at Menard?

10  A.  They're -- they -- there are five -- well, in the east

11  house, there are five tiers.  And on the tier, I think it's

12  like 11 -- I mean, like a hundred cells in a row.  And bars,

13  catwalk.

14          MR. CROWL:  Judge, may we show the witness

15  Plaintiff's Exhibit 47?

16          THE COURT:  You may.

17          Is this in evidence?

18          MR. CROWL:  It's not in evidence, Judge.

19  BY MR. CROWL:

20  Q.  Does that show Menard during the time you were there -- or

21  does it look like Menard at the time you were there?

22  A.  Yes, it does.

23          MR. CROWL:  Judge, we offer Plaintiff's Exhibit 47.

24          THE COURT:  Any objection?

25          MR. HALE:  I don't know if it's sufficient

Bolden - direct by Crowl

2788

1    foundation, Your Honor.

2           THE COURT:  Overruled.  You can publish.  It's

3    admitted.

4        (Plaintiff's Exhibit No. 47 was received in evidence.)

5    BY MR. CROWL:

6    Q.   So can you explain to the members of the jury what we're

7    looking at here?

8    A.   You're looking at -- if you look up on the wall, it says

9    1, 2, 5, 7, 9.  The 1 is one gallery.  The 2 -- I mean, the 3

10   is three gallery; 5 is five gallery; 7 -- you know . . .

11   Q.   And you mentioned that there were five tiers; is that

12   right?

13   A.   Yes.

14   Q.   And where are the cells as we look at this picture?

15   A.   You can see the cells on one gallery.  To the left, those

16   are cells.  Yeah, those are bars.  So it would open, yeah.

17   Q.   Approximately how large was the cell that you were placed

18   into?

19   A.   I can't say the distance of it -- I mean, the size -- the

20   size of it, but I would say it's like from the end of this

21   [indicating], whatever this is, to like maybe over there to --

22   on the other side of the judge where the computer is at.  And

23   the width is about from this wall here [indicating] to

24   maybe -- maybe about two feet -- no, maybe about a foot in

25   front of this -- where I'm sitting.

Bolden - direct by Crowl

2789

1   Q.  Would that be approximately seven feet by ten feet?

2   A.  Yes.  Yeah.

3          MR. CROWL:  For the record, Judge, since -- yeah,

4   thank you.

5          THE COURT:  Go ahead.

6   BY MR. CROWL:

7   Q.  And what was inside your cell?

8   A.  In the east house, they had a bunk -- bunk bed, a double

9   bunk, a sink, and a toilet.

10  Q.  Was there any privacy inside that cell, Mr. Bolden?

11  A.  No, sir.

12  Q.  Was there a desk or a chair?

13  A.  In the east house, I'm not sure because I was only there a

14  short period, but, yeah, I don't think so.

15  Q.  And then after east house, where were you moved?

16  A.  South house.

17  Q.  And what was the cell like in the south house?

18  A.  It was extremely small.  I know that went -- that cell,

19  it's about nine feet long because the bunk is six feet and

20  there's a few feet behind it.  So -- and I know if I -- I was

21  on the floor cleaning the floor, so -- up under the bunk.  So

22  it's like six by nine.

23  Q.  And in the cells where you were imprisoned at Menard, did

24  you have cellmates?

25  A.  Yes.

Bolden - direct by Crowl

2790

1   Q.  And when you say cellmates, was it just the two of you in

2   that cell?

3   A.  Yes.

4   Q.  Was there any air conditioning at Menard?

5   A.  No.

6   Q.  So what were the temperatures like?

7   A.  In the summer, the temperatures could be like -- like 110.

8   It seemed like hotter.  And especially if you're on the top

9   tier -- well, it's gone now.  If you was all the way on the

10  top, it's unbearable.

11  Q.  And how about in the wintertime?

12  A.  In the winter, if you up top, the same thing, it's

13  unbearable, the heat, because the radiators are on the bottom

14  of the building and the heat rises.  But if you're on the

15  bottom tiers, you'll freeze.

16  Q.  And how many different cellmates did you have during the

17  years when you were at Menard?

18  A.  I can't -- I don't know.  I can't imagine.  I don't know.

19  Q.  What kinds of crimes were they in prison for?

20  A.  Murders, rape, armed robbery, some serial killers, some

21  serial rapists.  Every crime -- every major crime, I believe.

