**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-417 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO PESAVENTO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eddie Bolden spent 22 years in prison for double murder before the Illinois Supreme Court vacated his convictions. He later obtained a certificate of innocence. After clearing his name, Bolden filed a section 1983 suit against four officers who played a key role in securing his convictions.

At the end of a three-week trial, a jury returned a verdict in favor of Bolden and against four former officers of the Chicago Police Department: Defendants Angelo Pesavento, James Oliver, and the estates of Defendants Edward Siwek and George Karl. Plaintiff ran the table. The jury found in favor of Bolden and against all four Defendants on all seven counts.

After hearing testimony about a wrongful conviction, and about an incarceration lasting more than two decades, the jury awarded substantial damages. The jury awarded Bolden $25,000,000 in compensatory damages, plus $100,000 in punitive damages against Pesavento and Oliver (each).

At the close of Plaintiff's evidence, Defendants orally moved for judgment as a matter of law. Defendants renewed their motion after the jury verdict. For the following reasons, Defendants' motion is denied.

**Background**

Giving a complete summary of the backstory of the case would be a tall order, to put it mildly. The case stretches back almost 30 years. The prequel – the state criminal case – has a number of chapters, covering the crimes, the investigation, the conviction, the appeal, the collateral challenge, and the successful quest to give Bolden his freedom.

The procedural history of this federal case is expansive, too. There are 669 docket entries, and counting, including hundreds of entries during the trial. It's a long story, so the Court will simply give the highlights before diving into the arguments.

The case involves a double murder on January 29, 1994, and the subsequent police investigation. Officers Pesavento, Oliver, Siwek, and Karl from the Chicago Police Department investigated the homicides, and ultimately charged Bolden with both murders.

The linchpin behind the decision to arrest and charge Bolden was a lineup identification by a witness named Clifford Frazier. Frazier was a brother of one of the murder victims. Frazier was outside a J&J Fish restaurant, a few blocks away from the scene of the murders. He was across the street from J&J Fish, near a parking lot by Harold's Chicken.

Frazier allegedly saw someone get into the backseat of a vehicle with the two soon-to-be murder victims, before driving off. The victims were involved in a drug deal. Frazier stayed behind, with two automatic weapons, to guard a large supply of cocaine in his car.

The victims drove a few blocks, and then the assailant shot them in the back of the head. Minutes later, that same person returned to the area of J&J Fish and got into a physical confrontation with Frazier. According to Frazier, they exchanged gunfire, and Frazier made a break for it. He suffered two gunshot wounds. The assailant then pistol whipped Frazier in the head with two guns.

2

Frazier spoke with the police several times in the days after the murders. For example, an officer (Temple) interviewed him at the scene, and a detective (Baker) interviewed him at the hospital that night. Frazier later gave the officers a description of the assailant: a tall, skinny, short-haired man with a light complexion. A sketch artist made a composite sketch based on his description.

A few weeks later, on February 26, 1994, Frazier came to a police station to view a lineup. Before he arrived, the police told Frazier that they had the shooter. Bolden was one of the five people in the lineup. Bolden had come to the station voluntarily with his attorney, in an effort to clear his name.

Things didn't work out that way. Frazier fingered Bolden as the murderer during the lineup. After that identification, Bolden was arrested and charged with double murder, and with attempted murder of Frazier.

Officer Pesavento testified before the grand jury to secure the indictment. He was the only witness before the grand jury. *See* 10/13/21 Trial Tr., at 926:13 – 927:6 (Dckt. No. 636) (Pesavento); Pl.'s Ex. 153. Officer Pesavento testified that all of the information that inculpated Bolden came from Frazier. *See* 10/13/21 Trial Tr., at 877:18 – 878:7, 879:9-21, 894:1-6, 927:23 – 928:6, 934:13-15 (Pesavento).

Officer Pesavanto told the grand jury that Frazier had identified Bolden in a lineup. *Id.* at 932:4-18 (Pesavento). But he did not show the grand jury the pictures of the lineup, so they did not have access to the photos to assess whether the lineup was fair. *Id.*

At trial, Frazier identified Bolden as the shooter, and testified about the lineup. No other witness identified Bolden as the shooter. *See* 10/12/21 Trial Tr., at 766:1-6 (Dckt. No. 635) (Pesavento); 10/13/21 Trial Tr., at 864:15 – 865:1, 894:1-5 (Dckt. No. 636) (Pesavento). In fact,

3

apart from Frazier, the state presented no other witness connecting Bolden to the crime. The state presented no physical or forensic evidence implicating Bolden. The police never tested two guns found at the murder scene.

After a four-day trial, the jury found Bolden guilty of all charges. He received a life sentence.

Bolden did not prevail on direct appeal. Bolden later filed a post-conviction petition based on ineffective assistance of counsel. The Circuit Court of Cook County dismissed the petition.

The Illinois Court of Appeals reversed the dismissal and ordered an evidentiary hearing. The Court of Appeals found that Bolden had made a substantial showing of ineffective assistance of counsel, based on a failure to contact alibi witnesses.

Along the way, the Court of Appeals noted how heavily the prosecution had relied on Frazier's testimony at trial. "Clifford [Frazier] presented the only narrative account of the murders." *See Illinois v. Bolden*, No. 94-cr-8397, slip. op., at 5 (Ill. App. Ct. June 18, 2014) (Dckt. No. 536-3, at 6 of 17). "The prosecution rested its case against Bolden on Clifford [Frazier's] testimony and the testimony of the expert who said that the bullets that killed [the two victims] came from the gun used to shoot Clifford [Frazier]." *Id.* at 13 (Dckt. No. 536-3, at 14 of 17).

"But Clifford [Frazier's] identification of Bolden has several weaknesses." *Id.* The Court of Appeals explained how some of Frazier's descriptions of the shooter did not match how Bolden looked at the time. *Id.* at 14 (Dckt. No. 536-3, at 15 of 17). Also, the lineup wasn't the first time that Frazier had seen Bolden that day. Frazier "walked very close to [Bolden's attorney] and Bolden in the police station, shortly before the lineup." *Id.*

4

The Court of Appeals found that the failure to call the alibi witnesses prejudiced Bolden because of significant weaknesses in the prosecution's case. The Court of Appeals pointed to "substantial problems with Clifford [Frazier's] identification of Bolden as the shooter and the lack of any other evidence against Bolden." *Id.*

The Court of Appeals ruled: "In light of the extremely thin case for the prosecution, based solely on the identification testimony of a single witness who did not know Bolden, and whose initial description of the shooter did not closely match Bolden's appearance, we find that Bolden has substantially shown that he suffered prejudice due to trial counsel's errors." *Id.* at 15.[1]

The case went back to the Circuit Court of Cook County for an evidentiary hearing, which took place in 2015. The Circuit Court vacated Bolden's convictions and ordered a new trial. Along the way, the Circuit Court commented on the weaknesses of the prosecution's case, too. "[T]he State's case against petitioner was far from overwhelming due to Frazier's substantially problematic identification and the lack of any other evidence connecting petitioner to the murders and attempted murder." *See Illinois v. Bolden*, No. 94-cr-0839701, slip. op., at 22 (Ill. Cir. Ct. Jan. 1, 2016) (Dckt. No. 536-4, at 23 of 24). "Upon a thorough examination of the trial record, this court determines that the evidence against petitioner was slight."[2] *Id.*

---

[1] At trial, this Court allowed Bolden to present the procedural history of his criminal case, in a neutral manner. But this Court did not allow Bolden to present to the jury the commentary by the Illinois Court of Appeals about the weaknesses of the prosecution's case against Bolden. This Court ruled that informing the jury about judicial commentary about the weaknesses in the case would be unduly prejudicial. *See* 10/25/21 Order (Dckt. No. 573). This Court took judicial notice of the procedural history, and read nine paragraphs summarizing the procedural history to the jury, but did not allow the jury to hear what the state court judges thought about the evidence. *See* 10/22/21 Trial Tr., at 3172:1 – 3177:1 (Dckt. No. 651).

[2] This Court did not allow the jury to hear that judicial commentary, either. *See* 10/25/21 Order (Dckt. No. 573).

5

The state later moved to dismiss all charges, leading to Bolden's release from incarceration. All told, Bolden served 22 years in prison. In 2016, Bolden received a certificate of innocence from the State of Illinois.

After regaining his freedom, and clearing his name, Bolden sought compensation for the two decades of incarceration. He filed suit against the four officers for their role in his arrest, pretrial detention, conviction, and incarceration.

Judge Shah (this Court's predecessor, before reassignment) granted in part and denied in part Defendants' motion for summary judgment. *See* 8/9/19 Mem. Opin. and Order (Dckt. No. 276). Judge Shah dismissed several claims, but seven claims remained. The surviving claims included four claims under the Fourth and Fourteenth Amendments, and three claims under Illinois law.

Specifically, the surviving claims included: (1) a due process claim about an unduly suggestive lineup, (2) a Fourth Amendment claim about pretrial detention without probable cause, (3) a Fourteenth Amendment claim about a failure to intervene, (4) a conspiracy claim about depriving Bolden of his constitutional rights, (5) intentional infliction of emotional distress, (6) malicious prosecution, and (7) civil conspiracy.

The case was reassigned to this Court as part of the initial allocation of cases after taking the bench. *See* 9/16/19 Order (Dckt. No. 282). The timing of the reassignment wasn't ideal. At that point, trial was only six weeks away, and the parties predicted a three-week trial. At an initial hearing, the parties revealed that each side planned to file 12 motions *in limine*. *See* 10/9/19 Order (Dckt. No. 294). And then 24 motions *in limine* landed on the docket later that day.

