UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-417 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO PESAVENTO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Eddie Bolden spent 22 years in prison for double murder, before the Illinois Supreme Court vacated the convictions. The state elected not to prosecute him again, and Bolden obtained a certificate of innocence. Bolden regained his liberty, but no one could restore his past or return his liberty lost. Bolden responded to his ordeal by suing the four officers from the Chicago Police Department who played a role in securing his convictions.

This Court presided over a three-week trial, and Bolden won big. A jury returned a verdict in favor of Bolden, and against the four former officers, on all seven counts.

The jury awarded substantial damages against Defendants Angelo Pesavento, James Oliver, and the estates of Defendants Edward Siwek and George Karl. The jury awarded Bolden $25 million in compensatory damages, and awarded punitive damages against Pesavento and Oliver totaling $100,000 (each).

After trial, this Court denied Defendants' motion for judgment as a matter of law under Rule 50(a). After that ruling, Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b).

For the reasons explained below, Defendants' renewed motion for judgment as a matter of law is denied.

## Background

Before diving into the background, the Court forewarns the reader that the history of this case is a long and winding road. Bolden's quest for acquittal was a three-decades-long journey with many pit stops along the way. The case at hand has 700 docket entries, and counting.

Working through the entire backstory is no small task. To streamline things, this Court will assume familiarity with the facts from its earlier ruling on Defendants' motion for judgment as a matter of law. *See Bolden v. Pesavento*, 623 F. Supp. 3d 897 (N.D. Ill. 2022). The following summary of the trial is a sampling, not the full course meal.

### *The Murders*

At a high level, this case is about a double murder that took place on the streets of Chicago on January 29, 1994, and the investigation and convictions that followed. Officers Pesavento, Oliver, Siwek, and Karl from the Chicago Police Department investigated the homicides. Bolden was ultimately charged with both murders.

The decision to arrest and charge Bolden heavily relied on a lineup identification by Clifford Frazier. Frazier allegedly witnessed the two murder victims with the attacker, right before the murders. His brother was a murder victim.

At the time of the murders, Frazier was outside a J&J Fish restaurant. He was across the street from J&J Fish, near a parking lot by Harold's Chicken.

Frazier allegedly saw someone enter the backseat of a car with the two soon-to-be murder victims and drive off. The victims were involved in a drug deal. Armed with two automatic weapons, Frazier stayed back, guarding a large supply of cocaine in his car.

The victims drove a few blocks. Then, the assailant shot them in the head.

Minutes later, the assailant headed back to the vicinity of J&J Fish and got into a physical confrontation with Frazier. According to Frazier, they exchanged gunfire, and Frazier made a break for it. The assailant laid two bullets into Frazier, and pistol-whipped Frazier in the head with two guns.

At the civil trial before this Court, Bolden testified that he was inside J&J Fish at the time, playing Pac Man. *See* 10/21/21 Trial Tr., at 2749:11-24 (Dckt. No. 646) (Bolden). He testified that he saw a masked assailant fight, pistol-whip, and shoot Frazier, before running off. *Id.* at 2750:22 – 2751:21; 10/22/21 Trial Tr., at 3046:20 – 3049:2 (Dckt. No. 650) (Bolden). The assailant was wearing a ski mask at the time. *Id.*

At the civil trial, Bolden also testified that the assailant pulled his mask down. Bolden recognized him. Bolden testified that the assailant was Roderick Stewart, a member of the Gangster Disciples. *Id.* at 2751:22 – 2752:7.

Bolden testified that he called 911. *Id.* at 2753:2 – 2754:7. Bolden told the jury that he gave the 911 operator his name, and asked her to "send the police and ambulance to J&J Fishery." *Id.* at 2753:7-12. The recording wasn't preserved.

When the police arrived, Bolden told the officers that he didn't see anything. *Id.* at 2756:6-16. Bolden did not tell the officers that Roderick Stewart was the assailant. *Id.* He feared for his life. *Id.*

Frazier spoke with the police several times. At the crime scene, Officer Temple interviewed Frazier (again, who had just been shot), and Detective Baker interviewed Frazier at the hospital later that night.

Frazier described the assailant to the officers as a tall, skinny, bald-headed man with a light complexion. *See* 10/25/21 Trial Tr., at 3396:22 – 3397:16, 3401:12-15, 3429:13-17, 3434:4-12 (Dckt. No. 653) (Frazier); Joint Tr. Ex. 25 (interview summary of Frazier on January 29, 1994).[1] A sketch artist used that description to prepare a composite sketch. *See* Pl.'s Trial Exs. 14, 19.

Before long, the police started looking for Bolden. During the civil trial, Bolden testified about a conversation that the police had with his mother when they were looking for him. *See* 10/21/21 Trial Tr., at 2757:4-11 (Dckt. No. 646) (Bolden). The police went to his mother's home. *Id.*

The police told Bolden's mother that they were looking for Bolden because he had killed someone, and if they caught him, "they were going to blow" Bolden's "brains out." *Id.* Detective Karl left his card with Bolden's mom. *Id.* at 2757:17-18.

### *The Lineup*

The police later showed Frazier a photo array. But Frazier did not make an identification based on the pictures alone. *See* 10/25/21 Trial Tr., at 3405:14 – 3406:15 (Dckt. No. 653) (Frazier); 10/13/21 Trial Tr., at 910:1 – 911:8 (Dckt. No. 636) (Pesavento).

---

[1] The Court offers citations to the trial record in the interest of assisting any interested reader. But the citations are inevitably, undoubtedly under-inclusive. The trial lasted about three weeks, and the trial testimony spans more than 4,000 pages. All too often, several different witnesses testified about the same topic, such as what happened during the lineup. Important witnesses included Bolden, Frazier (the witness who ID'ed him during the lineup), Detective Pesavento, Peters (the prosecutor during the criminal trial), and Foster (the defense attorney during the criminal trial), among others. *See* 10/21/21 Trial Tr., at 2740:19 (Dckt. No. 646) (Bolden); 10/25/21 Trial Tr., at 3368:21 (Dckt. No. 653) (Frazier); 10/12/21 Trial Tr., at 759:10 (Dckt. No. 635) (Pesavento); 10/20/21 Trial Tr., at 2563:23 (Dckt. No. 649) (Peters); 10/20/21 Trial Tr., at 2380:15 (Dckt. No. 648) (Foster). This Court already issued an opinion about the evidentiary basis for the due process claim about the lineup, and that opinion included lots of citations to the trial record. *See* 8/25/22 Mem. Opin. & Order (Dckt. No. 671); *Bolden v. Pesavento*, 623 F. Supp. 3d 897 (N.D. Ill. 2022).

4

Frazier needed to see people in person to make an identification. As it turns out, Bolden was the only person who was both in the photo array and in the in-person lineup. *See* 10/13/21 Trial Tr., at 921:18 – 922:19 (Dckt. No. 636) (Pesavento).

A few weeks later, on February 26, 1994, Frazier went to a police station to view a lineup. Before he arrived, the police told Frazier that they "got the guy that did the shooting." *See* 10/25/21 Trial Tr., at 3436:20 – 3437:7 (Dckt. No. 653) (Frazier). Frazier testified:

> Q:   And did you agree to go to the police station to view a lineup?
>
> A:   Yeah, they took me there. Yeah.
>
> Q:   Why did you want to participate in viewing a lineup?
>
> A:   Because they said they think they got the guy that I'm looking for – that they looking for.
>
> *       *       *
>
> Q:   And you talked to Officer Oliver and his partner before the lineup, correct?
>
> A:   I don't recall that.
>
> Q:   Well –
>
> A:   Oh, yeah, yeah. He told me – when he picked me up, he said they think they got the guy that did this to me.
>
> Q:   Yes. He said, we got the guy. We think we got the guy that did the shooting?
>
> A:   Yes, sir.
>
> Q:   And they told you that they wanted you to look at a lineup and see if you recognize the person that they got, right?
>
> A:   Yes, sir.

*See* 10/25/21 Trial Tr., at 3408:4-9, 3436:20 – 3437:7 (Dckt. No. 653) (Frazier).

The five-person lineup included Bolden. Of all things, Bolden had come to the station voluntarily with his attorney (Ingles), hoping to clear his name.

Things didn't work out that way. Bolden participated in a lineup, and Frazier identified him as the shooter. *See* 10/25/21 Trial Tr., at 3370:13-25 (Dckt. No. 653) (Frazier).

In the case at hand (before this Court), the jury heard two different versions of what took place at the police station and in the lineup room. Basically, Frazier testified that he immediately identified Bolden as the shooter. But Bolden testified that Frazier initially picked someone else, before the officers called special attention to Bolden, and then Frazier fingered him on the second try.

Frazier told the jury that he recognized Bolden right away, and identified him without any hesitation:

> Q:     Okay. And where were the suspects that stood in the lineup?
>
> A:     They was behind the glass.
>
> Q:     Okay. And do you recall the lights in your room being off?
>
> A:     It was dark where I was at.
>
> Q:     What about the lights in the other room?
>
> A:     They was bright.
>
> Q:     And tell us what you remember about the moment when you picked out Mr. Bolden.
>
> A:     As soon as I saw him, I said, "That's him."
>
> Q:     Was there any hesitation on your part?
>
> A:     Absolutely not. I'll never forget that face.

*Id.* at 3409:9-21. Frazier later testified that he was "100 percent" positive that Bolden was the shooter.[2] *Id.* at 3413:25 – 3414:3; *see also id.* at 3513:17 – 3514:1.

Frazier denied feeling any pressure from the police to pick Bolden:

> Q:   Mr. Frazier, did you identify him as the person that left with your brother and your cousin and the person that came back to shoot you?
>
> A:   Yes, I did.
>
> Q:   Did anyone tell you to pick Mr. Bolden out of the lineup?
>
> A:   No.
>
> Q:   Did anyone influence you to pick Mr. Bolden out of the lineup?
>
> A:   No.

*Id.* at 3410:15-23; *see also id.* at 3512:18-22.

The jury heard from Bolden a much different version of what transpired during that fateful visit to the police station.

During the civil trial, Bolden testified that he went with his attorney to the police station, and talked with Detective Pesavento and Detective Karl about participating in the lineup. Bolden agreed to participate, so the officers left to line things up for the lineup.

Bolden and his attorney waited alone in a hallway. As they waited, Officer Oliver walked right by them with Frazier (the witness). *See* 10/21/21 Trial Tr., at 2762:10 – 2764:9 (Dckt. No. 646) (Bolden); 10/22/21 Trial Tr., at 3045:9-19 (Dckt. No. 650) (Bolden).

Bolden recognized Frazier as the man who was shot outside J&J Fish on the night of the murders. *See* 10/22/21 Trial Tr., at 3045:13-19 (Dckt. No. 650) (Bolden). Frazier was at the police station as the witness for the lineup. *Id.*

---

[2] During cross examination, Bolden's counsel raised all sorts of reasons to call into question Frazier's credibility. They explored the possibility that he would be charged with crimes, and so on. At the end of the day, the credibility of the witnesses was up to the jury.

So, right before the lineup, the witness (Frazier) walked right by a person who was going to be in the lineup (Bolden). They were able to see each other.[3] When Frazier later laid eyes on Bolden in the lineup room, Frazier had already laid eyes on him in the police station.

On the witness stand, Detective Pesavento admitted that it would be unfairly suggestive to allow the witness to see a suspect before the lineup:

> Q: You would agree that it would be improper to allow a witness to see the suspect standing with his attorney before the witness viewed the suspect in the lineup, right?
>
> A: Yes.
>
> Q: It would be a violation of your training, correct?
>
> A: Correct.
>
> Q: And it would be unfairly suggestive, correct?
>
> A: Right.

*See* 10/13/21 Trial Tr., at 924:7-14 (Dckt. No. 636) (Pesavento).

