UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-417 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO PESAVENTO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### **MEMORANDUM OPINION AND ORDER**

Plaintiff Eddie Bolden spent 22 years in prison for double murder, before the Illinois Supreme Court vacated his convictions. The state dropped the case, and Bolden obtained a certificate of innocence. Bolden then turned around and sued the four officers from the Chicago Police Department who played a role in securing his convictions.

This Court presided over a hard-fought jury trial that lasted nearly three weeks. Along the way, the parties raised quite a few arguments about the admissibility of certain evidence. Each side filed at least a dozen motions *in limine*, and they made a wide assortment of objections throughout the trial (as they should).

This Court listened to the parties, heard them out, and made countless evidentiary rulings. That exercise required careful balancing and discretionary judgment calls, based on the record as a whole. This Court had a first-hand look and a game-day feel for how things were playing out in the real world of the courtroom. And in particular, this Court had a bird's-eye view from the perch of the bench to see how things were impacting the jury.

In the end, the jury returned a verdict in favor of Bolden, and against all four Defendants, on all counts. Defendants, in turn, filed a motion for a new trial. They take issue with the

testimony given by Bolden's expert about lineups, arguing that he perjured himself. Defendants also repeat various evidentiary arguments, and bring back arguments about the jury instructions.

For the following reasons, Defendants' motion for a new trial is denied.

## Background

At this point, any interested reader knows the backstory of the case, and then some. The Court assumes familiarity with the facts from its earlier rulings on Defendants' Rule 50(a) and Rule 50(b) motions. *See* 8/25/22 Mem. Opin. & Order (Dckt. No. 671); 3/23/24 Mem. Opin. & Order (Dckt. No. 724). So a short summary will do here.

In a nutshell, this case is about a double murder that took place on the streets of Chicago on January 29, 1994, and the investigation and convictions that followed. Officers Pesavento, Oliver, Siwek, and Karl from the Chicago Police Department investigated the homicides. In the end, Bolden was arrested and convicted of both murders.

The linchpin behind the convictions was a lineup identification by Clifford Frazier. Frazier was across the street from J&J Fish when the two soon-to-be murder victims got into a car with the assailant, and drove off. Frazier stayed back, guarding the cocaine.

They drove only a few blocks. And then, the assailant shot them in the head. Frazier's brother was one of the murder victims.

Before long, the assailant returned to the area by J&J Fish, and fought, shot, and pistol-whipped Frazier. The police soon arrived. Frazier spoke to the police that night and in the days that followed. In February 1994, Frazier identified Bolden as the murderer during a lineup.

Right after the lineup, Bolden was arrested and charged with double murder, and with the attempted murder of Frazier. The lineup identification was the key piece of evidence.

At the criminal trial, Frazier identified Bolden as the shooter, and testified about the lineup. No other witness identified Bolden as the shooter. *See* 10/12/21 Trial Tr., at 766:1-6 (Dckt. No. 635) (Pesavento); 10/13/21 Trial Tr., at 864:15 – 865:1, 894:1-5 (Dckt. No. 636) (Pesavento). Detective Pesavento testified about Frazier's identification at the lineup, too.

The state didn't present any witness connecting Bolden to the crime, other than Frazier. It didn't present physical or forensic evidence linking Bolden to the murders, either. And the police never tested the gun found at the murder scene.

A jury found Bolden guilty of all charges after a four-day trial. He received a life sentence.

A lengthy post-conviction process in state court ensued. After a series of twists and turns, the Circuit Court vacated Bolden's convictions. It pointed out the shakiness of the prosecution's case, which depended almost entirely on the Frazier identification. "[T]he State's case against petitioner was far from overwhelming due to Frazier's substantially problematic identification and the lack of any other evidence connecting petitioner to the murders and attempted murder." *See Illinois v. Bolden*, No. 94-cr-0839701, slip. opin., at 22 (Ill. Cir. Ct. Jan. 1, 2016) (Dckt. No. 536-4, at 23 of 24).

The state dropped the charges, and Bolden was released from incarceration. By then, he had served 22 years in prison. He obtained a certificate of innocence from the State of Illinois.

Bolden then sued the four officers for their role in his arrest, pretrial detention, conviction, and incarceration.