22  Q.  Did any have mental issues?

23  A.  Yes.

24  Q.  How did that affect you?

25  A.  I -- to explain it, it's -- I had a cell -- one of those

Bolden - direct by Crowl

2791

1   cellmates, quite a few of them.  And you have to like act like

2   everything is all right.  You know, like they're not mentally

3   ill.  You know, so it's hard to deal with them.  You just try

4   to ignore, you know, the things that they're doing.  Like --

5   Q.  Did you have an incident with anybody who was mentally ill

6   who was one of your cellmates?

7   A.  Yes, I did.

8   Q.  And what happened?

9   A.  I was asleep.  I woke up.  And they -- we have rubber

10  house shoes, shower shoes.  So I put my shower shoe on to go

11  back to the toilet, and I slipped.  So I turned the light on,

12  and it had feces all over the floor, and my cellmate was just

13  up in his bunk like he hadn't done anything.

14  Q.  Did you have control over your own movements --

15  A.  No, sir.

16  Q.  -- when you were at Menard?

17  A.  No, sir.

18  Q.  Were you allowed out of your cell?

19  A.  Yes.

20  Q.  When were you allowed out of your cell?

21  A.  We went to lunch.  We were allowed 30 minutes out for

22  lunch and then 30 minutes out for dinner.  That's every day.

23  Q.  And were you ever let out other than the 30 minutes for

24  lunch and 30 minutes for dinner?

25  A.  Yes.

Bolden - direct by Crowl

2792

1  Q.  When?

2  A.  Like recreation, which was I think two days a week for a

3  couple of hours.

4  Q.  And where was the recreation?

5  A.  It's -- there was a big yard, a yard, a prison yard.

6  Q.  Was it good to be outside?

7  A.  No, it was not.

8  Q.  I'm sorry, you said --

9  A.  No, it was not.

10 Q.  Why was it not good to be outside?

11 A.  Well, when I came to Menard, they -- we went to the yard,

12 five tiers on that side, they let everybody out at the same

13 time.  So it was -- each tier was like -- it was at least 200,

14 I believe.  So that's like a thousand guys out on the yard at

15 the same time.

16 Q.  And what's the yard like?

17 A.  It's -- it's dangerous.  It's -- yeah, it's dangerous.  I

18 was -- like when I was on the phone, a guy -- they just walked

19 up and beat him while I was on the phone next to him.  So

20 that's --

21 Q.  While you were in the yard?

22 A.  Yeah, we were all in the yard.  They walk past me and beat

23 this guy next to me.  They beat him, beat him.

24 Q.  And did the guards do anything?

25 A.  No.

Bolden - direct by Crowl

2793

1   Q.   When you were at Menard, how often would you see beatings?

2   A.   It -- it depended on which cell house you was in.  In the

3   east house, it was like every time you came out of the cell

4   for the yard, somebody was getting beat.

5            In the south house, it was -- when I got sent over

6   there, that's the low aggression.  So they didn't -- it wasn't

7   as violent, but a lot of the mentally ill patient -- prisoners

8   were there in the south house, so yeah.

9   Q.   Can you tell the members of the jury what a lockdown is,

10  Mr. Bolden.

11  A.   It's when the entire prison is locked down and no one is

12  allowed to come out of the cell.

13  Q.   Did lockdowns occur while you were at Menard?

14  A.   Yes.

15  Q.   And when you say no one is allowed to come out of the

16  cell, is that for 24 hours a day?

17  A.   That's for -- yes.

18  Q.   Seven days a week?

19  A.   Yes.

20  Q.   When you were on lockdown at Menard, how long could the

21  lockdown last?

22  A.   When I got to Menard, it was December.  The prison was on

23  lockdown.  They didn't let us out until it was hot outside.

24  So that was like maybe four or five months.

25  Q.   And what were the reasons for the lockdowns?

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 119 of 133 PageID #:19738
Bolden - direct by Crowl
2794

1   A.   There are several reasons.  Like -- well, violence,

2   extreme violence, they would lock the prison down for that.

3         The shakedown -- there's a statewide shakedown where

4   they lock down the entire state, every prison in the state,

5   and they search every -- every prison top to bottom.