Given the realities of the situation, the Court vacated the trial date. *Id.* After asking the parties about their trial availability, and considering their schedules (Dckt. No. 321), the Court reset the trial for July 13, 2020, the earliest workable date. *See* 10/22/19 Order (Dckt. No. 323).

That rescheduling seemed reasonable at the time. But no one at the end of 2019 could have envisioned the world-altering pandemic, which reached the country's shores and spread from coast to coast in the early months of 2020. The pandemic prompted the Chief Judge of the Northern District of Illinois to issue an emergency order, which effectively shut down civil trials for the time being. *See* 3/16/20 Order (Dckt. No. 380). This Court issued an order of its own, giving all parties in all of its cases six additional weeks for any pending deadlines. *See* 3/18/20 Order (Dckt. No. 381). That order seemed generous at the time, but in retrospect, it seems adorable.

The pandemic forced this Court to vacate the July 2020 trial date, too. *See* 5/20/20 Order (Dckt. No. 386). "In light of the coronavirus pandemic, it is unclear when trials will resume at the Northern District of Illinois." *Id.* Rescheduling the trial posed a challenge in the months that followed. *See, e.g.*, 7/29/20 Order (Dckt. No. 398) ("[T]rials in this District have not taken place since mid-March, 2020, and will not resume until August 3, 2020."); 11/24/20 Order (Dckt. No. 409) ("As the parties are undoubtedly aware, civil trials in this District will not resume until mid-January, 2021, at the earliest.").

Eventually, civil trials resumed, and the parties were cleared for landing. This Court reset the trial for October 4, 2021, and reserved three weeks. *See* 4/9/21 Order (Dckt. No. 428). The Court later ruled on pretrial motions, including motions *in limine* and *Daubert* motions. *See* 9/22/21 Order (Dckt. No. 467); 10/6/21 Order (Dckt. No. 489); 10/5/21 Order (Dckt. No. 480); 10/10/21 Order (Dckt. No. 496); 10/11/21 Order (Dckt. No. 505).

7

Trial took place from Friday, October 8 to Wednesday, October 27, 2022, spanning 13 days. *See* Dckt. Nos. 507, 514, 519, 526, 532, 544, 548–555, 558, 561–565, 574, 581, 598. The jury heard from 32 witnesses, including 17 in-court witnesses, 1 out-of-state witness by video (live), and 14 witnesses by deposition designations.

Bolden testified, and so did Frazier. The alibi witnesses testified, too. The parties presented dozens of exhibits. *See* Exhibit List (Dckt. No. 597). The transcript from the trial exceeds 4,000 pages.

In the end, the jury found in favor of Bolden, and against all four Defendants, on all seven counts. *See* 10/19/21 Order (Dckt. No. 615); Jury Verdict Form (Dckt. No. 621).

At the close of Bolden's case, Defendants orally moved for judgment as a matter of law. *See* 10/25/21 Trial Tr., at 3359:12-14 (Dckt. No. 652); 10/27/21 Trial Tr., at 3979:13-16 (Dckt. No. 656); 10/29/21 Order (Dckt. No. 616). Now before the Court is Defendants' renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). *See* Defs.' Mem. (Dckt. No. 587); *see also* 10/29/21 Order (Dckt. No. 616).

### Legal Standard

Under Rule 50(b), "after a jury verdict . . . a district court may direct the entry of 'judgment as a matter of law' if 'a reasonable jury would not have a legally sufficient evidentiary basis to find' in the nonmovant's favor." *Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021) (quoting Fed. R. Civ. P. 50(b)). Rule 50(b) "imposes 'a high bar.'" *Id.* (quoting *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019)). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Ruiz-Cortez*, 931 F.3d at 601.

The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Id.* (quoting

*EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)). A district court "review[s] the entire trial." *Bowers*, 1 F.4th at 519. But it "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

### Analysis

Defendants moved for judgment as a matter of law on all counts. But in their supporting brief, they advanced arguments about only four claims. *See* Defs.' Mem. (Dckt. No. 587). The memorandum addresses: (1) the Fourteenth Amendment claim about an unduly suggestive lineup, (2) the Fourth Amendment claim about pretrial detention without probable cause, (3) intentional infliction of emotional distress, and (4) malicious prosecution.

The first two claims spring from the Constitution, and the second two arise under state law. The Court will address the two constitutional claims individually. Then, the Court will address the two state claims together, because Defendants argue that the intentional infliction claim rises or falls with the malicious prosecution claim.

The punchline is straightforward. Bolden presented more than enough evidence for a reasonable jury to find for him and against all four Defendants on all four claims. The jury didn't have to do what it did, but the jury heard enough to do what it did.

## I. Fourteenth Amendment – Unduly Suggestive Lineup

"The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality." *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006). But it "does, however, guarantee the right to a fair trial – in this

context, via the due process clause of the Fourteenth Amendment – and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Id.*

The jury found in favor of Bolden on his claim about the lineup under the Fourteenth Amendment. *See* Verdict Form, at 2 (Dckt. No. 621). Specifically, the jury concluded that Defendants used an unduly suggestive lineup, which resulted in an unreliable identification that tainted Bolden's criminal trial and rendered it constitutionally unfair. *See* Jury Instructions, at 26 (Dckt. No. 599).

Defendants make three arguments in favor of judgment as a matter of law on the Fourteenth Amendment claim. First, Defendants put forward a few arguments about the standard that applies to a claim about an unduly suggestive lineup. Second, Defendants argue (in their reply brief) that Bolden failed to come forward with sufficient evidence that the lineup was unduly suggestive. Third, Defendants assert qualified immunity.

The Court will address the arguments in that order.

### A.     The Elements

Defendants begin by arguing that Bolden did not prove a claim about the lineup because he failed to show that he successfully challenged the lineup on direct appeal or collateral review. *See* Defs.' Mem., at 5–8 (Dckt. No. 587). As they see it, the claim "requires that a plaintiff establish that the [criminal] trial court's admission of an allegedly unreliable identification was reversed on direct appeal or on collateral review." *Id.* at 5. There is no such requirement.

Defendants rely on the Seventh Circuit's decision in *Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019). There, the police interviewed a witness (Tequilla Miller) in the early morning hours after a home burglary. *Id.* at 340. As Miller left the police station, officers

escorted Chris Coleman and another person down the same hallway. *Id.* Miller then announced: "Well, there goes two of them dudes that was at our house." *Id.*

A few hours later, Miller came back to the station and picked Coleman out of a photo array. *Id.* Later that day, she returned to the police station a third time. *Id.* She viewed a four-person lineup, and one of the officers told her that the lineup included the person who she had identified in the picture. *Id.* She then identified Coleman as the assailant. *Id.*

Coleman was later arrested and charged with armed robbery and other serious crimes. He moved to suppress the photo and lineup identifications based on the early morning hallway encounter. *Id.* at 341. The trial court denied the motion. The jury ultimately found Coleman guilty on all counts, and he received a significant sentence.

More than a decade later, Coleman came forward with affidavits from five people who confessed to committing the crimes. *Id.* at 343. The Illinois Supreme Court granted Coleman's successive petition for post-conviction relief, vacated his convictions, and remanded for another trial. *Id.* The state, in turn, dropped the case. Coleman later received a certificate of innocence.

Coleman then filed suit against the officers under section 1983. *Id.* at 344. One of the counts was a due process claim that the officers had used unusually suggestive procedures in connection with the identifications. The district court granted summary judgment to defendants, and the Seventh Circuit affirmed.

The Seventh Circuit concluded that Coleman had not presented sufficient evidence that the identifications were unduly suggestive or unreliable. *Id.* at 348 ("Tequilla's identification still bore enough indicia of reliability to warrant defendants' reliance."). There was "no evidence suggesting defendants knew Tequilla's identifications were tainted," either. *Id.* at 349. On top of it all, the identifications "were not so clearly tainted as to deny Coleman a fair trial." *Id.*

11

In other words, based on the summary judgment record, a reasonable jury could not find that the identifications were unduly suggestive, or that the identifications were unreliable, or that the trial was unfair. That is, the summary judgment record did not include enough evidence to support a potential verdict in Coleman's favor.

Along the way, the Seventh Circuit noted in *dicta* that Coleman had raised the identifications in a motion to suppress before trial, but then dropped the issue. *Id.* at 347. "Coleman did not object to Tequilla's in-court identification, and he did not address the suppression ruling in his criminal appeal." *Id.*

That passage did not announce a new rule. The Court of Appeals did not purport to lay down a rule that a plaintiff cannot bring a section 1983 claim unless he prevailed on that issue on direct appeal or collateral review. The Seventh Circuit was merely reciting the procedural history, not cementing a roadblock.

Instead, the Seventh Circuit raised the point to explain that even if the trial court *had* ruled on the suppression motion in Coleman's favor, tort liability would not inevitably follow. "[A]n officer is not automatically liable for violating a suspect's constitutional rights whenever a judge later deems a witness's identification inadmissible." *Id.* at 348.

It is undoubtedly true that a ruling by a trial court in a criminal case – one way, or the other – does not necessarily give rise to liability in a later civil case under section 1983. A trial court in a criminal case addresses the admissibility of evidence, not tort liability. The trial court has to call balls and strikes, and a police officer is not necessarily liable under section 1983 simply because the umpire calls a pitch outside.

12

Nothing in *Coleman* laid down the strict rule that Defendants put forward here. *Coleman* did not hold that a plaintiff can bring a section 1983 claim about an unduly suggestive lineup, only if that plaintiff successfully challenged the lineup on direct appeal or collateral review.

Defendants then latch on to a sentence in *Coleman* that, they say, requires a plaintiff to prove that a specific technique violated clearly established law.[3] "Our decision in *Phillips* notes a proviso [for section 1983 liability] for situations where an officer uses a specific interrogation technique proscribed by existing law." *Id.* at 347–48.