Before long, Bolden went into the lineup room, and took one of the five seats. *See* 10/21/21 Trial Tr., at 2764:14 – 2767:5 (Dckt. No. 646) (Bolden); *see also* 10/22/21 Trial Tr., at 3054:18 – 3067:13 (Dckt. No. 650) (Bolden). Bolden sat in chair no. 1, but the person sitting

---

[3] At the civil trial (before this Court), Bolden's criminal defense attorney (Ingles) took the stand. He testified about his experience at the police station with Bolden for the lineup. He recalled standing in an area of the police station, and seeing a black detective walk past him with two black males. *See* 10/14/21 Trial Tr., at 1278:7 – 1280:19, 1353:5 – 1363:13 (Dckt. No. 639) (Ingles); *see also* 10/14/21 Trial Tr., at 1373:20-24 (Dckt. No. 639) (Ingles) ("Q: Okay. And the reason you didn't object to the lineup going forward is because all these things you claim happened in the hallway didn't actually happen; isn't that correct, sir? A: That's a lie. You're a liar."). Bolden testified that his attorney did not recall seeing Frazier in the hallway before the lineup, but Ingles did testify about seeing them in the hallway. *See* 10/22/21 Trial Tr., at 3045:9-21 (Dckt. No. 650) (Bolden) (offering Bolden's understanding of his attorney's recollection). On the other end of the spectrum, Frazier denied that he saw Bolden in the hallway of the police station before the lineup. *See* 10/25/21 Trial Tr., at 3408:25 – 3409:3 (Dckt. No. 653) (Frazier). So the jury heard conflicting testimony, and was entitled to make a decision on who to believe.

next to him was too chatty, so Bolden switched seats with the person in chair no. 4. *See* 10/21/21 Trial Tr., at 2764:19 – 2765:9; *see also* 10/22/21 Trial Tr., at 3061:14 – 3062:1 (Dckt. No. 650) (Bolden).

Bolden and the others sat behind a large, one-way window, inside a little lineup room in a larger room. Everyone in the larger room could look in, but the individuals in the smaller lineup room could not look out because they were behind a one-way window. From their perspective, the window looked like a mirror.

But Bolden (at the civil trial) testified that he could see through the glass – just a little – when the light in the larger room changed. That exterior room was supposed to be dark. But someone then opened the door to the larger room (from the hallway), and let some light in. With the benefit of that light, Bolden could see the silhouettes of the people in the larger room (even though it was a one-way window).[4] *See* 10/21/21 Trial Tr., at 2765:10-20 (Dckt. No. 646) (Bolden).

Bolden saw two people walk up to the window, and stop in front of the person sitting in chair no. 1. A person then pointed at the guy in chair no. 1, and walked away. *Id.* at 2765:21-25; *see also* 10/22/21 Trial Tr., at 3061:14 – 3063:17 (Dckt. No. 650) (Bolden).

At the time, Bolden could not see the two people well enough to know who was who. But as Bolden later understood things, an officer took Frazier to the window, and Frazier pointed at the guy in chair no. 1.

---

[4] Bolden's expert, Dr. Gaut, explained in greater detail how the one-way glass works in a lineup room. For the glass to work properly, there needs to be low light in the larger room, and brighter light in the lineup room. The light disparity prevents the people inside the lineup room from seeing what is happening in the larger room. *See* 10/22/21 Trial Tr., at 3210:19 – 3212:15 (Dckt. No. 651) (Gaut). "Now, obviously if you change the lighting and made the light either equal to or more in the witness room, then the people in the participant room are going to be able to see through the glass and they're going to be able to see into your witness room, which you don't want." *Id.* at 3211:18-22.

At that point, an officer took the person who did the pointing (*i.e.*, Frazier) back to the window, and they stood right in front of Bolden in chair no. 4. *See* 10/21/21 Trial Tr., at 2766:1-16 (Dckt. No. 646) (Bolden). And then, Detective Karl opened the door to the little lineup room. *Id.* He looked at the guy in chair no. 1, and then at Bolden in chair no. 4. *Id.* Detective Karl looked at Bolden and said: "Eddie Bolden, right?" *Id.*

When Bolden didn't respond, Detective Karl said: "You're Eddie Bolden, right?" *Id.* Again, Bolden did not respond. *Id.*

So Detective Karl asked again: "Eddie Bolden, 5249 South Honore, right?" *Id.* Bolden shook his head yes. *Id.*

Detective Karl then asked everyone in the lineup to stand up. *Id.* At that point, the person standing right in front of Bolden – on the other side of the glass – shook his head yes and walked away. *Id.* at 2766:17-20.

That person was wearing a sweatshirt with the cartoon character of Garfield on the front, with a gold chain with the capital letter "D." *Id.* at 2766:21 – 2767:5. At the criminal trial, Frazier admitted that he owned a Garfield sweatshirt and a chain with a "D" on it. *See* 10/25/21 Trial Tr., at 3438:1 – 3441:9 (Dckt. No. 653) (Frazier).

During the civil trial (before this Court), Frazier denied that any of those events happened. He did not recall anyone switching seats. *See* 10/25/21 Trial Tr., at 3511:8-18 (Dckt. No. 653) (Frazier). He did not recall anyone calling out Bolden's name. *Id.* And he did not recall anyone opening the door and letting in light. *Id.*

There was less dispute at the civil trial about the heights of the participants in the lineup, and Frazier's opportunity to see the disparity. The jury in the case at hand heard about the

composition of the lineup, especially about the relative heights of the participants. According to Bolden, he stuck out from the crowd.

The witness (Frazier) told investigators that the assailant was tall. *See* 10/25/21 Trial Tr., at 3401:12-15 (Dckt. No. 653) (Frazier). Bolden is 6 feet, 2 inches tall.

Three of the four participants in the lineup were much shorter than Bolden. Two of the people were five inches shorter than Bolden. They were about 5 feet, 9 inches tall. *See* 10/13/21 Trial Tr., at 914:13 – 915:10 (Dckt. No. 636) (Pesavento); *see also* Joint Ex. 12 (a police report reflecting the heights of the participants in the lineup). Another person was only 5 feet, 5 inches tall – nine inches shorter than Bolden. *Id.*

The witness (Frazier) also told investigators that the assailant was skinny. Bolden was 153 pounds. The other tall person in the lineup was much heavier. That person was 6 feet, 4 inches tall, and weighed in at 260 pounds. He was more than 100 pounds heavier than Bolden. *See* Joint Ex. 12; 10/13/21 Trial Tr., at 915:11-16 (Dckt. No. 636) (Pesavento).

Basically, Frazier described the murderer as tall and skinny. A reasonable jury could conclude that there was only one tall, skinny person in that lineup: Bolden.

The officers took photos of the participants in the lineup shortly after the identification. The jury in the civil case saw those photos. *See* Pl.'s Exs. 41, 42.

During the civil trial, Detective Pesavento testified that the officers recognized the height disparity at the time. And they recognized that it would be unfair and unduly suggestive to do a standing lineup, given the height differences. He testified that the officers did a *sitting* lineup – not a standing lineup – to avoid that issue:

> Q:    So – now, you said – or did you recognize that this was an issue, the heights of these people?
>
> A:    Yes.

11

Q:     And so when – what did you do about that?

A:     We didn't do a standup lineup.  We had them sit.

Q:     Okay.  Now, are you certain that everyone was sitting down the entire time that Clifford Frazier saw them?

A:     Yes.

Q:     Now, you did a sit-down lineup because you knew that if you did a standing up lineup, it wouldn't be fair, correct?

A:     Correct.

Q:     It would be *unfairly suggestive of Mr. Bolden*, right?

A:     Yes.

*See* 10/13/21 Trial Tr., at 915:17 – 916:4 (Dckt. No. 636) (Pesavento) (emphasis added).

But at the civil trial (before this Court), Frazier (the witness) admitted that he saw everyone in the lineup *standing*, so he could see their heights.  In fact, the room was empty when Frazier arrived.  *See* 10/25/21 Trial Tr., at 3444:10 – 3446:1 (Dckt. No. 653) (Frazier).  Frazier then saw the participants in the lineup walk into the room.  *Id.*

Right after Frazier's identification, Bolden was arrested and charged with double murder, and with attempted murder of Frazier.

After leaving the lineup room, Bolden spotted his attorney in the hallway.  Bolden asked: "Man, what happened?"  *See* 10/22/21 Trial Tr., at 3062:17 – 3067:4 (Dckt. No. 650) (Bolden). Ingles (his attorney) explained that the police wouldn't let him in the lineup room, so he didn't see what happened.  *Id.*  Expletives flew.  *Id.*  For whatever reason, Bolden didn't tell his attorney that Frazier had identified someone else, meaning the person in chair no. 1.  *Id.*

Bolden's attorney (Ingles) left for the day, with check in hand.  He didn't represent Bolden in the criminal case.  He didn't return until the motion to suppress hearing.  *Id.* at

12

3066:20 – 3067:13.  Bolden got arrested and got charged.  His attorney got paid, pocketing $1,500.  *See* 10/14/21 Trial Tr., at 1287:3-13, 1306:1-22, 1333:10 – 1334:13 (Dckt. No. 639) (Ingles).

At the civil trial, Detective Pesavento admitted that the officers did not investigate any other suspect before arresting Bolden.  And Frazier was the only one pointing fingers at Bolden, literally and figuratively:

> Q:     Now – okay.  Well, you didn't investigate anybody else,
>        right?
>
> A:     No, but if the evidence points this way (indicating), I
>        don't go this way (indicating), then.  I don't go the opposite way.
>
> Q:     Well –
>
> A:     Just to have some paperwork.
>
> Q:     – as we've established, sir, the only evidence that
>        pointed this way was Clifford Frazier, correct?
>
> A:     Correct.
>
> Q:     And you didn't investigate anybody else, did you?
>
> A:     That's where the evidence was going.
>
> Q:     Sir, did you investigate any other subject?
>
> A:     I don't recall, but, yeah, probably not.

*See* 10/13/21 Trial Tr., at 879:12-25 (Dckt. No. 636) (Pesavento).

Detective Pesavento later testified before the grand jury to secure the indictment.  He was the only witness before the grand jury.  *See* 10/13/21 Trial Tr., at 926:13 – 927:6 (Dckt. No. 636) (Pesavento); 10/20/21 Trial Tr., at 2572:10 – 2575:3 (Dckt. No. 649) (Peters); Pl.'s Ex. 153.

13

Detective Pesavento told the grand jury that Frazier had identified Bolden in a lineup. *See* 10/13/21 Trial Tr., at 932:4-18 (Dckt. No. 636) (Pesavento). But he did not show the grand jury the pictures of the lineup, so the grand jurors could not look at the photos to evaluate whether the lineup was fair. *Id.*

According to Detective Pesavento, Frazier was the source for all of the information that inculpated Bolden. *See* 10/13/21 Trial Tr., at 877:18 – 878:7, 879:9-21, 894:1-6, 927:23 – 928:6, 934:13-15 (Dckt. No. 636) (Pesavento).

### *The Criminal Trial*

Before trial, the trial court held a suppression hearing about the lineup. The trial court heard testimony from the officers, and from Bolden himself. The trial court denied the motion to suppress. *See* 10/22/21 Trial Tr., at 3067:5 – 3068:5, 3089:7-19 (Dckt. No. 650) (Bolden); 10/20/21 Trial Tr., at 2432:10 – 2433:9 (Dckt. No. 648) (Foster); 10/14/21 Trial Tr., at 1297:3-21 (Dckt. No. 639) (Ingles).

Bolden went to trial on the double-murder charges in 1996.

During the criminal trial, Frazier was the main witness for the prosecution. *See* 10/20/21 Trial Tr., at 2587:14-21 (Dckt. No. 649) (Peters). During the civil trial (at hand), the prosecutor acknowledged the importance of Frazier as a witness during the criminal trial:

> Q: Remember Clifford Frazier was one of your witnesses?
>
> A: Yes.
>
> Q: He was your number one witness in terms of importance, wasn't he?
>
> A: Yes.
>
> Q: He was your star witness?
>
> A: He was the main witness, yes.