After summary judgment, seven claims remained in the case: (1) a Fourteenth Amendment due process claim about the right to a fair trial based on an unduly suggestive lineup, (2) a Fourth Amendment claim about pretrial detention without probable cause, (3) a

3

Fourteenth Amendment claim about a failure to intervene, (4) a conspiracy claim about depriving Bolden of his constitutional rights, (5) intentional infliction of emotional distress, (6) malicious prosecution, and (7) civil conspiracy.

This Court held a 13-day trial from Friday, October 8 to Wednesday, October 27, 2021. *See* Dckt. Nos. 507, 514, 519, 526, 532, 544, 548–55, 558, 561–65, 574, 581, 598. The jury heard from 32 witnesses. The witnesses included 17 in-court witnesses, 1 out-of-state witness by video (live), and 14 witnesses by deposition designations.

In the end, Bolden ran the table. The jury found in favor of Bolden, and against all four Defendants, on all seven counts. *See* 10/19/21 Order (Dckt. No. 615); Jury Verdict Form (Dckt. No. 621).

A flurry of post-trial motions followed. *See* Dckt. Nos. 680–83, 717. Relevant here, Defendants moved for a new trial under Rule 59 of the Federal Rules of Civil Procedure. *See* Defs.' Mtn. (Dckt. No. 683).

In their 80-page brief (which they had leave to file), Defendants pointed to several purported errors at trial. Much of the brief repeated arguments that Defendants made before and during trial (which is fine). To preserve resources, and in the interest of judicial economy, this Court issued an order saying that Bolden only needed to respond to new arguments, unless there was something else that he wanted to say. *See* 11/9/22 Order (Dckt. No. 692).

As their lead argument, Defendants raised a new issue about Bolden's expert witness, Dr. William Gaut. Defendants argued that Dr. Gaut perjured himself on the witness stand. *See* Defs.' Mtn., at 2 (Dckt. No. 683).

As directed, Bolden responded to the new argument about Dr. Gaut, but rested on its prior filings and oral responses at trial about the other issues. *See* 12/21/22 Pl.'s Resp. (Dckt.

No. 700). Based on the extensive briefing before and during trial, this Court already had what it needed on the issues that the parties already litigated.

## Legal Standard

A court "may" grant a motion for a new trial under Rule 59 if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. *See Arroyo v. Volvo Grp. N. Am., LLC*, 93 F.4th 1066, 1070 (7th Cir. 2024); *see also* Fed. R. Civ. P. 59. "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cty.*, 650 F.3d 631, 633 (7th Cir. 2011) (cleaned up).

But the district court cannot simply substitute its judgment for the jury's. "Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (cleaned up).

The standard for granting a new trial is relatively high. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 758 (7th Cir. 1994). "A new trial is warranted only if 'the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Plyler v. Whirlpool Corp.*, 751 F.3d 509, 513 (7th Cir. 2014) (quoting *Whitehead*, 680 F.3d at 928). A do-over requires a really good reason.

Evidentiary errors only warrant a new trial if they "had 'a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice.'" *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 812 (7th Cir. 2021) (quoting *Fields v. City of Chicago*, 981 F.3d 534, 544 (7th Cir. 2020)).

**Analysis**

Most of the motion for a new trial has a familiar ring. Defendants repeat many of the evidentiary arguments that they made before and during the trial. This Court has looked at those issues a second time, and given them a fresh look. This Court lands in the same place, for the same reasons.

But one argument is new. It requires a first look, not a second look.

Defendants seek a new trial based on the trial testimony of Bolden's expert witness, Dr. Gaut. *See* Gaut Report (Dckt. No. 317-1). Dr. Gaut was Bolden's expert about proper investigative practices for law enforcement, including how to perform a lineup.

The gist of Defendants' argument is that Dr. Gaut perjured himself when characterizing and downplaying his role in another criminal case, decades ago. Before drilling down and getting into the weeds of the argument, the Court will take a step back and bring the reader up to speed.

Before trial, Defendants filed a motion *in limine* to exclude the testimony of Dr. Gaut. *See* Defs.' Mtn. *in Limine* No. 10 (Dckt. No. 317). Some of his opinions fell by the wayside as a result of the summary judgment ruling by Judge Shah, such as his opinions about *Brady*. But other opinions remained. In particular, Bolden offered Dr. Gaut to testify about whether the lineup in Bolden's case lived up to industry standards.