6   Q.   What was it like being in prison during a lockdown?

7   A.   It was more -- it was more horrible than it was without

8   being on lockdown.  It's -- you don't come out -- you don't --

9   you may not get a shower; and depending on what the

10  circumstances were to get a lockdown -- if you -- if -- well,

11  if you're on lockdown for a long time without showers, you

12  have to smell everybody in the whole building.  You have to

13  smell every body function that a person has.  And it's --

14  lockdowns, nobody -- nobody sleeps because they don't have to

15  get up in the morning.  So it's just screaming all -- 24 hours

16  a day.  I mean, no -- it's never quiet.

17  Q.   Were there suicides while you were in prison?

18  A.   Yes.

19  Q.   How did that affect you?

20  A.   At first it really, really, really shook me up that people

21  were, you know, committing suicide.  And then it -- later on,

22  it was -- it scared me because I was having the same thoughts.

23  And, you know, it's -- it's hard to describe when everybody

24  sees it like, oh, he's dead, and I'm looking at it like he's

25  free.  He don't have to deal with this no more.

Bolden - direct by Crowl

2795

1    Q.  Why were you -- Mr. Bolden, there's a Kleenex to your left

2    if you need one, a tissue.

3             Why were you contemplating committing suicide?

4    A.  I wasn't supposed to be there.  I wasn't supposed to be in

5    there.

6    Q.  Mr. Bolden, let me -- let me move -- let me move to your

7    children.

8             Were you able to see your children while you were in

9    Menard?

10   A.  No -- well, not -- they didn't come visit me at Menard,

11   no.

12   Q.  And why was that?

13   A.  It was too far.

14   Q.  And you heard that your sister Ricquia visited one time;

15   is that right?

16   A.  Yes.

17   Q.  Why did she not visit more often?

18   A.  It was too far.  It was too far for visits.

19   Q.  And what was your mother's condition at the time?

20   A.  She was paralyzed and wheelchair bound.

21   Q.  Did there come a time where you were allowed to have

22   visitation with your children, even though you're at Menard,

23   at another institution?

24   A.  Yes.  Yes.

25   Q.  And what institution were they able to bring you to?

Bolden - direct by Crowl

2796

1  A.  Stateville.

2  Q.  And when they brought you to Stateville, who were you able

3  to see?

4  A.  Antonio and Dominique.

5  Q.  How many times did that happen while you were in this

6  six-year period at Menard?

7  A.  I don't remember exactly how many times.

8  Q.  Were you able to see Bryana?

9  A.  No.

10  Q.  Why not?

11  A.  She wouldn't come see me.  She say she didn't want to see

12  me in jail.

13  Q.  And how old were Dominique and Antonio while you were in

14  Menard?

15  A.  When I left Menard, Dominique was 10 and Antonio was 12.

16  Q.  While you were working at Menard -- or while you were in

17  prison at Menard, were you able to start working as well?

18  A.  Yes.

19  Q.  And what job were you allowed to get?

20  A.  I got a job as a copy clerk in the prison law library.

21  I'm sorry.

22  Q.  And did that help you in any way?

23  A.  Yes, it did.

24  Q.  What did it allow you to do, Mr. Bolden?

25  A.  It allowed me to get around law books and learn.

Bolden - direct by Crowl

2797

1   Q.  And did you file a post-conviction petition?

2   A.  Yes, I did.

3   Q.  How were you able to file a post-conviction petition

4   without a lawyer?

5   A.  They have forms in prison, and -- they're *pro se* forms

6   that you fill out yourself.  And you put it in the mail, send

7   it to the clerk.

8   Q.  And did you do that?

9   A.  Yes, I did.

10  Q.  In what year did you do that?

11  A.  1999.

12  Q.  Why did you file a post-conviction petition?

13  A.  I had -- I was trying to prove my innocence.

14  Q.  Tell the members of the jury how long that

15  post-petition -- or that post-conviction petition, how long it

16  was pending.

17  A.  I think like 14, 15, 16 years, something like that.

18  Q.  Did you give up on your legal efforts?

19  A.  No, sir.

20  Q.  Why not?

21  A.  Because I was innocent.  I had to get back to my kids.

22  Q.  At some point when you were at Menard, did you write some

23  books?