That passage did not announce a new rule, either. The Seventh Circuit simply noted that a defendant can be liable for using a specific interrogation technique that violates existing law. The Seventh Circuit did not say, as Defendants now suggest, that a defendant can be liable for an unduly suggestive lineup *only if* the defendant used a specific interrogation technique that violated existing law.

Defendants then rely on pre-*Coleman* precedent for the notion that the use of suggestive procedures cannot give rise to a due process claim. *See* Defs.' Mem., at 7 (Dckt. No. 587). But the Seventh Circuit has recognized a due process claim about unduly suggestive lineups, including in a pair of recent cases. *See Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003); *Alexander*, 433 F.3d at 555; *Reyes v. Nurse*, 38 F.4th 636, 644 (7th Cir. 2022); *Holloway v. City of Milwaukee*, 2022 WL 3152594, at *3 (7th Cir. 2022).

This Court instructed the jury on those elements at trial. Specifically, this Court instructed the jury that the claim about the lineup included three elements:

> In Count I, Plaintiff claims that Defendants violated his constitutional right to a fair trial by using suggestive identification procedures that tainted his criminal trial. Plaintiff may succeed on this claim by proving each of the following things by a preponderance of the evidence:

---

[3] Discussions about clearly established law often come up in the context of qualified immunity. But *Coleman* did not address qualified immunity.

> 1. the Defendant you are considering used unduly suggestive
>    identification procedures;
>
> 2. the resulting identification was not reliable; and
>
> 3. the flaws in the identification procedures made the criminal trial unfair.

*See* Jury Instructions, at 26 (Dckt. No. 599). The instruction also explained what "unduly suggestive" means, and directed the jury to consider the totality of the circumstances. *Id.*

As explained below, the jury heard and saw enough evidence to satisfy all of those elements.

### B.    The Sufficiency of the Evidence

Next, Defendants argue that Bolden failed to present sufficient evidence to support a verdict about an unduly suggestive lineup. The argument about the sufficiency of the evidence comes late, through the back door. In their opening brief, Defendants did not advance any argument about the sufficiency of the evidence. *See* Defs.' Mem. (Dckt. No. 587).

But Bolden may have come to their rescue, at least temporarily. In his response brief, Bolden preemptively argued that he did, in fact, prove the elements of a due process claim, even though Defendants never raised that argument in their opening brief. *See* Pl.'s Resp., at 2–8 (Dckt. No. 661). In their reply, Defendants seized on that opening, and argued for the first time that Bolden had failed to prove a constitutional violation. *See* Defs.' Reply, at 3–14 (Dckt. No. 666).[4]

 "To determine whether a particular procedure violated a defendant's constitutional rights," Bolden needed to satisfy "a well-settled, two-pronged analysis." *United States v.*

---

[4] The Court will address the argument on the merits, even though Defendants appear to have waived it by failing to make the point in their opening brief supporting their oral motion for judgment as a matter of law. Bolden seems to have waived waiver, too.

*Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009). "The first question is whether the 'identification procedure used by law enforcement was both suggestive and unnecessary.'" *Holloway*, 2022 WL 3152594, at *3 (cleaned up) (quoting *United States v. Sanders*, 708 F.3d 976, 983–84 (7th Cir. 2013)); *see also Reyes*, 38 F.4th at 644 ("Some cases ask whether the procedures were 'unduly' or 'impermissibly,' rather than 'unnecessarily,' suggestive."). The second question is, "based on the totality of the circumstances, whether the identification was sufficiently reliable to outweigh the effect of the tainted procedure." *Holloway*, 2022 WL 3152594, at *3.

A plaintiff must satisfy those two elements to prove that a lineup violated the Constitution. Those elements are necessary, but not sufficient, to prove a section 1983 claim about due process. *See Alexander*, 433 F.3d at 555 ("Grounded in due process, the constitutional interest implicated in challenges to police identification procedures is *evidentiary* in nature.") (emphasis in original).

A plaintiff also needs to "show[] how the flaws in [Defendants'] identification techniques made his trial unfair." *Id.* at 555; *see also Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987) ("Hensley has no claim under § 1983 arising out of his participation in an unduly suggestive lineup since he was not deprived of his right to a fair trial."). That obligation arises from the fact that the claim is a due process claim, and due process is about the fairness of the trial. So, a plaintiff must show that the lineup violated the Constitution *and* that the lineup rendered the trial unfair.

Defendants argue that Bolden failed to satisfy all three requirements. That is, according to Defendants, Bolden did not offer evidence that (1) the lineup was unduly suggestive, (2) the identification was unreliable, or (3) the criminal trial was unfair as a result.

Based on the record as a whole, viewed in a light favorable to Bolden, the jury heard sufficient evidence to support a finding in his favor against each officer under each prong.

### 1. Evidence about an Unduly Suggestive Lineup

The first question is whether the jury heard sufficient evidence of an unduly suggestive lineup. It did. Maybe the evidence did not compel a conclusion that the lineup was unduly suggestive. But it was enough to support that conclusion by a reasonable jury.

Suggestiveness is "evaluated by reference to the totality of the circumstances." *Id.* And Bolden had to prove not only that the lineup was suggestive, but also that it was "unduly," "impermissibly," or "unnecessarily" suggestive. *See Reyes*, 38 F.4th at 644.

Bolden presented the jury with several buckets of evidence that his lineup was unduly suggestive. Viewed as a whole, Bolden poured more than enough evidence into the record.

First, Bolden offered proof that Defendants primed the pump when they selected the participants for the lineup. The jury heard evidence that Bolden stuck out like a sore thumb.

The jury heard testimony about what Frazier told the police on the night of the murders (January 29, 1994), a few weeks before the lineup on February 26, 1994. Frazier described the murderer as "tall" and "skinny." *See* 10/25/21 Trial Tr., at 3396:22 – 3397:2, 3397:12-13, 3429:13-17, 3434:4-12 (Dckt. No. 653) (Frazier); *see also* Joint Ex. 25 (Baker interview summary of Frazier dated January 29, 1994) (describing the assailant as "Tall, skinny"). Frazier testified:

> Q: Do you remember the description you gave of Mr. Bolden to the police officers that night?
>
> A: I said he was tall, skinny, bald-headed, and he had thick eyebrows. And I told them – yeah, that's it. Yeah.

*See* 10/25/21 Trial Tr., at 3401:12-15.

So, before walking into the identification room, Frazier had locked himself into a description of the shooter. The assailant was tall and skinny. And the officers knew that Frazier would look for someone in the lineup who matched that description.

The jury saw photos of the lineup, which included Bolden and four fillers selected by Officers Pesavento, Karl, and Siwek. *See* 10/13/21 Trial Tr., at 914:19 – 915:10 (Dckt. No. 636) (Pesavento); Lineup Photos, Pl.'s Exs. 41, 42, 92; Defs.' Ex. 3; *see also* Lineup Photos (Dckt. No. 332-6, at 2–3 of 3). The jury also heard testimony about the heights and weights of the five people in the lineup. *See* 10/13/21 Trial Tr., at 914:13 – 915:16 (Dckt. No. 636) (Pesavento); *see also* Joint Ex. 12 (listing their heights and weights).

The four other people in the lineup were noticeably shorter or noticeably heavier than Bolden. Bolden was six feet, two inches tall, and he weighed 153 pounds. *See* Joint Ex. 12. Two of the people were five inches shorter (five feet, nine inches). *See* Joint Ex. 12; *see* 10/13/21 Trial Tr., at 914:13 – 915:6 (Dckt. No. 636) (Pesavento). One person was nine inches shorter (five feet, five inches). *Id.*

One person in the lineup was roughly Bolden's height. He was six feet, four inches tall. *See* Joint Ex. 12. But he weighed 260 pounds, so he was more than 100 pounds heavier than Bolden. *Id.*; *see also* 10/13/21 Trial Tr., at 915:11-16 (Dckt. No. 636) (Pesavento).

That heavy-set filler was a police officer, and he looked the part. He wore a white dress shirt, and black dress pants. *See* 10/13/21 Trial Tr., at 920:14-20 (Dckt. No. 636) (Pesavento). He was dressed noticeably more professionally than everyone else in the lineup. On the stand, Officer Pesavento didn't think that that filler looked like a police officer, but the jury could have reached a different conclusion. He looked like someone who might work down the hall in the police station, and saunter down to the lineup room in a pinch.

17

The jury heard evidence that Bolden looked different than the others in the lineup. And critically, he looked different in a way that would point Frazier's pair of eyes in Bolden's direction. If Frazier was looking for a tall, skinny guy, then Bolden was the tall, skinny guy. He was the *only* tall, skinny guy in that lineup.

At trial, Officer Pesavento testified that he recognized that the height disparity among the participants in the lineup was an issue. *Id.* at 915:17 – 916:9 (Pesavento). He testified:

> Q: Now, you did a sit-down lineup because you knew that if you did a standing up lineup, it wouldn't be fair, correct?
>
> A: Correct.
>
> Q: It would be unfairly suggestive of Mr. Bolden, right?
>
> A: Yes.

*Id.* at 915:25 – 916:4 (Pesavento). But Bolden and Frazier testified that the participants did, in fact, stand up during the identification. *See* 10/21/21 Trial Tr., at 2766:16-20 (Dckt. No. 646) (Bolden); 10/25/21 Trial Tr., at 3444:6 – 3446:4 (Frazier).

Putting those facts together, the jury heard Officer Pesavento testify that a lineup would be unduly suggestive if the participants had stood up, because of the height disparities. And then, the jury heard two other witnesses testify that the participants in the lineup were, in fact, standing up.