*See* 10/20/21 Trial Tr., at 2587:14-20 (Dckt. No. 649) (Peters).

Frazier identified Bolden as the shooter during the prosecution's case. *See* 10/25/21 Trial Tr., at 3413:14-16, 3512:23 – 3513:16 (Dckt. No. 653) (Frazier). Frazier also testified at the criminal trial about identifying Bolden during the lineup. *See, e.g.*, 10/25/21 Trial Tr., at 3512:23 – 3513:16 (Dckt. No. 653) (Frazier); 10/20/21 Trial Tr., at 2603:9-13 (Dckt. No. 649) (Peters). So, in the civil case at hand, the jury heard Frazier testify about his testimony in the criminal case about the lineup.

Bolden's defense attorney from the criminal case (Foster) testified at the civil trial (before this Court). Foster confirmed the importance of the lineup evidence at the criminal trial.

> Q: Did the prosecution introduce evidence of a lineup, a lineup identification at trial?
>
> A: Yes.
>
> Q: And did that evidence – did that evidence of the lineup include testimony from police officers and the identifying witness?
>
> A: I believe so.
>
> Q: Why was the lineup identification – well, was the lineup identification important to Mr. Bolden's trial?
>
> A: Because that's how they – that's how they arrested him. This Frazier character picked him out of a bad lineup.
>
> Q: And was the lineup itself, evidence of the lineup important to the trial?
>
> A: Very, yes. *It's the only evidence.*

*See* 10/20/21 Trial Tr., at 2384:24 – 2385:12 (Dckt. No. 648) (Foster) (emphasis added).  Defense counsel (Foster) then reiterated that the lineup evidence strengthened the prosecution's case at trial.[5]  *Id.* at 2386:7-16.

No other witness at the criminal trial identified Bolden as the shooter.  *See* 10/12/21 Trial Tr., at 766:1-6 (Dckt. No. 635) (Pesavento); 10/13/21 Trial Tr., at 864:15 – 865:1, 894:1-6 (Dckt. No. 636) (Pesavento).  In fact, the state presented no witness connecting Bolden to the crime, except Frazier.  *See* 10/21/21 Trial Tr., at 2782:5-25 (Dckt. No. 646) (Bolden); 10/20/21 Trial Tr., at 2382:20 – 2383:12 (Dckt. No. 648) (Foster).

The state presented no physical or forensic evidence implicating Bolden, either.  *See* 10/13/21 Trial Tr., at 884:5 – 887:2 (Dckt. No. 636) (Pesavento); 10/21/21 Trial Tr., at 2782:5-25 (Dckt. No. 646) (Bolden); 10/20/21 Trial Tr., at 2576:21 – 2577:1 (Dckt. No. 649) (Peters).  There was no fingerprint evidence or DNA evidence.  *Id.*  And the police did not test a gun found at the murder scene.  *See* 10/13/21 Trial Tr., at 846:10-13, 847:1-21 (Dckt. No. 636) (Pesavento).

In the case at hand (before this Court), Bolden testified that his criminal trial rested on the identification during the lineup:

> Q:      Was there any witness who said that you had shot the two people on January 29th of 1994?
>
> A:      No, there was not.
>
> Q:      What's your understanding of the case against you?
>
> A:      That Clifford Frazier had pointed me out as the person that left J&J Fishery with the two men that were shot, were murdered, and that I came back on foot and shot him.

---

[5]  This line of questioning required some delicate line-drawing.  Bolden brought a due process claim, and the key question is whether the lineup was unreliable and unduly suggestive, and whether the lineup tainted the criminal case by taking away the right to a fair trial.  So, this Court allowed the parties to explore the importance of the lineup evidence during criminal trial.  But this Court did not allow witnesses to speculate that the outcome of the trial would have been different without the lineup evidence.  *See, e.g.*, 10/20/21 Trial Tr., at 2385:13 – 2389:2, 2390:13 – 2391:21 (Dckt. No. 648) (Foster).

> Q:     And he pointed you out in that lineup; is that right?
>
> A:     Yes.

*See* 10/21/21 Trial Tr., at 2782:17-25 (Dckt. No. 646) (Bolden).

The criminal trial lasted four days.  In the end, the jury found Bolden guilty of all charges.  He received a life sentence.

In the civil trial, Bolden testified about how he responded when he heard the verdict in the criminal trial:

> Q:     And then you heard the verdict; is that right?
>
> A:     Yes.
>
> Q:     And what happened after the verdict?
>
> A:     I exploded.  I jumped up saying, "I didn't do this.  I had nothing to do with this."  And I used profanity.  And next thing I know I was being whisked out of the courtroom by a bunch of sheriff deputies.

*See* 10/21/21 Trial Tr., at 2784:5-11 (Dckt. No. 646) (Bolden).

### The Appeals

After losing the trial and his freedom, Bolden embarked on a long process to get it back.  It took more than two decades.

During the civil trial, this Court took judicial notice of the procedural history, and read a stipulation of the procedural history to the jury.  *See* Joint Tr. Ex. 26 (Dckt. No. 590) (summarizing the procedural history).  The jury heard the bottom line of each stage of the appeal and the post-conviction petition proceedings.  But the jury did not hear any judicial commentary from those opinions about the strengths and weaknesses of the prosecution's case.

Bolden didn't succeed on direct appeal.  He then filed a post-conviction petition based on ineffective assistance of counsel.  The Circuit Court of Cook County dismissed it.

The Illinois Court of Appeals reversed the dismissal and ordered an evidentiary hearing. The Court of Appeals found that Bolden had made a substantial showing of ineffective assistance of counsel, based on a failure to contact alibi witnesses.

Along the way, the Court of Appeals noted how heavily the prosecution had leaned on Frazier's testimony at trial. "Clifford [Frazier] presented the only narrative account of the murders." *See Illinois v. Bolden*, No. 94-cr-8397, slip. opin., at 5 (Ill. App. Ct. June 18, 2014) (Dckt. No. 536-3, at 6 of 17). "The prosecution rested its case against Bolden on Clifford [Frazier's] testimony and the testimony of the expert who said that the bullets that killed [the two victims] came from the gun used to shoot Clifford [Frazier]." *Id.* at 13 (Dckt. No. 536-3, at 14 of 17).

"But Clifford [Frazier's] *identification* of Bolden has *several weaknesses*." *Id.* (emphasis added). The Court of Appeals explained that some of Frazier's descriptions of the shooter did not match Bolden's appearance at the time. *Id.* at 14 (Dckt. No. 536-3, at 15 of 17).

The Court of Appeals called attention to the fact that the lineup wasn't the first time that Frazier had seen Bolden that day. Frazier "walked very close to [Bolden's attorney] and Bolden in the police station, shortly before the lineup." *Id.*

The Court of Appeals found that defense counsel's failure to call the alibi witnesses prejudiced Bolden, because of significant weaknesses in the prosecution's case. The Court of Appeals pointed to "substantial problems with Clifford [Frazier's] identification of Bolden as the shooter and the lack of any other evidence against Bolden." *Id.*

The Court of Appeals ruled: "In light of the *extremely thin case* for the prosecution, based solely on the identification testimony of a single witness who did not know Bolden, and whose initial description of the shooter did not closely match Bolden's appearance, we find that

Bolden has substantially shown that he suffered prejudice due to trial counsel's errors." *Id.* at 15 (emphasis added).[6]

The case went back to the Circuit Court of Cook County for an evidentiary hearing, which occurred in 2015. The Circuit Court vacated Bolden's convictions and ordered a new trial.

The Circuit Court noted the weaknesses of the prosecution's case, too. "[T]he State's case against petitioner was *far from overwhelming* due to Frazier's *substantially problematic identification* and the lack of any other evidence connecting petitioner to the murders and attempted murder." *See Illinois v. Bolden*, No. 94-cr-0839701, slip. opin., at 22 (Ill. Cir. Ct. Jan. 1, 2016) (Dckt. No. 536-4, at 23 of 24) (emphasis added).

The Circuit Court reiterated that there wasn't much evidence implicating Bolden in the murders. "Upon a thorough examination of the trial record, this court determines that the evidence against petitioner was *slight*."[7] *Id.* (emphasis added).

The state later moved to dismiss all charges, leading to Bolden's release from incarceration. By then, Bolden had served 22 years in prison.

In 2016, Bolden received a certificate of innocence from the State of Illinois.

---

[6] Again, at trial, this Court allowed Bolden to present the procedural history of his criminal case, in a neutral manner. But this Court did not allow Bolden to present to the jury the commentary by the Illinois Court of Appeals about the weaknesses of the prosecution's case against Bolden. This Court ruled that informing the jury about judicial commentary about the weaknesses in the case would be unduly prejudicial. *See* 10/25/21 Order (Dckt. No. 573). This Court took judicial notice of the procedural history, and read nine paragraphs summarizing the procedural history to the jury, but did not allow the jury to hear what the state court judges thought about the evidence. *See* 10/22/21 Trial Tr., at 3172:1 – 3177:1 (Dckt. No. 651).

[7] This Court did not allow the jury to hear that judicial commentary, either. *See* 10/25/21 Order (Dckt. No. 573).

***The Civil Lawsuit***

After regaining his freedom, and clearing his name, Bolden sought compensation for his decades of prison time. He filed suit against the four officers for their role in his arrest, pretrial detention, conviction, and incarceration.

Defendants included Angelo Pesavento, Ed Siwek, George Karl, and James Oliver. Pesavento, Siwek, and Karl were detectives assigned to the investigation. Oliver was a gang crimes specialist who assisted them.

Defendants moved for summary judgment on the due process claim, which included theories about the destruction, suppression, and fabrication of evidence. Each of those theories had sub-parts, too. Relevant here, the claim about the fabrication of evidence included a theory that the police fabricated the identification evidence, and a theory that the lineup was unduly suggestive.

Judge Shah (this Court's predecessor, before reassignment) largely granted Defendants' motion for summary judgment. *See* 8/9/19 Mem. Opin. & Order (Dckt. No. 276). Judge Shah granted the motion for summary judgment on all parts of the due process claim, with one exception. *Id.* at 50. Judge Shah allowed the claim to go forward about the unduly suggestive lineup. *Id.* at 48–49.

Judge Shah also denied Defendants' motion for summary judgment on the issue of qualified immunity. "It was clearly established many years before 1994 that the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law. Defendants are not entitled to qualified immunity with respect to the unduly suggestive lineup theory." *Id.* at 49–50 (cleaned up).

The summary judgment ruling trimmed the case. But even after the trimming, seven claims remained. The surviving claims included four claims under the Fourth and Fourteenth Amendments, and three claims under Illinois law.

Specifically, the surviving claims included: (1) a Fourteenth Amendment due process claim about an unduly suggestive lineup; (2) a Fourth Amendment claim about pretrial detention without probable cause; (3) a Fourteenth Amendment claim about a failure to intervene; (4) a conspiracy claim about depriving Bolden of his constitutional rights; (5) intentional infliction of emotional distress; (6) malicious prosecution; and (7) civil conspiracy.

The case arrived on this Court's docket as part of its initial allocation of 342 cases after taking the bench.[8] *See* 9/16/19 Order (Dckt. No. 282). The timing was far from ideal. A three-week trial was only six weeks away, and each side had filed a dozen motions *in limine* that needed rulings. *See* 10/9/19 Order (Dckt. No. 294). So, the Court vacated the trial date. *Id.*

After asking the parties about their trial availability, and considering their schedules (Dckt. No. 321), the Court reset the trial for July 13, 2020, the earliest workable date. *See* 10/22/19 Order (Dckt. No. 323). In October 2019, a July 2020 trial seemed perfectly reasonable. But by early 2020, the COVID-19 pandemic had wreaked havoc upon trial schedules throughout this nation, and this Court had to vacate the July 2020 trial date, too. *See* 5/20/20 Order (Dckt. No. 386).