This Court issued a written ruling on 27 motions *in limine*, and the motion about Dr. Gaut was one of the bunch. *See* 9/22/21 Order, at 28–31 (Dckt. No. 467). This Court granted in part and denied in part Defendants' motion *in limine* about Dr. Gaut.

This Court precluded Dr. Gaut from offering a few opinions. This Court barred Dr. Gaut from opining about whether Bolden could see through the one-way window in the lineup room. That opinion suffered from a few problems.

For starters, Dr. Gaut had "no particular expertise in interior lighting." *Id.* at 28. There was no foundation for the notion that the light conditions in 2018 (when the investigation happened) were the same as the light conditions in 1994 (when the lineup happened). *Id.* at 28–29. And in any event, the jury didn't need to hear from Dr. Gaut to decide if Bolden was believable about what he could see. *Id.* at 29. Bolden's mouth could speak for Bolden's eyes.

This Court also barred Dr. Gaut from testifying about whether Defendants violated *Brady*. *Id.* "Judge Shah granted summary judgment to the Defendants on the *Brady*-based due process claim." *Id.* at 29.

But some opinions were fair game. Most notably, this Court allowed Dr. Gaut to testify about whether the lineup in Bolden's case complied with generally applicable standards for law enforcement. *Id.* at 29–30.

This Court clarified the permissible scope of his testimony in a supplemental written ruling. *See* 10/6/21 Order (Dckt. No. 489). This Court gave an oral explanation, too. *See* 10/22/21 Trial Tr., at 3007:16 (Dckt. No. 650); 10/25/21 Order (Dckt. No. 572).

This Court did a little more trimming. This Court did not allow Dr. Gaut to testify about industry standards unless they applied to the officers in question.

"Testimony about the policies, practices, and guidelines is relevant to the extent that the officers in question received training about them, or were otherwise on notice about the policies, practices, and guidelines. . . . Evidence about police practices, policies, and guidelines is relevant if they applied to the officers in question and they knew about them. Evidence about

7

police standards in other parts of the country is not relevant if those standards did not apply to the officers in question." *See* 10/6/21 Order, at 17 (Dckt. No. 489).

This Court constructed a few more guardrails. This Court did not allow Dr. Gaut to testify about whether the officers had probable cause to arrest Bolden. *See, e.g.*, 10/22/21 Trial Tr., at 3071:15-20, 3073:17-19 (Dckt. No. 650). Dr. Gaut could not offer legal conclusions, or testify about intent. *Id.* at 3074:24 – 3075:1, 3077:21-24. Finally, this Court did not allow Dr. Gaut to simply regurgitate the facts, and thus lend a veneer of expert credibility to the testimony of fact witnesses.

During a hearing, defense counsel raised the fact that they had stumbled upon a state court appellate opinion from the 1990s about Dr. Gaut, when he was in law enforcement. The punchline is that Dr. Gaut coerced a confession from a juvenile in a capital case.

Defense counsel explained his discovery. "So I was doing some research on him, and I came across an opinion. This is an opinion from the criminal Court of Appeals of Alabama. I'll hand a copy up, if I could. It's an opinion where the Court found that Mr. Gaut, when he was a captain of the Birmingham Police Department, improperly coerced a confession from a juvenile by telling the person they could go home if they just gave a statement. The reason I think it's relevant here is, he is supposed to be the procedures guy." *Id.* at 3082:12-20.

This Court gave defense counsel the green light. "I think it's fair game. . . . Totally fine." *Id.* at 3082:21, 24.

This Court gave "wide" latitude to defense counsel to explore that topic in cross examination. *Id.* at 3083:2-7. The widest possible boundaries. This Court placed no limits on defense counsel. He was free to have at it.

From a pot-calling-the-kettle-black, people-in-glass-houses-shouldn't-throw-stones perspective, a person who coerces confessions out of juveniles in murder investigations may not be the best spokesperson for proper police procedures.

Dr. Gaut then took the stand, and the testimony lasted less than a full day. *See* 10/25/21 Minute Entry (Dckt. No. 574); 10/25/21 Minute Entry (Dckt. No. 581); *see also* 10/22/21 Trial Tr., at 3178:16 (Dckt. No. 651); 10/25/21 Trial Tr., at 3241:8 (Dckt. No. 652).[1]

Dr. Gaut testified about the investigation, and the officers' failure to follow the policies and procedures of the Chicago Police Department. He also opined about their failure to comply with generally applicable standards in the law enforcement community. Much of his testimony involved the lineup.