24  A.  Yes, I did.

25  Q.  Why did you do that?

Bolden - direct by Crowl

2798

1    A.   In prison, I created this -- like, I lived in my own mind.

2    So I wrote a lot.  I worked on my case.  I wrote.  It helped

3    me to block out what was going on around me.  I got to write

4    every emotion that I felt.  You know, I mean, if I was angry,

5    I could write angry stuff.  I just didn't -- I didn't, I

6    guess -- what's the word I'm looking for?  Like, I could write

7    angry and be angry on paper, but I wouldn't let nobody else --

8    I wouldn't push that off on nobody else.

9    Q.   And when you were writing these books, were you trying to

10   be factual or not?

11   A.   They were fiction.

12   Q.   And I want to ask you about what happened with one of

13   these books that you were writing.  Do you remember the title

14   of a book you called America Eats Its Young?

15   A.   Yes.

16   Q.   What happened with that book?

17   A.   Prison guards shook the cell down at Menard, and they --

18   Q.   What does it mean to shake a cell down?

19   A.   Oh.  They open -- they come in the cell and search it for

20   contraband.  And they were searching my cell for contraband,

21   and I guess they saw it and looked through it and didn't

22   appreciate it.

23   Q.   And had you dedicated the book in any way?

24   A.   Yes, I did.

25   Q.   Who did you dedicate the book to?

Bolden - direct by Crowl

2799

1    A.   The Black Panther Party for Self-Defense.

2    Q.   What happened after the guards found your book during the

3    shakedown?

4    A.   I was at work in the prison law library.  They came over

5    to the law library, like five or six of them, handcuffed me

6    and took me to Internal Affairs and questioned me about what I

7    had written.

8    Q.   And did you receive discipline because of this book?

9    A.   Yes, I did.

10   Q.   And tell the members of the jury where you were sent.

11   A.   I was -- I was sent to segregation for six months for gang

12   activity for the dedication.

13   Q.   Tell the members of the jury what it was like in

14   segregation during that period.

15   A.   When I came back there, when they brought me back there,

16   they were -- they -- there was this mentally ill guy in his

17   cell.  And they were upset with me.  So they moved him out of

18   his cell, moved him in another one, and put me in his cell.

19   And his cell had feces.  The toilet was -- like he had never

20   flushed his toilet.  Feces was sitting up high on the toilet.

21   It was -- it was disgusting.

22        And they didn't bring me anything to clean the cell.

23   They just left me standing in the middle of the floor till the

24   next shift, and that's like 10:00 o'clock at night.  So other

25   prisoners passed me towels and stuff and shampoo to clean as

Bolden - direct by Crowl

2800

1  best I could.

2  Q.  And in segregation, I assume you had no cellmate; is that

3  right?

4  A.  No.  No, I did not.

5  Q.  And how long were you in that cell in -- every day?

6  A.  24 hours a day.

7  Q.  Were you ever allowed out for other reasons?

8  A.  Yes.  Shower.  They gave you a shower once a week.  Recre-

9  -- they let you out on the yard once a week, but that was -- I

10 wouldn't go -- I went out there once and wouldn't go back.

11 Q.  How long were you in segregation on your -- you said it

12 was a six-month sentence?

13 A.  Yes.

14 Q.  How long did you serve?

15 A.  Five months and I think like 12 days.

16 Q.  Why did you get out early?

17 A.  Because I had appealed the findings, and Springfield --

18 that's who you appeal to -- they found that I had not

19 committed any offense and that the Black Panther Party was not

20 a gang, and they reversed it and let me out.

21 Q.  And that was after, you said, five months and two weeks of

22 your sentence?

23 A.  Something like that, yes.

24 Q.  While you were in Menard, did something happen with your

25 grandmother?

Case: 1:17-cv-00417 Document #: 646 Filed: 11/16/21 Page 126 of 133 PageID #:19745
Bolden - direct by Crowl
2801

1    A.  Yes.

2            MR. CROWL:  Judge, may we show the witness

3    Plaintiff's Exhibit 188.4?

4            THE COURT:  You may.

5    BY MR. CROWL:

6    Q.  Who is this a photograph of?

7    A.  That's my grandma.  That's my grandmother Mary Lee.

8            MR. CROWL:  May we show the jury, Judge?  We offer --

9            THE COURT:  Any objection?

10           MR. HALE:  No, Your Honor.

11           THE COURT:  Admitted.  You can publish.

12     (Plaintiff's Exhibit No. 188.4 was received in evidence.)