Small differences in the appearances of the suspect and the fillers cannot support a finding that the lineup was unduly suggestive. After all, everyone looks different than everyone else. To support a claim, the differences have to be meaningful. Stark differences that draw attention to a specific person – and make him stick out from the crowd, in a "pick-*this*-guy" kind of way – can support a finding that the lineup was improperly suggestive. *Cf. United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) ("[T]he participants in a lineup need only have

18

'descriptive features within a reasonable range of similarity to each other.'") (citation omitted);
*see also United States v. Wade*, 388 U.S. 218, 232–33 (1967) (referring to "other participants in a
lineup [being] grossly dissimilar in appearance to the subject" as one of "numerous instances of
suggestive procedures"). Here, the jury had a basis to conclude that the differences were
meaningful, especially in light of Frazier's description of the assailant as tall and skinny.

Second, Frazier testified that, before the lineup, Officer Oliver told him that they "got the
guy that did the shooting." *See* 10/25/21 Trial Tr., at 3436:20 – 3437:7 (Dckt. No. 653)
(Frazier). That's why Frazier agreed to view the lineup in the first place. He testified:

> Q: And did you agree to go to the police station to view a lineup?
>
> A: Yeah, they took me there. Yeah.
>
> Q: Why did you want to participate in viewing a lineup?
>
> A: Because they said they think they got the guy that I'm looking for
>    – that they [were] looking for.

*Id.* at 3408:4-9 (Dckt. No. 653) (Frazier).

A reasonable jury could conclude that the police created an expectation in Frazier's mind
that the shooter would be in the lineup. That expectation could have affected the likelihood of
Frazier picking someone in that panel. *Cf. Simmons v. United States*, 390 U.S. 377, 383 (1968)
("The chance of misidentification is also heightened if the police indicate to the witness that they
have other evidence that one of the persons pictured committed the crime.").

Bolden presented evidence about the lineup from an expert, Dr. Gaut. *See* 10/22/21 Trial
Tr., at 3192:18 – 3210:17 (Dckt. No. 651) (Gaut). He testified about general orders from the
Chicago Police Department, which set policies for how to conduct an investigation, including
lineups. Dr. Gaut also explained that it was against generally accepted police practices to tell a
witness that the police had the culprit in custody. *Id.* at 3194:22 – 3199:12 (Gaut). In his

opinion, "it puts an undue pressure on the witness that, okay, if the police have him, then I'm obligated to identify him." *Id.* at 3197:3-5 (Gaut); *see also id.* at 3198:13 (testifying about the "tremendous amount of pressure on a witness" created by telling the witness that the police have the culprit).

That expert testimony supported a finding that the lineup was unduly suggestive. *See Sanders v. City of Chicago Heights*, 2016 WL 2866097, at *9 (N.D. Ill. 2016) (St. Eve, J.) ("Because [the plaintiff] has presented evidence in the form of Dr. Gaut's . . . expert opinion[] that the . . . physical line-up [was] outside of generally accepted professional standards and biased, he has presented sufficient evidence raising a reasonable inference that these identification procedures were unnecessarily suggestive.").

Third, Bolden presented evidence about what took place immediately before Bolden entered the lineup room. The events in the preceding few minutes set the stage for a suggestive lineup. Or, at the very least, a reasonable jury could have reached that conclusion.

After hearing that the police had found the shooter, Frazier came to the police station for the identification. But Frazier did not see Bolden for the first time that day during the lineup itself. In fact, Frazier and an officer walked right by Bolden when he was with his lawyer and a few officers.

Specifically, Officers Pesavento and Karl placed Bolden and his then-attorney (Ingles) in an open area of the police station before the lineup. *See* 10/14/21 Trial Tr., at 1278:3 – 1279:5 (Dckt. No. 639) (Ingles); Joint Ex. 7 (photos of the inside of the police station). Then, Officer Oliver walked by with Frazier – right past Bolden, his attorney, and a few officers – not long before the lineup. *See* 10/14/21 Trial Tr., at 1279:6 – 1280:15 (Dckt. No. 639) (Ingles); 10/21/21 Trial Tr., at 2762:11 – 2763:11 (Dckt. No. 646) (Bolden).

Bolden's then-attorney testified: "Well, in order for them to get by us, because these aisles are not that wide and we weren't pinned against the wall or against any of the desks, we had to move aside a little, and they moved aside a little, and they passed us. They looked at us. We looked at them." See 10/14/21 Trial Tr., at 1279:20-24 (Dckt. No. 639) (Ingles). "And then they went around the corner. And as the big guy in the Army jacket [*i.e.*, Frazier] went around the corner, he turned back and looked at us again, and then went into the room where I had gotten the coffee out of, and they closed that door." *Id.* at 1279:25 – 1280:3 (Ingles).

Bolden gave similar testimony about what happened at the police station. "They walked right past me, right in front of me." *See* 10/21/21 Trial Tr., at 2763:5 (Dckt. No. 646) (Bolden). And he recognized the person with Officer Oliver as the person who had entered J&J Fish on the night of the murders (*i.e.*, Frazier). *Id.* at 2763:7-8 (Bolden).

So, when Frazier laid eyes on Bolden in the lineup room, Frazier had already laid eyes on him in the police station. That sneak peek took place nearby, not long before the identification.

Putting it all together, an officer told Frazier, before the lineup, that they had apprehended the assailant. And then, Defendants allowed Frazier to see Bolden – with police officers – in another room before the lineup. The jury had a basis to conclude that allowing Frazier to see Bolden before the lineup planted a visual seed.

Officer Pesavento admitted that it would be inappropriate – and unfairly suggestive – to allow the witness to see the suspect before the lineup:

> Q:  You would agree that it would be improper to allow a witness to see the suspect standing with his attorney before the witness viewed the suspect in the lineup, right?
>
> A:  Yes.
>
> Q:  It would be a violation of your training, correct?

> A:     Correct.
>
> Q:     And it would be unfairly suggestive, correct?
>
> A:     Right.

*See* 10/13/21 Trial Tr., at 924:7-14 (Dckt. No. 636) (Pesavento).

Dr. Gaut testified that telling Frazier that they had the suspect, and then allowing Frazier to see Bolden with police officers before the lineup, compounded the pressure on Frazier to pick someone – that is, to pick Bolden. *See* 10/22/21 Trial Tr., at 3192:18 – 3210:17 (Dckt. No. 651) (Gaut).

Maybe the hallway encounter was nothing more than "happenstance," with no misconduct by the officers. *See Coleman*, 925 F.3d at 348. To be sure, that was a possible inference from the testimony. But it was not the *only* possible inference. Viewing the evidence as a whole, in a light favorable to Bolden, the jury heard enough evidence to support the inference that the pre-lineup encounter was part of an effort to finger Bolden. *See* 10/22/21 Trial Tr., at 3197:20 – 3198:15 (Dckt. No. 651) (Gaut).

Fourth, Bolden presented other evidence that could support a finding that the lineup was unduly suggestive. Bolden testified that he entered the lineup room, and one of the officers told him to sit in chair number one, which he did. *See* 10/21/21 Trial Tr., at 2764:14 – 2765:1 (Dckt. No. 646) (Bolden). But the person sitting next to Bolden was chatty, and Bolden didn't feel like small talk. *Id.* at 2765:2-9 (Bolden). So he switched seats, and moved to chair number four. *Id.*

Bolden testified that he could see through the glass – a one-way mirror – and see into viewing room "a little bit." *Id.* at 2765:13-20 (Bolden). He could see silhouettes. *Id.*

Bolden then saw two people walk up to the mirror, and one of them pointed at chair number one. "I saw two people walk up to the window and stop in front of the guy in chair No.

1. The guy pointed at chair No. 1 and walked away." *Id.* at 2765:23-25 (Bolden). So, Bolden saw someone point to Bolden's old seat – the spot where the officer originally told him to sit.

A jury could infer from that testimony that Frazier was the person who did the pointing. And a jury could infer that Frazier pointed at someone else – the person sitting in chair number one – not Bolden. So, a jury could infer from the testimony that Frazier originally fingered someone else as the shooter.[5]

Bolden testified that two people then walked up to the mirror, and stood right in front of him. "The person that was standing there with him pulled him back to the window and moved down in front of – they stood in front of me." *Id.* at 2766:1-5 (Bolden).

Then, Officer Karl opened the door of the lineup room, looked at the guy in chair number one, looked at Bolden, and then said: "Eddie Bolden, right?" *Id.* at 2766:6-16 (Bolden). Bolden didn't respond. The officer asked him for his name a few more times, before Bolden finally shook his head. *Id.* at 2766:14-15 (Bolden) ("And I looked at him and I shook my head yes."). The officer then shut the door, and everyone in the lineup room stood up. *Id.* at 2766:15-16 (Bolden).

And then, Frazier identified Bolden as the shooter. *Id.* at 2766:17-20 (Bolden). The officers then placed Bolden under arrest. *Id.* at 2767:6-9 (Bolden).

A jury could infer that the officers nudged Frazier toward identifying Bolden after Frazier pointed at someone else. According to Bolden, the officers put Frazier right in front of him, on

---

[5] The other possible option is that a police officer did the pointing. That is, maybe an officer, not Frazier, pointed at whoever was sitting in chair number one. That gesture would be bad, too. Imagine if a police officer had pointed at chair number one, and then said something along the lines of, "he was sitting right here a minute ago." There is no evidence that a police officer made that statement. But it illustrates the point. Nothing good could come from an officer pointing at a person in chair number one. Whoever pointed, and for whatever reason, a jury could construe it to support Bolden's argument that the lineup was problematic.

the other side of the glass. And then, one of the officers opened a side door to the lineup room, and called out Bolden's name, and continued to do so until Bolden responded. Frazier picked Bolden after Bolden nodded in response to the officer who called his name. *See Fletcher v. Bogucki*, 2021 WL 4477968, at *6 (N.D. Ill. 2021) ("But here, Defendant Officers are alleged to have steamrolled over Friend's failure to identify Fletcher by instructing her to identify him. Fletcher asserts, and Defendants do not dispute, that such an identification technique was plainly proscribed by law.").