Eventually, civil trials resumed, and the parties were cleared for landing. This Court reset the trial for October 4, 2021, and reserved three weeks. *See* 4/9/21 Order (Dckt. No. 428). The Court later ruled on pretrial motions, including motions *in limine* and *Daubert* motions. *See*

---

[8] Taking the bench as a district court judge is a little like getting dealt 342 cards in the world's biggest game of Uno. It takes a lot of time and effort just to figure out what you've been dealt. And handling each case takes a lot more effort than playing each card.

9/22/21 Order (Dckt. No. 467); 10/6/21 Order (Dckt. No. 489); 10/5/21 Order (Dckt. No. 480);

10/10/21 Order (Dckt. No. 496); 10/11/21 Order (Dckt. No. 505).

### The Trial

Trial took place from Friday, October 8 to Wednesday, October 27, 2021, spanning 13

trial days. *See* Trial Trs. (Dckt. Nos. 507, 514, 519, 526, 532, 544, 548–55, 558, 561–65, 574,

581, 598). The jury heard from 32 witnesses. The testimony came from 17 in-court witnesses,

1 out-of-state witness by video (live), and 14 witnesses by deposition designations.

Detective Pesavento testified live, in the courtroom. Officer Oliver testified remotely, by

video. Detective Karl (deceased) and Detective Siwek (deceased) testified by deposition

designation.

Bolden testified, and so did Frazier. The alibi witnesses – meaning the witnesses that

Bolden's defense counsel failed to call at the criminal trial, leading to a finding of ineffective

assistance of counsel – finally testified. Believability was up to the jury.

The trial was chock-full of dramatic moments and lively examinations.

Frazier stuck by his testimony that Bolden killed his brother and the other victim. And he

voiced disgust with the certificate of innocence:

> Q: Have you learned that Mr. Bolden went through a court proceeding where
> he was given something called a Certificate of Innocence?
>
> A: Yes, somebody told me that, some person at Cook County. Yeah.
>
> Q: Okay. And were you given an opportunity to participate in that hearing
> whatsoever?
>
> A: No.
>
> Q: Were you given an opportunity to object?
>
> A: No.

22

Q:     Were you given an opportunity to present your side of the story as a victim?

A:     No.

Q:     Were you allowed to present any evidence?

A:     No.

Q:     Do you agree with the decision that Mr. Bolden should be declared innocent?

A:     He killed my brother and he tried to kill me, so, no, I don't agree with it.

*See* 10/25/21 Trial Tr., at 3372:6-24 (Dckt. No. 653) (Frazier).

The jury heard testimony about policies and procedures for lineups by the Chicago Police Department. *See* Pl.'s Ex. 13. Detective Pesavento testified about the importance of doing lineups the right way:

Q:     Now, before February 26, 1994, you had received training on how to avoid tainting lineups, correct?

A:     Yes.

Q:     And lineups are really important, aren't they?

A:     Yes.

Q:     Most of the training that you received was common sense?

A:     Correct.

Q:     You know, don't point anything out to the witness, correct?

A:     Yes.

Q:     Don't allow the witness to see the suspect before the lineup?

A:     Correct.

Q:     Find people who are about the same age, height, weight, and other physical characteristics?

23

> A:    Yes.
>
> Q:    Don't tell the witness that you believe the suspect was in the lineup?
>
> A:    Correct.
>
> Q:    And you were trained on all of those things, correct?
>
> A:    Yes.

*See* 10/13/21 Trial Tr., at 911:9 – 912:4 (Dckt. No. 636) (Pesavento).

The jury heard evidence that all four Defendants played a role in the lineup. Detective Pesavento testified that he, Detective Karl, and Detective Siwek were the "persons conducting the lineup." *See* 10/13/21 Trial Tr., at 914:16-18 (Dckt. No. 636) (Pesavento). Detective Pesavento helped arrange the lineup. *Id.* at 912:5-7, 915:17 – 916:4, 921:18 – 922:19. Detective Siwek prepared the lineup report. *See* Joint Tr. Ex. 12. Detective Karl opened the door to the lineup room and asked Bolden his name, multiple times, before Bolden gave a head nod. *See* 10/21/21 Trial Tr., at 2766:1-16 (Dckt. No. 646) (Bolden).

Officer Oliver brought Frazier to the lineup and called him before the lineup to tell him that the officers had found the shooter. *See* 10/25/21 Trial Tr., at 3436:17 – 3437:7 (Dckt. No. 653) (Frazier). Bolden testified that Officer Oliver and Frazier walked by Bolden in the hallway before the lineup. *See* 10/21/21 Trial Tr., at 2762:10 – 2764:9 (Dckt. No. 646) (Bolden). Frazier testified that Officer Oliver was in the lineup room with him, too. *See* 10/25/21 Trial Tr., at 3437:23-25 (Dckt. No. 653) (Frazier).

Bolden also called an expert witness (Dr. Gaut) who testified about standards for lineups within the law enforcement community. *See* 10/22/21 Trial Tr., at 3178:16 – 3221:22 (Dckt. No. 651) (Gaut); 10/25/21 Trial Tr., at 3241:8 – 3355:21 (Dckt. No. 652) (Gaut).

Dr. Gaut testified that the lineup involving Bolden did not comply with the general orders, policies, and procedures of the Chicago Police Department, and did not comply with generally accepted law enforcement practices. *See* 10/22/21 Trial Tr., at 3192:23 – 3210:17 (Dckt. No. 651) (Gaut).

For example, Dr. Gaut testified that it was against generally accepted police practices to tell a witness that the police had the culprit in custody. *See* 10/22/21 Trial Tr., at 3192:18 – 3210:17 (Dckt. No. 651) (Gaut) ("When the witness is told, 'We got the guy. We got the guy that did the shooting. And you're going to look at him in a lineup,' it puts an undue pressure on the witness that, okay, if the police have him, then I'm obligated to identify him.").

Dr. Gaut also faulted the lineup for including individuals who looked nothing like Bolden. *Id.* at 3202:9 – 3206:22 ("[W]hat stands out is the fact that Mr. Bolden is the only suspect there who's bald. Everyone else has hair."). And he slammed the police for including a police officer in the lineup (the taller, heavier participant was a police officer). *Id.* at 3209:22-23 ("It's inappropriate, as I say, to use a police officer in a live lineup to begin with.").

Overall, on a scale of 1 to 10, Dr. Gaut gave Bolden's lineup a 0:

> Q:    Now, you have – we are looking at this one lineup. You have seen hundreds. In your opinion and your experience, where does this fall on the spectrum of lineups with regard to the appearance of the fillers?
>
> A:    If I were putting this on a scale of say 1 to 10, where 10 would be I have no objections, everything looks great, and a 1 is an absolute zero, there is no way that this should have ever happened, *I would rate this one as the zero*. This, in my experience, does not conform both to Chicago Police policy or to generally accepted law enforcement procedures.

*See* 10/22/21 Trial Tr., at 3210:6-17 (Dckt. No. 651) (Gaut) (emphasis added).

The parties presented dozens of exhibits. *See* Exhibit List (Dckt. No. 597). The trial transcript exceeds 4,000 pages.

In the end, Bolden ran the table. The jury found in favor of Bolden, and against all four Defendants, on all seven counts. *See* 10/19/21 Order (Dckt. No. 615); Jury Verdict Form (Dckt. No. 621).

Viewed in retrospect, it is all too easy to view a jury verdict as inevitable. But no outcome was inevitable from this jury. The trial was hard fought, and each side landed punches. The trial was full of hotly contested facts, close questions, and jump balls. In the end, the jury called the game, and decided the final score.

At the close of Bolden's case, Defendants orally moved for judgment as a matter of law. *See* 10/25/21 Trial Tr., at 3359:12-14 (Dckt. No. 652); 10/27/21 Trial Tr., at 3979:13-16 (Dckt. No. 656); 10/29/21 Order (Dckt. No. 616). Defendants then filed a written memorandum in support of that motion. *See* Defs.' Mem. (Dckt. No. 587); *see also* 10/29/21 Order (Dckt. No. 616).

This Court issued a 47-page opinion denying that motion under Rule 50(a).[9] *See* 8/25/22 Mem. Opin. & Order (Dckt. No. 671); *Bolden v. Pesavento*, 623 F. Supp. 3d 897 (N.D. Ill. 2022). That opinion devoted over 20 pages to the sufficiency of the evidence about the lineup.

Three claims remained against the City of Chicago that were not covered at trial: a *Monell* claim, and claims for *respondeat superior* and indemnification. *See* 8/25/22 Order (Dckt. No. 672). So, the Court ordered the parties to file a statement about how they planned to proceed

---

[9] At one point, this Court's opinion inadvertently cited Rule 50(b), even though the motion fell under Rule 50(a). *See* 8/25/22 Mem. Opin. & Order, at 8 (Dckt. No. 671). At that point, the motion fell under Rule 50(a), not Rule 50(b), because Defendants made the motion before the jury returned a verdict. *See* Fed. R. Civ. P. 50. One month later, this Court flagged the errant citation in its *mea culpa* Order dated September 30, 2022. *See* 9/30/22 Order (Dckt. No. 674). The Court brings it up again simply to avoid any possible confusion. Here's the bottom line. The last ruling involved a motion about the sufficiency of the evidence that Defendants raised at the close of Plaintiff's case. The current ruling involves a motion about the sufficiency of the evidence that Defendants raised after the entry of judgment. Rule 50(a) applied then, and Rule 50(b) applies now.

on those claims. *Id.* In turn, the parties agreed that judgment should be entered in Bolden's favor (and against the City) on the *respondeat superior* and indemnification claims, and Bolden moved to voluntarily dismiss the *Monell* claim. *See* 9/30/22 Order (Dckt. No. 674). The Court then entered judgment. *See* Judgment (Dckt. No. 675).

A flurry of post-trial motions followed. *See* Dckt. Nos. 680–83, 717. Relevant here, Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b).[10] *See* Defs.' Mtn. (Dckt. No. 681).

### Legal Standard

Under Rule 50(b), "after a jury verdict . . . a district court may direct the entry of 'judgment as a matter of law' if 'a reasonable jury would not have a legally sufficient evidentiary basis to find' in the nonmovant's favor." *Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021) (quoting Fed. R. Civ. P. 50(b)). Rule 50(b) "imposes 'a high bar.'" *Id.* (quoting *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019)). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Ruiz-Cortez*, 931 F.3d at 601.

The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Id.* (quoting *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)). A district court "review[s] the entire trial." *Bowers*, 1 F.4th at 519. But it "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

---

[10] The Court thanks counsel for the high-quality filings, and for their high-level advocacy throughout the trial (and beyond). The lawyering on both sides was first-rate.

## Analysis

Defendants moved for judgment as a matter of law on all seven counts.  *See* Defs.' Mem., at 1–2 (Dckt. No. 681).  The Court will begin by addressing Bolden's Fourteenth Amendment due process claim about the right to a fair trial, before flipping over to the Fourth Amendment pretrial detention claim.  Then, the Court will turn to the state law claims for malicious prosecution and intentional infliction of emotional distress.  Finally, the Court will discuss the claims for failure to intervene and conspiracy.

## I.      Fourteenth Amendment Due Process – Unduly Suggestive Lineup

The first claim is a due process claim about the unduly suggestive lineup.  Bolden claimed, and the jury found, that Defendants violated his right to a fair trial under the Fourteenth Amendment by securing his conviction with improper evidence.

"The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality."  *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006).  It "does, however, guarantee the right to a fair trial – in this context, via the due process clause of the Fourteenth Amendment – and that right is violated if unduly suggestive identification techniques are allowed to taint the trial."  *Id.*

In a prior ruling, this Court addressed the sufficiency of the evidence about the due process claim about an unduly suggestive lineup.  *See* 8/25/22 Mem. Opin. & Order (Dckt. No. 671).  In a nutshell, the jury heard a substantial body of evidence that called into question the reliability of the lineup and the fairness of the criminal trial.