Overall, Dr. Gaut ranked the investigation in the Bolden case, and gave it a score of 1 or 2 out of 10:

> Q: Based on your 25-plus-year law enforcement career, how does the nature and extent of defendants' policy and procedure violations in this investigation compare to other cases of which you have examined?
>
> A: Again, on a – I guess if I were doing this on a 1-to-10 scale with a 10 being the best investigation I've ever seen, this would probably rank down around the 1-2 level. There were too many things that amounted to what I would consider gross violations of detective policies, procedures, not only those by national – excuse me – by generally accepted procedures, but those that are initiated by the Chicago Police Department. So there's multiple violations that, in my opinion, are not acceptable.

---

[1] Along the way, Dr. Gaut blurted out that an alibi witness said that Bolden was inside the restaurant at the time of the shooting. Dr. Gaut added: "That alone should have exonerated Mr. Bolden, in my opinion." *See* 10/25/21 Trial Tr., at 3253:11 – 3254:5 (Dckt. No. 652). Defense counsel objected. This Court sustained that objection, and struck the testimony. *Id.* This Court addressed the topic in a side bar, too. *Id.* at 3259:7 – 3261:6. This Court did not allow Dr. Gaut to testify about guilt or innocence, and he should not have opined on that point *sua sponte*. Even so, the Court and the parties agreed that striking the testimony was a sufficient cure. It is important to keep perspective on one or two lines of testimony in a 4,000-page transcript, in a trial lasting three weeks. Still, Dr. Gaut shouldn't have said it, and should have known better.

9

*See* 10/25/21 Trial Tr., at 3258:15 – 3259:4 (Dckt. No. 652) (Gaut).

The score for the lineup was even worse. Dr. Gaut gave the lineup in Bolden's case a score of 0 on a scale of 1 to 10 (which is hard to do):

> Q: Now, you have – we are looking at this one lineup. You have seen hundreds. In your opinion and your experience, where does this fall on the spectrum of lineups with regard to the appearance of the fillers?
>
> A: If I were putting this on a scale of say 1 to 10, where 10 would be I have no objections, everything looks great, and a 1 is an absolute zero, there is no way that this should have ever happened, *I would rate this one as the zero*. This, in my experience, does not conform both to Chicago Police policy or to generally accepted law enforcement procedures.

*See* 10/22/21 Trial Tr., at 3210:6-17 (Dckt. No. 651) (Gaut) (emphasis added).

When it came time for cross examination, it didn't take long for defense counsel to raise the issue of Dr. Gaut's involvement in the *Rincher* case in Alabama. *Id.* at 3263:6 (showing the start of cross examination). Defense counsel came out swinging, pitched a tent, and dug deep. *Id.* at 3266:24 – 3287:23.

That case involved a 17-year-old suspect named Patrick Rincher, who is black. *See Rincher v. State*, 632 So.2d 37 (Ala. Ct. App. 1993). He was a suspect in a homicide investigation. At the time, Dr. Gaut was the caption of the police department in Birmingham, Alabama.

According to the state court decision, then-Captain Gaut interrogated the juvenile, and told him that he could go home after he told the truth. The juvenile later confessed. *Id.* at 38–40. The juvenile was found guilty of murders, and sentenced to life in prison.

The state appellate court concluded that Gaut "coerced" the confession. *Id.* at 40. "The record shows that the appellant's confession was made after Captain Gaut promised the appellant

10

that he could go home if he made a statement. The appellant was subjected to custodial questioning about alleged criminal activity. Considering the appellant's age and the fact that he wanted to go home, the statement was induced by Captain Gaut's promise." *Id.*

The Court of Criminal Appeals of Alabama ruled that Gaut coerced the confession, and ruled that the admission of the confession into evidence was not harmless. So the Court reversed the conviction. *Id.* at 40–41.

During trial before this Court, defense counsel peppered Dr. Gaut with questions about his involvement in that case. A good deal of the pepper stuck, and stung. *Id.*

Along the way, defense counsel impeached Dr. Gaut with passages from an opinion by the Alabama Court of Criminal Appeals. *Id.* And several times, Dr. Gaut testified that the state court of appeals got it wrong.