13   BY MR. CROWL:

14   Q.  And you said this is which grandmother?

15   A.  That's my father's mother, my Aunt Brenda's mother, Mary

16   Lee.

17   Q.  Is this the grandmother who you went and lived with for a

18   while?

19   A.  No.

20   Q.  Okay.  How close were you to this grandmother?

21   A.  Extremely close.

22   Q.  Was she one of your favorite grandparents?

23   A.  She was actually my favorite person in the world.

24   Q.  And how did you learn that she had passed?

25   A.  We were on lockdown.  And the counselor -- his name was

Bolden - direct by Crowl

2802

1    Crane.  He came to the cell with the guard and told me that I
2    had a telephone call.  They handcuffed me and took me to the
3    counselor's office, and then the counselor called Aunt Brenda
4    and I talked to her.
5    Q.  And were you able to actually speak with your grandmother?
6    A.  Yes, I was.
7    Q.  Before she passed?
8    A.  Yeah.  Yes.
9    Q.  And what was said?
10   A.  I had -- Brenda told me what the situation was.  They said
11   when she went to sleep, she wouldn't wake back up.  So when
12   she got on the phone, I said, "Hey, lady, I heard you're
13   trying to leave me."  She said, "I'm tired."  And that was it.
14   She gave the phone -- she said she loved me and gave the phone
15   back to Aunt Brenda.
16   Q.  Were you able to go to her funeral?
17   A.  No.
18   Q.  Why not?
19   A.  No money.  I didn't even ask.  I didn't.  Aunt Brenda did.
20   Q.  Did something happen with your father while you were in
21   Menard?
22   A.  Yes.
23   Q.  What happened?
24   A.  He died.
25          MR. CROWL:  May we show Plaintiff's Exhibit 188.2 to

Bolden - direct by Crowl

2803

1    the witness, Judge?

2                THE COURT:  Yes, absolutely.

3    BY MR. CROWL:

4    Q.  Is this a photograph of your father?

5    A.  Yes.

6                MR. CROWL:  We offer and request to publish this

7    exhibit, Judge.

8                THE COURT:  Any objection?

9                MR. HALE:  No objection.

10               THE COURT:  Admitted.  You can publish.

11      (Plaintiff's Exhibit No. 188.2 was received in evidence.)

12   BY MR. CROWL:

13   Q.  Who is this a photograph of, Mr. Bolden?

14   A.  My father, Eddie Bolden.

15   Q.  How did you learn that he had passed?

16   A.  I called my mother, and she told me -- well, my mother

17   called out to the prison, and they told me to call home.  So I

18   called my mother and she told me.

19   Q.  And did a second grandmother pass while you were in

20   prison?

21   A.  Yes.

22               MR. CROWL:  May we show just the witness Plaintiff's

23   Exhibit 188.5, Judge?

24               THE COURT:  Yes, you may.

25   BY MR. CROWL:

Bolden - direct by Crowl

2804

1    Q.  Is that a photograph of your other grandmother?

2    A.  Yes.  Yes, it is.

3            MR. CROWL:  We offer and request to publish, Judge.

4            THE COURT:  Any objection?

5            MR. HALE:  No, Your Honor.

6            THE COURT:  You can publish it.  It's admitted.

7       (Plaintiff's Exhibit No. 188.5 was received in evidence.)

8    BY MR. CROWL:

9    Q.  Can you tell us who's in this photograph, Mr. Bolden?

10   A.  That's my grandmother, Amry Knight, to the left -- to the

11   left, and my great-grandmother, Malinda Smith, to the right,

12   her mother.

13   Q.  And how did you learn that your grandmother had passed?

14   A.  I called a relative and they told me she had passed.

15   Q.  And did your second grandfather pass while you were in

16   Menard?

17   A.  Yes.

18           MR. CROWL:  May we show to the witness, Judge,

19   Plaintiff's Exhibit 188.6?

20           THE COURT:  Yes.

21   BY MR. CROWL:

22   Q.  Is that a picture of your second grandfather?

23   A.  Yes, it is.

24           MR. CROWL:  May we show the jury, Judge, and we offer

25   into evidence?

Bolden - direct by Crowl

2805

1              THE COURT:  Any objection?

2              MR. HALE:  No objection.

3              THE COURT:  You may.  You may publish it.  Admitted.

4        (Plaintiff's Exhibit No. 188.6 was received in evidence.)