Fifth, Dr. Gaut tied it all together, and opined on whether the lineup in question complied with generally accepted police practices. In his opinion, it didn't come close: "If I were putting this on a scale of say 1 to 10, where 10 would be I have no objections, everything looks great, and a 1 is an absolute zero, there is no way that this should have ever happened, I would rate this one as the zero. This, in my experience, does not conform both to Chicago Police policy or to generally accepted law enforcement procedures." *See* 10/22/21 Trial Tr., at 3210:11-17 (Dckt. No. 651) (Gaut).

Defendants offer another argument in their reply (and thus, it is arguably waived). Defendants argue that the lineup was not impermissibly suggestive because Frazier's identification was not based on "an irreparable misidentification." *See* Defs.' Reply, at 4 (Dckt. No. 666) (quoting *United States v. L'Allier*, 838 F.2d 234, 239 (7th Cir. 1988)). And, according to Defendants, a misidentification is *never* irreparable "[i]f the criminal defendant can present evidence of the weaknesses in the identification to the jury." *Id.*

A trial court should exclude evidence in a criminal trial "if the pretrial procedure 'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Williams*, 522 F.3d at 810; *see also Gonzalez*, 863 F.3d at 584 ("In

24

determining whether a particular identification procedure violates a defendant's due process

rights, courts first consider 'whether the police used an impermissibly suggestive procedure in

obtaining the out-of-court identification. If so, the second inquiry is whether, under all the

circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable

misidentification.'") (quoting *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).

Defendants take the *Williams* principle and turn it upside down. A trial court should not

allow the jury to hear evidence about a lineup if cross examination could not fix the

misidentification. *See Williams*, 522 F.3d at 810. But that principle does not mean that cross

examination always fixes the problem if the evidence does come in.

Defendants' argument proves too much. If the ability to cross examine witnesses at the

criminal trial was sufficient to dispel a claim about an unduly suggestive lineup, then it is hard to

see how there could ever be a claim about a unduly suggestive lineup. The ability to cross

examine a witness does not automatically negate a possible section 1983 claim. Cross

examination can be a cure, but it is not necessarily a cure-all.

### 2. Evidence about the Unreliability of the Identification

The next question is the unreliability of the identification by Frazier. Bolden had to

prove that the identification was unreliable. Suffice it to say that the jury heard plenty of

evidence to call into question the reliability of Frazier's identification.

The reliability of the identification, like the suggestiveness of the lineup, depends on the

totality of the circumstances. *See Alexander*, 433 F.3d at 555. "The Supreme Court set forth

several factors for courts to use to determine whether an unduly suggestive identification

procedure was still to be considered reliable under the circumstances: (1) the opportunity of the

witness to observe the criminal at the time of the crime (or prior to the identification); (2) the

witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the length of time between the crime and the identification." *Lee v. Foster*, 750 F.3d 687, 692 (7th Cir. 2014); *see also Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

Defendants argue that Bolden presented evidence that questioned Frazier's credibility, but did not provide any evidence that questioned the reliability of Frazier's identification. *See* Defs.' Reply, at 7 (Dckt. No. 666). Actually, there was plenty of evidence to call into question the reliability of the identification.

Bolden offered several pieces of evidence that would allow a jury to find that Frazier's identification was unreliable. For starters, consider Frazier's opportunity to see the assailant, and Frazier's degree of attention. He had an opportunity to view the assailant, but the circumstances were less than ideal.

Frazier originally told the police that he first saw the soon-to-be attacker from a restaurant across a four-lane street, when Frazier was inside Harold's Chicken. *See* 10/25/21 Trial Tr., at 3381:4 – 3382:13, 3464:1 – 3468:17 (Dckt. No. 653) (Frazier). The attack occurred around 8:00 p.m., long after dark on that wintry night. *See* 10/19/21 Trial Tr., at 2313:21-22 (Dckt. No. 645) (Temple).

Frazier gave a different rendition at the civil trial. He testified that he saw the assailant leave J&J Fish, cross the street, and enter Harold's Chicken – not far from where Frazier was standing – before leaving and getting in the car with the two victims. *See* 10/25/21 Trial Tr., at 3382:7 – 3384:16 (Dckt. No. 653) (Frazier). So the record was mixed about how far Frazier was from the assailant before he drove off with the two murder victims.

Putting that aside, Frazier did get a close-up view of the assailant. But it was a little too close for comfort.

After the murders, the assailant returned to the area outside J&J Fish, and according to Frazier, he exchanged gunfire with Frazier. *Id.* at 3487:4 – 3489:5 (Frazier). Frazier suffered two gunshot wounds, to his leg and back. *Id.* at 3390:3-13. At the time, Frazier was "[r]unning for [his] life." *Id.* at 3391:8 (Frazier).

Frazier described the trauma of getting shot: "I was running. One went through my leg, which I didn't feel, and then one hit me in the back, and I was – I was out, like dead out. There was complete darkness, and two images restored me and said 'Not yet, my son,' and the light came back on. So I got up. I noticed I couldn't move my right arm." *Id.* at 3392:8-13 (Frazier).

The fight later turned to blows, with Frazier on the receiving end. Frazier testified that the assailant beat him over the head repeatedly with his gun, and with Frazier's own gun. *Id.* at 3396:1-11, 3397:17-22 (Frazier).

The jury also heard conflicting evidence about whether the assailant was wearing a mask. Bolden testified that he was inside J&J Fish, looked out the window, and saw two people fighting. According to Bolden, one person was hitting the other (*i.e.*, Frazier) on the head with a gun, and the assailant was wearing a ski mask. *See* 10/21/21 Trial Tr., at 2751:10-18, 2756:11-16 (Dckt. No. 646) (Bolden).

If the jury believed Bolden on this point (as the Court must assume, given the procedural posture), then the assailant was wearing a ski mask. And a ski mask would have interfered with Frazier's ability to identity the person hitting him in the head.

The shots and the blows could have interfered with Frazier's ability to see who was attacking him. Frazier presumably had things on his mind – like survival – other than identifying

the other person. True, it is certainly possible that the face of an attacker could be seared into the

mind of the victim. Victims sometimes have a crystal-clear image of how an assailant looked,

despite the ongoing violence. But not always. And here, a reasonable jury could have reached

the conclusion that the violence interfered with Frazier's ability to get an accurate mental picture

of his attacker.

Turning to the third factor, the jury heard testimony that called into question the accuracy

of Frazier's description of his assailant. His initial description of the attacker – taken that night

at J&J Fish – lacked any details about the appearance of the attacker. *See* 10/19/21 Trial Tr., at

2312:13-17 (Dckt. No. 645) (Temple); *see also* Pl.'s Ex. 24, at 1 (Temple General Offense Case

Report).

Frazier testified that he gave the police a description of the shooter on the night of the

shooting:

> Q:  Do you remember the description you gave of Mr. Bolden to the
>      police officers that night?
>
> A:  I said he was tall, skinny, bald-headed, and he had thick eyebrows.
>      And I told them – yeah, that's it. Yeah.

*See* 10/25/21 Trial Tr., at 3401:12-15 (Dckt. No. 653) (Frazier). But Officer Temple interviewed

Frazier that night. And according to her, she asked Frazier for a description of the shooter, and

Frazier couldn't give one:

> Q:  Now, during the conversation with Clifford Frazier, did you ask
>      him to give you a description of his assailant?
>
> A:  Yes, I did.
>
> Q:  He did not give you a description, did he?
>
> A:  No.

*See* 10/19/21 Trial Tr., at 2312:13-17 (Dckt. No. 645) (Temple); *see also* Pl.'s Ex. 24, at 1 (Temple General Offense Case Report) ("Victim alleges he does not know offender.").[6]

Then, in an interview with police at the hospital on January 29, 1994 (the night of the shooting), Frazier described his attacker as "clean shaven." *See* Joint Ex. 25 (Baker interview summary of Frazier dated January 29, 1994). But Bolden had a mustache. *See* Joint Ex. 14 (Bolden's mugshot).[7]

The sketch of the assailant did not inspire confidence, either. Frazier described the assailant to a sketch artist, who produced a drawing based on Frazier's description. *See* Pl.'s Ex. 19. The sketch shows an individual with short hair and no facial hair. *Id.* But Bolden was bald and had a mustache. *See* Joint Ex. 14.

A reasonable jury could find that the drawing looked nothing like Bolden. *See* 10/19/21 Trial Tr., at 2323:13-24 (Dckt. No. 645) (Temple); 10/25/21 Trial Tr., at 3429:8-24, 3444:25 – 3446:1 (Dckt. No. 653) (Frazier); *compare* Pl.'s Ex. 19 (the sketch by the sketch artist), *with* Joint Ex. 14 (Bolden's mugshot).

"Based on these facts, a reasonable jury could infer that [Frazier] had a diminished opportunity to observe the crime, lacked attention to detail, and that [his] prior identification of [the suspect] did not meet [Bolden's] description." *See Sanders*, 2016 WL 2866097, at *9.

---

[6] The jury heard Temple's testimony from the criminal trial of Bolden in October 1996, and from her deposition in this lawsuit in April 2018. *See* 10/19/21 Trial Tr., at 2310:2-15 (Dckt. No. 645) (Temple). The passage where she describes the interview with Frazier is from her trial testimony in 1996.