To briefly uncrack the nutshell, the police told Frazier (the witness) that they had the shooter before Frazier arrived at the police station.  And then, an officer walked Frazier right by Bolden in the hallway shortly before the identification.

Both of those facts arguably primed the pump against Bolden. The police told the witness that they got the guy, and then gave Frazier a sneak peek at Bolden. Taken together, the police created a sense of expectation (of seeing the shooter), and then created a mental image that could spur a sense of familiarity in the lineup that soon followed (akin to a recency bias).

The jury also heard evidence about the lineup itself. Beforehand, Frazier described the shooter as tall and thin. Bolden matched that description better than anyone else in the lineup. In fact, a reasonable jury could find that Bolden was the *only* tall and skinny participant in the lineup.

Three of the participants were noticeably shorter than Bolden, and the other person was noticeably heavier than Bolden. It's like looking for a sandwich from a menu of lunch offerings, and then picking the one-and-only sandwich.

The record includes other evidence of irregularities, too. Bolden testified that the witness originally pointed to the person sitting in chair no. 1. That was Bolden's original chair, but he swapped seats and moved to chair no. 4 shortly before the identification.

And then, after the witness pointed at the person in chair no. 1, an officer took Frazier back to the window and put him right in front of Bolden. At that point, another officer opened the door to the lineup room, and repeatedly asked Bolden to identify himself. When Bolden eventually did so, the witness finally pointed at Bolden, sitting in chair no. 4.

Essentially, it was "try again," followed by spoonfeeding.

This Court already ruled that the evidence adequately supports the jury's finding of liability. This Court viewed the record as a whole in a light favorable to Bolden as the prevailing party. The jury didn't have to do what it did, but the jury heard enough to do what it did.

At this point, the question is the legal sufficiency of the claim. Defendants advance a trio of arguments in favor of judgment as a matter of law under Rule 50(b) on the Fourteenth Amendment claim about the right to a fair trial based on the unduly suggestive lineup.

First, Defendants contend that a faulty lineup cannot give rise to a claim under section 1983, based on recent Supreme Court case law. *See* Defs.' Mem., at 3 (Dckt. No. 681). Second, Defendants argue that Bolden was not deprived of a fair trial because he had a fair opportunity to challenge the identification at his criminal proceedings. *Id.* at 8. Finally, Defendants assert qualified immunity. *Id.* at 19. The Court will address each argument in turn.

### A.   Unduly Suggestive Lineups, the Right to a Fair Trial, and Section 1983

Defendants begin with the argument that an unduly suggestive lineup cannot give rise to a claim under section 1983. *See* Defs.' Mem., at 5–6 (Dckt. No. 681). Specifically, they contend that the rule against suggestive lineups is a prophylactic rule, not a constitutional right. *Id.* As they read *Vega v. Tekoh*, 597 U.S. 134 (2022), a violation of a prophylactic rule cannot give rise to a claim under section 1983. The Supreme Court issued that decision after the trial at hand.

Before getting into the argument, the Court will start with a quick tour through the constitutional backcountry. That is, the Court will summarize *Vega*, and the Seventh Circuit's recent question about *Vega* in *Holloway*. Then, the Court will distill the Seventh Circuit's discussion about lineups in *Alexander*. At that point, the tour will end, and the discussion of Defendants' argument will begin.

In *Vega*, the Supreme Court addressed a claim about the failure to give a *Miranda* warning before a confession. The police questioned Tekoh at his workplace, without giving him a *Miranda* warning. He confessed to a crime. That confession was admitted into evidence during his criminal trial, but the jury acquitted him.

Tekoh then turned the tables and sued the police. He claimed that the use of an un-*Mirandized* statement violated his rights under the Fifth Amendment. He brought a claim under section 1983, which authorizes a claim against a person who, acting under color of state law, "subjects" a person or "causes [a person] to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *See* 42 U.S.C. § 1983.

The Supreme Court ruled that a failure to give a *Miranda* warning, in and of itself, cannot give rise to a claim under section 1983. The reason had to do with the nature of *Miranda* warnings themselves.

The key concept is the prophylactic character of *Miranda* warnings. *Miranda* warnings protect something *else*. *Miranda* warnings are not an end unto themselves. *Miranda* warnings are constitutionally inspired, not constitutionally required.

"*Miranda* itself and our subsequent cases make clear that *Miranda* imposed a set of prophylactic rules." *See Vega*, 597 U.S. at 142. That is, "[i]n *Miranda*, the Court concluded that additional procedural protections were necessary to prevent the violation of this important right [against self-incrimination] when suspects who are in custody are interrogated by the police." *Id.* at 141.

*Miranda* protected the right against self-incrimination. But *Miranda* did not create a constitutional right, in and of itself, to receive a forewarning from the police. "*Miranda* did not hold that a violation of the rules it established necessarily constitute a Fifth Amendment violation, and it is difficult to see how it could have held otherwise." *Id.* at 142.

Basically, *Miranda* warnings protect a constitutional right – the right against self-incrimination – but *Miranda* warnings *themselves* aren't a right. *Id.* at 148. The Supreme Court expressly rejected the notion that a "violation of *Miranda* constitutes a violation of the

31

Fifth Amendment right against compelled self-incrimination." *Id.* at 142; *see also id.* at 148 ("At the same time, however, the Court made it clear that it was not equating a violation of the *Miranda* rules with an outright Fifth Amendment violation."). *Miranda* warnings provide a blanket of protection, not a "straitjacket." *Id.* at 143.

*Miranda* created "procedural protections" to "safeguard" the right against self-incrimination under the Fifth Amendment. *Id.* at 141, 142. But "a violation of *Miranda* does not necessarily constitute a violation of the Constitution." *Id.* at 150. And if the Constitution does not guarantee a right to *Miranda* warnings, then a failure to give *Miranda* warnings cannot deprive a person of "rights . . . secured by the Constitution and laws." *See* 42 U.S.C. § 1983. So there was no claim under section 1983.

*Vega* took place in the Land of *Miranda*. The Supreme Court did not address whether a violation of any other prophylactic rule could give rise to a claim under section 1983.

The Seventh Circuit touched on how *Vega* might apply to claims about unduly suggestive lineups in *Holloway v. City of Milwaukee*, 43 F.4th 760 (7th Cir. 2022). The parties in that case didn't address the issue, and the Seventh Circuit didn't decide it, either.

Still, the Seventh Circuit flagged the question. The Seventh Circuit raised "whether the protection against unduly suggestive identification procedures is, like *Miranda*, only a trial right, or whether it is more broadly enforceable, through either a suit under section 1983 or otherwise." *Id.* at 766.

The Seventh Circuit considered two possible answers. "[P]erhaps the right to be free from suggestive identification procedures is a substantive right that flows from the Due Process Clauses; or perhaps, even though a constitutional right, it is just a trial right that is not violated

unless there is a tainted identification at trial." *Id.* The Seventh Circuit posed the question, and left it open.

The disjunctive in *Holloway* is key. As the Seventh Circuit viewed things, *Vega* left open two parallel paths. First, an unduly suggestive lineup *itself* violates the Constitution.[11] Second, the introduction of a tainted identification *at trial* triggers a due process right. *Id.*

Pre-*Vega* precedent from the Seventh Circuit points strongly toward door number two. In *Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006), the Seventh Circuit explained that an unduly suggestive lineup, standing alone, is not a constitutional violation. But an unduly suggestive lineup can give rise to a constitutional violation when it taints a criminal trial.

"The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality. . . . It does, however, guarantee the right to a fair trial – in this context, via the due process clause of the Fourteenth Amendment – and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Alexander*, 433 F.3d at 555.

The Seventh Circuit in *Alexander* went on to explain that a claim about a lineup rests on the right to a fair trial under the Due Process Clause. "Grounded in due process, the constitutional interest implicated in challenges to police identification procedures is evidentiary in nature. . . . [T]he *Brathwaite* rule regarding unduly suggestive identification procedures 'is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the

---

[11] It's hard to see how this path isn't blocked by *Brathwaite*, *Stovall*, *Hensley*, and *Alexander*. "Unlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *See Brathwaite*, 432 U.S. at 113 n.13; *see also Alexander*, 433 F.3d at 555; *Hensley*, 818 F.2d at 650 ("[W]e find that *Stovall* and *Brathwaite* establish procedural safeguards to insure that only reliable identification evidence is admitted at trial. *Stovall* and *Brathwaite* do not establish a right to an impartial lineup as long as the evidence gained through that lineup is not used at trial.").

violation of that core right and not the prophylactic rule that should be actionable under § 1983.'" *Id.*

The Seventh Circuit in *Alexander* built on the Supreme Court's decision in *Brathwaite*. *Id.* "Unlike a warrantless search, a suggestive preindictment identification does not in itself intrude upon a constitutionally protected interest." *See Manson v. Brathwaite*, 432 U.S. 98, 113 & n.13 (1977). The rule against unfair lineups protects an "*evidentiary* interest" in a fair trial. *Id.* at 113 (emphasis added); *see also Hensley v. Carey*, 818 F.2d 646, 648 (7th Cir. 1987) ("Thus, the procedural safeguards established in *Brathwaite* and *Stovall* protect only against the admission of unreliable evidence at trial and does not establish a constitutional right to be free of suggestive lineups as Hensley argues.").

Other courts in this district have noted how *Alexander*'s discussion of lineups aligns with the treatment of *Miranda* warnings in *Vega*. *See Blackmon v. City of Chicago*, 2023 WL 7160639, at *14 (N.D. Ill. 2023) (Jenkins, J.) ("This approach [from *Alexander*] tracks the Supreme Court's treatment of *Miranda* rights in *Vega*."); *Washington v. Boudreau*, 2022 WL 4599708, at *22 (N.D. Ill. 2022). *But see Ezell v. City of Chicago*, 2024 WL 278829, at *24 (N.D. Ill. 2024) (concluding that *Vega* bars an unduly suggestive lineup claim under section 1983 because the right against an unduly suggestive lineup is a prophylactic trial right).

Other circuits took a similar approach pre-*Vega*, meaning an approach similar to the one followed by the Seventh Circuit in *Alexander*. They limited claims about lineups to situations when a criminal defendant was denied the right to a fair trial. *See, e.g.*, *Hernandez v. Terrones*, 397 F. App'x 954, 970 (5th Cir. 2010) ("[I]n order for there to be a due process violation in the context of an unduly suggestive identification procedure, the defendant's right to a fair trial must be impaired."); *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000) ("In the context

34

of unduly suggestive lineups, only a violation of the core right – the right to a fair trial – is actionable under § 1983."); *Antonio v. Moore*, 174 F. App'x 131, 135 (4th Cir. 2006) ("[U]nduly suggestive identification procedures . . . do not, in and of themselves, implicate the defendant's Fourteenth or Sixth Amendment rights, as long as the tainted evidence obtained is not used at trial.").

That's the constitutional backcountry. Against that backdrop, Defendants believe that the Supreme Court's decision in *Vega* forecloses a claim under section 1983 about unduly suggestive lineups. The argument goes something like this.

According to Defendants, the Supreme Court in *Vega* ruled that the prophylactic rule about custodial interrogations announced in *Miranda* cannot give rise to a claim under section 1983. In a similar vein, the Seventh Circuit in *Alexander* described the rule against unduly suggestive lineups as a prophylactic rule. As Defendants see it, if a prophylactic rule about custodial interrogations cannot give rise to a section 1983 claim, then a prophylactic rule about unduly suggestive lineups cannot give rise to a claim, either.

At first glance, that argument might have a surface appeal. But digging deeper, there isn't much there.

The argument suffers from a few problems. The argument rests too heavily on the use of the same legal lingo, meaning the use of the phrase "prophylactic rule." And more importantly, Bolden's trial *did* involve a claim about a constitutional right. The jury expressly found that Defendants violated his constitutional right to a fair trial.