For example, the state court of appeals said that Dr. Gaut pulled Rincher out of school and read him his rights. But Dr. Gaut testified that he never read Rincher his rights because he wasn't under arrest:

> Q: So the court opinion is wrong. Is that your testimony, sir?
>
> A: It is.
>
> Q: Okay. But can we agree the court opinion says that you read him his rights, right?
>
> A: That's what this opinion says.
>
> Q: And court opinion said that you read them from – his rights from an adult waiver form because the juvenile form wasn't available, right? That's what it says?
>
> A: That's what it says. But, again, I never read him his rights.
>
> Q: The court opinion is wrong about that.
>
> A: Apparently so.

11

*See* 10/22/21 Trial Tr., at 3271:2-14 (Dckt. No. 651) (Gaut).

Defense counsel proceeded to skewer Dr. Gaut with various lines from the state appellate court decision. He didn't pull any punches.

The testimony was a terrible look for Dr. Gaut. Dr. Gaut wagged his finger at Defendants, in expert fashion, for failing to treat Bolden the right way during an investigation. But when Dr. Gaut was Captain Gaut, he coerced a confession of a juvenile in a capital case. Gaut pulled a black teenager out of school, and didn't let him go home and see his mom.

Despite the existence of a coerced confession of a teenager in a capital case, Dr. Gaut gave himself high marks. Dr. Gaut testified that he should receive a score of . . . 9 out of 10:

> Q: The July 23rd, 1993, court opinion says that "the juvenile's confession was coerced," right, sir?
>
> A: It does.
>
> Q: And this is valid case law, correct, sir?
>
> A: To my knowledge, yes.
>
> Q: Thank you, sir. So, sir, on a scale of 1 to 10, with the best being somebody who followed proper procedure, that's a 10, and a zero being somebody who did not follow proper procedure, what grade would you give yourself for your activity and interactions with 17-year-old Patrick Rincher? What number would you give for that, sir?
>
> A: Based on what I did and my actions and reporting it immediately, *I'd give myself a 9/10*.
>
> Q: A *9 or 10* for coercing a confession from a juvenile, that's your grade?
>
> A: No, sir, that's –
>
> Q: Okay. All right. Thank you, sir, for that.
>
> A: Sure.

*Id.* at 3282:2-20 (emphasis added).

If that score seems like grade inflation, you're not alone.

Of all things, Dr. Gaut tried to take credit for exposing the coerced confession. That is, Dr. Gaut made it seem like *he was the one* who brought the issue of a coerced confession to the attention of the state's attorney, and the trial court. He wasn't a crooked cop – he was wearing a cape.

The following colloquy is a bit long, but it captures the crux of the matter. Defense counsel asked how Dr. Gaut could have any credibility as an expert in law enforcement techniques when he coerced a murder confession from a teenager. In response, Dr. Gaut tried to explain that he disclosed the misconduct, and did not commit the misconduct:

> Q: What I'm asking you, sir, is, you are the guy who the courts found coerced a juvenile's confession, 17-year-old African American young man, Patrick Deslander Rincher, the Court found you coerced his confession, and you're coming into this court and you're now telling this jury you are the guy who follows all the rules, knows all the rules, and you are going to tell this jury how all the proper practices and procedures work. Is that what you want the jury to know, sir?
>
> A: No, sir. I'm telling you that I brought it to the attention of the state's attorney, who didn't agree with me; I brought it to the attention of a judge, who held a hearing; I brought it to the attention of the trial court, who held a hearing, all of whom agreed that I did not – that there was no coercion, even though I believed there was. And only when it went to the appeals court several years later did the appeals court agree with me that the statement should not have been admitted into evidence. It was, in fact, coerced.
>
> Q: This court opinion is a valid court opinion, sir. What are you talking about?
>
> A: That's the appellate court who overruled the trial court judge, the hearing judge, and the state's attorney, all of whom claimed that I

>           had done no wrong, even though I claimed that it was not proper
>           and should not have been admissible.
>
> Q:       Everything you just said, let's put aside, okay? The court opinion
>          says you coerced this young man's confession, right?
>
> A:       And it does – and I believe –
>
> Q:       That's what it says, right, sir? Yes or no?
>
> THE COURT: Hang on.
>
> A:       Yes.

*Id.* at 3280:11 – 3281:18.