5    BY MR. CROWL:

6    Q.  And what's this a photograph of, Mr. Bolden?

7    A.  That's my grandfather, Joe Lee.

8    Q.  How did you learn that he had passed?

9    A.  I called Aunt Brenda and she told me.

10   Q.  Mr. Bolden, how did the loss of these family members while

11   you were in Menard affect you?

12   A.  It was -- it was -- it was hard to -- it was hard because,

13   like, I didn't have -- like all my life I had them to run to,

14   and when they passed, I was on my own.  I mean, I had never

15   thought about the point -- the time coming when I would no

16   longer be a son or a grandson to anybody.  I wasn't that

17   anymore.  I was just me.

18             I mean, days -- some days you don't want to go --

19   keep going, and that -- those are some of the things that --

20   that had me wanting to end it.  You know, I had nobody no more

21   but Aunt Brenda.

22             MR. CROWL:  Judge, I don't know where we are on time,

23   I'm about to move to another topic.  I'm fine to go into that

24   topic or --

25             THE COURT:  If this is a nice breaking point for you,

2806

1    we want to make sure everybody in the gallery gets lunch.

2           Folks, we're going to take our lunch break today.  We

3    will come back after you've had a chance to relax and get some

4    food.  Okay?  We're adjourned in the meantime.

5           THE COURT SECURITY OFFICER:  All rise.

6        (Jury out.)

7           THE COURT:  One quick thing.  Are you folks -- I

8    should've asked this at the beginning of the trial.  Are you

9    folks able to actually get some food during these lunch

10   breaks?  I hope.  Are you able to get sandwiches downstairs or

11   have something brought in?

12          MR. CROWL:  We are, Judge.

13          THE COURT:  Okay.  I didn't want to pry, but I

14   probably should have explored that earlier in the trial.

15          Why don't we come back, what do you think, 45, 50

16   minutes, somewhere around maybe 1:15, 1:20?

17          MR. CROWL:  Yes, Judge.

18          THE COURT:  Is that okay?  I want to make sure the

19   witness and you all get time to do whatever you want to do.

20   Okay.  We'll be back.

21          MR. CROWL:  Keep our blood sugar up.

22          THE COURT:  One quick thing before we break, do you

23   folks need a ruling on anything related to the procedural

24   history of the case, what can come in, what can't?  Because if

25   so, I want to make sure I look at that over the lunch break.

1    I'll do whatever you folks need.  Go ahead.

2         MR. CROWL:  One possibility, Judge, is, with

3    Mr. Bolden, I can ask him about the opinions and offer them

4    conditionally, and then Your Honor can rule later as to what

5    gets actually admitted into evidence.  We won't show it to the

6    jury.

7         THE COURT:  When you say "offer them", do you mean

8    the opinions themselves?

9         MR. CROWL:  The opinions themselves, and then it can

10   be determined by Your Honor at what level of specificity.

11   We've got a redacted version, which we -- which is one of your

12   options, but we at least need to put those into the record at

13   some point before he's done testifying.

14        THE COURT:  He can certainly say the punch line of

15   what happened at each step.

16        MR. CROWL:  Yes.

17        THE COURT:  I'm skeptical of admitting the opinions

18   themselves unless you tell me that's what they typically do,

19   but I'm skeptical of that.  I haven't looked through any -- I

20   haven't seen any redacted copies, so I don't know what they

21   would be.

22        It does seem to me that you folks need, during the

23   break, to talk things over, see if there's a stipulation.  If

24   there's not, I'll rule on it.

25        MR. CROWL:  Okay.

2808

1    THE COURT:  I'll look at it in the meantime.  If you

2    folks need a longer break so you can talk this over, that's

3    fine, too.  Just check in with my courtroom deputy, you know,

4    by 1:15, 1:20.  Let me know, and I'll come down when you're

5    ready.

6    MR. CROWL:  Thank you, Judge.

7    (Luncheon recess taken at 12:35 p.m.)

8    *   *   *   *   *   *

9    CERTIFICATE

10    I certify that the foregoing is a correct transcript from

11    the record of proceedings in the above-entitled matter.

12

13    /s/ *Amy Spee*                    *10/22/21*

14    Amy Spee, CSR, RPR, CRR          Date
     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25