[7] The jury also heard other evidence about whether Bolden's appearance matched the description given by Frazier. For example, the jury heard evidence that Frazier told the officers that the assailant had a light complexion. *See, e.g.*, 10/13/21 Trial Tr., at 839:1-13 (Dckt. No. 636) (Pesavento). But Bolden had a medium complexion. *Id.*; 10/21/21 Trial Tr., at 2783:6-20 (Dckt. No. 646) (Bolden); Joint Ex. 13. In addition, the jury heard evidence that Bolden's eyebrows did not match the description, either. *See* 10/21/21 Trial Tr., at 2783:6-20 (Dckt. No. 646) (Bolden)

The fourth factor, Frazier's certainty in his identification, added more warning signs. Frazier could not identify Bolden in a photo array. *See* 10/13/21 Trial Tr., at 1080:20 – 1081:6 (Dckt. No. 637) (Pesavento); 10/25/21 Trial Tr., at 3405:14 – 3406:15 (Dckt. No. 653) (Frazier). When he looked at a photo lineup, he said that he would need to see the people in person. *Id.*

Bolden presented evidence that, during the lineup, Frazier originally pointed to someone else – the person in seat number one – in the lineup room. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden). And then, an officer moved Frazier down the room, and stood him right in front of Bolden, who was standing on the other side of the glass. *Id.* at 2766:1-5 (Bolden). After an officer called Bolden's name, and prompted a nod, Frazier fingered Bolden. *Id.* at 2766:6-20 (Bolden).

Based on that evidence, the jury could have concluded that Frazier did not have a clear mental picture of what the assailant looked like. He couldn't identify the person by photo. He initially pointed to someone else in the lineup. And he fingered Bolden as the shooter only after an officer moved Frazier right in front of Bolden, and another officer called out Bolden's name.

The fifth and final factor is the amount of time between the incident and the identification. The lineup took place about four weeks after the incident. In the grand scheme of things, four weeks is not much time. But viewing the evidence in a light favorable to Bolden, maybe the jury was not swayed by an identification that took place almost a month after the fact.

Finally, in addition to the five factors just described, the jury could consider the "totality of circumstances" surrounding Frazier's identification. *See Holloway*, 2022 WL 3152594, at *3. On that front, the jury heard numerous pieces of evidence that cast doubt on the reliability of the identification.

For example, the jury heard testimony that called into question Frazier's motivation for cooperating with the police. The jury heard evidence that Frazier himself was engaged in criminal conduct – and the police knew it.

The police collected evidence that Frazier was part of the drug deal that night, standing guard over two kilograms of cocaine with two automatic weapons. *See* 10/13/21 Trial Tr., at 871:6-21, 888:7 – 893:25 (Dckt. No. 636) (Pesavento); 10/25/21 Trial Tr., at 3459:19 – 3462:10 (Dckt. No. 653) (Frazier). The police had evidence at the time that Frazier possessed quite a few illegal firearms in his apartment. *See, e.g.*, 10/25/21 Trial Tr., at 3415:1 – 3427:19, 3499:15 – 3505:19 (Frazier). There was evidence that Frazier had four kilograms of cocaine in his apartment on the night of the murder, which was worth hundreds of thousands of dollars. *Id.* at 3454:4-10 (Frazier).

But Frazier was never charged with a crime. The jury could reasonably infer that he had an incentive to cooperate with the police and point fingers at Bolden, to escape his own criminal liability.

The jury also heard evidence that Frazier thought that Oliver sounded "like a crooked cop," was threatened by Oliver, and felt unsafe around him. *Id.* at 3424:3 – 3427:19 (Frazier). A jury could believe that Frazier fingered Bolden because Frazier felt intimidated.

Other portions of the trial undermined Frazier's reliability when he fingered Bolden. The jury saw repeated impeachment, heard evidence of shifting stories, and watched his demeanor from a front row seat. *Id.* at 3452:9 – 3499:21 (Frazier). All things considered, some of the points were relatively small, covering topics such as where he initially parked, and whether he ate chicken, and whether he stepped inside J&J Fish. But as the saying goes, quantity has a quality all its own.

31

Some of the cross examination points were more impactful. For instance, at the civil trial, Frazier testified that he saw his soon-to-be assailant "[c]lear as day" shortly before the murder. *Id.* at 3384:14-16 (Frazier). And his brother – the soon-to-be murder victim – told Frazier that the assailant's name was "Lynier." *Id.* at 3386:2-11, 3387:4-6, 3392:1-3 (Frazier).

At the time, Eddie Bolden went by Lynier. *See, e.g.*, 10/21/21 Trial Tr., at 3124:14-23 (Dckt. No. 650) (Bolden). So, according to Frazier, he knew the name of the shooter before the shooter shot his brother.

But Frazier apparently never passed along that key tidbit of information to the police. Officer Temple interviewed Frazier at J&J Fish on the night of the incident, and Frazier never mentioned anything about his assailant, let alone the assailant's name. *See* 10/19/21 Trial Tr., at 2311:8 – 2312:2 (Dckt. No. 645) (Temple). Temple testified that she asked him for a description of his assailant, but he didn't respond. *Id.* at 2312:13-17 (Temple). Temple also testified that she asked Frazier if he knew the assailant, and he said that he did not. *Id.* at 2312:18-19 (Temple). In a case report about the conversation with Frazier, Temple did not include any description of Frazier's attacker, but she did write "[v]ictim alleges he does not know offender." *See* Pl.'s Ex. 24, at 1 (Temple General Offense Case Report).

Frazier then met with two other officers in the hospital the day of his attack, but the officers' notes from those meetings do not mention the name of the attacker. *See* Joint Ex. 25 (report of Baker's interview with Frazier dated January 29, 1994); Pl.'s Ex. 18 (report of Willis's interview with Frazier dated January 29, 1994). And Frazier had a conversation with Oliver in early February 1994, but Frazier couldn't recall if he ever mentioned a name for the assailant at that point, either. *See* 10/25/21 Trial Tr., at 3476:20-22 (Dckt. No. 653) (Frazier).

Bolden's counsel cross examined Frazier on this point, and exposed his failure to share the name of the shooter with the police. *See id.* at 3476:4 – 3477:1 (Frazier); *see also* 10/13/21 Trial Tr., at 900:3-13 (Dckt. No. 636) (Pesavento). That is, the jury heard Frazier say that he knew the name of the shooter, and then acknowledge that there was no evidence that he ever shared that information with the police.

A failure to share something as basic and as important as the shooter's name could call into question the reliability of the identification. If you want the police to catch the person who just shot your sibling, telling the police the shooter's name is a good place to start.

Officer Pesavento admitted that Frazier was a drug dealer who was involved in the drug deal in question, and that his story had problems. He admitted that "most of the time" people involved in drug deals are "not very reliable." *See* 10/13/21 Trial Tr., at 870:15 – 871:10 (Dckt. No. 636) (Pesavento). And he admitted that he did not do anything to corroborate Frazier's account of what happened:

> Q:     So before you arrested Mr. Bolden for a crime that carried a life sentence, you knew that Clifford Frazier was a drug dealer, correct?
>
> A:     Correct.
>
> Q:     And before you arrested Eddie Bolden for these crimes, your experience had taught you that drug dealers often lie to cover themselves, correct?
>
> A:     Correct.
>
> Q:     And before you arrested Eddie Bolden, you knew that there were real problems with his stories, at least the ones we just discussed, correct?
>
> A:     Correct.

33

> Q:     And you did not do a single thing to corroborate any of Clifford
>        Frazier's statements about what happened on January 29th except
>        that he was present at the scene, correct?
>
> A:     Correct.

*See* 10/13/21 Trial Tr., at 909:8-23 (Dckt. No. 636) (Pesavento).

Viewing the record as a whole, in a light favorable to Bolden, the jury saw and heard more than enough to call into question the reliability of Frazier's identification way back when. Bolden presented sufficient evidence to suggest that Frazier's identification was unreliable – not simply that Frazier himself is not credible. As a result, a jury could find that Bolden proved the second element of his Fourteenth Amendment claim.

### 3.     Evidence about the Unfairness of the Criminal Trial

The final question is the fairness of the criminal trial. Bolden had to show that the improper lineup tainted his criminal trial and rendered it unfair.

"[F]lawed identification procedures are not themselves constitutional violations; plaintiffs must show how those flawed procedures compromised the constitutional right to a fair trial." *Alexander*, 433 F.3d at 555. To that end, the Seventh Circuit has provided "illustrative, not exhaustive" factors for a plaintiff to point to: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Id.*

Bolden submitted evidence about the importance of the lineup at the criminal trial. Both the prosecutor and defense counsel agreed that the lineup identification was crucial to his

conviction.  *See* 10/20/21 Trial Tr., at 2385:10-12 (Dckt. No. 648) (Foster); 10/20/21 Trial Tr., at 2575:18 – 2576:1 (Dckt. No. 649) (Peters).  Bolden's then-attorney testified about the importance of the lineup at the criminal trial:

> Q:     And was the lineup itself, evidence of the lineup important to the trial?
>
> A:     Very, yes.  It's the only evidence.

*See* 10/20/21 Trial Tr., at 2385:10-12 (Foster).

The prosecutor agreed.  In fact, the prosecutor testified that the identification by Frazier was the most important piece of evidence at the criminal trial:

> Q:     And we'll talk about that for a second.  Because you would certainly agree that Clifford Frazier's identification was a central part of your case; is that right?
>
> A:     Yes.
>
> Q:     In fact, it was the most important part of your case, right?
>
> A:     That would be fair to say.
>
> Q:     It was essential to your case?
>
> A:     That would be fair to say.

*See* 10/20/21 Trial Tr., at 2575:18 – 2576:1 (Dckt. No. 649) (Peters).