For starters, the focus on the phrase "prophylactic rule" might create more shade than light in this setting. *Alexander* did not announce a prophylactic rule about unduly suggestive lineups in the same way that *Miranda* announced a rule prophylactic for custodial interrogations.

35

In *Miranda*, the Supreme Court basically created a safe harbor for law enforcement when dealing with suspects in custody. It created a blanket of protection for the underlying constitutional right – as long as the police did X, Y, and Z, the police would not violate the Fifth Amendment. *Miranda* wrote a how-to and how-not-to manual, of sorts. If the police do things This Way, but not That Way, they stand on solid constitutional footing.

That's not exactly how the Seventh Circuit used the term "prophylactic rule" in *Alexander*. The Seventh Circuit did not purport to create a safe harbor by laying down a set of guidelines for lineups. Instead, the Seventh Circuit noted that the constitutional right in question was the right to a fair trial, not the right to a certain procedure when it came to lineups.

There, the Seventh Circuit noted that an unduly suggestive lineup can lead to a violation of the constitutional right to a fair trial. In that sense, an unduly suggestive lineup has evidentiary value, but it is not a constitutional violation in its own right (no pun intended). That is, an unduly suggestive lineup is a piece of evidence that could support a finding of a violation of the constitutional right to a fair trial.

An unduly suggestive lineup is simply one of the ways that could lead to a violation of the constitutional right to a fair trial. An unduly suggestive lineup is one of many possible tributaries that could lead to the Big River of Unconstitutionality when it comes to the right to a fair trial.

And in any event, the Supreme Court in *Vega* did not announce that a violation of a prophylactic rule cannot lead to a claim, no matter what else happens. In *Vega*, the Supreme Court dealt with a violation of a prophylactic rule (*i.e.*, the rule about custodial interrogations in *Miranda*), *without* a violation of an underlying constitutional right.

*Vega* held that a violation of a prophylactic rule, without a violation of a constitutional right, cannot give rise to a claim under section 1983. *Vega* did not hold that a violation of a prophylactic rule cannot give rise to a claim under section 1983 if it *does* lead to a violation of a constitutional right.

A violation of a prophylactic rule *alone* cannot support a claim. But a violation of a prophylactic rule can support a claim when a plaintiff proves a constitutional violation as a result of the violation of the prophylactic rule. And that's what happened here.

Bolden did not merely prove that the police performed an unduly suggestive lineup. In fact, that wasn't the claim. Bolden proved that the officers violated his constitutional right to a fair trial, and did so by presenting evidence of an unduly suggestive lineup. The jury found that Defendants violated Bolden's constitutional right to a fair trial, full stop.

The North Star of the claim is the constitutional right to a fair trial under the Due Process Clause, not the right to be free from an unduly suggestive lineup. And here, that path to the North Star was charted by an unduly suggestive lineup.

The jury instructions reflected the nature of Bolden's claim. This Court squarely asked the jury to decide if Defendants violated Bolden's right to a fair trial by using an unduly suggestive lineup:

> In Count I, Plaintiff claims that Defendants violated his constitutional *right to a fair trial* by using suggestive identification procedures *that tainted his criminal trial.* Plaintiff may succeed on this claim by proving each of the following things by a preponderance of the evidence:
>
> 1. the Defendant you are considering used unduly suggestive identification procedures;
>
> 2. the resulting identification was not reliable; and
>
> 3. the flaws in the identification procedures *made the criminal trial unfair.*

37

*See* Jury Instructions, at 26 (Dckt. No. 599) (emphasis added).

The third prong of the jury instructions specifically required the jury to decide if the criminal trial was unfair, in violation of the Due Process Clause. *Id.* To find for Bolden on Count I, the jury had to find that the suggestive lineup denied Bolden of the right to a fair trial – not simply that Defendants violated a prophylactic rule.

Again, the jury heard plenty of evidence that the officers performed an unduly suggestive lineup. The jury also heard more than enough evidence that the unduly suggestive lineup tainted the criminal trial. *See Bolden*, 623 F. Supp. 3d at 920.

The civil jury (in the case at hand) heard about the evidence that the prosecution presented to the criminal jury about the lineup. The civil jury heard that two witnesses testified in the criminal case about the lineup. Frazier testified about the lineup at the criminal trial. *See* 10/20/21 Trial Tr., at 2603:5 – 2604:20 (Dckt. No. 649) (Peters). Detective Pesavento also testified about the lineup at the criminal trial. Pesavento testified that Frazier identified Bolden as the shooter during the lineup. *Id.*

In the civil trial, both the prosecutor and Bolden's criminal defense counsel testified that the lineup identification was critical to his conviction in the criminal case. *See* 10/20/21 Trial Tr., at 2385:10-12 (Dckt. No. 648) (Foster); 10/20/21 Trial Tr., at 2575:18 – 2576:1 (Dckt. No. 649) (Peters). In the civil trial, Bolden's criminal defense trial testified about the importance of the lineup at the criminal trial:

> Q:    Mr. Foster, if Mr. Bolden had not had evidence presented at trial of a lineup and only had an in-court identification, for example, would that have affected the strength of the prosecution's evidence at trial?
>
> A:    Yes.

*See* 10/20/21 Trial Tr., at 2386:7-11 (Dckt. No. 648) (Foster).

Indeed, Bolden's former lawyer testified that the lineup was *the only evidence* linking Bolden to the murders.

> Q:    And was the lineup itself, evidence of the lineup important to the trial?
>
> A:    Very, yes.  *It's the only evidence.*

*See* 10/20/21 Trial Tr., at 2385:10-12 (Dckt. No. 648) (Foster) (emphasis added).

The prosecutor agreed.  The prosecutor testified that the Frazier identification – including the identification at the lineup – was *critical* to the state's case against Bolden.

> Q:    And speaking of that, identification was central to your case, wasn't it?
>
> A:    Yes.
>
> Q:    And Clifford Frazier was your identification witness, right?
>
> A:    Yes.
>
> Q:    And his lineup identification was *critical* to your case, wasn't it?
>
> A:    *Yes, I believe he made a lineup identification.*

*See* 10/20/21 Trial Tr., at 2600:18 – 2601:1 (Dckt. No. 649) (Peters) (emphasis added).

The prosecutor explained to the jury (again, meaning the civil jury in the case at hand) why testimony about a lineup identification is so powerful.  She explained:

> Q:    And can you tell the members of the jury why a lineup is so much more important evidence than just doing an in-court identification?
>
> A:    Typically a lineup is done closer in time to when the incident occurred when an event is fresher in the memory of the person who's looking at the lineup, and a trial could be years or months later.  I think this trial was two and a half years later.

*See* 10/20/21 Trial Tr., at 2601:2-9 (Dckt. No. 649) (Peters).

In fact, the prosecutor testified that the identification by Frazier was the *most important* piece of evidence at the criminal trial:

> Q:     And we'll talk about that for a second.  Because you would
>        certainly agree that Clifford Frazier's identification was a central
>        part of your case; is that right?
>
> A:     Yes.
>
> Q:     In fact, it was the most important part of your case, right?
>
> A:     That would be fair to say.
>
> Q:     It was essential to your case?
>
> A:     That would be fair to say.

*See* 10/20/21 Trial Tr., at 2575:18 – 2576:1 (Dckt. No. 649) (Peters).

The prosecutor testified that two witnesses (Frazier, and a police officer) testified in front

of the jury in the criminal trial about the lineup.  And once again, the prosecutor agreed that the

testimony about the lineup was important in the criminal case:

> Q:     So for you, at least, the identification in the lineup that happened before,
>        that was crucial to your case; isn't that right?
>
> A:     It was *certainly important*, yes.
>
> Q:     And there were two witnesses in your case who testified about the lineup
>        identification.  For instance, Clifford Frazier, you had him testify to the
>        lineup identification, right?
>
> A:     Yes.
>
> Q:     And you also had Detective Pesavento testify about the lineup
>        identification, didn't you?
>
> A:     I don't recall who I had from the police department, but I certainly would
>        have had somebody from the police department – likely a detective –
>        testify about it.

*See* 10/20/21 Trial Tr., at 2603:5-18 (Dckt. No. 649) (Peters) (emphasis added).

The jury heard that no physical or forensic evidence linked Bolden to the murders.  *See*

10/13/21 Trial Tr., at 884:7 – 887:2 (Dckt. No. 636) (Pesavento); 10/20/21 Trial Tr., at 2576:21 –

2577:1 (Dckt. No. 649) (Peters).  And Frazier was the only witness at trial who pointed to Bolden as the shooter.  *See* 10/20/21 Trial Tr., at 2382:20 – 2383:13 (Dckt. No. 648) (Foster); *see also* 10/20/21 Trial Tr., at 2576:14-16 (Dckt. No. 649) (Peters) (Q:  "The only person who ties to Mr. Bolden is Clifford Frazier, right?"  A:  "I believe so, yes.").

The jury heard about Officer's Pesavento's testimony before the grand jury to secure the indictment of Bolden, too.  *See* 10/13/21 Trial Tr., at 926:2 – 934:15 (Dckt. No. 636) (Pesavento).  Detective Pesavento was the only witness who testified before the grand jury.  *Id.* at 927:4-6; 10/20/21 Trial Tr., at 2575:1-3 (Dckt. No. 649) (Peters).

Detective Pesavento admitted that he informed the grand jury that "all" of the information in the case came from Frazier, the unreliable witness.  *See* 10/13/21 Trial Tr., at 934:13-15 (Dckt. No. 636) (Pesavento) (Q:  "You had told the grand jury that all of your information came from Clifford Frazier, right?"  A:  "Yes.").

Basically, the jury heard substantial evidence that Frazier's identification – after the unduly suggestive lineup – played a front and center role in securing Bolden's convictions.  After considering that evidence, the civil jury concluded that the lineup made Bolden's criminal trial unfair.

Putting it all together, the civil jury did not merely find that Defendants violated a prophylactic rule, and nothing else.  The civil jury expressly found that Defendants violated Bolden's constitutional right to a fair trial in the criminal case, in violation of the Due Process Clause of the Fourteenth Amendment.  The jury reached that conclusion based on the evidence about the unduly suggestive lineup.  The jury found that the evidence about the lineup tainted Bolden's criminal trial.

In sum, the claim was viable, and the evidence was more than enough.

41

### B.    Deprivation of Due Process

Defendants next argue – in two paragraphs, with no case citations – that Bolden was not deprived of a fair trial because he had the opportunity to contest the identification during his criminal trial (and in fact, he challenged the identification).  *See* Defs.' Mem., at 8 (Dckt. No. 681).

Out of the box, that argument is a bit of a puzzle.  It is hard to see how the ability to challenge the admissibility or strength of evidence during the criminal trial could doom a claim about the denial of a right to a fair trial.  After all, it's always the case that a party can challenge the admissibility or strength of the evidence.

Defendants' argument proves too much.  If Defendants are right, then it is hard to see how a plaintiff could ever bring a claim about a violation of the right to a fair trial based on improper evidence.  The whole point is that the trial was unfair.  And the trial was unfair because bad evidence came into evidence.

Courts follow a two-step inquiry to determine whether a lineup violated a plaintiff's "due-process right to a fair trial."  *See Holloway*, 43 F.4th at 766.  "The first question is whether the identification procedure used by law enforcement was both suggestive and unnecessary.  If so, [the court] then decide[s], based on the totality of the circumstances, whether the identification was sufficiently reliable to outweigh the effect of the tainted procedure."  *Id.* (cleaned up).  "[T]he situation must have involved 'improper state conduct' – one in which the circumstances did not justify law enforcement's suggestive behavior."  *United States v. Sanders*, 708 F.3d 976, 984 (7th Cir. 2013) (citation omitted).

A plaintiff must show that the identification was "so clearly tainted" that it deprived him of his right to "a fair trial."  *See Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019);

*see also Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) ("Due process . . . prohibit[s] evidence when it is so extremely unfair that its admission violates fundamental conceptions of justice.") (citation omitted).