In the motion at hand, Defendants now seek a new trial based on new information about that old case. After the Bolden trial, defense counsel pulled the state appellate court record in the *Rincher* case, and made a few discoveries.

Defendants believe that Dr. Gaut gave inaccurate testimony, again and again, on the witness stand during the trial before this Court. In their motion, Defendants included a table that offered a side-by-side comparison of Dr. Gaut's testimony (on the one hand) to the record in the state court appeal in *Rincher* (on the other). *See* Defs.' Mtn., at 5–10 (Dckt. No. 683). The table goes on for five pages.

As they see things, the testimony by Dr. Gaut in the trial was worse than wrong. In their view, the testimony was perjury.

This Court declines the invitation to order a new trial, for a few reasons.

As a starting point, granting a new trial would be no small thing. The parties tried the case for almost three weeks. The jury heard lots of testimony, read lots of documents, and saw lots of examinations. District courts do not lightly disturb a jury's verdict. The standard for granting a new trial is high, and for good reason.

Oftentimes, a party will seek a new trial based on the erroneous admission or exclusion of evidence. In that situation, courts "grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice. Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the trial." *See EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (cleaned up).

That's not exactly the situation at hand. This Court did not exclude any evidence on this issue. And importantly, this Court did not prevent Defendants from exploring the issue during cross examination in any way, shape, or form. This Court gave defense counsel the green light, and waved defense counsel through. And defense counsel capably ran with it.

Instead, the issue has to do with the post-trial discovery of other information that defense counsel could have used to take the cross examination to 11, so to speak. Part of the argument seems to be that cross examination would have been even better if they had had this information at the time.

But the thrust of the argument seems to rest on the "substantial justice" part of the test for a new trial. As Defendants see things, Bolden relied on an expert to prove his case, and that expert perjured himself. So, in their view, the jury verdict as a whole is compromised.

That's a bridge too far. Defense counsel cross examined Dr. Gaut, quite capably, on this point already. Maybe defense counsel didn't have all of the ammunition that they now wish they had at the time. But it is hard to see how Defendants could have gotten any more mileage out of this issue.

The jury heard that Dr. Gaut was involved in a homicide investigation of a teenager that went sideways. The jury listened to the statements by the Alabama appellate court about

then-Captain Gaut's role in the misconduct. An appellate court ruled that Dr. Gaut coerced a teenager into a confession of murder, and this jury heard all about it.

Defense counsel capably muddied Dr. Gaut's credibility on this point. It is hard to see how defense counsel could have scored more points with more mud.

This line of questioning could dirty-up Dr. Gaut, but only so far. The testimony in question was about Dr. Gaut's handling of a criminal case in the early 1990s, almost 30 years before the trial in the case at hand.

In fact, the Alabama case is so old (from 1991) that it predates Bolden's arrest in 1994. Any documents from that trial would satisfy the ancient document rule, with a decade to spare. *See* Fed. R. Evid. 803(16). The Alabama interrogation took place two years after the Berlin Wall came down (in 1989), and one year after the first Gulf War (in 1990). George Bush was President. George *H. W.* Bush, that is.

The Alabama case may have shed light on Dr. Gaut's credibility, and that's important. The credibility of the messenger has a lot to do with the value of the message. Even so, the jury heard it, and got the point. The punches landed, and the jury heard them land.

Plus, the Alabama case wasn't the main event. It was closer to a side show, in the grand scheme of things. It had nothing to do with the Bolden case. It did not involve the substance of the expert's testimony. It involved his track record. You can get only so much mileage out of a cross examination of a track record from 30 years ago.

This Court must review the trial record as a whole, too. Here, trial lasted almost three weeks. Dr. Gaut's involvement in the *Rincher* case was a blip on the radar screen, nothing more.

In the grand scheme of things, the testimony was a flea on a hair on a tail of a dog. It does not justify upsetting the entire applecart of trial, and throwing everything out. That conclusion holds true even if Dr. Gaut's testimony pushed the boundaries of candor.

After viewing the record as a whole, and considering all of the issues in the motion, the Court is left with the firm conviction that Defendants received a fair trial, and there is no valid basis for a new one. Motion denied.

## Conclusion

For the foregoing reasons, Defendants' motion for a new trial is denied.

Date:   March 24, 2024

Steven C. Seeger
United States District Judge