There was no physical or forensic evidence of Bolden's guilt.  *See* 10/13/21 Trial Tr., at 884:7 – 887:2 (Dckt. No. 636).  And no other witness testified that Bolden was the shooter.  *See* 10/20/21 Trial Tr., at 2576:21 – 2577:1 (Dckt. No. 648) (Foster).  The jury had an adequate basis to conclude that, apart from Frazier's testimony, the evidence linking Bolden to the crime was thin.  Apart from Frazier's testimony, there wasn't much else.

Defendants assert that Bolden didn't provide enough evidence of an unfair trial, because he didn't answer the other "illustrative" questions from *Alexander*.  *See* Defs.' Reply, at 13–14

(Dckt. No. 666).  Actually, Bolden did cover the terrain and answer the questions.  He addressed what identification evidence was presented at trial, and what the witnesses said, and whether they were cross examined, and so on.

The key point is simple.  Bolden offered substantial evidence that the *only* meaningful evidence of his guilt in his criminal trial was the unduly suggestive lineup that led to an unreliable identification.  *See* 10/20/21 Trial Tr., at 2385:10-12 (Dckt. No. 648) (Foster); 10/20/21 Trial Tr., at 2575:18 – 2576:1, 2576:21 – 2577:1 (Dckt. No. 649) (Peters).  A jury could find that the introduction of this unreliable evidence – without any corroboration – could have made his trial unfair.

Defendants' motion for judgment as a matter of law on the Fourteenth Amendment claim is denied to the extent that Defendants argue that Bolden provided insufficient evidence for a jury to find in his favor.[8]

## C.    Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity.  *See* Defs.' Mem., at 8–10 (Dckt. No. 587); Defs.' Reply, at 14–19 (Dckt. No. 666).  They claim that Bolden can't point to any precedent that clearly established that this type of suggestive lineup violated the Constitution, as it was interpreted in 1994 during Bolden's double-murder trial.

Judge Shah denied qualified immunity at the summary judgment stage.  *See* Mem. Op. and Order, at 49–50 (Dckt. No. 276) ("It was clearly established many years before 1994 that

---

[8]  In their Reply, Defendants make cursory arguments that Defendant Siwek in particular did not have knowledge of the suggestive procedures, and therefore could not be found liable for a Fourteenth Amendment violation.  *See* Defs.' Reply, at 3, 23–24 (Dckt. No. 666).  That argument fails.  Evidence suggests that Siwek helped prepare and conduct the lineup, and then asked the prosecutors to charge Bolden with murder.  *See* 10/13/21 Trial Tr., at 914:15-18 (Dckt. No. 636) (Pesavento); 10/26/21 Trial Tr., at 3666:9-13 (Dckt. No. 654) (Beligratis).  So there was enough evidence for a reasonable jury to conclude that he knew of the constitutional violation.

'the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law.' Defendants are not entitled to qualified immunity with respect to the unduly suggestive lineup theory.") (citing *Foster v. California*, 394 U.S. 440, 442 (1969)). This Court does the same.

The whole point of a lineup is that the witness – not the police – does the picking. That reality has been true since day one. Case law predating 1981 "put a police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a [lineup] the identity of the suspected offender." *See Hampton v. City of Chicago*, 2017 WL 2985743, at *29 (N.D. Ill. 2017). As such, officers in 1994 knew that they couldn't point to a suspect and tell the witness to choose that person.[9]

Bolden provided evidence that Defendants nudged Frazier in the direction of identifying him. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden). So clearly established law proscribed Defendants' actions at the time of Bolden's lineup.

Defendants' motion for judgment as a matter of law on the Fourteenth Amendment claim based on qualified immunity is denied.

## II. Fourth Amendment

Defendants make two arguments about the Fourth Amendment claim. First, they argue that Bolden did not present any evidence that Defendants lacked probable cause to detain him

---

[9] It seems obvious that an officer can't tell a witness who to pick, and then use that identification to bring charges against the handpicked suspect. The Court is skeptical that this is the sort of behavior that requires identical precedent to overcome qualified immunity. Some actions are "so obvious" that non-identical case law gives defendants "fair warning that their conduct violated the Constitution." *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Surely a police officer knows that he cannot tell a witness who to pick in a lineup, even if the exact sort of lineup at issue hadn't been considered by the Seventh Circuit or Supreme Court before 1994.

pretrial. *See* Defs.' Mem., at 1–5 (Dckt. No. 587); Defs.' Reply, at 19–29 (Dckt. No. 666). Second, they assert qualified immunity. *See* Defs.' Mem., at 10–11; Defs.' Reply, at 29–30.

### A. Insufficient Evidence

Defendants argue that the grand jury indictment of Bolden created a presumption of probable cause that Bolden did not rebut. *See* Defs.' Reply, at 19–23 (Dckt. No. 666). And they contend that even without that indictment, Bolden did not prove that Defendants lacked probable cause. *See* Defs.' Mem., at 1–5 (Dckt. No. 587); Defs.' Reply, at 23–29.

A grand jury indictment creates a presumption of probable cause. *See Coleman*, 925 F.3d at 351. "[T]his presumption may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means." *Id.*; *see also Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019). In other words, Bolden would need to "demonstrate [that Defendants] knew they lacked probable cause to arrest him." *See Coleman*, 925 F.3d at 351.

On this record, a reasonable jury could find that the officers knew that they lacked probable cause to arrest Bolden. Probable cause rested on the identification, and the record was loaded with evidence supporting an inference that identification was problematic, for the reasons already explained. Based on the record as a whole, Bolden successfully rebutted the presumption of probable cause from the grand jury indictment.

Defendants argue that Judge Shah already found that Defendants did not know that the identification was false. They point to the fact that Judge Shah granted summary judgment to Defendants on the due process claim to the extent that Bolden relied on a theory of fabrication of evidence. *See* 8/9/19 Mem. Opin. and Order, at 48 (Dckt. No. 276) ("Taken in a light favorable to Bolden, defendants' actions during the lineup could be characterized as coercive, but there are no facts to suggest that they knew the identification they were coercing was false."). Judge Shah

ruled: "it is not enough that defendants should have known that the evidence was false; they must have actually known that it was." *Id.* And Judge Shah saw no such evidence in the summary judgment record.

Defendants conflate the relevant standards. Judge Shah addressed the requirements to prove a claim of fabrication of evidence. And the standard for a due process fabrication claim is different than the standard for overcoming a presumption of probable cause based on a finding by a grand jury.

To prove a due process fabrication claim, a plaintiff must prove that an officer "knew – with certainty" that the identification "was false." *See Coleman*, 925 F.3d at 344. But to overcome a presumption of probable cause by a grand jury, a plaintiff simply needs to prove that defendants "knew they lacked probable cause to arrest him." *Id.* at 351.

Here, Bolden presented evidence that Defendants pointed Frazier in Bolden's direction, literally and figuratively, during the lineup. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden). A reasonable jury could have found that the lineup was rife with other problems, too.

Even if the officers did not know "with certainty" that Frazier's identification was false, the jury heard enough evidence to conclude that the identification was unreliable. While "identifications, even if questionable" can be "enough to give [officers] probable cause to arrest," it was reasonable for a jury to determine that this identification was not one of those cases. *See Coleman*, 925 F.3d at 351.

The question, then, is whether Bolden affirmatively proved the lack of probable cause. Police officers have probable cause "if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable

caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013). "Police need not run down all leads before making an arrest – especially not when a crime is violent and leaving the perpetrator at large may endanger other persons." *Phillips*, 668 F.3d at 914. But they "should pursue reasonable avenues of investigation and may not close [their] eyes to facts that would clarify the situation." *See McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009).

Defendants argue that they had probable cause because they received evidence that someone named "Lynier" (Bolden's middle name and nickname) committed the murders. *See* Defs.' Mem., at 19 (Dckt. No. 587). According to Defendants, "[t]his alone was sufficient for probable cause." *See* Defs.' Reply, at 28 (Dckt. No. 666).

But the person who gave the officers that information was Frazier. *See* 10/13/21 Trial Tr., at 1049:15-20 (Dckt. No. 637) (Pesavento). So Defendants placed all their faith in Frazier. Bolden introduced evidence that Frazier (1) was involved in a drug deal that night, (2) could not identify any suspect in a photo array, and (3) provided a description for a composite sketch of a suspect who arguably looked nothing like Bolden. *See* 10/19/21 Trial Tr., at 2323:13-24 (Dckt. No. 645) (Temple); 10/25/21 Trial Tr., at 3429:8-24, 3444:25 – 3446:1 (Dckt. No. 653) (Frazier). Finally, the jury heard that a person (which the jury could infer was Frazier) pointed at someone in the first chair, before an officer moved him down and stood him in front of Bolden's spot in the lineup. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden).

Meanwhile, the jury heard evidence that Defendants closed their eyes to credible leads. Bolden presented evidence that he told Defendants that he was the one who called 911 after Frazier was attacked. *See* 10/21/21 Trial Tr., at 2771:10-12 (Dckt. No. 646) (Bolden). But

40

Defendants didn't pursue the 911 tapes. *See* 10/13/21 Trial Tr., at 972:20-25 (Dckt. No. 637) (Pesavento). Defendants also had the gun used during the attack on Frazier, but they didn't test the blood. *See* 10/14/21 Trial Tr., at 1231:17 – 12:32:24 (Dckt. No. 638) (Pesavento). And a partner of one of the murder victims gave Defendants a list of names of people who might have carried out a gang-related hit on the victims. *See* 10/18/21 Trial Tr., at 1962:5 – 1963:22 (Dckt. No. 643) (Steward). But, despite believing that the murders were retaliation for failing to pay a tax to a local gang, Defendants didn't investigate a single person on the list. *See* 10/13/21 Trial Tr., at 933:24 – 935:9 (Dckt. No. 636) (Pesavento)

All told, a reasonable jury could find that Defendants closed their eyes to facts leading them away from Bolden, and embraced an uncorroborated, dubious assertion that Bolden was the murderer. The jury heard and saw enough evidence to find that Defendants did not have probable cause to arrest and detain Bolden pretrial.