In *Alexander*, the Seventh Circuit identified several non-exhaustive factors that "have a bearing on whether a fair trial was had." *See Alexander*, 433 F.3d at 555. Those factors include: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Id.*

The Seventh Circuit explained that Alexander hadn't carried his burden at the summary judgment stage because he "recited a litany of poor investigative practices," but failed to direct the court "to anything that occurred during the pretrial or trial proceedings in the prosecution against him." *Id.* at 556; *see also id.* ("Photos of the lineup and photo array are in the record, but without the corresponding trial testimony from the police, victims, and eyewitnesses, we cannot conduct the appropriate legal analysis.").

Basically, it is not enough that the police used unduly suggestive identification procedures. A claim exists only if the criminal trial itself was unconstitutionally unfair. *Id.* at 555.

At bottom, the claim is about the fairness of the trial, not the fairness of the lineup. An unfair lineup, followed by a fair trial, does not deprive a defendant of the right to a fair trial.

For that reason, a criminal defendant who does not go to trial cannot raise a Fourteenth Amendment due process claim about an unduly suggestive lineup. *See Hensley v. Carey*, 818

F.2d 646, 649 (7th Cir. 1987) (holding that plaintiff "could not possibly have been deprived of his right to a fair trial since he was never tried"); *see also Fletcher v. Bogucki*, 2021 WL 4477968, at *6 (N.D. Ill. 2021).

But Bolden *did* go to trial. And he provided plenty of evidence about "*how* th[e] flawed procedures compromised the constitutional right to a fair trial." *See Alexander*, 433 F.3d at 555 (emphasis in original).

Again, the jury heard testimony that Frazier's identification was the linchpin behind Bolden's convictions. *See, e.g.*, 10/20/21 Trial Tr., at 2575:18 – 2576:1 (Dckt. No. 649) (Peters); 10/20/21 Trial Tr., at 2385:10-12 (Dckt. No. 648) (Foster). Frazier's testimony was the key piece of evidence at Bolden's criminal trial – with no other eyewitness testimony, or forensic evidence, linking Bolden to the crimes. *See* 10/13/21 Trial Tr., at 884:7 – 887:2 (Dckt. No. 636); 10/20/21 Trial Tr., at 2576:21 – 2577:1 (Dckt. No. 649) (Peters).

And as the Court explained in its earlier ruling, Bolden answered the full range of "illustrative" questions from *Alexander*. "He addressed what identification evidence was presented at trial, and what the witnesses said, and whether they were cross examined, and so on." *Bolden*, 623 F. Supp. 3d at 920. Even though the jury heard that Bolden had the chance to undermine the Frazier identification at his trial, it concluded that the identification tainted the trial, and made it unfair. *Id.* The jury was reasonable in reaching that conclusion.

In their reply brief, Defendants cite a trio of Seventh Circuit cases. *See* Defs.' Reply, at 5 (Dckt. No. 710); *see also Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003); *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014); *Avery v. City of Milwaukee*, 847 F.3d 322 (7th Cir. 2017).

According to Defendants, this case law shows that Bolden cannot have a valid due process claim if he had the chance to undermine the identification at trial. *Id.* But none of these cases undermines the framework set forth in *Alexander* and restated by the Seventh Circuit more recently in *Holloway*.

In *Newsome* – a pre-*Alexander* case – the Seventh Circuit stated that "the constitutional violation justifying an award of damages is not the conduct of the lineups but the concealment of evidence about them." *Newsome*, 319 F.3d at 305. Concealment or suppression of evidence is central to a *Brady* claim. *See Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019).

But *Alexander* paves a separate path that plaintiffs can walk down, without having to show that the police or prosecution violated the duty to disclosure exculpatory evidence. "The court did not limit the plaintiff in *Alexander* to establishing a constitutional violation solely under *Brady* by showing that prosecutors failed to disclose that the identification evidence was unduly suggestive. In fact, the *Alexander* court never mentioned *Brady* or the government's obligation to disclose exculpatory evidence." *See McGee v. City of Chicago*, 2008 WL 11517151, at *3 (N.D. Ill. 2008). So, *Newsome* does not block the path.

*Petty* involved a "fabrication of evidence" claim that was really a "coercion" claim. *See Petty*, 754 F.3d at 423. After determining that Petty merely alleged that the testimony was coerced – rather than fabricated – the Seventh Circuit concluded that "Petty's claim fails because his claim is a 'coercion' case for which there is no cognizable due process claim." *Id.* But *Petty* did not address an unduly suggestive lineup, which the Seventh Circuit recognizes as a cognizable basis for a due process claim. *See Holloway*, 43 F.4th at 765 (recognizing unduly suggestive lineup claims).

45

*Avery* didn't involve an unduly suggestive lineup, either – it involved falsified evidence. *See Avery*, 847 F.3d at 439. But in dicta, the Seventh Circuit explained that "a claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights. . . . Because coerced testimony may in fact be true, the due-process right to a fair trial isn't implicated absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it." *Id.* The Seventh Circuit reasoned that, once the coerced testimony is disclosed under *Brady*, "the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth." *Id.*

But the *Alexander* line of cases does not state that unduly suggestive lineup claims turn on whether a *Brady* violation occurred. Defendants haven't pointed this Court to any cases involving the dismissal of a Fourteenth Amendment due process claim based on an unduly suggestive lineup because the plaintiff had the opportunity to challenge the identification at trial.

This Court has not found any case law standing for that proposition, either. *Cf. Washington*, 2022 WL 4599708, at *23 (allowing a plaintiff who knew about evidentiary issues before his criminal trial to press forward with an unduly suggestive lineup claim); *Fletcher*, 2021 WL 4477968, at *6 (rejecting the notion that a "defendant must first successfully suppress a challenged identification in his criminal case before he can pursue a claim for unduly suggestive identification techniques").

Taking a step back, *Alexander* charts a path for an unduly suggestive lineup claim that seems to stand separate and apart from *Brady*. *See McGee*, 2008 WL 11517151, at *3; *cf. Holloway*, 43 F.4th at 765–69 (addressing plaintiff's unduly suggestive lineup and *Brady* claims separately). If an unduly suggestive lineup claim requires that a criminal defendant was in the

46

dark about bad evidence, then an unduly suggestive lineup claim is really just a *Brady* claim in disguise.

That is, as Defendants see things, an unduly suggestive lineup claim that depends on withholding or suppressing evidence folds into a *Brady* claim. But under the Seventh Circuit's current case law, *Brady* and *Alexander* create a two-lane road to trial. There are two paths – one requires the withholding of evidence (*Brady*), and the other does not (*Alexander*). And Bolden's claim drove in the *Alexander* lane, not the *Brady* lane.

The jury heard evidence about Bolden's opportunity to present evidence about the unreliable identification. But they also heard – repeatedly – that the Frazier identification was the driving force behind his convictions. Based on that evidence, the jury found that the unduly suggestive lineup deprived Bolden of the right to a fair trial. The jury could reach that result regardless of whether Bolden introduced favorable evidence about the lineup during his criminal trial.

Therefore, the motion for judgment as a matter of law is denied to the extent that Defendants argue that Bolden had an opportunity to litigate the unduly suggestive lineup in the criminal proceedings.

### C. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity. *See* Defs.' Mem., at 19 (Dckt. No. 681). In their view, Bolden cannot point to any precedent that clearly established that this kind of suggestive lineup violated the Constitution, as interpreted in 1994 (*i.e.*, when Bolden's arrest took place).

Before diving into the claims, the Court points out that Defendants already raised the issue of qualified immunity, twice.

Judge Shah denied qualified immunity at the summary judgment stage. *See* 8/9/19 Mem. Opin. & Order, at 49–50 (Dckt. No. 276). "It was clearly established many years before 1994 that the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law. Defendants are not entitled to qualified immunity with respect to the unduly suggestive lineup theory." *Id.* (cleaned up) (citing *Foster v. California*, 394 U.S. 440, 442 (1969).

More recently, this Court denied qualified immunity when ruling on Defendants' Rule 50(a) motion. *See Bolden*, 623 F. Supp. 3d at 921 ("Case law predating 1981 put a police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a lineup the identity of the suspected offender. . . . As such, officers in 1994 knew that they couldn't point to a suspect and tell the witness to choose that person.") (cleaned up).

The third time is not a charm for Defendants, and the Court once again concludes that Defendants are not entitled to qualified immunity. The Court reaches the same conclusion for the same reasons.

"If the Fifth and Fourteenth Amendment protections of due process mean anything, they mean a right to a fair, impartial decisionmaker." *Prude v. Meli*, 76 F.4th 648, 660 (7th Cir. 2023). A reasonable official could not believe "that predetermining the outcome of a [lineup] – no matter how that is accomplished – is consistent with due process." *Id.*

Bolden presented evidence that Defendants rigged the lineup. According to Bolden's testimony, Frazier originally pointed to someone else in the lineup room. *See* 10/21/21 Trial Tr., at 2765:10 – 2766:22 (Dckt. No. 646) (Bolden). Then, an officer moved Frazier, and stood him right in front of Bolden, who was on the other side of the glass. *Id.* at 2766:1-5. After an officer called Bolden's name, prompting a nod, Frazier identified Bolden. *Id.* at 2766:6-20.

"Pick *this* guy, not *that* guy" is not consistent with due process, to put it mildly. As this Court explained previously, "[i]t seems obvious that an officer can't tell a witness who to pick, and then use that identification to bring charges against the handpicked suspect. . . . Surely a police officer knows that he cannot tell a witness who to pick in a lineup, even if the exact sort of lineup at issue hadn't been considered by the Seventh Circuit or Supreme Court before 1994." *See Bolden*, 623 F. Supp. 3d at 921 n.9; *see also Blackmon*, 2023 WL 7160639, at *20 (Jenkins, J.) (denying qualified immunity where, under plaintiff's view of the facts, defendants took "steps designed to induce [the witness] to identify [the plaintiff]," and opining that "[n]o reasonable officer could conclude that such a distinction influences the constitutionality of identification procedures, even without a closely analogous case on point"); *Hampton v. City of Chicago*, 2017 WL 2985743, at *29 (N.D. Ill. 2017) (opining that case law predating 1981 "put a police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a [lineup] the identity of the suspected offender").

As this Court explained before, clearly established law at the time prohibited Defendants from pointing Frazier in the direction of identifying Bolden. So, Defendants aren't entitled to qualified immunity.

## II. Fourth Amendment

Defendants argue that the Fourth Amendment claim fails for two reasons. First, they contend that Bolden failed to prove that the officers lacked probable cause. *See* Defs.' Mem., at 9–18 (Dckt. No. 681). Second, they assert qualified immunity. *Id.* at 19–22.

### A. Probable Cause

The Seventh Circuit has held that "identification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause." *Moorer*

*v. City of Chicago*, 2024 WL 511197, at *4 (7th Cir. 2024). A plaintiff can demonstrate that an identification did not create probable cause by "point[ing] to evidence that would make the identifications so incredible that an officer could not reasonably believe the witnesses were telling the truth." *Id.*

Defendants launch three arguments about the lack of probable cause. First, they contend that the grand jury indictment created a presumption of probable cause that Bolden failed to rebut. *Id.* at 10. Second, they argue that Frazier's lineup identification established probable cause. *See id.* at 12–13. Finally, they believe that there was probable cause even without Frazier's identification because they received evidence that someone named "Lynier" (Bolden's middle name and nickname) committed the murders. *Id.* at 13–18.

This Court addressed – and rejected – each of these arguments in its ruling on the Rule 50(a) motion. *See Bolden*, 623 F. Supp. 3d at 921–23.

In that ruling, the Court explained that the grand injury indictment created a rebuttable presumption of probable cause. *See id.* at 922 (citing *Coleman*, 925 F.3d at 351). But on this record, a reasonable jury could find that "the officers knew that they lacked probable cause to arrest Bolden" because "the record was loaded with evidence supporting an inference that [the Frazier] identification was problematic." *Id.*[12]

This Court then turned to Frazier's lineup identification. *Id.* Bolden presented evidence that "Defendants pointed Frazier in Bolden's direction, literally and figuratively" at the lineup.