### B. Qualified Immunity

Next, Defendants argue that, even if they lacked probable cause to detain Bolden pretrial, they should receive qualified immunity. *See* Defs.' Mem., at 10–11 (Dckt. No. 587); Defs.' Reply, at 29–30 (Dckt. No. 666).

Defendants are immune if "a reasonable officer could have mistakenly believed that probable cause existed." *Williams*, 733 F.3d at 758; *see also Abbott v. Sangamon County*, 705 F.3d 706, 714–15 (7th Cir. 2013) ("Often termed 'arguable probable cause,' qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists.") (citations omitted). And probable cause can rest on testimony from only one person. In 1994, it was settled law that "a single tipster could supply probable cause to issue a search or

41

arrest warrant, if the police had reason to think that the informant had firsthand knowledge and was reliable." *Gamenos v. Jewel Cos.*, 797 F.2d 432, 440 (7th Cir. 1986).

That's an important "if." The flipside is true, too. There is no probable cause if the police know that the only witness is unreliable. The police cannot rely on an identification from a lineup if they know that the witness himself couldn't identify the suspect.

Here, the only piece of evidence tying Bolden to the murders was the identification by Frazier at the lineup. Without that evidence, there was no foundation for the arrest and the indictment. There were no other witnesses, and there was no physical or forensic evidence tying Bolden to the shootings.

The grand jury found probable cause to indict Bolden based on testimony presented by Officer Pesavento. Officer Pesavento, in turn, relied exclusively on the lineup identification by Frazier. And the jury found that that lineup was constitutionally flawed.

The jury heard evidence suggesting the Frazier himself could not identify the suspect with any degree of reliability. Viewing the record in a light favorable to Bolden, the jury heard evidence that Frazier's description of the assailant did not look like Bolden at all, as demonstrated by the sketch by the sketch artist. He could not identify the suspect in a photo array. He initially pointed at a person sitting in chair one, even though Bolden was sitting in chair four. And Frazier fingered Bolden only after a police officer called Bolden's name.

The jury in this case could have found that the officers engineered a lineup that was foreordained to lead to the selection of Bolden. No reasonable officer could think that there is probable cause to arrest Bolden if the only witness against Bolden could not stand on his own two feet.

Also, a witness with "a motive to lie" about the suspect might "taint the statement" if there is "evidence suggesting that the motive was acted on." *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988). Here, there was plenty of evidence that Frazier had a motive to lie, and acted on that motive.

The lack of qualified immunity for the pretrial detention flows from the lack of qualified immunity for the lineup itself. If the officers aren't entitled to qualified immunity for the lineup, then it is hard to see how they could have qualified immunity for pretrial detention based on a finding of probable cause based solely on the lineup.

Because Bolden provided enough evidence for a jury to find that Defendants lacked probable cause to arrest him, and because Defendants are not granted qualified immunity, Defendants' motion for judgment as a matter of law on the Fourth Amendment claim is denied.

### III. Intentional Infliction of Emotional Distress & Malicious Prosecution

Finally, Defendants argue that Bolden failed to prove three of the five elements of a malicious prosecution claim under Illinois law. *See* Defs.' Mem., at 11–21 (Dckt. No. 587). And Bolden's claim of intentional infliction of emotional distress is derivative of his malicious prosecution claim because the emotional distress was caused by the malicious prosecution. So Defendants argue that if Bolden's malicious prosecution claim fails, then his claim of intentional infliction of emotional distress fails too. *Id.* at 20–21 n.9.

As the jury was instructed, a malicious prosecution claim required Bolden to prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the

plaintiff." *See Jonier v. Benton Cmty. Bank*, 82 Ill. 2d 40, 44 Ill. Dec. 260, 411 N.E.2d 229, 231 (1980); *see also* Jury Instructions, at 33 (Dckt. No. 599).

Defendants argue that Bolden provided insufficient evidence for the first, third, and fourth elements. First, Defendants argue that no jury could find that Defendants commenced or continued Bolden's prosecution. *See* Defs.' Mem., at 12–16 (Dckt. No. 587). Second, they maintain that Defendants had probable cause. *Id.* at 16–19. Third, Defendants contend that no reasonable jury could find that they acted with malice. *Id.* at 20.

As discussed above, Bolden offered evidence that could support a finding that the officers lacked probable cause. That leaves elements one and four. Bolden presented evidence supporting both elements.

The Court starts with element one: the commencement or continuance of an original criminal or civil judicial proceeding by the defendant.

For the commencement prong, "the relevant inquiry is whether the officer proximately caused the commencement or continuance of the criminal proceeding." *See Beaman v. Freesmeyer*, 2021 IL 125617, 451 Ill. Dec. 310, 183 N.E.3d 767, 782 (2021). "[L]iability for malicious prosecution 'extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all the elements of the tort are present.'" *Beaman v. Freesmeyer*, 2019 IL 122654, 433 Ill. Dec. 130, 131 N.E.3d 488, 495 (2019) (citation omitted); *see also Beaman*, 183 N.E.3d at 782. The Illinois Supreme Court has "held that the significant-role determination must include 'those persons who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct' that was instrumental in the

commencement or continuation of the criminal prosecution." *Beaman*, 183 N.E.3d at 782 (quoting *Beaman*, 131 N.E.3d at 500).

Defendants argue that after Frazier's identification, Defendants arrested Bolden and recommended charges, turning the rest of the process over to the prosecution, with no further influence on their end. *See* Defs.' Mem., at 12 (Dckt. No. 587). To them, that "limited role" cannot meet the commencement element. *Id.*

But "the rule that a prosecutor's independent decision to commence or continue a criminal action 'breaks the causal chain' only applies *in the absence* of a police officer's conduct that satisfies the significant-role assessment." *Beaman*, 183 N.E.3d at 783 (emphasis in original). The assumption is "that the prosecutor has received a full and fair report detailing a complete good-faith investigation intended to ascertain the identity of the person responsible for the crime." *Id.* But if "an investigative team conducts a bad-faith and incomplete investigation – designed to implicate a particular individual regardless of the evidence – the prosecutor is effectively prevented from fully exercising that independent judgment." *Id.*; *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (holding that "a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced [that] decision").

As already explained, Bolden presented evidence that the officers conducted an unduly suggestive lineup, and failed to investigate other potential leads. They presented the results of a faulty, incomplete investigation to James Beligratis, the felony review attorney, who relied on the information. *See* 10/26/21 Trial Tr., at 3666:9 – 3668:6 (Dckt. No. 654) (Beligratis). They also conveyed the information to Lynda Peters, the prosecutor. *See* 10/20/21 Trial Tr., at

2567:3-8 (Dckt. No. 649) (Peters). Both prosecutors relied on Defendants' investigative file, believing it to be "truthful and correct" and to contain "complete information." *Id.* at 2583 – 2584:5 (Peters); *see* 10/26/21 Trial Tr., at 3668:3-6 (Beligratis)

The jury heard enough evidence to conclude that the officers "conduct[ed] a bad-faith an incomplete investigation" which was "designed to implicate a particular individual regardless of the evidence." *See Beaman*, 183 N.E.3d at 783. As such, Bolden presented an adequate evidentiary basis for the finding that Defendants caused the commencement of Bolden's criminal trial.

Finally, the Court turns to element four: the presence of malice. Malice is "the initiation of a prosecution for an improper motive." *Id.* at 793. And "[a]n improper motive for a prosecution is any reason other than to bring the responsible party to justice." *Id.*

The jury heard evidence that Defendants sought to bring someone other than the responsible party to justice. Leads pointed different directions, and Defendants decided to ignore them. *See* 10/18/21 Trial Tr., at 1962:5 – 1963:22 (Dckt. No. 643) (Steward); 10/13/21 Trial Tr., at 933:24 – 935:9 (Dckt. No. 636) (Pesavento). A jury could construe the testimony about the lineup as evidence of malice, too. Bolden testified that someone (who the jury could infer was Frazier) pointed to a different suspect sitting in chair number one, before an officer steered him down the room and put him in front of Bolden. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden).

Bolden also offered evidence, including expert testimony, that Defendants repeatedly acted in ways contrary to their training and inconsistent with generally applicable police standards. *See* 10/22/21 Trial Tr., at 3192:18 – 3210:17 (Dckt. No. 651) (Gaut). Such evidence could add to a jury's belief that Defendants did not act to bring the right person to justice.

The jury heard enough about the investigation and the lineup to support a finding of malice. Again, the jury didn't have to find malice. It was possible to hear the evidence and conclude that the police officers did their level best, and did so in good faith. But on this record, the jury did not have to conclude that the investigation was malice-free. It came down to a jury question, and the jury gave the answer.

Bolden provided enough evidence to support a jury verdict on a malicious prosecution claim. So Defendants' motion for judgment as a matter of law on the malicious prosecution claim is denied.

Defendants' only remaining argument for judgment as a matter of law on the intentional infliction of emotional distress claim depends on the success of its arguments about the malicious prosecution claim. So Defendants' motion for judgment as a matter of law on the intentional infliction of emotional distress claim is denied, too.

## Conclusion

For the foregoing reasons, Defendants' motion for judgment as a matter of law is denied.


Date:   August 25, 2022                        _____
                                               Steven C. Seeger
                                               United States District Judge