---

[12] Defendants claim that the inference of probable cause arising from the indictment could not have been rebutted because the jury did not have to determine whether Defendants "knew there was no probable cause or obtained the identification by fraud." *See* Defs.' Reply, at 9 (Dckt. No. 710). Bolden could rebut the presumption of probable cause created by the indictment by producing "evidence that law enforcement obtained the indictment through improper or fraudulent means." *Coleman*, 925 F.3d at 351. Bolden offered evidence that the indictment was obtained because of the problematic Frazier identification, and a reasonable jury could thus conclude that the indictment was improperly obtained.

*Id.* So, the Court concluded that the jury "heard enough evidence to conclude that the identification was unreliable," and thus insufficient for probable cause. *Id.*

By way of analogy (albeit an extreme one), a lineup identification by a blindfolded witness could not give rise to a finding of probable cause. If the witness cannot see the people, then the identification isn't worth much.

At some point, a lineup is so unreliable that it cannot support a finding of probable cause. And here, the jury heard enough evidence to reach the conclusion that the lineup was so problematic that it could not give rise to probable cause.

Finally, this Court rejected the notion that evidence about "Lynier" was a sufficient basis for probable cause. The person who fed the officers information about Lynier was none other than Frazier. *Id.* at 923.

The jury was treated to a spirited cross examination of Frazier. The jury heard all sorts of reasons for calling into question his credibility. It was one of many slugfests, going round after round, with blows landed by each side. The jury heard enough to reach the conclusion that the police could not automatically take Frazier's statements to the bank, or to the courthouse.

The Court also stated that "the jury heard evidence that Defendants closed their eyes to credible leads," including evidence presented by Bolden that he had called 911 after Frazier's attack. *Id.*

To the extent that Defendants simply rehash their old arguments, this Court reaches the same conclusion. A reasonable jury could find that Defendants lacked probable cause.

Separately, the parties disagree about whether Defendants' argument has a new flavor, too.

Defendants argue that "Bolden's Fourth Amendment claim is for a *post-legal process*, pre-trial detention without probable cause." *See* Defs.' Mem., at 9 (Dckt. No. 681) (emphasis in original). Therefore, Defendants believe that Bolden had to show a lack of probable cause when legal process was initiated – not when he was arrested. *Id.*

Bolden claims that "[t]his argument is new, and, therefore, waived." *See* Pl.'s Resp., at 10 (Dckt. No. 698). Defendants disagree. They think that they made this argument before. And they contend that Bolden is acting like his Fourth Amendment claim is about his *arrest*, even though his claim is actually about *pretrial detention*. *See* Defs.' Reply, at 6 (Dckt. No. 710).

"Because the Rule 50(b) motion is only a renewal of the [Rule 50(a)] preverdict motion, it can be granted only on grounds advanced in the preverdict motion. Thus, if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (citations omitted); *see also Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 604 (7th Cir. 2017).

So, if Defendants did not preview this argument in their Rule 50(a) motion, they have waived it. Waiver seems to be a problem, but waiver is not the main problem. Defendants' argument fails on the merits.

Taking a step back, the Supreme Court has recognized that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." *See Manuel v. City of Joliet (Manuel I)*, 580 U.S. 357, 369 (2017).

According to the Seventh Circuit, *Manuel I* "clarified that the constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure' both *before* formal legal process and *after* – and is justified only

on probable cause." *See Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019) (emphasis in original). In other words, a plaintiff like Bolden can bring a claim for wrongful pretrial detention based on conduct that came before legal process.

The Supreme Court addressed the right recognized by *Manuel I* again in *Thompson v. Clark*, 596 U.S. 36 (2022). In *Thompson*, the Supreme Court labeled the right as a "malicious prosecution" claim. *Id.* at 42.

Before *Thompson*, the Seventh Circuit recognized a Fourth Amendment "pretrial detention" claim, but rejected a Fourth Amendment "malicious prosecution" claim. The Seventh Circuit in *Manuel II* explained the lay of the land: "After *Manuel I*, 'Fourth Amendment malicious prosecution' is the wrong characterization. There is only a Fourth Amendment claim – the absence of probable cause that would justify the detention." *See Manuel v. City of Joliet (Manuel II)*, 903 F.3d 667, 670 (7th Cir. 2018).

Terminology aside, the Seventh Circuit has yet to address whether *Thompson* alters the pretrial detention claim on the merits. The Seventh Circuit has not yet clarified whether pretrial detention and malicious prosecution are separate but related actions, or if *Thompson* leaves the same structure in place, while simply resulting in a name change to the *Manuel I* right. *Cf. Towne v. Donnelly*, 44 F.4th 666, 676 (7th Cir. 2022) (declining to address the effect of *Thompson* due to waiver); *Smith v. City of Chicago*, 2022 WL 2752603, at *1 (7th Cir. 2022) (addressing only the effect of *Thompson* on when a claim accrues); *Chen v. Yellen*, 2023 WL 8925038, at *2 (7th Cir. 2023) (citing favorably pre-*Thompson* case law articulating the requirements for a Fourth Amendment claim).

Under either framing of the Fourth Amendment cause of action (that is, "pretrial detention" or "malicious prosecution"), a plaintiff must show a lack of probable cause. *See*

53

*Lewis*, 914 F.3d at 476–77; *Thompson*, 596 U.S. at 43; *see also Franklin v. Askew*, 2022 WL 17093358, at *4 n.3 (N.D. Ill. 2022) ("Whatever the characterization of [the] claim, [the plaintiff] must prove that officers lacked probable cause to detain him or press charges against him."); *Mack v. City of Chicago*, 2023 WL 4744791, at *17 (N.D. Ill. 2023) ("The existence of probable cause, like in the unlawful detention context, defeats a Fourth Amendment malicious prosecution claim."); *O'Brien v. City of Chicago*, 2023 WL 3947940, at *6 n.5 (N.D. Ill. 2023).

In the case at hand, any distinction between malicious prosecution and pretrial detention is immaterial. As the Court explained in its previous ruling, Bolden presented evidence of a lack of probable cause at all stages – *i.e.*, for his arrest, pretrial detention, and prosecution.

Based on the evidence that Bolden presented at trial, a reasonable jury could find that Defendants lacked probable cause for the whole nine yards, including Bolden's arrest and detention. *See Bolden*, 623 F. Supp. 3d at 903–04. Frazier's identification was the whole ballgame, and Bolden presented evidence that the identification was unreliable. *Id.*; *see also Olson v. Cross*, 2024 WL 361200, at *16 & n.19 (N.D. Ill. 2024) (concluding that plaintiff had rebutted the presumption of probable cause created by a grand jury indictment by showing that his confession was coerced).

Bolden presented evidence at the civil trial showing that Defendants conducted an incomplete, bad-faith investigation. And he presented evidence that the prosecution relied on the investigation (which they believed to be complete) to bring the charges and secure the convictions. *See Bolden*, 623 F. Supp. 3d at 925–26 (N.D. Ill. 2022) ("Bolden presented evidence that the officers conducted an unduly suggestive lineup, and failed to investigate other potential leads. They presented the results of a faulty, incomplete investigation to James Beligratis, the felony review attorney, who relied on the information. *See* 10/26/21 Trial Tr., at

54

3666:9 – 3668:6 (Dckt. No. 654) (Beligratis).  They also conveyed the information to Lynda

Peters, the prosecutor.  *See* 10/20/21 Trial Tr., at 2567:3-8 (Dckt. No. 649) (Peters).  Both

prosecutors relied on Defendants' investigative file, believing it to be "truthful and correct" and

to contain "complete information."  *Id.* at 2583 – 2584:5 (Peters); *see* 10/26/21 Trial Tr., at

3668:3-6 (Beligratis)").

Basically, Bolden offered evidence that the prosecution relied on Defendants'

substandard investigation, without knowing about its deficiencies.  In light of that evidence, a

reasonable jury could find a lack of probable cause for the prosecution.

In sum, a reasonable jury could find a lack of probable cause for both the pretrial

detention and prosecution.  The Court therefore denies Defendants' Rule 50(b) motion to the

extent that they claim probable cause existed as a matter of law.

### B.      Qualified Immunity

Next, Defendants argue that, even if they lacked probable cause, they should receive

qualified immunity (which requires only arguable probable cause).  *See* Defs.' Mem., at 21–22

(Dckt. No. 681).

This Court held that Defendants weren't entitled to qualified immunity in its prior ruling.

*See Bolden*, 623 F. Supp. 3d at 924.  The Court explained:  "There is no probable cause if the

police know that the only witness is unreliable.  The police cannot rely on an identification from

a lineup if they know that the witness himself couldn't identify the suspect."  *Id.*

Bolden presented evidence that Defendants fixed the identification by Frazier, the sole

witness.  So the Court concluded that Defendants did not have arguable probable cause.  *Id.*  The

Court also noted that Bolden had presented "plenty of evidence that Frazier had a motive to lie,

and acted on that motive."  *Id.*

55

The Court's earlier opinion explained the link between the lack of qualified immunity on the Fourteenth Amendment and Fourth Amendment claims. "If the officers aren't entitled to qualified immunity for the lineup, then it is hard to see how they could have qualified immunity for pretrial detention based on a finding of probable cause based solely on the lineup." *Id.*

Defendants' arguments for qualified immunity on this go-round are the same as their arguments on the last go-round. So, the result is also the same. The Court denies qualified immunity on Bolden's Fourth Amendment claim.

Bolden presented enough evidence for the jury to find that Defendants lacked probable cause to detain him. The Court also denies qualified immunity. As a result, the Court denies Defendants' motion for judgment as a matter of law on the Fourth Amendment claim.

## III. Malicious Prosecution & Intentional Infliction of Emotional Distress

Defendants argue that Bolden failed to offer sufficient evidence on probable cause for his malicious prosecution claim. *See* Defs.' Mem., at 9 (Dckt. No. 681). As they did in their Rule 50(a) briefing, Defendants concede here that Bolden's intentional infliction of emotional distress claim rises or falls with the malicious prosecution claim. *Id.* at 23; *see also Bolden*, 623 F. Supp. 3d at 926–27.

In its ruling on the Rule 50(a) motion, the Court concluded that Bolden offered enough evidence for a reasonable jury to find that Defendants' lack of probable cause resulted in Bolden's prosecution. *See Bolden*, 623 F. Supp. 3d at 926. When evaluating Defendants' arguments about probable cause for the Fourth Amendment claim above, the Court reached the same conclusion (*i.e.*, that a reasonable jury could find that Bolden was prosecuted because of the problematic identification, for which Defendants lacked probable cause).

For the reasons stated in its earlier ruling and in the above discussion of probable cause, the Court denies the Rule 50(b) motion on the state-law malicious prosecution claim. Because Defendants' arguments about the intentional infliction of emotional distress claim hinge on the success of their arguments about the malicious prosecution claim, the Rule 50(b) motion is denied for the intentional infliction of emotional distress claim, too.

## IV.     Failure to Intervene & Conspiracy

Finally, Defendants contend that the Court should grant judgment as a matter of law on the failure to intervene and conspiracy claims. *See* Defs.' Mem., at 23 (Dckt. No. 681).

Defendants argue that, if the Court grants judgment in their favor on the Fourteenth and Fourth Amendment claims, the failure to intervene and conspiracy claims necessarily fail too, because those claims require an underlying constitutional violation. *Id.*; *see also* Defs.' Reply, at 15 (Dckt. No. 710).

Because the Court declines to disturb the jury's verdict on the Fourth and Fourteenth Amendment claims, the Court also denies judgment as a matter of law on the failure to intervene and conspiracy claims.

### Conclusion

For the foregoing reasons, Defendants' renewed motion for judgment as a matter of law under Rule 50(b) is denied.

Date:   March 23, 2024

Steven C. Seeger
United States District Judge